**2022-1866, 2022-1867, 2022-1868, 2022-2013, 2022-2014, 2022-2015**

# United States Court of Appeals
# for the Federal Circuit

**GOOGLE LLC,**
*Appellant*

v.

**SINGULAR COMPUTING LLC,**
*Cross-Appellant*

**Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Case Nos.
IPR2021-00155, IPR2021-00165, and IPR2021-00179**

## CORRECTED NON-CONFIDENTIAL BRIEF OF
## APPELLANT GOOGLE LLC

Eugene M. Paige
KEKER, VAN NEST & PETERS LLP
633 Battery St.
San Francisco, CA 94111
(415) 391-5400

Nathan R. Speed
Gregory F. Corbett
Elisabeth H. Hunt
Anant K. Saraswat
WOLF GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

Asim Bhansali
Michael Kwun
KWUN, BHANSALI, LAZARUS LLP
555 Montgomery St., Suite 750
San Francisco, CA 94111
(415) 630-2350

*Counsel for Appellant Google LLC*

## PATENT CLAIMS AT ISSUE

## Relevant Claims for U.S. Patent No. 10,416,961 (Appx288-290)[*]

1. A device comprising: at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

2. The device of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

3. The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

21. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: a plurality of components comprising: at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value; wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X %

---

[*] Claims 1, 2, and 21 are included as the claims from which claims 3 and 23 depend.

of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

23. The device of claim 21, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

## Relevant Claims for U.S. Patent No. 9,218,156 (Appx317-318) [*]

1. A device comprising: at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

2. The method of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

3. The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

4. The device of claim 3, wherein X=10%.

---

[*] Claims 1 and 2 are included as the claims from which claims 3-8 depend.

5. The device of claim 3, wherein Y=0.2%.

6. The device of claim 3, wherein X=10% and Y=0.2%.

7. The device of claim 3, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

8. The device of claim 3, wherein the first operation is multiplication.

### Relevant Claims for U.S. Patent No. 8,407,273 (Appx346-348) [*]

1. A device: comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

3. The device of claim 1, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

4. The device of claim 3, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

5. The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

6. The device of claim 5, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

---

[*] Claims 1, 20, and 33 are included as the claims from which claims 3-20, 25, and 34-35 depend.

7. The device of claim 1, wherein the at least one first LPHDR execution unit comprises at least one hundred LPHDR execution units.

8. The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

9. The device of claim 1, wherein the at least one first LPHDR execution unit comprises at least five hundred LPHDR execution units.

10. The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least five hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

11. The device of claim 8, wherein X=10%.

12. The device of claim 8, wherein Y=0.1%.

13. The device of claim 8, wherein Y=0.15%.

14. The device of claim 8, wherein Y=0.2%.

15. The device of claim 8, wherein X=10% and wherein Y=0.1%.

16. The device of claim 8, wherein X=10% and wherein Y=0.15%.

17. The device of claim 8, wherein X=10% and wherein Y=0.2%.

18. The device of claim 8, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

19. The device of claim 1, wherein the at least one first LPHDR execution unit comprises a plurality of locally connected LPHDR execution units.

20. The device of claim 1, wherein the device has a SIMD architecture.

25. The device of claim 1, wherein the at least one LPHDR execution unit comprises at least five hundred locally connected LPHDR execution units, wherein the device includes memory locally accessible to at least one of the LPHDR execution units, and wherein the device is implemented on a silicon chip using digital technology.

33. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value; wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

34. The device of claim 33, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

35. The device of claim 33, wherein the number of LPHDR execution units in the second device exceeds by at least ten the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

36. A device: comprising at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; wherein the number of LPHDR execution units in the device exceeds the non-negative

integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

37. The device of claim 36, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

38. The device of claim 36, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

39. The device of claim 38, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

40. The device of claim 36, wherein the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

41. The device of claim 40, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

42. The device of claim 36, wherein the at least one first LPHDR execution unit comprises at least one hundred LPHDR execution units.

43. The device of claim 36, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

44. The device of claim 36, wherein the at least one first LPHDR execution unit comprises at least five hundred LPHDR execution units.

45. The device of claim 36, wherein the number of LPHDR execution units in the device exceeds by at least five hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

46. The device of claim 43, wherein X=10%.

47. The device of claim 43, wherein Y=0.1%.

48. The device of claim 43, wherein Y=0.15%.

49. The device of claim 43, wherein Y=0.2%.

50. The device of claim 43, wherein X=10% and wherein Y=0.1%.

51. The device of claim 43, wherein X=10% and wherein Y=0.15%.

52. The device of claim 43, wherein X=10% and wherein Y=0.2%.

53. The device of claim 43, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

54. The device of claim 36, wherein the at least one first LPHDR execution unit comprises a plurality of locally connected LPHDR execution units.

55. The device of claim 36, wherein the device has a SIMD architecture.

56. The device of claim 36, wherein the device includes memory locally accessible to the at least one first LPHDR execution unit.

57. The device of claim 36, wherein the device is implemented on a silicon chip.

58. The device of claim 36, wherein the device is implemented on a silicon chip using digital technology.

59. The device of claim 36, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit.

60. The device of claim 36, wherein the at least one LPHDR execution unit comprises at least five hundred locally connected LPHDR execution units, wherein the device includes memory locally accessible to at least one of the LPHDR execution units, and wherein the device is implemented on a silicon chip using digital technology.

61. The device of claim 36, wherein the device is part of a mobile device.

63. The device of claim 36, wherein the at least one first LPHDR execution unit represents numbers using a floating point representation.

67. The device of claim 36, wherein the device is adapted to perform nearest neighbor search.

68. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least 5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least 5% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least 0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; wherein the number of LPHDR execution units in the second device exceeds the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

69. The device of claim 68, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

70. The device of claim 68, wherein the number of LPHDR execution units in the second device exceeds by at least ten the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2022-2013, 2022-2014, 2022-2015

**Short Case Caption** Singular Computing LLC v. Google LLC

**Filing Party/Entity** Google LLC

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 9/21/2022

Signature:  /s/ Nathan R. Speed

Name:    Nathan R. Speed

FORM 9. Certificate of Interest

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Google LLC | | XXVI Holdings Inc.; Alphabet Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Wolf, Greenfield & Sacks, P.C. | Adam R. Wichman | |
| Wolf, Greenfield & Sacks, P.C. | Richard F. Giunta | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Singular Computing LLC v. Google LLC | 1:19-cv-12551 | (DMA) |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE ...................................................... i

CERTIFICATE OF INTEREST ................................................. ix

TABLE OF AUTHORITIES ................................................. xiii

STATEMENT OF RELATED CASES ................................. xvi

JURISDICTIONAL STATEMENT .................................... xvii

INTRODUCTION ................................................................ 1

STATEMENT OF THE ISSUES ........................................... 4

STATEMENT OF THE CASE ............................................... 5

    A.    Technical Background .......................................... 5

    B.    Singular's Patents ............................................... 7

        1.    Singular's Purported Invention. ....................... 7

        2.    The Challenged Claims .................................. 9

    C.    The Board's Proceedings ................................... 11

        3.    Google's Petitions ......................................... 11

            a.    The Prior Art ........................................... 11

                i.    Dockser .......................................... 11

                ii.    Tong .............................................. 13

                iii.    MacMillan ..................................... 16

            b.    The Dockser and Dockser-Tong Grounds ..... 17

            c.    The Dockser-MacMillan and Dockser-MacMillan-Tong Grounds ............................ 19

                i.    Dockser-MacMillan ........................ 19

                ii.    Dockser-MacMillan-Tong .............. 21

d. Institution ........................................................................23

4. The Trial ..............................................................................23

5. The Final Written Decisions ...................................................26

a. Citing an alleged increase in manufacturing costs, the Board found POSAs lacked motivation to pursue the Dockser-MacMillan combination...................................26

b. Interpreting Dockser and Tong as teaching that full-precision capabilities are fundamental, the Board found POSAs lacked motivation to pursue the customized Dockser-MacMillan-Tong combination. ........................27

SUMMARY OF THE ARGUMENT .....................................................31

STANDARD OF REVIEW ....................................................................35

ARGUMENT ..........................................................................................36

I. The Board Erred by Finding that Cost Alone Would Have Dissuaded POSAs from Combining Dockser with MacMillan. ....................................36

A. Cost Alone Is a Legally Insufficient Reason to Find POSAs Would Not Have Pursued an Otherwise Beneficial Combination..................37

B. Substantial Evidence Does Not Support the Board's Finding that the Dockser-MacMillan Combination Would Have Resulted in the "Costs" MacMillan Sought to Avoid. .................................................43

C. The Board Committed Legal Error by Disregarding the Undisputed Technical Benefits of Dockser-MacMillan Simply Because the Board Believed the Combination Might Not Have Been the Most Desirable One. .......................................................................................48

D. Under the Correct Legal Framework, the Record Demonstrates that POSAs Would Have Been Motivated to Pursue the Dockser-MacMillan Combination. ...................................................................51

II. The Board Erred in Finding that Google Failed to Identify Sufficient Motivation to Implement a Customized Version of Dockser-MacMillan-Tong...........................................................................54

A.    POSAs Had Ample Motivation to Combine Dockser, MacMillan, and Tong as Set Forth in Google's Customized Implementation..............54

B.    The Board's Contrary Determination Is Premised on the Unsubstantiated Finding that Full-Precision Capability Was Fundamental to Dockser and Tong. ....................................................57

C.    Even if Dockser and Tong Taught that Full-Precision Capability Was Preferred for General-Purpose Processors, That Finding Would Not Negate POSAs' Motivation to Pursue Dockser-MacMillan-Tong. ....64

D.    The Board's Reliance on Economic Concerns for the Dockser-MacMillan-Tong Combination Was Erroneous..................................66

III.    The Court Should Reverse; Remand Is Unnecessary....................................67

A.    There Are No Unresolved Secondary Consideration Arguments for the Board to Assess. ............................................................................68

B.    Singular's Remaining Argument Against the Customized Dockser-MacMillan-Tong Combination Lacks Support. ..................................71

CONCLUSION ......................................................................................................73

## CONFIDENTIAL MATERIAL OMITTED

The material redacted from the final written decisions contained in the addendum following this brief is subject to the Board's Protective Orders issued in IPR2021-00155, IPR2021-00165 and IPR2021-00179.   The redacted material appears at Appx38-43, Appx49, Appx126-131, Appx137, Appx211-216, and Appx223.

# TABLE OF AUTHORITIES

## CASES

*Bayer Pharma AG v. Watson Labs., Inc.*,
  874 F.3d 1316 (Fed. Cir. 2017) ..........................................................57

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
  4 F.4th 1370 (Fed. Cir. 2021) ............................................................43

*Corephotonics, Ltd. v. Apple Inc.*,
  Case No. 2020-1961, 2021 WL 4944471 (Fed. Cir. Oct. 25, 2021) ...................50

*Corning v. Fast Felt Corp.*,
  873 F.3d 896 (Fed. Cir. 2017) ...........................................................67

*Friskit, Inc. v. Real Networks, Inc.*,
  306 F. App'x 610 (Fed. Cir. 2009) .....................................................40

*General Elec. Co. v. Raytheon Techs. Corp.*,
  983 F.3d 1334 (Fed. Cir. 2020) .........................................................65

*Grit Energy Solutions, LLC v. Oren Technologies, LLC*,
  957 F.3d 1309 (Fed. Cir. 2020) .........................................................41

*Henny Penny Corp. v. Frymaster LLC*,
  938 F.3d 1324 (Fed. Cir. 2019) .........................................................43

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) .........................................................63

*In re Farrenkopf*,
  713 F.2d 714 (Fed. Cir. 1983) ................................................... passim

*In re Fulton*,
  391 F.3d 1195 (Fed. Cir. 2004) .........................................................50

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ................................................... 47, 63

*In re Gordon*,
  733 F.2d 900 (Fed. Cir. 1984) ..........................................................43

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ................................................................50

*In re Magna Elecs., Inc.*,
   611 F. App'x 969 (Fed. Cir. 2015) ........................................................41

*In re Mouttet*,
   686 F.3d 1322 (Fed. Cir. 2012) ..............................................................50

*In re Nilssen*,
   827 F.2d 1098 (Fed. Cir. 1987) ..............................................................40

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 784 (Fed. Cir. 2021) .................................................. 35, 48, 49

*Intel Corp. v. Qualcomm Inc.*,
   Case Nos. 2020-92, -93, 2022 WL 880681
   (Fed. Cir. Mar. 4, 2022) ......................................................... 50, 67

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) ..............................................................50

*Oatey Co. v. IPS Corp.*,
   514 F.3d 1271 (Fed. Cir. 2008) ..............................................................72

*Orthopedic Equipment Co. v. United States*,
   702 F.2d 1005 (Fed. Cir. 1983) .................................................... 39, 40

*Raytheon Co. v. Sony Corp.*,
   727 F. App'x 662 (Fed. Cir. 2018) .............................................. 64, 65

*TQ Delta, LLC v. Cisco Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ..............................................................45

*TriVascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ..............................................................43

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ................................................................. xvii

35 U.S.C. § 141(c) ............................................................................. xvii

35 U.S.C. § 316(c) ............................................................................. xvii

35 U.S.C. § 319 ................................................................................................ xvii

## STATEMENT OF RELATED CASES

The following case involving U.S. Patent Nos. 8,407,273 ("'273 patent"), 9,218,156 ("'156 patent"), and 10,416,961 ("'961 patent") may directly affect or be directly affected by a decision in these appeals: *Singular Computing LLC v. Google LLC*, 19-cv-12551-FDS (D. Mass.).

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. § 316(c) and issued its decisions May 11, 2022.  Appx1; Appx89; Appx174. Google timely appealed June 2, 2022. Appx6247-6248; Appx8229-8230; Appx10019-10020.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

# INTRODUCTION[1]

In three related IPRs, Google challenged various claims from three Singular patents sharing a common specification.  The Board found that the prior art Google identified invalidated many of those claims:

| Proceeding | Claims Found Unpatentable | Claims Found Not Proven Unpatentable |
|---|---|---|
| IPR2021-00155 (’961 Patent) | 1-2, 4-5, 10, 13-14, 21, 24-25 | 3, 23 |
| IPR2021-00165 (’156 Patent) | 1-2, 16, 33 | 3-8 |
| IPR2021-00179 (’273 Patent) | 1-2, 21-24, 26, 28, 32-33 | 3-20, 25, 34-61, 63, 67-70 |

In finding certain challenged claims were not proven obvious, the Board concluded that persons of ordinary skill in the art ("POSAs") would not have had a motivation to pursue either of two combinations that Google advanced against those claims: (1) Dockser with MacMillan and (2) Dockser with MacMillan and Tong. Those conclusions rest on legal error by misapplying this Court's motivation-to-combine precedent and factual findings that are not supported by substantial evidence.

***The Board's Legal Errors.***  In rejecting Google's combinations, the Board misapplied this Court's motivation-to-combine precedent in two critical respects.

---

[1] Emphasis added throughout.

First, the Board concluded that POSAs would not have had a motivation to pursue either of Google's proposed combinations based on the legally irrelevant premise that the resulting modified device allegedly would have cost more to manufacture than an unmodified device. "That a given combination would not be made by businessmen for economic reasons," however, "does not mean that [POSAs] would not make the combination because of some technological incompatibility. ***Only the latter fact would be relevant***." *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983). The Board's reliance on purported ***economic*** concerns with Google's combinations, not any ***technological*** incompatibility, was legal error.

Second, the Board compounded its first legal error by treating any alleged drawback to the combinations—*e.g.*, increased manufacturing cost—as a *per se* bar to obviousness. But this Court has consistently explained that the legally relevant question is whether the prior art suggests ***some*** reason for pursuing a combination, not whether the art suggests it is the most desirable one. The Board ran afoul of that rule by focusing on only one supposed (financial) drawback without explaining why that drawback purportedly negates the undisputed technological benefits the combinations provided—including reduced power consumption, which reduces operating ***costs***.

***The Board's Factual Errors***. The Board's motivation-to-combine findings were also premised on fact findings that the record does not support.

First, the Board's "costs" reasoning depends on finding the combinations to be more costly. The evidence the Board cited does not support that finding, nor does it support the Board's conclusion that such costs would have approached the costs that MacMillan suggested would be commercially undesirable (even if that finding were legally relevant).

Second, in rejecting Google's second combination (Dockser-MacMillan-Tong), the Board found that the combination required removing a feature from Dockser that (according to Singular and the Board) both Dockser and Tong taught was "fundamental." To the contrary, Dockser and Tong *explicitly* identify the purportedly "fundamental" feature as one that *might* be useful in certain contexts, but is *unnecessary* in other contexts, including the context that was the focus of Google's combination. The record does not support the Board's "fundamental" feature finding.

***Remand Is Unnecessary.*** The Board's decisions should—at minimum—be vacated and remanded. But remand is unnecessary if the Court concludes that the Board erred in its treatment of Dockser-MacMillan-Tong. For that combination, the record forecloses any remaining challenges Singular raised, and the Court can hold the challenged claims unpatentable without remand.

## STATEMENT OF THE ISSUES

1.     In view of this Court's precedent that financial concerns with a proposed combination are irrelevant, did the Board commit legal error when it held POSAs would not have combined Dockser with MacMillan—despite the undisputed technological benefits the combination provided—solely because the combination's device might be more expensive to manufacture than an unmodified device?

2.     Did the Board commit legal error when it ignored the respective benefits that would have resulted from combining either (i) Dockser with MacMillan or (ii) Dockser with MacMillan and Tong on the basis that the resulting combinations might not be the most desirable devices?

3.     Does substantial evidence support the Board's findings that: (i) Google's combinations would have resulted in more expensive devices where that finding is premised on conclusory expert testimony and speculative interpretations of the prior art, and (ii) the Dockser-MacMillan-Tong combination requires removing a "fundamental" feature from Dockser where Dockser and Tong both say the allegedly "fundamental" feature is unnecessary in the very context for which the combination is intended?

**STATEMENT OF THE CASE**

### A.    Technical Background

Singular's patents relate to "processors or other devices which use ***low***

***precision high dynamic range*** (LPHDR) processing elements to perform

computations (such as arithmetic operations)." Appx276 (5:58-62).[2] Precision and

dynamic range are concepts relevant for representing numbers and performing

operations (*e.g.*, multiplication), including when those operations are performed

using computers.

"Precision" is related to the ability to represent numbers that differ from each

other by small amounts; for example, the number 3.141592 is more precise than if

rounded to 3.14, which is more precise than if rounded to 3.  Appx1057-1058 (¶ 21);

Appx6911-6912; Appx8653-8654.

"Dynamic range" refers to the range between the largest and smallest values

that a numbering format can represent and that can be operated on or produced as

results when using that format.  Appx274 (2:23-27).  For example, if a number

format allows for operating on or producing numbers between 1 and 1000, that is a

higher (wider) dynamic range than a format that only allows for operating on or

---

[2] Citations are to the '961 patent; the '156 and '273 patents contain identical
disclosures.

producing numbers between 1 and 10.  Appx1058-1059 (¶ 24); Appx6912-6913; Appx8654-8655.

In many numerical representation formats, numbers are represented by a string of data units, such as digits.  In binary data representations, numbers are represented by a string of data units that are each either 0 or 1; in computers, these units are "bits."  A computer can be designed to represent all numbers as bit strings of a particular "width," *e.g.*, 8-bit, 16-bit, 32-bit, or 64-bit strings.  Appx275 (3:45-53).  A designer must decide the bit-width (*i.e.*, how many bits will be used to represent a number), as well as how many of those bits to allocate to expressing precision versus expressing dynamic range.  The more bits allocated to dynamic range, the wider the range between the largest and smallest possible values that can be operated on or produced.  The more bits allocated to precision, the more precisely processors can represent values produced by operations.  Given a fixed bit-width, there is always a tradeoff between precision and dynamic range.  Appx1060 (¶ 27); Appx6914; Appx8656.

In modern computing, numbers are often represented in a format called "floating point" that is akin to scientific notation.  Appx1060-1061 (¶ 28); Appx6914-6915; Appx8656-8657.  Scientific notation is a common way to represent very large or small numbers.  For example, $1.25 \times 10^9$ is more efficient to write than 1,250,000,000.  Computers often use binary floating point, with numbers expressed

as 1 + [a fraction] (called the "mantissa") times 2 raised to a power (called the "exponent").    Appx1061-1062 (¶¶ 29-30); Appx6915-6916; Appx8657-8658; Appx1505 ([0003]-[0004]).  For example, the number 18 is expressed as $1.125 \times 2^4$, where 1.125 is the mantissa, and 4 is the exponent.[3]  The more bits dedicated to the mantissa, the higher the precision; the more bits dedicated to the exponent, the wider the dynamic range.  Appx1061-1062 (¶ 30); Appx6915-6916; Appx8657-8658.

Before Singular filed the application to which its patents claim priority, the Institute of Electrical and Electronics Engineers (IEEE) published a standard 32-bit floating-point representation that allocated 8 bits to the exponent, 23 bits to the mantissa fraction, and one "sign" bit to indicate whether the number is positive (sign 0) or negative (sign 1).  Appx1061 (¶ 29); Appx6915; Appx8657.  The standard 32-bit floating-point representation thus dedicated 23 bits to expressing precision and 8 bits to expressing dynamic range.

B.    **Singular's Patents**

1.    **Singular's Purported Invention.**

According to Singular's patents, "the common belief among" POSAs was that "modern applications require high precision processing"; this belief, the patents said,

---

[3] The mantissa fraction .125 (1/8) can be represented as binary bit sequence .001, and the exponent 4 can be represented as binary bit sequence 100.

led POSAs to design CPUs to provide "accurate and widely standardized arithmetic" with 32-bit floating-point numbers.  Appx275 (3:3-10); Appx277 (7:8-15).

The patents argued that conventional CPUs that perform all operations using standard 32-bit floating-point numbers were "inefficient" because there are "in fact a variety of useful algorithms [that] function adequately at much lower precision." Appx274 (2:62-63), Appx277 (7:13-23); Appx275 (3:11-17).    Stated plainly, Singular claimed some software applications functioned adequately if the processors supporting the application did low-precision calculations, so designing processors to always do high- (or full-) precision calculations was overkill.

To address this purported inefficiency, the Singular patents proposed devices that include "*low precision* high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)."    Appx276 (5:58-62). According to the patents, the processing elements can perform arithmetic (*e.g.*, multiplication) on a high dynamic range of values and "produce results that frequently differ from exact results by at least 0.1%," which is "far worse precision" than the IEEE 32-bit standard.  Appx274-276 (2:16-21, 5:21).  The patents discuss several software applications that allegedly work even when supported by processors that sometimes produce imprecise results.  Appx282-285 (17:1-23:39).

Contrary to Singular's suggestion (Appx277 (7:13-17)), the patents' central observation—that not all software applications require high precision and thus some

applications could be supported by processors that perform operations with lower precision—was known in the art.

For example, Tong (*infra* pp. 13-15) explained that "[i]t has long been known that many…applications can get by with less precision." Appx1476. Tong's experimental results—published nine years before Singular filed its provisional application—demonstrated that certain software programs functioned accurately with low-precision high-dynamic-range arithmetic ("fine precision…is not essential"), and that lowering precision saved power by "reduc[ing] waste [from] unnecessary bits." Appx1476, Appx1480-1482.

Similarly, Dockser (*infra* pp. 11-13) describes an execution unit that saves power by reducing precision in its floating-point operations to whatever precision a particular application needed. Appx1470 ([0003]-[0007]). Consistent with Tong, Dockser explains that certain software applications like "generating 3D graphics" do not require the level of precision that the IEEE 32-bit floating-point standard provides (*i.e.*, 23 mantissa bits). Appx1470 ([0002]-[0003]).

## 2.    The Challenged Claims

Singular's patents claim devices that comprise at least one "low precision high dynamic range (LPHDR) execution unit." The claimed "execution unit" is adapted to execute an operation (*e.g.*, multiplication) on an input signal representing a first numerical value to produce an output signal representing a second numerical value.

The "execution unit" is characterized as "LPHDR" because it performs a low-precision ("LP") operation on a high dynamic range ("HDR") of values. Appx1057 (¶ 20); Appx6911; Appx8653. The challenged claims recite a particular amount of error that the low-precision operation must produce, and the claimed error amount ranges from results that differ "by at least [ ] 0.05% from the result of an exact mathematical calculation"[4] to results that differ "by at least [ ] 0.2% from the result of an exact mathematical calculation."[5]

Google challenged certain claims of each Singular patent. As seen in the chart *supra* p. 1, the Board found Google had proven many challenged claims unpatentable, but not others.

The Board found the challenged claims requiring only "at least one" LPHDR execution unit unpatentable. But the Board found Google had not proven obvious various (mostly dependent) claims reciting a device having a number of LPHDR execution units that is ***greater than one***. Dependent claim 7 of the '273 patent is an example. It depends from independent claim 1, which recites a device comprising "***at least one*** first low precision high dynamic range (LPHDR) execution unit," and it limits claim 1 to a device "wherein the at least one first LPHDR execution unit

---

[4] *E.g.*, Appx317-318 (claims 1, 16, 33); Appx346-348 (claims 1, 33, 36, 68).

[5] *E.g.*, Appx288-289 (claims 1, 10, 21).

comprises *at least one hundred* LPHDR execution units." Appx346. The Board found claim 1 obvious, but not claim 7. Appx258.

As discussed below, the Board's patentability finding as to the "greater-than-one" claims centered on whether Google had shown that POSAs had motivation to include more than one prior-art LPHDR execution unit in a device.

### C. The Board's Proceedings

### 3. Google's Petitions

#### a. The Prior Art

Google relied on three principal references: Dockser, Tong, and MacMillan.

#### i. Dockser

Dockser (Appx1465-1475) discloses a processor that performs floating-point operations. Appx1471 ([0015]), Appx1466 (FIG. 1). Dockser explains that floating-point processors ("FPPs") operate on numbers represented in a floating-point format (Appx1470 ([0001])); that the then-standard IEEE 32-bit floating-point format used "a 23-bit mantissa" (Appx1470 ([0002])); and that "[t]he precision of the floating-point processor is defined by the number of bits used to represent the mantissa. The more bits in the mantissa, the greater the precision" (*id.*).

Dockser observes that "[h]igher precision results in a higher accuracy, but commonly results in increased power consumption." Appx1470 ([0002]). Thus, FPPs could be power-inefficient because "[w]hile some applications may require [23-bit-mantissa] precision, other applications," *e.g.*, "graphics applications," "may

not." Appx1470 ([0003]). Unnecessary power consumption, Dockser warns, was particularly concerning in battery-operated devices like laptops. *Id*.

Dockser discusses two classes of FPPs. The first comprises FPPs intended to support "an application [that] always requires a certain reduced precision." *Id*. These application-specific FPPs "can be designed and built to [the] reduced precision" that the application they support requires. *Id*. The second class comprises FPPs intended as "general purpose processor[s]" that are designed and built to support both applications needing only low precision (*e.g.*, graphics processing) and those requiring high precision (*e.g.*, GPS functions). *Id.*

Rather than focus on application-specific FPPs, Dockser focuses on general-purpose FPPs. Specifically, Dockser discloses an FPP "configured to select a subprecision for a floating-point operation." Appx1470 ([0005]). This selectability permits the FPP to adjust the amount of precision it uses for each operation, allowing it to use less precision for applications that do not need full-precision operations and full 23-bit precision for applications that require such precision. Appx1471-1472 ([0014], [0026]).

Dockser's exemplary FPP includes a floating-point controller having a register that receives "subprecision select bits" specifying how many mantissa bits to use for a particular floating-point operation. Appx1471 ([0015]-[0018]). The

controller shuts off power to portions of the FPP that store or process unnecessary mantissa bits. Appx1472 ([0026]-[0027]).

In one example, a particular floating-point operation only requires the precision of 9 mantissa bits, so Dockser's FPP removes power from "register elements" that would have stored the remaining 14 mantissa bits if the IEEE-standard 23 mantissa bits had been used. Appx1472 ([0026]). By enabling the FPP to shut down power to certain "register elements," reducing the number of mantissa bits retained in a given operation, Dockser's FPP achieves power savings over traditional FPPs. Appx1471 ([0014], [0018]).

### ii.    Tong

Tong (Appx1476-1489) is titled "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic." Appx1476. Like Dockser, Tong recognized that the number of mantissa bits used when performing floating-point operations impacts power consumption and precision, *i.e.*, using fewer mantissa bits consumes less power but achieves less precision. Appx1481 (explaining that "using fewer bits" reduces "power dissipation" but "reduces precision"). Tong further explained that "[i]t has long been known that many [ ] signal processing applications"—*e.g.*, "speech recognition and image processing"— "can get by with less precision/range than full" 23-bit-mantissa floating-point

precision. Appx1476; Appx1483 (a "custom [floating-point] format" with reduced precision "may be a viable option" for "application-specific task[s]").

Tong discloses test results measuring the impact reduced precision has on five benchmark signal-processing programs chosen to "range in complexity." Appx1481. Using these results, Tong sought to determine "the *minimal* number of mantissa…bits" for each application "to *reduce* power consumption, yet *maintain* [the] program's overall accuracy." Appx1476 (emphasis original).

As seen below in Tong's Figure 6 (annotated), none of the five representative signal-processing programs had any "noticeable degradation in accuracy" when the number of mantissa bits was reduced from 23 down to 11. Appx1481-1482. And for two programs, "ALVINN" and "Sphinx," "the accuracy does not change significantly with as few as 5 mantissa bits." Appx1481.



Appx1482.

Having determined the minimum number of mantissa bits necessary to maintain acceptable accuracy for particular signal-processing programs, Tong teaches using "reduced-precision arithmetic" to "omit the unnecessary bits and computations on them" (Appx1487), to thereby "reduce waste" (Appx1476), and "significantly reduce…power consumption while maintaining a program's overall accuracy" (Appx1477). *See also* Appx1482 ("the fine precision" that standard 23-bit-mantissa floating-point offers "is not essential").

### iii.     MacMillan

MacMillan (Appx1490-1504) discloses a parallel-processing architecture for "adding supercomputer performance" to computer systems for personal use, including personal computers ("PCs"). Appx1499-1500 (5:22-24, 7:14-19). With MacMillan's architecture, "add[ing] parallel processing capabilities to the personal computer[] result[s] in substantial performance improvements" at the expense of "moderate cost." Appx1500-1501 (9:17-19, 8:51-55).

MacMillan explains that then-existing *super*computers were significantly more powerful than conventional *personal* computers. Appx1497 (1:15-18). That performance, however, came at a significant financial cost, with supercomputers "typically cost[ing] $100,000 or more." Appx1497 (1:18-20). MacMillan hypothesized that if "supercomputing performance could be achieved in low cost computers, such as [PCs], this could dramatically expand the market for [PCs]." Appx1497 (1:20-23).

MacMillan discloses a parallel-processing architecture that added "much higher performance computing" to PCs while only "moderate[ly]" increasing their cost. Appx1500 (8:51-55). MacMillan's architecture achieves "substantial performance improvements" by adding a "Single Instruction Multiple Data (SIMD)" subsystem to "existing system architectures." Appx1499 (5:48-6:10), Appx1501 (9:17-23). The SIMD subsystem includes multiple parallel "processing elements

(PE's)," with each PE including "floating point accelerators" that "perform…operations on…32-bit words," *i.e.*, with 23-bit-mantissa precision. Appx1501 (9:11-19), Appx1502 (12:35-59). MacMillan's architecture also includes a "Host CPU." Appx1501 (9:20-31); Appx1493.

According to MacMillan, in its SIMD design the number of PEs containing floating-point accelerators could be 256 in one example, and could be scaled to "tens of thousands…or more." Appx1497 (2:13-16), Appx1502-1504 (12:60-13:4, 13:39-41, 16:20-22).

**b.    The Dockser and Dockser-Tong Grounds**

In each petition, Google argued that the challenged claims reciting only "at least one" LPHDR execution unit would have been obvious over either Dockser alone (**Ground 1)** or Dockser in view of Tong (**Ground 2**).    Appx673-712; Appx6379-6417; Appx8353-8390.  The Board agreed.  Appx19-67; Appx108-152; Appx193-238.  Google provides a brief overview of Grounds 1-2 to give context to Google's Grounds 3-4, which built upon Grounds 1-2.

For **Ground 1**, Google explained that Dockser discloses an example in which its FPP reduces the number of mantissa bits used to perform an operation from 23 bits down to 9 bits.  Appx687-694; Appx6394-6401; Appx8367-8375.  Google and its expert—Richard Goodin—explained that when Dockser's FPP performed multiplication operations retaining 9 bits of mantissa (or fewer), the operations met

the minimum error amounts recited in the challenged claims and thus Dockser's FPP was an LPHDR execution unit as claimed. Appx695-698; Appx6402-6403; Appx8375-8377.

To prove this, Mr. Goodin wrote a computer program that performs floating-point multiplication operations the way Dockser's FPP does when retaining 9 mantissa bits and showed that those operations met the claimed minimum error amounts. Appx695-696; Appx6402-6403; Appx8375-8376. Mr. Goodin also provided the Board with an algebraic analysis that confirmed the same point. Appx696-698; Appx6403; Appx8376-8377.

For **Ground 2**, Google argued Tong's teachings and tests would have motivated POSAs to configure Dockser's FPP to perform operations at the precision levels Tong teaches for particular applications. Appx705-708; Appx6410-6413; Appx8383-8386. Specifically, Tong's teaching that a 5-bit-mantissa precision level suffices for certain software programs like ALVINN and Sphinx would have motivated POSAs to configure Dockser's FPP to operate at that precision level to conserve power when performing those programs. Appx708-710; Appx6413-6415; Appx8386-8388. Google again provided the Board with results from Mr. Goodin's software program and his algebraic calculations confirming that Dockser's FPP, configured to use 5-bit-mantissa precision, met the claimed error amounts. Appx709; Appx6414; Appx8387.

### c. The Dockser-MacMillan and Dockser-MacMillan-Tong Grounds

In each petition, Google separately argued that the challenged "greater-than-one" LPHDR execution unit claims would have been obvious over Dockser in view of MacMillan and/or over Dockser in view of MacMillan and Tong.

### i. Dockser-MacMillan

For the Dockser-MacMillan combination (**Ground 3**), Google argued POSAs had reason to implement MacMillan's SIMD architecture such that each of the 256 or more PEs in MacMillan's design used Dockser's FPP as the PE's floating-point accelerator. Appx712-715; Appx6417-6420; Appx8390-8393. Implemented in this manner, Google explained, Dockser-MacMillan's device would include 256 or more LPHDR execution units, *i.e.*, Dockser FPPs incorporated into MacMillan's PEs. Appx716-718; Appx6421-6423; Appx8394-8396. The resulting device, Google argued, would meet the challenged "greater-than-one" LPHDR execution unit claims.

In establishing why POSAs would have pursued the combination, Google first noted that MacMillan teaches incorporating its SIMD architecture in battery-operated devices like "laptops." Appx714 (quoting Appx1497 (1:6-9), Appx1499-1500 (5:22-45, 7:14-34)); Appx6419; Appx8392. As Google and Mr. Goodin explained, these were the same types of battery-operated devices for which Dockser's FPPs were designed to provide "[p]ower management" through reduced-

precision floating-point operations. Appx714 (citing Appx1470 ([0003]), Appx1275-1277 (¶ 351)); Appx6419; Appx7124-7126; Appx8392; Appx8883-8885.

Citing MacMillan's teaching that "increase[d] power dissipation and hence power supply capacity and cost" was a drawback to prior-art SIMD architectures (Appx1498 (3:2-6)), Google argued POSAs would have been motivated to use Dockser's FPP to implement each "floating-point accelerator" in the PEs of MacMillan's SIMD architecture to (a) achieve the increased speed MacMillan's parallelism offers while (b) lowering power consumption as Dockser teaches and which MacMillan says would address drawbacks of prior-art SIMD designs. Appx714-715 (citing Appx1277-1279 (¶¶ 352-354)); Appx6419-6420; Appx7126-7128; Appx8393; Appx8885-8887.

Additionally, Google explained that MacMillan's SIMD architecture is beneficial for applications including "animation, … rendering…, and video games" (Appx1500 (7:14-34)), which are the same types of "graphics applications" for which Dockser teaches its FPPs can beneficially save power by reducing unnecessary precision (Appx1470 ([0003])). Appx715 (citing Appx1280 (¶ 355)); Appx6420; Appx7129; Appx8393; Apx8888.

### ii.    Dockser-MacMillan-Tong

With its Dockser-MacMillan-Tong combination (**Ground 4**), Google expanded on Ground 3 and set forth two different implementations of Ground 3's Dockser-MacMillan device that Tong's teachings motivated.

Google first argued that, having implemented MacMillan's SIMD device to use Dockser's FPPs as in Ground 3, POSAs would have configured those general-purpose FPPs to perform operations retaining as few as five precision bits when executing programs like ALVINN and Sphinx given Tong's test results confirming such precision levels support those programs.    Appx719-720; Appx6426-6427; Appx8401-8403.    For this appeal, Google's first Ground 4 implementation rises and falls with Ground 3's Dockser-MacMillan implementation as the Board explicitly rejected both implementations for the same reason, *i.e.*, cost. *Infra* pp. 26-28.

Google then set forth an ***alternative*** implementation of Dockser-MacMillan-Tong in which the FPPs taught by Dockser would have been used in MacMillan's PEs and would have been ***customized*** to use only precision levels lower than the then-standard 23-bit-mantissa precision level.    Appx720-723; Appx6427-6430; Appx8404-8406.    In this alternative implementation, Dockser's FPPs would retain the ability to select between different precision levels, but only between varying low-precision levels, *e.g.*, levels having 11 mantissa bits or fewer as taught by Tong (and

therefore they would be unable to select full 23-mantissa-bits precision).  Appx721; Appx6428; Appx8404-8405; Appx6208-6209 (44:23-45:24).

To establish why POSAs would have been motivated to adopt this alternative implementation of Dockser-MacMillan-Tong, Google explained that one embodiment MacMillan disclosed is an embedded computer that supports "embedded applications" (*i.e.*, applications designed for a "specific" purpose) like "signal processing."  Appx720 (quoting Appx1500 (7:15-34)); Appx6427; Appx8404.

Google then noted that Tong tested five exemplary signal-processing programs, and that Tong's results showed those programs use significantly less power, while still maintaining acceptable accuracy, when supported by processors operating at precision levels between 5 and 11 mantissa bits.  Appx721 (citing Appx1481-1482, Appx1487); Appx6427-6428; Appx8404.  POSAs, Google argued, would have been motivated to use Dockser's FPPs, operating at Tong's precision levels, in MacMillan's embedded signal-processing system, based on Tong's teachings that lower-precision operations can reduce power consumption while still maintaining accuracy of certain signal-processing programs.  Appx721 (citing Appx1298-1301 (¶¶ 389-392)); Appx6427-6428; Appx7152-7155; Appx8404; Appx8922-8925.

Google further explained that in an embedded system designed for signal processing, POSAs would have been motivated to customize Dockser's FPPs in MacMillan's PEs to operate only at precision levels lower than full precision, in view of Tong's teachings that "the fine precision of the 23-bit mantissa is not essential." Appx721 (quoting Appx1482); Appx6428; Appx8404-8405. As Google and its expert explained, Dockser teaches that its FPPs use "register files" that can be "formatted differently from IEEE 32-bit single format" (Appx1471 ([0017])), and POSAs would have been motivated to implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit (23-bit-mantissa) registers to avoid wasting circuit space on some register elements that will always be unpowered, because they correspond to mantissa bits that will not be used in an application-specific system that always operates at lower precision. Appx721 (citing Appx1302 (¶ 394)); Appx6428; Appx7156; Appx8405; Appx8926.

### d.    Institution

The Board instituted review against all challenged claims. Appx3972-4010; Appx7661-7702; Appx9442-9482.

### 4.    The Trial

During trial, as relevant to Google's appeals, Singular argued POSAs would not have pursued Google's Dockser-MacMillan or Dockser-MacMillan-Tong combinations.

According to Singular, POSAs would not have been motivated to implement MacMillan's device using Dockser's FPPs as the floating-point accelerator in MacMillan's PEs because doing so would make MacMillan's device more expensive. Appx4623-4624; Appx7824-7825; Appx9602-9604. Singular advanced this argument against the Dockser-MacMillan and the Dockser-MacMillan-Tong combinations. Appx4623-4624; Appx4627; Appx7824-7825; Appx7828; Appx9602-9604; Appx9606.

In reply, Google explained Singular's "costs" critique lacked factual support and was "legally irrelevant" because, as the Board explained in its institution decisions, "whether a 'combination would not be made by businessmen for economic reasons' is not probative of nonobviousness." Appx5051-5052 (quoting the Board at Appx4008 which quoted *Farrenkopf*, 713 F.2d at 718); Appx7974; Appx7699-7700; Appx9753; Appx9479-9480. In its sur-reply, Singular doubled down on its contention that POSAs would not have pursued the combinations because they would have resulted in "costlier" devices. Appx5950-5951; Appx8120-8121; Appx9910-9911.

Singular also argued POSAs would not have been motivated to implement Dockser-MacMillan-Tong in a customized manner because customizing Dockser's FPPs to only operate at lower than full precision would have been contrary to the "inventive concept" of both Dockser and Tong that Singular alleged was "supporting

- 24 -

a range of selectable precisions including full precision" so as "to always be able to execute full-precision operations."  Appx4629-4632; Appx7830-7833; Appx9608-9611.

Google replied that the ability to execute full-precision operations was not a central tenet of either Tong or Dockser.  Tong explicitly teaches that "'not all programs need the precision provided by generic FP hardware,' and for an 'application-specific task'—like the applications used in [Dockser-MacMillan-Tong's] embedded signal-processing system—a 'custom FP format may be a viable option.'"  Appx5057-5058 (quoting Appx1481-1483); Appx5131-5133 (¶¶ 56-57); Appx7979-7980; Appx8053-8055; Appx9758-9759; Appx9832-9834.  Likewise, Google explained that Dockser was not limited to devices with the ability to select full precision as Dockser explicitly taught that its hardware could be "formatted differently" from the then-standard full-precision format.  Appx5058 (citing Appx1471 ([0017])); Appx7980; Appx9759.  Google's alternative implementation thus did not violate any "inventive concept" of Dockser or Tong and was wholly consistent with their teachings.  Singular's sur-reply repeated its contention that POSAs lacked motivation to remove full-precision capability from Dockser's FPPs.  Appx5951-5952; Appx8121-8122; Appx9911-9913.

5.     **The Final Written Decisions**

In three substantively identical decisions, the Board found that Google had demonstrated that the challenged "at-least-one" LPHDR execution unit claims were unpatentable as obvious over Dockser as well as Dockser-Tong, but said Google had not proven that the challenged "greater-than-one" LPHDR execution unit claims were unpatentable as obvious.

        **a.**      **Citing an alleged increase in manufacturing costs, the Board found POSAs lacked motivation to pursue the Dockser-MacMillan combination.**

For Dockser-MacMillan, the Board found POSAs would not have had reason to pursue the combination because doing so purportedly would have "increased costs."  Appx75; Appx159; Appx243.  According to the Board, MacMillan is "focused on avoiding increased costs associated with added complexity," and Dockser's FPPs would have increased the cost of manufacturing MacMillan's device because the FPP requires "additional control circuitry to implement its selectable subprecision."  Appx72; Appx156; Appx242-243.

Recognizing this Court's precedent that economic concerns businesspersons might have with a combination are legally irrelevant, the Board said: "[T]his is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PE; the evidence shows that doing so would increase costs because of the added complexity and size of the FPP—a concern that

MacMillan explicitly counsels against."  Appx75-76; Appx160; Appx246.  But the Board did not cite (and Singular did not introduce) any evidence that the size or complexity of Dockser's FPPs would have made incorporating those FPPs into MacMillan's PEs unduly challenging or that there was some technological incompatibility between the references' teachings.  Nor was there evidence that Dockser's FPPs would introduce any cost increase, let alone at a level MacMillan was concerned about.  And although the Board never disagreed that the combination would enjoy the "individual benefits" of MacMillan and Dockser, *i.e.*, increased performance speed and reduced power consumption, it found MacMillan's concern with financial costs outweighed those benefits.  Appx76; Appx160; Appx246.

> **b.** **Interpreting Dockser and Tong as teaching that full-precision capabilities are fundamental, the Board found POSAs lacked motivation to pursue the customized Dockser-MacMillan-Tong combination.**

Turning to Ground 4, the Board found Google had not shown that POSAs had motivation to combine Dockser, MacMillan, and Tong as the petitions set forth. Starting with Google's first (non-customized) implementation of Dockser-MacMillan-Tong, the Board relied on the same "cost" rationale it articulated against Ground 3's Dockser-MacMillan combination to find that POSAs would have lacked motivation to pursue the non-customized implementation of Dockser-MacMillan-Tong.  Appx78; Appx162; Appx249.

As for Google's second (customized) implementation of Dockser-MacMillan-Tong, the Board found POSAs lacked motivation to pursue the proposed combination for two reasons.

First, as with the other Dockser-MacMillan-based combinations, the Board found POSAs would not have pursued the customized implementation because Dockser's FPPs retained the ability to select different levels of low precision and thus required the same control circuitry that the Board said made manufacturing MacMillan's device too expensive. Appx82; Appx166-167; Appx254. The Board also said MacMillan cautions against added complexity to achieve its "cost objectives," and that the customized implementation "would add complexity" because it involves customization. Appx82; Appx166-167; Appx254.

Second, the Board found the customized implementation was "predicated on *removing* what is a fundamental feature of Dockser and Tong—namely, the ability to operate at full precision or select a precision less than full precision." Appx80 (emphasis original); Appx164; Appx251. According to the Board, POSAs would not have been "motivated to remove the feature [*i.e.*, full precision] that Dockser describes as always present" (Appx81), and that Tong purportedly "characterizes as important." Appx82. *See also* Appx165-166; Appx252-253.

In reaching its determination, the Board recognized that Dockser taught that "for certain applications…a reduced precision may be acceptable" (Appx80 (quoting

Appx1470 ([0003]))), but nonetheless focused exclusively on Dockser's disclosures that full-precision capability was needed for "general purpose processors" (Appx1470 ([0003]) that supported applications requiring full precision. Appx80-81 (citing, *e.g.*, Appx1470 ([0003])). *See also* Appx164-165; Appx251-252. The Board then faulted Google's proposed implementation for "remov[ing] the feature" (Appx81; Appx165; Appx252) that permits Dockser's FPPs to serve as "general purpose processors" (Appx1470 ([0003]), despite Google's customized Dockser-MacMillan-Tong combination being premised on designing custom low-precision FPPs for an embedded signal-processing system, *i.e.*, application-specific processors, not general-purpose processors. Appx78-79 (summarizing Google's implementation as an "embedded signal processing system"); Appx162-163; Appx250.

In finding that Tong reinforced the need to retain full-precision capabilities in Dockser's FPPs, the Board recognized that Tong (just like Dockser) taught that "'not all programs need the precision provided by generic FP hardware,' and 'the fine precision of the 23-bit mantissa is not essential' and 'a single custom FP format may be a viable option' for particular applications." Appx81 (quoting Appx1481-1483); *see also* Appx165; Appx253. Yet, as with Dockser, the Board focused exclusively on Tong's statements that full-precision capability was needed if a processor was intended to be "'more generally useful.'" Appx81 (quoting Appx1483); *see also*

- 29 -

Appx166; Appx253.    The Board thus found Tong failed to support Google's proposed motivation to combine, despite Tong's teaching that "[f]or a narrow application-specific task," like the tasks the customized Dockser-MacMillan-Tong device performs, "a single custom FP format may be a viable option."  Appx1483.

## SUMMARY OF THE ARGUMENT

The Board's holding that the challenged "greater-than-one" claims were not proven unpatentable is flawed in multiple respects.

**A.** For Ground 3 (Dockser-MacMillan), Google demonstrated that POSAs would have been motivated to combine Dockser and MacMillan to arrive at a device containing more than one LPHDR execution unit. For example, Google explained (and Singular never disputed) that using multiple Dockser FPPs within MacMillan's SIMD architecture would have resulted in a more power-efficient device while benefiting from the increased computing performance that MacMillan's architecture offered over prior-art devices.

The Board found POSAs would have lacked motivation to combine Dockser and MacMillan solely because manufacturing MacMillan's device using Dockser's FPPs purportedly would have been more expensive than manufacturing MacMillan's unmodified device. That finding is legally and factually flawed.

1. The Board's reliance on alleged *economic* costs associated with using Dockser's FPPs in MacMillan's device, rather any *technological* drawbacks to doing so, is contrary to this Court's precedent. Since the early 1980s, this Court has been clear that "*[o]nly the latter fact would be relevant*." *Farrenkopf*, 713 F.2d at 718. The Board's rejection of Google's motivation-to-combine rationale is thus premised on a legally irrelevant consideration.

- 31 -

2. The Board's "cost" rationale is also premised on a fact finding—that using Dockser's FPPs in MacMillan's device would have made the device more expensive to manufacture—that the record does not support. There is no evidence upon which the Board reasonably could have concluded that Dockser's FPPs would have increased costs—let alone to the levels that MacMillan said were undesirable, or that such manufacturing costs would not be offset by the cost *savings* the FPPs provided through reduced power consumption.

3. The Board compounded its legally erroneous reliance on economic cost (and its erroneous fact finding that the combinations would be more costly) by treating that lone alleged downside as a *per se* bar to POSAs pursuing Google's combinations. This Court has consistently explained that the relevant question for obviousness is not whether the prior art suggests that the combination is the most desirable combination, but whether the prior art suggests *some* reason for pursuing it. Because it found that the resulting device might not have been the most desirable device—to a businessperson concerned only about costs—the Board, contrary to this Court's precedent, failed to consider whether the technological benefits the combinations would have achieved—including reduced power consumption, which reduces operating *costs*—would have given POSAs *some* reason to pursue the combinations.

**B.** For Ground 4, Google argued that Dockser, MacMillan, and Tong together gave POSAs reason to implement a "customized" version of Dockser's FPPs in MacMillan's device. As Google explained (and Singular never disputed), using customized Dockser FPPs within MacMillan's device would have beneficially saved power, maintained increased computing performance, and eliminated waste by reducing the FPPs' size. The Board found Google's combination unpersuasive, but that finding is legally and factually flawed.

1. The Board relied again on its erroneous "costs" finding to conclude that POSAs lacked a motivation to pursue the customized Dockser-MacMillan-Tong combination. As explained above, that finding was legally and factually erroneous.

2. Separately, the Board found that Google's customized combination removed from Dockser a feature that the Board said Dockser and Tong characterized as "fundamental"—the ability to perform operations at full precision—and that POSAs would not have had reason to do so. The Board's finding that the ability to operate at full precision is fundamental to Dockser and Tong lacks substantial evidence support.

Although Dockser's FPPs can serve as general-purpose processors capable of performing full-precision operations, Dockser also teaches that customized application-specific processors that use only lower precision—like the one Google proposed—are both feasible and useful in certain contexts, like the embedded signal-

Case: 22-1866     Document: 30     Page: 54     Filed: 09/21/2022

processing context that formed the basis of Google's customized combination.  Tong unambiguously reinforces that same understanding as it teaches that full precision is "not essential" (Appx1482) and that processors operating only at low precision levels are "viable option[s]" for supporting applications like the embedded signal-processing applications used in Google's customized combination (Appx1483).

3.   Even if Dockser and Tong taught that full precision was a preferred capability, the Board erred in treating that preference as dispositive.  As explained above, an obvious combination need not be the most desirable combination, it need only be one that POSAs had reason to pursue.  And the record uniformly confirms POSAs had reason to pursue Google's customized Dockser-MacMillan-Tong combination.

**C.**  The Court should reverse the Board's finding that the challenged claims were not shown to be obvious in view of Google's customized Dockser-MacMillan-Tong combination.  The record forecloses any remaining arguments Singular raised against that combination, making remand unnecessary.

## STANDARD OF REVIEW

This Court reviews "the Board's factual findings for substantial evidence and its legal conclusions de novo." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 794 (Fed. Cir. 2021). Obviousness is a legal determination based on underlying facts including whether POSAs would have been motivated to combine the prior art to achieve the claimed invention. *Id.* Whether substantial evidence supports the Board's factual findings must be assessed "[u]nder applicable legal principles." *Id.* at 796.

# ARGUMENT

## I. THE BOARD ERRED BY FINDING THAT COST ALONE WOULD HAVE DISSUADED POSAS FROM COMBINING DOCKSER WITH MACMILLAN.

Google advanced a straightforward obviousness theory: POSAs would have been motivated to implement Dockser's FPP as the floating-point accelerator in each of the 256+ PEs in MacMillan's battery-operated device (*e.g.*, laptop) because doing so would have resulted in a device that achieved both Dockser's and MacMillan's benefits, *i.e.*, a device having increased computing performance from MacMillan's SIMD architecture while consuming less power by using Dockser's FPPs to adjust precision level at which the device operates depending on the software application being supported. Appx669, Appx712-718; Appx1275-1280 (¶¶ 351-355); *see also* Appx6376; Appx6417-6425; Appx7124-7129; Appx8350; Appx8390-8401; Appx8883-8888. Neither Singular nor its expert disputed that the Dockser-MacMillan device would achieve the respective technological benefits of Dockser and MacMillan, nor did they dispute that reduced power consumption and increased performance were desirable attributes.

Instead, Singular argued (and the Board found) that POSAs would not have pursued the combination ***solely*** because the proposed Dockser-MacMillan device allegedly would have cost some unknown amount more to manufacture than MacMillan's unmodified device. The Board's finding is legally erroneous and factually unsupported.

### A. Cost Alone Is a Legally Insufficient Reason to Find POSAs Would Not Have Pursued an Otherwise Beneficial Combination.

The Board found POSAs would not have been motivated to pursue Dockser-MacMillan due to purported "increased costs" of manufacturing associated with modifying MacMillan's PEs to include Dockser's FPPs. Appx72; Appx242; Appx156-157. Although the Board also said MacMillan counseled against adding "complexity and size" to computers, the Board recognized that the ***only*** reason MacMillan made this statement was to avoid the "increased ***costs*** associated with added complexity and size." Appx75; *see also* Appx72; Appx242-243; Appx156-157. In other words, "complexity" and "size" did not introduce technological concerns for MacMillan; they introduced only economic concerns.

As discussed *supra* pp. 16-17, MacMillan's concern with "costs" is in the context of the $100,000 price-tag of then-existing supercomputers and similarly high costs of then-existing SIMD architectures. MacMillan detailed various reasons why such prior-art systems were prohibitively expensive (Appx1497-1499), and then described a novel SIMD architecture that could be ***added*** to existing personal computers to provide them with "much higher performance computing at moderate cost." Appx1500 (8:51-55). MacMillan thus does not caution against adding "moderate cost" to existing PCs; it simply sought to avoid the $100,000-type costs that MacMillan said made non-personal supercomputers too expensive for most people. Appx1499 (5:10-45).

The Board failed to appreciate the context in which MacMillan discussed "costs" and thus mistakenly found that combining Dockser with MacMillan would have incurred the types of "costs" MacMillan sought to avoid. *Infra* Section I.B. More fundamentally, the Board's focus on costs *at all* was legal error as this Court has consistently held that economic concerns businesspersons might have with hypothetical combinations are irrelevant to obviousness—the only relevant concerns are *technical* ones that skilled artisans would have had. As the Court explained decades ago:

> We agree with the board that additional expense associated with the addition of inhibitors would not discourage [POSAs] from seeking the convenience expected therefrom. That a given combination would not be made by businessmen for economic reasons does not mean that [POSAs] would not make the combination because of some technological incompatibility. ***Only the latter fact would be relevant***.

*Farrenkopf*, 713 F.2d at 718.

In *Farrenkopf*, the patentee argued POSAs would not have added inhibitors to a reference that explicitly cautioned that "the use of inhibitors can be costly." *Id.* This is the *same* rationale the Board employed here, in asserting that its reasoning for lack of motivation was that cost is "a concern that MacMillan explicitly counsels against." Appx75-76; Appx159-160; Appx245-246. *Farrenkopf* rejected that rationale as being premised on a legally irrelevant fact—increased financial cost of

the combination—even when cost concerns are explicitly mentioned in the prior art being modified.[6]

Similarly, the Court in *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1013 (Fed. Cir. 1983), rejected a patentee's contention that two references would not be combined given "the unlikelihood of a retail business using [the resulting device] because of its enormous size, cost, and complexity." This Court explained that even if the proposed combination "does not make good economic sense," it was obvious to pursue because "there is no mismatch between [the references'] technologies." *Id.*

Just as there was no technological "mismatch" in *Orthopedic Equipment*, there is no "mismatch" between the technologies of Dockser and MacMillan. As Google's expert (Mr. Goodin) explained, MacMillan's embodiments include battery-powered devices like "laptops" and Dockser teaches that power consumption is "of particular concern in battery operated devices" like "laptops." Appx1275-1277 (¶ 351) (quoting Appx1500 (7:14-34) and Appx1470 ([0003])); Appx7124-7126; Appx8883-8885. Mr. Goodin likewise explained that MacMillan teaches that "'power dissipation'…should be considered in pursuing the performance

---

[6] Unlike here (*infra* Section I.B), there was no dispute in *Farrenkopf* that the combination would incur the specific cost that the primary reference cautioned against.

improvements of MacMillan's SIMD architecture," and that because Dockser's FPPs reduce power consumption, they reduce the power demands that MacMillan seeks to avoid.[7]  Appx1277-1278 (¶¶ 352-353); Appx7126-7127; Appx8885-8886. There is no technological mismatch between Dockser and MacMillan; they are perfectly aligned.

In the decades since *Farrenkopf* and *Orthopedic Equipment*, this Court has repeatedly reaffirmed their holdings that economic concerns regarding a combination are irrelevant to obviousness.  *In re Nilssen*, 827 F.2d 1098 (Fed. Cir. 1987) (unpublished table decision) (rejecting argument that reduced power consumption would not have motivated POSA to pursue combination given "the ***cost*** of adding an additional resistor," and explaining that the cost-focused argument "does not go to ***technical reasons*** why the combination would not have been obvious. Those, not business reasons, ***control the obviousness determination***."); *Friskit, Inc. v. Real Networks, Inc.*, 306 F. App'x 610, 617-18 (Fed. Cir. 2009) (rejecting contention that "market forces" allegedly "taught away from the claimed method" where the prior art did not suggest "any technical challenge" to achieving

---

[7] MacMillan also teaches that reducing power dissipation directly reduces "power supply and ***cost***." Appx1498 (3:2-6).  Therefore, if the economic cost of a device is relevant to obviousness, that consideration should have weighed in ***favor*** of the Dockser-MacMillan combination.  As discussed *infra* pp. 46-47, the Board failed to address MacMillan's teaching that reducing a device's power demands reduces costs.

the claimed method); *In re Magna Elecs., Inc.*, 611 F. App'x 969, 973 (Fed. Cir. 2015) (expert's skepticism whether combination could be manufactured was irrelevant because it "relies only on high costs and other companies' purported preferences," not "technical infeasibility or manufacturing uncertainty").

Most recently, in *Grit Energy Solutions, LLC v. Oren Technologies, LLC*, 957 F.3d 1309 (Fed. Cir. 2020), this Court vacated the Board's finding that POSAs would not have been motivated to modify a system because doing so "would result in a more expensive system." *Id.* at 1323. "[E]ven if we accept the Board's factual determination that swapping Eng Soon's components would result in a more expensive system," this Court said, "that determination, standing alone, is insufficient to reject each of [petitioner's] arguments as to why a skilled artisan would have been motivated to make the proposed swap." *Id.* at 1323-24.

In instituting trial, the Board, citing *Farrenkopf*, cautioned that "economic reasons" do not defeat obviousness, and rejected Singular's "cost" argument as unsupported. Appx4008; Appx7699-7700; Appx9480. In its final decisions, however, the Board changed course and attempted to justify its pivot by saying MacMillan's concern about costs "is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PEs; the evidence shows that doing so would increase costs because of the added complexity and size of the FPP—a concern that MacMillan explicitly counsels against."

Appx75-76; Appx160; Appx246. But MacMillan counsels against "add[ing] *significant* complexity" (Appx1499 (5:42-44)) and size precisely and *only* to avoid arriving at "*much* higher cost than computer systems for personal use" (Appx1499 (5:22-45)), not because of any technological problems.

As MacMillan explains, then-existing supercomputers were more powerful than PCs but "typically cost $100,000 or more." Appx1497 (1:15-23). MacMillan says POSAs tried to offer supercomputer performance at lower prices by developing SIMD architectures; however, even those designs were "much higher cost" than PCs and "many SIMD computer system vendors…experienced financial difficulties resulting in bankruptcy partly as a result of the high cost." Appx1499 (5:23-37). MacMillan thus sought to develop SIMD architectures that were less expensive than supercomputers or prior-art SIMD architectures for business reasons. To meet this "cost objective[]," MacMillan said, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Appx1499 (5:37-45). MacMillan is thus explicit that increased complexity or size creates potential *economic concerns*—*i.e.*, if the price of manufacturing the device becomes too high it may be less commercially appealing. MacMillan is silent on any *technological* concerns that complexity and size would introduce. "Only the latter fact would be relevant." *Farrenkopf*, 713 F.2d at 718.

To justify its "cost" reasoning, the Board cited four cases from this Court (Appx75, Appx159-160, Appx245-246), but none involved a finding that financial concerns would have dissuaded POSAs from pursuing a proposed combination; rather, each involved a classic "teaching away" finding based on *technological* drawbacks. *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1375-78 (Fed. Cir. 2021) (no motivation to broaden molecular weight where prior art identified narrow molecular weight as a "key feature" that "*performs* better"); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (no motivation to make device "inoperable"); *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) (no motivation to replace tissue-penetrating barbs with non-tissue-penetrating ridges where doing so "destroy[s] the [barb's] basic objectives"); *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (no motivation to pursue combination requiring additional "plumbing" and which "decrease[s] efficiency"). Unlike those cases, the Board identified no technical challenges teaching POSAs away from Dockser-MacMillan.

### B. Substantial Evidence Does Not Support the Board's Finding that the Dockser-MacMillan Combination Would Have Resulted in the "Costs" MacMillan Sought to Avoid.

Even if "costs" were legally relevant to negating the existence of a technological motivation to combine, substantial evidence does not support the Board's findings (i) that Dockser-MacMillan's device would have been more costly

than MacMillan's device or (ii) that any such increased cost was the type of significant cost against which MacMillan cautioned.

The evidence the Board cited as supporting its cost analysis were (1) "the disclosures of Dockser and MacMillan," (2) "expert testimony" from Singular's expert, and (3) "cross-examination testimony" from Google's expert. Appx76; Appx160-161; Appx246-247. None of this evidence supports the Board's finding.

First, "the disclosures of Dockser and MacMillan" say nothing to support a finding that Dockser-MacMillan's device would be more costly. The Board read Dockser as requiring "additional control circuitry" to select different precision levels (Appx72), and said such circuitry is "beyond that of a typical full precision execution unit" (Appx74). *See also* Appx156, Appx158; Appx242, Appx244. But even if some pieces of Dockser's circuitry are different from "typical," nothing in Dockser says its "control circuitry" makes the FPPs more costly than full-precision execution units. As for MacMillan, the Board said MacMillan cautions against the manufacturing costs associated with "significant complexity" or increased size (Appx72-73; Appx156-158; Appx242-244), but (as discussed *infra* pp. 46-48) nothing in the record supports the Board's inferential leap that Dockser's FPPs present the "significant complexity" or require the increased size that MacMillan cautions against as commercially undesirable.

Second, the testimony of Singular's expert—Dr. Khatri—that the Board cited does not support the Board's fact findings. To begin, Dr. Khatri's testimony focused solely on *size*, not complexity; his testimony does not support the Board's finding that Dockser's FPPs would have added complexity to MacMillan's device. Appx4970 (¶ 51), Appx4992-4993 (¶¶ 101-104); Appx7893, Appx7915-7916; Appx9671, Appx9693-9694. And even regarding size, Dr. Khatri only baldly asserted that Dockser's control circuitry would increase the size of MacMillan's PE and thus increase costs. Appx4992-4993 (¶¶ 101-104); Appx7915-7916; Appx9693-9694. Dr. Khatri provided no underlying analysis demonstrating that this purported increase in *size*, even if assumed true, would have increased *costs* in 2009 (when Singular's patent applications were filed), after process manufacturing had advanced for over a decade since MacMillan's 1995 publication. *Id.* Dr. Khatri simply alleged Dockser-MacMillan would "increase costs" because "Dockser FPP units would require additional circuitry and chip space." Appx4993 (¶ 104); Appx7916; Appx9694. This is a quintessential conclusion without objective support; it does not qualify as substantial evidence. *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358-59 (Fed. Cir. 2019).

Third, the only "cross-examination testimony" from Mr. Goodin that the Board cited is 43:21-45:9 of his deposition transcript. Appx72; Appx242; Appx156. In those pages, Mr. Goodin confirmed Dockser includes "circuitry that would cause

power to be removed" from register elements.  Appx4743.  This testimony says nothing about whether implementing MacMillan's PEs with Dockser's FPPs would be more costly to manufacture than MacMillan alone.  On that point, Mr. Goodin was clear: there was no evidence "to demonstrate that incorporating Dockser's FPP into MacMillan's system would increase cost at all, much less to any appreciable degree," or that such costs "would outweigh the cost decrease gained by Dockser's power savings."  Appx5112 (¶ 31); Appx8034; Appx9813.

Apart from the evidence the Board said supported its analysis, the Board (and Dr. Khatri) failed to consider evidence that Google introduced undercutting Singular's speculative "cost" theory.  Specifically, neither Dr. Khatri nor the Board considered the cost *savings* the combination offered.  Appx1277-1278 (¶¶ 352-353); Appx5112 (¶ 31); Appx7126-7127; Appx8034; Appx8885-8886; Appx9813.  By using Dockser's FPPs, Dockser-MacMillan's device would consume less power than MacMillan's unmodified device; and MacMillan says reducing a device's power demands reduces the need for "***power supply capacity and cost***."  Appx1498 (3:2-6); Appx1277-1278 (¶¶ 352-353); Appx5112 (¶ 31); Appx7126-7127; Appx8034; Appx8885-8886; Appx9813.  There is nothing in the record suggesting that the alleged increased cost to manufacture Dockser-MacMillan, even if such cost had been established, would outweigh the device's decreased power-consumption costs.

Finally, even if substantial evidence supported Singular's speculative "cost" theory, there is no evidence that any increased cost to manufacturing Dockser-MacMillan would have risen to the level of cost MacMillan sought to avoid. As explained *supra* pp. 16-17, MacMillan was concerned with avoiding the ***$100,000*** price-tag of prior-art supercomputers. ***Nothing*** in the record suggests that modifying MacMillan's personal-computing device to include Dockser's FPPs would have resulted in a device that approached anything like that price.

MacMillan itself explicitly recognizes the benefit of incurring "moderate cost" to provide "much higher performance" by adding supercomputing capability to PCs. Appx1500 (8:51-55); Appx1499 (6:11-14) (explaining "the present invention….provid[es] scalable performance ***at various price points***" by "adding ***additional*** shared memory" to "boost[]" performance). ***No*** record evidence supports a finding that any alleged manufacturing cost increase incurred from using Dockser's FPPs would produce anything beyond the "moderate cost" that MacMillan says is worthwhile to achieve desirable enhancements.

The substantial evidence standard "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). Here, the full record supports neither the Board's finding that Dockser-MacMillan is more costly to manufacture than MacMillan alone nor its finding that any such cost was of the

- 47 -

level that MacMillan cautioned against rather than the "moderate cost" that MacMillan said is worth incurring to achieve other benefits.

### C. The Board Committed Legal Error by Disregarding the Undisputed Technical Benefits of Dockser-MacMillan Simply Because the Board Believed the Combination Might Not Have Been the Most Desirable One.

Even if cost were a consideration relevant for defeating obviousness, and even if the record had supported that there was some increased cost to manufacturing Dockser-MacMillan's device as compared to MacMillan's unmodified device, this Court's precedent does not require that the "combination be the *best* option, only that it be a *suitable* option." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) (quotation marks omitted; emphasis original). At a minimum, Google established that Dockser-MacMillan was a "suitable" option for a high-performance laptop that consumed less power.

The Board recognized Google's position that Dockser-MacMillan yielded a device that enjoyed the "individual benefits" of MacMillan's and Dockser's approaches, *i.e.*, increased performance from MacMillan's SIMD architecture and decreased power consumption from Dockser's FPPs. Appx76; Appx160; Appx246. But the Board failed to give those "individual benefits" any weight in its analysis because the device allegedly would have been more costly to manufacture and thus less commercially desirable. The Board effectively treated the allegedly less-than-perfect nature of the combination as a *per se* bar to finding obviousness.

- 48 -

Yet, even if combining references yields a less-than-perfect combination, the combination's benefits can still make it obvious to POSAs and non-inventive for the patentee. For example, in *Intel*, Intel argued POSAs would have used a prior-art switch described in the background of the Burgener reference to solve a problem present in a different device. *Id.* at 799. The Board found Intel's motivation-to-combine analysis flawed because Burgener "criticizes and purports to improve" upon the prior-art switch. *Id.* This Court held the Board's reasoning lacked substantial evidence support under the correct legal standard: "Our caselaw is clear. It's not necessary to show that a combination is the *best* option, only that it is a *suitable* option." *Id.* at 800 (internal quotation omitted; emphasis original). Because the prior-art switch solved a problem present in a prior-art device, the Court found sufficient motivation to combine the references despite Burgener's criticism of the switch. *Id.* The same reasoning the Court applied in *Intel* applies here—even assuming *arguendo* that MacMillan cautioned against increased cost associated with Dockser-MacMillan, Google provided ample evidence that POSAs would have found Dockser-MacMillan a suitable option for high-performance computing with low power consumption.

*Intel* is not an outlier. The Court has consistently found combinations obvious to pursue despite allegations that there would be some drawback. *See, e.g.*, *Intel Corp. v. Qualcomm Inc.*, Case Nos. 2020-92, -93, 2022 WL 880681, *4 (Fed. Cir.

Mar. 4, 2022) (reversing Board's motivation-to-combine determination: "Whether Lee presents the best combination to achieve the claimed invention is irrelevant."); *Corephotonics, Ltd. v. Apple Inc.*, Case No. 2020-1961, 2021 WL 4944471, *5-6 (Fed. Cir. Oct. 25, 2021) (affirming rejection of patentee's argument that "higher costs or reduced manufacturability" would have "undermined" motivation to combine and explaining that "it is a commonplace fact that design decisions entail making tradeoffs among multiple objectives"); *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) (obvious to combine a reference using optical circuits with another using electrical circuits even though the optical-circuits reference described electrical circuits as "inferior…for certain purposes" because that teaching fails to suggest that "the claimed invention would be unlikely to work using electrical circuitry; [it] alleges only that it may be inferior for certain purposes"); *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) ("[E]ven if [the combination] resulted in a device that would be less effective for the purpose intended by [one reference], the teaching of the [ ] reference is not limited to the specific invention disclosed."); *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004).

As this Court has explained succinctly, "a given course of action often has simultaneous advantages and disadvantages, and ***this does not necessarily obviate motivation to combine***." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). Even if economic costs were a relevant consideration for defeating

obviousness and even if the record supported finding that Dockser-MacMillan's device was more costly, the Board's refusal to consider whether the benefits Dockser-MacMillan offered—high-performance computing with lower power consumption—made the combination a suitable option for POSAs was legal error warranting reversal.

### D. Under the Correct Legal Framework, the Record Demonstrates that POSAs Would Have Been Motivated to Pursue the Dockser-MacMillan Combination.

Viewed through the correct legal lens, the record supports only one conclusion: POSAs would have had a motivation to combine Dockser and MacMillan to obtain the petitions' Dockser-MacMillan device.

MacMillan teaches benefits to incorporating SIMD parallel processing in personal-use computers, including battery-operated devices like "laptops." Appx1497 (1:6-9), Appx1499-1500 (5:22-45, 7:14-34). These are the same battery-operated devices for which Dockser says "unnecessary power consumption" is "of particular concern," and for which Dockser's FPPs provide beneficial "[p]ower management" through reduced-precision floating-point operations. Appx1470 ([0003]). MacMillan also teaches that its SIMD architecture is beneficial for applications including "animation,… rendering…, and video games" (Appx1500 (7:14-33)), which are the same types of "graphics applications" that Dockser says do not require full precision and thus can be supported by reduced-precision FPPs.

Appx1470 ([0003]); Appx1280 (¶ 355); Appx7129; Appx8888. MacMillan and Dockser are thus directed to compatible improvements, *i.e.*, increasing computational speed using a SIMD architecture and reducing unnecessary power consumption, for the same types of devices, *i.e.*, battery-operated devices, that support the same types of applications, *e.g.*, graphics applications.

Although Dockser alone would have motivated POSAs to reduce unnecessary power consumption in MacMillan's SIMD architecture, MacMillan also provides such motivation. In identifying limitations with prior-art SIMD architectures, MacMillan points to a "bottleneck between the chips used to hold PEs and the chips used to provide memory storage." Appx1497 (2:26-48). MacMillan notes that the conventional technique for addressing the bottleneck problem "increases power dissipation and hence ***power supply capacity and cost***," which in turn "may also require increased space between chips or circuit boards for better cooling, leading to larger, more costly cabinets." Appx1497-1498 (2:62-3:6). One of MacMillan's goals is to "overcom[e]" the "limitations" it identifies in prior-art SIMD systems (Appx1499 (5:38-42)), and thus one goal of MacMillan is to reduce "power dissipation and hence power supply capacity and cost" in a SIMD architecture. Appx1498 (3:3-4); Appx1277-1278 (¶ 352); Appx7126-7127; Appx8885-8886. As such, Dockser's FPPs help MacMillan achieve one of its explicit goals.

As Mr. Goodin explained, POSAs considering Dockser's and MacMillan's teachings would have seen a natural fit between those teachings, and would "have been motivated to use Dockser's FPP to implement each floating-point accelerator in the parallel PEs of MacMillan's SIMD architecture, to increase speed as MacMillan teaches while lowering power consumption as Dockser teaches." Appx1278 (¶ 353) (internal quotations omitted); Appx7127; Appx8886.

In its decisions, the Board did not disagree with any of the facts set forth above. It only concluded that despite the synergy between Dockser and MacMillan, and despite the benefits Dockser-MacMillan's device would provide, POSAs would not have pursued that device because it would allegedly be more costly to manufacture. Appx76; Appx160; Appx246. The Board thus assessed Google's evidence through the wrong legal lens.

The Board's finding of no motivation to combine Dockser with MacMillan cannot stand under the correct legal framework, *i.e.*, one in which financial costs cannot, as a matter of law, defeat a technological motivation to combine and (at a minimum) do not operate as a *per se* bar to an obviousness finding. Indeed, when assessed using the correct legal framework, the only factually and legally supportable conclusion is that POSAs had motivation to pursue Dockser-MacMillan.

## II.  THE BOARD ERRED IN FINDING THAT GOOGLE FAILED TO IDENTIFY SUFFICIENT MOTIVATION TO IMPLEMENT A CUSTOMIZED VERSION OF DOCKSER-MACMILLAN-TONG.

Although the Board's flawed motivation-to-combine analysis for Ground 3's Dockser-MacMillan combination (and by extension Ground 4's non-customized implementation of Dockser-MacMillan-Tong[8]) would necessitate vacatur and remand, remand is not necessary because the Board's errors with respect to Ground 4's customized Dockser-MacMillan-Tong combination warrant outright reversal.[9] Appx77 n.8; Appx161 n.8; Appx247 n.8.

### A.  POSAs Had Ample Motivation to Combine Dockser, MacMillan, and Tong as Set Forth in Google's Customized Implementation.

For the customized Dockser-MacMillan-Tong combination, Google argued that POSAs had reason to implement Dockser-MacMillan such that the FPPs were

---

[8] The Board's same flawed "cost" rationale was its sole basis for rejecting Ground 4's non-customized implementation of Dockser-MacMillan-Tong. Appx78; Appx162; Appx249.

[9] Remand would be needed so the Board can address a claim construction argument that Singular advanced against those two combinations but which the Board declined to address. Appx77 n.8; Appx161 n.8; Appx247 n.8. In short, most of the "greater-than-one" claims require that the number of LPHDR "execution units in the device *exceeds* [by some amount] the number of execution units in the device that are adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (referred to as "32-bit EUs" for shorthand by the Board, *e.g.*, Appx4002). Singular argued that Dockser's FPPs are 32-bit EUs, and therefore the number of LPHDR execution units in Dockser-MacMillan (and the non-customized Dockser-MacMillan-Tong) does not "exceed" the number of 32-bit EUs. Appx4616-4623; Appx5946-5950; Appx7816-7824; Appx8116-8120; Appx9595-9602; Appx9906-9910.

customized to operate only at the lower precision levels that Tong disclosed as adequate for signal-processing applications. Appx720-723; Appx1298-1305 (¶¶ 389-399); Appx6427-6430; Appx7152-7159; Appx8404-8406; Appx8922-8929. The implementation was straightforward.

As Mr. Goodin explained, an embodiment of MacMillan is a system "designed primarily" for a "specific application, including embedded applications" like "signal processing." Appx1298-1299 (¶ 389) (quoting Appx1500 (7:15-34)); Appx7152-7153; Appx8922-8923. MacMillan's SIMD device could thus be an "embedded computer" designed to perform specific applications like signal processing. Appx1500 (7:21-32) (listing examples of "embedded computers").

Mr. Goodin then explained that Tong's tests "show that programs such as speech recognition and image processing use significantly less power with [a] reduced bitwidth [floating-point] representation than with an IEEE-standard [floating-point] representation," and that Tong notes that "[i]t has long been known that many *such signal processing applications* can get by with less precision/range than full [floating-point]." Appx1299-1300 (¶ 390) (quoting Appx1476); Appx1482 ("fine precision of the 23-bit mantissa is not essential"); Appx7153-7154; Appx8923-8924. Tong, Mr. Goodin explained, thus confirms that the software applications Tong tested are examples of embedded signal-processing applications,

and that such applications do not require the full precision that conventional 32-bit FPPs provided. Appx1299-1300 (¶ 390); Appx7153-7154; Appx8923-8924.

In view of Tong's teachings that embedded applications, like signal-processing applications, "can get by with less precision," and its test results showing that several benchmark signal-processing applications had no "noticeable degradation in accuracy when the mantissa bitwidth is reduced from 23 to 11 bits," and at least two—ALVINN and Sphinx—performed well with precision as low as 5 mantissa bits, Mr. Goodin explained POSAs would have had reason to implement a customized version of Dockser-MacMillan in which the device is an embedded computer designed specifically to support signal-processing programs, like ALVINN and Sphinx. Appx1300-1301 (¶¶ 391-392); Appx7154-7155; Appx8924-8925. In this implementation, Dockser's FPPs would have been customized to select only among certain low precision levels because the embedded applications that the FPPs would support do not need full-precision capabilities. Appx1301-1302 (¶ 393); Appx7155-7156; Appx8925-8926. POSAs would have customized Dockser's FPPs by removing register elements that would have stored mantissa bits that the processor would never use, because having register elements that would never be used would "waste circuit space or incur unnecessary cost." Appx1302 (¶ 394); Appx7156; Appx8926.

Before the Board, neither Singular nor its expert disputed that (1) MacMillan's SIMD device can be implemented as an embedded computer supporting embedded signal-processing applications, (2) the signal-processing programs Tong tested are exemplary embedded applications, (3) Tong's testing demonstrated that such embedded applications can be supported using less-than-full precision, and (4) removing register elements from Dockser's FPPs that would never be used would have reduced wasted circuit space, saved unnecessary costs, and yet still supported the embedded signal-processing applications Tong tested like ALVINN or Sphinx. In the face of these undisputed facts, POSAs unquestionably had reason to pursue Google's customized Dockser-MacMillan-Tong device. *Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1324 (Fed. Cir. 2017) ("Any motivation…is sufficient.") (internal quotation omitted).

## B. The Board's Contrary Determination Is Premised on the Unsubstantiated Finding that Full-Precision Capability Was Fundamental to Dockser and Tong.

In rejecting Google's straightforward combination, the Board focused on the fact that the customized FPPs would not be able to perform full-precision operations. According to the Board, POSAs would not have been motivated to "*remov[e]* what is a fundamental feature of Dockser and Tong—namely, the ability to operate at full precision or select a precision less than full precision." Appx80 (emphasis original); Appx164; Appx251. That finding lacks support.

Full-precision capability is not "fundamental" to Dockser.  Dockser describes an exemplary FPP that has the ability to operate with precisions ranging from full 23-bit-mantissa precision down to any lower precision level, *e.g.*, 9 mantissa bits. Appx1471-1473 ([0015]-[0019], [0023]-[0029], [0032]).  To do this, the exemplary FPP has a "register file" that stores floating-point numbers in IEEE-standard 32-bit format.   Appx1470-1471 ([0002], [0017]).   But as Google and Mr. Goodin explained, Dockser also explicitly teaches that its "register file" can be "formatted ***differently*** from IEEE 32-bit." Appx1471 ([0017]); Appx721-722; Appx1302-1303 (¶¶ 394-395); Appx5134 (¶ 59).  Dockser is thus explicit that the "register file" need not be designed to store numbers with 23 mantissa bits, and instead could be designed differently.

Neither the Board nor Dr. Khatri ever addressed Dockser's "formatted differently" disclosure.  Instead, each focused almost exclusively on Dockser's paragraph [0003].  Appx80-81; Appx4997 (¶¶ 112-114); Appx4630-4631; *see also* Appx164-165;  Appx7920;  Appx7831-7832;  Appx251-252;  Appx9697-9698; Appx9609-9610.  In that paragraph, Dockser says in part:

> ***For general purpose processors***, however, the common situation is that for certain applications, e.g. generating 3D graphics, a reduced precision may be acceptable, and ***for other applications***, e.g. implementing Global Positioning System (GPS) functions, ***a greater precision may be needed***.  Accordingly, there is a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable.

Appx1470 ([0003]).

The Board misread paragraph [0003] to teach that Dockser "*requires* full precision with the capability to select less than full precision." Appx80; Appx164; Appx251. The plain language says such precision "*may*" be needed only for certain applications, *e.g.*, GPS. More fundamentally, however, the Board overlooked a preceding sentence in the same paragraph explicitly teaching that: "If it is known that an application always requires a certain reduced precision, *the floating-point processor can be designed and built to that reduced precision*." Appx1470 ([0003]). Dockser thus acknowledges that application-specific processors "built" to reduced precision levels were known and useful for certain applications that only needed low precision, *e.g.*, applications for "generating 3D graphics." *Id.* As Mr. Goodin explained, paragraph [0003] confirms that while "*some* processors, *i.e.*, 'general purpose processors,' '*may*' require full precision," there are "[o]ther types of processors (not intended to be 'general purpose') [that] may not." Appx5133-5134 (¶ 58); Appx5058; Appx8055-8056; Appx7980; Appx9834-9835; Appx9759.

The Board never accounted for Dockser's explicit teaching that application-specific processors "designed and built to [ ] reduced precision" levels were known. Instead, the Board mischaracterized Mr. Goodin as "agree[ing]" that Dockser "requires full precision," but the cited deposition testimony supports no such finding.

Appx80-81 (citing Appx4741-4742 (36:16-37:17, 38:3-8)), Appx4746 (55:21-57:12)); Appx165; Appx252.

In the first passage (36:16-37:17), Mr. Goodin agreed that "in at least one embodiment of Dockser it *can* operate on a selectable precision, including the full 23 bits" (Appx4741); he never said that Dockser *required* that capability. And in the second passage (38:3-8), he confirmed that Dockser did not disclose an embodiment "without selectable precision." Appx4742. Nothing in that answer suggests Mr. Goodin read Dockser to "require[] full precision." Similarly, in the third passage (55:21-57:12), Mr. Goodin said "Dockser requires selectable precision." Appx4746. Again, he did not say Dockser requires full precision, just "selectable precision." As Google explained in its petitions and at the oral hearing, the customized Dockser-MacMillan-Tong device retained Dockser's ability to select precision levels, it just selected between different *low precision* levels and did not have the ability to select higher-than-necessary levels including full precision. Appx721 (explaining Tong discloses precision levels ranging between "5 and 11 mantissa" bits and arguing POSAs "would have been motivated to use Dockser's FPPs…with Tong's precision level*s*" [plural] such that the FPPs "only operate at precision level*s* [plural] lower than full FP 32-bit operations"); Appx6428; Appx8404-8405; Appx6208-6209.

In summary, the record does not support the Board's finding that the ability to select full precision is "fundamental" to Dockser. Dockser does not say that. Mr. Goodin never said it. Although Dockser focuses on general-purpose processors that can select full precision to support applications requiring such precision, it nowhere says full-precision capabilities are ***required*** in all types of devices. To the contrary, Dockser's paragraph [0003] explicitly says full precision is not needed for certain applications (*i.e.*, those requiring only low precision like those supported in the customized Dockser-MacMillan-Tong combination), and that customized processors "designed and built to that reduced precision" (like the customized Dockser-MacMillan-Tong combination), were known.

As for Tong, the Board said Tong reinforced its finding that POSAs would not have pursued the customized Dockser-MacMillan-Tong combination because full-precision capabilities are purportedly "fundamental" and "important" to Tong. Appx80-82; Appx164-166; Appx251-253. Substantial evidence does not support that finding.

The Board conceded "Tong discloses that [1] 'not all programs need the precision provided by generic FP hardware,' and [2] 'the fine precision of the 23-bit mantissa is not essential," and [3] 'a single custom FP format may be a viable option' for particular applications." Appx81; Appx165; Appx253. Each of these disclosures unmistakably teaches that full precision is not required. Appx5132-5133 (¶ 57);

Appx8054-8055; Appx9833-9834.   The Board nevertheless concluded that "full precision" was "fundamental" to Tong because of the following paragraph:

> [B]y reducing either precision or range from 32 to fewer bits, we should be able to create custom FP hardware which has lower power simply because of the bit reductions.  For a narrow application-specific task, a single custom FP format may be a viable option.  However, *to be more generally useful, we need to consider arithmetic architectures which can scale to different FP formats*.  Even though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears *inevitable that some fraction of our operands will require full IEEE-standard precision*"

Appx81 (Board's emphasis) (quoting Appx1483); Appx166; Appx253.

As its emphasis confirms, the Board read Tong's disclosure that architectures with full-precision capabilities were "more ***generally*** useful" and that "some ***fraction***" of operands "require" full precision to mean that full-precision capability is "fundamental."  Appx80-81; Appx164-166; Appx251-253.  That interpretation is not consistent with Tong when read in its entirety.

Tong nowhere says that the ***only*** useful architectures are those with full-precision capabilities.  It says such architectures are "more ***generally*** useful," but explicitly recognizes that "[f]or a narrow application-specific task, a single custom FP format may be a viable option."  Appx1483.  Full-precision capabilities cannot be fundamental to Tong when—like Dockser—Tong explicitly teaches that customized low-precision processors are "***viable option[s]***" for application-specific tasks.  *Id.*

Indeed, as the Board recognized (Appx81; Appx166; Appx253) but seemingly did not appreciate, Tong explicitly says "not all programs need the precision provided by generic FP hardware." Appx1481. That was the entire purpose of Tong's tests—to determine whether typical signal-processing applications could perform adequately with lower precision. Appx1476. Tong confirms that for at least the five representative benchmark signal-processing applications Tong tested, full precision (and the power it requires) is not necessary. For such programs, full precision is far from fundamental, it is superfluous—or, as Tong put it, "not essential." Appx1482; *see also* Appx1476 ("unnecessary bits in the FP representation" are "waste"); Appx5132-5133 (¶ 57); Appx8054-8055; Appx9833-9834.

Considering "the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision," *Gartside*, 203 F.3d at 1312, substantial evidence does not support the Board's finding that full-precision capabilities are "fundamental" to either Dockser or Tong. Full precision might be preferred for general-purpose processors, but both references are explicit that full precision is not needed in all contexts and that certain embedded applications, like Tong's signal-processing applications, can be beneficially supported by customized (non-general-purpose) processors that lack full-precision capabilities. The Board's contrary finding cannot stand.

**C.    Even if Dockser and Tong Taught that Full-Precision Capability Was Preferred for General-Purpose Processors, That Finding Would Not Negate POSAs' Motivation to Pursue Dockser-MacMillan-Tong.**

"A reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012).  Accordingly, even if Dockser and Tong taught that general-purpose FPPs with full-precision capabilities were preferable, that teaching would not set forth the exclusive embodiment for which Dockser and/or Tong could be used in combination.  Rather, POSAs would also have motivation to pursue less-preferred processors whose lack of full-precision capabilities brought other beneficial attributes like reduced power consumption and removal of unnecessary circuitry.

As discussed in *supra* Section I.C, this Court's precedent is replete with cases finding POSAs had motivation to pursue combinations even where—as the Board (erroneously) found here—the prior art purportedly discloses preferences that seemingly run counter to the combination.

Beyond the cases discussed in Section I.C., *Raytheon Co. v. Sony Corp.*, 727 F. App'x 662 (Fed. Cir. 2018), provides another helpful example.  In *Raytheon*, the Liu reference acknowledged that silicon devices were "adequate for many applications" but "unsuitable" for others and thus Liu's preferred embodiment did not use silicon.  *Id.* at 666.  Citing these disclosures, the patentee argued POSAs

would not have had motivation to combine Liu with references using silicon. *Id.* at 667. Yet because Liu confirmed silicon-based devices were known to be "adequate for many applications," this Court explained that POSAs "cannot be assumed to ignore Liu['s silicon disclosure] merely because [Liu] is primarily directed to a specific application" for which Liu says silicon is unsuitable. *Id.* at 667. Even though using silicon-based devices might be "less efficient or less desirable" for the specific application to which Liu was directed, using silicon-based devices for ***other*** applications was nonetheless obvious to POSAs given Liu's acknowledgment that silicon devices were "generally known" and "adequate for many applications." *Id.*

The facts here align with *Raytheon*. Even if Dockser and Tong said customized FPPs with only low-precision capabilities were unsuitable as general-purpose processors, the references also acknowledge that customized low-precision processors exist and are useful in certain contexts, *i.e.*, as application-specific processors that support applications only requiring low-precision operations. Neither Dockser nor Tong says anything ***negative*** about using customized low-precision processors in application-specific contexts, and thus—just as in *Raytheon*—the references would not dissuade POSAs from pursuing such customized processors in appropriate scenarios (*e.g.*, for embedded applications requiring only low precision) given their known benefits. *See also General Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1350-51 (Fed. Cir. 2020).

The Board's finding that POSAs lacked motivation to combine Dockser, MacMillan, and Tong because the resulting customized device may not have resulted in the most "generally" useful device is legal error.

### D. The Board's Reliance on Economic Concerns for the Dockser-MacMillan-Tong Combination Was Erroneous.

Apart from its unsupported "fundamental" feature finding, the Board also said POSAs would not have pursued the customized Dockser-MacMillan-Tong combination for the same "cost" rationale it cited against Dockser-MacMillan. Appx82; Appx166-167; Appx254. For the reasons discussed *supra* Sections I.A-C, that rationale is flawed.

In assessing the customized Dockser-MacMillan-Tong combination, the Board made one additional finding in purported support of its "cost" rationale. The Board said that a "customized implementation" necessarily "would add complexity," and thus POSAs would not have pursued the combination because the added customization would go against MacMillan's "cost objectives." Appx82; Appx166-167; Appx254. But the Board cited ***no facts*** to support its conclusion that customization necessarily adds any appreciable amount of complexity, much less the "significant complexity" MacMillan says can make devices more costly. Appx1499 (5:42-44).

In fact, Mr. Goodin explained (with citations to corroborating evidence) that customized implementations were common for embedded systems and that

customization typically reduces the size of the customized component. Appx5136-5137 (¶ 62) (citing Appx5464, Appx5468; Appx5920 (1:23-26); Appx5478; Appx5488); Appx8058-8059; Appx9837-9838. Therefore, if Dr. Khatri and the Board are correct that smaller devices are less expensive to manufacture (*supra* pp. 44-46), then even if Google's customized implementation added some unknown amount of "complexity," it also reduced the size of Dockser's FPPs and thus saved manufacturing costs thereby achieving MacMillan's "cost objective." In other words, MacMillan's "cost objective" (if relevant) weighs ***in favor of*** Google's customized implementation.

***

When the record on the customized Dockser-MacMillan-Tong combination is viewed as a whole—such that full-precision capability is understood not to be fundamental to Dockser and Tong—and the correct legal framework is applied—in which financial costs alone cannot defeat obviousness and an obvious combination need not be the most preferred combination—the Board's finding of no motivation to combine cannot stand.

## III. THE COURT SHOULD REVERSE; REMAND IS UNNECESSARY.

If the Court finds the Board erred in concluding that POSAs would not have had motivation to pursue the customized Dockser-MacMillan-Tong combination, then remand is unnecessary because there are no outstanding issues that the Board

needs to resolve for that combination. *Corning v. Fast Felt Corp.*, 873 F.3d 896, 901-03 (Fed. Cir. 2017) (reversing where there was "only one permissible factual finding"); *Intel Corp.*, 2022 WL 880681 at *4-5 (reversing motivation-to-combine finding and holding claims unpatentable).

Singular may argue remand is needed to address secondary considerations and/or Singular's contention that the customized Dockser-MacMillan-Tong combination does not disclose one limitation of certain challenged "greater-than-one" claims, but the record forecloses the need for remand.

### A.    There Are No Unresolved Secondary Consideration Arguments for the Board to Assess.

Singular introduced evidence of alleged objective indicia of non-obviousness. Appx4635-4660; Appx7836-7862; Appx9614-9640. The Board said that because POSAs lacked motivation to pursue the Dockser-MacMillan and Dockser-MacMillan-Tong combinations, "we need not assess objective indicia of nonobviousness with respect to [the "greater-than one" claims]." Appx36 n.4; Appx124 n.3; Appx209 n.3. But the Board *did* assess that same evidence with respect to the "at-least-one" LPHDR execution unit claims. Appx35-51; Appx123-139; Appx209-225. According to the Board, Singular's secondary-considerations evidence for the "at-least-one" claims was fatally deficient; those same deficiencies necessarily apply to the "greater-than-one" claims too.

***Copying and Commercial Success***.  The Board found Singular's copying and commercial-success evidence was not probative because, *inter alia*, Singular did not "even attempt to demonstrate" that Google's products met the challenged claims' "X and Y percentage [error] limitations."  Appx49-50; Appx137-138; Appx223-224.  Instead, Singular relied on ***Google***'s analysis for ***Dockser***, but never explained "how the cited analysis" of Dockser applies to Google's products.  Appx49-50; Appx137-138; Appx223-224.  This failure applies to both sets of claims, and therefore Singular necessarily cannot demonstrate that a nexus (presumed or otherwise) exists between Google's products and the "greater-than-one" claims.

Likewise, the Board found that even if a nexus existed, Singular's commercial-success evidence—a *PCMag India* article—was "too speculative" and related to ***other*** Google products, not the ones that Singular said practiced the claims.  Appx50-51; Appx138-139; Appx224.  Again, this finding applies equally to the "greater-than-one" claims.

***Industry Skepticism***.  The Board rejected Singular's industry-skepticism evidence because it related to whether low-precision operations "would be commercially valuable" and did "not show skepticism as to whether or how a problem could be solved or whether such applications would *work*."  Appx39 (emphasis original); Appx127; Appx213.  This reasoning applies to the "greater-than-one" claims too.

***Industry Praise***.  The Board rejected Singular's industry-praise evidence as "too ambiguous and high-level."  Appx42; Appx130; Appx215.  For example, Singular relied on e-mails to Singular's inventor that the Board agreed were "merely cordial statements," not "evidence of industry praising" Singular's invention.  Appx42; Appx130; Appx215.  Likewise, Singular relied on its inventor's notes of his "subjective recollection" from a meeting, but the notes "do[] not mention any specific ideas or features that allegedly were praised, or why or for what they were being praised.'"  Appx41; Appx129; Appx214-215.  The Board's reasoning applies to both sets of claims.

***Unexpected Results***.  The Board rejected Singular's unexpected-results evidence because it "does not establish a difference between the alleged results," *i.e.*, alleged positive test results at low precision, "and the closest prior art," *i.e.*, Dockser and Tong, each of which achieved similar results.  Appx42-43; Appx130-132; Appx216-217.  As the Board explained, Singular compared its purported invention to a "CPU without any reduced precision capability."  Appx43; Appx131; Appx217.  This apples-to-oranges comparison between a full-precision-only CPU and a low-precision processor is equally inapt for the "greater-than-one" LPHDR execution unit claims.

Thus, although the Board said it did not address Singular's objective-indicia evidence with respect to the "greater-than-one" claims, the analysis the Board ***did***

*perform* forecloses any argument from Singular that the objective indicia defeat obviousness for those claims. Remand to address Singular's secondary-considerations evidence is unwarranted.

### B. Singular's Remaining Argument Against the Customized Dockser-MacMillan-Tong Combination Lacks Support.

Certain "greater-than-one" claims in the '961 and '156 patents recite a "computing device adapted to control the operation of" the LPHDR execution units. Appx288-289 (claim 3, but not claim 23); Appx317 (claims 3-8). Similarly, claim 59 of the '273 patent (and only that claim) recites a "digital processor adapted to control the operation of" the LPHDR execution units. Appx348.

For the Dockser-MacMillan-based combinations (including the customized Dockser-MacMillan-Tong combination), Google explained that MacMillan's host CPU met the claimed "computing device" or "digital processor" because it controls initiation of the processing performed by the processing elements (PEs) containing Dockser's FPPs, *i.e.*, the claimed LPHDR execution units. Appx715-716; Appx6420-6421; Appx8393-8394. In response, Singular argued the CPU does not control Dockser's FPPs because a SIMD controller (an intermediary component instructed by the CPU) controls them. Appx4624-4626; Appx7825-7827; Appx9604-9605. In other words, Singular argued the claims were limited to some form of ***direct*** control.

The Board did not address Singular's argument, but the record supports only one conclusion: MacMillan's host CPU meets the claimed "computing device" or "digital processor." Contrary to Singular's narrow interpretation, the claims' plain language does not limit them to **direct** control and the specification provides no basis for construing them so narrowly. Indeed, Singular's Figure 1 embodiment includes a host device that controls operation of the LPHDR units by instructing an intermediate control unit—just like MacMillan's host CPU does in Dockser-MacMillan-Tong. Appx277 (8:10-29, 8:59-63); Appx5115-5116 (¶ 37) Appx8037-8038; Appx9816-9817. Singular's interpretation thus violates a cardinal principle of claim construction by excluding an embodiment. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008).

After Google demonstrated the flaws in Singular's interpretation of the relevant claims (Appx5052-5054; Appx7974-7976; Appx9753-9755), Singular never raised this argument at the oral hearing. There is no need to remand these cases for the Board to address a facially flawed claim construction argument. The Dockser-MacMillan-Tong combination unquestionably discloses the claimed "computing device" or "digital processor" when those terms are afforded their plain meaning in view of the specification.

**CONCLUSION**

The Court should reverse the Board's finding that Google had not proven the challenged claims obvious in view of Google's customized Dockser-MacMillan-Tong combination.

Alternatively, the Court should vacate and remand with instructions to the Board that Google has met its burden to show a motivation to combine (i) Dockser with MacMillan and (ii) Dockser with MacMillan and Tong.

Respectfully submitted,

Date: September 21, 2022

*/s/ Nathan R. Speed*

Nathan R. Speed
WOLF GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 646-8000
Fax: (617) 646-8646

*Counsel for Appellant Google LLC*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page(s)**

Final Written Decision, IPR2021-00155,
Paper No. 62 (May 11, 2022)........................................................ Appx1-88

Final Written Decision, IPR2021-00165,
Paper No. 62 (May 11, 2022).................................................... Appx89-173

Final Written Decision, IPR2021-00179,
Paper No. 62 (May 11, 2022)................................................. Appx174-260

U.S. Patent No. 10,416,961 (Exhibit 1001).......................... Appx261-290

U.S. Patent No. 9,218,156 (Exhibit 1001)............................ Appx291-319

U.S. Patent No. 8,407,273 (Exhibit 1001)............................ Appx320-348

PUBLIC VERSION

Trials@uspto.gov                                                                    Paper 57
571-272-7822                                                              Date: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

————————————

IPR2021-00155
Patent 10,416,961 B2

————————————

Before JUSTIN T. ARBES, STACEY G. WHITE, and JASON M. REPKO,
*Administrative Patent Judges.*

PER CURIAM.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*
Granting Patent Owner's and Petitioner's Motions to Seal
*37 C.F.R. §§ 42.14, 42.54*

PUBLIC VERSION

IPR2021-00155
Patent 10,416,961 B2

# I.   INTRODUCTION

## A.   Background and Summary

Petitioner Google LLC filed a Petition (Paper 2, "Pet.") requesting
*inter partes* review of claims 1–5, 10, 13, 14, 21, and 23–25 of U.S. Patent
No. 10,416,961 B2 (Ex. 1001, "the '961 patent") pursuant to 35 U.S.C.
§ 311(a).  On May 12, 2021, we instituted an *inter partes* review as to all
challenged claims on all grounds of unpatentability asserted in the Petition.
Paper 16 ("Decision on Institution" or "Dec. on Inst.").  Patent Owner
Singular Computing LLC subsequently filed a Patent Owner Response
(Paper 28, "PO Resp."), Petitioner filed a Reply (Paper 34, "Reply"), and
Patent Owner filed a Sur-Reply (Paper 38, "Sur-Reply").  Patent Owner filed
a Motion to Exclude (Paper 46, "Mot.") certain evidence submitted by
Petitioner, to which Petitioner filed an Opposition (Paper 47, "Opp.") and
Patent Owner filed a Reply (Paper 49, "Mot. Reply").  An oral hearing was
held on February 11, 2022, and transcripts of the hearing are included in the
record (Paper 55, "Conf. Tr."; Paper 56, "Public Tr.").  The parties also filed
Motions to Seal (Papers 52 and 54) portions of their demonstrative exhibits
containing confidential information.

We have jurisdiction under 35 U.S.C. § 6.  This Final Written
Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that
follow, we determine that Petitioner has shown by a preponderance of the
evidence that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable,
but has not shown by a preponderance of the evidence that claims 3 and 23
are unpatentable.

IPR2021-00155
Patent 10,416,961 B2

## B.  Related Matters

According to the parties, the '961 patent has been asserted in *Singular Computing LLC v. Google LLC*, No. 1:19-cv-12551-FDS (D. Mass.).  *See* Pet. xi; Paper 6, 1 (Mandatory Notices).

Petitioner filed another petition challenging the '961 patent in IPR2021-00154, which was denied.  *See* Pet. x; Paper 6, 1.  The parties also identify the following *inter partes* reviews as related: IPR2021-00164 (denied) and IPR2021-00165 (instituted) challenging U.S. Patent No. 9,218,156 B2; and IPR2021-00178 (denied) and IPR2021-00179 (instituted) challenging U.S. Patent No. 8,407,273 B2.  *See* Pet. xi; Paper 6, 1.

## C.  The '961 Patent

The '961 patent, entitled "Processing with Compact Arithmetic Processing Element," issued on September 17, 2019.  Ex. 1001, code 45. The '961 patent relates to "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)."  *Id.* at col. 5, ll. 58–62.

According to the '961 patent, conventional CPU chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications.  *Id.* at col. 2, l. 62–col. 3, l. 10.  For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations."  *Id.* at col. 3, ll. 3–10.  According to the '961 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor,

3

IPR2021-00155
Patent 10,416,961 B2

from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors." *Id.* at col. 3, ll. 11–17. But "[c]urrent architectures for general purpose computing fail to deliver this power." *Id.* at col. 3, ll. 16–17.

The '961 patent is therefore "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at col. 1, l. 66–col. 2, l. 15. According to the '961 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at col. 2, ll. 16–19. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at col. 2, ll. 23–27. Figure 6, reproduced below "is an example design for an LPHDR arithmetic unit according to one embodiment" of the '961 patent. Ex. 1001, 2:44–45.



IPR2021-00155
Patent 10,416,961 B2

FIG. 6 provides "an example design for an LPHDR arithmetic unit according to one embodiment of" the '961 patent. Ex. 1001, 2:44–45.

As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces output 602c. *Id.* at col. 12, ll. 55–56. The LPHDR arithmetic unit "is controlled by control signals 412*a-d*, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602*a-b*." *Id.* at col. 12, ll. 62–65. According to the '961 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602*a-b* by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at col. 12, l. 65–col. 13, l. 1. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at col. 13, ll. 5–14. The '961 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at col. 13, ll. 12–14.

According to the '961 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at col. 17, ll. 30–33. The '961 patent provides, as examples, applications including "finding nearest neighbors," *id.* at col. 17, l. 41–col. 21, l. 43, "distance weighted scoring," *id.* at 21:45–22:35, and "removing motion blur in images," *id.* at col. 22, l. 37–col. 23, l. 48.

### D. Claims

Of the claims challenged by Petitioner, claims 1, 10, and 21 are independent. Claim 1 is reproduced below.

IPR2021-00155
Patent 10,416,961 B2

> 1. A device comprising:
>
> at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,
>
> wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and
>
> at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

Ex. 1001, col. 30, ll. 17–37.

### E.  Evidence

The pending grounds of unpatentability in the instant *inter partes* review are based on the following prior art:

> U.S. Patent No. 5,689,677, issued Nov. 18, 1997 (Ex. 1009, "MacMillan");
>
> U.S. Patent Application Publication No. 2007/0203967 A1, published Aug. 30, 2007 (Ex. 1007, "Dockser"); and
>
> Jonathan Ying Fai Tong, David Nagle, & Rob A. Rutenbar, "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, vol. 8, no. 3 (June 2000) (Ex. 1008, "Tong").

Petitioner filed a declaration from Richard Goodin, P.E. (Ex. 1003, "Goodin Decl.") with its Petition and a reply declaration from Mr. Goodin (Ex. 1071)

IPR2021-00155
Patent 10,416,961 B2

with its Reply. Patent Owner filed declarations from Sunil P. Khatri, Ph.D. (Ex. 2051, "Khatri Decl.") and Joseph Bates, Ph.D. (Ex. 2052) with its Response. Also submitted as evidence are transcripts of the depositions of Mr. Goodin (Ex. 2043) and Dr. Khatri (Ex. 1072).

## F.  Asserted Grounds

This *inter partes* review involves the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4, 5, 10, 13, 14 | 103(a)[1] | Dockser |
| 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | 103(a) | Dockser, Tong |
| 1–5, 10, 13, 14 | 103(a) | Dockser, MacMillan |
| 1–5, 10, 13, 14, 21, 23–25 | 103(a) | Dockser, Tong, MacMillan |

## II.  ANALYSIS

### A.  Level of Ordinary Skill in the Art

In determining the level of ordinary skill in the art for a challenged patent, we look to "1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654,

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Here, Petitioner's challenges are based on the pre-AIA version of 35 U.S.C. § 103.

IPR2021-00155
Patent 10,416,961 B2

666–67 (Fed. Cir. 2000).  "Not all such factors may be present in every case, and one or more of them may predominate."  *Id.*

Petitioner asserts that at the time of the earliest possible effective filing date of the '961 patent (June 19, 2009), a person of ordinary skill in the art would have had "at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture."  Pet. 9 (citing Goodin Decl. ¶ 43).  Patent Owner's proposed definition of the level of ordinary skill in the art is the same other than it removes the phrases "or the equivalent" and "at least."  PO Resp. 14 (citing Khatri Decl. ¶¶ 36–37).  There is little difference between the parties' proposed definitions, and the parties and their experts do not explain the basis for their proposals.  Arguably, however, the term "at least" creates unnecessary ambiguity.  Based on the full record developed during trial, including our review of the '961 patent and the types of problems and solutions described in the '961 patent and cited prior art, we determine that a person of ordinary skill in the art would have had a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and two years of academic or industry experience in computer architecture.  *See, e.g.*, Ex. 1001, col. 1, l. 15–62 (describing in the "Background" section of the '961 patent various conventional methods of computation and their alleged deficiencies).  We apply that definition for purposes of this Decision.

IPR2021-00155
Patent 10,416,961 B2

### B. Claim Interpretation

We need only construe terms that are in controversy and only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

Claim 1 recites, in part, "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Ex. 1001, col. 30, ll. 18–22. Independent claims 10 and 21 recite similar limitations. *See id.* at col. 31, ll. 27–31 (claim 10); col. 32, ll. 43–47 (claim 21).

At issue here is the meaning of "low precision high dynamic range (LPHDR) execution unit," as recited in claims 1, 10, and 21. Specifically, we need to resolve the question of whether this execution unit must be adapted to execute arithmetic operations *only* at low precision. For the reasons that follow, we determine that it does not.

Petitioner argues that, in the prior art used in all challenges, Dockser's floating-point processor (FPP), including the floating-point operator (FPO) inside the FPP, is low precision "because 'the precision' of operations in the FPP is 'reduced' . . . , and because it operates with the minimum imprecision" recited in the claim. Pet. 15 (citing Goodin Decl. ¶¶ 208–209; Ex. 1001, col. 26, l. 61–col. 28, l. 8; Ex. 1035, 8). Petitioner asserts that, in the claim, the minimum imprecision is found in the limitation that it calls *1B2*:

> for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit

IPR2021-00155
Patent 10,416,961 B2

> executing the first operation on that input differs by at least
> Y=0.2% from the result of an exact mathematical calculation of
> the first operation on the numerical values of that same input.

Ex. 1001, col. 31, ll. 34–43. According to Petitioner, the '961 patent characterizes degrees of precision described in language mirroring *1B2* as "low precision." Pet. 15 (citing Ex. 1001, col. 26, l. 61–col. 28, l. 8). Petitioner argues that the execution units in the prior art fall within the scope of the recited unit if they perform reduced precision operations and at least one, but not necessarily all, of those operations meets the other requirements of claim 1. *See, e.g.*, *id.* at 32 (explaining that "numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision"); Reply 2–3 (discussing the "low precision" requirement).

Patent Owner argues that the LPHDR execution unit should be construed as "an execution unit that executes arithmetic operations *only* at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below." PO Resp. 15 (emphasis added). We emphasize "only" because Patent Owner argues the recited LPHDR execution unit "necessarily excludes full-precision or mixed full and low precision units." *Id.* at 16 (citing Khatri Decl. ¶ 60).

In support of its proposed construction, Patent Owner asserts that construing the LPHDR execution unit as encompassing full or mixed precision units would "impermissibly read out 'low precision high dynamic range' and render the limitation meaningless." *Id.* (citing *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022–23 (Fed. Cir. 2020)); *see*

*also id.* at 17 (arguing Petitioner's construction reads "'low precision' out of the claims entirely").

Based on the totality of the record, we agree with Petitioner that the recited LPHDR execution unit does not exclude mixed full and low precision execution units (i.e., those that are capable of arithmetic operations at both levels of precision). *See, e.g.*, Pet. 15, 32. We reject Patent Owner's argument that interpreting the claim in this way renders the term "low precision" "meaningless." PO Resp. 15–16. Rather, the term "low precision" imposes the requirement that the unit must *at least* perform arithmetic operations at low precision, which would exclude units that operate only at full precision, for example. Thus, we disagree with Patent Owner and assign little weight to the Khatri Declaration on this issue. *See id.* at 15–17; Khatri Decl. ¶¶ 60–61.

As stated in our Decision to Institute, the recitation of "a first operation" in claim 1 requires only one or more first operations that meet the low precision criteria specified in the claim. Dec. on Inst. 18. The claims do not require that "every" operation must be low precision or exclude the LPHDR execution unit from having other capabilities for other operations. *Id.* Indeed, Patent Owner agrees that "a claim's recitation of an 'execution unit adapted to execute a first operation' would normally not preclude that execution unit from performing other types of operations." PO Resp. 17. Patent Owner, though, argues that this "rule does not apply when the specification teaches otherwise, as is the situation here." *Id.* at 17–18. We disagree.

Patent Owner relies on exemplary non-limiting embodiments from the '961 patent. *See id.* at 18. Specifically, Patent Owner argues that "the claimed LPHDR execution units are smaller and have fewer transistors" than

IPR2021-00155
Patent 10,416,961 B2

prior art full precision execution units. *Id.* (citing Khatri Decl. ¶ 62). But the cited passage pertains only to exemplary embodiments and says that the "amount of resources" is small, with transistors being only one example of such resources:

> For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a *small amount of resources (e.g., transistors or volume)* compared with traditional architectures.

Ex. 1001, 8:1–5 (emphasis added). In fact, some embodiments do not even require transistors: "Examples of such technologies include . . . other technologies whether based on transistors or not . . . ." Ex. 1001, col. 26, ll. 27–42, *cited in* Reply 6.

The reference to the "small amount of resources" in the cited passage (Ex. 1001, col. 8, ll. 1–5) is consistent with Petitioner's construction that the LPHDR execution unit need only perform low precision operations some of the time because the record shows that doing so would save power and other computational resources. For example, Dr. Khatri testified that "exact computing . . . takes up a lot of resources, takes up a lot of power, takes up a lot of area, and takes up a lot of delay." Ex. 1072 ("Deposition of Sunil P. Khatri"), 47:2–5. Mr. Goodin explained that reducing precision may achieve power savings. *See, e.g.*, Ex. 2043 ("Deposition of Richard M. Goodin"), 34:21–35:4; *see also id.* at 31:2–32:1 (discussing how selectable precision may achieve savings). The Goodin Declaration cites specific examples of how this is achieved. *See, e.g.*, Goodin Decl. ¶¶ 31–33 (citing Ex. 1008, 273, 277–279); ¶ 35 (citing Ex. 1007 ¶¶ 3–7). Thus, we disagree with Patent Owner's argument about reducing transistors and assign little

weight to the Khatri Declaration on this issue.  *See* PO Resp. 18; Khatri
Decl. ¶ 62.

Also, we agree with Petitioner that the degree of low precision is
described in limitation *1B2* in claim 1 and similar limitations in the other
claims.  Pet. 15.  The language used in *1B2* is consistent with how the patent
describes low precision.  Ex. 1001, col. 26, l. 61–col. 28, l. 8, *cited in*
Pet. 15.  For example, the patent states, "[t]he degree of precision of a 'low
precision, high dynamic range' arithmetic element may vary from
implementation to implementation."  *Id.* at col. 26, ll. 61–63.  The patent
then lists several examples.  *Id.* at col. 26, l. 61–col. 28, l. 8.  In one
example, "a LPHDR arithmetic element may produce results which are
sometimes (or all of the time) no closer than 0.2% to the correct result."
*Id.* at col. 27, ll. 7–10.  Similarly, the claims recite, "the numerical values
represented by the first output signal of the LPHDR unit executing the first
operation on that input differs by at least Y=0.2% from the result of an exact
mathematical calculation of the first operation on the numerical values of
that same input." *Id.* at col. 30, ll. 29–34 (claim 1); col. 31, ll. 38–43 (claim
10); col. 32, ll. 54–59 (claim 21).

Patent Owner agrees that the claims provide the parameters of the low
precision and high dynamic range in the limitations "wherein the dynamic
range . . ." and "for at least X=10% . . . ."  PO Resp. 16.  Indeed, Patent
Owner in the related district court case argued that the subsequent claim
language specifying percentages "*defines* the term 'low precision'" and
"specifies the degree of precision that an LPHDR execution unit must have
in order to satisfy the 'low precision' . . . limitation of the claim."  Ex. 1065,
9 (emphasis added); *see also* Ex. 1066, 12 (arguing that "'low precision high
dynamic range' is defined in [the] claim itself"); Reply 2.  Patent Owner,

however, argues that those limitations "do not allow for the execution unit to have full precision (or [low] dynamic range) capability." PO Resp. 16.

But the claims do not recite that every operation must meet these criteria. Rather, the claims only recite that the criteria apply to "a first operation." Ex. 1001, col. 30, ll. 23–34. This reading is consistent with the examples of LPHDR elements from the written description. *See* Ex. 1001, col. 26, l. 61–col. 28, l. 8, *cited in* Pet. 15. In those examples, the LPHDR arithmetic elements may produce results that are only "sometimes" no closer than the percentage to the correct result. *See id.* Thus, we agree with Patent Owner's argument that the claims provide the parameters for the term "low precision," but we disagree that the parameters must apply to every operation. *See* PO Resp. 16. For the same reasons, we assign little weight to the Khatri Declaration on this issue. *See* Khatri Decl. ¶¶ 60–64.

Patent Owner also argues that "small size and low transistor count . . . is what allows a much larger number of LPHDR execution units to operate in parallel on a single chip." PO Resp. 19. But the requirement of a "much larger number" is not in the independent claims. Nor do the claims (or Patent Owner's proposed construction) include any limitations on size of the LPHDR execution unit or its transistor count. And "not every benefit flowing from an invention is a claim limitation." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010). Even so, the specification states that some embodiments are not based on transistors. *See, e.g.*, Ex. 1001, col. 26, ll. 27–42. So we find no support in the written description for Patent Owner's argument about small size and low transistor count. *See* PO Resp. 19. For the same reasons, we assign little weight to the Khatri Declaration on this issue. *See* Khatri Decl. ¶¶ 63–64.

IPR2021-00155
Patent 10,416,961 B2

We also agree with Petitioner that the written description does not support Patent Owner's assertion that the patent contrasts LPHDR execution units with other units that operate in both high and low precision. PO Resp. 19, 23 (citing Ex. 1001, 5:23–33); Reply 7 (discussing Patent Owner's argument). The relevant part of the patent describes a graphics processor that supports 16-bit and 32-bit floating point formats:

> When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

Ex. 1001, col. 5, ll. 23–33. This paragraph does not define the term "low precision." *Id.* Nor does the patent explain how the 16-bit units meet the claimed requirements for low precision units that are recited in the claim. *See id.* Also, there is no discussion of these units in the part of the written description that lists examples of low precision units. *See id.* at col. 26, ll. 61–col. 28, ll. 8. Thus, we disagree with Patent Owner that the patent contrasts LHPDR units with those that operate in both high and low precision. PO Resp. 19, 23. For the same reasons, we assign little weight to the Khatri Declaration on this issue. *See* Khatri Decl. ¶¶ 63–64.

To the contrary, we agree with Petitioner that the patent discloses at least one embodiment that performs operations other than LPHDR computations:

> [W]hile the obvious method of using the above [logarithmic number system (LNS)] operations is to do LPHDR

IPR2021-00155
Patent 10,416,961 B2

> arithmetic, the programmer also may consider selected values to
> be 12 bit two's complement binary numbers. MUL and DIV may
> be used to add and subtract such values . . . . *So besides doing
> LPHDR computations*, this digital embodiment using LNS can
> perform simple binary arithmetic on short signed integers.

Ex. 1001, col. 14, ll. 12–22 (emphasis added), *quoted in* Reply 4. Because

the unit performs arithmetic operations other than those at low precision, this

example contradicts Patent Owner's argument that an LPHDR execution

unit is "an execution unit that executes arithmetic operations *only* at low

precision." PO Resp. 15 (emphasis added).

Patent Owner counters, "as Dr. Khatri explained, one of skill in the art

would not apply the terms 'precision' or 'dynamic range' to integers." Sur-

Reply 4 (citing Ex. 1072, 116:5–118:3). In Patent Owner's view, a person

of ordinary skill in the art "would understand that [Patent Owner]'s proposed

construction would *not* exclude execution units that can perform integer

operations, like the LNS embodiment described in the patent specification."

*Id.* at 4–5. Yet Patent Owner's proposed construction makes no distinction

between integer or floating-point operations. PO Resp. 15. Rather, the

construction refers to "arithmetic operations," generally. *See id.*

In its Sur-Reply, Patent Owner proposes an alternative construction—

for the first time in this proceeding—that further defines "arithmetic

operations" to be "*floating-point* arithmetic operations." Sur-Reply 5

(emphasis added). But a sur-reply must only respond to arguments raised in

the preceding brief. Patent Trial and Appeal Board, *Consolidated Trial

Practice Guide* 73–74 (Nov. 2019) ("TPG").[2] Under 37 C.F.R. § 42.23(b),

"respond" does not mean proceed in a new direction with a new approach.

---

[2] https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf

IPR2021-00155
Patent 10,416,961 B2

*See id.* at 74. "[A] sur-reply that raises a new issue or belatedly presents evidence may not be considered." *Id.* So, apart from noting that we do not see any reason to limit the LPHDR execution unit to only low precision operations—regardless of how those operations are defined—for the reasons discussed above, we do not further consider this new claim construction presented for the first time in the Sur-Reply. *See* Sur-Reply 5.

In sum, we agree with Petitioner that the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that are capable of performing operations at low and full precision, and the degree of "low precision" is defined in limitation *1B2*. *See, e.g.*, Pet. 15, 32; Reply 2–3. To determine the patentability of the challenged claims, we need not further construe LPHDR execution unit. *See Nidec*, 868 F.3d at 1017.

## C. *Legal Standards*

To prevail in its challenges to the patentability of claims 1–5, 10, 13, 14, 21, and 23–25 of the '961 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). This burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("Where, as here, the only question presented is whether due consideration of the four *Graham* factors renders a claim or claims obvious, no burden shifts from the patent challenger to the patentee.").

IPR2021-00155
Patent 10,416,961 B2

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a) (2006)). The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Additionally, objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Id.* When conducting an obviousness analysis, we consider a prior art reference "not only for what it expressly teaches, but also for what it fairly suggests." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (citation omitted).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to

IPR2021-00155
Patent 10,416,961 B2

combine the elements in the way the claimed new invention does"). Also, "[t]hough less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016).

"Although the *KSR* test is flexible, the Board 'must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention.'" *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (citation omitted). Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *accord In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (stating that "conclusory statements" amount to an "insufficient articulation[] of motivation to combine"; "instead, the finding must be supported by a 'reasoned explanation'" (citation omitted)); *Magnum Oil*, 829 F.3d at 1380 ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness.").

### D. Obviousness Ground Based on Dockser (Claims 1, 2, 4, 5, 10, 13, and 14)

Petitioner contends that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable over Dockser under 35 U.S.C. § 103(a). Pet. 45–56.

IPR2021-00155
Patent 10,416,961 B2

### 1. Dockser

Dockser discloses performing floating-point operations with a floating-point processor having "selectable subprecision." Ex. 1007, code (57), ¶¶ 15, 17. "A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa. To find the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent. The sign is applied to the resultant value." *Id.* ¶ 1. "The precision of the floating-point processor is defined by the number of bits used to represent the mantissa. The more bits in the mantissa, the greater the precision." *Id.* ¶ 2. "The precision of [a] floating-point processor generally depends on the particular application. For example, the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa." *Id.* "Higher precision results in a higher accuracy, but commonly results in increased power consumption." *Id.* Dockser explains that the performance of floating-point operations also can be computationally inefficient because "[w]hile some applications may require [high] types of precision, other applications may not." *Id.* ¶ 3. For example, "some graphics applications may only require a 16-bit mantissa," such that "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," but other applications may require "greater precision." *Id.* Accordingly, there was "a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable." *Id.*

Figure 1 of Dockser is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



FIG. 1

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

Figure 2 of Dockser is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



FIG. 2

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if

IPR2021-00155
Patent 10,416,961 B2

each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits). Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively. Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3B depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31.

IPR2021-00155
Patent 10,416,961 B2

A partial product 420-i is generated for every bit in multiplier 404 at corresponding stage 410-i and then left-shifted "as a function of the multiplier bit with which it is associated, after which the operation moves on to the next stage." *Id.* ¶ 31.  The partial products are eventually added together to generate output value 430.  *Id.*  "[P]ower may be removed from the logic used to implement the stages to the right of the line 405" indicating the selected subprecision.  *Id.* ¶¶ 32–33.

### 2.   *Claim 1*

Petitioner explains in detail how Dockser teaches or suggests every limitation of claim 1, relying on the testimony of Mr. Goodin as support. *See* Pet. 10–39; Goodin Decl. ¶¶ 183–200.

Claim 1 recites, in part, "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value."  Ex. 1001, 30:18–22.

Petitioner asserts that Dockser's floating-point processor (FPP) is a "low precision high dynamic range (LPHDR) execution unit."[3]  Pet. 13–15. According to the Petition, Dockser's FPP is in a computing system "as part of the main processor or as a coprocessor."  *Id.* at 13 (citing Ex. 1007 ¶¶ 1, 15, 35–36).  Petitioner asserts that the computing system is the claimed

---

[3] Petitioner also provides an "alternative mapping" where "the floating-point operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit. Pet. 14–15, 19, 38.  We need not evaluate those arguments because we determine that Petitioner has made a sufficient showing that the FPP is an LPHDR execution unit.

IPR2021-00155
Patent 10,416,961 B2

"device" comprising the FPP.  *Id.* (citing Goodin Decl. ¶¶ 196–197).  We agree.  Our reasoning follows.

### a)   *"high dynamic range"*

With respect to the "high dynamic range" aspect of the LPHDR execution unit, the claim requires that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000."  Ex. 1001, 30:23–25.

Petitioner asserts that Dockser's FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '961 patent.  Pet. 15 (citing Ex. 1007 ¶ 17; Ex. 1001, 14:61–15:3).  Petitioner's assertion, which is not disputed by Patent Owner, is adequately supported by the record.

For example, Dockser's register location 200 stores a 32-bit binary floating-point number, in an IEEE-754 32-bit single format, with 8-bit exponent 204.  Ex. 1007 ¶¶ 2, 17, *cited in* Pet. 20.  According to the Goodin Declaration, the dynamic range of normal IEEE-754 operands would be from around $2^{-126}$, which is much smaller than 1/65,000, to around $2^{127}$, which is much larger than 65,000.  Goodin Decl. ¶ 232, *cited in* Pet. 20.  We credit the Goodin Declaration on this point because it is consistent with Dockser.  *See id.*; Ex. 1007 ¶¶ 2, 16–17, 24.  Thus, Petitioner has shown Dockser's FPP meets the dynamic-range limitation recited in claim 1.

### b)   *"a first operation"*

Claim 1 recites that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to

IPR2021-00155
Patent 10,416,961 B2

produce a first output signal representing a second numerical value."
Ex. 1001, 30:18–22.

Petitioner argues that Dockser's FPP is adapted to execute a "first operation" (e.g., "reduced-precision multiplication") on a "first input signal representing a first numerical value" (i.e., input electrical signal representing an operand received at the registers) to produce a "first output signal representing a second numerical value" (i.e., output electrical signal representing an operand sent to a register and then main memory). Pet. 19.

Patent Owner does not present an argument to specifically address this argument and evidence. *See* PO Resp.; Sur-Reply.

Based on our review of the totality of the evidence in this case, we agree that Dockser's FPP is adapted to execute the recited first operation. Dockser's FPP receives the operands as input values. Ex. 1007, Fig. 1. Dockser's FPP performs operations on the inputs via the FPP's data paths 134–139 and components 140–144. *Id.*, Fig. 1. We agree with Petitioner that Dockser teaches that the operand data to the FPP is a "first input signal representing a first numerical value" because it represents the operand number. *Id.* ¶ 17. The FPP executes the operation and produces an output value, or output number, which is represented by output bits. *Id.* ¶ 34. In this way, that value is the recited "second numerical value." *See* Pet. 18. We credit the Goodin Declaration on this point. Goodin ¶¶ 223-226.

We also credit the Goodin Declaration's analysis showing that Dockser's computing circuits "move" data between components, such as from memory to processor, via electrical signals. *See* Goodin Decl. ¶ 220 (citing Ex. 1014, col. 1, ll. 36–37). On this issue, the record provides adequate support for the Goodin Declaration. *See* Ex. 1007 ¶¶ 16–17; Ex.

IPR2021-00155
Patent 10,416,961 B2

1014, col. 1, ll. 36–37.  Thus, Petitioner has shown that signals represent the recited values.

Considering all the arguments and evidence in this case, Petitioner has sufficiently shown that Dockser teaches that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value," as recited in claim 1.  Pet. 15–20.

c)    *"low precision"*

As for the "low precision" aspect of the LPHDR execution unit, Patent Owner argues that Dockser's FPP is not an LPHDR execution unit because the FPP is capable of both low and full precision operations.  *See* PO. Resp. 15, 21–24.  We disagree with Patent Owner's argument and underlying construction for the reasons discussed in Section II.B.  Instead, we agree with Petitioner that (1) the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that perform operations at low and full precision, and (2) the degree of "low precision" required by the claim is in limitation *1B2*.  *See, e.g.*, Pet. 15, 32; Reply 2–3.

d)    *Limitation 1B2*

Under the interpretation discussed in Section II.B, Petitioner has shown that Dockser teaches the recited LPHDR execution unit.  In particular, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP "operates with the minimum imprecision" required by limitation *1B2*.  Pet. 15 (quoting Ex. 1007 ¶ 14).  Limitation *1B2* recites,

IPR2021-00155
Patent 10,416,961 B2

for at least X=10% of the possible valid inputs to the first
operation, the *statistical mean*, over repeated execution of the
first operation on each specific input from the at least X % of the
possible valid inputs to the first operation, of the numerical
values represented by the first output signal of the LPHDR unit
executing the first operation on that input differs by at least
Y=0.2% from the result of an *exact mathematical calculation* of
the first operation on the numerical values of that same input.

Ex. 1001, col. 30, ll. 24–34 (emphasis added). We first analyze the

"statistical mean" limitation before turning to the "exact mathematical

calculation" limitation.


### (1) "Statistical Mean"

Petitioner argues that a person of ordinary skill in the art would have

understood the "statistical mean" limitation

in the context of the '961 patent's stated intent to claim not only
"repeatable" deterministic embodiments like digital circuits that
always produce the same output when repeating an operation on
the same input, but also analog embodiments that are
non-deterministic because they "introduce noise into their
computations, so the computations are not repeatable."

Pet. 22 (quoting Ex. 1001, 3:63–4:2).

In Petitioner's view, for "non-deterministic embodiments," the

statistical mean would be the average of "the different outputs produced by

the same operation on the same input." *Id.* Petitioner argues that, for

"deterministic digital embodiments" like Dockser, the statistical mean is

"the same as the numerical value of the first output signal for any individual

execution of the first operation on each specific input, because that output is

always the same for any specific input." *Id.* at 23. In Petitioner's view,

repeatedly executing a multiplication operation using Dockser's floating-

point multiplier "on the same input (*i.e.*, pair of operands) with the same

IPR2021-00155
Patent 10,416,961 B2

precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.*

Patent Owner does not dispute this reasoning. *See* PO Resp.; Sur-Reply.

Based on the totality of the evidence, Petitioner's analysis of "deterministic digital embodiments" to address the "statistical mean" limitation is adequately supported by the record. Pet. 22–23. We are persuaded by Petitioner's reasoning that the '961 patent's written description has both analog and digital embodiments. *See, e.g.*, Ex. 1001, col. 3, l. 63–col. 4, l. 2; col. 14, l. 23–col. 15, l. 3; col. 17, ll. 22–26. Dockser uses "a conventional floating-point multiplier." Ex. 1007 ¶ 20. Petitioner adequately supports its assertion that this is a deterministic digital circuit. Pet. 23 (citing Goodin Decl. ¶ 241; Ex. 1011, col. 1, ll. 40–42). And we credit the Goodin Declaration that, in such a digital circuit, a floating-point multiplier operating on the same input with the same precision level yields the same result for every execution, and thus, the statistical mean is the same as the output for any single execution. Goodin Decl. ¶ 240, *cited in* Pet. 23.

*(2)   "exact mathematical calculation"*

As for the "exact mathematical calculation" limitation, Petitioner argues that because Dockser performs a reduced precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation: "the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied without reducing precision." Pet. 24 (emphasis omitted) (citing Goodin Decl. ¶ 244; Appendix I.B).

IPR2021-00155
Patent 10,416,961 B2

### (3)  Y Relative Error for X Valid Inputs

According to the Petition, "Dockser discloses two precision-reducing techniques that can be used separately or together."  Pet. 26 (citing Ex. 1007 ¶¶ 4–7; Goodin Decl. ¶¶ 255–261).  One technique removes power from storage elements in the FPP registers that correspond to the excess, dropped mantissa bits, which drops bits from the operands.  *Id.*  The other technique removes elements from the multiplier logic that computes the product of the operand mantissas.  *Id.*  Petitioner asserts that both techniques individually and in combination teach limitation *1B2*.

We determine that Petitioner has made a sufficient showing that Dockser meets the recited requirements for low precision under the register bit-dropping rationale.  Patent Owner does not present arguments specific to this technique.  *See* PO Resp.; Sur-Reply.  We need not evaluate Petitioner's alternative rationale based on the multiplier logic.  Our reasoning follows.

### (4)  Register Bit-Dropping

Petitioner explains how Dockser teaches that "for at least X=10% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.2%" from the result of the exact mathematical calculation.  Pet. 24–39.  In Petitioner's view, the "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception)."  *Id.* at 25.  Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs.  *Id.*

IPR2021-00155
Patent 10,416,961 B2

We agree.  Dockser retains only some of the bits of a mantissa fraction.  In one example, nine most-significant bits of the mantissa fraction are retained, and the other 14 excess bits are dropped.  Ex. 1007 ¶¶ 25–28, *cited in* Pet. 25; Goodin Decl. ¶ 254.  The outputs of Dockser's unpowered storage elements are tied to zero voltage.  Goodin Decl. ¶ 269; Ex. 1007 ¶¶ 26 (discussing removing power from the register elements for the excess bits), 29 (discussing "unpowered bits").  With support from the Goodin Declaration and corroborating evidence, Petitioner shows that tying the outputs of the unpowered storage elements for the 14 "excess" bits to zero voltage would make those bits zeroes.  Pet. 29–30 (citing Goodin Decl. ¶¶ 269–71).

Multiplying two operands with excess bits dropped (representing zero) reduces the output's precision.  Ex. 1007 ¶¶ 24–26.  Petitioner provides a representative example from the Goodin Declaration:

> the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.37871718406677246609375) would become 01100000100000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 01000100110111000001000 (representing a mantissa of 1.26898288726806640625) would become 01000100100000000000000 (representing a mantissa of 1.267578125).

Pet. 30 (citing Goodin Decl. ¶ 273).  So the decrease in precision depends on the number of mantissa bits dropped.  *See id.*; *see also* Goodin Decl. ¶ 278.  And we agree with Petitioner that Dockser suggests that any desired number of mantissa bits can be dropped.  Pet. 32.  For example, Dockser describes how the precision is selectable.  *See* Ex. 1007 ¶¶ 14–15, 17 (describing selectable reduced precision), *discussed in* Pet. 5.

IPR2021-00155
Patent 10,416,961 B2

Petitioner asserts that Dockser's register bit-dropping technique meets limitation *1B2* in two ways. Pet. 27–38. First, Petitioner presents results of a software demonstration to show that Dockser's 9 mantissa bits meets limitation *1B2*. *Id.* at 32. Second, Petitioner uses a pencil-and-paper algebraic analysis to show that retaining 7 mantissa bits meets limitation *1B2*. *Id.* at 33.

As for the software demonstration, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), a [person of ordinary skill in the art] would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 32. Petitioner states that Mr. Goodin wrote a program to perform reduced precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.2% relative error for 14.6% of possible valid inputs (greater than X=10%)." *Id.* at 33, 66–68 (citing Goodin Decl. ¶¶ 412–426, 464–469).

Patent Owner did not rebut this argument and evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's assertions about recited X and Y percentages, and we credit the Goodin Declaration on this issue, which is supported by the record. *See* Goodin Decl. ¶¶ 412–426. In particular, Mr. Goodin summarizes the results of the software program in the table below.

IPR2021-00155
Patent 10,416,961 B2

| Retained Fraction Bits | Claimed Y% | Percentage of Tested Pairs Meeting Claimed Y% | Adjusted "Dockser's X%" |
|---|---|---|---|
| 9 | ≥ .2% | 14.674747% | ≥ 14.59791% |
| 5 | ≥ .2% | 99.547206% | ≥ 99.02600% |

The table shows the percentage of tested pairs that meet the claimed Y percentage as output by the software program. Goodin Decl. ¶ 423. It also shows a "Dockser's X" percentage, which is adjusted to exclude possible overflow and underflow pairs, that meets the claimed requirements. *Id.* The X value is calculated by multiplying the percentage output by the software program by an adjustment ratio. *Id.* The adjustment ratio is described in Appendix I.D of the Goodin Declaration. *Id.* The Goodin Declaration also explains that, if "the 'exact mathematical calculation' of multiplication of two single-format floating-point operands is the product rounded or truncated to single format (having a 23-bit-fraction mantissa), the claims are still met." *Id.* ¶ 426. To show this, Mr. Goodin wrote an alternative version of the program under this assumption, which also gives results that meet the claim limitations. *Id.* After review of the arguments and evidence on these issues, we credit the Goodin Declaration's software-based analysis. *Id.* ¶¶ 412–426.

As for the algebraic analysis, Petitioner argues that a person of ordinary skill in the art "would also have understood algebraically that Dockser's register bit-dropping technique meets [the limitation] when performed at certain selected precision levels, by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." Pet. 33. Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as

IPR2021-00155
Patent 10,416,961 B2

their eighth and ninth fraction bits," such that retaining only 7 mantissa bits of operands would result in "*every* input in that 12% produc[ing] at *minimum* 0.39% relative error." *Id.* at 33, 68–72 (citing Goodin Decl. ¶¶ 427–444).

Patent Owner did not rebut this argument and evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's algebraic method showing recited X and Y percentages and credit the Goodin Declaration on this issue. *See* Goodin Decl. ¶¶ 427–444. Under this reasoning, for the 12.5% of all possible $M_4$ mantissa values with zero in the first fraction bit and ones in the $(K + 1)^{th}$ and $(K + 2)^{th}$ fraction bits, the following inequality holds when Dockser's register bit-dropping truncates the operands to K fraction bits:

$$Y \geq \frac{\left(2^{-(K+1)} + 2^{-(K+2)}\right)}{(1.5 - 2^{-23})} \times 100\% \qquad \textbf{\textit{(Equation C)}}$$

*Id.* ¶ 442. The table below shows the results of evaluating Equation C with K=7 and K=5 retained fraction bits as the selected precision level. *Id.*

| Retained Fraction Bits (K) | X% | Y% |
|---|---|---|
| 7 | ≥ 12% | ≥ 0.3906% |
| 5 | ≥ 12% | ≥ 1.5625% |

The table above shows that both values of K meet the '961 patent's claimed minimum X and Y. *Id.* ¶ 444. After review of the arguments and evidence on these issues, we credit the Goodin Declaration's algebraic analysis. *Id.* ¶¶ 427–444.

IPR2021-00155
Patent 10,416,961 B2

*e)    "control the operation"*

Lastly, claim 1 recites, "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit." Petitioner asserts that Dockser's main processor meets the computing device limitation.  Pet. 39.

Patent Owner does not provide evidence or argument specific to this limitation.

We agree with Petitioner because Dockser's processor writes subprecision select bits to the FPP's control register, and in at least this way, Dockser's main processor is adapted to control the FPP's operation by specifying its precision level.  *See* Ex. 1007 ¶¶ 15, 18, 25, 35.  We credit the Goodin Declaration on this issue, which is supported by the evidence of record.  *See* Goodin Decl. ¶ 310.

*f)    Objective Indicia of Nonobviousness*

In addition to its argument based on the interpretation of "low precision high dynamic range (LPHDR) execution unit," Patent Owner argues that objective indicia of nonobviousness demonstrate that the challenged claims would not have been obvious to a person of ordinary skill in the art.  PO Resp. 47–72.  Because the parties largely refer to the challenged claims collectively in their arguments regarding objective indicia of nonobviousness, we do so as well and now address those arguments as applied to all of the claims challenged as obvious over Dockser alone or the combination of Dockser and Tong, i.e., claims 1, 2, 4, 5, 10, 13, 14, 21, 24,

IPR2021-00155
Patent 10,416,961 B2

and 25, which we refer to as the "Dockser/Tong-challenged claims."[4]  *See id.*; Reply 19–30; Sur-Reply 18–25.

"In order to accord substantial weight to [objective indicia] in an obviousness analysis, the evidence of [objective indicia] must have a nexus to the claims, *i.e.*, there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (citations and internal quotation marks omitted).  "The patentee bears the burden of showing that a nexus exists." *Id.*  "To determine whether the patentee has met that burden, we consider the correspondence between the objective evidence and the claim scope." *Id.*  A patentee is entitled to a rebuttable presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (citation omitted).  Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021).  "As part of the presumption analysis, the fact finder must consider the unclaimed features of the stated products to determine their level of significance and their impact on the correspondence between

---

[4] As explained below, we determine that Petitioner has not proven that certain claims are unpatentable over the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, because Petitioner has not sufficiently shown a reason to combine with MacMillan.  *See infra* Sections II.F, II.G.  Accordingly, we need not assess objective indicia of nonobviousness with respect to those claims.  *See Mylan Pharms. Inc. v. Res. Corp. Techs., Inc.*, 914 F.3d 1366, 1376 (Fed. Cir. 2019) ("Because we agree with the Board that Appellants failed to establish a motivation to modify compound 3I, we need not reach Appellants' arguments regarding objective indicia.").

IPR2021-00155
Patent 10,416,961 B2

the claim and the products." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1418 (Fed. Cir. 2022). When, "for example, the patented invention is only a small component of the product tied to the objective evidence, there is no presumption of nexus." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333 (Fed. Cir. 2019). Absent a presumption of nexus, a patent owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (citation omitted).

"Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011). On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016). A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* at 1330. Ultimately, the fact finder must weigh the objective indicia of nonobviousness presented in the context of whether the claimed invention as a whole would have been obvious to an ordinarily skilled artisan. *Id.* at 1331–32; *Lectrosonics, Inc. v Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential).

Material Subject to Protective Order Has Been Redacted

IPR2021-00155
Patent 10,416,961 B2

### (1) *Industry Skepticism*

"If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors [nonobviousness].  Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the claimed invention."  *WBIP*, 829 F.3d at 1335.  As evidence of alleged industry skepticism, Patent Owner points to various statements made by employees of Petitioner after meeting with Dr. Bates, the inventor of the '961 patent, in 2010.  PO Resp. 48–52.  According to Patent Owner, Dr. Bates explained that floating point units programmed to perform ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ *Id.* at 49–52 (citing Exs. 2009, 2027, 2028, 2030).  Patent Owner contends that the cited statements from Petitioner's employees "express skepticism about utility of the low-precision arithmetic performed by the large numbers of low-precision execution units,"[5] which is a "key feature" of the challenged claims, and have a nexus to the challenged

---

[5] Claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by only a single LPHDR execution unit.  The only challenged claims of the '961 patent that arguably require a "large number[]" of LPHDR execution units are challenged in Petitioner's asserted grounds based on combinations with MacMillan.  *See* PO Resp. 52.  For example, claims 3 and 23 recite "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to . . . ."  Ex. 1001, col. 30, ll. 43–48 (claim 3); col. 32, ll. 62–65 (claim 23).

Material Subject to Protective Order Has Been Redacted

IPR2021-00155
Patent 10,416,961 B2

claims because they were made in response to Dr. Bates's presentations. *Id.* at 52.

Petitioner argues that Patent Owner's evidence is irrelevant because it is dated after the earliest possible effective filing date of the '961 patent (June 19, 2009). Reply 22. We disagree that evidence of industry skepticism must itself be dated before the relevant invention. *See WBIP*, 829 F.3d at 1335–36 (considering evidence of skepticism dated after the invention of the patent at issue); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (same); Sur-Reply 19–20.

We have reviewed the substance of the statements cited by Patent Owner, though, and are not persuaded that they are probative of nonobviousness. The statements by Petitioner's engineers relate to whether applications using "approximate" arithmetic would be commercially valuable; they do not show skepticism as to whether or how a problem could be solved or whether such applications would *work*. *See WBIP*, 829 F.3d at 1335. For example, Tom Dean stated that



Ex. 2009, 1 (emphasis added).

Ex. 2029, 1 (emphasis added).

IPR2021-00155
Patent 10,416,961 B2



Ex. 2028, 1 (emphasis added).

Ex. 2030, 2. Thus, the cited comments appear to indicate that floating point units performing "approximate" arithmetic would only be commercially valuable for a limited set of applications, rather than expressing skepticism as to whether such applications would work. Patent Owner also has not explained sufficiently why the fact that "approximate" arithmetic was considered useful for some applications but not others, amounts to industry skepticism over the claimed invention as a whole, which is not limited to a particular application. We find that Patent Owner's evidence of alleged industry skepticism does not weigh in favor of nonobviousness of the claims challenged under the Dockser-Tong combination.

### (2) Industry Praise

"Evidence that the industry praised a claimed invention or a product which embodies the patent claims weighs against an assertion that the same claim would have been obvious. Industry participants, especially competitors, are not likely to praise an obvious advance over the known art." *WBIP*, 829 F.3d at 1334. Patent Owner points to four statements of alleged industry praise from "leading figures in computer science" and argues that they have a nexus to the Dockser/Tong-challenged claims because they relate to Dr. Bates and his presentations to Petitioner in 2010, 2011, and 2013. PO Resp. 52–53.

IPR2021-00155
Patent 10,416,961 B2

Patent Owner cites Dr. Bates's notes from ███████████
███████████████████████████████████████████
███████████████████ *See id.* at 52; Ex. 2050. This single
line in the notes does not mention any specific ideas or features that
allegedly were praised, or why or for what they were being praised. Patent
Owner argues that there is "no requirement that praise identify exactly the
features being praised." Sur-Reply 20. But evidence of industry praise must
be for "the claimed invention," and the notes only state that ████████
███████████████ *See* Ex. 2050; *Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc); *WBIP*, 829 F.3d at 1334.
The notes also have less probative value because they were written by
Dr. Bates based on his subjective recollection of Mr. Dean's reaction at the
meeting, rather than, for example, being prepared by a third party or Mr.
Dean himself. Ex. 2052 ¶ 7.

Patent Owner also cites three 2011 emails sent by employees of
Petitioner to Dr. Bates. PO Resp. 52–53. Andrew Ng wrote the following to
Dr. Bates:



Ex. 2033, 1. Astro Teller wrote that ████████████████████
█████████████████████ and Johnny Chen wrote, ███████████
██████████████████████████████ *See*

IPR2021-00155
Patent 10,416,961 B2

Exs. 2031, 2032. We view these emails as more consistent with Petitioner's view as "merely cordial statements made to Dr. Bates," rather than evidence of industry praising the inventions of the Dockser/Tong-challenged claims as Patent Owner contends. *See* Reply 24. Further, they are statements by employees of Petitioner only (not any other industry participant or industry group) and do not mention any specific ideas or features from Dr. Bates's presentations that were being praised. We find that Patent Owner's evidence of alleged industry praise is too ambiguous and high-level to be probative of nonobviousness.

### (3) *Unexpected Results*

"To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Meyers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014). Also, "[w]hen assessing unexpected properties, . . . we must evaluate the significance and 'kind' of expected results along with the unexpected results." *Id.* As evidence of alleged unexpected results, Patent Owner points to a September 2013 presentation that Dr. Bates gave to Petitioner showing

███████████████████████████████████████

████████████████████ PO Resp. 53–57 (citing Ex. 2005). Patent Owner argues that the unexpected nature of the results is "confirmed by skepticism expressed by" David Patterson, Ph.D. (an employee of Petitioner and "acclaimed expert in the field of computer science and computer architecture" according to Patent Owner), and "further supported by Dockser

IPR2021-00155
Patent 10,416,961 B2

and Tong," which teach that higher precision is "generally" needed.  *Id.* at 56–57 (citing Ex. 1003 ¶¶ 124–125; Ex. 1007 ¶ 3; Ex. 1008, 280; Ex. 2012).

The cited evidence, however, does not establish a difference between the alleged results and the closest prior art.  Dr. Bates's presentation includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2005, 11; *see* PO Resp. 55. In this case, however, the closest prior art is Dockser and Tong, both of which teach reduced precision arithmetic and, importantly, show that high performance with reduced precision was *expected* for certain applications. *See* Reply 25; Ex. 1007 ¶ 3 ("[F]or certain applications, . . . a reduced precision, may be acceptable, and for other applications, . . . a greater precision may be needed."); Ex. 1008, 273 ("[M]any programs which manipulate human sensory inputs, e.g., speech and image recognition, suffer no loss of accuracy with reduced bitwidth in the mantissa or exponent.")." Patent Owner contends that Dockser and Tong are not appropriate for comparison because they do not "provide computing scale results" and have an "entirely different focus on power savings."  Sur-Reply 21.  We disagree. As explained above, we find that Dockser teaches the claim 1 LPHDR execution unit performing the recited reduced precision arithmetic.  *See supra* Sections II.D.2.a)–e).  Patent Owner's only comparison, however, is to a CPU without any reduced precision capability.  *See* PO Resp. 55.  We find that Patent Owner's evidence of alleged unexpected results does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims because it does not establish a difference between the results and the closest prior art and does not establish that such a difference would have been unexpected by a person of ordinary skill in the art.

IPR2021-00155
Patent 10,416,961 B2

### (4) Copying and Commercial Success

"Copying may . . . be another form of flattering praise for inventive features," as "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336 (citation omitted). Copying "requires evidence of efforts to replicate a specific product." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). "This may be demonstrated either through internal documents; direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica; or access to, and substantial similarity to, the patented product (as opposed to the patent)." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (internal citations omitted). However, "a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000); *see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[M]ore than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue." (citation omitted)).

Commercial success is typically shown with evidence of "significant sales in a relevant market." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (citation omitted). "When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

IPR2021-00155
Patent 10,416,961 B2

Patent Owner argues that after Dr. Bates made his presentations to Petitioner in 2010–2014, Petitioner copied Dr. Bates's invention in its Tensor Processing Unit (TPU) v2 and v3 products released in 2017–2018, which "use execution units designed to perform operations using a low-precision 'floating point format called bfloat16' in order to achieve increased parallelism and scale." PO Resp. 57–58 (citing Ex. 2010; Ex. 2011, 9; Ex. 2034, 6; Khatri Decl. ¶¶ 126–127). The bfloat16 format "keep[s] the same 8 bit exponent as found in 32-bit IEEE floating point" but "reduces precision significantly by using only a 7-bit mantissa, as opposed to the 23-bit mantissa of IEEE 32-bit floating point." *Id.* at 58 (citing Ex. 2041, 2). According to Patent Owner, Petitioner uses the TPUv2 and TPUv3 products to "power all of its major products and services, including Search, Translate, Photos, Assistant, and Gmail," saving Petitioner "at least $10 billion." *Id.* at 61–62 (citing Exs. 2011, 2015–18, 2040). Patent Owner argues that a nexus is presumed because the TPUv2 and TPUv3 products are coextensive with claims 1–5, 10, and 13–14. *Id.* at 59, 62–72. Patent Owner further contends that, even if not presumed, a nexus is shown by "internal communications among [Petitioner's] own engineers and executives" and Petitioner's communications with Dr. Bates. *Id.* at 59–61 (citing Exs. 2007, 2014, 2035–2039, 2042, 2047, 2048).

We have reviewed the cited evidence and do not find it probative of nonobviousness. First, we are not persuaded that a nexus should be presumed because the TPU products are coextensive with the Dockser/Tong-challenged claims, as Patent Owner contends. Petitioner and Mr. Goodin identify a number of other allegedly material features of the products that are not part of the Dockser/Tong-challenged claims: "Inter-Core Interconnect" (ICI), "Systolic array," "Two TensorCores per chip," "High-bandwidth

IPR2021-00155
Patent 10,416,961 B2

memory," "Liquid cooling," and "Accelerated Linear Algebra compiler."
*See* Reply 26; Ex. 1071 ¶¶ 85–92.  We focus on the first two features in
particular because the evidence of record characterizes them as significant.

Regarding the ICI of the TPU products, Dr. Patterson stated the
following:

> So the *critical feature* of the supercomputer is the way
> they talk to each other – you know, the chips talk to each other.
> So what's called – [Petitioner] invented something called ICI.
> It's a custom Inter-Core Interconnect that they did custom for
> this design; it's not some standard that you buy off the shelf.
> It runs at about 500 gigabits per section in both directions per
> link, and there's four of those links.

Ex. 2012, 14:17–24 (emphasis added).  An article authored by Dr. Patterson
and others[6] states that "[t]he *critical architecture feature* of a modern
supercomputer is how its chips communicate: what is the speed of a link;
what is the interconnect topology; does it have centralized versus distributed
switches; and so on," and the TPUv2 product has "four custom Inter-Core
Interconnect (ICI) links, each running at 496Gbits/s per direction."
Ex. 2016, 69; *see id.* at 70, 72, Fig. 2 (showing that ICI is part of the TPUv3
product as well); Ex. 1071 ¶ 87.

Regarding the systolic array architecture of the TPU products,
Dr. Patterson stated as follows:

> This systolic array idea brought back from the past that
> probably *cut the energy costs in half* for the multiplier, which is
> a lot of it.  And then it was domain-specific.  So a lot of the things
> that are complicated and area consuming on CPUs like branch

---

[6] We disagree with Patent Owner that the materials cited herein are merely
"marketing documents."  *See* Conf. Tr. 13:18–24.  Dr. Patterson's comments
are from an audio transcription of a YouTube video filed by Patent Owner
(Ex. 2012), and the article is from the publication *Communications of the
ACM* (Ex. 2016).  *See* PO Resp. ix.

IPR2021-00155
Patent 10,416,961 B2

> predictors and caches – CPUs are covered with caches – they're
> not there because they're not helpful for this application. It was
> better to use more multiple units and dedicated memory units.
> So that *saves energy* and you could reuse the resources. So that
> was a *big success*.

Ex. 2012, 9:9–18 (emphasis added). He also agreed with an article
comparing the TPU to graphics processing units (GPUs) stating that "GPUs
incur high overhead in performance, area, and energy due to heavy
multithreading," whereas "[t]he systolic organization of TPUs captures the
data reuse while being simple by avoiding multithreading." *Id.* at
33:20–34:2. The article authored by Dr. Patterson and others includes
similar statements. Ex. 2016, 70 ("The TPUv2 node of the supercomputer
followed the main ideas of TPUv1: A large two-dimensional matrix multiply
unit (MXU) *using a systolic array to reduce area and energy* plus large,
software-controlled on-chip memories instead of caches." (emphasis
added)), 74 (quoting the earlier article stating that the "systolic organization"
of the TPU captures data reuse "while being simple by avoiding
multithreading"); *see* Ex. 1071 ¶ 88.

Patent Owner contends that Petitioner fails to show that the "features
are so critical that the TPUs are not 'essentially the invention.'" Sur-Reply
21. We are not persuaded. Petitioner does more than merely identify
unclaimed features of the TPU products. Petitioner cites evidence,
supported by the testimony of Mr. Goodin, showing that at least the ICI and
systolic array architecture materially affect the TPU products' performance
and were viewed as critical, successful features that were reasons for the
TPU products' improved performance. *See Fox Factory*, 944 F.3d at 1374
("[I]f the unclaimed features amount to nothing more than additional
insignificant features, presuming nexus may nevertheless be appropriate."),

1375–76 (noting that the challenged patent and the patent owner's "marketing materials confirm that the forwardly protruding tooth tips, hook features, and mud clearing recesses each materially impacts the functioning of a chainring," such that "[f]or each of these features that the Board confirms is included in the [allegedly coextensive] chainrings, nexus can only be presumed between the . . . chainrings and a patent claim if the claim includes limitations relating to these features"). Patent Owner does not point to any evidence indicating that view to be factually incorrect. *See* Ex. 1072, 147:15–149:2 (Dr. Khatri opining that "the TPUs have the features that . . . are in these claims" and stating that he has no opinion "about what the TPUs . . . might have in addition"). We find that a presumption of nexus is inappropriate with respect to the TPU products.

Regardless of whether a presumption of nexus applies, we are not persuaded that Patent Owner has made a sufficient showing of nexus for two reasons. First, Patent Owner's nexus arguments are premised on the TPUv2 and TPUv3 products' "low-precision" bfloat16 floating point format having an 8-bit exponent and 7-bit mantissa. PO Resp. 57–58 (arguing that Petitioner copied Dr. Bates's invention by implementing "execution units designed to perform operations using" the bfloat16 format), 62 (arguing commercial success due to the bfloat16 format using "low-precision multipliers"). But "[l]ow-precision arithmetic—including LPHDR multiplication—was not novel" and thus cannot be the basis for a finding of nexus. *See* Reply 20; *Kao*, 639 F.3d at 1068; *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."). Tong taught such a format nine years before the '961 patent. Tong describes two different experiments emulating "different bitwidth FP units": one that

IPR2021-00155
Patent 10,416,961 B2

"implements the IEEE-754 standard" and then varies the mantissa bitwidth
(shown in Figure 6), and another that "implements the IEEE-754 standard"
and then varies the exponent bitwidth (shown in Figure 7). Ex. 1008, 278–
279. Thus, we agree with Mr. Goodin that a person of ordinary skill in the
art "would have understood that Tong's Figure 6 . . . discloses a floating-
point format with an 8-bit exponent (which is the exponent size of single-
precision floating-point in the IEEE standard) . . . and a 7-bit mantissa." *See*
Ex. 1071 ¶ 74 (citing Ex. 1008, 274, 278–279; Ex. 1003 ¶ 330). Tong
discloses that the 8-bit exponent/7-bit mantissa format produced useful
results for both a "neural network trainer" application (ALVINN) and a
"speech recognition program" (Sphinx III). *See* Ex. 1008, 278–279;
Ex. 1071 ¶ 75. Notably, these applications mirror Dr. Bates's 2013
presentation discussing ███████████████████████████" *See*
Ex. 2005, 12–13.

To be sure, the fact that the 8-bit exponent/7-bit mantissa format was
known in the prior art is not dispositive. *See WBIP*, 829 F.3d at
1330–31. "Commercial success, for example, may be linked to an
individual element or, in other circumstances, it could be linked to the
inventive combination of known elements." *Id.* at 1332. Patent Owner,
however, has not identified and explained a specific combination of
elements (as opposed to just the "low-precision" bfloat16 floating point
format) that could serve as a nexus for the evidence of alleged copying and
commercial success.[7] *See* PO Resp. 57–58, 61–62.

---

[7] To the extent Patent Owner alleges commercial success from Petitioner
"[u]sing hundreds of thousands of these low-precision TPV v2 and v3
devices," we note again that claim 1 recites "at least one" LPHDR execution
unit and thus is satisfied by a single unit. *See* PO Resp. 61.

IPR2021-00155
Patent 10,416,961 B2

Second, when arguing that the TPUv2 and TPUv3 products meet the X and Y percentage limitations of claim 1, Patent Owner points to the bfloat16 floating point format with a 7-bit mantissa and states that Petitioner argues in the Petition (with respect to Dockser) that "utilizing 7 bits of mantissa in multiplication operations resulting in a minimum of 12% of valid floating point 32 inputs producing at least 0.39% relative error compared to the exact mathematical calculation of a full-precision multiplication on those same inputs." PO Resp. 66–67 (citing Pet. 33–34, 72; Khatri Decl. ¶¶ 135–136). Patent Owner does not explain, however, how the cited analysis of how *Dockser* teaches the X and Y percentage limitations applies to the TPUv2 and TPUv3 products. As Petitioner points out, Patent Owner "does not even attempt to demonstrate that [Petitioner's] TPUs perform the same bit-dropping techniques as Dockser." *See* Reply 27. Patent Owner has not established a sufficient nexus between the alleged copying and commercial success of the TPUv2 and TPUv3 products and the Dockser/Tong-challenged claims.

Finally, we note that Patent Owner's evidence of commercial success would be unpersuasive even if Patent Owner had established a nexus. Patent Owner's sole support for the alleged commercial success of the TPUv2 and TPUv3 products is an article in *PCMag India*. *See* PO Resp. 62 (citing Ex. 2017). That article states in relevant part:

> As AI and Machine Learning advanced, [Petitioner] was faced with the proposition of doubling the number of data centers it operates to handle the increased workloads. Building multiple data centers to handle the growing amounts of data sets *could have easily cost the company anything above $10 billion*.
>
> So [Petitioner] decided to take another route by optimizing its current data centers for better efficiency. The search giant in late 2013 decided to produce a custom chip in order to improve

IPR2021-00155
Patent 10,416,961 B2

> cost-performance over the GPUs it had deployed.  Thus *the first
> TPU* was born.

Ex. 2017, 3 (emphasis added).  The above statement as to how much "could

have" been saved is too speculative to reach a conclusion of commercial

success.  *See id.*  It also pertains to Petitioner's "first" TPU, not the TPUv2

and TPUv3 products that use the bfloat16 format.  *See id.*; Ex. 2016, 69

("Quantized arithmetic—8-bit integer instead of 32-bit floating point (FP)—

can work for inference like in TPUv1 but reduced-precision training is an

active research area.").

Accordingly, we find that Patent Owner's evidence of alleged copying

and commercial success does not weigh in favor of nonobviousness of the

Dockser/Tong-challenged claims.

### g)   Conclusion

Based on all the evidence of record, including evidence of objective

indicia of nonobviousness submitted by Patent Owner, we determine that

claim 1 would have been obvious based on Dockser under 35 U.S.C.

§ 103(a).

### 3.   Claim 2

Claim 2 recites, "The device of claim 1, wherein the at least one first

computing device comprises at least one of a central processing unit (CPU),

a graphics processing unit (GPU), a field programmable gate array (FPGA),

a microcode-based processor, a hardware sequencer, and a state machine."

In Petitioner's view, only one of the alternatives recited in claim 2

needs to be met.  Pet. 40.  We agree because claim 2 recites "at least one of,"

which indicates that what follows should be read disjunctively.

IPR2021-00155
Patent 10,416,961 B2

Petitioner asserts that Dockser's "main processor" is a "general-purpose processor" implementable as a "state machine," as recited. *Id.* (citing Ex. 1007 ¶¶ 15, 35).

Patent Owner does not provide arguments specifically directed to this analysis. *See* PO Resp.; Sur-Reply.

We agree with Petitioner because Dockser's FPP can be part of the main processor, and the quoted part of Dockser explains that the FPP is part of a general-purpose processor. Ex. 1007 ¶¶ 15, 35. We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references. *See* Goodin Decl. ¶¶ 312–311. Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claim 2 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### 4. Claim 10

Claim 10 is an independent claim that recites, "A device comprising: a plurality of components comprising: at lease one first" LPHDR execution unit with all the same limitations as the LPHDR execution unit recited in claim 1. Ex. 1001, col. 31, ll. 25–43. That is, claim 10 is similar to claim 1 except that it adds "a plurality of components comprising" and lacks "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit" at the end. *Compare id.* (claim 10), *with id.* at col. 30, ll. 17–37 (claim 1).

According to Petitioner, Dockser's computing system has a plurality of components: a main processor and an FPP. Pet. 41 (citing Goodin Decl. ¶ 313). Petitioner, alternatively, argues that, if claim 10 were

IPR2021-00155
Patent 10,416,961 B2

interpreted to require that a plurality of components be included in a single LPHDR execution unit, Dockser's FPP has multiple components: registers, controller, and FPO, which also has adder and multiplier. *Id.* (citing Goodin Decl. ¶ 314; Ex. 1007 ¶¶ 15, 19–22). Petitioner relies on its analysis of claim 1 to address the remaining limitations, which are also found claim 1. *Id.* (citing Goodin Decl. ¶¶ 315–316).

Apart from its arguments directed to the features recited in claim 1, Patent Owner does not provide arguments specifically directed to this analysis. *See* PO Resp.; Sur-Reply.

We agree with Petitioner that Dockser's computing system has a plurality of components under either interpretation. *See* Pet. 41. Those components are described in the cited parts of Dockser. Ex. 1007 ¶¶ 15, 19–22. We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references. *See* Goodin Decl. ¶¶ 313–314. For the reasons discussed in Section II.D.2, Petitioner has shown that Dockser teaches the features recited in claim 10 that are shared with claim 1.

Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claim 10 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### 5.   *Claims 4 and 13*

Claim 4 recites, "The device of claim 1, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000." Ex. 1001, col. 30, ll. 49–51. Claim 13

IPR2021-00155
Patent 10,416,961 B2

recites a similar limitation but depends from claim 10. *Id.* at col. 31, ll. 52–54.

According to the Petition, "[t]he dynamic range of possible valid inputs to Dockser's operation extends from approximately $2^{-126}$ (much smaller than 1/1,000,000) to approximately $2^{127}$ (much larger than 1,000,000), meeting claims 4 and 13." Pet. 41 (citing Goodin Decl. ¶¶ 317–318; Pet., Section V.B.3 (discussing claim 1)).

Patent Owner does not provide arguments specifically directed to this analysis. *See* PO Resp.; Sur-Reply.

We agree with Petitioner that Dockser's dynamic range meets the recited range. Pet. 41. The dynamic range is determined by the number of exponent bits. *See, e.g.*, Ex. 1015, col. 8, ll. 48–49 ("The dynamic range increases with the number of bits dedicated to the exponent . . . ."), *cited in* Goodin Decl. ¶ 231, Pet. 20. Dockser's FPP operates on IEE-745 numbers with 8-bit exponents. Ex. 1007 ¶¶ 2, 16, 17, 24, *cited in* Pet. 20 (Section V.B.3). Those 8-bit exponents range from -126 to 127, which means that the dynamic range of "normal" IEEE-754 single-format operands is approximately $2^{-126}$ to $2^{127}$." Goodin Decl. ¶ 232.

We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references. *See* Goodin Decl. ¶¶ 232–231, 317–318.

Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claims 4 and 13 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

IPR2021-00155
Patent 10,416,961 B2

### 6. Claims 5 and 14

Claim 5 recites, "The device of claim 1, wherein the first operation is multiplication." Claim 14 recites a similar limitation but depends from claim 10. Petitioner asserts that "Dockser's claimed 'first operation' is reduced-precision 'multiplication.'" Pet. 41 (citing Goodin Decl. ¶¶ 319–321). Patent Owner does not provide arguments specifically directed to this analysis. *See* PO Resp.; Sur-Reply. We agree with Petitioner for the reasons discussed in Section II.D.2, where we analyzed the "first operation" in the context of claim 1.

We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references. Goodin Decl. ¶¶ 319–321.

Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claims 5 and 14 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### E. Obviousness Ground Based on Dockser and Tong (Claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25)

### 1. Tong

Tong is an IEEE journal article entitled "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic." Ex. 1008, 273. Tong teaches reducing power consumption by minimizing the bitwidth representation of floating-point data. *Id.* According to Tong, using a variable bitwidth floating-point unit saves power. *Id.*

IPR2021-00155
Patent 10,416,961 B2

### 2.   Claim 1

Petitioner argues that the subject matter of claim 1 would have been obvious over the combination of Dockser and Tong for reasons similar to those analyzed with respect to Dockser alone. *See* Pet. 42–45.  Additionally, Petitioner asserts that "Tong, like Dockser . . . , confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision." *Id.* at 43 (citing Ex. 1008, 273–278, Goodin Decl. ¶¶ 323–325). Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 44.



Tong's Figure 6, above, is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the horizontal axis. *Id.* at 43–44.  The figure shows this data for five programs:

IPR2021-00155
Patent 10,416,961 B2

ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx III. *Id.* The programs implement different signal-processing tasks. *See, e.g.*, Ex. 1008, 278 (Table IV). ALVINN, for example, is a neural network trainer that uses backpropagation. *Id.* And Sphinx III is a speech-recognition program. *Id.*

Petitioner argues that "Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx [III]) would have motivated a [person of ordinary skill in the art] to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." *Id.* at 45. According to the Petition, one of ordinary skill in the art would have done so "to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision." *Id.* (citing Goodin Decl. ¶ 333). Petitioner also concludes that determining the "optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application" was a matter of routine optimization of a result-effective variable. *Id.* at 46–47.

Patent Owner argues that, because Dockser lacks an LPHDR execution unit and Tong does not remedy that deficiency, the Dockser-Tong combination does not render obvious any challenged claim. PO Resp. 24; Sur-Reply 9. We disagree for the reasons discussed in Section II.D.2 analyzing Petitioner's challenge based on Dockser alone.

Patent Owner further argues that Tong does not teach using only 5 mantissa bits, which means that the Dockser-Tong combination lacks the imprecision required to meet the X and Y values recited in the imprecision limitation. PO Resp. 24. In Patent Owner's view, "Tong teaches that at least 11 mantissa bits are required for consistent performance, even for 'programs dealing with human interfaces [that] process sensory data with

IPR2021-00155
Patent 10,416,961 B2

intrinsically low resolutions.'"  *Id.* at 25 (citing Ex. 1008, 278).  According to Patent Owner, "Petitioner makes no effort to show that arithmetic with the 'required' 11-bit mantissa is an LPHDR operation and meets the X/Y limitations of the claims."  PO Resp. 25.

Yet Patent Owner's argument about an 11-bit mantissa (PO Resp. 24–25) does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP to operate at a "selected precision level" according to Tong (Pet. 45).  Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits."  Pet. 45.  Thus, we disagree with Patent Owner's argument about an 11-bit mantissa.  PO Resp. 24–25; Sur-Reply 9.  For this reason, we do not credit the Khatri Declaration on this point.  Khatri Decl. ¶ 77.

Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. Pet. 46 (citing Goodin Decl. ¶ 335).  Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits.  *Id.* (citing Goodin Decl. ¶ 336).

Petitioner adequately shows that the X and Y limitations are met for the 5-mantissa bit rationale.  Pet. 46.  In particular, Mr. Goodin's software program shows "when retaining 5 mantissa fraction bits in view of Tong, Dockser's register bit-dropping technique produces at least Y=0.2% relative error for 99.03% of possible valid inputs, and Dockser's logic bit-dropping technique produces at least Y=0.2% relative error for 99.44% of possible valid inputs," and the algebraic analysis shows that "Dockser's register bit-dropping technique when retaining 5 mantissa fraction bits produces a minimum of 1.56% relative error (greater than Y=0.2%) for over 12% of

IPR2021-00155
Patent 10,416,961 B2

possible valid inputs (greater than X=10%)."  Goodin Decl. ¶ 335.  After review of the arguments and evidence on these issues, we credit the Goodin Declaration's algebraic analysis and software-based analysis.  *Id.* ¶ 335, Appendix I.B–D.

Although Patent Owner does not present argument specifically directed to Mr. Goodin's software-based or algebraic analysis, Patent Owner argues that one of ordinary skill in the art would not have chosen a 5-bit mantissa: "Tong's experimental results show that using fewer than 11 mantissa bits unacceptably reduces accuracy for the benchmark applications *that were specifically selected* (from a category of programs) for their high tolerance for imprecision."  PO Resp. 25 (citing Khatri Decl. ¶ 78).  To illustrate this point, Patent Owner annotates Tong's Figure 6, reproduced below:



Tong's Figure 6, above, shows the experimental results with color annotations indicating "the precision levels suitable for general-purpose

IPR2021-00155
Patent 10,416,961 B2

operation (green), those at which a significant percentage of applications begin to produce unacceptable results (yellow), and finally, levels of precision that are unsuitable for most testing benchmarks (red)." *Id.* at 26 (citing Khatri Decl. ¶ 79).

Patent Owner argues that there is no motivation to combine Dockser and Tong because "there is no evidence to show that a POSA [person of ordinary skill in the art] would have chosen Tong's 5-bit examples over the 7, 9, or 11-bit examples." *Id.* at 26–27; *see also* Sur-Reply 10. According to Patent Owner, "Tong does not disclose any extra capability that would have motivated a POSA to use it with Dockser." PO Resp. 27 (citing Khatri Decl. ¶¶ 81–82). In Patent Owner's view, Petitioner relies on hindsight to choose 5 bits and does not offer any differences between Dockser and the claimed invention or other non-hindsight motivation to combine with Tong. *Id.* According to Patent Owner, "Tong teaches that 'it appears inevitable that some fraction of our operands will require full IEEE standard precision,'" which means that a person of ordinary skill in the art would not have been motivated to operate only in 5-bit, 7-bit, or 9-bit modes as Petitioner suggests. Sur-Reply 10.

We disagree with Patent Owner's arguments directed to the rationale for using 5 mantissa bits. *See* PO Resp. 25–27; Sur-Reply 10. Petitioner's reasoning for the 5-bit example is "to conserve power when running [certain] applications, or others empirically determined (using Tong's techniques) to not require greater precision." Pet. 45 (citing Goodin Decl. ¶ 333). For example, in the ALVINN and Sphinx III line plots in Tong's Figure 6, Petitioner added a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. *Id.* at 44. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not

IPR2021-00155
Patent 10,416,961 B2

change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Ex. 1008, 278, § V.B.). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption. *Id.* Petitioner characterizes Tong as "[h]aving empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications." *Id.* (citing Ex. 1008, 273, 274, 279, 284).

Petitioner's assertions are adequately supported by the record. We are persuaded by Petitioner's reliance on Tong's Figure 6 to determine how many bits are needed in a particular application. *See* Pet. 44. That is, Petitioner's choice is not arbitrary or solely based on the '961 patent's written description alone. *See* PO Resp. 25–27. Rather, Petitioner's choice of 5-bits is based on Tong's experimental results for *certain* applications. *See* Pet. 44. We emphasize *certain* because Petitioner is not saying that 5-bits is suitable for every application. *See id.* Full precision may be needed some of the time. *See* Ex. 1008, 280, *discussed in* Sur-Reply 10. But, even if Tong teaches that some applications begin to produce unacceptable results below 11-bits, as Patent Owner notes (PO Resp. 25–26), Tong teaches that 5-bits would be enough for certain ones: ALVINN and Sphinx III shown in Tong's Figure 6. Pet. 44.

Patent Owner argues that "Tong lists those two applications amongst a great many other disclosed applications that all require full precision, and that a POSA would therefore not be motivated to configure Dockser to operate with a 5-bit mantissa just to support those two applications given the far larger number of disclosed applications that require full precision." Sur-Reply 9; PO Resp. 24-27.

We disagree with Patent Owner's argument here because the record adequately supports Petitioner's rationale that "[d]etermining the optimum

IPR2021-00155
Patent 10,416,961 B2

range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application" was a matter of routine optimization of a result-effective variable, and Tong, in particular, shows an optimization for a particular program. Pet. 46–47. The record adequately supports Petitioner's reasoning here: Dr. Khatri testified that "exact computing . . . takes up a lot of power." Ex. 1072 ("Deposition of Sunil P. Khatri"), 47:2–5. Mr. Goodin explained that reducing precision may reduce power consumption. *See, e.g.*, Ex. 2043 ("Deposition of Richard M. Goodin"), 34:21–35:4; *see also id.* at 31:2–32:1 (discussing how selectable precision may achieve savings). And we credit the Goodin Declaration's explanation of how Tong achieves this for certain applications. *See, e.g.*, Goodin Decl. ¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 333, 336 (citing Ex. 1008, 278). That is, Petitioner's proposed combination would omit unnecessary bits to reduce waste and power consumption. Pet. 44.

Thus, we disagree with Patent Owner's arguments regarding the combination with Tong. *See* PO Resp. 25–27; Sur-Reply 9–10. For the same reasons, we do not credit the Khatri Declaration on this point. Khatri Decl. ¶¶ 74–82.

For the reasons discussed, we determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the limitations recited in claim 1.

Thus, Petitioner has shown, by a preponderance of the evidence, that claim 1 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a) with a reasonable expectation of success. In coming to this

IPR2021-00155
Patent 10,416,961 B2

conclusion, we also have taken into account the parties' arguments and evidence regarding the objective indicia of nonobviousness. *Supra* Section D.2.f).

### 3.    *Claims 2, 4, 5, 10, 13, and 14*

Petitioner asserts that the subject matter recited in claims 2, 4, 5, 10, 13, and 14 would have been obvious over the combination of Dockser and Tong for reasons similar to those presented in the ground based on Dockser alone. *See* Pet. 45–47. For the reasons discussed in Section II.D.2 analyzing Dockser alone, Petitioner's contentions are supported by the Goodin Declaration and are persuasive. *See id.* Patent Owner does not present arguments specifically directed to the challenge based on the Dockser-Tong challenge to these claims. *See* PO Resp.; Sur-Reply.

To the extent Patent Owner's arguments apply to claims 2, 4, 5, 10, 13, and 14, we disagree with Patent Owner's arguments for the same reasons explained above. *See supra* Sections II.D.2, II.E.2. After reviewing the arguments and evidence on these issues, we agree with Petitioner and credit Mr. Goodin's testimony. Goodin Decl. ¶¶ 322–346. We determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the subject matter recited in claims 2, 4, 5, 10, 13, and 14 with a reasonable expectation of success. Based on all of the evidence of record, including evidence of secondary considerations of nonobviousness submitted by Patent Owner, we determine that the subject matter of claims

IPR2021-00155
Patent 10,416,961 B2

2, 4, 5, 10, 13, and 14 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).  *Supra* Section D.2.f).

### 4.   Claim 21

Claim 21 recites limitations similar to those in claim 1 but as a computer program to emulate a device:

> A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: a plurality of components comprising: at least one first low precision high-dynamic range (LPHDR) execution unit adapted to . . . .

Ex. 1001, col. 32, ll. 37–44.

Petitioner asserts that Tong teaches emulating, in software, different bitwidth FP units to determine application accuracy.  Pet. 47 (citing Ex. 1008, 278).  According to Petitioner, based on this teaching, one of ordinary skill in the art would have been motivated "to emulate the Dockser/Tong device ([Pet.] § VI.B) in software to assess the accuracy of applications running on the device at selected precision levels, and a POSA would have had a reasonable expectation of success in doing so."  *Id.* (citing Goodin Decl. ¶¶ 339–340).

Petitioner asserts that "[w]hen the Dockser/Tong device is 'emulated in software' per Tong's teachings ([Ex. 1008], 278) cited [in Pet.] § VI.A, the conventional and obvious implementation of such 'software' is 'computer program instructions' stored in 'a computer-readable memory' and 'executable by [a] processor' within a 'device' (e.g., a computer) as claimed."  *Id.* at 48 (citing Goodin Decl. ¶ 341; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 13–15).

IPR2021-00155
Patent 10,416,961 B2

For reasons similar to those with respect to claim 1, Petitioner argues that a person of ordinary skill in the art would have been motivated by Tong to use a computer to emulate the combined teachings of Dockser and Tong, "meeting the 'second device' of [21A1]), which comprises a plurality of components including a main processor and Dockser's execution unit (which itself comprises multiple components)." *Id.* (citing Goodin Decl. ¶ 342). Petitioner argues that Tong emulates a device in the same way as the '961 patent does:

> Like the '961 patent's only examples of "emulat[ing] a… device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulates of the reduced-precision arithmetic the device would perform.

*Id.* (citing Ex. 1001, col. 17, ll. 14–28, col. 18, l. 65–col. 19, l. 25; Ex. 1008, 278; Goodin Decl. ¶¶ 343).

Patent Owner does not provide arguments specifically directed to Petitioner's arguments or evidence about claim 21 or software emulation. *See* PO Resp.; Sur-Reply.

After review of the arguments and evidence on these issues, we agree with Petitioner and credit the Goodin Declaration. Goodin Decl. ¶¶ 341, 343.

In particular, the '961 patent describes code written in the C programming language to perform the same arithmetic operations in the same order using the same method as one implemented in hardware. Ex. 1001, col. 18, l. 65–col. 19, l. 25, *cited in* Pet. 48. We agree with Petitioner that Tong similarly uses a computer program to simulate reduced-precision arithmetic that a hardware unit would perform. Pet. 48. For

IPR2021-00155
Patent 10,416,961 B2

example, Tong uses an "FP software emulation package" to simulate reduced-precision arithmetic.  Ex. 1008, 278, *cited in* Pet. 48.

Petitioner's obviousness rationale—i.e., "to assess the accuracy of applications running on the device at selected precision levels"—is adequately supported by the record: Tong explains that the emulation package was used to assess "different mantissa and exponent bitwidths." *See* Pet. 47 (citing Ex. 1008, 278).  Petitioner's assertion that software is computer program instructions stored in a computer-readable memory and executable by a processor within a computing device is adequately supported by at least the Goodin Declaration and the evidence that it cites. Pet. 48 (citing Goodin Decl. ¶ 341; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 13–15).

For the same reasons discussed with respect to claim 1, Petitioner shows the subject matter recited in claim 21 that is also recited in claim 1 would have been obvious over the Dockser-Tong combination.  *See supra* Section II.E.2.

Thus, we determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong.  *See KSR*, 550 U.S. at 418.  Based on the Petition, and taking into account Patent Owner's arguments on objective indicia, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the limitations recited in claim 21.

Accordingly, Petitioner has shown that claim 21 is unpatentable over the Dockser-Tong combination.

IPR2021-00155
Patent 10,416,961 B2

### 5.  *Claims 24 and 25*

Claims 24 and 25 depend from claim 21 but are otherwise identical to claims 4 and 5.  Pet. 49.  Patent Owner does not present arguments specifically directed to these claims.  *See* PO Resp.; Sur-Reply.  For the same reasons discussed with respect to claims 4, 5, and 21, Petitioner has shown that claims 24, and 25 are unpatentable over the Dockser-Tong combination, and we credit the corresponding parts of the Goodin Declaration.  Pet. 47–49; *see* Goodin Decl. ¶¶ 339–346.

### F.  *Obviousness Ground Based on Dockser and MacMillan (Claim 3)*

### 1.  *MacMillan*

MacMillan is entitled "Circuit for Enhancing Performance of a Computer for Personal Use."  Ex. 1009, code (54).  MacMillan discloses using Single Instruction Multiple Data (SIMD) parallel-processing architectures for "adding supercomputer performance to a computer for personal use."  *Id.* at col. 5, ll. 22–54.  MacMillan's computer system comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access memory (SIMD-RAM) devices.  *Id.* at col. 9, ll. 11–19, 30–31, Figs. 2, 3.  Figure 5 of MacMillan is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



FIG. 5

Figure 5 depicts SIMD-RAM device 254 comprising a plurality of
DRAMs 304 coupled to a plurality of processing elements 302 (PE0, PE1,
PE2, etc.) connected to SIMD bus 240. *Id.* at col. 12, ll. 35–43. MacMillan
discloses that "[e]ach PE contains a 32-bit wide data path and can perform
atomic operations on bits, bytes, 16-bit words, and 32-bit words," "each
DRAM 304 is independently addressed by its PE," "[i]nteger and floating
point accelerators could be included in each PE," and "[e]xecution autonomy
is provided, in which specific PEs can be excluded from executing specific
instructions." *Id.* at col. 12, ll. 47–59. MacMillan describes an example
architecture of a system with 256 PEs, but states that the disclosed
architecture "allows scaling to higher or lower density chips with more or
fewer PEs." *Id.* at col. 12, l. 60–col. 13, l. 4, col. 13, ll. 38–41, col. 16,
ll. 20–22.

IPR2021-00155
Patent 10,416,961 B2

### 2. Claim 3

Petitioner contends that claims 1–5, 10, 13, and 14 are unpatentable over Dockser and MacMillan under 35 U.S.C. § 103(a). Pet. 49–55. Of those claims, claims 1 and 10 are independent. Petitioner has shown that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable. *See supra* Section II.D. Given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable over Dockser and MacMillan. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that the "Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims"). Claim 3 is only challenged under this ground and the ground based on Dockser, MacMillan, and Tong. *See infra* Section II.G.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. Thus, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a). Our reasoning follows.

Claim 3 depends from claim 1 and recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (the "exceeds" limitation). Petitioner relies on

IPR2021-00155
Patent 10,416,961 B2

MacMillan for its teachings regarding multiple floating-point execution
units, and argues that a person of ordinary skill in the art "would have been
motivated to use Dockser's FPP to implement each 'floating-point
accelerator' in the parallel PEs of MacMillan's SIMD architecture to
increase performance speed as MacMillan teaches while lowering power
consumption as Dockser teaches."  Pet. 51–52 (citing Goodin Decl.
¶¶ 353–354).  According to Petitioner, "using Dockser's FPP as the
floating-point accelerator in MacMillan's PE would have achieved the
predictable result of enabling the PEs to perform reduced-precision
floating-point arithmetic as taught by Dockser at reduced power."  *Id.* at 52
(citing Goodin Decl. ¶ 354; Ex. 1009, col. 12, ll. 47–49; Ex. 1024, col. 1,
ll. 43–58).  Petitioner further contends that MacMillan's SIMD parallel
processing is used in "the same types of computers for which Dockser's FPP
provides '[p]ower management'" and would be beneficial for the same types
of "'graphics applications' for which Dockser teaches its FPP can
beneficially save power by reducing unnecessary precision."  *Id.* at 51–52
(citing Goodin Decl. ¶¶ 351, 355; Ex. 1007 ¶ 3; Ex. 1009, col. 1, ll. 6–9, col.
5, ll. 22–45, col. 7, ll. 14–34).

   With respect to the "exceeds" limitation in particular, Petitioner
asserts that MacMillan teaches 256 PEs, and the Dockser-MacMillan
combination would have a single Host CPU and at least one FPP in each PE.
*Id.* at 54 (citing Goodin Decl. ¶¶ 372–373).  Petitioner asserts that
MacMillan's example architecture includes 256 PEs and scales to tens of
thousands or more.  *Id.* (citing Ex. 1009, col. 12, l. 60–col. 13, l. 4; col. 13,
ll. 39–41; col. 16, ll. 20–22).  Thus, in Petitioner's proposed combined
device based on Dockser and MacMillan, the number of LPHDR execution
units (Dockser FPPs) "exceeds by over 100 the non-negative integer number

IPR2021-00155
Patent 10,416,961 B2

of Host CPU floating-point execution units." *Id.* (citing Goodin Decl. ¶¶ 372–373).

Patent Owner responds that a person of ordinary skill in the art would not have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner.  PO Resp. 35–36.  Patent Owner argues that "Dockser is focused on the objective of reducing power consumption," whereas "MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption." *Id.* at 35 (citing Ex. 1009, col. 3, ll. 4–6; Khatri Decl. ¶ 102).  Patent Owner further contends that "[i]ncorporating Dockser's FPPs into MacMillan would . . . defeat MacMillan's stated objective of achieving a high-scale SIMD computer architecture at 'lower system cost.'" *Id.* at 36 (citing Ex. 1009, col. 5, ll. 58–59; Khatri Decl. ¶ 103).  According to Patent Owner, "Dockser's FPPs are even *larger* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes," such that "replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore increase costs, while providing no benefit." *Id.* (citing Khatri Decl. ¶ 104); *see also* Sur-Reply 14–15.

Petitioner argues in its Reply that the asserted combination would achieve both benefits of increasing performance speed (based on MacMillan) and lowering power consumption (based on Dockser), and that Patent Owner fails to provide supporting evidence for its argument that incorporating Dockser's FPP into the MacMillan device would increase costs, and even if it had, economic reasons are not indicative of nonobviousness.  Reply 9–10 (citing Ex. 1071 ¶¶ 30–31).

IPR2021-00155
Patent 10,416,961 B2

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser and MacMillan, we agree with Patent Owner. Dockser teaches a single FPP with "selectable subprecision" that is capable of both full precision and reduced precision operations. *See* Ex. 1007, code (57), ¶ 15. The FPP includes additional control circuitry, such as floating-point controller 130 and control register 137, that allows selection of a subprecision for floating-point operations. *Id.* ¶¶ 15, 18, Fig. 1. Dockser describes "a variety of ways" in which "subprecision select bits may be used to reduce the precision of a floating-point operation." *Id.* ¶¶ 18, 23–34. Reduced precision can be achieved, with resultant power savings, either by removing power from "floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" or "removing power to the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 4–7, 26–27. Mr. Goodin agrees that Dockser's FPP requires additional control circuitry to implement its selectable subprecision. Ex. 2043, 43:21–45:9.

MacMillan, by contrast, is heavily focused on avoiding increased costs associated with added complexity. MacMillan states that "[i]f supercomputing performance could be achieved in low cost computers, such as personal computers, this could dramatically expand the market for personal computers." Ex. 1009, col. 1, ll. 21–24. SIMD computing capability can be added to personal computers, "resulting in much higher performance computing at moderate cost." *Id.* at col. 8, ll. 51–55. MacMillan, however, describes numerous limitations of known SIMD designs at the time, many of which relate to increased costs from added complexity (e.g., additional registers), size, etc. *See, e.g.*, *id.* at col. 2,

IPR2021-00155
Patent 10,416,961 B2

ll. 56–61 ("hav[ing] a large register set on each PE . . . increases die area per

PE, resulting in higher costs per PE"), col. 2, ll. 62–65 ("Adding pins can

reduce the PE-to-memory bottleneck, but leads to increased packaging costs.

It may also require tighter geometries or increased numbers of layers on

printed circuits boards, further increasing costs."), col. 3, ll. 1–3 ("Adding

output buffers to drive increased pin counts also increases power dissipation

and hence power supply capacity and cost."), col. 4, ll. 39–40 ("The PE

array[] disk may be limited in size due to technology or cost factors.").

> Importantly, MacMillan states:
>
> Overcoming the above limitations would allow supercomputing performance to be provided in a *low cost* computer system for personal use, dramatically expanding the potential market for systems with supercomputer performance. To meet the cost objectives, the SIMD capabilities *should not add significant complexity to the architecture of a computer system for personal use*. The present invention addresses the above needs.

*Id.* at col. 5, ll. 38–45 (emphasis added). MacMillan's disclosed

architecture—with multiple, less costly PEs operating in parallel to increase

computational power—is expressly intended to account for these limitations.

*See id.* at col. 5, ll. 44–45, col. 5, ll. 58–61 (the disclosed system with

"shared memory results in lower system cost and more flexibility in using

memory"), col. 6, ll. 1–10 ("Another aspect of the invention is that it shows

how parallel SIMD processing can be added inexpensively to existing

system architectures. This cost-effective addition of parallel processing can

be made to popular, low cost computer systems running popular operating

systems . . . ."), col. 6, ll. 41–45, col. 16, ll. 14–27.

In determining how a person of ordinary skill in the art would have

understood those disclosures, we credit the testimony of Dr. Khatri, which is

consistent with, and a logical reading of, Dockser and MacMillan. *See Icon*

IPR2021-00155
Patent 10,416,961 B2

*Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017)
(stating that the Board "is permitted to weigh expert testimony and other
record evidence and, in so doing, rely on certain portions of an expert's
declaration while disregarding others"). Specifically, the circuitry
implementing Dockser's selectable subprecision is beyond that of a typical
full precision execution unit. Dr. Khatri testifies that

> [b]ecause Dockser's execution unit is capable of
> full-precision, and uses conventional arithmetic units, a [person
> of ordinary skill in the art] would understand that it would have
> at least as many transistors and take up at least as much space as
> a conventional full-precision arithmetic unit, even when
> operating in a reduced-precision mode. Indeed, because
> Dockser's execution unit includes additional control circuits for
> selecting reduced-precision modes, a [person of ordinary skill in
> the art] would expect it to be *larger* than a conventional
> full-precision execution unit, making it unsuitable for scaling,
> and therefore unsuitable for use in parallel processing arrays.

*See* Khatri Decl. ¶ 51. Petitioner's asserted combination of incorporating
Dockser's FPP into each of multiple PEs in MacMillan's device "would
require additional circuitry and chip space and would therefore *increase*
costs," "defeat[ing] MacMillan's stated objective of achieving a highly
parallel SIMD computer architecture at 'lower system cost.'" *See id.*
¶¶ 103–104. Again, MacMillan specifically counsels that to achieve its cost
objectives, "SIMD capabilities should not add significant complexity to the
architecture of a computer system for personal use." Ex. 1009, col. 5,
ll. 42–44. The combination proposed by Petitioner would do so.
MacMillan's PEs already perform full precision operations; Dockser's
selectable subprecision circuitry would add complexity beyond that of a
typical full precision execution unit. *See* Khatri Decl. ¶¶ 103–104; Ex. 1009,

IPR2021-00155
Patent 10,416,961 B2

col. 12, ll. 47–49 ("Each PE contains a 32-bit wide data path and can perform atomic operations on . . . 32-bit words.").

A person of ordinary skill in the art, reading MacMillan and understanding its emphasis on avoiding increased costs associated with added complexity and size, would not have been motivated to modify MacMillan's device by incorporating Dockser's FPP into the PEs. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376–77 (Fed. Cir. 2021) (finding insufficient motivation to "increase [a prior art reference's] melt flow rate to the claimed range," in part because the reference "includes numerous examples of processing techniques that are typically used to increase melt flow rate, which [the reference] cautions should *not* be used due to the risk of obtaining a broader molecular weight distribution"); *TriVascular*, 812 F.3d at 1067–69 (finding insufficient motivation to combine two references by "substitut[ing] the recessed barbs of [one reference] with the protuberances of [another reference], since [the petitioner's] proposed substitution would destroy the basic objective of the barbs"); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (finding no reason to modify a prior art device where the modification would render the device "inoperable for its intended purpose"); *see also Henny Penny*, 938 F.3d at 1332 (affirming the Board's finding of no motivation to combine where the Board "credited [the patent owner's] expert's testimony that following [one reference's] method of diverting and cooling the oil in [another reference's] system would introduce 'additional plumbing and complexity'"). Notably, this is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PEs; the evidence shows that doing so would increase costs because of the added complexity and size of

IPR2021-00155
Patent 10,416,961 B2

the FPP—a concern that MacMillan explicitly counsels against.  *See* Sur-Reply 14–15.

Petitioner's position is that the individual benefits of MacMillan's approach (increasing performance speed from many low-cost processors operating in parallel) and Dockser's approach (lowering power consumption using additional circuitry added to a single, more complex processor) would have motivated a person of ordinary skill in the art to combine the references' teachings by incorporating Dockser's FPP into the multiple PEs in MacMillan's device.  *See* Pet. 6, 49–55.  Given the express teachings of MacMillan, however, we are not persuaded that an ordinarily skilled artisan would have been motivated to combine the two different approaches in that manner.  Specifically, MacMillan's repeated statements that its approach is designed to avoid increased costs from added complexity and size (and thereby allow for many low-cost processors in the device) would have dissuaded a person of ordinary skill in the art from doing so.

To the extent Petitioner and Mr. Goodin fault Patent Owner for not providing evidence supporting its position, we are not persuaded.  *See* Reply 9–10; Ex. 1071 ¶¶ 30–31.  Petitioner bears the burden of proving unpatentability by a preponderance of the evidence, which includes proving that a person of ordinary skill in the art would have had reason to combine the prior art references.  *See* 35 U.S.C. § 316(e); *Magnum Oil*, 829 F.3d at 1380.  Moreover, Patent Owner's arguments are supported by evidence. Patent Owner relies on the disclosures of Dockser and MacMillan themselves, expert testimony from Dr. Khatri (which we credit on the issue of reasons to combine Dockser and MacMillan), and cross-examination testimony from Mr. Goodin.  *See* PO Resp. 35–36; Sur-Reply 14–15; Khatri Decl. ¶¶ 101–104.

IPR2021-00155
Patent 10,416,961 B2

For the reasons explained above, we are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).[8]

### G. Obviousness Ground Based on Dockser, Tong, and MacMillan (Claims 3 and 23)

Petitioner contends that claims 1–5, 10, 13, 14, 21, and 23–25 are unpatentable over Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a). Pet. 56–60. Of those claims, claims 1, 10, and 21 are independent. Petitioner has shown that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable. *See supra* Section II.D. Given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable over Dockser and MacMillan. *Boston Sci. Scimed,* 809 F. App'x at 990. Petitioner challenges claim 3 under this ground and the ground based on Dockser and MacMillan. *See supra* Section II.F. Claim 23 is challenged under this ground only. Claims 3 and 23 recite the same limitation, but depend from claims 1 and 21, respectively.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. Thus, Petitioner has not shown, by a

---

[8] Given this determination, we need not address Patent Owner's argument that the references fail to teach the "exceeds" limitation of claim 3. *See* PO Resp. 28–35; Sur-Reply 10–14.

IPR2021-00155
Patent 10,416,961 B2

preponderance of the evidence, that the subject matter recited in claims 3 and 23 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a). Our reasoning follows.

As for the unpatentability of claims 3 and 23, Petitioner presents two theories. First, Petitioner argues that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels, such that "[t]he resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong)" teaches the claim limitations "for the same reasons Dockser/MacMillan does," referring to Petitioner's earlier analysis of the asserted ground based on Dockser and MacMillan. Pet. 56–57. We are not persuaded by those arguments for the reasons explained above. *See supra* Section II.F.

Second, Petitioner presents another theory based on a "customized implementation" of Dockser's FPPs. Pet. 57–60 (citing Goodin Decl. ¶¶ 389–399); Reply 15–19 (citing Ex. 1071 ¶¶ 56–62). Petitioner argues that a person of ordinary skill in the art "would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'" Pet. 58 (citing Ex. 1008, 279; Goodin Decl. ¶ 393). Specifically, according to Petitioner, an ordinarily skilled artisan would have been motivated to "implement Dockser's FPPs in the embedded signal processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered" and likewise "implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth

IPR2021-00155
Patent 10,416,961 B2

(smaller than 23-bit) corresponding to the precision level selected for the embedded application." *Id.* at 58–59 (citing Goodin Decl. ¶ 394).

Petitioner's analysis is premised on an "alternative interpretation" of the portion of the "exceeds" limitation referring to execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." *Id.* at 57–60. Under that interpretation, an execution unit could meet the "adapted to" clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* at 59–60. Dockser's FPP, modified as described above, would not be such a unit because it has registers and multiplier logic with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the "adapted to" clause. *Id.* at 60.

Patent Owner responds that a person of ordinary skill in the art "would not have been motivated to re-engineer the FPP of Dockser to remove its 32-bit capability [based on Tong] and then incorporate the re-engineered Dockser unit into the system of MacMillan." PO Resp. 40–41 (citing Khatri Decl. ¶¶ 108–109). Patent Owner argues that none of the three references support Petitioner's view. *Id.* at 40–43. First, Dockser teaches a device that "support[s] a range of selectable precisions including full precision," and "[a]djusting Dockser by removing its full-precision capability violates a central tenet of Dockser—to always be able to execute full-precision operations." *Id.* at 42 (citing Khatri Decl. ¶ 114; Ex. 1007 ¶ 3). Second, Tong similarly teaches a device with "both full- and reduced-precision capabilities," and would have reinforced Dockser's teaching that "while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision." *Id.* (emphasis

IPR2021-00155
Patent 10,416,961 B2

omitted) (citing Khatri Decl. ¶ 112; Ex. 1007 ¶ 3). Third, the asserted combination, "which requires special, customized registers, logic elements, [and] arithmetic units, . . . would increase manufacturing costs and goes directly against the teachings of MacMillan," in particular its teaching that adding "significant complexity" to the SIMD architecture should be avoided. *Id.* at 43–44 (citing Ex. 1009, col. 24, ll. 24–26, ll. 34–36). The parties in their Reply and Sur-Reply disagree as to the meaning of certain cited disclosures in the references. *See* Reply 15–19; Sur-Reply 15–18.

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser, Tong, and MacMillan, we agree with Patent Owner. Petitioner's asserted combination is predicated on *removing* what is a fundamental feature of Dockser and Tong—namely, the ability to operate at full precision or select a precision less than full precision. Dockser teaches a single processor with a default full precision mode that is capable of also operating in selectable reduced precision modes. Ex. 1007 ¶¶ 3–4 ("[T]he common situation is that for certain applications, . . . a reduced precision may be acceptable, and for other applications, . . . a greater precision may be needed. Accordingly, there is a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable."). Dockser's FPP operates on 32-bit full precision values and performs arithmetic operations at a particular subprecision if the associated "subprecision select bits" are set, but if not, operates at full precision. *Id.* ¶¶ 17–19, 23–29, 32, claims 1 (reciting "a floating-point processor having a maximum precision" and "selecting a subprecision less than the maximum precision"), 8, 15, 20. Dockser thus requires full precision with the capability to select a subprecision less than full precision, as Mr. Goodin agrees. *See* Ex. 2043, 36:16–37:17, 38:3–8 ("I don't believe Dockser

IPR2021-00155
Patent 10,416,961 B2

discloses any embodiments without floating-point . . . selectable precision."), 55:21–57:12 ("Dockser requires selectable precision"). Indeed, Petitioner explicitly relies on the fact that "Dockser's precision is selectable" when asserting that a person of ordinary skill in the art would have combined the teachings of Dockser and Tong. *See* Pet. 45; Reply 8; Sur-Reply 17. We see no basis to conclude that a person of ordinary skill in the art would have been motivated to remove the feature that Dockser describes as always present and that is the basis for Petitioner's other assertions regarding Dockser and Tong. *See Chemours*, 4 F.4th at 1377 (finding insufficient motivation to modify a prior art reference "when doing so would necessarily involve altering the inventive concept of" the reference); Public Tr. 41:21–42:8.

Tong likewise does not support Petitioner's asserted motivation to combine. Tong discloses that "not all programs need the precision provided by generic FP hardware," and "the fine precision of the 23-bit mantissa is not essential" and "a single custom FP format may be a viable option" for particular applications, but full precision is necessary for other applications. *See* Ex. 1008, 278–280. Tong states that "scientific programs such as large-scale computational fluid dynamics or electric circuit simulation . . . require a huge amount of precision." *Id.* at 279. Tong further discloses that

> by reducing either precision or range from 32 to fewer bits, we should be able to create custom FP hardware which has lower power simply because of the bit reductions. For a narrow, application-specific task, a single custom FP format may be a viable option. However, *to be more generally useful, we need to consider arithmetic architectures which can scale to different FP formats*. Even though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears *inevitable that some fraction of our operands will require full IEEE-standard precision*.

IPR2021-00155
Patent 10,416,961 B2

*Id.* at 280 (emphasis added). Given those disclosures, we are not persuaded that a person of ordinary skill in the art would have been motivated to remove from Dockser's FPP the capability (i.e., selectability from full precision) that Tong characterizes as important.[9]

Finally, with respect to MacMillan, the reference states that to achieve its cost objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44. The Dockser-Tong-MacMillan combined device would add complexity because it involves a "customized implementation" of the multiplier logic in Dockser's FPP. *See* Pet. 59–60; Reply 15. Further, to the extent some selectability remains (among levels below full precision) in Petitioner's "customized implementation," the modified Dockser FPP would still require Dockser's additional control circuitry to implement that selectable subprecision. As explained above, such circuitry would increase costs due to added complexity and size, which MacMillan expressly counsels against. *See supra* Section II.F.

---

[9] Petitioner has shown sufficiently that a person of ordinary skill in the art would have been motivated to *select* a particular precision level in Dockser's FPP based on the teachings of Tong, but not to *remove* functionality from the FPP itself. *See supra* Section II.E.2; *compare* Pet. 45 (arguing that Tong "would have motivated a [person of ordinary skill in the art] to *configure* Dockser's FPP . . . to *operate at* a *selected* precision level retaining as few as 5 mantissa fraction bits . . . or others empirically determined (using Tong's techniques) to not require greater precision" (emphasis added)), *with id.* at 58–59 (arguing that a person of ordinary skill in the art "would have been motivated to *customize* Dockser's FPPs in MacMillan's PEs" by removing register storage elements to have "smaller than 32-bit registers" (for the register bit-dropping technique) or removing multiplier logic elements (for the multiplier logic technique) (emphasis added)).

IPR2021-00155
Patent 10,416,961 B2

We credit the testimony of Dr. Khatri on these points, as it is explained sufficiently and is consistent with the disclosures of the references. *See* Khatri Decl. ¶¶ 46–48, 107–115. Petitioner has not shown sufficiently that a person of ordinary skill in the art would have combined the teachings of Dockser, Tong, and MacMillan to remove from Dockser's FPP the ability to select a precision less than full precision and then incorporate the modified FPP into the PEs of MacMillan. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 3 and 23 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

### *H. Motion to Exclude*

Patent Owner moves to exclude (1) Exhibits 1073, 1075–1078, 1082–1084, 1088–1090, and 1096–1097 as "irrelevant and prejudicial" under Federal Rules of Evidence 402 and 403; (2) Exhibit 1082 for the same reasons and also as unauthenticated under Federal Rule of Evidence 901; (3) and Exhibits 1094 and 1095 as containing inadmissible hearsay under Federal Rule of Evidence 802. Mot. 3–7. Patent Owner's Motion is dismissed as moot, as we do not rely on the exhibits in a manner adverse to Patent Owner in our Decision.

In particular, Petitioner cites Exhibits 1073 and 1075 in support of its argument that Dockser and MacMillan teach the "exceeds" limitation of claim 8 and similar limitations in other claims. *See* Mot. 3–4; Reply 14. Petitioner cites Exhibits 1076–1078 and 1097 in response to an argument made by Patent Owner in its Response regarding MacMillan. *See* Mot. 4; Reply 16–17, 25. We need not reach those arguments because we determine that Petitioner has not shown unpatentability of the claims challenged based

IPR2021-00155
Patent 10,416,961 B2

on the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, for other reasons. *See supra* Sections II.F and II.G

Petitioner cites Exhibits 1078, 1082–1084, 1088–1090, and 1094–1096 in support of its arguments regarding objective indicia of nonobviousness. *See* Mot. 4–7; Reply 19–30. As explained above, we do not find Patent Owner's evidence of objective indicia of nonobviousness persuasive, and do not rely on the disputed exhibits in reaching that conclusion.

## I.    *Motions to Seal*

The parties move to seal portions of their demonstrative exhibits that quote or describe material that we previously ordered sealed. Papers 52, 54; *see* Papers 27, 48 (granting motions to seal). The parties filed unredacted confidential and redacted public versions of their demonstrative exhibits. Exs. 1098, 2054. Upon reviewing the materials sought to be sealed, it appears that the parties' characterization of the materials is accurate and the redactions are narrowly tailored to only confidential information. The parties have established good cause to seal the redacted portions of the demonstrative exhibits. We grant the motions to seal.

## III. CONCLUSION[10]

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 of the '961 patent are

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or*

IPR2021-00155
Patent 10,416,961 B2

unpatentable, but has not demonstrated, by a preponderance of the evidence,

that claims 3 and 23 are unpatentable.

---

*Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3),
42.8(b)(2).

IPR2021-00155
Patent 10,416,961 B2

In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 5, 10, 13, 14 | 103(a) | Dockser | 1, 2, 4, 5, 10, 13, 14 | |
| 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | 103(a) | Dockser, Tong | 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | |
| 1–5, 10, 13, 14 | 103(a) | Dockser, MacMillan[11] | | 3 |
| 1–5, 10, 13, 14, 21, 23–25 | 103(a) | Dockser, Tong, MacMillan[12] | | 3, 23 |
| **Overall Outcome** | | | 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | 3, 23 |

---

[11] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable over Dockser and MacMillan. *See supra* Section II.E.

[12] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable over Dockser, Tong, and MacMillan. *See supra* Section II.G.

IPR2021-00155
Patent 10,416,961 B2

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 of the '961 patent have been shown to be unpatentable, and claims 3 and 23 of the '961 patent have not been shown to be unpatentable; and

FURTHER ORDERED that the parties' Motions to Seal (Papers 52 and 54) are *granted*, and the unredacted confidential versions of the demonstrative exhibits (Exhibits 1098 and 2054) shall remain under seal pursuant to the default protective order previously entered in the instant proceeding; and

FURTHER ORDER that Patent Owner's Motion to Exclude (Paper 46) is dismissed.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00155
Patent 10,416,961 B2

FOR PETITIONER:

Elisabeth H. Hunt
Richard F. Giunta
Anant K. Saraswat
Adam R. Wichman
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent J. Rubino, III
Enrique W. Iturralde
Richard Cowell
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com
rcowell@fabricantllp.com

Brian M. Seeve
Matthew D. Vella
PRINCE LOBEL TYE LLP
bseeve@pricelobel.com
mvella@pricelobel.com

PUBLIC VERSION

Trials@uspto.gov                                                    Paper 57
571-272-7822                                               Date: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————————————

IPR2021-00165
Patent 9,218,156 B2

———————————————

Before JUSTIN T. ARBES, STACEY G. WHITE, and JASON M. REPKO,
*Administrative Patent Judges.*

PER CURIAM.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*
Granting Patent Owner's and Petitioner's Motions to Seal
*37 C.F.R. §§ 42.14, 42.54*

PUBLIC VERSION

IPR2021-00165
Patent 9,218,156 B2

# I.  INTRODUCTION

## A.  Background and Summary

Petitioner Google LLC filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–8, 16, and 33 of U.S. Patent No. 9,218,156 B2 (Ex. 1001, "the '156 patent") pursuant to 35 U.S.C. § 311(a). On May 13, 2021, we instituted an *inter partes* review as to all challenged claims on all grounds of unpatentability asserted in the Petition.  Paper 16 ("Decision on Institution" or "Dec. on Inst.").  Patent Owner Singular Computing LLC subsequently filed a Patent Owner Response (Paper 28, "PO Resp."), Petitioner filed a Reply (Paper 34, "Reply"), and Patent Owner filed a Sur-Reply (Paper 38, "Sur-Reply").  Patent Owner filed a Motion to Exclude (Paper 46, "Mot.") certain evidence submitted by Petitioner, to which Petitioner filed an Opposition (Paper 47) and Patent Owner filed a Reply (Paper 49).  An oral hearing was held on February 11, 2022, and transcripts of the hearing are included in the record (Paper 55, "Conf. Tr."; Paper 56, "Public Tr.").  The parties also filed Motions to Seal (Papers 52 and 54) portions of their demonstrative exhibits containing confidential information.

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 16, and 33 are unpatentable, but has not shown by a preponderance of the evidence that claims 3–8 are unpatentable.

## B.  Related Matters

The parties indicate that the '156 patent is the subject of *Singular Computing LLC v. Google LLC*, Case No. 1:19-cv-12551-FDS (D. Mass.)

IPR2021-00165
Patent 9,218,156 B2

("the district court case").  *See* Pet. xi; Paper 9, 1.  Petitioner filed another
petition challenging claims 1–8, 16–25, and 33–42 of the '156 patent in
IPR2021-00164, which was denied, and filed four other petitions
challenging claims of two related patents also asserted in the district court
case in IPR2021-00154 (denied), IPR2021-00155 (instituted),
IPR2021-00178 (denied), and IPR2021-00179 (instituted).

### C.  The '156 Patent

The '156 patent, entitled "Processing with Compact Arithmetic
Processing Element," relates to "computer processors or other devices which
use low precision high dynamic range (LPHDR) processing elements to
perform computations (such as arithmetic operations)."  Ex. 1001, code (54),
col. 6, ll. 3–7.

According to the '156 patent, conventional central processing unit
(CPU) chips make inefficient use of transistors as a tradeoff for delivering
the high precision required by many applications.  *Id.* at col. 3, ll. 11–26.
For example, conventional CPU chips "perform[] exact arithmetic with
integers typically 32 or 64 bits long and perform[] rather accurate and
widely standardized arithmetic with 32 and 64 bit floating point numbers,"
but require "on the order of a million transistors to implement the arithmetic
operations."  *Id.* at col. 3, ll. 19–26.  According to the '156 patent, "many
economically important applications . . . are not especially sensitive to
precision and . . . would greatly benefit, in the form of application
performance per transistor, from the ability to draw upon a far greater
fraction of the computing power inherent in those million transistors."  *Id.* at
col. 3, ll. 27–32.  But "[c]urrent architectures for general purpose computing
fail to deliver this power."  *Id.* at col. 3, ll. 32–33.

IPR2021-00165
Patent 9,218,156 B2

The '156 patent is, therefore, "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at col. 2, ll. 15–22. According to the '156 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at col. 2, ll. 32–35. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at col. 2, ll. 40–43. Figure 6, reproduced below, is an example of an LPHDR arithmetic unit according to one embodiment of the '156 patent.



Figure 6 provides "an example design for an LPHDR arithmetic unit according to one embodiment of" the '156 patent. *Id.* at col. 2, ll. 60–61. As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces output 602c. *Id.* at col. 12, ll. 55–56. The LPHDR arithmetic unit "is

IPR2021-00165
Patent 9,218,156 B2

controlled by control signals 412*a-d*, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602*a-b*." *Id.* at col. 12, ll. 62–65. According to the '156 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602*a-b* by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at col. 12, l. 65–col. 13, l. 1. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at col. 13, ll. 4–13. The '156 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at col. 13, ll. 11–13.

According to the '156 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at col. 17, ll. 20–23. The '156 patent provides, as examples, applications including "finding nearest neighbors," *id.* at col. 17, l. 31–col. 21, l. 26, "distance weighted scoring," *id.* at col. 21, l. 28–col. 22, l. 17, and "removing motion blur in images," *id.* at col. 22, l. 19–col. 23, l. 34.

### D. Illustrative Claims

Challenged claims 1, 16, and 33 of the '156 patent are independent. Claims 2–8 depend from claim 1. Claims 1–3 recite:

> 1. A device comprising:
>
> at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

2. The method of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

3. The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

## E.  Evidence

The pending grounds of unpatentability in the instant *inter partes* review are based on the following prior art:

U.S. Patent No. 5,689,677, issued Nov. 18, 1997 (Ex. 1009, "MacMillan");

U.S. Patent Application Publication No. 2007/0203967 A1, published Aug. 30, 2007 (Ex. 1007, "Dockser"); and

Jonathan Ying Fai Tong, David Nagle, & Rob A. Rutenbar, "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," *IEEE*

IPR2021-00165
Patent 9,218,156 B2

> *Transactions on Very Large Scale Integration (VLSI) Systems*,
> vol. 8, no. 3 (June 2000) (Ex. 1008, "Tong").

Petitioner filed a declaration from Richard Goodin, P.E. (Ex. 1003) with its

Petition and a reply declaration from Mr. Goodin (Ex. 1071) with its Reply.

Patent Owner filed declarations from Sunil P. Khatri, Ph.D. (Ex. 2051) and

Joseph Bates, Ph.D. (the named inventor of the '156 patent) (Ex. 2052) with

its Response.  Also submitted as evidence are transcripts of the depositions

of Mr. Goodin (Ex. 2043) and Dr. Khatri (Ex. 1072).

## F.  *Asserted Grounds*

This *inter partes* review involves the following grounds of

unpatentability:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 16 | 103(a)[1] | Dockser |
| 1, 2, 16, 33 | 103(a) | Dockser, Tong |
| 1–8, 16 | 103(a) | Dockser, MacMillan |
| 1–8, 16, 33 | 103(a) | Dockser, Tong, MacMillan |

## II.  ANALYSIS

### A.  *Level of Ordinary Skill in the Art*

In determining the level of ordinary skill in the art for a challenged

patent, we look to "1) the types of problems encountered in the art; 2) the

prior art solutions to those problems; 3) the rapidity with which innovations

are made; 4) the sophistication of the technology; and 5) the educational

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284
(2011) ("AIA"), amended 35 U.S.C. § 103.  Here, Petitioner's challenges are
based on the pre-AIA version of 35 U.S.C. § 103.

IPR2021-00165
Patent 9,218,156 B2

level of active workers in the field." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666–667 (Fed. Cir. 2000). "Not all such factors may be present in every case, and one or more of them may predominate." *Id.*

Petitioner asserts that at the time of the earliest possible effective filing date of the '156 patent (June 19, 2009), a person of ordinary skill in the art would have had "at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture." Pet. 8–9 (citing Ex. 1003 ¶¶ 43–45). Patent Owner's proposed definition of the level of ordinary skill in the art is the same other than it removes the phrases "or the equivalent" and "at least." PO Resp. 14 (citing Ex. 2001 ¶¶ 36–37). There is little difference between the parties' proposed definitions, and the parties and their experts do not explain the basis for their proposals. Arguably, however, the term "at least" creates unnecessary ambiguity. Based on the full record developed during trial, including our review of the '156 patent and the types of problems and solutions described in the '156 patent and cited prior art, we determine that a person of ordinary skill in the art would have had a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and two years of academic or industry experience in computer architecture. *See, e.g.*, Ex. 1001, col. 1, l. 29–col. 2, l. 11 (describing in the "Background" section of the '156 patent various conventional methods of computation and their alleged deficiencies). We apply that definition for purposes of this Decision.

IPR2021-00165
Patent 9,218,156 B2

### B. Claim Interpretation

We interpret the claims of the challenged patent

> using the same claim construction standard that would be used to
> construe the [claims] in a civil action under 35 U.S.C. 282(b),
> including construing the [claims] in accordance with the ordinary
> and customary meaning of such [claims] as understood by one of
> ordinary skill in the art and the prosecution history pertaining to
> the patent.

37 C.F.R. § 42.100(b) (2020). "In determining the meaning of [a] disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006). Claim terms are given their plain and ordinary meaning as would be understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). We conclude that only one claim term requires interpretation to decide the issues presented during trial. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("Because we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy,' we need not construe [a particular claim limitation] where the construction is not 'material to the . . . dispute.'" (citation omitted)).

IPR2021-00165
Patent 9,218,156 B2

Claim 1 recites "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Independent claims 16 and 33 recite the same limitation.

At issue here is the meaning of "low precision high dynamic range (LPHDR) execution unit," as recited in claims 1, 16, and 33. Specifically, we need to resolve the question of whether this execution unit must be adapted to execute arithmetic operations *only* at low precision. For the reasons that follow, we determine that it does not.

Petitioner argues that, in the prior art used in all challenges, Dockser's floating-point processor (FPP), including the floating-point operator (FPO) inside the FPP, is low precision "because 'the precision' of operations in the FPP is 'reduced,' . . . and because it operates with the minimum imprecision" recited in the claim. Pet. 14–15 (citing Ex. 1003 ¶¶ 209–210; Ex. 1001, col. 26, l. 39–col. 27, l. 51; Ex. 1035, 8). Petitioner asserts that, in the claim, the minimum imprecision is found in the limitation that it calls *1B2*:

> for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

Ex. 1001, col. 29, l. 62–col. 30, l. 4. According to Petitioner, the '156 patent characterizes degrees of precision described in language mirroring *1B2* as "low precision." Pet. 14–15. Petitioner argues that the execution units in

IPR2021-00165
Patent 9,218,156 B2

the prior art fall within the scope of the recited unit if they perform reduced precision operations and at least one, but not necessarily all, of those operations meets the other requirements of claim 1.  *See, e.g.*, *id.* at 32 (explaining that "numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision"); Reply 2–3 (discussing the "low precision" requirement).

　　Patent Owner argues that the LPHDR execution unit should be construed as "an execution unit that executes arithmetic operations *only* at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below."  PO Resp. 15 (emphasis added).  We emphasize "only" because Patent Owner argues that the recited LPHDR execution unit "necessarily excludes full-precision or mixed full and low precision units."  *Id.* at 16 (citing Ex. 2051 ¶ 60).

　　In support of its proposed construction, Patent Owner asserts that construing the LPHDR execution unit as encompassing full or mixed precision units would "impermissibly read out 'low precision high dynamic range' and render the limitation meaningless."  *Id.* (citing *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022–23 (Fed. Cir. 2020)); *see also id.* at 17 (arguing that Petitioner's construction reads "'low precision' out of the claims entirely").

　　Based on the totality of the record, we agree with Petitioner that the recited LPHDR execution unit does not exclude mixed full and low precision execution units (i.e., those that are capable of arithmetic operations at both levels of precision).  *See, e.g.*, Pet. 14–15, 31–32.  We reject Patent Owner's argument that interpreting the claim in this way renders the term "low precision" "meaningless."  *See* PO Resp. 15–17.  Rather, the term "low

IPR2021-00165
Patent 9,218,156 B2

precision" imposes the requirement that the unit must *at least* perform arithmetic operations at low precision, which would exclude units that operate only at full precision, for example. Thus, we disagree with Patent Owner and assign little weight to Dr. Khatri's testimony on this issue. *See id.*; Ex. 2051 ¶¶ 60–61.

As stated in our Decision on Institution, the recitation of "a first operation" in claim 1 requires only one or more first operations that meet the low precision criteria specified in the claim. Dec. on Inst. 21–22. The claims do not require that "every" operation must be low precision or exclude the LPHDR execution unit from having other capabilities for other operations. *Id.* Indeed, Patent Owner agrees that "a claim's recitation of an 'execution unit adapted to execute a first operation' would normally not preclude that execution unit from performing other types of operations." PO Resp. 17–18. Patent Owner, though, argues that this "rule does not apply when the specification teaches otherwise, as is the situation here." *Id.* We disagree.

Patent Owner relies on exemplary non-limiting embodiments from the '156 patent. *See id.* at 18. Specifically, Patent Owner argues that "the claimed LPHDR execution units are smaller and have fewer transistors" than prior art full precision execution units. *Id.* (citing Ex. 2051 ¶ 62). But the cited passage pertains only to exemplary embodiments and says that the "amount of resources" is small, with transistors being only one example of such resources:

> For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a *small amount of resources (e.g., transistors or volume)* compared with traditional architectures.

IPR2021-00165
Patent 9,218,156 B2

Ex. 1001, col. 8, ll. 8–16 (emphasis added).  In fact, some embodiments do not even require transistors: "[e]xamples of such technologies include . . . other technologies whether based on transistors or not."  *Id.* at col. 26, ll. 13–20, *cited in* Reply 6.

The reference to the "small amount of resources" in the cited passage (Ex. 1001, col. 8, ll. 8–16) is consistent with Petitioner's position that the LPHDR execution unit need only perform low precision operations some of the time because the record shows that doing so would save power and other computational resources.  For example, Dr. Khatri testified that "exact computing . . . takes up a lot of resources, takes up a lot of power, takes up a lot of area, and takes up a lot of delay."  Ex. 1072, 47:2–5.  Mr. Goodin explained that reducing precision may achieve power savings.  *See, e.g.*, Ex. 2043, 34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision may achieve power savings).  Mr. Goodin cites specific examples of how this is achieved.  *See, e.g.*, Ex. 1003 ¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 35 (citing Ex. 1007 ¶¶ 3–7).  Thus, we disagree with Patent Owner's argument about reducing transistors and assign little weight to Dr. Khatri's testimony on this issue.  *See* PO Resp. 18; Ex. 2051 ¶ 62.

Also, we agree with Petitioner that the degree of low precision is described in limitation *1B2* in claim 1 and similar limitations in the other claims.  Pet. 14–15.  The language used in *1B2* is consistent with how the '156 patent describes low precision.  Ex. 1001, col. 26, l. 39–col. 27, l. 51, *cited in* Pet. 14–15.  For example, the patent states, "[t]he degree of precision of a 'low precision, high dynamic range' arithmetic element may vary from implementation to implementation."  *Id.* at col. 26, ll. 39–41.  The patent then lists several examples.  *Id.* at col. 26, l. 41–col. 27, l. 51.  In one example, "a LPHDR arithmetic element produces results which are

IPR2021-00165
Patent 9,218,156 B2

sometimes (or all of the time) no closer than 0.05% to the correct result."
*Id.* at col. 26, ll. 44–49.  Similarly, independent claims 1, 16, and 33 recite
that

> the statistical mean . . . of the numerical values represented by
> the first output signal of the LPHDR unit executing the first
> operation on that input differs by at least Y=0.05% from the
> result of an exact mathematical calculation of the first operation
> on the numerical values of that same input.

Patent Owner agrees that the claims provide the parameters of the low
precision and high dynamic range in the limitations "wherein the dynamic
range . . ." and "for at least X=5% . . . ."  PO Resp. 16.  Indeed, Patent
Owner in the district court case argued that the subsequent claim language
specifying percentages "*defines* the term 'low precision'" and "specifies the
degree of precision that an LPHDR execution unit must have in order to
satisfy the 'low precision' . . . limitation of the claim."  Ex. 1065, 9
(emphasis added); *see also* Ex. 1066, 12 (arguing that "'low precision high
dynamic range' is defined in [the] claim itself"); Reply 2.  Patent Owner,
however, argues that those limitations "do not allow for the execution unit to
have full-precision (or [low] dynamic range) capability."  PO Resp. 16.

But the claims do not recite that every operation must meet these
criteria.  Rather, the claims only recite that the criteria apply to "a first
operation."  This reading is consistent with the examples of LPHDR
elements from the written description.  *See* Ex. 1001, col. 26, l. 39–col. 27,
l. 51, *cited in* Pet. 14–15.  In those examples, the LPHDR arithmetic
elements may produce results that are only "sometimes" no closer than the
percentage to the correct result.  *See id.*  Thus, we agree with Patent Owner's
argument that the claims provide the parameters for the term "low
precision," but we disagree that the parameters must apply to every

14

IPR2021-00165
Patent 9,218,156 B2

operation.  *See* PO Resp. 16.  For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue.  *See* Ex. 2051 ¶¶ 60–64.

Patent Owner also argues that "small size and low transistor count . . . is what allows a much larger number of LPHDR execution units to operate in parallel on a single chip."  PO Resp. 19.  But the requirement of a "much larger number" is not in the independent claims.  Nor do the claims (or Patent Owner's proposed construction) include any limitations on size of the LPHDR execution unit or its transistor count.  And "not every benefit flowing from an invention is a claim limitation."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010).  Even so, the Specification states that some embodiments are not based on transistors.  *See, e.g.*, Ex. 1001, col. 26, ll. 13–20.  So we find no support in the written description for Patent Owner's argument about small size and low transistor count.  *See* PO Resp. 19.  For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue.  *See* Ex. 2051 ¶¶ 63–64.

We also agree with Petitioner that the written description does not support Patent Owner's assertion that the '156 patent contrasts LPHDR execution units with other units that operate in both high and low precision.  *See* PO Resp. 19, 23 (citing Ex. 1001, col. 5, ll. 36–45); Reply 7 (discussing Patent Owner's argument).  The relevant part of the '156 patent describes a graphics processor that supports 16-bit and 32-bit floating point formats:

> When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point.  That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications.  Thus, existing GPUs devote substantial resources

IPR2021-00165
Patent 9,218,156 B2

> to 32 (and increasingly 64) bit arithmetic and are wasteful of
> transistors in the sense discussed above.

Ex. 1001, col. 5, ll. 36–45.  This paragraph does not define the term "low precision."  *Id.*  Nor does the patent explain how the 16-bit units meet the claimed requirements for low precision units that are recited in the claim.  *See id.*  Also, there is no discussion of these units in the part of the written description that lists examples of low precision units.  *See id.* at col. 26, l. 39–col. 27, l. 51.  Thus, we disagree with Patent Owner that the '156 patent contrasts LHPDR execution units with those that operate in both high and low precision.  PO Resp. 19, 23.  For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue.  *See* Ex. 2051 ¶¶ 63–64, 72.

To the contrary, we agree with Petitioner that the '156 patent discloses at least one embodiment that performs operations other than LPHDR computations:

> [W]hile the obvious method of using the above [logarithmic number system (LNS)] operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers.  MUL and DIV may be used to add and subtract such values . . . . *So besides doing LPHDR computations*, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Ex. 1001, col. 14, ll. 9–18 (emphasis added), *quoted in* Reply 4.  Because the unit performs arithmetic operations other than those at low precision, this example contradicts Patent Owner's argument that an LPHDR execution unit is "an execution unit that executes arithmetic operations *only* at low precision."  PO Resp. 15 (emphasis added).

Patent Owner counters, "as Dr. Khatri explained, a [person of ordinary skill in the art] would not apply the terms 'precision' or 'dynamic

IPR2021-00165
Patent 9,218,156 B2

range' to integers." Sur-Reply 4 (citing Ex. 1072, 116:5–118:3). In Patent Owner's view, a person of ordinary skill in the art "would understand that [Patent Owner's] proposed construction would *not* exclude execution units that can perform integer operations, like the LNS embodiment described in the patent specification." *Id.* at 4–5. Yet Patent Owner's proposed construction makes no distinction between integer or floating-point operations. PO Resp. 15. Rather, the construction refers to "arithmetic operations," generally. *See id.*

In its Sur-Reply, Patent Owner proposes an alternative construction—for the first time in this proceeding—that further defines "arithmetic operations" to be "*floating-point* arithmetic operations." Sur-Reply 5. But a sur-reply must only respond to arguments raised in the preceding brief. Patent Trial and Appeal Board Consolidated Trial Practice Guide (Nov. 2019), 73–74, *available at* https://www.uspto.gov/ TrialPracticeGuideConsolidated. Under 37 C.F.R. § 42.23(b), "respond" does not mean proceed in a new direction with a new approach. *See id.* at 74. "[A] sur-reply that raises a new issue or belatedly presents evidence may not be considered." *Id.* So, apart from noting that we do not see any reason to limit the LPHDR execution unit to only low precision operations—regardless of how those operations are defined—for the reasons discussed above, we do not further consider this new claim construction presented for the first time in the Sur-Reply. *See* Sur-Reply 5.

In sum, we agree with Petitioner that the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that are capable of performing operations at low and full precision, and the degree of "low precision" is defined in limitation *1B2*. *See, e.g.*, Pet. 14–15, 31–32; Reply 2–3. To determine the patentability of the challenged claims, we need

17

IPR2021-00165
Patent 9,218,156 B2

not further construe "low precision high dynamic range (LPHDR) execution unit." *See Nidec*, 868 F.3d at 1017.

## C.   Legal Standards

To prevail in its challenges to the patentability of claims 1–8, 16, and 33 of the '156 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016).  This burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("Where, as here, the only question presented is whether due consideration of the four *Graham* factors renders a claim or claims obvious, no burden shifts from the patent challenger to the patentee.").

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a) (2006)). The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  Additionally, objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc.,

might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.  As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Id.*  When conducting an obviousness analysis, we consider a prior art reference "not only for what it expressly teaches, but also for what it fairly suggests." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (citation omitted).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418.  An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does").  Also, "[t]hough less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016).

"Although the *KSR* test is flexible, the Board 'must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention.'" *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (citation omitted).  Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some

IPR2021-00165
Patent 9,218,156 B2

articulated reasoning with some rational underpinning to support the legal
conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*,
441 F.3d 977, 988 (Fed. Cir. 2006)); *accord In re NuVasive, Inc.*, 842 F.3d
1376, 1383 (Fed. Cir. 2016) (stating that "conclusory statements" amount to
an "insufficient articulation[] of motivation to combine"; "instead, the
finding must be supported by a 'reasoned explanation'" (citation omitted));
*Magnum Oil*, 829 F.3d at 1380 ("To satisfy its burden of proving
obviousness, a petitioner cannot employ mere conclusory statements.  The
petitioner must instead articulate specific reasoning, based on evidence of
record, to support the legal conclusion of obviousness.").

### D.   Obviousness Ground Based on Dockser (Claims 1, 2, and 16)

#### 1.   Dockser

Dockser discloses performing floating-point operations with a
floating-point processor having "selectable subprecision."  Ex. 1007,
code (57), ¶¶ 15, 17.  "A floating-point representation of a number
commonly includes a sign component, an exponent, and a mantissa.  To find
the value of a floating-point number, the mantissa is multiplied by a base
(commonly 2 in computers) raised to the power of the exponent.  The sign is
applied to the resultant value." *Id.* ¶ 1.  "The precision of the floating-point
processor is defined by the number of bits used to represent the mantissa.
The more bits in the mantissa, the greater the precision." *Id.* ¶ 2.  "The
precision of [a] floating-point processor generally depends on the particular
application.  For example, the ANSI/IEEE-754 standard (commonly
followed by modern computers) specifies a 32-bit single format having a
1-bit sign, an 8-bit exponent, and a 23-bit mantissa." *Id.*  "Higher precision
results in a higher accuracy, but commonly results in increased power

consumption." *Id.* Dockser explains that the performance of floating-point operations also can be computationally inefficient because "[w]hile some applications may require [high] types of precision, other applications may not." *Id.* ¶ 3. For example, "some graphics applications may only require a 16-bit mantissa," such that "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," but other applications may require "greater precision." *Id.* Accordingly, there was "a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable." *Id.*

Figure 1 of Dockser is reproduced below.



FIG. 1

IPR2021-00165
Patent 9,218,156 B2

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

Figure 2 of Dockser is reproduced below.



FIG. 2

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

IPR2021-00165
Patent 9,218,156 B2

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits). Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively.

IPR2021-00165
Patent 9,218,156 B2

Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3B depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31. A partial product 420-i is generated for every bit in multiplier 404 at corresponding stage 410-i and then left-shifted "as a function of the multiplier bit with which it is associated, after which the operation moves on to the next stage." *Id.* ¶ 31. The partial products are eventually added together to generate output value 430. *Id.* "[P]ower may be removed from the logic used to implement the stages to the right of the line 405" indicating the selected subprecision. *Id.* ¶¶ 32–33.

### 2. *Claim 1*

Petitioner explains in detail how Dockser teaches or suggests every limitation of claim 1, relying on the testimony of Mr. Goodin as support. *See* Pet. 9–38; Ex. 1003 ¶¶ 197–304.

IPR2021-00165
Patent 9,218,156 B2

Claim 1 recites a device comprising "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Petitioner asserts that Dockser's floating-point processor (FPP) is a "low precision high dynamic range (LPHDR) execution unit."[2]  Pet. 13–15. According to Petitioner, Dockser's FPP is incorporated in a computing system, which is the claimed "device" comprising the FPP.  *Id.* at 13 (citing Ex. 1003 ¶ 197–198; Ex. 1007 ¶¶ 1, 15, 35–36).  We agree with Petitioner.

### a)   *"High Dynamic Range"*

With respect to the "high dynamic range" aspect of the LPHDR execution unit, the claim requires that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000."  Petitioner asserts that Dockser's FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '156 patent.  Pet. 15 (citing Ex. 1007 ¶ 17; Ex. 1001, col. 14, ll. 56–64).  Petitioner's assertion, which is not disputed by Patent Owner, is adequately supported by the record.

For example, Dockser's register location 200 stores a 32-bit binary floating-point number, in an IEEE-754 32-bit single format, with 8-bit exponent 204.  Ex. 1007 ¶¶ 2, 17, *cited in* Pet. 20.  According to

---

[2] Petitioner also provides an "alternative mapping" where "the floating-point operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit. Pet. 14–15, 19, 21, 37.  We need not evaluate those arguments because we determine that Petitioner has made a sufficient showing based on the full trial record that the FPP is an LPHDR execution unit.

IPR2021-00165
Patent 9,218,156 B2

Mr. Goodin, the dynamic range of normal IEEE-754 operands would be
from around $2^{-126}$, which is much smaller than 1/65,000, to around $2^{127}$,
which is much larger than 65,000. Ex. 1003 ¶ 233, *cited in* Pet. 20.
We credit Mr. Goodin's testimony on this point because it is consistent with
Dockser. *See id.*; Ex. 1007 ¶¶ 2, 16–17, 24. Thus, Petitioner has shown that
Dockser's FPP meets the dynamic range limitation recited in claim 1.

### b) *"A First Operation"*

Claim 1 recites that the LPHDR execution unit is "adapted to execute
a first operation on a first input signal representing a first numerical value to
produce a first output signal representing a second numerical value."
Petitioner argues that Dockser's FPP is adapted to execute a "first operation"
(e.g., "reduced-precision multiplication") on a "first input signal
representing a first numerical value" (i.e., input electrical signal representing
an operand received at the registers) to produce a "first output signal
representing a second numerical value" (i.e., output electrical signal
representing an operand sent to a register and then main memory).
Pet. 17–19.

Patent Owner does not present an argument to specifically address this
argument and evidence. *See* PO Resp.; Sur-Reply.

Based on our review of the totality of the evidence in this case, we
agree that Dockser's FPP is adapted to execute the recited first operation.
Dockser's FPP receives the operands as input values. Ex. 1007, Fig. 1.
Dockser's FPP performs operations on the inputs via the FPP's data paths
134–139 and components 140–144. *Id.* We agree with Petitioner that
Dockser teaches that the operand data to the FPP is a "first input signal
representing a first numerical value" because it represents the operand

IPR2021-00165
Patent 9,218,156 B2

number. *Id.* ¶ 17. The FPP executes the operation and produces an "output value," or "output number," which is represented by "output bits." *Id.* ¶ 34. In this way, that value is the recited "second numerical value." *See* Pet. 17–19. We credit Mr. Goodin's testimony on this point. Ex. 1003 ¶¶ 224–227.

We also credit Mr. Goodin's analysis showing that Dockser's computing circuits "move" data between components, such as from memory to the processor, via electrical signals. *See id.* ¶ 221 (citing Ex. 1014, col. 1, ll. 36–37). On this issue, the record provides adequate support for Mr. Goodin's testimony. *See* Ex. 1007 ¶¶ 16–17; Ex. 1014, col. 1, ll. 36–37. Thus, Petitioner has shown that signals represent the recited values.

Considering all of the arguments and evidence in this case, Petitioner has sufficiently shown that Dockser teaches that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value," as recited in claim 1. Pet. 15–20.

c)    *"Low Precision"*

As for the "low precision" aspect of the LPHDR execution unit, Patent Owner argues that Dockser's FPP is not an LPHDR execution unit because the FPP is capable of both low and full precision operations. *See* PO Resp. 15, 20–24. We disagree with Patent Owner's argument and underlying construction for the reasons discussed in Section II.B. Instead, we agree with Petitioner that (1) the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that perform operations at low and full precision, and (2) the degree of "low precision"

IPR2021-00165
Patent 9,218,156 B2

required by the claim is defined in limitation *1B2*. *See, e.g.*, Pet. 14–15, 31–32; Reply 2–3.

### d) Limitation 1B2

Under the interpretation discussed in Section II.B, Petitioner has shown that Dockser teaches the recited LPHDR execution unit. In particular, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP "operates with the minimum imprecision" required by limitation *1B2*. Pet. 14–15 (quoting Ex. 1007 ¶ 14). Limitation *1B2* recites (emphasis added):

> for at least X=5% of the possible valid inputs to the first operation, the *statistical mean*, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an *exact mathematical calculation* of the first operation on the numerical values of that same input.

We first analyze the "statistical mean" limitation before turning to the "exact mathematical calculation" limitation.

### (1) "Statistical Mean"

Petitioner argues that a person of ordinary skill in the art would have understood the "statistical mean" limitation

> in the context of the '156 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."

IPR2021-00165
Patent 9,218,156 B2

Pet. 22 (quoting Ex. 1001, col. 4, ll. 11–17).

In Petitioner's view, for "non-deterministic embodiments," the statistical mean would be the average of "the different outputs produced by the same operation on the same input." *Id.* at 22. Petitioner argues that, for "deterministic digital embodiments" like Dockser, the statistical mean is "the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input." *Id.* at 23. In Petitioner's view, repeatedly executing a multiplication operation using Dockser's floating point multiplier "on the same input (*i.e.*, pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.*

Patent Owner does not dispute this reasoning. *See* PO Resp.; Sur-Reply.

Based on the totality of the evidence, Petitioner's analysis of "deterministic digital embodiments" to address the "statistical mean" limitation is adequately supported by the record. Pet. 23. We are persuaded by Petitioner's reasoning that the '156 patent's written description has both analog and digital embodiments. *See, e.g.*, Ex. 1001, col. 4, ll. 11–17, col. 14, ll. 19–65, col. 17, ll. 12–18. Dockser uses "a conventional floating-point multiplier." Ex. 1007 ¶ 20. Petitioner adequately supports its assertion that this is a deterministic digital circuit. Pet. 23 (citing Ex. 1003 ¶ 242; Ex. 1011, col. 1, ll. 40–42). And we credit Mr. Goodin's testimony that, in such a digital circuit, a floating-point multiplier operating on the same input with the same precision level yields the same result for

IPR2021-00165
Patent 9,218,156 B2

every execution, and thus, the statistical mean is the same as the output for any single execution.  Ex. 1003 ¶ 243, *cited in* Pet. 23.

### (2)  *"Exact Mathematical Calculation"*

As for the "exact mathematical calculation" limitation, Petitioner argues that because Dockser performs a reduced precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation: "the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied without reducing precision."  Pet. 24 (emphasis omitted) (citing Ex. 1003 ¶ 245; Pet. App'x I.B).

### (3)  *Y Relative Error for X Valid Inputs*

According to Petitioner, "Dockser discloses two precision-reducing techniques that can be used separately or together."  Pet. 26 (citing Ex. 1007 ¶¶ 4–7; Ex. 1003 ¶¶ 256–262).  One technique removes power from storage elements in the FPP registers that correspond to the excess, dropped mantissa bits, which drops bits from the operands.  *Id.*  The other technique "remov[es] power from elements within the multiplier logic that computes the product of the operand mantissas."  *Id.*  Petitioner asserts that both techniques individually and in combination teach limitation *1B2*.

We determine that Petitioner has made a sufficient showing that Dockser meets the recited requirements for low precision under the register bit-dropping rationale.  Patent Owner does not present arguments specific to this technique.  *See* PO Resp.; Sur-Reply.  We need not evaluate Petitioner's alternative rationale based on the multiplier logic.  Our reasoning follows.

IPR2021-00165
Patent 9,218,156 B2

### (4) Register Bit-Dropping

Petitioner explains how Dockser teaches that "for at least X=5% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.05%" from the result of the exact mathematical calculation. Pet. 24–37. In Petitioner's view, the "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception)." *Id.* at 25. Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs. *Id.*

We agree. Dockser retains only some of the bits of a mantissa fraction: in one example, the nine most-significant bits of the mantissa fraction are retained, and the other 14 excess bits are dropped. Ex. 1007 ¶¶ 25–28, *cited in* Pet. 25; Ex. 1003 ¶ 255. The outputs of Dockser's unpowered storage elements are tied to zero voltage. Ex. 1003 ¶ 270; Ex. 1007 ¶¶ 26 (discussing removing power from the register elements for the excess bits), 29 (discussing "unpowered bits"). With support from Mr. Goodin and corroborating evidence, Petitioner shows that tying the outputs of the unpowered storage elements for the 14 "excess" bits to zero voltage would make those bits zeroes. Pet. 29 (citing Ex. 1003 ¶¶ 270–272).

Multiplying two operands with excess bits dropped (representing zero) reduces the output's precision. Ex. 1007 ¶¶ 24–26. Petitioner provides a representative example described by Mr. Goodin:

the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.3787171840667724609375) would become

IPR2021-00165
Patent 9,218,156 B2

> 0110000010000000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 0100010011011100001000 (representing a mantissa of 1.26898288726806640625) would become 0100010010000000000000 (representing a mantissa of 1.267578125).

Pet. 30 (citing Ex. 1003 ¶ 274). So the decrease in precision depends on the number of mantissa bits dropped. *See id.*; *see also* Ex. 1003 ¶ 279. And we agree with Petitioner that Dockser suggests that any desired number of mantissa bits can be dropped. Pet. 32. For example, Dockser describes how the precision is selectable. *See* Ex. 1007 ¶¶ 14–15, 17 (describing selectable reduced precision), *discussed in* Pet. 5.

Petitioner asserts that Dockser's register bit-dropping technique meets limitation *1B2* in two ways. Pet. 27–33. First, Petitioner presents results of a software demonstration to show that Dockser's 9 mantissa bits meets limitation *1B2*. *Id.* at 32–33. Second, Petitioner uses a pencil-and-paper algebraic analysis to show that retaining 9 mantissa bits meets limitation *1B2*. *Id.* at 33.

As for the software demonstration, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas)," a person of ordinary skill in the art "would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 32–33. Petitioner states that Mr. Goodin wrote a program to perform reduced precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.05% relative

IPR2021-00165
Patent 9,218,156 B2

error for 92.1% of possible valid inputs (greater than X=5%)." *Id.* at 32–33, 66–68 (citing Ex. 1003 ¶¶ 282–284, 414–424, 468–473).

Patent Owner did not rebut this evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's assertions about the recited X and Y percentages, and we credit Mr. Goodin's testimony on this issue, which is supported by the record. *See* Ex. 1003 ¶¶ 414–428. In particular, Mr. Goodin summarizes the results of the software program in the table below. *Id.* ¶ 425.

| Retained Fraction Bits | Claimed Y% | Percentage of Tested Pairs Meeting Claimed Y% | Adjusted "Dockser's X%" |
|---|---|---|---|
| 9 | ≥ 0.05% | 92.628313% | ≥ 92.14333% |
|  | ≥ 0.20% | 14.674747% | ≥ 14.59791% |
| 5 | ≥ 0.05% | 99.971764% | ≥ 99.44834% |
|  | ≥ 0.20% | 99.547206% | ≥ 99.02600% |

The table shows the percentage of tested pairs that meet the claimed Y percentage as output by the software program. *Id.* It also shows a "Dockser's X" percentage, which is adjusted to exclude possible overflow and underflow pairs, that meets the claimed requirements. *Id.* The X value is calculated by multiplying the percentage output by the software program by an adjustment ratio. *Id.* The adjustment ratio is described in Appendix I.E of Mr. Goodin's declaration. *Id.* Mr. Goodin also explains that, if "the 'exact mathematical calculation' of multiplication of two single-format floating-point operands is the product rounded or truncated to single format (having a 23-bit-fraction mantissa), the claims are still met." *Id.* ¶ 428. To show this, Mr. Goodin wrote an alternative version of the program under this assumption, which also gives results that meet the claim limitations. *Id.*

IPR2021-00165
Patent 9,218,156 B2

After review of the arguments and evidence on these issues, we credit Mr. Goodin's software-based analysis. *Id.* ¶¶ 414–428.

As for the algebraic analysis, Petitioner argues that a person of ordinary skill in the art "would also have understood algebraically that Dockser's register bit-dropping technique meets [limitation *1B2*], by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." Pet. 33. Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their tenth and eleventh fraction bits," such that retaining only 9 mantissa bits of operands would result in "*every* input in that 12% produc[ing] at *minimum* 0.097% relative error." *Id.* at 33, 69–73 (citing Ex. 1003 ¶¶ 285–286, 429–448).

Patent Owner did not rebut this evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's algebraic method showing the recited X and Y percentages, and credit Mr. Goodin's testimony on this issue. *See* Ex. 1003 ¶¶ 429–448. Under this reasoning, "for the 12.5% of all possible $M_A$ [mantissa] values with zero in the first fraction bit and ones in the $(K + 1)^{th}$ and $(K + 2)^{th}$ fraction bits," the following inequality holds "when Dockser's register bit-dropping truncates the operands to K fraction bits":

$$Y \geq \frac{\left(2^{-(K+1)} + 2^{-(K+2)}\right)}{\left(1.5 - 2^{-23}\right)} \times 100\% \qquad \textbf{\textit{(Equation C)}}$$

*Id.* ¶ 444.

IPR2021-00165
Patent 9,218,156 B2

The table below shows the results of evaluating Equation C with K=9, K=8, K=7, and K=5 retained fraction bits as the selected precision level. *Id.* ¶ 448.

| Retained Fraction Bits (K) | Equation C: Minimum Y for $X \geq 12\%$ | Equation D: Minimum Y for $X \geq 6\%$ | Meets X/Y Percentages Recited by Challenged Claims: |
|---|---|---|---|
| 9 | $\geq 0.0976\%$ | $\geq 0.1171\%$ | 1, 4, 16, 33 |
| 8 | $\geq 0.1953\%$ | $\geq 0.2343\%$ | All above plus 5 |
| 7 | $\geq 0.3906\%$ | $\geq 0.4687\%$ | All above plus 6 |
| 5 | $\geq 1.5625\%$ | $\geq 1.8750\%$ | All above |

The table above shows that the values of K meet the '156 patent's claimed minimum X and Y. *Id.* After review of the arguments and evidence on these issues, we credit Mr. Goodin's algebraic analysis. *Id.* ¶¶ 429–448.

### e) "Control the Operation"

Lastly, claim 1 recites "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit." Petitioner asserts that Dockser's main processor meets the computing device limitation. Pet. 38. Patent Owner does not provide evidence or argument specific to this limitation. We agree with Petitioner because Dockser's processor writes subprecision select bits to the FPP's control register, and in at least this way, Dockser's main processor is adapted to control the FPP's operation by specifying its precision level. *See* Ex. 1007 ¶¶ 15, 18, 25, 35. We credit Mr. Goodin's testimony on this issue, which is supported by the evidence of record. *See* Ex. 1003 ¶ 304.

### f) Objective Indicia of Nonobviousness

In addition to its argument based on the interpretation of "low precision high dynamic range (LPHDR) execution unit," Patent Owner

IPR2021-00165
Patent 9,218,156 B2

argues that objective indicia of nonobviousness demonstrate that the
challenged claims would not have been obvious to a person of ordinary skill
in the art.  PO Resp. 48–74.  Because the parties largely refer to the
challenged claims collectively in their arguments regarding objective indicia,
we do so as well and now address those arguments as applied to all of the
claims challenged as obvious over Dockser alone or the combination of
Dockser and Tong, i.e., claims 1, 2, 16, and 33, which we refer to as the
"Dockser/Tong-challenged claims."[3]  *See id.*; Reply 19–30; Sur-Reply
18–26.

　　　"In order to accord substantial weight to secondary considerations in
an obviousness analysis, the evidence of secondary considerations must have
a nexus to the claims, *i.e.*, there must be a legally and factually sufficient
connection between the evidence and the patented invention."  *Fox Factory,
Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (citations and
internal quotation marks omitted).  "The patentee bears the burden of
showing that a nexus exists."  *Id.*  "To determine whether the patentee has
met that burden, we consider the correspondence between the objective
evidence and the claim scope."  *Id.*  A patentee is entitled to a rebuttable
presumption of nexus "when the patentee shows that the asserted objective

---

[3] As explained below, we determine that Petitioner has not proven that
certain claims are unpatentable over the combinations of Dockser and
MacMillan, and Dockser, Tong, and MacMillan, because Petitioner has not
sufficiently shown a reason to combine with MacMillan.  *See infra*
Sections II.F, II.G.  Accordingly, we need not assess objective indicia of
nonobviousness with respect to those claims.  *See Mylan Pharms. Inc. v.
Res. Corp. Techs., Inc.*, 914 F.3d 1366, 1376 (Fed. Cir. 2019) ("Because we
agree with the Board that Appellants failed to establish a motivation to
modify compound 3I, we need not reach Appellants' arguments regarding
objective indicia.").

IPR2021-00165
Patent 9,218,156 B2

evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (citation omitted). Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021). "As part of the presumption analysis, the fact finder must consider the unclaimed features of the stated products to determine their level of significance and their impact on the correspondence between the claim and the products." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1418 (Fed. Cir. 2022). When, "for example, the patented invention is only a small component of the product tied to the objective evidence, there is no presumption of nexus." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333 (Fed. Cir. 2019). Absent a presumption of nexus, a patent owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (citation omitted).

"Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011). On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016). A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when

Material Subject to Protective Order Has Been Redacted
IPR2021-00165
Patent 9,218,156 B2

objective evidence is tied to the supposedly 'new' feature(s)." *Id.* at 1330.

Ultimately, the fact finder must weigh the objective indicia evidence

presented in the context of whether the claimed invention as a whole would

have been obvious to an ordinarily skilled artisan. *Id.* at 1331–32;

*Lectrosonics, Inc. v Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB

Jan. 24, 2020) (precedential).


*(1)  Industry Skepticism*

"If industry participants or skilled artisans are skeptical about whether

or how a problem could be solved or the workability of the claimed solution,

it favors non-obviousness.  Doubt or disbelief by skilled artisans regarding

the likely success of a combination or solution weighs against the notion that

one would combine elements in references to achieve the claimed

invention."  *WBIP*, 829 F.3d at 1335.  As evidence of alleged industry

skepticism, Patent Owner points to various statements made by employees

of Petitioner after meeting with Dr. Bates (the named inventor of the

'156 patent) in 2010.  PO Resp. 49–53.  According to Patent Owner,

Dr. Bates explained that floating point units programmed to perform



*Id.* at 49–52 (citing Exs. 2009, 2027,

2028, 2030).  Patent Owner contends that the cited statements from

Petitioner's employees "express skepticism about utility of the low-precision

arithmetic performed by the large numbers of low-precision execution

Material Subject to Protective Order Has Been Redacted

IPR2021-00165
Patent 9,218,156 B2

units,"[4] which is a "key feature" of the challenged claims, and have a nexus to the challenged claims because they were made in response to Dr. Bates's presentations. *Id.* at 52–53.

Petitioner argues that Patent Owner's evidence is irrelevant because it is dated after the earliest possible effective filing date of the '156 patent (June 19, 2009). Reply 22. We disagree that evidence of industry skepticism must itself be dated before the relevant invention. *See WBIP*, 829 F.3d at 1335–36 (considering evidence of skepticism dated after the invention of the patent at issue); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (same); Sur-Reply 19.

We have reviewed the substance of the statements cited by Patent Owner, though, and are not persuaded that they are probative of nonobviousness. The statements by Petitioner's engineers relate to whether applications using "approximate" arithmetic would be commercially valuable; they do not show skepticism as to whether or how a problem could be solved or whether such applications would *work*. *See WBIP*, 829 F.3d at 1335. For example, Tom Dean stated that ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

---

[4] Claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by only a single LPHDR execution unit. The only challenged claims of the '156 patent that arguably require a "large number[]" of LPHDR execution units are challenged in Petitioner's asserted grounds based on combinations with MacMillan. *See* PO Resp. 50. For example, claim 3 recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."

Material Subject to Protective Order Has Been Redacted

IPR2021-00165
Patent 9,218,156 B2



Ex. 2009, 1 (emphasis added).

Ex. 2029, 1 (emphasis added).

Ex. 2028, 1 (emphasis added).

Ex. 2030, 2. Thus, the cited comments appear to indicate that floating point units performing "approximate" arithmetic would only be commercially valuable for a limited set of applications, rather than expressing skepticism as to whether such applications would work. Patent Owner also has not explained sufficiently why the fact that "approximate" arithmetic was considered useful for some applications, but not others, amounts to industry skepticism over the claimed invention as a whole (which is not limited to a particular application). We find that Patent Owner's evidence of alleged industry skepticism does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims.

### (2) Industry Praise

"Evidence that the industry praised a claimed invention or a product which embodies the patent claims weighs against an assertion that the same claim would have been obvious. Industry participants, especially

competitors, are not likely to praise an obvious advance over the known art."
*WBIP*, 829 F.3d at 1334.  Patent Owner points to four statements of alleged
industry praise from "leading figures in computer science" and argues that
they have a nexus to the challenged claims because they relate to Dr. Bates
and his presentations to Petitioner in 2010, 2011, and 2013.  PO Resp.
53–54.

Patent Owner cites Dr. Bates's notes from 

*See id.* at 53; Ex. 2050.  This single
line in the notes does not mention any specific ideas or features that
allegedly were praised, or why or for what they were being praised.  Patent
Owner argues that there is "no requirement that praise identify exactly the
features being praised."  Sur-Reply 20.  But evidence of industry praise must
be for "the claimed invention," and the notes only state that

*See* Ex. 2050; *Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc); *WBIP*, 829 F.3d at 1334.
The notes also have less probative value because they were written by
Dr. Bates based on his subjective recollection of Mr. Dean's reaction at the
meeting, rather than, for example, being prepared by a third party or
Mr. Dean himself.  Ex. 2052 ¶ 7.

Patent Owner also cites three 2011 emails sent by employees of
Petitioner to Dr. Bates.  PO Resp. 53–54.  Andrew Ng wrote the following to
Dr. Bates:



Material Subject to Protective Order Has Been Redacted

IPR2021-00165
Patent 9,218,156 B2



Ex. 2033, 1. Astro Teller wrote that ██████████████████████

████████████████████████ and Johnny Chen wrote, ████████

██████████████████████████████████████ *See*

Exs. 2031, 2032. We view these emails as more consistent with Petitioner's

view as "merely cordial statements made to Dr. Bates," rather than evidence

of industry praising the inventions of the Dockser/Tong-challenged claims as

Patent Owner contends. *See* Reply 24. Further, they are statements by

employees of Petitioner only (not any other industry participant or industry

group) and do not mention any specific ideas or features from Dr. Bates's

presentations that were being praised. We find that Patent Owner's evidence

of alleged industry praise is too ambiguous and high-level to be probative of

nonobviousness.

### (3) Unexpected Results

"To be particularly probative, evidence of unexpected results must

establish that there is a difference between the results obtained and those of

the closest prior art, and that the difference would not have been expected by

one of ordinary skill in the art at the time of the invention." *Bristol-Meyers

Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014).

Also, "[w]hen assessing unexpected properties, . . . we must evaluate the

significance and 'kind' of expected results along with the unexpected

results." *Id.* As evidence of alleged unexpected results, Patent Owner points

to a September 2013 presentation that Dr. Bates gave to Petitioner showing

████████████████████████████████████████████████

IPR2021-00165
Patent 9,218,156 B2

████████████████████ PO Resp. 54–58 (citing Ex. 2005). Patent Owner

argues that the unexpected nature of the results is "confirmed by skepticism

expressed by" David Patterson, Ph.D. (an employee of Petitioner and

"acclaimed expert in the field of computer science and computer

architecture" according to Patent Owner), and "further supported by Dockser

and Tong," which teach that higher precision is "generally" needed. *Id.* at

55–57 (citing Ex. 1007 ¶ 3; Ex. 1008, 280; Ex. 2012; Ex. 2051 ¶¶ 124–125).

The cited evidence, however, does not establish a difference between

the alleged results and the closest prior art. Dr. Bates's presentation includes

████████████████████████ Ex. 2005, 11; *see* PO Resp. 56.

In this case, however, the closest prior art is Dockser and Tong, both of

which teach reduced precision arithmetic and, importantly, show that high

performance with reduced precision was *expected* for certain applications.

*See* Reply 25; Ex. 1007 ¶ 3 ("[F]or certain applications, . . . a reduced

precision, may be acceptable, and for other applications, . . . a greater

precision may be needed."); Ex. 1008, 273 ("[M]any programs which

manipulate human sensory inputs, e.g., speech and image recognition, suffer

no loss of accuracy with reduced bitwidth in the mantissa or exponent.")."

Patent Owner contends that Dockser and Tong are not appropriate for

comparison because they do not "provide computing scale results" and have

an "entirely different focus on power savings." Sur-Reply 21. We disagree.

As explained above, we find that Dockser teaches the claim 1 LPHDR

execution unit performing the recited reduced precision arithmetic. *See*

*supra* Section II.D.2. Patent Owner's only comparison, however, is to a

CPU without any reduced precision capability. *See* PO Resp. 56. We find

that Patent Owner's evidence of alleged unexpected results does not weigh

in favor of nonobviousness of the Dockser/Tong-challenged claims because

IPR2021-00165
Patent 9,218,156 B2

it does not establish a difference between the results and the closest prior art and does not establish that such a difference would have been unexpected by a person of ordinary skill in the art.

### (4) Copying and Commercial Success

"Copying may . . . be another form of flattering praise for inventive features," as "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336 (citation omitted). Copying "requires evidence of efforts to replicate a specific product." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). "This may be demonstrated either through internal documents; direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica; or access to, and substantial similarity to, the patented product (as opposed to the patent)." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (internal citations omitted). However, "a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000); *see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[M]ore than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue." (citation omitted)).

Commercial success is typically shown with evidence of "significant sales in a relevant market." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (citation omitted). "When a patentee can demonstrate commercial success, usually shown by significant sales in a

IPR2021-00165
Patent 9,218,156 B2

relevant market, and that the successful product is the invention disclosed
and claimed in the patent, it is presumed that the commercial success is due
to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
106 F.3d 1563, 1571 (Fed. Cir. 1997).

Patent Owner argues that after Dr. Bates made his presentations to
Petitioner in 2010–2014, Petitioner copied Dr. Bates's invention in its
Tensor Processing Unit (TPU) v2 and v3 products released in 2017–2018,
which "use execution units designed to perform operations using a
low-precision 'floating point format called bfloat16' in order to achieve
increased parallelism and scale." PO Resp. 58–59 (citing Ex. 2010;
Ex. 2011, 9; Ex. 2034, 6; Ex. 2051 ¶¶ 126–127). The bfloat16 format
"keep[s] the same 8 bit exponent as found in 32-bit IEEE floating point" but
"reduces precision significantly by using only a 7-bit mantissa, as opposed
to the 23-bit mantissa of IEEE 32-bit floating point." *Id.* at 59–60 (citing
Ex. 2041, 1–2). According to Patent Owner, Petitioner uses the TPUv2 and
TPUv3 products to "power all of its major products and services, including
Search, Translate, Photos, Assistant, and Gmail," saving Petitioner "at least
$10 billion." *Id.* at 62–63 (citing Exs. 2011, 2015–18, 2040). Patent Owner
argues that a nexus is presumed because the TPUv2 and TPUv3 products are
coextensive with the challenged claims. *Id.* at 60, 63–69 (citing Pet. 20–21,
73; Ex. 1003 ¶¶ 231–232; Ex. 2011; Ex. 2016; Ex. 2041, 7; Ex. 2049;
Ex. 2051 ¶¶ 129–138). Patent Owner further contends that, even if not
presumed, a nexus is shown by "internal communications among
[Petitioner's] own engineers and executives" and Petitioner's
communications with Dr. Bates. *Id.* at 60–63 (citing Exs. 2007, 2011, 2016,
2035–39, 2041, 2042, 2047, 2048).

IPR2021-00165
Patent 9,218,156 B2

We have reviewed the cited evidence and do not find it probative of nonobviousness. First, we are not persuaded that a nexus should be presumed because the TPU products are coextensive with the Dockser/Tong-challenged claims, as Patent Owner contends. Petitioner and Mr. Goodin identify a number of other allegedly material features of the products that are not part of the claims: "Inter-Core Interconnect" (ICI), "Systolic array," "Two TensorCores per chip," "High-bandwidth memory," "Liquid cooling," and "Accelerated Linear Algebra compiler." *See* Reply 26; Ex. 1071 ¶¶ 86–92. We focus on the first two features in particular because the evidence of record characterizes them as significant.

Regarding the ICI of the TPU products, Dr. Patterson stated the following:

> So the *critical feature* of the supercomputer is the way they talk to each other – you know, the chips talk to each other. So what's called – [Petitioner] invented something called ICI. It's a custom Inter-Core Interconnect that they did custom for this design; it's not some standard that you buy off the shelf. It runs at about 500 gigabits per section in both directions per link, and there's four of those links.

Ex. 2012, 14:17–24 (emphasis added). An article authored by Dr. Patterson and others[5] states that "[t]he *critical architecture feature* of a modern supercomputer is how its chips communicate: what is the speed of a link; what is the interconnect topology; does it have centralized versus distributed switches; and so on," and the TPUv2 product has "four custom Inter-Core

---

[5] We disagree with Patent Owner that the materials cited herein are merely "marketing documents." *See* Conf. Tr. 13:18–24. Dr. Patterson's comments are from an audio transcription of a YouTube video filed by Patent Owner (Ex. 2012), and the article is from the publication *Communications of the ACM* (Ex. 2016). *See* PO Resp. ix.

IPR2021-00165
Patent 9,218,156 B2

Interconnect (ICI) links, each running at 496Gbits/s per direction."

Ex. 2016, 69; *see id.* at 70, 72, Fig. 2 (showing that ICI is part of the TPUv3

product as well); Ex. 1071 ¶ 87.

Regarding the systolic array architecture of the TPU products,

Dr. Patterson stated as follows:

> This systolic array idea brought back from the past that probably *cut the energy costs in half* for the multiplier, which is a lot of it. And then it was domain-specific. So a lot of the things that are complicated and area consuming on CPUs like branch predictors and caches – CPUs are covered with caches – they're not there because they're not helpful for this application. It was better to use more multiple units and dedicated memory units. So that *saves energy* and you could reuse the resources. So that was a *big success*.

Ex. 2012, 9:9–18 (emphasis added). He also agreed with an article

comparing the TPU to graphics processing units (GPUs) stating that "GPUs

incur high overhead in performance, area, and energy due to heavy

multithreading," whereas "[t]he systolic organization of TPUs captures the

data reuse while being simple by avoiding multithreading." *Id.* at

33:20–34:2. The article authored by Dr. Patterson and others includes

similar statements. Ex. 2016, 70 ("The TPUv2 node of the supercomputer

followed the main ideas of TPUv1: A large two-dimensional matrix multiply

unit (MXU) *using a systolic array to reduce area and energy* plus large,

software-controlled on-chip memories instead of caches." (emphasis

added)), 74 (quoting the earlier article stating that the "systolic organization"

of the TPU captures data reuse "while being simple by avoiding

multithreading"); *see* Ex. 1071 ¶ 88.

Patent Owner contends that Petitioner fails to show that the "features

are so critical that the TPUs are not 'essentially the invention.'" Sur-Reply

IPR2021-00165
Patent 9,218,156 B2

22. We are not persuaded. Petitioner does more than merely identify unclaimed features of the TPU products. Petitioner cites evidence, supported by the testimony of Mr. Goodin, showing that at least the ICI and systolic array architecture materially affect the TPU products' performance and were viewed as critical, successful features that were reasons for the TPU products' improved performance. *See Fox Factory*, 944 F.3d at 1374 ("[I]f the unclaimed features amount to nothing more than additional insignificant features, presuming nexus may nevertheless be appropriate."), 1375–76 (noting that the challenged patent and the patent owner's "marketing materials confirm that the forwardly protruding tooth tips, hook features, and mud clearing recesses each materially impacts the functioning of a chainring," such that "[f]or each of these features that the Board confirms is included in the [allegedly coextensive] chainrings, nexus can only be presumed between the . . . chainrings and a patent claim if the claim includes limitations relating to these features"). Patent Owner does not point to any evidence indicating that view to be factually incorrect. *See* Ex. 1072, 147:15–149:2 (Dr. Khatri opining that "the TPUs have the features that . . . are in these claims" and stating that he has no opinion "about what the TPUs . . . might have in addition"). We find that a presumption of nexus is inappropriate with respect to the TPU products.

Regardless of whether a presumption of nexus applies, we are not persuaded that Patent Owner has made a sufficient showing of nexus for two reasons. First, Patent Owner's nexus arguments are premised on the TPUv2 and TPUv3 products' "low-precision" bfloat16 floating point format having an 8-bit exponent and 7-bit mantissa. PO Resp. 58–59 (arguing that Petitioner copied Dr. Bates's invention by implementing "execution units designed to perform operations using" the bfloat16 format), 63 (arguing

Material Subject to Protective Order Has Been Redacted
IPR2021-00165
Patent 9,218,156 B2

commercial success due to the bfloat16 format using "low-precision
multipliers"). But "[l]ow-precision arithmetic—including LPHDR
multiplication—was not novel" and thus, cannot be the basis for a finding of
nexus. *See* Reply 20; *Kao*, 639 F.3d at 1068; *Tokai Corp. v. Easton
Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial
success is due to an element in the prior art, no nexus exists."). Tong taught
such a format nine years before the '156 patent. Tong describes two
different experiments emulating "different bitwidth FP units": one that
"implements the IEEE-754 standard" and then varies the mantissa bitwidth
(shown in Figure 6), and another that "implements the IEEE-754 standard"
and then varies the exponent bitwidth (shown in Figure 7). Ex. 1008,
278–279. Thus, we agree with Mr. Goodin that a person of ordinary skill in
the art "would have understood that Tong's Figure 6 . . . discloses a
floating-point format with an 8-bit exponent (which is the exponent size of
single-precision floating-point in the IEEE standard) . . . and a 7-bit
mantissa." *See* Ex. 1071 ¶ 74 (citing Ex. 1008, 274, 278–279; Ex. 1003
¶ 330). Tong discloses that the 8-bit exponent/7-bit mantissa format
produced useful results for both a "neural network trainer" application
(ALVINN) and a "speech recognition program" (Sphinx III). *See* Ex. 1008,
278–279; Ex. 1071 ¶ 75. Notably, these applications mirror Dr. Bates's
2013 presentation discussing ███████████████████████████ *See*
Ex. 2005, 12–13.

To be sure, the fact that the 8-bit exponent/7-bit mantissa format was
known in the prior art is not dispositive. *See WBIP*, 829 F.3d at
1330–31. "Commercial success, for example, may be linked to an
individual element or, in other circumstances, it could be linked to the
inventive combination of known elements." *Id.* at 1332. Patent Owner,

IPR2021-00165
Patent 9,218,156 B2

however, has not identified and explained a specific combination of elements (as opposed to just the "low-precision" bfloat16 floating point format) that could serve as a nexus for the evidence of alleged copying and commercial success.[6] *See* PO Resp. 58–59, 63.

Second, when arguing that the TPUv2 and TPUv3 products meet the X and Y percentage limitations of claim 1, Patent Owner points to the bfloat16 floating point format with a 7-bit mantissa and states that Petitioner argues in the Petition (with respect to Dockser) that "utilizing 7 bits of mantissa in multiplication operations results in a minimum of 12% of valid floating point 32 inputs producing at least 0.39% relative error compared to the exact mathematical calculation of a full-precision multiplication on those same inputs." *Id.* at 67–68 (citing Pet. 73; Ex. 2051 ¶¶ 135–136). Patent Owner does not explain, however, how the cited analysis of how Dockser teaches the X and Y percentage limitations applies to the TPUv2 and TPUv3 products. As Petitioner points out, Patent Owner "does not even attempt to demonstrate that [Petitioner's] TPUs perform the same bit-dropping techniques as Dockser." *See* Reply 27. Patent Owner has not established a sufficient nexus between the alleged copying and commercial success of the TPUv2 and TPUv3 products and the Dockser/Tong-challenged claims.

Finally, we note that Patent Owner's evidence of commercial success would be unpersuasive even if Patent Owner had established a nexus. Patent Owner's sole support for the alleged commercial success of the TPUv2 and

---

[6] To the extent Patent Owner alleges commercial success from Petitioner "[u]sing hundreds of thousands of these low-precision TPU v2 and v3 devices," we note again that claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by a single unit. *See* PO Resp. 63.

IPR2021-00165
Patent 9,218,156 B2

TPUv3 products is an article in *PCMag India*.  *See* PO Resp. 63 (citing

Ex. 2017).  That article states in relevant part:

> As AI and Machine Learning advanced, [Petitioner] was faced with the proposition of doubling the number of data centers it operates to handle the increased workloads.  Building multiple data centers to handle the growing amounts of data sets *could have easily cost the company anything above $10 billion*.
>
> So [Petitioner] decided to take another route by optimizing its current data centers for better efficiency.  The search giant in late 2013 decided to produce a custom chip in order to improve cost-performance over the GPUs it had deployed.  Thus *the first TPU* was born.

Ex. 2017, 3 (emphasis added).  The above statement as to how much "could

have" been saved is too speculative to reach a conclusion of commercial

success.  *See id.*  It also pertains to Petitioner's "first" TPU, not the TPUv2

and TPUv3 products that use the bfloat16 format.  *See id.*; Ex. 2016, 69

("Quantized arithmetic—8-bit integer instead of 32-bit floating point (FP)—

can work for inference like in TPUv1 but reduced-precision training is an

active research area.").

Accordingly, we find that Patent Owner's evidence of alleged copying

and commercial success does not weigh in favor of nonobviousness of the

Dockser/Tong-challenged claims.


### g)   Conclusion

Based on all of the evidence of record, including evidence of objective

indicia of nonobviousness submitted by Patent Owner, we determine that

claim 1 would have been obvious based on Dockser under 35 U.S.C.

§ 103(a).

IPR2021-00165
Patent 9,218,156 B2

### 3.  Claims 2 and 16

Claim 2 depends from claim 1, and recites that "the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine." In Petitioner's view, only one of the alternatives recited in claim 2 needs to be met.  Pet. 38–39.  We agree because claim 2 recites "at least one of," which indicates that what follows should be read disjunctively.  Petitioner asserts that Dockser's "main processor" is "a 'general purpose processor' implementable as a 'state machine' as claimed." *Id.* at 39 (citing Ex. 1007 ¶¶ 15, 35).

Claim 16 is an independent claim that recites a "device comprising: a plurality of components comprising: at least one first" LPHDR execution unit having the same properties as recited in claim 1.  That is, claim 16 is similar to claim 1 except that it adds "a plurality of components comprising" and lacks "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit" at the end. According to Petitioner, Dockser's computing system has a plurality of components:  a main processor and an FPP. *Id.* (citing Ex. 1003 ¶ 307). Petitioner, alternatively, argues that, if claim 16 were interpreted to require that a plurality of components be included in a single LPHDR execution unit, Dockser's FPP has multiple components:  registers, controller, and FPO, which also has an adder and multiplier. *Id.* at 40 (citing Ex. 1003 ¶ 308; Ex. 1007 ¶¶ 15, 19–22).  Petitioner relies on its analysis of claim 1 to address the remaining limitations, which are also found claim 1. *Id.* (citing Ex. 1003 ¶¶ 309–310).  We agree with Petitioner that Dockser's computing system has a plurality of components under either interpretation. *See id.* at

IPR2021-00165
Patent 9,218,156 B2

39–40.  Those components are described in the cited parts of Dockser.
Ex. 1007 ¶¶ 15, 19–22.

Patent Owner does not argue separately claims 2 and 16 in its
Response, only disputing Petitioner's contentions regarding the LPHDR
execution unit recited in claims 1 and 16.  PO Resp. 20–24.  We have
reviewed Petitioner's contentions regarding claims 2 and 16, which are
consistent with the disclosure of Dockser and supported by the testimony of
Mr. Goodin, taken into account evidence of objective indicia of
nonobviousness submitted by Patent Owner, and are persuaded that
Petitioner has proven, by a preponderance of the evidence, that claims 2 and
16 would have been obvious based on Dockser under 35 U.S.C. § 103(a).
*See* Pet. 38–40; Ex. 1003 ¶¶ 305–310; *supra* Section II.D.2(e).

### E.  *Obviousness Ground Based on Dockser and Tong (Claims 1, 2, 16, and 33)*

#### 1.  *Tong*

Tong is an IEEE journal article entitled "Reducing Power by
Optimizing the Necessary Precision/Range of Floating-Point Arithmetic."
Ex. 1008, 273.  Tong teaches reducing power consumption by minimizing
the bitwidth representation of floating-point data.  *Id.*  According to Tong,
using a variable bitwidth floating-point unit saves power.  *Id.*

#### 2.  *Claims 1, 2, and 16*

Petitioner argues that the subject matter of claim 1 would have been
obvious over the combination of Dockser and Tong[7] for reasons similar to

---

[7] Petitioner provides evidence supporting its contention that Tong is a prior
art printed publication under 35 U.S.C. § 102(b).  *See* Pet. 40–41 (citing

IPR2021-00165
Patent 9,218,156 B2

those analyzed with respect to Dockser alone. *See* Pet. 41–45. Additionally, Petitioner asserts that "Tong, like Dockser, . . . confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision." *Id.* at 41 (citing Ex. 1008, 273–278; Ex. 1003 ¶¶ 312–313). Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 42.



Tong's Figure 6, above, is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the horizontal axis. *Id.* at 41–42. The figure shows this data for five programs: ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx III. *Id.* The programs implement different signal-processing tasks. *See, e.g.*, Ex. 1008, 278 (Table IV). ALVINN, for example, is a neural network trainer that uses backpropagation. *Id.* And Sphinx III is a speech-recognition program. *Id.*

---

Ex. 1025 ¶¶ 8–11; Ex. 1026, 27; Ex. 1027, 27). Patent Owner does not assert otherwise in its Response, and we agree that Tong is prior art for the reasons stated by Petitioner.

IPR2021-00165
Patent 9,218,156 B2

Petitioner argues that "Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx [III]) would have motivated a [person of ordinary skill in the art] to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." Pet. 43–44. According to Petitioner, one of ordinary skill in the art would have done so "to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision." *Id.* (citing Ex. 1003 ¶ 322). Petitioner also concludes that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable." *Id.* at 45.

Patent Owner argues that, because Dockser lacks an LPHDR execution unit and Tong does not remedy that deficiency, the Dockser-Tong combination does not render obvious any challenged claim. PO Resp. 24–25; Sur-Reply 9. We disagree for the reasons discussed above regarding Petitioner's challenge based on Dockser alone. *See supra* Section II.D.2.

Patent Owner further argues that Tong does not teach using only 5 mantissa bits, which means that the Dockser-Tong combination lacks the imprecision required to meet the X and Y values recited in limitation *1B2*. PO Resp. 25. In Patent Owner's view, "Tong teaches that at least 11 mantissa bits are required for consistent performance, even for 'programs dealing with human interfaces [that] process sensory data with intrinsically low resolutions.'" *Id.* (quoting Ex. 1008, 278). According to Patent Owner, "Petitioner makes no effort to show that arithmetic with the 'required' 11-bit mantissa is an LPHDR operation and meets the X/Y limitations of the claims." *Id.*

IPR2021-00165
Patent 9,218,156 B2

Yet Patent Owner's argument about an 11-bit mantissa (*id.*) does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP to operate at a "selected precision level" according to Tong (Pet. 43–45). Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." *Id.* at 43–44. Thus, we disagree with Patent Owner's argument about an 11-bit mantissa. *See* PO Resp. 25; Sur-Reply 9. For this reason, we do not credit Dr. Khatri's testimony on this point. Ex. 2051 ¶ 77.

Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. Pet. 44 (citing Ex. 1003 ¶ 324). Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits. *Id.* (citing Ex. 1003 ¶ 324).

Petitioner adequately shows that the X and Y limitations are met for the 5 mantissa bit rationale. *Id.* at 43–45. In particular, Mr. Goodin's software program shows that "when retaining 5 mantissa fraction bits in view of Tong, Dockser's register bit-dropping technique produces at least Y=0.05% relative error for 99.45% of possible valid inputs, and Dockser's logic bit-dropping technique produces at least Y=0.05% relative error for 99.47% of possible valid inputs," and the algebraic analysis shows that "Dockser's register bit-dropping technique when retaining 5 mantissa fraction bits produces a minimum of 1.56% relative error (greater than Y=0.05%) for over 12% of possible valid inputs (greater than X=5%)." Ex. 1003 ¶ 324. After review of the arguments and evidence on these issues, we credit Mr. Goodin's algebraic analysis and software-based analysis. *See id.*, App'x I.B–D.

IPR2021-00165
Patent 9,218,156 B2

Although Patent Owner does not present argument specifically
directed to Mr. Goodin's software-based or algebraic analysis, Patent Owner
argues that one of ordinary skill in the art would not have chosen a 5-bit
mantissa: "Tong's experimental results show that using fewer than 11
mantissa bits unacceptably reduces accuracy for the benchmark applications
*that were specifically selected* (from a category of programs) for their high
tolerance for imprecision." PO Resp. 25–26 (citing Ex. 2051 ¶ 78). To
illustrate this point, Patent Owner annotates Tong's Figure 6, reproduced
below.



Tong's Figure 6, above, shows the experimental results with color
annotations indicating "the precision levels suitable for general-purpose
operation (green), those at which a significant percentage of applications
begin to produce unacceptable results (yellow), and finally, levels of
precision that are unsuitable for most testing benchmarks (red)." *Id.* (citing
Ex. 2051 ¶ 79).

IPR2021-00165
Patent 9,218,156 B2

Patent Owner argues that there is no motivation to combine Dockser and Tong because "there is no evidence to show that a [person of ordinary skill in the art] would have chosen Tong's 5-bit examples over the 7, 9, or 11-bit examples." *Id.* at 26–27; *see also* Sur-Reply 9–10. According to Patent Owner, "Tong does not disclose any extra capability that would have motivated a [person of ordinary skill in the art] to use it with Dockser." PO Resp. 26–27 (citing Ex. 2051 ¶¶ 81–82). In Patent Owner's view, Petitioner relies on hindsight to choose 5 bits and does not offer any differences between Dockser and the claimed invention or other non-hindsight motivation to combine with Tong. *Id.* According to Patent Owner, "Tong teaches that 'it appears inevitable that some fraction of our operands will require full IEEE standard precision,'" which means that a person of ordinary skill in the art would not have been motivated to operate only in 5-bit, 7-bit, or 9-bit modes as Petitioner suggests. Sur-Reply 10 (quoting Ex. 1008, 280).

We disagree with Patent Owner's arguments directed to the rationale for using 5 mantissa bits. *See* PO Resp. 25–27; Sur-Reply 9–10. Petitioner's reasoning for the 5-bit example is "to conserve power when running [certain] applications, or others empirically determined (using Tong's techniques) to not require greater precision." Pet. 43–44 (citing Ex. 1003 ¶ 322). For example, in the ALVINN and Sphinx III line plots in Tong's Figure 6, Petitioner added a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. *Id.* at 42. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Ex. 1008, 278). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption. *Id.* at 42–43. Petitioner characterizes Tong

IPR2021-00165
Patent 9,218,156 B2

as "[h]aving empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications." *Id.* at 43 (citing Ex. 1008, 273, 274, 279, 284).

Petitioner's assertions are adequately supported by the record. We are persuaded by Petitioner's reliance on Tong's Figure 6 to determine how many bits are needed in a particular application. *See id.* at 42–44. That is, Petitioner's choice is not arbitrary or solely based on the '156 patent's written description alone. *See* PO Resp. 25–26. Rather, Petitioner's choice of 5 bits is based on Tong's experimental results for *certain* applications. *See* Pet. 42–44. We emphasize *certain* because Petitioner is not saying that 5-bits is suitable for every application. *See id.* Full precision may be needed some of the time. *See* Ex. 1008, 280; Sur-Reply 9–10. But, even if Tong teaches that some applications begin to produce unacceptable results below 11-bits, as Patent Owner notes (PO Resp. 25–26), Tong teaches that 5-bits would be enough for certain ones: ALVINN and Sphinx III shown in Tong's Figure 6. Pet. 42–44.

Patent Owner argues that "Tong lists those two applications amongst a great many other disclosed applications that all require full precision, and that a [person of ordinary skill in the art] would therefore not be motivated to configure Dockser to operate with a 5-bit mantissa just to support those two applications given the far larger number of disclosed applications that require full precision." Sur-Reply 9; PO Resp. 25–27.

We disagree with Patent Owner's argument here because the record adequately supports Petitioner's rationale that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable," and Tong, in particular, shows an optimization

IPR2021-00165
Patent 9,218,156 B2

for a particular program. Pet. 43–45. The record adequately supports
Petitioner's reasoning here: Dr. Khatri testified that "exact computing . . .
takes up a lot of power." Ex. 1072, 47:2–5. Mr. Goodin explained that
reducing precision may reduce power consumption. *See, e.g.*, Ex. 2043,
34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision
may achieve power savings). And we credit Mr. Goodin's explanation of
how Tong achieves this for certain applications. *See, e.g.*, Ex. 1003
¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 322, 325 (citing Ex. 1008, 278).
That is, Petitioner's proposed combination would omit unnecessary bits to
reduce waste and power consumption. Pet. 43–45.

Thus, we find Patent Owner's arguments regarding the combination
with Tong unavailing. *See* PO Resp. 25–27; Sur-Reply 9–10. For the same
reasons, we do not credit Dr. Khatri's testimony on this point. Ex. 2051
¶¶ 77–82.

For the reasons discussed, we determine that Petitioner provides
articulated reasoning, supported by rational underpinnings, why one of
ordinary skill in the art would have combined Dockser and Tong. *See KSR*,
550 U.S. at 418. Based on the Petition, we find that a person of ordinary
skill in the art would have modified Dockser with Tong to arrive at the
device recited in claim 1 with a reasonable expectation of success. Based on
all of the evidence of record, including evidence of objective indicia of
nonobviousness submitted by Patent Owner, we determine that claim 1
would have been obvious based on Dockser and Tong under 35 U.S.C.
§ 103(a).

Petitioner asserts that the subject matter recited in claims 2 and 16
would have been obvious over the combination of Dockser and Tong for
reasons similar to those presented in the ground based on Dockser alone.

IPR2021-00165
Patent 9,218,156 B2

*See* Pet. 43–45.  For the reasons discussed above and the reasons discussed for Dockser alone, Petitioner's contentions are supported by Mr. Goodin's testimony and are persuasive.  *See id.*; *supra* Section II.D.3.  Patent Owner does not present arguments specifically directed to these claims.  *See* PO Resp.; Sur-Reply.  We disagree with Patent Owner's arguments regarding claim 1 based on the full trial record for the same reasons explained above.  *See supra* Section II.D.2.  Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claims 2 and 16 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

### 3.    *Claim 33*

Claim 33 recites a "device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: a plurality of components comprising" an LPHDR execution unit having the same properties as recited in claim 1. Petitioner asserts that Tong teaches emulating, in software, different bitwidth FP units to determine application accuracy.  Pet. 46 (citing Ex. 1008, 278). According to Petitioner, based on this teaching, one of ordinary skill in the art would have been motivated "to emulate the Dockser/Tong device . . . in software to assess the accuracy of applications running on the device at selected precision levels, and a [person of ordinary skill in the art] would have had a reasonable expectation of success in doing so."  *Id.* (citing Ex. 1003 ¶¶ 328–329).

Petitioner asserts that "[w]hen the Dockser/Tong device is 'emulated in software' per Tong's teachings, . . . the conventional and obvious

IPR2021-00165
Patent 9,218,156 B2

implementation of such 'software' is 'computer program instructions' stored in 'a computer-readable memory' and 'executable by [a] processor' within a 'device' (*e.g.*, a computer) as claimed." *Id.* (citing Ex. 1003 ¶ 330; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 25, ll. 58–60). For reasons similar to those with respect to claim 1, Petitioner argues that a person of ordinary skill in the art would have been motivated by Tong to use a computer to emulate the combined teachings of Dockser and Tong, "meeting the 'second device' [recited in claim 33]), which comprises a plurality of components including a main processor and Dockser's execution unit." *Id.* at 46–47 (citing Ex. 1003 ¶ 331). Petitioner argues that Tong emulates a device in the same way as the '156 patent does:

> Like the '156 patent's only examples of "emulat[ing] a . . . device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform.

*Id.* at 47 (citing Ex. 1001, col. 17, ll. 5–19, col. 18, l. 52–col. 19, l. 11; Ex. 1008, 278; Ex. 1003 ¶¶ 332–333).

Patent Owner does not argue separately claim 33 in its Response, only disputing Petitioner's contentions regarding claim 1 and the alleged motivation to combine Dockser and Tong, which we address above. PO Resp. 24–26; *see supra* Section II.E.2. After review of the arguments and evidence on these issues, we agree with Petitioner and credit Mr. Goodin's testimony. *See* Ex. 1003 ¶¶ 328–335.

In particular, the '156 patent describes code written in the C programming language to perform the same arithmetic operations in the same order using the same method as one implemented in hardware.

IPR2021-00165
Patent 9,218,156 B2

Ex. 1001, col. 18, l. 52–col. 19, l. 11, *cited in* Pet. 47.  We agree with Petitioner that Tong similarly uses a computer program to simulate reduced precision arithmetic that a hardware unit would perform.  *See* Pet. 47.  For example, Tong uses an "FP software emulation package" to simulate reduced precision arithmetic and determine "the relationship between program accuracy and number of bits in FP representation."  Ex. 1008, 278, *cited in* Pet. 47.

Petitioner's obviousness rationale—i.e., "to assess the accuracy of applications running on the device at selected precision levels"—is adequately supported by the record: Tong explains that the emulation package was used to assess "different mantissa and exponent bitwidths." *See* Pet. 46 (citing Ex. 1008, 278).  Petitioner's assertion that software is computer program instructions stored in a computer-readable memory and executable by a processor within a computing device is adequately supported by at least Mr. Goodin's testimony and the evidence that he cites. *Id.* at 46–47 (citing Ex. 1003 ¶ 330; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 25, ll. 58–60).

For the same reasons discussed with respect to claims 1 and 16, Petitioner has shown that the subject matter recited in claim 33 that is also recited in claims 1 and 16 would have been obvious over the Dockser-Tong combination.  *See supra* Section II.E.2.

We determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong.  *See KSR*, 550 U.S. at 418.  Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the device recited in claim 33 with a reasonable expectation of success.  Based on all of the evidence of record,

IPR2021-00165
Patent 9,218,156 B2

including evidence of objective indicia of nonobviousness submitted by
Patent Owner, we determine that claim 33 would have been obvious based
on Dockser and Tong under 35 U.S.C. § 103(a).

### F.  Obviousness Ground Based on Dockser and MacMillan (Claims 1–8 and 16)

#### 1.  MacMillan

MacMillan is entitled "Circuit for Enhancing Performance of a
Computer for Personal Use." Ex. 1009, code (54).  MacMillan discloses
using Single Instruction Multiple Data (SIMD) parallel-processing
architectures for "adding supercomputer performance to a computer for
personal use." *Id.* at col. 5, ll. 22–54.  MacMillan's computer system
comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and
SIMD-random access memory (SIMD-RAM) devices. *Id.* at col. 9,
ll. 11–19, 30–31, Figs. 2, 3.

IPR2021-00165
Patent 9,218,156 B2

Figure 5 of MacMillan is reproduced below.



**FIG. 5**

Figure 5 depicts SIMD-RAM device 254 comprising a plurality of
DRAMs 304 coupled to a plurality of processing elements 302 (PE0, PE1,
PE2, etc.) connected to SIMD bus 240. *Id.* at col. 12, ll. 35–43. MacMillan
discloses that "[e]ach PE contains a 32-bit wide data path and can perform
atomic operations on bits, bytes, 16-bit words, and 32-bit words," "each
DRAM 304 is independently addressed by its PE," "[i]nteger and floating
point accelerators could be included in each PE," and "[e]xecution autonomy
is provided, in which specific PEs can be excluded from executing specific
instructions." *Id.* at col. 12, ll. 47–59. MacMillan describes an example
architecture of a system with 256 PEs, but states that the disclosed
architecture "allows scaling to higher or lower density chips with more or
fewer PEs." *Id.* at col. 12, l. 60–col. 13, l. 4, col. 13, ll. 38–41, col. 16,
ll. 20–22.

IPR2021-00165
Patent 9,218,156 B2

## 2.    *Claim 3*

Petitioner contends that claims 1–8 and 16 are unpatentable over Dockser and MacMillan under 35 U.S.C. § 103(a).  Pet. 47–55.  Claim 3 depends from claim 2 (which depends from claim 1) and recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (the "exceeds" limitation).  Petitioner relies on MacMillan for its teachings regarding multiple floating-point execution units, and argues that a person of ordinary skill in the art "would have been motivated to use Dockser's FPP to implement each 'floating-point accelerator' in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches."  *Id.* at 6, 49–50 (citing Ex. 1003 ¶¶ 341–342).  According to Petitioner, "using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power."  *Id.* at 50 (citing Ex. 1003 ¶ 343; Ex. 1009, col. 12, ll. 47–49; Ex. 1024, col. 1, ll. 43–58).  Petitioner further contends that MacMillan's SIMD parallel processing is used in "the same types of computers for which Dockser's FPP provides '[p]ower management'" and would be beneficial for the same types of "'graphics applications' for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision."  *Id.* at 49–50 (citing Ex. 1003 ¶¶ 340, 344; Ex. 1007 ¶ 3; Ex. 1009, col. 1, ll. 6–9, col. 5, ll. 22–45, col. 7, ll. 14–34).

IPR2021-00165
Patent 9,218,156 B2

With respect to the "exceeds" limitation in particular, Petitioner asserts that MacMillan teaches 256 PEs, and the Dockser-MacMillan combination would have a "single Host CPU floating-point unit" and at least one FPP in each of the PEs, of which there can be "256 or more." *Id.* at 51–53 (quoting Ex. 1009, col. 2, ll. 13–15; citing Ex. 1003 ¶ 361–362, 366). Thus, in Petitioner's proposed combined device based on Dockser and MacMillan, the number of LPHDR execution units (Dockser FPPs) "exceeds by over 100 its number (one) of traditional-precision execution units (the single Host CPU floating-point unit)." *Id.* (citing Ex. 1003 ¶ 366).

Patent Owner responds that a person of ordinary skill in the art would not have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. PO Resp. 36–37. Patent Owner argues that "Dockser is focused on the objective of reducing power consumption," whereas "MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption." *Id.* at 36 (citing Ex. 1009, col. 3, ll. 4–6; Ex. 2051 ¶¶ 101–102). Patent Owner further contends that "[i]ncorporating Dockser's FPPs into MacMillan would . . . defeat MacMillan's stated objective of achieving a high-scale SIMD computer architecture at 'lower system cost.'" *Id.* at 36–37 (citing Ex. 1009, col. 5, ll. 58–59; Ex. 2051 ¶ 103). According to Patent Owner, "Dockser's FPPs are even *larger* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes," such that "replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit." *Id.* at 37 (citing Ex. 2051 ¶ 104); *see also* Sur-Reply 14–15.

IPR2021-00165
Patent 9,218,156 B2

Petitioner argues in its Reply that the asserted combination would achieve both benefits of increasing performance speed (based on MacMillan) and lowering power consumption (based on Dockser), and that Patent Owner fails to provide supporting evidence for its argument that incorporating Dockser's FPP into the MacMillan device would increase costs, and even if it had, economic reasons are not indicative of nonobviousness.  Reply 9–10 (citing Ex. 1071 ¶¶ 30–31).

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser and MacMillan, we agree with Patent Owner. Dockser teaches a single FPP with "selectable subprecision" that is capable of both full precision and reduced precision operations.  *See* Ex. 1007, code (57), ¶ 15.  The FPP includes additional control circuitry, such as floating-point controller 130 and control register 137, that allows selection of a subprecision for floating-point operations.  *Id.* ¶¶ 15, 18, Fig. 1. Dockser describes "a variety of ways" in which "subprecision select bits may be used to reduce the precision of a floating-point operation."  *Id.* ¶¶ 18, 23–34.  Reduced precision can be achieved, with resultant power savings, either by removing power from "floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" or "removing power to the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected."  *Id.* ¶¶ 4–7, 26–27.  Mr. Goodin agrees that Dockser's FPP requires additional control circuitry to implement its selectable subprecision.  Ex. 2043, 43:21–45:9.

MacMillan, by contrast, is heavily focused on avoiding increased costs associated with added complexity.  MacMillan states that "[i]f supercomputing performance could be achieved in low cost computers, such

IPR2021-00165
Patent 9,218,156 B2

as personal computers, this could dramatically expand the market for personal computers." Ex. 1009, col. 1, ll. 21–24. SIMD computing capability can be added to personal computers, "resulting in much higher performance computing at moderate cost." *Id.* at col. 8, ll. 51–55. MacMillan, however, describes numerous limitations of known SIMD designs at the time, many of which relate to increased costs from added complexity (e.g., additional registers), size, etc. *See, e.g., id.* at col. 2, ll. 56–61 ("hav[ing] a large register set on each PE . . . increases die area per PE, resulting in higher costs per PE"), col. 2, ll. 62–65 ("Adding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs. It may also require tighter geometries or increased numbers of layers on printed circuits boards, further increasing costs."), col. 3, ll. 2–4 ("Adding output buffers to drive increased pin counts also increases power dissipation and hence power supply capacity and cost."), col. 4, ll. 39–40 ("The PE array[] disk may be limited in size due to technology or cost factors.").

> Importantly, MacMillan states:
>
> Overcoming the above limitations would allow supercomputing performance to be provided in a *low cost* computer system for personal use, dramatically expanding the potential market for systems with supercomputer performance. To meet the cost objectives, the SIMD capabilities *should not add significant complexity to the architecture of a computer system for personal use*. The present invention addresses the above needs.

*Id.* at col. 5, ll. 38–45 (emphasis added). MacMillan's disclosed architecture—with multiple, less costly PEs operating in parallel to increase computational power—is expressly intended to account for these limitations. *See id.* at col. 5, ll. 44–45, col. 5, ll. 58–61 (the disclosed system with "shared memory results in lower system cost and more flexibility in using memory"), col. 6, ll. 1–10 ("Another aspect of the invention is that it shows

IPR2021-00165
Patent 9,218,156 B2

how parallel SIMD processing can be added inexpensively to existing system architectures. This cost-effective addition of parallel processing can be made to popular, low cost computer systems running popular operating systems . . . ."), col. 6, ll. 41–45, col. 16, ll. 14–27.

In determining how a person of ordinary skill in the art would have understood those disclosures, we credit the testimony of Dr. Khatri, which is consistent with, and a logical reading of, Dockser and MacMillan. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017) (stating that the Board "is permitted to weigh expert testimony and other record evidence and, in so doing, rely on certain portions of an expert's declaration while disregarding others"). Specifically, the circuitry implementing Dockser's selectable subprecision is beyond that of a typical full precision execution unit. Dr. Khatri testifies that

> [b]ecause Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a [person of ordinary skill in the art] would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a [person of ordinary skill in the art] would expect it to be *larger* than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

*See* Ex. 2051 ¶ 51. Petitioner's asserted combination of incorporating Dockser's FPP into each of multiple PEs in MacMillan's device "would require additional circuitry and chip space and would therefore *increase* costs," "defeat[ing] MacMillan's stated objective of achieving a highly parallel SIMD computer architecture at 'lower system cost.'" *See id.* ¶¶ 103–104. Again, MacMillan specifically counsels that to achieve its cost

IPR2021-00165
Patent 9,218,156 B2

objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44. The combination proposed by Petitioner would do so. MacMillan's PEs already perform full precision operations; Dockser's selectable subprecision circuitry would add complexity beyond that of a typical full precision execution unit. *See* Ex. 2051 ¶¶ 103–104; Ex. 1009, col. 12, ll. 47–49 ("Each PE contains a 32-bit wide data path and can perform atomic operations on . . . 32-bit words.").

A person of ordinary skill in the art, reading MacMillan and understanding its emphasis on avoiding increased costs associated with added complexity and size, would not have been motivated to modify MacMillan's device by incorporating Dockser's FPP into the PEs. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376–77 (Fed. Cir. 2021) (finding insufficient motivation to "increase [a prior art reference's] melt flow rate to the claimed range," in part because the reference "includes numerous examples of processing techniques that are typically used to increase melt flow rate, which [the reference] cautions should *not* be used due to the risk of obtaining a broader molecular weight distribution"); *TriVascular*, 812 F.3d at 1067–69 (finding insufficient motivation to combine two references by "substitut[ing] the recessed barbs of [one reference] with the protuberances of [another reference], since [the petitioner's] proposed substitution would destroy the basic objective of the barbs"); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (finding no reason to modify a prior art device where the modification would render the device "inoperable for its intended purpose"); *see also Henny Penny*, 938 F.3d at 1332 (affirming the Board's finding of no motivation to combine where the Board "credited [the patent owner's] expert's testimony that following [one

IPR2021-00165
Patent 9,218,156 B2

reference's] method of diverting and cooling the oil in [another reference's] system would introduce 'additional plumbing and complexity'"). Notably, this is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PEs; the evidence shows that doing so would increase costs because of the added complexity and size of the FPP—a concern that MacMillan explicitly counsels against. *See* Sur-Reply 15.

Petitioner's position is that the individual benefits of MacMillan's approach (increasing performance speed from many low-cost processors operating in parallel) and Dockser's approach (lowering power consumption using additional circuitry added to a single, more complex processor) would have motivated a person of ordinary skill in the art to combine the references' teachings by incorporating Dockser's FPP into the multiple PEs in MacMillan's device. Pet. 6, 49–50. Given the express teachings of MacMillan, however, we are not persuaded that an ordinarily skilled artisan would have been motivated to combine the two different approaches in that manner. Specifically, MacMillan's repeated statements that its approach is designed to avoid increased costs from added complexity and size (and thereby allow for many low-cost processors in the device) would have dissuaded a person of ordinary skill in the art from doing so.

To the extent Petitioner and Mr. Goodin fault Patent Owner for not providing evidence supporting its position, we are not persuaded. *See* Reply 9–10; Ex. 1071 ¶ 31. Petitioner bears the burden of proving unpatentability by a preponderance of the evidence, which includes proving that a person of ordinary skill in the art would have had reason to combine the prior art references. *See* 35 U.S.C. § 316(e); *Magnum Oil*, 829 F.3d at 1380. Moreover, Patent Owner's arguments are supported by evidence. Patent

IPR2021-00165
Patent 9,218,156 B2

Owner relies on the disclosures of Dockser and MacMillan themselves, expert testimony from Dr. Khatri (which we credit on the issue of reasons to combine Dockser and MacMillan), and cross-examination testimony from Mr. Goodin. *See* PO Resp. 36–37; Sur-Reply 14–15; Ex. 2051 ¶¶ 101–104.

For the reasons explained above, we are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner.[8] Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

### 3.   *Claims 4–8*

Claims 4–8 depend from claim 3.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 4–8 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

### 4.   *Claims 1, 2, and 16*

As explained above, we conclude that claims 1, 2, and 16 are unpatentable over Dockser, and over Dockser and Tong, under 35 U.S.C. § 103(a).  *See supra* Sections II.D–E.  As such, we need not address

---

[8] Given this determination, we need not address Patent Owner's argument that the references fail to teach the "exceeds" limitation of claim 3 because the alleged "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) are "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (in addition to executing at reduced precision) and thus "the number of LPHDR execution units will never exceed the number of claim 3 full-precision multiplication execution units," as required by the claim. *See* PO Resp. 28–36; Reply 12–15; Sur-Reply 10–14.

IPR2021-00165
Patent 9,218,156 B2

Petitioner's alternative ground based on Dockser and MacMillan as to claims 1, 2, and 16. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that "the Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

### G. *Obviousness Ground Based on Dockser, Tong, and MacMillan (Claims 1–8, 16, and 33)*

#### *1. Claim 3*

Petitioner contends that claims 1–8, 16, and 33 are unpatentable over Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a). Pet. 56–60. Petitioner presents two theories with respect to claim 3. First, Petitioner argues that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels, such that "[t]he resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong)" teaches the claim limitations "for the same reasons Dockser/MacMillan does," referring to Petitioner's earlier analysis of the asserted ground based on Dockser and MacMillan. Pet. 56–57. We are not persuaded by those arguments for the reasons explained above. *See supra* Section II.F.2.

Second, Petitioner presents another theory based on a "customized implementation" of Dockser's FPPs. Pet. 57–60 (citing Ex. 1003 ¶¶ 391–401); Reply 15–17 (citing Ex. 1071 ¶¶ 56–62). Petitioner argues that a person of ordinary skill in the art "would have been motivated to

IPR2021-00165
Patent 9,218,156 B2

customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'" Pet. 57–58 (citing Ex. 1008, 279). Specifically, according to Petitioner, an ordinarily skilled artisan would have been motivated to "implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered" and likewise "implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application." *Id.* at 58–59.

Petitioner's analysis is premised on an "alternative interpretation" of the portion of the "exceeds" limitation referring to execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." *Id.* at 59–60. Under that interpretation, an execution unit could meet the "adapted to" clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* Dockser's FPP, modified as described above, would not be such a unit because it has registers and multiplier logic with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the "adapted to" clause. *Id.*

Patent Owner responds that a person of ordinary skill in the art "would not have been motivated to re-engineer the FPP of Dockser to remove its 32-bit capability [based on Tong] and then incorporate the re-engineered Dockser unit into the system of MacMillan." PO Resp. 40–45 (citing Ex. 2051 ¶¶ 108–115). Patent Owner argues that none of the three

references support Petitioner's view. *Id.* at 42–45. First, Dockser teaches a device that "support[s] a range of selectable precisions including full precision," and "[a]djusting Dockser by removing its full-precision capability violates a central tenet of Dockser—to always be able to execute full-precision operations." *Id.* at 43–44. Second, Tong similarly teaches a device with "both full- and reduced-precision capabilities," and would have reinforced Dockser's teaching that "while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision." *Id.* at 42–43 (emphasis omitted). Third, the asserted combination, "which requires special, customized registers, logic elements, [and] arithmetic units, . . . would increase manufacturing costs and goes directly against the teachings of MacMillan," in particular its teaching that adding "significant complexity" to the SIMD architecture should be avoided. *Id.* at 44–45. The parties in their Reply and Sur-Reply disagree as to the meaning of certain cited disclosures in the references. *See* Reply 15–17; Sur-Reply 15–18.

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser, Tong, and MacMillan, we agree with Patent Owner. Petitioner's asserted combination is predicated on *removing* what is a fundamental feature of Dockser and Tong—namely, the ability to operate at full precision or select a precision less than full precision. Dockser teaches a single processor with a default full precision mode that is capable of also operating in selectable reduced precision modes. Ex. 1007 ¶¶ 3–4 ("[T]he common situation is that for certain applications, . . . a reduced precision may be acceptable, and for other applications, . . . a greater precision may be needed. Accordingly, there is a need in the art for a floating-point processor

IPR2021-00165
Patent 9,218,156 B2

in which the reduced precision, or subprecision, of the floating-point format
is selectable."). Dockser's FPP operates on 32-bit full precision values and
performs arithmetic operations at a particular subprecision if the associated
"subprecision select bits" are set, but if not, operates at full precision. *Id.*
¶¶ 17–19, 23–29, 32, claims 1 (reciting "a floating-point processor having a
maximum precision" and "selecting a subprecision less than the maximum
precision"), 8, 15, 20. Dockser thus requires full precision with the
capability to select a subprecision less than full precision, as Mr. Goodin
agrees. *See* Ex. 2043, 36:16–37:17, 38:3–8 ("I don't believe Dockser
discloses any embodiments without floating-point . . . selectable
precision."), 55:21–57:12 ("Dockser requires selectable precision"). Indeed,
Petitioner explicitly relies on the fact that "Dockser's precision is selectable"
when asserting that a person of ordinary skill in the art would have
combined the teachings of Dockser and Tong. *See* Pet. 43; Reply 8;
Sur-Reply 17. We see no basis to conclude that a person of ordinary skill in
the art would have been motivated to remove the feature that Dockser
describes as always present and that is the basis for Petitioner's other
assertions regarding Dockser and Tong. *See Chemours*, 4 F.4th at 1376–77
(finding insufficient motivation to modify a prior art reference "when doing
so would necessarily involve altering the inventive concept of" the
reference); Public Tr. 41:21–42:8.

    Tong likewise does not support Petitioner's asserted motivation to
combine. Tong discloses that "not all programs need the precision provided
by generic FP hardware," and "the fine precision of the 23-bit mantissa is
not essential" and "a single custom FP format may be a viable option" for
particular applications, but full precision is necessary for other applications.
*See* Ex. 1008, 278–280. Tong states that "scientific programs such as

IPR2021-00165
Patent 9,218,156 B2

large-scale computational fluid dynamics or electric circuit simulation . . .

require a huge amount of precision." *Id.* at 279. Tong further discloses that

> by reducing either precision or range from 32 to fewer bits, we
> should be able to create custom FP hardware which has lower
> power simply because of the bit reductions. For a narrow,
> application-specific task, a single custom FP format may be a
> viable option. However, *to be more generally useful, we need to
> consider arithmetic architectures which can scale to different FP
> formats*. Even though we may be able to assume that most of our
> operands can be computed successfully in limited precision, it
> appears *inevitable that some fraction of our operands will
> require full IEEE-standard precision*.

*Id.* at 280 (emphasis added). Given those disclosures, we are not persuaded

that a person of ordinary skill in the art would have been motivated to

remove from Dockser's FPP the capability (i.e., selectability from full

precision) that Tong characterizes as important.[9]

Finally, with respect to MacMillan, the reference states that to achieve

its cost objectives, "SIMD capabilities should not add significant complexity

to the architecture of a computer system for personal use." Ex. 1009, col. 5,

---

[9] Petitioner has shown sufficiently that a person of ordinary skill in the art
would have been motivated to *select* a particular precision level in Dockser's
FPP based on the teachings of Tong, but not to *remove* functionality from
the FPP itself. *See supra* Section II.E.2; *compare* Pet. 43–44 (arguing that
Tong "would have motivated a [person of ordinary skill in the art] to
*configure* Dockser's FPP . . . to *operate at* a *selected* precision level
retaining as few as 5 mantissa fraction bits . . . or others empirically
determined (using Tong's techniques) to not require greater precision"
(emphasis added)), *with id.* at 58–59 (arguing that a person of ordinary skill
in the art "would have been motivated to *customize* Dockser's FPPs in
MacMillan's PEs" by removing register storage elements to have "smaller
than 32-bit registers" (for the register bit-dropping technique) or removing
multiplier logic elements (for the multiplier logic technique) (emphasis
added)).

IPR2021-00165
Patent 9,218,156 B2

ll. 42–44.  The Dockser-Tong-MacMillan combined device would add complexity because it involves a "customized implementation" of the multiplier logic in Dockser's FPP.  *See* Pet. 57–58; Reply 15.  Further, to the extent some selectability remains (among levels below full precision) in Petitioner's "customized implementation," the modified Dockser FPP would still require Dockser's additional control circuitry to implement that selectable subprecision.  As explained above, such circuitry would increase costs due to added complexity and size, which MacMillan expressly counsels against.  *See supra* Section II.F.2.

We credit the testimony of Dr. Khatri on these points, as it is explained sufficiently and is consistent with the disclosures of the references.  *See* Ex. 2051 ¶¶ 46–48, 107–115.  Petitioner has not shown sufficiently that a person of ordinary skill in the art would have combined the teachings of Dockser, Tong, and MacMillan to remove from Dockser's FPP the ability to select a precision less than full precision and then incorporate the modified FPP into the PEs of MacMillan.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

### 2.  *Claims 4–8*

Claims 4–8 depend from claim 3.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 4–8 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

IPR2021-00165
Patent 9,218,156 B2

### 3. Claims 1, 2, 16, and 33

As explained above, we conclude that claims 1, 2, and 16 are unpatentable over Dockser, and claims 1, 2, 16, and 33 are unpatentable over Dockser and Tong, under 35 U.S.C. § 103(a). *See supra* Sections II.D–E. As such, we need not address Petitioner's alternative ground based on Dockser, Tong, and MacMillan as to claims 1, 2, 16, and 33. *See Boston Sci. Scimed*, 809 F. App'x at 990.

### H. Patent Owner's Motion to Exclude

Patent Owner moves to exclude (1) Exhibits 1073, 1075–1078, 1082–1084, 1088–1090, 1096, and 1097 as "irrelevant and prejudicial" under Federal Rules of Evidence 402 and 403; (2) Exhibit 1082 for the same reasons and also as unauthenticated under Federal Rule of Evidence 901; (3) and Exhibits 1094 and 1095 as containing inadmissible hearsay under Federal Rule of Evidence 802. Mot. 3–7. Patent Owner's Motion is dismissed as moot, as we do not rely on the exhibits in a manner adverse to Patent Owner in our Decision.

In particular, Petitioner cites Exhibits 1073 and 1075 in support of its argument that Dockser and MacMillan teach the "exceeds" limitation of claim 3. *See* Mot. 3–4; Reply 13–14. Petitioner cites Exhibits 1076–1078 and 1097 in response to an argument made by Patent Owner in its Response regarding MacMillan. *See* Mot. 4; Reply 16–17. We need not reach those arguments because we determine that Petitioner has not shown unpatentability of the claims challenged based on the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, for other reasons. *See supra* Sections II.F, II.G.

IPR2021-00165
Patent 9,218,156 B2

Petitioner cites Exhibits 1078, 1082–1084, 1088–1090, and 1094–1096 in support of its arguments regarding objective indicia of nonobviousness. *See* Mot. 4–7; Reply 21–22, 25, 27–28. As explained above, we do not find Patent Owner's evidence of objective indicia of nonobviousness persuasive with respect to claims 1, 2, 16, and 33, and do not rely on the disputed exhibits in reaching that conclusion. *See supra* Sections II.D, II.E.

## I.    *Motions to Seal*

The parties move to seal portions of their demonstrative exhibits that quote or describe material that we previously ordered sealed. Papers 52, 54; *see* Papers 27, 48 (granting motions to seal). The parties filed unredacted confidential and redacted public versions of their demonstrative exhibits. Exs. 1098, 2054. Upon reviewing the materials sought to be sealed, it appears that the parties' characterization of the materials is accurate and the redactions are narrowly tailored to only confidential information. The parties have established good cause to seal the redacted portions of the demonstrative exhibits. We grant the Motions to Seal.

IPR2021-00165
Patent 9,218,156 B2

### III. CONCLUSION[10]

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 16, and 33 of the '156 patent are unpatentable, but has not demonstrated, by a preponderance of the evidence, that claims 3–8 are unpatentable.

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), 42.8(b)(2).

IPR2021-00165
Patent 9,218,156 B2

In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 16 | 103(a) | Dockser | 1, 2, 16 | |
| 1, 2, 16, 33 | 103(a) | Dockser, Tong | 1, 2, 16, 33 | |
| 1–8, 16 | 103(a) | Dockser, MacMillan[11] | | 3–8 |
| 1–8, 16, 33 | 103(a) | Dockser, Tong, MacMillan[12] | | 3–8 |
| **Overall Outcome** | | | 1, 2, 16, 33 | 3–8 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 16, and 33 of the '156 patent have been shown to be unpatentable, and claims 3–8 of the '156 patent have not been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 46) is *dismissed*; and

---

[11] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, and 16 are unpatentable over Dockser and MacMillan. *See supra* Section II.F.4.

[12] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 16, and 33 are unpatentable over Dockser, Tong, and MacMillan. *See supra* Section II.G.3.

IPR2021-00165
Patent 9,218,156 B2

FURTHER ORDERED that the parties' Motions to Seal (Papers 52 and 54) are *granted*, and the unredacted confidential versions of the demonstrative exhibits (Exhibits 1098 and 2054) shall remain under seal pursuant to the default protective order previously entered in the instant proceeding.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00165
Patent 9,218,156 B2

FOR PETITIONER:

Elisabeth H. Hunt
Richard F. Giunta
Anant K. Saraswat
Adam R. Wichman
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent J. Rubino, III
Enrique W. Iturralde
Richard Cowell
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com
rcowell@fabricantllp.com

Brian M. Seeve
Matthew D. Vella
PRINCE LOBEL TYE LLP
bseeve@pricelobel.com
mvella@pricelobel.com

PUBLIC VERSION

Trials@uspto.gov                                                                Paper 57
571-272-7822                                                        Date: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――――――――

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

―――――――――――――――

IPR2021-00179
Patent 8,407,273 B2

―――――――――――――――

Before JUSTIN T. ARBES, STACEY G. WHITE, and JASON M. REPKO,
*Administrative Patent Judges.*

PER CURIAM.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*
Granting Patent Owner's and Petitioner's Motions to Seal
*37 C.F.R. §§ 42.14, 42.54*

PUBLIC VERSION

IPR2021-00179
Patent 8,407,273 B2

# I.  INTRODUCTION

## A.  Background and Summary

Petitioner Google LLC filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–26, 28, 32–61, 63, and 67–70 of U.S. Patent No. 8,407,273 B2 (Ex. 1001, "the '273 patent") pursuant to 35 U.S.C. § 311(a).  On May 14, 2021, we instituted an *inter partes* review as to all challenged claims on all grounds of unpatentability asserted in the Petition. Paper 16 ("Decision on Institution" or "Dec. on Inst.").  Patent Owner Singular Computing LLC subsequently filed a Patent Owner Response (Paper 28, "PO Resp."), Petitioner filed a Reply (Paper 34, "Reply"), and Patent Owner filed a Sur-Reply (Paper 39, "Sur-Reply").  Patent Owner filed a Motion to Exclude (Paper 46, "Mot.") certain evidence submitted by Petitioner, to which Petitioner filed an Opposition (Paper 47) and Patent Owner filed a Reply (Paper 49).  An oral hearing was held on February 11, 2022, and transcripts of the hearing are included in the record (Paper 55, "Conf. Tr."; Paper 56, "Public Tr.").  The parties also filed Motions to Seal (Papers 52 and 54) portions of their demonstrative exhibits containing confidential information.

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 21–24, 26, 28, 32, and 33 are unpatentable, but has not shown by a preponderance of the evidence that claims 3–20, 25, 34–61, 63, and 67–70 are unpatentable.

IPR2021-00179
Patent 8,407,273 B2

### B.   Related Matters

The parties indicate that the '273 patent is the subject of *Singular Computing LLC v. Google LLC*, Case No. 1:19-cv-12551-FDS (D. Mass.) ("the district court case").  *See* Pet. xi; Paper 8, 1.  Petitioner filed another petition challenging claims 1–70 of the '273 patent in IPR2021-00178, which was denied, and filed four other petitions challenging claims of two related patents also asserted in the district court case in IPR2021-00154 (denied), IPR2021-00155 (instituted), IPR2021-00164 (denied), and IPR2021-00165 (instituted).

### C.   The '273 Patent

The '273 patent, entitled "Processing with Compact Arithmetic Processing Element," issued on March 26, 2013.  Ex. 1001, codes (45), (54).  The '273 patent describes "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)."  *Id.* at col. 5, l. 65–col. 6, l. 2.  According to the '273 patent, conventional central processing unit (CPU) chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications.  *Id.* at col. 3, ll. 7–22.  For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations."  *Id.* at col. 3, ll. 15–22.  According to the '273 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater

IPR2021-00179
Patent 8,407,273 B2

fraction of the computing power inherent in those million transistors." *Id.* at col. 3, ll. 23–28. But "[c]urrent architectures for general purpose computing fail to deliver this power." *Id.* at col. 3, ll. 28–29.

The '273 patent is, therefore, "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at col. 2, ll. 11–18. According to the '273 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at col. 2, ll. 28–31. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at col. 2, ll. 35–39.

Figure 6 of the '273 patent is reproduced below.



FIG. 6

IPR2021-00179
Patent 8,407,273 B2

Figure 6 depicts "an example design for an LPHDR arithmetic unit according to one embodiment of [the '273 patent]." *Id.* at col. 2, ll. 56–57. As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces an output 602c. *Id.* at col. 12, ll. 52–53. The LPHDR arithmetic unit "is controlled by control signals 412a-d, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602a-b." *Id.* at col. 12, ll. 59–62. According to the '273 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602a-b by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at col. 12, ll. 62–65. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at col. 13, ll. 1–8.

The '273 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at col. 13, ll. 8–10. According to the '273 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at col. 17, ll. 18–21. The '273 patent provides, as examples, applications including "finding nearest neighbors," *id.* at col. 17, l. 29–col. 21, l. 32, "distance weighted scoring," *id.* at col. 21, l. 34–col. 22, l. 24, and "removing motion blur in images," *id.* at col. 22, l. 26–col. 23, l. 30.

IPR2021-00179
Patent 8,407,273 B2

### D. Illustrative Claims

Challenged claims 1, 33, 36, and 68 of the '273 patent are independent. Claims 2–26, 28, and 32 depend from claim 1, claims 34 and 35 depend from claim 33, claims 37–61, 63, and 67 depend from claim 36, and claims 69 and 70 depend from claim 68. Claims 1 and 8 recite:

> 1. A device:
>
> comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,
>
> wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.
>
> 8. The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

### E. Evidence

The pending grounds of unpatentability in the instant *inter partes* review are based on the following prior art:

> U.S. Patent No. 5,689,677, issued Nov. 18, 1997 (Ex. 1009, "MacMillan");
>
> U.S. Patent Application Publication No. 2007/0203967 A1, published Aug. 30, 2007 (Ex. 1007, "Dockser"); and

IPR2021-00179
Patent 8,407,273 B2

>Jonathan Ying Fai Tong, David Nagle, & Rob A. Rutenbar, "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, vol. 8, no. 3 (June 2000) (Ex. 1008, "Tong").

Petitioner filed a declaration from Richard Goodin, P.E. (Ex. 1003) with its Petition and a reply declaration from Mr. Goodin (Ex. 1071) with its Reply. Patent Owner filed declarations from Sunil P. Khatri, Ph.D. (Ex. 2051) and Joseph Bates, Ph.D. (the named inventor of the '273 patent) (Ex. 2052) with its Response.  Also submitted as evidence are transcripts of the depositions of Mr. Goodin (Ex. 2043) and Dr. Khatri (Ex. 1072).

### F.  Asserted Grounds

This *inter partes* review involves the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 21–24, 26, 28 | 103(a)[1] | Dockser |
| 1, 2, 21–24, 26, 28, 32, 33 | 103(a) | Dockser, Tong |
| 1–26, 28, 36–61, 63 | 103(a) | Dockser, MacMillan |
| 1–26, 28, 32–61, 63, 67–70 | 103(a) | Dockser, Tong, MacMillan |

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  Here, Petitioner's challenges are based on the pre-AIA version of 35 U.S.C. § 103.

IPR2021-00179
Patent 8,407,273 B2

## II.  ANALYSIS

### A.  Level of Ordinary Skill in the Art

In determining the level of ordinary skill in the art for a challenged patent, we look to "1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666–667 (Fed. Cir. 2000).  "Not all such factors may be present in every case, and one or more of them may predominate." *Id.*

Petitioner asserts that at the time of the earliest possible effective filing date of the '273 patent (June 19, 2009), a person of ordinary skill in the art would have had "at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture." Pet. 7–8 (citing Ex. 1003 ¶¶ 43–45).  Patent Owner's proposed definition of the level of ordinary skill in the art is the same other than it removes the phrases "or the equivalent" and "at least." PO Resp. 14 (citing Ex. 2001 ¶¶ 36–37).  There is little difference between the parties' proposed definitions, and the parties and their experts do not explain the basis for their proposals.  Arguably, however, the term "at least" creates unnecessary ambiguity.  Based on the full record developed during trial, including our review of the '273 patent and the types of problems and solutions described in the '273 patent and cited prior art, we determine that a person of ordinary skill in the art would have had a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and two years of academic or industry experience in computer architecture.  *See, e.g.*, Ex. 1001, col. 1, l. 26–col. 2, l. 7 (describing in the

IPR2021-00179
Patent 8,407,273 B2

"Background" section of the '273 patent various conventional methods of computation and their alleged deficiencies).  We apply that definition for purposes of this Decision.

### B.   Claim Interpretation

We interpret the claims of the challenged patent

> using the same claim construction standard that would be used to construe the [claims] in a civil action under 35 U.S.C. 282(b), including construing the [claims] in accordance with the ordinary and customary meaning of such [claims] as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

37 C.F.R. § 42.100(b) (2020).  "In determining the meaning of [a] disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006).  Claim terms are given their plain and ordinary meaning as would be understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  We conclude that only one claim term requires interpretation to decide the issues presented during trial. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("Because we need only

IPR2021-00179
Patent 8,407,273 B2

construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy,' we need not construe [a particular claim limitation] where the construction is not 'material to the . . . dispute.'" (citation omitted)).

Claim 1 recites "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Independent claims 33, 36, and 68 recite the same limitation.

At issue here is the meaning of "low precision high dynamic range (LPHDR) execution unit," as recited in claims 1, 33, 36, and 68. Specifically, we need to resolve the question of whether this execution unit must be adapted to execute arithmetic operations *only* at low precision. For the reasons that follow, we determine that it does not.

Petitioner argues that, in the prior art used in all challenges, Dockser's floating-point processor (FPP), including the floating-point operator (FPO) inside the FPP, is low precision "because 'the precision' of operations in the FPP is 'reduced,' . . . and because it operates with the minimum imprecision" recited in the claim. Pet. 13–14 (citing Ex. 1003 ¶¶ 217–218; Ex. 1001, col. 26, l. 50–col. 27, l. 62; Ex. 1035, 8). Petitioner asserts that, in the claim, the minimum imprecision is found in the limitation that it calls *1B2*:

> for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least

IPR2021-00179
Patent 8,407,273 B2

> Y=0.05% from the result of an exact mathematical calculation of
> the first operation on the numerical values of that same input.

Ex. 1001, col. 30, ll. 6–16.  According to Petitioner, the '273 patent characterizes degrees of precision described in language mirroring *1B2* as "low precision."  Pet. 13–14.  Petitioner argues that the execution units in the prior art fall within the scope of the recited unit if they perform reduced precision operations and at least one, but not necessarily all, of those operations meets the other requirements of claim 1.  *See, e.g.*, *id.* at 30 (explaining that "numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision"); Reply 2–3 (discussing the "low precision" requirement).

Patent Owner argues that the LPHDR execution unit should be construed as "an execution unit that executes arithmetic operations *only* at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below."  PO Resp. 15 (emphasis added).  We emphasize "only" because Patent Owner argues that the recited LPHDR execution unit "necessarily excludes full-precision or mixed full and low precision units."  *Id.* at 16 (citing Ex. 2051 ¶ 60).

In support of its proposed construction, Patent Owner asserts that construing the LPHDR execution unit as encompassing full or mixed precision units would "impermissibly read out 'low precision high dynamic range' and render the limitation meaningless."  *Id.* (citing *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022–23 (Fed. Cir. 2020)); *see also id.* at 17 (arguing that Petitioner's construction reads "'low precision' out of the claims entirely").

Based on the totality of the record, we agree with Petitioner that the recited LPHDR execution unit does not exclude mixed full and low precision execution units (i.e., those that are capable of arithmetic operations at both levels of precision). *See, e.g.*, Pet. 13–14, 30. We reject Patent Owner's argument that interpreting the claim in this way renders the term "low precision" "meaningless." *See* PO Resp. 15–17. Rather, the term "low precision" imposes the requirement that the unit must *at least* perform arithmetic operations at low precision, which would exclude units that operate only at full precision, for example. Thus, we disagree with Patent Owner and assign little weight to Dr. Khatri's testimony on this issue. *See id.*; Ex. 2051 ¶¶ 60–61.

As stated in our Decision on Institution, the recitation of "a first operation" in claim 1 requires only one or more first operations that meet the low precision criteria specified in the claim. Dec. on Inst. 19. The claims do not require that "every" operation must be low precision or exclude the LPHDR execution unit from having other capabilities for other operations. *Id.* Indeed, Patent Owner agrees that "a claim's recitation of an 'execution unit adapted to execute a first operation' would normally not preclude that execution unit from performing other types of operations." PO Resp. 17–18. Patent Owner, though, argues that this "rule does not apply when the specification teaches otherwise, as is the situation here." *Id.* We disagree.

Patent Owner relies on exemplary non-limiting embodiments from the '273 patent. *See id.* at 18. Specifically, Patent Owner argues that "the claimed LPHDR execution units are smaller and have fewer transistors" than prior art full precision execution units. *Id.* (citing Ex. 2051 ¶ 62). But the cited passage pertains only to exemplary embodiments and says that the

IPR2021-00179
Patent 8,407,273 B2

"amount of resources" is small, with transistors being only one example of such resources:

> For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a *small amount of resources (e.g., transistors or volume)* compared with traditional architectures.

Ex. 1001, col. 8, ll. 3–7 (emphasis added).  In fact, some embodiments do not even require transistors: "[e]xamples of such technologies include . . . other technologies whether based on transistors or not."  *Id.* at col. 26, ll. 24–31, *cited in* Reply 6.

The reference to the "small amount of resources" in the cited passage (Ex. 1001, col. 8, ll. 3–7) is consistent with Petitioner's position that the LPHDR execution unit need only perform low precision operations some of the time because the record shows that doing so would save power and other computational resources.  For example, Dr. Khatri testified that "exact computing . . . takes up a lot of resources, takes up a lot of power, takes up a lot of area, and takes up a lot of delay."  Ex. 1072, 47:2–5.  Mr. Goodin explained that reducing precision may achieve power savings.  *See, e.g.*, Ex. 2043, 34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision may achieve power savings).  Mr. Goodin cites specific examples of how this is achieved.  *See, e.g.*, Ex. 1003 ¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 35 (citing Ex. 1007 ¶¶ 3–7). Thus, we disagree with Patent Owner's argument about reducing transistors and assign little weight to Dr. Khatri's testimony on this issue.  *See* PO Resp. 18; Ex. 2051 ¶ 62.

Also, we agree with Petitioner that the degree of low precision is described in limitation *1B2* in claim 1 and similar limitations in the other claims.  Pet. 13–14.  The language used in *1B2* is consistent with how the

IPR2021-00179
Patent 8,407,273 B2

'273 patent describes low precision. Ex. 1001, col. 26, l. 50–col. 27, l. 62, *cited in* Pet. 13–14. For example, the patent states, "[t]he degree of precision of a 'low precision, high dynamic range' arithmetic element may vary from implementation to implementation." *Id.* at col. 26, ll. 50–52. The patent then lists several examples. *Id.* at col. 26, l. 52–col. 27, l. 62. In one example, "a LPHDR arithmetic element produces results which are sometimes (or all of the time) no closer than 0.05% to the correct result." *Id.* at col. 26, ll. 55–60. Similarly, claim 1 recites (and claims 33, 36, and 68 recite similar limitations) that

> the statistical mean . . . of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

Patent Owner agrees that the claims provide the parameters of the low precision and high dynamic range in the limitations "wherein the dynamic range . . ." and "for at least X=5% . . . ." PO Resp. 16. Indeed, Patent Owner in the district court case argued that the subsequent claim language specifying percentages "*defines* the term 'low precision'" and "specifies the degree of precision that an LPHDR execution unit must have in order to satisfy the 'low precision' . . . limitation of the claim." Ex. 1065, 9 (emphasis added); *see also* Ex. 1066, 12 (arguing that "'low precision high dynamic range' is defined in [the] claim itself"); Reply 2. Patent Owner, however, argues that those limitations "do not allow for the execution unit to have full-precision (or [low] dynamic range) capability." PO Resp. 16.

But the claims do not recite that every operation must meet these criteria. Rather, the claims only recite that the criteria apply to "a first operation." This reading is consistent with the examples of LPHDR

IPR2021-00179
Patent 8,407,273 B2

elements from the written description.  *See* Ex. 1001, col. 26, l. 50–col. 27, l. 62, *cited in* Pet. 13–14.  In those examples, the LPHDR arithmetic elements may produce results that are only "sometimes" no closer than the percentage to the correct result.  *See id.*  Thus, we agree with Patent Owner's argument that the claims provide the parameters for the term "low precision," but we disagree that the parameters must apply to every operation.  *See* PO Resp. 16.  For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue.  *See* Ex. 2051 ¶¶ 60–64.

Patent Owner also argues that "small size and low transistor count . . . is what allows a much larger number of LPHDR execution units to operate in parallel on a single chip."  PO Resp. 19.  But the requirement of a "much larger number" is not in the independent claims.  Nor do the claims (or Patent Owner's proposed construction) include any limitations on size of the LPHDR execution unit or its transistor count.  And "not every benefit flowing from an invention is a claim limitation."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010).  Even so, the Specification states that some embodiments are not based on transistors.  *See, e.g.*, Ex. 1001, col. 26, ll. 24–31.  So we find no support in the written description for Patent Owner's argument about small size and low transistor count.  *See* PO Resp. 19.  For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue.  *See* Ex. 2051 ¶¶ 63–64.

We also agree with Petitioner that the written description does not support Patent Owner's assertion that the '273 patent contrasts LPHDR execution units with other units that operate in both high and low precision.  *See* PO Resp. 19, 23 (citing Ex. 1001, col. 5, ll. 31–40); Reply 7 (discussing Patent Owner's argument).  The relevant part of the '273 patent describes a graphics processor that supports 16-bit and 32-bit floating point formats:

IPR2021-00179
Patent 8,407,273 B2

> When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

Ex. 1001, col. 5, ll. 31–40. This paragraph does not define the term "low precision." *Id.* Nor does the patent explain how the 16-bit units meet the claimed requirements for low precision units that are recited in the claim. *See id.* Also, there is no discussion of these units in the part of the written description that lists examples of low precision units. *See id.* at col. 26, l. 50–col. 27, l. 62. Thus, we disagree with Patent Owner that the '273 patent contrasts LHPDR execution units with those that operate in both high and low precision. PO Resp. 19, 23. For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue. *See* Ex. 2051 ¶¶ 63–64, 72.

To the contrary, we agree with Petitioner that the '273 patent discloses at least one embodiment that performs operations other than LPHDR computations:

> [W]hile the obvious method of using the above [logarithmic number system (LNS)] operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values . . . . *So besides doing LPHDR computations*, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Ex. 1001, col. 14, ll. 6–15 (emphasis added), *quoted in* Reply 4. Because the unit performs arithmetic operations other than those at low precision, this

IPR2021-00179
Patent 8,407,273 B2

example contradicts Patent Owner's argument that an LPHDR execution
unit is "an execution unit that executes arithmetic operations *only* at low
precision." PO Resp. 15 (emphasis added).

Patent Owner counters, "as Dr. Khatri explained, a [person of
ordinary skill in the art] would not apply [the terms] 'precision' or 'dynamic
range' to integers." Sur-Reply 4 (citing Ex. 1072, 116:5–118:3). In Patent
Owner's view, a person of ordinary skill in the art "would understand that
[Patent Owner's] proposed construction would *not* exclude execution units
that can perform integer operations, like the LNS embodiment described in
the patent specification." *Id.* at 4–5. Yet Patent Owner's proposed
construction makes no distinction between integer or floating-point
operations. PO Resp. 15. Rather, the construction refers to "arithmetic
operations," generally. *See id.*

In its Sur-Reply, Patent Owner proposes an alternative construction—
for the first time in this proceeding—that further defines "arithmetic
operations" to be "*floating-point* arithmetic operations." Sur-Reply 5.
But a sur-reply must only respond to arguments raised in the preceding brief.
Patent Trial and Appeal Board Consolidated Trial Practice Guide
(Nov. 2019), 73–74, *available at* https://www.uspto.gov/
TrialPracticeGuideConsolidated. Under 37 C.F.R. § 42.23(b), "respond"
does not mean proceed in a new direction with a new approach. *See id.* at
74. "[A] sur-reply that raises a new issue or belatedly presents evidence
may not be considered." *Id.* So, apart from noting that we do not see any
reason to limit the LPHDR execution unit to only low precision operations—
regardless of how those operations are defined—for the reasons discussed
above, we do not further consider this new claim construction presented for
the first time in the Sur-Reply. *See* Sur-Reply 5.

IPR2021-00179
Patent 8,407,273 B2

In sum, we agree with Petitioner that the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that are capable of performing operations at low and full precision, and the degree of "low precision" is defined in limitation *1B2*. *See, e.g.*, Pet. 13–14, 30; Reply 2–3. To determine the patentability of the challenged claims, we need not further construe "low precision high dynamic range (LPHDR) execution unit." *See Nidec*, 868 F.3d at 1017.

## C. Legal Standards

To prevail in its challenges to the patentability of claims 1–26, 28, 32–61, 63, and 67–70 of the '273 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). This burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("Where, as here, the only question presented is whether due consideration of the four *Graham* factors renders a claim or claims obvious, no burden shifts from the patent challenger to the patentee.").

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a) (2006)).

IPR2021-00179
Patent 8,407,273 B2

The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Additionally, objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Id.* When conducting an obviousness analysis, we consider a prior art reference "not only for what it expressly teaches, but also for what it fairly suggests." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (citation omitted).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"). Also, "[t]hough less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016).

IPR2021-00179
Patent 8,407,273 B2

"Although the *KSR* test is flexible, the Board 'must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention.'" *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (citation omitted).  Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *accord In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (stating that "conclusory statements" amount to an "insufficient articulation[] of motivation to combine"; "instead, the finding must be supported by a 'reasoned explanation'" (citation omitted)); *Magnum Oil*, 829 F.3d at 1380 ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements.  The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness.").

## D. Obviousness Ground Based on Dockser (Claims 1, 2, 21–24, 26, and 28)

### 1. Dockser

Dockser discloses performing floating-point operations with a floating-point processor having "selectable subprecision."  Ex. 1007, code (57), ¶¶ 15, 17.  "A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa.  To find the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent.  The sign is applied to the resultant value." *Id.* ¶ 1.  "The precision of the floating-point processor is defined by the number of bits used to represent the mantissa.

IPR2021-00179
Patent 8,407,273 B2

The more bits in the mantissa, the greater the precision." *Id.* ¶ 2. "The precision of [a] floating-point processor generally depends on the particular application. For example, the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa." *Id.* "Higher precision results in a higher accuracy, but commonly results in increased power consumption." *Id.* Dockser explains that the performance of floating-point operations also can be computationally inefficient because "[w]hile some applications may require [high] types of precision, other applications may not." *Id.* ¶ 3. For example, "some graphics applications may only require a 16-bit mantissa," such that "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," but other applications may require "greater precision." *Id.* Accordingly, there was "a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable." *Id.*

IPR2021-00179
Patent 8,407,273 B2

Figure 1 of Dockser is reproduced below.



FIG. I

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

IPR2021-00179
Patent 8,407,273 B2

Figure 2 of Dockser is reproduced below.



FIG. 2

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision

IPR2021-00179
Patent 8,407,273 B2

select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits). Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively. Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3B depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the

IPR2021-00179
Patent 8,407,273 B2

multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31.
A partial product 420-i is generated for every bit in multiplier 404 at
corresponding stage 410-i and then left-shifted "as a function of the
multiplier bit with which it is associated, after which the operation moves on
to the next stage." *Id.* ¶ 31. The partial products are eventually added
together to generate output value 430. *Id.* "[P]ower may be removed from
the logic used to implement the stages to the right of the line 405" indicating
the selected subprecision. *Id.* ¶¶ 32–33.

### 2. Claim 1

Petitioner explains in detail how Dockser teaches or suggests every
limitation of claim 1, relying on the testimony of Mr. Goodin as support.
*See* Pet. 8–36; Ex. 1003 ¶¶ 204–310.

Claim 1 recites a device comprising "at least one first low precision
high dynamic range (LPHDR) execution unit adapted to execute a first
operation on a first input signal representing a first numerical value to
produce a first output signal representing a second numerical value."
Petitioner asserts that Dockser's floating-point processor (FPP) is a "low
precision high dynamic range (LPHDR) execution unit."[2] Pet. 12–14.
According to Petitioner, Dockser's FPP is incorporated in a computing
system, which is the claimed "device" comprising the FPP. *Id.* at 12 (citing
Ex. 1003 ¶ 204; Ex. 1007 ¶¶ 1, 15, 35–36). Petitioner argues that "[w]ithin

---

[2] Petitioner also provides an "alternative mapping" where "the floating-point
operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit.
Pet. 13, 18–20, 35. We need not evaluate those arguments because we
determine that Petitioner has made a sufficient showing based on the full
trial record that the FPP is an LPHDR execution unit.

IPR2021-00179
Patent 8,407,273 B2

Dockser's computing system, the FPP is implemented in a 'hardware component[]' such as an [application specific integrated circuit (ASIC)] or [field-programmable gate array (FPGA)], which is also a claimed 'device' comprising the FPP." *Id.* (citing Ex. 1003 ¶ 206; Ex. 1007 ¶ 35). We agree with Petitioner.

### a)  *"High Dynamic Range"*

With respect to the "high dynamic range" aspect of the LPHDR execution unit, the claim requires that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000." Petitioner asserts that Dockser's FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '273 patent. Pet. 14 (citing Ex. 1007 ¶ 17; Ex. 1001, col. 14, ll. 53–61). Petitioner's assertion, which is not disputed by Patent Owner, is adequately supported by the record.

For example, Dockser's register location 200 stores a 32-bit binary floating-point number, in an IEEE-754 32-bit single format, with 8-bit exponent 204. Ex. 1007 ¶¶ 2, 17, *cited in* Pet. 19. According to Mr. Goodin, the dynamic range of normal IEEE-754 operands would be from around $2^{-126}$, which is much smaller than 1/65,000, to around $2^{127}$, which is much larger than 65,000. Ex. 1003 ¶ 241, *cited in* Pet. 19. We credit Mr. Goodin's testimony on this point because it is consistent with Dockser. *See id.*; Ex. 1007 ¶¶ 2, 16–17, 24. Thus, Petitioner has shown that Dockser's FPP meets the dynamic range limitation recited in claim 1.

*b)* *"A First Operation"*

Claim 1 recites that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Petitioner argues that Dockser's FPP is adapted to execute a "first operation" (e.g., "reduced-precision multiplication") on a "first input signal representing a first numerical value" (i.e., input electrical signal representing an operand received at the registers) to produce a "first output signal representing a second numerical value" (i.e., output electrical signal representing an operand sent to a register and then main memory). Pet. 16–18.

Patent Owner does not present an argument to specifically address this argument and evidence. *See* PO Resp.; Sur-Reply.

Based on our review of the totality of the evidence in this case, we agree that Dockser's FPP is adapted to execute the recited first operation. Dockser's FPP receives the operands as input values. Ex. 1007, Fig. 1. Dockser's FPP performs operations on the inputs via the FPP's data paths 134–139 and components 140–144. *Id.* We agree with Petitioner that Dockser teaches that the operand data to the FPP is a "first input signal representing a first numerical value" because it represents the operand number. *Id.* ¶ 17. The FPP executes the operation and produces an "output value," or "output number," which is represented by "output bits." *Id.* ¶ 34. In this way, that value is the recited "second numerical value." *See* Pet. 16–18. We credit Mr. Goodin's testimony on this point. Ex. 1003 ¶¶ 232–235.

We also credit Mr. Goodin's analysis showing that Dockser's computing circuits "move" data between components, such as from memory

IPR2021-00179
Patent 8,407,273 B2

to the processor, via electrical signals. *See id.* ¶ 229 (citing Ex. 1014, col. 1, ll. 36–37). On this issue, the record provides adequate support for Mr. Goodin's testimony. *See* Ex. 1007 ¶¶ 16–17; Ex. 1014, col. 1, ll. 36–37. Thus, Petitioner has shown that signals represent the recited values.

Considering all of the arguments and evidence in this case, Petitioner has sufficiently shown that Dockser teaches that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value," as recited in claim 1. Pet. 14–18.

### c) *"Low Precision"*

As for the "low precision" aspect of the LPHDR execution unit, Patent Owner argues that Dockser's FPP is not an LPHDR execution unit because the FPP is capable of both low and full precision operations. *See* PO Resp. 15, 20–24. We disagree with Patent Owner's argument and underlying construction for the reasons discussed in Section II.B. Instead, we agree with Petitioner that (1) the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that perform operations at low and full precision, and (2) the degree of "low precision" required by the claim is defined in limitation *1B2*. *See, e.g.*, Pet. 13–14, 30; Reply 2–3.

### d) *Limitation 1B2*

Under the interpretation discussed in Section II.B, Petitioner has shown that Dockser teaches the recited LPHDR execution unit. In particular, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP

28

IPR2021-00179
Patent 8,407,273 B2

"operates with the minimum imprecision" required by limitation *1B2*.

Pet. 13–14 (quoting Ex. 1007 ¶ 14).  Limitation *1B2* recites (emphasis added):

> for at least X=5% of the possible valid inputs to the first operation, the *statistical mean*, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an *exact mathematical calculation* of the first operation on the numerical values of that same input.

We first analyze the "statistical mean" limitation before turning to the "exact mathematical calculation" limitation.

### (1)  "Statistical Mean"

Petitioner argues that a person of ordinary skill in the art would have understood the "statistical mean" limitation

> in the context of the '273 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."

Pet. 20–21 (quoting Ex. 1001, col. 4, ll. 7–13).

In Petitioner's view, for "non-deterministic embodiments," the statistical mean would be the average of "the different outputs produced by the same operation on the same input."  *Id.* at 21.  Petitioner argues that, for "deterministic digital embodiments" like Dockser, the statistical mean is "the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input."  *Id.*  In Petitioner's view, repeatedly

IPR2021-00179
Patent 8,407,273 B2

executing a multiplication operation using Dockser's floating-point multiplier "on the same input (*i.e.*, pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.* at 22.

Patent Owner does not dispute this reasoning. *See* PO Resp.; Sur-Reply.

Based on the totality of the evidence, Petitioner's analysis of "deterministic digital embodiments" to address the "statistical mean" limitation is adequately supported by the record. Pet. 21–22. We are persuaded by Petitioner's reasoning that the '273 patent's written description has both analog and digital embodiments. *See, e.g.*, Ex. 1001, col. 4, ll. 7–13, col. 14, ll. 16–61, col. 17, ll. 10–14. Dockser uses "a conventional floating-point multiplier." Ex. 1007 ¶ 20. Petitioner adequately supports its assertion that this is a deterministic digital circuit. Pet. 22 (citing Ex. 1003 ¶ 250; Ex. 1011, col. 1, ll. 40–42). And we credit Mr. Goodin's testimony that, in such a digital circuit, a floating-point multiplier operating on the same input with the same precision level yields the same result for every execution, and thus, the statistical mean is the same as the output for any single execution. Ex. 1003 ¶ 251, *cited in* Pet. 22.

### (2)  *"Exact Mathematical Calculation"*

As for the "exact mathematical calculation" limitation, Petitioner argues that because Dockser performs a reduced precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation: "the (>32-bit) product that would result if the pair of

IPR2021-00179
Patent 8,407,273 B2

input 32-bit operands were multiplied without reducing precision."

Pet. 22–23 (emphasis omitted) (citing Ex. 1003 ¶ 253; Pet. App'x I.B).

### (3) Y Relative Error for X Valid Inputs

According to Petitioner, "Dockser discloses two precision-reducing techniques that can be used separately or together." Pet. 25 (citing Ex. 1007 ¶¶ 4–7; Ex. 1003 ¶¶ 264–270). One technique removes power from storage elements in the FPP registers that correspond to the excess, dropped mantissa bits, which drops bits from the operands. *Id.* The other technique "remov[es] power from elements within the multiplier logic that computes the product of the operand mantissas." *Id.* Petitioner asserts that both techniques individually and in combination teach limitation *1B2*.

We determine that Petitioner has made a sufficient showing that Dockser meets the recited requirements for low precision under the register bit-dropping rationale. Patent Owner does not present arguments specific to this technique. *See* PO Resp.; Sur-Reply. We need not evaluate Petitioner's alternative rationale based on the multiplier logic. Our reasoning follows.

### (4) Register Bit-Dropping

Petitioner explains how Dockser teaches that "for at least X=5% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.05%" from the result of the exact mathematical calculation. Pet. 23–36. In Petitioner's view, the "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an

IPR2021-00179
Patent 8,407,273 B2

overflow/underflow exception).” *Id.* at 23. Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs. *Id.* at 23–24.

We agree. Dockser retains only some of the bits of a mantissa fraction: in one example, the nine most-significant bits of the mantissa fraction are retained, and the other 14 excess bits are dropped. Ex. 1007 ¶¶ 25–28, *cited in* Pet. 24; Ex. 1003 ¶ 263. The outputs of Dockser's unpowered storage elements are tied to zero voltage. Ex. 1003 ¶ 278; Ex. 1007 ¶¶ 26 (discussing removing power from the register elements for the excess bits), 29 (discussing "unpowered bits"). With support from Mr. Goodin and corroborating evidence, Petitioner shows that tying the outputs of the unpowered storage elements for the 14 "excess" bits to zero voltage would make those bits zeroes. Pet. 28 (citing Ex. 1003 ¶¶ 278–280).

Multiplying two operands with excess bits dropped (representing zero) reduces the output's precision. Ex. 1007 ¶¶ 24–26. Petitioner provides a representative example described by Mr. Goodin:

> the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.37871718406677724609375) would become 01100000100000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 01000100110111000001000 (representing a mantissa of 1.26898288726806640625) would become 01000100100000000000000 (representing a mantissa of 1.267578125).

Pet. 28–29 (citing Ex. 1003 ¶ 282). So the decrease in precision depends on the number of mantissa bits dropped. *See id.*; *see also* Ex. 1003 ¶ 287. And we agree with Petitioner that Dockser suggests that any desired number of mantissa bits can be dropped. Pet. 30. For example, Dockser describes how

IPR2021-00179
Patent 8,407,273 B2

the precision is selectable. *See* Ex. 1007 ¶¶ 14–15, 17 (describing selectable reduced precision), *discussed in* Pet. 4.

Petitioner asserts that Dockser's register bit-dropping technique meets limitation *1B2* in two ways. Pet. 26–32. First, Petitioner presents results of a software demonstration to show that Dockser's 9 mantissa bits meets limitation *1B2*. *Id.* at 30–31. Second, Petitioner uses a pencil-and-paper algebraic analysis to show that retaining 9 mantissa bits meets limitation *1B2*. *Id.* at 31–32.

As for the software demonstration, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas)," a person of ordinary skill in the art "would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 30–31. Petitioner states that Mr. Goodin wrote a program to perform reduced precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.05% relative error for 92.1% of possible valid inputs (greater than X=5%)." *Id.* at 30–31, 68–70 (citing Ex. 1003 ¶¶ 290–292, 441–455, 495–500).

Patent Owner did not rebut this evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's assertions about the recited X and Y percentages, and we credit Mr. Goodin's testimony on this issue, which is supported by the record. *See* Ex. 1003 ¶¶ 441–455.

IPR2021-00179
Patent 8,407,273 B2

In particular, Mr. Goodin summarizes the results of the software program in the table below. *Id.* ¶ 452.

| Retained Fraction Bits | Claimed Y% | Percentage of Tested Pairs Meeting Claimed Y% | Adjusted "Dockser's X%" |
|---|---|---|---|
| 9 | ≥ 0.05% | 92.628313% | ≥ 92.14333% |
| | ≥ 0.10% | 70.494075% | ≥ 70.12498% |
| | ≥ 0.15% | 39.118049% | ≥ 38.91323% |
| | ≥ 0.20% | 14.674747% | ≥ 14.59791% |
| 5 | ≥ 0.05% | 99.971764% | ≥ 99.44834% |
| | ≥ 0.10% | 99.886981% | ≥ 99.36400% |
| | ≥ 0.15% | 99.976929% | ≥ 99.22327% |
| | ≥ 0.20% | 99.547206% | ≥ 99.02600% |

The table shows the percentage of tested pairs that meet the claimed Y percentage as output by the software program. *Id.* It also shows a "Dockser's X" percentage, which is adjusted to exclude possible overflow and underflow pairs, that meets the claimed requirements. *Id.* The X value is calculated by multiplying the percentage output by the software program by an adjustment ratio. *Id.* The adjustment ratio is described in Appendix I.E of Mr. Goodin's declaration. *Id.* Mr. Goodin also explains that, if "the 'exact mathematical calculation' of multiplication of two single-format floating-point operands is the product rounded or truncated to single format (having a 23-bit-fraction mantissa), the claims are still met." *Id.* ¶ 455. To show this, Mr. Goodin wrote an alternative version of the program under this assumption, which also gives results that meet the claim limitations. *Id.* After review of the arguments and evidence on these issues, we credit Mr. Goodin's software-based analysis. *Id.* ¶¶ 441–455.

As for the algebraic analysis, Petitioner argues that a person of ordinary skill in the art "would also have understood algebraically that

IPR2021-00179
Patent 8,407,273 B2

Dockser's register bit-dropping technique meets [limitation *1B2*], by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." Pet. 31–32.  Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their tenth and eleventh fraction bits," such that retaining only 9 mantissa bits of operands would result in "*every* input in that 12% produc[ing] at *minimum* 0.097% relative error."  *Id.* at 31–32, 71–76 (citing Ex. 1003 ¶¶ 293–294, 456–475).

Patent Owner did not rebut this evidence.  *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's algebraic method showing the recited X and Y percentages, and credit Mr. Goodin's testimony on this issue.  *See* Ex. 1003 ¶¶ 456–475.  Under this reasoning, "for the 12.5% of all possible $M_A$ [mantissa] values with zero in the first fraction bit and ones in the $(K + 1)^{th}$ and $(K + 2)^{th}$ fraction bits," the following inequality holds "when Dockser's register bit-dropping truncates the operands to K fraction bits":

$$Y \geq \frac{\left(2^{-(K+1)} + 2^{-(K+2)}\right)}{\left(1.5 - 2^{-23}\right)} \times 100\% \qquad \textbf{\textit{(Equation C)}}$$

*Id.* ¶ 471.  The table below shows the results of evaluating Equation C with K=9, K=8, K=7, and K=5 retained fraction bits as the selected precision level.  *Id.* ¶ 475.

| Retained Fraction Bits (K) | Equation C: Minimum Y for $X \geq 12\%$ | Equation D: Minimum Y for $X \geq 6\%$ | Meets X/Y Percentages Recited by Claims: |
|---|---|---|---|
| 9 | $\geq 0.0976\%$ | $\geq 0.1171\%$ | 1, 11-12, 33, 36, 46-47, 68 |
| 8 | $\geq 0.1953\%$ | $\geq 0.2343\%$ | All above plus 13-16, 48-51 |
| 7 | $\geq 0.3906\%$ | $\geq 0.4687\%$ | All above plus 17, 52 |
| 5 | $\geq 1.5625\%$ | $\geq 1.8750\%$ | All above |

IPR2021-00179
Patent 8,407,273 B2

The table above shows that the values of K meet the '273 patent's claimed minimum X and Y.  *Id.*  After review of the arguments and evidence on these issues, we credit Mr. Goodin's algebraic analysis.  *Id.* ¶¶ 456–475.

### e)  Objective Indicia of Nonobviousness

In addition to its argument based on the interpretation of "low precision high dynamic range (LPHDR) execution unit," Patent Owner argues that objective indicia of nonobviousness demonstrate that the challenged claims would not have been obvious to a person of ordinary skill in the art.  PO Resp. 46–72.  Because the parties largely refer to the challenged claims collectively in their arguments regarding objective indicia, we do so as well and now address those arguments as applied to all of the claims challenged as obvious over Dockser alone or the combination of Dockser and Tong, i.e., claims 1, 2, 21–24, 26, 28, 32, and 33, which we refer to as the "Dockser/Tong-challenged claims."[3]  *See id.*; Reply 19–30; Sur-Reply 19–26.

"In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a nexus to the claims, *i.e.*, there must be a legally and factually sufficient

---

[3] As explained below, we determine that Petitioner has not proven that certain claims are unpatentable over the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, because Petitioner has not sufficiently shown a reason to combine with MacMillan.  *See infra* Sections II.F, II.G.  Accordingly, we need not assess objective indicia of nonobviousness with respect to those claims.  *See Mylan Pharms. Inc. v. Res. Corp. Techs., Inc.*, 914 F.3d 1366, 1376 (Fed. Cir. 2019) ("Because we agree with the Board that Appellants failed to establish a motivation to modify compound 3I, we need not reach Appellants' arguments regarding objective indicia.").

IPR2021-00179
Patent 8,407,273 B2

connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (citations and internal quotation marks omitted). "The patentee bears the burden of showing that a nexus exists." *Id.* "To determine whether the patentee has met that burden, we consider the correspondence between the objective evidence and the claim scope." *Id.* A patentee is entitled to a rebuttable presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (citation omitted). Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021). "As part of the presumption analysis, the fact finder must consider the unclaimed features of the stated products to determine their level of significance and their impact on the correspondence between the claim and the products." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1418 (Fed. Cir. 2022). When, "for example, the patented invention is only a small component of the product tied to the objective evidence, there is no presumption of nexus." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333 (Fed. Cir. 2019). Absent a presumption of nexus, a patent owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (citation omitted).

"Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*,

Material Subject to Protective Order Has Been Redacted

IPR2021-00179
Patent 8,407,273 B2

639 F.3d 1057, 1068–69 (Fed. Cir. 2011).  On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight."  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016).  A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)."  *Id.* at 1330.  Ultimately, the fact finder must weigh the objective indicia evidence presented in the context of whether the claimed invention as a whole would have been obvious to an ordinarily skilled artisan.  *Id.* at 1331–32; *Lectrosonics, Inc. v Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential).

### (1)  Industry Skepticism

"If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness.  Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the claimed invention."  *WBIP*, 829 F.3d at 1335.  As evidence of alleged industry skepticism, Patent Owner points to various statements made by employees of Petitioner after meeting with Dr. Bates (the named inventor of the '273 patent) in 2010.  PO Resp. 47–51.  According to Patent Owner, Dr. Bates explained that floating point units programmed to perform

Material Subject to Protective Order Has Been Redacted

IPR2021-00179
Patent 8,407,273 B2

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 48–51 (citing Exs. 2009, 2027,
2028, 2030). Patent Owner contends that the cited statements from
Petitioner's employees "express skepticism about utility of the low-precision
arithmetic performed by the large numbers of low-precision execution
units,"[4] which is a "key feature" of the challenged claims, and have a nexus
to the challenged claims because they were made in response to Dr. Bates's
presentations. *Id.* at 51.

Petitioner argues that Patent Owner's evidence is irrelevant because
it is dated after the earliest possible effective filing date of the '273 patent
(June 19, 2009). Reply 22. We disagree that evidence of industry
skepticism must itself be dated before the relevant invention. *See WBIP*,
829 F.3d at 1335–36 (considering evidence of skepticism dated after the
invention of the patent at issue); *Pressure Prods. Med. Supplies, Inc. v.
Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (same); Sur-Reply
19–20.

---

[4] Claim 1 recites "at least one" LPHDR execution unit and thus is satisfied
by only a single LPHDR execution unit. The only challenged claims of the
'273 patent that arguably require a "large number[]" of LPHDR execution
units are challenged in Petitioner's asserted grounds based on combinations
with MacMillan. *See* PO Resp. 51. For example, claim 7 recites that "the at
least one first LPHDR execution unit comprises at least one hundred
LPHDR execution units," and claim 8 recites that "the number of LPHDR
execution units in the device exceeds by at least one hundred the
non-negative integer number of execution units in the device adapted to
execute at least the operation of multiplication on floating point numbers
that are at least 32 bits wide."

IPR2021-00179
Patent 8,407,273 B2

We have reviewed the substance of the statements cited by Patent Owner, though, and are not persuaded that they are probative of nonobviousness. The statements by Petitioner's engineers relate to whether applications using "approximate" arithmetic would be commercially valuable; they do not show skepticism as to whether or how a problem could be solved or whether such applications would *work*. *See WBIP*, 829 F.3d at 1335. For example, Tom Dean stated that



Ex. 2009, 1 (emphasis added).

Ex. 2029, 1 (emphasis added).

Ex. 2028, 1 (emphasis added).

Ex. 2030, 2. Thus, the cited comments appear to indicate that floating point units performing "approximate" arithmetic would only be commercially valuable for a limited set of applications, rather than expressing skepticism as to whether such applications would work. Patent Owner also has not explained sufficiently why the fact that "approximate" arithmetic was considered useful for some

Material Subject to Protective Order Has Been Redacted
IPR2021-00179
Patent 8,407,273 B2

applications, but not others, amounts to industry skepticism over the claimed
invention as a whole (which is not limited to a particular application).  We
find that Patent Owner's evidence of alleged industry skepticism does not
weigh in favor of nonobviousness of the Dockser/Tong-challenged claims.

*(2)  Industry Praise*

"Evidence that the industry praised a claimed invention or a product
which embodies the patent claims weighs against an assertion that the same
claim would have been obvious.  Industry participants, especially
competitors, are not likely to praise an obvious advance over the known art."
*WBIP*, 829 F.3d at 1334.  Patent Owner points to four statements of alleged
industry praise from "leading figures in computer science" and argues that
they have a nexus to the challenged claims because they relate to Dr. Bates
and his presentations to Petitioner in 2010, 2011, and 2013.  PO Resp.
51–52.

Patent Owner cites Dr. Bates's notes from ███████████████
████████████████████████████████████████████████
█████████████████████████ *See id.* at 51; Ex. 2050.  This single
line in the notes does not mention any specific ideas or features that
allegedly were praised, or why or for what they were being praised.  Patent
Owner argues that there is "no requirement that praise identify exactly the
features being praised."  Sur-Reply 20.  But evidence of industry praise must
be for "the claimed invention," and the notes only state that ███████████
█████████████████ *See* Ex. 2050; *Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc); *WBIP*, 829 F.3d at 1334.
The notes also have less probative value because they were written by
Dr. Bates based on his subjective recollection of Mr. Dean's reaction at the

IPR2021-00179
Patent 8,407,273 B2

meeting, rather than, for example, being prepared by a third party or
Mr. Dean himself.  Ex. 2052 ¶ 7.

Patent Owner also cites three 2011 emails sent by employees of
Petitioner to Dr. Bates.  PO Resp. 51–52.  Andrew Ng wrote the following to
Dr. Bates:



Ex. 2033, 1.  Astro Teller wrote that

and Johnny Chen wrote,

*See*

Exs. 2031, 2032.  We view these emails as more consistent with Petitioner's
view as "merely cordial statements made to Dr. Bates," rather than evidence
of industry praising the inventions of the Dockser/Tong-challenged claims as
Patent Owner contends.  *See* Reply 24.  Further, they are statements by
employees of Petitioner only (not any other industry participant or industry
group) and do not mention any specific ideas or features from Dr. Bates's
presentations that were being praised.  We find that Patent Owner's evidence
of alleged industry praise is too ambiguous and high-level to be probative of
nonobviousness.

Material Subject to Protective Order Has Been Redacted

IPR2021-00179
Patent 8,407,273 B2

### (3) Unexpected Results

"To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Meyers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014). Also, "[w]hen assessing unexpected properties, . . . we must evaluate the significance and 'kind' of expected results along with the unexpected results." *Id.* As evidence of alleged unexpected results, Patent Owner points to a September 2013 presentation that Dr. Bates gave to Petitioner showing

███████████████████████████████████████████████

████████████████████████ PO Resp. 52–56 (citing Ex. 2005). Patent Owner argues that the unexpected nature of the results is "confirmed by skepticism expressed by" David Patterson, Ph.D. (an employee of Petitioner and "acclaimed expert in the field of computer science and computer architecture" according to Patent Owner), and "further supported by Dockser and Tong," which teach that higher precision is "generally" needed. *Id.* at 55–56 (citing Ex. 1007 ¶ 3; Ex. 1008, 280; Ex. 2012; Ex. 2051 ¶¶ 124–125).

The cited evidence, however, does not establish a difference between the alleged results and the closest prior art. Dr. Bates's presentation includes

████████████████████████████████████ Ex. 2005, 11; *see* PO Resp. 54. In this case, however, the closest prior art is Dockser and Tong, both of which teach reduced precision arithmetic and, importantly, show that high performance with reduced precision was *expected* for certain applications. *See* Reply 25; Ex. 1007 ¶ 3 ("[F]or certain applications, . . . a reduced precision, may be acceptable, and for other applications, . . . a greater precision may be needed."); Ex. 1008, 273 ("[M]any programs which

IPR2021-00179
Patent 8,407,273 B2

manipulate human sensory inputs, e.g., speech and image recognition, suffer no loss of accuracy with reduced bitwidth in the mantissa or exponent.").” Patent Owner contends that Dockser and Tong are not appropriate for comparison because they do not “provide computing scale results” and have an “entirely different focus on power savings.” Sur-Reply 21. We disagree. As explained above, we find that Dockser teaches the claim 1 LPHDR execution unit performing the recited reduced precision arithmetic. *See supra* Section II.D.2. Patent Owner's only comparison, however, is to a CPU without any reduced precision capability. *See* PO Resp. 54. We find that Patent Owner's evidence of alleged unexpected results does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims because it does not establish a difference between the results and the closest prior art and does not establish that such a difference would have been unexpected by a person of ordinary skill in the art.

### (4)  Copying and Commercial Success

“Copying may . . . be another form of flattering praise for inventive features,” as “[t]he fact that a competitor copied technology suggests it would not have been obvious.” *WBIP*, 829 F.3d at 1336 (citation omitted). Copying “requires evidence of efforts to replicate a specific product.” *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). “This may be demonstrated either through internal documents; direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica; or access to, and substantial similarity to, the patented product (as opposed to the patent).” *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (internal citations omitted). However, “a showing of

IPR2021-00179
Patent 8,407,273 B2

copying is only equivocal evidence of non-obviousness in the absence of
more compelling objective indicia of other secondary considerations."
*Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000);
*see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[M]ore than
the mere fact of copying by an accused infringer is needed to make that
action significant to a determination of the obviousness issue." (citation
omitted)).

Commercial success is typically shown with evidence of "significant
sales in a relevant market." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d
1299, 1312 (Fed. Cir. 2006) (citation omitted). "When a patentee can
demonstrate commercial success, usually shown by significant sales in a
relevant market, and that the successful product is the invention disclosed
and claimed in the patent, it is presumed that the commercial success is due
to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
106 F.3d 1563, 1571 (Fed. Cir. 1997).

Patent Owner argues that after Dr. Bates made his presentations to
Petitioner in 2010–2014, Petitioner copied Dr. Bates's invention in its
Tensor Processing Unit (TPU) v2 and v3 products released in 2017–2018,
which "use execution units designed to perform operations using a
low-precision 'floating point format called bfloat16' in order to achieve
increased parallelism and scale." PO Resp. 56–57 (citing Ex. 2010;
Ex. 2011, 9; Ex. 2034, 6; Ex. 2051 ¶¶ 126–127). The bfloat16 format
"keep[s] the same 8 bit exponent as found in 32-bit IEEE floating point" but
"reduces precision significantly by using only a 7-bit mantissa, as opposed
to the 23-bit mantissa of IEEE 32-bit floating point." *Id.* at 57–58 (citing
Ex. 2041, 1–2). According to Patent Owner, Petitioner uses the TPUv2 and
TPUv3 products to "power all of its major products and services, including

IPR2021-00179
Patent 8,407,273 B2

Search, Translate, Photos, Assistant, and Gmail," saving Petitioner "at least $10 billion." *Id.* at 60–61 (citing Exs. 2011, 2015–18, 2040). Patent Owner argues that a nexus is presumed because the TPUv2 and TPUv3 products are coextensive with the challenged claims. *Id.* at 58, 61–66 (citing Pet. 19–20, 73; Ex. 1003 ¶¶ 231–232; Ex. 2011; Ex. 2016; Ex. 2041, 7; Ex. 2049; Ex. 2051 ¶¶ 129–136). Patent Owner further contends that, even if not presumed, a nexus is shown by "internal communications among [Petitioner's] own engineers and executives" and Petitioner's communications with Dr. Bates. *Id.* at 58–61 (citing Exs. 2007, 2011, 2016, 2035–39, 2041, 2042, 2047, 2048).

We have reviewed the cited evidence and do not find it probative of nonobviousness. First, we are not persuaded that a nexus should be presumed because the TPU products are coextensive with the Dockser/Tong-challenged claims, as Patent Owner contends. Petitioner and Mr. Goodin identify a number of other allegedly material features of the products that are not part of the claims: "Inter-Core Interconnect" (ICI), "Systolic array," "Two TensorCores per chip," "High-bandwidth memory," "Liquid cooling," and "Accelerated Linear Algebra compiler." *See* Reply 26; Ex. 1071 ¶¶ 86–92. We focus on the first two features in particular because the evidence of record characterizes them as significant.

Regarding the ICI of the TPU products, Dr. Patterson stated the following:

> So the *critical feature* of the supercomputer is the way they talk to each other – you know, the chips talk to each other. So what's called – [Petitioner] invented something called ICI. It's a custom Inter-Core Interconnect that they did custom for this design; it's not some standard that you buy off the shelf. It runs at about 500 gigabits per section in both directions per link, and there's four of those links.

IPR2021-00179
Patent 8,407,273 B2

Ex. 2012, 14:17–24 (emphasis added).  An article authored by Dr. Patterson

and others[5] states that "[t]he *critical architecture feature* of a modern

supercomputer is how its chips communicate: what is the speed of a link;

what is the interconnect topology; does it have centralized versus distributed

switches; and so on," and the TPUv2 product has "four custom Inter-Core

Interconnect (ICI) links, each running at 496Gbits/s per direction."

Ex. 2016, 69; *see id.* at 70, 72, Fig. 2 (showing that ICI is part of the TPUv3

product as well); Ex. 1071 ¶ 87.

    Regarding the systolic array architecture of the TPU products,

Dr. Patterson stated as follows:

> This systolic array idea brought back from the past that
> probably *cut the energy costs in half* for the multiplier, which is
> a lot of it.  And then it was domain-specific.  So a lot of the things
> that are complicated and area consuming on CPUs like branch
> predictors and caches – CPUs are covered with caches – they're
> not there because they're not helpful for this application.  It was
> better to use more multiple units and dedicated memory units.
> So that *saves energy* and you could reuse the resources.  So that
> was a *big success*.

Ex. 2012, 9:9–18 (emphasis added).  He also agreed with an article

comparing the TPU to graphics processing units (GPUs) stating that "GPUs

incur high overhead in performance, area, and energy due to heavy

multithreading," whereas "[t]he systolic organization of TPUs captures the

data reuse while being simple by avoiding multithreading."  *Id.* at

---

[5] We disagree with Patent Owner that the materials cited herein are merely
"marketing documents."  *See* Conf. Tr. 13:18–24.  Dr. Patterson's comments
are from an audio transcription of a YouTube video filed by Patent Owner
(Ex. 2012), and the article is from the publication *Communications of the
ACM* (Ex. 2016).  *See* PO Resp. ix.

33:20–34:2.  The article authored by Dr. Patterson and others includes similar statements.  Ex. 2016, 70 ("The TPUv2 node of the supercomputer followed the main ideas of TPUv1: A large two-dimensional matrix multiply unit (MXU) *using a systolic array to reduce area and energy* plus large, software-controlled on-chip memories instead of caches." (emphasis added)), 74 (quoting the earlier article stating that the "systolic organization" of the TPU captures data reuse "while being simple by avoiding multithreading"); *see* Ex. 1071 ¶ 88.

Patent Owner contends that Petitioner fails to show that the "features are so critical that the TPUs are not 'essentially the invention.'"  Sur-Reply 22.  We are not persuaded.  Petitioner does more than merely identify unclaimed features of the TPU products.  Petitioner cites evidence, supported by the testimony of Mr. Goodin, showing that at least the ICI and systolic array architecture materially affect the TPU products' performance and were viewed as critical, successful features that were reasons for the TPU products' improved performance.  *See Fox Factory*, 944 F.3d at 1374 ("[I]f the unclaimed features amount to nothing more than additional insignificant features, presuming nexus may nevertheless be appropriate."), 1375–76 (noting that the challenged patent and the patent owner's "marketing materials confirm that the forwardly protruding tooth tips, hook features, and mud clearing recesses each materially impacts the functioning of a chainring," such that "[f]or each of these features that the Board confirms is included in the [allegedly coextensive] chainrings, nexus can only be presumed between the . . . chainrings and a patent claim if the claim includes limitations relating to these features").  Patent Owner does not point to any evidence indicating that view to be factually incorrect.  *See* Ex. 1072, 147:15–149:2 (Dr. Khatri opining that "the TPUs have the features that . . .

are in these claims" and stating that he has no opinion "about what the TPUs
. . . might have in addition"). We find that a presumption of nexus is
inappropriate with respect to the TPU products.

Regardless of whether a presumption of nexus applies, we are not
persuaded that Patent Owner has made a sufficient showing of nexus for two
reasons. First, Patent Owner's nexus arguments are premised on the TPUv2
and TPUv3 products' "low-precision" bfloat16 floating point format having
an 8-bit exponent and 7-bit mantissa. PO Resp. 56–57 (arguing that
Petitioner copied Dr. Bates's invention by implementing "execution units
designed to perform operations using" the bfloat16 format), 61 (arguing
commercial success due to the bfloat16 format using "low-precision
multipliers"). But "[l]ow-precision arithmetic—including LPHDR
multiplication—was not novel" and thus, cannot be the basis for a finding of
nexus. *See* Reply 20; *Kao*, 639 F.3d at 1068; *Tokai Corp. v. Easton
Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial
success is due to an element in the prior art, no nexus exists."). Tong taught
such a format nine years before the '273 patent. Tong describes two
different experiments emulating "different bitwidth FP units": one that
"implements the IEEE-754 standard" and then varies the mantissa bitwidth
(shown in Figure 6), and another that "implements the IEEE-754 standard"
and then varies the exponent bitwidth (shown in Figure 7). Ex. 1008,
278–279. Thus, we agree with Mr. Goodin that a person of ordinary skill in
the art "would have understood that Tong's Figure 6 . . . discloses a
floating-point format with an 8-bit exponent (which is the exponent size of
single-precision floating-point in the IEEE standard) . . . and a 7-bit
mantissa." *See* Ex. 1071 ¶ 74 (citing Ex. 1008, 274, 278–279; Ex. 1003
¶ 330). Tong discloses that the 8-bit exponent/7-bit mantissa format

IPR2021-00179
Patent 8,407,273 B2

produced useful results for both a "neural network trainer" application
(ALVINN) and a "speech recognition program" (Sphinx III).  *See* Ex. 1008,
278–279; Ex. 1071 ¶ 75.  Notably, these applications mirror Dr. Bates's
2013 presentation discussing ██████████████████████  *See*
Ex. 2005, 12–13.

To be sure, the fact that the 8-bit exponent/7-bit mantissa format was
known in the prior art is not dispositive.  *See WBIP*, 829 F.3d at
1330–31.  "Commercial success, for example, may be linked to an
individual element or, in other circumstances, it could be linked to the
inventive combination of known elements."  *Id.* at 1332.  Patent Owner,
however, has not identified and explained a specific combination of
elements (as opposed to just the "low-precision" bfloat16 floating point
format) that could serve as a nexus for the evidence of alleged copying and
commercial success.[6]  *See* PO Resp. 56–57, 61.

Second, when arguing that the TPUv2 and TPUv3 products meet the
X and Y percentage limitations of claim 1, Patent Owner points to the
bfloat16 floating point format with a 7-bit mantissa and states that Petitioner
argues in the Petition (with respect to Dockser) that "utilizing 7 bits of
mantissa in multiplication operations results in a minimum of 12% of valid
floating point 32 inputs producing at least 0.39% relative error compared to
the exact mathematical calculation of a full-precision multiplication on those
same inputs."  *Id.* at 65–66 (citing Pet. 73; Ex. 2051 ¶¶ 135–136).  Patent
Owner does not explain, however, how the cited analysis of how Dockser

---

[6] To the extent Patent Owner alleges commercial success from Petitioner
"[u]sing hundreds of thousands of these low-precision TPU v2 and v3
devices," we note again that claim 1 recites "at least one" LPHDR execution
unit and thus is satisfied by a single unit.  *See* PO Resp. 61.

IPR2021-00179
Patent 8,407,273 B2

teaches the X and Y percentage limitations applies to the TPUv2 and TPUv3 products. As Petitioner points out, Patent Owner "does not even attempt to demonstrate that [Petitioner's] TPUs perform the same bit-dropping techniques as Dockser." *See* Reply 27. Patent Owner has not established a sufficient nexus between the alleged copying and commercial success of the TPUv2 and TPUv3 products and the Dockser/Tong-challenged claims.

Finally, we note that Patent Owner's evidence of commercial success would be unpersuasive even if Patent Owner had established a nexus. Patent Owner's sole support for the alleged commercial success of the TPUv2 and TPUv3 products is an article in *PCMag India*. *See* PO Resp. 61 (citing Ex. 2017). That article states in relevant part:

> As AI and Machine Learning advanced, [Petitioner] was faced with the proposition of doubling the number of data centers it operates to handle the increased workloads. Building multiple data centers to handle the growing amounts of data sets *could have easily cost the company anything above $10 billion*.
>
> So [Petitioner] decided to take another route by optimizing its current data centers for better efficiency. The search giant in late 2013 decided to produce a custom chip in order to improve cost-performance over the GPUs it had deployed. Thus *the first TPU* was born.

Ex. 2017, 3 (emphasis added). The above statement as to how much "could have" been saved is too speculative to reach a conclusion of commercial success. *See id.* It also pertains to Petitioner's "first" TPU, not the TPUv2 and TPUv3 products that use the bfloat16 format. *See id.*; Ex. 2016, 69 ("Quantized arithmetic—8-bit integer instead of 32-bit floating point (FP)—can work for inference like in TPUv1 but reduced-precision training is an active research area.").

IPR2021-00179
Patent 8,407,273 B2

Accordingly, we find that Patent Owner's evidence of alleged copying and commercial success does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims.

### f)    Conclusion

Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 1 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### 3.    Claims 2, 21–24, 26, and 28

Claims 2, 21–24, 26, and 28 depend from claim 1. Claim 2 recites that "the at least one first LPHDR execution unit comprises at least part of an FPGA." Dockser discloses an FPP that is part of "a field programmable gate array (FPGA) or other programmable logic component." Ex. 1007 ¶ 35; *see* Pet. 36.

Claim 21 recites that "the device includes memory locally accessible to the at least one first LPHDR execution unit." Petitioner argues that local registers 110 are locally accessible to the FPP. Pet. 36–37 (citing Ex. 1007 ¶¶ 15–16).

Claim 22 recites that "the device is implemented on a silicon chip" and claim 23 recites that "the device is implemented on a silicon chip using digital technology." Petitioner cites Dockser's disclosure that the FPP can be part of an ASIC and "process[es] . . . bits." *Id.* at 37 (citing Ex. 1007, code (57), ¶ 35). Petitioner further argues that "[i]mplementing Dockser's integrated circuit on a silicon chip would have been the typical, conventional, and obvious implementation." *Id.* (citing Ex. 1003 ¶ 316;

Case: 22-1866    Document: 30    Page: 321    Filed: 09/21/2022

IPR2021-00179
Patent 8,407,273 B2

Ex. 1054 ¶ 5 ("[a]n integrated circuit conventionally comes in the form of a silicon chip"); Ex. 1055 ¶ 5 ("Integrated circuits (chips) are generally made of silicon on which electronic circuits are fabricated.")).

Claim 24 recites that "the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit." Petitioner argues that "Dockser's computing system . . . includes a 'main processor' which a [person of ordinary skill in the art] would have understood is a 'digital processor' . . . because it communicates via 'bits.'" *Id.* (citing Ex. 1007 ¶¶ 15, 25, 35). Petitioner further argues that even if not, using a digital processor "would have been the typical and obvious implementation of Dockser's 'conventional processor.'" *Id.* at 37–38 (citing Ex. 1007 ¶ 35; Ex. 1023, col. 1, ll. 16–48). According to Petitioner, "Dockser's main processor is 'adapted to control the operation of'" the FPP "by specifying its precision level by writing 'subprecision select bits' to the FPP's '*control* register.'" *Id.* at 38 (citing Ex. 1007 ¶¶ 18, 25).

Claim 26 recites that "the device is part of a mobile device." Petitioner cites Dockser's disclosure that the computing system can be part of a wireless telephone, personal digital assistant (PDA), pager, or other type of device. *Id.* (citing Ex. 1007 ¶ 3).

Claim 28 recites that "the at least one first LPHDR execution unit represents numbers using a floating point representation." Dockser teaches an FPP operating on numbers using a floating point representation (with an exponent and mantissa). Ex. 1007 ¶¶ 1–2, 15–22; *see* Pet. 9–13, 38.

Patent Owner does not argue separately dependent claims 2, 21–24, 26, and 28 in its Response, only disputing Petitioner's contentions with respect to parent claim 1. PO Resp. 20–24. We have reviewed Petitioner's contentions regarding claims 2, 21–24, 26, and 28, which are consistent with

53
APPX00226

IPR2021-00179
Patent 8,407,273 B2

the disclosure of Dockser and supported by the testimony of Mr. Goodin, taken into account evidence of objective indicia of nonobviousness submitted by Patent Owner, and are persuaded that Petitioner has proven, by a preponderance of the evidence, that dependent claims 2, 21–24, 26, and 28 would have been obvious based on Dockser under 35 U.S.C. § 103(a). *See* Pet. 36–38; Ex. 1003 ¶¶ 311–322; *supra* Section II.D.2(e).

### E.  Obviousness Ground Based on Dockser and Tong (Claims 1, 2, 21–24, 26, 28, 32, and 33)

#### 1.  Tong

Tong is an IEEE journal article entitled "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic." Ex. 1008, 273.  Tong teaches reducing power consumption by minimizing the bitwidth representation of floating-point data. *Id.* According to Tong, using a variable bitwidth floating-point unit saves power. *Id.*

#### 2.  Claims 1, 2, 21–24, 26, and 28

Petitioner argues that the subject matter of claim 1 would have been obvious over the combination of Dockser and Tong[7] for reasons similar to those analyzed with respect to Dockser alone. *See* Pet. 39–43.  Additionally, Petitioner asserts that "Tong, like Dockser, . . . confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and

---

[7] Petitioner provides evidence supporting its contention that Tong is a prior art printed publication under 35 U.S.C. § 102(b). *See* Pet. 38–39 (citing Ex. 1025 ¶¶ 8–11; Ex. 1026, 27; Ex. 1027, 27).  Patent Owner does not assert otherwise in its Response, and we agree that Tong is prior art for the reasons stated by Petitioner.

IPR2021-00179
Patent 8,407,273 B2

precision." *Id.* at 39–40 (citing Ex. 1008, 273–278; Ex. 1003 ¶¶ 324–325). Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 40.



Tong's Figure 6, above, is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the horizontal axis. *Id.* at 39–40. The figure shows this data for five programs: ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx III. *Id.* The programs implement different signal-processing tasks. *See, e.g.*, Ex. 1008, 278 (Table IV). ALVINN, for example, is a neural network trainer that uses backpropagation. *Id.* And Sphinx III is a speech-recognition program. *Id.*

Petitioner argues that "Tong teaching that [a precision level] retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx [III]) would have motivated a [person of ordinary skill in the art] to configure Docker's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." Pet. 41–42. According to Petitioner, one of ordinary skill in the art would have done so "to conserve power when running those applications, or others empirically determined to

IPR2021-00179
Patent 8,407,273 B2

not require greater precision using Tong's techniques." *Id.* (citing Ex. 1003 ¶ 334). Petitioner also concludes that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable." *Id.* at 43.

Patent Owner argues that, because Dockser lacks an LPHDR execution unit and Tong does not remedy that deficiency, the Dockser-Tong combination does not render obvious any challenged claim. PO Resp. 24; Sur-Reply 9. We disagree for the reasons discussed above regarding Petitioner's challenge based on Dockser alone. *See supra* Section II.D.2.

Patent Owner further argues that Tong does not teach using only 5 mantissa bits, which means that the Dockser-Tong combination lacks the imprecision required to meet the X and Y values recited in limitation *1B2*. PO Resp. 24. In Patent Owner's view, "Tong teaches that at least 11 mantissa bits are required for consistent performance, even for 'programs dealing with human interfaces [that] process sensory data with intrinsically low resolutions.'" *Id.* (quoting Ex. 1008, 278). According to Patent Owner, "Petitioner makes no effort to show that arithmetic with the 'required' 11-bit mantissa is an LPHDR operation and meets the X/Y limitations of the claims." *Id.* at 25.

Yet Patent Owner's argument about an 11-bit mantissa (*id.* at 24–25) does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP to operate at a "selected precision level" according to Tong (Pet. 41–43). Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." *Id.* at 41–42. Thus, we disagree with Patent Owner's argument about an 11-bit mantissa.

IPR2021-00179
Patent 8,407,273 B2

*See* PO Resp. 24–25; Sur-Reply 9.  For this reason, we do not credit
Dr. Khatri's testimony on this point.  Ex. 2051 ¶ 77.

Petitioner used a software program to determine the relative error
when retaining 5 mantissa fraction bits—i.e., the number of bits that
Dockser would use under Petitioner's proposed combination with Tong.
Pet. 42 (citing Ex. 1003 ¶ 336).  Also, the algebraic analysis cited by
Petitioner uses 5 mantissa fraction bits.  *Id.* (citing Ex. 1003 ¶ 336).

Petitioner adequately shows that the X and Y limitations are met for
the 5 mantissa bit rationale.  *Id.* at 41–43.  In particular, Mr. Goodin's
software program shows that "when retaining 5 mantissa fraction bits in
view of Tong, Dockser's register bit-dropping technique produces at least
Y=0.05% relative error for 99.45% of possible valid inputs, and Dockser's
logic bit-dropping technique produces at least Y=0.05% relative error for
99.47% of possible valid inputs," and the algebraic analysis shows that
"Dockser's register bit-dropping technique when retaining 5 mantissa
fraction bits produces a minimum of 1.56% relative error (greater than
Y=0.05%) for over 12% of possible valid inputs (greater than X=5%)."
Ex. 1003 ¶ 336.  After review of the arguments and evidence on these issues,
we credit Mr. Goodin's algebraic analysis and software-based analysis.  *See*
*id.*, App'x I.B–D.

Although Patent Owner does not present argument specifically
directed to Mr. Goodin's software-based or algebraic analysis, Patent Owner
argues that one of ordinary skill in the art would not have chosen a 5-bit
mantissa: "Tong's experimental results show that using fewer than 11
mantissa bits unacceptably reduces accuracy for the benchmark applications
*that were specifically selected* (from a category of programs) for their high
tolerance for imprecision."  PO Resp. 25 (citing Ex. 2051 ¶ 78).  To

IPR2021-00179
Patent 8,407,273 B2

illustrate this point, Patent Owner annotates Tong's Figure 6, reproduced below.



Tong's Figure 6, above, shows the experimental results with color annotations indicating "the precision levels suitable for general-purpose operation (green), those at which a significant percentage of applications begin to produce unacceptable results (yellow), and finally, levels of precision that are unsuitable for most testing benchmarks (red)." *Id.* at 25–26 (citing Ex. 2051 ¶ 79).

Patent Owner argues that there is no motivation to combine Dockser and Tong because "there is no evidence to show that a [person of ordinary skill in the art] would have chosen Tong's 5-bit examples over the 7, 9, or 11-bit examples." *Id.* at 26; *see also* Sur-Reply 9–10. According to Patent Owner, "Tong does not disclose any extra capability that would have motivated a [person of ordinary skill in the art] to use it with Dockser." PO Resp. 26 (citing Ex. 2051 ¶¶ 81–82). In Patent Owner's view, Petitioner

IPR2021-00179
Patent 8,407,273 B2

relies on hindsight to choose 5 bits and does not offer any differences between Dockser and the claimed invention or other non-hindsight motivation to combine with Tong. *Id.* According to Patent Owner, "Tong teaches that 'it appears inevitable that some fraction of our operands will require full IEEE standard precision,'" which means that a person of ordinary skill in the art would not have been motivated to operate only in 5-bit, 7-bit, or 9-bit modes as Petitioner suggests. Sur-Reply 10 (quoting Ex. 1008, 280).

We disagree with Patent Owner's arguments directed to the rationale for using 5 mantissa bits. *See* PO Resp. 24–26; Sur-Reply 9–10. Petitioner's reasoning for the 5-bit example is "to conserve power when running [certain] applications, or others empirically determined to not require greater precision using Tong's techniques." Pet. 41–42 (citing Ex. 1003 ¶ 334). For example, in the ALVINN and Sphinx III line plots in Tong's Figure 6, Petitioner added a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. *Id.* at 40. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Ex. 1008, 278). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption. *Id.* at 40–41. Petitioner characterizes Tong as "[h]aving empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications." *Id.* at 41 (citing Ex. 1008, 273, 274, 279, 284).

Petitioner's assertions are adequately supported by the record. We are persuaded by Petitioner's reliance on Tong's Figure 6 to determine how many bits are needed in a particular application. *See id.* at 40–42. That is, Petitioner's choice is not arbitrary or solely based on the '273 patent's

IPR2021-00179
Patent 8,407,273 B2

written description alone. *See* PO Resp. 24–26. Rather, Petitioner's choice of 5 bits is based on Tong's experimental results for *certain* applications. *See* Pet. 40–42. We emphasize *certain* because Petitioner is not saying that 5-bits is suitable for every application. *See id.* Full precision may be needed some of the time. *See* Ex. 1008, 280; Sur-Reply 9–10. But, even if Tong teaches that some applications begin to produce unacceptable results below 11-bits, as Patent Owner notes (PO Resp. 24–25), Tong teaches that 5-bits would be enough for certain ones: ALVINN and Sphinx III shown in Tong's Figure 6. Pet. 40–42.

Patent Owner argues that "Tong lists those two applications amongst a great many other disclosed applications that all require full precision, and that a [person of ordinary skill in the art] would therefore not be motivated to configure Dockser to operate with a 5-bit mantissa just to support those two applications given the far larger number of disclosed applications that require full precision." Sur-Reply 9; PO Resp. 24–26.

We disagree with Patent Owner's argument here because the record adequately supports Petitioner's rationale that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable," and Tong, in particular, shows an optimization for a particular program. Pet. 41–43. The record adequately supports Petitioner's reasoning here: Dr. Khatri testified that "exact computing . . . takes up a lot of power." Ex. 1072, 47:2–5. Mr. Goodin explained that reducing precision may reduce power consumption. *See, e.g.*, Ex. 2043, 34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision may achieve power savings). And we credit Mr. Goodin's explanation of how Tong achieves this for certain applications. *See, e.g.*, Ex. 1003

IPR2021-00179
Patent 8,407,273 B2

¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 334, 337 (citing Ex. 1008, 278). That is, Petitioner's proposed combination would omit unnecessary bits to reduce waste and power consumption. Pet. 41–43.

Thus, we find Patent Owner's arguments regarding the combination with Tong unavailing. *See* PO Resp. 24–26; Sur-Reply 9–10. For the same reasons, we do not credit Dr. Khatri's testimony on this point. Ex. 2051 ¶¶ 77–82.

For the reasons discussed, we determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the device recited in claim 1 with a reasonable expectation of success. Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 1 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

Petitioner asserts that the subject matter recited in claims 2, 21–24, 26, and 28 would have been obvious over the combination of Dockser and Tong for reasons similar to those presented in the ground based on Dockser alone. *See* Pet. 41–43. For the reasons discussed above and the reasons discussed for Dockser alone, Petitioner's contentions are supported by Mr. Goodin's testimony and are persuasive. *See id.*; *supra* Section II.D.3. Patent Owner does not present arguments specifically directed to these claims. *See* PO Resp.; Sur-Reply. We disagree with Patent Owner's arguments regarding claim 1 based on the full trial record for the same reasons explained above. *See supra* Section II.D.2. Based on all of the evidence of

IPR2021-00179
Patent 8,407,273 B2

record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claims 2, 21–24, 26, and 28 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

### 3. *Claim 32*

Claim 32 depends from claim 1 and recites that "the device is adapted to perform nearest neighbor search." Petitioner argues that the combined device in the asserted combination "implements Dockser's FPP using the precision Tong teaches for neural-network image-classification applications including ALVINN," and a person of ordinary skill in the art would have been motivated to perform "nearest neighbor search" as claimed as well because that type of search "was commonly used and well known to be advantageous for image-classification (including neural-network) applications." Pet. 43–44 (citing Ex. 1003 ¶ 340; Ex. 1056 ¶¶ 1–4; Ex. 1057, col. 1, ll. 15–50). Patent Owner does not argue separately dependent claim 32 in its Response, only disputing Petitioner's contentions regarding parent claim 1 and the alleged motivation to combine Dockser and Tong, which we address above. PO Resp. 24–26; *see supra* Section II.E.2. Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 32 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a). *See* Pet. 43–44; Ex. 1003 ¶ 340.

### 4. *Claim 33*

Claim 33 recites a "device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to

IPR2021-00179
Patent 8,407,273 B2

emulate a second device comprising" an LPHDR execution unit having the same properties as recited in claim 1. Petitioner asserts that Tong teaches emulating, in software, different bitwidth FP units to determine application accuracy. Pet. 44 (citing Ex. 1008, 278). According to Petitioner, based on this teaching, one of ordinary skill in the art would have been motivated "to emulate the Dockser/Tong device . . . in software to assess the accuracy of applications running on the device at selected precision levels, and a [person of ordinary skill in the art] would have had a reasonable expectation of success in doing so." *Id.* (citing Ex. 1003 ¶¶ 341–342).

Petitioner asserts that "[w]hen the Dockser/Tong device is 'emulated in software' per Tong's teachings, . . . the conventional and obvious implementation of such 'software' is 'computer program instructions' stored in 'a computer-readable memory' and 'executable by [a] processor' within a 'device' (*e.g.*, a computer) as claimed." *Id.* (citing Ex. 1003 ¶ 343; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 2–4). For reasons similar to those with respect to claim 1, Petitioner argues that a person of ordinary skill in the art would have been motivated by Tong to use a computer to emulate the combined teachings of Dockser and Tong, "meeting the 'second device' [recited in claim 33]), which comprises Dockser's execution unit." *Id.* at 44–45 (citing Ex. 1003 ¶ 344). Petitioner argues that Tong emulates a device in the same way as the '273 patent does:

> Like the '273 patent's only examples of "emulat[ing] a . . . device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform.

IPR2021-00179
Patent 8,407,273 B2

*Id.* at 45 (citing Ex. 1001, col. 17, ll. 3–17, col. 18, l. 52–col. 19, l. 12; Ex. 1008, 278; Ex. 1003 ¶¶ 345–346).

Patent Owner does not argue separately claim 33 in its Response, only disputing Petitioner's contentions regarding claim 1 and the alleged motivation to combine Dockser and Tong, which we address above. PO Resp. 24–26; *see supra* Section II.E.2. After review of the arguments and evidence on these issues, we agree with Petitioner and credit Mr. Goodin's testimony. *See* Ex. 1003 ¶¶ 341–348.

In particular, the '273 patent describes code written in the C programming language to perform the same arithmetic operations in the same order using the same method as one implemented in hardware. Ex. 1001, col. 18, l. 52–col. 19, l. 12, *cited in* Pet. 45. We agree with Petitioner that Tong similarly uses a computer program to simulate reduced precision arithmetic that a hardware unit would perform. *See* Pet. 45. For example, Tong uses an "FP software emulation package" to simulate reduced precision arithmetic and determine "the relationship between program accuracy and number of bits in FP representation." Ex. 1008, 278, *cited in* Pet. 45.

Petitioner's obviousness rationale—i.e., "to assess the accuracy of applications running on the device at selected precision levels"—is adequately supported by the record: Tong explains that the emulation package was used to assess "different mantissa and exponent bitwidths." *See* Pet. 44 (citing Ex. 1008, 278). Petitioner's assertion that software is computer program instructions stored in a computer-readable memory and executable by a processor within a computing device is adequately supported by at least Mr. Goodin's testimony and the evidence that he cites.

IPR2021-00179
Patent 8,407,273 B2

*Id.* at 44–45 (citing Ex. 1003 ¶ 343; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 2–4).

For the same reasons discussed with respect to claim 1, Petitioner has shown that the subject matter recited in claim 33 that is also recited in claim 1 would have been obvious over the Dockser-Tong combination. *See supra* Section II.E.2.

We determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the device recited in claim 33 with a reasonable expectation of success. Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 33 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

### F.    *Obviousness Ground Based on Dockser and MacMillan (Claims 1–26, 28, 36–61, and 63)*

#### 1.    *MacMillan*

MacMillan is entitled "Circuit for Enhancing Performance of a Computer for Personal Use." Ex. 1009, code (54). MacMillan discloses using Single Instruction Multiple Data (SIMD) parallel-processing architectures for "adding supercomputer performance to a computer for personal use." *Id.* at col. 5, ll. 22–54. MacMillan's computer system comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access memory (SIMD-RAM) devices. *Id.* at col. 9, ll. 11–19, 30–31, Figs. 2, 3.

IPR2021-00179
Patent 8,407,273 B2

Figure 5 of MacMillan is reproduced below.



FIG. 5

Figure 5 depicts SIMD-RAM device 254 comprising a plurality of
DRAMs 304 coupled to a plurality of processing elements 302 (PE0, PE1,
PE2, etc.) connected to SIMD bus 240. *Id.* at col. 12, ll. 35–43. MacMillan
discloses that "[e]ach PE contains a 32-bit wide data path and can perform
atomic operations on bits, bytes, 16-bit words, and 32-bit words," "each
DRAM 304 is independently addressed by its PE," "[i]nteger and floating
point accelerators could be included in each PE," and "[e]xecution autonomy
is provided, in which specific PEs can be excluded from executing specific
instructions." *Id.* at col. 12, ll. 47–59. MacMillan describes an example
architecture of a system with 256 PEs, but states that the disclosed
architecture "allows scaling to higher or lower density chips with more or
fewer PEs." *Id.* at col. 12, l. 60–col. 13, l. 4, col. 13, ll. 38–41, col. 16,
ll. 20–22.

IPR2021-00179
Patent 8,407,273 B2

## 2.  Claim 8

Petitioner contends that claims 1–26, 28, 36–61, and 63 are unpatentable over Dockser and MacMillan under 35 U.S.C. § 103(a). Pet. 45–56.  We begin with claim 8, which is illustrative of the disputed issues addressed by the parties in their papers.

Claim 8 depends from claim 1 and recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (the "exceeds" limitation).  Petitioner relies on MacMillan for its teachings regarding multiple floating-point execution units, and argues that a person of ordinary skill in the art "would have been motivated to use Dockser's FPP to implement each 'floating-point accelerator' in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches."  *Id.* at 5, 47–48 (citing Ex. 1003 ¶¶ 354–355).  According to Petitioner, "using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power."  *Id.* at 48 (citing Ex. 1003 ¶ 356; Ex. 1009, col. 12, ll. 47–49; Ex. 1024, col. 1, ll. 43–58).  Petitioner further contends that MacMillan's SIMD parallel processing is used in "the same types of computers for which Dockser's FPP provides '[p]ower management'" and would be beneficial for the same types of "'graphics applications' for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision."  *Id.* at 47–48

IPR2021-00179
Patent 8,407,273 B2

(citing Ex. 1003 ¶¶ 353, 357; Ex. 1007 ¶ 3; Ex. 1009, col. 1, ll. 6–9, col. 5, ll. 22–45, col. 7, ll. 14–34).

With respect to the "exceeds" limitation in particular, Petitioner asserts that MacMillan teaches 256 PEs, and the Dockser-MacMillan combination would have a "single Host CPU floating-point unit" and at least one FPP in each of the PEs, of which there can be "256 or more, up to 'tens of thousands.'"  *Id.* at 49–51 (quoting Ex. 1009, col. 2, ll. 13–15; citing Ex. 1003 ¶¶ 361, 369, 370, 374).  Thus, in Petitioner's proposed combined device based on Dockser and MacMillan, the number of LPHDR execution units (Dockser FPPs) "exceeds its number (one) of traditional-precision execution units (the single Host CPU floating-point unit) by . . . more than 100."  *Id.* at 50–51 (citing Ex. 1003 ¶¶ 369, 370, 374).

Patent Owner responds that a person of ordinary skill in the art would not have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner.  PO Resp. 34–36.  Patent Owner argues that "Dockser is focused on the objective of reducing power consumption," whereas "MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption."  *Id.* at 34–35 (citing Ex. 1009, col. 3, ll. 4–6; Ex. 2051 ¶¶ 101–102).  Patent Owner further contends that "[i]ncorporating Dockser's FPPs into MacMillan would . . . defeat MacMillan's stated objective of achieving a high-scale SIMD computer architecture at 'lower system cost.'"  *Id.* at 35 (citing Ex. 1009, col. 5, ll. 58–59; Ex. 2051 ¶ 103).  According to Patent Owner, "Dockser's FPPs are even *larger* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes," such that "replacing the full-precision execution units of MacMillan with Dockser FPP units would

Case: 22-1866    Document: 30    Page: 337    Filed: 09/21/2022

IPR2021-00179
Patent 8,407,273 B2

require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit." *Id.* at 34–35 (citing Ex. 2051 ¶ 104); *see also* Sur-Reply 14–15.

Petitioner argues in its Reply that the asserted combination would achieve both benefits of increasing performance speed (based on MacMillan) and lowering power consumption (based on Dockser), and that Patent Owner fails to provide supporting evidence for its argument that incorporating Dockser's FPP into the MacMillan device would increase costs, and even if it had, economic reasons are not indicative of nonobviousness. Reply 9–10 (citing Ex. 1071 ¶¶ 30–31).

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser and MacMillan, we agree with Patent Owner. Dockser teaches a single FPP with "selectable subprecision" that is capable of both full precision and reduced precision operations. *See* Ex. 1007, code (57), ¶ 15. The FPP includes additional control circuitry, such as floating-point controller 130 and control register 137, that allows selection of a subprecision for floating-point operations. *Id.* ¶¶ 15, 18, Fig. 1. Dockser describes "a variety of ways" in which "subprecision select bits may be used to reduce the precision of a floating-point operation." *Id.* ¶¶ 18, 23–34. Reduced precision can be achieved, with resultant power savings, either by removing power from "floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" or "removing power to the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 4–7, 26–27. Mr. Goodin agrees that Dockser's FPP requires additional control circuitry to implement its selectable subprecision. Ex. 2043, 43:21–45:9.

69
APPX00242

IPR2021-00179
Patent 8,407,273 B2

MacMillan, by contrast, is heavily focused on avoiding increased costs associated with added complexity. MacMillan states that "[i]f supercomputing performance could be achieved in low cost computers, such as personal computers, this could dramatically expand the market for personal computers." Ex. 1009, col. 1, ll. 21–24. SIMD computing capability can be added to personal computers, "resulting in much higher performance computing at moderate cost." *Id.* at col. 8, ll. 51–55. MacMillan, however, describes numerous limitations of known SIMD designs at the time, many of which relate to increased costs from added complexity (e.g., additional registers), size, etc. *See, e.g.*, *id.* at col. 2, ll. 56–61 ("hav[ing] a large register set on each PE . . . increases die area per PE, resulting in higher costs per PE"), col. 2, ll. 62–65 ("Adding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs. It may also require tighter geometries or increased numbers of layers on printed circuits boards, further increasing costs."), col. 3, ll. 2–4 ("Adding output buffers to drive increased pin counts also increases power dissipation and hence power supply capacity and cost."), col. 4, ll. 39–40 ("The PE array[] disk may be limited in size due to technology or cost factors.").

Importantly, MacMillan states:

> Overcoming the above limitations would allow supercomputing performance to be provided in a *low cost* computer system for personal use, dramatically expanding the potential market for systems with supercomputer performance. To meet the cost objectives, the SIMD capabilities *should not add significant complexity to the architecture of a computer system for personal use*. The present invention addresses the above needs.

*Id.* at col. 5, ll. 38–45 (emphasis added). MacMillan's disclosed architecture—with multiple, less costly PEs operating in parallel to increase computational power—is expressly intended to account for these limitations.

IPR2021-00179
Patent 8,407,273 B2

*See id.* at col. 5, ll. 44–45, col. 5, ll. 58–61 (the disclosed system with "shared memory results in lower system cost and more flexibility in using memory"), col. 6, ll. 1–10 ("Another aspect of the invention is that it shows how parallel SIMD processing can be added inexpensively to existing system architectures. This cost-effective addition of parallel processing can be made to popular, low cost computer systems running popular operating systems . . . ."), col. 6, ll. 41–45, col. 16, ll. 14–27.

In determining how a person of ordinary skill in the art would have understood those disclosures, we credit the testimony of Dr. Khatri, which is consistent with, and a logical reading of, Dockser and MacMillan. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017) (stating that the Board "is permitted to weigh expert testimony and other record evidence and, in so doing, rely on certain portions of an expert's declaration while disregarding others"). Specifically, the circuitry implementing Dockser's selectable subprecision is beyond that of a typical full precision execution unit. Dr. Khatri testifies that

> [b]ecause Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a [person of ordinary skill in the art] would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a [person of ordinary skill in the art] would expect it to be *larger* than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

*See* Ex. 2051 ¶ 51. Petitioner's asserted combination of incorporating Dockser's FPP into each of multiple PEs in MacMillan's device "would require additional circuitry and chip space and would therefore *increase*

IPR2021-00179
Patent 8,407,273 B2

costs," "defeat[ing] MacMillan's stated objective of achieving a highly
parallel SIMD computer architecture at 'lower system cost.'" *See id.*
¶¶ 103–104. Again, MacMillan specifically counsels that to achieve its cost
objectives, "SIMD capabilities should not add significant complexity to the
architecture of a computer system for personal use." Ex. 1009, col. 5,
ll. 42–44. The combination proposed by Petitioner would do so.
MacMillan's PEs already perform full precision operations; Dockser's
selectable subprecision circuitry would add complexity beyond that of a
typical full precision execution unit. *See* Ex. 2051 ¶¶ 103–104; Ex. 1009,
col. 12, ll. 47–49 ("Each PE contains a 32-bit wide data path and can
perform atomic operations on . . . 32-bit words.").

A person of ordinary skill in the art, reading MacMillan and
understanding its emphasis on avoiding increased costs associated with
added complexity and size, would not have been motivated to modify
MacMillan's device by incorporating Dockser's FPP into the PEs. *See
Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376–77
(Fed. Cir. 2021) (finding insufficient motivation to "increase [a prior art
reference's] melt flow rate to the claimed range," in part because the
reference "includes numerous examples of processing techniques that are
typically used to increase melt flow rate, which [the reference] cautions
should *not* be used due to the risk of obtaining a broader molecular weight
distribution"); *TriVascular*, 812 F.3d at 1067–69 (finding insufficient
motivation to combine two references by "substitut[ing] the recessed barbs
of [one reference] with the protuberances of [another reference], since [the
petitioner's] proposed substitution would destroy the basic objective of the
barbs"); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (finding no reason
to modify a prior art device where the modification would render the device

IPR2021-00179
Patent 8,407,273 B2

"inoperable for its intended purpose"); *see also Henny Penny*, 938 F.3d at 1332 (affirming the Board's finding of no motivation to combine where the Board "credited [the patent owner's] expert's testimony that following [one reference's] method of diverting and cooling the oil in [another reference's] system would introduce 'additional plumbing and complexity'"). Notably, this is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PEs; the evidence shows that doing so would increase costs because of the added complexity and size of the FPP—a concern that MacMillan explicitly counsels against. *See* Sur-Reply 15.

Petitioner's position is that the individual benefits of MacMillan's approach (increasing performance speed from many low-cost processors operating in parallel) and Dockser's approach (lowering power consumption using additional circuitry added to a single, more complex processor) would have motivated a person of ordinary skill in the art to combine the references' teachings by incorporating Dockser's FPP into the multiple PEs in MacMillan's device. Pet. 5, 47–48. Given the express teachings of MacMillan, however, we are not persuaded that an ordinarily skilled artisan would have been motivated to combine the two different approaches in that manner. Specifically, MacMillan's repeated statements that its approach is designed to avoid increased costs from added complexity and size (and thereby allow for many low-cost processors in the device) would have dissuaded a person of ordinary skill in the art from doing so.

To the extent Petitioner and Mr. Goodin fault Patent Owner for not providing evidence supporting its position, we are not persuaded. *See* Reply 9–10; Ex. 1071 ¶ 31. Petitioner bears the burden of proving unpatentability by a preponderance of the evidence, which includes proving that a person of

IPR2021-00179
Patent 8,407,273 B2

ordinary skill in the art would have had reason to combine the prior art references. *See* 35 U.S.C. § 316(e); *Magnum Oil*, 829 F.3d at 1380. Moreover, Patent Owner's arguments are supported by evidence. Patent Owner relies on the disclosures of Dockser and MacMillan themselves, expert testimony from Dr. Khatri (which we credit on the issue of reasons to combine Dockser and MacMillan), and cross-examination testimony from Mr. Goodin. *See* PO Resp. 34–36; Sur-Reply 14–15; Ex. 2051 ¶¶ 101–104.

For the reasons explained above, we are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner.[8] Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 8 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

### 3. *Claims 3–7, 9–20, 25, 36–61, and 63*

Many of the other challenged claims include limitations similar to the "exceeds" limitation of claim 8. Claims 5 and 10 recite the same limitation, replacing "at least one hundred" with "at least ten" and "at least five hundred," respectively. Claim 36 recites that "the number of LPHDR execution units in the device exceeds the non-negative integer number of

---

[8] Given this determination, we need not address Patent Owner's argument that the references fail to teach the "exceeds" limitation of claim 8 (as well as similar limitations in claims 5, 6, 10–18, 36–61, and 63) because the alleged "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) are "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (in addition to executing at reduced precision) and thus "the number of LPHDR execution units will never exceed the number of full-precision multiplication execution units," as required by the claim. *See* PO Resp. 27–34; Reply 12–15; Sur-Reply 10–14.

IPR2021-00179
Patent 8,407,273 B2

execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." Claims 40, 43, and 45, which depend from claim 36, mirror claims 5, 8, and 10. Claim 6 depends from claim 5, claims 11–18 depend from claim 8, and claims 37–61 and 63 depend from claim 36. For all of these claims, Petitioner relies on the same theory regarding Dockser and MacMillan asserted for claim 8—namely, incorporating Dockser's FPP into each PE of MacMillan operating in parallel, such that the number of "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) in the combined device allegedly would exceed by a certain amount (e.g., at least one, at least ten, at least 100, at least 500) the number of "execution units . . . adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (i.e., the Host CPU floating-point unit). Pet. 47–51, 56.

As to the remaining claims 3, 4, 7, 9, 19, 20, and 25 (that do not recite the "exceeds" limitation or a similar limitation), Petitioner's analysis is premised on the same combination of Dockser and MacMillan, with Dockser's FPP incorporated into each PE of MacMillan's SIMD-RAM architecture, such that the combined device has multiple "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) operating in parallel. *Id.* at 47–49, 53–55.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. *See supra* Section II.F.2. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 3–7, 9–20, 25, 36–61, and 63 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

IPR2021-00179
Patent 8,407,273 B2

### 4. Claims 1, 2, 21–24, 26, and 28

As explained above, we conclude that claims 1, 2, 21–24, 26, and 28 are unpatentable over Dockser, and over Dockser and Tong, under 35 U.S.C. § 103(a). *See supra* Sections II.D–E. As such, we need not address Petitioner's alternative ground based on Dockser and MacMillan as to claims 1, 2, 21–24, 26, and 28. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that "the Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

### G. Obviousness Ground Based on Dockser, Tong, and MacMillan (Claims 1–26, 28, 32–61, 63, and 67–70)

#### 1. Claim 8

Petitioner contends that claims 1–26, 28, 32–61, 63, and 67–70 are unpatentable over Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a). Pet. 56–61. We again begin with illustrative claim 8. Petitioner presents two theories. First, Petitioner argues that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels, such that "[t]he resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong)" teaches the claim limitations "for the same reasons Dockser/MacMillan does," referring to Petitioner's earlier analysis of the asserted ground based on Dockser and MacMillan. Pet. 56–57. We are not persuaded by those arguments for the reasons explained above. *See supra* Section II.F.2.

IPR2021-00179
Patent 8,407,273 B2

Second, Petitioner presents another theory based on a "customized implementation" of Dockser's FPPs. Pet. 59–61 (citing Ex. 1003 ¶¶ 418–428); Reply 15–17 (citing Ex. 1071 ¶¶ 56–62). Petitioner argues that a person of ordinary skill in the art "would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'" Pet. 59–60 (citing Ex. 1008, 279). Specifically, according to Petitioner, an ordinarily skilled artisan would have been motivated to "implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered" and likewise "implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application." *Id.* at 60.

Petitioner's analysis is premised on an "alternative interpretation" of the portion of the "exceeds" limitation referring to execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." *Id.* at 59–61. Under that interpretation, an execution unit could meet the "adapted to" clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* at 61. Dockser's FPP, modified as described above, would not be such a unit because it has registers and multiplier logic with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the "adapted to" clause. *Id.*

IPR2021-00179
Patent 8,407,273 B2

Patent Owner responds that a person of ordinary skill in the art "would not have been motivated to re-engineer the FPP of Dockser to remove its 32-bit capability [based on Tong] and then incorporate the re-engineered Dockser unit into the system of MacMillan."  PO Resp. 38–43 (citing Ex. 2051 ¶¶ 108–115).  Patent Owner argues that none of the three references support Petitioner's view.  *Id.* at 40–43.  First, Dockser teaches a device that "support[s] a range of selectable precisions including full precision," and "[a]djusting Dockser by removing its full-precision capability violates a central tenet of Dockser—to always be able to execute full-precision operations."  *Id.* at 41–42.  Second, Tong similarly teaches a device with "both full- and reduced-precision capabilities," and would have reinforced Dockser's teaching that "while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision."  *Id.* at 40–41 (emphasis omitted).  Third, the asserted combination, "which requires special, customized registers, logic elements, [and] arithmetic units, . . . would increase manufacturing costs and goes directly against the teachings of MacMillan," in particular its teaching that adding "significant complexity" to the SIMD architecture should be avoided. *Id.* at 42–43.  The parties in their Reply and Sur-Reply disagree as to the meaning of certain cited disclosures in the references.  *See* Reply 15–17; Sur-Reply 15–18.

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser, Tong, and MacMillan, we agree with Patent Owner. Petitioner's asserted combination is predicated on *removing* what is a fundamental feature of Dockser and Tong—namely, the ability to operate at full precision or select a precision less than full precision.  Dockser teaches a

IPR2021-00179
Patent 8,407,273 B2

single processor with a default full precision mode that is capable of also operating in selectable reduced precision modes. Ex. 1007 ¶¶ 3–4 ("[T]he common situation is that for certain applications, . . . a reduced precision may be acceptable, and for other applications, . . . a greater precision may be needed. Accordingly, there is a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable."). Dockser's FPP operates on 32-bit full precision values and performs arithmetic operations at a particular subprecision if the associated "subprecision select bits" are set, but if not, operates at full precision. *Id.* ¶¶ 17–19, 23–29, 32, claims 1 (reciting "a floating-point processor having a maximum precision" and "selecting a subprecision less than the maximum precision"), 8, 15, 20. Dockser thus requires full precision with the capability to select a subprecision less than full precision, as Mr. Goodin agrees. *See* Ex. 2043, 36:16–37:17, 38:3–8 ("I don't believe Dockser discloses any embodiments without floating-point . . . selectable precision."), 55:21–57:12 ("Dockser requires selectable precision"). Indeed, Petitioner explicitly relies on the fact that "Dockser's precision is selectable" when asserting that a person of ordinary skill in the art would have combined the teachings of Dockser and Tong. *See* Pet. 41; Reply 8; Sur-Reply 17. We see no basis to conclude that a person of ordinary skill in the art would have been motivated to remove the feature that Dockser describes as always present and that is the basis for Petitioner's other assertions regarding Dockser and Tong. *See Chemours*, 4 F.4th at 1376–77 (finding insufficient motivation to modify a prior art reference "when doing so would necessarily involve altering the inventive concept of" the reference); Public Tr. 41:21–42:8.

IPR2021-00179
Patent 8,407,273 B2

Tong likewise does not support Petitioner's asserted motivation to combine. Tong discloses that "not all programs need the precision provided by generic FP hardware," and "the fine precision of the 23-bit mantissa is not essential" and "a single custom FP format may be a viable option" for particular applications, but full precision is necessary for other applications. *See* Ex. 1008, 278–280. Tong states that "scientific programs such as large-scale computational fluid dynamics or electric circuit simulation . . . require a huge amount of precision." *Id.* at 279. Tong further discloses that

> by reducing either precision or range from 32 to fewer bits, we should be able to create custom FP hardware which has lower power simply because of the bit reductions. For a narrow, application-specific task, a single custom FP format may be a viable option. However, *to be more generally useful, we need to consider arithmetic architectures which can scale to different FP formats*. Even though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears *inevitable that some fraction of our operands will require full IEEE-standard precision*.

*Id.* at 280 (emphasis added). Given those disclosures, we are not persuaded that a person of ordinary skill in the art would have been motivated to remove from Dockser's FPP the capability (i.e., selectability from full precision) that Tong characterizes as important.[9]

---

[9] Petitioner has shown sufficiently that a person of ordinary skill in the art would have been motivated to *select* a particular precision level in Dockser's FPP based on the teachings of Tong, but not to *remove* functionality from the FPP itself. *See supra* Section II.E.2; *compare* Pet. 41–42 (arguing that Tong "would have motivated a [person of ordinary skill in the art] to *configure* Dockser's FPP . . . to *operate at* a *selected* precision level retaining as few as 5 mantissa fraction bits . . . or others empirically determined to not require greater precision using Tong's techniques" (emphasis added)), *with id.* at 59–60 (arguing that a person of ordinary skill in the art "would have been motivated to *customize* Dockser's FPPs in

IPR2021-00179
Patent 8,407,273 B2

Finally, with respect to MacMillan, the reference states that to achieve its cost objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44. The Dockser-Tong-MacMillan combined device would add complexity because it involves a "customized implementation" of the multiplier logic in Dockser's FPP. *See* Pet. 59–60; Reply 15. Further, to the extent some selectability remains (among levels below full precision) in Petitioner's "customized implementation," the modified Dockser FPP would still require Dockser's additional control circuitry to implement that selectable subprecision. As explained above, such circuitry would increase costs due to added complexity and size, which MacMillan expressly counsels against. *See supra* Section II.F.2.

We credit the testimony of Dr. Khatri on these points, as it is explained sufficiently and is consistent with the disclosures of the references. *See* Ex. 2051 ¶¶ 46–48, 107–115. Petitioner has not shown sufficiently that a person of ordinary skill in the art would have combined the teachings of Dockser, Tong, and MacMillan to remove from Dockser's FPP the ability to select a precision less than full precision and then incorporate the modified FPP into the PEs of MacMillan. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 8 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

---

MacMillan's PEs" by removing register storage elements to have "smaller than 32-bit registers" (for the register bit-dropping technique) or removing multiplier logic elements (for the multiplier logic technique) (emphasis added)).

IPR2021-00179
Patent 8,407,273 B2

>        2.  *Claims 3–7, 9–20, 25, 34–61, 63, and 67–70*

Claims 5, 6, 10–18, 35–61, 63, and 67–70 recite (either on their own or via dependency) the "exceeds" limitation or an analogous limitation.  *See supra* Section II.F.3.  Petitioner relies on the combined teachings of Dockser and MacMillan, advancing its original theory regarding the combination of Dockser and MacMillan as well as the "customized implementation" argument addressed above for certain claims.  *See* Pet. 47–61; Reply 15–17.  Claims 3, 4, 7, 9, 19, 20, and 25 do not recite the "exceeds" limitation or an analogous limitation, but Petitioner relies on the same arguments regarding the combination of Dockser and MacMillan.  *See* Pet. 47–58.  Regarding claim 34, Petitioner refers to its earlier analysis of Dockser and MacMillan for claim 3.  *Id.* at 58–59.  Petitioner does not argue that Tong cures any of the deficiencies identified above regarding the asserted combination of Dockser and MacMillan.  *See id.* at 56–61.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser, Tong, and MacMillan in the manner asserted by Petitioner.  *See supra* Sections II.F.2, II.G.1.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 3–7, 9–20, 25, 34–61, 63, and 67–70 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

>        3.  *Claims 1, 2, 21–24, 26, 28, 32, and 33*

As explained above, we conclude that claims 1, 2, 21–24, 26, and 28 are unpatentable over Dockser, and claims 1, 2, 21–24, 26, 28, 32, and 33 are unpatentable over Dockser and Tong, under 35 U.S.C. § 103(a).  *See supra* Sections II.D–E.  As such, we need not address Petitioner's alternative

IPR2021-00179
Patent 8,407,273 B2

ground based on Dockser, Tong, and MacMillan as to claims 1, 2, 21–24, 26, 28, 32, and 33. *See Boston Sci. Scimed*, 809 F. App'x at 990.

### H. Patent Owner's Motion to Exclude

Patent Owner moves to exclude (1) Exhibits 1073, 1075–1078, 1082–1084, 1088–1090, 1096, and 1097 as "irrelevant and prejudicial" under Federal Rules of Evidence 402 and 403; (2) Exhibit 1082 for the same reasons and also as unauthenticated under Federal Rule of Evidence 901; (3) and Exhibits 1094 and 1095 as containing inadmissible hearsay under Federal Rule of Evidence 802. Mot. 3–7. Patent Owner's Motion is dismissed as moot, as we do not rely on the exhibits in a manner adverse to Patent Owner in our Decision.

In particular, Petitioner cites Exhibits 1073 and 1075 in support of its argument that Dockser and MacMillan teach the "exceeds" limitation of claim 8 and similar limitations in other claims. *See* Mot. 3–4; Reply 14. Petitioner cites Exhibits 1076–1078 and 1097 in response to an argument made by Patent Owner in its Response regarding MacMillan. *See* Mot. 4; Reply 16–17. We need not reach those arguments because we determine that Petitioner has not shown unpatentability of the claims challenged based on the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, for other reasons. *See supra* Sections II.F, II.G.

Petitioner cites Exhibits 1078, 1082–1084, 1088–1090, and 1094–1096 in support of its arguments regarding objective indicia of nonobviousness. *See* Mot. 4–7; Reply 21–22, 25, 27–28. As explained above, we do not find Patent Owner's evidence of objective indicia of nonobviousness persuasive with respect to claims 1, 2, 21–24, 26, 28, 32,

IPR2021-00179
Patent 8,407,273 B2

and 33, and do not rely on the disputed exhibits in reaching that conclusion. *See supra* Sections II.D, II.E.

## I.    *Motions to Seal*

The parties move to seal portions of their demonstrative exhibits that quote or describe material that we previously ordered sealed. Papers 52, 54; *see* Papers 27, 48 (granting motions to seal). The parties filed unredacted confidential and redacted public versions of their demonstrative exhibits. Exs. 1098, 2054. Upon reviewing the materials sought to be sealed, it appears that the parties' characterization of the materials is accurate and the redactions are narrowly tailored to only confidential information. The parties have established good cause to seal the redacted portions of the demonstrative exhibits. We grant the Motions to Seal.

## III. CONCLUSION[10]

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 21–24, 26, 28, 32, and 33 of the '273 patent are unpatentable, but has not demonstrated, by a preponderance of the evidence, that claims 3–20, 25, 34–61, 63, and 67–70 are unpatentable.

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), 42.8(b)(2).

IPR2021-00179
Patent 8,407,273 B2

In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 21–24, 26, 28 | 103(a) | Dockser | 1, 2, 21–24, 26, 28 | |
| 1, 2, 21–24, 26, 28, 32, 33 | 103(a) | Dockser, Tong | 1, 2, 21–24, 26, 28, 32, 33 | |
| 1–26, 28, 36–61, 63 | 103(a) | Dockser, MacMillan[11] | | 3–20, 25, 36–61, 63 |
| 1–26, 28, 32–61, 63, 67–70 | 103(a) | Dockser, Tong, MacMillan[12] | | 3–20, 25, 34–61, 63, 67–70 |
| **Overall Outcome** | | | 1, 2, 21–24, 26, 28, 32, 33 | 3–20, 25, 34–61, 63, 67–70 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 21–24, 26, 28, 32, and 33 of the '273 patent have been shown to be unpatentable, and claims 3–20, 25, 34–61, 63, and 67–70 of the '273 patent have not been shown to be unpatentable;

---

[11] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 21–24, 26, and 28 are unpatentable over Dockser and MacMillan. *See supra* Section II.F.4.

[12] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 21–24, 26, 28, 32, and 33 are unpatentable over Dockser, Tong, and MacMillan. *See supra* Section II.G.3.

IPR2021-00179
Patent 8,407,273 B2

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 46) is *dismissed*; and

FURTHER ORDERED that the parties' Motions to Seal (Papers 52 and 54) are *granted*, and the unredacted confidential versions of the demonstrative exhibits (Exhibits 1098 and 2054) shall remain under seal pursuant to the default protective order previously entered in the instant proceeding.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00179
Patent 8,407,273 B2

FOR PETITIONER:

Elisabeth H. Hunt
Richard F. Giunta
Anant K. Saraswat
Adam R. Wichman
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent J. Rubino, III
Enrique W. Iturralde
Richard Cowell
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com
rcowell@fabricantllp.com

Brian M. Seeve
Matthew D. Vella
PRINCE LOBEL TYE LLP
bseeve@pricelobel.com
mvella@pricelobel.com



US010416961B2

(12) **United States Patent**
     Bates

(10) **Patent No.: US 10,416,961 B2**
(45) **Date of Patent:** *Sep. 17, 2019**

(54) **PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT**

(71) Applicant: **Singular Computing LLC**, Newton, MA (US)

(72) Inventor: **Joseph Bates**, Newton, MA (US)

(73) Assignee: **Singular Computing LLC**, Newton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/175,131**

(22) Filed: **Oct. 30, 2018**

(65) **Prior Publication Data**

US 2019/0065147 A1     Feb. 28, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/784,359, filed on Oct. 16, 2017, now Pat. No. 10,120,648, which is a continuation of application No. 14/976,852, filed on Dec. 21, 2015, now Pat. No. 9,792,088, which is a continuation of application No. 13/849,606, filed on Mar. 25, 2013, now Pat. No. 9,218,156, which is a continuation of application No. 13/399,884, filed on Feb. 17, 2012, now Pat. No. 8,407,273, which is a continuation of application No. 12/816,201, filed on Jun. 15, 2010, now Pat. No. 8,150,902.

(60) Provisional application No. 61/218,691, filed on Jun. 19, 2009.

(51) **Int. Cl.**
     *G06F 7/483* (2006.01)
     *G06F 7/523* (2006.01)
     *H03K 19/177* (2006.01)
     *G06F 7/38* (2006.01)

(52) **U.S. Cl.**
     CPC ................ *G06F 7/483* (2013.01); *G06F 7/38* (2013.01); *G06F 7/4833* (2013.01); *G06F 7/5235* (2013.01); *H03K 19/17728* (2013.01)

(58) **Field of Classification Search**
     None
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,518,615 B1     4/2009   Airey
2006/0111840 A1  5/2006   Van Diggelen

FOREIGN PATENT DOCUMENTS

CN     105760135 B     5/2016
EP     3410291 A      12/2018

OTHER PUBLICATIONS

Examination Report dated Nov. 26, 2018, in Indian patent application No. 98/MUMNP/2012, 7 pages.
Extended European Search Report dated Nov. 8, 2018 in European patent application No. 18177602.2, 9 pages.
(Continued)

*Primary Examiner* — Michael D. Yaary
(74) *Attorney, Agent, or Firm* — Blueshift IP, LLC; Robert Plotkin

(57) **ABSTRACT**

Low precision computers can be efficient at finding possible answers to search problems. However, sometimes the task demands finding better answers than a single low precision search. A computer system augments low precision computing with a small amount of high precision computing, to improve search quality with little additional computing.

**27 Claims, 11 Drawing Sheets**



Google Exhibit 1001
Google v. Singular

**US 10,416,961 B2**

Page 2

(56)        **References Cited**

OTHER PUBLICATIONS

Bottou, et al., "The Tradeoffs of Large Scale Learning", NIPS'07 Proceedings of the 20th International Conference on Neural Information Processing Systems pp. 161-168.
Gupta, et al., "Deep Learning with Limited Numerical Precision" ICML'15 Proceedings of the 32nd Internat'l Conf. on Machine Learning—vol. 37 pp. 1737-1746.
Hammerstrom, "A VLSI Architecture for High-Performance, Low-Cost, On-chip Learning", IJCNN International Joint Conference on Neural Networks 1990.
Hohfeld, et al., "Probabilistic rounding in neural network learning with limited precision", Neurocomputing 4 (1992) 291-299.
Holt, et al., "Finite Precision Error Analysis of Neural Network Electronic Hardware Implementations", IJCNN-91—Seattle International Joint Conference on Neural Networks 1991.

Iwata, et al, "An Artificial Neural Network Accelerator Using General Purpose 24 Bit Floating Point Digital Signal Processors" Internat'l Joint Cont. on Neural Networks 1998.
Krizhevsky, "Learning Multiple Layers of Features from Tiny Images", University of Toronto, Apr. 8, 2009.
"Digital Signal Processor, HD61810B, User's Manual," distributed by Hitachi #S12, available online at <https://archive.org/details/bitsavers_hitachidatlSignalProcessorUsersManual_4735688/page/n5>, last accessed on Jul. 5, 2019, 124 pages.
Wikipedia contributors. "Half-precision floating-point format." Wikipedia, the Free Encyclopedia. Wikipedia, the Free Encyclopedia, 6 pages, available online at <https://en.wikipedia.org/w/index.php?title=Half-precision_floating-point_format&oldid=900307014> , last accessed on Jun. 3, 2019, 6 pages.
Slide 2.2 Programming Guide, Programming the 3Dfx Interactive Glide™ Rasterization Library 2.2, Document Release 014, Mar. 8, 1997, by 3Dfx Interactive, Inc. available online at <http://www.gamers.org/dEngine/xf3D/glide/glidepgm.htm> , last accessed on Jun. 3, 2019, 167 pages.



FIG. 1



FIG. 2



FIG. 3

U.S. Patent    Sep. 17, 2019    Sheet 4 of 11    US 10,416,961 B2



FIG. 4



FIG. 5

FIG. 6



FIG. 7



FIG. 8



FIG. 9

U.S. Patent    Sep. 17, 2019    Sheet 10 of 11    US 10,416,961 B2



FIG. 10



FIG. 11

US 10,416,961 B2

1

## PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT

### COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

### BACKGROUND

The ability to compute rapidly has become enormously important to humanity. Weather and climate prediction, medical applications (such as drug design and non-invasive imaging), national defense, geological exploration, financial modeling, Internet search, network communications, scientific research in varied fields, and even the design of new computing hardware have each become dependent on the ability to rapidly perform massive amounts of calculation. Future progress, such as the computer-aided design of complex nano-scale systems or development of consumer products that can see, hear, and understand, will demand economical delivery of even greater computing power.

Gordon Moore's prediction, that computing performance per dollar would double every two years, has proved valid for over 30 years and looks likely to continue in some form. But despite this rapid exponential improvement, the reality is that the inherent computing power available from silicon has grown far more quickly than it has been made available to software. In other words, although the theoretical computing power of computing hardware has grown exponentially, the interfaces through which software is required to access the hardware limits the ability of software to use hardware to perform computations at anything approaching the hardware's theoretical maximum computing power.

Consider a modern silicon microprocessor chip containing about one billion transistors, clocked at roughly 1 GHz. On each cycle the chip delivers approximately one useful arithmetic operation to the software it is running. For instance, a value might be transferred between registers, another value might be incremented, perhaps a multiply is accomplished. This is not terribly different from what chips did 30 years ago, though the clock rates are perhaps a thousand times faster today.

Real computers are built as physical devices, and the underlying physics from which the machines are built often exhibits complex and interesting behavior. For example, a silicon MOSFET transistor is a device capable of performing interesting non-linear operations, such as exponentiation. The junction of two wires can add currents. If configured properly, a billion transistors and wires should be able to perform some significant fraction of a billion interesting computational operations within a few propagation delays of the basic components (a "cycle" if the overall design is a traditional digital design). Yet, today's CPU chips use their billion transistors to enable software to perform merely a few such operations per cycle, not the significant fraction of the billion that might be possible.

### SUMMARY

Embodiments of the present invention are directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

In some embodiments, "low precision" processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1% (one tenth of one percent). This is far worse precision than the widely used IEEE 754 single precision floating point standard. Programmable embodiments of the present invention may be programmed with algorithms that function adequately despite these unusually large relative errors. In some embodiments, the processing elements have "high dynamic range" in the sense that they are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an example overall design of a SIMD processor according to one embodiment of the present invention.

FIG. 2 is an example of the Processing Element Array of a SIMD processor according to one embodiment of the present invention.

FIG. 3 is an example of how a Processing Element in a Processing Element Array communicates data with other parts of the processor according to one embodiment of the present invention.

FIG. 4 is an example design for a Processing Element according to one embodiment of the present invention.

FIG. 5 is an example LPHDR data word format according to one embodiment of the present invention.

FIG. 6 is an example design for an LPHDR arithmetic unit according to one embodiment of the present invention.

FIG. 7 is an original image.

FIG. 8 is an image blurred by a blur kernel according to one embodiment of the present invention.

FIG. 9 is an image produced by Richardson Lucy deconvolution using floating point arithmetic according to one embodiment of the present invention.

FIG. 10 is an image produced by Richardson Lucy deconvolution using LPHDR floating point arithmetic with added noise (fp+noise) according to one embodiment of the present invention.

FIG. 11 is an image produced by Richardson Lucy deconvolution using LPHDR logarithmic arithmetic (1 ns) according to one embodiment of the present invention.

### DETAILED DESCRIPTION

As described above, today's CPU chips make inefficient use of their transistors. For example, a conventional CPU chip containing a billion transistors might enable software to perform merely a few operations per clock cycle. Although this is highly inefficient, those having ordinary skill in the art design CPUs in this way for what are widely accepted to be

US 10,416,961 B2

3

valid reasons. For example, such designs satisfy the (often essential) requirement for software compatibility with earlier designs. Furthermore, they deliver great precision, performing exact arithmetic with integers typically 32 or 64 bits long and performing rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers. Many applications need this kind of precision. As a result, conventional CPUs typically are designed to provide such precision, using on the order of a million transistors to implement the arithmetic operations.

There are many economically important applications, however, which are not especially sensitive to precision and that would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors. Current architectures for general purpose computing fail to deliver this power.

Because of the weaknesses of conventional computers, such as typical microprocessors, other kinds of computers have been developed to attain higher performance. These machines include single instruction stream/multiple data stream (SIMD) designs, multiple instruction stream/multiple data stream (MIMD) designs, reconfigurable architectures such as field programmable gate arrays (FPGAs), and graphics processing unit designs (GPUs) which, when applied to general purpose computing, may be viewed as single instruction stream/multiple thread (SIMT) designs.

SIMD machines follow a sequential program, with each instruction performing operations on a collection of data. They come in two main varieties: vector processors and array processors. Vector processors stream data through a processing element (or small collection of such elements). Each component of the data stream is processed similarly. Vector machines gain speed by eliminating many instruction fetch/decode operations and by pipelining the processor so that the clock speed of the operations is increased.

Array processors distribute data across a grid of processing elements (PEs). Each element has its own memory. Instructions are broadcast to the PEs from a central control until, sequentially. Each PE performs the broadcast instruction on its local data (often with the option to sit idle that cycle). Array processors gain speed by using silicon efficiently—using just one instruction fetch/decode unit to drive many small simple execution units in parallel.

Array processors have been built using fixed point arithmetic at a wide variety of bit widths, such as 1, 4, 8, and wider, and using floating point arithmetic. Small bit widths allow the processing elements to be small, which allows more of them to fit in the computer, but many operations must be carried out in sequence to perform conventional arithmetic calculations. Wider widths allow conventional arithmetic operations to be completed in a single cycle. In practice, wider widths are desirable. Machines that were originally designed with small bit widths, such as the Connection Machine-1 and the Goodyear Massively Parallel Processor, which each used 1 bit wide processing elements, evolved toward wider data paths to better support fast arithmetic, producing machines such as the Connection Machine-2 which included 32 bit floating point hardware and the MasPar machines which succeeded the Goodyear machine and provided 4 bit processing elements in the MasPar-1 and 32 bit processing elements in the MasPar-2.

Array processors also have been designed to use analog representations of numbers and analog circuits to perform computations. The SCAMP is such a machine. These machines provide low precision arithmetic, in which each operation might introduce perhaps an error of a few per-

4

centage points in its results. They also introduce noise into their computations, so the computations are not repeatable. Further, they represent only a small range of values, corresponding for instance to 8 bit fixed point values rather than providing the large dynamic range of typical 32 or 64 bit floating point representations. Given these limitations, the SCAMP was not intended as a general purpose computer, but instead was designed and used for image processing and for modeling biological early vision processes. Such applications do not require a full range of arithmetic operations in hardware, and the SCAMP, for example, omits general division and multiplication from its design.

While SIMD machines were popular in the 1980s, as price/performance for microprocessors improved designers began building machines from large collections of communicating microprocessors. These MIMD machines are fast and can have price/performance comparable to their component microprocessors, but they exhibit the same inefficiency as those components in that they deliver to software relatively little computation per transistor.

Field Programmable Gate Arrays (FPGAs) are integrated circuits containing a large grid of general purpose digital elements with reconfigurable wiring between those elements. The elements originally were single digital gates, such as AND and OR gates, but evolved to larger elements that could, for instance, be programmed to map 6 inputs to 1 output according to any Boolean function. This architecture allows the FPGA to be configured from external sources to perform a wide variety of digital computations, which allows the device to be used as a co-processor to a CPU to accelerate computation. However, arithmetic operations such as multiplication and division on integers, and especially on floating point numbers, require many gates and can absorb a large fraction of an FPGA's general purpose resources. For this reason, modern FPGAs often devote a significant portion of their area to providing dozens or hundreds of multiplier blocks, which can be used instead of general purpose resources for computations requiring multiplication. These multiplier blocks typically perform 18 bit or wider integer multiplies, and use many transistors, as similar multiplier circuits do when they are part of a general purpose CPU.

Existing Field Programmable Analog Arrays (FPAAs) are analogous to FPGAs, but their configurable elements perform analog processing. These devices generally are intended to do signal processing, such as helping model neural circuitry. They are relatively low precision, have relatively low dynamic range, and introduce noise into computation. They have not been designed as, or intended for use as, general purpose computers. For instance, they are not seen by those having ordinary skill in the art as machines that can run the variety of complex algorithms with floating point arithmetic that typically run on high performance digital computers.

Finally, Graphics Processing Units (GPUs) are a variety of parallel processor that evolved to provide high speed graphics capabilities to personal computers. They offer standard floating point computing abilities with very high performance for certain tasks. Their computing model is sometimes based on having thousands of nearly identical threads of computing (SIMT), which are executed by a collection of SIMD-like internal computing engines, each of which is directed and redirected to perform work for which a slow external DRAM memory has provided data. Like other machines that implement standard floating point arithmetic, they use many transistors for that arithmetic. They are

US 10,416,961 B2

5

as wasteful of those transistors, in the sense discussed above, as are general purpose CPUs.

Some GPUs include support for 16 bit floating point values (sometimes called the "Half" format). The GPU manufacturers, currently such as NVIDIA or AMD/ATI, describe this capability as being useful for rendering images with higher dynamic range than the usual 32 bit RGBA format, which uses 8 bits of fixed point data per color, while also saving space over using 32 bit floating point for color components. The special effects movie firm Industrial Light and Magic (ILM) independently defined an identical representation in their OpenEXR standard, which they describe as "a high dynamic-range (HDR) image file format developed by Industrial Light & Magic for use in computer imaging applications." Wikipedia (late 2008) describes the 16 bit floating point representation thusly: "This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth."

When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

The variety of architectures mentioned above are all attempts to get more performance from silicon than is available in a traditional processor design. But designers of traditional processors also have been struggling to use the enormous increase in available transistors to improve performance of their machines. These machines often are required, because of history and economics, to support large existing instruction sets, such as the Intel x86 instruction set. This is difficult, because of the law of diminishing returns, which does not enable twice the performance to be delivered by twice the transistor count. One facet of these designers' struggle has been to increase the precision of arithmetic operations, since transistors are abundant and some applications could be sped up significantly if the processor natively supported long (e.g., 64 bit) numbers. With the increase of native fixed point precision from 8 to 16 to 32 to 64 bits, and of floating point from 32 to 64 and sometimes 128 bits, programmers have come to think in terms of high precision and to develop algorithms based on the assumption that computer processors provide such precision, since it comes as an integral part of each new generation of silicon chips and thus is "free."

Embodiments of the present invention efficiently provide computing power using a fundamentally different approach than those described above. In particular, embodiments of the present invention are directed to computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations).

One variety of LPHDR arithmetic represents values from one millionth up to one million with a precision of about 0.1%. If these values were represented and manipulated using the methods of floating point arithmetic, they would have binary mantissas of no more than 10 bits plus a sign bit

6

and binary exponents of at least 5 bits plus a sign bit. However, the circuits to multiply and divide these floating point values would be relatively large. One example of an alternative embodiment is to use a logarithmic representation of the values. In such an approach, the values require the same number of bits to represent, but multiplication and division are implemented as addition and subtraction, respectively, of the logarithmic representations. Addition and subtraction may be implemented efficiently as described below. As a result, the area of the arithmetic circuits remains relatively small and a greater number of computing elements can be fit into a given area of silicon. This means the machine can perform a greater number of operations per unit of time or per unit power, which gives it an advantage for those computations able to be expressed in the LPHDR framework.

Another embodiment is to use analog representations and processing mechanisms. Analog implementation of LPHDR arithmetic has the potential to be superior to digital implementation, because it tends to use the natural analog physics of transistors or other physical devices instead of using only the digital subset of the device's behavior. This fuller use of the devices' natural abilities may permit smaller mechanisms for doing LPHDR arithmetic. In recent years, in the field of silicon circuitry, analog methods have been supplanted by digital methods. In part, this is because of the ease of doing digital design compared to analog design. Also in part, it is because of the continued rapid scaling of digital technology ("Moore's Law") compared to analog technology. In particular, at deep submicron dimensions, analog transistors no longer work as they had in prior generations of larger-scale technology. This change of familiar behavior has made analog design still harder in recent years. However, digital transistors are in fact analog transistors used in a digital way, meaning digital circuits are really analog circuits designed to attempt to switch the transistors between completely on and completely off states. As scaling continues, even this use of transistors is starting to come face to face with the realities of analog behavior. Scaling of transistors for digital use is expected either to stall or to require digital designers increasingly to acknowledge and work with analog issues. For these reasons, digital embodiments may no longer be easy, reliable, and scalable, and analog embodiments of LPHDR arithmetic may come to dominate commercial architectures.

Because LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other, and therefore may constitute a massively parallel LPHDR processor or other device. Such a processor or other device has not been described or practiced as a means of doing general purpose computing by those having ordinary skill in the art for at least two reasons. First, it is commonly believed by those having ordinary skill in the art, that LPHDR computation, and in particular massive amounts of LPHDR computation, whether performed in a massively parallel way or not, is not practical as a substrate for moderately general computing. Second, it is commonly believed by those having ordinary skill in the art that massive amounts of even high precision computation on a single chip or in a single machine, as is enabled by a compact arithmetic processing unit, is not useful without a corresponding increase in bandwidth between processing elements within the machine and into and out of the machine because computing is wire limited and arithmetic can be considered to be available at no cost.

US 10,416,961 B2

7

Despite these views—that massive amounts of arithmetic on a chip or in a massively parallel machine are not useful, and that massive amounts of LPHDR arithmetic are even worse—embodiments of the present invention disclosed herein demonstrate that massively parallel LPHDR designs are in fact useful and provide significant practical benefits in at least several significant applications.

To conclude, modern digital computing systems provide high precision arithmetic, but that precision is costly. A modern double precision floating point multiplier may require on the order of a million transistors, even though only a handful of transistors is required to perform a low precision multiplication. Despite the common belief among those having ordinary skill in the art that modern applications require high precision processing, in fact a variety of useful algorithms function adequately at much lower precision. As a result, such algorithms may be performed by processors or other devices implemented according to embodiments of the present invention, which come closer to achieving the goal of using a few transistors to multiply and a wire junction to add, thus enabling massively parallel arithmetic computation to be performed with relatively small amounts of physical resources (such as a single silicon chip). Although certain specialized tasks can function at low precision, it is not obvious, and in fact has been viewed as clearly false by those having ordinary skill in the art, that relatively general purpose computing such as is typically performed today on general purpose computers can be done at low precision. However, in fact a variety of useful and important algorithms can be made to function adequately at much lower than 32 bit precision in a massively parallel computing framework, and certain embodiments of the present invention support such algorithms, thereby offering much more efficient use of transistors, and thereby provide improved speed, power, and/or cost, compared to conventional computers.

Various computing devices implemented according to embodiments of the present invention will now be described. Some of these embodiments may be an instance of a SIMD computer architecture. Other architectures may be used, such as MIMD architectures, programmable array architectures (such as FPGAs and FPAAs), or GPU/SIMT architectures. The techniques disclosed herein may, for example, be implemented using any processor or other device having such an existing architecture, and replacing or augmenting some or all existing arithmetic units in the processor or other device, if any, with LPHDR arithmetic units in any of the ways disclosed herein. Devices implemented according to embodiments of the present invention, however, need not start with an existing processor design, but instead may be designed from scratch to include LPHDR arithmetic units within any of the architectures just described, or any other architecture.

Embodiments of the present invention may, for example, be implemented using the architecture of a particular kind of SIMD computer, the array processor. There are many variations and specific instances of array processors described in the scientific and commercial literature. Examples include the Illiac 4, the Connection Machine 1 and 2, the Goodyear MPP, and the MasPar line of computers.

Embodiments of the present invention need not, however, be implemented as SIMD computers. For example, embodiments of the present invention may be implemented as FPGAs, FPAAs, or related architectures that provide for flexible connectivity of a set of processing elements. For example, embodiments of the present invention may be implemented as GPU/SIMTs and as MIMDs, among others.

8

For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures. Furthermore, references herein to "processing elements" within embodiments of the present invention should be understood more generally as any kind of execution unit, whether for performing LPHDR operations or otherwise.

An example SIMD computing system 100 is illustrated in FIG. 1. The computing system 100 includes a collection of many processing elements (PEs). Sometimes present are a control unit (CU) 106, an I/O unit (IOU) 108, various Peripheral devices 110, and a Host computer 102. The collection of PEs is referred to herein as "the Processing Element Array" (PEA), even though it need not be two-dimensional or an array or grid or other particular layout. Some machines include additional components, such as an additional memory system called the "Staging Memory" in the Goodyear MPP, but these additional elements are neither essential in the computer nor needed to understand embodiments of the present invention and therefore are omitted here for clarity of explanation. One embodiment of the present invention is a SIMD computing system of the kind shown in FIG. 1, in which one or more (e.g., all) of the PEs in the PEA 104 are LPHDR elements, as that term is used herein.

The Host 102 is responsible for overall control of the computing system 100. It performs the serial, or mostly serial, computation typical of a traditional uni-processor. The Host 102 could have more complicated structure, of course, including parallelism of various sorts. Indeed a heterogeneous computing system combining multiple computing architectures in a single machine is a good use for embodiments of the present invention.

A goal of the Host 102 is to have the PEA 104 perform massive amounts of computation in a useful way. It does this by causing the PEs to perform computations, typically on data stored locally in each PE, in parallel with one another. If there are many PEs, much work gets done during each unit of time.

The PEs in the PEA 104 may be able to perform their individual computations roughly as fast as the Host 102 performs its computations. This means it may be inefficient to have the Host 102 attempt to control the PEA 104 on a time scale as fine as the Host's or PEA's minimal time step. (This minimal time, in a traditional digital design, would be the clock period.) For this reason, the specialized control unit (CU) 106 may be included in the architecture. The CU 106 has the primary task of retrieving and decoding instructions from an instruction memory, which conceptually is part of the CU 106, and issuing the partially decoded instructions to all the PEs in the PEA 104. (This may be viewed by the CU software as happening roughly simultaneously for all the PEs, though it need not literally be synchronous, and in fact it may be effective to use an asynchronous design in which multiple instructions at different stages of completion simultaneously propagate gradually across the PEA, for instance as a series of wave fronts.)

In a design which includes the CU 106, the Host 102 typically will load the instructions (the program) for the PEA 104 into the CU instruction memory (not shown in FIG. 1), then instruct the CU 106 to interpret the program and cause the PEA 104 to compute according to the instructions. The program may, for example, look generally similar to a typical machine language program, with instructions to cause data movement, logical operations, arithmetic operations, etc., in and between the PEs and other instructions to

US 10,416,961 B2

9

do similar operations together with control flow operations within the CU **106**. Thus, the CU **106** may run a typical sort of program, but with the ability to issue massively parallel instructions to the PEA **104**.

In order to get data into and out of the CU **106** and PEA **104**, the I/O Unit **108** may interface the CU **106** and PEA **104** with the Host **102**, the Host's memory (not shown in FIG. **1**), and the system's Peripherals **110**, such as external storage (e.g., disk drives), display devices for visualization of the computational results, and sometimes special high bandwidth input devices (e.g., vision sensors). The PEA's ability to process data far faster than the Host **102** makes it useful for the IOU **108** to be able to completely bypass the Host **102** for some of its data transfers. Also, the Host **102** may have its own ways of communicating with the Peripherals **110**.

The particular embodiment illustrated in FIG. **1** is shown merely for purposes of example and does not constitute a limitation of the present invention. For example, alternatively the functions performed by the CU **106** could instead be performed by the Host **102** with the CU **106** omitted. The CU **106** could be implemented as hardware distant from the PEA **104** (e.g., off-chip), or the CU **106** could be near to the PEA **104** (e.g., on-chip). I/O could be routed through the CU **106** with the IOU **108** omitted or through the separate I/O unit **108**, as shown. Furthermore, the Host **102** is optional; the CU **106** may include, for example, a CPU, or otherwise include components sufficient to replace the functions performed by the Host **102**. The Peripherals **110** shown in FIG. **1** are optional. The design shown in FIG. **1** could have a special memory, such as the Goodyear MPP's "staging memory," which provides an intermediate level of local storage. Such memory could, for example, be bonded to the LPHDR chip using 3D fabrication technology to provide relatively fast parallel access to the memory from the PEs in the PEA **104**.

The PEA **104** itself, besides communicating with the CU **106** and IOU **108** and possibly other mechanisms, has ways for data to move within the array. For example, the PEA **104** may be implemented such that data may move from PEs only to their nearest neighbors, that is, there are no long distance transfers. FIGS. **2** and **3** show embodiments of the present invention which use this approach, where the nearest neighbors are the four adjacent PEs toward the North, East, West, and South, called a NEWS design. For example, FIG. **2** shows a subset of the PEs in PEA **104**, namely PE **202**, PE **204**, PE **206**, PE **208**, and PE **210**. When the CU **106** issues data movement instructions, all the PEs access data from or send data to their respective specified nearest neighbor. For instance, every PE might access a specified data value in its neighbor to the West and copy it into its own local storage. In some embodiments, such as some analog embodiments, these kinds of transfers may result in some degradation of the value copied.

FIG. **3** shows a PE **302** that includes data connections to the IOU **108**. PE **302** is connected at the North to PE **304**, at the East to PE **306**, at the South to PE **308**, and at the West to PE **310**. However, driving signals from inside the PEA **104** out to the IOU **108** usually requires a physically relatively large driving circuit or analogous mechanism. Having those at every PE may absorb much of the available resources of the hardware implementation technology (such as VLSI area). In addition, having independent connections from every PE to the IOU **108** means many such connections, and long connections, which also may absorb much of the available hardware resources. For these reasons, the connections between the PEs and the IOU **108** may be

10

limited to those PEs at the edges of the PE array **104**. In this case, to get data out of, and perhaps into, the PEA **104**, the data is read and written at the edges of the array and CU instructions are performed to shift data between the edges and interior of the PEA **104**. The design may permit data to be pushed from the IOU **108** inward to any PE in the array using direct connections, but may require readout to occur by using the CU **106** to shift data to the edges where it can be read by the IOU **108**.

Connections between the CU **106** and PEA **104** have analogous variations. One design may include the ability to drive instructions into all the PEs roughly simultaneously, but another approach is to have the instructions flow gradually (for instance, shift in discrete time steps) across the PEA **104** to reach the PEs. Some SIMD designs, which may be implemented in embodiments of the present invention, have a facility by which a "wired-or" or "wired-and" of the state of every PE in the PEA **104** can be read by the CU **106** in approximately one instruction delay time.

There are many well studied variations on these matters in the literature, any of which may be incorporated into embodiments of the present invention. For example, an interconnect, such as an 8-way local interconnect, may be used. The local connections may include a mixture of various distance hops, such as distance 4 or 16 as well as distance 1. The outside edges may be connected using any topology, such as a torus or twisted torus. Instead of or in addition to a local interconnect, a more complex global interconnect, such as the hypercube design, may be used. Furthermore, the physical implementation of the PEA **104** (e.g., a chip) could be replicated (e.g., tiled on a circuit board) to produce a larger PEA. The replication may form a simple grid or other arrangement, just as the component PEAs may but need not be grids.

FIG. **4** shows an example design for a PE **400** (which may be used to implement any one or more of the PEs in the PEA **104**). The PE **400** stores local data. The amount of memory for the local data varies significantly from design to design. It may depend on the implementation technologies available for fabricating the PE **400**. Sometimes rarely changing values (Constants) take less room than frequently changing values (Registers), and a design may provide more Constants than Registers. For instance, this may be the case with digital embodiments that use single transistor cells for the Constants (e.g., floating gate Flash memory cells) and multiple transistor cells for the Registers (e.g., 6-transistor SRAM cells). Sometimes the situation is reversed, as may be the case in analog embodiments, where substantial area for capacitance may be needed to ensure stable long term storage of Constants, and such embodiments may have more Registers than Constants. Typical storage capacities might be tens or hundreds of arithmetic values stored in the Registers and Constants in each PE, but these capacities are adjustable by the designer. Some designs, for instance, may have Register storage but no Constant storage. Some designs may have thousands or even many more values stored in each PE. All of these variations may be reflected in embodiments of the present invention.

Each PE needs to operate on its local data. For this reason within the PE **400** there are data paths **402**$a$-$i$, routing mechanisms (such as the multiplexor MUX **404**), and components to perform some collection of logical and arithmetic operations (such as the logic unit **406** and the LPHDR arithmetic unit **408**). The LPHDR arithmetic unit **408** performs LPHDR arithmetic operations, as that term is used herein. The input, output, and intermediate "values"

US 10,416,961 B2

11                                                    12

received by, output by, and operated on by the PE **400** may, for example, take the form of electrical signals representing numerical values.

The PE **400** also may have one or more flag bits, shown as Mask **410** in FIG. **4**. The purpose of the Mask **410** is to enable some PEs, the ones in which a specified Mask bit is set, to ignore some instructions issued by the CU **106**. This allows some variation in the usual lock-step behaviors of all PEs in the PEA **104**. For instance, the CU **106** may issue an instruction that causes each PE to reset or set its Mask **410** depending on whether a specified Register in the PE is positive or negative. A subsequent instruction, for instance an arithmetic instruction, may include a bit meaning that the instruction should be performed only by those PEs whose Mask **410** is reset. This combination has the effect of conditionally performing the arithmetic instruction in each PE depending on whether the specified Register in that PE was positive. As with the Compare instructions of traditional computers, there are many possible design choices for mechanisms to set and clear Masks.

The operation of the PEs is controlled by control signals **412***a-d* received from the CU **106**, four of which are shown in FIG. **4** merely for purposes of example and not limitation. We have not shown details of this mechanism, but the control signals **412***a-d* specify which Register or Constant memory values in the PE **400** or one of its neighbors to send to the data paths, which operations should be performed by the Logic **406** or Arithmetic **408** or other processing mechanisms, where the results should be stored in the Registers, how to set, reset, and use the Mask **410**, and so on. These matters are well described in the literature on SIMD processors.

Many variations of this PE **400** and PEA design are possible and fall within the scope of the present invention. Digital PEs can have shifters, lookup tables, and many other mechanisms such as described in the literature. Analog PEs can have time-based operators, filters, comparators with global broadcast signals and many other mechanisms such as described in the literature. The PEA **104** can include global mechanisms such as wired-OR or wired-AND for digital PEAs or wired-SUM for analog PEAs. Again, there are many variations well described in the literature on digital and analog computing architectures.

For example, LPHDR operations other than and/or in addition to addition and multiplication may be supported. For example, a machine which can only perform multiplication and the function (1−X) may be used to approximate addition and other arithmetic operations. Other collections of LPHDR operations may be used to approximate LPHDR arithmetic operations, such as addition, multiplication, subtraction, and division, using techniques that are well-known to those having ordinary skill in the art.

One aspect of embodiments of the present invention that is unique is the inclusion of LPHDR arithmetic mechanisms in the PEs. Embodiments of such mechanisms will now be described.

One digital embodiment of the LPHDR arithmetic unit **408** operates on digital (binary) representations of numbers. In one digital embodiment these numbers are represented by their logarithms. Such a representation is called a Logarithmic Number System (LNS), which is well-understood by those having ordinary skill in the art.

In an LNS, numbers are represented as a sign and an exponent. There is an implicit base for the logarithms, typically 2 when working with digital hardware. In the present embodiment, a base of 2 is used for purposes of example. As a result, a value, say B, is represented by its sign and a base 2 logarithm, say b, of its absolute value. For numbers to have representation errors of at most, say, 1% (one percent), the fractional part of this logarithm should be represented with enough precision that the least possible change in the fraction corresponds to about a 1% change in the value B. If fractions are represented using 6 bits, increasing or decreasing the fraction by 1 corresponds to multiplying or dividing B by the 64th root of 2, which is approximately 1.011. This means that numbers may be represented in the present embodiment with a multiplicative error of approximately 1%. So, in this example embodiment the fraction part of the representation has 6 bits.

Furthermore, the space of values processed in the present embodiment have high dynamic range. To represent numbers whose absolute value is from, say, one billionth to one billion, the integer part of the logarithm must be long enough to represent plus or minus the base 2 logarithm of one billion. That logarithm is about 29.9. In the present embodiment the integer part of the logarithm representation is 5 bits long to represent values from 0 to 31, which is sufficient. There also is a sign bit in the exponent. Negative logarithms are represented using two's complement representation.

In an LNS, the value zero corresponds to the logarithm negative infinity. One can choose a representation to explicitly represent this special value. However, to minimize resources (for instance, area) used by arithmetic circuits, the present embodiment represents zero by the most negative possible logarithm, which is −32, corresponding to the two's complement bit representation '100000 000000', and denoting a value of approximately 2.33E-10.

When computing, situations can arise in which operations cannot produce reasonable values. An example is when a number is too large to be represented in the chosen word format, such as when multiplying or adding two large numbers or upon divide by zero (or nearly zero). One common approach to this problem is to allow a value to be marked as Not A Number (NAN) and to make sure that each operation produces NAN if a problem arises or if either of its inputs is NAN. The present embodiment uses this approach, as will be described in the following.

FIG. **5** shows the word format **500** for these numbers, in the present embodiment. It has one NAN bit **502***a*, one bit **502***b* for the sign of the value, and 12 bits **502***c-e* representing the logarithm. The logarithm bits include a 5 bit integer part **502***d* and a 6 bit fraction part **502***e*. To permit the logarithms to be negative, there is a sign bit **502***c* for the logarithm which is represented in two's complement form. The NAN bit is set if some problem has arisen in computing the value. The word format **500** shown in FIG. **5** is merely an example and does not constitute a limitation of the present invention. Other variations may be used, so long as they have low precision and high dynamic range.

FIG. **6** shows an example digital implementation of the LPHDR arithmetic unit **408** for the representation illustrated in FIG. **5**. The unit **408** receives two inputs, A **602***a* and B **602***b*, and produces an output **602***c*. The inputs **602***a-b* and output **602***c* may, for example, take the form of electrical signals representing numerical values according to the representation illustrated in FIG. **5**, as is also true of signals transmitted within the unit **408** by components of the unit **408**. The inputs **602***a-b* and output **602***c* each are composed of a Value and a NAN (Not A Number) bit. The unit **408** is controlled by control signals **412***a-d*, coming from the CU **106**, that determine which available arithmetic operation will be performed on the inputs **602***a-b*. In this embodiment, all the available arithmetic operations are performed in parallel on the inputs **602***a-b* by adder/subtractor **604**, mul-

US 10,416,961 B2

13                                        14

tiplier 606, and divider 608. Adder/subtractor 604 performs LPHDR addition and subtraction, multiplier 606 performs LPHDR multiplication, and divider 608 performs LPHDR division.

The desired result (from among the outputs of adder/subtractor 604, multiplier 606, and divider 608) is chosen by the multiplexers (MUXes) 610a and 610b. The right hand MUX 610b sends the desired value to the output 602c. The left hand MUX 610a sends the corresponding NAN bit from the desired operation to the OR gate 612, which outputs a set NAN bit if either input is NAN or if the specified arithmetic operation yields NAN. The computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6.

LNS arithmetic has the great advantage that multiplication (MUL) and division (DIV) are very easy to compute and take few physical resources (e.g., little area in a silicon implementation). The sign of the result is the exclusive-or of the signs of the operands. The logarithm part of the output is the sum, in the case of MUL, or the difference, in the case of DIV, of the logarithm parts of the operands. The sum or difference of the logarithms can overflow, producing a NAN result. Certain other operations also are easy in LNS arithmetic. For instance, square root corresponds to dividing the logarithm in half, which in our representation means simply shifting it one bit position to the right.

Thus, the multiplier 606 and divider 608 in FIG. 6 are implemented as circuits that simply add or subtract their inputs, which are two's complement binary numbers (which in turn happen to be logarithms). If there is overflow, they output a 1 for NAN.

Implementing addition and subtraction in LNS, that is, the adder/subtractor 604 in FIG. 6, follows a common approach used in the literature on LNS. Consider addition. If we have two positive numbers B and C represented by their logarithms b and c, the representation of the sum of B and C is log(B+C). An approach to computing this result that is well known to those skilled in the art is based on noticing that $\log(B+C)=\log(B*(1+C/B))=\log(B)+\log(1+C/B)=b+F(c-b)$ where $F(x)=\log(1+2^x)$. Thus, the present embodiment computes c-b, feeds that through F, and adds the result to b, using standard digital techniques known to those skilled in the art.

Much of the published literature about LNS is concerned with how to compute F(x), the special function for ADD, along with a similar function for SUB. Often these two functions share circuitry, and this is why a single combined adder/subtractor 604 is used in the embodiment of FIG. 6. There are many published ways to compute these functions or approximations to them, including discussions of how to do this when the values are of low precision. Any such method, or other method, may be used. Generally speaking, the more appropriate variations for massively parallel LPHDR arithmetic are those that require the minimal use of resources, such as circuit area, taking advantage of the fact that the representation used in the embodiment of FIG. 6 is low precision and that the arithmetic operations need not be deterministic nor return the most accurate possible answer within the low precision representation. Thus, embodiments of the present invention may use circuitry that does not compute the best possible answer, even among the limited choices available in a low precision representation.

In order to enable conditional operation of selected PEs, the present embodiment is able to reset and set the MASK flag 410 based on results of computations. The mechanism for doing this is that the CU 106 includes instructions that cause the MASK 410 in each PE to unconditionally reset or

set its flag along with other instructions to perform basic tests on values entering the MASK 410 on data path 402f and to set the flag accordingly. Examples of these latter instructions include copying the sign bit or NAN bit of the word on data path 402f into the MASK bit 410. Another example is to set the MASK bit 410 if the 12 bit value part of the word on data path 402f is equal to binary zero. There are many additional and alternative ways for doing this that are directly analogous to comparison instructions in traditional processors and which are well understood by those skilled in the art.

It is worth noting that while the obvious method of using the above LNS operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values, since that is precisely their behavior in LNS implementations. The Mask setting instructions can compare these simple binary values. So besides doing LPHDR computations, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Some embodiments of the present invention may include analog representations and processing methods. Such embodiments may, for example, represent LPHDR values as charges, currents, voltages, frequencies, pulse widths, pulse densities, various forms of spikes, or in other forms not characteristic of traditional digital implementations. There are many such representations discussed in the literature, along with mechanisms for processing values so represented. Such methods, often called Analog methods, can be used to perform LPHDR arithmetic in the broad range of architectures we have discussed, of which SIMD is one example.

An example of an analog SIMD architecture is the SCAMP design (and related designs) of Dudek. In that design values have low dynamic range, being accurate roughly to within 1%. Values are represented by charges on capacitors. Those capacitors typically are the gates of transistors. Each PE has several memory cells, analogous to the Registers shown in FIG. 4. Addition is performed by turning on pass transistors from the two operands, which transfer their charge onto an analog bus, where it is summed by the natural physics of charge and wires, upon which it is gated onto another Register to charge up its capacitor, which then represents the sum of the operands. The detailed mechanism disclosed by Dudek actually produces the negative of the sum, but the basic concept is as described and is a simple way to perform addition and subtraction using analog representations and simple processing mechanisms.

Variations of the SCAMP design have been fabricated and used to perform a range of low precision, low dynamic range computations related to image processing. These designs do not perform high dynamic range arithmetic, nor do they include mechanisms for performing multiplication or division of values stored in Registers. However, the Dudek designs suggest the general feasibility of constructing analog SIMD machines. The following describes how to build an analog SIMD machine that performs LPHDR arithmetic, and is thus an embodiment of the present invention.

One embodiment of the present invention represents values as a mixture of analog and digital forms. This embodiment represents values as low precision, normalized, base 2 floating point numbers, where the mantissa is an analog value and the exponent is a binary digital value. The analog value may be accurate to about 1%, following the approach of Dudek, which is well within the range of

US 10,416,961 B2

15

reasonable analog processing techniques. The exponent may be 6 bits long, or whatever is needed to provide the desired high dynamic range.

To multiply values, the embodiment proceeds by analogy to traditional floating point methods. The digital exponents are summed using a binary arithmetic adder, a standard digital technique. The analog mantissas are multiplied. Since they represent normalized values between approximately ½ and 1, their product may be as small as approximately ¼. Such a product value needs to be normalized back to the range ½ to 1. This is done, in the present embodiment, by comparing the analog mantissa to an analog representation of ½, using a threshold circuit. If the mantissa is below ½, then it is doubled and one is subtracted from the exponent, where such subtraction is simple digital subtraction. Doubling the mantissa is implemented in a way that corresponds to the chosen analog representation. For example, whatever means are being used to add two analog values can be used to double the mantissa, by adding it to a copy of itself. For example, if the mantissa is represented as a current, such as copy may be produced by a current mirror, or other suitable mechanism, and addition may be performed by a current summing junction.

The means of multiplying the original analog mantissas depends on the representation chosen. For example, if mantissas are represented using charge, following SCAMP, then any known method from the literature may be used to convert charge to current. For instance, since the charge on a capacitor determines the voltage on the capacitor, this may be implemented as a conversion from voltage to current, which is a basic technique in analog electronics known to those skilled in the art. In any case, if the mantissas are represented as currents, or once the mantissas are converted to currents, they may be multiplied using, for instance, the techniques of Gilbert. The Gilbert multiplier produces a current, representing the product, which may, if necessary, then be converted back to charge (or whatever representation is used). These are merely examples of how the needed operations might be performed. The literature discusses these matters extensively and these kinds of analog circuits are known to those skilled in the art.

Adding and subtracting values requires pre-normalization of the values to the same exponent, as is done in traditional digital floating point arithmetic. The present embodiment does this by comparing the exponents and choosing the smaller one. Then the smaller one is subtracted from the larger, using digital means. The difference specifies how many times the mantissa which corresponds to the smaller exponent needs to be divided in half. If that mantissa is represented by (or converted to) a current, then an analog R-2R style ladder may be used to divide the current in half the required number of times, with the stage of the ladder specified by the difference of exponents calculated as above. The resulting scaled down current is added to (or subtracted from, if this is an LPHDR subtraction operation) the current corresponding to the mantissa associated with the larger exponent to yield the output mantissa. The output exponent associated with the output mantissa is the larger exponent. Post-normalization may be needed at this point. If the output mantissa is greater than 1, then it needs to be divided in half and the output exponent needs to be incremented. If it is less than ½, then it needs to be doubled enough times to exceed ½ and the output exponent must be decremented correspondingly, which may be performed by a series of threshold circuits, doubler circuits, and associated decrementer circuits. These increments and decrements of the binary digital exponent, and corresponding doublings and halvings of the

16

analog mantissa current, are straightforward operations well known to those skilled in the art.

The present embodiment represents the exponent as a digital binary number. Alternate embodiments may represent the exponent as an analog value. However, it is important that the exponent be represented in storage and computation in such a manner that neither noise nor other errors cause a change in the value it represents. Such changes in the exponent could introduce factors of two (or in some embodiments larger) changes in the values of the stored numbers. To maintain accuracy of the exponents, an embodiment may quantize the exponent to relatively few levels, for instance 16 values plus a sign bit. During processing, slight variations in the analog representation of the exponent may then be removed by circuitry that restores values to the 16 standard quantization levels. To get sufficient dynamic range in such an embodiment, the floating point numbers may be processed as base 4 numbers, rather than the usual base 2 numbers. This means, for instance, that normalized mantissas are in the range ¼ to 1. The methods discussed above for addition, subtraction, and multiplication apply as described, with slight and straightforward variations.

The analog and mixed signal embodiments discussed above are merely examples and do not constitute a limitation of the present invention. The published literature on neuromorphic, analog, and mixed signal techniques provides a wealth of methods that enable LPHDR storage and processing to be implemented. Such storage and processing may introduce noise as well as fabrication errors into the behavior of machines performing LPHDR arithmetic. The results we present below, on software applications running using "fp+noise" arithmetic, show that despite these very "undigital" qualities a machine built in this way is surprisingly useful.

Evidence that LPHDR arithmetic is useful in several important practical computing applications will now be provided. The evidence is presented for a broad variety of embodiments of the present invention, thereby showing that the usefulness does not depend much on the detailed implementation.

For the goal of showing usefulness, we choose a very general embodiment of an LPHDR machine. Our model of the machine is that it provides at least the following capabilities: (1) is massively parallel, (2) provides LPHDR arithmetic possibly with noise, (3) provides a small amount of memory local to each arithmetic unit, (4) provides the arithmetic/memory units in a two-dimensional physical layout with only local connections between units (rather than some more powerful, flexible, or sophisticated connection mechanism), and (5) provides only limited bandwidth between the machine and the host machine. Note that this model is merely an example which is used for the purpose of demonstrating the utility of various embodiments of the present invention, and does not constitute a limitation of the present invention. This model includes, among others, implementations that are digital or analog or mixed, have zero or more noise, have architectures which are FPGA-like, or SIMD-like, or MIMD-like, or otherwise meet the assumptions of the model. More general architectures, such as shared memory designs, GPU-like designs, or other sophisticated designs subsume this model's capabilities, and so LPHDR arithmetic in those architectures also is useful. While we are thus showing that LPHDR arithmetic is useful for a broad range of designs, of which SIMD is only an instance, for purpose of discussion below, we call each unit, which pairs memory with arithmetic, a Processing Element or "PE".

US 10,416,961 B2

17

Several applications are discussed below. For each, the discussion shows (1) that the results are useful when computation is performed in possibly noisy LPHDR arithmetic, and (2) that the computation can be physically laid out in two dimensions with only local flow of data between units, only limited memory within each unit, and only limited data flow to/from the host machine, in such a way that the computation makes efficient use of the machine's resources (area, time, power). The first requirement is referred to as "Accuracy" and the second requirement "Efficiency." Applications that meet both requirements running in this model will function well on many kinds of LPHDR machines, and thus those machines are a broadly useful invention.

Applications are tested using two embodiments for the machine's arithmetic. One uses accurate floating point arithmetic but multiplies the result of each arithmetic operation by a uniformly chosen random number between 0.99 and 1.01. In the following discussion, this embodiment is denoted "fp+noise". It may represent the results produced by an analog embodiment of the machine.

A second embodiment uses logarithmic arithmetic with a value representation as shown in FIG. 5. The arithmetic is repeatable, that is, not noisy, but because of the short fraction size it produces errors of up to approximately 1-2% in each operation. In the following discussion, this embodiment is denoted "1 ns". It may represent the results produced by a particular digital embodiment of the machine.

To demonstrate usefulness of embodiments of the invention, we shall discuss three computational tasks that are enabled by embodiments of the invention and which in turn enable a variety of practical applications. Two of the tasks are related to finding nearest neighbors and the other is related to processing visual information. We shall describe the tasks, note their practical application, and then demonstrate that each task is solvable using the general model described above and thus solvable using embodiments of the present invention.

Application 1: Finding Nearest Neighbors

Given a large set of vectors, called Examples, and a given vector, called Test, the nearest neighbor problem ("NN") is to find the Example which is closest to Test where the distance metric is the square of the Euclidean distance (sum of squares of distances between respective components).

NN is a widely useful computation. One use is for data compression, where it is called "vector quantization". In this application we have a set of relatively long vectors in a "code book" (these are the Examples) and associated short code words (for instance the index of the vector in the code book). We move through a sequence of vectors to be compressed, and for each such vector (Test), find the nearest vector in the code book and output the corresponding code word. This reduces the sequence of vectors to the shorter sequence of code words. Because the code words do not completely specify the original sequence of vectors, this is a lossy form of data compression. Among other applications, it may be used in speech compression and in the MPEG standards.

Another application of NN would be in determining whether snippets of video occur in a large video database. Here we might abstract frames of video from the snippet into feature vectors, using known methods, such as color histograms, scale invariant feature extraction, etc. The Examples would be analogous feature vectors extracted from the video

18

database. We would like to know whether any vector from the snippet was close to any vector from the database, which NN can help us decide.

In many applications of nearest neighbor, we would prefer to find the true nearest neighbor but it is acceptable if we sometimes find another neighbor that is only slightly farther away or if we almost always find the true nearest neighbor. Thus, an approximate solution to the nearest neighbor problem is useful, especially if it can be computed especially quickly, or at low power, or with some other advantage compared to an exact solution.

We shall now show that approximate nearest neighbor is computable using embodiments of the present invention in a way that meets the criteria of Accuracy and Efficiency.

Algorithm. The following describes an algorithm which may be performed by machines implemented according to embodiments of the present invention, such as by executing software including instructions for performing the algorithm. The inputs to the algorithm are a set of Examples and a Test vector. The algorithm seeks to find the nearest (or almost nearest) Example to the Test.

In the simplest version of the algorithm, the number of Examples may be no larger than the number of PEs and each vector must be short enough to fit within a single PE's memory. The Examples are placed into the memories associated with the PEs, so that one Example is placed in each PE. Given a Test, the Test is passed through all the PEs, in turn. Accompanying the Test as it passes through the PEs is the distance from the Test to the nearest Example found so far, along with information that indicates what PE (and thus what Example) yielded that nearest Example found so far. Each PE computes the distance between the Test and the Example stored in that PE's memory, and then passes along the Test together with either the distance and indicator that was passed into this PE (if the distance computed by this PE exceeded the distance passed into the PE) or the distance this PE computed along with information indicating this PE's Example is the nearest so far (if the distance computed by this PE is less than the distance passed into the PE). Thus, the algorithm is doing a simple minimization operation as the Test is passed through the set of PEs. When the Test and associated information leave the last PE, the output is a representation of which PE (and Example) was closest to the Test, along with the distance between that Example and the Test.

In a more efficient variant of this algorithm, the Test is first passed along, for example, the top row, then every column passes the Test and associated information downward, effectively doing a search in parallel with other columns, and once the information reaches the bottom it passes across the bottom row computing a minimum distance Example of all the columns processed so far as it passes across the row. This means that the time required to process the Test is proportional to (the greater of) the number of PEs in a row or column.

An enhancement of this algorithm proceeds as above but computes and passes along information indicating both the nearest and the second nearest Example found so far. When this information exits the array of PEs, the digital processor that is hosting the PE array computes (in high precision) the distance between the Test and the two Examples indicated by the PE array, and the nearer of the two is output as the likely nearest neighbor to the Test.

Accuracy. We expressed the arithmetic performed by the enhanced algorithm described above as code in the C programming language. That code computes both nearest

US 10,416,961 B2

19

neighbors, which are discussed here, along with weighted scores, which are discussed below.

The C code performs the same set of arithmetic operations in the same order using the same methods of performing arithmetic as an actual implementation of the present invention, such as one implemented in hardware. It thus yields the same results as the enhanced algorithm would yield when running on an implementation of the present invention. (How the algorithm is organized to run efficiently on such an implementation is discussed below in the section on Efficiency.)

In particular, when computing the distance between the Test and each Example, the code uses Kahan's method, discussed below, to perform the possibly long summation required to form the sum of the squares of the distances between vector components of the Test and Example.

The C code contains several implementations for arithmetic, as discussed above. When compiled with "#define fp" the arithmetic is done using IEEE standard floating point. If a command line argument is passed in to enable noisy arithmetic, then random noise is added to the result of every calculation. This is the "fp+noise" form of arithmetic. When compiled without "#define fp" the arithmetic is done using low precision logarithmic arithmetic with a 6 bit base-2 fraction. This is the "1 ns" form of arithmetic.

When the code was run it produced traces showing the results of the computations it performed. These traces, shown below, show that with certain command line arguments the enhanced algorithm yielded certain results for LPHDR nearest neighbor calculations. These results provide details showing the usefulness of this approach. We shall discuss the results briefly here.

The first results are for "fp+noise". Ten distinct runs were performed. Each run generated one million random Example vectors of length five, where each component of each vector was drawn from N(0,1)—the Gaussian (normal) distribution with mean zero and standard deviation 1. Each run then generated one hundred Test vectors of length five, where each component of each vector also was drawn from N(0,1). For each Test, the nearest neighbor was computed both according to the enhanced algorithm above and according to the standard nearest neighbor method using high precision floating point arithmetic. A count was kept of the number of times the enhanced algorithm yielded the same result as the standard floating point method. The results were as follows:
% ./a.out 5 10 1000000 100 1
Representation is Floating Point with noise.
Run 1. On 100 tests, 100(100.0%) matches and 0.81% mean score error.
Run 2. On 100 tests, 100(100.0%) matches and 0.84% mean score error.
Run 3. On 100 tests, 100(100.0%) matches and 0.98% mean score error.
Run 4. On 100 tests, 100(100.0%) matches and 0.81% mean score error.
Run 5. On 100 tests, 100(100.0%) matches and 0.94% mean score error.
Run 6. On 100 tests, 100(100.0%) matches and 0.82% mean score error.
Run 7. On 100 tests, 100(100.0%) matches and 0.78% mean score error.
Run 8. On 100 tests, 100(100.0%) matches and 0.86% mean score error.
Run 9. On 100 tests, 100(100.0%) matches and 0.85% mean score error.
Run 10. On 100 tests, 99(99.0%) matches and 0.86% mean score error.

20

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.90%.
Average score error between LPHDR and DP=0.85%.

The "mean score error" values are considered below in the discussion of weighted scores. The "matches" information is relevant here.

Of the ten runs, only one had any test, of the 100 tests performed, which yielded a nearest neighbor different from what the usual high precision method yielded. Thus, the average percentage of matches between the enhanced and the usual method was 99.9%.

A similar computation was then performed using "1 ns" arithmetic. In this case, the results were:
% ./a.out 5 10 1000000 100 0
Representation is LNS without noise.
Run 1. On 100 tests, 100(100.0%) matches and 0.15% mean score error.
Run 2. On 100 tests, 100(100.0%) matches and 0.07% mean score error.
Run 3. On 100 tests, 100(100.0%) matches and 0.08% mean score error.
Run 4. On 100 tests, 100(100.0%) matches and 0.09% mean score error.
Run 5. On 100 tests, 100(100.0%) matches and 0.11% mean score error.
Run 6. On 100 tests, 100(100.0%) matches and 0.16% mean score error.
Run 7. On 100 tests, 100(100.0%) matches and 0.07% mean score error.
Run 8. On 100 tests, 100(100.0%) matches and 0.13% mean score error.
Run 9. On 100 tests, 99(99.0%) matches and 0.17% mean score error.
Run 10. On 100 tests, 98(98.0%) matches and 0.16% mean score error.
Average percentage of time LPHDR (with final DP correction) finds nearest example=99.70%.
Average score error between LPHDR and DP=0.12%.

The average percentage of matches was 99.7%, slightly worse than for "fp+noise".

The accuracy shown by the enhanced nearest neighbor algorithm using two forms of LPHDR arithmetic is surprising. To perform many calculations sequentially with 1% error and yet produce a final result with less than 1% error may seem counter-intuitive. Nonetheless, the LPHDR arithmetic proves effective, and the accuracy shown is high enough to be useful in applications for which approximate nearest neighbor calculations are useful.

As an extreme case, a variant of fp+noise was tested in which the noise varied uniformly from +10% to −5%. Thus, each arithmetic operation produced a result that was between 10% too large and 5% too small. The enhanced nearest neighbor algorithm, as described above, was performed where each run generated 100,000 Example vectors. The surprising results, below, show that even with this extreme level of imprecise, noisy, and non-zero mean LPHDR arithmetic, useful results can be achieved.
Run 1. On 100 tests, 97(97.0%) matches.
Run 2. On 100 tests, 100(100.0%) matches.
Run 3. On 100 tests, 100(100.0%) matches.
Run 4. On 100 tests, 98(98.0%) matches.
Run 5. On 100 tests, 98(98.0%) matches.
Run 6. On 100 tests, 99(99.0%) matches.
Run 7. On 100 tests, 99(99.0%) matches.

US 10,416,961 B2

21                                22

Run 8. On 100 tests, 99(99.0%) matches.
Run 9. On 100 tests, 99(99.0%) matches.
Run 10. On 100 tests, 99(99.0%) matches.
Average percentage of time LPHDR (with final DP correction) finds nearest example=98.80%.

Efficiency. In contrast to the surprising Accuracy results, it is clear to those having ordinary skill in the art that the calculations of the enhanced nearest neighbor algorithm can be performed efficiently in the computing model presented, where the arithmetic/memory units are connected in a two-dimensional physical layout, using only local communication between PEs. However, this does not address the matter of keeping the machine busy doing useful work using only low bandwidth to the host machine.

When computing the nearest neighbor to a single Test, the Test flows across all the PEs in the array. As discussed above, if the array is an M×M grid, it takes at least O(M) steps for the Test to pass through the machine and return results to the host. During this time the machine performs O(M×M) nearest neighbor distance computations, but since the machine is capable of performing O(M×M) calculations at each step, a factor of O(M) is lost.

This speedup, compared to a serial machine, of a factor of O(M) is significant and useful. However, the efficiency can be even higher. If sufficiently many Test vectors, say O(M), or more, are to be processed then they can be streamed into the machine and made to flow through in a pipelined fashion. The time to process O(M) Tests remains O(M), the same as for a single Test, but now the machine performs O(M)×O(M×M) distance computations, and thus within a constant factor the full computing capacity of the machine is used.

Thus, the machine is especially efficient if it is processing at least as many Test vectors as the square root of the number of PEs. There are applications that fit well into this form, such as pattern recognition or compression of many independent Tests (e.g., blocks of an image, parts of a file, price histories of independent stocks) as well as the problem of finding the nearest neighbor to every Example in the set of Examples. This is in contrast to the general view among those having ordinary skill in the art, as discussed above, that machines with very many arithmetic processing elements on a single chip, or similar, are not very useful.

Application 2: Distance Weighted Scoring

A task related to Nearest Neighbor is Distance Weighted Scoring. In this task, each Example has an associated Score. This is a number that in some way characterizes the Example. For instance, if the Examples are abstractions of the history of prices of a given stock, the Scores might be historical probabilities of whether the price is about to increase or decrease. Given a Test vector, the task is to form a weighted sum of the Scores of all the Examples, where the weights are a diminishing function of the distance from the Test to the respective Examples. For example, this weighted score might be taken as a prediction of the future price of the stock whose history is represented by the Test. This use of embodiments of the invention might help support, for instance, high speed trading of stocks, as is performed by certain "quantitative" hedge funds, despite the general view by those having ordinary skill in the art that low precision computation is not of use in financial applications.

The C code described above computes weighted scores along with nearest neighbors. The scores assigned to Examples in this computation are random numbers drawn uniformly from the range [0,1]. The weight for each

Example in this computation is defined to be the un-normalized weight for the Example divided by the sum of the un-normalized weights for all Examples, where the un-normalized weight for each Example is defined to be the reciprocal of the sum of one plus the squared distance from the Example to the Test vector. As discussed above, the code performs a number of runs, each producing many Examples and Tests, and compares results of traditional floating point computations with results calculated using fp+noise and 1 ns arithmetic.

Looking again at the trace results of running the simulation, above, we see that for fp+noise the LPHDR weighted scores on average were within 0.85% of the correct value and never were as much as 1% different. For 1 ns arithmetic the errors were even smaller, averaging just 0.12% error.

These results are surprising given that computing an overall weighted score involves summing the individual weighted scores associated with each Example. Since each run was processing 1,000,000 Examples, this means that the sums were over one million small positive values. The naive method of summing one million small values with errors of about 1% in each addition should yield results that approximate noise. However, the code performs its sums using a long known method invented by Kahan (Kahan, William (January 1965), "Further remarks on reducing truncation errors", Communications of the ACM 8 (1): 40). The method makes it feasible to perform long sums, such as are done for Distance Weighted Scores, or as might be used in computational finance when computing prices of derivative securities using Monte Carlo methods, or for performing deconvolution in image processing algorithms, as will be discussed next.

The Efficiency of this algorithm is similar to that of NN, as discussed earlier. If many Test vectors are processed at once, the machine performs especially efficiently.

Application 3: Removing Motion Blur in Images

In order to gather sufficient light to form an image, camera shutters are often left open for long enough that camera motion can cause blurring. This can happen as a result of camera shake in inexpensive consumer cameras as well as with very expensive but fast moving cameras mounted on satellites or aircraft. If the motion path of the camera is known (or can be computed) then the blur can be substantially removed using various deblurring algorithms. One such algorithm is the Richardson-Lucy method ("RL"), and we show here that embodiments of the present invention can run that algorithm and produce useful results. Following the discussion format above, we discuss efficiency of Accuracy and Efficiency.

Algorithm. The Richardson-Lucy algorithm is well known and widely available. Assume that an image has been blurred using a known kernel. In particular, assume that the kernel is a straight line and that the image has been oriented so that the blur has occurred purely in a horizontal direction. Consider the particular kernel for which the J'th pixel in each row of the blurred image is the uniformly weighted mean of pixels J through J+31 in the original unblurred image.

Accuracy. We implemented in the C programming language a straightforward version of the RL method that uses LPHDR arithmetic. The program reads a test image, blurs it using the kernel discussed above, then deblurs it using either fp+noise or 1 ns arithmetic. The RL algorithm computes sums, such as when convolving the kernel with the current approximation of the deblurred image. Our implementation

US 10,416,961 B2

23                                                    24

computes these sums using the Kahan method, discussed earlier. FIG. **7** shows the test image in original form. It is a satellite picture of a building used during Barack Obama's inauguration. FIG. **8** shows the image extremely blurred by the kernel. It is difficult to see any particular objects in this image. FIG. **9** shows the result of deblurring using standard floating point arithmetic. FIG. **10** shows the result of deblurring using fp+noise arithmetic, and FIG. **11** shows the result of deblurring using 1 ns arithmetic. In all these cases the image is sufficiently restored that it is possible to recognize buildings, streets, parking lots, and cars.

In addition to displaying the images herein for judgement using the human eye, we computed a numerical measure of deblurring performance. We computed the mean difference, over all pixels in the image, between each original pixel value (a gray scale value from 0 to 255) and the corresponding value in the image reconstructed by the RL method. Those numerical measures are shown below in Table 1:

TABLE 1

| Image type | Mean pixel error |
|---|---|
| Blurred | 32.0 |
| RL using standard floating point | 13.0 |
| RL using fp + noise | 13.8 |
| RL using lns | 14.8 |

These results, together with the subjective but important judgements made by the human eye, show that LPHDR arithmetic provides a substantial and useful degree of deblurring compared to standard floating point arithmetic. Further, in this example we chose an extreme degree of blurring, to better convey the concept and visual impact of the deblurring using LPHDR arithmetic. On more gentle and typical blur kernels, the resulting deblurred images are much closer to the originals than in this case, as can be seen by shrinking the kernel length and running the RL algorithm with LPHDR arithmetic on those more typical cases.

Efficiency. It is clear to those with ordinary skill in the art that Richardson-Lucy using a local kernel performs only local computational operations. An image to be deblurred can be loaded into the PE array, storing one or more pixels per PE, the deconvolution operation of RL can then be iterated dozens or hundreds of times, and the deblurred image can be read back to the host processor. As long as sufficient iterations are performed, this makes efficient use of the machine.

An extreme form of image deblurring is the Iterative Reconstruction method used in computational tomography. Reconstructing 3D volumes from 2D projections is an extremely computational task. The method discussed above generalizes naturally to Iterative Reconstruction and makes efficient use of the machine.

Among the advantages of embodiments of the invention are one or more of the following.

PEs implemented according to certain embodiments of the present invention may be relatively small for PEs that can do arithmetic. This means that there are many PEs per unit of resource (e.g., transistor, area, volume), which in turn means that there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs. For instance, a digital embodiment of the present invention built as a large silicon chip fabricated with current state of the art technology might perform tens of thousand of arithmetic operations per cycle,

as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. These ratios reflect an architectural advantage of embodiments of the present invention that should persist as fabrication technology continues to improve, even as we reach nanotechnology or other implementations for digital and analog computing.

Doing arithmetic with few resources generally means, and in the embodiments shown specifically means, that the arithmetic is done using low power. As a result, a machine implemented in accordance with embodiments of the present invention can have extremely high performance with reasonable power (for instance in the tens of watts) or low power (for instance a fraction of a watt) with reasonably high performance. This means that such embodiments may be suitable for the full range of computing, from supercomputers, through desktops, down to mobile computing. Similarly, and since cost is generally associated with the amount of available resources, embodiments of the present invention may provide a relatively high amount of computing power per unit of cost compared to conventional computing devices.

The SIMD architecture is rather old and is frequently discarded as an approach to computer design by those having ordinary skill in the art. However, if the processing elements of a SIMD machine can be made particularly small while retaining important functionality, such as general arithmetic ability, the architecture can be useful. The embodiments presented herein have precisely those qualities.

The discovery that massive amounts of LPHDR arithmetic is useful as a fairly general computing framework, as opposed to the common belief that it is not useful, can be an advantage in any (massively or non-massively) parallel machine design or non-parallel design, not just in SIMD embodiments. It could be used in FPGAs, FPAAs, GPU/SIMT machines, MIMD machines, and in any kind of machine that uses compact arithmetic processing elements to perform large amounts of computation using a small amount of resources (like transistors or volume).

Another advantage of embodiments of the present invention is that they are not merely useful for performing computations efficiently in general, but that they can be used to tackle a variety of real-world problems which are typically assumed to require high-precision computing elements, even though such embodiments include only (or predominantly) low-precision computing elements. Although several examples of such real-world problems have been presented herein, and although we have also had success implementing non-bonded force field computations for molecular dynamics simulation and other tasks, these are merely examples and do not constitute an exhaustive set of the real-world problems that embodiments of the present invention may be used to solve.

The embodiments disclosed above are merely examples and do not constitute limitations of the present invention. Rather, embodiments of the present invention may be implemented in a variety of other ways, such as the following.

For example, embodiments of the present invention may represent values in any of a variety of ways, such as by using digital or analog representations, such as fixed point, logarithmic, or floating point representations, voltages, currents, charges, pulse width, pulse density, frequency, probability, spikes, timing, or combinations thereof. These underlying representations may be used individually or in combination to represent the LPHDR values. LPHDR arithmetic circuits may be implemented in any of a variety of ways, such as by using various digital methods (which may be parallel or

US 10,416,961 B2

serial, pipelined or not) or analog methods or combinations thereof. Arithmetic elements may be connected using various connection architectures, such as nearest 4, nearest 8, hops of varying degree, and architectures which may or may not be rectangular or grid-like. Any method may be used for communication among arithmetic elements, such as parallel or serial, digital or analog or mixed-mode communication. Arithmetic elements may operate synchronously or asynchronously, and may operate globally simultaneously or not. Arithmetic elements may be implemented, for example, on a single physical device, such as a silicon chip, or spread across multiple devices and an embodiment built from multiple devices may have its arithmetic elements connected in a variety of ways, including for example being connected as a grid, torus, hypercube, tree, or other method. Arithmetic elements may be connected to a host machine, if any, in a variety of ways, depending on the cost and bandwidth and other requirements of a particular embodiment. For example there may be many host machines connected to the collection of arithmetic elements.

Although certain embodiments of the present invention are described as being implemented as a SIMD architecture, this is merely an example and does not constitute a limitation of the present invention. For example, embodiments of the present invention may be implemented as reconfigurable architectures, such as but not limited to programmable logic devices, field programmable analog arrays, or field programmable gate array architectures, such as a design in which existing multiplier blocks of an FPGA are replaced with or supplemented by LPHDR arithmetic elements of any of the kinds disclosed herein, or for example in which LPHDR elements are included in a new or existing reconfigurable device design. As another example, embodiments of the present invention may be implemented as a GPU or SIMT-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR elements could supplement or replace traditional arithmetic elements in current or new graphics processing unit designs. As yet another example, embodiments of the present invention may be implemented as a MIMD-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR arithmetic elements could supplement or replace traditional arithmetic elements in current or new MIMD computing system designs. As yet another example, embodiments of the present invention may be implemented as any kind of machine, including a massively parallel machine, which uses compact arithmetic processing elements to provide large amounts of arithmetic computing capability using a small amount of resources (for example, transistors or area or volume) compared with traditional architectures.

Although certain embodiments of the present invention are described herein as executing software, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using microcode or a hardware sequencer or state machine or other controller to control LPHDR arithmetic elements of any of the kinds disclosed herein. Alternatively, for example, embodiments of the present invention may be implemented using hard-wired, burned, or otherwise pre-programmed controllers to control LPHDR arithmetic elements of any of the kinds disclosed herein.

Although certain embodiments of the present invention are described herein as being implemented using custom silicon as the hardware, this is merely an example and does not constitute a limitation of the present invention. Alterna-

tively, for example, embodiments of the present invention may be implemented using FPGA or other reconfigurable chips as the underlying hardware, in which the FPGAs or other reconfigurable chips are configured to perform the LPHDR operations disclosed herein. As another example, embodiments of the present invention may be implemented using any programmable conventional digital or analog computing architecture (including those which use high-precision computing elements, including those which use other kinds of non-LPHDR hardware to perform LPHDR arithmetic, and including those which are massively parallel) which has been programmed with software to perform the LPHDR operations disclosed herein. For example, embodiments of the present invention may be implemented using a software emulator of the functions disclosed herein.

As yet another example, embodiments of the present invention may be implemented using 3D fabrication technologies, whether based on silicon chips or otherwise. Some example embodiments are those in which a memory chip has been bonded onto a processor or other device chip or in which several memory and/or processor or other device chips have been bonded to each other in a stack. 3D embodiments of the present invention are very useful as they may be denser than 2D embodiments and may enable 3D communication of information between the processing units, which enables more algorithms to run efficiently on those embodiments compared to 2D embodiments.

Although certain embodiments of the present invention are described herein as being implemented using silicon chip fabrication technology, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using technologies that may enable other sorts of traditional digital and analog computing processors or other devices. Examples of such technologies include various nanomechanical and nanoelectronic technologies, chemistry based technologies such as for DNA computing, nanowire and nanotube based technologies, optical technologies, mechanical technologies, biological technologies, and other technologies whether based on transistors or not that are capable of implementing LPHDR architectures of the kinds disclosed herein.

Certain embodiments of the present invention have been described as "massively parallel" embodiments. Although certain embodiments of the present invention may include thousands, millions, or more arithmetic units, embodiments of the present invention may include any number of arithmetic units (as few as one). For example, even an embodiment which includes only a single LPHDR unit may be used within a serial processing unit or other device to provide a significant amount of LPHDR processing power in a small, inexpensive processor or other device.

For certain embodiments of the present invention, even if implemented using only digital techniques, the arithmetic operations may not yield deterministic, repeatable, or the most accurate possible results within the chosen low precision representation. For instance, on certain specific input values, an arithmetic operation may produce a result which is not the nearest value in the chosen representation to the true arithmetic result.

The degree of precision of a "low precision, high dynamic range" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, in certain embodiments, a LPHDR arithmetic element produces results which are sometimes (or all of the

US 10,416,961 B2

27

time) no closer than 0.05% to the correct result (that is, the absolute value of the difference between the produced result and the correct result is no more than one-twentieth of one percent of the absolute value of the correct result). As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.1% to the correct result. As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.2% to the correct result. As yet another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.5% to the correct result. As yet further examples, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 1%, or 2%, or 5%, or 10%, or 20% to the correct result.

Besides having various possible degrees of precision, implementations may vary in the dynamic range of the space of values they process. For example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one millionth to one million. As another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one billionth to one billion. As yet another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one sixty five thousandth to sixty five thousand. As yet further examples, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range from any specific value between zero and one sixty five thousandth up to any specific value greater than sixty five thousand. As yet further examples, other embodiments may process values in spaces with dynamic ranges that may combine and may fall between the prior examples, for example ranging from approximately one billionth to one million. In all of these example embodiments of the present invention, as well as in other embodiments, the values that we are discussing may be signed, so that the above descriptions characterize the absolute values of the numbers being discussed.

The frequency with which LPHDR arithmetic elements may yield only approximations to correct results may vary from implementation to implementation. For example, consider an embodiment in which LPHDR arithmetic elements can perform one or more operations (perhaps including, for example, trigonometric functions), and for each operation the LPHDR elements each accept a set of inputs drawn from a range of valid values, and for each specific set of input values the LPHDR elements each produce one or more output values (for example, simultaneously computing both sin and cos of an input), and the output values produced for a specific set of inputs may be deterministic or non-deterministic. In such an example embodiment, consider further a fraction F of the valid inputs and a relative error amount E by which the result calculated by an LPHDR element may differ from the mathematically correct result. In certain embodiments of the present invention, for each LPHDR arithmetic element, for at least one operation that the LPHDR unit is capable of performing, for at least fraction F of the possible valid inputs to that operation, for at least one output signal produced by that operation, the statistical mean, over repeated execution, of the numerical values represented by that output signal of the LPHDR unit, when executing that operation on each of those respective inputs, differs by at least E from the result of an exact mathematical calculation of the operation on those same input values, where F is 1% and E is 0.05%. In several other example

28

embodiments, F is not 1% but instead is one of 2%, or 5%, or 10%, or 20%, or 50%. For each of these example embodiments, each with some specific value for F, there are other example embodiments in which E is not 0.05% but instead is 0.1%, or 0.2%, or 0.5%, or 1%, or 2%, or 5%, or 10%, or 20%. These varied embodiments are merely examples and do not constitute limitations of the present invention.

For certain devices (such as computers or processors or other devices) embodied according the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits). If NL is the total number of LPHDR elements in such a device, and NH is the total number of elements in the device which are designed to perform high dynamic range arithmetic of traditional precision, then NL exceeds T (NH), where T ( ) is some function. Any of a variety of functions may be used as the function T ( ). For example, in certain embodiments, T (NH) may be twenty plus three times NH, and the number of LPHDR arithmetic elements in the device may exceed twenty more than three times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed fifty more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one hundred more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed five thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. Certain embodiments of the present invention may be implemented within a single physical device, such as but not limited to a silicon chip or a chip stack or a chip package or a circuit board, and the number NL of LPHDR elements in the physical device and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the physical device may be the total counts of the respective elements within that physical device. Certain embodiments of the present invention may be implemented in a computing system including more than one physical device, such as but not limited to a collection of silicon chips or chip stacks or chip packages or circuit boards coupled to and communicating with each other using any means (such as a bus, switch, any kind of network connection, or other means of communication), and in this case the number NL of LPHDR elements in the computing system and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the computing system may be the total counts of the respective elements within all those physical devices jointly.

US 10,416,961 B2

29                                              30

Certain embodiments of the present invention may constitute, or may be part of, processors, which are devices capable of executing software to perform computations. Such processors may include mechanisms for storing software, for using the software to determine what operations to perform, for performing those operations, for storing numerical data, for modifying data according to the software specified operations, and for communicating with devices connected to the processor. Processors may be reconfigurable devices, such as, without limitation, field programmable arrays. Processors may be co-processors to assist host machines or may be capable of operating independently of an external host. Processors may be formed as a collection of component host processors and co-processors of various types, such as CPUs, GPUs, FPGAs, or other processors or other devices, which in the art may be referred to as a heterogeneous processor design or heterogeneous computing system, some or all of which components might incorporate the same or distinct varieties of embodiments of the present invention.

Embodiments of the present invention may, however, be implemented in devices in addition to or other than processors. For example, a computer including a processor and other components (such as memory coupled to the processor by a data path), wherein the processor includes components for performing LPHDR operations in any of the ways disclosed herein, is an example of an embodiment of the present invention. More generally, any device or combination of devices, whether or not falling within the meaning of a "processor," which performs the functions disclosed herein may constitute an example of an embodiment of the present invention.

More generally, any of the techniques described above may be implemented, for example, in hardware, software tangibly stored on a computer-readable medium, firmware, or any combination thereof. The techniques described above may be implemented in one or more computer programs executing on a programmable computer including a processor, a storage medium readable by the processor (including, for example, volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. Program code may be applied to input entered using the input device to perform the functions described and to generate output. The output may be provided to one or more output devices.

Each computer program within the scope of the claims below may be implemented in any programming language, such as assembly language, machine language, a high-level procedural programming language, or an object-oriented programming language. The programming language may, for example, be a compiled or interpreted programming language.

Each such computer program may be implemented in a computer program product tangibly embodied in a machine-readable storage device for execution by a computer processor. Method steps of the invention may be performed by a computer processor executing a program tangibly embodied on a computer-readable medium to perform functions of the invention by operating on input and generating output. Suitable processors include, by way of example, both general and special purpose microprocessors. Generally, the processor receives instructions and data from a read-only memory and/or a random access memory. Storage devices suitable for tangibly embodying computer program instructions include, for example, all forms of non-volatile memory, such as semiconductor memory devices, including EPROM, EEPROM, and flash memory devices; magnetic

disks such as internal hard disks and removable disks; magneto-optical disks; and CD-ROMs. Any of the foregoing may be supplemented by, or incorporated in, specially-designed ASICs (application-specific integrated circuits) or FPGAs (Field-Programmable Gate Arrays). A computer can generally also receive programs and data from a storage medium such as an internal disk (not shown) or a removable disk. These elements will also be found in a conventional desktop or workstation computer as well as other computers suitable for executing computer programs implementing the methods described herein, which may be used in conjunction with any digital print engine or marking engine, display monitor, or other raster output device capable of producing color or gray scale pixels on paper, film, display screen, or other output medium.

The invention claimed is:

**1**. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

**2**. The device of claim **1**, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

**3**. The device of claim **2**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**4**. The device of claim **1**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**5**. The device of claim **1**, wherein the first operation is multiplication.

**6**. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR

US 10,416,961 B2

31

unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nanomechanical-technology-based execution unit, a nanoelectronic-technology-based execution unit, a nanowire-technology-based execution unit, a nanotube-technology-based execution unit, and an optical-technology-based execution unit.

**7**. The device of claim **6**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**8**. The device of claim **6**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 1,000,000.

**9**. The device of claim **6**, wherein the first operation is multiplication.

**10**. A device comprising:

a plurality of components comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**11**. The device of claim **10**, wherein the plurality of components are arranged in a stack.

**12**. The device of claim **11**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**13**. The device of claim **10**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**14**. The device of claim **10**, wherein the first operation is multiplication.

**15**. The device of claim **10**, wherein the plurality of components are bonded.

**16**. The device of claim **10**, wherein the plurality of components are arranged in a stack and bonded.

**17**. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first

32

operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nanomechanical-technology-based execution unit, a nanoelectronic-technology-based execution unit, a nanowire-technology-based execution unit, a nanotube-technology-based execution unit, and an optical-technology-based execution unit.

**18**. The device of claim **17**, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**19**. The device of claim **17**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**20**. The device of claim **17**, wherein the first operation is multiplication.

**21**. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

a plurality of components comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**22**. The device of claim **21**, wherein the plurality of components are arranged in a stack.

**23**. The device of claim **17**, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

US 10,416,961 B2

33

34

**24**. The device of claim **21**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**25**. The device of claim **21**, wherein the first operation is multiplication.

**26**. The device of claim **21**, wherein the plurality of components are bonded.

**27**. The device of claim **21**, wherein the plurality of components are arranged in a stack and bonded.

\*  \*  \*  \*  \*



US009218156B2

(12) **United States Patent**
Bates

(10) **Patent No.:** US 9,218,156 B2
(45) **Date of Patent:** *Dec. 22, 2015

(54) **PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT**

(71) Applicant: **Singular Computing LLC**, Newton, MA (US)

(72) Inventor: **Joseph Bates**, Newton, MA (US)

(73) Assignee: **Singular Computing LLC**, Newton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 158 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/849,606**

(22) Filed: **Mar. 25, 2013**

(65) **Prior Publication Data**

US 2014/0095571 A1    Apr. 3, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/399,884, filed on Feb. 17, 2012, now Pat. No. 8,407,273, which is a continuation of application No. 12/816,201, filed on Jun. 15, 2010, now Pat. No. 8,150,902.

(60) Provisional application No. 61/218,691, filed on Jun. 19, 2009.

(51) **Int. Cl.**
*G06F 7/38* (2006.01)
*G06F 7/483* (2006.01)
*G06F 7/523* (2006.01)
*H03K 19/177* (2006.01)

(52) **U.S. Cl.**
CPC .............. *G06F 7/38* (2013.01); *G06F 7/4833* (2013.01); *G06F 7/5235* (2013.01); *H03K 19/17728* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| JP | H0314128 | 1/1991 |
| JP | H06075986 | 3/1994 |
| JP | 2008158822 | 7/2008 |
| JP | 2012530966 | 12/2012 |

OTHER PUBLICATIONS

Naohito Nakasato, et al., "A Compiler for High Performance Adaptive Precision Computing," A paper of SACSIS (Symposium on Advanced Computing Systems and Infrastructures) 2008, Information Processing Society of Japan, Jun. 4, 2008, No. 5, pp. 149-156.

*Primary Examiner* — Michael D Yaary
(74) *Attorney, Agent, or Firm* — Robert Plotkin, P.C.; Robert Plotkin

(57) **ABSTRACT**

A processor or other device, such as a programmable and/or massively parallel processor or other device, includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements, if any, in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

**42 Claims, 11 Drawing Sheets**



Google Exhibit 1001
Google v. Singular



FIG. 1



FIG. 2



FIG. 3

U.S. Patent

Dec. 22, 2015

Sheet 4 of 11

US 9,218,156 B2



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

1

# PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/399,884, filed on Feb. 17, 2012, entitled, "Processing with Compact Arithmetic Processing Element," now U.S. Pat. No. 8,407,273; which is a continuation of U.S. patent application Ser. No. 12/816,201, filed on Jun. 15, 2010, entitled, "Processing with Compact Arithmetic Processing Element," now U.S. Pat. No. 8,150,902; which claims the benefit of U.S. Provisional Patent Application Ser. No. 61/218,691, filed on Jun. 19, 2009, entitled, "Massively Parallel Processing with Compact Arithmetic Element"; all of which are hereby incorporated by reference herein.

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND

The ability to compute rapidly has become enormously important to humanity. Weather and climate prediction, medical applications (such as drug design and non-invasive imaging), national defense, geological exploration, financial modeling, Internet search, network communications, scientific research in varied fields, and even the design of new computing hardware have each become dependent on the ability to rapidly perform massive amounts of calculation. Future progress, such as the computer-aided design of complex nano-scale systems or development of consumer products that can see, hear, and understand, will demand economical delivery of even greater computing power.

Gordon Moore's prediction, that computing performance per dollar would double every two years, has proved valid for over 30 years and looks likely to continue in some form. But despite this rapid exponential improvement, the reality is that the inherent computing power available from silicon has grown far more quickly than it has been made available to software. In other words, although the theoretical computing power of computing hardware has grown exponentially, the interfaces through which software is required to access the hardware limits the ability of software to use hardware to perform computations at anything approaching the hardware's theoretical maximum computing power.

Consider a modern silicon microprocessor chip containing about one billion transistors, clocked at roughly 1 GHz. On each cycle the chip delivers approximately one useful arithmetic operation to the software it is running. For instance, a value might be transferred between registers, another value might be incremented, perhaps a multiply is accomplished. This is not terribly different from what chips did 30 years ago, though the clock rates are perhaps a thousand times faster today.

Real computers are built as physical devices, and the underlying physics from which the machines are built often exhibits complex and interesting behavior. For example, a silicon MOSFET transistor is a device capable of performing

2

interesting non-linear operations, such as exponentiation. The junction of two wires can add currents. If configured properly, a billion transistors and wires should be able to perform some significant fraction of a billion interesting computational operations within a few propagation delays of the basic components (a "cycle" if the overall design is a traditional digital design). Yet, today's CPU chips use their billion transistors to enable software to perform merely a few such operations per cycle, not the significant fraction of the billion that might be possible.

## SUMMARY

Embodiments of the present invention are directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

In some embodiments, "low precision" processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1% (one tenth of one percent). This is far worse precision than the widely used IEEE 754 single precision floating point standard. Programmable embodiments of the present invention may be programmed with algorithms that function adequately despite these unusually large relative errors. In some embodiments, the processing elements have "high dynamic range" in the sense that they are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an example overall design of a SIMD processor according to one embodiment of the present invention.

FIG. 2 is an example of the Processing Element Array of a SIMD processor according to one embodiment of the present invention.

FIG. 3 is an example of how a Processing Element in a Processing Element Array communicates data with other parts of the processor according to one embodiment of the present invention.

FIG. 4 is an example design for a Processing Element according to one embodiment of the present invention.

FIG. 5 is an example LPHDR data word format according to one embodiment of the present invention.

FIG. 6 is an example design for an LPHDR arithmetic unit according to one embodiment of the present invention.

FIG. 7 is an original image.

FIG. 8 is an image blurred by a blur kernel according to one embodiment of the present invention.

FIG. 9 is an image produced by Richardson Lucy deconvolution using floating point arithmetic according to one embodiment of the present invention.

US 9,218,156 B2

3

FIG. **10** is an image produced by Richardson Lucy deconvolution using LPHDR floating point arithmetic with added noise (fp+noise) according to one embodiment of the present invention.

FIG. **11** is an image produced by Richardson Lucy deconvolution using LPHDR logarithmic arithmetic (lns) according to one embodiment of the present invention.

DETAILED DESCRIPTION

As described above, today's CPU chips make inefficient use of their transistors. For example, a conventional CPU chip containing a billion transistors might enable software to perform merely a few operations per clock cycle. Although this is highly inefficient, those having ordinary skill in the art design CPUs in this way for what are widely accepted to be valid reasons. For example, such designs satisfy the (often essential) requirement for software compatibility with earlier designs. Furthermore, they deliver great precision, performing exact arithmetic with integers typically 32 or 64 bits long and performing rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers. Many applications need this kind of precision. As a result, conventional CPUs typically are designed to provide such precision, using on the order of a million transistors to implement the arithmetic operations.

There are many economically important applications, however, which are not especially sensitive to precision and that would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors. Current architectures for general purpose computing fail to deliver this power.

Because of the weaknesses of conventional computers, such as typical microprocessors, other kinds of computers have been developed to attain higher performance. These machines include single instruction stream/multiple data stream (SIMD) designs, multiple instruction stream/multiple data stream (MIMD) designs, reconfigurable architectures such as field programmable gate arrays (FPGAs), and graphics processing unit designs (GPUs) which, when applied to general purpose computing, may be viewed as single instruction stream/multiple thread (SIMT) designs.

SIMD machines follow a sequential program, with each instruction performing operations on a collection of data. They come in two main varieties: vector processors and array processors. Vector processors stream data through a processing element (or small collection of such elements). Each component of the data stream is processed similarly. Vector machines gain speed by eliminating many instruction fetch/decode operations and by pipelining the processor so that the clock speed of the operations is increased.

Array processors distribute data across a grid of processing elements (PEs). Each element has its own memory. Instructions are broadcast to the PEs from a central control until, sequentially. Each PE performs the broadcast instruction on its local data (often with the option to sit idle that cycle). Array processors gain speed by using silicon efficiently—using just one instruction fetch/decode unit to drive many small simple execution units in parallel.

Array processors have been built using fixed point arithmetic at a wide variety of bit widths, such as 1, 4, 8, and wider, and using floating point arithmetic. Small bit widths allow the processing elements to be small, which allows more of them to fit in the computer, but many operations must be carried out in sequence to perform conventional arithmetic calculations. Wider widths allow conventional arithmetic operations to be

4

completed in a single cycle. In practice, wider widths are desirable. Machines that were originally designed with small bit widths, such as the Connection Machine-1 and the Goodyear Massively Parallel Processor, which each used 1 bit wide processing elements, evolved toward wider data paths to better support fast arithmetic, producing machines such as the Connection Machine-2 which included 32 bit floating point hardware and the MasPar machines which succeeded the Goodyear machine and provided 4 bit processing elements in the MasPar-1 and 32 bit processing elements in the MasPar-2.

Array processors also have been designed to use analog representations of numbers and analog circuits to perform computations. The SCAMP is such a machine. These machines provide low precision arithmetic, in which each operation might introduce perhaps an error of a few percentage points in its results. They also introduce noise into their computations, so the computations are not repeatable. Further, they represent only a small range of values, corresponding for instance to 8 bit fixed point values rather than providing the large dynamic range of typical 32 or 64 bit floating point representations. Given these limitations, the SCAMP was not intended as a general purpose computer, but instead was designed and used for image processing and for modeling biological early vision processes. Such applications do not require a full range of arithmetic operations in hardware, and the SCAMP, for example, omits general division and multiplication from its design.

While SIMD machines were popular in the 1980s, as price/performance for microprocessors improved designers began building machines from large collections of communicating microprocessors. These MIMD machines are fast and can have price/performance comparable to their component microprocessors, but they exhibit the same inefficiency as those components in that they deliver to their software relatively little computation per transistor.

Field Programmable Gate Arrays (FPGAs) are integrated circuits containing a large grid of general purpose digital elements with reconfigurable wiring between those elements. The elements originally were single digital gates, such as AND and OR gates, but evolved to larger elements that could, for instance, be programmed to map 6 inputs to 1 output according to any Boolean function. This architecture allows the FPGA to be configured from external sources to perform a wide variety of digital computations, which allows the device to be used as a co-processor to a CPU to accelerate computation. However, arithmetic operations such as multiplication and division on integers, and especially on floating point numbers, require many gates and can absorb a large fraction of an FPGA's general purpose resources. For this reason, modern FPGAs often devote a significant portion of their area to providing dozens or hundreds of multiplier blocks, which can be used instead of general purpose resources for computations requiring multiplication. These multiplier blocks typically perform 18 bit or wider integer multiplies, and use many transistors, as similar multiplier circuits do when they are part of a general purpose CPU.

Existing Field Programmable Analog Arrays (FPAAs) are analogous to FPGAs, but their configurable elements perform analog processing. These devices generally are intended to do signal processing, such as helping model neural circuitry. They are relatively low precision, have relatively low dynamic range, and introduce noise into computation. They have not been designed as, or intended for use as, general purpose computers. For instance, they are not seen by those having ordinary skill in the art as machines that can run the variety of complex algorithms with floating point arithmetic that typically run on high performance digital computers.

US 9,218,156 B2

5

Finally, Graphics Processing Units (GPUs) are a variety of parallel processor that evolved to provide high speed graphics capabilities to personal computers. They offer standard floating point computing abilities with very high performance for certain tasks. Their computing model is sometimes based on having thousands of nearly identical threads of computing (SIMT), which are executed by a collection of SIMD-like internal computing engines, each of which is directed and redirected to perform work for which a slow external DRAM memory has provided data. Like other machines that implement standard floating point arithmetic, they use many transistors for that arithmetic. They are as wasteful of those transistors, in the sense discussed above, as are general purpose CPUs.

Some GPUs include support for 16 bit floating point values (sometimes called the "Half" format). The GPU manufacturers, currently such as NVIDIA or AMD/ATI, describe this capability as being useful for rendering images with higher dynamic range than the usual 32 bit RGBA format, which uses 8 bits of fixed point data per color, while also saving space over using 32 bit floating point for color components. The special effects movie firm Industrial Light and Magic (ILM) independently defined an identical representation in their OpenEXR standard, which they describe as "a high dynamic-range (HDR) image file format developed by Industrial Light & Magic for use in computer imaging applications." Wikipedia (late 2008) describes the 16 bit floating point representation thusly: "This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth."

When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly **64**) bit arithmetic and are wasteful of transistors in the sense discussed above.

The variety of architectures mentioned above are all attempts to get more performance from silicon than is available in a traditional processor design. But designers of traditional processors also have been struggling to use the enormous increase in available transistors to improve performance of their machines. These machines often are required, because of history and economics, to support large existing instruction sets, such as the Intel x86 instruction set. This is difficult, because of the law of diminishing returns, which does not enable twice the performance to be delivered by twice the transistor count. One facet of these designers' struggle has been to increase the precision of arithmetic operations, since transistors are abundant and some applications could be sped up significantly if the processor natively supported long (e.g., 64 bit) numbers. With the increase of native fixed point precision from 8 to 16 to 32 to 64 bits, and of floating point from 32 to 64 and sometimes 128 bits, programmers have come to think in terms of high precision and to develop algorithms based on the assumption that computer processors provide such precision, since it comes as an integral part of each new generation of silicon chips and thus is "free."

6

Embodiments of the present invention efficiently provide computing power using a fundamentally different approach than those described above. In particular, embodiments of the present invention are directed to computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations).

One variety of LPHDR arithmetic represents values from one millionth up to one million with a precision of about 0.1%. If these values were represented and manipulated using the methods of floating point arithmetic, they would have binary mantissas of no more than 10 bits plus a sign bit and binary exponents of at least 5 bits plus a sign bit. However, the circuits to multiply and divide these floating point values would be relatively large. One example of an alternative embodiment is to use a logarithmic representation of the values. In such an approach, the values require the same number of bits to represent, but multiplication and division are implemented as addition and subtraction, respectively, of the logarithmic representations. Addition and subtraction may be implemented efficiently as described below. As a result, the area of the arithmetic circuits remains relatively small and a greater number of computing elements can be fit into a given area of silicon. This means the machine can perform a greater number of operations per unit of time or per unit power, which gives it an advantage for those computations able to be expressed in the LPHDR framework.

Another embodiment is to use analog representations and processing mechanisms. Analog implementation of LPHDR arithmetic has the potential to be superior to digital implementation, because it tends to use the natural analog physics of transistors or other physical devices instead of using only the digital subset of the device's behavior. This fuller use of the devices' natural abilities may permit smaller mechanisms for doing LPHDR arithmetic. In recent years, in the field of silicon circuitry, analog methods have been supplanted by digital methods. In part, this is because of the ease of doing digital design compared to analog design. Also in part, it is because of the continued rapid scaling of digital technology ("Moore's Law") compared to analog technology. In particular, at deep submicron dimensions, analog transistors no longer work as they had in prior generations of larger-scale technology. This change of familiar behavior has made analog design still harder in recent years. However, digital transistors are in fact analog transistors used in a digital way, meaning digital circuits are really analog circuits designed to attempt to switch the transistors between completely on and completely off states. As scaling continues, even this use of transistors is starting to come face to face with the realities of analog behavior. Scaling of transistors for digital use is expected either to stall or to require digital designers increasingly to acknowledge and work with analog issues. For these reasons, digital embodiments may no longer be easy, reliable, and scalable, and analog embodiments of LPHDR arithmetic may come to dominate commercial architectures.

Because LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other, and therefore may constitute a massively parallel LPHDR processor or other device. Such a processor or other device has not been described or practiced as a means of doing general purpose computing by those having ordinary skill in the art for at least two reasons. First, it is commonly believed by those having ordinary skill in the art, that LPHDR computation, and in particular massive amounts of LPHDR computation, whether performed in a massively parallel way or not, is not practical as a substrate

US 9,218,156 B2

7

for moderately general computing. Second, it is commonly believed by those having ordinary skill in the art that massive amounts of even high precision computation on a single chip or in a single machine, as is enabled by a compact arithmetic processing unit, is not useful without a corresponding increase in bandwidth between processing elements within the machine and into and out of the machine because computing is wire limited and arithmetic can be considered to be available at no cost.

Despite these views—that massive amounts of arithmetic on a chip or in a massively parallel machine are not useful, and that massive amounts of LPHDR arithmetic are even worse—embodiments of the present invention disclosed herein demonstrate that massively parallel LPHDR designs are in fact useful and provide significant practical benefits in at least several significant applications.

To conclude, modern digital computing systems provide high precision arithmetic, but that precision is costly. A modern double precision floating point multiplier may require on the order of a million transistors, even though only a handful of transistors is required to perform a low precision multiplication. Despite the common belief among those having ordinary skill in the art that modern applications require high precision processing, in fact a variety of useful algorithms function adequately at much lower precision. As a result, such algorithms may be performed by processors or other devices implemented according to embodiments of the present invention, which come closer to achieving the goal of using a few transistors to multiply and a wire junction to add, thus enabling massively parallel arithmetic computation to be performed with relatively small amounts of physical resources (such as a single silicon chip). Although certain specialized tasks can function at low precision, it is not obvious, and in fact has been viewed as clearly false by those having ordinary skill in the art, that relatively general purpose computing such as is typically performed today on general purpose computers can be done at low precision. However, in fact a variety of useful and important algorithms can be made to function adequately at much lower than 32 bit precision in a massively parallel computing framework, and certain embodiments of the present invention support such algorithms, thereby offering much more efficient use of transistors, and thereby provide improved speed, power, and/or cost, compared to conventional computers.

Various computing devices implemented according to embodiments of the present invention will now be described. Some of these embodiments may be an instance of a SIMD computer architecture. Other architectures may be used, such as MIMD architectures, programmable array architectures (such as FPGAs and FPAAs), or GPU/SIMT architectures. The techniques disclosed herein may, for example, be implemented using any processor or other device having such an existing architecture, and replacing or augmenting some or all existing arithmetic units in the processor or other device, if any, with LPHDR arithmetic units in any of the ways disclosed herein. Devices implemented according to embodiments of the present invention, however, need not start with an existing processor design, but instead may be designed from scratch to include LPHDR arithmetic units within any of the architectures just described, or any other architecture.

Embodiments of the present invention may, for example, be implemented using the architecture of a particular kind of SIMD computer, the array processor. There are many variations and specific instances of array processors described in the scientific and commercial literature. Examples include the Illiac 4, the Connection Machine 1 and 2, the Goodyear MPP, and the MasPar line of computers.

8

Embodiments of the present invention need not, however, be implemented as SIMD computers. For example, embodiments of the present invention may be implemented as FPGAs, FPAAs, or related architectures that provide for flexible connectivity of a set of processing elements. For example, embodiments of the present invention may be implemented as GPU/SIMTs and as MIMDs, among others. For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures. Furthermore, references herein to "processing elements" within embodiments of the present invention should be understood more generally as any kind of execution unit, whether for performing LPHDR operations or otherwise.

An example SIMD computing system 100 is illustrated in FIG. 1. The computing system 100 includes a collection of many processing elements (PEs) 104. Sometimes present are a control unit (CU) 106, an I/O unit (IOU) 108, various Peripheral devices 110, and a Host computer 102. The collection of PEs is referred to herein as "the Processing Element Array" (PEA), even though it need not be two-dimensional or an array or grid or other particular layout. Some machines include additional components, such as an additional memory system called the "Staging Memory" in the Goodyear MPP, but these additional elements are neither essential in the computer nor needed to understand embodiments of the present invention and therefore are omitted here for clarity of explanation. One embodiment of the present invention is a SIMD computing system of the kind shown in FIG. 1, in which one or more (e.g., all) of the PEs in the PEA 104 are LPHDR elements, as that term is used herein.

The Host 102 is responsible for overall control of the computing system 100. It performs the serial, or mostly serial, computation typical of a traditional uni-processor. The Host 102 could have more complicated structure, of course, including parallelism of various sorts. Indeed a heterogeneous computing system combining multiple computing architectures in a single machine is a good use for embodiments of the present invention.

A goal of the Host 102 is to have the PEA 104 perform massive amounts of computation in a useful way. It does this by causing the PEs to perform computations, typically on data stored locally in each PE, in parallel with one another. If there are many PEs, much work gets done during each unit of time.

The PEs in the PEA 104 may be able to perform their individual computations roughly as fast as the Host 102 performs its computations. This means it may be inefficient to have the Host 102 attempt to control the PEA 104 on a time scale as fine as the Host's or PEA's minimal time step. (This minimal time, in a traditional digital design, would be the clock period.) For this reason, the specialized control unit (CU) 106 may be included in the architecture. The CU 106 has the primary task of retrieving and decoding instructions from an instruction memory, which conceptually is part of the CU 106, and issuing the partially decoded instructions to all the PEs in the PEA 104. (This may be viewed by the CU software as happening roughly simultaneously for all the PEs, though it need not literally be synchronous, and in fact it may be effective to use an asynchronous design in which multiple instructions at different stages of completion simultaneously propagate gradually across the PEA, for instance as a series of wave fronts.)

In a design which includes the CU 106, the Host 102 typically will load the instructions (the program) for the PEA 104 into the CU instruction memory (not shown in FIG. 1),

US 9,218,156 B2

9

then instruct the CU **106** to interpret the program and cause the PEA **104** to compute according to the instructions. The program may, for example, look generally similar to a typical machine language program, with instructions to cause data movement, logical operations, arithmetic operations, etc., in and between the PEs and other instructions to do similar operations together with control flow operations within the CU **106**. Thus, the CU **106** may run a typical sort of program, but with the ability to issue massively parallel instructions to the PEA **104**.

In order to get data into and out of the CU **106** and PEA **104**, the I/O Unit **108** may interface the CU **106** and PEA **104** with the Host **102**, the Host's memory (not shown in FIG. 1), and the system's Peripherals **110**, such as external storage (e.g., disk drives), display devices for visualization of the computational results, and sometimes special high bandwidth input devices (e.g., vision sensors). The PEA's ability to process data far faster than the Host **102** makes it useful for the IOU **108** to be able to completely bypass the Host **102** for some of its data transfers. Also, the Host **102** may have its own ways of communicating with the Peripherals **110**.

The particular embodiment illustrated in FIG. 1 is shown merely for purposes of example and does not constitute a limitation of the present invention. For example, alternatively the functions performed by the CU **106** could instead be performed by the Host **102** with the CU **106** omitted. The CU **106** could be implemented as hardware distant from the PEA **104** (e.g., off-chip), or the CU **106** could be near to the PEA **104** (e.g., on-chip). I/O could be routed through the CU **106** with the IOU **108** omitted or through the separate I/O controller **108**, as shown. Furthermore, the Host **102** is optional; the CU **106** may include, for example, a CPU, or otherwise include components sufficient to replace the functions performed by the Host **102**. The Peripherals **110** shown in FIG. 1 are optional. The design shown in FIG. 1 could have a special memory, such as the Goodyear MPP's "staging memory," which provides an intermediate level of local storage. Such memory could, for example, be bonded to the LPHDR chip using 3D fabrication technology to provide relatively fast parallel access to the memory from the PEs in the PEA **104**.

The PEA **104** itself, besides communicating with the CU **106** and IOU **108** and possibly other mechanisms, has ways for data to move within the array. For example, the PEA **104** may be implemented such that data may move from PEs only to their nearest neighbors, that is, there are no long distance transfers. FIGS. 2 and 3 show embodiments of the present invention which use this approach, where the nearest neighbors are the four adjacent PEs toward the North, East, West, and South, called a NEWS design. For example, FIG. 2 shows a subset of the PEs in PEA **104**, namely PE **202**, PE **204**, PE **206**, PE **208**, and PE **210**. When the CU **106** issues data movement instructions, all the PEs access data from or send data to their respective specified nearest neighbor. For instance, every PE might access a specified data value in its neighbor to the West and copy it into its own local storage. In some embodiments, such as some analog embodiments, these kinds of transfers may result in some degradation of the value copied.

FIG. 3 shows a PE **302** that includes data connections to the IOU **108**. PE **302** is connected at the North to PE **304**, at the East to PE **306**, at the South to PE **308**, and at the West to PE **310**. However, driving signals from inside the PEA **104** out to the IOU **108** usually requires a physically relatively large driving circuit or analogous mechanism. Having those at every PE may absorb much of the available resources of the hardware implementation technology (such as VLSI area). In

10

addition, having independent connections from every PE to the IOU **108** means many such connections, and long connections, which also may absorb much of the available hardware resources. For these reasons, the connections between the PEs and the IOU **108** may be limited to those PEs at the edges of the PE array **104**. In this case, to get data out of, and perhaps into, the PEA **104**, the data is read and written at the edges of the array and CU instructions are performed to shift data between the edges and interior of the PEA **104**. The design may permit data to be pushed from the IOU **108** inward to any PE in the array using direct connections, but may require readout to occur by using the CU **106** to shift data to the edges where it can be read by the IOU **108**.

Connections between the CU **106** and PEA **104** have analogous variations. One design may include the ability to drive instructions into all the PEs roughly simultaneously, but another approach is to have the instructions flow gradually (for instance, shift in discrete time steps) across the PEA **104** to reach the PEs. Some SIMD designs, which may be implemented in embodiments of the present invention, have a facility by which a "wired-or" or "wired- and" of the state of every PE in the PEA **104** can be read by the CU **106** in approximately one instruction delay time.

There are many well studied variations on these matters in the literature, any of which may be incorporated into embodiments of the present invention. For example, an interconnect, such as an 8-way local interconnect, may be used. The local connections may include a mixture of various distance hops, such as distance **4** or **16** as well as distance **1**. The outside edges may be connected using any topology, such as a torus or twisted torus. Instead of or in addition to a local interconnect, a more complex global interconnect, such as the hypercube design, may be used. Furthermore, the physical implementation of the PEA **104** (e.g., a chip) could be replicated (e.g., tiled on a circuit board) to produce a larger PEA. The replication may form a simple grid or other arrangement, just as the component PEAs may but need not be grids.

FIG. 4 shows an example design for a PE **400** (which may be used to implement any one or more of the PEs in the PEA **104**). The PE **400** stores local data. The amount of memory for the local data varies significantly from design to design. It may depend on the implementation technologies available for fabricating the PE **400**. Sometimes rarely changing values (Constants) take less room than frequently changing values (Registers), and a design may provide more Constants than Registers. For instance, this may be the case with digital embodiments that use single transistor cells for the Constants (e.g., floating gate Flash memory cells) and multiple transistor cells for the Registers (e.g., 6-transistor SRAM cells). Sometimes the situation is reversed, as may be the case in analog embodiments, where substantial area for capacitance may be needed to ensure stable long term storage of Constants, and such embodiments may have more Registers than Constants. Typical storage capacities might be tens or hundreds of arithmetic values stored in the Registers and Constants in each PE, but these capacities are adjustable by the designer. Some designs, for instance, may have Register storage but no Constant storage. Some designs may have thousands or even many more values stored in each PE. All of these variations may be reflected in embodiments of the present invention.

Each PE needs to operate on its local data. For this reason within the PE **400** there are data paths **402**$a$-$i$, routing mechanisms (such as the multiplexor MUX **404**), and components to perform some collection of logical and arithmetic operations (such as the logic unit **406** and the LPHDR arithmetic unit **408**). The LPHDR arithmetic unit **408** performs LPHDR

US 9,218,156 B2

11

arithmetic operations, as that term is used herein. The input, output, and intermediate "values" received by, output by, and operated on by the PE 400 may, for example, take the form of electrical signals representing numerical values.

The PE 400 also may have one or more flag bits, shown as Mask 410 in FIG. 4. The purpose of the Mask 410 is to enable some PEs, the ones in which a specified Mask bit is set, to ignore some instructions issued by the CU 106. This allows some variation in the usual lock-step behaviors of all PEs in the PEA 104. For instance, the CU 106 may issue an instruction that causes each PE to reset or set its Mask 410 depending on whether a specified Register in the PE is positive or negative. A subsequent instruction, for instance an arithmetic instruction, may include a bit meaning that the instruction should be performed only by those PEs whose Mask 410 is reset. This instruction has the effect of conditionally performing the arithmetic instruction in each PE depending on whether the specified Register in that PE was positive. As with the Compare instructions of traditional computers, there are many possible design choices for mechanisms to set and clear Masks.

The operation of the PEs is controlled by control signals 412a-d received from the CU 106, four of which are shown in FIG. 4 merely for purposes of example and not limitation. We have not shown details of this mechanism, but the control signals 412a-d specify which Register or Constant memory values in the PE 400 or one of its neighbors to send to the data paths, which operations should be performed by the Logic 406 or Arithmetic 408 or other processing mechanisms, where the results should be stored in the Registers, how to set, reset, and use the Mask 410, and so on. These matters are well described in the literature on SIMD processors.

Many variations of this PE 400 and PEA design are possible and fall within the scope of the present invention. Digital PEs can have shifters, lookup tables, and many other mechanisms such as described in the literature. Analog PEs can have time-based operators, filters, comparators with global broadcast signals and many other mechanisms such as described in the literature. The PEA 104 can include global mechanisms such as wired-OR or wired-AND for digital PEs or wired-SUM for analog PEAs Again, there are many variations well described in the literature on digital and analog computing architectures.

For example, LPHDR operations other than and/or in addition to addition and multiplication may be supported. For example, a machine which can only perform multiplication and the function (1-X) may be used to approximate addition and other arithmetic operations. Other collections of LPHDR operations may be used to approximate LPHDR arithmetic operations, such as addition, multiplication, subtraction, and division, using techniques that are well-known to those having ordinary skill in the art.

One aspect of embodiments of the present invention that is unique is the inclusion of LPHDR arithmetic mechanisms in the PEs. Embodiments of such mechanisms will now be described.

One digital embodiment of the LPHDR arithmetic unit 408 operates on digital (binary) representations of numbers. In one digital embodiment these numbers are represented by their logarithms. Such a representation is called a Logarithmic Number System (LNS), which is well-understood by those having ordinary skill in the art.

In an LNS, numbers are represented as a sign and an exponent. There is an implicit base for the logarithms, typically 2 when working with digital hardware. In the present embodiment, a base of 2 is used for purposes of example. As a result, a value, say B, is represented by its sign and a base 2

12

logarithm, say b, of its absolute value. For numbers to have representation errors of at most, say, 1% (one percent), the fractional part of this logarithm should be represented with enough precision that the least possible change in the fraction corresponds to about a 1% change in the value B. If fractions are represented using 6 bits, increasing or decreasing the fraction by 1 corresponds to multiplying or dividing B by the 64th root of 2, which is approximately 1.011. This means that numbers may be represented in the present embodiment with a multiplicative error of approximately 1%. So, in this example embodiment the fraction part of the representation has 6 bits.

Furthermore, the space of values processed in the present embodiment have high dynamic range. To represent numbers whose absolute value is from, say, one billionth to one billion, the integer part of the logarithm must be long enough to represent plus or minus the base 2 logarithm of one billion. That logarithm is about 29.9. In the present embodiment the integer part of the logarithm representation is 5 bits long to represent values from 0 to 31, which is sufficient. There also is a sign bit in the exponent. Negative logarithms are represented using two's complement representation.

In an LNS, the value zero corresponds to the logarithm negative infinity. One can choose a representation to explicitly represent this special value. However, to minimize resources (for instance, area) used by arithmetic circuits, the present embodiment represents zero by the most negative possible logarithm, which is −32, corresponding to the two's complement bit representation '100000 000000', and denoting a value of approximately 2.33E-10.

When computing, situations can arise in which operations cannot produce reasonable values. An example is when a number is too large to be represented in the chosen word format, such as when multiplying or adding two large numbers or upon divide by zero (or nearly zero). One common approach to this problem is to allow a value to be marked as Not A Number (NAN) and to make sure that each operation produces NAN if a problem arises or if either of its inputs is NAN. The present embodiment uses this approach, as will be described in the following.

FIG. 5 shows the word format 500 for these numbers, in the present embodiment. It has one NAN bit 502a, one bit 502b for the sign of the value, and 12 bits 502c-e representing the logarithm. The logarithm bits include a 5 bit integer part 502d and a 6 bit fraction part 502e. To permit the logarithms to be negative, there is a sign bit 502c for the logarithm which is represented in two's complement form. The NAN bit is set if some problem has arisen in computing the value. The word format 500 shown in FIG. 5 is merely an example and does not constitute a limitation of the present invention. Other variations may be used, so long as they have low precision and high dynamic range.

FIG. 6 shows an example digital implementation of the LPHDR arithmetic unit 408 for the representation illustrated in FIG. 5. The unit 408 receives two inputs, A 602a and B 602b, and produces an output 602c. The inputs 602a-b and output 602c may, for example, take the form of electrical signals representing numerical values according to the representation illustrated in FIG. 5, as is also true of signals transmitted within the unit 408 by components of the unit 408. The inputs 602a-b and output 602c each are composed of a Value and a NAN (Not A Number) bit. The unit 408 is controlled by control signals 412a-d, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602a-b. In this embodiment, all the available arithmetic operations are performed in parallel on the inputs 602a-b by adder/subtractor 604, multiplier 606, and divider

US 9,218,156 B2

13

**608**. Adder/subtractor **604** performs LPHDR addition and subtraction, multiplier **606** performs LPHDR multiplication, and divider **608** performs LPHDR division.

The desired result (from among the outputs of adder/subtractor **604**, multiplier **606**, and divider **608**) is chosen by the multiplexers (MUXes) **610***a* and **610***b*. The right hand MUX **610***b* sends the desired value to the output **602***c*. The left hand MUX **610***a* sends the corresponding NAN bit from the desired operation to the OR gate **612**, which outputs a set NAN bit if either input is NAN or if the specified arithmetic operation yields NAN. The computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. **6**.

LNS arithmetic has the great advantage that multiplication (MUL) and division (DIV) are very easy to compute and take few physical resources (e.g., little area in a silicon implementation). The sign of the result is the exclusive-or of the signs of the operands. The logarithm part of the output is the sum, in the case of MUL, or the difference, in the case of DIV, of the logarithm parts of the operands. The sum or difference of the logarithms can overflow, producing a NAN result. Certain other operations also are easy in LNS arithmetic. For instance, square root corresponds to dividing the logarithm in half, which in our representation means simply shifting it one bit position to the right.

Thus, the multiplier **606** and divider **608** in FIG. **6** are implemented as circuits that simply add or subtract their inputs, which are two's complement binary numbers (which in turn happen to be logarithms). If there is overflow, they output a NAN.

Implementing addition and subtraction in LNS, that is, the adder/subtractor **604** in FIG. **6**, follows a common approach used in the literature on LNS. Consider addition. If we have two positive numbers B and C represented by their logarithms b and c, the representation of the sum of B and C is log(B+C). An approach to computing this result that is well known to those skilled in the art is based on noticing that log(B+C)=log (B*(1+C/B))=log(B)+log(1+C/B)=b+F(c−b) where F(x) =log(1+2^x). Thus, the present embodiment computes c−b, feeds that through F, and adds the result to b, using standard digital techniques known to those skilled in the art.

Much of the published literature about LNS is concerned with how to compute F(x), the special function for ADD, along with a similar function for SUB. Often these two functions share circuitry, and this is why a single combined adder/subtractor **604** is used in the embodiment of FIG. **6**. There are many published ways to compute these functions or approximations to them, including discussions of how to do this when the values are of low precision. Any such method, or other method, may be used. Generally speaking, the more appropriate variations for massively parallel LPHDR arithmetic are those that require the minimal use of resources, such as circuit area, taking advantage of the fact that the representation used in the embodiment of FIG. **6** is low precision and that the arithmetic operations need not be deterministic nor return the most accurate possible answer within the low precision representation. Thus, embodiments of the present invention may use circuitry that does not compute the best possible answer, even among the limited choices available in a low precision representation.

In order to enable conditional operation of selected PEs, the present embodiment is able to reset and set the MASK flag **410** based on results of computations. The mechanism for doing this is that the CU **106** includes instructions that cause the MASK **410** in each PE to unconditionally reset or set its flag along with other instructions to perform basic tests on values entering the MASK **410** on data path **402***f* and to set the

14

flag accordingly. Examples of these latter instructions include copying the sign bit or NAN bit of the word on data path **402***f* into the MASK bit **410**. Another example is to set the MASK bit **410** if the 12 bit value part of the word on data path **402***f* is equal to binary zero. There are many additional and alternative ways for doing this that are directly analogous to comparison instructions in traditional processors and which are well understood by those skilled in the art.

It is worth noting that while the obvious method of using the above LNS operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values, since that is precisely their behavior in LNS implementations. The Mask setting instructions can compare these simple binary values. So besides doing LPHDR computations, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Some embodiments of the present invention may include analog representations and processing methods. Such embodiments may, for example, represent LPHDR values as charges, currents, voltages, frequencies, pulse widths, pulse densities, various forms of spikes, or in other forms not characteristic of traditional digital implementations. There are many such representations discussed in the literature, along with mechanisms for processing values so represented. Such methods, often called Analog methods, can be used to perform LPHDR arithmetic in the broad range of architectures we have discussed, of which SIMD is one example.

An example of an analog SIMD architecture is the SCAMP design (and related designs) of Dudek. In that design values have low dynamic range, being accurate roughly to within 1%. Values are represented by charges on capacitors. Those capacitors typically are the gates of transistors. Each PE has several memory cells, analogous to the Registers shown in FIG. **4**. Addition is performed by turning on pass transistors from the two operands, which transfer their charge onto an analog bus, where it is summed by the natural physics of charge and wires, upon which it is gated onto another Register to charge up its capacitor, which then represents the sum of the operands. The detailed mechanism disclosed by Dudek actually produces the negative of the sum, but the basic concept is as described and is a simple way to perform addition and subtraction using analog representations and simple processing mechanisms.

Variations of the SCAMP design have been fabricated and used to perform a range of low precision, low dynamic range computations related to image processing. These designs do not perform high dynamic range arithmetic, nor do they include mechanisms for performing multiplication or division of values stored in Registers. However, the Dudek designs suggest the general feasibility of constructing analog SIMD machines. The following describes how to build an analog SIMD machine that performs LPHDR arithmetic, and is thus an embodiment of the present invention.

One embodiment of the present invention represents values as a mixture of analog and digital forms. This embodiment represents values as low precision, normalized, base 2 floating point numbers, where the mantissa is an analog value and the exponent is a binary digital value. The analog value may be accurate to about 1%, following the approach of Dudek, which is well within the range of reasonable analog processing techniques. The exponent may be 6 bits long, or whatever is needed to provide the desired high dynamic range.

To multiply values, the embodiment proceeds by analogy to traditional floating point methods. The digital exponents are summed using a binary arithmetic adder, a standard digital

US 9,218,156 B2

15                                                                16

technique. The analog mantissas are multiplied. Since they represent normalized values between approximately ½ and 1, their product may be as small as approximately ¼. Such a product value needs to be normalized back to the range ½ to 1. This is done, in the present embodiment, by comparing the analog mantissa to an analog representation of ½, using a threshold circuit. If the mantissa is below ½, then it is doubled and one is subtracted from the exponent, where such subtraction is simple digital subtraction. Doubling the mantissa is implemented in a way that corresponds to the chosen analog representation. For example, whatever means are being used to add two analog values can be used to double the mantissa, by adding it to a copy of itself. For example, if the mantissa is represented as a current, such as copy may be produced by a current mirror, or other suitable mechanism, and addition may be performed by a current summing junction.

The means of multiplying the original analog mantissas depends on the representation chosen. For example, if mantissas are represented using charge, following SCAMP, then any known method from the literature may be used to convert charge to current. For instance, since the charge on a capacitor determines the voltage on the capacitor, this may be implemented as a conversion from voltage to current, which is a basic technique in analog electronics known to those skilled in the art. In any case, if the mantissas are represented as currents, or once the mantissas are converted to currents, they may be multiplied using, for instance, the techniques of Gilbert. The Gilbert multiplier produces a current, representing the product, which may, if necessary, then be converted back to charge (or whatever representation is used). These are merely examples of how the needed operations might be performed. The literature discusses these matters extensively and these kinds of analog circuits are known to those skilled in the art.

Adding and subtracting values requires pre-normalization of the values to the same exponent, as is done in traditional digital floating point arithmetic. The present embodiment does this by comparing the exponents and choosing the smaller one. Then the smaller one is subtracted from the larger, using digital means. The difference specifies how many times the mantissa which corresponds to the smaller exponent needs to be divided in half. If that mantissa is represented by (or converted to) a current, then an analog R-2R style ladder may be used to divide the current in half the required number of times, with the stage of the ladder specified by the difference of exponents calculated as above. The resulting scaled down current is added to (or subtracted from, if this is an LPHDR subtraction operation) the current corresponding to the mantissa associated with the larger exponent to yield the output mantissa. The output exponent associated with the output mantissa is the larger exponent. Post-normalization may be needed as above. If the output mantissa is greater than 1, then it needs to be divided in half and the output exponent needs to be incremented. If it is less than ½, then it needs to be doubled enough times to exceed ½ and the output exponent must be decremented correspondingly, which may be performed by a series of threshold circuits, doubler circuits, and associated decrementer circuits. These increments and decrements of the binary digital exponent, and corresponding doublings and halvings of the analog mantissa current, are straightforward operations well known to those skilled in the art.

The present embodiment represents the exponent as a digital binary number. Alternate embodiments may represent the exponent as an analog value. However, it is important that the exponent be represented in storage and computation in such a manner that neither noise nor other errors cause a change in

the value it represents. Such changes in the exponent could introduce factors of two (or in some embodiments larger) changes in the values of the stored numbers. To maintain accuracy of the exponents, an embodiment may quantize the exponent to relatively few levels, for instance 16 values plus a sign bit. During processing, slight variations in the analog representation of the exponent may then be removed by circuitry that restores values to the 16 standard quantization levels. To get sufficient dynamic range in such an embodiment, the floating point numbers may be processed as base 4 numbers, rather than the usual base 2 numbers. This means, for instance, that normalized values are in the range ¼ to 1. The methods discussed above for addition, subtraction, and multiplication apply as described, with slight and straightforward variations.

The analog and mixed signal embodiments discussed above are merely examples and do not constitute a limitation of the present invention. The published literature on neuromorphic, analog, and mixed signal techniques provides a wealth of methods that enable LPHDR storage and processing to be implemented. Such storage and processing may introduce noise as well as fabrication errors into the behavior of machines performing LPHDR arithmetic. The results we present below, on software applications running using "fp+ noise" arithmetic, show that despite these very "un-digital" qualities a machine built in this way is surprisingly useful.

Evidence that LPHDR arithmetic is useful in several important practical computing applications will now be provided. The evidence is presented for a broad variety of embodiments of the present invention, thereby showing that the usefulness does not depend much on the detailed implementation.

For the goal of showing usefulness, we choose a very general embodiment of an LPHDR machine. Our model of the machine is that it provides at least the following capabilities: (1) is massively parallel, (2) provides LPHDR arithmetic possibly with noise, (3) provides a small amount of memory local to each arithmetic unit, (4) provides the arithmetic/memory units in a two-dimensional physical layout with only local connections between units (rather than some more powerful, flexible, or sophisticated connection mechanism), and (5) provides only limited bandwidth between the machine and the host machine. Note that this model is merely an example which is used for the purpose of demonstrating the utility of various embodiments of the present invention. This model includes, among others, implementations that are digital or analog or mixed, have zero or more noise, have architectures which are FPGA-like, or SIMD-like, or MIMD-like, or otherwise meet the assumptions of the model. More general architectures, such as shared memory designs, GPU-like designs, or other sophisticated designs subsume this model's capabilities, and so LPHDR arithmetic in those architectures also is useful. While we are thus showing that LPHDR arithmetic is useful for a broad range of designs, of which SIMD is only an instance, for purpose of discussion below, we call each unit, which pairs memory with arithmetic, a Processing Element or "PE".

Several applications are discussed below. For each, the discussion shows (1) that the results are useful when computation is performed in possibly noisy LPHDR arithmetic, and (2) that the computation can be physically laid out in two dimensions with only local flow of data between units, only limited memory within each unit, and only limited data flow to/from the host machine, in such a way that the computation makes efficient use of the machine's resources (area, time, power). The first requirement is referred to as "Accuracy" and

US 9,218,156 B2

17

the second requirement "Efficiency." Applications that meet both requirements running in this model will function well on many kinds of LPHDR machines, and thus those machines are a broadly useful invention.

Applications are tested using two embodiments for the machine's arithmetic. One uses accurate floating point arithmetic but multiplies the result of each arithmetic operation by a uniformly chosen random number between 0.99 and 1.01. In the following discussion, this embodiment is denoted "fp+ noise". It may represent the results produced by an analog embodiment of the machine.

A second embodiment uses logarithmic arithmetic with a value representation as shown in FIG. **5**. The arithmetic is repeatable, that is, not noisy, but because of the short fraction size it produces errors of up to approximately 1-2% in each operation. In the following discussion, this embodiment is denoted "lns". It may represent the results produced by a particular digital embodiment of the machine.

To demonstrate usefulness of embodiments of the invention, we shall discuss three computational tasks that are enabled by embodiments of the invention and which in turn enable a variety of practical applications. Two of the tasks are related to finding nearest neighbors and the other is related to processing visual information. We shall describe the tasks, note their practical application, and then demonstrate that each task is solvable using the general model described above and thus solvable using embodiments of the present invention.

### Application 1: Finding Nearest Neighbors

Given a large set of vectors, called Examples, and a given vector, called Test, the nearest neighbor problem ("NN") is to find the Example which is closest to Test where the distance metric is the square of the Euclidean distance (sum of squares of distances between respective components).

NN is a widely useful computation. One use is for data compression, where it is called "vector quantization". In this application we have a set of relatively long vectors in a "code book" (these are the Examples) and associated short code words (for instance the index of the vector in the code book). We move through a sequence of vectors to be compressed, and for each such vector (Test), find the nearest vector in the code book and output the corresponding code word. This reduces the sequence of vectors to the shorter sequence of code words. Because the code words do not completely specify the original sequence of vectors, this is a lossy form of data compression. Among other applications, it may be used in speech compression and in the MPEG standards.

Another application of NN would be in determining whether snippets of video occur in a large video database. Here we might abstract frames of video from the snippet into feature vectors, using known methods, such as color histograms, scale invariant feature extraction, etc. The Examples would be analogous feature vectors extracted from the video database. We would like to know whether any vector from the snippet was close to any vector from the database, which NN can help us decide.

In many applications of nearest neighbor, we would prefer to find the true nearest neighbor but it is acceptable if we sometimes find another neighbor that is only slightly farther away or if we almost always find the true nearest neighbor. Thus, an approximate solution to the nearest neighbor problem is useful, especially if it can be computed especially quickly, or at low power, or with some other advantage compared to an exact solution.

18

We shall now show that approximate nearest neighbor is computable using embodiments of the present invention in a way that meets the criteria of Accuracy and Efficiency.

Algorithm. The following describes an algorithm which may be performed by machines implemented according to embodiments of the present invention, such as by executing software including instructions for performing the algorithm. The inputs to the algorithm are a set of Examples and a Test vector. The algorithm seeks to find the nearest (or almost nearest) Example to the Test.

In the simplest version of the algorithm, the number of Examples may be no larger than the number of PEs and each vector must be short enough to fit within a single PE's memory. The Examples are placed into the memories associated with the PEs, so that one Example is placed in each PE. Given a Test, the Test is passed through all the PEs, in turn. Accompanying the Test as it passes through the PEs is the distance from the Test to the nearest Example found so far, along with information that indicates what PE (and thus what Example) yielded that nearest Example found so far. Each PE computes the distance between the Test and the Example stored in that PE's memory, and then passes along the Test together with either the distance and indicator that was passed into this PE (if the distance computed by this PE exceeded the distance passed into the PE) or the distance this PE computed along with information indicating this PE's Example is the nearest so far (if the distance computed by this PE is less than the distance passed into the PE). Thus, the algorithm is doing a simple minimization operation as the Test is passed through the set of PEs. When the Test and associated information leave the last PE, the output is a representation of which PE (and Example) was closest to the Test, along with the distance between that Example and the Test.

In a more efficient variant of this algorithm, the Test is first passed along, for example, the top row, then every column passes the Test and associated information downward, effectively doing a search in parallel with other columns, and once the information reaches the bottom it passes across the bottom row computing a minimum distance Example of all the columns processed so far as it passes across the row. This means that the time required to process the Test is proportional to (the greater of) the number of PEs in a row or column.

An enhancement of this algorithm proceeds as above but computes and passes along information indicating both the nearest and the second nearest Example found so far. When this information exits the array of PEs, the digital processor that is hosting the PE array computes (in high precision) the distance between the Test and the two Examples indicated by the PE array, and the nearer of the two is output as the likely nearest neighbor to the Test.

Accuracy. We expressed the arithmetic performed by the enhanced algorithm described above as code in the C programming language. That code computes both nearest neighbors, which are discussed here, along with weighted scores, which are discussed below.

The C code performs the same set of arithmetic operations in the same order using the same methods of performing arithmetic as an actual implementation of the present invention, such as one implemented in hardware. It thus yields the same results as the enhanced algorithm would yield when running on an implementation of the present invention. (How the algorithm is organized to run efficiently on such an implementation is discussed below in the section on Efficiency.)

In particular, when computing the distance between the Test and each Example, the code uses Kahan's method, discussed below, to perform the possibly long summation

US 9,218,156 B2

**19**

required to form the sum of the squares of the distances between vector components of the Test and Example.

The C code contains several implementations for arithmetic, as discussed above. When compiled with "#define fp" the arithmetic is done using IEEE standard floating point. If a command line argument is passed in to enable noisy arithmetic, then random noise is added to the result of every calculation. This is the "fp+noise" form of arithmetic. When compiled without "#define fp" the arithmetic is done using low precision logarithmic arithmetic with a 6 bit base-2 fraction. This is the "lns" form of arithmetic.

When the code was run it produced traces showing the results of the computations it performed. These traces, shown below, show that with certain command line arguments the enhanced algorithm yielded certain results for LPHDR nearest neighbor calculations. These results provide details showing the usefulness of this approach. We shall discuss the results briefly here.

The first results are for "fp+noise". Ten distinct runs were performed. Each run generated one million random Example vectors of length five, where each component of each vector was drawn from N(0,1)—the Gaussian (normal) distribution with mean zero and standard deviation **1**. Each run then generated one hundred Test vectors of length five, where each component of each vector also was drawn from N(0,1). For each Test, the nearest neighbor was computed both according to the enhanced algorithm above and according to the standard nearest neighbor method using high precision floating point arithmetic. A count was kept of the number of times the enhanced algorithm yielded the same result as the standard floating point method. The results were as follows:

% ./a.out 5 10 1000000 100 1

Representation is Floating Point with noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.84% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.98% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.94% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.82% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.78% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.86% mean score error.

Run 9. On 100 tests, 100(100.0%) matches and 0.85% mean score error.

Run 10. On 100 tests, 99(99.0%) matches and 0.86% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.90%.

Average score error between LPHDR and DP=0.85%.

The "mean score error" values are considered below in the discussion of weighted scores. The "matches" information is relevant here.

Of the ten runs, only one had any test, of the 100 tests performed, which yielded a nearest neighbor different from what the usual high precision method yielded. Thus, the average percentage of matches between the enhanced algorithm running with "fp+noise" arithmetic and the usual method was 99.9%.

A similar computation was then performed using "lns" arithmetic. In this case, the results were:

**20**

& ./a.out 5 10 1000000 100 0

Representation is LNS without noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.15% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.08% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.09% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.11% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.16% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.13% mean score error.

Run 9. On 100 tests, 99(99.0%) matches and 0.17% mean score error.

Run 10. On 100 tests, 98(98.0%) matches and 0.16% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.70%.

Average score error between LPHDR and DP=0.12%.

The average percentage of matches was 99.7%, slightly worse than for "fp+noise".

The accuracy shown by the enhanced nearest neighbor algorithm using two forms of LPHDR arithmetic is surprising. To perform many calculations sequentially with 1% error and yet produce a final result with less than 1% error may seem counter-intuitive. Nonetheless, the LPHDR arithmetic proves effective, and the accuracy shown is high enough to be useful in applications for which approximate nearest neighbor calculations are useful.

As an extreme case, a variant of fp+noise was tested in which the noise varied uniformly from +10% to −5%. Thus, each arithmetic operation produced a result that was between 10% too large and 5% too small. The enhanced nearest neighbor algorithm, as described above, was performed where each run generated 100,000 Example vectors. The surprising results, below, show that even with this extreme level of imprecise, noisy, and non-zero mean LPHDR arithmetic, useful results can be achieved.

Run 1. On 100 tests, 97(97.0%) matches.

Run 2. On 100 tests, 100(100.0%) matches.

Run 3. On 100 tests, 100(100.0%) matches.

Run 4. On 100 tests, 98(98.0%) matches.

Run 5. On 100 tests, 98(98.0%) matches.

Run 6. On 100 tests, 99(99.0%) matches.

Run 7. On 100 tests, 99(99.0%) matches.

Run 8. On 100 tests, 99(99.0%) matches.

Run 9. On 100 tests, 99(99.0%) matches.

Run 10. On 100 tests, 99(99.0%) matches.

Average percentage of time LPHDR (with final DP correction) finds nearest example=98.80%.

Efficiency. In contrast to the surprising Accuracy results, it is clear to those having ordinary skill in the art that the calculations of the enhanced nearest neighbor algorithm can be performed efficiently in the computing model presented, where the arithmetic/memory units are connected in a two-dimensional physical layout, using only local communication between PEs. However, this does not address the matter of keeping the machine busy doing useful work using only low bandwidth to the host machine.

When computing the nearest neighbor to a single Test, the Test flows across all the PEs in the array. As discussed above,

US 9,218,156 B2

21

if the array is an M×M grid, it takes at least O(M) steps for the Test to pass through the machine and return results to the host. During this time the machine performs 0(M×M) nearest neighbor distance computations, but since the machine is capable of performing 0(M×M) calculations at each step, a factor of O(M) is lost.

This speedup, compared to a serial machine, of a factor of O(M) is significant and useful. However, the efficiency can be even higher. If sufficiently many Test vectors, say O(M), or more, are to be processed then they can be streamed into the machine and made to flow through in a pipelined fashion. The time to process O(M) Tests remains O(M), the same as for a single Test, but now the machine performs O(M)×O(M×M) distance computations, and thus within a constant factor the full computing capacity of the machine is used.

Thus, the machine is especially efficient if it is processing at least as many Test vectors as the square root of the number of PEs. There are applications that fit well into this form, such as pattern recognition or compression of many independent Tests (e.g., blocks of an image, parts of a file, price histories of independent stocks) as well as the problem of finding the nearest neighbor to every Example in the set of Examples. This is in contrast to the general view among those having ordinary skill in the art, as discussed above, that machines with very many arithmetic processing elements on a single chip, or similar, are not very useful.

### Application 2: Distance Weighted Scoring

A task related to Nearest Neighbor is Distance Weighted Scoring. In this task, each Example has an associated Score. This is a number that in some way characterizes the Example. For instance, if the Examples are abstractions of the history of prices of a given stock, the Scores might be historical probabilities of whether the price is about to increase or decrease. Given a Test vector, the task is to form a weighted sum of the Scores of all the Examples, where the weights are a diminishing function of the distance from the Test to the respective Examples. For example, this weighted score might be taken as a prediction of the future price of the stock whose history is represented by the Test. This use of embodiments of the invention might help support, for instance, high speed trading of stocks, as is performed by certain "quantitative" hedge funds, despite the conventional view by those having ordinary skill in the art that low precision computation is not of use in financial applications.

The C code described above computes weighted scores along with nearest neighbors. The scores assigned to Examples in this computation are random numbers drawn uniformly from the range [0,1]. The weight for each Example in this computation is defined to be the un-normalized weight for the Example divided by the sum of the un-normalized weights for all Examples, where the un-normalized weight for each Example is defined to be the reciprocal of the sum of one plus the squared distance from the Example to the Test vector. As discussed above, the code performs a number of runs, each producing many Examples and Tests, and compares results of traditional floating point computations with results calculated using fp+noise and Ins arithmetic.

Looking again at the trace results of running the simulation, above, we see that for fp+noise the LPHDR weighted scores on average were within 0.85% of the correct value and never were as much as 1% different. For Ins arithmetic the errors were even smaller, averaging just 0.12% error.

These results are surprising given that computing an overall weighted score involves summing the individual weighted scores associated with each Example. Since each run was

22

processing 1,000,000 Examples, this means that the sums were over one million small positive values. The naive method of summing one million small values with errors of about 1% in each addition should yield results that approximate noise. However, the code performs its sums using a long known method invented by Kahan (Kahan, William (January 1965), "Further remarks on reducing truncation errors", Communications of the ACM 8 (1): 40). The method makes it feasible to perform long sums, such as are done for Distance Weighted Scores, or as might be used in computational finance when computing prices of derivative securities using Monte Carlo methods, or for performing deconvolution in image processing algorithms, as will be discussed next.

The Efficiency of this algorithm is similar to that of NN, as discussed earlier. If many Test vectors are processed at once, the machine performs especially efficiently.

### Application 3: Removing Motion Blur in Images

In order to gather sufficient light to form an image, camera shutters are often left open for long enough that camera motion can cause blurring. This can happen as a result of camera shake in inexpensive consumer cameras as well as with very expensive but fast moving cameras mounted on satellites or aircraft. If the motion path of the camera is known (or can be computed) then the blur can be substantially removed using various deblurring algorithms. One such algorithm is the Richardson-Lucy method ("RL"), and we show here that embodiments of the present invention can run that algorithm and produce useful results. Following the discussion format above, we discuss criteria of Accuracy and Efficiency.

Algorithm. The Richardson-Lucy method is well known and widely available. Assume that an image has been blurred using a known kernel. In particular, assume that the kernel is a straight line and that the image has been oriented so that the blur has occurred purely in a horizontal direction. Consider the particular kernel for which the J'th pixel in each row of the blurred image is the uniformly weighted mean of pixels J through J+31 in the original unblurred image.

Accuracy. We implemented in the C programming language a straightforward version of the RL method that uses LPHDR arithmetic. The program reads a test image, blurs it using the kernel discussed above, then deblurs it using either fp+noise or Ins arithmetic. The RL algorithm computes sums, such as when convolving the kernel with the current approximation of the deblurred image. Our implementation computes these sums using the Kahan method, discussed earlier. FIG. 7 shows the test image in original form. It is a satellite picture of a building used during Barack Obama's inauguration. FIG. 8 shows the image extremely blurred by the kernel. It is difficult to see any particular objects in this image. FIG. 9 shows the result of deblurring using standard floating point arithmetic. FIG. 10 shows the result of deblurring using fp+noise arithmetic, and FIG. 11 shows the result of deblurring using Ins arithmetic. In all these cases the image is sufficiently restored that it is possible to recognize buildings, streets, parking lots, and cars.

In addition to displaying the images herein for judgement using the human eye, we computed a numerical measure of deblurring performance. We computed the mean difference, over all pixels in the image, between each original pixel value (a gray scale value from 0 to 255) and the corresponding value in the image reconstructed by the RL method. Those numerical measures are shown below in Table 1:

US 9,218,156 B2

23

TABLE 1

| Image type | Mean pixel error |
|---|---|
| Blurred | 32.0 |
| RL using standard floating point | 13.0 |
| RL using fp + noise | 13.8 |
| RL using lns | 14.8 |

These results, together with the subjective but important judgements made by the human eye, show that LPHDR arithmetic provides a substantial and useful degree of deblurring compared to standard floating point arithmetic. Further, in this example we chose an extreme degree of blurring, to better convey the concept and visual impact of the deblurring using LPHDR arithmetic. On more gentle and typical blur kernels, the resulting deblurred images are much closer to the originals than in this case, as can be seen by shrinking the kernel length and running the RL algorithm with LPHDR arithmetic on those more typical cases.

Efficiency. It is clear to those with ordinary skill in the art that Richardson-Lucy using a local kernel performs only local computational operations. An image to be deblurred can be loaded into the PE array, storing one or more pixels per PE, the deconvolution operation of RL can then be iterated dozens or hundreds of times, and the deblurred image can be read back to the host processor. As long as sufficient iterations are performed, this makes efficient use of the machine.

An extreme form of image deblurring is the Iterative Reconstruction method used in computational tomography. Reconstructing 3D volumes from 2D projections is an extremely computational task. The method discussed above generalizes naturally to Iterative Reconstruction and makes efficient use of the machine.

Among the advantages of embodiments of the invention are one or more of the following.

PEs implemented according to certain embodiments of the present invention may be relatively small for PEs that can do arithmetic. This means that there are many PEs per unit of resource (e.g., transistor, area, volume), which in turn means that there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs. For instance, a digital embodiment of the present invention built as a large silicon chip fabricated with current state of the art technology might perform tens of thousand of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. These ratios reflect an architectural advantage of embodiments of the present invention that should persist as fabrication technology continues to improve, even as we reach nanotechnology or other implementations for digital and analog computing.

Doing arithmetic with few resources generally means, and in the embodiments shown specifically means, that the arithmetic is done using low power. As a result, a machine implemented in accordance with embodiments of the present invention can have extremely high performance with reasonable power (for instance in the tens of watts) or low power (for instance a fraction of a watt) with reasonably high performance. This means that such embodiments may be suitable for the full range of computing, from supercomputers, through desktops, down to mobile computing. Similarly, and since cost is generally associated with the amount of available resources, embodiments of the present invention may provide a relatively high amount of computing power per unit of cost compared to conventional computing devices.

24

The SIMD architecture is rather old and is frequently discarded as an approach to computer design by those having ordinary skill in the art. However, if the processing elements of a SIMD machine can be made particularly small while retaining important functionality, such as general arithmetic ability, the architecture can be useful. The embodiments presented herein have precisely those qualities.

The discovery that massive amounts of LPHDR arithmetic is useful as a fairly general computing framework, as opposed to the common belief that it is not useful, can be an advantage in any (massively or non-massively) parallel machine design or non-parallel design, not just in SIMD embodiments. It could be used in FPGAs, FPAAs, GPU/SIMT machines, MIMD machines, and in any kind of machine that uses compact arithmetic processing elements to perform large amounts of computation using a small amount of resources (like transistors or volume).

Another advantage of embodiments of the present invention is that they are not merely useful for performing computations efficiently in general, but that they can be used to tackle a variety of real-world problems which are typically assumed to require high-precision computing elements, even though such embodiments include only (or predominantly) low-precision computing elements. Although several examples of such real-world problems have been presented herein, and although we have also had success implementing non-bonded force field computations for molecular dynamics simulation and other tasks, these are merely examples and do not constitute an exhaustive set of the real-world problems that embodiments of the present invention may be used to solve.

The embodiments disclosed above are merely examples and do not constitute limitations of the present invention. Rather, embodiments of the present invention may be implemented in a variety of other ways, such as the following.

For example, embodiments of the present invention may represent values in any of a variety of ways, such as by using digital or analog representations, such as fixed point, logarithmic, or floating point representations, voltages, currents, charges, pulse width, pulse density, frequency, probability, spikes, timing, or combinations thereof. These underlying representations may be used individually or in combination to represent the LPHDR values. LPHDR arithmetic circuits may be implemented in any of a variety of ways, such as by using various digital methods (which may be parallel or serial, pipelined or not) or analog methods or combinations thereof. Arithmetic elements may be connected using various connection architectures, such as nearest 4, nearest 8, hops of varying degree, and architectures which may or may not be rectangular or grid-like. Any method may be used for communication among arithmetic elements, such as parallel or serial, digital or analog or mixed-mode communication. Arithmetic elements may operate synchronously or asynchronously, and may operate globally simultaneously or not. Arithmetic elements may be implemented, for example, on a single physical device, such as a silicon chip, or spread across multiple devices and an embodiment built from multiple devices may have its arithmetic elements connected in a variety of ways, including for example being connected as a grid, torus, hypercube, tree, or other method. Arithmetic elements may be connected to a host machine, if any, in a variety of ways, depending on the cost and bandwidth and other requirements of a particular embodiment. For example there may be many host machines connected to the collection of arithmetic elements.

Although certain embodiments of the present invention are described as being implemented as a SIMD architecture, this

US 9,218,156 B2

25

is merely an example and does not constitute a limitation of the present invention. For example, embodiments of the present invention may be implemented as reconfigurable architectures, such as but not limited to programmable logic devices, field programmable analog arrays, or field programmable gate array architectures, such as a design in which existing multiplier blocks of an FPGA are replaced with or supplemented by LPHDR arithmetic elements of any of the kinds disclosed herein, or for example in which LPHDR elements are included in a new or existing reconfigurable device design. As another example, embodiments of the present invention may be implemented as a GPU or SIMT-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR elements could supplement or replace traditional arithmetic elements in current or new graphics processing unit designs. As yet another example, embodiments of the present invention may be implemented as a MIMD-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR arithmetic elements could supplement or replace traditional arithmetic elements in current or new MIMD computing system designs. As yet another example, embodiments of the present invention may be implemented as any kind of machine, including a massively parallel machine, which uses compact arithmetic processing elements to provide large amounts of arithmetic computing capability using a small amount of resources (for example, transistors or area or volume) compared with traditional architectures.

Although certain embodiments of the present invention are described herein as executing software, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using microcode or a hardware sequencer or state machine or other controller to control LPHDR arithmetic elements of any of the kinds disclosed herein. Alternatively, for example, embodiments of the present invention may be implemented using hardwired, burned, or otherwise pre-programmed controllers to control LPHDR arithmetic elements of any of the kinds disclosed herein.

Although certain embodiments of the present invention are described herein as being implemented using custom silicon as the hardware, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using FPGA or other reconfigurable chips as the underlying hardware, in which the FPGAs or other reconfigurable chips are configured to perform the LPHDR operations disclosed herein. As another example, embodiments of the present invention may be implemented using any programmable conventional digital or analog computing architecture (including those which use high-precision computing elements, including those which use other kinds of non-LPHDR hardware to perform LPHDR arithmetic, and including those which are massively parallel) which has been programmed with software to perform the LPHDR operations disclosed herein. For example, embodiments of the present invention may be implemented using a software emulator of the functions disclosed herein.

As yet another example, embodiments of the present invention may be implemented using 3D fabrication technologies, whether based on silicon chips or otherwise. Some example embodiments are those in which a memory chip has been bonded onto a processor or other device chip or in which several memory and/or processor or other device chips have been bonded to each other in a stack. 3D embodiments of the

26

present invention are very useful as they may be denser than 2D embodiments and may enable 3D communication of information between the processing units, which enables more algorithms to run efficiently on those embodiments compared to 2D embodiments.

Although certain embodiments of the present invention are described herein as being implemented using silicon chip fabrication technology, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using technologies that may enable other sorts of traditional digital and analog computing processors or other devices. Examples of such technologies include various nanomechanical and nanoelectronic technologies, chemistry based technologies such as for DNA computing, nanowire and nanotube based technologies, optical technologies, mechanical technologies, biological technologies, and other technologies whether based on transistors or not that are capable of implementing LPHDR architectures of the kinds disclosed herein.

Certain embodiments of the present invention have been described as "massively parallel" embodiments. Although certain embodiments of the present invention may include thousands, millions, or more arithmetic units, embodiments of the present invention may include any number of arithmetic units (as few as one). For example, even an embodiment which includes only a single LPHDR unit may be used within a serial processing unit or other device to provide a significant amount of LPHDR processing power in a small, inexpensive processor or other device.

For certain embodiments of the present invention, even if implemented using only digital techniques, the arithmetic operations may not yield deterministic, repeatable, or the most accurate possible results within the chosen low precision representation. For instance, on certain specific input values, an arithmetic operation may produce a result which is not the nearest value in the chosen representation to the true arithmetic result.

The degree of precision of a "low precision, high dynamic range" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, in certain embodiments, a LPHDR arithmetic element produces results which are sometimes (or all of the time) no closer than 0.05% to the correct result (that is, the absolute value of the difference between the produced result and the correct result is no more than one-twentieth of one percent of the absolute value of the correct result). As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.1% to the correct result. As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.2% to the correct result. As yet another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.5% to the correct result. As yet further examples, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 1%, or 2%, or 5%, or 10%, or 20% to the correct result.

Besides having various possible degrees of precision, implementations may vary in the dynamic range of the space of values they process. For example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one millionth to one million. As another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which

US 9,218,156 B2

27

may range approximately from one billionth to one billion. As yet another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one sixty five thousandth to sixty five thousand. As yet further examples, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range from any specific value between zero and one sixty five thousandth up to any specific value greater than sixty five thousand. As yet further examples, other embodiments may process values in spaces with dynamic ranges that may combine and may fall between the prior examples, for example ranging from approximately one billionth to ten million. In all of these example embodiments of the present invention, as well as in other embodiments, the values that we are discussing may be signed, so that the above descriptions characterize the absolute values of the numbers being discussed.

The frequency with which LPHDR arithmetic elements may yield only approximations to correct results may vary from implementation to implementation. For example, consider an embodiment in which LPHDR arithmetic elements can perform one or more operations (perhaps including, for example, trigonometric functions), and for each operation the LPHDR elements each accept a set of inputs drawn from a range of valid values, and for each specific set of input values the LPHDR elements each produce one or more output values (for example, simultaneously computing both sin and cos of an input), and the output values produced for a specific set of inputs may be deterministic or non-deterministic. In such an example embodiment, consider further a fraction F of the valid inputs and a relative error amount E by which the result calculated by an LPHDR element may differ from the mathematically correct result. In certain embodiments of the present invention, for each LPHDR arithmetic element, for at least one operation that the LPHDR unit is capable of performing, for at least fraction F of the possible valid inputs to that operation, for at least one output signal produced by that operation, the statistical mean, over repeated execution, of the numerical values represented by that output signal of the LPHDR unit, when executing that operation on each of those respective inputs, differs by at least E from the result of an exact mathematical calculation of the operation on those same input values, where F is 1% and E is 0.05%. In several other example embodiments, F is not 1% but instead is one of 2%, or 5%, or 10%, or 20%, or 50%. For each of these example embodiments, each with some specific value for F, there are other example embodiments in which E is not 0.05% but instead is 0.1%, or 0.2%, or 0.5%, or 1%, or 2%, or 5%, or 10%, or 20%. These varied embodiments are merely examples and do not constitute limitations of the present invention.

For certain devices (such as computers or processors or other devices) embodied according the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits). If NL is the total number of LPHDR elements in such a device, and NH is the total number of elements in the device which are designed to perform high dynamic range arithmetic of traditional precision, then NL exceeds T(NH), where T( ) is some function. Any of a variety of functions may be used as the function T( ). For example, in certain embodiments, T(NH) may be twenty plus three times NH, and the number of LPHDR arithmetic elements in the device may exceed twenty more than three times the number

28

of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed fifty more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one hundred more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed five thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. Certain embodiments of the present invention may be implemented within a single physical device, such as but not limited to a silicon chip or a chip stack or a chip package or a circuit board, and the number NL of LPHDR elements in the physical device and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the physical device may be the total counts of the respective elements within that physical device. Certain embodiments of the present invention may be implemented in a computing system including more than one physical device, such as but not limited to a collection of silicon chips or chip stacks or chip packages or circuit boards coupled to and communicating with each other using any means (such as a bus, switch, any kind of network connection, or other means of communication), and in this case the number NL of LPHDR elements in the computing system and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the computing system may be the total counts of the respective elements within all those physical devices jointly.

Certain embodiments of the present invention may constitute, or may be part of, processors, which are devices capable of executing software to perform computations. Such processors may include mechanisms for storing software, for using the software to determine what operations to perform, for performing those operations, for storing numerical data, for modifying data according to the software specified operations, and for communicating with devices connected to the processor. Processors may be reconfigurable devices, such as, without limitation, field programmable arrays. Processors may be co-processors to assist host machines or may be capable of operating independently of an external host. Processors may be formed as a collection of component host processors and co-processors of various types, such as CPUs, GPUs, FPGAs, or other processors or other devices, which in the art may be referred to as a heterogeneous processor design or heterogeneous computing system, some or all of which components might incorporate the same or distinct varieties of embodiments of the present invention.

Embodiments of the present invention may, however, be implemented in devices in addition to or other than processors. For example, a computer including a processor and other components (such as memory coupled to the processor by a data path), wherein the processor includes components for performing LPHDR operations in any of the ways disclosed herein, is an example of an embodiment of the present inven-

US 9,218,156 B2

29                                              30

tion. More generally, any device or combination of devices, whether or not falling within the meaning of a "processor," which performs the functions disclosed herein may constitute an example of an embodiment of the present invention.

More generally, any of the techniques described above may be implemented, for example, in hardware, software tangibly stored on a computer-readable medium, firmware, or any combination thereof. The techniques described above may be implemented in one or more computer programs executing on a programmable computer including a processor, a storage medium readable by the processor (including, for example, volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. Program code may be applied to input entered using the input device to perform the functions described and to generate output. The output may be provided to one or more output devices.

Each computer program within the scope of the claims below may be implemented in any programming language, such as assembly language, machine language, a high-level procedural programming language, or an object-oriented programming language. The programming language may, for example, be a compiled or interpreted programming language.

Each such computer program may be implemented in a computer program product tangibly embodied in a machine-readable storage device for execution by a computer processor. Method steps of the invention may be performed by a computer processor executing a program tangibly embodied on a computer-readable medium to perform functions of the invention by operating on input and generating output. Suitable processors include, by way of example, both general and special purpose microprocessors. Generally, the processor receives instructions and data from a read-only memory and/or a random access memory. Storage devices suitable for tangibly embodying computer program instructions include, for example, all forms of non-volatile memory, such as semiconductor memory devices, including EPROM, EEPROM, and flash memory devices; magnetic disks such as internal hard disks and removable disks; magneto-optical disks; and CD-ROMs. Any of the foregoing may be supplemented by, or incorporated in, specially-designed ASICs (application-specific integrated circuits) or FPGAs (Field-Programmable Gate Arrays). A computer can generally also receive programs and data from a storage medium such as an internal disk (not shown) or a removable disk. These elements will also be found in a conventional desktop or workstation computer as well as other computers suitable for executing computer programs implementing the methods described herein, which may be used in conjunction with any digital print engine or marking engine, display monitor, or other raster output device capable of producing color or gray scale pixels on paper, film, display screen, or other output medium.

The invention claimed is:

1. A device comprising:
at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,
    wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the

LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and
at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

2. The method of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

3. The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

4. The device of claim 3, wherein X=10%.

5. The device of claim 3, wherein Y=0.2%.

6. The device of claim 3, wherein X=10% and Y=0.2%.

7. The device of claim 3, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

8. The device of claim 3, wherein the first operation is multiplication.

9. A device comprising:
at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,
    wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and
    wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nanomechanical-technology-based execution unit, a nanoelectronic-technology-based execution unit, a nanowire-technology-based execution unit, a nanotube-technology-based execution unit, and an optical-technology-based execution unit.

10. The device of claim 9, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

11. The device of claim 10, wherein X=10%.

12. The device of claim 10, wherein Y=0.2%.

13. The device of claim 10, wherein X=10% and Y=0.2%.

14. The device of claim 10, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

15. The device of claim 10, wherein the first operation is multiplication.

16. A device comprising:
a plurality of components comprising:

US 9,218,156 B2

31

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**17.** The device of claim **16**, wherein the plurality of components are arranged in a stack.

**18.** The device of claim **17**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**19.** The device of claim **18**, wherein X=10%.

**20.** The device of claim **18**, wherein Y=0.2%.

**21.** The device of claim **18**, wherein X=10% and Y=0.2%.

**22.** The device of claim **18**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**23.** The device of claim **18**, wherein the first operation is multiplication.

**24.** The device of claim **16**, wherein the plurality of components are bonded.

**25.** The device of claim **16**, wherein the plurality of components are arranged in a stack and bonded.

**26.** A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nano-mechanical-technology-based execution unit, a nano-

32

electronic-technology-based execution unit, a nanowire-technology-based execution unit, a nanotube-technology-based execution unit, and an optical-technology-based execution unit.

**27.** The device of claim **26**, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**28.** The device of claim **27**, wherein X=10%.

**29.** The device of claim **27**, wherein Y=0.2%.

**30.** The device of claim **27**, wherein X=10% and Y=0.2%.

**31.** The device of claim **27**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**32.** The device of claim **27**, wherein the first operation is multiplication.

**33.** A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

a plurality of components comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**34.** The device of claim **33**, wherein the plurality of components are arranged in a stack.

**35.** The device of claim **34**, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**36.** The device of claim **35**, wherein X=10%.

**37.** The device of claim **35**, wherein Y=0.2%.

**38.** The device of claim **35**, wherein X=10% and Y=0.2%.

**39.** The device of claim **35**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**40.** The device of claim **35**, wherein the first operation is multiplication.

**41.** The device of claim **33**, wherein the plurality of components are bonded.

**42.** The device of claim **33**, wherein the plurality of components are arranged in a stack and bonded.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 9,218,156 B2 | Page 1 of 1 |
| APPLICATION NO. | : 13/849606 | |
| DATED | : December 22, 2015 | |
| INVENTOR(S) | : Bates | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Column 9, Lines 30-31, delete "I/O controller 108," and insert -- I/O unit 108, --, therefor.

In Column 20, Line 1, delete "&" and insert -- % --, therefor.

In Column 21, Line 3, delete "0(M×M)" and insert -- O(M×M) --, therefor.

In Column 21, Line 5, delete "0(M×M)" and insert -- O(M×M) --, therefor.

In Column 22, Line 6, delete "Kahan (Kahan," and insert -- Kahan --, therefor.

In Column 30, Line 7, in Claim 2, delete "The method" and insert -- The device --, therefor.

Signed and Sealed this
Twenty-third Day of May, 2017

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*



US008407273B2

(12) **United States Patent**

Bates

(10) Patent No.: **US 8,407,273 B2**
(45) Date of Patent: **\*Mar. 26, 2013**

(54) **PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT**

(75) Inventor: **Joseph Bates**, Lexington, MA (US)

(73) Assignee: **Singular Computing LLC**, Newton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/399,884**

(22) Filed: **Feb. 17, 2012**

(65) **Prior Publication Data**

US 2013/0031153 A1     Jan. 31, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/816,201, filed on Jun. 15, 2010, now Pat. No. 8,150,902.

(60) Provisional application No. 61/218,691, filed on Jun. 19, 2009.

(51) **Int. Cl.**
*G06F 7/38*          (2006.01)

(52) **U.S. Cl.** ......... **708/524**; 708/490; 712/221; 382/255

(58) **Field of Classification Search** ...................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,226,166 A | 7/1993 | Ishida et al. | |
| 5,293,500 A | 3/1994 | Ishida et al. | |
| 5,809,320 A | 9/1998 | Jain et al. | |
| 5,867,683 A | 2/1999 | Witt et al. | |
| 5,887,160 A | 3/1999 | Lauritzen et al. | |
| 5,892,962 A | 4/1999 | Cloutier | |
| 2004/0054708 A1 | 3/2004 | Happonen | |

*Primary Examiner* — Michael D Yaary

(74) *Attorney, Agent, or Firm* — Robert Plotkin, P.C.

(57) **ABSTRACT**

A processor or other device, such as a programmable and/or massively parallel processor or other device, includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements, if any, in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

**70 Claims, 11 Drawing Sheets**



Google Exhibit 1001
Google v. Singular



FIG. 1



FIG. 2



FIG. 3



FIG. 4

U.S. Patent

Mar. 26, 2013

Sheet 5 of 11

US 8,407,273 B2



FIG. 5

U.S. Patent

Mar. 26, 2013

Sheet 6 of 11

US 8,407,273 B2



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

US 8,407,273 B2

1

# PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/816,201, filed on Jun. 15, 2010, now U.S. Pat. No. 8,150,902 entitled, "Processing with Compact Arithmetic Processing Element," which claims the benefit of U.S. Provisional Patent Application Ser. No. 61/218,691, filed on Jun. 19, 2009, entitled, "Massively Parallel Processing with Compact Arithmetic Element," both of which are hereby incorporated by reference herein.

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND

The ability to compute rapidly has become enormously important to humanity. Weather and climate prediction, medical applications (such as drug design and non-invasive imaging), national defense, geological exploration, financial modeling, Internet search, network communications, scientific research in varied fields, and even the design of new computing hardware have each become dependent on the ability to rapidly perform massive amounts of calculation. Future progress, such as the computer-aided design of complex nano-scale systems or development of consumer products that can see, hear, and understand, will demand exponential delivery of even greater computing power.

Gordon Moore's prediction, that computing performance per dollar would double every two years, has proved valid for over 30 years and looks likely to continue in some form. But despite this rapid exponential improvement, the reality is that the inherent computing power available from silicon has grown far more quickly than it has been made available to software. In other words, although the theoretical computing power of computing hardware has grown exponentially, the interfaces through which software is required to access the hardware limits the ability of software to use hardware to perform computations at anything approaching the hardware's theoretical maximum computing power.

Consider a modern silicon microprocessor chip containing about one billion transistors, clocked at roughly 1 GHz. On each cycle the chip delivers approximately one useful arithmetic operation to the software it is running. For instance, a value might be transferred between registers, another value might be incremented, perhaps a multiply is accomplished. This is not terribly different from what chips did 30 years ago, though the clock rates are perhaps a thousand times faster today.

Real computers are built as physical devices, and the underlying physics from which the machines are built often exhibits complex and interesting behavior. For example, a silicon MOSFET transistor is a device capable of performing interesting non-linear operations, such as exponentiation. The junction of two wires can add currents. If configured properly, a billion transistors and wires should be able to

2

perform some significant fraction of a billion interesting computational operations within a few propagation delays of the basic components (a "cycle" if the overall design is a traditional digital design). Yet, today's CPU chips use their billion transistors to enable software to perform merely a few such operations per cycle, not the significant fraction of the billion that might be possible.

## SUMMARY

Embodiments of the present invention are directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

In some embodiments, "low precision" processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1% (one tenth of one percent). This is far worse precision than the widely used IEEE 754 single precision floating point standard. Programmable embodiments of the present invention may be programmed with algorithms that function adequately despite these unusually large relative errors. In some embodiments, the processing elements have "high dynamic range" in the sense that they are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an example overall design of a SIMD processor according to one embodiment of the present invention.

FIG. 2 is an example of the Processing Element Array of a SIMD processor according to one embodiment of the present invention.

FIG. 3 is an example of how a Processing Element in a Processing Element Array communicates data with other parts of the processor according to one embodiment of the present invention.

FIG. 4 is an example design for a Processing Element according to one embodiment of the present invention.

FIG. 5 is an example LPHDR data word format according to one embodiment of the present invention.

FIG. 6 is an example design for an LPHDR arithmetic unit according to one embodiment of the present invention.

FIG. 7 is an original image.

FIG. 8 is an image blurred by a blur kernel according to one embodiment of the present invention.

FIG. 9 is an image produced by Richardson Lucy deconvolution using floating point arithmetic according to one embodiment of the present invention.

FIG. 10 is an image produced by Richardson Lucy deconvolution using LPHDR floating point arithmetic with added noise (fp+noise) according to one embodiment of the present invention.

US 8,407,273 B2

3

FIG. **11** is an image produced by Richardson Lucy deconvolution using LPHDR logarithmic arithmetic (lns) according to one embodiment of the present invention.

DETAILED DESCRIPTION

As described above, today's CPU chips make inefficient use of their transistors. For example, a conventional CPU chip containing a billion transistors might enable software to perform merely a few operations per clock cycle. Although this is highly inefficient, those having ordinary skill in the art design CPUs in this way for what are widely accepted to be valid reasons. For example, such designs satisfy the (often essential) requirement for software compatibility with earlier designs. Furthermore, they deliver great precision, performing exact arithmetic with integers typically 32 or 64 bits long and performing rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers. Many applications need this kind of precision. As a result, conventional CPUs typically are designed to provide such precision, using on the order of a million transistors to implement the arithmetic operations.

There are many economically important applications, however, which are not especially sensitive to precision and that would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors. Current architectures for general purpose computing fail to deliver this power.

Because of the weaknesses of conventional computers, such as typical microprocessors, other kinds of computers have been developed to attain higher performance. These machines include single instruction stream/multiple data stream (SIMD) designs, multiple instruction stream/multiple data stream (MIMD) designs, reconfigurable architectures such as field programmable gate arrays (FPGAs), and graphics processing unit designs (GPUs) which, when applied to general purpose computing, may be viewed as single instruction stream/multiple thread (SIMT) designs.

SIMD machines follow a sequential program, with each instruction performing operations on a collection of data. They come in two main varieties: vector processors and array processors. Vector processors stream data through a processing element (or small collection of such elements). Each component of the data stream is processed similarly. Vector machines gain speed by eliminating many instruction fetch/decode operations and by pipelining the processor so that the clock speed of the operations is increased.

Array processors distribute data across a grid of processing elements (PEs). Each element has its own memory. Instructions are broadcast to the PEs from a central control unit, sequentially. Each PE performs the broadcast instruction on its local data (often with the option to sit idle that cycle). Array processors gain speed by using silicon efficiently—using just one instruction fetch/decode unit to drive many small simple execution units in parallel.

Array processors have been built using fixed point arithmetic at a wide variety of bit widths, such as 1, 4, 8, and wider, and using floating point arithmetic. Small bit widths allow the processing elements to be small, which allows more of them to fit in the computer, but many operations must be carried out in sequence to perform conventional arithmetic calculations. Wider widths allow conventional arithmetic operations to be completed in a single cycle. In practice, wider widths are desirable. Machines that were originally designed with small bit widths, such as the Connection Machine-1 and the Goodyear Massively Parallel Processor, which each used 1 bit wide

4

processing elements, evolved toward wider data paths to better support fast arithmetic, producing machines such as the Connection Machine-2 which included 32 bit floating point hardware and the MasPar machines which succeeded the Goodyear machine and provided 4 bit processing elements in the MasPar-1 and 32 bit processing elements in the MasPar-2.

Array processors also have been designed to use analog representations of numbers and analog circuits to perform computations. The SCAMP is such a machine. These machines provide low precision arithmetic, in which each operation might introduce perhaps an error of a few percentage points in its results. They also introduce noise into their computations, so the computations are not repeatable. Further, they represent only a small range of values, corresponding for instance to 8 bit fixed point values rather than providing the large dynamic range of typical 32 or 64 bit floating point representations. Given these limitations, the SCAMP was not intended as a general purpose computer, but instead was designed and used for image processing and for modeling biological early vision processes. Such applications do not require a full range of arithmetic operations in hardware, and the SCAMP, for example, omits general division and multiplication from its design.

While SIMD machines were popular in the 1980s, as price/performance for microprocessors improved designers began building machines from large collections of communicating microprocessors. These MIMD machines are fast and can have price/performance comparable to their component microprocessors, but they exhibit the same inefficiency as those components in that they deliver to their software relatively little computation per transistor.

Field Programmable Gate Arrays (FPGAs) are integrated circuits containing a large grid of general purpose digital elements with reconfigurable wiring between those elements. The elements originally were single digital gates, such as AND and OR gates, but evolved to larger elements that could, for instance, be programmed to map 6 inputs to 1 output according to any Boolean function. This architecture allows the FPGA to be configured from external sources to perform a wide variety of digital computations, which allows the device to be used as a co-processor to a CPU to accelerate computation. However, arithmetic operations such as multiplication and division on integers, and especially on floating point numbers, require many gates and can absorb a large fraction of an FPGA's general purpose resources. For this reason, modern FPGAs devote a significant portion of their area to providing dozens or hundreds of multiplier blocks, which can be used instead of general purpose resources for computations requiring multiplication. These multiplier blocks typically perform 18 bit or wider integer multiplies, and use many transistors, as similar multiplier circuits do when they are part of a general purpose CPU.

Existing Field Programmable Analog Arrays (FPAAs) are analogous to FPGAs, but their configurable elements perform analog processing. These devices generally are intended to do signal processing, such as helping model neural circuitry. They are relatively low precision, have relatively low dynamic range, and introduce noise into computation. They have not been designed as, or intended for use as, general purpose computers. For instance, they are not seen by those having ordinary skill in the art as machines that can run the variety of complex algorithms with floating point arithmetic that typically run on high performance digital computers.

Finally, Graphics Processing Units (GPUs) are a variety of parallel processor that evolved to provide high speed graphics capabilities to personal computers. They offer standard floating point computing abilities with very high performance for

US 8,407,273 B2

5                                               6

certain tasks. Their computing model is sometimes based on having thousands of nearly identical threads of computing (SIMT), which are executed by a collection of SIMD-like internal computing engines, each of which is directed and redirected to perform work for which a slow external DRAM memory has provided data. Like other machines that implement standard floating point arithmetic, they use many transistors for that arithmetic. They are as wasteful of those transistors, in the sense discussed above, as are general purpose CPUs.

Some GPUs include support for 16 bit floating point values (sometimes called the "Half" format). The GPU manufacturers, currently such as NVIDIA or AMD/ATI, describe this capability as being useful for rendering images with higher dynamic range than the usual 32 bit RGBA format, which uses 8 bits of fixed point data per color, while also saving space over using 32 bit floating point for color components. The special effects movie firm Industrial Light and Magic (ILM) independently defined an identical representation in their OpenEXR standard, which they describe as "a high dynamic-range (HDR) image file format developed by Industrial Light & Magic for use in computer imaging applications." Wikipedia (late 2008) describes the 16 bit floating point representation thusly: "This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth."

When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

The variety of architectures mentioned above are all attempts to get more performance from silicon than is available in a traditional processor design. But designers of traditional processors also have been struggling to use the enormous increase in available transistors to improve performance of their machines. These machines often are required, because of history and economics, to support large existing instruction sets, such as the Intel x86 instruction set. This is difficult, because of the law of diminishing returns, which does not enable twice the performance to be delivered by twice the transistor count. One facet of these designers' struggle has been to increase the precision of arithmetic operations, since transistors are abundant and some applications could be sped up significantly if the processor natively supported long (e.g., 64 bit) numbers. With the increase of native fixed point precision from 8 to 16 to 32 to 64 bits, and of floating point from 32 to 64 and sometimes 128 bits, programmers have come to think in terms of high precision and to develop algorithms based on the assumption that computer processors provide such precision, since it comes as an integral part of each new generation of silicon chips and thus is "free."

Embodiments of the present invention efficiently provide computing power using a fundamentally different approach than those described above. In particular, embodiments of the present invention are directed to computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations).

One variety of LPHDR arithmetic represents values from one millionth up to one million with a precision of about 0.1%. If these values were represented and manipulated using the methods of floating point arithmetic, they would have binary mantissas of no more than 10 bits plus a sign bit and binary exponents of at least 5 bits plus a sign bit. However, the circuits to multiply and divide these floating point values would be relatively large. One example of an alternative embodiment is to use a logarithmic representation of the values. In such an approach, the values require the same number of bits to represent, but multiplication and division are implemented as addition and subtraction, respectively, of the logarithmic representations. Addition and subtraction may be implemented efficiently as described below. As a result, the area of the arithmetic circuits remains relatively small and a greater number of computing elements can be fit into a given area of silicon. This means the machine can perform a greater number of operations per unit of time or per unit power, which gives it an advantage for those computations able to be expressed in the LPHDR framework.

Another embodiment is to use analog representations and processing mechanisms. Analog implementation of LPHDR arithmetic has the potential to be superior to digital implementation, because it tends to use the natural analog physics of transistors or other physical devices instead of using only the digital subset of the device's behavior. This fuller use of the devices' natural abilities may permit smaller mechanisms for doing LPHDR arithmetic. In recent years, in the field of silicon circuitry, analog methods have been supplanted by digital methods. In part, this is because of the ease of doing digital design compared to analog design. Also in part, it is because of the continued rapid scaling of digital technology ("Moore's Law") compared to analog technology. In particular, at deep submicron dimensions, analog transistors no longer work as they had in prior generations of larger-scale technology. This change of familiar behavior has made analog design still harder in recent years. However, digital transistors are in fact analog transistors used in a digital way, meaning digital circuits are really analog circuits designed to attempt to switch the transistors between completely on and completely off states. As scaling continues, even this use of transistors is starting to come face to face with the realities of analog behavior. Scaling of transistors for digital use is expected either to stall or to require digital designers increasingly to acknowledge and work with analog issues. For these reasons, digital embodiments may no longer be easy, reliable, and scalable, and analog embodiments of LPHDR arithmetic may come to dominate commercial architectures.

Because LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other, and therefore may constitute a massively parallel LPHDR processor or other device. Such a processor or other device has not been described or practiced as a means of doing general purpose computing by those having ordinary skill in the art for at least two reasons. First, it is commonly believed by those having ordinary skill in the art, that LPHDR computation, and in particular massive amounts of LPHDR computation, whether performed in a massively parallel way or not, is not practical as a substrate for moderately general computing. Second, it is commonly believed by those having ordinary skill in the art that massive amounts of even high precision computation on a single chip or in a single machine, as is enabled by a compact arithmetic processing unit, is not useful without a corresponding

US 8,407,273 B2

7

increase in bandwidth between processing elements within the machine and into and out of the machine because computing is wire limited and arithmetic can be considered to be available at no cost.

Despite these views—that massive amounts of arithmetic on a chip or in a massively parallel machine are not useful, and that massive amounts of LPHDR arithmetic are even worse—embodiments of the present invention disclosed herein demonstrate that massively parallel LPHDR designs are in fact useful and provide significant practical benefits in at least several significant applications.

To conclude, modern digital computing systems provide high precision arithmetic, but that precision is costly. A modern double precision floating point multiplier may require on the order of a million transistors, even though only a handful of transistors is required to perform a low precision multiplication. Despite the common belief among those having ordinary skill in the art that modern applications require high precision processing, in fact a variety of useful algorithms function adequately at much lower precision. As a result, such algorithms may be performed by processors or other devices implemented according to embodiments of the present invention, which come closer to achieving the goal of using a few transistors to multiply and a wire junction to add, thus enabling massively parallel arithmetic computation to be performed with relatively small amounts of physical resources (such as a single silicon chip). Although certain specialized tasks can function at low precision, it is not obvious, and in fact has been viewed as clearly false by those having ordinary skill in the art, that relatively general purpose computing such as is typically performed today on general purpose computers can be done at low precision. However, in fact a variety of useful and important algorithms can be made to function adequately at much lower than 32 bit precision in a massively parallel computing framework, and certain embodiments of the present invention support such algorithms, thereby offering much more efficient use of transistors, and thereby provide improved speed, power, and/or cost, compared to conventional computers.

Various computing devices implemented according to embodiments of the present invention will now be described. Some of these embodiments may be an instance of a SIMD computer architecture. Other architectures may be used, such as MIMD architectures, programmable array architectures (such as FPGAs and FPAAs), or GPU/SIMT architectures. The techniques disclosed herein may, for example, be implemented using any processor or other device having such an existing architecture, and replacing or augmenting some or all existing arithmetic units in the processor or other device, if any, with LPHDR arithmetic units in any of the ways disclosed herein. Devices implemented according to embodiments of the present invention, however, need not start with an existing processor design, but instead may be designed from scratch to include LPHDR arithmetic units within any of the architectures just described, or any other architecture.

Embodiments of the present invention may, for example, be implemented using the architecture of a particular kind of SIMD computer, the array processor. The array has variations and specific instances of array processors described in the scientific and commercial literature. Examples include the Illiac 4, the Connection Machine 1 and 2, the Goodyear MPP, and the MasPar line of computers.

Embodiments of the present invention need not, however, be implemented as SIMD computers. For example, embodiments of the present invention may be implemented as FPGAs, FPAAs, or related architectures that provide for flexible connectivity of a set of processing elements. For

8

example, embodiments of the present invention may be implemented as GPU/SIMTs and as MIMDs, among others. For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures. Furthermore, references herein to "processing elements" within embodiments of the present invention should be understood more generally as any kind of execution unit, whether for performing LPHDR operations or otherwise.

An example SIMD computing system 100 is illustrated in FIG. 1. The computing system 100 includes a collection of many processing elements (PEs) 104. Sometimes present are a control unit (CU) 106, an I/O unit (IOU) 108, various Peripheral devices 110, and a Host computer 102. The collection of PEs is referred to herein as "the Processing Element Array" (PEA). Even though it need not be two-dimensional or an array or grid or other particular layout. Some machines include additional components, such as an additional memory system called the "Staging Memory" in the Goodyear MPP, but these additional elements are neither essential in the computer nor needed to understand embodiments of the present invention and therefore are omitted here for clarity of explanation. One embodiment of the present invention is a SIMD computing system of the kind shown in FIG. 1, in which one or more (e.g., all) of the PEs in the PEA 104 are LPHDR elements, as that term is used herein.

The Host 102 is responsible for overall control of the computing system 100. It performs the serial, or mostly serial, computation typical of a traditional uni-processor. The Host 102 could have more complicated structure, of course, including parallelism of various sorts. Indeed a heterogeneous computing system combining multiple computing architectures in a single machine is a good use for embodiments of the present invention.

A goal of the Host 102 is to have the PEA 104 perform massive amounts of computation in a useful way. It does this by causing the PEs to perform computations, typically on data stored locally in each PE, in parallel with one another. If there are many PEs, much work gets done during each unit of time.

The PEs in the PEA 104 may be able to perform their individual computations roughly as fast as the Host 102 performs its computations. This means it may be inefficient to have the Host 102 attempt to control the PEA 104 on a time scale as fine as the Host's or PEA's minimal time step. (This minimal time, in a traditional digital design, would be the clock period.) For this reason, the specialized control unit (CU) 106 may be included in the architecture. The CU 106 has the primary task of retrieving and decoding instructions from an instruction memory, which conceptually is part of the CU 106, and issuing the partially decoded instructions to all the PEs in the PEA 104. (This may be viewed by the CU software as happening roughly simultaneously for all the PEs, though it need not literally be synchronous, and in fact it may be effective to use an asynchronous design in which multiple instructions at different stages of completion simultaneously propagate gradually across the PEA, for instance as a series of wave fronts.)

In a design which includes the CU 106, the Host 102 typically will load the instructions (the program) for the PEA 104 into the CU instruction memory (not shown in FIG. 1), then instruct the CU 106 to interpret the program and cause the PEA 104 to compute according to the instructions. The program may, for example, look generally similar to a typical machine language program, with instructions to cause data movement, logical operations, arithmetic operations, etc., in

US 8,407,273 B2

9

and between the PEs and other instructions to do similar operations together with control flow operations within the CU **106**. Thus, the CU **106** may run a typical sort of program, but with the ability to issue massively parallel instructions to the PEA **104**.

In order to get data into and out of the CU **106** and PEA **104**, the I/O Unit **108** may interface the CU **106** and PEA **104** with the Host **102**, the Host's memory (not shown in FIG. 1), and the system's Peripherals **110**, such as external storage (e.g., disk drives), display devices for visualization of the computational results, and sometimes special high bandwidth input devices (e.g., vision sensors). The PEA's ability to process data far faster than the Host **102** makes it useful for the IOU **108** to be able to completely bypass the Host **102** for some of its data transfers. Also, the Host **102** may have its own ways of communicating with the Peripherals **110**.

The particular embodiment illustrated in FIG. 1 is shown merely for purposes of example and does not constitute a limitation of the present invention. For example, alternatively the functions performed by the CU **106** could instead be performed by the Host **102** with the CU **106** omitted. The CU **106** could be implemented as hardware distant from the PEA **104** (e.g., off-chip), or the CU **106** could be near to the PEA **104** (e.g., on-chip). I/O could be routed through the CU **106** with the IOU **108** omitted or through the separate I/O controller **108**, as shown. Furthermore, the Host **102** is optional; the CU **106** may include, for example, a CPU, or otherwise include components sufficient to replace the functions performed by the Host **102**. The Peripherals **110** shown in FIG. 1 are optional. The design shown in FIG. 1 could have a special memory, such as the Goodyear MPP's "staging memory," which provides an intermediate level of local storage. Such memory could, for example, be bonded to the LPHDR chip using 3D fabrication technology to provide relatively fast parallel access to the memory from the PEs in the PEA **104**.

The PEA **104** itself, besides communicating with the CU **106** and IOU **108** and possibly other mechanisms, has ways for data to move within the array. For example, the PEA **104** may be implemented such that data may move from PEs only to their nearest neighbors, that is, there are no long distance transfers. FIGS. 2 and 3 show embodiments of the present invention which use this approach, where the nearest neighbors are the four adjacent PEs toward the North, East, West, and South, called a NEWS design. For example, FIG. 2 shows a subset of the PEs in PEA **104**, namely PE **202**, PE **204**, PE **206**, PE **208**, and PE **210**. When the CU **106** issues data movement instructions, all the PEs access data from or send data to their respective specified nearest neighbor. For instance, every PE might access a specified data value in its neighbor to the West and copy it into its own local storage. In some embodiments, such as some analog embodiments, these kinds of transfers may result in some degradation of the value copied.

FIG. 3 shows a PE **302** that includes data connections to the IOU **108**. PE **302** is connected at the North to PE **304**, at the East to PE **306**, at the South to PE **308**, and at the West to PE **310**. However, driving signals from inside the PEA **104** out to the IOU **108** usually requires a physically relatively large driving circuit or analogous mechanism. Having those at every PE may absorb much of the available resources of the hardware implementation technology (such as VLSI area). In addition, having independent connections from every PE to the IOU **108** means many such connections, and long connections, which also may absorb much of the available hardware resources. For these reasons, the connections between the PEs and the IOU **108** may be limited to those PEs at the

10

edges of the PE array **104**. In this case, to get data out of, and perhaps into, the PEA **104**, the data is read and written at the edges of the array and CU instructions are performed to shift data between the edges and interior of the PEA **104**. The design may permit data to be pushed from the IOU **108** inward to any PE in the array using direct connections, but may require readout to occur by using the CU **106** to shift data to the edges where it can be read by the IOU **108**.

Connections between the CU **106** and PEA **104** have analogous variations. One design may include the ability to drive instructions into all the PEs roughly simultaneously, but another approach is to have the instructions flow gradually (for instance, shift in discrete time steps) across the PEA **104** to reach the PEs. Some SIMD designs, which may be implemented in embodiments of the present invention, have a facility by which a "wired-or" or "wired-and" of the state of every PE in the PEA **104** can be read by the CU **106** in approximately one instruction delay time.

There are many well studied variations on these matters in the literature, any of which may be incorporated into embodiments of the present invention. For example, an interconnect, such as an 8-way local interconnect, may be used. The local connections may include a mixture of various distance hops, such as distance 4 or 16 as well as distance 1. The outside edges may be connected using any topology, such as a torus or twisted torus. Instead of or in addition to a local interconnect, a more complex global interconnect, such as the hypercube design, may be used. Furthermore, the physical implementation of the PEA **104** (e.g., a chip) could be replicated (e.g., tiled on a circuit board) to produce a larger PEA. The replication may form a simple grid or other arrangement, just as the component PEAs may but need not be grids.

FIG. 4 shows an example design for a PE **400** (which may be used to implement any one or more of the PEs in the PEA **104**). The PE **400** stores local data. The amount of memory for the local data varies significantly from design to design. It may depend on the implementation technologies available for fabricating the PE **400**. Sometimes rarely changing values (Constants) take less room than frequently changing values (Registers), and a design may provide more Constants than Registers. For instance, this may be the case with digital embodiments that use single transistor cells for the Constants (e.g., floating gate Flash memory cells) and multiple transistor cells for the Registers (e.g., 6-transistor SRAM cells). Sometimes the situation is reversed, as may be the case in analog embodiments, where substantial area for capacitance may be needed to ensure stable long term storage of Constants, and such embodiments may have more Registers than Constants. Typical storage capacities might be tens or hundreds of arithmetic values stored in the Registers and Constants in each PE, but these capacities are adjustable by the designer. Some designs, for instance, may have Register storage but no Constant storage. Some designs may have thousands or even many more values stored in each PE. All of these variations may be reflected in embodiments of the present invention.

Each PE needs to operate on its local data. For this reason within the PE **400** there are data paths **402***a-i*, routing mechanisms (such as the multiplexor MUX **404**), and components to perform some collection of logical and arithmetic operations (such as the logic unit **406** and the LPHDR arithmetic unit **408**). The LPHDR arithmetic unit **408** performs LPHDR arithmetic operations, as that term is used herein. The input, output, and intermediate "values" received by, output by, and operated on by the PE **400** may, for example, take the form of electrical signals representing numerical values.

US 8,407,273 B2

11                                              12

The PE **400** also may have one or more flag bits, shown as Mask **410** in FIG. **4**. The purpose of the Mask **410** is to enable some PEs, the ones in which a specified Mask bit is set, to ignore some instructions issued by the CU **106**. This allows some variation in the usual lock-step behaviors of all PEs in the PEA **104**. For instance, the CU **106** may issue an instruction that causes each PE to reset or set its Mask **410** depending on whether a specified Register in the PE is positive or negative. A subsequent instruction, for instance an arithmetic instruction, may include a bit meaning that the instruction should be performed only by those PEs whose Mask **410** is reset. This combination has the effect of conditionally performing the arithmetic instruction in each PE depending on whether the specified Register in that PE was positive. As with the Compare instructions of traditional computers, there are many possible design choices for mechanisms to set and clear Masks.

The operation of the PEs is controlled by control signals **412**a-d received from the CU **106**, four of which are shown in FIG. **4** merely for purposes of example and not limitation. Digital PEs can have shifters, lookup tables, and many other mechanisms such as described in the literature. Analog PEs can have time-based operators, filters, comparators with global broadcast signals and many other mechanisms such as described in the literature. The PEA **104** can include global mechanisms such as wired-OR or wired-AND for digital PEAs or wired-SUM for analog PEAs Again, there are many variations well described in the literature on digital and analog computing architectures.

For example, LPHDR operations other than and/or in addition to addition and multiplication may be supported. For example, a machine which can only perform multiplication and the function (**1**-X) may be used to approximate addition and other arithmetic operations. Other collections of LPHDR operations may be used to approximate LPHDR arithmetic operations, such as addition, multiplication, subtraction, and division, using techniques that are well-known to those having ordinary skill in the art.

One aspect of embodiments of the present invention that is unique is the inclusion of LPHDR arithmetic mechanisms in the PEs. Embodiments of such mechanisms will now be described.

One digital embodiment of the LPHDR arithmetic unit **408** operates on digital (binary) representations of numbers. In one digital embodiment these numbers are represented by their logarithms. Such a representation is called a Logarithmic Number System (LNS), which is well-understood by those having ordinary skill in the art.

In an LNS, numbers are represented as a sign and an exponent. There is an implicit base for the logarithms, typically 2 when working with digital hardware. In the present embodiment, a base of 2 is used for purposes of example. As a result, a value, say B, is represented by its sign and a base 2 logarithm, say b, of its absolute value. For numbers to have representation errors of at most, say, 1% (one percent), the fractional part of this logarithm should be represented with enough precision that the least possible change in the fraction

corresponds to about a 1% change in the value B. If fractions are represented using 6 bits, increasing or decreasing the fraction by 1 corresponds to multiplying or dividing B by the 64th root of 2, which is approximately 1.011. This means that numbers may be represented in the present embodiment with a multiplicative error of approximately 1%. So, in this example embodiment the fraction part of the representation has 6 bits.

Furthermore, the space of values processed in the present embodiment have high dynamic range. To represent numbers whose absolute value is from, say, one billionth to one billion, the integer part of the logarithm must be long enough to represent plus or minus the base 2 logarithm of one billion. That logarithm is about 29.9. In the present embodiment the integer part of the logarithm representation is 5 bits long to represent values from 0 to 31, which is sufficient. There also is a sign bit in the exponent. Negative logarithms are represented using two's complement representation.

In an LNS, the value zero corresponds to the logarithm negative infinity. One can choose a representation to explicitly represent this special value. However, to minimize resources (for instance, area) used by arithmetic circuits, the present embodiment represents zero by the most negative possible logarithm, which is −32, corresponding to the two's complement bit representation '100000 000000', and denoting a value of approximately 2.33E-10.

When computing, situations can arise in which operations cannot produce reasonable values. An example is when a number is too large to be represented in the chosen word format, such as when multiplying or adding two large numbers or upon divide by zero (or nearly zero). One common approach to this problem is to allow a value to be marked as Not A Number (NAN) and to make sure that each operation produces NAN if a problem arises or if either of its inputs is NAN. The present embodiment uses this approach, as will be described in the following.

FIG. **5** shows the word format **500** for these numbers, in the present embodiment. It has one NAN bit **502**a, one bit **502**b for the sign of the value, and 12 bits **502**c-e representing the logarithm. The logarithm bits include a 5 bit integer part **502**d and a 6 bit fraction part **502**e. To permit the logarithms to be negative, there is a sign bit **502**c for the logarithm which is represented in two's complement form. The NAN bit is set if some problem has arisen in computing the value. The word format **500** shown in FIG. **5** is merely an example and does not constitute a limitation of the present invention. Other variations may be used, so long as they have low precision and high dynamic range.

FIG. **6** shows an example digital implementation of the LPHDR arithmetic unit **408** for the representation illustrated in FIG. **5**. The unit **408** receives two inputs, A **602**a and B **602**b, and produces an output **602**c. The inputs **602**a-b and output **602**c may, for example, take the form of electrical signals representing numerical values according to the representation illustrated in FIG. **5**, as is also true of signals transmitted within the unit **408** by components of the unit **408**. The inputs **602**a-b and output **602**c each are composed of a Value and a NAN (Not A Number) bit. The unit **408** is controlled by control signals **412**a-d, coming from the CU **106**, that determine which available arithmetic operation will be performed on the inputs **602**a-b. In this embodiment, all the available arithmetic operations are performed in parallel on the inputs **602**a-b by adder/subtractor **604**, multiplier **606**, and divider **608**. Adder/subtractor **604** performs LPHDR addition and subtraction, multiplier **606** performs LPHDR multiplication, and divider **608** performs LPHDR division.

US 8,407,273 B2

13

14

The desired result (from among the outputs of adder/subtractor **604**, multiplier **606**, and divider **608**) is chosen by the multiplexers (MUXes) **610**$a$ and **610**$b$. The right hand MUX **610**$b$ sends the desired value to the output **602**$c$. The left hand MUX **610**$a$ sends the corresponding NAN bit from the desired operation to the OR gate **612**, which outputs a set NAN bit if either input is NAN or if the specified arithmetic operation yields NAN. The computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. **6**.

LNS arithmetic has the great advantage that multiplication (MUL) and division (DIV) are very easy to compute and take few physical resources (e.g., little area in a silicon implementation). The sign of the result is the exclusive-or of the signs of the operands. The logarithm part of the output is the sum, in the case of MUL, or the difference, in the case of DIV, of the logarithm parts of the operands. The sum or difference of the logarithms can overflow, producing a NAN result. Certain other operations also are easy in LNS arithmetic. For instance, square root corresponds to dividing the logarithm in half, which in our representation means simply shifting it one bit position to the right.

Thus, the multiplier **606** and divider **608** in FIG. **6** are implemented as circuits that simply add or subtract their inputs, which are two's complement binary numbers (which in turn happen to be logarithms). If there is overflow, they output a 1 for NAN.

Implementing addition and subtraction in LNS, that is, the adder/subtractor **604** in FIG. **6**, follows a common approach used in the literature on LNS. Consider addition. If we have two positive numbers B and C represented by their logarithms b and c, the representation of the sum of B and C is log(B+C). An approach to computing this result that is well known to those skilled in the art is based on noticing that log(B+C)=log (B*(1+C/B))=log(B)+log(1+C/B)=b+F(c−b) where F(x) =log(1+2^x). Thus, the present embodiment computes c−b, feeds that through F, and adds the result to b, using standard digital techniques known to those skilled in the art.

Much of the published literature about LNS is concerned with how to compute F(x), the special function for ADD, along with a similar function for SUB. Often these two functions share circuitry, and this is why a single combined adder/subtractor **604** is used in the embodiment of FIG. **6**. There are many published ways to compute these functions or approximations to them, including discussions of how to do this when the values are of low precision. Any such method, or other method, may be used. Generally speaking, the more appropriate variations for massively parallel LPHDR arithmetic are those that require the minimal use of resources, such as circuit area, taking advantage of the fact that the representation used in the embodiment of FIG. **6** is low precision and that the arithmetic operations need not be deterministic nor return the most accurate possible answer within the low precision representation. Thus, embodiments of the present invention may use circuitry that does not compute the best possible answer, even among the limited choices available in a low precision representation.

In order to enable conditional operation of selected PEs, the present embodiment is able to reset and set the MASK flag **410** based on results of computations. The mechanism for doing this is that the CU **106** includes instructions that cause the MASK **410** in each PE to unconditionally reset or set its flag along with other instructions to perform basic tests on values entering the MASK **410** on data path **402**$f$ and to set the flag accordingly. Examples of these latter instructions include copying the sign bit or NAN bit of the word on data path **402**$f$ into the MASK bit **410**. Another example is to set the MASK

bit **410** if the 12 bit value part of the word on data path **402**$f$ is equal to binary zero. There are many additional and alternative ways for doing this that are directly analogous to comparison instructions in traditional processors and which are well understood by those skilled in the art.

It is worth noting that while the obvious method of using the above LNS operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values, since that is precisely their behavior in LNS implementations. The Mask setting instructions can compare these simple binary values. So besides doing LPHDR computations, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Some embodiments of the present invention may include analog representations and processing methods. Such embodiments may, for example, represent LPHDR values as charges, currents, voltages, frequencies, pulse widths, pulse densities, various forms of spikes, or in other forms not characteristic of traditional digital implementations. There are many such representations discussed in the literature, along with mechanisms for processing values so represented. Such methods, often called Analog methods, can be used to perform LPHDR arithmetic in the broad range of architectures we have discussed, of which SIMD is one example.

An example of an analog SIMD architecture is the SCAMP design (and related designs) of Dudek. In that design values have low dynamic range, being accurate roughly to within 1%. Values are represented by charges on capacitors. Those capacitors typically are the gates of transistors. Each PE has several memory cells, analogous to the Registers shown in FIG. **4**. Addition is performed by turning on pass transistors from the two operands, which transfer their charge onto an analog bus, where it is summed by the natural physics of charge and wires, upon which it is gated onto another Register to charge up its capacitor, which then represents the sum of the operands. The detailed mechanism disclosed by Dudek actually produces the negative of the sum, but the basic concept is as described and is a simple way to perform addition and subtraction using analog representations and simple processing mechanisms.

Variations of the SCAMP design have been fabricated and used to perform a range of low precision, low dynamic range computations related to image processing. These designs do not perform high dynamic range arithmetic, nor do they include mechanisms for performing multiplication or division of values stored in Registers. However, the Dudek designs suggest the general feasibility of constructing analog SIMD machines. The following describes how to build an analog SIMD machine that performs LPHDR arithmetic, and is thus an embodiment of the present invention.

One embodiment of the present invention represents values as a mixture of analog and digital forms. This embodiment represents values as low precision, normalized, base 2 floating point numbers, where the mantissa is an analog value and the exponent is a binary digital value. The analog value may be accurate to about 1%, following the approach of Dudek, which is well within the range of reasonable analog processing techniques. The exponent may be 6 bits long, or whatever is needed to provide the desired high dynamic range.

To multiply values, the embodiment proceeds by analogy to traditional floating point methods. The digital exponents are summed using a binary arithmetic adder, a standard digital technique. The analog mantissas are multiplied. Since they represent normalized values between approximately ½ and 1, their product may be as small as approximately ¼. Such a

US 8,407,273 B2

15

product value needs to be normalized back to the range ½ to 1. This is done, in the present embodiment, by comparing the analog mantissa to an analog representation of ½, using a threshold circuit. If the mantissa is below ½, then it is doubled and one is subtracted from the exponent, where such subtraction is simple digital subtraction. Doubling the mantissa is implemented in a way that corresponds to the chosen analog representation. For example, whatever means are being used to add two analog values can be used to double the mantissa, by adding it to a copy of itself. For example, if the mantissa is represented as a current, such as copy may be produced by a current mirror, or other suitable mechanism, and addition may be performed by a current summing junction.

The means of multiplying the original analog mantissas depends on the representation chosen. For example, if mantissas are represented using charge, following SCAMP, then any known method from the literature may be used to convert charge to current. For instance, since the charge on a capacitor determines the voltage on the capacitor, this may be implemented as a conversion from voltage to current, which is a basic technique in analog electronics known to those skilled in the art. In any case, if the mantissas are represented as currents, or once the mantissas are converted to currents, they may be multiplied using, for instance, the techniques of Gilbert. The Gilbert multiplier produces a current, representing the product, which may, if necessary, then be converted back to charge (or whatever representation is used). These are merely examples of how the needed operations might be performed. The literature discusses these matters extensively and these kinds of analog circuits are known to those skilled in the art.

Adding and subtracting values requires pre-normalization of the values to the same exponent, as is done in traditional digital floating point arithmetic. The present embodiment does this by comparing the exponents and choosing the smaller one. Then the smaller one is subtracted from the larger, using digital means. The difference specifies how many times the mantissa which corresponds to the smaller exponent needs to be divided in half. If that mantissa is represented by (or converted to) a current, then an analog R-2R style ladder may be used to divide the current in half the required number of times, with the stage of the ladder specified by the difference of exponents calculated as above. The resulting scaled down current is added to (or subtracted from, if this is an LPHDR subtraction operation) the current corresponding to the mantissa associated with the larger exponent to yield the output mantissa. The output exponent associated with the output mantissa is the larger exponent. Post-normalization may be needed at this point. If the output exponent is greater than 1, then it needs to be divided in half and the output exponent needs to be incremented. If it is less than ½, then it needs to be doubled enough times to exceed ½ and the output exponent must be decremented correspondingly, which may be performed by a series of threshold circuits, doubler circuits, and associated decrementer circuits. These increments and decrements of the binary digital exponent, and corresponding doublings and halvings of the analog mantissa current, are straightforward operations well known to those skilled in the art.

The present embodiment represents the exponent as a digital binary number. Alternate embodiments may represent the exponent as an analog value. However, it is important that the exponent be represented in storage and computation in such a manner that neither noise nor other errors cause a change in the value it represents. Such changes in the exponent could introduce factors of two (or in some embodiments larger) changes in the values of the stored numbers. To maintain

16

accuracy of the exponents, an embodiment may quantize the exponent to relatively few levels, for instance 16 values plus a sign bit. During processing, slight variations in the analog representation of the exponent may then be removed by circuitry that restores values to the 16 standard quantization levels. To get sufficient dynamic range in such an embodiment, the floating point numbers may be processed as base 4 numbers, rather than the usual base 2 numbers. This means, for instance, that normalized mantissas are in the range ¼ to 1. The methods discussed above for addition, subtraction, and multiplication apply as described, with slight and straightforward variations.

The analog and mixed signal embodiments discussed above are merely examples and do not constitute a limitation of the present invention. The published literature on neuromorphic, analog, and mixed signal techniques provides a wealth of methods that enable LPHDR storage and processing to be implemented. Such storage and processing may introduce noise as well as fabrication errors into the behavior of machines performing LPHDR arithmetic. The results we present below, on software applications running using "fp+noise" arithmetic, show that despite these very "un-digital" qualities a machine built in this way is surprisingly useful.

Evidence that LPHDR arithmetic is useful in several important practical computing applications will now be provided. The evidence is presented for a broad variety of embodiments of the present invention, thereby showing that the usefulness does not depend much on the detailed implementation.

For the goal of showing usefulness, we choose a very general embodiment of an LPHDR machine. Our model of the machine is that it provides at least the following capabilities: (1) is massively parallel, (2) provides LPHDR arithmetic possibly with noise, (3) provides a small amount of memory local to each arithmetic unit, (4) provides the arithmetic/memory units in a two-dimensional physical layout with only local connections between units (rather than some more powerful, flexible, or sophisticated connection mechanism), and (5) provides only limited bandwidth between the machine and the host machine. Note that this model is merely an example which is used for the purpose of demonstrating the utility of various embodiments of the present invention. This model includes, among others, implementations that are digital or analog or mixed, have zero or more noise, have architectures which are FPGA-like, or SIMD-like, or MIMD-like, or otherwise meet the assumptions of the model. More general architectures, such as shared memory designs, GPU-like designs, or other sophisticated designs subsume this model's capabilities, and so LPHDR arithmetic in those architectures also is useful. While we are thus showing that LPHDR arithmetic is useful for a broad range of designs, of which SIMD is only an instance, for purpose of discussion below, we call each unit, which pairs memory with arithmetic, a Processing Element or "PE".

Several applications are discussed below. For each, the discussion shows (1) that the results are useful when computation is performed in possibly noisy LPHDR arithmetic, and (2) that the computation can be physically laid out in two dimensions with only local flow of data between units, only limited memory within each unit, and only limited data flow to/from the host machine, in such a way that the computation makes efficient use of the machine's resources (area, time, power). The first requirement is referred to as "Accuracy" and the second requirement "Efficiency." Applications that meet both requirements running in this model will function well on

US 8,407,273 B2

17

many kinds of LPHDR machines, and thus those machines are a broadly useful invention.

Applications are tested using two embodiments for the machine's arithmetic. One uses accurate floating point arithmetic but multiplies the result of each arithmetic operation by a uniformly chosen random number between 0.99 and 1.01. In the following discussion, this embodiment is denoted "fp+ noise". It may represent the results produced by an analog embodiment of the machine.

A second embodiment uses logarithmic arithmetic with a value representation as shown in FIG. **5**. The arithmetic is repeatable, that is, is not noisy, but because of the short fraction size it produces errors of up to approximately 1-2% in each operation. In the following discussion, this embodiment is denoted "lns". It may represent the results produced by a particular digital embodiment of the machine.

To demonstrate usefulness of embodiments of the invention, we shall discuss three computational tasks that are enabled by embodiments of the invention and which in turn enable a variety of practical applications. Two of the tasks are related to finding nearest neighbors and the other is related to processing visual information. We shall describe the tasks, note their practical application, and then demonstrate that each task is solvable using the general model described above and thus solvable using embodiments of the present invention.

Application 1

Finding Nearest Neighbors

Given a large set of vectors, called Examples, and a given vector, called Test, the nearest neighbor problem ("NN") is to find the Example which is closest to Test where the distance metric is the square of the Euclidean distance (sum of squares of distances between respective components).

NN is a widely useful computation. One use is for data compression, where it is called "vector quantization". In this application we have a set of relatively long vectors in a "code book" (these are the Examples) and associated short code words (for instance the index of the vector in the code book). We move through a sequence of vectors to be compressed, and for each such vector (Test), find the nearest vector in the code book and output the corresponding code word. This reduces the sequence of vectors to the shorter sequence of code words. Because the code words do not completely specify the original sequence of vectors, this is a lossy form of data compression. Among other applications, it may be used in speech compression and in the MPEG standards.

Another application of NN would be in determining whether snippets of video occur in a large video database. Here we might abstract frames of video from the snippet into feature vectors, using known methods, such as color histograms, scale invariant feature extraction, etc. The Examples would be analogous feature vectors extracted from the video database. We would like to know whether any vector from the snippet was close to any vector from the database, which NN can help us decide.

In many applications of nearest neighbor, we would prefer to find the true nearest neighbor but it is acceptable if we sometimes find another neighbor that is only slightly farther away or if we almost always find the true nearest neighbor. Thus, an approximate solution to the nearest neighbor problem is useful, especially if it can be computed especially quickly, or at low power, or with some other advantage compared to an exact solution.

18

We shall now show that approximate nearest neighbor is computable using embodiments of the present invention in a way that meets the criteria of Accuracy and Efficiency.

Algorithm.

The following describes an algorithm which may be performed by machines implemented according to embodiments of the present invention, such as by executing software including instructions for performing the algorithm. The inputs to the algorithm are a set of Examples and a Test vector. The algorithm seeks to find the nearest (or almost nearest) Example to the Test.

In the simplest version of the algorithm, the number of Examples may be no larger than the number of PEs and each vector must be short enough to fit within a single PE's memory. The Examples are placed into the memories associated with the PEs, so that one Example is placed in each PE. Given a Test, the Test is passed through all the PEs, in turn. Accompanying the Test as it passes through the PEs is the distance from the Test to the nearest Example found so far, along with information that indicates what PE (and thus what Example) yielded that nearest Example found so far. Each PE computes the distance between the Test and the Example stored in that PE's memory, and then passes along the Test together with either the distance and indicator that was passed into this PE (if the distance computed by this PE exceeded the distance passed into the PE) or the distance this PE computed along with information indicating this PE's Example is the nearest so far (if the distance computed by this PE is less than the distance passed into the PE). Thus, the algorithm is doing a simple minimization operation as the Test is passed through the set of PEs. When the Test and associated information leave the last PE, the output is a representation of which PE (and Example) was closest to the Test, along with the distance between that Example and the Test.

In a more efficient variant of this algorithm, the Test is first passed along, for example, the top row, then every column passes the Test and associated information downward, effectively doing a search in parallel with other columns, and once the information reaches the bottom it passes across the bottom row computing a minimum distance Example of all the columns processed so far as it passes across the row. This means that the time required to process the Test is proportional to (the greater of) the number of PEs in a row or column.

An enhancement of this algorithm proceeds as above but computes and passes along information indicating both the nearest and the second nearest Example found so far. When this information exits the array of PEs, the digital processor that is hosting the PE array computes (in high precision) the distance between the Test and the two Examples indicated by the PE array, and the nearer of the two is output as the likely nearest neighbor to the Test.

Accuracy.

We expressed the arithmetic performed by the enhanced algorithm described above as code in the C programming language. That code computes both nearest neighbors, which are discussed here, along with weighted scores, which are discussed below.

The C code performs the same set of arithmetic operations in the same order using the same methods of performing arithmetic as an actual implementation of the present invention, such as one implemented in hardware. It thus yields the same results as an enhanced algorithm would yield when running on an implementation of the present invention. (How the algorithm is organized to run efficiently on such an implementation is discussed below in the section on Efficiency.)

In particular, when computing the distance between the Test and each Example, the code uses Kahan's method, dis-

US 8,407,273 B2

19

20

cussed below, to perform the possibly long summation required to form the sum of the squares of the distances between vector components of the Test and Example.

The C code contains several implementations for arithmetic, as discussed above. When compiled with "#define fp" the arithmetic is done using IEEE standard floating point. If a command line argument is passed in to enable noisy arithmetic, then random noise is added to the result of every calculation. This is the "fp+noise" form of arithmetic. When compiled without "#define fp" the arithmetic is done using low precision logarithmic arithmetic with a 6 bit base-2 fraction. This is the "lns" form of arithmetic.

When the code was run it produced traces showing the results of the computations it performed. These traces, shown below, show that with certain command line arguments the enhanced algorithm yielded certain results for LPHDR nearest neighbor calculations. These results provide details showing the usefulness of this approach. We shall discuss the results briefly here.

The first results are for "fp+noise". Ten distinct runs were performed. Each run generated one million random Example vectors of length five, where each component of each vector was drawn from N(0,1)—the Gaussian (normal) distribution with mean zero and standard deviation 1. Each run then generated one hundred Test vectors of length five, where each component of each vector also was drawn from N(0,1). For each Test, the nearest neighbor was computed both according to the enhanced algorithm above and according to the standard nearest neighbor method using high precision floating point arithmetic. A count was kept of the number of times the enhanced algorithm yielded the same result as the standard floating point method. The results were as follows:

% ./a.out 5 10 1000000 100 1

Representation is Floating Point with noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.84% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.98% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.94% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.82% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.78% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.86% mean score error.

Run 9. On 100 tests, 100(100.0%) matches and 0.85% mean score error.

Run 10. On 100 tests, 99(99.0%) matches and 0.86% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.90%.

Average score error between LPHDR and DP=0.85%.

The "mean score error" values are considered below in the discussion of weighted scores. The "matches" information is relevant here.

Of the ten runs, only one had any test, of the 100 tests performed, which yielded a nearest neighbor different from what the usual high precision method yielded. Thus, the average percentage of matches between the enhanced algorithm running with "fp+noise" arithmetic and the usual method was 99.9%.

A similar computation was then performed using "lns" arithmetic. In this case, the results were:

% ./a.out 5 10 1000000 100 0

Representation is LNS without noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.15% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.08% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.09% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.11% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.16% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.13% mean score error.

Run 9. On 100 tests, 99(99.0%) matches and 0.17% mean score error.

Run 10. On 100 tests, 98(98.0%) matches and 0.16% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.70%.

Average score error between LPHDR and DP=0.12%.

The average percentage of matches was 99.7%, slightly worse than for "fp+noise".

The accuracy shown by the enhanced nearest neighbor algorithm using two forms of LPHDR arithmetic is surprising. To perform many calculations sequentially with 1% error and yet produce a final result with less than 1% error may seem counter-intuitive. Nonetheless, the LPHDR arithmetic proves effective, and the accuracy shown is high enough to be useful in applications for which approximate nearest neighbor calculations are useful.

As an extreme case, a variant of fp+noise was tested in which the noise varied uniformly from +10% to −5%. Thus, each arithmetic operation produced a result that was between 10% too large and 5% too small. The enhanced nearest neighbor algorithm, as described above, was performed where each run generated 100,000 Example vectors. The surprising results, below, show that even with this extreme level of imprecise, noisy, and non-zero mean LPHDR arithmetic, useful results can be achieved.

Run 1. On 100 tests, 97(97.0%) matches.

Run 2. On 100 tests, 100(100.0%) matches.

Run 3. On 100 tests, 100(100.0%) matches.

Run 4. On 100 tests, 98(98.0%) matches.

Run 5. On 100 tests, 98(98.0%) matches.

Run 6. On 100 tests, 99(99.0%) matches.

Run 7. On 100 tests, 99(99.0%) matches.

Run 8. On 100 tests, 99(99.0%) matches.

Run 9. On 100 tests, 99(99.0%) matches.

Run 10. On 100 tests, 99(99.0%) matches.

Average percentage of time LPHDR (with final DP correction) finds nearest example=98.80%.

Efficiency.

In contrast to the surprising Accuracy results, it is clear to those having ordinary skill in the art that the calculations of the enhanced nearest neighbor algorithm can be performed efficiently in the computing model presented, where the arithmetic/memory units are connected in a two-dimensional physical layout, using only local communication between

US 8,407,273 B2

21

PEs. However, this does not address the matter of keeping the machine busy doing useful work using only low bandwidth to the host machine.

When computing the nearest neighbor to a single Test, the Test flows across all the PEs in the array. As discussed above, if the array is an M×M grid, it takes at least O(M) steps for the Test to pass through the machine and return results to the host. During this time the machine performs O(M×M) nearest neighbor distance computations, but since the machine is capable of performing O(M×M) calculations at each step, a factor of O(M) is lost.

This speedup, compared to a serial machine, of a factor of O(M) is significant and useful. However, the efficiency can be even higher. If sufficiently many Test vectors, say O(M), or more, are to be processed then they can be streamed into the machine and made to flow through in a pipelined fashion. The time to process O(M) Tests remains O(M), the same as for a single Test, but now the machine performs O(M)×O(M×M) distance computations, and thus within a constant factor the full computing capacity of the machine is used.

Thus, the machine is especially efficient if it is processing at least as many Test vectors as the square root of the number of PEs. There are applications that fit well into this form, such as pattern recognition or compression of many independent Tests (e.g., blocks of an image, parts of a file, price histories of independent stocks) as well as the problem of finding the nearest neighbor to every Example in the set of Examples. This is in contrast to the general view among those having ordinary skill in the art, as discussed above, that machines with very many arithmetic processing elements on a single chip, or similar, are not very useful.

### Application 2

#### Distance Weighted Scoring

A task related to Nearest Neighbor is Distance Weighted Scoring. In this task, each Example has an associated Score. This is a number that in some way characterizes the Example. For instance, if the Examples are abstractions of the history of prices of a given stock, the Scores might be historical probabilities of whether the price is about to increase or decrease. Given a Test vector, the task is to form a weighted sum of the Scores of all the Examples, where the weights are a diminishing function of the distance from the Test to the respective Examples. For example, this weighted score might be taken as a prediction of the future price of the stock whose history is represented by the Test. This use of embodiments of the invention might help support, for instance, high speed trading of stocks, as is performed by certain "quantitative" hedge funds, despite the general view by those having ordinary skill in the art that low precision computation is not of use in financial applications.

The C code described above computes weighted scores along with nearest neighbors. The scores assigned to Examples in this computation are random numbers drawn uniformly from the range [0,1]. The weight for each Example in this computation is defined to be the un-normalized weight for the Example divided by the sum of the un-normalized weights for all Examples, where the un-normalized weight for each Example is defined to be the reciprocal of the sum of one plus the squared distance from the Example to the Test vector. As discussed above, the code performs a number of runs, each producing many Examples and Tests, and compares results of traditional floating point computations with results calculated using fp+noise and Ins arithmetic.

22

Looking again at the trace results of running the simulation, above, we see that for fp+noise the LPHDR weighted scores on average were within 0.85% of the correct value and never were as much as 1% different. For Ins arithmetic the errors were even smaller, averaging just 0.12% error.

These results are surprising given that computing an overall weighted score involves summing the individual weighted scores associated with each Example. Since each run was processing 1,000,000 Examples, this means that the sums were over one million small positive values. The naive method of summing one million small values with errors of about 1% in each addition should yield results that approximate noise. However, the code performs its sums using a long known method invented by Kahan (Kahan, William (January 1965), "Further remarks on reducing truncation errors", Communications of the ACM 8 (1): 40). The method makes it feasible to perform long sums, such as are done for Distance Weighted Scores, or as might be used in computational finance when computing prices of derivative securities using Monte Carlo methods, or for performing deconvolution in image processing algorithms, as will be discussed next.

The Efficiency of this algorithm is similar to that of NN, as discussed earlier. If many Test vectors are processed at once, the machine performs especially efficiently.

### Application 3

#### Removing Motion Blur in Images

In order to gather sufficient light to form an image, camera shutters are often left open for long enough that camera motion can cause blurring. This can happen as a result of camera shake in inexpensive consumer cameras as well as with very expensive but fast moving cameras mounted on satellites or aircraft. If the motion path of the camera is known (or can be computed) then the blur can be substantially removed using various deblurring algorithms. One such algorithm is the Richardson-Lucy method ("RL"), and we show here that embodiments of the present invention can run that algorithm and produce useful results. Following the discussion format above, we discuss criteria of Accuracy and Efficiency.

Algorithm.

The Richardson-Lucy algorithm is well known and widely available. Assume that an image has been blurred using a known kernel. In particular, assume that the kernel is a straight line and that the image has been oriented so that the blur has occurred purely in a horizontal direction. Consider the particular kernel for which the J'th pixel in each row of the blurred image is the uniformly weighted mean of pixels J through J+31 in the original unblurred image.

Accuracy.

We implemented in the C programming language a straightforward version of the RL method that uses LPHDR arithmetic. The program reads a test image, blurs it using the kernel discussed above, then deblurs it using either fp+noise or Ins arithmetic. The RL algorithm computes sums, such as when convolving the kernel with the current approximation of the deblurred image. Our implementation computes these sums using the Kahan method, discussed earlier. FIG. 7 shows the test image in original form. It is a satellite picture of a building used during Barack Obama's inauguration. FIG. 8 shows the image extremely blurred by the kernel. It is difficult to see any particular objects in this image. FIG. 9 shows the result of deblurring using standard floating point arithmetic. FIG. 10 shows the result of deblurring using fp+noise arithmetic, and FIG. 11 shows the result of deblurring using Ins

US 8,407,273 B2

**23**

arithmetic. In all these cases the image is sufficiently restored that it is possible to recognize buildings, streets, parking lots, and cars.

In addition to displaying the images herein for judgement using the human eye, we computed a numerical measure of deblurring performance. We computed the mean difference, over all pixels in the image, between each original pixel value (a gray scale value from 0 to 255) and the corresponding value in the image reconstructed by the RL method. Those numerical measures are shown below in Table 1:

TABLE 1

| Image type | Mean pixel error |
|---|---|
| Blurred | 32.0 |
| RL using standard floating point | 13.0 |
| RL using fp + noise | 13.8 |
| RL using lns | 14.8 |

These results, together with the subjective but important judgements made by the human eye, show that LPHDR arithmetic provides a substantial and useful degree of deblurring compared to standard floating point arithmetic. Further, in this example we chose an extreme degree of blurring, to better convey the concept and visual impact of the deblurring using LPHDR arithmetic. On more gentle and typical blur kernels, the resulting deblurred images are much closer to the originals than in this case, as can be seen by shrinking the kernel length and running the RL algorithm with LPHDR arithmetic on those more typical cases.

Efficiency.

It is clear to those with ordinary skill in the art that Richardson-Lucy using a local kernel performs only local computational operations. An image to be deblurred can be loaded into the PE array, storing one or more pixels per PE, the deconvolution operation of RL can then be iterated dozens or hundreds of times, and the deblurred image can be read back to the host processor. As long as sufficient iterations are performed, this makes efficient use of the machine.

An extreme form of image deblurring is the Iterative Reconstruction method used in computational tomography. Reconstructing 3D volumes from 2D projections is an extremely computational task. The method discussed above generalizes naturally to Iterative Reconstruction and makes efficient use of the machine.

Among the advantages of embodiments of the invention are one or more of the following.

PEs implemented according to certain embodiments of the present invention may be relatively small for PEs that can do arithmetic. This means that there are many PEs per unit of resource (e.g., transistor, area, volume), which in turn means that there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs. For instance, a digital embodiment of the present invention built as a large silicon chip fabricated with current state of the art technology might perform tens of thousand of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. These ratios reflect an architectural advantage of embodiments of the present invention that should persist as fabrication technology continues to improve, even as we reach nanotechnology or other implementations for digital and analog computing.

Doing arithmetic with few resources generally means, and in the embodiments shown specifically means, that the arithmetic is done using low power. As a result, a machine imple-

**24**

mented in accordance with embodiments of the present invention can have extremely high performance with reasonable power (for instance in the tens of watts) or low power (for instance a fraction of a watt) with reasonably high performance. This means that such embodiments may be suitable for the full range of computing, from supercomputers, through desktops, down to mobile computing. Similarly, and since cost is generally associated with the amount of available resources, embodiments of the present invention may provide a relatively high amount of computing power per unit of cost compared to conventional computing devices.

The SIMD architecture is rather old and is frequently discarded as an approach to computer design by those having ordinary skill in the art. However, if the processing elements of a SIMD machine can be made particularly small while retaining important functionality, such as general arithmetic ability, the architecture can be useful. The embodiments presented herein have precisely those qualities.

The discovery that massive amounts of LPHDR arithmetic is useful as a fairly general computing framework, as opposed to the common belief that it is not useful, can be an advantage in any (massively or non-massively) parallel machine design or non-parallel design, not just in SIMD embodiments. It could be used in FPGAs, FPAAs, GPU/SIMT machines, MIMD machines, and in any kind of machine that uses compact arithmetic processing elements to perform large amounts of computation using a small amount of resources (like transistors or volume).

Another advantage of embodiments of the present invention is that they are not merely useful for performing computations efficiently in general, but that they can be used to tackle a variety of real-world problems which are typically assumed to require high-precision computing elements, even though such embodiments include only (or predominantly) low-precision computing elements. Although several examples of such real-world problems have been presented herein, and although we have also had success implementing non-bonded force field computations for molecular dynamics simulation and other tasks, these are merely examples and do not constitute an exhaustive set of the real-world problems that embodiments of the present invention may be used to solve.

The embodiments disclosed above are merely examples and do not constitute limitations of the present invention. Rather, embodiments of the present invention may be implemented in a variety of other ways, such as the following.

For example, embodiments of the present invention may represent values in any of a variety of ways, such as by using digital or analog representations, such as fixed point, logarithmic, or floating point representations, voltages, currents, charges, pulse width, pulse density, frequency, probability, spikes, timing, or combinations thereof. These underlying representations may be used individually or in combination to represent the LPHDR values. LPHDR arithmetic circuits may be implemented in any of a variety of ways, such as by using various digital methods (which may be parallel or serial, pipelined or not) or analog methods or combinations thereof. Arithmetic elements may be connected using various connection architectures, such as nearest 4, nearest 8, hops of varying degree, and architectures which may or may not be rectangular or grid-like. Any method may be used for communication among arithmetic elements, such as parallel or serial, digital or analog or mixed-mode communication. Arithmetic elements may operate synchronously or asynchronously, and may operate globally simultaneously or not. Arithmetic elements may be implemented, for example, on a single physical device, such as a silicon chip, or spread across multiple

US 8,407,273 B2

25

26

devices and an embodiment built from multiple devices may have its arithmetic elements connected in a variety of ways, including for example being connected as a grid, torus, hypercube, tree, or other method. Arithmetic elements may be connected to a host machine, if any, in a variety of ways, depending on the cost and bandwidth and other requirements of a particular embodiment. For example there may be many host machines connected to the collection of arithmetic elements.

Although certain embodiments of the present invention are described as being implemented as a SIMD architecture, this is merely an example and does not constitute a limitation of the present invention. For example, embodiments of the present invention may be implemented as reconfigurable architectures, such as but not limited to programmable logic devices, field programmable analog arrays, or field programmable gate array architectures, such as a design in which existing multiplier blocks of an FPGA are replaced with or supplemented by LPHDR arithmetic elements of any of the kinds disclosed herein, or for example in which LPHDR elements are included in a new or existing reconfigurable device design. As another example, embodiments of the present invention may be implemented as a GPU or SIMT-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR elements could supplement or replace traditional arithmetic elements in current or new graphics processing unit designs. As yet another example, embodiments of the present invention may be implemented as a MIMD-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR arithmetic elements could supplement or replace traditional arithmetic elements in current or new MIMD computing systems designs. As yet another example, embodiments of the present invention may be implemented as any kind of machine, including a massively parallel machine, which uses compact arithmetic processing elements to provide large amounts of arithmetic computing capability using a small amount of resources (for example, transistors or area or volume) compared with traditional architectures.

Although certain embodiments of the present invention are described herein as executing software, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using microcode or a hardware sequencer or state machine or other controller to control LPHDR arithmetic elements of any of the kinds disclosed herein. Alternatively, for example, embodiments of the present invention may be implemented using hardwired, burned, or otherwise pre-programmed controllers to control LPHDR arithmetic elements of any of the kinds disclosed herein.

Although certain embodiments of the present invention are described herein as being implemented using custom silicon as the hardware, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using FPGA or other reconfigurable chips as the underlying hardware, in which the FPGAs or other reconfigurable chips are configured to perform the LPHDR operations disclosed herein. As another example, embodiments of the present invention may be implemented using any programmable conventional digital or analog computing architecture (including those which use high-precision computing elements, including those which use other kinds of non-LPHDR hardware to perform LPHDR arithmetic, and including those which are massively parallel) which has been programmed with software to perform the LPHDR operations disclosed herein. For example, embodiments of the present invention may be implemented using a software emulator of the functions disclosed herein.

As yet another example, embodiments of the present invention may be implemented using 3D fabrication technologies, whether based on silicon chips or otherwise. Some example embodiments are those in which a memory chip has been bonded onto a processor or other device chip or in which several memory and/or processor or other device chips have been bonded to each other in a stack. 3D embodiments of the present invention are very useful as they may be denser than 2D embodiments and may enable 3D communication of information between the processing units, which enables more algorithms to run efficiently on those embodiments compared to 2D embodiments.

Although certain embodiments of the present invention are described herein as being implemented using silicon chip fabrication technology, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using technologies that may enable other sorts of traditional digital and analog computing processors or other devices. Examples of such technologies include various nanomechanical and nanoelectronic technologies, chemistry based technologies such as for DNA computing, nanowire and nanotube based technologies, optical technologies, mechanical technologies, biological technologies, and other technologies whether based on transistors or not that are capable of implementing LPHDR architectures of the kinds disclosed herein.

Certain embodiments of the present invention have been described as "massively parallel" embodiments. Although certain embodiments of the present invention may include thousands, millions, or more arithmetic units, embodiments of the present invention may include any number of arithmetic units (as few as one). For example, even an embodiment which includes only a single LPHDR unit may be used within a serial processing unit or other device to provide a significant amount of LPHDR processing power in a small, inexpensive processor or other device.

For certain embodiments of the present invention, even if implemented using only digital techniques, the arithmetic operations may not yield deterministic, repeatable, or the most accurate possible results within the chosen low precision representation. For instance, on certain specific input values, an arithmetic operation may produce a result which is not the nearest value in the chosen representation to the true arithmetic result.

The degree of precision of a "low precision, high dynamic range" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, in certain embodiments, a LPHDR arithmetic element produces results which are sometimes (or all of the time) no closer than 0.05% to the correct result (that is, the absolute value of the difference between the produced result and the correct result is no more than one-twentieth of one percent of the absolute value of the correct result). As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.1% to the correct result. As another example, a LPHDR arithmetic element may produce results which are sometimes (or al of the time) no closer than 0.2% to the correct result. As yet another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than

US 8,407,273 B2

27                                                                                          28

0.5% to the correct result. As yet further examples, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 1%, or 2%, or 5%, or 10%, or 20% to the correct result.

Besides having various possible degrees of precision, implementations may vary in the dynamic range of the space of values they process. For example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one millionth to one million. As another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one billionth to one billion. As yet another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one sixty five thousandth to sixty five thousand. As yet further examples, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range from any specific value between zero and one sixty five thousandth up to any specific value greater than sixty five thousand. As yet further examples, other embodiments may process values in spaces with dynamic ranges that may combine and may fall between the prior examples, for example ranging from approximately one billionth to ten million. In all of these example embodiments of the present invention, as well as in other embodiments, the values that we are discussing may be signed, so that the above descriptions characterize the absolute values of the numbers being discussed.

The frequency with which LPHDR arithmetic elements may yield only approximations to correct results may vary from implementation to implementation. For example, consider an embodiment in which LPHDR arithmetic elements can perform one or more operations (perhaps including, for example, trigonometric functions), and for each operation the LPHDR elements each accept a set of inputs drawn from a range of valid values, and for each specific set of input values the LPHDR elements each produce one or more output values (for example, simultaneously computing both sin and cos of an input), and the output values produced for a specific set of inputs may be deterministic or non-deterministic. In such an example embodiment, consider further a fraction F of the valid inputs and a relative error amount E by which the result calculated by an LPHDR element may differ from the mathematically correct result. In certain embodiments of the present invention, for each LPHDR arithmetic element, for at least one operation that the LPHDR unit is capable of performing, for at least fraction F of the possible valid inputs to that operation, for at least one output signal produced by that operation, the statistical mean, over repeated execution, of the numerical values represented by that output signal of the LPHDR unit, when executing that operation on each of those respective inputs, differs by at least E from the result of an exact mathematical calculation of the operation on those same input values, where F is 1% and E is 0.05%. In several other example embodiments, F is not 1% but instead is one of 2%, or 5%, or 10%, or 20%, or 50%. For each of these example embodiments, each with some specific value for F, there are other example embodiments in which E is not 0.05% but instead is 0.1%, or 0.2%, or 0.5%, or 1%, or 2%, or 5%, or 10%, or 20%. These varied embodiments are merely examples and do not constitute limitations of the present invention.

For certain devices (such as computers or processors or other devices) embodied according the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits). If NL is the total number of LPHDR elements in such a device, and NH is the total number of elements in the device which are designed to perform high dynamic range arithmetic of traditional precision, then NL exceeds T(NH), where TO is some function. Any of a variety of functions may be used as the function TO. For example, in certain embodiments, T(NH) may be twenty plus three times NH, and the number of LPHDR arithmetic elements in the device may exceed twenty more than three times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed fifty more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one hundred more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed five thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. Certain embodiments of the present invention may be implemented within a single physical device, such as but not limited to a silicon chip or a chip stack or a chip package or a circuit board, and the number NL of LPHDR elements in the physical device and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the physical device may be the total counts of the respective elements within that physical device. Certain embodiments of the present invention may be implemented in a computing system including more than one physical device, such as but not limited to a collection of silicon chips or chip stacks or chip packages or circuit boards coupled to and communicating with each other using any means (such as a bus, switch, any kind of network connection, or other means of communication), and in this case the number NL of LPHDR elements in the computing system and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the computing system may be the total counts of the respective elements within all those physical devices jointly.

Certain embodiments of the present invention may constitute, or may be part of, processors, which are devices capable of executing software to perform computations. Such processors may include mechanisms for storing software, for using the software to determine what operations to perform, for performing those operations, for storing numerical data, for modifying data according to the software specified operations, and for communicating with devices connected to the processor. Processors may be reconfigurable devices, such as, without limitation, field programmable arrays. Processors may be co-processors to assist host machines or may be capable of operating independently of an external host. Processors may be formed as a collection of component host processors and co-processors of various types, such as CPUs, GPUs, FPGAs, or other processors or other devices, which in

US 8,407,273 B2

29

the art may be referred to as a heterogeneous processor design or heterogeneous computing system, some or all of which components might incorporate the same or distinct varieties of embodiments of the present invention.

Embodiments of the present invention may, however, be implemented in devices in addition to or other than processors. For example, a computer including a processor and other components (such as memory coupled to the processor by a data path), wherein the processor includes components for performing LPHDR operations in any of the ways disclosed herein, is an example of an embodiment of the present invention. More generally, any device or combination of devices, whether or not falling within the meaning of a "processor," which performs the functions disclosed herein may constitute an example of an embodiment of the present invention.

More generally, any of the techniques described above may be implemented, for example, in hardware, software tangibly stored on a computer-readable medium, firmware, or any combination thereof. The techniques described above may be implemented in one or more computer programs executing on a programmable computer including a processor, a storage medium readable by the processor (including, for example, volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. Program code may be applied to input entered using the input device to perform the functions described and to generate output. The output may be provided to one or more output devices.

Each computer program within the scope of the claims below may be implemented in any programming language, such as assembly language, machine language, a high-level procedural programming language, or an object-oriented programming language. The programming language may, for example, be a compiled or interpreted programming language.

Each such computer program may be implemented in a computer program product tangibly embodied in a machine-readable storage device for execution by a computer processor. Method steps of the invention may be performed by a computer processor executing a program tangibly embodied on a computer-readable medium to perform functions of the invention by operating on input and generating output. Suitable processors include, by way of example, both general and special purpose microprocessors. Generally, the processor receives instructions and data from a read-only memory and/or a random access memory. Storage devices suitable for tangibly embodying computer program instructions include, for example, all forms of non-volatile memory, such as semiconductor memory devices, including EPROM, EEPROM, and flash memory devices; magnetic disks such as internal hard disks and removable disks; magneto-optical disks; and CD-ROMs. Any of the foregoing may be supplemented by, or incorporated in, specially-designed ASICs (application-specific integrated circuits) or FPGAs (Field-Programmable Gate Arrays). A computer can generally also receive programs and data from a storage medium such as an internal disk (not shown) or a removable disk. These elements will also be found in a conventional desktop or workstation computer as well as other computers suitable for executing computer programs implementing the methods described herein, which may be used in conjunction with any digital print engine or marking engine, display monitor, or other raster output device capable of producing color or gray scale pixels on paper, film, display screen, or other output medium.

The invention claimed is:

**1**. A device:

comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first

30

operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**2**. The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**3**. The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**4**. The device of claim **3**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**5**. The device of claim **1**, wherein the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**6**. The device of claim **5**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**7**. The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least one hundred LPHDR execution units.

**8**. The device of claim **1**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**9**. The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least five hundred LPHDR execution units.

**10**. The device of claim **1**, wherein the number of LPHDR execution units in the device exceeds by at least five hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**11**. The device of claim **8**, wherein X=10%.

**12**. The device of claim **8**, wherein Y=0.1%.

**13**. The device of claim **8**, wherein Y=0.15%.

**14**. The device of claim **8**, wherein Y=0.2%.

**15**. The device of claim **8**, wherein X=10% and wherein Y=0.1%.

**16**. The device of claim **8**, wherein X=10% and wherein Y=0.15%.

**17**. The device of claim **8**, wherein X=10% and wherein Y=0.2%.

**18**. The device of claim **8**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**19**. The device of claim **1**, wherein the at least one first LPHDR execution unit comprises a plurality of locally connected LPHDR execution units.

**20**. The device of claim **1**, wherein the device has a SIMD architecture.

**21**. The device of claim **1**, wherein the device includes memory locally accessible to the at least one first LPHDR execution unit.

US 8,407,273 B2

31

**22**. The device of claim **1**, wherein the device is implemented on a silicon chip.

**23**. The device of claim **1**, wherein the device is implemented on a silicon chip using digital technology.

**24**. The device of claim **1**, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit.

**25**. The device of claim **1**, wherein the at least one LPHDR execution unit comprises at least five hundred locally connected LPHDR execution units, wherein the device includes memory locally accessible to at least one of the LPHDR execution units, and wherein the device is implemented on a silicon chip using digital technology.

**26**. The device of claim **1**, wherein the device is part of a mobile device.

**27**. The device of claim **1**, wherein the at least one first LPHDR execution unit represents numbers using a logarithmic representation.

**28**. The device of claim **1**, wherein the at least one first LPHDR execution unit represents numbers using a floating point representation.

**29**. The device of claim **1**:
wherein the device further comprises input means for receiving data representing an input image; and
wherein the input image includes the first input signal.

**30**. The device of claim **29**, wherein the device is part of a mobile device.

**31**. The device of claim **29**, wherein the device is adapted to deblur the input image.

**32**. The device of claim **1**, wherein the device is adapted to perform nearest neighbor search.

**33**. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:
at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;
wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**34**. The device of claim **33**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**35**. The device of claim **33**, wherein the number of LPHDR execution units in the second device exceeds by at least ten the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**36**. A device:
comprising at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

32

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;
wherein the number of LPHDR execution units in the device exceeds the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**37**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**38**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**39**. The device of claim **38**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**40**. The device of claim **36**, wherein the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**41**. The device of claim **40**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**42**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least one hundred LPHDR execution units.

**43**. The device of claim **36**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**44**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least five hundred LPHDR execution units.

**45**. The device of claim **36**, wherein the number of LPHDR execution units in the device exceeds by at least five hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**46**. The device of claim **43**, wherein X=10%.

**47**. The device of claim **43**, wherein Y=0.1%.

**48**. The device of claim **43**, wherein Y=0.15%.

**49**. The device of claim **43**, wherein Y=0.2%.

**50**. The device of claim **43**, wherein X=10% and wherein Y=0.1%.

**51**. The device of claim **43**, wherein X=10% and wherein Y=0.15%.

**52**. The device of claim **43**, wherein X=10% and wherein Y=0.2%.

**53**. The device of claim **43**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**54**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises a plurality of locally connected LPHDR execution units.

**55**. The device of claim **36**, wherein the device has a SIMD architecture.

US 8,407,273 B2

33

**56**. The device of claim **36**, wherein the device includes memory locally accessible to the at least one first LPHDR execution unit.

**57**. The device of claim **36**, wherein the device is implemented on a silicon chip.

**58**. The device of claim **36**, wherein the device is implemented on a silicon chip using digital technology.

**59**. The device of claim **36**, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit.

**60**. The device of claim **36**, wherein the at least one LPHDR execution unit comprises at least five hundred locally connected LPHDR execution units, wherein the device includes memory locally accessible to at least one of the LPHDR execution units, and wherein the device is implemented on a silicon chip using digital technology.

**61**. The device of claim **36**, wherein the device is part of a mobile device.

**62**. The device of claim **36**, wherein the at least one first LPHDR execution unit represents numbers using a logarithmic representation.

**63**. The device of claim **36**, wherein the at least one first LPHDR execution unit represents numbers using a floating point representation.

**64**. The device of claim **36**:

wherein the device further comprises input means for receiving data representing an input image; and

wherein the input image includes the first input signal.

**65**. The device of claim **64**, wherein the device is part of a mobile device.

**66**. The device of claim **64**, wherein the device is adapted to deblur the input image.

**67**. The device of claim **36**, wherein the device is adapted to perform nearest neighbor search.

34

**68**. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least 5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least 5% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least 0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;

wherein the number of LPHDR execution units in the second device exceeds the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**69**. The device of claim **68**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**70**. The device of claim **68**, wherein the number of LPHDR execution units in the second device exceeds by at least ten the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

*  *  *  *  *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2022-1866, 2022-1867, 2022-1868, 2022-2013, 2022-2014, 2022-2015

**Short Case Caption:** Google LLC v. Singular Computing LLC

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda.  *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___zero (0)___ number of unique words (including numbers) marked confidential.

☑  This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑  This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐  This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date:  09/21/2022

Signature:  /s/ Nathan R. Speed

Name:  Nathan R. Speed

# CERTIFICATE OF SERVICE AND FILING

I hereby certify that a true and correct copy of the foregoing **Principal Brief for Appellant (confidential and non-confidential versions)** has been electronically filed with the Clerk of Court using the CM/ECF system, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including counsel for Cross-Appellant:

Peter Lambrianakos
FABRICANT LLP
411 Theodore Fremd Avenue,
Suite 206
Rye, NY 10580
plambrianakos@fabricantllp.com

Richard M. Cowell
FABRICANT LLP
411 Theodore Fremd Avenue,
Suite 206
Rye, NY 10580
rcowell@fabricantllp.com

Additionally, confidential copies will be served via e-mail only to counsel for Cross-Appellant on this 21st day of September 2022.  Counsel for Cross-Appellant has consented in writing to electronic service via e-mail pursuant to Fed. R. App. P. 25(c)(2) and Fed. Cir. R. 25(e)(4).

Date: September 21, 2022

/s/ Nathan R. Speed
Nathan R. Speed
WOLF GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA  02210
Telephone: (617) 646-8000
Fax: (617) 646-8646
nspeed@wolfgreenfield.com
*Counsel for Appellant Google, LLC*

## CERTIFICATE OF COMPLIANCE

The Principal Brief of Appellant complies with the length limits set forth in Fed. Cir. R. 32(a). Specifically, this brief contains 13,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b), as determined by the word count feature of the word processing program used to create the brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using a proportionally spaced typeface using Microsoft Word for Microsoft Office 365, 14-point Times New Roman font.

Date: September 21, 2022    */s/ Nathan R. Speed*
                                        Nathan R. Speed