**2022-1866, 2022-1867, 2022-1868**
**VOLUME I OF III; APPX00001-APPX01339**

# United States Court of Appeals
# for the Federal Circuit

### GOOGLE LLC,
*Appellant*

v.

### SINGULAR COMPUTING LLC,
*Appellee*

**Appeals from the United States Patent and Trademark Office,**
**Patent Trial and Appeal Board in Case Nos.**
**IPR2021-00155, IPR2021-00165, and IPR2021-00179**

### NON-CONFIDENTIAL JOINT APPENDIX

Alfred R. Fabricant
Peter Lambrianakos
Vincent J. Rubino, III
Richard M. Cowell
FABRICANT LLP
411 Theodore Fremd Ave.
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797

James J. Foster
PRINCE LOBEL TYE LLP
One International Place
Suite 3700
Boston, MA 02110
(617) 456-8000

Nathan R. Speed
Gregory F. Corbett
Elisabeth H. Hunt
Anant K. Saraswat
WOLF GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 646-8000

Eugene M. Paige
KEKER, VAN NEST & PETERS LLP
633 Battery St.
San Francisco, CA 94111
(415) 391-5400

Asim Bhansali
Michael Kwun
KWUN, BHANSALI, LAZARUS LLP
555 Montgomery St., Suite 750
San Francisco, CA 94111
(415) 630-2350

*Counsel for Appellee Singular Computing LLC*

*Counsel for Appellant Google LLC*

## TABLE OF CONTENTS

### NON-CONFIDENTIAL JOINT APPENDIX VOLUME I

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00155) | Appx1-88 |
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00165) | Appx89-173 |
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00179) | Appx174-260 |
| 9/17/2019 | Exhibit 1001 | U.S. Patent 10,416,961 (IPR2021-00155) | Appx261-290 |
| 12/22/2015 | Exhibit 1001 | U.S. Patent 9,218,156 (IPR2021-00165) | Appx291-319 |
| 3/26/2013 | Exhibit 1001 | U.S. Patent 8,407,273 (IPR2021-00179) | Appx320-348 |
| 7/15/2022 | | Notice Forwarding Certified Lists (IPR-2021-00155, 00165 and 00179) | Appx349-356 Appx453-456 Appx550-553 |
| 10/30/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00155) | Appx652 Appx669 Appx673-723 |
| 10/30/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00155) | Appx1039 Appx1057-1062 Appx1161 Appx1230 Appx1271-1273 Appx1275-1280 Appx1291-1292 Appx1298-1305 Appx1339 |

### NON-CONFIDENTIAL JOINT APPENDIX VOLUME II

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 10/30/2020 | Exhibit 1007 | U.S. Patent Application Published No. 2007/0203967 ("Dockser") | Appx1465-1475 |
| 10/30/2020 | Exhibit 1008 | Tong et. al, Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic, Vol. 8, No. 3, June 2000 | Appx1476-1489 |
| 10/30/2020 | Exhibit 1009 | U.S. Patent No. 5,689,677 ("MacMillan") | Appx1490-1504 |

| 10/30/2020 | Exhibit 1010 | U.S. Patent Application Published No. 2007/0266071 ("Dockser-Lall") | Appx1505-1514 |
|---|---|---|---|
| 5/12/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00155) | Appx3972-4010 |
| 7/5/2021 | Exhibit 2002 | Exhibit 2002 (Sealed) | Appx4049 Appx4051-4059 |
| 7/5/2021 | Exhibit 2003 | Exhibit 2003 (Sealed) | Appx4061 |
| 7/5/2021 | Exhibit 2004 | Exhibit 2004 (Sealed) | Appx4081 Appx4086 |
| 7/5/2021 | Exhibit 2005 | Exhibit 2005 (Sealed) | Appx4094 Appx4098 |
| 7/5/2021 | Exhibit 2006 | Exhibit 2006 (Sealed) | Appx4113 |
| 7/5/2021 | Exhibit 2007 | Exhibit 2007 (Sealed) | Appx4131 |
| 7/5/2021 | Exhibit 2009 | Exhibit 2009 (Sealed) | Appx4161 |
| 7/6/2021 | Exhibit 2011 | The Deep Learning Revolution and Its Implications for Computer Architecture and Chip Design - Jeff Dean 2020 - 1911.05289 | Appx4182 |
| 7/6/2021 | Exhibit 2014 | Exhibit 2014 (Sealed) | Appx4286 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx4578 Appx4616-4627 Appx4629-4632 Appx4635-4660 |
| 8/9/2021 | Exhibit 2026 | Exhibit 2026 (Sealed) | Appx4671 |
| 8/9/2021 | Exhibit 2027 | Exhibit 2027 (Sealed) | Appx4673 |
| 8/9/2021 | Exhibit 2028 | Exhibit 2028 (Sealed) | Appx4676 |
| 8/9/2021 | Exhibit 2029 | Exhibit 2029 (Sealed) | Appx4678 |
| 8/9/2021 | Exhibit 2030 | Exhibit 2030 (Sealed) | Appx4682 |
| 8/9/2021 | Exhibit 2031 | Exhibit 2031 (Sealed) | Appx4687 |
| 8/9/2021 | Exhibit 2032 | Exhibit 2032 (Sealed) | Appx4688 |
| 8/9/2021 | Exhibit 2033 | Exhibit 2033 (Sealed) | Appx4689-4690 |
| 8/9/2021 | Exhibit 2034 | Google AI with Jeff Dean | Appx4691 Appx4696 |
| 8/9/2021 | Exhibit 2035 | Exhibit 2035 (Sealed) | Appx4706 |
| 8/9/2021 | Exhibit 2036 | Exhibit 2036 (Sealed) | Appx4709 |
| 8/9/2021 | Exhibit 2037 | Build and Train Machine Learning Models on Our New Google Cloud TPUs | Appx4713 |

| | | | |
|---|---|---|---|
| 8/9/2021 | Exhibit 2038 | Google's Scalable Supercomputers for Machine Learning, Cloud TPU Pods, are Now Publicly Available in Beta | Appx4716 |
| 8/9/2021 | Exhibit 2039 | Exhibit 2039 (Sealed) | Appx4718 |
| 8/9/2021 | Exhibit 2042 | Exhibit 2042 (Sealed) | Appx4730 |
| 8/9/2021 | Exhibit 2043 | Deposition of Richard M. Goodin, dated July 30, 2021 | Appx4732-4733 Appx4739-4743 Appx4746 Appx4749-4750 |
| 8/9/2021 | Exhibit 2049 | Belletti, et al., Tensor Processing Units for Financial Monte Carlo | Appx4939 |
| 8/9/2021 | Exhibit 2050 | Exhibit 2050 (Sealed) | Appx4949 |
| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D. (Confidential Protective Order Material (IPR2021-00155) (Sealed) | Appx4950 Appx4963-4973 Appx4985-4986 Appx4988-4989 Appx4992-4993 Appx4996-4998 Appx5001 Appx5004-5014 Appx5016 |
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx5031 Appx5044 Appx5051-5058 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IPR2021-00155) | Appx5082 Appx5112 Appx5115-5116 Appx5131-5134 Appx5136-5138 Appx5153 Appx5174 |
| 11/1/2021 | Exhibit 1072 | Transcript of October 21, 2021, Deposition of Sunil P. Khatri (IPR2021-00155, IPR2021-00165 and IPR2021-00179) | Appx5178-5180 Appx5212 Appx5316-5318 |
| 11/1/2021 | Exhibit 1076 | Cooper, K.D., Code Optimization for Embedded Systems, Air Force Research Laboratory ("Cooper") | Appx5459 Appx5464 Appx5468 |
| 11/1/2021 | Exhibit 1077 | Lienhart et. al, Proceedings of the 10th Annual IEEE Symposium on Field-Programmable Custom | Appx5478 |

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
|  |  | Computing Machines, 2002 ("Lienhart") |  |
| 11/1/2021 | Exhibit 1078 | Fang et. al, Proceedings of the 2003 Design Automation Conference, 2003 ("Fang") | Appx5488 |
| 11/1/2021 | Exhibit 1097 | U.S. Patent No. 7,921,425 ("Miner") | Appx5913-5928 |
| 12/13/2021 | Paper No. 38 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx5933 Appx5946-5952 Appx5955-5956 |
| 2/8/2022 | Exhibit 1098 | Petitioner's Demonstrative Exhibits (Confidential Protective Order Material) (IPR2021-00155, IPR2021-00165, IPR2021-00179) (Sealed) | Appx6066 Appx6086 |
| 4/6/2022 | Paper No. 56 | February 11, 2022 Hearing Transcript (Part 2: Public Redacted Version) (IPR2021-00155, IPR2021-00165, IPR2021-00179) | Appx6165-6166 Appx6184 Appx6206-6209 |
| 6/2/2022 | Paper No. 63 | Petitioner's Notice of Appeal (IPR2021-00155) | Appx6247-6248 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00155) | Appx6351-6355 |

## NON-CONFIDENTIAL JOINT APPENDIX VOLUME III

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 11/5/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00165) | Appx6359 Appx6376 Appx6379-6430 Appx6442 |
| 11/5/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00165) | Appx6893 Appx6911-6916 Appx7120-7122 Appx7124-7129 Appx7140-7141 Appx7152-7159 Appx7194 |
| 5/13/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00165) | Appx7661-7702 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00165) (Sealed) | Appx7778 Appx7816-7828 Appx7830-7833 Appx7836-7862 |

4

| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D. (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx7873<br>Appx7886-7896<br>Appx7908-7909<br>Appx7911-7912<br>Appx7915-7916<br>Appx7919-7921<br>Appx7924<br>Appx7927-7938 |
|---|---|---|---|
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner Response (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx7953<br>Appx7966<br>Appx7973-7980 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IPR2021-00165) | Appx8004<br>Appx8034<br>Appx8037-8038<br>Appx8053-8056<br>Appx8058-8060<br>Appx8075-8080<br>Appx8096 |
| 12/13/2021 | Paper No. 38 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx8103<br>Appx8116-8122<br>Appx8126 |
| 6/2/2022 | Paper No. 63 | Petitioner's Notice of Appeal (IPR2021-00165) | Appx8229-8230 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00165) | Appx8326-8330 |
| 11/6/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00179) | Appx8334<br>Appx8350<br>Appx8353-8406 |
| 11/6/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00179) | Appx8633<br>Appx8653-8658<br>Appx8879-8881<br>Appx8883-8888<br>Appx8896-8897<br>Appx8922-8929<br>Appx8963 |
| 5/14/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00179) | Appx9442-9482 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00179) (Sealed) | Appx9558<br>Appx9595-9606<br>Appx9608-9611<br>Appx9614-9640 |
| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D (Confidential Protective Order Material) (IPR2021-00179) (Sealed) | Appx9651<br>Appx9664-9674<br>Appx9686-9687<br>Appx9689-9690<br>Appx9693-9694<br>Appx9696-9699<br>Appx9702-9715 |

| | | | Appx9717 |
|---|---|---|---|
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner Response (Confidential Protective Order Material (IPR2021-00179) (Sealed) | Appx9732 Appx9745 Appx9752-9759 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IRP2021-00179) | Appx9783 Appx9813 Appx9816-9817 Appx9832-9835 Appx9837-9839 Appx9854-9859 Appx9875 |
| 12/13/2021 | Paper No. 39 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material (IPR2021-00179) (Sealed) | Appx9893 Appx9906-9913 Appx9916 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00179) | Appx10118-10120 |

## CONFIDENTIAL MATERIAL OMITTED

The material redacted from this joint appendix on pages Appx38-43, Appx49, Appx126-131, Appx137, Appx211-216, Appx223, Appx4636-4645, Appx4647-4649, Appx5001, Appx5955-5956, Appx7837-7846, Appx7848-7850, Appx7924, Appx8126, Appx9615-9624, Appx9626-9628, Appx9702-9703 and Appx9916 is subject to a protective order issued by the Patent Trial and Appeal Board in IPR2021-00155, IPR2021-00165, and IPR2021-00179.  The redacted material includes confidential e-mails and PowerPoint presentations that are subject to a non-disclosure agreement as well as quotes of those documents that appear in the parties' filings and expert declarations.  All of the redacted material was filed under seal at the Patent Trial and Appeal Board.

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————————————————————————————

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 10,416,961
Filing Date: October 30, 2018
Issue Date: September 17, 2019

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

———————————————————————————————————————

**DEFAULT PROTECTIVE ORDER**

Case No. IPR2021-00155

———————————————————————————————————————

IPR2021-00155
PATENT NO. 10,416,961

The following Default Protective Order will govern the filing and treatment of confidential information in the proceeding:

## Default Protective Order

This protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Confidential information shall be clearly marked "PROTECTIVE ORDER MATERIAL."

2. Access to confidential information is limited to the following individuals who have executed the acknowledgment appended to this order:

(A) <u>Parties</u>. Persons who are owners of a patent involved in the proceeding and other persons who are named parties to the proceeding.

(B) <u>Party Representatives</u>. Representatives of record for a party in the proceeding.

(C) <u>Experts</u>. Retained experts of a party in the proceeding who further certify in the Acknowledgement that they are not a competitor to any party, or a consultant for, or employed by, such a competitor with respect to the subject matter of the proceeding.

(D) <u>In-house counsel</u>. In-house counsel of a party.

1

(E) Support Personnel. Administrative assistants, clerical staff, court reporters and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding shall not be required to sign an Acknowledgement, but shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives confidential information.

(F) The Office. Employees and representatives of the United States Patent and Trademark Office who have a need for access to the confidential information shall have such access without the requirement to sign an Acknowledgement. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.

3. Employees (e.g., corporate officers), consultants, or other persons performing work for a party, other than those persons identified above in (d)(2)(A)–(E), shall be extended access to confidential information only upon agreement of the parties or by order of the Board upon a motion brought by the party seeking to disclose confidential information to that person and after signing the Acknowledgment. The party opposing disclosure to that person shall have the

2

burden of proving that such person should be restricted from access to confidential

information.

4. Persons receiving confidential information shall use reasonable efforts to

maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not

authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the

information, which efforts shall be no less rigorous than those the recipient

uses to maintain the confidentiality of information not received from the

disclosing party;

(C) Ensuring that support personnel of the recipient who have access to the

confidential information understand and abide by the obligation to maintain

the confidentiality of information received that is designated as confidential;

and

(D) Limiting the copying of confidential information to a reasonable number

of copies needed for conduct of the proceeding and maintaining a record of

the locations of such copies.

Singular's Exhibit No. 2024, IPR2021-00155
Page 004

5. Persons receiving confidential information shall use the following procedures to maintain the confidentiality of the information:

(A) <u>Documents and Information Filed With the Board</u>.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The documents or information shall remain under seal unless the Board determines that some or all of it does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed

4

under seal. The redacted information shall remain under seal unless the

Board determines that some or all of the redacted information does not

qualify for confidential treatment.

(B) Documents and Information Exchanged Among the Parties. Documents

(including deposition transcripts) and other information designated as

confidential that are disclosed to another party during discovery or other

proceedings before the Board shall be clearly marked as "PROTECTIVE

ORDER MATERIAL" and shall be produced in a manner that maintains its

confidentiality.

6. Within 60 days after the final disposition of this action, including the

exhaustion of all appeals and motions, each party receiving confidential

information must return, or certify the destruction of, all copies of the confidential

information to the producing party.

(k) Standard Acknowledgement of Protective Order. The following form

may be used to acknowledge a protective order and gain access to information

covered by the protective order:

5

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 10,416,961
Filing Date: October 30, 2018
Issue Date: September 17, 2019

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____

**STANDARD ACKNOWLEDGMENT FOR ACCESS TO PROTECTIVE
ORDER MATERIAL**

Case No. IPR2021-00155

_____

6

**Standard Acknowledgment for Access to Protective Order Material**

I _____, affirm

that I have read the Protective Order; that I will abide by its terms;

that I will use the confidential information only in connection with

this proceeding and for no other purpose; that I will only allow access

to support staff who are reasonably necessary to assist me in this

proceeding; that prior to any disclosure to such support staff I

informed or will inform them of the requirements of the Protective

Order; that I am personally responsible for the requirements of the

terms of the Protective Order and I agree to submit to the jurisdiction

of the Office and the United States District Court for the Eastern

District of Virginia for purposes of enforcing the terms of the

Protective Order and providing remedies for its breach.


_____

[Signature]

7

IPR2021-00165
PATENT NO. 9,218,156

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____


GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.


Patent No. 9,218,156
Filing Date: March 25, 2013
Issue Date: December 22, 2015

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____


**DEFAULT PROTECTIVE ORDER**

Case No. IPR2021-00165

_____

The following Default Protective Order will govern the filing and treatment of confidential information in the proceeding:

## Default Protective Order

This protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Confidential information shall be clearly marked "PROTECTIVE ORDER MATERIAL."


2. Access to confidential information is limited to the following individuals who have executed the acknowledgment appended to this order:

(A) <u>Parties</u>. Persons who are owners of a patent involved in the proceeding and other persons who are named parties to the proceeding.

(B) <u>Party Representatives</u>. Representatives of record for a party in the proceeding.

(C) <u>Experts</u>. Retained experts of a party in the proceeding who further certify in the Acknowledgement that they are not a competitor to any party, or a consultant for, or employed by, such a competitor with respect to the subject matter of the proceeding.

(D) <u>In-house counsel</u>. In-house counsel of a party.

1

(E) <u>Support Personnel</u>. Administrative assistants, clerical staff, court reporters and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding shall not be required to sign an Acknowledgement, but shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives confidential information.

(F) <u>The Office</u>. Employees and representatives of the United States Patent and Trademark Office who have a need for access to the confidential information shall have such access without the requirement to sign an Acknowledgement. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.


3. Employees (e.g., corporate officers), consultants, or other persons performing work for a party, other than those persons identified above in (d)(2)(A)–(E), shall be extended access to confidential information only upon agreement of the parties or by order of the Board upon a motion brought by the party seeking to disclose confidential information to that person and after signing the Acknowledgment. The party opposing disclosure to that person shall have the

2

burden of proving that such person should be restricted from access to confidential information.

4. Persons receiving confidential information shall use reasonable efforts to maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the information, which efforts shall be no less rigorous than those the recipient uses to maintain the confidentiality of information not received from the disclosing party;

(C) Ensuring that support personnel of the recipient who have access to the confidential information understand and abide by the obligation to maintain the confidentiality of information received that is designated as confidential; and

(D) Limiting the copying of confidential information to a reasonable number of copies needed for conduct of the proceeding and maintaining a record of the locations of such copies.

5. Persons receiving confidential information shall use the following procedures to maintain the confidentiality of the information:

(A) <u>Documents and Information Filed With the Board</u>.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The documents or information shall remain under seal unless the Board determines that some or all of it does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed

4

under seal. The redacted information shall remain under seal unless the

Board determines that some or all of the redacted information does not

qualify for confidential treatment.

(B) Documents and Information Exchanged Among the Parties. Documents

(including deposition transcripts) and other information designated as

confidential that are disclosed to another party during discovery or other

proceedings before the Board shall be clearly marked as "PROTECTIVE

ORDER MATERIAL" and shall be produced in a manner that maintains its

confidentiality.


6. Within 60 days after the final disposition of this action, including the

exhaustion of all appeals and motions, each party receiving confidential

information must return, or certify the destruction of, all copies of the confidential

information to the producing party.


(k) Standard Acknowledgement of Protective Order. The following form

may be used to acknowledge a protective order and gain access to information

covered by the protective order:


5

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 9,218,156
Filing Date: March 25, 2013
Issue Date: December 22, 2015

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____

**STANDARD ACKNOWLEDGMENT FOR ACCESS TO PROTECTIVE
ORDER MATERIAL**

Case No. IPR2021-00165

_____

6

**Standard Acknowledgment for Access to Protective Order Material**

I _____, affirm

that I have read the Protective Order; that I will abide by its terms;

that I will use the confidential information only in connection with

this proceeding and for no other purpose; that I will only allow access

to support staff who are reasonably necessary to assist me in this

proceeding; that prior to any disclosure to such support staff I

informed or will inform them of the requirements of the Protective

Order; that I am personally responsible for the requirements of the

terms of the Protective Order and I agree to submit to the jurisdiction

of the Office and the United States District Court for the Eastern

District of Virginia for purposes of enforcing the terms of the

Protective Order and providing remedies for its breach.

_____
[Signature]

7

IPR2021-00179
PATENT NO. 8,407,273

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 8,407,273
Filing Date: February 17, 2012
Issue Date: March 26, 2013

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____

**DEFAULT PROTECTIVE ORDER**

Case No. IPR2021-00179

_____

Singular's Exhibit No. 2024, IPR2021-00179
Page 001

The following Default Protective Order will govern the filing and treatment of confidential information in the proceeding:

## Default Protective Order

This protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Confidential information shall be clearly marked "PROTECTIVE ORDER MATERIAL."


2. Access to confidential information is limited to the following individuals who have executed the acknowledgment appended to this order:

(A) <u>Parties</u>. Persons who are owners of a patent involved in the proceeding and other persons who are named parties to the proceeding.

(B) <u>Party Representatives</u>. Representatives of record for a party in the proceeding.

(C) <u>Experts</u>. Retained experts of a party in the proceeding who further certify in the Acknowledgement that they are not a competitor to any party, or a consultant for, or employed by, such a competitor with respect to the subject matter of the proceeding.

(D) <u>In-house counsel</u>. In-house counsel of a party.

1

(E) <u>Support Personnel</u>. Administrative assistants, clerical staff, court reporters and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding shall not be required to sign an Acknowledgement, but shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives confidential information.

(F) <u>The Office</u>. Employees and representatives of the United States Patent and Trademark Office who have a need for access to the confidential information shall have such access without the requirement to sign an Acknowledgement. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.

3. Employees (e.g., corporate officers), consultants, or other persons performing work for a party, other than those persons identified above in (d)(2)(A)–(E), shall be extended access to confidential information only upon agreement of the parties or by order of the Board upon a motion brought by the party seeking to disclose confidential information to that person and after signing the Acknowledgment. The party opposing disclosure to that person shall have the

2

burden of proving that such person should be restricted from access to confidential information.

4. Persons receiving confidential information shall use reasonable efforts to maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the information, which efforts shall be no less rigorous than those the recipient uses to maintain the confidentiality of information not received from the disclosing party;

(C) Ensuring that support personnel of the recipient who have access to the confidential information understand and abide by the obligation to maintain the confidentiality of information received that is designated as confidential; and

(D) Limiting the copying of confidential information to a reasonable number of copies needed for conduct of the proceeding and maintaining a record of the locations of such copies.

Singular's Exhibit No. 2024, IPR2021-00179
Page 004

5. Persons receiving confidential information shall use the following procedures to maintain the confidentiality of the information:

(A) <u>Documents and Information Filed With the Board</u>.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The documents or information shall remain under seal unless the Board determines that some or all of it does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed

4

under seal. The redacted information shall remain under seal unless the

Board determines that some or all of the redacted information does not

qualify for confidential treatment.

(B) Documents and Information Exchanged Among the Parties. Documents

(including deposition transcripts) and other information designated as

confidential that are disclosed to another party during discovery or other

proceedings before the Board shall be clearly marked as "PROTECTIVE

ORDER MATERIAL" and shall be produced in a manner that maintains its

confidentiality.


6. Within 60 days after the final disposition of this action, including the

exhaustion of all appeals and motions, each party receiving confidential

information must return, or certify the destruction of, all copies of the confidential

information to the producing party.


(k) Standard Acknowledgement of Protective Order. The following form

may be used to acknowledge a protective order and gain access to information

covered by the protective order:

5

IPR2021-00179
PATENT NO. 8,407,273

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.


Patent No. 8,407,273
Filing Date: February 17, 2012
Issue Date: March 26, 2013

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____

**STANDARD ACKNOWLEDGMENT FOR ACCESS TO PROTECTIVE
ORDER MATERIAL**

Case No. IPR2021-00179

_____

6

**Standard Acknowledgment for Access to Protective Order Material**

I _____, affirm

that I have read the Protective Order; that I will abide by its terms;

that I will use the confidential information only in connection with

this proceeding and for no other purpose; that I will only allow access

to support staff who are reasonably necessary to assist me in this

proceeding; that prior to any disclosure to such support staff I

informed or will inform them of the requirements of the Protective

Order; that I am personally responsible for the requirements of the

terms of the Protective Order and I agree to submit to the jurisdiction

of the Office and the United States District Court for the Eastern

District of Virginia for purposes of enforcing the terms of the

Protective Order and providing remedies for its breach.

_____
[Signature]

7

Singular's Exhibit No. 2024, IPR2021-00179
Page 008

PUBLIC VERSION

Trials@uspto.gov                                                           Paper 57
571-272-7822                                                    Date: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

————————————

IPR2021-00155
Patent 10,416,961 B2

————————————

Before JUSTIN T. ARBES, STACEY G. WHITE, and JASON M. REPKO,
*Administrative Patent Judges.*

PER CURIAM.


JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*
Granting Patent Owner's and Petitioner's Motions to Seal
*37 C.F.R. §§ 42.14, 42.54*

PUBLIC VERSION

IPR2021-00155
Patent 10,416,961 B2

# I.   INTRODUCTION

## *A.   Background and Summary*

Petitioner Google LLC filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–5, 10, 13, 14, 21, and 23–25 of U.S. Patent No. 10,416,961 B2 (Ex. 1001, "the '961 patent") pursuant to 35 U.S.C. § 311(a).  On May 12, 2021, we instituted an *inter partes* review as to all challenged claims on all grounds of unpatentability asserted in the Petition.  Paper 16 ("Decision on Institution" or "Dec. on Inst.").  Patent Owner Singular Computing LLC subsequently filed a Patent Owner Response (Paper 28, "PO Resp."), Petitioner filed a Reply (Paper 34, "Reply"), and Patent Owner filed a Sur-Reply (Paper 38, "Sur-Reply").  Patent Owner filed a Motion to Exclude (Paper 46, "Mot.") certain evidence submitted by Petitioner, to which Petitioner filed an Opposition (Paper 47, "Opp.") and Patent Owner filed a Reply (Paper 49, "Mot. Reply").  An oral hearing was held on February 11, 2022, and transcripts of the hearing are included in the record (Paper 55, "Conf. Tr."; Paper 56, "Public Tr.").  The parties also filed Motions to Seal (Papers 52 and 54) portions of their demonstrative exhibits containing confidential information.

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable, but has not shown by a preponderance of the evidence that claims 3 and 23 are unpatentable.

IPR2021-00155
Patent 10,416,961 B2

*B. Related Matters*

According to the parties, the '961 patent has been asserted in *Singular Computing LLC v. Google LLC*, No. 1:19-cv-12551-FDS (D. Mass.). *See* Pet. xi; Paper 6, 1 (Mandatory Notices).

Petitioner filed another petition challenging the '961 patent in IPR2021-00154, which was denied. *See* Pet. x; Paper 6, 1. The parties also identify the following *inter partes* reviews as related: IPR2021-00164 (denied) and IPR2021-00165 (instituted) challenging U.S. Patent No. 9,218,156 B2; and IPR2021-00178 (denied) and IPR2021-00179 (instituted) challenging U.S. Patent No. 8,407,273 B2. *See* Pet. xi; Paper 6, 1.

*C. The '961 Patent*

The '961 patent, entitled "Processing with Compact Arithmetic Processing Element," issued on September 17, 2019. Ex. 1001, code 45. The '961 patent relates to "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)." *Id.* at col. 5, ll. 58–62.

According to the '961 patent, conventional CPU chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications. *Id.* at col. 2, l. 62–col. 3, l. 10. For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations." *Id.* at col. 3, ll. 3–10. According to the '961 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor,

IPR2021-00155
Patent 10,416,961 B2

from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors." *Id.* at col. 3, ll. 11–17. But "[c]urrent architectures for general purpose computing fail to deliver this power." *Id.* at col. 3, ll. 16–17.

The '961 patent is therefore "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at col. 1, l. 66–col. 2, l. 15. According to the '961 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at col. 2, ll. 16–19. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at col. 2, ll. 23–27. Figure 6, reproduced below "is an example design for an LPHDR arithmetic unit according to one embodiment" of the '961 patent. Ex. 1001, 2:44–45.



IPR2021-00155
Patent 10,416,961 B2

FIG. 6 provides "an example design for an LPHDR arithmetic unit according to one embodiment of" the '961 patent. Ex. 1001, 2:44–45.

As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces output 602c. *Id.* at col. 12, ll. 55–56. The LPHDR arithmetic unit "is controlled by control signals 412*a-d*, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602*a-b*." *Id.* at col. 12, ll. 62–65. According to the '961 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602*a-b* by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at col. 12, l. 65–col. 13, l. 1. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at col. 13, ll. 5–14. The '961 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at col. 13, ll. 12–14.

According to the '961 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at col. 17, ll. 30–33. The '961 patent provides, as examples, applications including "finding nearest neighbors," *id.* at col. 17, l. 41–col. 21, l. 43, "distance weighted scoring," *id.* at 21:45–22:35, and "removing motion blur in images," *id.* at col. 22, l. 37–col. 23, l. 48.

## D. Claims

Of the claims challenged by Petitioner, claims 1, 10, and 21 are independent. Claim 1 is reproduced below.

IPR2021-00155
Patent 10,416,961 B2

1. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

Ex. 1001, col. 30, ll. 17–37.


*E. Evidence*

The pending grounds of unpatentability in the instant *inter partes*

review are based on the following prior art:

U.S. Patent No. 5,689,677, issued Nov. 18, 1997 (Ex. 1009, "MacMillan");

U.S. Patent Application Publication No. 2007/0203967 A1, published Aug. 30, 2007 (Ex. 1007, "Dockser"); and

Jonathan Ying Fai Tong, David Nagle, & Rob A. Rutenbar, "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, vol. 8, no. 3 (June 2000) (Ex. 1008, "Tong").

Petitioner filed a declaration from Richard Goodin, P.E. (Ex. 1003, "Goodin

Decl.") with its Petition and a reply declaration from Mr. Goodin (Ex. 1071)

IPR2021-00155
Patent 10,416,961 B2

with its Reply. Patent Owner filed declarations from Sunil P. Khatri, Ph.D. (Ex. 2051, "Khatri Decl.") and Joseph Bates, Ph.D. (Ex. 2052) with its Response. Also submitted as evidence are transcripts of the depositions of Mr. Goodin (Ex. 2043) and Dr. Khatri (Ex. 1072).

## F. Asserted Grounds

This *inter partes* review involves the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4, 5, 10, 13, 14 | 103(a)[1] | Dockser |
| 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | 103(a) | Dockser, Tong |
| 1–5, 10, 13, 14 | 103(a) | Dockser, MacMillan |
| 1–5, 10, 13, 14, 21, 23–25 | 103(a) | Dockser, Tong, MacMillan |

## II. ANALYSIS

### A. Level of Ordinary Skill in the Art

In determining the level of ordinary skill in the art for a challenged patent, we look to "1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654,

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Here, Petitioner's challenges are based on the pre-AIA version of 35 U.S.C. § 103.

666–67 (Fed. Cir. 2000). "Not all such factors may be present in every case, and one or more of them may predominate." *Id.*

Petitioner asserts that at the time of the earliest possible effective filing date of the '961 patent (June 19, 2009), a person of ordinary skill in the art would have had "at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture." Pet. 9 (citing Goodin Decl. ¶ 43). Patent Owner's proposed definition of the level of ordinary skill in the art is the same other than it removes the phrases "or the equivalent" and "at least." PO Resp. 14 (citing Khatri Decl. ¶¶ 36–37). There is little difference between the parties' proposed definitions, and the parties and their experts do not explain the basis for their proposals. Arguably, however, the term "at least" creates unnecessary ambiguity. Based on the full record developed during trial, including our review of the '961 patent and the types of problems and solutions described in the '961 patent and cited prior art, we determine that a person of ordinary skill in the art would have had a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and two years of academic or industry experience in computer architecture. *See, e.g.*, Ex. 1001, col. 1, l. 15–62 (describing in the "Background" section of the '961 patent various conventional methods of computation and their alleged deficiencies). We apply that definition for purposes of this Decision.

IPR2021-00155
Patent 10,416,961 B2

*B. Claim Interpretation*

We need only construe terms that are in controversy and only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

Claim 1 recites, in part, "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Ex. 1001, col. 30, ll. 18–22. Independent claims 10 and 21 recite similar limitations. *See id.* at col. 31, ll. 27–31 (claim 10); col. 32, ll. 43–47 (claim 21).

At issue here is the meaning of "low precision high dynamic range (LPHDR) execution unit," as recited in claims 1, 10, and 21. Specifically, we need to resolve the question of whether this execution unit must be adapted to execute arithmetic operations *only* at low precision. For the reasons that follow, we determine that it does not.

Petitioner argues that, in the prior art used in all challenges, Dockser's floating-point processor (FPP), including the floating-point operator (FPO) inside the FPP, is low precision "because 'the precision' of operations in the FPP is 'reduced' . . . , and because it operates with the minimum imprecision" recited in the claim. Pet. 15 (citing Goodin Decl. ¶¶ 208–209; Ex. 1001, col. 26, l. 61–col. 28, l. 8; Ex. 1035, 8). Petitioner asserts that, in the claim, the minimum imprecision is found in the limitation that it calls *1B2*:

> for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit

IPR2021-00155
Patent 10,416,961 B2

> executing the first operation on that input differs by at least
> Y=0.2% from the result of an exact mathematical calculation of
> the first operation on the numerical values of that same input.

Ex. 1001, col. 31, ll. 34–43.  According to Petitioner, the '961 patent
characterizes degrees of precision described in language mirroring *1B2* as
"low precision." Pet. 15 (citing Ex. 1001, col. 26, l. 61–col. 28, l. 8).
Petitioner argues that the execution units in the prior art fall within the scope
of the recited unit if they perform reduced precision operations and at least
one, but not necessarily all, of those operations meets the other requirements
of claim 1.  *See, e.g.*, *id.* at 32 (explaining that "numerous obvious
implementations of Dockser's FPP drop sufficient bits to yield an execution
unit meeting the claimed minimum imprecision"); Reply 2–3 (discussing the
"low precision" requirement).

Patent Owner argues that the LPHDR execution unit should be
construed as "an execution unit that executes arithmetic operations *only* at
low precision and with high dynamic range, wherein 'high dynamic range'
and 'low precision' are defined according to the numerical requirements
below." PO Resp. 15 (emphasis added).  We emphasize "only" because
Patent Owner argues the recited LPHDR execution unit "necessarily
excludes full-precision or mixed full and low precision units." *Id.* at 16
(citing Khatri Decl. ¶ 60).

In support of its proposed construction, Patent Owner asserts that
construing the LPHDR execution unit as encompassing full or mixed
precision units would "impermissibly read out 'low precision high dynamic
range' and render the limitation meaningless." *Id.* (citing *Network-1 Techs.,
Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022–23 (Fed. Cir. 2020)); *see*

IPR2021-00155
Patent 10,416,961 B2

*also id.* at 17 (arguing Petitioner's construction reads "'low precision' out of
the claims entirely").

Based on the totality of the record, we agree with Petitioner that the
recited LPHDR execution unit does not exclude mixed full and low
precision execution units (i.e., those that are capable of arithmetic operations
at both levels of precision). *See, e.g.*, Pet. 15, 32. We reject Patent Owner's
argument that interpreting the claim in this way renders the term "low
precision" "meaningless." PO Resp. 15–16. Rather, the term "low
precision" imposes the requirement that the unit must *at least* perform
arithmetic operations at low precision, which would exclude units that
operate only at full precision, for example. Thus, we disagree with Patent
Owner and assign little weight to the Khatri Declaration on this issue. *See
id.* at 15–17; Khatri Decl. ¶¶ 60–61.

As stated in our Decision to Institute, the recitation of "a first
operation" in claim 1 requires only one or more first operations that meet the
low precision criteria specified in the claim. Dec. on Inst. 18. The claims do
not require that "every" operation must be low precision or exclude the
LPHDR execution unit from having other capabilities for other operations.
*Id.* Indeed, Patent Owner agrees that "a claim's recitation of an 'execution
unit adapted to execute a first operation' would normally not preclude that
execution unit from performing other types of operations." PO Resp. 17.
Patent Owner, though, argues that this "rule does not apply when the
specification teaches otherwise, as is the situation here." *Id.* at 17–18. We
disagree.

Patent Owner relies on exemplary non-limiting embodiments from the
'961 patent. *See id.* at 18. Specifically, Patent Owner argues that "the
claimed LPHDR execution units are smaller and have fewer transistors" than

11

prior art full precision execution units. *Id.* (citing Khatri Decl. ¶ 62). But the cited passage pertains only to exemplary embodiments and says that the "amount of resources" is small, with transistors being only one example of such resources:

> For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a *small amount of resources (e.g., transistors or volume)* compared with traditional architectures.

Ex. 1001, 8:1–5 (emphasis added). In fact, some embodiments do not even require transistors: "Examples of such technologies include . . . other technologies whether based on transistors or not . . . ." Ex. 1001, col. 26, ll. 27–42, *cited in* Reply 6.

The reference to the "small amount of resources" in the cited passage (Ex. 1001, col. 8, ll. 1–5) is consistent with Petitioner's construction that the LPHDR execution unit need only perform low precision operations some of the time because the record shows that doing so would save power and other computational resources. For example, Dr. Khatri testified that "exact computing . . . takes up a lot of resources, takes up a lot of power, takes up a lot of area, and takes up a lot of delay." Ex. 1072 ("Deposition of Sunil P. Khatri"), 47:2–5. Mr. Goodin explained that reducing precision may achieve power savings. *See, e.g.*, Ex. 2043 ("Deposition of Richard M. Goodin"), 34:21–35:4; *see also id.* at 31:2–32:1 (discussing how selectable precision may achieve savings). The Goodin Declaration cites specific examples of how this is achieved. *See, e.g.*, Goodin Decl. ¶¶ 31–33 (citing Ex. 1008, 273, 277–279); ¶ 35 (citing Ex. 1007 ¶¶ 3–7). Thus, we disagree with Patent Owner's argument about reducing transistors and assign little

IPR2021-00155
Patent 10,416,961 B2

weight to the Khatri Declaration on this issue. *See* PO Resp. 18; Khatri Decl. ¶ 62.

Also, we agree with Petitioner that the degree of low precision is described in limitation *1B2* in claim 1 and similar limitations in the other claims. Pet. 15. The language used in *1B2* is consistent with how the patent describes low precision. Ex. 1001, col. 26, l. 61–col. 28, l. 8, *cited in* Pet. 15. For example, the patent states, "[t]he degree of precision of a 'low precision, high dynamic range' arithmetic element may vary from implementation to implementation." *Id.* at col. 26, ll. 61–63. The patent then lists several examples. *Id.* at col. 26, l. 61–col. 28, l. 8. In one example, "a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.2% to the correct result." *Id.* at col. 27, ll. 7–10. Similarly, the claims recite, "the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input." *Id.* at col. 30, ll. 29–34 (claim 1); col. 31, ll. 38–43 (claim 10); col. 32, ll. 54–59 (claim 21).

Patent Owner agrees that the claims provide the parameters of the low precision and high dynamic range in the limitations "wherein the dynamic range . . ." and "for at least X=10% . . . ." PO Resp. 16. Indeed, Patent Owner in the related district court case argued that the subsequent claim language specifying percentages "*defines* the term 'low precision'" and "specifies the degree of precision that an LPHDR execution unit must have in order to satisfy the 'low precision' . . . limitation of the claim." Ex. 1065, 9 (emphasis added); *see also* Ex. 1066, 12 (arguing that "'low precision high dynamic range' is defined in [the] claim itself"); Reply 2. Patent Owner,

IPR2021-00155
Patent 10,416,961 B2

however, argues that those limitations "do not allow for the execution unit to have full precision (or [low] dynamic range) capability."  PO Resp. 16.

But the claims do not recite that every operation must meet these criteria.  Rather, the claims only recite that the criteria apply to "a first operation."  Ex. 1001, col. 30, ll. 23–34.  This reading is consistent with the examples of LPHDR elements from the written description.  *See* Ex. 1001, col. 26, l. 61–col. 28, l. 8, *cited in* Pet. 15.  In those examples, the LPHDR arithmetic elements may produce results that are only "sometimes" no closer than the percentage to the correct result.  *See id.*  Thus, we agree with Patent Owner's argument that the claims provide the parameters for the term "low precision," but we disagree that the parameters must apply to every operation.  *See* PO Resp. 16.  For the same reasons, we assign little weight to the Khatri Declaration on this issue.  *See* Khatri Decl. ¶¶ 60–64.

Patent Owner also argues that "small size and low transistor count . . . is what allows a much larger number of LPHDR execution units to operate in parallel on a single chip."  PO Resp. 19.  But the requirement of a "much larger number" is not in the independent claims.  Nor do the claims (or Patent Owner's proposed construction) include any limitations on size of the LPHDR execution unit or its transistor count.  And "not every benefit flowing from an invention is a claim limitation."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010).  Even so, the specification states that some embodiments are not based on transistors.  *See, e.g.*, Ex. 1001, col. 26, ll. 27–42.  So we find no support in the written description for Patent Owner's argument about small size and low transistor count.  *See* PO Resp. 19.  For the same reasons, we assign little weight to the Khatri Declaration on this issue.  *See* Khatri Decl. ¶¶ 63–64.

We also agree with Petitioner that the written description does not support Patent Owner's assertion that the patent contrasts LPHDR execution units with other units that operate in both high and low precision.  PO Resp. 19, 23 (citing Ex. 1001, 5:23–33); Reply 7 (discussing Patent Owner's argument).  The relevant part of the patent describes a graphics processor that supports 16-bit and 32-bit floating point formats:

> When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

Ex. 1001, col. 5, ll. 23–33.  This paragraph does not define the term "low precision."  *Id.*  Nor does the patent explain how the 16-bit units meet the claimed requirements for low precision units that are recited in the claim.  *See id.*  Also, there is no discussion of these units in the part of the written description that lists examples of low precision units.  *See id.* at col. 26, ll. 61–col. 28, ll. 8.  Thus, we disagree with Patent Owner that the patent contrasts LHPDR units with those that operate in both high and low precision.  PO Resp. 19, 23.  For the same reasons, we assign little weight to the Khatri Declaration on this issue.  *See* Khatri Decl. ¶¶ 63–64.

To the contrary, we agree with Petitioner that the patent discloses at least one embodiment that performs operations other than LPHDR computations:

> [W]hile the obvious method of using the above [logarithmic number system (LNS)] operations is to do LPHDR

IPR2021-00155
Patent 10,416,961 B2

> arithmetic, the programmer also may consider selected values to
> be 12 bit two's complement binary numbers. MUL and DIV may
> be used to add and subtract such values . . . . *So besides doing
> LPHDR computations*, this digital embodiment using LNS can
> perform simple binary arithmetic on short signed integers.

Ex. 1001, col. 14, ll. 12–22 (emphasis added), *quoted in* Reply 4.  Because

the unit performs arithmetic operations other than those at low precision, this

example contradicts Patent Owner's argument that an LPHDR execution

unit is "an execution unit that executes arithmetic operations *only* at low

precision."  PO Resp. 15 (emphasis added).

Patent Owner counters, "as Dr. Khatri explained, one of skill in the art

would not apply the terms 'precision' or 'dynamic range' to integers."  Sur-

Reply 4 (citing Ex. 1072, 116:5–118:3).  In Patent Owner's view, a person

of ordinary skill in the art "would understand that [Patent Owner]'s proposed

construction would *not* exclude execution units that can perform integer

operations, like the LNS embodiment described in the patent specification."

*Id.* at 4–5.  Yet Patent Owner's proposed construction makes no distinction

between integer or floating-point operations.  PO Resp. 15.  Rather, the

construction refers to "arithmetic operations," generally.  *See id.*

In its Sur-Reply, Patent Owner proposes an alternative construction—

for the first time in this proceeding—that further defines "arithmetic

operations" to be "*floating-point* arithmetic operations."  Sur-Reply 5

(emphasis added).  But a sur-reply must only respond to arguments raised in

the preceding brief.  Patent Trial and Appeal Board, *Consolidated Trial

Practice Guide* 73–74 (Nov. 2019) ("TPG").[2]  Under 37 C.F.R. § 42.23(b),

"respond" does not mean proceed in a new direction with a new approach.

---

[2] https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf

*See id.* at 74.  "[A] sur-reply that raises a new issue or belatedly presents evidence may not be considered." *Id.*  So, apart from noting that we do not see any reason to limit the LPHDR execution unit to only low precision operations—regardless of how those operations are defined—for the reasons discussed above, we do not further consider this new claim construction presented for the first time in the Sur-Reply.  *See* Sur-Reply 5.

In sum, we agree with Petitioner that the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that are capable of performing operations at low and full precision, and the degree of "low precision" is defined in limitation *1B2*.  *See, e.g.*, Pet. 15, 32; Reply 2–3.  To determine the patentability of the challenged claims, we need not further construe LPHDR execution unit.  *See Nidec*, 868 F.3d at 1017.

## C.  Legal Standards

To prevail in its challenges to the patentability of claims 1–5, 10, 13, 14, 21, and 23–25 of the '961 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016).  This burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("Where, as here, the only question presented is whether due consideration of the four *Graham* factors renders a claim or claims obvious, no burden shifts from the patent challenger to the patentee.").

IPR2021-00155
Patent 10,416,961 B2

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a) (2006)). The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Additionally, objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Id.* When conducting an obviousness analysis, we consider a prior art reference "not only for what it expressly teaches, but also for what it fairly suggests." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (citation omitted).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to

IPR2021-00155
Patent 10,416,961 B2

combine the elements in the way the claimed new invention does"). Also, "[t]hough less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016).

"Although the *KSR* test is flexible, the Board 'must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention.'" *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (citation omitted). Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *accord In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (stating that "conclusory statements" amount to an "insufficient articulation[] of motivation to combine"; "instead, the finding must be supported by a 'reasoned explanation'" (citation omitted)); *Magnum Oil*, 829 F.3d at 1380 ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness.").

### D. Obviousness Ground Based on Dockser (Claims 1, 2, 4, 5, 10, 13, and 14)

Petitioner contends that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable over Dockser under 35 U.S.C. § 103(a). Pet. 45–56.

IPR2021-00155
Patent 10,416,961 B2

*1.  Dockser*

Dockser discloses performing floating-point operations with a floating-point processor having "selectable subprecision."  Ex. 1007, code (57), ¶¶ 15, 17.  "A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa.  To find the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent.  The sign is applied to the resultant value."  *Id.* ¶ 1.  "The precision of the floating-point processor is defined by the number of bits used to represent the mantissa.  The more bits in the mantissa, the greater the precision."  *Id.* ¶ 2.  "The precision of [a] floating-point processor generally depends on the particular application.  For example, the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa."  *Id.*  "Higher precision results in a higher accuracy, but commonly results in increased power consumption."  *Id.*  Dockser explains that the performance of floating-point operations also can be computationally inefficient because "[w]hile some applications may require [high] types of precision, other applications may not."  *Id.* ¶ 3.  For example, "some graphics applications may only require a 16-bit mantissa," such that "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," but other applications may require "greater precision."  *Id.*  Accordingly, there was "a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable."  *Id.*

Figure 1 of Dockser is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



FIG. 1

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

Figure 2 of Dockser is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



**FIG. 2**

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if

IPR2021-00155
Patent 10,416,961 B2

each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits). Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively. Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3B depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31.

IPR2021-00155
Patent 10,416,961 B2

A partial product 420-i is generated for every bit in multiplier 404 at corresponding stage 410-i and then left-shifted "as a function of the multiplier bit with which it is associated, after which the operation moves on to the next stage." *Id.* ¶ 31. The partial products are eventually added together to generate output value 430. *Id.* "[P]ower may be removed from the logic used to implement the stages to the right of the line 405" indicating the selected subprecision. *Id.* ¶¶ 32–33.

### 2. *Claim 1*

Petitioner explains in detail how Dockser teaches or suggests every limitation of claim 1, relying on the testimony of Mr. Goodin as support. *See* Pet. 10–39; Goodin Decl. ¶¶ 183–200.

Claim 1 recites, in part, "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Ex. 1001, 30:18–22.

Petitioner asserts that Dockser's floating-point processor (FPP) is a "low precision high dynamic range (LPHDR) execution unit."[3] Pet. 13–15. According to the Petition, Dockser's FPP is in a computing system "as part of the main processor or as a coprocessor." *Id.* at 13 (citing Ex. 1007 ¶¶ 1, 15, 35–36). Petitioner asserts that the computing system is the claimed

---

[3] Petitioner also provides an "alternative mapping" where "the floating-point operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit. Pet. 14–15, 19, 38. We need not evaluate those arguments because we determine that Petitioner has made a sufficient showing that the FPP is an LPHDR execution unit.

IPR2021-00155
Patent 10,416,961 B2

"device" comprising the FPP. *Id.* (citing Goodin Decl. ¶¶ 196–197). We agree. Our reasoning follows.

### a)    "high dynamic range"

With respect to the "high dynamic range" aspect of the LPHDR execution unit, the claim requires that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000." Ex. 1001, 30:23–25.

Petitioner asserts that Dockser's FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '961 patent. Pet. 15 (citing Ex. 1007 ¶ 17; Ex. 1001, 14:61–15:3). Petitioner's assertion, which is not disputed by Patent Owner, is adequately supported by the record.

For example, Dockser's register location 200 stores a 32-bit binary floating-point number, in an IEEE-754 32-bit single format, with 8-bit exponent 204. Ex. 1007 ¶¶ 2, 17, *cited in* Pet. 20. According to the Goodin Declaration, the dynamic range of normal IEEE-754 operands would be from around $2^{-126}$, which is much smaller than 1/65,000, to around $2^{127}$, which is much larger than 65,000. Goodin Decl. ¶ 232, *cited in* Pet. 20. We credit the Goodin Declaration on this point because it is consistent with Dockser. *See id.*; Ex. 1007 ¶¶ 2, 16–17, 24. Thus, Petitioner has shown Dockser's FPP meets the dynamic-range limitation recited in claim 1.

### b)    "a first operation"

Claim 1 recites that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to

produce a first output signal representing a second numerical value."
Ex. 1001, 30:18–22.

Petitioner argues that Dockser's FPP is adapted to execute a "first
operation" (e.g., "reduced-precision multiplication") on a "first input signal
representing a first numerical value" (i.e., input electrical signal representing
an operand received at the registers) to produce a "first output signal
representing a second numerical value" (i.e., output electrical signal
representing an operand sent to a register and then main memory). Pet. 19.

Patent Owner does not present an argument to specifically address this
argument and evidence. *See* PO Resp.; Sur-Reply.

Based on our review of the totality of the evidence in this case, we
agree that Dockser's FPP is adapted to execute the recited first operation.
Dockser's FPP receives the operands as input values. Ex. 1007, Fig. 1.
Dockser's FPP performs operations on the inputs via the FPP's data paths
134–139 and components 140–144. *Id.*, Fig. 1. We agree with Petitioner
that Dockser teaches that the operand data to the FPP is a "first input signal
representing a first numerical value" because it represents the operand
number. *Id.* ¶ 17. The FPP executes the operation and produces an output
value, or output number, which is represented by output bits. *Id.* ¶ 34. In
this way, that value is the recited "second numerical value." *See* Pet. 18.
We credit the Goodin Declaration on this point. Goodin ¶¶ 223-226.

We also credit the Goodin Declaration's analysis showing that
Dockser's computing circuits "move" data between components, such as
from memory to processor, via electrical signals. *See* Goodin Decl. ¶ 220
(citing Ex. 1014, col. 1, ll. 36–37). On this issue, the record provides
adequate support for the Goodin Declaration. *See* Ex. 1007 ¶¶ 16–17; Ex.

IPR2021-00155
Patent 10,416,961 B2

1014, col. 1, ll. 36–37.  Thus, Petitioner has shown that signals represent the recited values.

Considering all the arguments and evidence in this case, Petitioner has sufficiently shown that Dockser teaches that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value," as recited in claim 1.  Pet. 15–20.

### c)  *"low precision"*

As for the "low precision" aspect of the LPHDR execution unit, Patent Owner argues that Dockser's FPP is not an LPHDR execution unit because the FPP is capable of both low and full precision operations.  *See* PO. Resp. 15, 21–24.  We disagree with Patent Owner's argument and underlying construction for the reasons discussed in Section II.B.  Instead, we agree with Petitioner that (1) the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that perform operations at low and full precision, and (2) the degree of "low precision" required by the claim is in limitation *1B2*.  *See, e.g.*, Pet. 15, 32; Reply 2–3.

### d)  *Limitation 1B2*

Under the interpretation discussed in Section II.B, Petitioner has shown that Dockser teaches the recited LPHDR execution unit.  In particular, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP "operates with the minimum imprecision" required by limitation *IB2*.  Pet. 15 (quoting Ex. 1007 ¶ 14).  Limitation *1B2* recites,

IPR2021-00155
Patent 10,416,961 B2

> for at least X=10% of the possible valid inputs to the first
> operation, the *statistical mean*, over repeated execution of the
> first operation on each specific input from the at least X % of the
> possible valid inputs to the first operation, of the numerical
> values represented by the first output signal of the LPHDR unit
> executing the first operation on that input differs by at least
> Y=0.2% from the result of an *exact mathematical calculation* of
> the first operation on the numerical values of that same input.

Ex. 1001, col. 30, ll. 24–34 (emphasis added). We first analyze the
"statistical mean" limitation before turning to the "exact mathematical
calculation" limitation.

### *(1) "Statistical Mean"*

Petitioner argues that a person of ordinary skill in the art would have
understood the "statistical mean" limitation

> in the context of the '961 patent's stated intent to claim not only
> "repeatable" deterministic embodiments like digital circuits that
> always produce the same output when repeating an operation on
> the same input, but also analog embodiments that are
> non-deterministic because they "introduce noise into their
> computations, so the computations are not repeatable."

Pet. 22 (quoting Ex. 1001, 3:63–4:2).

In Petitioner's view, for "non-deterministic embodiments," the
statistical mean would be the average of "the different outputs produced by
the same operation on the same input." *Id.* Petitioner argues that, for
"deterministic digital embodiments" like Dockser, the statistical mean is
"the same as the numerical value of the first output signal for any individual
execution of the first operation on each specific input, because that output is
always the same for any specific input." *Id.* at 23. In Petitioner's view,
repeatedly executing a multiplication operation using Dockser's floating-
point multiplier "on the same input (*i.e.*, pair of operands) with the same

precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.*

Patent Owner does not dispute this reasoning. *See* PO Resp.; Sur-Reply.

Based on the totality of the evidence, Petitioner's analysis of "deterministic digital embodiments" to address the "statistical mean" limitation is adequately supported by the record. Pet. 22–23. We are persuaded by Petitioner's reasoning that the '961 patent's written description has both analog and digital embodiments. *See, e.g.*, Ex. 1001, col. 3, l. 63–col. 4, l. 2; col. 14, l. 23–col. 15, l. 3; col. 17, ll. 22–26. Dockser uses "a conventional floating-point multiplier." Ex. 1007 ¶ 20. Petitioner adequately supports its assertion that this is a deterministic digital circuit. Pet. 23 (citing Goodin Decl. ¶ 241; Ex. 1011, col. 1, ll. 40–42). And we credit the Goodin Declaration that, in such a digital circuit, a floating-point multiplier operating on the same input with the same precision level yields the same result for every execution, and thus, the statistical mean is the same as the output for any single execution. Goodin Decl. ¶ 240, *cited in* Pet. 23.

### (2) *"exact mathematical calculation"*

As for the "exact mathematical calculation" limitation, Petitioner argues that because Dockser performs a reduced precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation: "the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied without reducing precision." Pet. 24 (emphasis omitted) (citing Goodin Decl. ¶ 244; Appendix I.B).

IPR2021-00155
Patent 10,416,961 B2

### (3)  Y Relative Error for X Valid Inputs

According to the Petition, "Dockser discloses two precision-reducing techniques that can be used separately or together."  Pet. 26 (citing Ex. 1007 ¶¶ 4–7; Goodin Decl. ¶¶ 255–261).  One technique removes power from storage elements in the FPP registers that correspond to the excess, dropped mantissa bits, which drops bits from the operands.  *Id.*  The other technique removes elements from the multiplier logic that computes the product of the operand mantissas.  *Id.*  Petitioner asserts that both techniques individually and in combination teach limitation *1B2*.

We determine that Petitioner has made a sufficient showing that Dockser meets the recited requirements for low precision under the register bit-dropping rationale.  Patent Owner does not present arguments specific to this technique.  *See* PO Resp.; Sur-Reply.  We need not evaluate Petitioner's alternative rationale based on the multiplier logic.  Our reasoning follows.

### (4)  Register Bit-Dropping

Petitioner explains how Dockser teaches that "for at least X=10% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.2%" from the result of the exact mathematical calculation.  Pet. 24–39.  In Petitioner's view, the "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception)."  *Id.* at 25.  Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs.  *Id.*

IPR2021-00155
Patent 10,416,961 B2

We agree. Dockser retains only some of the bits of a mantissa fraction. In one example, nine most-significant bits of the mantissa fraction are retained, and the other 14 excess bits are dropped. Ex. 1007 ¶¶ 25–28, *cited in* Pet. 25; Goodin Decl. ¶ 254. The outputs of Dockser's unpowered storage elements are tied to zero voltage. Goodin Decl. ¶ 269; Ex. 1007 ¶¶ 26 (discussing removing power from the register elements for the excess bits), 29 (discussing "unpowered bits"). With support from the Goodin Declaration and corroborating evidence, Petitioner shows that tying the outputs of the unpowered storage elements for the 14 "excess" bits to zero voltage would make those bits zeroes. Pet. 29–30 (citing Goodin Decl. ¶¶ 269–71).

Multiplying two operands with excess bits dropped (representing zero) reduces the output's precision. Ex. 1007 ¶¶ 24–26. Petitioner provides a representative example from the Goodin Declaration:

> the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.3787171840667724609375) would become 01100000100000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 01000100110111000001000 (representing a mantissa of 1.26898288726806640625) would become 01000100100000000000000 (representing a mantissa of 1.267578125).

Pet. 30 (citing Goodin Decl. ¶ 273). So the decrease in precision depends on the number of mantissa bits dropped. *See id.*; *see also* Goodin Decl. ¶ 278. And we agree with Petitioner that Dockser suggests that any desired number of mantissa bits can be dropped. Pet. 32. For example, Dockser describes how the precision is selectable. *See* Ex. 1007 ¶¶ 14–15, 17 (describing selectable reduced precision), *discussed in* Pet. 5.

IPR2021-00155
Patent 10,416,961 B2

Petitioner asserts that Dockser's register bit-dropping technique meets limitation *1B2* in two ways.  Pet. 27–38.  First, Petitioner presents results of a software demonstration to show that Dockser's 9 mantissa bits meets limitation *1B2*.  *Id.* at 32.  Second, Petitioner uses a pencil-and-paper algebraic analysis to show that retaining 7 mantissa bits meets limitation *1B2*.  *Id.* at 33.

As for the software demonstration, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), a [person of ordinary skill in the art] would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped."  *Id.* at 32.  Petitioner states that Mr. Goodin wrote a program to perform reduced precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.2% relative error for 14.6% of possible valid inputs (greater than X=10%)."  *Id.* at 33, 66–68 (citing Goodin Decl. ¶¶ 412–426, 464–469).

Patent Owner did not rebut this argument and evidence.  *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's assertions about recited X and Y percentages, and we credit the Goodin Declaration on this issue, which is supported by the record.  *See* Goodin Decl. ¶¶ 412–426.  In particular, Mr. Goodin summarizes the results of the software program in the table below.

IPR2021-00155
Patent 10,416,961 B2

| Retained Fraction Bits | Claimed Y% | Percentage of Tested Pairs Meeting Claimed Y% | Adjusted "Dockser's X%" |
|---|---|---|---|
| 9 | ≥ .2% | 14.674747% | ≥ 14.59791% |
| 5 | ≥ .2% | 99.547206% | ≥ 99.02600% |

The table shows the percentage of tested pairs that meet the claimed Y percentage as output by the software program. Goodin Decl. ¶ 423. It also shows a "Dockser's X" percentage, which is adjusted to exclude possible overflow and underflow pairs, that meets the claimed requirements. *Id.* The X value is calculated by multiplying the percentage output by the software program by an adjustment ratio. *Id.* The adjustment ratio is described in Appendix I.D of the Goodin Declaration. *Id.* The Goodin Declaration also explains that, if "the 'exact mathematical calculation' of multiplication of two single-format floating-point operands is the product rounded or truncated to single format (having a 23-bit-fraction mantissa), the claims are still met." *Id.* ¶ 426. To show this, Mr. Goodin wrote an alternative version of the program under this assumption, which also gives results that meet the claim limitations. *Id.* After review of the arguments and evidence on these issues, we credit the Goodin Declaration's software-based analysis. *Id.* ¶¶ 412–426.

As for the algebraic analysis, Petitioner argues that a person of ordinary skill in the art "would also have understood algebraically that Dockser's register bit-dropping technique meets [the limitation] when performed at certain selected precision levels, by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." Pet. 33. Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as

IPR2021-00155
Patent 10,416,961 B2

their eighth and ninth fraction bits," such that retaining only 7 mantissa bits of operands would result in "*every* input in that 12% produc[ing] at *minimum* 0.39% relative error." *Id.* at 33, 68–72 (citing Goodin Decl. ¶¶ 427–444).

Patent Owner did not rebut this argument and evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's algebraic method showing recited X and Y percentages and credit the Goodin Declaration on this issue. *See* Goodin Decl. ¶¶ 427–444. Under this reasoning, for the 12.5% of all possible $M_A$ mantissa values with zero in the first fraction bit and ones in the $(K + 1)^{th}$ and $(K + 2)^{th}$ fraction bits, the following inequality holds when Dockser's register bit-dropping truncates the operands to K fraction bits:

$$Y \geq \frac{\left(2^{-(K+1)} + 2^{-(K+2)}\right)}{(1.5 - 2^{-23})} \times 100\% \qquad \textbf{\textit{(Equation C)}}$$

*Id.* ¶ 442. The table below shows the results of evaluating Equation C with K=7 and K=5 retained fraction bits as the selected precision level. *Id.*

| Retained Fraction Bits (K) | X% | Y% |
|---|---|---|
| 7 | ≥ 12% | ≥ 0.3906% |
| 5 | ≥ 12% | ≥ 1.5625% |

The table above shows that both values of K meet the '961 patent's claimed minimum X and Y. *Id.* ¶ 444. After review of the arguments and evidence on these issues, we credit the Goodin Declaration's algebraic analysis. *Id.* ¶¶ 427–444.

IPR2021-00155
Patent 10,416,961 B2

### e)    *"control the operation"*

Lastly, claim 1 recites, "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit." Petitioner asserts that Dockser's main processor meets the computing device limitation.  Pet. 39.

Patent Owner does not provide evidence or argument specific to this limitation.

We agree with Petitioner because Dockser's processor writes subprecision select bits to the FPP's control register, and in at least this way, Dockser's main processor is adapted to control the FPP's operation by specifying its precision level.  *See* Ex. 1007 ¶¶ 15, 18, 25, 35.  We credit the Goodin Declaration on this issue, which is supported by the evidence of record.  *See* Goodin Decl. ¶ 310.

### f)    *Objective Indicia of Nonobviousness*

In addition to its argument based on the interpretation of "low precision high dynamic range (LPHDR) execution unit," Patent Owner argues that objective indicia of nonobviousness demonstrate that the challenged claims would not have been obvious to a person of ordinary skill in the art.  PO Resp. 47–72.  Because the parties largely refer to the challenged claims collectively in their arguments regarding objective indicia of nonobviousness, we do so as well and now address those arguments as applied to all of the claims challenged as obvious over Dockser alone or the combination of Dockser and Tong, i.e., claims 1, 2, 4, 5, 10, 13, 14, 21, 24,

and 25, which we refer to as the "Dockser/Tong-challenged claims."[4] *See id.*; Reply 19–30; Sur-Reply 18–25.

"In order to accord substantial weight to [objective indicia] in an obviousness analysis, the evidence of [objective indicia] must have a nexus to the claims, *i.e.*, there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (citations and internal quotation marks omitted). "The patentee bears the burden of showing that a nexus exists." *Id.* "To determine whether the patentee has met that burden, we consider the correspondence between the objective evidence and the claim scope." *Id.* A patentee is entitled to a rebuttable presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (citation omitted). Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021). "As part of the presumption analysis, the fact finder must consider the unclaimed features of the stated products to determine their level of significance and their impact on the correspondence between

---

[4] As explained below, we determine that Petitioner has not proven that certain claims are unpatentable over the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, because Petitioner has not sufficiently shown a reason to combine with MacMillan. *See infra* Sections II.F, II.G. Accordingly, we need not assess objective indicia of nonobviousness with respect to those claims. *See Mylan Pharms. Inc. v. Res. Corp. Techs., Inc.*, 914 F.3d 1366, 1376 (Fed. Cir. 2019) ("Because we agree with the Board that Appellants failed to establish a motivation to modify compound 3I, we need not reach Appellants' arguments regarding objective indicia.").

IPR2021-00155
Patent 10,416,961 B2

the claim and the products." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1418 (Fed. Cir. 2022).  When, "for example, the patented invention is only a small component of the product tied to the objective evidence, there is no presumption of nexus." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333 (Fed. Cir. 2019).  Absent a presumption of nexus, a patent owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (citation omitted).

"Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011).  On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016).  A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* at 1330.  Ultimately, the fact finder must weigh the objective indicia of nonobviousness presented in the context of whether the claimed invention as a whole would have been obvious to an ordinarily skilled artisan. *Id.* at 1331–32; *Lectrosonics, Inc. v Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential).

IPR2021-00155
Patent 10,416,961 B2

*(1) Industry Skepticism*

"If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors [nonobviousness].  Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the claimed invention."  *WBIP*, 829 F.3d at 1335.  As evidence of alleged industry skepticism, Patent Owner points to various statements made by employees of Petitioner after meeting with Dr. Bates, the inventor of the '961 patent, in 2010.  PO Resp. 48–52.  According to Patent Owner, Dr. Bates explained that floating point units programmed to perform ██████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████  *Id.* at 49–52 (citing Exs. 2009, 2027, 2028, 2030).  Patent Owner contends that the cited statements from Petitioner's employees "express skepticism about utility of the low-precision arithmetic performed by the large numbers of low-precision execution units,"[5] which is a "key feature" of the challenged claims, and have a nexus to the challenged

---

[5] Claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by only a single LPHDR execution unit.  The only challenged claims of the '961 patent that arguably require a "large number[]" of LPHDR execution units are challenged in Petitioner's asserted grounds based on combinations with MacMillan.  *See* PO Resp. 52.  For example, claims 3 and 23 recite "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to . . . ."  Ex. 1001, col. 30, ll. 43–48 (claim 3); col. 32, ll. 62–65 (claim 23).

IPR2021-00155
Patent 10,416,961 B2

claims because they were made in response to Dr. Bates's presentations. *Id.* at 52.

Petitioner argues that Patent Owner's evidence is irrelevant because it is dated after the earliest possible effective filing date of the '961 patent (June 19, 2009). Reply 22. We disagree that evidence of industry skepticism must itself be dated before the relevant invention. *See WBIP*, 829 F.3d at 1335–36 (considering evidence of skepticism dated after the invention of the patent at issue); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (same); Sur-Reply 19–20.

We have reviewed the substance of the statements cited by Patent Owner, though, and are not persuaded that they are probative of nonobviousness. The statements by Petitioner's engineers relate to whether applications using "approximate" arithmetic would be commercially valuable; they do not show skepticism as to whether or how a problem could be solved or whether such applications would *work*. *See WBIP*, 829 F.3d at 1335. For example, Tom Dean stated that



Ex. 2009, 1 (emphasis added).

Ex. 2029, 1 (emphasis added).

IPR2021-00155
Patent 10,416,961 B2



Ex. 2028, 1 (emphasis added). ███████████

███████████████████████ Ex. 2030, 2.  Thus, the cited

comments appear to indicate that floating point units performing

"approximate" arithmetic would only be commercially valuable for a limited

set of applications, rather than expressing skepticism as to whether such

applications would work.  Patent Owner also has not explained sufficiently

why the fact that "approximate" arithmetic was considered useful for some

applications but not others, amounts to industry skepticism over the claimed

invention as a whole, which is not limited to a particular application.  We

find that Patent Owner's evidence of alleged industry skepticism does not

weigh in favor of nonobviousness of the claims challenged under the

Dockser-Tong combination.

### (2) Industry Praise

"Evidence that the industry praised a claimed invention or a product

which embodies the patent claims weighs against an assertion that the same

claim would have been obvious.  Industry participants, especially

competitors, are not likely to praise an obvious advance over the known art."

*WBIP*, 829 F.3d at 1334.  Patent Owner points to four statements of alleged

industry praise from "leading figures in computer science" and argues that

they have a nexus to the Dockser/Tong-challenged claims because they

relate to Dr. Bates and his presentations to Petitioner in 2010, 2011, and

2013.  PO Resp. 52–53.

40

IPR2021-00155
Patent 10,416,961 B2

Patent Owner cites Dr. Bates's notes from █████████████

█████████████████████████████████████████████████████

███████████████████████████  *See id.* at 52; Ex. 2050.  This single

line in the notes does not mention any specific ideas or features that

allegedly were praised, or why or for what they were being praised.  Patent

Owner argues that there is "no requirement that praise identify exactly the

features being praised."  Sur-Reply 20.  But evidence of industry praise must

be for "the claimed invention," and the notes only state that ██████████

███████████████████  *See* Ex. 2050; *Apple Inc. v. Samsung Elecs. Co.*,

839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc); *WBIP*, 829 F.3d at 1334.

The notes also have less probative value because they were written by

Dr. Bates based on his subjective recollection of Mr. Dean's reaction at the

meeting, rather than, for example, being prepared by a third party or Mr.

Dean himself.  Ex. 2052 ¶ 7.

Patent Owner also cites three 2011 emails sent by employees of

Petitioner to Dr. Bates.  PO Resp. 52–53.  Andrew Ng wrote the following to

Dr. Bates:



Ex. 2033, 1.  Astro Teller wrote that ████████████████████████

██████████████████████  and Johnny Chen wrote, ███████████

██████████████████████████████████████  *See*

IPR2021-00155
Patent 10,416,961 B2

Exs. 2031, 2032. We view these emails as more consistent with Petitioner's view as "merely cordial statements made to Dr. Bates," rather than evidence of industry praising the inventions of the Dockser/Tong-challenged claims as Patent Owner contends. *See* Reply 24. Further, they are statements by employees of Petitioner only (not any other industry participant or industry group) and do not mention any specific ideas or features from Dr. Bates's presentations that were being praised. We find that Patent Owner's evidence of alleged industry praise is too ambiguous and high-level to be probative of nonobviousness.

### (3) Unexpected Results

"To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Meyers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014). Also, "[w]hen assessing unexpected properties, . . . we must evaluate the significance and 'kind' of expected results along with the unexpected results." *Id.* As evidence of alleged unexpected results, Patent Owner points to a September 2013 presentation that Dr. Bates gave to Petitioner showing

PO Resp. 53–57 (citing Ex. 2005). Patent Owner argues that the unexpected nature of the results is "confirmed by skepticism expressed by" David Patterson, Ph.D. (an employee of Petitioner and "acclaimed expert in the field of computer science and computer architecture" according to Patent Owner), and "further supported by Dockser

42

IPR2021-00155
Patent 10,416,961 B2

and Tong," which teach that higher precision is "generally" needed. *Id.* at 56–57 (citing Ex. 1003 ¶¶ 124–125; Ex. 1007 ¶ 3; Ex. 1008, 280; Ex. 2012).

The cited evidence, however, does not establish a difference between the alleged results and the closest prior art. Dr. Bates's presentation includes

██████████████████████████████████████ Ex. 2005, 11; *see* PO Resp. 55.

In this case, however, the closest prior art is Dockser and Tong, both of which teach reduced precision arithmetic and, importantly, show that high performance with reduced precision was *expected* for certain applications. *See* Reply 25; Ex. 1007 ¶ 3 ("[F]or certain applications, . . . a reduced precision, may be acceptable, and for other applications, . . . a greater precision may be needed."); Ex. 1008, 273 ("[M]any programs which manipulate human sensory inputs, e.g., speech and image recognition, suffer no loss of accuracy with reduced bitwidth in the mantissa or exponent.")." Patent Owner contends that Dockser and Tong are not appropriate for comparison because they do not "provide computing scale results" and have an "entirely different focus on power savings." Sur-Reply 21. We disagree. As explained above, we find that Dockser teaches the claim 1 LPHDR execution unit performing the recited reduced precision arithmetic. *See supra* Sections II.D.2.a)–e). Patent Owner's only comparison, however, is to a CPU without any reduced precision capability. *See* PO Resp. 55. We find that Patent Owner's evidence of alleged unexpected results does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims because it does not establish a difference between the results and the closest prior art and does not establish that such a difference would have been unexpected by a person of ordinary skill in the art.

IPR2021-00155
Patent 10,416,961 B2

### (4) Copying and Commercial Success

"Copying may . . . be another form of flattering praise for inventive features," as "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336 (citation omitted). Copying "requires evidence of efforts to replicate a specific product." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). "This may be demonstrated either through internal documents; direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica; or access to, and substantial similarity to, the patented product (as opposed to the patent)." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (internal citations omitted). However, "a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000); *see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[M]ore than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue." (citation omitted)).

Commercial success is typically shown with evidence of "significant sales in a relevant market." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (citation omitted). "When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

Patent Owner argues that after Dr. Bates made his presentations to Petitioner in 2010–2014, Petitioner copied Dr. Bates's invention in its Tensor Processing Unit (TPU) v2 and v3 products released in 2017–2018, which "use execution units designed to perform operations using a low-precision 'floating point format called bfloat16' in order to achieve increased parallelism and scale." PO Resp. 57–58 (citing Ex. 2010; Ex. 2011, 9; Ex. 2034, 6; Khatri Decl. ¶¶ 126–127). The bfloat16 format "keep[s] the same 8 bit exponent as found in 32-bit IEEE floating point" but "reduces precision significantly by using only a 7-bit mantissa, as opposed to the 23-bit mantissa of IEEE 32-bit floating point." *Id.* at 58 (citing Ex. 2041, 2). According to Patent Owner, Petitioner uses the TPUv2 and TPUv3 products to "power all of its major products and services, including Search, Translate, Photos, Assistant, and Gmail," saving Petitioner "at least $10 billion." *Id.* at 61–62 (citing Exs. 2011, 2015–18, 2040). Patent Owner argues that a nexus is presumed because the TPUv2 and TPUv3 products are coextensive with claims 1–5, 10, and 13–14. *Id.* at 59, 62–72. Patent Owner further contends that, even if not presumed, a nexus is shown by "internal communications among [Petitioner's] own engineers and executives" and Petitioner's communications with Dr. Bates. *Id.* at 59–61 (citing Exs. 2007, 2014, 2035–2039, 2042, 2047, 2048).

We have reviewed the cited evidence and do not find it probative of nonobviousness. First, we are not persuaded that a nexus should be presumed because the TPU products are coextensive with the Dockser/Tong-challenged claims, as Patent Owner contends. Petitioner and Mr. Goodin identify a number of other allegedly material features of the products that are not part of the Dockser/Tong-challenged claims: "Inter-Core Interconnect" (ICI), "Systolic array," "Two TensorCores per chip," "High-bandwidth

memory," "Liquid cooling," and "Accelerated Linear Algebra compiler."
*See* Reply 26; Ex. 1071 ¶¶ 85–92. We focus on the first two features in
particular because the evidence of record characterizes them as significant.

Regarding the ICI of the TPU products, Dr. Patterson stated the
following:

> So the *critical feature* of the supercomputer is the way
> they talk to each other – you know, the chips talk to each other.
> So what's called – [Petitioner] invented something called ICI.
> It's a custom Inter-Core Interconnect that they did custom for
> this design; it's not some standard that you buy off the shelf.
> It runs at about 500 gigabits per section in both directions per
> link, and there's four of those links.

Ex. 2012, 14:17–24 (emphasis added). An article authored by Dr. Patterson
and others[6] states that "[t]he *critical architecture feature* of a modern
supercomputer is how its chips communicate: what is the speed of a link;
what is the interconnect topology; does it have centralized versus distributed
switches; and so on," and the TPUv2 product has "four custom Inter-Core
Interconnect (ICI) links, each running at 496Gbits/s per direction."
Ex. 2016, 69; *see id.* at 70, 72, Fig. 2 (showing that ICI is part of the TPUv3
product as well); Ex. 1071 ¶ 87.

Regarding the systolic array architecture of the TPU products,
Dr. Patterson stated as follows:

> This systolic array idea brought back from the past that
> probably *cut the energy costs in half* for the multiplier, which is
> a lot of it. And then it was domain-specific. So a lot of the things
> that are complicated and area consuming on CPUs like branch

---

[6] We disagree with Patent Owner that the materials cited herein are merely
"marketing documents." *See* Conf. Tr. 13:18–24. Dr. Patterson's comments
are from an audio transcription of a YouTube video filed by Patent Owner
(Ex. 2012), and the article is from the publication *Communications of the
ACM* (Ex. 2016). *See* PO Resp. ix.

IPR2021-00155
Patent 10,416,961 B2

> predictors and caches – CPUs are covered with caches – they're
> not there because they're not helpful for this application. It was
> better to use more multiple units and dedicated memory units.
> So that *saves energy* and you could reuse the resources. So that
> was a *big success*.

Ex. 2012, 9:9–18 (emphasis added). He also agreed with an article

comparing the TPU to graphics processing units (GPUs) stating that "GPUs

incur high overhead in performance, area, and energy due to heavy

multithreading," whereas "[t]he systolic organization of TPUs captures the

data reuse while being simple by avoiding multithreading." *Id.* at

33:20–34:2. The article authored by Dr. Patterson and others includes

similar statements. Ex. 2016, 70 ("The TPUv2 node of the supercomputer

followed the main ideas of TPUv1: A large two-dimensional matrix multiply

unit (MXU) *using a systolic array to reduce area and energy* plus large,

software-controlled on-chip memories instead of caches." (emphasis

added)), 74 (quoting the earlier article stating that the "systolic organization"

of the TPU captures data reuse "while being simple by avoiding

multithreading"); *see* Ex. 1071 ¶ 88.

    Patent Owner contends that Petitioner fails to show that the "features

are so critical that the TPUs are not 'essentially the invention.'" Sur-Reply

21. We are not persuaded. Petitioner does more than merely identify

unclaimed features of the TPU products. Petitioner cites evidence,

supported by the testimony of Mr. Goodin, showing that at least the ICI and

systolic array architecture materially affect the TPU products' performance

and were viewed as critical, successful features that were reasons for the

TPU products' improved performance. *See Fox Factory*, 944 F.3d at 1374

("[I]f the unclaimed features amount to nothing more than additional

insignificant features, presuming nexus may nevertheless be appropriate."),

1375–76 (noting that the challenged patent and the patent owner's "marketing materials confirm that the forwardly protruding tooth tips, hook features, and mud clearing recesses each materially impacts the functioning of a chainring," such that "[f]or each of these features that the Board confirms is included in the [allegedly coextensive] chainrings, nexus can only be presumed between the . . . chainrings and a patent claim if the claim includes limitations relating to these features"). Patent Owner does not point to any evidence indicating that view to be factually incorrect. *See* Ex. 1072, 147:15–149:2 (Dr. Khatri opining that "the TPUs have the features that . . . are in these claims" and stating that he has no opinion "about what the TPUs . . . might have in addition"). We find that a presumption of nexus is inappropriate with respect to the TPU products.

Regardless of whether a presumption of nexus applies, we are not persuaded that Patent Owner has made a sufficient showing of nexus for two reasons. First, Patent Owner's nexus arguments are premised on the TPUv2 and TPUv3 products' "low-precision" bfloat16 floating point format having an 8-bit exponent and 7-bit mantissa. PO Resp. 57–58 (arguing that Petitioner copied Dr. Bates's invention by implementing "execution units designed to perform operations using" the bfloat16 format), 62 (arguing commercial success due to the bfloat16 format using "low-precision multipliers"). But "[l]ow-precision arithmetic—including LPHDR multiplication—was not novel" and thus cannot be the basis for a finding of nexus. *See* Reply 20; *Kao*, 639 F.3d at 1068; *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."). Tong taught such a format nine years before the '961 patent. Tong describes two different experiments emulating "different bitwidth FP units": one that

IPR2021-00155
Patent 10,416,961 B2

"implements the IEEE-754 standard" and then varies the mantissa bitwidth (shown in Figure 6), and another that "implements the IEEE-754 standard" and then varies the exponent bitwidth (shown in Figure 7). Ex. 1008, 278–279. Thus, we agree with Mr. Goodin that a person of ordinary skill in the art "would have understood that Tong's Figure 6 . . . discloses a floating-point format with an 8-bit exponent (which is the exponent size of single-precision floating-point in the IEEE standard) . . . and a 7-bit mantissa." *See* Ex. 1071 ¶ 74 (citing Ex. 1008, 274, 278–279; Ex. 1003 ¶ 330). Tong discloses that the 8-bit exponent/7-bit mantissa format produced useful results for both a "neural network trainer" application (ALVINN) and a "speech recognition program" (Sphinx III). *See* Ex. 1008, 278–279; Ex. 1071 ¶ 75. Notably, these applications mirror Dr. Bates's 2013 presentation discussing ███████████████████████████████" *See* Ex. 2005, 12–13.

To be sure, the fact that the 8-bit exponent/7-bit mantissa format was known in the prior art is not dispositive. *See WBIP*, 829 F.3d at 1330–31. "Commercial success, for example, may be linked to an individual element or, in other circumstances, it could be linked to the inventive combination of known elements." *Id.* at 1332. Patent Owner, however, has not identified and explained a specific combination of elements (as opposed to just the "low-precision" bfloat16 floating point format) that could serve as a nexus for the evidence of alleged copying and commercial success.[7] *See* PO Resp. 57–58, 61–62.

---

[7] To the extent Patent Owner alleges commercial success from Petitioner "[u]sing hundreds of thousands of these low-precision TPV v2 and v3 devices," we note again that claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by a single unit. *See* PO Resp. 61.

Second, when arguing that the TPUv2 and TPUv3 products meet the X and Y percentage limitations of claim 1, Patent Owner points to the bfloat16 floating point format with a 7-bit mantissa and states that Petitioner argues in the Petition (with respect to Dockser) that "utilizing 7 bits of mantissa in multiplication operations resulting in a minimum of 12% of valid floating point 32 inputs producing at least 0.39% relative error compared to the exact mathematical calculation of a full-precision multiplication on those same inputs." PO Resp. 66–67 (citing Pet. 33–34, 72; Khatri Decl. ¶¶ 135–136). Patent Owner does not explain, however, how the cited analysis of how *Dockser* teaches the X and Y percentage limitations applies to the TPUv2 and TPUv3 products. As Petitioner points out, Patent Owner "does not even attempt to demonstrate that [Petitioner's] TPUs perform the same bit-dropping techniques as Dockser." *See* Reply 27. Patent Owner has not established a sufficient nexus between the alleged copying and commercial success of the TPUv2 and TPUv3 products and the Dockser/Tong-challenged claims.

Finally, we note that Patent Owner's evidence of commercial success would be unpersuasive even if Patent Owner had established a nexus. Patent Owner's sole support for the alleged commercial success of the TPUv2 and TPUv3 products is an article in *PCMag India*. *See* PO Resp. 62 (citing Ex. 2017). That article states in relevant part:

> As AI and Machine Learning advanced, [Petitioner] was faced with the proposition of doubling the number of data centers it operates to handle the increased workloads. Building multiple data centers to handle the growing amounts of data sets *could have easily cost the company anything above $10 billion*.
>
> So [Petitioner] decided to take another route by optimizing its current data centers for better efficiency. The search giant in late 2013 decided to produce a custom chip in order to improve

cost-performance over the GPUs it had deployed.  Thus *the first TPU* was born.

Ex. 2017, 3 (emphasis added).  The above statement as to how much "could have" been saved is too speculative to reach a conclusion of commercial success.  *See id.*  It also pertains to Petitioner's "first" TPU, not the TPUv2 and TPUv3 products that use the bfloat16 format.  *See id.*; Ex. 2016, 69 ("Quantized arithmetic—8-bit integer instead of 32-bit floating point (FP)— can work for inference like in TPUv1 but reduced-precision training is an active research area.").

Accordingly, we find that Patent Owner's evidence of alleged copying and commercial success does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims.

### g)   Conclusion

Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 1 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### 3.   Claim 2

Claim 2 recites, "The device of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine."

In Petitioner's view, only one of the alternatives recited in claim 2 needs to be met.  Pet. 40.  We agree because claim 2 recites "at least one of," which indicates that what follows should be read disjunctively.

IPR2021-00155
Patent 10,416,961 B2

Petitioner asserts that Dockser's "main processor" is a "general-purpose processor" implementable as a "state machine," as recited. *Id.* (citing Ex. 1007 ¶¶ 15, 35).

Patent Owner does not provide arguments specifically directed to this analysis. *See* PO Resp.; Sur-Reply.

We agree with Petitioner because Dockser's FPP can be part of the main processor, and the quoted part of Dockser explains that the FPP is part of a general-purpose processor. Ex. 1007 ¶¶ 15, 35. We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references. *See* Goodin Decl. ¶¶ 312–311. Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claim 2 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### 4. *Claim 10*

Claim 10 is an independent claim that recites, "A device comprising: a plurality of components comprising: at lease one first" LPHDR execution unit with all the same limitations as the LPHDR execution unit recited in claim 1. Ex. 1001, col. 31, ll. 25–43. That is, claim 10 is similar to claim 1 except that it adds "a plurality of components comprising" and lacks "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit" at the end. *Compare id.* (claim 10), *with id.* at col. 30, ll. 17–37 (claim 1).

According to Petitioner, Dockser's computing system has a plurality of components: a main processor and an FPP. Pet. 41 (citing Goodin Decl. ¶ 313). Petitioner, alternatively, argues that, if claim 10 were

IPR2021-00155
Patent 10,416,961 B2

interpreted to require that a plurality of components be included in a single LPHDR execution unit, Dockser's FPP has multiple components: registers, controller, and FPO, which also has adder and multiplier. *Id.* (citing Goodin Decl. ¶ 314; Ex. 1007 ¶¶ 15, 19–22). Petitioner relies on its analysis of claim 1 to address the remaining limitations, which are also found claim 1. *Id.* (citing Goodin Decl. ¶¶ 315–316).

Apart from its arguments directed to the features recited in claim 1, Patent Owner does not provide arguments specifically directed to this analysis. *See* PO Resp.; Sur-Reply.

We agree with Petitioner that Dockser's computing system has a plurality of components under either interpretation. *See* Pet. 41. Those components are described in the cited parts of Dockser. Ex. 1007 ¶¶ 15, 19–22. We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references. *See* Goodin Decl. ¶¶ 313–314. For the reasons discussed in Section II.D.2, Petitioner has shown that Dockser teaches the features recited in claim 10 that are shared with claim 1.

Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claim 10 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

#### 5. *Claims 4 and 13*

Claim 4 recites, "The device of claim 1, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000." Ex. 1001, col. 30, ll. 49–51. Claim 13

recites a similar limitation but depends from claim 10.  *Id.* at col. 31, ll. 52–54.

According to the Petition, "[t]he dynamic range of possible valid inputs to Dockser's operation extends from approximately $2^{-126}$ (much smaller than 1/1,000,000) to approximately $2^{127}$ (much larger than 1,000,000), meeting claims 4 and 13."  Pet. 41 (citing Goodin Decl. ¶¶ 317–318; Pet., Section V.B.3 (discussing claim 1)).

Patent Owner does not provide arguments specifically directed to this analysis.  *See* PO Resp.; Sur-Reply.

We agree with Petitioner that Dockser's dynamic range meets the recited range.  Pet. 41.  The dynamic range is determined by the number of exponent bits.  *See, e.g.*, Ex. 1015, col. 8, ll. 48–49 ("The dynamic range increases with the number of bits dedicated to the exponent . . . ."), *cited in* Goodin Decl. ¶ 231, Pet. 20.  Dockser's FPP operates on IEE-745 numbers with 8-bit exponents.  Ex. 1007 ¶¶ 2, 16, 17, 24, *cited in* Pet. 20 (Section V.B.3).  Those 8-bit exponents range from -126 to 127, which means that the dynamic range of "normal" IEEE-754 single-format operands is approximately $2^{-126}$ to $2^{127}$."  Goodin Decl. ¶ 232.

We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references.  *See* Goodin Decl. ¶¶ 232–231, 317–318.

Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claims 4 and 13 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

IPR2021-00155
Patent 10,416,961 B2

### 6. Claims 5 and 14

Claim 5 recites, "The device of claim 1, wherein the first operation is multiplication." Claim 14 recites a similar limitation but depends from claim 10. Petitioner asserts that "Dockser's claimed 'first operation' is reduced-precision 'multiplication.'" Pet. 41 (citing Goodin Decl. ¶¶ 319–321). Patent Owner does not provide arguments specifically directed to this analysis. *See* PO Resp.; Sur-Reply. We agree with Petitioner for the reasons discussed in Section II.D.2, where we analyzed the "first operation" in the context of claim 1.

We credit the Goodin Declaration on these points, as it is explained sufficiently and consistent with the disclosures of the references. Goodin Decl. ¶¶ 319–321.

Based on all the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner (*supra* Section II.D.2.f)), Petitioner has shown, by a preponderance of the evidence, that claims 5 and 14 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### E. Obviousness Ground Based on Dockser and Tong (Claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25)

### 1. Tong

Tong is an IEEE journal article entitled "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic." Ex. 1008, 273. Tong teaches reducing power consumption by minimizing the bitwidth representation of floating-point data. *Id.* According to Tong, using a variable bitwidth floating-point unit saves power. *Id.*

IPR2021-00155
Patent 10,416,961 B2

### 2. *Claim 1*

Petitioner argues that the subject matter of claim 1 would have been obvious over the combination of Dockser and Tong for reasons similar to those analyzed with respect to Dockser alone. *See* Pet. 42–45. Additionally, Petitioner asserts that "Tong, like Dockser . . . , confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision." *Id.* at 43 (citing Ex. 1008, 273–278, Goodin Decl. ¶¶ 323–325). Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 44.



Tong's Figure 6, above, is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the horizontal axis. *Id.* at 43–44. The figure shows this data for five programs:

ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx III. *Id.* The programs implement different signal-processing tasks. *See, e.g.*, Ex. 1008, 278 (Table IV). ALVINN, for example, is a neural network trainer that uses backpropagation. *Id.* And Sphinx III is a speech-recognition program. *Id.*

Petitioner argues that "Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx [III]) would have motivated a [person of ordinary skill in the art] to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." *Id.* at 45. According to the Petition, one of ordinary skill in the art would have done so "to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision." *Id.* (citing Goodin Decl. ¶ 333). Petitioner also concludes that determining the "optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application" was a matter of routine optimization of a result-effective variable. *Id.* at 46–47.

Patent Owner argues that, because Dockser lacks an LPHDR execution unit and Tong does not remedy that deficiency, the Dockser-Tong combination does not render obvious any challenged claim. PO Resp. 24; Sur-Reply 9. We disagree for the reasons discussed in Section II.D.2 analyzing Petitioner's challenge based on Dockser alone.

Patent Owner further argues that Tong does not teach using only 5 mantissa bits, which means that the Dockser-Tong combination lacks the imprecision required to meet the X and Y values recited in the imprecision limitation. PO Resp. 24. In Patent Owner's view, "Tong teaches that at least 11 mantissa bits are required for consistent performance, even for 'programs dealing with human interfaces [that] process sensory data with

IPR2021-00155
Patent 10,416,961 B2

intrinsically low resolutions.'" *Id.* at 25 (citing Ex. 1008, 278). According to Patent Owner, "Petitioner makes no effort to show that arithmetic with the 'required' 11-bit mantissa is an LPHDR operation and meets the X/Y limitations of the claims." PO Resp. 25.

Yet Patent Owner's argument about an 11-bit mantissa (PO Resp. 24–25) does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP to operate at a "selected precision level" according to Tong (Pet. 45). Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." Pet. 45. Thus, we disagree with Patent Owner's argument about an 11-bit mantissa. PO Resp. 24–25; Sur-Reply 9. For this reason, we do not credit the Khatri Declaration on this point. Khatri Decl. ¶ 77.

Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. Pet. 46 (citing Goodin Decl. ¶ 335). Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits. *Id.* (citing Goodin Decl. ¶ 336).

Petitioner adequately shows that the X and Y limitations are met for the 5-mantissa bit rationale. Pet. 46. In particular, Mr. Goodin's software program shows "when retaining 5 mantissa fraction bits in view of Tong, Dockser's register bit-dropping technique produces at least Y=0.2% relative error for 99.03% of possible valid inputs, and Dockser's logic bit-dropping technique produces at least Y=0.2% relative error for 99.44% of possible valid inputs," and the algebraic analysis shows that "Dockser's register bit-dropping technique when retaining 5 mantissa fraction bits produces a minimum of 1.56% relative error (greater than Y=0.2%) for over 12% of

IPR2021-00155
Patent 10,416,961 B2

possible valid inputs (greater than X=10%)." Goodin Decl. ¶ 335. After review of the arguments and evidence on these issues, we credit the Goodin Declaration's algebraic analysis and software-based analysis. *Id.* ¶ 335, Appendix I.B–D.

Although Patent Owner does not present argument specifically directed to Mr. Goodin's software-based or algebraic analysis, Patent Owner argues that one of ordinary skill in the art would not have chosen a 5-bit mantissa: "Tong's experimental results show that using fewer than 11 mantissa bits unacceptably reduces accuracy for the benchmark applications *that were specifically selected* (from a category of programs) for their high tolerance for imprecision." PO Resp. 25 (citing Khatri Decl. ¶ 78). To illustrate this point, Patent Owner annotates Tong's Figure 6, reproduced below:



Tong's Figure 6, above, shows the experimental results with color annotations indicating "the precision levels suitable for general-purpose

IPR2021-00155
Patent 10,416,961 B2

operation (green), those at which a significant percentage of applications begin to produce unacceptable results (yellow), and finally, levels of precision that are unsuitable for most testing benchmarks (red)." *Id.* at 26 (citing Khatri Decl. ¶ 79).

Patent Owner argues that there is no motivation to combine Dockser and Tong because "there is no evidence to show that a POSA [person of ordinary skill in the art] would have chosen Tong's 5-bit examples over the 7, 9, or 11-bit examples." *Id.* at 26–27; *see also* Sur-Reply 10. According to Patent Owner, "Tong does not disclose any extra capability that would have motivated a POSA to use it with Dockser." PO Resp. 27 (citing Khatri Decl. ¶¶ 81–82). In Patent Owner's view, Petitioner relies on hindsight to choose 5 bits and does not offer any differences between Dockser and the claimed invention or other non-hindsight motivation to combine with Tong. *Id.* According to Patent Owner, "Tong teaches that 'it appears inevitable that some fraction of our operands will require full IEEE standard precision,'" which means that a person of ordinary skill in the art would not have been motivated to operate only in 5-bit, 7-bit, or 9-bit modes as Petitioner suggests. Sur-Reply 10.

We disagree with Patent Owner's arguments directed to the rationale for using 5 mantissa bits. *See* PO Resp. 25–27; Sur-Reply 10. Petitioner's reasoning for the 5-bit example is "to conserve power when running [certain] applications, or others empirically determined (using Tong's techniques) to not require greater precision." Pet. 45 (citing Goodin Decl. ¶ 333). For example, in the ALVINN and Sphinx III line plots in Tong's Figure 6, Petitioner added a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. *Id.* at 44. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not

IPR2021-00155
Patent 10,416,961 B2

change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Ex. 1008, 278, § V.B.). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption. *Id.* Petitioner characterizes Tong as "[h]aving empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications." *Id.* (citing Ex. 1008, 273, 274, 279, 284).

Petitioner's assertions are adequately supported by the record. We are persuaded by Petitioner's reliance on Tong's Figure 6 to determine how many bits are needed in a particular application. *See* Pet. 44. That is, Petitioner's choice is not arbitrary or solely based on the '961 patent's written description alone. *See* PO Resp. 25–27. Rather, Petitioner's choice of 5-bits is based on Tong's experimental results for *certain* applications. *See* Pet. 44. We emphasize *certain* because Petitioner is not saying that 5-bits is suitable for every application. *See id.* Full precision may be needed some of the time. *See* Ex. 1008, 280, *discussed in* Sur-Reply 10. But, even if Tong teaches that some applications begin to produce unacceptable results below 11-bits, as Patent Owner notes (PO Resp. 25–26), Tong teaches that 5-bits would be enough for certain ones: ALVINN and Sphinx III shown in Tong's Figure 6. Pet. 44.

Patent Owner argues that "Tong lists those two applications amongst a great many other disclosed applications that all require full precision, and that a POSA would therefore not be motivated to configure Dockser to operate with a 5-bit mantissa just to support those two applications given the far larger number of disclosed applications that require full precision." Sur-Reply 9; PO Resp. 24-27.

We disagree with Patent Owner's argument here because the record adequately supports Petitioner's rationale that "[d]etermining the optimum

range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application" was a matter of routine optimization of a result-effective variable, and Tong, in particular, shows an optimization for a particular program. Pet. 46–47. The record adequately supports Petitioner's reasoning here: Dr. Khatri testified that "exact computing . . . takes up a lot of power." Ex. 1072 ("Deposition of Sunil P. Khatri"), 47:2–5. Mr. Goodin explained that reducing precision may reduce power consumption. *See, e.g.*, Ex. 2043 ("Deposition of Richard M. Goodin"), 34:21–35:4; *see also id.* at 31:2–32:1 (discussing how selectable precision may achieve savings). And we credit the Goodin Declaration's explanation of how Tong achieves this for certain applications. *See, e.g.*, Goodin Decl. ¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 333, 336 (citing Ex. 1008, 278). That is, Petitioner's proposed combination would omit unnecessary bits to reduce waste and power consumption. Pet. 44.

Thus, we disagree with Patent Owner's arguments regarding the combination with Tong. *See* PO Resp. 25–27; Sur-Reply 9–10. For the same reasons, we do not credit the Khatri Declaration on this point. Khatri Decl. ¶¶ 74–82.

For the reasons discussed, we determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the limitations recited in claim 1.

Thus, Petitioner has shown, by a preponderance of the evidence, that claim 1 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a) with a reasonable expectation of success. In coming to this

IPR2021-00155
Patent 10,416,961 B2

conclusion, we also have taken into account the parties' arguments and
evidence regarding the objective indicia of nonobviousness. *Supra* Section
D.2.f).

### 3.    Claims 2, 4, 5, 10, 13, and 14

Petitioner asserts that the subject matter recited in claims 2, 4, 5, 10,
13, and 14 would have been obvious over the combination of Dockser and
Tong for reasons similar to those presented in the ground based on Dockser
alone. *See* Pet. 45–47. For the reasons discussed in Section II.D.2 analyzing
Dockser alone, Petitioner's contentions are supported by the Goodin
Declaration and are persuasive. *See id.* Patent Owner does not present
arguments specifically directed to the challenge based on the Dockser-Tong
challenge to these claims. *See* PO Resp.; Sur-Reply.

To the extent Patent Owner's arguments apply to claims 2, 4, 5, 10,
13, and 14, we disagree with Patent Owner's arguments for the same reasons
explained above. *See supra* Sections II.D.2, II.E.2. After reviewing the
arguments and evidence on these issues, we agree with Petitioner and credit
Mr. Goodin's testimony. Goodin Decl. ¶¶ 322–346. We determine that
Petitioner provides articulated reasoning, supported by rational
underpinnings, why one of ordinary skill in the art would have combined
Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we
find that a person of ordinary skill in the art would have modified Dockser
with Tong to arrive at the subject matter recited in claims 2, 4, 5, 10, 13, and
14 with a reasonable expectation of success. Based on all of the evidence of
record, including evidence of secondary considerations of nonobviousness
submitted by Patent Owner, we determine that the subject matter of claims

IPR2021-00155
Patent 10,416,961 B2

2, 4, 5, 10, 13, and 14 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a). *Supra* Section D.2.f).

### 4. Claim 21

Claim 21 recites limitations similar to those in claim 1 but as a computer program to emulate a device:

> A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: a plurality of components comprising: at least one first low precision high-dynamic range (LPHDR) execution unit adapted to . . . .

Ex. 1001, col. 32, ll. 37–44.

Petitioner asserts that Tong teaches emulating, in software, different bitwidth FP units to determine application accuracy. Pet. 47 (citing Ex. 1008, 278). According to Petitioner, based on this teaching, one of ordinary skill in the art would have been motivated "to emulate the Dockser/Tong device ([Pet.] § VI.B) in software to assess the accuracy of applications running on the device at selected precision levels, and a POSA would have had a reasonable expectation of success in doing so." *Id.* (citing Goodin Decl. ¶¶ 339–340).

Petitioner asserts that "[w]hen the Dockser/Tong device is 'emulated in software' per Tong's teachings ([Ex. 1008], 278) cited [in Pet.] § VI.A, the conventional and obvious implementation of such 'software' is 'computer program instructions' stored in 'a computer-readable memory' and 'executable by [a] processor' within a 'device' (e.g., a computer) as claimed." *Id.* at 48 (citing Goodin Decl. ¶ 341; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 13–15).

For reasons similar to those with respect to claim 1, Petitioner argues that a person of ordinary skill in the art would have been motivated by Tong to use a computer to emulate the combined teachings of Dockser and Tong, "meeting the 'second device' of [21A1]), which comprises a plurality of components including a main processor and Dockser's execution unit (which itself comprises multiple components)." *Id.* (citing Goodin Decl. ¶ 342). Petitioner argues that Tong emulates a device in the same way as the '961 patent does:

> Like the '961 patent's only examples of "emulat[ing] a… device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform.

*Id.* (citing Ex. 1001, col. 17, ll. 14–28, col. 18, l. 65–col. 19, l. 25; Ex. 1008, 278; Goodin Decl. ¶¶ 343).

Patent Owner does not provide arguments specifically directed to Petitioner's arguments or evidence about claim 21 or software emulation. *See* PO Resp.; Sur-Reply.

After review of the arguments and evidence on these issues, we agree with Petitioner and credit the Goodin Declaration. Goodin Decl. ¶¶ 341, 343.

In particular, the '961 patent describes code written in the C programming language to perform the same arithmetic operations in the same order using the same method as one implemented in hardware. Ex. 1001, col. 18, l. 65–col. 19, l. 25, *cited in* Pet. 48. We agree with Petitioner that Tong similarly uses a computer program to simulate reduced-precision arithmetic that a hardware unit would perform. Pet. 48. For

IPR2021-00155
Patent 10,416,961 B2

example, Tong uses an "FP software emulation package" to simulate reduced-precision arithmetic.  Ex. 1008, 278, *cited in* Pet. 48.

Petitioner's obviousness rationale—i.e., "to assess the accuracy of applications running on the device at selected precision levels"—is adequately supported by the record: Tong explains that the emulation package was used to assess "different mantissa and exponent bitwidths." *See* Pet. 47 (citing Ex. 1008, 278).  Petitioner's assertion that software is computer program instructions stored in a computer-readable memory and executable by a processor within a computing device is adequately supported by at least the Goodin Declaration and the evidence that it cites. Pet. 48 (citing Goodin Decl. ¶ 341; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 13–15).

For the same reasons discussed with respect to claim 1, Petitioner shows the subject matter recited in claim 21 that is also recited in claim 1 would have been obvious over the Dockser-Tong combination.  *See supra* Section II.E.2.

Thus, we determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong.  *See KSR*, 550 U.S. at 418.  Based on the Petition, and taking into account Patent Owner's arguments on objective indicia, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the limitations recited in claim 21.

Accordingly, Petitioner has shown that claim 21 is unpatentable over the Dockser-Tong combination.

IPR2021-00155
Patent 10,416,961 B2

### 5. *Claims 24 and 25*

Claims 24 and 25 depend from claim 21 but are otherwise identical to claims 4 and 5.  Pet. 49.  Patent Owner does not present arguments specifically directed to these claims.  *See* PO Resp.; Sur-Reply.  For the same reasons discussed with respect to claims 4, 5, and 21, Petitioner has shown that claims 24, and 25 are unpatentable over the Dockser-Tong combination, and we credit the corresponding parts of the Goodin Declaration.  Pet. 47–49; *see* Goodin Decl. ¶¶ 339–346.

### F. *Obviousness Ground Based on Dockser and MacMillan (Claim 3)*

#### 1. *MacMillan*

MacMillan is entitled "Circuit for Enhancing Performance of a Computer for Personal Use."  Ex. 1009, code (54).  MacMillan discloses using Single Instruction Multiple Data (SIMD) parallel-processing architectures for "adding supercomputer performance to a computer for personal use."  *Id.* at col. 5, ll. 22–54.  MacMillan's computer system comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access memory (SIMD-RAM) devices.  *Id.* at col. 9, ll. 11–19, 30–31, Figs. 2, 3.  Figure 5 of MacMillan is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



FIG. 5

Figure 5 depicts SIMD-RAM device 254 comprising a plurality of DRAMs 304 coupled to a plurality of processing elements 302 (PE0, PE1, PE2, etc.) connected to SIMD bus 240. *Id.* at col. 12, ll. 35–43. MacMillan discloses that "[e]ach PE contains a 32-bit wide data path and can perform atomic operations on bits, bytes, 16-bit words, and 32-bit words," "each DRAM 304 is independently addressed by its PE," "[i]nteger and floating point accelerators could be included in each PE," and "[e]xecution autonomy is provided, in which specific PEs can be excluded from executing specific instructions." *Id.* at col. 12, ll. 47–59. MacMillan describes an example architecture of a system with 256 PEs, but states that the disclosed architecture "allows scaling to higher or lower density chips with more or fewer PEs." *Id.* at col. 12, l. 60–col. 13, l. 4, col. 13, ll. 38–41, col. 16, ll. 20–22.

*2. Claim 3*

Petitioner contends that claims 1–5, 10, 13, and 14 are unpatentable over Dockser and MacMillan under 35 U.S.C. § 103(a).  Pet. 49–55.  Of those claims, claims 1 and 10 are independent.  Petitioner has shown that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable.  *See supra* Section II.D.  Given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable over Dockser and MacMillan.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that the "Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").  Claim 3 is only challenged under this ground and the ground based on Dockser, MacMillan, and Tong.  *See infra* Section II.G.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner.  Thus, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).  Our reasoning follows.

Claim 3 depends from claim 1 and recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (the "exceeds" limitation).  Petitioner relies on

IPR2021-00155
Patent 10,416,961 B2

MacMillan for its teachings regarding multiple floating-point execution units, and argues that a person of ordinary skill in the art "would have been motivated to use Dockser's FPP to implement each 'floating-point accelerator' in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches."  Pet. 51–52 (citing Goodin Decl. ¶¶ 353–354).  According to Petitioner, "using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power."  *Id.* at 52 (citing Goodin Decl. ¶ 354; Ex. 1009, col. 12, ll. 47–49; Ex. 1024, col. 1, ll. 43–58).  Petitioner further contends that MacMillan's SIMD parallel processing is used in "the same types of computers for which Dockser's FPP provides '[p]ower management'" and would be beneficial for the same types of "'graphics applications' for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision."  *Id.* at 51–52 (citing Goodin Decl. ¶¶ 351, 355; Ex. 1007 ¶ 3; Ex. 1009, col. 1, ll. 6–9, col. 5, ll. 22–45, col. 7, ll. 14–34).

With respect to the "exceeds" limitation in particular, Petitioner asserts that MacMillan teaches 256 PEs, and the Dockser-MacMillan combination would have a single Host CPU and at least one FPP in each PE.  *Id.* at 54 (citing Goodin Decl. ¶¶ 372–373).  Petitioner asserts that MacMillan's example architecture includes 256 PEs and scales to tens of thousands or more.  *Id.* (citing Ex. 1009, col. 12, l. 60–col. 13, l. 4; col. 13, ll. 39–41; col. 16, ll. 20–22).  Thus, in Petitioner's proposed combined device based on Dockser and MacMillan, the number of LPHDR execution units (Dockser FPPs) "exceeds by over 100 the non-negative integer number

IPR2021-00155
Patent 10,416,961 B2

of Host CPU floating-point execution units." *Id.* (citing Goodin Decl.
¶¶ 372–373).

Patent Owner responds that a person of ordinary skill in the art would
not have been motivated to combine the teachings of Dockser and
MacMillan in the manner asserted by Petitioner. PO Resp. 35–36. Patent
Owner argues that "Dockser is focused on the objective of reducing power
consumption," whereas "MacMillan is focused on a parallel architecture that
increases computational power, and not focused on reducing power
consumption." *Id.* at 35 (citing Ex. 1009, col. 3, ll. 4–6; Khatri Decl. ¶ 102).
Patent Owner further contends that "[i]ncorporating Dockser's FPPs into
MacMillan would . . . defeat MacMillan's stated objective of achieving a
high-scale SIMD computer architecture at 'lower system cost.'" *Id.* at 36
(citing Ex. 1009, col. 5, ll. 58–59; Khatri Decl. ¶ 103). According to Patent
Owner, "Dockser's FPPs are even *larger* than traditional full-precision
execution units because of the control circuitry needed to implement the
selectable subprecision modes," such that "replacing the full-precision
execution units of MacMillan with Dockser FPP units would require
additional circuitry and chip space and would therefore increase costs, while
providing no benefit." *Id.* (citing Khatri Decl. ¶ 104); *see also* Sur-Reply
14–15.

Petitioner argues in its Reply that the asserted combination would
achieve both benefits of increasing performance speed (based on
MacMillan) and lowering power consumption (based on Dockser), and that
Patent Owner fails to provide supporting evidence for its argument that
incorporating Dockser's FPP into the MacMillan device would increase
costs, and even if it had, economic reasons are not indicative of
nonobviousness. Reply 9–10 (citing Ex. 1071 ¶¶ 30–31).

IPR2021-00155
Patent 10,416,961 B2

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser and MacMillan, we agree with Patent Owner. Dockser teaches a single FPP with "selectable subprecision" that is capable of both full precision and reduced precision operations.  *See* Ex. 1007, code (57), ¶ 15.  The FPP includes additional control circuitry, such as floating-point controller 130 and control register 137, that allows selection of a subprecision for floating-point operations.  *Id.* ¶¶ 15, 18, Fig. 1. Dockser describes "a variety of ways" in which "subprecision select bits may be used to reduce the precision of a floating-point operation."  *Id.* ¶¶ 18, 23–34.  Reduced precision can be achieved, with resultant power savings, either by removing power from "floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" or "removing power to the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected."  *Id.* ¶¶ 4–7, 26–27.  Mr. Goodin agrees that Dockser's FPP requires additional control circuitry to implement its selectable subprecision.  Ex. 2043, 43:21–45:9.

MacMillan, by contrast, is heavily focused on avoiding increased costs associated with added complexity.  MacMillan states that "[i]f supercomputing performance could be achieved in low cost computers, such as personal computers, this could dramatically expand the market for personal computers."  Ex. 1009, col. 1, ll. 21–24.  SIMD computing capability can be added to personal computers, "resulting in much higher performance computing at moderate cost."  *Id.* at col. 8, ll. 51–55. MacMillan, however, describes numerous limitations of known SIMD designs at the time, many of which relate to increased costs from added complexity (e.g., additional registers), size, etc.  *See, e.g., id.* at col. 2,

ll. 56–61 ("hav[ing] a large register set on each PE . . . increases die area per PE, resulting in higher costs per PE"), col. 2, ll. 62–65 ("Adding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs. It may also require tighter geometries or increased numbers of layers on printed circuits boards, further increasing costs."), col. 3, ll. 1–3 ("Adding output buffers to drive increased pin counts also increases power dissipation and hence power supply capacity and cost."), col. 4, ll. 39–40 ("The PE array[] disk may be limited in size due to technology or cost factors.").

> Importantly, MacMillan states:
>
> Overcoming the above limitations would allow supercomputing performance to be provided in a *low cost* computer system for personal use, dramatically expanding the potential market for systems with supercomputer performance.  To meet the cost objectives, the SIMD capabilities *should not add significant complexity to the architecture of a computer system for personal use*.  The present invention addresses the above needs.

*Id.* at col. 5, ll. 38–45 (emphasis added).  MacMillan's disclosed architecture—with multiple, less costly PEs operating in parallel to increase computational power—is expressly intended to account for these limitations. *See id.* at col. 5, ll. 44–45, col. 5, ll. 58–61 (the disclosed system with "shared memory results in lower system cost and more flexibility in using memory"), col. 6, ll. 1–10 ("Another aspect of the invention is that it shows how parallel SIMD processing can be added inexpensively to existing system architectures.  This cost-effective addition of parallel processing can be made to popular, low cost computer systems running popular operating systems . . . ."), col. 6, ll. 41–45, col. 16, ll. 14–27.

> In determining how a person of ordinary skill in the art would have understood those disclosures, we credit the testimony of Dr. Khatri, which is consistent with, and a logical reading of, Dockser and MacMillan. *See Icon*

*Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017) (stating that the Board "is permitted to weigh expert testimony and other record evidence and, in so doing, rely on certain portions of an expert's declaration while disregarding others"). Specifically, the circuitry implementing Dockser's selectable subprecision is beyond that of a typical full precision execution unit. Dr. Khatri testifies that

> [b]ecause Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a [person of ordinary skill in the art] would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a [person of ordinary skill in the art] would expect it to be *larger* than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

*See* Khatri Decl. ¶ 51. Petitioner's asserted combination of incorporating Dockser's FPP into each of multiple PEs in MacMillan's device "would require additional circuitry and chip space and would therefore *increase* costs," "defeat[ing] MacMillan's stated objective of achieving a highly parallel SIMD computer architecture at 'lower system cost.'" *See id.* ¶¶ 103–104. Again, MacMillan specifically counsels that to achieve its cost objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44. The combination proposed by Petitioner would do so. MacMillan's PEs already perform full precision operations; Dockser's selectable subprecision circuitry would add complexity beyond that of a typical full precision execution unit. *See* Khatri Decl. ¶¶ 103–104; Ex. 1009,

col. 12, ll. 47–49 ("Each PE contains a 32-bit wide data path and can perform atomic operations on . . . 32-bit words.").

A person of ordinary skill in the art, reading MacMillan and understanding its emphasis on avoiding increased costs associated with added complexity and size, would not have been motivated to modify MacMillan's device by incorporating Dockser's FPP into the PEs. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376–77 (Fed. Cir. 2021) (finding insufficient motivation to "increase [a prior art reference's] melt flow rate to the claimed range," in part because the reference "includes numerous examples of processing techniques that are typically used to increase melt flow rate, which [the reference] cautions should *not* be used due to the risk of obtaining a broader molecular weight distribution"); *TriVascular*, 812 F.3d at 1067–69 (finding insufficient motivation to combine two references by "substitut[ing] the recessed barbs of [one reference] with the protuberances of [another reference], since [the petitioner's] proposed substitution would destroy the basic objective of the barbs"); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (finding no reason to modify a prior art device where the modification would render the device "inoperable for its intended purpose"); *see also Henny Penny*, 938 F.3d at 1332 (affirming the Board's finding of no motivation to combine where the Board "credited [the patent owner's] expert's testimony that following [one reference's] method of diverting and cooling the oil in [another reference's] system would introduce 'additional plumbing and complexity'"). Notably, this is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PEs; the evidence shows that doing so would increase costs because of the added complexity and size of

IPR2021-00155
Patent 10,416,961 B2

the FPP—a concern that MacMillan explicitly counsels against.  *See* Sur-Reply 14–15.

Petitioner's position is that the individual benefits of MacMillan's approach (increasing performance speed from many low-cost processors operating in parallel) and Dockser's approach (lowering power consumption using additional circuitry added to a single, more complex processor) would have motivated a person of ordinary skill in the art to combine the references' teachings by incorporating Dockser's FPP into the multiple PEs in MacMillan's device.  *See* Pet. 6, 49–55.  Given the express teachings of MacMillan, however, we are not persuaded that an ordinarily skilled artisan would have been motivated to combine the two different approaches in that manner.  Specifically, MacMillan's repeated statements that its approach is designed to avoid increased costs from added complexity and size (and thereby allow for many low-cost processors in the device) would have dissuaded a person of ordinary skill in the art from doing so.

To the extent Petitioner and Mr. Goodin fault Patent Owner for not providing evidence supporting its position, we are not persuaded.  *See* Reply 9–10; Ex. 1071 ¶¶ 30–31.  Petitioner bears the burden of proving unpatentability by a preponderance of the evidence, which includes proving that a person of ordinary skill in the art would have had reason to combine the prior art references.  *See* 35 U.S.C. § 316(e); *Magnum Oil*, 829 F.3d at 1380.  Moreover, Patent Owner's arguments are supported by evidence. Patent Owner relies on the disclosures of Dockser and MacMillan themselves, expert testimony from Dr. Khatri (which we credit on the issue of reasons to combine Dockser and MacMillan), and cross-examination testimony from Mr. Goodin.  *See* PO Resp. 35–36; Sur-Reply 14–15; Khatri Decl. ¶¶ 101–104.

For the reasons explained above, we are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).[8]

### G. Obviousness Ground Based on Dockser, Tong, and MacMillan (Claims 3 and 23)

Petitioner contends that claims 1–5, 10, 13, 14, 21, and 23–25 are unpatentable over Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a). Pet. 56–60. Of those claims, claims 1, 10, and 21 are independent. Petitioner has shown that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable. *See supra* Section II.D. Given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable over Dockser and MacMillan. *Boston Sci. Scimed,* 809 F. App'x at 990. Petitioner challenges claim 3 under this ground and the ground based on Dockser and MacMillan. *See supra* Section II.F. Claim 23 is challenged under this ground only. Claims 3 and 23 recite the same limitation, but depend from claims 1 and 21, respectively.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. Thus, Petitioner has not shown, by a

---

[8] Given this determination, we need not address Patent Owner's argument that the references fail to teach the "exceeds" limitation of claim 3. *See* PO Resp. 28–35; Sur-Reply 10–14.

preponderance of the evidence, that the subject matter recited in claims 3 and 23 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).  Our reasoning follows.

As for the unpatentability of claims 3 and 23, Petitioner presents two theories.  First, Petitioner argues that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels, such that "[t]he resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong)" teaches the claim limitations "for the same reasons Dockser/MacMillan does," referring to Petitioner's earlier analysis of the asserted ground based on Dockser and MacMillan. Pet. 56–57.  We are not persuaded by those arguments for the reasons explained above.  *See supra* Section II.F.

Second, Petitioner presents another theory based on a "customized implementation" of Dockser's FPPs.  Pet. 57–60 (citing Goodin Decl. ¶¶ 389–399); Reply 15–19 (citing Ex. 1071 ¶¶ 56–62).  Petitioner argues that a person of ordinary skill in the art "would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'"  Pet. 58 (citing Ex. 1008, 279; Goodin Decl. ¶ 393).  Specifically, according to Petitioner, an ordinarily skilled artisan would have been motivated to "implement Dockser's FPPs in the embedded signal processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered" and likewise "implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth

IPR2021-00155
Patent 10,416,961 B2

(smaller than 23-bit) corresponding to the precision level selected for the embedded application." *Id.* at 58–59 (citing Goodin Decl. ¶ 394).

Petitioner's analysis is premised on an "alternative interpretation" of the portion of the "exceeds" limitation referring to execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." *Id.* at 57–60. Under that interpretation, an execution unit could meet the "adapted to" clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* at 59–60. Dockser's FPP, modified as described above, would not be such a unit because it has registers and multiplier logic with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the "adapted to" clause. *Id.* at 60.

Patent Owner responds that a person of ordinary skill in the art "would not have been motivated to re-engineer the FPP of Dockser to remove its 32-bit capability [based on Tong] and then incorporate the re-engineered Dockser unit into the system of MacMillan." PO Resp. 40–41 (citing Khatri Decl. ¶¶ 108–109). Patent Owner argues that none of the three references support Petitioner's view. *Id.* at 40–43. First, Dockser teaches a device that "support[s] a range of selectable precisions including full precision," and "[a]djusting Dockser by removing its full-precision capability violates a central tenet of Dockser—to always be able to execute full-precision operations." *Id.* at 42 (citing Khatri Decl. ¶ 114; Ex. 1007 ¶ 3). Second, Tong similarly teaches a device with "both full- and reduced-precision capabilities," and would have reinforced Dockser's teaching that "while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision." *Id.* (emphasis

omitted) (citing Khatri Decl. ¶ 112; Ex. 1007 ¶ 3).  Third, the asserted

combination, "which requires special, customized registers, logic elements,

[and] arithmetic units, . . . would increase manufacturing costs and goes

directly against the teachings of MacMillan," in particular its teaching that

adding "significant complexity" to the SIMD architecture should be avoided.

*Id.* at 43–44 (citing Ex. 1009, col. 24, ll. 24–26, ll. 34–36).  The parties in

their Reply and Sur-Reply disagree as to the meaning of certain cited

disclosures in the references.  *See* Reply 15–19; Sur-Reply 15–18.

  After reviewing the parties' arguments and evidence, and the full

disclosures of Dockser, Tong, and MacMillan, we agree with Patent Owner.

Petitioner's asserted combination is predicated on *removing* what is a

fundamental feature of Dockser and Tong—namely, the ability to operate at

full precision or select a precision less than full precision.  Dockser teaches a

single processor with a default full precision mode that is capable of also

operating in selectable reduced precision modes.  Ex. 1007 ¶¶ 3–4 ("[T]he

common situation is that for certain applications, . . . a reduced precision

may be acceptable, and for other applications, . . . a greater precision may be

needed.  Accordingly, there is a need in the art for a floating-point processor

in which the reduced precision, or subprecision, of the floating-point format

is selectable.").  Dockser's FPP operates on 32-bit full precision values and

performs arithmetic operations at a particular subprecision if the associated

"subprecision select bits" are set, but if not, operates at full precision.  *Id.*

¶¶ 17–19, 23–29, 32, claims 1 (reciting "a floating-point processor having a

maximum precision" and "selecting a subprecision less than the maximum

precision"), 8, 15, 20.  Dockser thus requires full precision with the

capability to select a subprecision less than full precision, as Mr. Goodin

agrees.  *See* Ex. 2043, 36:16–37:17, 38:3–8 ("I don't believe Dockser

IPR2021-00155
Patent 10,416,961 B2

discloses any embodiments without floating-point . . . selectable precision."), 55:21–57:12 ("Dockser requires selectable precision"). Indeed, Petitioner explicitly relies on the fact that "Dockser's precision is selectable" when asserting that a person of ordinary skill in the art would have combined the teachings of Dockser and Tong. *See* Pet. 45; Reply 8; Sur-Reply 17. We see no basis to conclude that a person of ordinary skill in the art would have been motivated to remove the feature that Dockser describes as always present and that is the basis for Petitioner's other assertions regarding Dockser and Tong. *See Chemours*, 4 F.4th at 1377 (finding insufficient motivation to modify a prior art reference "when doing so would necessarily involve altering the inventive concept of" the reference); Public Tr. 41:21–42:8.

Tong likewise does not support Petitioner's asserted motivation to combine. Tong discloses that "not all programs need the precision provided by generic FP hardware," and "the fine precision of the 23-bit mantissa is not essential" and "a single custom FP format may be a viable option" for particular applications, but full precision is necessary for other applications. *See* Ex. 1008, 278–280. Tong states that "scientific programs such as large-scale computational fluid dynamics or electric circuit simulation . . . require a huge amount of precision." *Id.* at 279. Tong further discloses that

> by reducing either precision or range from 32 to fewer bits, we should be able to create custom FP hardware which has lower power simply because of the bit reductions. For a narrow, application-specific task, a single custom FP format may be a viable option. However, *to be more generally useful, we need to consider arithmetic architectures which can scale to different FP formats*. Even though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears *inevitable that some fraction of our operands will require full IEEE-standard precision*.

*Id.* at 280 (emphasis added). Given those disclosures, we are not persuaded that a person of ordinary skill in the art would have been motivated to remove from Dockser's FPP the capability (i.e., selectability from full precision) that Tong characterizes as important.[9]

Finally, with respect to MacMillan, the reference states that to achieve its cost objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44. The Dockser-Tong-MacMillan combined device would add complexity because it involves a "customized implementation" of the multiplier logic in Dockser's FPP. *See* Pet. 59–60; Reply 15. Further, to the extent some selectability remains (among levels below full precision) in Petitioner's "customized implementation," the modified Dockser FPP would still require Dockser's additional control circuitry to implement that selectable subprecision. As explained above, such circuitry would increase costs due to added complexity and size, which MacMillan expressly counsels against. *See supra* Section II.F.

---

[9] Petitioner has shown sufficiently that a person of ordinary skill in the art would have been motivated to *select* a particular precision level in Dockser's FPP based on the teachings of Tong, but not to *remove* functionality from the FPP itself. *See supra* Section II.E.2; *compare* Pet. 45 (arguing that Tong "would have motivated a [person of ordinary skill in the art] to *configure* Dockser's FPP . . . to *operate at a selected* precision level retaining as few as 5 mantissa fraction bits . . . or others empirically determined (using Tong's techniques) to not require greater precision" (emphasis added)), *with id.* at 58–59 (arguing that a person of ordinary skill in the art "would have been motivated to *customize* Dockser's FPPs in MacMillan's PEs" by removing register storage elements to have "smaller than 32-bit registers" (for the register bit-dropping technique) or removing multiplier logic elements (for the multiplier logic technique) (emphasis added)).

IPR2021-00155
Patent 10,416,961 B2

We credit the testimony of Dr. Khatri on these points, as it is explained sufficiently and is consistent with the disclosures of the references. *See* Khatri Decl. ¶¶ 46–48, 107–115. Petitioner has not shown sufficiently that a person of ordinary skill in the art would have combined the teachings of Dockser, Tong, and MacMillan to remove from Dockser's FPP the ability to select a precision less than full precision and then incorporate the modified FPP into the PEs of MacMillan. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 3 and 23 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

## H.  Motion to Exclude

Patent Owner moves to exclude (1) Exhibits 1073, 1075–1078, 1082–1084, 1088–1090, and 1096–1097 as "irrelevant and prejudicial" under Federal Rules of Evidence 402 and 403; (2) Exhibit 1082 for the same reasons and also as unauthenticated under Federal Rule of Evidence 901; (3) and Exhibits 1094 and 1095 as containing inadmissible hearsay under Federal Rule of Evidence 802. Mot. 3–7. Patent Owner's Motion is dismissed as moot, as we do not rely on the exhibits in a manner adverse to Patent Owner in our Decision.

In particular, Petitioner cites Exhibits 1073 and 1075 in support of its argument that Dockser and MacMillan teach the "exceeds" limitation of claim 8 and similar limitations in other claims. *See* Mot. 3–4; Reply 14. Petitioner cites Exhibits 1076–1078 and 1097 in response to an argument made by Patent Owner in its Response regarding MacMillan. *See* Mot. 4; Reply 16–17, 25. We need not reach those arguments because we determine that Petitioner has not shown unpatentability of the claims challenged based

IPR2021-00155
Patent 10,416,961 B2

on the combinations of Dockser and MacMillan, and Dockser, Tong, and
MacMillan, for other reasons. *See supra* Sections II.F and II.G

Petitioner cites Exhibits 1078, 1082–1084, 1088–1090, and
1094–1096 in support of its arguments regarding objective indicia of
nonobviousness. *See* Mot. 4–7; Reply 19–30. As explained above, we do
not find Patent Owner's evidence of objective indicia of nonobviousness
persuasive, and do not rely on the disputed exhibits in reaching that
conclusion.

## I.    *Motions to Seal*

The parties move to seal portions of their demonstrative exhibits that
quote or describe material that we previously ordered sealed. Papers 52, 54;
*see* Papers 27, 48 (granting motions to seal). The parties filed unredacted
confidential and redacted public versions of their demonstrative exhibits.
Exs. 1098, 2054. Upon reviewing the materials sought to be sealed, it
appears that the parties' characterization of the materials is accurate and the
redactions are narrowly tailored to only confidential information. The
parties have established good cause to seal the redacted portions of the
demonstrative exhibits. We grant the motions to seal.

## III. CONCLUSION[10]

Petitioner has demonstrated, by a preponderance of the evidence, that
claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 of the '961 patent are

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
Decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or*

IPR2021-00155
Patent 10,416,961 B2

unpatentable, but has not demonstrated, by a preponderance of the evidence,

that claims 3 and 23 are unpatentable.

_____

*Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. §§ 42.8(a)(3),
42.8(b)(2).

IPR2021-00155
Patent 10,416,961 B2

In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 5, 10, 13, 14 | 103(a) | Dockser | 1, 2, 4, 5, 10, 13, 14 | |
| 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | 103(a) | Dockser, Tong | 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | |
| 1–5, 10, 13, 14 | 103(a) | Dockser, MacMillan[11] | | 3 |
| 1–5, 10, 13, 14, 21, 23–25 | 103(a) | Dockser, Tong, MacMillan[12] | | 3, 23 |
| **Overall Outcome** | | | 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | 3, 23 |

---

[11] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, and 14 are unpatentable over Dockser and MacMillan.  *See supra* Section II.E.

[12] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable over Dockser, Tong, and MacMillan.  *See supra* Section II.G.

IPR2021-00155
Patent 10,416,961 B2

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 4, 5, 10, 13, 14, 21, 24, and 25 of the '961 patent have been shown to be unpatentable, and claims 3 and 23 of the '961 patent have not been shown to be unpatentable; and

FURTHER ORDERED that the parties' Motions to Seal (Papers 52 and 54) are *granted*, and the unredacted confidential versions of the demonstrative exhibits (Exhibits 1098 and 2054) shall remain under seal pursuant to the default protective order previously entered in the instant proceeding; and

FURTHER ORDER that Patent Owner's Motion to Exclude (Paper 46) is dismissed.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00155
Patent 10,416,961 B2

FOR PETITIONER:

Elisabeth H. Hunt
Richard F. Giunta
Anant K. Saraswat
Adam R. Wichman
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent J. Rubino, III
Enrique W. Iturralde
Richard Cowell
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com
rcowell@fabricantllp.com

Brian M. Seeve
Matthew D. Vella
PRINCE LOBEL TYE LLP
bseeve@pricelobel.com
mvella@pricelobel.com

88

PUBLIC VERSION

Trials@uspto.gov                                                        Paper 57
571-272-7822                                                    Date: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

————————————————

IPR2021-00165
Patent 9,218,156 B2

————————————————

Before JUSTIN T. ARBES, STACEY G. WHITE, and JASON M. REPKO,
*Administrative Patent Judges.*

PER CURIAM.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*
Granting Patent Owner's and Petitioner's Motions to Seal
*37 C.F.R. §§ 42.14, 42.54*

PUBLIC VERSION

IPR2021-00165
Patent 9,218,156 B2

# I. INTRODUCTION

## A. Background and Summary

Petitioner Google LLC filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–8, 16, and 33 of U.S. Patent No. 9,218,156 B2 (Ex. 1001, "the '156 patent") pursuant to 35 U.S.C. § 311(a). On May 13, 2021, we instituted an *inter partes* review as to all challenged claims on all grounds of unpatentability asserted in the Petition. Paper 16 ("Decision on Institution" or "Dec. on Inst."). Patent Owner Singular Computing LLC subsequently filed a Patent Owner Response (Paper 28, "PO Resp."), Petitioner filed a Reply (Paper 34, "Reply"), and Patent Owner filed a Sur-Reply (Paper 38, "Sur-Reply"). Patent Owner filed a Motion to Exclude (Paper 46, "Mot.") certain evidence submitted by Petitioner, to which Petitioner filed an Opposition (Paper 47) and Patent Owner filed a Reply (Paper 49). An oral hearing was held on February 11, 2022, and transcripts of the hearing are included in the record (Paper 55, "Conf. Tr."; Paper 56, "Public Tr."). The parties also filed Motions to Seal (Papers 52 and 54) portions of their demonstrative exhibits containing confidential information.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 16, and 33 are unpatentable, but has not shown by a preponderance of the evidence that claims 3–8 are unpatentable.

## B. Related Matters

The parties indicate that the '156 patent is the subject of *Singular Computing LLC v. Google LLC*, Case No. 1:19-cv-12551-FDS (D. Mass.)

("the district court case").  *See* Pet. xi; Paper 9, 1.  Petitioner filed another petition challenging claims 1–8, 16–25, and 33–42 of the '156 patent in IPR2021-00164, which was denied, and filed four other petitions challenging claims of two related patents also asserted in the district court case in IPR2021-00154 (denied), IPR2021-00155 (instituted), IPR2021-00178 (denied), and IPR2021-00179 (instituted).

## C. The '156 Patent

The '156 patent, entitled "Processing with Compact Arithmetic Processing Element," relates to "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)."  Ex. 1001, code (54), col. 6, ll. 3–7.

According to the '156 patent, conventional central processing unit (CPU) chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications.  *Id.* at col. 3, ll. 11–26.  For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations."  *Id.* at col. 3, ll. 19–26.  According to the '156 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors."  *Id.* at col. 3, ll. 27–32.  But "[c]urrent architectures for general purpose computing fail to deliver this power."  *Id.* at col. 3, ll. 32–33.

IPR2021-00165
Patent 9,218,156 B2

The '156 patent is, therefore, "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at col. 2, ll. 15–22. According to the '156 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at col. 2, ll. 32–35. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at col. 2, ll. 40–43. Figure 6, reproduced below, is an example of an LPHDR arithmetic unit according to one embodiment of the '156 patent.



Figure 6 provides "an example design for an LPHDR arithmetic unit according to one embodiment of" the '156 patent. *Id.* at col. 2, ll. 60–61. As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces output 602c. *Id.* at col. 12, ll. 55–56. The LPHDR arithmetic unit "is

controlled by control signals 412*a-d*, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602*a-b*." *Id.* at col. 12, ll. 62–65. According to the '156 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602*a-b* by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at col. 12, l. 65–col. 13, l. 1. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at col. 13, ll. 4–13. The '156 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at col. 13, ll. 11–13.

According to the '156 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at col. 17, ll. 20–23. The '156 patent provides, as examples, applications including "finding nearest neighbors," *id.* at col. 17, l. 31–col. 21, l. 26, "distance weighted scoring," *id.* at col. 21, l. 28–col. 22, l. 17, and "removing motion blur in images," *id.* at col. 22, l. 19–col. 23, l. 34.

### D. Illustrative Claims

Challenged claims 1, 16, and 33 of the '156 patent are independent. Claims 2–8 depend from claim 1. Claims 1–3 recite:

1. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

2. The method of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

3. The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

## E. Evidence

The pending grounds of unpatentability in the instant *inter partes* review are based on the following prior art:

U.S. Patent No. 5,689,677, issued Nov. 18, 1997 (Ex. 1009, "MacMillan");

U.S. Patent Application Publication No. 2007/0203967 A1, published Aug. 30, 2007 (Ex. 1007, "Dockser"); and

Jonathan Ying Fai Tong, David Nagle, & Rob A. Rutenbar, "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," *IEEE*

IPR2021-00165
Patent 9,218,156 B2

> *Transactions on Very Large Scale Integration (VLSI) Systems*,
> vol. 8, no. 3 (June 2000) (Ex. 1008, "Tong").

Petitioner filed a declaration from Richard Goodin, P.E. (Ex. 1003) with its Petition and a reply declaration from Mr. Goodin (Ex. 1071) with its Reply. Patent Owner filed declarations from Sunil P. Khatri, Ph.D. (Ex. 2051) and Joseph Bates, Ph.D. (the named inventor of the '156 patent) (Ex. 2052) with its Response. Also submitted as evidence are transcripts of the depositions of Mr. Goodin (Ex. 2043) and Dr. Khatri (Ex. 1072).

### F.  Asserted Grounds

This *inter partes* review involves the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 16 | 103(a)[1] | Dockser |
| 1, 2, 16, 33 | 103(a) | Dockser, Tong |
| 1–8, 16 | 103(a) | Dockser, MacMillan |
| 1–8, 16, 33 | 103(a) | Dockser, Tong, MacMillan |

## II.  ANALYSIS

### A.  Level of Ordinary Skill in the Art

In determining the level of ordinary skill in the art for a challenged patent, we look to "1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  Here, Petitioner's challenges are based on the pre-AIA version of 35 U.S.C. § 103.

level of active workers in the field." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666–667 (Fed. Cir. 2000). "Not all such factors may be present in every case, and one or more of them may predominate." *Id.*

Petitioner asserts that at the time of the earliest possible effective filing date of the '156 patent (June 19, 2009), a person of ordinary skill in the art would have had "at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture." Pet. 8–9 (citing Ex. 1003 ¶¶ 43–45). Patent Owner's proposed definition of the level of ordinary skill in the art is the same other than it removes the phrases "or the equivalent" and "at least." PO Resp. 14 (citing Ex. 2001 ¶¶ 36–37). There is little difference between the parties' proposed definitions, and the parties and their experts do not explain the basis for their proposals. Arguably, however, the term "at least" creates unnecessary ambiguity. Based on the full record developed during trial, including our review of the '156 patent and the types of problems and solutions described in the '156 patent and cited prior art, we determine that a person of ordinary skill in the art would have had a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and two years of academic or industry experience in computer architecture. *See, e.g.*, Ex. 1001, col. 1, l. 29–col. 2, l. 11 (describing in the "Background" section of the '156 patent various conventional methods of computation and their alleged deficiencies). We apply that definition for purposes of this Decision.

IPR2021-00165
Patent 9,218,156 B2

### B. Claim Interpretation

We interpret the claims of the challenged patent

> using the same claim construction standard that would be used to
> construe the [claims] in a civil action under 35 U.S.C. 282(b),
> including construing the [claims] in accordance with the ordinary
> and customary meaning of such [claims] as understood by one of
> ordinary skill in the art and the prosecution history pertaining to
> the patent.

37 C.F.R. § 42.100(b) (2020). "In determining the meaning of [a] disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006). Claim terms are given their plain and ordinary meaning as would be understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). We conclude that only one claim term requires interpretation to decide the issues presented during trial. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("Because we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy,' we need not construe [a particular claim limitation] where the construction is not 'material to the . . . dispute.'" (citation omitted)).

9

Claim 1 recites "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value."  Independent claims 16 and 33 recite the same limitation.

At issue here is the meaning of "low precision high dynamic range (LPHDR) execution unit," as recited in claims 1, 16, and 33. Specifically, we need to resolve the question of whether this execution unit must be adapted to execute arithmetic operations *only* at low precision.  For the reasons that follow, we determine that it does not.

Petitioner argues that, in the prior art used in all challenges, Dockser's floating-point processor (FPP), including the floating-point operator (FPO) inside the FPP, is low precision "because 'the precision' of operations in the FPP is 'reduced,' . . . and because it operates with the minimum imprecision" recited in the claim.  Pet. 14–15 (citing Ex. 1003 ¶¶ 209–210; Ex. 1001, col. 26, l. 39–col. 27, l. 51; Ex. 1035, 8).  Petitioner asserts that, in the claim, the minimum imprecision is found in the limitation that it calls *1B2*:

> for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

Ex. 1001, col. 29, l. 62–col. 30, l. 4.  According to Petitioner, the '156 patent characterizes degrees of precision described in language mirroring *1B2* as "low precision."  Pet. 14–15.  Petitioner argues that the execution units in

the prior art fall within the scope of the recited unit if they perform reduced precision operations and at least one, but not necessarily all, of those operations meets the other requirements of claim 1. *See, e.g.*, *id.* at 32 (explaining that "numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision"); Reply 2–3 (discussing the "low precision" requirement).

Patent Owner argues that the LPHDR execution unit should be construed as "an execution unit that executes arithmetic operations *only* at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below." PO Resp. 15 (emphasis added). We emphasize "only" because Patent Owner argues that the recited LPHDR execution unit "necessarily excludes full-precision or mixed full and low precision units." *Id.* at 16 (citing Ex. 2051 ¶ 60).

In support of its proposed construction, Patent Owner asserts that construing the LPHDR execution unit as encompassing full or mixed precision units would "impermissibly read out 'low precision high dynamic range' and render the limitation meaningless." *Id.* (citing *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022–23 (Fed. Cir. 2020)); *see also id.* at 17 (arguing that Petitioner's construction reads "'low precision' out of the claims entirely").

Based on the totality of the record, we agree with Petitioner that the recited LPHDR execution unit does not exclude mixed full and low precision execution units (i.e., those that are capable of arithmetic operations at both levels of precision). *See, e.g.*, Pet. 14–15, 31–32. We reject Patent Owner's argument that interpreting the claim in this way renders the term "low precision" "meaningless." *See* PO Resp. 15–17. Rather, the term "low

precision" imposes the requirement that the unit must *at least* perform arithmetic operations at low precision, which would exclude units that operate only at full precision, for example. Thus, we disagree with Patent Owner and assign little weight to Dr. Khatri's testimony on this issue. *See id.*; Ex. 2051 ¶¶ 60–61.

As stated in our Decision on Institution, the recitation of "a first operation" in claim 1 requires only one or more first operations that meet the low precision criteria specified in the claim. Dec. on Inst. 21–22. The claims do not require that "every" operation must be low precision or exclude the LPHDR execution unit from having other capabilities for other operations. *Id.* Indeed, Patent Owner agrees that "a claim's recitation of an 'execution unit adapted to execute a first operation' would normally not preclude that execution unit from performing other types of operations." PO Resp. 17–18. Patent Owner, though, argues that this "rule does not apply when the specification teaches otherwise, as is the situation here." *Id.* We disagree.

Patent Owner relies on exemplary non-limiting embodiments from the '156 patent. *See id.* at 18. Specifically, Patent Owner argues that "the claimed LPHDR execution units are smaller and have fewer transistors" than prior art full precision execution units. *Id.* (citing Ex. 2051 ¶ 62). But the cited passage pertains only to exemplary embodiments and says that the "amount of resources" is small, with transistors being only one example of such resources:

> For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a *small amount of resources (e.g., transistors or volume)* compared with traditional architectures.

Ex. 1001, col. 8, ll. 8–16 (emphasis added).  In fact, some embodiments do not even require transistors: "[e]xamples of such technologies include . . . other technologies whether based on transistors or not."  *Id.* at col. 26, ll. 13–20, *cited in* Reply 6.

The reference to the "small amount of resources" in the cited passage (Ex. 1001, col. 8, ll. 8–16) is consistent with Petitioner's position that the LPHDR execution unit need only perform low precision operations some of the time because the record shows that doing so would save power and other computational resources.  For example, Dr. Khatri testified that "exact computing . . . takes up a lot of resources, takes up a lot of power, takes up a lot of area, and takes up a lot of delay."  Ex. 1072, 47:2–5.  Mr. Goodin explained that reducing precision may achieve power savings.  *See, e.g.*, Ex. 2043, 34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision may achieve power savings).  Mr. Goodin cites specific examples of how this is achieved.  *See, e.g.*, Ex. 1003 ¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 35 (citing Ex. 1007 ¶¶ 3–7). Thus, we disagree with Patent Owner's argument about reducing transistors and assign little weight to Dr. Khatri's testimony on this issue.  *See* PO Resp. 18; Ex. 2051 ¶ 62.

Also, we agree with Petitioner that the degree of low precision is described in limitation *1B2* in claim 1 and similar limitations in the other claims.  Pet. 14–15.  The language used in *1B2* is consistent with how the '156 patent describes low precision.  Ex. 1001, col. 26, l. 39–col. 27, l. 51, *cited in* Pet. 14–15.  For example, the patent states, "[t]he degree of precision of a 'low precision, high dynamic range' arithmetic element may vary from implementation to implementation."  *Id.* at col. 26, ll. 39–41.  The patent then lists several examples.  *Id.* at col. 26, l. 41–col. 27, l. 51.  In one example, "a LPHDR arithmetic element produces results which are

IPR2021-00165
Patent 9,218,156 B2

sometimes (or all of the time) no closer than 0.05% to the correct result."
*Id.* at col. 26, ll. 44–49.  Similarly, independent claims 1, 16, and 33 recite
that

> the statistical mean . . . of the numerical values represented by
> the first output signal of the LPHDR unit executing the first
> operation on that input differs by at least Y=0.05% from the
> result of an exact mathematical calculation of the first operation
> on the numerical values of that same input.

Patent Owner agrees that the claims provide the parameters of the low
precision and high dynamic range in the limitations "wherein the dynamic
range . . ." and "for at least X=5% . . . ."  PO Resp. 16.  Indeed, Patent
Owner in the district court case argued that the subsequent claim language
specifying percentages "*defines* the term 'low precision'" and "specifies the
degree of precision that an LPHDR execution unit must have in order to
satisfy the 'low precision' . . . limitation of the claim."  Ex. 1065, 9
(emphasis added); *see also* Ex. 1066, 12 (arguing that "'low precision high
dynamic range' is defined in [the] claim itself"); Reply 2.  Patent Owner,
however, argues that those limitations "do not allow for the execution unit to
have full-precision (or [low] dynamic range) capability."  PO Resp. 16.

But the claims do not recite that every operation must meet these
criteria.  Rather, the claims only recite that the criteria apply to "a first
operation."  This reading is consistent with the examples of LPHDR
elements from the written description.  *See* Ex. 1001, col. 26, l. 39–col. 27,
l. 51, *cited in* Pet. 14–15.  In those examples, the LPHDR arithmetic
elements may produce results that are only "sometimes" no closer than the
percentage to the correct result.  *See id.*  Thus, we agree with Patent Owner's
argument that the claims provide the parameters for the term "low
precision," but we disagree that the parameters must apply to every

14

operation. *See* PO Resp. 16. For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue. *See* Ex. 2051 ¶¶ 60–64.

Patent Owner also argues that "small size and low transistor count . . . is what allows a much larger number of LPHDR execution units to operate in parallel on a single chip." PO Resp. 19. But the requirement of a "much larger number" is not in the independent claims. Nor do the claims (or Patent Owner's proposed construction) include any limitations on size of the LPHDR execution unit or its transistor count. And "not every benefit flowing from an invention is a claim limitation." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010). Even so, the Specification states that some embodiments are not based on transistors. *See, e.g.*, Ex. 1001, col. 26, ll. 13–20. So we find no support in the written description for Patent Owner's argument about small size and low transistor count. *See* PO Resp. 19. For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue. *See* Ex. 2051 ¶¶ 63–64.

We also agree with Petitioner that the written description does not support Patent Owner's assertion that the '156 patent contrasts LPHDR execution units with other units that operate in both high and low precision. *See* PO Resp. 19, 23 (citing Ex. 1001, col. 5, ll. 36–45); Reply 7 (discussing Patent Owner's argument). The relevant part of the '156 patent describes a graphics processor that supports 16-bit and 32-bit floating point formats:

> When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources

IPR2021-00165
Patent 9,218,156 B2

> to 32 (and increasingly 64) bit arithmetic and are wasteful of
> transistors in the sense discussed above.

Ex. 1001, col. 5, ll. 36–45. This paragraph does not define the term "low precision." *Id.* Nor does the patent explain how the 16-bit units meet the claimed requirements for low precision units that are recited in the claim. *See id.* Also, there is no discussion of these units in the part of the written description that lists examples of low precision units. *See id.* at col. 26, l. 39–col. 27, l. 51. Thus, we disagree with Patent Owner that the '156 patent contrasts LHPDR execution units with those that operate in both high and low precision. PO Resp. 19, 23. For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue. *See* Ex. 2051 ¶¶ 63–64, 72.

To the contrary, we agree with Petitioner that the '156 patent discloses at least one embodiment that performs operations other than LPHDR computations:

> [W]hile the obvious method of using the above [logarithmic number system (LNS)] operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values . . . . *So besides doing LPHDR computations*, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Ex. 1001, col. 14, ll. 9–18 (emphasis added), *quoted in* Reply 4. Because the unit performs arithmetic operations other than those at low precision, this example contradicts Patent Owner's argument that an LPHDR execution unit is "an execution unit that executes arithmetic operations *only* at low precision." PO Resp. 15 (emphasis added).

Patent Owner counters, "as Dr. Khatri explained, a [person of ordinary skill in the art] would not apply the terms 'precision' or 'dynamic

IPR2021-00165
Patent 9,218,156 B2

range' to integers." Sur-Reply 4 (citing Ex. 1072, 116:5–118:3). In Patent Owner's view, a person of ordinary skill in the art "would understand that [Patent Owner's] proposed construction would *not* exclude execution units that can perform integer operations, like the LNS embodiment described in the patent specification." *Id.* at 4–5. Yet Patent Owner's proposed construction makes no distinction between integer or floating-point operations. PO Resp. 15. Rather, the construction refers to "arithmetic operations," generally. *See id.*

In its Sur-Reply, Patent Owner proposes an alternative construction—for the first time in this proceeding—that further defines "arithmetic operations" to be "*floating-point* arithmetic operations." Sur-Reply 5. But a sur-reply must only respond to arguments raised in the preceding brief. Patent Trial and Appeal Board Consolidated Trial Practice Guide (Nov. 2019), 73–74, *available at* https://www.uspto.gov/ TrialPracticeGuideConsolidated. Under 37 C.F.R. § 42.23(b), "respond" does not mean proceed in a new direction with a new approach. *See id.* at 74. "[A] sur-reply that raises a new issue or belatedly presents evidence may not be considered." *Id.* So, apart from noting that we do not see any reason to limit the LPHDR execution unit to only low precision operations—regardless of how those operations are defined—for the reasons discussed above, we do not further consider this new claim construction presented for the first time in the Sur-Reply. *See* Sur-Reply 5.

In sum, we agree with Petitioner that the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that are capable of performing operations at low and full precision, and the degree of "low precision" is defined in limitation *1B2*. *See, e.g.*, Pet. 14–15, 31–32; Reply 2–3. To determine the patentability of the challenged claims, we need

IPR2021-00165
Patent 9,218,156 B2

not further construe "low precision high dynamic range (LPHDR) execution unit." *See Nidec*, 868 F.3d at 1017.

### C. Legal Standards

To prevail in its challenges to the patentability of claims 1–8, 16, and 33 of the '156 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). This burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("Where, as here, the only question presented is whether due consideration of the four *Graham* factors renders a claim or claims obvious, no burden shifts from the patent challenger to the patentee.").

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a) (2006)). The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Additionally, objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc.,

might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Id.* When conducting an obviousness analysis, we consider a prior art reference "not only for what it expressly teaches, but also for what it fairly suggests." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (citation omitted).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"). Also, "[t]hough less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016).

"Although the *KSR* test is flexible, the Board 'must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention.'" *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (citation omitted). Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some

IPR2021-00165
Patent 9,218,156 B2

articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *accord In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (stating that "conclusory statements" amount to an "insufficient articulation[] of motivation to combine"; "instead, the finding must be supported by a 'reasoned explanation'" (citation omitted)); *Magnum Oil*, 829 F.3d at 1380 ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness.").

### D. Obviousness Ground Based on Dockser (Claims 1, 2, and 16)

#### 1. Dockser

Dockser discloses performing floating-point operations with a floating-point processor having "selectable subprecision." Ex. 1007, code (57), ¶¶ 15, 17. "A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa. To find the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent. The sign is applied to the resultant value." *Id.* ¶ 1. "The precision of the floating-point processor is defined by the number of bits used to represent the mantissa. The more bits in the mantissa, the greater the precision." *Id.* ¶ 2. "The precision of [a] floating-point processor generally depends on the particular application. For example, the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa." *Id.* "Higher precision results in a higher accuracy, but commonly results in increased power

consumption." *Id.* Dockser explains that the performance of floating-point operations also can be computationally inefficient because "[w]hile some applications may require [high] types of precision, other applications may not." *Id.* ¶ 3. For example, "some graphics applications may only require a 16-bit mantissa," such that "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," but other applications may require "greater precision." *Id.* Accordingly, there was "a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable." *Id.*

Figure 1 of Dockser is reproduced below.



FIG. 1

IPR2021-00165
Patent 9,218,156 B2

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

Figure 2 of Dockser is reproduced below.



FIG. 2

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits). Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively.

IPR2021-00165
Patent 9,218,156 B2

Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3B depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31. A partial product 420-i is generated for every bit in multiplier 404 at corresponding stage 410-i and then left-shifted "as a function of the multiplier bit with which it is associated, after which the operation moves on to the next stage." *Id.* ¶ 31. The partial products are eventually added together to generate output value 430. *Id.* "[P]ower may be removed from the logic used to implement the stages to the right of the line 405" indicating the selected subprecision. *Id.* ¶¶ 32–33.

### 2. *Claim 1*

Petitioner explains in detail how Dockser teaches or suggests every limitation of claim 1, relying on the testimony of Mr. Goodin as support. *See* Pet. 9–38; Ex. 1003 ¶¶ 197–304.

IPR2021-00165
Patent 9,218,156 B2

Claim 1 recites a device comprising "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Petitioner asserts that Dockser's floating-point processor (FPP) is a "low precision high dynamic range (LPHDR) execution unit."[2]  Pet. 13–15. According to Petitioner, Dockser's FPP is incorporated in a computing system, which is the claimed "device" comprising the FPP.  *Id.* at 13 (citing Ex. 1003 ¶ 197–198; Ex. 1007 ¶¶ 1, 15, 35–36).  We agree with Petitioner.

### a)  *"High Dynamic Range"*

With respect to the "high dynamic range" aspect of the LPHDR execution unit, the claim requires that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000."  Petitioner asserts that Dockser's FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '156 patent.  Pet. 15 (citing Ex. 1007 ¶ 17; Ex. 1001, col. 14, ll. 56–64).  Petitioner's assertion, which is not disputed by Patent Owner, is adequately supported by the record.

For example, Dockser's register location 200 stores a 32-bit binary floating-point number, in an IEEE-754 32-bit single format, with 8-bit exponent 204.  Ex. 1007 ¶¶ 2, 17, *cited in* Pet. 20.  According to

---

[2] Petitioner also provides an "alternative mapping" where "the floating-point operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit. Pet. 14–15, 19, 21, 37.  We need not evaluate those arguments because we determine that Petitioner has made a sufficient showing based on the full trial record that the FPP is an LPHDR execution unit.

Mr. Goodin, the dynamic range of normal IEEE-754 operands would be from around $2^{-126}$, which is much smaller than $1/65,000$, to around $2^{127}$, which is much larger than 65,000. Ex. 1003 ¶ 233, *cited in* Pet. 20. We credit Mr. Goodin's testimony on this point because it is consistent with Dockser. *See id.*; Ex. 1007 ¶¶ 2, 16–17, 24. Thus, Petitioner has shown that Dockser's FPP meets the dynamic range limitation recited in claim 1.

### b)  *"A First Operation"*

Claim 1 recites that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Petitioner argues that Dockser's FPP is adapted to execute a "first operation" (e.g., "reduced-precision multiplication") on a "first input signal representing a first numerical value" (i.e., input electrical signal representing an operand received at the registers) to produce a "first output signal representing a second numerical value" (i.e., output electrical signal representing an operand sent to a register and then main memory). Pet. 17–19.

Patent Owner does not present an argument to specifically address this argument and evidence. *See* PO Resp.; Sur-Reply.

Based on our review of the totality of the evidence in this case, we agree that Dockser's FPP is adapted to execute the recited first operation. Dockser's FPP receives the operands as input values. Ex. 1007, Fig. 1. Dockser's FPP performs operations on the inputs via the FPP's data paths 134–139 and components 140–144. *Id.* We agree with Petitioner that Dockser teaches that the operand data to the FPP is a "first input signal representing a first numerical value" because it represents the operand

number.  *Id.* ¶ 17.  The FPP executes the operation and produces an "output value," or "output number," which is represented by "output bits."  *Id.* ¶ 34.  In this way, that value is the recited "second numerical value."  *See* Pet. 17–19.  We credit Mr. Goodin's testimony on this point.  Ex. 1003 ¶¶ 224–227.

We also credit Mr. Goodin's analysis showing that Dockser's computing circuits "move" data between components, such as from memory to the processor, via electrical signals.  *See id.* ¶ 221 (citing Ex. 1014, col. 1, ll. 36–37).  On this issue, the record provides adequate support for Mr. Goodin's testimony.  *See* Ex. 1007 ¶¶ 16–17; Ex. 1014, col. 1, ll. 36–37.  Thus, Petitioner has shown that signals represent the recited values.

Considering all of the arguments and evidence in this case, Petitioner has sufficiently shown that Dockser teaches that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value," as recited in claim 1.  Pet. 15–20.

### c)  *"Low Precision"*

As for the "low precision" aspect of the LPHDR execution unit, Patent Owner argues that Dockser's FPP is not an LPHDR execution unit because the FPP is capable of both low and full precision operations.  *See* PO Resp. 15, 20–24.  We disagree with Patent Owner's argument and underlying construction for the reasons discussed in Section II.B.  Instead, we agree with Petitioner that (1) the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that perform operations at low and full precision, and (2) the degree of "low precision"

required by the claim is defined in limitation *1B2*. *See, e.g.*, Pet. 14–15, 31–32; Reply 2–3.

### d) *Limitation 1B2*

Under the interpretation discussed in Section II.B, Petitioner has shown that Dockser teaches the recited LPHDR execution unit. In particular, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP "operates with the minimum imprecision" required by limitation *1B2*. Pet. 14–15 (quoting Ex. 1007 ¶ 14). Limitation *1B2* recites (emphasis added):

> for at least X=5% of the possible valid inputs to the first operation, the *statistical mean*, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an *exact mathematical calculation* of the first operation on the numerical values of that same input.

We first analyze the "statistical mean" limitation before turning to the "exact mathematical calculation" limitation.

### (1) *"Statistical Mean"*

Petitioner argues that a person of ordinary skill in the art would have understood the "statistical mean" limitation

> in the context of the '156 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."

Pet. 22 (quoting Ex. 1001, col. 4, ll. 11–17).

In Petitioner's view, for "non-deterministic embodiments," the statistical mean would be the average of "the different outputs produced by the same operation on the same input." *Id.* at 22. Petitioner argues that, for "deterministic digital embodiments" like Dockser, the statistical mean is "the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input." *Id.* at 23. In Petitioner's view, repeatedly executing a multiplication operation using Dockser's floating point multiplier "on the same input (*i.e.*, pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.*

Patent Owner does not dispute this reasoning. *See* PO Resp.; Sur-Reply.

Based on the totality of the evidence, Petitioner's analysis of "deterministic digital embodiments" to address the "statistical mean" limitation is adequately supported by the record. Pet. 23. We are persuaded by Petitioner's reasoning that the '156 patent's written description has both analog and digital embodiments. *See, e.g.*, Ex. 1001, col. 4, ll. 11–17, col. 14, ll. 19–65, col. 17, ll. 12–18. Dockser uses "a conventional floating-point multiplier." Ex. 1007 ¶ 20. Petitioner adequately supports its assertion that this is a deterministic digital circuit. Pet. 23 (citing Ex. 1003 ¶ 242; Ex. 1011, col. 1, ll. 40–42). And we credit Mr. Goodin's testimony that, in such a digital circuit, a floating-point multiplier operating on the same input with the same precision level yields the same result for

every execution, and thus, the statistical mean is the same as the output for any single execution.  Ex. 1003 ¶ 243, *cited in* Pet. 23.


### (2) "Exact Mathematical Calculation"

As for the "exact mathematical calculation" limitation, Petitioner argues that because Dockser performs a reduced precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation: "the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied without reducing precision."  Pet. 24 (emphasis omitted) (citing Ex. 1003 ¶ 245; Pet. App'x I.B).


### (3) Y Relative Error for X Valid Inputs

According to Petitioner, "Dockser discloses two precision-reducing techniques that can be used separately or together."  Pet. 26 (citing Ex. 1007 ¶¶ 4–7; Ex. 1003 ¶¶ 256–262).  One technique removes power from storage elements in the FPP registers that correspond to the excess, dropped mantissa bits, which drops bits from the operands.  *Id.*  The other technique "remov[es] power from elements within the multiplier logic that computes the product of the operand mantissas."  *Id.*  Petitioner asserts that both techniques individually and in combination teach limitation *1B2*.

We determine that Petitioner has made a sufficient showing that Dockser meets the recited requirements for low precision under the register bit-dropping rationale.  Patent Owner does not present arguments specific to this technique.  *See* PO Resp.; Sur-Reply.  We need not evaluate Petitioner's alternative rationale based on the multiplier logic.  Our reasoning follows.

*(4)  Register Bit-Dropping*

Petitioner explains how Dockser teaches that "for at least X=5% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.05%" from the result of the exact mathematical calculation.  Pet. 24–37.  In Petitioner's view, the "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception)."  *Id.* at 25.  Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs.  *Id.*

We agree.  Dockser retains only some of the bits of a mantissa fraction: in one example, the nine most-significant bits of the mantissa fraction are retained, and the other 14 excess bits are dropped.  Ex. 1007 ¶¶ 25–28, *cited in* Pet. 25; Ex. 1003 ¶ 255.  The outputs of Dockser's unpowered storage elements are tied to zero voltage.  Ex. 1003 ¶ 270; Ex. 1007 ¶¶ 26 (discussing removing power from the register elements for the excess bits), 29 (discussing "unpowered bits").  With support from Mr. Goodin and corroborating evidence, Petitioner shows that tying the outputs of the unpowered storage elements for the 14 "excess" bits to zero voltage would make those bits zeroes.  Pet. 29 (citing Ex. 1003 ¶¶ 270–272).

Multiplying two operands with excess bits dropped (representing zero) reduces the output's precision.  Ex. 1007 ¶¶ 24–26.  Petitioner provides a representative example described by Mr. Goodin:

the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.3787171840667724609375) would become

> 011000001000000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 01000100110111000001000 (representing a mantissa of 1.26898288726806640625) would become 01000100100000000000000 (representing a mantissa of 1.267578125).

Pet. 30 (citing Ex. 1003 ¶ 274). So the decrease in precision depends on the number of mantissa bits dropped. *See id.*; *see also* Ex. 1003 ¶ 279. And we agree with Petitioner that Dockser suggests that any desired number of mantissa bits can be dropped. Pet. 32. For example, Dockser describes how the precision is selectable. *See* Ex. 1007 ¶¶ 14–15, 17 (describing selectable reduced precision), *discussed in* Pet. 5.

Petitioner asserts that Dockser's register bit-dropping technique meets limitation *1B2* in two ways. Pet. 27–33. First, Petitioner presents results of a software demonstration to show that Dockser's 9 mantissa bits meets limitation *1B2*. *Id.* at 32–33. Second, Petitioner uses a pencil-and-paper algebraic analysis to show that retaining 9 mantissa bits meets limitation *1B2*. *Id.* at 33.

As for the software demonstration, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas)," a person of ordinary skill in the art "would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 32–33. Petitioner states that Mr. Goodin wrote a program to perform reduced precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.05% relative

IPR2021-00165
Patent 9,218,156 B2

error for 92.1% of possible valid inputs (greater than X=5%)." *Id.* at 32–33, 66–68 (citing Ex. 1003 ¶¶ 282–284, 414–424, 468–473).

Patent Owner did not rebut this evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's assertions about the recited X and Y percentages, and we credit Mr. Goodin's testimony on this issue, which is supported by the record. *See* Ex. 1003 ¶¶ 414–428. In particular, Mr. Goodin summarizes the results of the software program in the table below. *Id.* ¶ 425.

| Retained Fraction Bits | Claimed Y% | Percentage of Tested Pairs Meeting Claimed Y% | Adjusted "Dockser's X%" |
|---|---|---|---|
| 9 | ≥ 0.05% | 92.628313% | ≥ 92.14333% |
| | ≥ 0.20% | 14.674747% | ≥ 14.59791% |
| 5 | ≥ 0.05% | 99.971764% | ≥ 99.44834% |
| | ≥ 0.20% | 99.547206% | ≥ 99.02600% |

The table shows the percentage of tested pairs that meet the claimed Y percentage as output by the software program. *Id.* It also shows a "Dockser's X" percentage, which is adjusted to exclude possible overflow and underflow pairs, that meets the claimed requirements. *Id.* The X value is calculated by multiplying the percentage output by the software program by an adjustment ratio. *Id.* The adjustment ratio is described in Appendix I.E of Mr. Goodin's declaration. *Id.* Mr. Goodin also explains that, if "the 'exact mathematical calculation' of multiplication of two single-format floating-point operands is the product rounded or truncated to single format (having a 23-bit-fraction mantissa), the claims are still met." *Id.* ¶ 428. To show this, Mr. Goodin wrote an alternative version of the program under this assumption, which also gives results that meet the claim limitations. *Id.*

IPR2021-00165
Patent 9,218,156 B2

After review of the arguments and evidence on these issues, we credit Mr. Goodin's software-based analysis.  *Id.* ¶¶ 414–428.

As for the algebraic analysis, Petitioner argues that a person of ordinary skill in the art "would also have understood algebraically that Dockser's register bit-dropping technique meets [limitation *1B2*], by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions."  Pet. 33.  Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their tenth and eleventh fraction bits," such that retaining only 9 mantissa bits of operands would result in "*every* input in that 12% produc[ing] at *minimum* 0.097% relative error."  *Id.* at 33, 69–73 (citing Ex. 1003 ¶¶ 285–286, 429–448).

Patent Owner did not rebut this evidence.  *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's algebraic method showing the recited X and Y percentages, and credit Mr. Goodin's testimony on this issue.  *See* Ex. 1003 ¶¶ 429–448.  Under this reasoning, "for the 12.5% of all possible $M_A$ [mantissa] values with zero in the first fraction bit and ones in the $(K+1)^{th}$ and $(K+2)^{th}$ fraction bits," the following inequality holds "when Dockser's register bit-dropping truncates the operands to K fraction bits":

$$Y \geq \frac{\left(2^{-(K+1)} + 2^{-(K+2)}\right)}{(1.5 - 2^{-23})} \times 100\% \qquad (\textbf{\textit{Equation C}})$$

*Id.* ¶ 444.

IPR2021-00165
Patent 9,218,156 B2

The table below shows the results of evaluating Equation C with K=9, K=8, K=7, and K=5 retained fraction bits as the selected precision level. *Id.* ¶ 448.

| Retained Fraction Bits (K) | Equation C: Minimum Y for $X \geq 12\%$ | Equation D: Minimum Y for $X \geq 6\%$ | Meets X/Y Percentages Recited by Challenged Claims: |
|---|---|---|---|
| 9 | $\geq 0.0976\%$ | $\geq 0.1171\%$ | 1, 4, 16, 33 |
| 8 | $\geq 0.1953\%$ | $\geq 0.2343\%$ | All above plus 5 |
| 7 | $\geq 0.3906\%$ | $\geq 0.4687\%$ | All above plus 6 |
| 5 | $\geq 1.5625\%$ | $\geq 1.8750\%$ | All above |

The table above shows that the values of K meet the '156 patent's claimed minimum X and Y. *Id.* After review of the arguments and evidence on these issues, we credit Mr. Goodin's algebraic analysis. *Id.* ¶¶ 429–448.

### e)    *"Control the Operation"*

Lastly, claim 1 recites "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit." Petitioner asserts that Dockser's main processor meets the computing device limitation. Pet. 38. Patent Owner does not provide evidence or argument specific to this limitation. We agree with Petitioner because Dockser's processor writes subprecision select bits to the FPP's control register, and in at least this way, Dockser's main processor is adapted to control the FPP's operation by specifying its precision level. *See* Ex. 1007 ¶¶ 15, 18, 25, 35. We credit Mr. Goodin's testimony on this issue, which is supported by the evidence of record. *See* Ex. 1003 ¶ 304.

### f)    *Objective Indicia of Nonobviousness*

In addition to its argument based on the interpretation of "low precision high dynamic range (LPHDR) execution unit," Patent Owner

IPR2021-00165
Patent 9,218,156 B2

argues that objective indicia of nonobviousness demonstrate that the challenged claims would not have been obvious to a person of ordinary skill in the art.  PO Resp. 48–74.  Because the parties largely refer to the challenged claims collectively in their arguments regarding objective indicia, we do so as well and now address those arguments as applied to all of the claims challenged as obvious over Dockser alone or the combination of Dockser and Tong, i.e., claims 1, 2, 16, and 33, which we refer to as the "Dockser/Tong-challenged claims."[3]  *See id.*; Reply 19–30; Sur-Reply 18–26.

"In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a nexus to the claims, *i.e.*, there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (citations and internal quotation marks omitted).  "The patentee bears the burden of showing that a nexus exists." *Id.*  "To determine whether the patentee has met that burden, we consider the correspondence between the objective evidence and the claim scope." *Id.*  A patentee is entitled to a rebuttable presumption of nexus "when the patentee shows that the asserted objective

_____

[3] As explained below, we determine that Petitioner has not proven that certain claims are unpatentable over the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, because Petitioner has not sufficiently shown a reason to combine with MacMillan.  *See infra* Sections II.F, II.G.  Accordingly, we need not assess objective indicia of nonobviousness with respect to those claims.  *See Mylan Pharms. Inc. v. Res. Corp. Techs., Inc.*, 914 F.3d 1366, 1376 (Fed. Cir. 2019) ("Because we agree with the Board that Appellants failed to establish a motivation to modify compound 3I, we need not reach Appellants' arguments regarding objective indicia.").

evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (citation omitted). Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021). "As part of the presumption analysis, the fact finder must consider the unclaimed features of the stated products to determine their level of significance and their impact on the correspondence between the claim and the products." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1418 (Fed. Cir. 2022). When, "for example, the patented invention is only a small component of the product tied to the objective evidence, there is no presumption of nexus." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333 (Fed. Cir. 2019). Absent a presumption of nexus, a patent owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (citation omitted).

"Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011). On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016). A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when

IPR2021-00165
Patent 9,218,156 B2

objective evidence is tied to the supposedly 'new' feature(s)." *Id.* at 1330.
Ultimately, the fact finder must weigh the objective indicia evidence
presented in the context of whether the claimed invention as a whole would
have been obvious to an ordinarily skilled artisan. *Id.* at 1331–32;
*Lectrosonics, Inc. v Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB
Jan. 24, 2020) (precedential).

### *(1)  Industry Skepticism*

"If industry participants or skilled artisans are skeptical about whether
or how a problem could be solved or the workability of the claimed solution,
it favors non-obviousness.  Doubt or disbelief by skilled artisans regarding
the likely success of a combination or solution weighs against the notion that
one would combine elements in references to achieve the claimed
invention." *WBIP*, 829 F.3d at 1335.  As evidence of alleged industry
skepticism, Patent Owner points to various statements made by employees
of Petitioner after meeting with Dr. Bates (the named inventor of the
'156 patent) in 2010.  PO Resp. 49–53.  According to Patent Owner,
Dr. Bates explained that floating point units programmed to perform



*Id.* at 49–52 (citing Exs. 2009, 2027,
2028, 2030).  Patent Owner contends that the cited statements from
Petitioner's employees "express skepticism about utility of the low-precision
arithmetic performed by the large numbers of low-precision execution

IPR2021-00165
Patent 9,218,156 B2

units,"[4] which is a "key feature" of the challenged claims, and have a nexus

to the challenged claims because they were made in response to Dr. Bates's

presentations. *Id.* at 52–53.

Petitioner argues that Patent Owner's evidence is irrelevant because

it is dated after the earliest possible effective filing date of the '156 patent

(June 19, 2009). Reply 22. We disagree that evidence of industry

skepticism must itself be dated before the relevant invention. *See WBIP*,

829 F.3d at 1335–36 (considering evidence of skepticism dated after the

invention of the patent at issue); *Pressure Prods. Med. Supplies, Inc. v.

Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (same); Sur-Reply

19.

We have reviewed the substance of the statements cited by Patent

Owner, though, and are not persuaded that they are probative of

nonobviousness. The statements by Petitioner's engineers relate to whether

applications using "approximate" arithmetic would be commercially

valuable; they do not show skepticism as to whether or how a problem could

be solved or whether such applications would *work*. *See WBIP*, 829 F.3d at

1335. For example, Tom Dean stated that ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████

---

[4] Claim 1 recites "at least one" LPHDR execution unit and thus is satisfied
by only a single LPHDR execution unit. The only challenged claims of the
'156 patent that arguably require a "large number[]" of LPHDR execution
units are challenged in Petitioner's asserted grounds based on combinations
with MacMillan. *See* PO Resp. 50. For example, claim 3 recites that "the
number of LPHDR execution units in the device exceeds by at least one
hundred the non-negative integer number of execution units in the device
adapted to execute at least the operation of multiplication on floating point
numbers that are at least 32 bits wide."

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00165
Patent 9,218,156 B2

Ex. 2009, 1 (emphasis added).

Ex. 2029, 1 (emphasis added).



Ex. 2028, 1 (emphasis added).

Ex. 2030, 2. Thus, the cited comments appear to indicate that floating point units performing "approximate" arithmetic would only be commercially valuable for a limited set of applications, rather than expressing skepticism as to whether such applications would work. Patent Owner also has not explained sufficiently why the fact that "approximate" arithmetic was considered useful for some applications, but not others, amounts to industry skepticism over the claimed invention as a whole (which is not limited to a particular application). We find that Patent Owner's evidence of alleged industry skepticism does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims.

*(2) Industry Praise*

"Evidence that the industry praised a claimed invention or a product which embodies the patent claims weighs against an assertion that the same claim would have been obvious. Industry participants, especially

40

IPR2021-00165
Patent 9,218,156 B2

competitors, are not likely to praise an obvious advance over the known art."
*WBIP*, 829 F.3d at 1334. Patent Owner points to four statements of alleged
industry praise from "leading figures in computer science" and argues that
they have a nexus to the challenged claims because they relate to Dr. Bates
and his presentations to Petitioner in 2010, 2011, and 2013. PO Resp.
53–54.



      Patent Owner cites Dr. Bates's notes from ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 53; Ex. 2050. This single
line in the notes does not mention any specific ideas or features that
allegedly were praised, or why or for what they were being praised. Patent
Owner argues that there is "no requirement that praise identify exactly the
features being praised." Sur-Reply 20. But evidence of industry praise must
be for "the claimed invention," and the notes only state that ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ *See* Ex. 2050; *Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc); *WBIP*, 829 F.3d at 1334.
The notes also have less probative value because they were written by
Dr. Bates based on his subjective recollection of Mr. Dean's reaction at the
meeting, rather than, for example, being prepared by a third party or
Mr. Dean himself. Ex. 2052 ¶ 7.

      Patent Owner also cites three 2011 emails sent by employees of
Petitioner to Dr. Bates. PO Resp. 53–54. Andrew Ng wrote the following to
Dr. Bates:



**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00165
Patent 9,218,156 B2

[REDACTED]

Ex. 2033, 1. Astro Teller wrote that [REDACTED] [REDACTED] and Johnny Chen wrote, [REDACTED] [REDACTED] *See* Exs. 2031, 2032. We view these emails as more consistent with Petitioner's view as "merely cordial statements made to Dr. Bates," rather than evidence of industry praising the inventions of the Dockser/Tong-challenged claims as Patent Owner contends. *See* Reply 24. Further, they are statements by employees of Petitioner only (not any other industry participant or industry group) and do not mention any specific ideas or features from Dr. Bates's presentations that were being praised. We find that Patent Owner's evidence of alleged industry praise is too ambiguous and high-level to be probative of nonobviousness.

### (3) Unexpected Results

"To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Meyers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014). Also, "[w]hen assessing unexpected properties, . . . we must evaluate the significance and 'kind' of expected results along with the unexpected results." *Id.* As evidence of alleged unexpected results, Patent Owner points to a September 2013 presentation that Dr. Bates gave to Petitioner showing

[REDACTED]

42

IPR2021-00165
Patent 9,218,156 B2

████████████████████ PO Resp. 54–58 (citing Ex. 2005). Patent Owner
argues that the unexpected nature of the results is "confirmed by skepticism
expressed by" David Patterson, Ph.D. (an employee of Petitioner and
"acclaimed expert in the field of computer science and computer
architecture" according to Patent Owner), and "further supported by Dockser
and Tong," which teach that higher precision is "generally" needed. *Id.* at
55–57 (citing Ex. 1007 ¶ 3; Ex. 1008, 280; Ex. 2012; Ex. 2051 ¶¶ 124–125).

The cited evidence, however, does not establish a difference between
the alleged results and the closest prior art. Dr. Bates's presentation includes
████████████████████████ Ex. 2005, 11; *see* PO Resp. 56.
In this case, however, the closest prior art is Dockser and Tong, both of
which teach reduced precision arithmetic and, importantly, show that high
performance with reduced precision was *expected* for certain applications.
*See* Reply 25; Ex. 1007 ¶ 3 ("[F]or certain applications, . . . a reduced
precision, may be acceptable, and for other applications, . . . a greater
precision may be needed."); Ex. 1008, 273 ("[M]any programs which
manipulate human sensory inputs, e.g., speech and image recognition, suffer
no loss of accuracy with reduced bitwidth in the mantissa or exponent.")."
Patent Owner contends that Dockser and Tong are not appropriate for
comparison because they do not "provide computing scale results" and have
an "entirely different focus on power savings." Sur-Reply 21. We disagree.
As explained above, we find that Dockser teaches the claim 1 LPHDR
execution unit performing the recited reduced precision arithmetic. *See
supra* Section II.D.2. Patent Owner's only comparison, however, is to a
CPU without any reduced precision capability. *See* PO Resp. 56. We find
that Patent Owner's evidence of alleged unexpected results does not weigh
in favor of nonobviousness of the Dockser/Tong-challenged claims because

IPR2021-00165
Patent 9,218,156 B2

it does not establish a difference between the results and the closest prior art and does not establish that such a difference would have been unexpected by a person of ordinary skill in the art.

*(4) Copying and Commercial Success*

"Copying may . . . be another form of flattering praise for inventive features," as "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336 (citation omitted). Copying "requires evidence of efforts to replicate a specific product." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). "This may be demonstrated either through internal documents; direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica; or access to, and substantial similarity to, the patented product (as opposed to the patent)." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (internal citations omitted). However, "a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000); *see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[M]ore than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue." (citation omitted)).

Commercial success is typically shown with evidence of "significant sales in a relevant market." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (citation omitted). "When a patentee can demonstrate commercial success, usually shown by significant sales in a

44

relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

Patent Owner argues that after Dr. Bates made his presentations to Petitioner in 2010–2014, Petitioner copied Dr. Bates's invention in its Tensor Processing Unit (TPU) v2 and v3 products released in 2017–2018, which "use execution units designed to perform operations using a low-precision 'floating point format called bfloat16' in order to achieve increased parallelism and scale." PO Resp. 58–59 (citing Ex. 2010; Ex. 2011, 9; Ex. 2034, 6; Ex. 2051 ¶¶ 126–127). The bfloat16 format "keep[s] the same 8 bit exponent as found in 32-bit IEEE floating point" but "reduces precision significantly by using only a 7-bit mantissa, as opposed to the 23-bit mantissa of IEEE 32-bit floating point." *Id.* at 59–60 (citing Ex. 2041, 1–2). According to Patent Owner, Petitioner uses the TPUv2 and TPUv3 products to "power all of its major products and services, including Search, Translate, Photos, Assistant, and Gmail," saving Petitioner "at least $10 billion." *Id.* at 62–63 (citing Exs. 2011, 2015–18, 2040). Patent Owner argues that a nexus is presumed because the TPUv2 and TPUv3 products are coextensive with the challenged claims. *Id.* at 60, 63–69 (citing Pet. 20–21, 73; Ex. 1003 ¶¶ 231–232; Ex. 2011; Ex. 2016; Ex. 2041, 7; Ex. 2049; Ex. 2051 ¶¶ 129–138). Patent Owner further contends that, even if not presumed, a nexus is shown by "internal communications among [Petitioner's] own engineers and executives" and Petitioner's communications with Dr. Bates. *Id.* at 60–63 (citing Exs. 2007, 2011, 2016, 2035–39, 2041, 2042, 2047, 2048).

We have reviewed the cited evidence and do not find it probative of nonobviousness. First, we are not persuaded that a nexus should be presumed because the TPU products are coextensive with the Dockser/Tong-challenged claims, as Patent Owner contends. Petitioner and Mr. Goodin identify a number of other allegedly material features of the products that are not part of the claims: "Inter-Core Interconnect" (ICI), "Systolic array," "Two TensorCores per chip," "High-bandwidth memory," "Liquid cooling," and "Accelerated Linear Algebra compiler." *See* Reply 26; Ex. 1071 ¶¶ 86–92. We focus on the first two features in particular because the evidence of record characterizes them as significant.

Regarding the ICI of the TPU products, Dr. Patterson stated the following:

> So the *critical feature* of the supercomputer is the way they talk to each other – you know, the chips talk to each other. So what's called – [Petitioner] invented something called ICI. It's a custom Inter-Core Interconnect that they did custom for this design; it's not some standard that you buy off the shelf. It runs at about 500 gigabits per section in both directions per link, and there's four of those links.

Ex. 2012, 14:17–24 (emphasis added). An article authored by Dr. Patterson and others[5] states that "[t]he *critical architecture feature* of a modern supercomputer is how its chips communicate: what is the speed of a link; what is the interconnect topology; does it have centralized versus distributed switches; and so on," and the TPUv2 product has "four custom Inter-Core

---

[5] We disagree with Patent Owner that the materials cited herein are merely "marketing documents." *See* Conf. Tr. 13:18–24. Dr. Patterson's comments are from an audio transcription of a YouTube video filed by Patent Owner (Ex. 2012), and the article is from the publication *Communications of the ACM* (Ex. 2016). *See* PO Resp. ix.

Interconnect (ICI) links, each running at 496Gbits/s per direction."

Ex. 2016, 69; *see id.* at 70, 72, Fig. 2 (showing that ICI is part of the TPUv3

product as well); Ex. 1071 ¶ 87.

Regarding the systolic array architecture of the TPU products,

Dr. Patterson stated as follows:

> This systolic array idea brought back from the past that
> probably *cut the energy costs in half* for the multiplier, which is
> a lot of it. And then it was domain-specific. So a lot of the things
> that are complicated and area consuming on CPUs like branch
> predictors and caches – CPUs are covered with caches – they're
> not there because they're not helpful for this application. It was
> better to use more multiple units and dedicated memory units.
> So that *saves energy* and you could reuse the resources. So that
> was a *big success*.

Ex. 2012, 9:9–18 (emphasis added). He also agreed with an article

comparing the TPU to graphics processing units (GPUs) stating that "GPUs

incur high overhead in performance, area, and energy due to heavy

multithreading," whereas "[t]he systolic organization of TPUs captures the

data reuse while being simple by avoiding multithreading." *Id.* at

33:20–34:2. The article authored by Dr. Patterson and others includes

similar statements. Ex. 2016, 70 ("The TPUv2 node of the supercomputer

followed the main ideas of TPUv1: A large two-dimensional matrix multiply

unit (MXU) *using a systolic array to reduce area and energy* plus large,

software-controlled on-chip memories instead of caches." (emphasis

added)), 74 (quoting the earlier article stating that the "systolic organization"

of the TPU captures data reuse "while being simple by avoiding

multithreading"); *see* Ex. 1071 ¶ 88.

Patent Owner contends that Petitioner fails to show that the "features

are so critical that the TPUs are not 'essentially the invention.'" Sur-Reply

22.  We are not persuaded.  Petitioner does more than merely identify unclaimed features of the TPU products.  Petitioner cites evidence, supported by the testimony of Mr. Goodin, showing that at least the ICI and systolic array architecture materially affect the TPU products' performance and were viewed as critical, successful features that were reasons for the TPU products' improved performance.  *See Fox Factory*, 944 F.3d at 1374 ("[I]f the unclaimed features amount to nothing more than additional insignificant features, presuming nexus may nevertheless be appropriate."), 1375–76 (noting that the challenged patent and the patent owner's "marketing materials confirm that the forwardly protruding tooth tips, hook features, and mud clearing recesses each materially impacts the functioning of a chainring," such that "[f]or each of these features that the Board confirms is included in the [allegedly coextensive] chainrings, nexus can only be presumed between the . . . chainrings and a patent claim if the claim includes limitations relating to these features").  Patent Owner does not point to any evidence indicating that view to be factually incorrect.  *See* Ex. 1072, 147:15–149:2 (Dr. Khatri opining that "the TPUs have the features that . . . are in these claims" and stating that he has no opinion "about what the TPUs . . . might have in addition").  We find that a presumption of nexus is inappropriate with respect to the TPU products.

Regardless of whether a presumption of nexus applies, we are not persuaded that Patent Owner has made a sufficient showing of nexus for two reasons.  First, Patent Owner's nexus arguments are premised on the TPUv2 and TPUv3 products' "low-precision" bfloat16 floating point format having an 8-bit exponent and 7-bit mantissa.  PO Resp. 58–59 (arguing that Petitioner copied Dr. Bates's invention by implementing "execution units designed to perform operations using" the bfloat16 format), 63 (arguing

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00165
Patent 9,218,156 B2

commercial success due to the bfloat16 format using "low-precision multipliers"). But "[l]ow-precision arithmetic—including LPHDR multiplication—was not novel" and thus, cannot be the basis for a finding of nexus. *See* Reply 20; *Kao*, 639 F.3d at 1068; *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."). Tong taught such a format nine years before the '156 patent. Tong describes two different experiments emulating "different bitwidth FP units": one that "implements the IEEE-754 standard" and then varies the mantissa bitwidth (shown in Figure 6), and another that "implements the IEEE-754 standard" and then varies the exponent bitwidth (shown in Figure 7). Ex. 1008, 278–279. Thus, we agree with Mr. Goodin that a person of ordinary skill in the art "would have understood that Tong's Figure 6 . . . discloses a floating-point format with an 8-bit exponent (which is the exponent size of single-precision floating-point in the IEEE standard) . . . and a 7-bit mantissa." *See* Ex. 1071 ¶ 74 (citing Ex. 1008, 274, 278–279; Ex. 1003 ¶ 330). Tong discloses that the 8-bit exponent/7-bit mantissa format produced useful results for both a "neural network trainer" application (ALVINN) and a "speech recognition program" (Sphinx III). *See* Ex. 1008, 278–279; Ex. 1071 ¶ 75. Notably, these applications mirror Dr. Bates's 2013 presentation discussing ██████████████████████████ *See* Ex. 2005, 12–13.

To be sure, the fact that the 8-bit exponent/7-bit mantissa format was known in the prior art is not dispositive. *See WBIP*, 829 F.3d at 1330–31. "Commercial success, for example, may be linked to an individual element or, in other circumstances, it could be linked to the inventive combination of known elements." *Id.* at 1332. Patent Owner,

IPR2021-00165
Patent 9,218,156 B2

however, has not identified and explained a specific combination of elements (as opposed to just the "low-precision" bfloat16 floating point format) that could serve as a nexus for the evidence of alleged copying and commercial success.[6]  *See* PO Resp. 58–59, 63.

Second, when arguing that the TPUv2 and TPUv3 products meet the X and Y percentage limitations of claim 1, Patent Owner points to the bfloat16 floating point format with a 7-bit mantissa and states that Petitioner argues in the Petition (with respect to Dockser) that "utilizing 7 bits of mantissa in multiplication operations results in a minimum of 12% of valid floating point 32 inputs producing at least 0.39% relative error compared to the exact mathematical calculation of a full-precision multiplication on those same inputs." *Id.* at 67–68 (citing Pet. 73; Ex. 2051 ¶¶ 135–136).  Patent Owner does not explain, however, how the cited analysis of how Dockser teaches the X and Y percentage limitations applies to the TPUv2 and TPUv3 products.  As Petitioner points out, Patent Owner "does not even attempt to demonstrate that [Petitioner's] TPUs perform the same bit-dropping techniques as Dockser." *See* Reply 27.  Patent Owner has not established a sufficient nexus between the alleged copying and commercial success of the TPUv2 and TPUv3 products and the Dockser/Tong-challenged claims.

Finally, we note that Patent Owner's evidence of commercial success would be unpersuasive even if Patent Owner had established a nexus.  Patent Owner's sole support for the alleged commercial success of the TPUv2 and

---

[6] To the extent Patent Owner alleges commercial success from Petitioner "[u]sing hundreds of thousands of these low-precision TPU v2 and v3 devices," we note again that claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by a single unit.  *See* PO Resp. 63.

IPR2021-00165
Patent 9,218,156 B2

TPUv3 products is an article in *PCMag India*.  *See* PO Resp. 63 (citing

Ex. 2017).  That article states in relevant part:

> As AI and Machine Learning advanced, [Petitioner] was faced with the proposition of doubling the number of data centers it operates to handle the increased workloads.  Building multiple data centers to handle the growing amounts of data sets *could have easily cost the company anything above $10 billion*.

> So [Petitioner] decided to take another route by optimizing its current data centers for better efficiency.  The search giant in late 2013 decided to produce a custom chip in order to improve cost-performance over the GPUs it had deployed.  Thus *the first TPU* was born.

Ex. 2017, 3 (emphasis added).  The above statement as to how much "could

have" been saved is too speculative to reach a conclusion of commercial

success.  *See id.*  It also pertains to Petitioner's "first" TPU, not the TPUv2

and TPUv3 products that use the bfloat16 format.  *See id.*; Ex. 2016, 69

("Quantized arithmetic—8-bit integer instead of 32-bit floating point (FP)—

can work for inference like in TPUv1 but reduced-precision training is an

active research area.").

Accordingly, we find that Patent Owner's evidence of alleged copying

and commercial success does not weigh in favor of nonobviousness of the

Dockser/Tong-challenged claims.

### g)   Conclusion

Based on all of the evidence of record, including evidence of objective

indicia of nonobviousness submitted by Patent Owner, we determine that

claim 1 would have been obvious based on Dockser under 35 U.S.C.

§ 103(a).

### 3.  Claims 2 and 16

Claim 2 depends from claim 1, and recites that "the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine." In Petitioner's view, only one of the alternatives recited in claim 2 needs to be met.  Pet. 38–39.  We agree because claim 2 recites "at least one of," which indicates that what follows should be read disjunctively.  Petitioner asserts that Dockser's "main processor" is "a 'general purpose processor' implementable as a 'state machine' as claimed."  *Id.* at 39 (citing Ex. 1007 ¶¶ 15, 35).

Claim 16 is an independent claim that recites a "device comprising: a plurality of components comprising: at least one first" LPHDR execution unit having the same properties as recited in claim 1.  That is, claim 16 is similar to claim 1 except that it adds "a plurality of components comprising" and lacks "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit" at the end. According to Petitioner, Dockser's computing system has a plurality of components:  a main processor and an FPP.  *Id.* (citing Ex. 1003 ¶ 307). Petitioner, alternatively, argues that, if claim 16 were interpreted to require that a plurality of components be included in a single LPHDR execution unit, Dockser's FPP has multiple components:  registers, controller, and FPO, which also has an adder and multiplier.  *Id.* at 40 (citing Ex. 1003 ¶ 308; Ex. 1007 ¶¶ 15, 19–22).  Petitioner relies on its analysis of claim 1 to address the remaining limitations, which are also found claim 1.  *Id.* (citing Ex. 1003 ¶¶ 309–310).  We agree with Petitioner that Dockser's computing system has a plurality of components under either interpretation.  *See id.* at

IPR2021-00165
Patent 9,218,156 B2

39–40.  Those components are described in the cited parts of Dockser.
Ex. 1007 ¶¶ 15, 19–22.

Patent Owner does not argue separately claims 2 and 16 in its
Response, only disputing Petitioner's contentions regarding the LPHDR
execution unit recited in claims 1 and 16.  PO Resp. 20–24.  We have
reviewed Petitioner's contentions regarding claims 2 and 16, which are
consistent with the disclosure of Dockser and supported by the testimony of
Mr. Goodin, taken into account evidence of objective indicia of
nonobviousness submitted by Patent Owner, and are persuaded that
Petitioner has proven, by a preponderance of the evidence, that claims 2 and
16 would have been obvious based on Dockser under 35 U.S.C. § 103(a).
*See* Pet. 38–40; Ex. 1003 ¶¶ 305–310; *supra* Section II.D.2(e).

### E.  Obviousness Ground Based on Dockser and Tong (Claims 1, 2, 16, and 33)

#### 1.  Tong

Tong is an IEEE journal article entitled "Reducing Power by
Optimizing the Necessary Precision/Range of Floating-Point Arithmetic."
Ex. 1008, 273.  Tong teaches reducing power consumption by minimizing
the bitwidth representation of floating-point data.  *Id.*  According to Tong,
using a variable bitwidth floating-point unit saves power.  *Id.*

#### 2.  Claims 1, 2, and 16

Petitioner argues that the subject matter of claim 1 would have been
obvious over the combination of Dockser and Tong[7] for reasons similar to

---

[7] Petitioner provides evidence supporting its contention that Tong is a prior
art printed publication under 35 U.S.C. § 102(b).  *See* Pet. 40–41 (citing

those analyzed with respect to Dockser alone. *See* Pet. 41–45. Additionally, Petitioner asserts that "Tong, like Dockser, . . . confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision." *Id.* at 41 (citing Ex. 1008, 273–278; Ex. 1003 ¶¶ 312–313). Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 42.



Tong's Figure 6, above, is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the horizontal axis. *Id.* at 41–42. The figure shows this data for five programs: ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx III. *Id.* The programs implement different signal-processing tasks. *See, e.g.*, Ex. 1008, 278 (Table IV). ALVINN, for example, is a neural network trainer that uses backpropagation. *Id.* And Sphinx III is a speech-recognition program. *Id.*

---

Ex. 1025 ¶¶ 8–11; Ex. 1026, 27; Ex. 1027, 27). Patent Owner does not assert otherwise in its Response, and we agree that Tong is prior art for the reasons stated by Petitioner.

Petitioner argues that "Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx [III]) would have motivated a [person of ordinary skill in the art] to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." Pet. 43–44. According to Petitioner, one of ordinary skill in the art would have done so "to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision." *Id.* (citing Ex. 1003 ¶ 322). Petitioner also concludes that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable." *Id.* at 45.

Patent Owner argues that, because Dockser lacks an LPHDR execution unit and Tong does not remedy that deficiency, the Dockser-Tong combination does not render obvious any challenged claim. PO Resp. 24–25; Sur-Reply 9. We disagree for the reasons discussed above regarding Petitioner's challenge based on Dockser alone. *See supra* Section II.D.2.

Patent Owner further argues that Tong does not teach using only 5 mantissa bits, which means that the Dockser-Tong combination lacks the imprecision required to meet the X and Y values recited in limitation *1B2*. PO Resp. 25. In Patent Owner's view, "Tong teaches that at least 11 mantissa bits are required for consistent performance, even for 'programs dealing with human interfaces [that] process sensory data with intrinsically low resolutions.'" *Id.* (quoting Ex. 1008, 278). According to Patent Owner, "Petitioner makes no effort to show that arithmetic with the 'required' 11-bit mantissa is an LPHDR operation and meets the X/Y limitations of the claims." *Id.*

Yet Patent Owner's argument about an 11-bit mantissa (*id.*) does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP to operate at a "selected precision level" according to Tong (Pet. 43–45). Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." *Id.* at 43–44. Thus, we disagree with Patent Owner's argument about an 11-bit mantissa. *See* PO Resp. 25; Sur-Reply 9. For this reason, we do not credit Dr. Khatri's testimony on this point. Ex. 2051 ¶ 77.

Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. Pet. 44 (citing Ex. 1003 ¶ 324). Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits. *Id.* (citing Ex. 1003 ¶ 324).

Petitioner adequately shows that the X and Y limitations are met for the 5 mantissa bit rationale. *Id.* at 43–45. In particular, Mr. Goodin's software program shows that "when retaining 5 mantissa fraction bits in view of Tong, Dockser's register bit-dropping technique produces at least Y=0.05% relative error for 99.45% of possible valid inputs, and Dockser's logic bit-dropping technique produces at least Y=0.05% relative error for 99.47% of possible valid inputs," and the algebraic analysis shows that "Dockser's register bit-dropping technique when retaining 5 mantissa fraction bits produces a minimum of 1.56% relative error (greater than Y=0.05%) for over 12% of possible valid inputs (greater than X=5%)." Ex. 1003 ¶ 324. After review of the arguments and evidence on these issues, we credit Mr. Goodin's algebraic analysis and software-based analysis. *See id.*, App'x I.B–D.

IPR2021-00165
Patent 9,218,156 B2

Although Patent Owner does not present argument specifically directed to Mr. Goodin's software-based or algebraic analysis, Patent Owner argues that one of ordinary skill in the art would not have chosen a 5-bit mantissa: "Tong's experimental results show that using fewer than 11 mantissa bits unacceptably reduces accuracy for the benchmark applications *that were specifically selected* (from a category of programs) for their high tolerance for imprecision." PO Resp. 25–26 (citing Ex. 2051 ¶ 78). To illustrate this point, Patent Owner annotates Tong's Figure 6, reproduced below.



Tong's Figure 6, above, shows the experimental results with color annotations indicating "the precision levels suitable for general-purpose operation (green), those at which a significant percentage of applications begin to produce unacceptable results (yellow), and finally, levels of precision that are unsuitable for most testing benchmarks (red)." *Id.* (citing Ex. 2051 ¶ 79).

IPR2021-00165
Patent 9,218,156 B2

Patent Owner argues that there is no motivation to combine Dockser and Tong because "there is no evidence to show that a [person of ordinary skill in the art] would have chosen Tong's 5-bit examples over the 7, 9, or 11-bit examples." *Id.* at 26–27; *see also* Sur-Reply 9–10. According to Patent Owner, "Tong does not disclose any extra capability that would have motivated a [person of ordinary skill in the art] to use it with Dockser." PO Resp. 26–27 (citing Ex. 2051 ¶¶ 81–82). In Patent Owner's view, Petitioner relies on hindsight to choose 5 bits and does not offer any differences between Dockser and the claimed invention or other non-hindsight motivation to combine with Tong. *Id.* According to Patent Owner, "Tong teaches that 'it appears inevitable that some fraction of our operands will require full IEEE standard precision,'" which means that a person of ordinary skill in the art would not have been motivated to operate only in 5-bit, 7-bit, or 9-bit modes as Petitioner suggests. Sur-Reply 10 (quoting Ex. 1008, 280).

We disagree with Patent Owner's arguments directed to the rationale for using 5 mantissa bits. *See* PO Resp. 25–27; Sur-Reply 9–10. Petitioner's reasoning for the 5-bit example is "to conserve power when running [certain] applications, or others empirically determined (using Tong's techniques) to not require greater precision." Pet. 43–44 (citing Ex. 1003 ¶ 322). For example, in the ALVINN and Sphinx III line plots in Tong's Figure 6, Petitioner added a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. *Id.* at 42. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Ex. 1008, 278). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption. *Id.* at 42–43. Petitioner characterizes Tong

IPR2021-00165
Patent 9,218,156 B2

as "[h]aving empirically determined the minimum number of mantissa bits
necessary to maintain acceptable accuracy of particular applications." *Id.* at
43 (citing Ex. 1008, 273, 274, 279, 284).

Petitioner's assertions are adequately supported by the record. We are
persuaded by Petitioner's reliance on Tong's Figure 6 to determine how
many bits are needed in a particular application. *See id.* at 42–44. That is,
Petitioner's choice is not arbitrary or solely based on the '156 patent's
written description alone. *See* PO Resp. 25–26. Rather, Petitioner's choice
of 5 bits is based on Tong's experimental results for *certain* applications.
*See* Pet. 42–44. We emphasize *certain* because Petitioner is not saying that
5-bits is suitable for every application. *See id.* Full precision may be needed
some of the time. *See* Ex. 1008, 280; Sur-Reply 9–10. But, even if Tong
teaches that some applications begin to produce unacceptable results below
11-bits, as Patent Owner notes (PO Resp. 25–26), Tong teaches that 5-bits
would be enough for certain ones: ALVINN and Sphinx III shown in Tong's
Figure 6. Pet. 42–44.

Patent Owner argues that "Tong lists those two applications amongst
a great many other disclosed applications that all require full precision, and
that a [person of ordinary skill in the art] would therefore not be motivated
to configure Dockser to operate with a 5-bit mantissa just to support those
two applications given the far larger number of disclosed applications that
require full precision." Sur-Reply 9; PO Resp. 25–27.

We disagree with Patent Owner's argument here because the record
adequately supports Petitioner's rationale that "[d]etermining the optimum
range of imprecision to achieve the best power reduction without sacrificing
accuracy for a particular application was a matter of routine optimization of
a result-effective variable," and Tong, in particular, shows an optimization

for a particular program. Pet. 43–45. The record adequately supports Petitioner's reasoning here: Dr. Khatri testified that "exact computing . . . takes up a lot of power." Ex. 1072, 47:2–5. Mr. Goodin explained that reducing precision may reduce power consumption. *See, e.g.*, Ex. 2043, 34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision may achieve power savings). And we credit Mr. Goodin's explanation of how Tong achieves this for certain applications. *See, e.g.*, Ex. 1003 ¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 322, 325 (citing Ex. 1008, 278). That is, Petitioner's proposed combination would omit unnecessary bits to reduce waste and power consumption. Pet. 43–45.

Thus, we find Patent Owner's arguments regarding the combination with Tong unavailing. *See* PO Resp. 25–27; Sur-Reply 9–10. For the same reasons, we do not credit Dr. Khatri's testimony on this point. Ex. 2051 ¶¶ 77–82.

For the reasons discussed, we determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the device recited in claim 1 with a reasonable expectation of success. Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 1 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

Petitioner asserts that the subject matter recited in claims 2 and 16 would have been obvious over the combination of Dockser and Tong for reasons similar to those presented in the ground based on Dockser alone.

*See* Pet. 43–45.  For the reasons discussed above and the reasons discussed for Dockser alone, Petitioner's contentions are supported by Mr. Goodin's testimony and are persuasive.  *See id.*; *supra* Section II.D.3.  Patent Owner does not present arguments specifically directed to these claims.  *See* PO Resp.; Sur-Reply.  We disagree with Patent Owner's arguments regarding claim 1 based on the full trial record for the same reasons explained above.  *See supra* Section II.D.2.  Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claims 2 and 16 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

### 3.  Claim 33

Claim 33 recites a "device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: a plurality of components comprising" an LPHDR execution unit having the same properties as recited in claim 1.  Petitioner asserts that Tong teaches emulating, in software, different bitwidth FP units to determine application accuracy.  Pet. 46 (citing Ex. 1008, 278).  According to Petitioner, based on this teaching, one of ordinary skill in the art would have been motivated "to emulate the Dockser/Tong device . . . in software to assess the accuracy of applications running on the device at selected precision levels, and a [person of ordinary skill in the art] would have had a reasonable expectation of success in doing so."  *Id.* (citing Ex. 1003 ¶¶ 328–329).

Petitioner asserts that "[w]hen the Dockser/Tong device is 'emulated in software' per Tong's teachings, . . . the conventional and obvious

IPR2021-00165
Patent 9,218,156 B2

implementation of such 'software' is 'computer program instructions' stored in 'a computer-readable memory' and 'executable by [a] processor' within a 'device' (*e.g.*, a computer) as claimed." *Id.* (citing Ex. 1003 ¶ 330; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 25, ll. 58–60). For reasons similar to those with respect to claim 1, Petitioner argues that a person of ordinary skill in the art would have been motivated by Tong to use a computer to emulate the combined teachings of Dockser and Tong, "meeting the 'second device' [recited in claim 33]), which comprises a plurality of components including a main processor and Dockser's execution unit." *Id.* at 46–47 (citing Ex. 1003 ¶ 331). Petitioner argues that Tong emulates a device in the same way as the '156 patent does:

> Like the '156 patent's only examples of "emulat[ing] a . . . device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform.

*Id.* at 47 (citing Ex. 1001, col. 17, ll. 5–19, col. 18, l. 52–col. 19, l. 11; Ex. 1008, 278; Ex. 1003 ¶¶ 332–333).

Patent Owner does not argue separately claim 33 in its Response, only disputing Petitioner's contentions regarding claim 1 and the alleged motivation to combine Dockser and Tong, which we address above. PO Resp. 24–26; *see supra* Section II.E.2. After review of the arguments and evidence on these issues, we agree with Petitioner and credit Mr. Goodin's testimony. *See* Ex. 1003 ¶¶ 328–335.

In particular, the '156 patent describes code written in the C programming language to perform the same arithmetic operations in the same order using the same method as one implemented in hardware.

IPR2021-00165
Patent 9,218,156 B2

Ex. 1001, col. 18, l. 52–col. 19, l. 11, *cited in* Pet. 47. We agree with Petitioner that Tong similarly uses a computer program to simulate reduced precision arithmetic that a hardware unit would perform. *See* Pet. 47. For example, Tong uses an "FP software emulation package" to simulate reduced precision arithmetic and determine "the relationship between program accuracy and number of bits in FP representation." Ex. 1008, 278, *cited in* Pet. 47.

Petitioner's obviousness rationale—i.e., "to assess the accuracy of applications running on the device at selected precision levels"—is adequately supported by the record: Tong explains that the emulation package was used to assess "different mantissa and exponent bitwidths." *See* Pet. 46 (citing Ex. 1008, 278). Petitioner's assertion that software is computer program instructions stored in a computer-readable memory and executable by a processor within a computing device is adequately supported by at least Mr. Goodin's testimony and the evidence that he cites. *Id.* at 46–47 (citing Ex. 1003 ¶ 330; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 25, ll. 58–60).

For the same reasons discussed with respect to claims 1 and 16, Petitioner has shown that the subject matter recited in claim 33 that is also recited in claims 1 and 16 would have been obvious over the Dockser-Tong combination. *See supra* Section II.E.2.

We determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the device recited in claim 33 with a reasonable expectation of success. Based on all of the evidence of record,

including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 33 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

### F. Obviousness Ground Based on Dockser and MacMillan (Claims 1–8 and 16)

#### 1. MacMillan

MacMillan is entitled "Circuit for Enhancing Performance of a Computer for Personal Use." Ex. 1009, code (54). MacMillan discloses using Single Instruction Multiple Data (SIMD) parallel-processing architectures for "adding supercomputer performance to a computer for personal use." *Id.* at col. 5, ll. 22–54. MacMillan's computer system comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access memory (SIMD-RAM) devices. *Id.* at col. 9, ll. 11–19, 30–31, Figs. 2, 3.

IPR2021-00165
Patent 9,218,156 B2

Figure 5 of MacMillan is reproduced below.



Figure 5 depicts SIMD-RAM device 254 comprising a plurality of
DRAMs 304 coupled to a plurality of processing elements 302 (PE0, PE1,
PE2, etc.) connected to SIMD bus 240. *Id.* at col. 12, ll. 35–43. MacMillan
discloses that "[e]ach PE contains a 32-bit wide data path and can perform
atomic operations on bits, bytes, 16-bit words, and 32-bit words," "each
DRAM 304 is independently addressed by its PE," "[i]nteger and floating
point accelerators could be included in each PE," and "[e]xecution autonomy
is provided, in which specific PEs can be excluded from executing specific
instructions." *Id.* at col. 12, ll. 47–59. MacMillan describes an example
architecture of a system with 256 PEs, but states that the disclosed
architecture "allows scaling to higher or lower density chips with more or
fewer PEs." *Id.* at col. 12, l. 60–col. 13, l. 4, col. 13, ll. 38–41, col. 16,
ll. 20–22.

IPR2021-00165
Patent 9,218,156 B2

### 2. Claim 3

Petitioner contends that claims 1–8 and 16 are unpatentable over Dockser and MacMillan under 35 U.S.C. § 103(a).  Pet. 47–55.  Claim 3 depends from claim 2 (which depends from claim 1) and recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (the "exceeds" limitation).  Petitioner relies on MacMillan for its teachings regarding multiple floating-point execution units, and argues that a person of ordinary skill in the art "would have been motivated to use Dockser's FPP to implement each 'floating-point accelerator' in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches."  *Id.* at 6, 49–50 (citing Ex. 1003 ¶¶ 341–342).  According to Petitioner, "using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power."  *Id.* at 50 (citing Ex. 1003 ¶ 343; Ex. 1009, col. 12, ll. 47–49; Ex. 1024, col. 1, ll. 43–58).  Petitioner further contends that MacMillan's SIMD parallel processing is used in "the same types of computers for which Dockser's FPP provides '[p]ower management'" and would be beneficial for the same types of "'graphics applications' for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision."  *Id.* at 49–50 (citing Ex. 1003 ¶¶ 340, 344; Ex. 1007 ¶ 3; Ex. 1009, col. 1, ll. 6–9, col. 5, ll. 22–45, col. 7, ll. 14–34).

IPR2021-00165
Patent 9,218,156 B2

With respect to the "exceeds" limitation in particular, Petitioner asserts that MacMillan teaches 256 PEs, and the Dockser-MacMillan combination would have a "single Host CPU floating-point unit" and at least one FPP in each of the PEs, of which there can be "256 or more." *Id.* at 51–53 (quoting Ex. 1009, col. 2, ll. 13–15; citing Ex. 1003 ¶ 361–362, 366). Thus, in Petitioner's proposed combined device based on Dockser and MacMillan, the number of LPHDR execution units (Dockser FPPs) "exceeds by over 100 its number (one) of traditional-precision execution units (the single Host CPU floating-point unit)." *Id.* (citing Ex. 1003 ¶ 366).

Patent Owner responds that a person of ordinary skill in the art would not have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. PO Resp. 36–37. Patent Owner argues that "Dockser is focused on the objective of reducing power consumption," whereas "MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption." *Id.* at 36 (citing Ex. 1009, col. 3, ll. 4–6; Ex. 2051 ¶¶ 101–102). Patent Owner further contends that "[i]ncorporating Dockser's FPPs into MacMillan would . . . defeat MacMillan's stated objective of achieving a high-scale SIMD computer architecture at 'lower system cost.'" *Id.* at 36–37 (citing Ex. 1009, col. 5, ll. 58–59; Ex. 2051 ¶ 103). According to Patent Owner, "Dockser's FPPs are even *larger* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes," such that "replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit." *Id.* at 37 (citing Ex. 2051 ¶ 104); *see also* Sur-Reply 14–15.

IPR2021-00165
Patent 9,218,156 B2

Petitioner argues in its Reply that the asserted combination would achieve both benefits of increasing performance speed (based on MacMillan) and lowering power consumption (based on Dockser), and that Patent Owner fails to provide supporting evidence for its argument that incorporating Dockser's FPP into the MacMillan device would increase costs, and even if it had, economic reasons are not indicative of nonobviousness.  Reply 9–10 (citing Ex. 1071 ¶¶ 30–31).

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser and MacMillan, we agree with Patent Owner. Dockser teaches a single FPP with "selectable subprecision" that is capable of both full precision and reduced precision operations.  *See* Ex. 1007, code (57), ¶ 15.  The FPP includes additional control circuitry, such as floating-point controller 130 and control register 137, that allows selection of a subprecision for floating-point operations.  *Id.* ¶¶ 15, 18, Fig. 1. Dockser describes "a variety of ways" in which "subprecision select bits may be used to reduce the precision of a floating-point operation."  *Id.* ¶¶ 18, 23–34.  Reduced precision can be achieved, with resultant power savings, either by removing power from "floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" or "removing power to the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected."  *Id.* ¶¶ 4–7, 26–27.  Mr. Goodin agrees that Dockser's FPP requires additional control circuitry to implement its selectable subprecision.  Ex. 2043, 43:21–45:9.

MacMillan, by contrast, is heavily focused on avoiding increased costs associated with added complexity.  MacMillan states that "[i]f supercomputing performance could be achieved in low cost computers, such

68

IPR2021-00165
Patent 9,218,156 B2

as personal computers, this could dramatically expand the market for personal computers." Ex. 1009, col. 1, ll. 21–24. SIMD computing capability can be added to personal computers, "resulting in much higher performance computing at moderate cost." *Id.* at col. 8, ll. 51–55. MacMillan, however, describes numerous limitations of known SIMD designs at the time, many of which relate to increased costs from added complexity (e.g., additional registers), size, etc. *See, e.g., id.* at col. 2, ll. 56–61 ("hav[ing] a large register set on each PE . . . increases die area per PE, resulting in higher costs per PE"), col. 2, ll. 62–65 ("Adding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs. It may also require tighter geometries or increased numbers of layers on printed circuits boards, further increasing costs."), col. 3, ll. 2–4 ("Adding output buffers to drive increased pin counts also increases power dissipation and hence power supply capacity and cost."), col. 4, ll. 39–40 ("The PE array[] disk may be limited in size due to technology or cost factors.").

> Importantly, MacMillan states:
>
> Overcoming the above limitations would allow supercomputing performance to be provided in a *low cost* computer system for personal use, dramatically expanding the potential market for systems with supercomputer performance. To meet the cost objectives, the SIMD capabilities *should not add significant complexity to the architecture of a computer system for personal use.* The present invention addresses the above needs.

*Id.* at col. 5, ll. 38–45 (emphasis added). MacMillan's disclosed architecture—with multiple, less costly PEs operating in parallel to increase computational power—is expressly intended to account for these limitations. *See id.* at col. 5, ll. 44–45, col. 5, ll. 58–61 (the disclosed system with "shared memory results in lower system cost and more flexibility in using memory"), col. 6, ll. 1–10 ("Another aspect of the invention is that it shows

IPR2021-00165
Patent 9,218,156 B2

how parallel SIMD processing can be added inexpensively to existing system architectures. This cost-effective addition of parallel processing can be made to popular, low cost computer systems running popular operating systems . . . ."), col. 6, ll. 41–45, col. 16, ll. 14–27.

In determining how a person of ordinary skill in the art would have understood those disclosures, we credit the testimony of Dr. Khatri, which is consistent with, and a logical reading of, Dockser and MacMillan. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017) (stating that the Board "is permitted to weigh expert testimony and other record evidence and, in so doing, rely on certain portions of an expert's declaration while disregarding others"). Specifically, the circuitry implementing Dockser's selectable subprecision is beyond that of a typical full precision execution unit. Dr. Khatri testifies that

> [b]ecause Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a [person of ordinary skill in the art] would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a [person of ordinary skill in the art] would expect it to be *larger* than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

*See* Ex. 2051 ¶ 51. Petitioner's asserted combination of incorporating Dockser's FPP into each of multiple PEs in MacMillan's device "would require additional circuitry and chip space and would therefore *increase* costs," "defeat[ing] MacMillan's stated objective of achieving a highly parallel SIMD computer architecture at 'lower system cost.'" *See id.* ¶¶ 103–104. Again, MacMillan specifically counsels that to achieve its cost

70

objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44. The combination proposed by Petitioner would do so. MacMillan's PEs already perform full precision operations; Dockser's selectable subprecision circuitry would add complexity beyond that of a typical full precision execution unit. *See* Ex. 2051 ¶¶ 103–104; Ex. 1009, col. 12, ll. 47–49 ("Each PE contains a 32-bit wide data path and can perform atomic operations on . . . 32-bit words.").

A person of ordinary skill in the art, reading MacMillan and understanding its emphasis on avoiding increased costs associated with added complexity and size, would not have been motivated to modify MacMillan's device by incorporating Dockser's FPP into the PEs. *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376–77 (Fed. Cir. 2021) (finding insufficient motivation to "increase [a prior art reference's] melt flow rate to the claimed range," in part because the reference "includes numerous examples of processing techniques that are typically used to increase melt flow rate, which [the reference] cautions should *not* be used due to the risk of obtaining a broader molecular weight distribution"); *TriVascular*, 812 F.3d at 1067–69 (finding insufficient motivation to combine two references by "substitut[ing] the recessed barbs of [one reference] with the protuberances of [another reference], since [the petitioner's] proposed substitution would destroy the basic objective of the barbs"); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (finding no reason to modify a prior art device where the modification would render the device "inoperable for its intended purpose"); *see also Henny Penny*, 938 F.3d at 1332 (affirming the Board's finding of no motivation to combine where the Board "credited [the patent owner's] expert's testimony that following [one

reference's] method of diverting and cooling the oil in [another reference's] system would introduce 'additional plumbing and complexity'"). Notably, this is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PEs; the evidence shows that doing so would increase costs because of the added complexity and size of the FPP—a concern that MacMillan explicitly counsels against. *See* Sur-Reply 15.

Petitioner's position is that the individual benefits of MacMillan's approach (increasing performance speed from many low-cost processors operating in parallel) and Dockser's approach (lowering power consumption using additional circuitry added to a single, more complex processor) would have motivated a person of ordinary skill in the art to combine the references' teachings by incorporating Dockser's FPP into the multiple PEs in MacMillan's device. Pet. 6, 49–50. Given the express teachings of MacMillan, however, we are not persuaded that an ordinarily skilled artisan would have been motivated to combine the two different approaches in that manner. Specifically, MacMillan's repeated statements that its approach is designed to avoid increased costs from added complexity and size (and thereby allow for many low-cost processors in the device) would have dissuaded a person of ordinary skill in the art from doing so.

To the extent Petitioner and Mr. Goodin fault Patent Owner for not providing evidence supporting its position, we are not persuaded. *See* Reply 9–10; Ex. 1071 ¶ 31. Petitioner bears the burden of proving unpatentability by a preponderance of the evidence, which includes proving that a person of ordinary skill in the art would have had reason to combine the prior art references. *See* 35 U.S.C. § 316(e); *Magnum Oil*, 829 F.3d at 1380. Moreover, Patent Owner's arguments are supported by evidence. Patent

IPR2021-00165
Patent 9,218,156 B2

Owner relies on the disclosures of Dockser and MacMillan themselves, expert testimony from Dr. Khatri (which we credit on the issue of reasons to combine Dockser and MacMillan), and cross-examination testimony from Mr. Goodin.  *See* PO Resp. 36–37; Sur-Reply 14–15; Ex. 2051 ¶¶ 101–104.

For the reasons explained above, we are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner.[8] Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

### 3.    Claims 4–8

Claims 4–8 depend from claim 3.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 4–8 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

### 4.    Claims 1, 2, and 16

As explained above, we conclude that claims 1, 2, and 16 are unpatentable over Dockser, and over Dockser and Tong, under 35 U.S.C. § 103(a).  *See supra* Sections II.D–E.  As such, we need not address

---

[8] Given this determination, we need not address Patent Owner's argument that the references fail to teach the "exceeds" limitation of claim 3 because the alleged "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) are "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (in addition to executing at reduced precision) and thus "the number of LPHDR execution units will never exceed the number of claim 3 full-precision multiplication execution units," as required by the claim.  *See* PO Resp. 28–36; Reply 12–15; Sur-Reply 10–14.

IPR2021-00165
Patent 9,218,156 B2

Petitioner's alternative ground based on Dockser and MacMillan as to claims 1, 2, and 16. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that "the Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

### G. Obviousness Ground Based on Dockser, Tong, and MacMillan (Claims 1–8, 16, and 33)

#### 1. Claim 3

Petitioner contends that claims 1–8, 16, and 33 are unpatentable over Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a). Pet. 56–60. Petitioner presents two theories with respect to claim 3. First, Petitioner argues that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels, such that "[t]he resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong)" teaches the claim limitations "for the same reasons Dockser/MacMillan does," referring to Petitioner's earlier analysis of the asserted ground based on Dockser and MacMillan. Pet. 56–57. We are not persuaded by those arguments for the reasons explained above. *See supra* Section II.F.2.

Second, Petitioner presents another theory based on a "customized implementation" of Dockser's FPPs. Pet. 57–60 (citing Ex. 1003 ¶¶ 391–401); Reply 15–17 (citing Ex. 1071 ¶¶ 56–62). Petitioner argues that a person of ordinary skill in the art "would have been motivated to

IPR2021-00165
Patent 9,218,156 B2

customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'" Pet. 57–58 (citing Ex. 1008, 279). Specifically, according to Petitioner, an ordinarily skilled artisan would have been motivated to "implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered" and likewise "implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application." *Id.* at 58–59.

Petitioner's analysis is premised on an "alternative interpretation" of the portion of the "exceeds" limitation referring to execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." *Id.* at 59–60. Under that interpretation, an execution unit could meet the "adapted to" clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* Dockser's FPP, modified as described above, would not be such a unit because it has registers and multiplier logic with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the "adapted to" clause. *Id.*

Patent Owner responds that a person of ordinary skill in the art "would not have been motivated to re-engineer the FPP of Dockser to remove its 32-bit capability [based on Tong] and then incorporate the re-engineered Dockser unit into the system of MacMillan." PO Resp. 40–45 (citing Ex. 2051 ¶¶ 108–115). Patent Owner argues that none of the three

references support Petitioner's view. *Id.* at 42–45. First, Dockser teaches a device that "support[s] a range of selectable precisions including full precision," and "[a]djusting Dockser by removing its full-precision capability violates a central tenet of Dockser—to always be able to execute full-precision operations." *Id.* at 43–44. Second, Tong similarly teaches a device with "both full- and reduced-precision capabilities," and would have reinforced Dockser's teaching that "while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision." *Id.* at 42–43 (emphasis omitted). Third, the asserted combination, "which requires special, customized registers, logic elements, [and] arithmetic units, . . . would increase manufacturing costs and goes directly against the teachings of MacMillan," in particular its teaching that adding "significant complexity" to the SIMD architecture should be avoided. *Id.* at 44–45. The parties in their Reply and Sur-Reply disagree as to the meaning of certain cited disclosures in the references. *See* Reply 15–17; Sur-Reply 15–18.

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser, Tong, and MacMillan, we agree with Patent Owner. Petitioner's asserted combination is predicated on *removing* what is a fundamental feature of Dockser and Tong—namely, the ability to operate at full precision or select a precision less than full precision. Dockser teaches a single processor with a default full precision mode that is capable of also operating in selectable reduced precision modes. Ex. 1007 ¶¶ 3–4 ("[T]he common situation is that for certain applications, . . . a reduced precision may be acceptable, and for other applications, . . . a greater precision may be needed. Accordingly, there is a need in the art for a floating-point processor

IPR2021-00165
Patent 9,218,156 B2

in which the reduced precision, or subprecision, of the floating-point format is selectable.").  Dockser's FPP operates on 32-bit full precision values and performs arithmetic operations at a particular subprecision if the associated "subprecision select bits" are set, but if not, operates at full precision.  *Id.* ¶¶ 17–19, 23–29, 32, claims 1 (reciting "a floating-point processor having a maximum precision" and "selecting a subprecision less than the maximum precision"), 8, 15, 20.  Dockser thus requires full precision with the capability to select a subprecision less than full precision, as Mr. Goodin agrees.  *See* Ex. 2043, 36:16–37:17, 38:3–8 ("I don't believe Dockser discloses any embodiments without floating-point . . . selectable precision."), 55:21–57:12 ("Dockser requires selectable precision").  Indeed, Petitioner explicitly relies on the fact that "Dockser's precision is selectable" when asserting that a person of ordinary skill in the art would have combined the teachings of Dockser and Tong.  *See* Pet. 43; Reply 8; Sur-Reply 17.  We see no basis to conclude that a person of ordinary skill in the art would have been motivated to remove the feature that Dockser describes as always present and that is the basis for Petitioner's other assertions regarding Dockser and Tong.  *See Chemours*, 4 F.4th at 1376–77 (finding insufficient motivation to modify a prior art reference "when doing so would necessarily involve altering the inventive concept of" the reference); Public Tr. 41:21–42:8.

Tong likewise does not support Petitioner's asserted motivation to combine.  Tong discloses that "not all programs need the precision provided by generic FP hardware," and "the fine precision of the 23-bit mantissa is not essential" and "a single custom FP format may be a viable option" for particular applications, but full precision is necessary for other applications.  *See* Ex. 1008, 278–280.  Tong states that "scientific programs such as

IPR2021-00165
Patent 9,218,156 B2

large-scale computational fluid dynamics or electric circuit simulation . . .

require a huge amount of precision." *Id.* at 279.  Tong further discloses that

> by reducing either precision or range from 32 to fewer bits, we
> should be able to create custom FP hardware which has lower
> power simply because of the bit reductions.  For a narrow,
> application-specific task, a single custom FP format may be a
> viable option.  However, *to be more generally useful, we need to
> consider arithmetic architectures which can scale to different FP
> formats*.  Even though we may be able to assume that most of our
> operands can be computed successfully in limited precision, it
> appears *inevitable that some fraction of our operands will
> require full IEEE-standard precision*.

*Id.* at 280 (emphasis added).  Given those disclosures, we are not persuaded

that a person of ordinary skill in the art would have been motivated to

remove from Dockser's FPP the capability (i.e., selectability from full

precision) that Tong characterizes as important.[9]

Finally, with respect to MacMillan, the reference states that to achieve

its cost objectives, "SIMD capabilities should not add significant complexity

to the architecture of a computer system for personal use."  Ex. 1009, col. 5,

---

[9] Petitioner has shown sufficiently that a person of ordinary skill in the art
would have been motivated to *select* a particular precision level in Dockser's
FPP based on the teachings of Tong, but not to *remove* functionality from
the FPP itself.  *See supra* Section II.E.2; *compare* Pet. 43–44 (arguing that
Tong "would have motivated a [person of ordinary skill in the art] to
*configure* Dockser's FPP . . . to *operate at* a *selected* precision level
retaining as few as 5 mantissa fraction bits . . . or others empirically
determined (using Tong's techniques) to not require greater precision"
(emphasis added)), *with id.* at 58–59 (arguing that a person of ordinary skill
in the art "would have been motivated to *customize* Dockser's FPPs in
MacMillan's PEs" by removing register storage elements to have "smaller
than 32-bit registers" (for the register bit-dropping technique) or removing
multiplier logic elements (for the multiplier logic technique) (emphasis
added)).

IPR2021-00165
Patent 9,218,156 B2

ll. 42–44.  The Dockser-Tong-MacMillan combined device would add complexity because it involves a "customized implementation" of the multiplier logic in Dockser's FPP.  *See* Pet. 57–58; Reply 15.  Further, to the extent some selectability remains (among levels below full precision) in Petitioner's "customized implementation," the modified Dockser FPP would still require Dockser's additional control circuitry to implement that selectable subprecision.  As explained above, such circuitry would increase costs due to added complexity and size, which MacMillan expressly counsels against.  *See supra* Section II.F.2.

We credit the testimony of Dr. Khatri on these points, as it is explained sufficiently and is consistent with the disclosures of the references.  *See* Ex. 2051 ¶¶ 46–48, 107–115.  Petitioner has not shown sufficiently that a person of ordinary skill in the art would have combined the teachings of Dockser, Tong, and MacMillan to remove from Dockser's FPP the ability to select a precision less than full precision and then incorporate the modified FPP into the PEs of MacMillan.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 3 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

## 2.   *Claims 4–8*

Claims 4–8 depend from claim 3.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 4–8 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

IPR2021-00165
Patent 9,218,156 B2

### 3.   Claims 1, 2, 16, and 33

As explained above, we conclude that claims 1, 2, and 16 are unpatentable over Dockser, and claims 1, 2, 16, and 33 are unpatentable over Dockser and Tong, under 35 U.S.C. § 103(a). *See supra* Sections II.D–E. As such, we need not address Petitioner's alternative ground based on Dockser, Tong, and MacMillan as to claims 1, 2, 16, and 33. *See Boston Sci. Scimed*, 809 F. App'x at 990.

### H.  Patent Owner's Motion to Exclude

Patent Owner moves to exclude (1) Exhibits 1073, 1075–1078, 1082–1084, 1088–1090, 1096, and 1097 as "irrelevant and prejudicial" under Federal Rules of Evidence 402 and 403; (2) Exhibit 1082 for the same reasons and also as unauthenticated under Federal Rule of Evidence 901; (3) and Exhibits 1094 and 1095 as containing inadmissible hearsay under Federal Rule of Evidence 802. Mot. 3–7. Patent Owner's Motion is dismissed as moot, as we do not rely on the exhibits in a manner adverse to Patent Owner in our Decision.

In particular, Petitioner cites Exhibits 1073 and 1075 in support of its argument that Dockser and MacMillan teach the "exceeds" limitation of claim 3. *See* Mot. 3–4; Reply 13–14. Petitioner cites Exhibits 1076–1078 and 1097 in response to an argument made by Patent Owner in its Response regarding MacMillan. *See* Mot. 4; Reply 16–17. We need not reach those arguments because we determine that Petitioner has not shown unpatentability of the claims challenged based on the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, for other reasons. *See supra* Sections II.F, II.G.

IPR2021-00165
Patent 9,218,156 B2

Petitioner cites Exhibits 1078, 1082–1084, 1088–1090, and 1094–1096 in support of its arguments regarding objective indicia of nonobviousness. *See* Mot. 4–7; Reply 21–22, 25, 27–28. As explained above, we do not find Patent Owner's evidence of objective indicia of nonobviousness persuasive with respect to claims 1, 2, 16, and 33, and do not rely on the disputed exhibits in reaching that conclusion. *See supra* Sections II.D, II.E.

## I.    *Motions to Seal*

The parties move to seal portions of their demonstrative exhibits that quote or describe material that we previously ordered sealed. Papers 52, 54; *see* Papers 27, 48 (granting motions to seal). The parties filed unredacted confidential and redacted public versions of their demonstrative exhibits. Exs. 1098, 2054. Upon reviewing the materials sought to be sealed, it appears that the parties' characterization of the materials is accurate and the redactions are narrowly tailored to only confidential information. The parties have established good cause to seal the redacted portions of the demonstrative exhibits. We grant the Motions to Seal.

IPR2021-00165
Patent 9,218,156 B2

### III. CONCLUSION[10]

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 16, and 33 of the '156 patent are unpatentable, but has not demonstrated, by a preponderance of the evidence, that claims 3–8 are unpatentable.

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), 42.8(b)(2).

IPR2021-00165
Patent 9,218,156 B2

In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 16 | 103(a) | Dockser | 1, 2, 16 | |
| 1, 2, 16, 33 | 103(a) | Dockser, Tong | 1, 2, 16, 33 | |
| 1–8, 16 | 103(a) | Dockser, MacMillan[11] | | 3–8 |
| 1–8, 16, 33 | 103(a) | Dockser, Tong, MacMillan[12] | | 3–8 |
| **Overall Outcome** | | | 1, 2, 16, 33 | 3–8 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 16, and 33 of the '156 patent have been shown to be unpatentable, and claims 3–8 of the '156 patent have not been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 46) is *dismissed*; and

---

[11] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, and 16 are unpatentable over Dockser and MacMillan. *See supra* Section II.F.4.

[12] As explained above, given our disposition of the grounds based on Dockser and the combination of Dockser and Tong, we do not reach Petitioner's alternative ground asserting that claims 1, 2, 16, and 33 are unpatentable over Dockser, Tong, and MacMillan. *See supra* Section II.G.3.

IPR2021-00165
Patent 9,218,156 B2

FURTHER ORDERED that the parties' Motions to Seal (Papers 52 and 54) are *granted*, and the unredacted confidential versions of the demonstrative exhibits (Exhibits 1098 and 2054) shall remain under seal pursuant to the default protective order previously entered in the instant proceeding.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00165
Patent 9,218,156 B2

FOR PETITIONER:

Elisabeth H. Hunt
Richard F. Giunta
Anant K. Saraswat
Adam R. Wichman
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent J. Rubino, III
Enrique W. Iturralde
Richard Cowell
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com
rcowell@fabricantllp.com

Brian M. Seeve
Matthew D. Vella
PRINCE LOBEL TYE LLP
bseeve@pricelobel.com
mvella@pricelobel.com

85

PUBLIC VERSION

Trials@uspto.gov                                    Paper 57
571-272-7822                              Date: May 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————————————

IPR2021-00179
Patent 8,407,273 B2

———————————————

Before JUSTIN T. ARBES, STACEY G. WHITE, and JASON M. REPKO,
*Administrative Patent Judges.*

PER CURIAM.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*
Granting Patent Owner's and Petitioner's Motions to Seal
*37 C.F.R. §§ 42.14, 42.54*

PUBLIC VERSION

IPR2021-00179
Patent 8,407,273 B2

# I.   INTRODUCTION

## *A.   Background and Summary*

Petitioner Google LLC filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–26, 28, 32–61, 63, and 67–70 of U.S. Patent No. 8,407,273 B2 (Ex. 1001, "the '273 patent") pursuant to 35 U.S.C. § 311(a).  On May 14, 2021, we instituted an *inter partes* review as to all challenged claims on all grounds of unpatentability asserted in the Petition. Paper 16 ("Decision on Institution" or "Dec. on Inst.").  Patent Owner Singular Computing LLC subsequently filed a Patent Owner Response (Paper 28, "PO Resp."), Petitioner filed a Reply (Paper 34, "Reply"), and Patent Owner filed a Sur-Reply (Paper 39, "Sur-Reply").  Patent Owner filed a Motion to Exclude (Paper 46, "Mot.") certain evidence submitted by Petitioner, to which Petitioner filed an Opposition (Paper 47) and Patent Owner filed a Reply (Paper 49).  An oral hearing was held on February 11, 2022, and transcripts of the hearing are included in the record (Paper 55, "Conf. Tr."; Paper 56, "Public Tr.").  The parties also filed Motions to Seal (Papers 52 and 54) portions of their demonstrative exhibits containing confidential information.

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 21–24, 26, 28, 32, and 33 are unpatentable, but has not shown by a preponderance of the evidence that claims 3–20, 25, 34–61, 63, and 67–70 are unpatentable.

IPR2021-00179
Patent 8,407,273 B2

## B. Related Matters

The parties indicate that the '273 patent is the subject of *Singular Computing LLC v. Google LLC*, Case No. 1:19-cv-12551-FDS (D. Mass.) ("the district court case"). *See* Pet. xi; Paper 8, 1. Petitioner filed another petition challenging claims 1–70 of the '273 patent in IPR2021-00178, which was denied, and filed four other petitions challenging claims of two related patents also asserted in the district court case in IPR2021-00154 (denied), IPR2021-00155 (instituted), IPR2021-00164 (denied), and IPR2021-00165 (instituted).

## C. The '273 Patent

The '273 patent, entitled "Processing with Compact Arithmetic Processing Element," issued on March 26, 2013. Ex. 1001, codes (45), (54). The '273 patent describes "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)." *Id.* at col. 5, l. 65–col. 6, l. 2. According to the '273 patent, conventional central processing unit (CPU) chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications. *Id.* at col. 3, ll. 7–22. For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations." *Id.* at col. 3, ll. 15–22. According to the '273 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater

IPR2021-00179
Patent 8,407,273 B2

fraction of the computing power inherent in those million transistors." *Id.* at col. 3, ll. 23–28.  But "[c]urrent architectures for general purpose computing fail to deliver this power." *Id.* at col. 3, ll. 28–29.

The '273 patent is, therefore, "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at col. 2, ll. 11–18.  According to the '273 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at col. 2, ll. 28–31.  In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at col. 2, ll. 35–39.

Figure 6 of the '273 patent is reproduced below.



FIG. 6

APPX00177

Figure 6 depicts "an example design for an LPHDR arithmetic unit according to one embodiment of [the '273 patent]." *Id.* at col. 2, ll. 56–57. As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces an output 602c. *Id.* at col. 12, ll. 52–53. The LPHDR arithmetic unit "is controlled by control signals 412a-d, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602a-b." *Id.* at col. 12, ll. 59–62. According to the '273 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602a-b by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at col. 12, ll. 62–65. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at col. 13, ll. 1–8.

The '273 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at col. 13, ll. 8–10. According to the '273 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at col. 17, ll. 18–21. The '273 patent provides, as examples, applications including "finding nearest neighbors," *id.* at col. 17, l. 29–col. 21, l. 32, "distance weighted scoring," *id.* at col. 21, l. 34–col. 22, l. 24, and "removing motion blur in images," *id.* at col. 22, l. 26–col. 23, l. 30.

IPR2021-00179
Patent 8,407,273 B2

*D.  Illustrative Claims*

Challenged claims 1, 33, 36, and 68 of the '273 patent are independent.  Claims 2–26, 28, and 32 depend from claim 1, claims 34 and 35 depend from claim 33, claims 37–61, 63, and 67 depend from claim 36, and claims 69 and 70 depend from claim 68.  Claims 1 and 8 recite:

> 1. A device:

> comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

> wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from $1/65,000$ through 65,000 and for at least $X=5\%$ of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least $X\%$ of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least $Y=0.05\%$ from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

> 8. The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

*E.  Evidence*

The pending grounds of unpatentability in the instant *inter partes* review are based on the following prior art:

> U.S. Patent No. 5,689,677, issued Nov. 18, 1997 (Ex. 1009, "MacMillan");

> U.S. Patent Application Publication No. 2007/0203967 A1, published Aug. 30, 2007 (Ex. 1007, "Dockser"); and

6

IPR2021-00179
Patent 8,407,273 B2

> Jonathan Ying Fai Tong, David Nagle, & Rob A. Rutenbar, "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, vol. 8, no. 3 (June 2000) (Ex. 1008, "Tong").

Petitioner filed a declaration from Richard Goodin, P.E. (Ex. 1003) with its Petition and a reply declaration from Mr. Goodin (Ex. 1071) with its Reply. Patent Owner filed declarations from Sunil P. Khatri, Ph.D. (Ex. 2051) and Joseph Bates, Ph.D. (the named inventor of the '273 patent) (Ex. 2052) with its Response. Also submitted as evidence are transcripts of the depositions of Mr. Goodin (Ex. 2043) and Dr. Khatri (Ex. 1072).

## F.   Asserted Grounds

This *inter partes* review involves the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 21–24, 26, 28 | 103(a)[1] | Dockser |
| 1, 2, 21–24, 26, 28, 32, 33 | 103(a) | Dockser, Tong |
| 1–26, 28, 36–61, 63 | 103(a) | Dockser, MacMillan |
| 1–26, 28, 32–61, 63, 67–70 | 103(a) | Dockser, Tong, MacMillan |

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Here, Petitioner's challenges are based on the pre-AIA version of 35 U.S.C. § 103.

## II. ANALYSIS

### A. Level of Ordinary Skill in the Art

In determining the level of ordinary skill in the art for a challenged patent, we look to "1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666–667 (Fed. Cir. 2000). "Not all such factors may be present in every case, and one or more of them may predominate." *Id.*

Petitioner asserts that at the time of the earliest possible effective filing date of the '273 patent (June 19, 2009), a person of ordinary skill in the art would have had "at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture." Pet. 7–8 (citing Ex. 1003 ¶¶ 43–45). Patent Owner's proposed definition of the level of ordinary skill in the art is the same other than it removes the phrases "or the equivalent" and "at least." PO Resp. 14 (citing Ex. 2001 ¶¶ 36–37). There is little difference between the parties' proposed definitions, and the parties and their experts do not explain the basis for their proposals. Arguably, however, the term "at least" creates unnecessary ambiguity. Based on the full record developed during trial, including our review of the '273 patent and the types of problems and solutions described in the '273 patent and cited prior art, we determine that a person of ordinary skill in the art would have had a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and two years of academic or industry experience in computer architecture. *See, e.g.*, Ex. 1001, col. 1, l. 26–col. 2, l. 7 (describing in the

"Background" section of the '273 patent various conventional methods of computation and their alleged deficiencies).  We apply that definition for purposes of this Decision.

### B.  Claim Interpretation

We interpret the claims of the challenged patent

> using the same claim construction standard that would be used to construe the [claims] in a civil action under 35 U.S.C. 282(b), including construing the [claims] in accordance with the ordinary and customary meaning of such [claims] as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

37 C.F.R. § 42.100(b) (2020).  "In determining the meaning of [a] disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006).  Claim terms are given their plain and ordinary meaning as would be understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  We conclude that only one claim term requires interpretation to decide the issues presented during trial.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("Because we need only

IPR2021-00179
Patent 8,407,273 B2

construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy,' we need not construe [a particular claim limitation] where the construction is not 'material to the . . . dispute.'" (citation omitted)).

Claim 1 recites "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Independent claims 33, 36, and 68 recite the same limitation.

At issue here is the meaning of "low precision high dynamic range (LPHDR) execution unit," as recited in claims 1, 33, 36, and 68. Specifically, we need to resolve the question of whether this execution unit must be adapted to execute arithmetic operations *only* at low precision. For the reasons that follow, we determine that it does not.

Petitioner argues that, in the prior art used in all challenges, Dockser's floating-point processor (FPP), including the floating-point operator (FPO) inside the FPP, is low precision "because 'the precision' of operations in the FPP is 'reduced,' . . . and because it operates with the minimum imprecision" recited in the claim. Pet. 13–14 (citing Ex. 1003 ¶¶ 217–218; Ex. 1001, col. 26, l. 50–col. 27, l. 62; Ex. 1035, 8). Petitioner asserts that, in the claim, the minimum imprecision is found in the limitation that it calls *1B2*:

> for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least

IPR2021-00179
Patent 8,407,273 B2

> Y=0.05% from the result of an exact mathematical calculation of
> the first operation on the numerical values of that same input.

Ex. 1001, col. 30, ll. 6–16.  According to Petitioner, the '273 patent characterizes degrees of precision described in language mirroring *1B2* as "low precision."  Pet. 13–14.  Petitioner argues that the execution units in the prior art fall within the scope of the recited unit if they perform reduced precision operations and at least one, but not necessarily all, of those operations meets the other requirements of claim 1.  *See, e.g.*, *id.* at 30 (explaining that "numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision"); Reply 2–3 (discussing the "low precision" requirement).

Patent Owner argues that the LPHDR execution unit should be construed as "an execution unit that executes arithmetic operations *only* at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below."  PO Resp. 15 (emphasis added).  We emphasize "only" because Patent Owner argues that the recited LPHDR execution unit "necessarily excludes full-precision or mixed full and low precision units."  *Id.* at 16 (citing Ex. 2051 ¶ 60).

In support of its proposed construction, Patent Owner asserts that construing the LPHDR execution unit as encompassing full or mixed precision units would "impermissibly read out 'low precision high dynamic range' and render the limitation meaningless."  *Id.* (citing *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022–23 (Fed. Cir. 2020)); *see also id.* at 17 (arguing that Petitioner's construction reads "'low precision' out of the claims entirely").

Based on the totality of the record, we agree with Petitioner that the recited LPHDR execution unit does not exclude mixed full and low precision execution units (i.e., those that are capable of arithmetic operations at both levels of precision). *See, e.g.*, Pet. 13–14, 30. We reject Patent Owner's argument that interpreting the claim in this way renders the term "low precision" "meaningless." *See* PO Resp. 15–17. Rather, the term "low precision" imposes the requirement that the unit must *at least* perform arithmetic operations at low precision, which would exclude units that operate only at full precision, for example. Thus, we disagree with Patent Owner and assign little weight to Dr. Khatri's testimony on this issue. *See id.*; Ex. 2051 ¶¶ 60–61.

As stated in our Decision on Institution, the recitation of "a first operation" in claim 1 requires only one or more first operations that meet the low precision criteria specified in the claim. Dec. on Inst. 19. The claims do not require that "every" operation must be low precision or exclude the LPHDR execution unit from having other capabilities for other operations. *Id.* Indeed, Patent Owner agrees that "a claim's recitation of an 'execution unit adapted to execute a first operation' would normally not preclude that execution unit from performing other types of operations." PO Resp. 17–18. Patent Owner, though, argues that this "rule does not apply when the specification teaches otherwise, as is the situation here." *Id.* We disagree.

Patent Owner relies on exemplary non-limiting embodiments from the '273 patent. *See id.* at 18. Specifically, Patent Owner argues that "the claimed LPHDR execution units are smaller and have fewer transistors" than prior art full precision execution units. *Id.* (citing Ex. 2051 ¶ 62). But the cited passage pertains only to exemplary embodiments and says that the

"amount of resources" is small, with transistors being only one example of such resources:

> For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a *small amount of resources (e.g., transistors or volume)* compared with traditional architectures.

Ex. 1001, col. 8, ll. 3–7 (emphasis added).  In fact, some embodiments do not even require transistors: "[e]xamples of such technologies include . . . other technologies whether based on transistors or not."  *Id.* at col. 26, ll. 24–31, *cited in* Reply 6.

The reference to the "small amount of resources" in the cited passage (Ex. 1001, col. 8, ll. 3–7) is consistent with Petitioner's position that the LPHDR execution unit need only perform low precision operations some of the time because the record shows that doing so would save power and other computational resources.  For example, Dr. Khatri testified that "exact computing . . . takes up a lot of resources, takes up a lot of power, takes up a lot of area, and takes up a lot of delay."  Ex. 1072, 47:2–5.  Mr. Goodin explained that reducing precision may achieve power savings.  *See, e.g.*, Ex. 2043, 34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision may achieve power savings).  Mr. Goodin cites specific examples of how this is achieved.  *See, e.g.*, Ex. 1003 ¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 35 (citing Ex. 1007 ¶¶ 3–7).  Thus, we disagree with Patent Owner's argument about reducing transistors and assign little weight to Dr. Khatri's testimony on this issue.  *See* PO Resp. 18; Ex. 2051 ¶ 62.

Also, we agree with Petitioner that the degree of low precision is described in limitation *1B2* in claim 1 and similar limitations in the other claims.  Pet. 13–14.  The language used in *1B2* is consistent with how the

IPR2021-00179
Patent 8,407,273 B2

'273 patent describes low precision. Ex. 1001, col. 26, l. 50–col. 27, l. 62, *cited in* Pet. 13–14. For example, the patent states, "[t]he degree of precision of a 'low precision, high dynamic range' arithmetic element may vary from implementation to implementation." *Id.* at col. 26, ll. 50–52. The patent then lists several examples. *Id.* at col. 26, l. 52–col. 27, l. 62. In one example, "a LPHDR arithmetic element produces results which are sometimes (or all of the time) no closer than 0.05% to the correct result." *Id.* at col. 26, ll. 55–60. Similarly, claim 1 recites (and claims 33, 36, and 68 recite similar limitations) that

> the statistical mean . . . of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

Patent Owner agrees that the claims provide the parameters of the low precision and high dynamic range in the limitations "wherein the dynamic range . . ." and "for at least X=5% . . . ." PO Resp. 16. Indeed, Patent Owner in the district court case argued that the subsequent claim language specifying percentages "*defines* the term 'low precision'" and "specifies the degree of precision that an LPHDR execution unit must have in order to satisfy the 'low precision' . . . limitation of the claim." Ex. 1065, 9 (emphasis added); *see also* Ex. 1066, 12 (arguing that "'low precision high dynamic range' is defined in [the] claim itself"); Reply 2. Patent Owner, however, argues that those limitations "do not allow for the execution unit to have full-precision (or [low] dynamic range) capability." PO Resp. 16.

But the claims do not recite that every operation must meet these criteria. Rather, the claims only recite that the criteria apply to "a first operation." This reading is consistent with the examples of LPHDR

14

elements from the written description. *See* Ex. 1001, col. 26, l. 50–col. 27, l. 62, *cited in* Pet. 13–14. In those examples, the LPHDR arithmetic elements may produce results that are only "sometimes" no closer than the percentage to the correct result. *See id.* Thus, we agree with Patent Owner's argument that the claims provide the parameters for the term "low precision," but we disagree that the parameters must apply to every operation. *See* PO Resp. 16. For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue. *See* Ex. 2051 ¶¶ 60–64.

Patent Owner also argues that "small size and low transistor count . . . is what allows a much larger number of LPHDR execution units to operate in parallel on a single chip." PO Resp. 19. But the requirement of a "much larger number" is not in the independent claims. Nor do the claims (or Patent Owner's proposed construction) include any limitations on size of the LPHDR execution unit or its transistor count. And "not every benefit flowing from an invention is a claim limitation." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010). Even so, the Specification states that some embodiments are not based on transistors. *See, e.g.*, Ex. 1001, col. 26, ll. 24–31. So we find no support in the written description for Patent Owner's argument about small size and low transistor count. *See* PO Resp. 19. For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue. *See* Ex. 2051 ¶¶ 63–64.

We also agree with Petitioner that the written description does not support Patent Owner's assertion that the '273 patent contrasts LPHDR execution units with other units that operate in both high and low precision. *See* PO Resp. 19, 23 (citing Ex. 1001, col. 5, ll. 31–40); Reply 7 (discussing Patent Owner's argument). The relevant part of the '273 patent describes a graphics processor that supports 16-bit and 32-bit floating point formats:

IPR2021-00179
Patent 8,407,273 B2

> When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

Ex. 1001, col. 5, ll. 31–40. This paragraph does not define the term "low precision." *Id.* Nor does the patent explain how the 16-bit units meet the claimed requirements for low precision units that are recited in the claim. *See id.* Also, there is no discussion of these units in the part of the written description that lists examples of low precision units. *See id.* at col. 26, l. 50–col. 27, l. 62. Thus, we disagree with Patent Owner that the '273 patent contrasts LHPDR execution units with those that operate in both high and low precision. PO Resp. 19, 23. For the same reasons, we assign little weight to Dr. Khatri's testimony on this issue. *See* Ex. 2051 ¶¶ 63–64, 72.

To the contrary, we agree with Petitioner that the '273 patent discloses at least one embodiment that performs operations other than LPHDR computations:

> [W]hile the obvious method of using the above [logarithmic number system (LNS)] operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values . . . . *So besides doing LPHDR computations*, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Ex. 1001, col. 14, ll. 6–15 (emphasis added), *quoted in* Reply 4. Because the unit performs arithmetic operations other than those at low precision, this

example contradicts Patent Owner's argument that an LPHDR execution unit is "an execution unit that executes arithmetic operations *only* at low precision."  PO Resp. 15 (emphasis added).

Patent Owner counters, "as Dr. Khatri explained, a [person of ordinary skill in the art] would not apply [the terms] 'precision' or 'dynamic range' to integers."  Sur-Reply 4 (citing Ex. 1072, 116:5–118:3).  In Patent Owner's view, a person of ordinary skill in the art "would understand that [Patent Owner's] proposed construction would *not* exclude execution units that can perform integer operations, like the LNS embodiment described in the patent specification."  *Id.* at 4–5.  Yet Patent Owner's proposed construction makes no distinction between integer or floating-point operations.  PO Resp. 15.  Rather, the construction refers to "arithmetic operations," generally.  *See id.*

In its Sur-Reply, Patent Owner proposes an alternative construction—for the first time in this proceeding—that further defines "arithmetic operations" to be "*floating-point* arithmetic operations."  Sur-Reply 5.  But a sur-reply must only respond to arguments raised in the preceding brief.  Patent Trial and Appeal Board Consolidated Trial Practice Guide (Nov. 2019), 73–74, *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.  Under 37 C.F.R. § 42.23(b), "respond" does not mean proceed in a new direction with a new approach.  *See id.* at 74.  "[A] sur-reply that raises a new issue or belatedly presents evidence may not be considered."  *Id.*  So, apart from noting that we do not see any reason to limit the LPHDR execution unit to only low precision operations—regardless of how those operations are defined—for the reasons discussed above, we do not further consider this new claim construction presented for the first time in the Sur-Reply.  *See* Sur-Reply 5.

17

IPR2021-00179
Patent 8,407,273 B2

In sum, we agree with Petitioner that the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that are capable of performing operations at low and full precision, and the degree of "low precision" is defined in limitation *1B2*.  *See, e.g.*, Pet. 13–14, 30; Reply 2–3.  To determine the patentability of the challenged claims, we need not further construe "low precision high dynamic range (LPHDR) execution unit." *See Nidec*, 868 F.3d at 1017.

### C.  Legal Standards

To prevail in its challenges to the patentability of claims 1–26, 28, 32–61, 63, and 67–70 of the '273 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016).  This burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("Where, as here, the only question presented is whether due consideration of the four *Graham* factors renders a claim or claims obvious, no burden shifts from the patent challenger to the patentee.").

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a) (2006)).

IPR2021-00179
Patent 8,407,273 B2

The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Additionally, objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Id.* When conducting an obviousness analysis, we consider a prior art reference "not only for what it expressly teaches, but also for what it fairly suggests." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (citation omitted).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"). Also, "[t]hough less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016).

"Although the *KSR* test is flexible, the Board 'must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention.'" *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (citation omitted). Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *accord In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (stating that "conclusory statements" amount to an "insufficient articulation[] of motivation to combine"; "instead, the finding must be supported by a 'reasoned explanation'" (citation omitted)); *Magnum Oil*, 829 F.3d at 1380 ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness.").

## D.  Obviousness Ground Based on Dockser (Claims 1, 2, 21–24, 26, and 28)

### 1.  Dockser

Dockser discloses performing floating-point operations with a floating-point processor having "selectable subprecision." Ex. 1007, code (57), ¶¶ 15, 17. "A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa. To find the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent. The sign is applied to the resultant value." *Id.* ¶ 1. "The precision of the floating-point processor is defined by the number of bits used to represent the mantissa.

IPR2021-00179
Patent 8,407,273 B2

The more bits in the mantissa, the greater the precision." *Id.* ¶ 2. "The precision of [a] floating-point processor generally depends on the particular application. For example, the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa." *Id.* "Higher precision results in a higher accuracy, but commonly results in increased power consumption." *Id.* Dockser explains that the performance of floating-point operations also can be computationally inefficient because "[w]hile some applications may require [high] types of precision, other applications may not." *Id.* ¶ 3. For example, "some graphics applications may only require a 16-bit mantissa," such that "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," but other applications may require "greater precision." *Id.* Accordingly, there was "a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable." *Id.*

IPR2021-00179
Patent 8,407,273 B2

Figure 1 of Dockser is reproduced below.



FIG. 1

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

IPR2021-00179
Patent 8,407,273 B2

Figure 2 of Dockser is reproduced below.



FIG. 2

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision

IPR2021-00179
Patent 8,407,273 B2

select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits). Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively. Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3B depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the

multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31.
A partial product 420-i is generated for every bit in multiplier 404 at
corresponding stage 410-i and then left-shifted "as a function of the
multiplier bit with which it is associated, after which the operation moves on
to the next stage." *Id.* ¶ 31. The partial products are eventually added
together to generate output value 430. *Id.* "[P]ower may be removed from
the logic used to implement the stages to the right of the line 405" indicating
the selected subprecision. *Id.* ¶¶ 32–33.

### 2. Claim 1

Petitioner explains in detail how Dockser teaches or suggests every
limitation of claim 1, relying on the testimony of Mr. Goodin as support.
*See* Pet. 8–36; Ex. 1003 ¶¶ 204–310.

Claim 1 recites a device comprising "at least one first low precision
high dynamic range (LPHDR) execution unit adapted to execute a first
operation on a first input signal representing a first numerical value to
produce a first output signal representing a second numerical value."
Petitioner asserts that Dockser's floating-point processor (FPP) is a "low
precision high dynamic range (LPHDR) execution unit."[2] Pet. 12–14.
According to Petitioner, Dockser's FPP is incorporated in a computing
system, which is the claimed "device" comprising the FPP. *Id.* at 12 (citing
Ex. 1003 ¶ 204; Ex. 1007 ¶¶ 1, 15, 35–36). Petitioner argues that "[w]ithin

---

[2] Petitioner also provides an "alternative mapping" where "the floating-point
operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit.
Pet. 13, 18–20, 35. We need not evaluate those arguments because we
determine that Petitioner has made a sufficient showing based on the full
trial record that the FPP is an LPHDR execution unit.

IPR2021-00179
Patent 8,407,273 B2

Dockser's computing system, the FPP is implemented in a 'hardware component[]' such as an [application specific integrated circuit (ASIC)] or [field-programmable gate array (FPGA)], which is also a claimed 'device' comprising the FPP." *Id.* (citing Ex. 1003 ¶ 206; Ex. 1007 ¶ 35). We agree with Petitioner.

### a)  *"High Dynamic Range"*

With respect to the "high dynamic range" aspect of the LPHDR execution unit, the claim requires that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000." Petitioner asserts that Dockser's FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '273 patent. Pet. 14 (citing Ex. 1007 ¶ 17; Ex. 1001, col. 14, ll. 53–61). Petitioner's assertion, which is not disputed by Patent Owner, is adequately supported by the record.

For example, Dockser's register location 200 stores a 32-bit binary floating-point number, in an IEEE-754 32-bit single format, with 8-bit exponent 204. Ex. 1007 ¶¶ 2, 17, *cited in* Pet. 19. According to Mr. Goodin, the dynamic range of normal IEEE-754 operands would be from around $2^{-126}$, which is much smaller than 1/65,000, to around $2^{127}$, which is much larger than 65,000. Ex. 1003 ¶ 241, *cited in* Pet. 19. We credit Mr. Goodin's testimony on this point because it is consistent with Dockser. *See id.*; Ex. 1007 ¶¶ 2, 16–17, 24. Thus, Petitioner has shown that Dockser's FPP meets the dynamic range limitation recited in claim 1.

*b)  "A First Operation"*

Claim 1 recites that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value." Petitioner argues that Dockser's FPP is adapted to execute a "first operation" (e.g., "reduced-precision multiplication") on a "first input signal representing a first numerical value" (i.e., input electrical signal representing an operand received at the registers) to produce a "first output signal representing a second numerical value" (i.e., output electrical signal representing an operand sent to a register and then main memory). Pet. 16–18.

Patent Owner does not present an argument to specifically address this argument and evidence. *See* PO Resp.; Sur-Reply.

Based on our review of the totality of the evidence in this case, we agree that Dockser's FPP is adapted to execute the recited first operation. Dockser's FPP receives the operands as input values. Ex. 1007, Fig. 1. Dockser's FPP performs operations on the inputs via the FPP's data paths 134–139 and components 140–144. *Id.* We agree with Petitioner that Dockser teaches that the operand data to the FPP is a "first input signal representing a first numerical value" because it represents the operand number. *Id.* ¶ 17. The FPP executes the operation and produces an "output value," or "output number," which is represented by "output bits." *Id.* ¶ 34. In this way, that value is the recited "second numerical value." *See* Pet. 16–18. We credit Mr. Goodin's testimony on this point. Ex. 1003 ¶¶ 232–235.

We also credit Mr. Goodin's analysis showing that Dockser's computing circuits "move" data between components, such as from memory

IPR2021-00179
Patent 8,407,273 B2

to the processor, via electrical signals. *See id.* ¶ 229 (citing Ex. 1014, col. 1, ll. 36–37). On this issue, the record provides adequate support for Mr. Goodin's testimony. *See* Ex. 1007 ¶¶ 16–17; Ex. 1014, col. 1, ll. 36–37. Thus, Petitioner has shown that signals represent the recited values.

Considering all of the arguments and evidence in this case, Petitioner has sufficiently shown that Dockser teaches that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value," as recited in claim 1. Pet. 14–18.

### c)   *"Low Precision"*

As for the "low precision" aspect of the LPHDR execution unit, Patent Owner argues that Dockser's FPP is not an LPHDR execution unit because the FPP is capable of both low and full precision operations. *See* PO Resp. 15, 20–24. We disagree with Patent Owner's argument and underlying construction for the reasons discussed in Section II.B. Instead, we agree with Petitioner that (1) the recited "low precision high dynamic range (LPHDR) execution unit" does not exclude units that perform operations at low and full precision, and (2) the degree of "low precision" required by the claim is defined in limitation *1B2*. *See, e.g.*, Pet. 13–14, 30; Reply 2–3.

### d)   *Limitation 1B2*

Under the interpretation discussed in Section II.B, Petitioner has shown that Dockser teaches the recited LPHDR execution unit. In particular, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP

IPR2021-00179
Patent 8,407,273 B2

"operates with the minimum imprecision" required by limitation *1B2*.

Pet. 13–14 (quoting Ex. 1007 ¶ 14). Limitation *1B2* recites (emphasis added):

> for at least X=5% of the possible valid inputs to the first operation, the *statistical mean*, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an *exact mathematical calculation* of the first operation on the numerical values of that same input.

We first analyze the "statistical mean" limitation before turning to the "exact mathematical calculation" limitation.

### *(1) "Statistical Mean"*

Petitioner argues that a person of ordinary skill in the art would have understood the "statistical mean" limitation

> in the context of the '273 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."

Pet. 20–21 (quoting Ex. 1001, col. 4, ll. 7–13).

In Petitioner's view, for "non-deterministic embodiments," the statistical mean would be the average of "the different outputs produced by the same operation on the same input." *Id.* at 21. Petitioner argues that, for "deterministic digital embodiments" like Dockser, the statistical mean is "the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input." *Id.* In Petitioner's view, repeatedly

executing a multiplication operation using Dockser's floating-point multiplier "on the same input (*i.e.*, pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.* at 22.

Patent Owner does not dispute this reasoning. *See* PO Resp.; Sur-Reply.

Based on the totality of the evidence, Petitioner's analysis of "deterministic digital embodiments" to address the "statistical mean" limitation is adequately supported by the record. Pet. 21–22. We are persuaded by Petitioner's reasoning that the '273 patent's written description has both analog and digital embodiments. *See, e.g.*, Ex. 1001, col. 4, ll. 7–13, col. 14, ll. 16–61, col. 17, ll. 10–14. Dockser uses "a conventional floating-point multiplier." Ex. 1007 ¶ 20. Petitioner adequately supports its assertion that this is a deterministic digital circuit. Pet. 22 (citing Ex. 1003 ¶ 250; Ex. 1011, col. 1, ll. 40–42). And we credit Mr. Goodin's testimony that, in such a digital circuit, a floating-point multiplier operating on the same input with the same precision level yields the same result for every execution, and thus, the statistical mean is the same as the output for any single execution. Ex. 1003 ¶ 251, *cited in* Pet. 22.

### (2) *"Exact Mathematical Calculation"*

As for the "exact mathematical calculation" limitation, Petitioner argues that because Dockser performs a reduced precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation: "the (>32-bit) product that would result if the pair of

input 32-bit operands were multiplied without reducing precision."
Pet. 22–23 (emphasis omitted) (citing Ex. 1003 ¶ 253; Pet. App'x I.B).

### (3) Y Relative Error for X Valid Inputs

According to Petitioner, "Dockser discloses two precision-reducing techniques that can be used separately or together." Pet. 25 (citing Ex. 1007 ¶¶ 4–7; Ex. 1003 ¶¶ 264–270). One technique removes power from storage elements in the FPP registers that correspond to the excess, dropped mantissa bits, which drops bits from the operands. *Id.* The other technique "remov[es] power from elements within the multiplier logic that computes the product of the operand mantissas." *Id.* Petitioner asserts that both techniques individually and in combination teach limitation *1B2*.

We determine that Petitioner has made a sufficient showing that Dockser meets the recited requirements for low precision under the register bit-dropping rationale. Patent Owner does not present arguments specific to this technique. *See* PO Resp.; Sur-Reply. We need not evaluate Petitioner's alternative rationale based on the multiplier logic. Our reasoning follows.

### (4) Register Bit-Dropping

Petitioner explains how Dockser teaches that "for at least X=5% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.05%" from the result of the exact mathematical calculation. Pet. 23–36. In Petitioner's view, the "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an

IPR2021-00179
Patent 8,407,273 B2

overflow/underflow exception)." *Id.* at 23. Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs. *Id.* at 23–24.

We agree. Dockser retains only some of the bits of a mantissa fraction: in one example, the nine most-significant bits of the mantissa fraction are retained, and the other 14 excess bits are dropped. Ex. 1007 ¶¶ 25–28, *cited in* Pet. 24; Ex. 1003 ¶ 263. The outputs of Dockser's unpowered storage elements are tied to zero voltage. Ex. 1003 ¶ 278; Ex. 1007 ¶¶ 26 (discussing removing power from the register elements for the excess bits), 29 (discussing "unpowered bits"). With support from Mr. Goodin and corroborating evidence, Petitioner shows that tying the outputs of the unpowered storage elements for the 14 "excess" bits to zero voltage would make those bits zeroes. Pet. 28 (citing Ex. 1003 ¶¶ 278–280).

Multiplying two operands with excess bits dropped (representing zero) reduces the output's precision. Ex. 1007 ¶¶ 24–26. Petitioner provides a representative example described by Mr. Goodin:

> the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.3787171840667724609375) would become 01100000100000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 01000100110111000001000 (representing a mantissa of 1.26898288726806640625) would become 01000100100000000000000 (representing a mantissa of 1.267578125).

Pet. 28–29 (citing Ex. 1003 ¶ 282). So the decrease in precision depends on the number of mantissa bits dropped. *See id.*; *see also* Ex. 1003 ¶ 287. And we agree with Petitioner that Dockser suggests that any desired number of mantissa bits can be dropped. Pet. 30. For example, Dockser describes how

the precision is selectable. *See* Ex. 1007 ¶¶ 14–15, 17 (describing selectable reduced precision), *discussed in* Pet. 4.

Petitioner asserts that Dockser's register bit-dropping technique meets limitation *1B2* in two ways. Pet. 26–32. First, Petitioner presents results of a software demonstration to show that Dockser's 9 mantissa bits meets limitation *1B2*. *Id.* at 30–31. Second, Petitioner uses a pencil-and-paper algebraic analysis to show that retaining 9 mantissa bits meets limitation *1B2*. *Id.* at 31–32.

As for the software demonstration, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas)," a person of ordinary skill in the art "would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 30–31. Petitioner states that Mr. Goodin wrote a program to perform reduced precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.05% relative error for 92.1% of possible valid inputs (greater than X=5%)." *Id.* at 30–31, 68–70 (citing Ex. 1003 ¶¶ 290–292, 441–455, 495–500).

Patent Owner did not rebut this evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's assertions about the recited X and Y percentages, and we credit Mr. Goodin's testimony on this issue, which is supported by the record. *See* Ex. 1003 ¶¶ 441–455.

In particular, Mr. Goodin summarizes the results of the software

program in the table below.  *Id.* ¶ 452.

| Retained Fraction Bits | Claimed Y% | Percentage of Tested Pairs Meeting Claimed Y% | Adjusted "Dockser's X%" |
|---|---|---|---|
| 9 | ≥ 0.05% | 92.628313% | ≥ 92.14333% |
|  | ≥ 0.10% | 70.494075% | ≥ 70.12498% |
|  | ≥ 0.15% | 39.118049% | ≥ 38.91323% |
|  | ≥ 0.20% | 14.674747% | ≥ 14.59791% |

| 5 | ≥ 0.05% | 99.971764% | ≥ 99.44834% |
|  | ≥ 0.10% | 99.886981% | ≥ 99.36400% |
|  | ≥ 0.15% | 99.976929% | ≥ 99.22327% |
|  | ≥ 0.20% | 99.547206% | ≥ 99.02600% |

The table shows the percentage of tested pairs that meet the claimed Y

percentage as output by the software program.  *Id.*  It also shows a

"Dockser's X" percentage, which is adjusted to exclude possible overflow

and underflow pairs, that meets the claimed requirements.  *Id.*  The X value

is calculated by multiplying the percentage output by the software program

by an adjustment ratio.  *Id.*  The adjustment ratio is described in Appendix

I.E of Mr. Goodin's declaration.  *Id.*  Mr. Goodin also explains that, if "the

'exact mathematical calculation' of multiplication of two single-format

floating-point operands is the product rounded or truncated to single format

(having a 23-bit-fraction mantissa), the claims are still met."  *Id.* ¶ 455.  To

show this, Mr. Goodin wrote an alternative version of the program under this

assumption, which also gives results that meet the claim limitations.  *Id.*

After review of the arguments and evidence on these issues, we credit

Mr. Goodin's software-based analysis.  *Id.* ¶¶ 441–455.

As for the algebraic analysis, Petitioner argues that a person of

ordinary skill in the art "would also have understood algebraically that

IPR2021-00179
Patent 8,407,273 B2

Dockser's register bit-dropping technique meets [limitation *1B2*], by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." Pet. 31–32. Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their tenth and eleventh fraction bits," such that retaining only 9 mantissa bits of operands would result in "*every* input in that 12% produc[ing] at *minimum* 0.097% relative error." *Id.* at 31–32, 71–76 (citing Ex. 1003 ¶¶ 293–294, 456–475).

Patent Owner did not rebut this evidence. *See* PO Resp.; Sur-Reply.

We are persuaded by Petitioner's algebraic method showing the recited X and Y percentages, and credit Mr. Goodin's testimony on this issue. *See* Ex. 1003 ¶¶ 456–475. Under this reasoning, "for the 12.5% of all possible $M_A$ [mantissa] values with zero in the first fraction bit and ones in the $(K + 1)^{th}$ and $(K + 2)^{th}$ fraction bits," the following inequality holds "when Dockser's register bit-dropping truncates the operands to K fraction bits":

$$Y \geq \frac{\left(2^{-(K+1)} + 2^{-(K+2)}\right)}{(1.5 - 2^{-23})} \times 100\% \qquad \textbf{\textit{(Equation C)}}$$

*Id.* ¶ 471. The table below shows the results of evaluating Equation C with K=9, K=8, K=7, and K=5 retained fraction bits as the selected precision level. *Id.* ¶ 475.

| Retained Fraction Bits (K) | Equation C: Minimum Y for $X \geq 12\%$ | Equation D: Minimum Y for $X \geq 6\%$ | Meets X/Y Percentages Recited by Claims: |
|---|---|---|---|
| 9 | $\geq 0.0976\%$ | $\geq 0.1171\%$ | 1, 11-12, 33, 36, 46-47, 68 |
| 8 | $\geq 0.1953\%$ | $\geq 0.2343\%$ | All above plus 13-16, 48-51 |
| 7 | $\geq 0.3906\%$ | $\geq 0.4687\%$ | All above plus 17, 52 |
| 5 | $\geq 1.5625\%$ | $\geq 1.8750\%$ | All above |

35

The table above shows that the values of K meet the '273 patent's claimed minimum X and Y. *Id.* After review of the arguments and evidence on these issues, we credit Mr. Goodin's algebraic analysis. *Id.* ¶¶ 456–475.

### e)  Objective Indicia of Nonobviousness

In addition to its argument based on the interpretation of "low precision high dynamic range (LPHDR) execution unit," Patent Owner argues that objective indicia of nonobviousness demonstrate that the challenged claims would not have been obvious to a person of ordinary skill in the art. PO Resp. 46–72. Because the parties largely refer to the challenged claims collectively in their arguments regarding objective indicia, we do so as well and now address those arguments as applied to all of the claims challenged as obvious over Dockser alone or the combination of Dockser and Tong, i.e., claims 1, 2, 21–24, 26, 28, 32, and 33, which we refer to as the "Dockser/Tong-challenged claims."[3] *See id.*; Reply 19–30; Sur-Reply 19–26.

"In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a nexus to the claims, *i.e.*, there must be a legally and factually sufficient

---

[3] As explained below, we determine that Petitioner has not proven that certain claims are unpatentable over the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, because Petitioner has not sufficiently shown a reason to combine with MacMillan. *See infra* Sections II.F, II.G. Accordingly, we need not assess objective indicia of nonobviousness with respect to those claims. *See Mylan Pharms. Inc. v. Res. Corp. Techs., Inc.*, 914 F.3d 1366, 1376 (Fed. Cir. 2019) ("Because we agree with the Board that Appellants failed to establish a motivation to modify compound 3I, we need not reach Appellants' arguments regarding objective indicia.").

IPR2021-00179
Patent 8,407,273 B2

connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (citations and internal quotation marks omitted). "The patentee bears the burden of showing that a nexus exists." *Id.* "To determine whether the patentee has met that burden, we consider the correspondence between the objective evidence and the claim scope." *Id.* A patentee is entitled to a rebuttable presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (citation omitted). Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021). "As part of the presumption analysis, the fact finder must consider the unclaimed features of the stated products to determine their level of significance and their impact on the correspondence between the claim and the products." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1418 (Fed. Cir. 2022). When, "for example, the patented invention is only a small component of the product tied to the objective evidence, there is no presumption of nexus." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333 (Fed. Cir. 2019). Absent a presumption of nexus, a patent owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (citation omitted).

"Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*,

639 F.3d 1057, 1068–69 (Fed. Cir. 2011). On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016). A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* at 1330. Ultimately, the fact finder must weigh the objective indicia evidence presented in the context of whether the claimed invention as a whole would have been obvious to an ordinarily skilled artisan. *Id.* at 1331–32; *Lectrosonics, Inc. v Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential).

### (1)  Industry Skepticism

"If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness. Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the claimed invention." *WBIP*, 829 F.3d at 1335. As evidence of alleged industry skepticism, Patent Owner points to various statements made by employees of Petitioner after meeting with Dr. Bates (the named inventor of the '273 patent) in 2010. PO Resp. 47–51. According to Patent Owner, Dr. Bates explained that floating point units programmed to perform

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00179
Patent 8,407,273 B2

███████████████████████████████████████

███████████████████████████████████

█████████████████████████ *Id.* at 48–51 (citing Exs. 2009, 2027, 2028, 2030).  Patent Owner contends that the cited statements from Petitioner's employees "express skepticism about utility of the low-precision arithmetic performed by the large numbers of low-precision execution units,"[4] which is a "key feature" of the challenged claims, and have a nexus to the challenged claims because they were made in response to Dr. Bates's presentations.  *Id.* at 51.

Petitioner argues that Patent Owner's evidence is irrelevant because it is dated after the earliest possible effective filing date of the '273 patent (June 19, 2009).  Reply 22.  We disagree that evidence of industry skepticism must itself be dated before the relevant invention.  *See WBIP*, 829 F.3d at 1335–36 (considering evidence of skepticism dated after the invention of the patent at issue); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (same); Sur-Reply 19–20.

---

[4] Claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by only a single LPHDR execution unit.  The only challenged claims of the '273 patent that arguably require a "large number[]" of LPHDR execution units are challenged in Petitioner's asserted grounds based on combinations with MacMillan.  *See* PO Resp. 51.  For example, claim 7 recites that "the at least one first LPHDR execution unit comprises at least one hundred LPHDR execution units," and claim 8 recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."

IPR2021-00179
Patent 8,407,273 B2

We have reviewed the substance of the statements cited by Patent Owner, though, and are not persuaded that they are probative of nonobviousness. The statements by Petitioner's engineers relate to whether applications using "approximate" arithmetic would be commercially valuable; they do not show skepticism as to whether or how a problem could be solved or whether such applications would *work. See WBIP*, 829 F.3d at 1335. For example, Tom Dean stated that



Ex. 2009, 1 (emphasis added).

Ex. 2029, 1 (emphasis added).

Ex. 2028, 1 (emphasis added).

Ex. 2030, 2. Thus, the cited comments appear to indicate that floating point units performing "approximate" arithmetic would only be commercially valuable for a limited set of applications, rather than expressing skepticism as to whether such applications would work. Patent Owner also has not explained sufficiently why the fact that "approximate" arithmetic was considered useful for some

40

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00179
Patent 8,407,273 B2

applications, but not others, amounts to industry skepticism over the claimed invention as a whole (which is not limited to a particular application). We find that Patent Owner's evidence of alleged industry skepticism does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims.

### (2) Industry Praise

"Evidence that the industry praised a claimed invention or a product which embodies the patent claims weighs against an assertion that the same claim would have been obvious. Industry participants, especially competitors, are not likely to praise an obvious advance over the known art." *WBIP*, 829 F.3d at 1334. Patent Owner points to four statements of alleged industry praise from "leading figures in computer science" and argues that they have a nexus to the challenged claims because they relate to Dr. Bates and his presentations to Petitioner in 2010, 2011, and 2013. PO Resp. 51–52.

Patent Owner cites Dr. Bates's notes from ████████████ ██████████████████████████████████████████ ████████████████████ *See id.* at 51; Ex. 2050. This single line in the notes does not mention any specific ideas or features that allegedly were praised, or why or for what they were being praised. Patent Owner argues that there is "no requirement that praise identify exactly the features being praised." Sur-Reply 20. But evidence of industry praise must be for "the claimed invention," and the notes only state that ████████ ████████████████ *See* Ex. 2050; *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc); *WBIP*, 829 F.3d at 1334. The notes also have less probative value because they were written by Dr. Bates based on his subjective recollection of Mr. Dean's reaction at the

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00179
Patent 8,407,273 B2

meeting, rather than, for example, being prepared by a third party or

Mr. Dean himself.  Ex. 2052 ¶ 7.

Patent Owner also cites three 2011 emails sent by employees of

Petitioner to Dr. Bates.  PO Resp. 51–52.  Andrew Ng wrote the following to

Dr. Bates:



Ex. 2033, 1.  Astro Teller wrote that ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Johnny Chen wrote, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See*

Exs. 2031, 2032.  We view these emails as more consistent with Petitioner's

view as "merely cordial statements made to Dr. Bates," rather than evidence

of industry praising the inventions of the Dockser/Tong-challenged claims as

Patent Owner contends.  *See* Reply 24.  Further, they are statements by

employees of Petitioner only (not any other industry participant or industry

group) and do not mention any specific ideas or features from Dr. Bates's

presentations that were being praised.  We find that Patent Owner's evidence

of alleged industry praise is too ambiguous and high-level to be probative of

nonobviousness.

42

### (3) Unexpected Results

"To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Meyers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014). Also, "[w]hen assessing unexpected properties, . . . we must evaluate the significance and 'kind' of expected results along with the unexpected results." *Id.* As evidence of alleged unexpected results, Patent Owner points to a September 2013 presentation that Dr. Bates gave to Petitioner showing

███████████████████████████████████████████████████

███████████████████ PO Resp. 52–56 (citing Ex. 2005). Patent Owner argues that the unexpected nature of the results is "confirmed by skepticism expressed by" David Patterson, Ph.D. (an employee of Petitioner and "acclaimed expert in the field of computer science and computer architecture" according to Patent Owner), and "further supported by Dockser and Tong," which teach that higher precision is "generally" needed. *Id.* at 55–56 (citing Ex. 1007 ¶ 3; Ex. 1008, 280; Ex. 2012; Ex. 2051 ¶¶ 124–125).

The cited evidence, however, does not establish a difference between the alleged results and the closest prior art. Dr. Bates's presentation includes

███████████████████████████████████ Ex. 2005, 11; *see* PO Resp. 54. In this case, however, the closest prior art is Dockser and Tong, both of which teach reduced precision arithmetic and, importantly, show that high performance with reduced precision was *expected* for certain applications. *See* Reply 25; Ex. 1007 ¶ 3 ("[F]or certain applications, . . . a reduced precision, may be acceptable, and for other applications, . . . a greater precision may be needed."); Ex. 1008, 273 ("[M]any programs which

manipulate human sensory inputs, e.g., speech and image recognition, suffer no loss of accuracy with reduced bitwidth in the mantissa or exponent.”).” Patent Owner contends that Dockser and Tong are not appropriate for comparison because they do not “provide computing scale results” and have an “entirely different focus on power savings.” Sur-Reply 21. We disagree. As explained above, we find that Dockser teaches the claim 1 LPHDR execution unit performing the recited reduced precision arithmetic. *See supra* Section II.D.2. Patent Owner’s only comparison, however, is to a CPU without any reduced precision capability. *See* PO Resp. 54. We find that Patent Owner’s evidence of alleged unexpected results does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims because it does not establish a difference between the results and the closest prior art and does not establish that such a difference would have been unexpected by a person of ordinary skill in the art.

### (4) Copying and Commercial Success

“Copying may . . . be another form of flattering praise for inventive features,” as “[t]he fact that a competitor copied technology suggests it would not have been obvious.” *WBIP*, 829 F.3d at 1336 (citation omitted). Copying “requires evidence of efforts to replicate a specific product.” *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). “This may be demonstrated either through internal documents; direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica; or access to, and substantial similarity to, the patented product (as opposed to the patent).” *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (internal citations omitted). However, “a showing of

copying is only equivocal evidence of non-obviousness in the absence of
more compelling objective indicia of other secondary considerations."
*Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000);
*see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[M]ore than
the mere fact of copying by an accused infringer is needed to make that
action significant to a determination of the obviousness issue." (citation
omitted)).

Commercial success is typically shown with evidence of "significant
sales in a relevant market." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d
1299, 1312 (Fed. Cir. 2006) (citation omitted). "When a patentee can
demonstrate commercial success, usually shown by significant sales in a
relevant market, and that the successful product is the invention disclosed
and claimed in the patent, it is presumed that the commercial success is due
to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
106 F.3d 1563, 1571 (Fed. Cir. 1997).

Patent Owner argues that after Dr. Bates made his presentations to
Petitioner in 2010–2014, Petitioner copied Dr. Bates's invention in its
Tensor Processing Unit (TPU) v2 and v3 products released in 2017–2018,
which "use execution units designed to perform operations using a
low-precision 'floating point format called bfloat16' in order to achieve
increased parallelism and scale." PO Resp. 56–57 (citing Ex. 2010;
Ex. 2011, 9; Ex. 2034, 6; Ex. 2051 ¶¶ 126–127). The bfloat16 format
"keep[s] the same 8 bit exponent as found in 32-bit IEEE floating point" but
"reduces precision significantly by using only a 7-bit mantissa, as opposed
to the 23-bit mantissa of IEEE 32-bit floating point." *Id.* at 57–58 (citing
Ex. 2041, 1–2). According to Patent Owner, Petitioner uses the TPUv2 and
TPUv3 products to "power all of its major products and services, including

IPR2021-00179
Patent 8,407,273 B2

Search, Translate, Photos, Assistant, and Gmail," saving Petitioner "at least $10 billion." *Id.* at 60–61 (citing Exs. 2011, 2015–18, 2040). Patent Owner argues that a nexus is presumed because the TPUv2 and TPUv3 products are coextensive with the challenged claims. *Id.* at 58, 61–66 (citing Pet. 19–20, 73; Ex. 1003 ¶¶ 231–232; Ex. 2011; Ex. 2016; Ex. 2041, 7; Ex. 2049; Ex. 2051 ¶¶ 129–136). Patent Owner further contends that, even if not presumed, a nexus is shown by "internal communications among [Petitioner's] own engineers and executives" and Petitioner's communications with Dr. Bates. *Id.* at 58–61 (citing Exs. 2007, 2011, 2016, 2035–39, 2041, 2042, 2047, 2048).

We have reviewed the cited evidence and do not find it probative of nonobviousness. First, we are not persuaded that a nexus should be presumed because the TPU products are coextensive with the Dockser/Tong-challenged claims, as Patent Owner contends. Petitioner and Mr. Goodin identify a number of other allegedly material features of the products that are not part of the claims: "Inter-Core Interconnect" (ICI), "Systolic array," "Two TensorCores per chip," "High-bandwidth memory," "Liquid cooling," and "Accelerated Linear Algebra compiler." *See* Reply 26; Ex. 1071 ¶¶ 86–92. We focus on the first two features in particular because the evidence of record characterizes them as significant.

Regarding the ICI of the TPU products, Dr. Patterson stated the following:

> So the *critical feature* of the supercomputer is the way they talk to each other – you know, the chips talk to each other. So what's called – [Petitioner] invented something called ICI. It's a custom Inter-Core Interconnect that they did custom for this design; it's not some standard that you buy off the shelf. It runs at about 500 gigabits per section in both directions per link, and there's four of those links.

46

IPR2021-00179
Patent 8,407,273 B2

Ex. 2012, 14:17–24 (emphasis added).  An article authored by Dr. Patterson

and others[5] states that "[t]he *critical architecture feature* of a modern

supercomputer is how its chips communicate: what is the speed of a link;

what is the interconnect topology; does it have centralized versus distributed

switches; and so on," and the TPUv2 product has "four custom Inter-Core

Interconnect (ICI) links, each running at 496Gbits/s per direction."

Ex. 2016, 69; *see id.* at 70, 72, Fig. 2 (showing that ICI is part of the TPUv3

product as well); Ex. 1071 ¶ 87.

> Regarding the systolic array architecture of the TPU products,

Dr. Patterson stated as follows:

> This systolic array idea brought back from the past that
> probably *cut the energy costs in half* for the multiplier, which is
> a lot of it.  And then it was domain-specific.  So a lot of the things
> that are complicated and area consuming on CPUs like branch
> predictors and caches – CPUs are covered with caches – they're
> not there because they're not helpful for this application.  It was
> better to use more multiple units and dedicated memory units.
> So that *saves energy* and you could reuse the resources.  So that
> was a *big success*.

Ex. 2012, 9:9–18 (emphasis added).  He also agreed with an article

comparing the TPU to graphics processing units (GPUs) stating that "GPUs

incur high overhead in performance, area, and energy due to heavy

multithreading," whereas "[t]he systolic organization of TPUs captures the

data reuse while being simple by avoiding multithreading."  *Id.* at

---

[5] We disagree with Patent Owner that the materials cited herein are merely
"marketing documents."  *See* Conf. Tr. 13:18–24.  Dr. Patterson's comments
are from an audio transcription of a YouTube video filed by Patent Owner
(Ex. 2012), and the article is from the publication *Communications of the
ACM* (Ex. 2016).  *See* PO Resp. ix.

IPR2021-00179
Patent 8,407,273 B2

33:20–34:2.  The article authored by Dr. Patterson and others includes

similar statements.  Ex. 2016, 70 ("The TPUv2 node of the supercomputer

followed the main ideas of TPUv1: A large two-dimensional matrix multiply

unit (MXU) *using a systolic array to reduce area and energy* plus large,

software-controlled on-chip memories instead of caches." (emphasis

added)), 74 (quoting the earlier article stating that the "systolic organization"

of the TPU captures data reuse "while being simple by avoiding

multithreading"); *see* Ex. 1071 ¶ 88.

Patent Owner contends that Petitioner fails to show that the "features

are so critical that the TPUs are not 'essentially the invention.'"  Sur-Reply

22.  We are not persuaded.  Petitioner does more than merely identify

unclaimed features of the TPU products.  Petitioner cites evidence,

supported by the testimony of Mr. Goodin, showing that at least the ICI and

systolic array architecture materially affect the TPU products' performance

and were viewed as critical, successful features that were reasons for the

TPU products' improved performance.  *See Fox Factory*, 944 F.3d at 1374

("[I]f the unclaimed features amount to nothing more than additional

insignificant features, presuming nexus may nevertheless be appropriate."),

1375–76 (noting that the challenged patent and the patent owner's

"marketing materials confirm that the forwardly protruding tooth tips, hook

features, and mud clearing recesses each materially impacts the functioning

of a chainring," such that "[f]or each of these features that the Board

confirms is included in the [allegedly coextensive] chainrings, nexus can

only be presumed between the . . . chainrings and a patent claim if the claim

includes limitations relating to these features").  Patent Owner does not point

to any evidence indicating that view to be factually incorrect.  *See* Ex. 1072,

147:15–149:2 (Dr. Khatri opining that "the TPUs have the features that . . .

IPR2021-00179
Patent 8,407,273 B2

are in these claims" and stating that he has no opinion "about what the TPUs . . . might have in addition"). We find that a presumption of nexus is inappropriate with respect to the TPU products.

Regardless of whether a presumption of nexus applies, we are not persuaded that Patent Owner has made a sufficient showing of nexus for two reasons. First, Patent Owner's nexus arguments are premised on the TPUv2 and TPUv3 products' "low-precision" bfloat16 floating point format having an 8-bit exponent and 7-bit mantissa. PO Resp. 56–57 (arguing that Petitioner copied Dr. Bates's invention by implementing "execution units designed to perform operations using" the bfloat16 format), 61 (arguing commercial success due to the bfloat16 format using "low-precision multipliers"). But "[l]ow-precision arithmetic—including LPHDR multiplication—was not novel" and thus, cannot be the basis for a finding of nexus. *See* Reply 20; *Kao*, 639 F.3d at 1068; *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."). Tong taught such a format nine years before the '273 patent. Tong describes two different experiments emulating "different bitwidth FP units": one that "implements the IEEE-754 standard" and then varies the mantissa bitwidth (shown in Figure 6), and another that "implements the IEEE-754 standard" and then varies the exponent bitwidth (shown in Figure 7). Ex. 1008, 278–279. Thus, we agree with Mr. Goodin that a person of ordinary skill in the art "would have understood that Tong's Figure 6 . . . discloses a floating-point format with an 8-bit exponent (which is the exponent size of single-precision floating-point in the IEEE standard) . . . and a 7-bit mantissa." *See* Ex. 1071 ¶ 74 (citing Ex. 1008, 274, 278–279; Ex. 1003 ¶ 330). Tong discloses that the 8-bit exponent/7-bit mantissa format

IPR2021-00179
Patent 8,407,273 B2

produced useful results for both a "neural network trainer" application (ALVINN) and a "speech recognition program" (Sphinx III). *See* Ex. 1008, 278–279; Ex. 1071 ¶ 75. Notably, these applications mirror Dr. Bates's 2013 presentation discussing ███████████████████████ *See* Ex. 2005, 12–13.

To be sure, the fact that the 8-bit exponent/7-bit mantissa format was known in the prior art is not dispositive. *See WBIP*, 829 F.3d at 1330–31. "Commercial success, for example, may be linked to an individual element or, in other circumstances, it could be linked to the inventive combination of known elements." *Id.* at 1332. Patent Owner, however, has not identified and explained a specific combination of elements (as opposed to just the "low-precision" bfloat16 floating point format) that could serve as a nexus for the evidence of alleged copying and commercial success.[6] *See* PO Resp. 56–57, 61.

Second, when arguing that the TPUv2 and TPUv3 products meet the X and Y percentage limitations of claim 1, Patent Owner points to the bfloat16 floating point format with a 7-bit mantissa and states that Petitioner argues in the Petition (with respect to Dockser) that "utilizing 7 bits of mantissa in multiplication operations results in a minimum of 12% of valid floating point 32 inputs producing at least 0.39% relative error compared to the exact mathematical calculation of a full-precision multiplication on those same inputs." *Id.* at 65–66 (citing Pet. 73; Ex. 2051 ¶¶ 135–136). Patent Owner does not explain, however, how the cited analysis of how Dockser

---

[6] To the extent Patent Owner alleges commercial success from Petitioner "[u]sing hundreds of thousands of these low-precision TPU v2 and v3 devices," we note again that claim 1 recites "at least one" LPHDR execution unit and thus is satisfied by a single unit. *See* PO Resp. 61.

teaches the X and Y percentage limitations applies to the TPUv2 and TPUv3 products. As Petitioner points out, Patent Owner "does not even attempt to demonstrate that [Petitioner's] TPUs perform the same bit-dropping techniques as Dockser." *See* Reply 27. Patent Owner has not established a sufficient nexus between the alleged copying and commercial success of the TPUv2 and TPUv3 products and the Dockser/Tong-challenged claims.

Finally, we note that Patent Owner's evidence of commercial success would be unpersuasive even if Patent Owner had established a nexus. Patent Owner's sole support for the alleged commercial success of the TPUv2 and TPUv3 products is an article in *PCMag India*. *See* PO Resp. 61 (citing Ex. 2017). That article states in relevant part:

> As AI and Machine Learning advanced, [Petitioner] was faced with the proposition of doubling the number of data centers it operates to handle the increased workloads. Building multiple data centers to handle the growing amounts of data sets *could have easily cost the company anything above $10 billion*.

> So [Petitioner] decided to take another route by optimizing its current data centers for better efficiency. The search giant in late 2013 decided to produce a custom chip in order to improve cost-performance over the GPUs it had deployed. Thus *the first TPU* was born.

Ex. 2017, 3 (emphasis added). The above statement as to how much "could have" been saved is too speculative to reach a conclusion of commercial success. *See id.* It also pertains to Petitioner's "first" TPU, not the TPUv2 and TPUv3 products that use the bfloat16 format. *See id.*; Ex. 2016, 69 ("Quantized arithmetic—8-bit integer instead of 32-bit floating point (FP)— can work for inference like in TPUv1 but reduced-precision training is an active research area.").

51

Accordingly, we find that Patent Owner's evidence of alleged copying and commercial success does not weigh in favor of nonobviousness of the Dockser/Tong-challenged claims.

### f)  Conclusion

Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 1 would have been obvious based on Dockser under 35 U.S.C. § 103(a).

### 3.  Claims 2, 21–24, 26, and 28

Claims 2, 21–24, 26, and 28 depend from claim 1.  Claim 2 recites that "the at least one first LPHDR execution unit comprises at least part of an FPGA."  Dockser discloses an FPP that is part of "a field programmable gate array (FPGA) or other programmable logic component."  Ex. 1007 ¶ 35; *see* Pet. 36.

Claim 21 recites that "the device includes memory locally accessible to the at least one first LPHDR execution unit."  Petitioner argues that local registers 110 are locally accessible to the FPP.  Pet. 36–37 (citing Ex. 1007 ¶¶ 15–16).

Claim 22 recites that "the device is implemented on a silicon chip" and claim 23 recites that "the device is implemented on a silicon chip using digital technology."  Petitioner cites Dockser's disclosure that the FPP can be part of an ASIC and "process[es] . . . bits."  *Id.* at 37 (citing Ex. 1007, code (57), ¶ 35).  Petitioner further argues that "[i]mplementing Dockser's integrated circuit on a silicon chip would have been the typical, conventional, and obvious implementation."  *Id.* (citing Ex. 1003 ¶ 316;

Ex. 1054 ¶ 5 ("[a]n integrated circuit conventionally comes in the form of a silicon chip"); Ex. 1055 ¶ 5 ("Integrated circuits (chips) are generally made of silicon on which electronic circuits are fabricated.")).

Claim 24 recites that "the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit." Petitioner argues that "Dockser's computing system . . . includes a 'main processor' which a [person of ordinary skill in the art] would have understood is a 'digital processor' . . . because it communicates via 'bits.'" *Id.* (citing Ex. 1007 ¶¶ 15, 25, 35). Petitioner further argues that even if not, using a digital processor "would have been the typical and obvious implementation of Dockser's 'conventional processor.'" *Id.* at 37–38 (citing Ex. 1007 ¶ 35; Ex. 1023, col. 1, ll. 16–48). According to Petitioner, "Dockser's main processor is 'adapted to control the operation of'" the FPP "by specifying its precision level by writing 'subprecision select bits' to the FPP's '*control* register.'" *Id.* at 38 (citing Ex. 1007 ¶¶ 18, 25).

Claim 26 recites that "the device is part of a mobile device." Petitioner cites Dockser's disclosure that the computing system can be part of a wireless telephone, personal digital assistant (PDA), pager, or other type of device. *Id.* (citing Ex. 1007 ¶ 3).

Claim 28 recites that "the at least one first LPHDR execution unit represents numbers using a floating point representation." Dockser teaches an FPP operating on numbers using a floating point representation (with an exponent and mantissa). Ex. 1007 ¶¶ 1–2, 15–22; *see* Pet. 9–13, 38.

Patent Owner does not argue separately dependent claims 2, 21–24, 26, and 28 in its Response, only disputing Petitioner's contentions with respect to parent claim 1. PO Resp. 20–24. We have reviewed Petitioner's contentions regarding claims 2, 21–24, 26, and 28, which are consistent with

IPR2021-00179
Patent 8,407,273 B2

the disclosure of Dockser and supported by the testimony of Mr. Goodin, taken into account evidence of objective indicia of nonobviousness submitted by Patent Owner, and are persuaded that Petitioner has proven, by a preponderance of the evidence, that dependent claims 2, 21–24, 26, and 28 would have been obvious based on Dockser under 35 U.S.C. § 103(a). *See* Pet. 36–38; Ex. 1003 ¶¶ 311–322; *supra* Section II.D.2(e).

### E. Obviousness Ground Based on Dockser and Tong (Claims 1, 2, 21–24, 26, 28, 32, and 33)

#### 1. Tong

Tong is an IEEE journal article entitled "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic." Ex. 1008, 273. Tong teaches reducing power consumption by minimizing the bitwidth representation of floating-point data. *Id.* According to Tong, using a variable bitwidth floating-point unit saves power. *Id.*

#### 2. Claims 1, 2, 21–24, 26, and 28

Petitioner argues that the subject matter of claim 1 would have been obvious over the combination of Dockser and Tong[7] for reasons similar to those analyzed with respect to Dockser alone. *See* Pet. 39–43. Additionally, Petitioner asserts that "Tong, like Dockser, . . . confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and

---

[7] Petitioner provides evidence supporting its contention that Tong is a prior art printed publication under 35 U.S.C. § 102(b). *See* Pet. 38–39 (citing Ex. 1025 ¶¶ 8–11; Ex. 1026, 27; Ex. 1027, 27). Patent Owner does not assert otherwise in its Response, and we agree that Tong is prior art for the reasons stated by Petitioner.

precision." *Id.* at 39–40 (citing Ex. 1008, 273–278; Ex. 1003 ¶¶ 324–325).
Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's
annotations. *Id.* at 40.



Tong's Figure 6, above, is a line graph showing program accuracy, from 0%
to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the
horizontal axis. *Id.* at 39–40. The figure shows this data for five programs:
ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx III. *Id.* The programs
implement different signal-processing tasks. *See, e.g.*, Ex. 1008, 278
(Table IV). ALVINN, for example, is a neural network trainer that uses
backpropagation. *Id.* And Sphinx III is a speech-recognition program. *Id.*

   Petitioner argues that "Tong teaching that [a precision level] retaining
5 mantissa fraction bits is sufficient in some applications (including
ALVINN and Sphinx [III]) would have motivated a [person of ordinary skill
in the art] to configure Dockser's FPP . . . to operate at a selected precision
level retaining as few as 5 mantissa fraction bits." Pet. 41–42. According to
Petitioner, one of ordinary skill in the art would have done so "to conserve
power when running those applications, or others empirically determined to

not require greater precision using Tong's techniques." *Id.* (citing Ex. 1003 ¶ 334). Petitioner also concludes that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable." *Id.* at 43.

Patent Owner argues that, because Dockser lacks an LPHDR execution unit and Tong does not remedy that deficiency, the Dockser-Tong combination does not render obvious any challenged claim. PO Resp. 24; Sur-Reply 9. We disagree for the reasons discussed above regarding Petitioner's challenge based on Dockser alone. *See supra* Section II.D.2.

Patent Owner further argues that Tong does not teach using only 5 mantissa bits, which means that the Dockser-Tong combination lacks the imprecision required to meet the X and Y values recited in limitation *1B2*. PO Resp. 24. In Patent Owner's view, "Tong teaches that at least 11 mantissa bits are required for consistent performance, even for 'programs dealing with human interfaces [that] process sensory data with intrinsically low resolutions.'" *Id.* (quoting Ex. 1008, 278). According to Patent Owner, "Petitioner makes no effort to show that arithmetic with the 'required' 11-bit mantissa is an LPHDR operation and meets the X/Y limitations of the claims." *Id.* at 25.

Yet Patent Owner's argument about an 11-bit mantissa (*id.* at 24–25) does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP to operate at a "selected precision level" according to Tong (Pet. 41–43). Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." *Id.* at 41–42. Thus, we disagree with Patent Owner's argument about an 11-bit mantissa.

*See* PO Resp. 24–25; Sur-Reply 9.  For this reason, we do not credit Dr. Khatri's testimony on this point.  Ex. 2051 ¶ 77.

Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. Pet. 42 (citing Ex. 1003 ¶ 336).  Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits.  *Id.* (citing Ex. 1003 ¶ 336).

Petitioner adequately shows that the X and Y limitations are met for the 5 mantissa bit rationale.  *Id.* at 41–43.  In particular, Mr. Goodin's software program shows that "when retaining 5 mantissa fraction bits in view of Tong, Dockser's register bit-dropping technique produces at least Y=0.05% relative error for 99.45% of possible valid inputs, and Dockser's logic bit-dropping technique produces at least Y=0.05% relative error for 99.47% of possible valid inputs," and the algebraic analysis shows that "Dockser's register bit-dropping technique when retaining 5 mantissa fraction bits produces a minimum of 1.56% relative error (greater than Y=0.05%) for over 12% of possible valid inputs (greater than X=5%)." Ex. 1003 ¶ 336.  After review of the arguments and evidence on these issues, we credit Mr. Goodin's algebraic analysis and software-based analysis.  *See id.*, App'x I.B–D.

Although Patent Owner does not present argument specifically directed to Mr. Goodin's software-based or algebraic analysis, Patent Owner argues that one of ordinary skill in the art would not have chosen a 5-bit mantissa: "Tong's experimental results show that using fewer than 11 mantissa bits unacceptably reduces accuracy for the benchmark applications *that were specifically selected* (from a category of programs) for their high tolerance for imprecision."  PO Resp. 25 (citing Ex. 2051 ¶ 78).  To

IPR2021-00179
Patent 8,407,273 B2

illustrate this point, Patent Owner annotates Tong's Figure 6, reproduced below.



Tong's Figure 6, above, shows the experimental results with color annotations indicating "the precision levels suitable for general-purpose operation (green), those at which a significant percentage of applications begin to produce unacceptable results (yellow), and finally, levels of precision that are unsuitable for most testing benchmarks (red)." *Id.* at 25–26 (citing Ex. 2051 ¶ 79).

Patent Owner argues that there is no motivation to combine Dockser and Tong because "there is no evidence to show that a [person of ordinary skill in the art] would have chosen Tong's 5-bit examples over the 7, 9, or 11-bit examples." *Id.* at 26; *see also* Sur-Reply 9–10. According to Patent Owner, "Tong does not disclose any extra capability that would have motivated a [person of ordinary skill in the art] to use it with Dockser." PO Resp. 26 (citing Ex. 2051 ¶¶ 81–82). In Patent Owner's view, Petitioner

IPR2021-00179
Patent 8,407,273 B2

relies on hindsight to choose 5 bits and does not offer any differences between Dockser and the claimed invention or other non-hindsight motivation to combine with Tong. *Id.* According to Patent Owner, "Tong teaches that 'it appears inevitable that some fraction of our operands will require full IEEE standard precision,'" which means that a person of ordinary skill in the art would not have been motivated to operate only in 5-bit, 7-bit, or 9-bit modes as Petitioner suggests. Sur-Reply 10 (quoting Ex. 1008, 280).

We disagree with Patent Owner's arguments directed to the rationale for using 5 mantissa bits. *See* PO Resp. 24–26; Sur-Reply 9–10. Petitioner's reasoning for the 5-bit example is "to conserve power when running [certain] applications, or others empirically determined to not require greater precision using Tong's techniques." Pet. 41–42 (citing Ex. 1003 ¶ 334). For example, in the ALVINN and Sphinx III line plots in Tong's Figure 6, Petitioner added a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. *Id.* at 40. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Ex. 1008, 278). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption. *Id.* at 40–41. Petitioner characterizes Tong as "[h]aving empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications." *Id.* at 41 (citing Ex. 1008, 273, 274, 279, 284).

Petitioner's assertions are adequately supported by the record. We are persuaded by Petitioner's reliance on Tong's Figure 6 to determine how many bits are needed in a particular application. *See id.* at 40–42. That is, Petitioner's choice is not arbitrary or solely based on the '273 patent's

IPR2021-00179
Patent 8,407,273 B2

written description alone. *See* PO Resp. 24–26. Rather, Petitioner's choice of 5 bits is based on Tong's experimental results for *certain* applications. *See* Pet. 40–42. We emphasize *certain* because Petitioner is not saying that 5-bits is suitable for every application. *See id.* Full precision may be needed some of the time. *See* Ex. 1008, 280; Sur-Reply 9–10. But, even if Tong teaches that some applications begin to produce unacceptable results below 11-bits, as Patent Owner notes (PO Resp. 24–25), Tong teaches that 5-bits would be enough for certain ones: ALVINN and Sphinx III shown in Tong's Figure 6. Pet. 40–42.

Patent Owner argues that "Tong lists those two applications amongst a great many other disclosed applications that all require full precision, and that a [person of ordinary skill in the art] would therefore not be motivated to configure Dockser to operate with a 5-bit mantissa just to support those two applications given the far larger number of disclosed applications that require full precision." Sur-Reply 9; PO Resp. 24–26.

We disagree with Patent Owner's argument here because the record adequately supports Petitioner's rationale that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable," and Tong, in particular, shows an optimization for a particular program. Pet. 41–43. The record adequately supports Petitioner's reasoning here: Dr. Khatri testified that "exact computing . . . takes up a lot of power." Ex. 1072, 47:2–5. Mr. Goodin explained that reducing precision may reduce power consumption. *See, e.g.*, Ex. 2043, 34:21–35:4; *see also id.* at 30:22–31:9 (discussing how selectable precision may achieve power savings). And we credit Mr. Goodin's explanation of how Tong achieves this for certain applications. *See, e.g.*, Ex. 1003

¶¶ 31–33 (citing Ex. 1008, 273, 277–279), 334, 337 (citing Ex. 1008, 278). That is, Petitioner's proposed combination would omit unnecessary bits to reduce waste and power consumption.  Pet. 41–43.

Thus, we find Patent Owner's arguments regarding the combination with Tong unavailing.  *See* PO Resp. 24–26; Sur-Reply 9–10.  For the same reasons, we do not credit Dr. Khatri's testimony on this point.  Ex. 2051 ¶¶ 77–82.

For the reasons discussed, we determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong.  *See KSR*, 550 U.S. at 418.  Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the device recited in claim 1 with a reasonable expectation of success.  Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 1 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

Petitioner asserts that the subject matter recited in claims 2, 21–24, 26, and 28 would have been obvious over the combination of Dockser and Tong for reasons similar to those presented in the ground based on Dockser alone. *See* Pet. 41–43.  For the reasons discussed above and the reasons discussed for Dockser alone, Petitioner's contentions are supported by Mr. Goodin's testimony and are persuasive.  *See id.*; *supra* Section II.D.3.  Patent Owner does not present arguments specifically directed to these claims.  *See* PO Resp.; Sur-Reply.  We disagree with Patent Owner's arguments regarding claim 1 based on the full trial record for the same reasons explained above.  *See supra* Section II.D.2.  Based on all of the evidence of

record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claims 2, 21–24, 26, and 28 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

### 3. Claim 32

Claim 32 depends from claim 1 and recites that "the device is adapted to perform nearest neighbor search." Petitioner argues that the combined device in the asserted combination "implements Dockser's FPP using the precision Tong teaches for neural-network image-classification applications including ALVINN," and a person of ordinary skill in the art would have been motivated to perform "nearest neighbor search" as claimed as well because that type of search "was commonly used and well known to be advantageous for image-classification (including neural-network) applications." Pet. 43–44 (citing Ex. 1003 ¶ 340; Ex. 1056 ¶¶ 1–4; Ex. 1057, col. 1, ll. 15–50). Patent Owner does not argue separately dependent claim 32 in its Response, only disputing Petitioner's contentions regarding parent claim 1 and the alleged motivation to combine Dockser and Tong, which we address above. PO Resp. 24–26; *see supra* Section II.E.2. Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 32 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a). *See* Pet. 43–44; Ex. 1003 ¶ 340.

### 4. Claim 33

Claim 33 recites a "device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to

emulate a second device comprising" an LPHDR execution unit having the same properties as recited in claim 1. Petitioner asserts that Tong teaches emulating, in software, different bitwidth FP units to determine application accuracy. Pet. 44 (citing Ex. 1008, 278). According to Petitioner, based on this teaching, one of ordinary skill in the art would have been motivated "to emulate the Dockser/Tong device . . . in software to assess the accuracy of applications running on the device at selected precision levels, and a [person of ordinary skill in the art] would have had a reasonable expectation of success in doing so." *Id.* (citing Ex. 1003 ¶¶ 341–342).

Petitioner asserts that "[w]hen the Dockser/Tong device is 'emulated in software' per Tong's teachings, . . . the conventional and obvious implementation of such 'software' is 'computer program instructions' stored in 'a computer-readable memory' and 'executable by [a] processor' within a 'device' (*e.g.*, a computer) as claimed." *Id.* (citing Ex. 1003 ¶ 343; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 2–4). For reasons similar to those with respect to claim 1, Petitioner argues that a person of ordinary skill in the art would have been motivated by Tong to use a computer to emulate the combined teachings of Dockser and Tong, "meeting the 'second device' [recited in claim 33]), which comprises Dockser's execution unit." *Id.* at 44–45 (citing Ex. 1003 ¶ 344). Petitioner argues that Tong emulates a device in the same way as the '273 patent does:

> Like the '273 patent's only examples of "emulat[ing] a . . . device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform.

*Id.* at 45 (citing Ex. 1001, col. 17, ll. 3–17, col. 18, l. 52–col. 19, l. 12;
Ex. 1008, 278; Ex. 1003 ¶¶ 345–346).

Patent Owner does not argue separately claim 33 in its Response, only
disputing Petitioner's contentions regarding claim 1 and the alleged
motivation to combine Dockser and Tong, which we address above.
PO Resp. 24–26; *see supra* Section II.E.2.  After review of the arguments
and evidence on these issues, we agree with Petitioner and credit
Mr. Goodin's testimony.  *See* Ex. 1003 ¶¶ 341–348.

In particular, the '273 patent describes code written in the
C programming language to perform the same arithmetic operations in the
same order using the same method as one implemented in hardware.
Ex. 1001, col. 18, l. 52–col. 19, l. 12, *cited in* Pet. 45.  We agree with
Petitioner that Tong similarly uses a computer program to simulate reduced
precision arithmetic that a hardware unit would perform.  *See* Pet. 45.  For
example, Tong uses an "FP software emulation package" to simulate
reduced precision arithmetic and determine "the relationship between
program accuracy and number of bits in FP representation."  Ex. 1008, 278,
*cited in* Pet. 45.

Petitioner's obviousness rationale—i.e., "to assess the accuracy of
applications running on the device at selected precision levels"—is
adequately supported by the record: Tong explains that the emulation
package was used to assess "different mantissa and exponent bitwidths."
*See* Pet. 44 (citing Ex. 1008, 278).  Petitioner's assertion that software is
computer program instructions stored in a computer-readable memory and
executable by a processor within a computing device is adequately
supported by at least Mr. Goodin's testimony and the evidence that he cites.

*Id.* at 44–45 (citing Ex. 1003 ¶ 343; Ex. 1007 ¶ 36; Ex. 1029 ¶¶ 8, 9, 14; Ex. 1001, col. 26, ll. 2–4).

For the same reasons discussed with respect to claim 1, Petitioner has shown that the subject matter recited in claim 33 that is also recited in claim 1 would have been obvious over the Dockser-Tong combination. *See supra* Section II.E.2.

We determine that Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined Dockser and Tong. *See KSR*, 550 U.S. at 418. Based on the Petition, we find that a person of ordinary skill in the art would have modified Dockser with Tong to arrive at the device recited in claim 33 with a reasonable expectation of success. Based on all of the evidence of record, including evidence of objective indicia of nonobviousness submitted by Patent Owner, we determine that claim 33 would have been obvious based on Dockser and Tong under 35 U.S.C. § 103(a).

### F. Obviousness Ground Based on Dockser and MacMillan (Claims 1–26, 28, 36–61, and 63)

#### 1. MacMillan

MacMillan is entitled "Circuit for Enhancing Performance of a Computer for Personal Use." Ex. 1009, code (54). MacMillan discloses using Single Instruction Multiple Data (SIMD) parallel-processing architectures for "adding supercomputer performance to a computer for personal use." *Id.* at col. 5, ll. 22–54. MacMillan's computer system comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access memory (SIMD-RAM) devices. *Id.* at col. 9, ll. 11–19, 30–31, Figs. 2, 3.

IPR2021-00179
Patent 8,407,273 B2

Figure 5 of MacMillan is reproduced below.



FIG. 5

Figure 5 depicts SIMD-RAM device 254 comprising a plurality of
DRAMs 304 coupled to a plurality of processing elements 302 (PE0, PE1,
PE2, etc.) connected to SIMD bus 240.  *Id.* at col. 12, ll. 35–43.  MacMillan
discloses that "[e]ach PE contains a 32-bit wide data path and can perform
atomic operations on bits, bytes, 16-bit words, and 32-bit words," "each
DRAM 304 is independently addressed by its PE," "[i]nteger and floating
point accelerators could be included in each PE," and "[e]xecution autonomy
is provided, in which specific PEs can be excluded from executing specific
instructions."  *Id.* at col. 12, ll. 47–59.  MacMillan describes an example
architecture of a system with 256 PEs, but states that the disclosed
architecture "allows scaling to higher or lower density chips with more or
fewer PEs."  *Id.* at col. 12, l. 60–col. 13, l. 4, col. 13, ll. 38–41, col. 16,
ll. 20–22.

### 2. *Claim 8*

Petitioner contends that claims 1–26, 28, 36–61, and 63 are unpatentable over Dockser and MacMillan under 35 U.S.C. § 103(a). Pet. 45–56. We begin with claim 8, which is illustrative of the disputed issues addressed by the parties in their papers.

Claim 8 depends from claim 1 and recites that "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (the "exceeds" limitation). Petitioner relies on MacMillan for its teachings regarding multiple floating-point execution units, and argues that a person of ordinary skill in the art "would have been motivated to use Dockser's FPP to implement each 'floating-point accelerator' in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches." *Id.* at 5, 47–48 (citing Ex. 1003 ¶¶ 354–355). According to Petitioner, "using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power." *Id.* at 48 (citing Ex. 1003 ¶ 356; Ex. 1009, col. 12, ll. 47–49; Ex. 1024, col. 1, ll. 43–58). Petitioner further contends that MacMillan's SIMD parallel processing is used in "the same types of computers for which Dockser's FPP provides '[p]ower management'" and would be beneficial for the same types of "'graphics applications' for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision." *Id.* at 47–48

(citing Ex. 1003 ¶¶ 353, 357; Ex. 1007 ¶ 3; Ex. 1009, col. 1, ll. 6–9, col. 5, ll. 22–45, col. 7, ll. 14–34).

With respect to the "exceeds" limitation in particular, Petitioner asserts that MacMillan teaches 256 PEs, and the Dockser-MacMillan combination would have a "single Host CPU floating-point unit" and at least one FPP in each of the PEs, of which there can be "256 or more, up to 'tens of thousands.'" *Id.* at 49–51 (quoting Ex. 1009, col. 2, ll. 13–15; citing Ex. 1003 ¶¶ 361, 369, 370, 374). Thus, in Petitioner's proposed combined device based on Dockser and MacMillan, the number of LPHDR execution units (Dockser FPPs) "exceeds its number (one) of traditional-precision execution units (the single Host CPU floating-point unit) by . . . more than 100." *Id.* at 50–51 (citing Ex. 1003 ¶¶ 369, 370, 374).

Patent Owner responds that a person of ordinary skill in the art would not have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. PO Resp. 34–36. Patent Owner argues that "Dockser is focused on the objective of reducing power consumption," whereas "MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption." *Id.* at 34–35 (citing Ex. 1009, col. 3, ll. 4–6; Ex. 2051 ¶¶ 101–102). Patent Owner further contends that "[i]ncorporating Dockser's FPPs into MacMillan would . . . defeat MacMillan's stated objective of achieving a high-scale SIMD computer architecture at 'lower system cost.'" *Id.* at 35 (citing Ex. 1009, col. 5, ll. 58–59; Ex. 2051 ¶ 103). According to Patent Owner, "Dockser's FPPs are even *larger* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes," such that "replacing the full-precision execution units of MacMillan with Dockser FPP units would

require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit." *Id.* at 34–35 (citing Ex. 2051 ¶ 104); *see also* Sur-Reply 14–15.

Petitioner argues in its Reply that the asserted combination would achieve both benefits of increasing performance speed (based on MacMillan) and lowering power consumption (based on Dockser), and that Patent Owner fails to provide supporting evidence for its argument that incorporating Dockser's FPP into the MacMillan device would increase costs, and even if it had, economic reasons are not indicative of nonobviousness.  Reply 9–10 (citing Ex. 1071 ¶¶ 30–31).

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser and MacMillan, we agree with Patent Owner. Dockser teaches a single FPP with "selectable subprecision" that is capable of both full precision and reduced precision operations.  *See* Ex. 1007, code (57), ¶ 15.  The FPP includes additional control circuitry, such as floating-point controller 130 and control register 137, that allows selection of a subprecision for floating-point operations.  *Id.* ¶¶ 15, 18, Fig. 1. Dockser describes "a variety of ways" in which "subprecision select bits may be used to reduce the precision of a floating-point operation."  *Id.* ¶¶ 18, 23–34.  Reduced precision can be achieved, with resultant power savings, either by removing power from "floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" or "removing power to the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected."  *Id.* ¶¶ 4–7, 26–27.  Mr. Goodin agrees that Dockser's FPP requires additional control circuitry to implement its selectable subprecision.  Ex. 2043, 43:21–45:9.

MacMillan, by contrast, is heavily focused on avoiding increased costs associated with added complexity. MacMillan states that "[i]f supercomputing performance could be achieved in low cost computers, such as personal computers, this could dramatically expand the market for personal computers." Ex. 1009, col. 1, ll. 21–24. SIMD computing capability can be added to personal computers, "resulting in much higher performance computing at moderate cost." *Id.* at col. 8, ll. 51–55. MacMillan, however, describes numerous limitations of known SIMD designs at the time, many of which relate to increased costs from added complexity (e.g., additional registers), size, etc. *See, e.g., id.* at col. 2, ll. 56–61 ("hav[ing] a large register set on each PE . . . increases die area per PE, resulting in higher costs per PE"), col. 2, ll. 62–65 ("Adding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs. It may also require tighter geometries or increased numbers of layers on printed circuits boards, further increasing costs."), col. 3, ll. 2–4 ("Adding output buffers to drive increased pin counts also increases power dissipation and hence power supply capacity and cost."), col. 4, ll. 39–40 ("The PE array[] disk may be limited in size due to technology or cost factors.").

> Importantly, MacMillan states:

> Overcoming the above limitations would allow supercomputing performance to be provided in a *low cost* computer system for personal use, dramatically expanding the potential market for systems with supercomputer performance. To meet the cost objectives, the SIMD capabilities *should not add significant complexity to the architecture of a computer system for personal use.* The present invention addresses the above needs.

*Id.* at col. 5, ll. 38–45 (emphasis added). MacMillan's disclosed architecture—with multiple, less costly PEs operating in parallel to increase computational power—is expressly intended to account for these limitations.

IPR2021-00179
Patent 8,407,273 B2

*See id.* at col. 5, ll. 44–45, col. 5, ll. 58–61 (the disclosed system with "shared memory results in lower system cost and more flexibility in using memory"), col. 6, ll. 1–10 ("Another aspect of the invention is that it shows how parallel SIMD processing can be added inexpensively to existing system architectures. This cost-effective addition of parallel processing can be made to popular, low cost computer systems running popular operating systems . . . ."), col. 6, ll. 41–45, col. 16, ll. 14–27.

In determining how a person of ordinary skill in the art would have understood those disclosures, we credit the testimony of Dr. Khatri, which is consistent with, and a logical reading of, Dockser and MacMillan. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017) (stating that the Board "is permitted to weigh expert testimony and other record evidence and, in so doing, rely on certain portions of an expert's declaration while disregarding others"). Specifically, the circuitry implementing Dockser's selectable subprecision is beyond that of a typical full precision execution unit. Dr. Khatri testifies that

> [b]ecause Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a [person of ordinary skill in the art] would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a [person of ordinary skill in the art] would expect it to be *larger* than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

*See* Ex. 2051 ¶ 51. Petitioner's asserted combination of incorporating Dockser's FPP into each of multiple PEs in MacMillan's device "would require additional circuitry and chip space and would therefore *increase*

IPR2021-00179
Patent 8,407,273 B2

costs," "defeat[ing] MacMillan's stated objective of achieving a highly parallel SIMD computer architecture at 'lower system cost.'" *See id.* ¶¶ 103–104.  Again, MacMillan specifically counsels that to achieve its cost objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44.  The combination proposed by Petitioner would do so. MacMillan's PEs already perform full precision operations; Dockser's selectable subprecision circuitry would add complexity beyond that of a typical full precision execution unit.  *See* Ex. 2051 ¶¶ 103–104; Ex. 1009, col. 12, ll. 47–49 ("Each PE contains a 32-bit wide data path and can perform atomic operations on . . . 32-bit words.").

A person of ordinary skill in the art, reading MacMillan and understanding its emphasis on avoiding increased costs associated with added complexity and size, would not have been motivated to modify MacMillan's device by incorporating Dockser's FPP into the PEs.  *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376–77 (Fed. Cir. 2021) (finding insufficient motivation to "increase [a prior art reference's] melt flow rate to the claimed range," in part because the reference "includes numerous examples of processing techniques that are typically used to increase melt flow rate, which [the reference] cautions should *not* be used due to the risk of obtaining a broader molecular weight distribution"); *TriVascular*, 812 F.3d at 1067–69 (finding insufficient motivation to combine two references by "substitut[ing] the recessed barbs of [one reference] with the protuberances of [another reference], since [the petitioner's] proposed substitution would destroy the basic objective of the barbs"); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (finding no reason to modify a prior art device where the modification would render the device

IPR2021-00179
Patent 8,407,273 B2

"inoperable for its intended purpose"); *see also Henny Penny*, 938 F.3d at 1332 (affirming the Board's finding of no motivation to combine where the Board "credited [the patent owner's] expert's testimony that following [one reference's] method of diverting and cooling the oil in [another reference's] system would introduce 'additional plumbing and complexity'"). Notably, this is not merely an economic concern over how expensive it would be to incorporate Dockser's FPP into MacMillan's PEs; the evidence shows that doing so would increase costs because of the added complexity and size of the FPP—a concern that MacMillan explicitly counsels against. *See* Sur-Reply 15.

Petitioner's position is that the individual benefits of MacMillan's approach (increasing performance speed from many low-cost processors operating in parallel) and Dockser's approach (lowering power consumption using additional circuitry added to a single, more complex processor) would have motivated a person of ordinary skill in the art to combine the references' teachings by incorporating Dockser's FPP into the multiple PEs in MacMillan's device. Pet. 5, 47–48. Given the express teachings of MacMillan, however, we are not persuaded that an ordinarily skilled artisan would have been motivated to combine the two different approaches in that manner. Specifically, MacMillan's repeated statements that its approach is designed to avoid increased costs from added complexity and size (and thereby allow for many low-cost processors in the device) would have dissuaded a person of ordinary skill in the art from doing so.

To the extent Petitioner and Mr. Goodin fault Patent Owner for not providing evidence supporting its position, we are not persuaded. *See* Reply 9–10; Ex. 1071 ¶ 31. Petitioner bears the burden of proving unpatentability by a preponderance of the evidence, which includes proving that a person of

IPR2021-00179
Patent 8,407,273 B2

ordinary skill in the art would have had reason to combine the prior art references. *See* 35 U.S.C. § 316(e); *Magnum Oil*, 829 F.3d at 1380. Moreover, Patent Owner's arguments are supported by evidence. Patent Owner relies on the disclosures of Dockser and MacMillan themselves, expert testimony from Dr. Khatri (which we credit on the issue of reasons to combine Dockser and MacMillan), and cross-examination testimony from Mr. Goodin. *See* PO Resp. 34–36; Sur-Reply 14–15; Ex. 2051 ¶¶ 101–104.

For the reasons explained above, we are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner.[8] Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 8 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

### 3. *Claims 3–7, 9–20, 25, 36–61, and 63*

Many of the other challenged claims include limitations similar to the "exceeds" limitation of claim 8. Claims 5 and 10 recite the same limitation, replacing "at least one hundred" with "at least ten" and "at least five hundred," respectively. Claim 36 recites that "the number of LPHDR execution units in the device exceeds the non-negative integer number of

---

[8] Given this determination, we need not address Patent Owner's argument that the references fail to teach the "exceeds" limitation of claim 8 (as well as similar limitations in claims 5, 6, 10–18, 36–61, and 63) because the alleged "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) are "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (in addition to executing at reduced precision) and thus "the number of LPHDR execution units will never exceed the number of full-precision multiplication execution units," as required by the claim. *See* PO Resp. 27–34; Reply 12–15; Sur-Reply 10–14.

IPR2021-00179
Patent 8,407,273 B2

execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." Claims 40, 43, and 45, which depend from claim 36, mirror claims 5, 8, and 10. Claim 6 depends from claim 5, claims 11–18 depend from claim 8, and claims 37–61 and 63 depend from claim 36. For all of these claims, Petitioner relies on the same theory regarding Dockser and MacMillan asserted for claim 8—namely, incorporating Dockser's FPP into each PE of MacMillan operating in parallel, such that the number of "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) in the combined device allegedly would exceed by a certain amount (e.g., at least one, at least ten, at least 100, at least 500) the number of "execution units . . . adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (i.e., the Host CPU floating-point unit). Pet. 47–51, 56.

As to the remaining claims 3, 4, 7, 9, 19, 20, and 25 (that do not recite the "exceeds" limitation or a similar limitation), Petitioner's analysis is premised on the same combination of Dockser and MacMillan, with Dockser's FPP incorporated into each PE of MacMillan's SIMD-RAM architecture, such that the combined device has multiple "LPHDR execution units" (i.e., the Dockser FPPs in the PEs) operating in parallel. *Id.* at 47–49, 53–55.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser and MacMillan in the manner asserted by Petitioner. *See supra* Section II.F.2. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 3–7, 9–20, 25, 36–61, and 63 would have been obvious based on Dockser and MacMillan under 35 U.S.C. § 103(a).

IPR2021-00179
Patent 8,407,273 B2

### 4.   *Claims 1, 2, 21–24, 26, and 28*

As explained above, we conclude that claims 1, 2, 21–24, 26, and 28 are unpatentable over Dockser, and over Dockser and Tong, under 35 U.S.C. § 103(a).  *See supra* Sections II.D–E.  As such, we need not address Petitioner's alternative ground based on Dockser and MacMillan as to claims 1, 2, 21–24, 26, and 28.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that "the Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

### G.  *Obviousness Ground Based on Dockser, Tong, and MacMillan (Claims 1–26, 28, 32–61, 63, and 67–70)*

### 1.   *Claim 8*

Petitioner contends that claims 1–26, 28, 32–61, 63, and 67–70 are unpatentable over Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a). Pet. 56–61.  We again begin with illustrative claim 8.  Petitioner presents two theories.  First, Petitioner argues that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels, such that "[t]he resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong)" teaches the claim limitations "for the same reasons Dockser/MacMillan does," referring to Petitioner's earlier analysis of the asserted ground based on Dockser and MacMillan. Pet. 56–57.  We are not persuaded by those arguments for the reasons explained above.  *See supra* Section II.F.2.

Second, Petitioner presents another theory based on a "customized implementation" of Dockser's FPPs.  Pet. 59–61 (citing Ex. 1003 ¶¶ 418–428); Reply 15–17 (citing Ex. 1071 ¶¶ 56–62).  Petitioner argues that a person of ordinary skill in the art "would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'"  Pet. 59–60 (citing Ex. 1008, 279).  Specifically, according to Petitioner, an ordinarily skilled artisan would have been motivated to "implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered" and likewise "implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application." *Id.* at 60.

Petitioner's analysis is premised on an "alternative interpretation" of the portion of the "exceeds" limitation referring to execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." *Id.* at 59–61.  Under that interpretation, an execution unit could meet the "adapted to" clause if it is capable of 32-bit multiplication in *some* configurations.  *Id.* at 61.  Dockser's FPP, modified as described above, would not be such a unit because it has registers and multiplier logic with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the "adapted to" clause.  *Id.*

Patent Owner responds that a person of ordinary skill in the art "would not have been motivated to re-engineer the FPP of Dockser to remove its 32-bit capability [based on Tong] and then incorporate the re-engineered Dockser unit into the system of MacMillan." PO Resp. 38–43 (citing Ex. 2051 ¶¶ 108–115). Patent Owner argues that none of the three references support Petitioner's view. *Id.* at 40–43. First, Dockser teaches a device that "support[s] a range of selectable precisions including full precision," and "[a]djusting Dockser by removing its full-precision capability violates a central tenet of Dockser—to always be able to execute full-precision operations." *Id.* at 41–42. Second, Tong similarly teaches a device with "both full- and reduced-precision capabilities," and would have reinforced Dockser's teaching that "while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision." *Id.* at 40–41 (emphasis omitted). Third, the asserted combination, "which requires special, customized registers, logic elements, [and] arithmetic units, . . . would increase manufacturing costs and goes directly against the teachings of MacMillan," in particular its teaching that adding "significant complexity" to the SIMD architecture should be avoided. *Id.* at 42–43. The parties in their Reply and Sur-Reply disagree as to the meaning of certain cited disclosures in the references. *See* Reply 15–17; Sur-Reply 15–18.

After reviewing the parties' arguments and evidence, and the full disclosures of Dockser, Tong, and MacMillan, we agree with Patent Owner. Petitioner's asserted combination is predicated on *removing* what is a fundamental feature of Dockser and Tong—namely, the ability to operate at full precision or select a precision less than full precision. Dockser teaches a

single processor with a default full precision mode that is capable of also operating in selectable reduced precision modes. Ex. 1007 ¶¶ 3–4 ("[T]he common situation is that for certain applications, . . . a reduced precision may be acceptable, and for other applications, . . . a greater precision may be needed. Accordingly, there is a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable."). Dockser's FPP operates on 32-bit full precision values and performs arithmetic operations at a particular subprecision if the associated "subprecision select bits" are set, but if not, operates at full precision. *Id.* ¶¶ 17–19, 23–29, 32, claims 1 (reciting "a floating-point processor having a maximum precision" and "selecting a subprecision less than the maximum precision"), 8, 15, 20. Dockser thus requires full precision with the capability to select a subprecision less than full precision, as Mr. Goodin agrees. *See* Ex. 2043, 36:16–37:17, 38:3–8 ("I don't believe Dockser discloses any embodiments without floating-point . . . selectable precision."), 55:21–57:12 ("Dockser requires selectable precision"). Indeed, Petitioner explicitly relies on the fact that "Dockser's precision is selectable" when asserting that a person of ordinary skill in the art would have combined the teachings of Dockser and Tong. *See* Pet. 41; Reply 8; Sur-Reply 17. We see no basis to conclude that a person of ordinary skill in the art would have been motivated to remove the feature that Dockser describes as always present and that is the basis for Petitioner's other assertions regarding Dockser and Tong. *See Chemours*, 4 F.4th at 1376–77 (finding insufficient motivation to modify a prior art reference "when doing so would necessarily involve altering the inventive concept of" the reference); Public Tr. 41:21–42:8.

IPR2021-00179
Patent 8,407,273 B2

Tong likewise does not support Petitioner's asserted motivation to combine. Tong discloses that "not all programs need the precision provided by generic FP hardware," and "the fine precision of the 23-bit mantissa is not essential" and "a single custom FP format may be a viable option" for particular applications, but full precision is necessary for other applications. *See* Ex. 1008, 278–280. Tong states that "scientific programs such as large-scale computational fluid dynamics or electric circuit simulation . . . require a huge amount of precision." *Id.* at 279. Tong further discloses that

> by reducing either precision or range from 32 to fewer bits, we should be able to create custom FP hardware which has lower power simply because of the bit reductions. For a narrow, application-specific task, a single custom FP format may be a viable option. However, *to be more generally useful, we need to consider arithmetic architectures which can scale to different FP formats.* Even though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears *inevitable that some fraction of our operands will require full IEEE-standard precision.*

*Id.* at 280 (emphasis added). Given those disclosures, we are not persuaded that a person of ordinary skill in the art would have been motivated to remove from Dockser's FPP the capability (i.e., selectability from full precision) that Tong characterizes as important.[9]

---

[9] Petitioner has shown sufficiently that a person of ordinary skill in the art would have been motivated to *select* a particular precision level in Dockser's FPP based on the teachings of Tong, but not to *remove* functionality from the FPP itself. *See supra* Section II.E.2; *compare* Pet. 41–42 (arguing that Tong "would have motivated a [person of ordinary skill in the art] to *configure* Dockser's FPP . . . to *operate at* a *selected* precision level retaining as few as 5 mantissa fraction bits . . . or others empirically determined to not require greater precision using Tong's techniques" (emphasis added)), *with id.* at 59–60 (arguing that a person of ordinary skill in the art "would have been motivated to *customize* Dockser's FPPs in

IPR2021-00179
Patent 8,407,273 B2

Finally, with respect to MacMillan, the reference states that to achieve its cost objectives, "SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use." Ex. 1009, col. 5, ll. 42–44. The Dockser-Tong-MacMillan combined device would add complexity because it involves a "customized implementation" of the multiplier logic in Dockser's FPP. *See* Pet. 59–60; Reply 15. Further, to the extent some selectability remains (among levels below full precision) in Petitioner's "customized implementation," the modified Dockser FPP would still require Dockser's additional control circuitry to implement that selectable subprecision. As explained above, such circuitry would increase costs due to added complexity and size, which MacMillan expressly counsels against. *See supra* Section II.F.2.

We credit the testimony of Dr. Khatri on these points, as it is explained sufficiently and is consistent with the disclosures of the references. *See* Ex. 2051 ¶¶ 46–48, 107–115. Petitioner has not shown sufficiently that a person of ordinary skill in the art would have combined the teachings of Dockser, Tong, and MacMillan to remove from Dockser's FPP the ability to select a precision less than full precision and then incorporate the modified FPP into the PEs of MacMillan. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claim 8 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

---

MacMillan's PEs" by removing register storage elements to have "smaller than 32-bit registers" (for the register bit-dropping technique) or removing multiplier logic elements (for the multiplier logic technique) (emphasis added)).

IPR2021-00179
Patent 8,407,273 B2

### 2.  *Claims 3–7, 9–20, 25, 34–61, 63, and 67–70*

Claims 5, 6, 10–18, 35–61, 63, and 67–70 recite (either on their own or via dependency) the "exceeds" limitation or an analogous limitation.  *See supra* Section II.F.3.  Petitioner relies on the combined teachings of Dockser and MacMillan, advancing its original theory regarding the combination of Dockser and MacMillan as well as the "customized implementation" argument addressed above for certain claims.  *See* Pet. 47–61; Reply 15–17.  Claims 3, 4, 7, 9, 19, 20, and 25 do not recite the "exceeds" limitation or an analogous limitation, but Petitioner relies on the same arguments regarding the combination of Dockser and MacMillan.  *See* Pet. 47–58.  Regarding claim 34, Petitioner refers to its earlier analysis of Dockser and MacMillan for claim 3.  *Id.* at 58–59.  Petitioner does not argue that Tong cures any of the deficiencies identified above regarding the asserted combination of Dockser and MacMillan.  *See id.* at 56–61.

We are not persuaded that a person of ordinary skill in the art would have been motivated to combine the teachings of Dockser, Tong, and MacMillan in the manner asserted by Petitioner.  *See supra* Sections II.F.2, II.G.1.  Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 3–7, 9–20, 25, 34–61, 63, and 67–70 would have been obvious based on Dockser, Tong, and MacMillan under 35 U.S.C. § 103(a).

### 3.  *Claims 1, 2, 21–24, 26, 28, 32, and 33*

As explained above, we conclude that claims 1, 2, 21–24, 26, and 28 are unpatentable over Dockser, and claims 1, 2, 21–24, 26, 28, 32, and 33 are unpatentable over Dockser and Tong, under 35 U.S.C. § 103(a).  *See supra* Sections II.D–E.  As such, we need not address Petitioner's alternative

IPR2021-00179
Patent 8,407,273 B2

ground based on Dockser, Tong, and MacMillan as to claims 1, 2, 21–24, 26, 28, 32, and 33. *See Boston Sci. Scimed*, 809 F. App'x at 990.

### H. Patent Owner's Motion to Exclude

Patent Owner moves to exclude (1) Exhibits 1073, 1075–1078, 1082–1084, 1088–1090, 1096, and 1097 as "irrelevant and prejudicial" under Federal Rules of Evidence 402 and 403; (2) Exhibit 1082 for the same reasons and also as unauthenticated under Federal Rule of Evidence 901; (3) and Exhibits 1094 and 1095 as containing inadmissible hearsay under Federal Rule of Evidence 802. Mot. 3–7. Patent Owner's Motion is dismissed as moot, as we do not rely on the exhibits in a manner adverse to Patent Owner in our Decision.

In particular, Petitioner cites Exhibits 1073 and 1075 in support of its argument that Dockser and MacMillan teach the "exceeds" limitation of claim 8 and similar limitations in other claims. *See* Mot. 3–4; Reply 14. Petitioner cites Exhibits 1076–1078 and 1097 in response to an argument made by Patent Owner in its Response regarding MacMillan. *See* Mot. 4; Reply 16–17. We need not reach those arguments because we determine that Petitioner has not shown unpatentability of the claims challenged based on the combinations of Dockser and MacMillan, and Dockser, Tong, and MacMillan, for other reasons. *See supra* Sections II.F, II.G.

Petitioner cites Exhibits 1078, 1082–1084, 1088–1090, and 1094–1096 in support of its arguments regarding objective indicia of nonobviousness. *See* Mot. 4–7; Reply 21–22, 25, 27–28. As explained above, we do not find Patent Owner's evidence of objective indicia of nonobviousness persuasive with respect to claims 1, 2, 21–24, 26, 28, 32,

and 33, and do not rely on the disputed exhibits in reaching that conclusion. *See supra* Sections II.D, II.E.

## I.    Motions to Seal

The parties move to seal portions of their demonstrative exhibits that quote or describe material that we previously ordered sealed.  Papers 52, 54; *see* Papers 27, 48 (granting motions to seal).  The parties filed unredacted confidential and redacted public versions of their demonstrative exhibits.  Exs. 1098, 2054.  Upon reviewing the materials sought to be sealed, it appears that the parties' characterization of the materials is accurate and the redactions are narrowly tailored to only confidential information.  The parties have established good cause to seal the redacted portions of the demonstrative exhibits.  We grant the Motions to Seal.

## III. CONCLUSION[10]

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 21–24, 26, 28, 32, and 33 of the '273 patent are unpatentable, but has not demonstrated, by a preponderance of the evidence, that claims 3–20, 25, 34–61, 63, and 67–70 are unpatentable.

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. §§ 42.8(a)(3), 42.8(b)(2).

IPR2021-00179
Patent 8,407,273 B2

In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 21–24, 26, 28 | 103(a) | Dockser | 1, 2, 21–24, 26, 28 | |
| 1, 2, 21–24, 26, 28, 32, 33 | 103(a) | Dockser, Tong | 1, 2, 21–24, 26, 28, 32, 33 | |
| 1–26, 28, 36–61, 63 | 103(a) | Dockser, MacMillan[11] | | 3–20, 25, 36–61, 63 |
| 1–26, 28, 32–61, 63, 67–70 | 103(a) | Dockser, Tong, MacMillan[12] | | 3–20, 25, 34–61, 63, 67–70 |
| **Overall Outcome** | | | 1, 2, 21–24, 26, 28, 32, 33 | 3–20, 25, 34–61, 63, 67–70 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 21–24, 26, 28, 32, and 33 of the
'273 patent have been shown to be unpatentable, and claims 3–20, 25,
34–61, 63, and 67–70 of the '273 patent have not been shown to be
unpatentable;

---

[11] As explained above, given our disposition of the grounds based on
Dockser and the combination of Dockser and Tong, we do not reach
Petitioner's alternative ground asserting that claims 1, 2, 21–24, 26, and 28
are unpatentable over Dockser and MacMillan. *See supra* Section II.F.4.

[12] As explained above, given our disposition of the grounds based on
Dockser and the combination of Dockser and Tong, we do not reach
Petitioner's alternative ground asserting that claims 1, 2, 21–24, 26, 28, 32,
and 33 are unpatentable over Dockser, Tong, and MacMillan. *See supra*
Section II.G.3.

IPR2021-00179
Patent 8,407,273 B2

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 46) is *dismissed*; and

FURTHER ORDERED that the parties' Motions to Seal (Papers 52 and 54) are *granted*, and the unredacted confidential versions of the demonstrative exhibits (Exhibits 1098 and 2054) shall remain under seal pursuant to the default protective order previously entered in the instant proceeding.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00179
Patent 8,407,273 B2

FOR PETITIONER:

Elisabeth H. Hunt
Richard F. Giunta
Anant K. Saraswat
Adam R. Wichman
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent J. Rubino, III
Enrique W. Iturralde
Richard Cowell
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com
rcowell@fabricantllp.com

Brian M. Seeve
Matthew D. Vella
PRINCE LOBEL TYE LLP
bseeve@pricelobel.com
mvella@pricelobel.com

87



US010416961B2

(12) **United States Patent**                  (10) **Patent No.:**     **US 10,416,961 B2**

Bates                                          (45) **Date of Patent:**      *Sep. 17, 2019

---

(54) **PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT**

(71) Applicant: **Singular Computing LLC**, Newton, MA (US)

(72) Inventor: **Joseph Bates**, Newton, MA (US)

(73) Assignee: **Singular Computing LLC**, Newton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/175,131**

(22) Filed: **Oct. 30, 2018**

(65) **Prior Publication Data**

US 2019/0065147 A1      Feb. 28, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/784,359, filed on Oct. 16, 2017, now Pat. No. 10,120,648, which is a continuation of application No. 14/976,852, filed on Dec. 21, 2015, now Pat. No. 9,792,088, which is a continuation of application No. 13/849,606, filed on Mar. 25, 2013, now Pat. No. 9,218,156, which is a continuation of application No. 13/399,884, filed on Feb. 17, 2012, now Pat. No. 8,407,273, which is a continuation of application No. 12/816,201, filed on Jun. 15, 2010, now Pat. No. 8,150,902.

(60) Provisional application No. 61/218,691, filed on Jun. 19, 2009.

(51) **Int. Cl.**
*G06F 7/483* (2006.01)
*G06F 7/523* (2006.01)

*H03K 19/177* (2006.01)
*G06F 7/38* (2006.01)

(52) **U.S. Cl.**
CPC ................ *G06F 7/483* (2013.01); *G06F 7/38* (2013.01); *G06F 7/4833* (2013.01); *G06F 7/5235* (2013.01); *H03K 19/17728* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,518,615 | B1 | 4/2009 | Airey |
| 2006/0111840 | A1 | 5/2006 | Van Diggelen |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 105760135 B | 5/2016 |
| EP | 3410291 A | 12/2018 |

OTHER PUBLICATIONS

Examination Report dated Nov. 26, 2018, in Indian patent application No. 98/MUMNP/2012, 7 pages.
Extended European Search Report dated Nov. 8, 2018 in European patent application No. 18177602.2, 9 pages.
(Continued)

*Primary Examiner* — Michael D. Yaary
(74) *Attorney, Agent, or Firm* — Blueshift IP, LLC; Robert Plotkin

(57) **ABSTRACT**

Low precision computers can be efficient at finding possible answers to search problems. However, sometimes the task demands finding better answers than a single low precision search. A computer system augments low precision computing with a small amount of high precision computing, to improve search quality with little additional computing.

**27 Claims, 11 Drawing Sheets**



Google Exhibit 1001
Google v. Singular

**US 10,416,961 B2**

Page 2

(56) **References Cited**

OTHER PUBLICATIONS

Bottou, et al., "The Tradeoffs of Large Scale Learning", NIPS'07 Proceedings of the 20th International Conference on Neural Information Processing Systems pp. 161-168.

Gupta, et al., "Deep Learning with Limited Numerical Precision" ICML'15 Proceedings of the 32nd Internat'l Conf. on Machine Learning—vol. 37 pp. 1737-1746.

Hammerstrom, "A VLSI Architecture for High-Performance, Low-Cost, On-chip Learning", IJCNN International Joint Conference on Neural Networks 1990.

Hohfeld, et al., "Probabilistic rounding in neural network learning with limited precision", Neurocomputing 4 (1992) 291-299.

Holt, et al., "Finite Precision Error Analysis of Neural Network Electronic Hardware Implementations", IJCNN-91—Seattle International Joint Conference on Neural Networks 1991.

Iwata, et al, "An Artificial Neural Network Accelerator Using General Purpose 24 Bit Floating Point Digital Signal Processors" Internat'l Joint Cont. on Neural Networks 1998.

Krizhevsky, "Learning Multiple Layers of Features from Tiny Images", University of Toronto, Apr. 8, 2009.

"Digital Signal Processor, HD61810B, User's Manual," distributed by Hitachi #S12, available online at <https://archive.org/details/bitsavers_hitachidatlSignalProcessorUsersManual_4735688/page/n5>, last accessed on Jul. 5, 2019, 124 pages.

Wikipedia contributors. "Half-precision floating-point format." Wikipedia, the Free Encyclopedia. Wikipedia, the Free Encyclopedia, 6 pages, available online at <https://en.wikipedia.org/w/index.php?title=Half-precision_floating-point_format&oldid=900307014>, last accessed on Jun. 3, 2019, 6 pages.

Slide 2.2 Programming Guide, Programming the 3Dfx Interactive Glide™ Rasterization Library 2.2, Document Release 014, Mar. 8, 1997, by 3Dfx Interactive, Inc. available online at <http://www.gamers.org/dEngine/xf3D/glide/glidepgm.htm>, last accessed onJun. 3, 2019, 167 pages.



FIG. 1



FIG. 2



FIG. 3

Case: 22-1866     Document: 50-1     Page: 298     Filed: 02/03/2023



FIG. 4



FIG. 5

Case: 22-1866    Document: 50-1    Page: 300    Filed: 02/03/2023



FIG. 6

APPX00268



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

US 10,416,961 B2

1

## PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT

### COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

### BACKGROUND

The ability to compute rapidly has become enormously important to humanity. Weather and climate prediction, medical applications (such as drug design and non-invasive imaging), national defense, geological exploration, financial modeling, Internet search, network communications, scientific research in varied fields, and even the design of new computing hardware have each become dependent on the ability to rapidly perform massive amounts of calculation. Future progress, such as the computer-aided design of complex nano-scale systems or development of consumer products that can see, hear, and understand, will demand economical delivery of even greater computing power.

Gordon Moore's prediction, that computing performance per dollar would double every two years, has proved valid for over 30 years and looks likely to continue in some form. But despite this rapid exponential improvement, the reality is that the inherent computing power available from silicon has grown far more quickly than it has been made available to software. In other words, although the theoretical computing power of computing hardware has grown exponentially, the interfaces through which software is required to access the hardware limits the ability of software to use hardware to perform computations at anything approaching the hardware's theoretical maximum computing power.

Consider a modern silicon microprocessor chip containing about one billion transistors, clocked at roughly 1 GHz. On each cycle the chip delivers approximately one useful arithmetic operation to the software it is running. For instance, a value might be transferred between registers, another value might be incremented, perhaps a multiply is accomplished. This is not terribly different from what chips did 30 years ago, though the clock rates are perhaps a thousand times faster today.

Real computers are built as physical devices, and the underlying physics from which the machines are built often exhibits complex and interesting behavior. For example, a silicon MOSFET transistor is a device capable of performing interesting non-linear operations, such as exponentiation. The junction of two wires can add currents. If configured properly, a billion transistors and wires should be able to perform some significant fraction of a billion interesting computational operations within a few propagation delays of the basic components (a "cycle" if the overall design is a traditional digital design). Yet, today's CPU chips use their billion transistors to enable software to perform merely a few such operations per cycle, not the significant fraction of the billion that might be possible.

### SUMMARY

Embodiments of the present invention are directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

In some embodiments, "low precision" processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1% (one tenth of one percent). This is far worse precision than the widely used IEEE 754 single precision floating point standard. Programmable embodiments of the present invention may be programmed with algorithms that function adequately despite these unusually large relative errors. In some embodiments, the processing elements have "high dynamic range" in the sense that they are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an example overall design of a SIMD processor according to one embodiment of the present invention.

FIG. 2 is an example of the Processing Element Array of a SIMD processor according to one embodiment of the present invention.

FIG. 3 is an example of how a Processing Element in a Processing Element Array communicates data with other parts of the processor according to one embodiment of the present invention.

FIG. 4 is an example design for a Processing Element according to one embodiment of the present invention.

FIG. 5 is an example LPHDR data word format according to one embodiment of the present invention.

FIG. 6 is an example design for an LPHDR arithmetic unit according to one embodiment of the present invention.

FIG. 7 is an original image.

FIG. 8 is an image blurred by a blur kernel according to one embodiment of the present invention.

FIG. 9 is an image produced by Richardson Lucy deconvolution using floating point arithmetic according to one embodiment of the present invention.

FIG. 10 is an image produced by Richardson Lucy deconvolution using LPHDR floating point arithmetic with added noise (fp+noise) according to one embodiment of the present invention.

FIG. 11 is an image produced by Richardson Lucy deconvolution using LPHDR logarithmic arithmetic (1 ns) according to one embodiment of the present invention.

### DETAILED DESCRIPTION

As described above, today's CPU chips make inefficient use of their transistors. For example, a conventional CPU chip containing a billion transistors might enable software to perform merely a few operations per clock cycle. Although this is highly inefficient, those having ordinary skill in the art design CPUs in this way for what are widely accepted to be

US 10,416,961 B2

3

valid reasons. For example, such designs satisfy the (often essential) requirement for software compatibility with earlier designs. Furthermore, they deliver great precision, performing exact arithmetic with integers typically 32 or 64 bits long and performing rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers. Many applications need this kind of precision. As a result, conventional CPUs typically are designed to provide such precision, using on the order of a million transistors to implement the arithmetic operations.

There are many economically important applications, however, which are not especially sensitive to precision and that would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors. Current architectures for general purpose computing fail to deliver this power.

Because of the weaknesses of conventional computers, such as typical microprocessors, other kinds of computers have been developed to attain higher performance. These machines include single instruction stream/multiple data stream (SIMD) designs, multiple instruction stream/multiple data stream (MIMD) designs, reconfigurable architectures such as field programmable gate arrays (FPGAs), and graphics processing unit designs (GPUs) which, when applied to general purpose computing, may be viewed as single instruction stream/multiple thread (SIMT) designs.

SIMD machines follow a sequential program, with each instruction performing operations on a collection of data. They come in two main varieties: vector processors and array processors. Vector processors stream data through a processing element (or small collection of such elements). Each component of the data stream is processed similarly. Vector machines gain speed by eliminating many instruction fetch/decode operations and by pipelining the processor so that the clock speed of the operations is increased.

Array processors distribute data across a grid of processing elements (PEs). Each element has its own memory. Instructions are broadcast to the PEs from a central control until, sequentially. Each PE performs the broadcast instruction on its local data (often with the option to sit idle that cycle). Array processors gain speed by using silicon efficiently—using just one instruction fetch/decode unit to drive many small simple execution units in parallel.

Array processors have been built using fixed point arithmetic at a wide variety of bit widths, such as 1, 4, 8, and wider, and using floating point arithmetic. Small bit widths allow the processing elements to be small, which allows more of them to fit in the computer, but many operations must be carried out in sequence to perform conventional arithmetic calculations. Wider widths allow conventional arithmetic operations to be completed in a single cycle. In practice, wider widths are desirable. Machines that were originally designed with small bit widths, such as the Connection Machine-1 and the Goodyear Massively Parallel Processor, which each used 1 bit wide processing paths, evolved toward wider data paths to better support fast arithmetic, producing machines such as the Connection Machine-2 which included 32 bit floating point hardware and the MasPar machines which succeeded the Goodyear machine and provided 4 bit processing elements in the MasPar-1 and 32 bit processing elements in the MasPar-2.

Array processors also have been designed to use analog representations of numbers and analog circuits to perform computations. The SCAMP is such a machine. These machines provide low precision arithmetic, in which each operation might introduce perhaps an error of a few per-

4

centage points in its results. They also introduce noise into their computations, so the computations are not repeatable. Further, they represent only a small range of values, corresponding for instance to 8 bit fixed point values rather than providing the large dynamic range of typical 32 or 64 bit floating point representations. Given these limitations, the SCAMP was not intended as a general purpose computer, but instead was designed and used for image processing and for modeling biological early vision processes. Such applications do not require a full range of arithmetic operations in hardware, and the SCAMP, for example, omits general division and multiplication from its design.

While SIMD machines were popular in the 1980s, as price/performance for microprocessors improved designers began building machines from large collections of communicating microprocessors. These MIMD machines are fast and can have price/performance comparable to their component microprocessors, but they exhibit the same inefficiency as those components in that they deliver to their software relatively little computation per transistor.

Field Programmable Gate Arrays (FPGAs) are integrated circuits containing a large grid of general purpose digital elements with reconfigurable wiring between those elements. The elements originally were single digital gates, such as AND and OR gates, but evolved to larger elements that could, for instance, be programmed to map 6 inputs to 1 output according to any Boolean function. This architecture allows the FPGA to be configured from external sources to perform a wide variety of digital computations, which allows the device to be used as a co-processor to a CPU to accelerate computation. However, arithmetic operations such as multiplication and division on integers, and especially on floating point numbers, require many gates and can absorb a large fraction of an FPGA's general purpose resources. For this reason, modern FPGAs often devote a significant portion of their area to providing dozens or hundreds of multiplier blocks, which can be used instead of general purpose resources for computations requiring multiplication. These multiplier blocks typically perform 18 bit or wider integer multiplies, and use many transistors, as similar multiplier circuits do when they are part of a general purpose CPU.

Existing Field Programmable Analog Arrays (FPAAs) are analogous to FPGAs, but their configurable elements perform analog processing. These devices generally are intended to do signal processing, such as helping model neural circuitry. They are relatively low precision, have relatively low dynamic range, and introduce noise into computation. They have not been designed as, or intended for use as, general purpose computers. For instance, they are not seen by those having ordinary skill in the art as machines that can run the variety of complex algorithms with floating point arithmetic that typically run on high performance digital computers.

Finally, Graphics Processing Units (GPUs) are a variety of parallel processor that evolved to provide high speed graphics capabilities to personal computers. They offer standard floating point computing abilities with very high performance for certain tasks. Their computing model is sometimes based on having thousands of nearly identical threads of computing (SIMT), which are executed by a collection of SIMD-like internal computing engines, each of which is directed and redirected to perform work for which a slow external DRAM memory has provided data. Like other machines that implement standard floating point arithmetic, they use many transistors for that arithmetic. They are

US 10,416,961 B2

5

as wasteful of those transistors, in the sense discussed above, as are general purpose CPUs.

Some GPUs include support for 16 bit floating point values (sometimes called the "Half" format). The GPU manufacturers, currently such as NVIDIA or AMD/ATI, describe this capability as being useful for rendering images with higher dynamic range than the usual 32 bit RGBA format, which uses 8 bits of fixed point data per color, while also saving space over using 32 bit floating point for color components. The special effects movie firm Industrial Light and Magic (ILM) independently defined an identical representation in their OpenEXR standard, which they describe as "a high dynamic-range (HDR) image file format developed by Industrial Light & Magic for use in computer imaging applications." Wikipedia (late 2008) describes the 16 bit floating point representation thusly: "This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth."

When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

The variety of architectures mentioned above are all attempts to get more performance from silicon than is available in a traditional processor design. But designers of traditional processors also have been struggling to use the enormous increase in available transistors to improve performance of their machines. These machines often are required, because of history and economics, to support large existing instruction sets, such as the Intel x86 instruction set. This is difficult, because of the law of diminishing returns, which does not enable twice the performance to be delivered by twice the transistor count. One facet of these designers' struggle has been to increase the precision of arithmetic operations, since transistors are abundant and some applications could be sped up significantly if the processor natively supported long (e.g., 64 bit) numbers. With the increase of native fixed point precision from 8 to 16 to 32 to 64 bits, and of floating point from 32 to 64 and sometimes 128 bits, programmers have come to think in terms of high precision and to develop algorithms based on the assumption that computer processors provide such precision, since it comes as an integral part of each new generation of silicon chips and thus is "free."

Embodiments of the present invention efficiently provide computing power using a fundamentally different approach than those described above. In particular, embodiments of the present invention are directed to computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations).

One variety of LPHDR arithmetic represents values from one millionth up to one million with a precision of about 0.1%. If these values were represented and manipulated using the methods of floating point arithmetic, they would have binary mantissas of no more than 10 bits plus a sign bit

6

and binary exponents of at least 5 bits plus a sign bit. However, the circuits to multiply and divide these floating point values would be relatively large. One example of an alternative embodiment is to use a logarithmic representation of the values. In such an approach, the values require the same number of bits to represent, but multiplication and division are implemented as addition and subtraction, respectively, of the logarithmic representations. Addition and subtraction may be implemented efficiently as described below. As a result, the area of the arithmetic circuits remains relatively small and a greater number of computing elements can be fit into a given area of silicon. This means the machine can perform a greater number of operations per unit of time or per unit power, which gives it an advantage for those computations able to be expressed in the LPHDR framework.

Another embodiment is to use analog representations and processing mechanisms. Analog implementation of LPHDR arithmetic has the potential to be superior to digital implementation, because it tends to use the natural analog physics of transistors or other physical devices instead of using only the digital subset of the device's behavior. This fuller use of the devices' natural abilities may permit smaller mechanisms for doing LPHDR arithmetic. In recent years, in the field of silicon circuitry, analog methods have been supplanted by digital methods. In part, this is because of the ease of doing digital design compared to analog design. Also in part, it is because of the continued rapid scaling of digital technology ("Moore's Law") compared to analog technology. In particular, at deep submicron dimensions, analog transistors no longer work as they had in prior generations of larger-scale technology. This change of familiar behavior has made analog design still harder in recent years. However, digital transistors are in fact analog transistors used in a digital way, meaning digital circuits are really analog circuits designed to attempt to switch the transistors between completely on and completely off states. As scaling continues, even this use of transistors is starting to come face to face with the realities of analog behavior. Scaling of transistors for digital use is expected either to stall or to require digital designers increasingly to acknowledge and work with analog issues. For these reasons, digital embodiments may no longer be easy, reliable, and scalable, and analog embodiments of LPHDR arithmetic may come to dominate commercial architectures.

Because LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other, and therefore may constitute a massively parallel LPHDR processor or other device. Such a processor or other device has not been described or practiced as a means of doing general purpose computing by those having ordinary skill in the art for at least two reasons. First, it is commonly believed by those having ordinary skill in the art, that LPHDR computation, and in particular massive amounts of LPHDR computation, whether performed in a massively parallel way or not, is not practical as a substrate for moderately general computing. Second, it is commonly believed by those having ordinary skill in the art that massive amounts of even high precision computation on a single chip or in a single machine, as is enabled by a compact arithmetic processing unit, is not useful without a corresponding increase in bandwidth between processing elements within the machine and into and out of the machine because computing is wire limited and arithmetic can be considered to be available at no cost.

US 10,416,961 B2

**7**

Despite these views—that massive amounts of arithmetic on a chip or in a massively parallel machine are not useful, and that massive amounts of LPHDR arithmetic are even worse—embodiments of the present invention disclosed herein demonstrate that massively parallel LPHDR designs are in fact useful and provide significant practical benefits in at least several significant applications.

To conclude, modern digital computing systems provide high precision arithmetic, but that precision is costly. A modern double precision floating point multiplier may require on the order of a million transistors, even though only a handful of transistors is required to perform a low precision multiplication. Despite the common belief among those having ordinary skill in the art that modern applications require high precision processing, in fact a variety of useful algorithms function adequately at much lower precision. As a result, such algorithms may be performed by processors or other devices implemented according to embodiments of the present invention, which come closer to achieving the goal of using a few transistors to multiply and a wire junction to add, thus enabling massively parallel arithmetic computation to be performed with relatively small amounts of physical resources (such as a single silicon chip). Although certain specialized tasks can function at low precision, it is not obvious, and in fact has been viewed as clearly false by those having ordinary skill in the art, that relatively general purpose computing such as is typically performed today on general purpose computers can be done at low precision. However, in fact a variety of useful and important algorithms can be made to function adequately at much lower than 32 bit precision in a massively parallel computing framework, and certain embodiments of the present invention support such algorithms, thereby offering much more efficient use of transistors, and thereby provide improved speed, power, and/or cost, compared to conventional computers.

Various computing devices implemented according to embodiments of the present invention will now be described. Some of these embodiments may be an instance of a SIMD computer architecture. Other architectures may be used, such as MIMD architectures, programmable array architectures (such as FPGAs and FPAAs), or GPU/SIMT architectures. The techniques disclosed herein may, for example, be implemented using any processor or other device having such an existing architecture, and replacing or augmenting some or all existing arithmetic units in the processor or other device, if any, with LPHDR arithmetic units in any of the ways disclosed herein. Devices implemented according to embodiments of the present invention, however, need not start with an existing processor design, but instead may be designed from scratch to include LPHDR arithmetic units within any of the architectures just described, or any other architecture.

Embodiments of the present invention may, for example, be implemented using the architecture of a particular kind of SIMD computer, the array processor. There are many variations and specific instances of array processors described in the scientific and commercial literature. Examples include the Illiac 4, the Connection Machine 1 and 2, the Goodyear MPP, and the MasPar line of computers.

Embodiments of the present invention need not, however, be implemented as SIMD computers. For example, embodiments of the present invention may be implemented as FPGAs, FPAAs, or related architectures that provide for flexible connectivity of a set of processing elements. For example, embodiments of the present invention may be implemented as GPU/SIMTs and as MIMDs, among others.

**8**

For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures. Furthermore, references herein to "processing elements" within embodiments of the present invention should be understood more generally as any kind of execution unit, whether for performing LPHDR operations or otherwise.

An example SIMD computing system **100** is illustrated in FIG. **1**. The computing system **100** includes a collection of many processing elements (PEs). Sometimes present are a control unit (CU) **106**, an I/O unit (IOU) **108**, various Peripheral devices **110**, and a Host computer **102**. The collection of PEs is referred to herein as "the Processing Element Array" (PEA), even though it need not be two-dimensional or an array or grid or other particular layout. Some machines include additional components, such as an additional memory system called the "Staging Memory" in the Goodyear MPP, but these additional elements are neither essential in the computer nor needed to understand embodiments of the present invention and therefore are omitted here for clarity of explanation. One embodiment of the present invention is a SIMD computing system of the kind shown in FIG. **1**, in which one or more (e.g., all) of the PEs in the PEA **104** are LPHDR elements, as that term is used herein.

The Host **102** is responsible for overall control of the computing system **100**. It performs the serial, or mostly serial, computation typical of a traditional uni-processor. The Host **102** could have more complicated structure, of course, including parallelism of various sorts. Indeed a heterogeneous computing system combining multiple computing architectures in a single machine is a good use for embodiments of the present invention.

A goal of the Host **102** is to have the PEA **104** perform massive amounts of computation in a useful way. It does this by causing the PEs to perform computations, typically on data stored locally in each PE, in parallel with one another. If there are many PEs, much work gets done during each unit of time.

The PEs in the PEA **104** may be able to perform their individual computations roughly as fast as the Host **102** performs its computations. This means it may be inefficient to have the Host **102** attempt to control the PEA **104** on a time scale as fine as the Host's or PEA's minimal time step. (This minimal time, in a traditional digital design, would be the clock period.) For this reason, the specialized control unit (CU) **106** may be included in the architecture. The CU **106** has the primary task of retrieving and decoding instructions from an instruction memory, which conceptually is part of the CU **106**, and issuing the partially decoded instructions to all the PEs in the PEA **104**. (This may be viewed by the CU software as happening roughly simultaneously for all the PEs, though it need not literally be synchronous, and in fact it may be effective to use an asynchronous design in which multiple instructions at different stages of completion simultaneously propagate gradually across the PEA, for instance as a series of wave fronts.)

In a design which includes the CU **106**, the Host **102** typically will load the instructions (the program) for the PEA **104** into the CU instruction memory (not shown in FIG. **1**), then instruct the CU **106** to interpret the program and cause the PEA **104** to compute according to the instructions. The program may, for example, look generally similar to a typical machine language program, with instructions to cause data movement, logical operations, arithmetic operations, etc., in and between the PEs and other instructions to

US 10,416,961 B2

9

do similar operations together with control flow operations within the CU 106. Thus, the CU 106 may run a typical sort of program, but with the ability to issue massively parallel instructions to the PEA 104.

In order to get data into and out of the CU 106 and PEA 104, the I/O Unit 108 may interface the CU 106 and PEA 104 with the Host 102, the Host's memory (not shown in FIG. 1), and the system's Peripherals 110, such as external storage (e.g., disk drives), display devices for visualization of the computational results, and sometimes special high bandwidth input devices (e.g., vision sensors). The PEA's ability to process data far faster than the Host 102 makes it useful for the IOU 108 to be able to completely bypass the Host 102 for some of its data transfers. Also, the Host 102 may have its own ways of communicating with the Peripherals 110.

The particular embodiment illustrated in FIG. 1 is shown merely for purposes of example and does not constitute a limitation of the present invention. For example, alternatively the functions performed by the CU 106 could instead be performed by the Host 102 with the CU 106 omitted. The CU 106 could be implemented as hardware distant from the PEA 104 (e.g., off-chip), or the CU 106 could be near to the PEA 104 (e.g., on-chip). I/O could be routed through the CU 106 with the IOU 108 omitted or through the separate I/O unit 108, as shown. Furthermore, the Host 102 is optional; the CU 106 may include, for example, a CPU, or otherwise include components sufficient to replace the functions performed by the Host 102. The Peripherals 110 shown in FIG. 1 are optional. The design shown in FIG. 1 could have a special memory, such as the Goodyear MPP's "staging memory," which provides an intermediate level of local storage. Such memory could, for example, be bonded to the LPHDR chip using 3D fabrication technology to provide relatively fast parallel access to the memory from the PEs in the PEA 104.

The PEA 104 itself, besides communicating with the CU 106 and IOU 108 and possibly other mechanisms, has ways for data to move within the array. For example, the PEA 104 may be implemented such that data may move from PEs only to their nearest neighbors, that is, there are no long distance transfers. FIGS. 2 and 3 show embodiments of the present invention which use this approach, where the nearest neighbors are the four adjacent PEs toward the North, East, West, and South, called a NEWS design. For example, FIG. 2 shows a subset of the PEs in PEA 104, namely PE 202, PE 204, PE 206, PE 208, and PE 210. When the CU 106 issues data movement instructions, all the PEs access data from or send data to their respective specified nearest neighbor. For instance, every PE might access a specified data value in its neighbor to the West and copy it into its own local storage. In some embodiments, such as some analog embodiments, these kinds of transfers may result in some degradation of the value copied.

FIG. 3 shows a PE 302 that includes data connections to the IOU 108. PE 302 is connected at the North to PE 304, at the East to PE 306, at the South to PE 308, and at the West to PE 310. However, driving signals from inside the PEA 104 out to the IOU 108 usually requires a physically relatively large driving circuit or analogous mechanism. Having those at every PE may absorb much of the available resources of the hardware implementation technology (such as VLSI area). In addition, having independent connections from every PE to the IOU 108 means many such connections, and long connections, which also may absorb much of the available hardware resources. For these reasons, the connections between the PEs and the IOU 108 may be

10

limited to those PEs at the edges of the PE array 104. In this case, to get data out of, and perhaps into, the PEA 104, the data is read and written at the edges of the array and CU instructions are performed to shift data between the edges and interior of the PEA 104. The design may permit data to be pushed from the IOU 108 inward to any PE in the array using direct connections, but may require readout to occur by using the IOU 108 to shift data to the edges where it can be read by the IOU 108.

Connections between the CU 106 and PEA 104 have analogous variations. One design may include the ability to drive instructions into all the PEs roughly simultaneously, but another approach is to have the instructions flow gradually (for instance, shift in discrete time steps) across the PEA 104 to reach the PEs. Some SIMD designs, which may be implemented in embodiments of the present invention, have a facility by which a "wired-or" or "wired-and" of the state of every PE in the PEA 104 can be read by the CU 106 in approximately one instruction delay time.

There are many well studied variations on these matters in the literature, any of which may be incorporated into embodiments of the present invention. For example, an interconnect, such as an 8-way local interconnect, may be used. The local connections may include a mixture of various distance hops, such as distance 4 or 16 as well as distance 1. The outside edges may be connected using any topology, such as a torus or twisted torus. Instead of or in addition to a local interconnect, a more complex global interconnect, such as the hypercube design, may be used. Furthermore, the physical implementation of the PEA 104 (e.g., a chip) could be replicated (e.g., tiled on a circuit board) to produce a larger PEA. The replication may form a simple grid or other arrangement, just as the component PEAs may but need not be grids.

FIG. 4 shows an example design for a PE 400 (which may be used to implement any one or more of the PEs in the PEA 104). The PE 400 stores local data. The amount of memory for the local data varies significantly from design to design. It may depend on the implementation technologies available for fabricating the PE 400. Sometimes rarely changing values (Constants) take less room than frequently changing values (Registers), and a design may provide more Constants than Registers. For instance, this may be the case with digital embodiments that use single transistor cells for the Constants (e.g., floating gate Flash memory cells) and multiple transistor cells for the Registers (e.g., 6-transistor SRAM cells). Sometimes the situation is reversed, as may be the case in analog embodiments, where substantial area for capacitance may be needed to ensure stable long term storage of Constants, and such embodiments may have more Registers than Constants. Typical storage capacities might be tens or hundreds of arithmetic values stored in the Registers and Constants in each PE, but these capacities are adjustable by the designer. Some designs, for instance, may have Register storage but no Constant storage. Some designs may have thousands or even many more values stored in each PE. All of these variations may be reflected in embodiments of the present invention.

Each PE needs to operate on its local data. For this reason within the PE 400 there are data paths 402a-i, routing mechanisms (such as the multiplexor MUX 404), and components to perform some collection of logical and arithmetic operations (such as the logic unit 406 and the LPHDR arithmetic unit 408). The LPHDR arithmetic unit 408 performs LPHDR arithmetic operations, as that term is used herein. The input, output, and intermediate "values"

US 10,416,961 B2

11

12

received by, output by, and operated on by the PE **400** may, for example, take the form of electrical signals representing numerical values.

The PE **400** also may have one or more flag bits, shown as Mask **410** in FIG. **4**. The purpose of the Mask **410** is to enable some PEs, the ones in which a specified Mask bit is set, to ignore some instructions issued by the CU **106**. This allows some variation in the usual lock-step behaviors of all PEs in the PEA **104**. For instance, the CU **106** may issue an instruction that causes each PE to reset or set its Mask **410** depending on whether a specified Register in the PE is positive or negative. A subsequent instruction, for instance an arithmetic instruction, may include a bit meaning that the instruction should be performed only by those PEs whose Mask **410** is reset. This combination has the effect of conditionally performing the arithmetic instruction in each PE depending on whether the specified Register in that PE was positive. As with the Compare instructions of traditional computers, there are many possible design choices for mechanisms to set and clear Masks.

The operation of the PEs is controlled by control signals **412**a-d received from the CU **106**, four of which are shown in FIG. **4** merely for purposes of example and not limitation. We have not shown details of this mechanism, but the control signals **412**a-d specify which Register or Constant memory values in the PE **400** or one of its neighbors to send to the data paths, which operations should be performed by the Logic **406** or Arithmetic **408** or other processing mechanisms, where the results should be stored in the Registers, how to set, reset, and use the Mask **410**, and so on. These matters are well described in the literature on SIMD processors.

Many variations of this PE **400** and PEA design are possible and fall within the scope of the present invention. Digital PEs can have shifters, lookup tables, and many other mechanisms such as described in the literature. Analog PEs can have time-based operators, filters, comparators with global broadcast signals and many other mechanisms such as described in the literature. The PEA **104** can include global mechanisms such as wired-OR or wired-AND for digital PEAs or wired-SUM for analog PEAs. Again, there are many variations well described in the literature on digital and analog computing architectures.

For example, LPHDR operations other than and/or in addition to addition and multiplication may be supported. For example, a machine which can only perform multiplication and the function (1−X) may be used to approximate addition and other arithmetic operations. Other collections of LPHDR operations may be used to approximate LPHDR arithmetic operations, such as addition, multiplication, subtraction, and division, using techniques that are well-known to those having ordinary skill in the art.

One aspect of embodiments of the present invention that is unique is the inclusion of LPHDR arithmetic mechanisms in the PEs. Embodiments of such mechanisms will now be described.

One digital embodiment of the LPHDR arithmetic unit **408** operates on digital (binary) representations of numbers. In one digital embodiment these numbers are represented by their logarithms. Such a representation is called a Logarithmic Number System (LNS), which is well-understood by those having ordinary skill in the art.

In an LNS, numbers are represented as a sign and an exponent. There is an implicit base for the logarithms, typically 2 when working with digital hardware. In the present embodiment, a base of 2 is used for purposes of example. As a result, a value, say B, is represented by its sign and a base 2 logarithm, say b, of its absolute value. For numbers to have representation errors of at most, say, 1% (one percent), the fractional part of this logarithm should be represented with enough precision that the least possible change in the fraction corresponds to about a 1% change in the value B. If fractions are represented using 6 bits, increasing or decreasing the fraction by 1 corresponds to multiplying or dividing B by the 64th root of 2, which is approximately 1.011. This means that numbers may be represented in the present embodiment with a multiplicative error of approximately 1%. So, in this example embodiment the fraction part of the representation has 6 bits.

Furthermore, the space of values processed in the present embodiment have high dynamic range. To represent numbers whose absolute value is from, say, one billionth to one billion, the integer part of the logarithm must be long enough to represent plus or minus the base 2 logarithm of one billion. That logarithm is about 29.9. In the present embodiment the integer part of the logarithm representation is 5 bits long to represent values from 0 to 31, which is sufficient. There also is a sign bit in the exponent. Negative logarithms are represented using two's complement representation.

In an LNS, the value zero corresponds to the logarithm negative infinity. One can choose a representation to explicitly represent this special value. However, to minimize resources (for instance, area) used by arithmetic circuits, the present embodiment represents zero by the most negative possible logarithm, which is −32, corresponding to the two's complement bit representation '100000 000000', and denoting a value of approximately 2.33E-10.

When computing, situations can arise in which operations cannot produce reasonable values. An example is when a number is too large to be represented in the chosen word format, such as when multiplying or adding two large numbers or upon divide by zero (or nearly zero). One common approach to this problem is to allow a value to be marked as Not A Number (NAN) and to make sure that each operation produces NAN if a problem arises or if either of its inputs is NAN. The present embodiment uses this approach, as will be described in the following.

FIG. **5** shows the word format **500** for these numbers, in the present embodiment. It has one NAN bit **502**a, one bit **502**b for the sign of the value, and 12 bits **502**c-e representing the logarithm. The logarithm bits include a 5 bit integer part **502**d and a 6 bit fraction part **502**e. To permit the logarithms to be negative, there is a sign bit **502**c for the logarithm which is represented in two's complement form. The NAN bit is set if some problem has arisen in computing the value. The word format **500** shown in FIG. **5** is merely an example and does not constitute a limitation of the present invention. Other variations may be used, so long as they have low precision and high dynamic range.

FIG. **6** shows an example digital implementation of the LPHDR arithmetic unit **408** for the representation illustrated in FIG. **5**. The unit **408** receives two inputs, A **602**a and B **602**b, and produces an output **602**c. The inputs **602**a-b and output **602**c may, for example, take the form of electrical signals representing numerical values according to the representation illustrated in FIG. **5**, as is also true of signals transmitted within the unit **408** by components of the unit **408**. The inputs **602**a-b and output **602**c each are composed of a Value and a NAN (Not A Number) bit. The unit **408** is controlled by control signals **412**a-d, coming from the CU **106**, that determine which available arithmetic operation will be performed on the inputs **602**a-b. In this embodiment, all the available arithmetic operations are performed in parallel on the inputs **602**a-b by adder/subtractor **604**, mul-

US 10,416,961 B2

13

tiplier **606**, and divider **608**. Adder/subtractor **604** performs LPHDR addition and subtraction, multiplier **606** performs LPHDR multiplication, and divider **608** performs LPHDR division.

The desired result (from among the outputs of adder/subtractor **604**, multiplier **606**, and divider **608**) is chosen by the multiplexers (MUXes) **610***a* and **610***b*. The right hand MUX **610***b* sends the desired value to the output **602***c*. The left hand MUX **610***a* sends the corresponding NAN bit from the desired operation to the OR gate **612**, which outputs a set NAN bit if either input is NAN or if the specified arithmetic operation yields NAN. The computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. **6**.

LNS arithmetic has the great advantage that multiplication (MUL) and division (DIV) are very easy to compute and take few physical resources (e.g., little area in a silicon implementation). The sign of the result is the exclusive-or of the signs of the operands. The logarithm part of the output is the sum, in the case of MUL, or the difference, in the case of DIV, of the logarithm parts of the operands. The sum or difference of the logarithms can overflow, producing a NAN result. Certain other operations also are easy in LNS arithmetic. For instance, square root corresponds to dividing the logarithm in half, which in our representation means simply shifting it one bit position to the right.

Thus, the multiplier **606** and divider **608** in FIG. **6** are implemented as circuits that simply add or subtract their inputs, which are two's complement binary numbers (which in turn happen to be logarithms). If there is overflow, they output a 1 for NAN.

Implementing addition and subtraction in LNS, that is, the adder/subtractor **604** in FIG. **6**, follows a common approach used in the literature on LNS. Consider addition. If we have two positive numbers B and C represented by their logarithms b and c, the representation of the sum of B and C is log(B+C). An approach to computing this result that is well known to those skilled in the art is based on noticing that log(B+C)=log(B*(1+C/B))=log(B)+log(1+C/B)=b+F(c−b) where F(x)=log(1+2^/\x). Thus, the present embodiment computes c-b, feeds that through F, and adds the result to b, using standard digital techniques known to those skilled in the art.

Much of the published literature about LNS is concerned with how to compute F(x), the special function for ADD, along with a similar function for SUB. Often these two functions share circuitry, and this is why a single combined adder/subtractor **604** is used in the embodiment of FIG. **6**. There are many published ways to compute these functions or approximations to them, including discussions of how to do this when the values are of low precision. Any such method, or other method, may be used. Generally speaking, the more appropriate variations for massively parallel LPHDR arithmetic are those that require the minimal use of resources, such as circuit area, taking advantage of the fact that the representation used in the embodiment of FIG. **6** is low precision and that the arithmetic operations need not be deterministic nor return the most accurate possible answer within the low precision representation. Thus, embodiments of the present invention may use circuitry that does not compute the best possible answer, even among the limited choices available in a low precision representation.

In order to enable conditional operation of selected PEs, the present embodiment is able to reset and set the MASK flag **410** based on results of computations. The mechanism for doing this is that the CU **106** includes instructions that cause the MASK **410** in each PE to unconditionally reset or

14

set its flag along with other instructions to perform basic tests on values entering the MASK **410** on data path **402***f* and to set the flag accordingly. Examples of these latter instructions include copying the sign bit or NAN bit of the word on data path **402***f* into the MASK bit **410**. Another example is to set the MASK bit **410** if the 12 bit value part of the word on data path **402***f* is equal to binary zero. There are many additional and alternative ways for doing this that are directly analogous to comparison instructions in traditional processors and which are well understood by those skilled in the art.

It is worth noting that while the obvious method of using the above LNS operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values, since that is precisely their behavior in LNS implementations. The Mask setting instructions can compare these simple binary values. So besides doing LPHDR computations, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Some embodiments of the present invention may include analog representations and processing methods. Such embodiments may, for example, represent LPHDR values as charges, currents, voltages, frequencies, pulse widths, pulse densities, various forms of spikes, or in other forms not characteristic of traditional digital implementations. There are many such representations discussed in the literature, along with mechanisms for processing values so represented. Such methods, often called Analog methods, can be used to perform LPHDR arithmetic in the broad range of architectures we have discussed, of which SIMD is one example.

An example of an analog SIMD architecture is the SCAMP design (and related designs) of Dudek. In that design values have low dynamic range, being accurate roughly to within 1%. Values are represented by charges on capacitors. Those capacitors typically are the gates of transistors. Each PE has several memory cells, analogous to the Registers shown in FIG. **4**. Addition is performed by turning on pass transistors from the two operands, which transfer their charge onto an analog bus, where it is summed by the natural physics of charge and wires, upon which it is gated onto another Register to charge up its capacitor, which then represents the sum of the operands. The detailed mechanism disclosed by Dudek actually produces the negative of the sum, but the basic concept is as described and is a simple way to perform addition and subtraction using analog representations and simple processing mechanisms.

Variations of the SCAMP design have been fabricated and used to perform a range of low precision, low dynamic range computations related to image processing. These designs do not perform high dynamic range arithmetic, nor do they include mechanisms for performing multiplication or division of values stored in Registers. However, the Dudek designs suggest the general feasibility of constructing analog SIMD machines. The following describes how to build an analog SIMD machine that performs LPHDR arithmetic, and is thus an embodiment of the present invention.

One embodiment of the present invention represents values as a mixture of analog and digital forms. This embodiment represents values as low precision, normalized, base 2 floating point numbers, where the mantissa is an analog value and the exponent is a binary digital value. The analog value may be accurate to about 1%, following the approach of Dudek, which is well within the range of

US 10,416,961 B2

15

reasonable analog processing techniques. The exponent may be 6 bits long, or whatever is needed to provide the desired high dynamic range.

To multiply values, the embodiment proceeds by analogy to traditional analog floating point methods. The digital exponents are summed using a binary arithmetic adder, a standard digital technique. The analog mantissas are multiplied. Since they represent normalized values between approximately ½ and 1, their product may be as small as approximately ¼. Such a product value needs to be normalized back to the range ½ to 1. This is done, in the present embodiment, by comparing the analog mantissa to an analog representation of ½, using a threshold circuit. If the mantissa is below ½, then it is doubled and one is subtracted from the exponent, where such subtraction is simple digital subtraction. Doubling the mantissa is implemented in a way that corresponds to the chosen analog representation. For example, whatever means are being used to add two analog values can be used to double the mantissa, by adding it to a copy of itself. For example, if the mantissa is represented as a current, such as copy may be produced by a current mirror, or other suitable mechanism, and addition may be performed by a current summing junction.

The means of multiplying the original analog mantissas depends on the representation chosen. For example, if mantissas are represented as charge, following SCAMP, then any known method from the literature may be used to convert charge to current. For instance, since the charge on a capacitor determines the voltage on the capacitor, this may be implemented as a conversion from voltage to current, which is a basic technique in analog electronics known to those skilled in the art. In any case, if the mantissas are represented as currents, or once the mantissas are converted to currents, they may be multiplied using, for instance, the techniques of Gilbert. The Gilbert multiplier produces a current, representing the product, which may, if necessary, then be converted back to charge (or whatever representation is used). These are merely examples of how the needed operations might be performed. The literature discusses these matters extensively and these kinds of analog circuits are known to those skilled in the art.

Adding and subtracting values requires pre-normalization of the values to the same exponent, as is done in traditional digital floating point arithmetic. The present embodiment does this by comparing the exponents and choosing the smaller one. Then the smaller one is subtracted from the larger, using digital means. The difference specifies how many times the mantissa which corresponds to the smaller exponent needs to be divided in half. If that mantissa is represented by (or converted to) a current, then an analog R-2R style ladder may be used to divide the current in half the required number of times, with the stage of the ladder specified by the difference of exponents calculated as above. The resulting scaled down current is added to (or subtracted from, if this is an LPHDR subtraction operation) the current corresponding to the mantissa associated with the larger exponent to yield the output mantissa. The output exponent associated with the output mantissa is the larger exponent. Post-normalization may be needed at this point. If the output mantissa is greater than 1, then it needs to be divided in half and the output exponent needs to be incremented. If it is less than ½, then it needs to be doubled enough times to exceed ½ and the output exponent must be decremented correspondingly, which may be performed by a series of threshold circuits, doubler circuits, and associated decrementer circuits. These increments and decrements of the binary digital exponent, and corresponding doublings and halvings of the

16

analog mantissa current, are straightforward operations well known to those skilled in the art.

The present embodiment represents the exponent as a digital binary number. Alternate embodiments may represent the exponent as an analog value. However, it is important that the exponent be represented in storage and computation in such a manner that neither noise nor other errors cause a change in the value it represents. Such changes in the exponent could introduce factors of two (or in some embodiments larger) changes in the values of the stored numbers. To maintain accuracy of the exponents, an embodiment may quantize the exponent to relatively few levels, for instance 16 values plus a sign bit. During processing, slight variations in the analog representation of the exponent may then be removed by circuitry that restores values to the 16 standard quantization levels. To get sufficient dynamic range in such an embodiment, the floating point numbers may be processed as base 4 numbers, rather than the usual base 2 numbers. This means, for instance, that normalized mantissas are in the range ¼ to 1. The methods discussed above for addition, subtraction, and multiplication apply as described, with slight and straightforward variations.

The analog and mixed signal embodiments discussed above are merely examples and do not constitute a limitation of the present invention. The published literature on neuromorphic, analog, and mixed signal techniques provides a wealth of methods that enable LPHDR storage and processing to be implemented. Such storage and processing may introduce noise as well as fabrication errors into the behavior of machines performing LPHDR arithmetic. The results we present below, on software applications running using "fp+noise" arithmetic, show that despite these very "un-digital" qualities a machine built in this way is surprisingly useful.

Evidence that LPHDR arithmetic is useful in several important practical computing applications will now be provided. The evidence is presented for a broad variety of embodiments of the present invention, thereby showing that the usefulness does not depend much on the detailed implementation.

For the goal of showing usefulness, we choose a very general embodiment of an LPHDR machine. Our model of the machine is that it provides at least the following capabilities: (1) is massively parallel, (2) provides LPHDR arithmetic possibly with noise, (3) provides a small amount of memory local to each arithmetic unit, (4) provides the arithmetic/memory units in a two-dimensional physical layout with only local connections between units (rather than some more powerful, flexible, or sophisticated connection mechanism), and (5) provides only limited bandwidth between the machine and the host machine. Note that this model is merely an example which is used for the purpose of demonstrating the utility of various embodiments of the present invention, and does not constitute a limitation of the present invention. This model includes, among others, implementations that are digital or analog or mixed, have zero or more noise, have architectures which are FPGA-like, or SIMD-like, or MIMD-like, or otherwise meet the assumptions of the model. More general architectures, such as shared memory designs, GPU-like designs, or other sophisticated designs subsume this model's capabilities, and so LPHDR arithmetic in those architectures also is useful. While we are thus showing that LPHDR arithmetic is useful for a broad range of designs, of which SIMD is only an instance, for purpose of discussion below, we call each unit, which pairs memory with arithmetic, a Processing Element or "PE".

US 10,416,961 B2

17

18

Several applications are discussed below. For each, the discussion shows (1) that the results are useful when computation is performed in possibly noisy LPHDR arithmetic, and (2) that the computation can be physically laid out in two dimensions with only local flow of data between units, only limited memory within each unit, and only limited data flow to/from the host machine, in such a way that the computation makes efficient use of the machine's resources (area, time, power). The first requirement is referred to as "Accuracy" and the second requirement "Efficiency." Applications that meet both requirements running in this model will function well on many kinds of LPHDR machines, and thus those machines are a broadly useful invention.

Applications are tested using two embodiments for the machine's arithmetic. One uses accurate floating point arithmetic but multiplies the result of each arithmetic operation by a uniformly chosen random number between 0.99 and 1.01. In the following discussion, this embodiment is denoted "fp+noise". It may represent the results produced by an analog embodiment of the machine.

A second embodiment uses logarithmic arithmetic with a value representation as shown in FIG. **5**. The arithmetic is repeatable, that is, not noisy, but because of the short fraction size it produces errors of up to approximately 1-2% in each operation. In the following discussion, this embodiment is denoted "1 ns". It may represent the results produced by a particular digital embodiment of the machine.

To demonstrate usefulness of embodiments of the invention, we shall discuss three computational tasks that are enabled by embodiments of the invention and which in turn enable a variety of practical applications. Two of the tasks are related to finding nearest neighbors and the other is related to processing visual information. We shall describe the tasks, note their practical application, and then demonstrate that each task is solvable using the general model described above and thus solvable using embodiments of the present invention.

Application 1: Finding Nearest Neighbors

Given a large set of vectors, called Examples, and a given vector, called Test, the nearest neighbor problem ("NN") is to find the Example which is closest to Test where the distance metric is the square of the Euclidean distance (sum of squares of distances between respective components).

NN is a widely useful computation. One use is for data compression, where it is called "vector quantization". In this application we have a set of relatively long vectors in a "code book" (these are the Examples) and associated short code words (for instance the index of the vector in the code book). We move through a sequence of vectors to be compressed, and for each such vector (Test), find the nearest vector in the code book and output the corresponding code word. This reduces the sequence of vectors to the shorter sequence of code words. Because the code words do not completely specify the original sequence of vectors, this is a lossy form of data compression. Among other applications, it may be used in speech compression and in the MPEG standards.

Another application of NN would be in determining whether snippets of video occur in a large video database. Here we might abstract frames of video from the snippet into feature vectors, using known methods, such as color histograms, scale invariant feature extraction, etc. The Examples would be analogous feature vectors extracted from the video

database. We would like to know whether any vector from the snippet was close to any vector from the database, which NN can help us decide.

In many applications of nearest neighbor, we would prefer to find the true nearest neighbor but it is acceptable if we sometimes find another neighbor that is only slightly farther away or if we almost always find the true nearest neighbor. Thus, an approximate solution to the nearest neighbor problem is useful, especially if it can be computed especially quickly, or at low power, or with some other advantage compared to an exact solution.

We shall now show that approximate nearest neighbor is computable using embodiments of the present invention in a way that meets the criteria of Accuracy and Efficiency.

Algorithm. The following describes an algorithm which may be performed by machines implemented according to embodiments of the present invention, such as by executing software including instructions for performing the algorithm. The inputs to the algorithm are a set of Examples and a Test vector. The algorithm seeks to find the nearest (or almost nearest) Example to the Test.

In the simplest version of the algorithm, the number of Examples may be no larger than the number of PEs and each vector must be short enough to fit within a single PE's memory. The Examples are placed into the memories associated with the PEs, so that one Example is placed in each PE. Given a Test, the Test is passed through all the PEs, in turn. Accompanying the Test as it passes through the PEs is the distance from the Test to the nearest Example found so far, along with information that indicates what PE (and thus what Example) yielded that nearest Example found so far. Each PE computes the distance between the Test and the Example stored in that PE's memory, and then passes along the Test together with either the distance and indicator that was passed into this PE (if the distance computed by this PE exceeded the distance passed into the PE) or the distance this PE computed along with information indicating this PE's Example is the nearest so far (if the distance computed by this PE is less than the distance passed into the PE). Thus, the algorithm is doing a simple minimization operation as the Test is passed through the set of PEs. When the Test and associated information leave the last PE, the output is a representation of which PE (and Example) was closest to the Test, along with the distance between that Example and the Test.

In a more efficient variant of this algorithm, the Test is first passed along, for example, the top row, then every column passes the Test and associated information downward, effectively doing a search in parallel with other columns, and once the information reaches the bottom it passes across the bottom row computing a minimum distance Example of all the columns processed so far as it passes across the row. This means that the time required to process the Test is proportional to (the greater of) the number of PEs in a row or column.

An enhancement of this algorithm proceeds as above but computes and passes along information indicating both the nearest and the second nearest Example found so far. When this information exits the array of PEs, the digital processor that is hosting the PE array computes (in high precision) the distance between the Test and the two Examples indicated by the PE array, and the nearer of the two is output as the likely nearest neighbor to the Test.

Accuracy. We expressed the arithmetic performed by the enhanced algorithm described above as code in the C programming language. That code computes both nearest

US 10,416,961 B2

**19**

neighbors, which are discussed here, along with weighted scores, which are discussed below.

The C code performs the same set of arithmetic operations in the same order using the same methods of performing arithmetic as an actual implementation of the present invention, such as one implemented in hardware. It thus yields the same results as the enhanced algorithm would yield when running on an implementation of the present invention. (How the algorithm is organized to run efficiently on such an implementation is discussed below in the section on Efficiency.)

In particular, when computing the distance between the Test and each Example, the code uses Kahan's algorithm, discussed below, to perform the possibly long summation required to form the sum of the squares of the distances between vector components of the Test and Example.

The C code contains several implementations for arithmetic, as discussed above. When compiled with "#define fp" the arithmetic is done using IEEE standard floating point. If a command line argument is passed in to enable noisy arithmetic, then random noise is added to the result of every calculation. This is the "fp+noise" form of arithmetic. When compiled without "#define fp" the arithmetic is done using low precision logarithmic arithmetic with a 6 bit base-2 fraction. This is the "1 ns" form of arithmetic.

When the code was run it produced traces showing the results of the computations it performed. These traces, shown below, show that with certain command line arguments the enhanced algorithm yielded certain results for LPHDR nearest neighbor calculations. These results provide details showing the usefulness of this approach. We shall discuss the results briefly here.

The first results are for "fp+noise". Ten distinct runs were performed. Each run generated one million random Example vectors of length five, where each component of each vector was drawn from N(0,1)—the Gaussian (normal) distribution with mean zero and standard deviation 1. Each run then generated one hundred Test vectors of length five, where each component of each vector also was drawn from N(0,1). For each Test, the nearest neighbor was computed both according to the enhanced algorithm above and according to the standard nearest neighbor method using high precision floating point arithmetic. A count was kept of the number of times the enhanced algorithm yielded the same result as the standard floating point method. The results were as follows:
% ./a.out 5 10 1000000 100 1
Representation is Floating Point with noise.
Run 1. On 100 tests, 100(100.0%) matches and 0.81% mean score error.
Run 2. On 100 tests, 100(100.0%) matches and 0.84% mean score error.
Run 3. On 100 tests, 100(100.0%) matches and 0.98% mean score error.
Run 4. On 100 tests, 100(100.0%) matches and 0.81% mean score error.
Run 5. On 100 tests, 100(100.0%) matches and 0.94% mean score error.
Run 6. On 100 tests, 100(100.0%) matches and 0.82% mean score error.
Run 7. On 100 tests, 100(100.0%) matches and 0.78% mean score error.
Run 8. On 100 tests, 100(100.0%) matches and 0.86% mean score error.
Run 9. On 100 tests, 100(100.0%) matches and 0.85% mean score error.
Run 10. On 100 tests, 99(99.0%) matches and 0.86% mean score error.

**20**

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.90%.
Average score error between LPHDR and DP=0.85%.

The "mean score error" values are considered below in the discussion of weighted scores. The "matches" information is relevant here.

Of the ten runs, only one had any test, of the 100 tests performed, which yielded a nearest neighbor different from what the usual high precision method yielded. Thus, the average percentage of matches between the enhanced algorithm running with "fp+noise" arithmetic and the usual method was 99.9%.

A similar computation was then performed using "1 ns" arithmetic. In this case, the results were:
% ./a.out 5 10 1000000 100 0
Representation is LNS without noise.
Run 1. On 100 tests, 100(100.0%) matches and 0.15% mean score error.
Run 2. On 100 tests, 100(100.0%) matches and 0.07% mean score error.
Run 3. On 100 tests, 100(100.0%) matches and 0.08% mean score error.
Run 4. On 100 tests, 100(100.0%) matches and 0.09% mean score error.
Run 5. On 100 tests, 100(100.0%) matches and 0.11% mean score error.
Run 6. On 100 tests, 100(100.0%) matches and 0.16% mean score error.
Run 7. On 100 tests, 100(100.0%) matches and 0.07% mean score error.
Run 8. On 100 tests, 100(100.0%) matches and 0.13% mean score error.
Run 9. On 100 tests, 99(99.0%) matches and 0.17% mean score error.
Run 10. On 100 tests, 98(98.0%) matches and 0.16% mean score error.
Average percentage of time LPHDR (with final DP correction) finds nearest example=99.70%.
Average score error between LPHDR and DP=0.12%.

The average percentage of matches was 99.7%, slightly worse than for "fp+noise".

The accuracy shown by the enhanced nearest neighbor algorithm using two forms of LPHDR arithmetic is surprising. To perform many calculations sequentially with 1% error and yet produce a final result with less than 1% error may seem counter-intuitive. Nonetheless, the LPHDR arithmetic proves effective, and the accuracy shown is high enough to be useful in applications for which approximate nearest neighbor calculations are useful.

As an extreme case, a variant of fp+noise was tested in which the noise varied uniformly from +10% to −5%. Thus, each arithmetic operation produced a result that was between 10% too large and 5% too small. The enhanced nearest neighbor algorithm, as described above, was performed where each run generated 100,000 Example vectors. The surprising results, below, show that even with this extreme level of imprecise, noisy, and non-zero mean LPHDR arithmetic, useful results can be achieved.
Run 1. On 100 tests, 97(97.0%) matches.
Run 2. On 100 tests, 100(100.0%) matches.
Run 3. On 100 tests, 100(100.0%) matches.
Run 4. On 100 tests, 98(98.0%) matches.
Run 5. On 100 tests, 98(98.0%) matches.
Run 6. On 100 tests, 99(99.0%) matches.
Run 7. On 100 tests, 99(99.0%) matches.

US 10,416,961 B2

21

Run 8. On 100 tests, 99(99.0%) matches.
Run 9. On 100 tests, 99(99.0%) matches.
Run 10. On 100 tests, 99(99.0%) matches.
Average percentage of time LPHDR (with final DP correction) finds nearest example=98.80%.

Efficiency. In contrast to the surprising Accuracy results, it is clear to those having ordinary skill in the art that the calculations of the enhanced nearest neighbor algorithm can be performed efficiently in the computing model presented, where the arithmetic/memory units are connected in a two-dimensional physical layout, using only local communication between PEs. However, this does not address the matter of keeping the machine busy doing useful work using only low bandwidth to the host machine.

When computing the nearest neighbor to a single Test, the Test flows across all the PEs in the array. As discussed above, if the array is an M×M grid, it takes at least O(M) steps for the Test to pass through the machine and return results to the host. During this time the machine performs O(M×M) nearest neighbor distance computations, but since the machine is capable of performing O(M×M) calculations at each step, a factor of O(M) is lost.

This speedup, compared to a serial machine, of a factor of O(M) is significant and useful. However, the efficiency can be even higher. If sufficiently many Test vectors, say O(M), or more, are to be processed then they can be streamed into the machine and made to flow through in a pipelined fashion. The time to process O(M) Tests remains O(M), the same as for a single Test, but now the machine performs O(M)×O(M×M) distance computations, and thus within a constant factor the full computing capacity of the machine is used.

Thus, the machine is especially efficient if it is processing at least as many Test vectors as the square root of the number of PEs. There are applications that fit well into this form, such as pattern recognition or compression of many independent Tests (e.g., blocks of an image, parts of a file, price histories of independent stocks) as well as the problem of finding the nearest neighbor to every Example in the set of Examples. This is in contrast to the general view among those having ordinary skill in the art, as discussed above, that machines with very many arithmetic processing elements on a single chip, or similar, are not very useful.

Application 2: Distance Weighted Scoring

A task related to Nearest Neighbor is Distance Weighted Scoring. In this task, each Example has an associated Score. This is a number that in some way characterizes the Example. For instance, if the Examples are abstractions of the history of prices of a given stock, the Scores might be historical probabilities of whether the price is about to increase or decrease. Given a Test vector, the task is to form a weighted sum of the Scores of all the Examples, where the weights are a diminishing function of the distance from the Test to the respective Examples. For example, this weighted score might be taken as a prediction of the future price of the stock whose history is represented by the Test. This use of embodiments of the invention might help support, for instance, high speed trading of stocks, as is performed by certain "quantitative" hedge funds, despite the general view by those having ordinary skill in the art that low precision computation is not of use in financial applications.

The C code described above computes weighted scores along with nearest neighbors. The scores assigned to Examples in this computation are random numbers drawn uniformly from the range [0,1]. The weight for each

22

Example in this computation is defined to be the unnormalized weight for the Example divided by the sum of the un-normalized weights for all Examples, where the un-normalized weight for each Example is defined to be the reciprocal of the sum of one plus the squared distance from the Example to the Test vector. As discussed above, the code performs a number of runs, each producing many Examples and Tests, and compares results of traditional floating point computations with results calculated using fp+noise and 1 ns arithmetic.

Looking again at the trace results of running the simulation, above, we see that for fp+noise the LPHDR weighted scores on average were within 0.85% of the correct value and never were as much as 1% different. For 1 ns arithmetic the errors were even smaller, averaging just 0.12% error.

These results are surprising given that computing an overall weighted score involves summing the individual weighted scores associated with each Example. Since each run was processing 1,000,000 Examples, this means that the sums were over one million small positive values. The naive method of summing one million small values with errors of about 1% in each addition should yield results that approximate noise. However, the code performs its sums using a long known method invented by Kahan (Kahan, William (January 1965), "Further remarks on reducing truncation errors", Communications of the ACM 8 (1): 40). The method makes it feasible to perform long sums, such as are done for Distance Weighted Scores, or as might be used in computational finance when computing prices of derivative securities using Monte Carlo methods, or for performing deconvolution in image processing algorithms, as will be discussed next.

The Efficiency of this algorithm is similar to that of NN, as discussed earlier. If many Test vectors are processed at once, the machine performs especially efficiently.

Application 3: Removing Motion Blur in Images

In order to gather sufficient light to form an image, camera shutters are often left open for long enough that camera motion can cause blurring. This can happen as a result of camera shake in inexpensive consumer cameras as well as with very expensive but fast moving cameras mounted on satellites or aircraft. If the motion path of the camera is known (or can be computed) then the blur can be substantially removed using various deblurring algorithms. One such algorithm is the Richardson-Lucy method ("RL"), and we show here that embodiments of the present invention can run that algorithm and produce useful results. Following the discussion format above, we discuss criteria of Accuracy and Efficiency.

Algorithm. The Richardson-Lucy algorithm is well known and widely available. Assume that an image has been blurred using a known kernel. In particular, assume that the kernel is a straight line and that the image has been oriented so that the blur has occurred purely in a horizontal direction. Consider the particular kernel for which the J'th pixel in each row of the blurred image is the uniformly weighted mean of pixels J through J+31 in the original unblurred image.

Accuracy. We implemented in the C programming language a straightforward version of the RL method that uses LPHDR arithmetic. The program reads a test image, blurs it using the kernel discussed above, then deblurs it using either fp+noise or 1 ns arithmetic. The RL algorithm computes sums, such as when convolving the kernel with the current approximation of the deblurred image. Our implementation

US 10,416,961 B2

23                                          24

computes these sums using the Kahan method, discussed earlier. FIG. **7** shows the test image in original form. It is a satellite picture of a building used during Barack Obama's inauguration. FIG. **8** shows the image extremely blurred by the kernel. It is difficult to see any particular objects in this image. FIG. **9** shows the result of deblurring using standard floating point arithmetic. FIG. **10** shows the result of deblurring using fp+noise arithmetic, and FIG. **11** shows the result of deblurring using 1 ns arithmetic. In all these cases the image is sufficiently restored that it is possible to recognize buildings, streets, parking lots, and cars.

In addition to displaying the images herein for judgement using the human eye, we computed a numerical measure of deblurring performance. We computed the mean difference, over all pixels in the image, between each original pixel value (a gray scale value from 0 to 255) and the corresponding value in the image reconstructed by the RL method. Those numerical measures are shown below in

Table 1:

TABLE 1

| Image type | Mean pixel error |
|---|---|
| Blurred | 32.0 |
| RL using standard floating point | 13.0 |
| RL using fp + noise | 13.8 |
| RL using lns | 14.8 |

These results, together with the subjective but important judgements made by the human eye, show that LPHDR arithmetic provides a substantial and useful degree of deblurring compared to standard floating point arithmetic. Further, in this example we chose an extreme degree of blurring, to better convey the concept and visual impact of the deblurring using LPHDR arithmetic. On more gentle and typical blur kernels, the resulting deblurred images are much closer to the originals than in this case, as can be seen by shrinking the kernel length and running the RL algorithm with LPHDR arithmetic on those more typical cases.

Efficiency. It is clear to those with ordinary skill in the art that Richardson-Lucy using a local kernel performs only local computational operations. An image to be deblurred can be loaded into the PE array, storing one or more pixels per PE, the deconvolution operation of RL can then be iterated dozens or hundreds of times, and the deblurred image can be read back to the host processor. As long as sufficient iterations are performed, this makes efficient use of the machine.

An extreme form of image deblurring is the Iterative Reconstruction method used in computational tomography. Reconstructing 3D volumes from 2D projections is an extremely computational task. The method discussed above generalizes naturally to Iterative Reconstruction and makes efficient use of the machine.

Among the advantages of embodiments of the invention are one or more of the following.

PEs implemented according to certain embodiments of the present invention may be relatively small for PEs that can do arithmetic. This means that there are many PEs per unit of resource (e.g., transistor, area, volume), which in turn means that there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs. For instance, a digital embodiment of the present invention built as a large silicon chip fabricated with current state of the art technology might perform tens of thousand of arithmetic operations per cycle,

as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. These ratios reflect an architectural advantage of embodiments of the present invention that should persist as fabrication technology continues to improve, even as we reach nanotechnology or other implementations for digital and analog computing.

Doing arithmetic with few resources generally means, and in the embodiments shown specifically means, that the arithmetic is done using low power. As a result, a machine implemented in accordance with embodiments of the present invention can have extremely high performance with reasonable power (for instance in the tens of watts) or low power (for instance a fraction of a watt) with reasonably high performance. This means that such embodiments may be suitable for the full range of computing, from supercomputers, through desktops, down to mobile computing. Similarly, and since cost is generally associated with the amount of available resources, embodiments of the present invention may provide a relatively high amount of computing power per unit of cost compared to conventional computing devices.

The SIMD architecture is rather old and is frequently discarded as an approach to computer design by those having ordinary skill in the art. However, if the processing elements of a SIMD machine can be made particularly small while retaining important functionality, such as general arithmetic ability, the architecture can be useful. The embodiments presented herein have precisely those qualities.

The discovery that massive amounts of LPHDR arithmetic is useful as a fairly general computing framework, as opposed to the common belief that it is not useful, can be an advantage in any (massively or non-massively) parallel machine design or non-parallel design, not just in SIMD embodiments. It could be used in FPGAs, FPAAs, GPU/ SIMT machines, MIMD machines, and in any kind of machine that uses compact arithmetic processing elements to perform large amounts of computation using a small amount of resources (like transistors or volume).

Another advantage of embodiments of the present invention is that they are not merely useful for performing computations efficiently in general, but that they can be used to tackle a variety of real-world problems which are typically assumed to require high-precision computing elements, even though such embodiments include only (or predominantly) low-precision computing elements. Although several examples of such real-world problems have been presented herein, and although we have also had success implementing non-bonded force field computations for molecular dynamics simulation and other tasks, these are merely examples and do not constitute an exhaustive set of the real-world problems that embodiments of the present invention may be used to solve.

The embodiments disclosed above are merely examples and do not constitute limitations of the present invention. Rather, embodiments of the present invention may be implemented in a variety of other ways, such as the following.

For example, embodiments of the present invention may represent values in any of a variety of ways, such as by using digital or analog representations, such as fixed point, logarithmic, or floating point representations, voltages, currents, charges, pulse width, pulse density, frequency, probability, spikes, timing, or combinations thereof. These underlying representations may be used individually or in combination to represent the LPHDR values. LPHDR arithmetic circuits may be implemented in any of a variety of ways, such as by using various digital methods (which may be parallel or

US 10,416,961 B2

25

26

serial, pipelined or not) or analog methods or combinations thereof. Arithmetic elements may be connected using various connection architectures, such as nearest 4, nearest 8, hops of varying degree, and architectures which may or may not be rectangular or grid-like. Any method may be used for communication among arithmetic elements, such as parallel or serial, digital or analog or mixed-mode communication. Arithmetic elements may operate synchronously or asynchronously, and may operate globally simultaneously or not. Arithmetic elements may be implemented, for example, on a single physical device, such as a silicon chip, or spread across multiple devices and an embodiment built from multiple devices may have its arithmetic elements connected in a variety of ways, including for example being connected as a grid, torus, hypercube, tree, or other method. Arithmetic elements may be connected to a host machine, if any, in a variety of ways, depending on the cost and bandwidth and other requirements of a particular embodiment. For example there may be many host machines connected to the collection of arithmetic elements.

Although certain embodiments of the present invention are described as being implemented as a SIMD architecture, this is merely an example and does not constitute a limitation of the present invention. For example, embodiments of the present invention may be implemented as reconfigurable architectures, such as but not limited to programmable logic devices, field programmable analog arrays, or field programmable gate array architectures, such as a design in which existing multiplier blocks of an FPGA are replaced with or supplemented by LPHDR arithmetic elements of any of the kinds disclosed herein, or for example in which LPHDR elements are included in a new or existing reconfigurable device design. As another example, embodiments of the present invention may be implemented as a GPU or SIMT-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR elements could supplement or replace traditional arithmetic elements in current or new graphics processing unit designs. As yet another example, embodiments of the present invention may be implemented as a MIMD-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR arithmetic elements could supplement or replace traditional arithmetic elements in current or new MIMD computing system designs. As yet another example, embodiments of the present invention may be implemented as any kind of machine, including a massively parallel machine, which uses compact arithmetic processing elements to provide large amounts of arithmetic computing capability using a small amount of resources (for example, transistors or area or volume) compared with traditional architectures.

Although certain embodiments of the present invention are described herein as executing software, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using microcode or a hardware sequencer or state machine or other controller to control LPHDR arithmetic elements of any of the kinds disclosed herein. Alternatively, for example, embodiments of the present invention may be implemented using hard-wired, burned, or otherwise pre-programmed controllers to control LPHDR arithmetic elements of any of the kinds disclosed herein.

Although certain embodiments of the present invention are described herein as being implemented using custom silicon as the hardware, this is merely an example and does not constitute a limitation of the present invention. Alterna-

tively, for example, embodiments of the present invention may be implemented using FPGA or other reconfigurable chips as the underlying hardware, in which the FPGAs or other reconfigurable chips are configured to perform the LPHDR operations disclosed herein. As another example, embodiments of the present invention may be implemented using any programmable conventional digital or analog computing architecture (including those which use high-precision computing elements, including those which use other kinds of non-LPHDR hardware to perform LPHDR arithmetic, and including those which are massively parallel) which has been programmed with software to perform the LPHDR operations disclosed herein. For example, embodiments of the present invention may be implemented using a software emulator of the functions disclosed herein.

As yet another example, embodiments of the present invention may be implemented using 3D fabrication technologies, whether based on silicon chips or otherwise. Some example embodiments are those in which a memory chip has been bonded onto a processor or other device chip or in which several memory and/or processor or other device chips have been bonded to each other in a stack. 3D embodiments of the present invention are very useful as they may be denser than 2D embodiments and may enable 3D communication of information between the processing units, which enables more algorithms to run efficiently on those embodiments compared to 2D embodiments.

Although certain embodiments of the present invention are described herein as being implemented using silicon chip fabrication technology, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using technologies that may enable other sorts of traditional digital and analog computing processors or other devices. Examples of such technologies include various nanomechanical and nanoelectronic technologies, chemistry based technologies such as for DNA computing, nanowire and nanotube based technologies, optical technologies, mechanical technologies, biological technologies, and other technologies whether based on transistors or not that are capable of implementing LPHDR architectures of the kinds disclosed herein.

Certain embodiments of the present invention have been described as "massively parallel" embodiments. Although certain embodiments of the present invention may include thousands, millions, or more arithmetic units, embodiments of the present invention may include any number of arithmetic units (as few as one). For example, even an embodiment which includes only a single LPHDR unit may be used within a serial processing unit or other device to provide a significant amount of LPHDR processing power in a small, inexpensive processor or other device.

For certain embodiments of the present invention, even if implemented using only digital techniques, the arithmetic operations may not yield deterministic, repeatable, or the most accurate possible results within the chosen low precision representation. For instance, on certain specific input values, an arithmetic operation may produce a result which is not the nearest value in the chosen representation to the true arithmetic result.

The degree of precision of a "low precision, high dynamic range" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, in certain embodiments, a LPHDR arithmetic element produces results which are sometimes (or all of the

US 10,416,961 B2

27                                                           28

time) no closer than 0.05% to the correct result (that is, the absolute value of the difference between the produced result and the correct result is no more than one-twentieth of one percent of the absolute value of the correct result). As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.1% to the correct result. As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.2% to the correct result. As yet another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.5% to the correct result. As yet further examples, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 1%, or 2%, or 5%, or 10%, or 20% to the correct result.

Besides having various possible degrees of precision, implementations may vary in the dynamic range of the space of values they process. For example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one millionth to one million. As another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one billionth to one billion. As yet another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one sixty five thousandth to sixty five thousand. As yet further examples, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range from any specific value between zero and one sixty five thousandth up to any specific value greater than sixty five thousand. As yet further examples, other embodiments may process values in spaces with dynamic ranges that may combine and may fall between the prior examples, for example ranging from approximately one billionth to ten million. In all of these example embodiments of the present invention, as well as in other embodiments, the values that we are discussing may be signed, so that the above descriptions characterize the absolute values of the numbers being discussed.

The frequency with which LPHDR arithmetic elements may yield only approximations to correct results may vary from implementation to implementation. For example, consider an embodiment in which LPHDR arithmetic elements can perform one or more operations (perhaps including, for example, trigonometric functions), and for each operation the LPHDR elements each accept a set of inputs drawn from a range of valid values, and for each specific set of input values the LPHDR elements each produce one or more output values (for example, simultaneously computing both sin and cos of an input), and the output values produced for a specific set of inputs may be deterministic or non-deterministic. In such an example embodiment, consider further a fraction F of the valid inputs and a relative error amount E by which the result calculated by an LPHDR element may differ from the mathematically correct result. In certain embodiments of the present invention, for each LPHDR arithmetic element, for at least one operation that the LPHDR unit is capable of performing, for at least fraction F of the possible valid inputs to that operation, for at least one output signal produced by that operation, the statistical mean, over repeated execution, of the numerical values represented by that output signal of the LPHDR unit, when executing that operation on each of those respective inputs, differs by at least E from the result of an exact mathematical calculation of the operation on those same input values, where F is 1% and E is 0.05%. In several other example

embodiments, F is not 1% but instead is one of 2%, or 5%, or 10%, or 20%, or 50%. For each of these example embodiments, each with some specific value for F, there are other example embodiments in which E is not 0.05% but instead is 0.1%, or 0.2%, or 0.5%, or 1%, or 2%, or 5%, or 10%, or 20%. These varied embodiments are merely examples and do not constitute limitations of the present invention.

For certain devices (such as computers or processors or other devices) embodied according the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits). If NL is the total number of LPHDR elements in such a device, and NH is the total number of elements in the device which are designed to perform high dynamic range arithmetic of traditional precision, then NL exceeds T (NH), where T ( ) is some function. Any of a variety of functions may be used as the function T ( ). For example, in certain embodiments, T (NH) may be twenty plus three times NH, and the number of LPHDR arithmetic elements in the device may exceed twenty more than three times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed fifty more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one hundred more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed five thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. Certain embodiments of the present invention may be implemented within a single physical device, such as but not limited to a silicon chip or a chip stack or a chip package or a circuit board, and the number NL of LPHDR elements in the physical device and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the physical device may be the total counts of the respective elements within that physical device. Certain embodiments of the present invention may be implemented in a computing system including more than one physical device, such as but not limited to a collection of silicon chips or chip stacks or chip packages or circuit boards coupled to and communicating with each other using any means (such as a bus, switch, any kind of network connection, or other means of communication), and in this case the number NL of LPHDR elements in the computing system and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the computing system may be the total counts of the respective elements within all those physical devices jointly.

US 10,416,961 B2

29                                                    30

Certain embodiments of the present invention may constitute, or may be part of, processors, which are devices capable of executing software to perform computations. Such processors may include mechanisms for storing software, for using the software to determine what operations to perform, for performing those operations, for storing numerical data, for modifying data according to the software specified operations, and for communicating with devices connected to the processor. Processors may be reconfigurable devices, such as, without limitation, field programmable arrays. Processors may be co-processors to assist host machines or may be capable of operating independently of an external host. Processors may be formed as a collection of component host processors and co-processors of various types, such as CPUs, GPUs, FPGAs, or other processors or other devices, which in the art may be referred to as a heterogeneous processor design or heterogeneous computing system, some or all of which components might incorporate the same or distinct varieties of embodiments of the present invention.

Embodiments of the present invention may, however, be implemented in devices in addition to or other than processors. For example, a computer including a processor and other components (such as memory coupled to the processor by a data path), wherein the processor includes components for performing LPHDR operations in any of the ways disclosed herein, is an example of an embodiment of the present invention. More generally, any device or combination of devices, whether or not falling within the meaning of a "processor," which performs the functions disclosed herein may constitute an example of an embodiment of the present invention.

More generally, any of the techniques described above may be implemented, for example, in hardware, software tangibly stored on a computer-readable medium, firmware, or any combination thereof. The techniques described above may be implemented in one or more computer programs executing on a programmable computer including a processor, a storage medium readable by the processor (including, for example, volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. Program code may be applied to input entered using the input device to perform the functions described and to generate output. The output may be provided to one or more output devices.

Each computer program within the scope of the claims below may be implemented in any programming language, such as assembly language, machine language, a high-level procedural programming language, or an object-oriented programming language. The programming language may, for example, be a compiled or interpreted programming language.

Each such computer program may be implemented in a computer program product tangibly embodied in a machine-readable storage device for execution by a computer processor. Method steps of the invention may be performed by a computer processor executing a program tangibly embodied on a computer-readable medium to perform functions of the invention by operating on input and generating output. Suitable processors include, by way of example, both general and special purpose microprocessors. Generally, the processor receives instructions and data from a read-only memory and/or a random access memory. Storage devices suitable for tangibly embodying computer program instructions include, for example, all forms of non-volatile memory, such as semiconductor memory devices, including EPROM, EEPROM, and flash memory devices; magnetic

disks such as internal hard disks and removable disks; magneto-optical disks; and CD-ROMs. Any of the foregoing may be supplemented by, or incorporated in, specially-designed ASICs (application-specific integrated circuits) or FPGAs (Field-Programmable Gate Arrays). A computer can generally also receive programs and data from a storage medium such as an internal disk (not shown) or a removable disk. These elements will also be found in a conventional desktop or workstation computer as well as other computers suitable for executing computer programs implementing the methods described herein, which may be used in conjunction with any digital print engine or marking engine, display monitor, or other raster output device capable of producing color or gray scale pixels on paper, film, display screen, or other output medium.

The invention claimed is:

**1**. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

**2**. The device of claim **1**, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

**3**. The device of claim **2**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**4**. The device of claim **1**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**5**. The device of claim **1**, wherein the first operation is multiplication.

**6**. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR

US 10,416,961 B2

31

unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nanomechanical-technology-based execution unit, a nanoelectronic-technology-based execution unit, a nanowire-technology-based execution unit, a nano-tube-technology-based execution unit, and an optical-technology-based execution unit.

7. The device of claim 6, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

8. The device of claim 6, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

9. The device of claim 6, wherein the first operation is multiplication.

10. A device comprising:

a plurality of components comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

11. The device of claim 10, wherein the plurality of components are arranged in a stack.

12. The device of claim 11, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

13. The device of claim 10, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

14. The device of claim 10, wherein the first operation is multiplication.

15. The device of claim 10, wherein the plurality of components are bonded.

16. The device of claim 10, wherein the plurality of components are arranged in a stack and bonded.

17. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first

32

operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nanomechanical-technology-based execution unit, a nanoelectronic-technology-based execution unit, a nanowire-technology-based execution unit, a nano-tube-technology-based execution unit, and an optical-technology-based execution unit.

18. The device of claim 17, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

19. The device of claim 17, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

20. The device of claim 17, wherein the first operation is multiplication.

21. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

a plurality of components comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

22. The device of claim 21, wherein the plurality of components are arranged in a stack.

23. The device of claim 21, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

US 10,416,961 B2

33

34

**24**. The device of claim **21**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**25**. The device of claim **21**, wherein the first operation is multiplication.

**26**. The device of claim **21**, wherein the plurality of components are bonded.

**27**. The device of claim **21**, wherein the plurality of components are arranged in a stack and bonded.

* * * * *



US009218156B2

(12) **United States Patent**

Bates

(10) **Patent No.:** **US 9,218,156 B2**
(45) **Date of Patent:** ***Dec. 22, 2015**

(54) **PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT**

(71) Applicant: **Singular Computing LLC**, Newton, MA (US)

(72) Inventor: **Joseph Bates**, Newton, MA (US)

(73) Assignee: **Singular Computing LLC**, Newton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 158 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/849,606**

(22) Filed: **Mar. 25, 2013**

(65) **Prior Publication Data**

US 2014/0095571 A1    Apr. 3, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/399,884, filed on Feb. 17, 2012, now Pat. No. 8,407,273, which is a continuation of application No. 12/816,201, filed on Jun. 15, 2010, now Pat. No. 8,150,902.

(60) Provisional application No. 61/218,691, filed on Jun. 19, 2009.

(51) **Int. Cl.**
*G06F 7/38* (2006.01)
*G06F 7/483* (2006.01)
*G06F 7/523* (2006.01)
*H03K 19/177* (2006.01)

(52) **U.S. Cl.**
CPC ............... *G06F 7/38* (2013.01); *G06F 7/4833* (2013.01); *G06F 7/5235* (2013.01); *H03K 19/17728* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| JP | H0314128 | 1/1991 |
| JP | H06075986 | 3/1994 |
| JP | 2008158822 | 7/2008 |
| JP | 2012530966 | 12/2012 |

OTHER PUBLICATIONS

Naohito Nakasato, et al., "A Compiler for High Performance Adaptive Precision Computing," A paper of SACSIS (Symposium on Advanced Computing Systems and Infrastructures) 2008, Information Processing Society of Japan, Jun. 4, 2008, No. 5, pp. 149-156.

*Primary Examiner* — Michael D Yaary
(74) *Attorney, Agent, or Firm* — Robert Plotkin, P.C.; Robert Plotkin

(57) **ABSTRACT**

A processor or other device, such as a programmable and/or massively parallel processor or other device, includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements, if any, in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

**42 Claims, 11 Drawing Sheets**



Google Exhibit 1001
Google v. Singular



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

US 9,218,156 B2

1

## PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/399,884, filed on Feb. 17, 2012, entitled, "Processing with Compact Arithmetic Processing Element," now U.S. Pat. No. 8,407,273; which is a continuation of U.S. patent application Ser. No. 12/816,201, filed on Jun. 15, 2010, entitled, "Processing with Compact Arithmetic Processing Element," now U.S. Pat. No. 8,150,902; which claims the benefit of U.S. Provisional Patent Application Ser. No. 61/218,691, filed on Jun. 19, 2009, entitled, "Massively Parallel Processing with Compact Arithmetic Element"; all of which are hereby incorporated by reference herein.

### COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

### BACKGROUND

The ability to compute rapidly has become enormously important to humanity. Weather and climate prediction, medical applications (such as drug design and non-invasive imaging), national defense, geological exploration, financial modeling, Internet search, network communications, scientific research in varied fields, and even the design of new computing hardware have each become dependent on the ability to rapidly perform massive amounts of calculation. Future progress, such as the computer-aided design of complex nano-scale systems or development of consumer products that can see, hear, and understand, will demand economical delivery of even greater computing power.

Gordon Moore's prediction, that computing performance per dollar would double every two years, has proved valid for over 30 years and looks likely to continue in some form. But despite this rapid exponential improvement, the reality is that the inherent computing power available from silicon has grown far more quickly than it has been made available to software. In other words, although the theoretical computing power of computing hardware has grown exponentially, the interfaces through which software is required to access the hardware limits the ability of software to use hardware to perform computations at anything approaching the hardware's theoretical maximum computing power.

Consider a modern silicon microprocessor chip containing about one billion transistors, clocked at roughly 1 GHz. On each cycle the chip delivers approximately one useful arithmetic operation to the software it is running. For instance, a value might be transferred between registers, another value might be incremented, perhaps a multiply is accomplished. This is not terribly different from what chips did 30 years ago, though the clock rates are perhaps a thousand times faster today.

Real computers are built as physical devices, and the underlying physics from which the machines are built often exhibits complex and interesting behavior. For example, a silicon MOSFET transistor is a device capable of performing

2

interesting non-linear operations, such as exponentiation. The junction of two wires can add currents. If configured properly, a billion transistors and wires should be able to perform some significant fraction of a billion interesting computational operations within a few propagation delays of the basic components (a "cycle" if the overall design is a traditional digital design). Yet, today's CPU chips use their billion transistors to enable software to perform merely a few such operations per cycle, not the significant fraction of the billion that might be possible.

### SUMMARY

Embodiments of the present invention are directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

In some embodiments, "low precision" processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1% (one tenth of one percent). This is far worse precision than the widely used IEEE 754 single precision floating point standard. Programmable embodiments of the present invention may be programmed with algorithms that function adequately despite these unusually large relative errors. In some embodiments, the processing elements have "high dynamic range" in the sense that they are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an example overall design of a SIMD processor according to one embodiment of the present invention.

FIG. 2 is an example of the Processing Element Array of a SIMD processor according to one embodiment of the present invention.

FIG. 3 is an example of how a Processing Element in a Processing Element Array communicates data with other parts of the processor according to one embodiment of the present invention.

FIG. 4 is an example design for a Processing Element according to one embodiment of the present invention.

FIG. 5 is an example LPHDR data word format according to one embodiment of the present invention.

FIG. 6 is an example design for an LPHDR arithmetic unit according to one embodiment of the present invention.

FIG. 7 is an original image.

FIG. 8 is an image blurred by a blur kernel according to one embodiment of the present invention.

FIG. 9 is an image produced by Richardson Lucy deconvolution using floating point arithmetic according to one embodiment of the present invention.

US 9,218,156 B2

3

FIG. **10** is an image produced by Richardson Lucy deconvolution using LPHDR floating point arithmetic with added noise (fp+noise) according to one embodiment of the present invention.

FIG. **11** is an image produced by Richardson Lucy deconvolution using LPHDR logarithmic arithmetic (lns) according to one embodiment of the present invention.

## DETAILED DESCRIPTION

As described above, today's CPU chips make inefficient use of their transistors. For example, a conventional CPU chip containing a billion transistors might enable software to perform merely a few operations per clock cycle. Although this is highly inefficient, many having ordinary skill in the art design CPUs in this way for what are widely accepted to be valid reasons. For example, such designs satisfy the (often essential) requirement for software compatibility with earlier designs. Furthermore, they deliver great precision, performing exact arithmetic with integers typically 32 or 64 bits long and performing rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers. Many applications need this kind of precision. As a result, conventional CPUs typically are designed to provide such precision, using on the order of a million transistors to implement the arithmetic operations.

There are many economically important applications, however, which are not especially sensitive to precision and that would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors. Current architectures for general purpose computing fail to deliver this power.

Because of the weaknesses of conventional computers, such as typical microprocessors, other kinds of computers have been developed to attain higher performance. These machines include single instruction stream/multiple data stream (SIMD) designs, multiple instruction stream/multiple data stream (MIMD) designs, reconfigurable architectures such as field programmable gate arrays (FPGAs), and graphics processing unit designs (GPUs) which, when applied to general purpose computing, may be viewed as single instruction stream/multiple thread (SIMT) designs.

SIMD machines follow a sequential program, with each instruction performing operations on a collection of data. They come in two main varieties: vector processors and array processors. Vector processors stream data through a processing element (or small collection of such elements). Each component of the data stream is processed similarly. Vector machines gain speed by eliminating many instruction fetch/decode operations and by pipelining the processor so that the clock speed of the operations is increased.

Array processors distribute data across a grid of processing elements (PEs). Each element has its own memory. Instructions are broadcast to the PEs from a central control until, sequentially. Each PE performs the broadcast instruction on its local data (often with the option to sit idle that cycle). Array processors gain speed by using silicon efficiently—using just one instruction fetch/decode unit to drive many small simple execution units in parallel.

Array processors have been built using fixed point arithmetic at a wide variety of bit widths, such as 1, 4, 8, and wider, and using floating point arithmetic. Small bit widths allow the processing elements to be small, which allows more of them to fit in the computer, but many operations must be carried out in sequence to perform conventional arithmetic calculations. Wider widths allow conventional arithmetic operations to be

4

completed in a single cycle. In practice, wider widths are desirable. Machines that were originally designed with small bit widths, such as the Connection Machine-1 and the Goodyear Massively Parallel Processor, which each used 1 bit wide processing elements, evolved toward wider data paths to better support fast arithmetic, producing machines such as the Connection Machine-2 which included 32 bit floating point hardware and the MasPar machines which succeeded the Goodyear machine and provided 4 bit processing elements in the MasPar-1 and 32 bit processing elements in the MasPar-2.

Array processors also have been designed to use analog representations of numbers and analog circuits to perform computations. The SCAMP is such a machine. These machines provide low precision arithmetic, in which each operation might introduce perhaps an error of a few percentage points in its results. They also introduce noise into their computations, so the computations are not repeatable. Further, they represent only a small range of values, corresponding for instance to 8 bit fixed point values rather than providing the large dynamic range of typical 32 or 64 bit floating point representations. Given these limitations, the SCAMP was not intended as a general purpose computer, but instead was designed and used for image processing and for modeling biological early vision processes. Such applications do not require a full range of arithmetic operations in hardware, and the SCAMP, for example, omits general division and multiplication from its design.

While SIMD machines were popular in the 1980s, as price/performance for microprocessors improved designers began building machines from large collections of communicating microprocessors. These MIMD machines are fast and can have price/performance comparable to their component microprocessors, but they exhibit the same inefficiency as those components in that they deliver to their software relatively little computation per transistor.

Field Programmable Gate Arrays (FPGAs) are integrated circuits containing a large grid of general purpose digital elements with reconfigurable wiring between those elements. The elements originally were single digital gates, such as AND and OR gates, but evolved to larger elements that could, for instance, be programmed to map 6 inputs to 1 output according to any Boolean function. This architecture allows the FPGA to be configured from external sources to perform a wide variety of digital computations, which allows the device to be used as a co-processor to a CPU to accelerate computation. However, arithmetic operations such as multiplication and division on integers, and especially on floating point numbers, require many gates and can absorb a large fraction of an FPGA's general purpose resources. For this reason, modern FPGAs often devote a significant portion of their area to providing dozens or hundreds of multiplier blocks, which can be used instead of general purpose resources for computations requiring multiplication. These multiplier blocks typically perform 18 bit or wider integer multiplies, and use many transistors, as similar multiplier circuits do when they are part of a general purpose CPU.

Existing Field Programmable Analog Arrays (FPAAs) are analogous to FPGAs, but their configurable elements perform analog processing. These devices generally are intended to do signal processing, such as helping model neural circuitry. They are relatively low precision, have relatively low dynamic range, and introduce noise into computation. They have not been designed as, or intended for use as, general purpose computers. For instance, they are not seen by those having ordinary skill in the art as machines that can run the variety of complex algorithms with floating point arithmetic that typically run on high performance digital computers.

US 9,218,156 B2

5

Finally, Graphics Processing Units (GPUs) are a variety of parallel processor that evolved to provide high speed graphics capabilities to personal computers. They offer standard floating point computing abilities with very high performance for certain tasks. Their computing model is sometimes based on having thousands of nearly identical threads of computing (SIMT), which are executed by a collection of SIMD-like internal computing engines, each of which is directed and redirected to perform work for which a slow external DRAM memory has provided data. Like other machines that implement standard floating point arithmetic, they use many transistors for that arithmetic. They are as wasteful of those transistors, in the sense discussed above, as are general purpose CPUs.

Some GPUs include support for 16 bit floating point values (sometimes called the "Half" format). The GPU manufacturers, currently such as NVIDIA or AMD/ATI, describe this capability as being useful for rendering images with higher dynamic range than the usual 32 bit RGBA format, which uses 8 bits of fixed point data per color, while also saving space over using 32 bit floating point for color components. The special effects movie firm Industrial Light and Magic (ILM) independently defined an identical representation in their OpenEXR standard, which they describe as "a high dynamic-range (HDR) image file format developed by Industrial Light & Magic for use in computer imaging applications." Wikipedia (late 2008) describes the 16 bit floating point representation thusly: "This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth."

When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly **64**) bit arithmetic and are wasteful of transistors in the sense discussed above.

The variety of architectures mentioned above are all attempts to get more performance from silicon than is available in a traditional processor design. But designers of traditional processors also have been struggling to use the enormous increase in available transistors to improve performance of their machines. These machines often are required, because of history and economics, to support large existing instruction sets, such as the Intel x86 instruction set. This is difficult, because of the law of diminishing returns, which does not enable twice the performance to be delivered by twice the transistor count. One facet of these designers' struggle has been to increase the precision of arithmetic operations, since transistors are abundant and some applications could be sped up significantly if the processor natively supported long (e.g., 64 bit) numbers. With the increase of native fixed point precision from 8 to 16 to 32 to 64 bits, and of floating point from 32 to 64 and sometimes 128 bits, programmers have come to think in terms of high precision and to develop algorithms based on the assumption that computer processors provide such precision, since it comes as an integral part of each new generation of silicon chips and thus is "free."

6

Embodiments of the present invention efficiently provide computing power using a fundamentally different approach than those described above. In particular, embodiments of the present invention are directed to computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations).

One variety of LPHDR arithmetic represents values from one millionth up to one million with a precision of about 0.1%. If these values were represented and manipulated using the methods of floating point arithmetic, they would have binary mantissas of no more than 10 bits plus a sign bit and binary exponents of at least 5 bits plus a sign bit. However, the circuits to multiply and divide these floating point values would be relatively large. One example of an alternative embodiment is to use a logarithmic representation of the values. In such an approach, the values require the same number of bits to represent, but multiplication and division are implemented as addition and subtraction, respectively, of the logarithmic representations. Addition and subtraction may be implemented efficiently as described below. As a result, the area of the arithmetic circuits remains relatively small and a greater number of computing elements can be fit into a given area of silicon. This means the machine can perform a greater number of operations per unit of time or per unit power, which gives it an advantage for those computations able to be expressed in the LPHDR framework.

Another embodiment is to use analog representations and processing mechanisms. Analog implementation of LPHDR arithmetic has the potential to be superior to digital implementation, because it tends to use the natural analog physics of transistors or other physical devices instead of using only the digital subset of the device's behavior. This fuller use of the devices' natural abilities may permit smaller mechanisms for doing LPHDR arithmetic. In recent years, in the field of silicon circuitry, analog methods have been supplanted by digital methods. In part, this is because of the ease of doing digital design compared to analog design. Also in part, it is because of the continued rapid scaling of digital technology ("Moore's Law") compared to analog technology. In particular, at deep submicron dimensions, analog transistors no longer work as they had in prior generations of larger-scale technology. This change of familiar behavior has made analog design still harder in recent years. However, digital transistors are in fact analog transistors used in a digital way, meaning digital circuits are really analog circuits designed to attempt to switch the transistors between completely on and completely off states. As scaling continues, even this use of transistors is starting to come face to face with the realities of analog behavior. Scaling of transistors for digital use is expected either to stall or to require digital designers increasingly to acknowledge and work with analog issues. For these reasons, digital embodiments may no longer be easy, reliable, and scalable, and analog embodiments of LPHDR arithmetic may come to dominate commercial architectures.

Because LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other, and therefore may constitute a massively parallel LPHDR processor or other device. Such a processor or other device has not been described or practiced as a means of doing general purpose computing for two reasons. First, it is commonly believed by those having ordinary skill in the art, that LPHDR computation, and in particular massive amounts of LPHDR computation, whether performed in a massively parallel way or not, is not practical as a substrate

APPX00305

US 9,218,156 B2

7

for moderately general computing. Second, it is commonly believed by those having ordinary skill in the art that massive amounts of even high precision computation on a single chip or in a single machine, as is enabled by a compact arithmetic processing unit, is not useful without a corresponding increase in bandwidth between processing elements within the machine and into and out of the machine because computing is wire limited and arithmetic can be considered to be available at no cost.

Despite these views—that massive amounts of arithmetic on a chip or in a massively parallel machine are not useful, and that massive amounts of LPHDR arithmetic are even worse—embodiments of the present invention disclosed herein demonstrate that massively parallel LPHDR designs are in fact useful and provide significant practical benefits in at least several significant applications.

To conclude, modern digital computing systems provide high precision arithmetic, but that precision is costly. A modern double precision floating point multiplier may require on the order of a million transistors, even though only a handful of transistors is required to perform a low precision multiplication. Despite the common belief among those having ordinary skill in the art that modern applications require high precision processing, in fact a variety of useful algorithms function adequately at much lower precision. As a result, such algorithms may be performed by processors or other devices implemented according to embodiments of the present invention, which come closer to achieving the goal of using a few transistors to multiply and a wire junction to add, thus enabling massively parallel arithmetic computation to be performed with relatively small amounts of physical resources (such as a single silicon chip). Although certain specialized tasks can function at low precision, it is not obvious, and in fact has been viewed as clearly false by those having ordinary skill in the art, that relatively general purpose computing such as is typically performed today on general purpose computers can be done at low precision. However, in fact a variety of useful and important algorithms can be made to function adequately at much lower than 32 bit precision in a massively parallel computing framework, and certain embodiments of the present invention support such algorithms, thereby offering much more efficient use of transistors, and thereby provide improved speed, power, and/or cost, compared to conventional computers.

Various computing devices implemented according to embodiments of the present invention will now be described. Some of these embodiments may be an instance of a SIMD computer architecture. Other architectures may be used, such as MIMD architectures, programmable array architectures (such as FPGAs and FPAAs), or GPU/SIMT architectures. The techniques disclosed herein may, for example, be implemented using any processor or other device having such an existing architecture, and replacing or augmenting some or all existing arithmetic units in the processor or other device, if any, with LPHDR arithmetic units in any of the ways disclosed herein. Devices implemented according to embodiments of the present invention, however, need not start with an existing processor design, but instead may be designed from scratch to include LPHDR arithmetic units within any of the architectures just described, or any other architecture.

Embodiments of the present invention may, for example, be implemented using the architecture of a particular kind of SIMD computer, the array processor. There are many variations and specific instances of array processors described in the scientific and commercial literature. Examples include the Illiac 4, the Connection Machine 1 and 2, the Goodyear MPP, and the MasPar line of computers.

8

Embodiments of the present invention need not, however, be implemented as SIMD computers. For example, embodiments of the present invention may be implemented as FPGAs, FPAAs, or related architectures that provide for flexible connectivity of a set of processing elements. For example, embodiments of the present invention may be implemented as GPU/SIMTs and as MIMDs, among others. For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures. Furthermore, references herein to "processing elements" within embodiments of the present invention should be understood more generally as any kind of execution unit, whether for performing LPHDR operations or otherwise.

An example SIMD computing system **100** is illustrated in FIG. **1**. The computing system **100** includes a collection of many processing elements (PEs) **104**. Sometimes present are a control unit (CU) **106**, an I/O unit (IOU) **108**, various Peripheral devices **110**, and a Host computer **102**. The collection of PEs is referred to herein as "the Processing Element Array" (PEA), even though it need not be two-dimensional or an array or grid or other particular layout. Some machines include additional components, such as an additional memory system called the "Staging Memory" in the Goodyear MPP, but these additional elements are neither essential in the computer nor needed to understand embodiments of the present invention and therefore are omitted here for clarity of explanation. One embodiment of the present invention is a SIMD computing system of the kind shown in FIG. **1**, in which one or more (e.g., all) of the PEs in the PEA **104** are LPHDR elements, as that term is used herein.

The Host **102** is responsible for overall control of the computing system **100**. It performs the serial, or mostly serial, computation typical of a traditional uni-processor. The Host **102** could have more complicated structure, of course, including parallelism of various sorts. Indeed a heterogeneous computing system combining multiple computing architectures in a single machine is a good use for embodiments of the present invention.

A goal of the Host **102** is to have the PEA **104** perform massive amounts of computation in a useful way. It does this by causing the PEs to perform computations, typically on data stored locally in each PE, in parallel with one another. If there are many PEs, much work gets done during each unit of time.

The PEs in the PEA **104** may be able to perform their individual computations roughly as fast as the Host **102** performs its computations. This means it may be inefficient to have the Host **102** attempt to control the PEA **104** on a time scale as fine as the Host's or PEA's minimal time step. (This minimal time, in a traditional digital design, would be the clock period.) For this reason, the specialized control unit (CU) **106** may be included in the architecture. The CU **106** has the primary task of retrieving and decoding instructions from an instruction memory, which conceptually is part of the CU **106**, and issuing the partially decoded instructions to all the PEs in the PEA **104**. (This may be viewed by the CU software as happening roughly simultaneously for all the PEs, though it need not literally be synchronous, and in fact it may be effective to use an asynchronous design in which multiple instructions at different stages of completion simultaneously propagate gradually across the PEA, for instance as a series of wave fronts.)

In a design which includes the CU **106**, the Host **102** typically will load the instructions (the program) for the PEA **104** into the CU instruction memory (not shown in FIG. **1**),

US 9,218,156 B2

9
10

then instruct the CU **106** to interpret the program and cause the PEA **104** to compute according to the instructions. The program may, for example, look generally similar to a typical machine language program, with instructions to cause data movement, logical operations, arithmetic operations, etc., in and between the PEs and other instructions to do similar operations together with control flow operations within the CU **106**. Thus, the CU **106** may run a typical sort of program, but with the ability to issue massively parallel instructions to the PEA **104**.

In order to get data into and out of the CU **106** and PEA **104**, the I/O Unit **108** may interface the CU **106** and PEA **104** with the Host **102**, the Host's memory (not shown in FIG. 1), and the system's Peripherals **110**, such as external storage (e.g., disk drives), display devices for visualization of the computational results, and sometimes special high bandwidth input devices (e.g., vision sensors). The PEA's ability to process data far faster than the Host **102** makes it useful for the IOU **108** to be able to completely bypass the Host **102** for some of its data transfers. Also, the Host **102** may have its own ways of communicating with the Peripherals **110**.

The particular embodiment illustrated in FIG. 1 is shown merely for purposes of example and does not constitute a limitation of the present invention. For example, alternatively the functions performed by the CU **106** could instead be performed by the Host **102** with the CU **106** omitted. The CU **106** could be implemented as hardware distant from the PEA **104** (e.g., off-chip), or the CU **106** could be near to the PEA **104** (e.g., on-chip). I/O could be routed through the CU **106** with the IOU **108** omitted or through the separate I/O controller **108**, as shown. Furthermore, the Host **102** is optional; the CU **106** may include, for example, a CPU, or otherwise include components sufficient to replace the functions performed by the Host **102**. The Peripherals **110** shown in FIG. 1 are optional. The design shown in FIG. 1 could have a special memory, such as the Goodyear MPP's "staging memory," which provides an intermediate level of local storage. Such memory could, for example, be bonded to the LPHDR chip using 3D fabrication technology to provide relatively fast parallel access to the memory from the PEs in the PEA **104**.

The PEA **104** itself, besides communicating with the CU **106** and IOU **108** and possibly other mechanisms, has ways for data to move within the array. For example, the PEA **104** may be implemented such that data may move from PEs only to their nearest neighbors, that is, there are no long distance transfers. FIGS. 2 and 3 show embodiments of the present invention which use this approach, where the nearest neighbors are the four adjacent PEs toward the North, East, West, and South, called a NEWS design. For example, FIG. 2 shows a subset of the PEs in PEA **104**, namely PE **202**, PE **204**, PE **206**, PE **208**, and PE **210**. When the CU **106** issues data movement instructions, all the PEs access data from or send data to their respective specified nearest neighbor. For instance, every PE might access a specified data value in its neighbor to the West and copy it into its own local storage. In some embodiments, such as some analog embodiments, these kinds of transfers may result in some degradation of the value copied.

FIG. 3 shows a PE **302** that includes data connections to the IOU **108**. PE **302** is connected at the North to PE **304**, at the East to PE **306**, at the South to PE **308**, and at the West to PE **310**. However, driving signals from inside the PEA **104** out to the IOU **108** usually requires a physically relatively large driving circuit or analogous mechanism. Having those at every PE may absorb much of the available resources of the hardware implementation technology (such as VLSI area). In addition, having independent connections from every PE to the IOU **108** means many such connections, and long connections, which also may absorb much of the available hardware resources. For these reasons, the connections between the PEs and the IOU **108** may be limited to those PEs at the edges of the PE array **104**. In this case, to get data out of, and perhaps into, the PEA **104**, the data is read and written at the edges of the array and CU instructions are performed to shift data between the edges and interior of the PEA **104**. The design may permit data to be pushed from the IOU **108** inward to any PE in the array using direct connections, but may require readout to occur by using the CU **106** to shift data to the edges where it can be read by the IOU **108**.

Connections between the CU **106** and PEA **104** have analogous variations. One design may include the ability to drive instructions into all the PEs roughly simultaneously, but another approach is to have the instructions flow gradually (for instance, shift in discrete time steps) across the PEA **104** to reach the PEs. Some SIMD designs, which may be implemented in embodiments of the present invention, have a facility by which a "wired-or" or "wired- and" of the state of every PE in the PEA **104** can be read by the CU **106** in approximately one instruction delay time.

There are many well studied variations on these matters in the literature, any of which may be incorporated into embodiments of the present invention. For example, an interconnect, such as an 8-way local interconnect, may be used. The local connections may include a mixture of various distance hops, such as distance **4** or **16** as well as distance **1**. The outside edges may be connected using any topology, such as a torus or twisted torus. Instead of or in addition to a local interconnect, a more complex global interconnect, such as the hypercube design, may be used. Furthermore, the physical implementation of the PEA **104** (e.g., a chip) could be replicated (e.g., tiled on a circuit board) to produce a larger PEA. The replication may form a simple grid or other arrangement, just as the component PEAs may but need not be grids.

FIG. 4 shows an example design for a PE **400** (which may be used to implement any one or more of the PEs in the PEA **104**). The PE **400** stores local data. The amount of memory for the local data varies significantly from design to design. It may depend on the implementation technologies available for fabricating the PE **400**. Sometimes rarely changing values (Constants) take less room than frequently changing values (Registers), and a design may provide more Constants than Registers. For instance, this may be the case with digital embodiments that use single transistor cells for the Constants (e.g., floating gate Flash memory cells) and multiple transistor cells for the Registers (e.g., 6-transistor SRAM cells). Sometimes the situation is reversed, as may be the case in analog embodiments, where substantial area for capacitance may be needed to ensure stable long term storage of Constants, and such embodiments may have more Registers than Constants. Typical storage capacities might be tens or hundreds of arithmetic values stored in the Registers and Constants in each PE, but these capacities are adjustable by the designer. Some designs, for instance, may have Register storage but no Constant storage. Some designs may have thousands or even many more values stored in each PE. All of these variations may be reflected in embodiments of the present invention.

Each PE needs to operate on its local data. For this reason within the PE **400** there are data paths **402***a-i*, routing mechanisms (such as the multiplexor MUX **404**), and components to perform some collection of logical and arithmetic operations (such as the logic unit **406** and the LPHDR arithmetic unit **408**). The LPHDR arithmetic unit **408** performs LPHDR

US 9,218,156 B2

11

arithmetic operations, as that term is used herein. The input, output, and intermediate "values" received by, output by, and operated on by the PE **400** may, for example, take the form of electrical signals representing numerical values.

The PE **400** also may have one or more flag bits, shown as Mask **410** in FIG. **4**. The purpose of the Mask **410** is to enable some PEs, the ones in which a specified Mask bit is set, to ignore some instructions issued by the CU **106**. This allows some variation in the usual lock-step behaviors of all PEs in the PEA **104**. For instance, the CU **106** may issue an instruction that causes each PE to reset or set its Mask **410** depending on whether a specified Register in the PE is positive or negative. A subsequent instruction, for instance an arithmetic instruction, may include a bit meaning that the instruction should be performed only by those PEs whose Mask **410** is reset. This combination has the effect of conditionally performing the arithmetic instruction in each PE depending on whether the specified Register in that PE was positive. As with the Compare instructions of traditional computers, there are many possible design choices for mechanisms to set and clear Masks.

The operation of the PEs is controlled by control signals **412a-d** received from the CU **106**, four of which are shown in FIG. **4** merely for purposes of example and not limitation. We have not shown details of this mechanism, but the control signals **412a-d** specify which Register or Constant memory values in the PE **400** or one of its neighbors to send to the data paths, which operations should be performed by the Logic **406** or Arithmetic **408** or other processing mechanisms, where the results should be stored in the Registers, how to set, reset, and use the Mask **410**, and so on. These matters are well described in the literature on SIMD processors.

Many variations of this PE **400** and PEA design are possible and fall within the scope of the present invention. Digital PEs can have shifters, lookup tables, and many other mechanisms such as described in the literature. Analog PEs can have time-based operators, filters, comparators with global broadcast signals and many other mechanisms such as described in the literature. The PEA **104** can include global mechanisms such as wired-OR or wired-AND for digital PEAs or wired-SUM for analog PEAs Again, there are many variations well described in the literature on digital and analog computing architectures.

For example, LPHDR operations other than and/or in addition to addition and multiplication may be supported. For example, a machine which can only perform multiplication and the function (**1**-X) may be used to approximate addition and other arithmetic operations. Other collections of LPHDR operations may be used to approximate LPHDR arithmetic operations, such as addition, multiplication, subtraction, and division, using techniques that are well-known to those having ordinary skill in the art.

One aspect of embodiments of the present invention that is unique is the inclusion of LPHDR arithmetic mechanisms in the PEs. Embodiments of such mechanisms will now be described.

One digital embodiment of the LPHDR arithmetic unit **408** operates on digital (binary) representations of numbers. In one digital embodiment these numbers are represented by their logarithms. Such a representation is called a Logarithmic Number System (LNS), which is well-understood by those having ordinary skill in the art.

In an LNS, numbers are represented as a sign and an exponent. There is an implicit base for the logarithms, typically 2 when working with digital hardware. In the present embodiment, a base of 2 is used for purposes of example. As a result, a value, say B, is represented by its sign and a base 2

12

logarithm, say b, of its absolute value. For numbers to have representation errors of at most, say, 1% (one percent), the fractional part of this logarithm should be represented with enough precision that the least possible change in the fraction corresponds to about a 1% change in the value B. If fractions are represented using 6 bits, increasing or decreasing the fraction by 1 corresponds to multiplying or dividing B by the 64th root of 2, which is approximately 1.011. This means that numbers may be represented in the present embodiment with a multiplicative error of approximately 1%. So, in this example embodiment the fraction part of the representation has 6 bits.

Furthermore, the space of values processed in the present embodiment have high dynamic range. To represent numbers whose absolute value is from, say, one billionth to one billion, the integer part of the logarithm must be long enough to represent plus or minus the base 2 logarithm of one billion. That logarithm is about 29.9. In the present embodiment the integer part of the logarithm representation is 5 bits long to represent values from 0 to 31, which is sufficient. There also is a sign bit in the exponent. Negative logarithms are represented using two's complement representation.

In an LNS, the value zero corresponds to the logarithm negative infinity. One can choose a representation to explicitly represent this special value. However, to minimize resources (for instance, area) used by arithmetic circuits, the present embodiment represents zero by the most negative possible logarithm, which is −32, corresponding to the two's complement bit representation '100000 000000', and denoting a value of approximately 2.33E-10.

When computing, situations can arise in which operations cannot produce reasonable values. An example is when a number is too large to be represented in the chosen word format, such as when multiplying or adding two large numbers or upon divide by zero (or nearly zero). One common approach to this problem is to allow a value to be marked as Not A Number (NAN) and to make sure that each operation produces NAN if a problem arises or if either of its inputs is NAN. The present embodiment uses this approach, as will be described in the following.

FIG. **5** shows the word format **500** for these numbers, in the present embodiment. It has one NAN bit **502a**, one bit **502b** for the sign of the value, and 12 bits **502c-e** representing the logarithm. The logarithm bits include a 5 bit integer part **502d** and a 6 bit fraction part **502e**. To permit the logarithms to be negative, there is a sign bit **502c** for the logarithm which is represented in two's complement form. The NAN bit is set if some problem has arisen in computing the value. The word format **500** shown in FIG. **5** is merely an example and does not constitute a limitation of the present invention. Other variations may be used, so long as they have low precision and high dynamic range.

FIG. **6** shows an example digital implementation of the LPHDR arithmetic unit **408** for the representation illustrated in FIG. **5**. The unit **408** receives two inputs, A **602a** and B **602b**, and produces an output **602c**. The inputs **602a-b** and output **602c** may, for example, take the form of electrical signals representing numerical values according to the representation illustrated in FIG. **5**, as is also true of signals transmitted within the unit **408** by components of the unit **408**. The inputs **602a-b** and output **602c** each are composed of a Value and a NAN (Not A Number) bit. The unit **408** is controlled by control signals **412a-d**, coming from the CU **106**, that determine which available arithmetic operation will be performed on the inputs **602a-b**. In this embodiment, all the available arithmetic operations are performed in parallel on the inputs **602a-b** by adder/subtractor **604**, multiplier **606**, and divider

US 9,218,156 B2

**13**

**608**. Adder/subtractor **604** performs LPHDR addition and subtraction, multiplier **606** performs LPHDR multiplication, and divider **608** performs LPHDR division.

The desired result (from among the outputs of adder/subtractor **604**, multiplier **606**, and divider **608**) is chosen by the multiplexers (MUXes) **610***a* and **610***b*. The right hand MUX **610***b* sends the desired value to the output **602***c*. The left hand MUX **610***a* sends the corresponding NAN bit from the desired operation to the OR gate **612**, which outputs a set NAN bit if either input is NAN or if the specified arithmetic operation yields NAN. The computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. **6**.

LNS arithmetic has the great advantage that multiplication (MUL) and division (DIV) are very easy to compute and take few physical resources (e.g., little area in a silicon implementation). The sign of the result is the exclusive-or of the signs of the operands. The logarithm part of the output is the sum, in the case of MUL, or the difference, in the case of DIV, of the logarithm parts of the operands. The sum or difference of the logarithms can overflow, producing a NAN result. Certain other operations also are easy in LNS arithmetic. For instance, square root corresponds to dividing the logarithm in half, which in our representation means simply shifting it one bit position to the right.

Thus, the multiplier **606** and divider **608** in FIG. **6** are implemented as circuits that simply add or subtract their inputs, which are two's complement binary numbers (which in turn happen to be logarithms). If there is overflow, they output a 1 for NAN.

Implementing addition and subtraction in LNS, that is, the adder/subtractor **604** in FIG. **6**, follows a common approach used in the literature on LNS. Consider addition. If we have two positive numbers B and C represented by their logarithms b and c, the representation of the sum of B and C is log(B+C). An approach to computing this result that is well known to those skilled in the art is based on noticing that log(B+C)=log (B*(1+C/B))=log(B)+log(1+C/B)=b+F(c−b) where F(x) =log(1+2^x). Thus, the present embodiment computes c−b, feeds that through F, and adds the result to b, using standard digital techniques known to those skilled in the art.

Much of the published literature about LNS is concerned with how to compute F(x), the special function for ADD, along with a similar function for SUB. Often these two functions share circuitry, and this is why a single combined adder/ subtractor **604** is used in the embodiment of FIG. **6**. There are many published ways to compute these functions or approximations to them, including discussions of how to do this when the values are of low precision. Any such method, or other method, may be used. Generally speaking, the more appropriate variations for massively parallel LPHDR arithmetic are those that require the minimal use of resources, such as circuit area, taking advantage of the fact that the representation used in the embodiment of FIG. **6** is low precision and that the arithmetic operations need not be deterministic nor return the most accurate possible answer within the low precision representation. Thus, embodiments of the present invention may use circuitry that does not compute the best possible answer, even among the limited choices available in a low precision representation.

In order to enable conditional operation of selected PEs, the present embodiment is able to reset and set the MASK flag **410** based on results of computations. The mechanism for doing this is that the CU **106** includes instructions that cause the MASK **410** in each PE to unconditionally reset or set its flag along with other instructions to perform basic tests on values entering the MASK **410** on data path **402***f* and to set the

**14**

flag accordingly. Examples of these latter instructions include copying the sign bit or NAN bit of the word on data path **402***f* into the MASK bit **410**. Another example is to set the MASK bit **410** if the 12 bit value part of the word on data path **402***f* is equal to binary zero. There are many additional and alternative ways for doing this that are directly analogous to comparison instructions in traditional processors and which are well understood by those skilled in the art.

It is worth noting that while the obvious method of using the above LNS operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values, since that is precisely their behavior in LNS implementations. The Mask setting instructions can compare these simple binary values. So besides doing LPHDR computations, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Some embodiments of the present invention may include analog representations and processing methods. Such embodiments may, for example, represent LPHDR values as charges, currents, voltages, frequencies, pulse widths, pulse densities, various forms of spikes, or in other forms not characteristic of traditional digital implementations. There are many such representations discussed in the literature, along with mechanisms for processing values so represented. Such methods, often called Analog methods, can be used to perform LPHDR arithmetic in the broad range of architectures we have discussed, of which SIMD is one example.

An example of an analog SIMD architecture is the SCAMP design (and related designs) of Dudek. In that design values have low dynamic range, being accurate roughly to within 1%. Values are represented by charges on capacitors. Those capacitors typically are the gates of transistors. Each PE has several memory cells, analogous to the Registers shown in FIG. **4**. Addition is performed by turning on pass transistors from the two operands, which transfer their charge onto an analog bus, where it is summed by the natural physics of charge and wires, upon which it is gated onto another Register to charge up its capacitor, which then represents the sum of the operands. The detailed mechanism disclosed by Dudek actually produces the negative of the sum, but the basic concept is as described and is a simple way to perform addition and subtraction using analog representations and simple processing mechanisms.

Variations of the SCAMP design have been fabricated and used to perform a range of low precision, low dynamic range computations related to image processing. These designs do not perform high dynamic range arithmetic, nor do they include mechanisms for performing multiplication or division of values stored in Registers. However, the Dudek designs suggest the general feasibility of constructing analog SIMD machines. The following describes how to build an analog SIMD machine that performs LPHDR arithmetic, and is thus an embodiment of the present invention.

One embodiment of the present invention represents values as a mixture of analog and digital forms. This embodiment represents values as low precision, normalized, base 2 floating point numbers, where the mantissa is an analog value and the exponent is a binary digital value. The analog value may be accurate to about 1%, following the approach of Dudek, which is well within the range of reasonable analog processing techniques. The exponent may be 6 bits long, or whatever is needed to provide the desired high dynamic range.

To multiply values, the embodiment proceeds by analogy to traditional floating point methods. The digital exponents are summed using a binary arithmetic adder, a standard digital

US 9,218,156 B2

15                                                              16

technique. The analog mantissas are multiplied. Since they represent normalized values between approximately ½ and 1, their product may be as small as approximately ¼. Such a product value needs to be normalized back to the range ½ to 1. This is done, in the present embodiment, by comparing the analog mantissa to an analog representation of ½, using a threshold circuit. If the mantissa is below ½, then it is doubled and one is subtracted from the exponent, where such subtraction is simple digital subtraction. Doubling the mantissa is implemented in a way that corresponds to the chosen analog representation. For example, whatever means are being used to add two analog values can be used to double the mantissa, by adding it to a copy of itself. For example, if the mantissa is represented as a current, such as copy may be produced by a current mirror, or other suitable mechanism, and addition may be performed by a current summing junction.

The means of multiplying the original analog mantissas depends on the representation chosen. For example, if mantissas are represented using charge, following SCAMP, then any known method from the literature may be used to convert charge to current. For instance, since the charge on a capacitor determines the voltage on the capacitor, this may be implemented as a conversion from voltage to current, which is a basic technique in analog electronics known to those skilled in the art. In any case, if the mantissas are represented as currents, or once the mantissas are converted to currents, they may be multiplied using, for instance, the techniques of Gilbert. The Gilbert multiplier produces a current, representing the product, which may, if necessary, then be converted back to charge (or whatever representation is used). These are merely examples of how the needed operations might be performed. The literature discusses these matters extensively and these kinds of analog circuits are known to those skilled in the art.

Adding and subtracting values requires pre-normalization of the values to the same exponent, as is done in traditional digital floating point arithmetic. The present embodiment does this by comparing the exponents and choosing the smaller one. Then the smaller one is subtracted from the larger, using digital means. The difference specifies how many times the mantissa which corresponds to the smaller exponent needs to be divided in half. If that mantissa is represented by (or converted to) a current, then an analog R-2R style ladder may be used to divide the current in half the required number of times, with the stage of the ladder specified by the difference of exponents calculated as above. The resulting scaled down current is added to (or subtracted from, if this is an LPHDR subtraction operation) the current corresponding to the mantissa associated with the larger exponent to yield the output mantissa. The output exponent associated with the output mantissa is the larger exponent. Post-normalization may be needed at this point. If the output mantissa is greater than 1, then it needs to be divided in half and the output exponent needs to be incremented. If it is less than ½, then it needs to be doubled enough times to exceed ½ and the output exponent must be decremented correspondingly, with the half being performed by a series of threshold circuits, doubler circuits, and associated decrementer circuits. These increments and decrements of the binary digital exponent, and corresponding doublings and halvings of the analog mantissa current, are straightforward operations well known to those skilled in the art.

The present embodiment represents the exponent as a digital binary number. Alternate embodiments may represent the exponent as an analog value. However, it is important that the exponent be represented in storage and computation in such a manner that neither noise nor other errors cause a change in

the value it represents. Such changes in the exponent could introduce factors of two (or in some embodiments larger) changes in the values of the stored numbers. To maintain accuracy of the exponents, an embodiment may quantize the exponent to relatively few levels, for instance 16 values plus a sign bit. During processing, slight variations in the analog representation of the exponent may then be removed by circuitry that restores values to the 16 standard quantization levels. To get sufficient dynamic range in such an embodiment, the floating point numbers may be processed as base 4 numbers, rather than the usual base 2 numbers. This means, for instance, that normalized mantissas are in the range ¼ to 1. The methods discussed above for addition, subtraction, and multiplication apply as described, with slight and straightforward variations.

The analog and mixed signal embodiments discussed above are merely examples and do not constitute a limitation of the present invention. The published literature on neuromorphic, analog, and mixed signal techniques provides a wealth of methods that enable LPHDR storage and processing to be implemented. Such storage and processing may introduce noise as well as fabrication errors into the behavior of machines performing LPHDR arithmetic. The results we present below, on software applications running using "fp+ noise" arithmetic, show that despite these very "un-digital" qualities a machine built in this way is surprisingly useful.

Evidence that LPHDR arithmetic is useful in several important practical computing applications will now be provided. The evidence is presented for a broad variety of embodiments of the present invention, thereby showing that the usefulness does not depend much on the detailed implementation.

For the goal of showing usefulness, we choose a very general embodiment of an LPHDR machine. Our model of the machine is that it provides at least the following capabilities: (1) is massively parallel, (2) provides LPHDR arithmetic possibly with noise, (3) provides a small amount of memory local to each arithmetic unit, (4) provides the arithmetic/memory units in a two-dimensional physical layout with only local connections between units (rather than some more powerful, flexible, or sophisticated connection mechanism), and (5) provides only limited bandwidth between the machine and the host machine. Note that this model is merely an example which is used for the purpose of demonstrating the utility of various embodiments of the present invention. This model includes, among others, implementations that are digital or analog or mixed, have zero or more noise, have architectures which are FPGA-like, or SIMD-like, or MIMD-like, or otherwise meet the assumptions of the model. More general architectures, such as shared memory designs, GPU-like designs, or other sophisticated designs subsume this model's capabilities, and so LPHDR arithmetic in those architectures also is useful. While we are thus showing that LPHDR arithmetic is useful for a broad range of designs, of which SIMD is only an instance, for purpose of discussion below, we call each unit, which pairs memory with arithmetic, a Processing Element or "PE".

Several applications are discussed below. For each, the discussion shows (1) that the results are useful when computation is performed in possibly noisy LPHDR arithmetic, and (2) that the computation can be physically laid out in two dimensions with only local flow of data between units, only limited memory within each unit, and only limited data flow to/from the host machine, in such a way that the computation makes efficient use of the machine's resources (area, time, power). The first requirement is referred to as "Accuracy" and

US 9,218,156 B2

17

the second requirement "Efficiency." Applications that meet both requirements running in this model will function well on many kinds of LPHDR machines, and thus those machines are a broadly useful invention.

Applications are tested using two embodiments for the machine's arithmetic. One uses accurate floating point arithmetic but multiplies the result of each arithmetic operation by a uniformly chosen random number between 0.99 and 1.01. In the following discussion, this embodiment is denoted "fp+ noise". It may represent the results produced by an analog embodiment of the machine.

A second embodiment uses logarithmic arithmetic with a value representation as shown in FIG. 5. The arithmetic is repeatable, that is, not noisy, but because of the short fraction size it produces errors of up to approximately 1-2% in each operation. In the following discussion, this embodiment is denoted "lns". It may represent the results produced by a particular digital embodiment of the machine.

To demonstrate usefulness of embodiments of the invention, we shall discuss three computational tasks that are enabled by embodiments of the invention and which in turn enable a variety of practical applications. Two of the tasks are related to finding nearest neighbors and the other is related to processing visual information. We shall describe the tasks, note their practical application, and then demonstrate that each task is solvable using the general model described above and thus solvable using embodiments of the present invention.

Application 1: Finding Nearest Neighbors

Given a large set of vectors, called Examples, and a given vector, called Test, the nearest neighbor problem ("NN") is to find the Example which is closest to Test where the distance metric is the square of the Euclidean distance (sum of squares of distances between respective components).

NN is a widely useful computation. One use is for data compression, where it is called "vector quantization". In this application we have a set of relatively long vectors in a "code book" (these are the Examples) and associated short code words (for instance the index of the vector in the code book). We move through a sequence of vectors to be compressed, and for each such vector (Test), find the nearest vector in the code book and output the corresponding code word. This reduces the sequence of vectors to the shorter sequence of code words. Because the code words do not completely specify the original sequence of vectors, this is a lossy form of data compression. Among other applications, it may be used in speech compression and in the MPEG standards.

Another application of NN would be in determining whether snippets of video occur in a large video database. Here we might abstract frames of video from the snippet into feature vectors, using known methods, such as color histograms, scale invariant feature extraction, etc. The Examples would be analogous feature vectors extracted from the video database. We would like to know whether any vector from the snippet was close to any vector from the database, which NN can help us decide.

In many applications of nearest neighbor, we would prefer to find the true nearest neighbor but it is acceptable if we sometimes find another neighbor that is only slightly farther away or if we almost always find the true nearest neighbor. Thus, an approximate solution to the nearest neighbor problem is useful, especially if it can be computed especially quickly, or at low power, or with some other advantage compared to an exact solution.

18

We shall now show that approximate nearest neighbor is computable using embodiments of the present invention in a way that meets the criteria of Accuracy and Efficiency.

Algorithm. The following describes an algorithm which may be performed by machines implemented according to embodiments of the present invention, such as by executing software including instructions for performing the algorithm. The inputs to the algorithm are a set of Examples and a Test vector. The algorithm seeks to find the nearest (or almost nearest) Example to the Test.

In the simplest version of the algorithm, the number of Examples may be no larger than the number of PEs and each vector must be short enough to fit within a single PE's memory. The Examples are placed into the memories associated with the PEs, so that one Example is placed in each PE. Given a Test, the Test is passed through all the PEs, in turn. Accompanying the Test as it passes through the PEs is the distance from the Test to the nearest Example found so far, along with information that indicates what PE (and thus what Example) yielded that nearest Example found so far. Each PE computes the distance between the Test and the Example stored in that PE's memory, and then passes along the Test together with either the distance and indicator that was passed into this PE (if the distance computed by this PE exceeded the distance passed into the PE) or the distance this PE computed along with information indicating this PE's Example is the nearest so far (if the distance computed by this PE is less than the distance passed into the PE). Thus, the algorithm is doing a simple minimization operation as the Test is passed through the set of PEs. When the Test and associated information leave the last PE, the output is a representation of which PE (and Example) was closest to the Test, along with the distance between that Example and the Test.

In a more efficient variant of this algorithm, the Test is first passed along, for example, the top row, then every column passes the Test and associated information downward, effectively doing a search in parallel with other columns, and once the information reaches the bottom it passes across the bottom row computing a minimum distance Example of all the columns processed so far as it passes across the row. This means that the time required to process the Test is proportional to (the greater of) the number of PEs in a row or column.

An enhancement of this algorithm proceeds as above but computes and passes along information indicating both the nearest and the second nearest Example found so far. When this information exits the array of PEs, the digital processor that is hosting the PE array computes (in high precision) the distance between the Test and the two Examples indicated by the PE array, and the nearer of the two is output as the likely nearest neighbor to the Test.

Accuracy. We expressed the arithmetic performed by the enhanced algorithm described above as code in the C programming language. That code computes both nearest neighbors, which are discussed here, along with weighted scores, which are discussed below.

The C code performs the same set of arithmetic operations in the same order using the same methods of performing arithmetic as an actual implementation of the present invention, such as one implemented in hardware. It thus yields the same results as the enhanced algorithm would yield when running on an implementation of the present invention. (How the algorithm is organized to run efficiently on such an implementation is discussed below in the section on Efficiency.)

In particular, when computing the distance between the Test and each Example, the code uses Kahan's method, discussed below, to perform the possibly long summation

US 9,218,156 B2

**19**

required to form the sum of the squares of the distances between vector components of the Test and Example.

The C code contains several implementations for arithmetic, as discussed above. When compiled with "#define fp" the arithmetic is done using IEEE standard floating point. If a command line argument is passed in to enable noisy arithmetic, then random noise is added to the result of every calculation. This is the "fp+noise" form of arithmetic. When compiled without "#define fp" the arithmetic is done using low precision logarithmic arithmetic with a 6 bit base-2 fraction. This is the "lns" form of arithmetic.

When the code was run it produced traces showing the results of the computations it performed. These traces, shown below, show that with certain command line arguments the enhanced algorithm yielded certain results for LPHDR nearest neighbor calculations. These results provide details showing the usefulness of this approach. We shall discuss the results briefly here.

The first results are for "fp+noise". Ten distinct runs were performed. Each run generated one million random Example vectors of length five, where each component of each vector was drawn from N(0,1)—the Gaussian (normal) distribution with mean zero and standard deviation 1. Each run then generated one hundred Test vectors of length five, where each component of each vector also was drawn from N(0,1). For each Test, the nearest neighbor was computed both according to the enhanced algorithm above and according to the standard nearest neighbor method using high precision floating point arithmetic. A count was kept of the number of times the enhanced algorithm yielded the same result as the standard floating point method. The results were as follows:

% ./a.out 5 10 1000000 100 1
Representation is Floating Point with noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.84% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.98% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.94% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.82% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.78% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.86% mean score error.

Run 9. On 100 tests, 100(100.0%) matches and 0.85% mean score error.

Run 10. On 100 tests, 99(99.0%) matches and 0.86% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.90%.

Average score error between LPHDR and DP=0.85%.

The "mean score error" values are considered below in the discussion of weighted scores. The "matches" information is relevant here.

Of the ten runs, only one had any test, of the 100 tests performed, which yielded a nearest neighbor different from what the usual high precision method yielded. Thus, the average percentage of matches between the enhanced algorithm running with "fp+noise" arithmetic and the usual method was 99.9%.

A similar computation was then performed using "lns" arithmetic. In this case, the results were:

**20**

& ./a.out 5 10 1000000 100 0
Representation is LNS without noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.15% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.08% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.09% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.11% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.16% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.13% mean score error.

Run 9. On 100 tests, 99(99.0%) matches and 0.17% mean score error.

Run 10. On 100 tests, 98(98.0%) matches and 0.16% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.70%.

Average score error between LPHDR and DP=0.12%.

The average percentage of matches was 99.7%, slightly worse than for "fp+noise".

The accuracy shown by the enhanced nearest neighbor algorithm using two forms of LPHDR arithmetic is surprising. To perform many calculations sequentially with 1% error and yet produce a final result with less than 1% error may seem counter-intuitive. Nonetheless, the LPHDR arithmetic proves effective, and the accuracy shown is high enough to be useful in applications for which approximate nearest neighbor calculations are useful.

As an extreme case, a variant of fp+noise was tested in which the noise varied uniformly from +10% to −5%. Thus, each arithmetic operation produced a result that was between 10% too large and 5% too small. The enhanced nearest neighbor algorithm, as described above, was performed where each run generated 100,000 Example vectors. The surprising results, below, show that even with this extreme level of imprecise, noisy, and non-zero mean LPHDR arithmetic, useful results can be achieved.

Run 1. On 100 tests, 97(97.0%) matches.
Run 2. On 100 tests, 100(100.0%) matches.
Run 3. On 100 tests, 100(100.0%) matches.
Run 4. On 100 tests, 98(98.0%) matches.
Run 5. On 100 tests, 98(98.0%) matches.
Run 6. On 100 tests, 99(99.0%) matches.
Run 7. On 100 tests, 99(99.0%) matches.
Run 8. On 100 tests, 99(99.0%) matches.
Run 9. On 100 tests, 99(99.0%) matches.
Run 10. On 100 tests, 99(99.0%) matches.

Average percentage of time LPHDR (with final DP correction) finds nearest example=98.80%.

Efficiency. In contrast to the surprising Accuracy results, it is clear to those having ordinary skill in the art that the calculations of the enhanced nearest neighbor algorithm can be performed efficiently in the computing model presented, where the arithmetic/memory units are connected in a two-dimensional physical layout, using only local communication between PEs. However, this does not address the matter of keeping the machine busy doing useful work using only low bandwidth to the host machine.

When computing the nearest neighbor to a single Test, the Test flows across all the PEs in the array. As discussed above,

US 9,218,156 B2

21

if the array is an M×M grid, it takes at least O(M) steps for the Test to pass through the machine and return results to the host. During this time the machine performs 0(M×M) nearest neighbor distance computations, but since the machine is capable of performing 0(M×M) calculations at each step, a factor of O(M) is lost.

This speedup, compared to a serial machine, of a factor of O(M) is significant and useful. However, the efficiency can be even higher. If sufficiently many Test vectors, say O(M), or more, are to be processed then they can be streamed into the machine and made to flow through in a pipelined fashion. The time to process O(M) Tests remains O(M), the same as for a single Test, but now the machine performs O(M)×O(M×M) distance computations, and thus within a constant factor the full computing capacity of the machine is used.

Thus, the machine is especially efficient if it is processing at least as many Test vectors as the square root of the number of PEs. There are applications that fit well into this form, such as pattern recognition or compression of many independent Tests (e.g., blocks of an image, parts of a file, price histories of independent stocks) as well as the problem of finding the nearest neighbor to every Example in the set of Examples. This is in contrast to the general view among those having ordinary skill in the art, as discussed above, that machines with very many arithmetic processing elements on a single chip, or similar, are not very useful.

Application 2: Distance Weighted Scoring

A task related to Nearest Neighbor is Distance Weighted Scoring. In this task, each Example has an associated Score. This is a number that in some way characterizes the Example. For instance, if the Examples are abstractions of the history of prices of a given stock, the Scores might be historical probabilities of whether the price is about to increase or decrease. Given a Test vector, the task is to form a weighted sum of the Scores of all the Examples, where the weights are a diminishing function of the distance from the Test to the respective Examples. For example, this weighted score might be taken as a prediction of the future price of the stock whose history is represented by the Test. This use of embodiments of the invention might help support, for instance, high speed trading of stocks, as is performed by certain "quantitative" hedge funds, despite the general view by those having ordinary skill in the art that low precision computation is not of use in financial applications.

The C code described above computes weighted scores along with nearest neighbors. The scores assigned to Examples in this computation are random numbers drawn uniformly from the range [0,1]. The weight for each Example in this computation is defined to be the un-normalized weight for the Example divided by the sum of the un-normalized weights for all Examples, where the un-normalized weight for each Example is defined to be the reciprocal of the sum of one plus the squared distance from the Example to the Test vector. As discussed above, the code performs a number of runs, each producing many Examples and Tests, and compares results of traditional floating point computations with results calculated using fp+noise and Ins arithmetic.

Looking again at the trace results of running the simulation, above, we see that for fp+noise the LPHDR weighted scores on average were within 0.85% of the correct value and never were as much as 1% different. For Ins arithmetic the errors were even smaller, averaging just 0.12% error.

These results are surprising given that computing an overall weighted score involves summing the individual weighted scores associated with each Example. Since each run was

22

processing 1,000,000 Examples, this means that the sums were over one million small positive values. The naive method of summing one million small values with errors of about 1% in each addition should yield results that approximate noise. However, the code performs its sums using a long known method invented by Kahan (Kahan, William (January 1965), "Further remarks on reducing truncation errors", Communications of the ACM 8 (1): 40). The method makes it feasible to perform long sums, such as are done for Distance Weighted Scores, or as might be used in computational finance when computing prices of derivative securities using Monte Carlo methods, or for performing deconvolution in image processing algorithms, as will be discussed next.

The Efficiency of this algorithm is similar to that of NN, as discussed earlier. If many Test vectors are processed at once, the machine performs especially efficiently.

Application 3: Removing Motion Blur in Images

In order to gather sufficient light to form an image, camera shutters are often left open for long enough that camera motion can cause blurring. This can happen as a result of camera shake in inexpensive consumer cameras as well as with very expensive but fast moving cameras mounted on satellites or aircraft. If the motion path of the camera is known (or can be computed) then the blur can be substantially removed using various deblurring algorithms. One such algorithm is the Richardson-Lucy method ("RL"), and we show here that embodiments of the present invention can run that algorithm and produce useful results. Following the discussion format above, we discuss criteria of Accuracy and Efficiency.

Algorithm. The Richardson-Lucy algorithm is well known and widely available. Assume that an image has been blurred using a known kernel. In particular, assume that the kernel is a straight line and that the image has been oriented so that the blur has occurred purely in a horizontal direction. Consider the particular kernel for which the J'th pixel in each row of the blurred image is the uniformly weighted mean of pixels J through J+31 in the original unblurred image.

Accuracy. We implemented in the C programming language a straightforward version of the RL method that uses LPHDR arithmetic. The program reads a test image, blurs it using the kernel discussed above, then deblurs it using either fp+noise or Ins arithmetic. The RL algorithm computes sums, such as when convolving the kernel with the current approximation of the deblurred image. Our implementation computes these sums using the Kahan method, discussed earlier. FIG. 7 shows the test image in original form. It is a satellite picture of a building used during Barack Obama's inauguration. FIG. 8 shows the image extremely blurred by the kernel. It is difficult to see any particular objects in this image. FIG. 9 shows the result of deblurring using standard floating point arithmetic. FIG. 10 shows the result of deblurring using fp+noise arithmetic, and FIG. 11 shows the result of deblurring using Ins arithmetic. In all these cases the image is sufficiently restored that it is possible to recognize buildings, streets, parking lots, and cars.

In addition to displaying the images herein for judgement using the human eye, we computed a numerical measure of deblurring performance. We computed the mean difference, over all pixels in the image, between each original pixel value (a gray scale value from 0 to 255) and the corresponding value in the image reconstructed by the RL method. Those numerical measures are shown below in Table 1:

US 9,218,156 B2

**23**

TABLE 1

| Image type | Mean pixel error |
|---|---|
| Blurred | 32.0 |
| RL using standard floating point | 13.0 |
| RL using fp + noise | 13.8 |
| RL using lns | 14.8 |

These results, together with the subjective but important judgements made by the human eye, show that LPHDR arithmetic provides a substantial and useful degree of deblurring compared to standard floating point arithmetic. Further, in this example we chose an extreme degree of blurring, to better convey the concept and visual impact of the deblurring using LPHDR arithmetic. On more gentle and typical blur kernels, the resulting deblurred images are much closer to the originals than in this case, as can be seen by shrinking the kernel length and running the RL algorithm with LPHDR arithmetic on those more typical cases.

Efficiency. It is clear to those with ordinary skill in the art that Richardson-Lucy using a local kernel performs only local computational operations. An image to be deblurred can be loaded into the PE array, storing one or more pixels per PE, the deconvolution operation of RL can then be iterated dozens or hundreds of times, and the deblurred image can be read back to the host processor. As long as sufficient iterations are performed, this makes efficient use of the machine.

An extreme form of image deblurring is the Iterative Reconstruction method used in computational tomography. Reconstructing 3D volumes from 2D projections is an extremely computational task. The method discussed above generalizes naturally to Iterative Reconstruction and makes efficient use of the machine.

Among the advantages of embodiments of the invention are one or more of the following.

PEs implemented according to certain embodiments of the present invention may be relatively small for PEs that can do arithmetic. This means that there are many PEs per unit of resource (e.g., transistor, area, volume), which in turn means that there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs. For instance, a digital embodiment of the present invention built as a large silicon chip fabricated with current state of the art technology might perform tens of thousand of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. These ratios reflect an architectural advantage of embodiments of the present invention that should persist as fabrication technology continues to improve, even as we reach nanotechnology or other implementations for digital and analog computing.

Doing arithmetic with few resources generally means, and in the embodiments shown specifically means, that the arithmetic is done using low power. As a result, a machine implemented in accordance with embodiments of the present invention can have extremely high performance with reasonable power (for instance in the tens of watts) or low power (for instance a fraction of a watt) with reasonably high performance. This means that such embodiments may be suitable for the full range of computing, from supercomputers, through desktops, down to mobile computing. Similarly, and since cost is generally associated with the amount of available resources, embodiments of the present invention may provide a relatively high amount of computing power per unit of cost compared to conventional computing devices.

**24**

The SIMD architecture is rather old and is frequently discarded as an approach to computer design by those having ordinary skill in the art. However, if the processing elements of a SIMD machine can be made particularly small while retaining important functionality, such as general arithmetic ability, the architecture can be useful. The embodiments presented herein have precisely those qualities.

The discovery that massive amounts of LPHDR arithmetic is useful as a fairly general computing framework, as opposed to the common belief that it is not useful, can be an advantage in any (massively or non-massively) parallel machine design or non-parallel design, not just in SIMD embodiments. It could be used in FPGAs, FPAAs, GPU/SIMT machines, MIMD machines, and in any kind of machine that uses compact arithmetic processing elements to perform large amounts of computation using a small amount of resources (like transistors or volume).

Another advantage of embodiments of the present invention is that they are not merely useful for performing computations efficiently in general, but that they can be used to tackle a variety of real-world problems which are typically assumed to require high-precision computing elements, even though such embodiments include only (or predominantly) low-precision computing elements. Although several examples of such real-world problems have been presented herein, and although we have also had success implementing non-bonded force field computations for molecular dynamics simulation and other tasks, these are merely examples and do not constitute an exhaustive set of the real-world problems that embodiments of the present invention may be used to solve.

The embodiments disclosed above are merely examples and do not constitute limitations of the present invention. Rather, embodiments of the present invention may be implemented in a variety of other ways, such as the following.

For example, embodiments of the present invention may represent values in any of a variety of ways, such as by using digital or analog representations, such as fixed point, logarithmic, or floating point representations, voltages, currents, charges, pulse width, pulse density, frequency, probability, spikes, timing, or combinations thereof. These underlying representations may be used individually or in combination to represent the LPHDR values. LPHDR arithmetic circuits may be implemented in any of a variety of ways, such as by using various digital methods (which may be parallel or serial, pipelined or not) or analog methods or combinations thereof. Arithmetic elements may be connected using various connection architectures, such as nearest 4, nearest 8, hops of varying degree, and architectures which may or may not be rectangular or grid-like. Any method may be used for communication among arithmetic elements, such as parallel or serial, digital or analog or mixed-mode communication. Arithmetic elements may operate synchronously or asynchronously, and may operate globally simultaneously or not. Arithmetic elements may be implemented, for example, on a single physical device, such as a silicon chip, or spread across multiple devices and an embodiment built from multiple devices may have its arithmetic elements connected in a variety of ways, including for example being connected as a grid, torus, hypercube, tree, or other method. Arithmetic elements may be connected to a host machine, if any, in a variety of ways, depending on the cost and bandwidth and other requirements of a particular embodiment. For example there may be many host machines connected to the collection of arithmetic elements.

Although certain embodiments of the present invention are described as being implemented as a SIMD architecture, this

US 9,218,156 B2

25

is merely an example and does not constitute a limitation of the present invention. For example, embodiments of the present invention may be implemented as reconfigurable architectures, such as but not limited to programmable logic devices, field programmable analog arrays, or field programmable gate array architectures, such as a design in which existing multiplier blocks of an FPGA are replaced with or supplemented by LPHDR arithmetic elements of any of the kinds disclosed herein, or in a design in which LPHDR elements are included in a new or existing reconfigurable device design. As another example, embodiments of the present invention may be implemented as a GPU or SIMT-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR elements could supplement or replace traditional arithmetic elements in current or new graphics processing unit designs. As yet another example, embodiments of the present invention may be implemented as a MIMD-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR arithmetic elements could supplement or replace traditional arithmetic elements in current or new MIMD computing system designs. As yet another example, embodiments of the present invention may be implemented as any kind of machine, including a massively parallel machine, which uses compact arithmetic processing elements to provide large amounts of arithmetic computing capability using a small amount of resources (for example, transistors or area or volume) compared with traditional architectures.

Although certain embodiments of the present invention are described herein as executing software, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using microcode or a hardware sequencer or state machine or other controller to control LPHDR arithmetic elements of any of the kinds disclosed herein. Alternatively, for example, embodiments of the present invention may be implemented using hardwired, burned, or otherwise pre-programmed controllers to control LPHDR arithmetic elements of any of the kinds disclosed herein.

Although certain embodiments of the present invention are described herein as being implemented using custom silicon as the hardware, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using FPGA or other reconfigurable chips as the underlying hardware, in which the FPGAs or other reconfigurable chips are configured to perform the LPHDR operations disclosed herein. As another example, embodiments of the present invention may be implemented using any programmable conventional digital or analog computing architecture (including those which use high-precision computing elements, including those which use other kinds of non-LPHDR hardware to perform LPHDR arithmetic, and including those which are massively parallel) which has been programmed with software to perform the LPHDR operations disclosed herein. For example, embodiments of the present invention may be implemented using a software emulator of the functions disclosed herein.

As yet another example, embodiments of the present invention may be implemented using 3D fabrication technologies, whether based on silicon chips or otherwise. Some example embodiments are those in which a memory chip has been bonded onto a processor or other device chip or in which several memory and/or processor or other device chips have been bonded to each other in a stack. 3D embodiments of the

26

present invention are very useful as they may be denser than 2D embodiments and may enable 3D communication of information between the processing units, which enables more algorithms to run efficiently on those embodiments compared to 2D embodiments.

Although certain embodiments of the present invention are described herein as being implemented using silicon chip fabrication technology, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using technologies that may enable other sorts of traditional digital and analog computing processors or other devices. Examples of such technologies include various nanomechanical and nanoelectronic technologies, chemistry based technologies such as for DNA computing, nanowire and nanotube based technologies, optical technologies, mechanical technologies, biological technologies, and other technologies whether based on transistors or not that are capable of implementing LPHDR architectures of the kinds disclosed herein.

Certain embodiments of the present invention have been described as "massively parallel" embodiments. Although certain embodiments of the present invention may include thousands, millions, or more arithmetic units, embodiments of the present invention may include any number of arithmetic units (as few as one). For example, even an embodiment which includes only a single LPHDR unit may be used within a serial processing unit or other device to provide a significant amount of LPHDR processing power in a small, inexpensive processor or other device.

For certain embodiments of the present invention, even if implemented using only digital techniques, the arithmetic operations may not yield deterministic, repeatable, or the most accurate possible results within the chosen low precision representation. For instance, on certain specific input values, an arithmetic operation may produce a result which is not the nearest value in the chosen representation to the true arithmetic result.

The degree of precision of a "low precision, high dynamic range" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, in certain embodiments, a LPHDR arithmetic element produces results which are sometimes (or all of the time) no closer than 0.05% to the correct result (that is, the absolute value of the difference between the produced result and the correct result is no more than one-twentieth of one percent of the absolute value of the correct result). As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.1% to the correct result. As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.2% to the correct result. As yet another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.5% to the correct result. As yet further examples, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 1%, or 2%, or 5%, or 10%, or 20% to the correct result.

Besides having various possible degrees of precision, implementations may vary in the dynamic range of the space of values they process. For example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one millionth to one million. As another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which

US 9,218,156 B2

27                                                        28

may range approximately from one billionth to one billion. As yet another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one sixty five thousandth to sixty five thousand. As yet further examples, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range from any specific value between zero and one sixty five thousandth up to any specific value greater than sixty five thousand. As yet further examples, other embodiments may process values in spaces with dynamic ranges that may combine and may fall between the prior examples, for example ranging from approximately one billionth to ten million. In all of these example embodiments of the present invention, as well as in other embodiments, the values that we are discussing may be signed, so that the above descriptions characterize the absolute values of the numbers being discussed.

The frequency with which LPHDR arithmetic elements may yield only approximations to correct results may vary from implementation to implementation. For example, consider an embodiment in which LPHDR arithmetic elements can perform one or more operations (perhaps including, for example, trigonometric functions), and for each operation the LPHDR elements each accept a set of inputs drawn from a range of valid values, and for each specific set of input values the LPHDR elements each produce one or more output values (for example, simultaneously computing both sin and cos of an input), and the output values produced for a specific set of inputs may be deterministic or non-deterministic. In such an example embodiment, consider further a fraction F of the valid inputs and a relative error amount E by which the result calculated by an LPHDR element may differ from the mathematically correct result. In certain embodiments of the present invention, for each LPHDR arithmetic element, for at least one operation that the LPHDR unit is capable of performing, for at least fraction F of the possible valid inputs to that operation, for at least one output signal produced by that operation, the statistical mean, over repeated execution, of the numerical values represented by that output signal of the LPHDR unit, when executing that operation on each of those respective inputs, differs by at least E from the result of an exact mathematical calculation of the operation on those same input values, where F is 1% and E is 0.05%. In several other example embodiments, F is not 1% but instead is one of 2%, or 5%, or 10%, or 20%, or 50%. For each of these example embodiments, each with some specific value for F, there are other example embodiments in which E is not 0.05% but instead is 0.1%, or 0.2%, or 0.5%, or 1%, or 2%, or 5%, or 10%, or 20%. These varied embodiments are merely examples and do not constitute limitations of the present invention.

For certain devices (such as computers or processors or other devices) embodied according the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits). If NL is the total number of LPHDR elements in such a device, and NH is the total number of elements in the device which are designed to perform high dynamic range arithmetic of traditional precision, then NL exceeds T(NH), where T( ) is some function. Any of a variety of functions may be used as the function T( ). For example, in certain embodiments, T(NH) may be twenty plus three times NH, and the number of LPHDR arithmetic elements in the device may exceed twenty more than three times the number

of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed fifty more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one hundred more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed five thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. Certain embodiments of the present invention may be implemented within a single physical device, such as but not limited to a silicon chip or a chip stack or a chip package or a circuit board, and the number NL of LPHDR elements in the physical device and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the physical device may be the total counts of the respective elements within that physical device. Certain embodiments of the present invention may be implemented in a computing system including more than one physical device, such as but not limited to a collection of silicon chips or chip stacks or chip packages or circuit boards coupled to and communicating with each other using any means (such as a bus, switch, any kind of network connection, or other means of communication), and in this case the number NL of LPHDR elements in the computing system and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the computing system may be the total counts of the respective elements within all those physical devices jointly.

Certain embodiments of the present invention may constitute, or may be part of, processors, which are devices capable of executing software to perform computations. Such processors may include mechanisms for storing software, for using the software to determine what operations to perform, for performing those operations, for storing numerical data, for modifying data according to the software specified operations, and for communicating with devices connected to the processor. Processors may be reconfigurable devices, such as, without limitation, field programmable arrays. Processors may be co-processors to assist host machines or may be capable of operating independently of an external host. Processors may be formed as a collection of component host processors and co-processors of various types, such as CPUs, GPUs, FPGAs, or other processors or other devices, which in the art may be referred to as a heterogeneous processor design or heterogeneous computing system, some or all of which components might incorporate the same or distinct varieties of embodiments of the present invention.

Embodiments of the present invention may, however, be implemented in devices in addition to or other than processors. For example, a computer including a processor and other components (such as memory coupled to the processor by a data path), wherein the processor includes components for performing LPHDR operations in any of the ways disclosed herein, is an example of an embodiment of the present inven-

US 9,218,156 B2

**29**

tion. More generally, any device or combination of devices, whether or not falling within the meaning of a "processor," which performs the functions disclosed herein may constitute an example of an embodiment of the present invention.

More generally, any of the techniques described above may be implemented, for example, in hardware, software tangibly stored on a computer-readable medium, firmware, or any combination thereof. The techniques described above may be implemented in one or more computer programs executing on a programmable computer including a processor, a storage medium readable by the processor (including, for example, volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. Program code may be applied to input entered using the input device to perform the functions described and to generate output. The output may be provided to one or more output devices.

Each computer program within the scope of the claims below may be implemented in any programming language, such as assembly language, machine language, a high-level procedural programming language, or an object-oriented programming language. The programming language may, for example, be a compiled or interpreted programming language.

Each such computer program may be implemented in a computer program product tangibly embodied in a machine-readable storage device for execution by a computer processor. Method steps of the invention may be performed by a computer processor executing a program tangibly embodied on a computer-readable medium to perform functions of the invention by operating on input and generating output. Suitable processors include, by way of example, both general and special purpose microprocessors. Generally, the processor receives instructions and data from a read-only memory and/or a random access memory. Storage devices suitable for tangibly embodying computer program instructions include, for example, all forms of non-volatile memory, such as semiconductor memory devices, including EPROM, EEPROM, and flash memory devices; magnetic disks such as internal hard disks and removable disks; magneto-optical disks; and CD-ROMs. Any of the foregoing may be supplemented by, or incorporated in, specially-designed ASICs (application-specific integrated circuits) or FPGAs (Field-Programmable Gate Arrays). A computer can generally also receive programs and data from a storage medium such as an internal disk (not shown) or a removable disk. These elements will also be found in a conventional desktop or workstation computer as well as other computers suitable for executing computer programs implementing the methods described herein, which may be used in conjunction with any digital print engine or marking engine, display monitor, or other raster output device capable of producing color or gray scale pixels on paper, film, display screen, or other output medium.

The invention claimed is:

1. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the

**30**

LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

2. The method of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine.

3. The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

4. The device of claim 3, wherein X=10%.

5. The device of claim 3, wherein Y=0.2%.

6. The device of claim 3, wherein X=10% and Y=0.2%.

7. The device of claim 3, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

8. The device of claim 3, wherein the first operation is multiplication.

9. A device comprising:

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nanomechanical-technology-based execution unit, a nanoelectronic-technology-based execution unit, a nanowire-technology-based execution unit, a nanotube-technology-based execution unit, and an optical-technology-based execution unit.

10. The device of claim 9, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

11. The device of claim 10, wherein X=10%.

12. The device of claim 10, wherein Y=0.2%.

13. The device of claim 10, wherein X=10% and Y=0.2%.

14. The device of claim 10, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

15. The device of claim 10, wherein the first operation is multiplication.

16. A device comprising:

a plurality of components comprising:

US 9,218,156 B2

31

at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**17.** The device of claim 16, wherein the plurality of components are arranged in a stack.

**18.** The device of claim 17, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**19.** The device of claim 18, wherein X=10%.

**20.** The device of claim 18, wherein Y=0.2%.

**21.** The device of claim 18, wherein X=10% and Y=0.2%.

**22.** The device of claim 18, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**23.** The device of claim 18, wherein the first operation is multiplication.

**24.** The device of claim 16, wherein the plurality of components are bonded.

**25.** The device of claim 16, wherein the plurality of components are arranged in a stack and bonded.

**26.** A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

wherein the at least one first LPHDR execution unit comprises at least one of a chemistry-technology-based execution unit, a biological-technology-based execution unit, a DNA-technology-based execution unit, a nano-mechanical-technology-based execution unit, a nano-

32

electronic-technology-based execution unit, a nanowire-technology-based execution unit, a nanotube-technology-based execution unit, and an optical-technology-based execution unit.

**27.** The device of claim 26, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**28.** The device of claim 27, wherein X=10%.

**29.** The device of claim 27, wherein Y=0.2%.

**30.** The device of claim 27, wherein X=10% and Y=0.2%.

**31.** The device of claim 27, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**32.** The device of claim 27, wherein the first operation is multiplication.

**33.** A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

a plurality of components comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**34.** The device of claim 33, wherein the plurality of components are arranged in a stack.

**35.** The device of claim 34, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**36.** The device of claim 35, wherein X=10%.

**37.** The device of claim 35, wherein Y=0.2%.

**38.** The device of claim 35, wherein X=10% and Y=0.2%.

**39.** The device of claim 35, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**40.** The device of claim 35, wherein the first operation is multiplication.

**41.** The device of claim 33, wherein the plurality of components are bonded.

**42.** The device of claim 33, wherein the plurality of components are arranged in a stack and bonded.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 9,218,156 B2 | Page 1 of 1 |
| APPLICATION NO. | : 13/849606 | |
| DATED | : December 22, 2015 | |
| INVENTOR(S) | : Bates | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Column 9, Lines 30-31, delete "I/O controller 108," and insert -- I/O unit 108, --, therefor.

In Column 20, Line 1, delete "&" and insert -- % --, therefor.

In Column 21, Line 3, delete "0(M×M)" and insert -- O(M×M) --, therefor.

In Column 21, Line 5, delete "0(M×M)" and insert -- O(M×M) --, therefor.

In Column 22, Line 6, delete "Kahan (Kahan," and insert -- Kahan --, therefor.

In Column 30, Line 7, in Claim 2, delete "The method" and insert -- The device --, therefor.

Signed and Sealed this
Twenty-third Day of May, 2017

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*



US008407273B2

(12) **United States Patent**
Bates

(10) Patent No.: **US 8,407,273 B2**
(45) **Date of Patent:** *Mar. 26, 2013

(54) **PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT**

(75) Inventor: **Joseph Bates**, Lexington, MA (US)

(73) Assignee: **Singular Computing LLC**, Newton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/399,884**

(22) Filed: **Feb. 17, 2012**

(65) **Prior Publication Data**

US 2013/0031153 A1    Jan. 31, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/816,201, filed on Jun. 15, 2010, now Pat. No. 8,150,902.

(60) Provisional application No. 61/218,691, filed on Jun. 19, 2009.

(51) **Int. Cl.**
*G06F 7/38* (2006.01)

(52) **U.S. Cl.** ......... **708/524**; 708/490; 712/221; 382/255

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,226,166 A | 7/1993 | Ishida et al. | |
| 5,293,500 A | 3/1994 | Ishida et al. | |
| 5,809,320 A | 9/1998 | Jain et al. | |
| 5,867,683 A | 2/1999 | Witt et al. | |
| 5,887,160 A | 3/1999 | Lauritzen et al. | |
| 5,892,962 A | 4/1999 | Cloutier | |
| 2004/0054708 A1 | 3/2004 | Happonen | |

*Primary Examiner* — Michael D Yaary
(74) *Attorney, Agent, or Firm* — Robert Plotkin, P.C.

(57) **ABSTRACT**

A processor or other device, such as a programmable and/or massively parallel processor or other device, includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements, if any, in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

70 Claims, 11 Drawing Sheets



Google Exhibit 1001
Google v. Singular



FIG. 1



FIG. 2



FIG. 3

Case: 22-1866    Document: 50-1    Page: 356    Filed: 02/03/2023



FIG. 4

Case: 22-1866     Document: 50-1     Page: 357     Filed: 02/03/2023



FIG. 5

Case: 22-1866    Document: 50-1    Page: 358    Filed: 02/03/2023



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

1

# PROCESSING WITH COMPACT ARITHMETIC PROCESSING ELEMENT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/816,201, filed on Jun. 15, 2010, now U.S. Pat. No. 8,150,902 entitled, "Processing with Compact Arithmetic Processing Element," which claims the benefit of U.S. Provisional Patent Application Ser. No. 61/218,691, filed on Jun. 19, 2009, entitled, "Massively Parallel Processing with Compact Arithmetic Element," both of which are hereby incorporated by reference herein.

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND

The ability to compute rapidly has become enormously important to humanity. Weather and climate prediction, medical applications (such as drug design and non-invasive imaging), national defense, geological exploration, financial modeling, Internet search, network communications, scientific research in varied fields, and even the design of new computing hardware have each become dependent on the ability to rapidly perform massive amounts of calculation. Future progress, such as the computer-aided design of complex nano-scale systems or development of consumer products that can see, hear, and understand, will demand economical delivery of even greater computing power.

Gordon Moore's prediction, that computing performance per dollar would double every two years, has proved valid for over 30 years and looks likely to continue in some form. But despite this rapid exponential improvement, the reality is that the inherent computing power available from silicon has grown far more quickly than it has been made available to software. In other words, although the theoretical computing power of computing hardware has grown exponentially, the interfaces through which software is required to access the hardware limits the ability of software to use hardware to perform computations at anything approaching the hardware's theoretical maximum computing power.

Consider a modern silicon microprocessor chip containing about one billion transistors, clocked at roughly 1 GHz. On each cycle the chip delivers approximately one useful arithmetic operation to the software it is running. For instance, a value might be transferred between registers, another value might be incremented, perhaps a multiply is accomplished. This is not terribly different from what chips did 30 years ago, though the clock rates are perhaps a thousand times faster today.

Real computers are built as physical devices, and the underlying physics from which the machines are built often exhibits complex and interesting behavior. For example, a silicon MOSFET transistor is a device capable of performing interesting non-linear operations, such as exponentiation. The junction of two wires can add currents. If configured properly, a billion transistors and wires should be able to

2

perform some significant fraction of a billion interesting computational operations within a few propagation delays of the basic components (a "cycle" if the overall design is a traditional digital design). Yet, today's CPU chips use their billion transistors to enable software to perform merely a few such operations per cycle, not the significant fraction of the billion that might be possible.

## SUMMARY

Embodiments of the present invention are directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations (possibly but not necessarily including, for example, one or more of addition, multiplication, subtraction, and division) on numerical values of low precision but high dynamic range ("LPHDR arithmetic"). Such a processor or other device may, for example, be implemented on a single chip. Whether or not implemented on a single chip, the number of LPHDR arithmetic elements in the processor or other device in certain embodiments of the present invention significantly exceeds (e.g., by at least 20 more than three times) the number of arithmetic elements in the processor or other device which are designed to perform high dynamic range arithmetic of traditional precision (such as 32 bit or 64 bit floating point arithmetic).

In some embodiments, "low precision" processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1% (one tenth of one percent). This is far worse precision than the widely used IEEE 754 single precision floating point standard. Programmable embodiments of the present invention may be programmed with algorithms that function adequately despite these unusually large relative errors. In some embodiments, the processing elements have "high dynamic range" in the sense that they are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an example overall design of a SIMD processor according to one embodiment of the present invention.

FIG. 2 is an example of the Processing Element Array of a SIMD processor according to one embodiment of the present invention.

FIG. 3 is an example of how a Processing Element in a Processing Element Array communicates data with other parts of the processor according to one embodiment of the present invention.

FIG. 4 is an example design for a Processing Element according to one embodiment of the present invention.

FIG. 5 is an example LPHDR data word format according to one embodiment of the present invention.

FIG. 6 is an example design for an LPHDR arithmetic unit according to one embodiment of the present invention.

FIG. 7 is an original image.

FIG. 8 is an image blurred by a blur kernel according to one embodiment of the present invention.

FIG. 9 is an image produced by Richardson Lucy deconvolution using floating point arithmetic according to one embodiment of the present invention.

FIG. 10 is an image produced by Richardson Lucy deconvolution using LPHDR floating point arithmetic with added noise (fp+noise) according to one embodiment of the present invention.

US 8,407,273 B2

3

FIG. 11 is an image produced by Richardson Lucy deconvolution using LPHDR logarithmic arithmetic (Ins) according to one embodiment of the present invention.

## DETAILED DESCRIPTION

As described above, today's CPU chips make inefficient use of their transistors. For example, a conventional CPU chip containing a billion transistors might enable software to perform merely a few operations per clock cycle. Although this is highly inefficient, those having ordinary skill in the art design CPUs in this way for what are widely accepted to be valid reasons. For example, such designs satisfy the (often essential) requirement for software compatibility with earlier designs. Furthermore, they deliver great precision, performing exact arithmetic with integers typically 32 or 64 bits long and performing rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers. Many applications need this kind of precision. As a result, conventional CPUs typically are designed to provide such precision, using on the order of a million transistors to implement the arithmetic operations.

There are many economically important applications, however, which are not especially sensitive to precision and that would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors. Current architectures for general purpose computing fail to deliver this power.

Because of the weaknesses of conventional computers, such as typical microprocessors, other kinds of computers have been developed to attain higher performance. These machines include single instruction stream/multiple data stream (SIMD) designs, multiple instruction stream/multiple data stream (MIMD) designs, reconfigurable architectures such as field programmable gate arrays (FPGAs), and graphics processing unit designs (GPUs) which, when applied to general purpose computing, may be viewed as single instruction stream/multiple thread (SIMT) designs.

SIMD machines follow a sequential program, with each instruction performing operations on a collection of data. They come in two main varieties: vector processors and array processors. Vector processors stream data through a processing element (or small collection of such elements). Each component of the data stream is processed similarly. Vector machines gain speed by eliminating many instruction fetch/decode operations and by pipelining the processor so that the clock speed of the operations is increased.

Array processors distribute data across a grid of processing elements (PEs). Each element has its own memory. Instructions are broadcast to the PEs from a central control unit, sequentially. Each PE performs the broadcast instruction on its local data (often with the option to sit idle that cycle). Array processors gain speed by using silicon efficiently—using just one instruction fetch/decode unit to drive many small simple execution units in parallel.

Array processors have been built using fixed point arithmetic at a wide variety of bit widths, such as 1, 4, 8, and wider, and using floating point arithmetic. Small bit widths allow the processing elements to be small, which allows more of them to fit in the computer, but many operations must be carried out in sequence to perform conventional arithmetic calculations. Wider widths allow conventional arithmetic operations to be completed in a single cycle. In practice, wider widths are desirable. Machines that were originally designed with small bit widths, such as the Connection Machine-1 and the Goodyear Massively Parallel Processor, which each used 1 bit wide

4

processing elements, evolved toward wider data paths to better support fast arithmetic, producing machines such as the Connection Machine-2 which included 32 bit floating point hardware and the MasPar machines which succeeded the Goodyear machine and provided 4 bit processing elements in the MasPar-1 and 32 bit processing elements in the MasPar-2.

Array processors also have been designed to use analog representations of numbers and analog circuits to perform computations. The SCAMP is such a machine. These machines provide low precision arithmetic, in which each operation might introduce perhaps an error of a few percentage points in its results. They also introduce noise into their computations, so the computations are not repeatable. Further, they represent only a small range of values, corresponding for instance to 8 bit fixed point values rather than providing the large dynamic range of typical 32 or 64 bit floating point representations. Given these limitations, the SCAMP was not intended as a general purpose computer, but instead was designed and used for image processing and for modeling biological early vision processes. Such applications do not require a full range of arithmetic operations in hardware, and the SCAMP, for example, omits general division and multiplication from its design.

While SIMD machines were popular in the 1980s, as price/performance for microprocessors improved designers began building machines from large collections of communicating microprocessors. These MIMD machines are fast and can have price/performance comparable to their component microprocessors, but they exhibit the same inefficiency as those components in that they deliver to their software relatively little computation per transistor.

Field Programmable Gate Arrays (FPGAs) are integrated circuits containing a large grid of general purpose digital elements with reconfigurable wiring between those elements. The elements originally were single digital gates, such as AND and OR gates, but evolved to larger elements that could, for instance, be programmed to map 6 inputs to 1 output according to any Boolean function. This architecture allows the FPGA to be configured from external sources to perform a wide variety of digital computations, which allows the device to be used as a co-processor to a CPU to accelerate computation. However, arithmetic operations such as multiplication and division on integers, and especially on floating point numbers, require many gates and can absorb a large fraction of an FPGA's general purpose resources. For this reason, modern FPGAs devote a significant portion of their area to providing dozens or hundreds of multiplier blocks, which can be used instead of general purpose resources for computations requiring multiplication. These multiplier blocks typically perform 18 bit or wider integer multiplies, and use many transistors, as similar multiplier circuits do when they are part of a general purpose CPU.

Existing Field Programmable Analog Arrays (FPAAs) are analogous to FPGAs, but their configurable elements perform analog processing. These devices generally are intended to do signal processing, such as helping model neural circuitry. They are relatively low precision, have relatively low dynamic range, and introduce noise into computation. They have not been designed as, or intended for use as, general purpose computers. For instance, they are not seen by those having ordinary skill in the art as machines that can run the variety of complex algorithms with floating point arithmetic that typically run on high performance digital computers.

Finally, Graphics Processing Units (GPUs) are a variety of parallel processor that evolved to provide high speed graphics capabilities to personal computers. They offer standard floating point computing abilities with very high performance for

US 8,407,273 B2

5

certain tasks. Their computing model is sometimes based on having thousands of nearly identical threads of computing (SIMT), which are executed by a collection of SIMD-like internal computing engines, each of which is directed and redirected to perform work for which a slow external DRAM memory has provided data. Like other machines that implement standard floating point arithmetic, they use many transistors for that arithmetic. They are as wasteful of those transistors, in the sense discussed above, as are general purpose CPUs.

Some GPUs include support for 16 bit floating point values (sometimes called the "Half" format). The GPU manufacturers, currently such as NVIDIA or AMD/ATI, describe this capability as being useful for rendering images with higher dynamic range than the usual 32 bit RGBA format, which uses 8 bits of fixed point data per color, while also saving space over using 32 bit floating point for color components. The special effects movie firm Industrial Light and Magic (ILM) independently defined an identical representation in their OpenEXR standard, which they describe as "a high dynamic-range (HDR) image file format developed by Industrial Light & Magic for use in computer imaging applications." Wikipedia (late 2008) describes the 16 bit floating point representation thusly: "This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth."

When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point, and increasingly, 64 bit floating point. That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, existing GPUs devote substantial resources to 32 (and increasingly 64) bit arithmetic and are wasteful of transistors in the sense discussed above.

The variety of architectures mentioned above are all attempts to get more performance from silicon than is available in a traditional processor design. But designers of traditional processors also have been struggling to use the enormous increase in available transistors to improve performance of their machines. These machines often are required, because of history and economics, to support large existing instruction sets, such as the Intel x86 instruction set. This is difficult, because of the law of diminishing returns, which does not enable twice the performance to be delivered by twice the transistor count. One facet of these designers' struggle has been to increase the precision of arithmetic operations, since transistors are abundant and some applications could be sped up significantly if the processor natively supported long (e.g., 64 bit) numbers. With the increase of native fixed point precision from 8 to 16 to 32 to 64 bits, and of floating point from 32 to 64 and sometimes 128 bits, programmers have come to think in terms of high precision and to develop algorithms based on the assumption that computer processors provide such precision, since it comes as an integral part of each new generation of silicon chips and thus is "free."

Embodiments of the present invention efficiently provide computing power using a fundamentally different approach than those described above. In particular, embodiments of the present invention are directed to computer processors or other devices which use low precision high dynamic range

6

(LPHDR) processing elements to perform computations (such as arithmetic operations).

One variety of LPHDR arithmetic represents values from one millionth up to one million with a precision of about 0.1%. If these values were represented and manipulated using the methods of floating point arithmetic, they would have binary mantissas of no more than 10 bits plus a sign bit and binary exponents of at least 5 bits plus a sign bit. However, the circuits to multiply and divide these floating point values would be relatively large. One example of an alternative embodiment is to use a logarithmic representation of the values. In such an approach, the values require the same number of bits to represent, but multiplication and division are implemented as addition and subtraction, respectively, of the logarithmic representations. Addition and subtraction may be implemented efficiently as described below. As a result, the area of the arithmetic circuits remains relatively small and a greater number of computing elements can be fit into a given area of silicon. This means the machine can perform a greater number of operations per unit of time or per unit power, which gives it an advantage for those computations able to be expressed in the LPHDR framework.

Another embodiment is to use analog representations and processing mechanisms. Analog implementation of LPHDR arithmetic has the potential to be superior to digital implementation, because it tends to use the natural analog physics of transistors or other physical devices instead of using only the digital subset of the device's behavior. This fuller use of the devices' natural abilities may permit smaller mechanisms for doing LPHDR arithmetic. In recent years, in the field of silicon circuitry, analog methods have been supplanted by digital methods. In part, this is because of the ease of doing digital design compared to analog design. Also in part, it is because of the continued rapid scaling of digital technology ("Moore's Law") compared to analog technology. In particular, at deep submicron dimensions, analog transistors no longer work as they had in prior generations of larger-scale technology. This change of familiar behavior has made analog design still harder in recent years. However, digital transistors are in fact analog transistors used in a digital way, meaning digital circuits are really analog circuits designed to attempt to switch the transistors between completely on and completely off states. As scaling continues, even this use of transistors is starting to come face to face with the realities of analog behavior. Scaling of transistors for digital use is expected either to stall or to require digital designers increasingly to acknowledge and work with analog issues. For these reasons, digital embodiments may no longer be easy, reliable, and scalable, and analog embodiments of LPHDR arithmetic may come to dominate commercial architectures.

Because LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other, and therefore may constitute a massively parallel LPHDR processor or other device. Such a processor or other device has not been described or practiced as a means of doing general purpose computing by those having ordinary skill in the art for at least two reasons. First, it is commonly believed by those having ordinary skill in the art, that LPHDR computation, and in particular massive amounts of LPHDR computation, whether performed in a massively parallel way or not, is not practical as a substrate for moderately general computing. Second, it is commonly believed by those having ordinary skill in the art that massive amounts of even high precision computation on a single chip or in a single machine, as is enabled by a compact arithmetic processing unit, is not useful without a corresponding

US 8,407,273 B2

7

increase in bandwidth between processing elements within the machine and into and out of the machine because computing is wire limited and arithmetic can be considered to be available at no cost.

Despite these views—that massive amounts of arithmetic on a chip or in a massively parallel machine are not useful, and that massive amounts of LPHDR arithmetic are even worse—embodiments of the present invention disclosed herein demonstrate that massively parallel LPHDR designs are in fact useful and provide significant practical benefits in at least several significant applications.

To conclude, modern digital computing systems provide high precision arithmetic, but that precision is costly. A modern double precision floating point multiplier may require on the order of a million transistors, even though only a handful of transistors is required to perform a low precision multiplication. Despite the common belief among those having ordinary skill in the art that modern applications require high precision processing, in fact a variety of useful algorithms function adequately at much lower precision. As a result, such algorithms may be performed by processors or other devices implemented according to embodiments of the present invention, which come closer to achieving the goal of using a few transistors to multiply and a wire junction to add, thus enabling massively parallel arithmetic computation to be performed with relatively small amounts of physical resources (such as a single silicon chip). Although certain specialized tasks can function at low precision, it is not obvious, and in fact has been viewed as clearly false by those having ordinary skill in the art, that relatively general purpose computing such as is typically performed today on general purpose computers can be done at low precision. However, in fact a variety of useful and important algorithms can be made to function adequately at much lower than 32 bit precision in a massively parallel computing framework, and certain embodiments of the present invention support such algorithms, thereby offering much more efficient use of transistors, and thereby provide improved speed, power, and/or cost, compared to conventional computers.

Various computing devices implemented according to embodiments of the present invention will now be described. Some of these embodiments may be an instance of a SIMD computer architecture. Other architectures may be used, such as MIMD architectures, programmable array architectures (such as FPGAs and FPAAs), or GPU/SIMT architectures. The techniques disclosed herein may, for example, be implemented using any processor or other device having such an existing architecture, and replacing or augmenting some or all existing arithmetic units in the processor or other device, if any, with LPHDR arithmetic units in any of the ways disclosed herein. Devices implemented according to embodiments of the present invention, however, need not start with an existing processor design, but instead may be designed from scratch to include LPHDR arithmetic units within any of the architectures just described, or any other architecture.

Embodiments of the present invention may, for example, be implemented using the architecture of a particular kind of SIMD computer, the array processor. There are many variations and specific instances of array processors described in the scientific and commercial literature. Examples include the Illiac 4, the Connection Machine 1 and 2, the Goodyear MPP, and the MasPar line of computers.

Embodiments of the present invention need not, however, be implemented as SIMD computers. For example, embodiments of the present invention may be implemented as FPGAs, FPAAs, or related architectures that provide for flexible connectivity of a set of processing elements. For

8

example, embodiments of the present invention may be implemented as GPU/SIMTs and as MIMDs, among others. For example, embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures. Furthermore, references herein to "processing elements" within embodiments of the present invention should be understood more generally as any kind of execution unit, whether for performing LPHDR operations or otherwise.

An example SIMD computing system 100 is illustrated in FIG. 1. The computing system 100 includes a collection of many processing elements (PEs) 104. Sometimes present are a control unit (CU) 106, an I/O unit (IOU) 108, various Peripheral devices 110, and a Host computer 102. The collection of PEs is referred to herein as "the Processing Element Array" (PEA), even though it need not be two-dimensional or an array or grid or other particular layout. Some machines include additional components, such as an additional memory system called the "Staging Memory" in the Goodyear MPP, but these additional elements are neither essential in the computer nor needed to understand embodiments of the present invention and therefore are omitted here for clarity of explanation. One embodiment of the present invention is a SIMD computing system of the kind shown in FIG. 1, in which one or more (e.g., all) of the PEs in the PEA 104 are LPHDR elements, as that term is used herein.

The Host 102 is responsible for overall control of the computing system 100. It performs the serial, or mostly serial, computation typical of a traditional uni-processor. The Host 102 could have more complicated structure, of course, including parallelism of various sorts. Indeed a heterogeneous computing system combining multiple computing architectures in a single machine is a good use for embodiments of the present invention.

A goal of the Host 102 is to have the PEA 104 perform massive amounts of computation in a useful way. It does this by causing the PEs to perform computations, typically on data stored locally in each PE, in parallel with one another. If there are many PEs, much work gets done during each unit of time.

The PEs in the PEA 104 may be able to perform their individual computations roughly as fast as the Host 102 performs its computations. This means it may be inefficient to have the Host 102 attempt to control the PEA 104 on a time scale as fine as the Host's or PEA's minimal time step. (This minimal time, in a traditional digital design, would be the clock period.) For this reason, the specialized control unit (CU) 106 may be included in the architecture. The CU 106 has the primary task of retrieving and decoding instructions from an instruction memory, which conceptually is part of the CU 106, and issuing the partially decoded instructions to all the PEs in the PEA 104. (This may be viewed by the CU software as happening roughly simultaneously for all the PEs, though it need not literally be synchronous, and in fact it may be effective to use an asynchronous design in which multiple instructions at different stages of completion simultaneously propagate gradually across the PEA, for instance as a series of wave fronts.)

In a design which includes the CU 106, the Host 102 typically will load the instructions (the program) for the PEA 104 into the CU instruction memory (not shown in FIG. 1), then instruct the CU 106 to interpret the program and cause the PEA 104 to compute according to the instructions. The program may, for example, look generally similar to a typical machine language program, with instructions to cause data movement, logical operations, arithmetic operations, etc., in

US 8,407,273 B2

9

and between the PEs and other instructions to do similar operations together with control flow operations within the CU 106. Thus, the CU 106 may run a typical sort of program, but with the ability to issue massively parallel instructions to the PEA 104.

In order to get data into and out of the CU 106 and PEA 104, the I/O Unit 108 may interface the CU 106 and PEA 104 with the Host 102, the Host's memory (not shown in FIG. 1), and the system's Peripherals 110, such as external storage (e.g., disk drives), display devices for visualization of the computational results, and sometimes special high bandwidth input devices (e.g., vision sensors). The PEA's ability to process data far faster than the Host 102 makes it useful for the IOU 108 to be able to completely bypass the Host 102 for some of its data transfers. Also, the Host 102 may have its own ways of communicating with the Peripherals 110.

The particular embodiment illustrated in FIG. 1 is shown merely for purposes of example and does not constitute a limitation of the present invention. For example, alternatively the functions performed by the CU 106 could instead be performed by the Host 102 with the CU 106 omitted. The CU 106 could be implemented as hardware distant from the PEA 104 (e.g., off-chip), or the CU 106 could be near to the PEA 104 (e.g., on-chip). I/O could be routed through the CU 106 with the IOU 108 omitted or through the separate I/O controller 108, as shown. Furthermore, the Host 102 is optional; the CU 106 may include, for example, a CPU, or otherwise include components sufficient to replace the functions performed by the Host 102. The Peripherals 110 shown in FIG. 1 are optional. The design shown in FIG. 1 could have a special memory, such as the Goodyear MPP's "staging memory," which provides an intermediate level of local storage. Such memory could, for example, be bonded to the LPHDR chip using 3D fabrication technology to provide relatively fast parallel access to the memory from the PEs in the PEA 104.

The PEA 104 itself, besides communicating with the CU 106 and IOU 108 and possibly other mechanisms, has ways for data to move within the array. For example, the PEA 104 may be implemented such that data may move from PEs only to their nearest neighbors, that is, there are no long distance transfers. FIGS. 2 and 3 show embodiments of the present invention which use this approach, where the nearest neighbors are the four adjacent PEs toward the North, East, West, and South, called a NEWS design. For example, FIG. 2 shows a subset of the PEs in PEA 104, namely PE 202, PE 204, PE 206, PE 208, and PE 210. When the CU 106 issues data movement instructions, all the PEs access data from or send data to their respective specified nearest neighbor. For instance, every PE might access a specified data value in its neighbor to the West and copy it into its own local storage. In some embodiments, such as some analog embodiments, these kinds of transfers may result in some degradation of the value copied.

FIG. 3 shows a PE 302 that includes data connections to the IOU 108. PE 302 is connected at the North to PE 304, at the East to PE 306, at the South to PE 308, and at the West to PE 310. However, driving signals from inside the PEA 104 out to the IOU 108 usually requires a physically relatively large driving circuit or analogous mechanism. Having those at every PE may absorb much of the available resources of the hardware implementation technology (such as VLSI area). In addition, having independent connections from every PE to the IOU 108 means many such connections, and long connections, which also may absorb much of the available hardware resources. For these reasons, the connections between the PEs and the IOU 108 may be limited to those PEs at the

10

edges of the PE array 104. In this case, to get data out of, and perhaps into, the PEA 104, the data is read and written at the edges of the array and CU instructions are performed to shift data between the edges and interior of the PEA 104. The design may permit data to be pushed from the IOU 108 inward to any PE in the array using direct connections, but may require readout to occur by using the CU 106 to shift data to the edges where it can be read by the IOU 108.

Connections between the CU 106 and PEA 104 have analogous variations. One design may include the ability to drive instructions into all the PEs roughly simultaneously, but another approach is to have the instructions flow gradually (for instance, shift in discrete time steps) across the PEA 104 to reach the PEs. Some SIMD designs, which may be implemented in embodiments of the present invention, have a facility by which a "wired-or" or "wired-and" of the state of every PE in the PEA 104 can be read by the CU 106 in approximately one instruction delay time.

There are many well studied variations on these matters in the literature, any of which may be incorporated into embodiments of the present invention. For example, an interconnect, such as an 8-way local interconnect, may be used. The local connections may include a mixture of various distance hops, such as distance 4 or 16 as well as distance 1. The outside edges may be connected using any topology, such as a torus or twisted torus. Instead of or in addition to a local interconnect, a more complex global interconnect, such as the hypercube design, may be used. Furthermore, the physical implementation of the PEA 104 (e.g., a chip) could be replicated (e.g., tiled on a circuit board) to produce a larger PEA. The replication may form a simple grid or other arrangement, just as the component PEAs may but need not be grids.

FIG. 4 shows an example design for a PE 400 (which may be used to implement any one or more of the PEs in the PEA 104). The PE 400 stores local data. The amount of memory for the local data varies significantly from design to design. It may depend on the implementation technologies available for fabricating the PE 400. Sometimes rarely changing values (Constants) take less room than frequently changing values (Registers), and a design may provide more Constants than Registers. For instance, this may be the case with digital embodiments that use single transistor cells for the Constants (e.g., floating gate Flash memory cells) and multiple transistor cells for the Registers (e.g., 6-transistor SRAM cells). Sometimes the situation is reversed, as may be the case in analog embodiments, where substantial area for capacitance may be needed to ensure stable long term storage of Constants, and such embodiments may have more Registers than Constants. Typical storage capacities might be tens or hundreds of arithmetic values stored in the Registers and Constants in each PE, but these capacities are adjustable by the designer. Some designs, for instance, may have Register storage but no Constant storage. Some designs may have thousands or even many more values stored in each PE. All of these variations may be reflected in embodiments of the present invention.

Each PE needs to operate on its local data. For this reason within the PE 400 there are data paths 402$a$-$i$, routing mechanisms (such as the multiplexor MUX 404), and components to perform some collection of logical and arithmetic operations (such as the logic unit 406 and the LPHDR arithmetic unit 408). The LPHDR arithmetic unit 408 performs LPHDR arithmetic operations, as that term is used herein. The input, output, and intermediate "values" received by, output by, and operated on by the PE 400 may, for example, take the form of electrical signals representing numerical values.

US 8,407,273 B2

11

The PE **400** also may have one or more flag bits, shown as Mask **410** in FIG. **4**. The purpose of the Mask **410** is to enable some PEs, the ones in which a specified Mask bit is set, to ignore some instructions issued by the CU **106**. This allows some variation in the usual lock-step behaviors of all PEs in the PEA **104**. For instance, the CU **106** may issue an instruction that causes each PE to reset or set its Mask **410** depending on whether a specified Register in the PE is positive or negative. A subsequent instruction, for instance an arithmetic instruction, may include a bit meaning that the instruction should be performed only by those PEs whose Mask **410** is reset. This combination has the effect of conditionally performing the arithmetic instruction in each PE depending on whether the specified Register in that PE was positive. As with the Compare instructions of traditional computers, there are many possible design choices for mechanisms to set and clear Masks.

The operation of the PEs is controlled by control signals **412***a-d* received from the CU **106**, four of which are shown in FIG. **4** merely for purposes of example and not limitation. We have not shown details of this mechanism, but the control signals **412***a-d* specify which Register or Constant memory values in the PE **400** or one of its neighbors to send to the data paths, which operations should be performed by the Logic **406** or Arithmetic **408** or other processing mechanisms, where the results should be stored in the Registers, how to set, reset, and use the Mask **410**, and so on. These matters are well described in the literature on SIMD processors.

Many variations of this PE **400** and PEA design are possible and fall within the scope of the present invention. Digital PEs can have shifters, lookup tables, and many other mechanisms such as described in the literature. Analog PEs can have time-based operators, filters, comparators with global broadcast signals and many other mechanisms such as described in the literature. The PEA **104** can include global mechanisms such as wired-OR or wired-AND for digital PEAs or wired-SUM for analog PEAs Again, there are many variations well described in the literature on digital and analog computing architectures.

For example, LPHDR operations other than and/or in addition to addition and multiplication may be supported. For example, a machine which can only perform multiplication and the function (**1**-X) may be used to approximate addition and other arithmetic operations. Other collections of LPHDR operations may be used to approximate LPHDR arithmetic operations, such as addition, multiplication, subtraction, and division, using techniques that are well-known to those having ordinary skill in the art.

One aspect of embodiments of the present invention that is unique is the inclusion of LPHDR arithmetic mechanisms in the PEs. Embodiments of such mechanisms will now be described.

One digital embodiment of the LPHDR arithmetic unit **408** operates on digital (binary) representations of numbers. In one digital embodiment these numbers are represented by their logarithms. Such a representation is called a Logarithmic Number System (LNS), which is well-understood by those having ordinary skill in the art.

In an LNS, numbers are represented as a sign and an exponent. There is an implicit base for the logarithms, typically 2 when working with digital hardware. In the present embodiment, a base of 2 is used for purposes of example. As a result, a value, say B, is represented by its sign and a base 2 logarithm, say b, of its absolute value. For numbers to have representation errors of at most, say, 1% (one percent), the fractional part of this logarithm should be represented with enough precision that the least possible change in the fraction

12

corresponds to about a 1% change in the value B. If fractions are represented using 6 bits, increasing or decreasing the fraction by 1 corresponds to multiplying or dividing B by the 64th root of 2, which is approximately 1.011. This means that numbers may be represented in the present embodiment with a multiplicative error of approximately 1%. So, in this example embodiment the fraction part of the representation has 6 bits.

Furthermore, the space of values processed in the present embodiment have high dynamic range. To represent numbers whose absolute value is from, say, one billionth to one billion, the integer part of the logarithm must be long enough to represent plus or minus the base 2 logarithm of one billion. That logarithm is about 29.9. In the present embodiment the integer part of the logarithm representation is 5 bits long to represent values from 0 to 31, which is sufficient. There also is a sign bit in the exponent. Negative logarithms are represented using two's complement representation.

In an LNS, the value zero corresponds to the logarithm negative infinity. One can choose a representation to explicitly represent this special value. However, to minimize resources (for instance, area) used by arithmetic circuits, the present embodiment represents zero by the most negative possible logarithm, which is –32, corresponding to the two's complement bit representation '100000 000000', and denoting a value of approximately 2.33E-10.

When computing, situations can arise in which operations cannot produce reasonable values. An example is when a number is too large to be represented in the chosen word format, such as when multiplying or adding two large numbers or upon divide by zero (or nearly zero). One common approach to this problem is to allow a value to be marked as Not A Number (NAN) and to make sure that each operation produces NAN if a problem arises or if either of its inputs is NAN. The present embodiment uses this approach, as will be described in the following.

FIG. **5** shows the word format **500** for these numbers, in the present embodiment. It has one NAN bit **502***a*, one bit **502***b* for the sign of the value, and 12 bits **502***c-e* representing the logarithm. The logarithm bits include a 5 bit integer part **502***d* and a 6 bit fraction part **502***e*. To permit the logarithms to be negative, there is a sign bit **502***c* for the logarithm which is represented in two's complement form. The NAN bit is set if some problem has arisen in computing the value. The word format **500** shown in FIG. **5** is merely an example and does not constitute a limitation of the present invention. Other variations may be used, so long as they have low precision and high dynamic range.

FIG. **6** shows an example digital implementation of the LPHDR arithmetic unit **408** for the representation illustrated in FIG. **5**. The unit **408** receives two inputs, A **602***a* and B **602***b*, and produces an output **602***c*. The inputs **602***a-b* and output **602***c* may, for example, take the form of electrical signals representing numerical values according to the representation illustrated in FIG. **5**, as is also true of signals transmitted within the unit **408** by components of the unit **408**. The inputs **602***a-b* and output **602***c* each are composed of a Value and a NAN (Not A Number) bit. The unit **408** is controlled by control signals **412***a-d*, coming from the CU **106**, that determine which available arithmetic operation will be performed on the inputs **602***a-b*. In this embodiment, all the available arithmetic operations are performed in parallel on the inputs **602***a-b* by adder/subtractor **604**, multiplier **606**, and divider **608**. Adder/subtractor **604** performs LPHDR addition and subtraction, multiplier **606** performs LPHDR multiplication, and divider **608** performs LPHDR division.

US 8,407,273 B2

13

The desired result (from among the outputs of adder/subtractor **604**, multiplier **606**, and divider **608**) is chosen by the multiplexers (MUXes) **610**$a$ and **610**$b$. The right hand MUX **610**$b$ sends the desired value to the output **602**$c$. The left hand MUX **610**$a$ sends the corresponding NAN bit from the desired operation to the OR gate **612**, which outputs a set NAN bit if either input is NAN or if the specified arithmetic operation yields NAN. The computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. **6**.

LNS arithmetic has the great advantage that multiplication (MUL) and division (DIV) are very easy to compute and take few physical resources (e.g., little area in a silicon implementation). The sign of the result is the exclusive-or of the signs of the operands. The logarithm part of the output is the sum, in the case of MUL, or the difference, in the case of DIV, of the logarithm parts of the operands. The sum or difference of the logarithms can overflow, producing a NAN result. Certain other operations also are easy in LNS arithmetic. For instance, square root corresponds to dividing the logarithm in half, which in our representation means simply shifting it one bit position to the right.

Thus, the multiplier **606** and divider **608** in FIG. **6** are implemented as circuits that simply add or subtract their inputs, which are two's complement binary numbers (which in turn happen to be logarithms). If there is overflow, they output a 1 for NAN.

Implementing addition and subtraction in LNS, that is, the adder/subtractor **604** in FIG. **6**, follows a common approach used in the literature on LNS. Consider addition. If we have two positive numbers B and C represented by their logarithms b and c, the representation of the sum of B and C is log(B+C). An approach to computing this result that is well known to those skilled in the art is based on noticing that log(B+C)=log (B*(1+C/B))=log(B)+log(1+C/B)=b+F(c−b) where F(x) =log(1+2ˆx). Thus, the present embodiment computes c−b, feeds that through F, and adds the result to b, using standard digital techniques known to those skilled in the art.

Much of the published literature about LNS is concerned with how to compute F(x), the special function for ADD, along with a similar function for SUB. Often these two functions share circuitry, and this is why a single combined adder/ subtractor **604** is used in the embodiment of FIG. **6**. There are many published ways to compute these functions or approximations to them, including discussions of how to do this when the values are of low precision. Any such method, or other method, may be used. Generally speaking, the more appropriate variations for massively parallel LPHDR arithmetic are those that require the minimal use of resources, such as circuit area, taking advantage of the fact that the representation used in the embodiment of FIG. **6** is low precision and that the arithmetic operations need not be deterministic nor return the most accurate possible answer within the low precision representation. Thus, embodiments of the present invention may use circuitry that does not compute the best possible answer, even among the limited choices available in a low precision representation.

In order to enable conditional operation of selected PEs, the present embodiment is able to reset and set the MASK flag **410** based on results of computations. The mechanism for doing this is that the CU **106** includes instructions that cause the MASK **410** in each PE to be unconditionally reset or set its flag along with other instructions to perform basic tests on values entering the MASK **410** on data path **402**$f$ and to set the flag accordingly. Examples of these latter instructions include copying the sign bit or NAN bit of the word on data path **402**$f$ into the MASK bit **410**. Another example is to set the MASK

14

bit **410** if the 12 bit value part of the word on data path **402**$f$ is equal to binary zero. There are many additional and alternative ways for doing this that are directly analogous to comparison instructions in traditional processors and which are well understood by those skilled in the art.

It is worth noting that while the obvious method of using the above LNS operations is to do LPHDR arithmetic, the programmer also may consider selected values to be 12 bit two's complement binary numbers. MUL and DIV may be used to add and subtract such values, since that is precisely their behavior in LNS implementations. The Mask setting instructions can compare these simple binary values. So besides doing LPHDR computations, this digital embodiment using LNS can perform simple binary arithmetic on short signed integers.

Some embodiments of the present invention may include analog representations and processing methods. Such embodiments may, for example, represent LPHDR values as charges, currents, voltages, frequencies, pulse widths, pulse densities, various forms of spikes, or in other forms not characteristic of traditional digital implementations. There are many such representations discussed in the literature, along with mechanisms for processing values so represented. Such methods, often called Analog methods, can be used to perform LPHDR arithmetic in the broad range of architectures we have discussed, of which SIMD is one example.

An example of an analog SIMD architecture is the SCAMP design (and related designs) of Dudek. In that design values have low dynamic range, being accurate roughly to within 1%. Values are represented by charges on capacitors. Those capacitors typically are the gates of transistors. Each PE has several memory cells, analogous to the Registers shown in FIG. **4**. Addition is performed by turning on pass transistors from the two operands, which transfer their charge onto an analog bus, where it is summed by the natural physics of charge and wires, upon which it is gated onto another Register to charge up its capacitor, which then represents the sum of the operands. The detailed mechanism disclosed by Dudek actually produces the negative of the sum, but the basic concept is as described and is a simple way to perform addition and subtraction using analog representations and simple processing mechanisms.

Variations of the SCAMP design have been fabricated and used to perform a range of low precision, low dynamic range computations related to image processing. These designs do not perform high dynamic range arithmetic, nor do they include mechanisms for performing multiplication or division of values stored in Registers. However, the Dudek designs suggest the general feasibility of constructing analog SIMD machines. The following describes how to build an analog SIMD machine that performs LPHDR arithmetic, and is thus an embodiment of the present invention.

One embodiment of the present invention represents values as a mixture of analog and digital forms. This embodiment represents values as low precision, normalized, base 2 floating point numbers, where the mantissa is an analog value and the exponent is a binary digital value. The analog value may be accurate to about 1%, following the approach of Dudek, which is well within the range of reasonable analog processing techniques. The exponent may be 6 bits long, or whatever is needed to provide the desired high dynamic range.

To multiply values, the embodiment proceeds by analogy to traditional floating point methods. The digital exponents are summed using a binary arithmetic adder, a standard digital technique. The analog mantissas are multiplied. Since they represent normalized values between approximately ½ and 1, their product may be as small as approximately ¼. Such a

US 8,407,273 B2

15                                                        16

product value needs to be normalized back to the range ½ to 1. This is done, in the present embodiment, by comparing the analog mantissa to an analog representation of ½, using a threshold circuit. If the mantissa is below ½, then it is doubled and one is subtracted from the exponent, where such subtraction is simple digital subtraction. Doubling the mantissa is implemented in a way that corresponds to the chosen analog representation. For example, whatever means are being used to add two analog values can be used to double the mantissa, by adding it to a copy of itself. For example, if the mantissa is represented as a current, such as copy may be produced by a current mirror, or other suitable mechanism, and addition may be performed by a current summing junction.

The means of multiplying the original analog mantissas depends on the representation chosen. For example, if mantissas are represented using charge, following SCAMP, then any known method from the literature may be used to convert charge to current. For instance, since the charge on a capacitor determines the voltage on the capacitor, this may be implemented as a conversion from voltage to current, which is a basic technique in analog electronics known to those skilled in the art. In any case, if the mantissas are represented as currents, or once the mantissas are converted to currents, they may be multiplied using, for instance, the techniques of Gilbert. The Gilbert multiplier produces a current, representing the product, which may, if necessary, then be converted back to charge (or whatever representation is used). These are merely examples of how the needed operations might be performed. The literature discusses these matters extensively and these kinds of analog circuits are known to those skilled in the art.

Adding and subtracting values requires pre-normalization of the values to the same exponent, as is done in traditional digital floating point arithmetic. The present embodiment does this by comparing the exponents and choosing the smaller one. Then the smaller one is subtracted from the larger, using digital means. The difference specifies how many times the mantissa which corresponds to the smaller exponent needs to be divided in half. If that mantissa is represented by (or converted to) a current, then an analog R-2R style ladder may be used to divide the current in half the required number of times, with the stage of the ladder specified by the difference of exponents calculated as above. The resulting scaled down current is added to (or subtracted from, if this is an LPHDR subtraction operation) the current corresponding to the mantissa associated with the larger exponent to yield the output mantissa. The output exponent associated with the output mantissa is the larger exponent. Post-normalization may be needed at this point. If the output mantissa is greater than 1, then it needs to be divided in half and the output exponent needs to be incremented. If it is less than ½, then it needs to be doubled enough times to exceed ½ and the output exponent must be decremented correspondingly, which may be performed by a series of threshold circuits, doubler circuits, and associated decrementer circuits. These increments and decrements of the binary digital exponent, and corresponding doublings and halvings of the analog mantissa current, are straightforward operations well known to those skilled in the art.

The present embodiment represents the exponent as a digital binary number. Alternate embodiments may represent the exponent as an analog value. However, it is important that the exponent be represented in storage and computation in such a manner that neither noise nor other errors cause a change in the value it represents. Such changes in the exponent could introduce factors of two (or in some embodiments larger) changes in the values of the stored numbers. To maintain

accuracy of the exponents, an embodiment may quantize the exponent to relatively few levels, for instance 16 values plus a sign bit. During processing, slight variations in the analog representation of the exponent may then be removed by circuitry that restores values to the 16 standard quantization levels. To get sufficient dynamic range in such an embodiment, the floating point numbers may be processed as base 4 numbers, rather than the usual base 2 numbers. This means, for instance, that normalized mantissas are in the range ¼ to 1. The methods discussed above for addition, subtraction, and multiplication apply as described, with slight and straightforward variations.

The analog and mixed signal embodiments discussed above are merely examples and do not constitute a limitation of the present invention. The published literature on neuromorphic, analog, and mixed signal techniques provides a wealth of methods that enable LPHDR storage and processing to be implemented. Such storage and processing may introduce noise as well as fabrication errors into the behavior of machines performing LPHDR arithmetic. The results we present below, on software applications running using "fp+ noise" arithmetic, show that despite these very "un-digital" qualities a machine built in this way is surprisingly useful.

Evidence that LPHDR arithmetic is useful in several important practical computing applications will now be provided. The evidence is presented for a broad variety of embodiments of the present invention, thereby showing that the usefulness does not depend much on the detailed implementation.

For the goal of showing usefulness, we choose a very general embodiment of an LPHDR machine. Our model of the machine is that it provides at least the following capabilities: (1) is massively parallel, (2) provides LPHDR arithmetic possibly with noise, (3) provides a small amount of memory local to each arithmetic unit, (4) provides the arithmetic/ memory units in a two-dimensional physical layout with only local connections between units (rather than some more powerful, flexible, or sophisticated connection mechanism), and (5) provides only limited bandwidth between the machine and the host machine. Note that this model is merely an example which is used for the purpose of demonstrating the utility of various embodiments of the present invention. This model includes, among others, implementations that are digital or analog or mixed, have zero or more noise, have architectures which are FPGA-like, or SIMD-like, or MIMD-like, or otherwise meet the assumptions of the model. More general architectures, such as shared memory designs, GPU-like designs, or other sophisticated designs subsume this model's capabilities, and so LPHDR arithmetic in those architectures also is useful. While we are thus showing that LPHDR arithmetic is useful for a broad range of designs, of which SIMD is only an instance, for purpose of discussion below, we call each unit, which pairs memory with arithmetic, a Processing Element or "PE".

Several applications are discussed below. For each, the discussion shows (1) that the results are useful when computation is performed in possibly noisy LPHDR arithmetic, and (2) that the computation can be physically laid out in two dimensions with only local flow of data between units, only limited memory within each unit, and only limited data flow to/from the host machine, in such a way that the computation makes efficient use of the machine's resources (area, time, power). The first requirement is referred to as "Accuracy" and the second requirement "Efficiency." Applications that meet both requirements running in this model will function well on

many kinds of LPHDR machines, and thus those machines are a broadly useful invention.

Applications are tested using two embodiments for the machine's arithmetic. One uses accurate floating point arithmetic but multiplies the result of each arithmetic operation by a uniformly chosen random number between 0.99 and 1.01. In the following discussion, this embodiment is denoted "fp+noise". It may represent the results produced by an analog embodiment of the machine.

A second embodiment uses logarithmic arithmetic with a value representation as shown in FIG. 5. The arithmetic is repeatable, that is, not noisy, but because of the short fraction size it produces errors of up to approximately 1-2% in each operation. In the following discussion, this embodiment is denoted "Ins". It may represent the results produced by a particular digital embodiment of the machine.

To demonstrate usefulness of embodiments of the invention, we shall discuss three computational tasks that are enabled by embodiments of the invention and which in turn enable a variety of practical applications. Two of the tasks are related to finding nearest neighbors and the other is related to processing visual information. We shall describe the tasks, note their practical application, and then demonstrate that each task is solvable using the general model described above and thus solvable using embodiments of the present invention.

Application 1

Finding Nearest Neighbors

Given a large set of vectors, called Examples, and a given vector, called Test, the nearest neighbor problem ("NN") is to find the Example which is closest to Test where the distance metric is the square of the Euclidean distance (sum of squares of distances between respective components).

NN is a widely useful computation. One use is for data compression, where it is called "vector quantization". In this application we have a set of relatively long vectors in a "code book" (these are the Examples) and associated short code words (for instance the index of the vector in the code book). We move through a sequence of vectors to be compressed, and for each such vector (Test), find the nearest vector in the code book and output the corresponding code word. This reduces the sequence of vectors to the shorter sequence of code words. Because the code words do not completely specify the original sequence of vectors, this is a lossy form of data compression. Among other applications, it may be used in speech compression and in the MPEG standards.

Another application of NN would be in determining whether snippets of video occur in a large video database. Here we might abstract frames of video from the snippet into feature vectors, using known methods, such as color histograms, scale invariant feature extraction, etc. The Examples would be analogous feature vectors extracted from the video database. We would like to know whether any vector from the snippet was close to any vector from the database, which NN can help us decide.

In many applications of nearest neighbor, we would prefer to find the true nearest neighbor but it is acceptable if we sometimes find another neighbor that is only slightly farther away or if we almost always find the true nearest neighbor. Thus, an approximate solution to the nearest neighbor problem is useful, especially if it can be computed especially quickly, or at low power, or with some other advantage compared to an exact solution.

We shall now show that approximate nearest neighbor is computable using embodiments of the present invention in a way that meets the criteria of Accuracy and Efficiency.

Algorithm.

The following describes an algorithm which may be performed by machines implemented according to embodiments of the present invention, such as by executing software including instructions for performing the algorithm. The inputs to the algorithm are a set of Examples and a Test vector. The algorithm seeks to find the nearest (or almost nearest) Example to the Test.

In the simplest version of the algorithm, the number of Examples may be no larger than the number of PEs and each vector must be short enough to fit within a single PE's memory. The Examples are placed into the memories associated with the PEs, so that one Example is placed in each PE. Given a Test, the Test is passed through all the PEs, in turn. Accompanying the Test as it passes through the PEs is the distance from the Test to the nearest Example found so far, along with information that indicates what PE (and thus what Example) yielded that nearest Example found so far. Each PE computes the distance between the Test and the Example stored in that PE's memory, and then passes along the Test together with either the distance and indicator that was passed into this PE (if the distance computed by this PE exceeded the distance passed into the PE) or the distance this PE computed along with information indicating this PE's Example is the nearest so far (if the distance computed by this PE is less than the distance passed into the PE). Thus, the algorithm is doing a simple minimization operation as the Test is passed through the set of PEs. When the Test and associated information leave the last PE, the output is a representation of which PE (and Example) was closest to the Test, along with the distance between that Example and the Test.

In a more efficient variant of this algorithm, the Test is first passed along, for example, the top row, then every column passes the Test and associated information downward, effectively doing a search in parallel with other columns, and once the information reaches the bottom it passes across the bottom row computing a minimum distance Example of all the columns processed so far as it passes across the row. This means that the time required to process the Test is proportional to (the greater of) the number of PEs in a row or column.

An enhancement of this algorithm proceeds as above but computes and passes along information indicating both the nearest and the second nearest Example found so far. When this information exits the array of PEs, the digital processor that is hosting the PE array computes (in high precision) the distance between the Test and the two Examples indicated by the PE array, and the nearer of the two is output as the likely nearest neighbor to the Test.

Accuracy.

We expressed the arithmetic performed by the enhanced algorithm described above as code in the C programming language. That code computes both nearest neighbors, which are discussed here, along with weighted scores, which are discussed below.

The C code performs the same set of arithmetic operations in the same order using the same methods of performing arithmetic as an actual implementation of the present invention, such as one implemented in hardware. It thus yields the same results as the enhanced algorithm would yield when running on an implementation of the present invention. (How the algorithm is organized to run efficiently on such an implementation is discussed below in the section on Efficiency.)

In particular, when computing the distance between the Test and each Example, the code uses Kahan's method, dis-

US 8,407,273 B2

**19**

cussed below, to perform the possibly long summation required to form the sum of the squares of the distances between vector components of the Test and Example.

The C code contains several implementations for arithmetic, as discussed above. When compiled with "#define fp" the arithmetic is done using IEEE standard floating point. If a command line argument is passed in to enable noisy arithmetic, then random noise is added to the result of every calculation. This is the "fp+noise" form of arithmetic. When compiled without "#define fp" the arithmetic is done using low precision logarithmic arithmetic with a 6 bit base-2 fraction. This is the "lns" form of arithmetic.

When the code was run it produced traces showing the results of the computations it performed. These traces, shown below, show that with certain command line arguments the enhanced algorithm yielded certain results for LPHDR nearest neighbor calculations. These results provide details showing the usefulness of this approach. We shall discuss the results briefly here.

The first results are for "fp+noise". Ten distinct runs were performed. Each run generated one million random Example vectors of length five, where each component of each vector was drawn from N(0,1)—the Gaussian (normal) distribution with mean zero and standard deviation 1. Each run then generated one hundred Test vectors of length five, where each component of each vector also was drawn from N(0,1). For each Test, the nearest neighbor was computed both according to the enhanced algorithm above and according to the standard nearest neighbor method using high precision floating point arithmetic. A count was kept of the number of times the enhanced algorithm yielded the same result as the standard floating point method. The results were as follows:

% ./a.out 5 10 1000000 100 1

Representation is Floating Point with noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.84% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.98% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.81% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.94% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.82% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.78% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.86% mean score error.

Run 9. On 100 tests, 100(100.0%) matches and 0.85% mean score error.

Run 10. On 100 tests, 99(99.0%) matches and 0.86% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.90%.

Average score error between LPHDR and DP=0.85%.

The "mean score error" values are considered below in the discussion of weighted scores. The "matches" information is relevant here.

Of the ten runs, only one had any test, of the 100 tests performed, which yielded a nearest neighbor different from what the usual high precision method yielded. Thus, the average percentage of matches between the enhanced algorithm running with "fp+noise" arithmetic and the usual method was 99.9%.

**20**

A similar computation was then performed using "lns" arithmetic. In this case, the results were:

% ./a.out 5 10 1000000 100 0

Representation is LNS without noise.

Run 1. On 100 tests, 100(100.0%) matches and 0.15% mean score error.

Run 2. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 3. On 100 tests, 100(100.0%) matches and 0.08% mean score error.

Run 4. On 100 tests, 100(100.0%) matches and 0.09% mean score error.

Run 5. On 100 tests, 100(100.0%) matches and 0.11% mean score error.

Run 6. On 100 tests, 100(100.0%) matches and 0.16% mean score error.

Run 7. On 100 tests, 100(100.0%) matches and 0.07% mean score error.

Run 8. On 100 tests, 100(100.0%) matches and 0.13% mean score error.

Run 9. On 100 tests, 99(99.0%) matches and 0.17% mean score error.

Run 10. On 100 tests, 98(98.0%) matches and 0.16% mean score error.

Average percentage of time LPHDR (with final DP correction) finds nearest example=99.70%.

Average score error between LPHDR and DP=0.12%.

The average percentage of matches was 99.7%, slightly worse than for "fp+noise".

The accuracy shown by the enhanced nearest neighbor algorithm using two forms of LPHDR arithmetic is surprising. To perform many calculations sequentially with 1% error and yet produce a final result with less than 1% error may seem counter-intuitive. Nonetheless, the LPHDR arithmetic proves effective, and the accuracy shown is high enough to be useful in applications for which approximate nearest neighbor calculations are useful.

As an extreme case, a variant of fp+noise was tested in which the noise varied uniformly from +10% to −5%. Thus, each arithmetic operation produced a result that was between 10% too large and 5% too small. The enhanced nearest neighbor algorithm, as described above, was performed where each run generated 100,000 Example vectors. The surprising results, below, show that even with this extreme level of imprecise, noisy, and non-zero mean LPHDR arithmetic, useful results can be achieved.

Run 1. On 100 tests, 97(97.0%) matches.

Run 2. On 100 tests, 100(100.0%) matches.

Run 3. On 100 tests, 100(100.0%) matches.

Run 4. On 100 tests, 98(98.0%) matches.

Run 5. On 100 tests, 98(98.0%) matches.

Run 6. On 100 tests, 99(99.0%) matches.

Run 7. On 100 tests, 99(99.0%) matches.

Run 8. On 100 tests, 99(99.0%) matches.

Run 9. On 100 tests, 99(99.0%) matches.

Run 10. On 100 tests, 99(99.0%) matches.

Average percentage of time LPHDR (with final DP correction) finds nearest example=98.80%.

Efficiency.

In contrast to the surprising Accuracy results, it is clear to those having ordinary skill in the art that the calculations of the enhanced nearest neighbor algorithm can be performed efficiently in the computing model presented, where the arithmetic/memory units are connected in a two-dimensional physical layout, using only local communication between

US 8,407,273 B2

21                                                                                    22

PEs. However, this does not address the matter of keeping the machine busy doing useful work using only low bandwidth to the host machine.

When computing the nearest neighbor to a single Test, the Test flows across all the PEs in the array. As discussed above, if the array is an M×M grid, it takes at least O(M) steps for the Test to pass through the machine and return results to the host. During this time the machine performs O(M×M) nearest neighbor distance computations, but since the machine is capable of performing O(M×M) calculations at each step, a factor of O(M) is lost.

This speedup, compared to a serial machine, of a factor of O(M) is significant and useful. However, the efficiency can be even higher. If sufficiently many Test vectors, say O(M), or more, are to be processed then they can be streamed into the machine and made to flow through in a pipelined fashion. The time to process O(M) Tests remains O(M), the same as for a single Test, but now the machine performs O(M)×O(M×M) distance computations, and thus within a constant factor the full computing capacity of the machine is used.

Thus, the machine is especially efficient if it is processing at least as many Test vectors as the square root of the number of PEs. There are applications that fit well into this form, such as pattern recognition or compression of many independent Tests (e.g., blocks of an image, parts of a file, price histories of independent stocks) as well as the problem of finding the nearest neighbor to every Example in the set of Examples. This is in contrast to the general view among those having ordinary skill in the art, as discussed above, that machines with very many arithmetic processing elements on a single chip, or similar, are not very useful.

Application 2

Distance Weighted Scoring

A task related to Nearest Neighbor is Distance Weighted Scoring. In this task, each Example has an associated Score. This is a number that in some way characterizes the Example. For instance, if the Examples are abstractions of the history of prices of a given stock, the Scores might be historical probabilities of whether the price is about to increase or decrease. Given a Test vector, the task is to form a weighted sum of the Scores of all the Examples, where the weights are a diminishing function of the distance from the Test to the respective Examples. For example, this weighted score might be taken as a prediction of the future price of the stock whose history is represented by the Test. This use of embodiments of the invention might help support, for instance, high speed trading of stocks, as is performed by certain "quantitative" hedge funds, despite the general view by those having ordinary skill in the art that low precision computation is not of use in financial applications.

The C code described above computes weighted scores along with nearest neighbors. The scores assigned to Examples in this computation are random numbers drawn uniformly from the range [0,1]. The weight for each Example in this computation is defined to be the un-normalized weight for the Example divided by the sum of the un-normalized weights for all Examples, where the un-normalized weight for each Example is defined to be the reciprocal of the sum of one plus the squared distance from the Example to the Test vector. As discussed above, the code performs a number of runs, each producing many Examples and Tests, and compares results of traditional floating point computations with results calculated using fp+noise and Ins arithmetic.

Looking again at the trace results of running the simulation, above, we see that for fp+noise the LPHDR weighted scores on average were within 0.85% of the correct value and never were as much as 1% different. For Ins arithmetic the errors were even smaller, averaging just 0.12% error.

These results are surprising given that computing an overall weighted score involves summing the individual weighted scores associated with each Example. Since each run was processing 1,000,000 Examples, this means that the sums were over one million small positive values. The naive method of summing one million small values with errors of about 1% in each addition should yield results that approximate noise. However, the code performs its sums using a long known method invented by Kahan (Kahan, William (January 1965), "Further remarks on reducing truncation errors", Communications of the ACM 8 (1): 40). The method makes it feasible to perform long sums, such as are done for Distance Weighted Scores, or as might be used in computational finance when computing prices of derivative securities using Monte Carlo methods, or for performing deconvolution in image processing algorithms, as will be discussed next.

The Efficiency of this algorithm is similar to that of NN, as discussed earlier. If many Test vectors are processed at once, the machine performs especially efficiently.

Application 3

Removing Motion Blur in Images

In order to gather sufficient light to form an image, camera shutters are often left open for long enough that camera motion can cause blurring. This can happen as a result of camera shake in inexpensive consumer cameras as well as with very expensive but fast moving cameras mounted on satellites or aircraft. If the motion path of the camera is known (or can be computed) then the blur can be substantially removed using various deblurring algorithms. One such algorithm is the Richardson-Lucy method ("RL"), and we show here that embodiments of the present invention can run that algorithm and produce useful results. Following the discussion format above, we discuss criteria of Accuracy and Efficiency.

Algorithm.

The Richardson-Lucy algorithm is well known and widely available. Assume that an image has been blurred using a known kernel. In particular, assume that the kernel is a straight line and that the image has been oriented so that the blur has occurred purely in a horizontal direction. Consider the particular kernel for which the J'th pixel in each row of the blurred image is the uniformly weighted mean of pixels J through J+31 in the original unblurred image.

Accuracy.

We implemented in the C programming language a straightforward version of the RL method that uses LPHDR arithmetic. The program reads a test image, blurs it using the kernel discussed above, then deblurs it using either fp+noise or Ins arithmetic. The RL algorithm computes sums, such as when convolving the kernel with the current approximation of the deblurred image. Our implementation computes these sums using the Kahan method, discussed earlier. FIG. 7 shows the test image in original form. It is a satellite picture of a building used during Barack Obama's inauguration. FIG. 8 shows the image extremely blurred by the kernel. It is difficult to see any particular objects in this image. FIG. 9 shows the result of deblurring using standard floating point arithmetic. FIG. 10 shows the result of deblurring using fp+noise arithmetic, and FIG. 11 shows the result of deblurring using Ins

US 8,407,273 B2

**23**

arithmetic. In all these cases the image is sufficiently restored that it is possible to recognize buildings, streets, parking lots, and cars.

In addition to displaying the images herein for judgement using the human eye, we computed a numerical measure of deblurring performance. We computed the mean difference, over all pixels in the image, between each original pixel value (a gray scale value from 0 to 255) and the corresponding value in the image reconstructed by the RL method. Those numerical measures are shown below in Table 1:

TABLE 1

| Image type | Mean pixel error |
|---|---|
| Blurred | 32.0 |
| RL using standard floating point | 13.0 |
| RL using fp + noise | 13.8 |
| RL using lns | 14.8 |

These results, together with the subjective but important judgements made by the human eye, show that LPHDR arithmetic provides a substantial and useful degree of deblurring compared to standard floating point arithmetic. Further, in this example we chose an extreme degree of blurring, to better convey the concept and visual impact of the deblurring using LPHDR arithmetic. On more gentle and typical blur kernels, the resulting deblurred images are much closer to the originals than in this case, as can be seen by shrinking the kernel length and running the RL algorithm with LPHDR arithmetic on those more typical cases.

Efficiency.

It is clear to those with ordinary skill in the art that Richardson-Lucy using a local kernel performs only local computational operations. An image to be deblurred can be loaded into the PE array, storing one or more pixels per PE, the deconvolution operation of RL can then be iterated dozens or hundreds of times, and the deblurred image can be read back to the host processor. As long as sufficient iterations are performed, this makes efficient use of the machine.

An extreme form of image deblurring is the Iterative Reconstruction method used in computational tomography. Reconstructing 3D volumes from 2D projections is an extremely computational task. The method discussed above generalizes naturally to Iterative Reconstruction and makes efficient use of the machine.

Among the advantages of embodiments of the invention are one or more of the following.

PEs implemented according to certain embodiments of the present invention may be relatively small for PEs that can do arithmetic. This means that there are many PEs per unit of resource (e.g., transistor, area, volume), which in turn means that there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs. For instance, a digital embodiment of the present invention built as a large silicon chip fabricated with current state of the art technology might perform tens of thousand of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. These ratios reflect an architectural advantage of embodiments of the present invention that should persist as fabrication technology continues to improve, even as we reach nanotechnology or other implementations for digital and analog computing.

Doing arithmetic with few resources generally means, and in the embodiments shown specifically means, that the arithmetic is done using low power. As a result, a machine imple-

**24**

mented in accordance with embodiments of the present invention can have extremely high performance with reasonable power (for instance in the tens of watts) or low power (for instance a fraction of a watt) with reasonably high performance. This means that such embodiments may be suitable for the full range of computing, from supercomputers, through desktops, down to mobile computing. Similarly, and since cost is generally associated with the amount of available resources, embodiments of the present invention may provide a relatively high amount of computing power per unit of cost compared to conventional computing devices.

The SIMD architecture is rather old and is frequently discarded as an approach to computer design by those having ordinary skill in the art. However, if the processing elements of a SIMD machine can be made particularly small while retaining important functionality, such as general arithmetic ability, the architecture can be useful. The embodiments presented herein have precisely those qualities.

The discovery that massive amounts of LPHDR arithmetic is useful as a fairly general computing framework, as opposed to the common belief that it is not useful, can be an advantage in any (massively or non-massively) parallel machine design or non-parallel design, not just in SIMD embodiments. It could be used in FPGAs, FPAAs, GPU/SIMT machines, MIMD machines, and in any kind of machine that uses compact arithmetic processing elements to perform large amounts of computation using a small amount of resources (like transistors or volume).

Another advantage of embodiments of the present invention is that they are not merely useful for performing computations efficiently in general, but that they can be used to tackle a variety of real-world problems which are typically assumed to require high-precision computing elements, even though such embodiments include only (or predominantly) low-precision computing elements. Although several examples of such real-world problems have been presented herein, and although we have also had success implementing non-bonded force field computations for molecular dynamics simulation and other tasks, these are merely examples and do not constitute an exhaustive set of the real-world problems that embodiments of the present invention may be used to solve.

The embodiments disclosed above are merely examples and do not constitute limitations of the present invention. Rather, embodiments of the present invention may be implemented in a variety of other ways, such as the following.

For example, embodiments of the present invention may represent values in any of a variety of ways, such as by using digital or analog representations, such as fixed point, logarithmic, or floating point representations, voltages, currents, charges, pulse width, pulse density, frequency, probability, spikes, timing, or combinations thereof. These underlying representations may be used individually or in combination to represent the LPHDR values. LPHDR arithmetic circuits may be implemented in any of a variety of ways, such as by using various digital methods (which may be parallel or serial, pipelined or not) or analog methods or combinations thereof. Arithmetic elements may be connected using various connection architectures, such as nearest 4, nearest 8, hops of varying degree, and architectures which may or may not be rectangular or grid-like. Any method may be used for communication among arithmetic elements, such as parallel or serial, digital or analog or mixed-mode communication. Arithmetic elements may operate synchronously or asynchronously, and may operate globally simultaneously or not. Arithmetic elements may be implemented, for example, on a single physical device, such as a silicon chip, or spread across multiple

US 8,407,273 B2

25                                                          26

devices and an embodiment built from multiple devices may have its arithmetic elements connected in a variety of ways, including for example being connected as a grid, torus, hypercube, tree, or other method. Arithmetic elements may be connected to a host machine, if any, in a variety of ways, depending on the cost and bandwidth and other requirements of a particular embodiment. For example there may be many host machines connected to the collection of arithmetic elements.

Although certain embodiments of the present invention are described as being implemented as a SIMD architecture, this is merely an example and does not constitute a limitation of the present invention. For example, embodiments of the present invention may be implemented as reconfigurable architectures, such as but not limited to programmable logic devices, field programmable analog arrays, or field programmable gate array architectures, such as a design in which existing multiplier blocks of an FPGA are replaced with or supplemented by LPHDR arithmetic elements of any of the kinds disclosed herein, or for example in which LPHDR elements are included in a new or existing reconfigurable device design. As another example, embodiments of the present invention may be implemented as a GPU or SIMT-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR elements could supplement or replace traditional arithmetic elements in current or new graphics processing unit designs. As yet another example, embodiments of the present invention may be implemented as a MIMD-style architecture which incorporates LPHDR arithmetic elements of any of the kinds disclosed herein. For example, LPHDR arithmetic elements could supplement or replace traditional arithmetic elements in current or new MIMD computing system designs. As yet another example, embodiments of the present invention may be implemented as any kind of machine, including a massively parallel machine, which uses compact arithmetic processing elements to provide large amounts of arithmetic computing capability using a small amount of resources (for example, transistors or area or volume) compared with traditional architectures.

Although certain embodiments of the present invention are described as executing software, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using microcode or a hardware sequencer or state machine or other controller to control LPHDR arithmetic elements of any of the kinds disclosed herein. Alternatively, for example, embodiments of the present invention may be implemented using hardwired, burned, or otherwise pre-programmed controllers to control LPHDR arithmetic elements of any of the kinds disclosed herein.

Although certain embodiments of the present invention are described herein as being implemented using custom silicon as the hardware, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using FPGA or other reconfigurable chips as the underlying hardware, in which the FPGAs or other reconfigurable chips are configured to perform the LPHDR operations disclosed herein. As another example, embodiments of the present invention may be implemented using any programmable conventional digital or analog computing architecture (including those which use high-precision computing elements, including those which use other kinds of non-LPHDR hardware to perform LPHDR arithmetic, and including those which are massively parallel) which has been programmed with software to perform the LPHDR operations disclosed herein. For example, embodiments of the present invention may be implemented using a software emulator of the functions disclosed herein.

As yet another example, embodiments of the present invention may be implemented using 3D fabrication technologies, whether based on silicon chips or otherwise. Some example embodiments are those in which a memory chip has been bonded onto a processor or other device chip or in which several memory and/or processor or other device chips have been bonded to each other in a stack. 3D embodiments of the present invention are very useful as they may be denser than 2D embodiments and may enable 3D communication of information between the processing units, which enables more algorithms to run efficiently on those embodiments compared to 2D embodiments.

Although certain embodiments of the present invention are described herein as being implemented using silicon chip fabrication technology, this is merely an example and does not constitute a limitation of the present invention. Alternatively, for example, embodiments of the present invention may be implemented using technologies that may enable other sorts of traditional digital and analog computing processors or other devices. Examples of such technologies include various nanomechanical and nanoelectronic technologies, chemistry based technologies such as for DNA computing, nanowire and nanotube based technologies, optical technologies, mechanical technologies, biological technologies, and other technologies whether based on transistors or not that are capable of implementing LPHDR architectures of the kinds disclosed herein.

Certain embodiments of the present invention have been described as "massively parallel" embodiments. Although certain embodiments of the present invention may include thousands, millions, or more arithmetic units, embodiments of the present invention may include any number of arithmetic units (as few as one). For example, even an embodiment which includes only a single LPHDR unit may be used within a serial processing unit or other device to provide a significant amount of LPHDR processing power in a small, inexpensive processor or other device.

For certain embodiments of the present invention, even if implemented using only digital techniques, the arithmetic operations may not yield deterministic, repeatable, or the most accurate possible results within the chosen low precision representation. For instance, on certain specific input values, an arithmetic operation may produce a result which is not the nearest value in the chosen representation to the true arithmetic result.

The degree of precision of a "low precision, high dynamic range" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, in certain embodiments, a LPHDR arithmetic element produces results which are sometimes (or all of the time) no closer than 0.05% to the correct result (that is, the absolute value of the difference between the produced result and the correct result is no more than one-twentieth of one percent of the absolute value of the correct result). As another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 0.1% to the correct result. As another example, a LPHDR arithmetic element may produce results which are sometimes (or al of the time) no closer than 0.2% to the correct result. As yet another example, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than

US 8,407,273 B2

27      28

0.5% to the correct result. As yet further examples, a LPHDR arithmetic element may produce results which are sometimes (or all of the time) no closer than 1%, or 2%, or 5%, or 10%, or 20% to the correct result.

Besides having various possible degrees of precision, implementations may vary in the dynamic range of the space of values they process. For example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one millionth to one million. As another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one billionth to one billion. As yet another example, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range approximately from one sixty five thousandth to sixty five thousand. As yet further examples, in certain embodiments, a LPHDR arithmetic element processes values in a space which may range from any specific value between zero and one sixty five thousandth up to any specific value greater than sixty five thousand. As yet further examples, other embodiments may process values in spaces with dynamic ranges that may combine and may fall between the prior examples, for example ranging from approximately one billionth to ten million. In all of these example embodiments of the present invention, as well as in other embodiments, the values that we are discussing may be signed, so that the above descriptions characterize the absolute values of the numbers being discussed.

The frequency with which LPHDR arithmetic elements may yield only approximations to correct results may vary from implementation to implementation. For example, consider an embodiment in which LPHDR arithmetic elements can perform one or more operations (perhaps including, for example, trigonometric functions), and for each operation the LPHDR elements each accept a set of inputs drawn from a range of valid values, and for each specific set of input values the LPHDR elements each produce one or more output values (for example, simultaneously computing both sin and cos of an input), and the output values produced for a specific set of inputs may be deterministic or non-deterministic. In such an example embodiment, consider further a fraction F of the valid inputs and a relative error amount E by which the result calculated by an LPHDR element may differ from the mathematically correct result. In certain embodiments of the present invention, for each LPHDR arithmetic element, for at least one operation that the LPHDR unit is capable of performing, for at least fraction F of the possible valid inputs to that operation, for at least one output signal produced by that operation, the statistical mean, over repeated execution of the numerical values represented by that output signal of the LPHDR unit, when executing that operation on each of those respective inputs, differs by at least E from the result of an exact mathematical calculation of the operation on those same input values, where F is 1% and E is 0.05%. In several other example embodiments, F is not 1% but instead is one of 2%, or 5%, or 10%, or 20%, or 50%. For each of these example embodiments, each with some specific value for F, there are other example embodiments in which E is not 0.05% but instead is 0.1%, or 0.2%, or 0.5%, or 1%, or 2%, or 5%, or 10%, or 20%. These varied embodiments are merely examples and do not constitute limitations of the present invention.

For certain devices (such as computers or processors or other devices) embodied according the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits). If NL is the total number of LPHDR elements in such a device, and NH is the total number of elements in the device which are designed to perform high dynamic range arithmetic of traditional precision, then NL exceeds T(NH), where TO is some function. Any of a variety of functions may be used as the function TO. For example, in certain embodiments, T(NH) may be twenty plus three times NH, and the number of LPHDR arithmetic elements in the device may exceed twenty more than three times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed fifty more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one hundred more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed one thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. As yet another example, in certain embodiments, the number of LPHDR arithmetic elements in the device may exceed five thousand more than five times the number of arithmetic elements in the device, if any, designed to perform high dynamic range arithmetic of traditional precision. Certain embodiments of the present invention may be implemented within a single physical device, such as but not limited to a silicon chip or a chip stack or a chip package or a circuit board, and the number NL of LPHDR elements in the physical device and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the physical device may be the total counts of the respective elements within that physical device. Certain embodiments of the present invention may be implemented in a computing system including more than one physical device, such as but not limited to a collection of silicon chips or chip stacks or chip packages or circuit boards coupled to and communicating with each other using any means (such as a bus, switch, any kind of network connection, or other means of communication), and in this case the number NL of LPHDR elements in the computing system and the number NH of elements designed to perform high dynamic range arithmetic of traditional precision in the computing system may be the total counts of the respective elements within all those physical devices jointly.

Certain embodiments of the present invention may constitute, or may be part of, processors, which are devices capable of executing software to perform computations. Such processors may include mechanisms for storing software, for using the software to determine what operations to perform, for performing those operations, for storing numerical data, for modifying data according to the software specified operations, and for communicating with devices connected to the processor. Processors may be reconfigurable devices, such as, without limitation, field programmable arrays. Processors may be co-processors to assist host machines or may be capable of operating independently of an external host. Processors may be formed as a collection of component host processors and co-processors of various types, such as CPUs, GPUs, FPGAs, or other processors or other devices, which in

US 8,407,273 B2

29                                                    30

the art may be referred to as a heterogeneous processor design or heterogeneous computing system, some or all of which components might incorporate the same or distinct varieties of embodiments of the present invention.

Embodiments of the present invention may, however, be implemented in devices in addition to or other than processors. For example, a computer including a processor and other components (such as memory coupled to the processor by a data path), wherein the processor includes components for performing LPHDR operations in any of the ways disclosed herein, is an example of an embodiment of the present invention. More generally, any device or combination of devices, whether or not falling within the meaning of a "processor," which performs the functions disclosed herein may constitute an example of an embodiment of the present invention.

More generally, any of the techniques described above may be implemented, for example, in hardware, software tangibly stored on a computer-readable medium, firmware, or any combination thereof. The techniques described above may be implemented in one or more computer programs executing on a programmable computer including a processor, a storage medium readable by the processor (including, for example, volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. Program code may be applied to input entered using the input device to perform the functions described and to generate output. The output may be provided to one or more output devices.

Each computer program within the scope of the claims below may be implemented in any programming language, such as assembly language, machine language, a high-level procedural programming language, or an object-oriented programming language. The programming language may, for example, be a compiled or interpreted programming language.

Each such computer program may be implemented in a computer program product tangibly embodied in a machine-readable storage device for execution by a computer processor. Method steps of the invention may be performed by a computer processor executing a program tangibly embodied on a computer-readable medium to perform functions of the invention by operating on input and generating output. Suitable processors include, by way of example, both general and special purpose microprocessors. Generally, the processor receives instructions and data from a read-only memory and/or a random access memory. Storage devices suitable for tangibly embodying computer program instructions include, for example, all forms of non-volatile memory, such as semiconductor memory devices, including EPROM, EEPROM, and flash memory devices; magnetic disks such as internal hard disks and removable disks; magneto-optical disks; and CD-ROMs. Any of the foregoing may be supplemented by, or incorporated in, specially-designed ASICs (application-specific integrated circuits) or FPGAs (Field-Programmable Gate Arrays). A computer can generally also receive programs and data from a storage medium such as an internal disk (not shown) or a removable disk. These elements will also be found in a conventional desktop or workstation computer as well as other computers suitable for executing computer programs implementing the methods described herein, which may be used in conjunction with any digital print engine or marking engine, display monitor, or other raster output device capable of producing color or gray scale pixels on paper, film, display screen, or other output medium.

The invention claimed is:

**1.** A device:

comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**2.** The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**3.** The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**4.** The device of claim **3**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**5.** The device of claim **1**, wherein the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**6.** The device of claim **5**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**7.** The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least one hundred LPHDR execution units.

**8.** The device of claim **1**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**9.** The device of claim **1**, wherein the at least one first LPHDR execution unit comprises at least five hundred LPHDR execution units.

**10.** The device of claim **1**, wherein the number of LPHDR execution units in the device exceeds by at least five hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**11.** The device of claim **8**, wherein X=10%.

**12.** The device of claim **8**, wherein Y=0.1%.

**13.** The device of claim **8**, wherein Y=0.15%.

**14.** The device of claim **8**, wherein Y=0.2%.

**15.** The device of claim **8**, wherein X=10% and wherein Y=0.1%.

**16.** The device of claim **8**, wherein X=10% and wherein Y=0.15%.

**17.** The device of claim **8**, wherein X=10% and wherein Y=0.2%.

**18.** The device of claim **8**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**19.** The device of claim **1**, wherein the at least one first LPHDR execution unit comprises a plurality of locally connected LPHDR execution units.

**20.** The device of claim **1**, wherein the device has a SIMD architecture.

**21.** The device of claim **1**, wherein the device includes memory locally accessible to the at least one first LPHDR execution unit.

31

**22**. The device of claim **1**, wherein the device is implemented on a silicon chip.

**23**. The device of claim **1**, wherein the device is implemented on a silicon chip using digital technology.

**24**. The device of claim **1**, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit.

**25**. The device of claim **1**, wherein the at least one LPHDR execution unit comprises at least five hundred locally connected LPHDR execution units, wherein the device includes memory locally accessible to at least one of the LPHDR execution units, and wherein the device is implemented on a silicon chip using digital technology.

**26**. The device of claim **1**, wherein the device is part of a mobile device.

**27**. The device of claim **1**, wherein the at least one first LPHDR execution unit represents numbers using a logarithmic representation.

**28**. The device of claim **1**, wherein the at least one first LPHDR execution unit represents numbers using a floating point representation.

**29**. The device of claim **1**:
wherein the device further comprises input means for receiving data representing an input image; and
wherein the input image includes the first input signal.

**30**. The device of claim **29**, wherein the device is part of a mobile device.

**31**. The device of claim **29**, wherein the device is adapted to deblur the input image.

**32**. The device of claim **1**, wherein the device is adapted to perform nearest neighbor search.

**33**. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:
at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value;
wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

**34**. The device of claim **33**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**35**. The device of claim **33**, wherein the number of LPHDR execution units in the second device exceeds by at least ten the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**36**. A device:
comprising at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

32

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;
wherein the number of LPHDR execution units in the device exceeds the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**37**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**38**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**39**. The device of claim **38**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**40**. The device of claim **36**, wherein the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**41**. The device of claim **40**, wherein the at least one first LPHDR execution unit comprises at least part of an FPGA.

**42**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least one hundred LPHDR execution units.

**43**. The device of claim **36**, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**44**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises at least five hundred LPHDR execution units.

**45**. The device of claim **36**, wherein the number of LPHDR execution units in the device exceeds by at least five hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**46**. The device of claim **43**, wherein X=10%.

**47**. The device of claim **43**, wherein Y=0.1%.

**48**. The device of claim **43**, wherein Y=0.15%.

**49**. The device of claim **43**, wherein Y=0.2%.

**50**. The device of claim **43**, wherein X=10% and wherein Y=0.1%.

**51**. The device of claim **43**, wherein X=10% and wherein Y=0.15%.

**52**. The device of claim **43**, wherein X=10% and wherein Y=0.2%.

**53**. The device of claim **43**, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.

**54**. The device of claim **36**, wherein the at least one first LPHDR execution unit comprises a plurality of locally connected LPHDR execution units.

**55**. The device of claim **36**, wherein the device has a SIMD architecture.

US 8,407,273 B2

33

**56**. The device of claim **36**, wherein the device includes memory locally accessible to the at least one first LPHDR execution unit.

**57**. The device of claim **36**, wherein the device is implemented on a silicon chip.

**58**. The device of claim **36**, wherein the device is implemented on a silicon chip using digital technology.

**59**. The device of claim **36**, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit.

**60**. The device of claim **36**, wherein the at least one LPHDR execution unit comprises at least five hundred locally connected LPHDR execution units, wherein the device includes memory locally accessible to at least one of the LPHDR execution units, and wherein the device is implemented on a silicon chip using digital technology.

**61**. The device of claim **36**, wherein the device is part of a mobile device.

**62**. The device of claim **36**, wherein the at least one first LPHDR execution unit represents numbers using a logarithmic representation.

**63**. The device of claim **36**, wherein the at least one first LPHDR execution unit represents numbers using a floating point representation.

**64**. The device of claim **36**:

wherein the device further comprises input means for receiving data representing an input image; and

wherein the input image includes the first input signal.

**65**. The device of claim **64**, wherein the device is part of a mobile device.

**66**. The device of claim **64**, wherein the device is adapted to deblur the input image.

**67**. The device of claim **36**, wherein the device is adapted to perform nearest neighbor search.

34

**68**. A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising:

at least one first low precision high-dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least 5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least 5% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least 0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;

wherein the number of LPHDR execution units in the second device exceeds the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

**69**. The device of claim **68**, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.

**70**. The device of claim **68**, wherein the number of LPHDR execution units in the second device exceeds by at least ten the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**GOOGLE LLC,**                          **Appeal Nos. 2022-1866**[1]
Petitioner/Appellant                     **2022-1867**
                                         **2022-1868**
**v.**                                   **2022-2013**
                                         **2022-2014**
**SINGULAR COMPUTING LLC,**              **2022-2015**
Patent Owner/Cross-Appellant

## Proceeding Nos.: IPR2021-00155, IPR2021-00165 and IPR2021-00179

## NOTICE FORWARDING CERTIFIED LISTS

Notices of Appeal to the United States Court of Appeals for the Federal

Circuit were timely filed by Appellant, Google LLC, on June 2, 2022, and Notices

of Cross-Appeal were timely filed by Cross-Appellant, Singular Computing LLC,

on July 12, 2022, in the United States Patent and Trademark Office in connection

with the above-identified *Inter Partes Review* (IPR) proceedings.  Pursuant to 35

U.S.C. § 143, Certified Lists are this day being forwarded to the Federal Circuit.

---

[1] Appeal No. 2022-1866 (Lead) is consolidated with Appeal Nos. 22-1867 and 22-1868 (Member Cases) and 22-2013, 22-2014, and 22-2015 (Cross-Appeals), pursuant to the Court's Order entered on June 13, 2022 (ECF No. 2), the Note to File (ECF No. 3) dated June 13, 2022, as well as the Note to File (ECF No. 12) dated July 13, 2022.

Date: July 13, 2022

Respectfully submitted,

Under Secretary of Commerce for Intellectual
Property and Director of the United States Patent
and Trademark Office

By: *Orchideh Rushenas*
_____

Orchideh Rushenas
Paralegal Specialist
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia  22313-1450
Orchideh.Rushenas@uspto.gov
571-272-9035

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LISTS has been served, via electronic mail, on counsel for Appellant and Cross-Appellant on this 13th day of July, 2022, as follows:

Nathan R. Speed
Gregory F. Corbett
Elisabeth H. Hunt
Anant K. Sarawat
WOLF, GREENFIELD & SACKS, P.C.
nspeed@wolfgreenfield.com
gcorbett@wolfgreenfield.com
ehunt@wolfgreenfield.com
asaraswat@wolfgreenfield.com

Eugene M. Paige
KEKER, VAN NEST & PETERS LLP
epaige@kvn.com

Asim Bhansali
Michael Kwun
KWUN BHANSALI LAZARUS LLP
abhansali@kblfirm.com
mkwun@kblfirm.com

*Attorneys for Appellant*

Peter Lambrianakos
Richard M. Cowell
FABRICANT LLP
plambrianakos@fabricantllp.com
rcowell@fabricantllp.com

*Attorneys for Cross-Appellant*

By:  *Orchideh Rushenas*
     _____
     Orchideh Rushenas
     Paralegal Specialist
     Office of the Solicitor
     U.S. Patent and Trademark Office
     Mail Stop 8, P.O. Box 1450
     Alexandria, Virginia  22313-1450
     Orchideh.Rushenas@uspto.gov
     571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>     July 13, 2022     </u>

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**GOOGLE LLC,**
**Petitioner,**

**v.**

**SINGULAR COMPUTING LLC,**
**Patent Owner.**

**Case: IPR2021-00155**
**Patent 10,416,961 B2**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

**Certifying Officer**

## Prosecution History for IPR2021-00155

| Date | Document |
|------|----------|
| 10/30/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 10,416,961 |
| 10/30/2020 | Petitioner's Power of Attorney |
| 10/30/2020 | Petitioner's Notice Ranking Petitions and Explaining Material Differences |
| 11/13/2020 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 11/20/2020 | Patent Owner's Power of Attorney |
| 11/20/2020 | Patent Owner's Mandatory Notices |
| 02/16/2021 | Patent Owner's Preliminary Response |
| 02/19/2021 | Patent Owner's Updated Power of Attorney |
| 02/19/2021 | Patent Owner's Updated Mandatory Notices |
| 03/04/2021 | Petitioner's Unopposed Motion for *Pro Hac Vice* Admission of Nathan R. Speed |
| 03/15/2021 | Petitioner's Notice of Filing Transcript of March 12, 2021 Conference Call |
| 03/16/2021 | Order Granting Petitioner's Motion for *Pro Hac Vice* Admission of Nathan R. Speed – 37 CFR § 42.10 |
| 03/16/2021 | Order Authorizing Petitioner Reply and Patent Owner's Sur-reply – 37 CFR § 42.5 |
| 03/19/2021 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 03/26/2021 | Patent Owner's Sur-Reply to Petitioner's Reply |
| 05/12/2021 | Decision Granting Institution of *Inter Partes* Review |
| 05/14/2021 | Scheduling Order |
| 07/02/2021 | Order – Conduct of Proceeding, Granting Patent Owner's Request for Authorization to File Motion for Additional Discovery |
| 07/06/2021 | Patent Owner's Motion for Additional Discovery (Confidential) |
| 07/06/2021 | Patent Owner's Combined Motion to Seal and Motion for Protective Order Pursuant to 37 CFR § 42.14 and 42.54 |
| 07/06/2021 | Patent Owner's Motion for Additional Discovery (Public) |
| 07/07/2021 | Petitioner's First Updated Mandatory Notices |
| 07/12/2021 | Patent Owner's Notice of Deposition of Richard Goodin |
| 07/13/2021 | Petitioner's Objections to Evidence Served with Patent Owner's Motion for Additional Discovery |
| 07/13/2021 | Petitioner's Opposition to Patent Owner's Motion for Additional Discovery |
| 07/15/2021 | Petitioner's Notice of Stipulation of Change to Due Dates 1-3 |

1

| Date | Document |
|------|----------|
| 07/22/2021 | Order Granting Motion to Seal and Motion for Entry of Protective Order – 37 CFR § 42.54 |
| 08/09/2021 | Patent Owner's Response (Confidential) |
| 08/09/2021 | Patent Owner's Motion to Seal |
| 08/09/2021 | Patent Owner's Response (Public – Document Unavailable) |
| 08/16/2021 | Petitioner's Objections to Evidence Served with Patent Owner's Response |
| 09/16/2021 | Patent Owner's Response (Public) |
| 09/28/2021 | Petitioner's Notice of Deposition of Sunil P. Khatri, Ph.D. |
| 11/01/2021 | Petitioner's Reply to Patent Owner's Response (Confidential) |
| 11/01/2021 | Petitioner's Reply to Patent Owner's Response (Public) |
| 11/01/2021 | Petitioner's First Motion to Seal |
| 11/08/2021 | Patent Owner's Objections to Petitioner's Evidence Submitted with Petitioner's Reply |
| 12/13/2021 | Patent Owner's Sur-Reply (Confidential) |
| 12/13/2021 | Patent Owner's Sur-Reply (Public) |
| 12/13/2021 | Patent Owner's Motion to Seal |
| 12/29/2021 | Patent Owner's Request for Oral Hearing |
| 12/29/2021 | Petitioner's Request for Oral Argument |
| 01/03/2022 | Order Setting Oral Argument – 37 C.F.R. § 42.70 |
| 01/10/2022 | Patent Owner's Updated Power of Attorney |
| 01/10/2022 | Patent Owner's Updated Mandatory Notices |
| 01/19/2022 | Patent Owner's Motion to Exclude Evidence |
| 01/26/2022 | Petitioner's Opposition to Patent Owner's Motion to Exclude Evidence |
| 02/01/2022 | Order Granting Motions to Seal – 37 CFR § 42.14 and 42.54 |
| 02/02/2022 | Patent Owner's Reply in Support of Motion to Exclude Evidence |
| 02/04/2022 | Panel Change Order, Conduct of the Proceeding – 37 CFR § 42.5 |
| 02/08/2022 | Petitioner's Notice of Filing Demonstrative Exhibits |
| 02/08/2022 | Petitioner's Second Motion to Seal |
| 02/08/2022 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 02/08/2022 | Patent Owner's Motion to Seal |
| 04/06/2022 | Record of Hearing Transcript (Confidential) |
| 04/06/2022 | Record of Hearing Transcript (Public) |
| 05/11/2022 | PTAB Decision (Confidential) |
| 05/18/2022 | Petitioner's Notice of Filing Joint Proposed Public Versions of Final Written Decision and Hearing Transcript (Part 2) |
| 05/18/2022 | Patent Owner's Updated Power of Attorney |

2

| Date | Document |
|---|---|
| 05/18/2022 | Patent Owner's Updated Mandatory Notices |
| 05/23/2022 | Transcript of Confidential Portion (Part 2) of Oral Hearing (Public) |
| 05/23/2022 | PTAB Decision (Public) |
| 06/02/2022 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |
| 06/22/2022 | Joint Motion for Preservation of the Record Pending Appeal |
| 06/23/2022 | Order Granting Motion to Preserve Record Pending Appeal |
| 07/12/2022 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>    July 13, 2022    </u>

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**GOOGLE LLC,**
**Petitioner,**

**v.**

**SINGULAR COMPUTING LLC,**
**Patent Owner.**

**Case: IPR2021-00165**
**Patent 9,218,156 B2**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*
**Certifying Officer**

## Prosecution History for IPR2021-00165

| Date | Document |
|------|----------|
| 11/05/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 9,218,156 |
| 11/05/2020 | Petitioner's Power of Attorney |
| 11/05/2020 | Petitioner's Notice Ranking Petitions and Explaining Material Differences |
| 11/17/2020 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 11/20/2020 | Patent Owner's Power of Attorney |
| 11/20/2020 | Patent Owner's Mandatory Notices |
| 02/17/2021 | Patent Owner's Preliminary Response |
| 02/19/2021 | Patent Owner's Updated Power of Attorney |
| 02/19/2021 | Patent Owner's Updated Mandatory Notices |
| 03/04/2021 | Petitioner's Unopposed Motion for *Pro Hac Vice* Admission of Nathan R. Speed |
| 03/15/2021 | Petitioner's Notice of Filing Transcript of March 12, 2021 Conference Call |
| 03/16/2021 | Order Granting Petitioner's Motion for *Pro Hac Vice* Admission of Nathan R. Speed – 37 CFR § 42.10 |
| 03/16/2021 | Order Authorizing Petitioner Reply and Patent Owner's Sur-reply – 37 CFR § 42.5 |
| 03/19/2021 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 03/26/2021 | Patent Owner's Sur-Reply to Petitioner's Reply |
| 05/13/2021 | Decision Granting Institution of *Inter Partes* Review |
| 05/14/2021 | Scheduling Order |
| 07/02/2021 | Order – Conduct of Proceeding, Granting Patent Owner's Request for Authorization to File Motion for Additional Discovery |
| 07/06/2021 | Patent Owner's Motion for Additional Discovery (Confidential) |
| 07/06/2021 | Patent Owner's Combined Motion to Seal and Motion for Protective Order Pursuant to 37 CFR § 42.14 and 42.54 (Confidential) |
| 07/06/2021 | Patent Owner's Motion for Additional Discovery (Public) |
| 07/07/2021 | Petitioner's First Updated Mandatory Notices |
| 07/12/2021 | Patent Owner's Notice of Deposition of Richard Goodin |
| 07/13/2021 | Petitioner's Objections to Evidence Served with Patent Owner's Motion for Additional Discovery |
| 07/13/2021 | Petitioner's Opposition to Patent Owner's Motion for Additional Discovery |
| 07/15/2021 | Petitioner's Notice of Stipulation of Change to Due Dates 1-3 |

1

| Date | Document |
|------|----------|
| 07/22/2021 | Order Granting Motion to Seal and Motion for Entry of Protective Order – 37 CFR § 42.54 |
| 08/09/2021 | Patent Owner's Response (Confidential) |
| 08/09/2021 | Patent Owner's Motion to Seal |
| 08/09/2021 | Patent Owner's Response (Public – Document Unavailable) |
| 08/16/2021 | Petitioner's Objections to Evidence Served with Patent Owner's Response |
| 09/16/2021 | Patent Owner's Response (Public) |
| 09/28/2021 | Petitioner's Notice of Deposition of Sunil P. Khatri, Ph.D. |
| 11/01/2021 | Petitioner's Reply to Patent Owner's Response (Confidential) |
| 11/01/2021 | Petitioner's Reply to Patent Owner's Response (Public) |
| 11/01/2021 | Petitioner's First Motion to Seal |
| 11/08/2021 | Patent Owner's Objections to Petitioner's Evidence Submitted with Petitioner's Reply |
| 12/13/2021 | Patent Owner's Sur-Reply (Confidential) |
| 12/13/2021 | Patent Owner's Sur-Reply (Public) |
| 12/13/2021 | Patent Owner's Motion to Seal |
| 12/29/2021 | Patent Owner's Request for Oral Hearing |
| 12/29/2021 | Petitioner's Request for Oral Argument |
| 01/03/2022 | Order Setting Oral Argument – 37 C.F.R. § 42.70 |
| 01/10/2022 | Patent Owner's Updated Power of Attorney |
| 01/10/2022 | Patent Owner's Updated Mandatory Notices |
| 01/19/2022 | Patent Owner's Motion to Exclude Evidence |
| 01/26/2022 | Petitioner's Opposition to Patent Owner's Motion to Exclude Evidence |
| 02/01/2022 | Order Granting Motions to Seal – 37 CFR § 42.14 and 42.54 |
| 02/02/2022 | Patent Owner's Reply in Support of Motion to Exclude Evidence |
| 02/04/2022 | Panel Change Order, Conduct of the Proceeding – 37 CFR § 42.5 |
| 02/08/2022 | Petitioner's Notice of Filing Demonstrative Exhibits |
| 02/08/2022 | Petitioner's Second Motion to Seal |
| 02/08/2022 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 02/08/2022 | Patent Owner's Motion to Seal |
| 04/06/2022 | Record of Hearing Transcript (Confidential) |
| 04/06/2022 | Record of Hearing Transcript (Public) |
| 05/11/2022 | PTAB Decision (Confidential) |
| 05/18/2022 | Petitioner's Notice of Filing Joint Proposed Public Versions of Final Written Decision and Hearing Transcript (Part 2) |
| 05/18/2022 | Patent Owner's Updated Power of Attorney |

2

| Date | Document |
|---|---|
| 05/18/2022 | Patent Owner's Updated Mandatory Notices |
| 05/23/2022 | Transcript of Confidential Portion (Part 2) of Oral Hearing (Public) |
| 05/23/2022 | PTAB Decision (Public) |
| 06/02/2022 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |
| 06/22/2022 | Joint Motion for Preservation of the Record Pending Appeal |
| 06/23/2022 | Order Granting Motion to Preserve Record Pending Appeal |
| 07/12/2022 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

<u>     July 13, 2022     </u>

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

### GOOGLE LLC,
**Petitioner,**

v.

### SINGULAR COMPUTING LLC,
**Patent Owner.**

### Case: IPR2021-00179
### Patent 8,407,273 B2



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

**Certifying Officer**

**Prosecution History for IPR2021-00179**

| Date | Document |
|------|----------|
| 11/06/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 8,407,273 |
| 11/06/2020 | Petitioner's Power of Attorney |
| 11/06/2020 | Petitioner's Notice Ranking Petitions and Explaining Material Differences |
| 11/20/2020 | Patent Owner's Power of Attorney |
| 11/20/2020 | Patent Owner's Mandatory Notices |
| 11/24/2020 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 02/19/2021 | Patent Owner's Updated Power of Attorney |
| 02/19/2021 | Patent Owner's Updated Mandatory Notices |
| 02/24/2021 | Patent Owner's Preliminary Response |
| 03/04/2021 | Petitioner's Unopposed Motion for *Pro Hac Vice* Admission of Nathan R. Speed |
| 03/15/2021 | Petitioner's Notice of Filing Transcript of March 12, 2021 Conference Call |
| 03/16/2021 | Order Granting Petitioner's Motion for *Pro Hac Vice* Admission of Nathan R. Speed – 37 CFR § 42.10 |
| 03/16/2021 | Order Authorizing Petitioner Reply and Patent Owner's Sur-reply – 37 CFR § 42.5 |
| 03/19/2021 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 03/26/2021 | Patent Owner's Sur-Reply to Petitioner's Reply |
| 05/14/2021 | Decision Granting Institution of *Inter Partes* Review |
| 05/14/2021 | Scheduling Order |
| 07/02/2021 | Order – Conduct of Proceeding, Granting Patent Owner's Request for Authorization to File Motion for Additional Discovery |
| 07/06/2021 | Patent Owner's Motion for Additional Discovery (Confidential) |
| 07/06/2021 | Patent Owner's Combined Motion to Seal and Motion for Protective Order Pursuant to 37 CFR § 42.14 and 42.54 (Confidential) |
| 07/06/2021 | Patent Owner's Motion for Additional Discovery (Public) |
| 07/07/2021 | Petitioner's First Updated Mandatory Notices |
| 07/12/2021 | Patent Owner's Notice of Deposition of Richard Goodin |
| 07/13/2021 | Petitioner's Objections to Evidence Served with Patent Owner's Motion for Additional Discovery |
| 07/13/2021 | Petitioner's Opposition to Patent Owner's Motion for Additional Discovery |
| 07/15/2021 | Petitioner's Notice of Stipulation of Change to Due Dates 1-3 |

1

| Date | Document |
|------|----------|
| 07/22/2021 | Order Granting Motion to Seal and Motion for Entry of Protective Order – 37 CFR § 42.54 |
| 08/09/2021 | Patent Owner's Response (Confidential) |
| 08/09/2021 | Patent Owner's Motion to Seal |
| 08/09/2021 | Patent Owner's Response (Public – Document Unavailable) |
| 08/16/2021 | Petitioner's Objections to Evidence Served with Patent Owner's Response |
| 09/16/2021 | Patent Owner's Response (Public) |
| 09/28/2021 | Petitioner's Notice of Deposition of Sunil P. Khatri, Ph.D. |
| 11/01/2021 | Petitioner's Reply to Patent Owner's Response (Confidential) |
| 11/01/2021 | Petitioner's Reply to Patent Owner's Response (Public) |
| 11/01/2021 | Petitioner's First Motion to Seal |
| 11/08/2021 | Patent Owner's Objections to Petitioner's Evidence Submitted with Petitioner's Reply |
| 12/13/2021 | Patent Owner's Motion to Seal |
| 12/13/2021 | Patent Owner's Sur-Reply (Confidential) |
| 12/13/2021 | Patent Owner's Sur-Reply (Public) |
| 12/29/2021 | Patent Owner's Request for Oral Hearing |
| 12/29/2021 | Petitioner's Request for Oral Argument |
| 01/03/2022 | Order Setting Oral Argument – 37 C.F.R. § 42.70 |
| 01/10/2022 | Patent Owner's Updated Power of Attorney |
| 01/10/2022 | Patent Owner's Updated Mandatory Notices |
| 01/19/2022 | Patent Owner's Motion to Exclude Evidence |
| 01/26/2022 | Petitioner's Opposition to Patent Owner's Motion to Exclude Evidence |
| 02/01/2022 | Order Granting Motions to Seal – 37 CFR § 42.14 and 42.54 |
| 02/02/2022 | Patent Owner's Reply in Support of Motion to Exclude Evidence |
| 02/04/2022 | Panel Change Order, Conduct of the Proceeding – 37 CFR § 42.5 |
| 02/08/2022 | Petitioner's Notice of Filing Demonstrative Exhibits |
| 02/08/2022 | Petitioner's Second Motion to Seal |
| 02/08/2022 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 02/08/2022 | Patent Owner's Motion to Seal |
| 04/06/2022 | Record of Hearing Transcript (Confidential) |
| 04/06/2022 | Record of Hearing Transcript (Public) |
| 05/11/2022 | PTAB Decision (Confidential) |
| 05/18/2022 | Petitioner's Notice of Filing Joint Proposed Public Versions of Final Written Decision and Hearing Transcript (Part 2) |
| 05/18/2022 | Patent Owner's Updated Power of Attorney |

2

| Date | Document |
|------|----------|
| 05/18/2022 | Patent Owner's Updated Mandatory Notices |
| 05/23/2022 | Transcript of Confidential Portion (Part 2) of Oral Hearing (Public) |
| 05/23/2022 | PTAB Decision (Public) |
| 06/02/2022 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |
| 06/22/2022 | Joint Motion for Preservation of the Record Pending Appeal |
| 06/23/2022 | Order Granting Motion to Preserve Record Pending Appeal |
| 07/12/2022 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

Paper No. __

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

————————

Case No. IPR2021-00155
Patent No. 10,416,961

————————

**PETITION FOR INTER PARTES REVIEW
UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.1 et seq**

software a device comprising an LPHDR execution unit; thus Dockser/Tong also meets claims 21 and 24-25.

**Ground 3**: MacMillan discloses a computer system with multiple floating-point execution units operating in parallel. *Infra* § VII.A. Based on MacMillan, a POSA would have been motivated to implement a device with multiple Dockser FPPs operating in parallel. The resulting device (Dockser/MacMillan) meets dependent claim 3's requirement of multiple LPHDR execution units, and provides an alternative basis for meeting the "plurality of components" in independent claim 10. MacMillan's "CPU" that controls the execution units (MacMillan, 10:27-53, 13:12-13, 13:38-62) provides an alternative basis for meeting claim 1's "computing device adapted to control the… execution unit" and claim 2's "CPU." *Infra* §§ VII.B-VII.E.

**Ground 4**: It would have been obvious to implement the Dockser/MacMillan device with the FPPs operating at Tong's precision levels. This Dockser/Tong/MacMillan combination meets the same claims met collectively by Grounds 2 and 3, and also dependent claim 23 which recites a parallel architecture (taught by MacMillan) and emulating the LPHDR execution units in software (taught by Tong).

- 6 -

## V.    **GROUND 1:  CLAIMS 1-2, 4-5, 10, AND 13-14 WOULD HAVE BEEN OBVIOUS OVER DOCKSER**

The '961 patent admits LPHDR execution units were known but alleges they were considered "not useful." '961 patent, 6:55-7:6; Goodin, ¶ 183.  The patent purports to encompass the idea "that LPHDR arithmetic is useful in several important practical computing applications" to save power ('961 patent, 16:35-37, 24:7-21), but the claims are not limited to methods of use in *particular* computing applications.  Instead they recite a device comprising an LPHDR execution unit, which was known as Dockser demonstrates.  Goodin, ¶ 184.

### A.    **Dockser**

Dockser (Ex. 1007)[1] discloses performing "mathematical operations" including "multiplication" using a "floating-point processor having a given precision."  [0001], Abstract.  Goodin, ¶ 185.

"Floating-point" is a number representation having "a sign component, an exponent, and a mantissa."  [0001].  The sign indicates whether the number is positive or negative, and the number's absolute value equals the mantissa multiplied by a base raised to the power of the exponent.  [0001].  "[F]loating-point" representation was widely used in computing and refers to a binary (base-2) representation unless some other base is expressed (*e.g.*, decimal floating-point);

---

[1] All citations in § V are to Ex. 1007 unless otherwise indicated.

- 10 -

that is how the term is used herein, in the '961 patent and in the prior-art references cited herein. Goodin, ¶ 186; '961 patent, 2:20-21; Dockser, [0001]; Tong, 274. As an example, the floating-point representation of the number 6 is: positive sign, exponent=2, mantissa=1.5 (*i.e.*, $1.5 \times 2^2 = 6$). Goodin, ¶¶ 187-188.

In standard floating-point representations of "normal" numbers (anything not smaller than $2^{-126}$), the mantissa is kept in the range $1 \leq mantissa < 2$, so only the fraction by which the mantissa exceeds 1 is specified (*i.e.*, the mantissa's leading 1 is "implied"). Dockser, [0002]; Dockser-Lall (Ex. 1010), [0003]-[0004]; Goodin, ¶ 189. For example, if three bits are used, the mantissa 1.5 is represented with three bits (100) that represent the fraction .5 as $(1 \times 2^{-1}) + (0 \times 2^{-2}) + (0 \times 2^{-3}) = .5$, and the mantissa 1.25 is represented as the bit sequence 010 that represents the fraction .25 as $(0 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) = .25$. Goodin, ¶ 190.

It was a well-known principle of mathematics and computing that "precision… is defined by the number of bits used to represent the mantissa"— "[t]he more [mantissa] bits… the greater the precision." [0002]; Gaffar (Ex. 1012), 4; Hekstra (Ex. 1013), 4:47-52. For example, the floating-point representation of the number 29 is positive sign, exponent=4, mantissa=1.8125 (*i.e.*, $1.8125 \times 2^4 = 29$). The 1.8125 mantissa can be represented precisely as the 4-bit sequence 1101, which represents the fraction .8125 as $(1 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) +$

- 11 -

$(1 \times 2^{-4})$.  If only three bits are used, the closest representable mantissas are 1.75

and 1.875—*i.e.*, the bit sequence 110 represents the mantissa $1 + (1 \times 2^{-1}) +$

$(1 \times 2^{-2}) + (0 \times 2^{-3}) = 1.75$, while the bit sequence 111 represents the mantissa

$1 + (1 \times 2^{-1}) + (1 \times 2^{-2}) + (1 \times 2^{-3}) = 1.875$.  Thus, with a 3-bit mantissa, the

number 29 cannot be represented precisely, but can be approximated less precisely

as $1.75 \times 2^4 = 28$ or $1.875 \times 2^4 = 30$.  Goodin, ¶¶ 191-192.

"[M]odern computers" "commonly" use the "ANSI/IEEE-754 standard…

32-bit single format," which represents floating-point numbers using "a 1-bit sign,

an 8-bit exponent, and a 23-bit mantissa."  [0002].  Dockser recognized that

"[w]hile some applications may require these types of precision, other applications

may not."  [0003].  For example, if the lower precision from using just 16 mantissa

bits suffices for a particular application, then "any accuracy beyond 16 bits of

precision tends to result in unnecessary power consumption," which "is of

particular concern in battery operated devices where power comes at a premium."

[0003]; Goodin, ¶ 193.

Dockser's "floating-point processor (FPP)" operates at a selectable

"subprecision of the floating-point format," below the precision of the "IEEE-754

32-bit single format" of the input numbers it receives, by removing power from

some least-significant mantissa bits in the FPP's operation, resulting in those

mantissa bits being dropped and "reducing the [FPP's] power consumption." [0014]-[0018], [0026]-[0027]; Goodin, ¶ 194.

As detailed below, certain implementation details (*e.g.*, the range of numbers the 32-bit IEEE-754 standard represents) were so well known as to be unnecessary for Dockser to explain. Goodin, ¶ 195; '961 patent, 2:20-21. Ground 1 establishes a POSA would have understood Dockser to teach a device implemented in these ways, or alternatively they would have been obvious implementations of Dockser's teachings. References below to Dockser "meeting" claim limitations refer to Dockser's device implemented to include any details discussed below as being the understood and/or obvious implementation of what Dockser describes.

## B.    Claim 1

### 1.    [1A1] "A device comprising: at least one… (LPHDR) execution unit"

Dockser's FPP is "incorporate[d]" in a "computing system[]…, as part of the main processor or as a coprocessor." [0001], [0015], [0035]-[0036]. The computing system is a claimed "device" comprising the FPP. Goodin, ¶¶ 196-197; '961 patent, 1:49, 7:37-40, 24:20-21, 28:9-12, 29:21-32 (claimed "device" includes "a computer including a processor and other components").

Dockser's FPP is an "execution unit" as claimed. Goodin, ¶ 198. It is a "specialized computing unit[] that perform[s] certain mathematical operations, e.g., multiplication, [etc.]" by "execut[ing]… instructions" including "multiply

- 13 -

instructions." [0001], [0019], [0024]; Goodin, ¶ 198. Like the "processing

element" (PE) the '961 patent describes as one possible embodiment of an LPHDR

"execution unit" ('961 patent, 8:5-9, 8:23-26), Dockser's FPP is a "unit[] which

pairs memory with arithmetic" and implements the memory as registers ('961

patent, 16:65-67; FIG. 4); both Dockser's FPP and the '961 patent's PE include

registers and an arithmetic unit to perform arithmetic operations on data locally

stored in the registers. '961 patent, FIGs. 4, 6, 10:36-11:43, 12:53-13:4; Dockser,

FIG. 1, [0015]-[0025]; Goodin, ¶¶ 199-206.



**Dockser, FIG. 1 (annotated)**    **'961 Patent, FIG. 4 (annotated)**

In an alternative mapping, the floating-point operator (FPO) inside

Dockser's FPP is also a claimed "execution unit" because it "include[s]…

components configured to perform… floating-point operations," including a

floating-point multiplier (MUL) that "execute[s] floating-point multiply

- 14 -

instructions." [0019]; Goodin, ¶ 207. References herein to "Dockser's execution unit" meeting a claim limitation refer to both Dockser's FPP and FPO meeting the limitation in the same way because the FPP includes the FPO.

Dockser's FPP (including its FPO) is "low precision" as claimed because "the precision" of operations in the FPP is "reduced" (*e.g.*, [0014]), and because it operates with the minimum imprecision in [1B2]. Goodin, ¶¶ 208-209; *infra* § V.B.4; '961 patent, 26:61-28:8 (characterizing "degrees of precision" described in language mirroring that in [1B2] as "low precision"); Ex. 1035, 8 (Singular's litigation assertion that "low precision" and "high dynamic range" are "defined in the claim").

The '961 patent describes a 6-bit floating-point exponent as "provid[ing] the desired high dynamic range." '961 patent, 14:61-15:3. Dockser's FPP (including its FPO) is "high dynamic range" because it uses an 8-bit floating-point exponent ([0017]) that provides an even higher dynamic range, and meets the range in [1B1]. Goodin, ¶ 210; *infra* § V.B.3; '961 patent, 27:17-40.

##### 2. [1A2] "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"

Dockser's FPP is "adapted to execute a first operation" as claimed because it "perform[s]… mathematical *operations*,[2] e.g., multiplication." [0001], [0004]-

---

[2] Emphasis added throughout.

[0008], [0019] (FPP components including FPO are "configured to **execute**" instructions of "**operations**"), [0024].  Goodin, ¶ 211.

The FPP executes the operations at reduced precision on "operands" ("32-bit binary floating-point **number[s]**" ([0016]-[0017], [0024])) that represent numerical values, as claimed.  Goodin, ¶¶ 212-213.

The '961 patent's "processing element" (PE) 400 (FIG. 4) is one example embodiment of an "execution unit… for performing LPHDR operations."  '961 patent, 8:5-26, 10:36-37, 1:66-2:19, 5:58-62.  PE 400 receives input via an "I/O [Input/Output] Unit" and "stores" input values in "Registers" as "local data" on which the PE "operate[s]" and "perform[s] computations."  *Id*., 9:5-16, 10:34-60, 8:35-38, FIGs. 1, 4 (annotated below); Goodin, ¶¶ 214-215.



FIG. 4

"The input… received by… PE 400 may… take the form of electrical signals representing numerical values." '961 patent, 10:67-11:3. The PE "operate[s] on its local data" (*e.g.*, input values received at the Registers) via "data paths 402*a-i*" through "routing mechanisms… and components" that represent values as electrical signals. *Id.*, 10:60-11:3; Goodin, ¶¶ 216-217. A POSA would have understood from the patent's description that the claimed execution unit's "first input signal representing a first numerical value" encompasses an input electrical signal (*e.g.*, 402i in FIG. 4) input to PE 400 (an example "execution unit") at a register as data on which the PE performs an operation via the PE's "data paths… and components." Goodin, ¶ 218.

Like the '961 patent's example PE embodiment, Dockser's FPP receives input values (operands) at registers, and performs operations on these inputs via the FPP's data paths 134-139 and components 140-144. FIG. 1; Goodin, ¶ 219. The operands are "move[d]" into the FPP's registers as "data from [the computer system's main] memory" in 32-bit format. [0016]-[0017]. A POSA would have understood Dockser to describe that the operand "data" being input to the FPP is a "first input signal representing a first numerical value" (*i.e.*, representing the operand "number" [0017]) as claimed, because computing circuits like Dockser's "move" data between components (*e.g.*, from memory to processor) via electrical signals. Goodin, ¶ 220; Begun (Ex. 1014), 1:36-37. Alternatively, to the extent

- 17 -

Dockser is not considered to expressly disclose that the data is moved to the FPP via electrical signals, that would have been the straightforward and obvious way to implement what Dockser describes. Goodin, ¶ 221; Begun, 1:36-37.

Dockser's FPP is thus "adapted to execute a first operation [*e.g.*, reduced-precision multiplication] on a first input signal representing a first numerical value [operand]" as claimed. Goodin, ¶ 222. The FPP's execution of the operation produces an "***output value***" (also called "***output number***"), represented by "output bits" ([0034]), that is a "second numerical value" as claimed. Goodin, ¶¶ 223-226.

The output value is sent to a register ([0024]), from where it is "move[d]… to… the main memory" ([0016]). Goodin, ¶ 227. A POSA would have understood Dockser to describe that the output value sent as bits from the FPP's registers to main memory is a "first output ***signal*** representing a second numerical value" as claimed, because circuits like Dockser's "move" data between such components via electrical signals. Goodin, ¶ 228; Begun, 1:36-37. Alternatively, to the extent Dockser is not considered to expressly disclose that the data is moved from the FPP to memory via electrical signals, that would have been the straightforward and obvious way to implement what Dockser describes. Goodin, ¶ 228; Begun, 1:36-37.

Thus, Dockser's FPP is "adapted to execute [the] first operation [*e.g.*, reduced-precision multiplication]… to produce a first output signal [electrical

- 18 -

signal sending output to memory] representing a second numerical value [the output number from the multiplication]" as claimed.  Goodin, ¶ 229.



Dockser, FIG. 1 (annotated)

In the alternative mapping where Dockser's FPO meets the claimed "execution unit" (*supra* § V.B.1), the FPO is "adapted to execute [the] first operation [reduced-precision multiplication] on a first input signal representing a first numerical value [signal 134 inputting operands to FPO] to produce a first output signal representing a second numerical value [signal 139 outputting multiplication result from FPO]" as claimed.  Goodin, ¶ 230; *infra* § V.B.4.c(2).

- 19 -



Dockser Figure 1 (annotated)

**3.    [1B1] "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000"**

Dockser's FPP operates on IEEE-754 32-bit single-format numbers having 8-bit exponents.  [0002], [0016]-[0017], [0024]; *supra* § V.B.1; Goodin, ¶ 231. The number of exponent bits determines dynamic range.  Goodin, ¶ 231; Gaffar, 4; Hekstra, 4:47-52; Grinberg (Ex. 1015), 8:48-49.

IEEE-754 8-bit exponents range from -126 to 127; thus the dynamic range of "normal" IEEE-754 single-format operands is from around $2^{-126}$ (much smaller than 1/65,000) to around $2^{127}$ (much larger than 65,000).  Goodin, ¶ 232; Dockser-Lall, [0004]; Tong, 274.  A POSA would have understood Dockser to disclose that its FPP supports these "normal" IEEE-754 single-format operands, as Dockser

makes no reference to supporting far less common "denormal" numbers (smaller than $2^{-126}$), let alone to supporting denormal numbers exclusively. Goodin, ¶ 233; Dockser-Lall, [0005], [0008]. To the extent Dockser is not considered to expressly disclose that the FPP operates on "normal" IEEE-754 single-format operands, that would have been a conventional and obvious way to implement what Dockser discloses. Goodin, ¶ 233. Thus, "the dynamic range of the possible valid inputs" (normal IEEE-754 single-format operands) to Dockser's FPP operation "is at least as wide as from 1/65,000 through 65,000" as claimed. Goodin, ¶ 234.

As discussed below (§ V.B.4.c), Dockser's precision-reduction techniques within the FPP do not change the exponents of operated-on numbers; thus the dynamic range of the possible valid inputs in the alternative mapping where the FPO meets the claimed "execution unit" (*supra* § V.B.1) is the same as that of the FPP inputs. Goodin, ¶ 235.

> **4.     [1B2] "for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input"**

### a.    "Statistical Mean" Limitation

The specification's only mention of "the statistical mean, over repeated execution of… [the] operation on each… respective input[]" ('961 patent, 27:56-28:6) references "non-deterministic" embodiments (*id.*, 27:43-56).  Goodin, ¶ 236. A POSA would have understood the claims' "statistical mean" limitation in the context of the '961 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."  '961 patent, 3:63-4:2, 14:23-15:3, 17:22-26; Goodin, ¶ 237.

For example, if an analog circuit represents the number 1 as a voltage somewhere between 0.99 and 1.01 ('961 patent, 14:20-38), a first execution of an operation that adds 1+1 may produce a result of 1.98, a second execution may produce 2.01, and repeated executions may produce different results unpredictably. Goodin, ¶ 238.  POSAs understood that for such non-deterministic embodiments, the claimed "statistical mean" limitation refers to averaging the different outputs produced by the same operation on the same input—*e.g.*, the mean of 1.98 and 2.01 is 1.995.  Goodin, ¶ 239.

- 22 -

For deterministic digital embodiments, the claimed "statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input" is the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input. Goodin, ¶ 240; Ex. 1032, ¶ 129 (Singular's same assertion in litigation).

Dockser uses "a conventional floating-point multiplier" ([0020]), which a POSA would have understood is a conventional deterministic digital circuit (Goodin, ¶ 241; Weiss (Ex. 1011), 1:40-42), so repeatedly executing Dockser's multiplication operation on the same input (*i.e.,* pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution. Goodin, ¶ 242. To the extent Dockser is not considered to expressly disclose that its "conventional floating-point multiplier" ([0020]) is a deterministic digital circuit, that would have been the conventional and obvious implementation. Goodin, ¶ 243; Weiss, 1:40-42; Ex. 1022, 5:14-21 ('961 patent's inventor explaining that "digital silicon" circuits are "deterministic, which programmers like").

- 23 -

### b.    "Exact Mathematical Calculation" Limitation

The numerical value of each input operand to Dockser's operation (reduced-precision multiplication) is the number represented by the IEEE-754 32-bit sequence ([0016]-[0018]; *supra* §§ V.B.2-V.B.3), and the claimed "result of an exact mathematical calculation of the first operation on the numerical values of that same input" is the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied *without* reducing precision.  Goodin, ¶ 244; *see infra* Appendix I.B. [3]  As discussed *infra* § V.B.4.c, the numerical value represented by Dockser's output signal differs from this "exact mathematical calculation" because Dockser performs reduced-precision multiplication.  Goodin, ¶ 244.

### c.    Relative Error (Y) for Fraction of Valid Inputs (X) Limitation

[1B2] recites that "for at least X=10% of the possible valid inputs to the first operation," the statistical mean limitation (met in Dockser by the numerical value represented by the output signal for any single execution of the first operation on a specific valid input—*supra* § V.B.4.a) "differs by at least Y=0.2% from" the exact mathematical calculation discussed *supra* § V.B.4.b.  Goodin, ¶ 245.  The '961 patent refers to the Y percentage as the "relative error amount E by which the result calculated by [the] LPHDR element… differ[s] from the

---

[3] The Petition's word count includes Appendix I.

mathematically correct result," and the X percentage as the "fraction F of the valid inputs" for which the operation produces at least that relative error amount. '961 patent, 27:53-28:8; Goodin, ¶ 246.

The claimed "possible valid inputs" are met in Dockser by the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception). [0016]-[0017], [0024]-[0027]; *supra* § V.B.3; Goodin, ¶ 247. As discussed below, Dockser meets [1B2] because Dockser operates the FPP and FPO at precision levels where the claimed relative error (Y) is at least 0.2% for at least X=10% of all valid input pairs of normal IEEE-754 32-bit single-format numbers. Goodin, ¶ 248.

The precision level is selected by specifying the number of mantissa fraction bits to be retained; the remaining "excess bits" are dropped. [0004]-[0007], [0017], [0026]-[0029]; FIG. 2; Goodin, ¶¶ 249-253. In one "example," Dockser retains only the 9 most-significant bits (MSBs)—*i.e.*, the leftmost 9 bits—of the mantissa fraction, and drops the remaining 14 mantissa bits. [0025]-[0028]; Goodin, ¶ 254.

- 25 -



Dockser, Figure 2 (annotated)

Dockser discloses two precision-reducing techniques that can be used separately or together. [0004]-[0007], Dockser claims 9-11; Goodin, ¶ 255-261. One technique drops bits from the operands by removing power from storage elements in the FPP's registers that correspond to the excess (dropped) mantissa bits. [0006], [0026]; Goodin, ¶ 256. The other technique drops bits by removing power from elements within the multiplier logic that computes the product of the operand mantissas. [0007], [0027], [0030]-[0034]; Goodin, ¶ 257.



Dockser, Figure 1 (annotated)

### (1)    Dockser's Register Bit-Dropping Meets [1B2]

A POSA would have understood Dockser's "conventional floating-point multiplier" ([0020]) multiplies two floating-point operands by (in relevant part) adding their exponents and multiplying their mantissas, as the '961 patent (at 15:4-7) acknowledges was the "traditional floating point method[]." Goodin, ¶ 262; Tong, 274-275. This conventional technique applies basic properties of multiplication and exponents where $(M_1 \times 2^{E_1}) \times (M_2 \times 2^{E_2}) = (M_1 \times M_2) \times 2^{E_1+E_2}$. Goodin, ¶ 262. Because Dockser reduces precision by dropping mantissa

bits ([0002]-[0003], [0026]), a POSA would have understood the mantissa multiplication produces error relative to an "exact mathematical calculation." Goodin, ¶ 263.

Specifically, Dockser's FPP receives operands into registers 115 as IEEE-754 single-format floating-point numbers with 23 bits representing the mantissa's fractional part (as discussed *supra* § V.A, the "1" in the mantissa's integer part is implied), but the register bit-dropping technique removes power from the register storage elements for "excess" least-significant mantissa bits to the right of the selected precision level in FIG. 2. [0006], [0016]-[0018], [0026]-[0028], FIGs. 1-2 (reproduced below, annotated); Goodin, ¶¶ 264-267.



FIG. 1



FIG. 2

"By way of example," if a precision level retaining 9 mantissa fraction bits is selected, "[p]ower can be removed from the floating-point register elements for the remaining 14 [mantissa] fraction bits." [0026]; Goodin, ¶ 268. A POSA would have understood the output of unpowered storage elements would be tied to zero voltage (*e.g.*, ground), making those 14 "excess" bits zeroes. [0026], [0029]; Goodin, ¶¶ 269-271 (citing Hawkins (Ex. 1020), 1:13-2:15 (unpowered elements should be tied to ground to prevent them from "draw[ing] unacceptably large amounts of power" and "shorting… the power supply"); Youngs (Ex. 1060), [0005]; Flynn (Ex. 1019), [0003]; Cohen (Ex. 1016), 3:63-66, 4:51-55 (interpreting low voltage as "0" is "typical[]…[in] digital computer system[s]")). To the extent

- 29 -

Dockser is not considered to disclose that the outputs of the unpowered register storage elements would be tied to ground to represent "0," that would have been the straightforward, well-known, conventional, and obvious way to implement Dockser's described unpowering of register storage elements, as corroborated, *inter alia*, by Hawkins, Youngs, Flynn and Cohen.  Goodin, ¶ 272.

As representative examples, the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.37871718406677724609375) would become 01100000100000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 01000100110111000001000 (representing a mantissa of 1.26898288726806640625) would become 01000100100000000000000 (representing a mantissa of 1.267578125).  Goodin, ¶ 273.

A pair of operands with "excess" bits dropped from the registers are multiplied together, producing a reduced-precision output that differs from the "exact" product of the original 32-bit operands.  [0024]-[0026]; Goodin, ¶ 274. For instance, if the two example 23-bit-fraction mantissas above were multiplied, the exact mantissa product would be 1.7495685129631510790204629302025; whereas the reduced-precision mantissa product output from Dockser's register bit-dropping technique would be 1.745395660400390625 (resulting from multiplying

- 30 -

the mantissas represented by the fraction bit sequences

01100000100000000000000 and 01000100100000000000000).  Goodin, ¶ 275.

Because Dockser's output mantissa differs from the exact mantissa product, the numerical value represented by the output floating-point number (composed of mantissa, exponent, and sign) differs from the exact product of the original floating-point operands.  Goodin, ¶ 276.  A POSA would have understood, by straightforward math detailed in Appendix I.A *infra*, that the relative error (the claimed "Y" percentage) of any floating-point number output from Dockser's reduced-precision multiplication is the same as the relative error of its mantissa, independent of its exponent and sign.  Goodin, ¶ 277.

A POSA would thus have understood Dockser's register bit-dropping technique produces relative error, the amount of which depends on the number of mantissa bits dropped—the more bits dropped, the greater the error.  Goodin, ¶ 278.

Claim 1 characterizes the claimed execution unit using ***performance*** characteristics of a minimum relative error (Y) and a minimum fraction (X) of the possible valid inputs that meet Y.  Claim 1 recites no ***structural*** characteristics of the execution unit, and the specification provides no guidance how to evaluate any execution unit's structure to determine whether it meets the claimed performance characteristics.  Goodin, ¶ 279.

- 31 -

A POSA asked whether Dockser's FPP meets the claimed imprecision performance characteristics would have understood that Dockser suggests any desired number of mantissa bits can be dropped, and that numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision. Goodin, ¶ 280. If asked to quantify how many bits dropped would meet the claimed X and Y, a POSA would have taken one of two approaches.

(i)     **Software Demonstration That Retaining Dockser's Disclosed 9 Mantissa Bits Meets [1B2]**

Given the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), a POSA would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped. Goodin, ¶ 281. As detailed in Appendix I.B *infra*, Mr. Goodin did just that. Specifically, he wrote a software program (which a POSA would have understood how to write) that performs floating-point multiplication operations the way Dockser's register bit-dropping technique does when dropping the 14 least-significant mantissa bits to zero as taught by Dockser. Dockser, [0026]; Goodin, ¶ 282. The program tested all possible valid pairs of normal IEEE-754 single-format operands (by testing all

- 32 -

possible valid mantissa pairs, because the relative error Y is independent of exponent and sign—*see infra* Appendix I.A), and demonstrates that Dockser's register bit-dropping technique, when performed with a selected precision level retaining 9 mantissa fraction bits as Dockser ([0026]) discloses, produces at least Y=0.2% relative error for 14.6% of possible valid inputs (greater than X=10%), meeting [1B2].  Goodin, ¶ 283.

> **(ii)    Pencil-and-Paper Algebraic Demonstration That an Obvious Implementation Retaining 7 Mantissa Bits Meets [1B2]**

A POSA would also have understood algebraically that Dockser's register bit-dropping technique meets [1B2] when performed at certain selected precision levels, by examining the absolute ***minimum*** relative error produced by zeroing certain mantissa bit positions.  Goodin, ¶ 284.  As detailed in Appendix I.C *infra*, over 12% of all possible valid normal IEEE-754 single-format operands have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their eighth and ninth fraction bits.  When Dockser's register bit-dropping retains only seven fraction bits, ***every*** input in that 12% produces at ***minimum*** 0.39% relative error, which meets [1B2]'s X and Y.  Goodin, ¶ 285.  A POSA would have found it obvious to implement Dockser while retaining only seven mantissa fraction bits for multiple reasons.

- 33 -

First, Dockser's FPP's precision level is "selectable" and a 9-fraction-bit selection is only a non-limiting "example." [0003]-[0004], [0026], [0013]; Goodin, ¶ 286. A POSA would have understood Dockser to suggest selecting other below-maximum (Dockser claim 1) precision levels, and selecting a precision level retaining 7 fraction bits (only two fewer than Dockser's 9-bit example) to be an obvious implementation of Dockser's teachings. Goodin, ¶ 287.

Second, other prior art taught a low-precision floating-point multiplier that retained even fewer fraction bits. Goodin, ¶ 288 (*e.g.*, Tong teaches retaining only 5 fraction bits); *infra* § VI.A.

Third, a POSA would have understood the number of mantissa fraction bits retained in Dockser to be a result-effective variable, so that choosing to retain any number (including 7 bits) would have been obvious in view of Dockser's teachings that the number of mantissa bits dropped/maintained was a "selectable" variable optimizable for different applications, and that the selection impacts the FPP's results through the precision of the outputs the FPP produces. [0002]-[0003], [0014], [0024]-[0027]; Goodin, ¶¶ 289-292; *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1010 (Fed. Cir. 2018) ("[D]iscovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art."); *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir.

- 34 -

2020) ("[I]t is not inventive to discover the optimum or workable ranges by routine experimentation.").

### (2)    Docker's Multiplier Logic Bit-Dropping Meets [1B2]

Docker's second precision-reduction technique removes power from bits within the FPO's logic that multiplies the operand mantissas.  [0007], [0027], [0030]-[0034]; Goodin, ¶ 293.  This logic operates conventionally, computing the mantissa product by generating and adding together "partial products" similar to pencil-and-paper long multiplication.  [0030]-[0031]; Goodin, ¶¶ 294-296.  This is illustrated in the simple example below using 5-bit mantissa fractions.  Each partial product results from multiplying the multiplicand (Mantissa A) by the "0" or "1" at each position in the multiplier (Mantissa B).

|     |   |   |   |   |   |   |   |   |   |   |   |   |                        |
|-----|---|---|---|---|---|---|---|---|---|---|---|---|------------------------|
|     | 1 | . | 0 | 1 | 1 | 0 | 0 |   |   |   |   |   | Mantissa A = 1.375     |
| x   | 1 | . | 0 | 1 | 0 | 0 | 1 |   |   |   |   |   | Mantissa B = 1.28125   |
|     |   |   |   |   |   | 1 | 0 | 1 | 1 | 0 | 0 |   |                        |
|     |   |   |   |   |   | 0 | 0 | 0 | 0 | 0 | 0 |   |                        |
|     |   |   |   |   | 0 | 0 | 0 | 0 | 0 | 0 |   |   |                        |
|     |   |   |   | 1 | 0 | 1 | 1 | 0 | 0 |   |   |   |                        |
|     |   |   | 0 | 0 | 0 | 0 | 0 | 0 |   |   |   |   |                        |
| (+) |   | 1 | 0 | 1 | 1 | 0 | 0 |   |   |   |   |   |                        |
|     | 1 | . | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | Mantissa product = 1.76171875 |

- 35 -

Power is removed from the logic that implements the partial product bits to the right of line 405 corresponding to a precision level selected for output value 430. Dockser, [0032]-[0034]; Goodin, ¶¶ 297-298. A POSA would have understood Dockser to disclose that the bits from which power is removed in the logic are dropped to 0s, or alternatively this would have been the conventional and obvious way to implement the power removal Dockser describes. Goodin, ¶ 299; *see supra* § V.B.4.c(1).



**Dockser, Fig. 3B (annotated)**

An example using the same exemplary operand mantissas discussed *supra* § V.B.4.c(1) is illustrated below, in which dropping partial-product bits to the right of the selected precision produces an output mantissa product of 1.744140625,

which differs from the exact product of 1.7495685129631510790204629302025.

Goodin, ¶ 300.



A POSA would have understood the relative error introduced depends on the number of mantissa bits dropped—the more bits dropped, the greater the error. Goodin, ¶ 301.

If asked whether Dockser's FPP using a selected precision level retaining 9 bits (as Dockser [0026] teaches) in the output mantissa by dropping less-significant bits in the multiplier logic meets the claimed X and Y, given the massive number of possible inputs Dockser's FPP supports (*supra* § V.B.4.c(1)(i)), a POSA would have written a software program. Goodin, ¶ 302. As detailed in Appendix I.D

*infra*, Mr. Goodin wrote a software program (which a POSA would have understood how to write) that performs floating-point multiplication operations the way Dockser's logic bit-dropping technique does by dropping to zero the mantissa partial product bits less significant than the 9-bit selected precision level. Goodin, ¶ 303. Mr. Goodin's program tested all possible valid pairs of normal IEEE-754 single-format operands (by testing all possible valid mantissa pairs—*supra* § V.B.4.c(1)(i); *infra* Appendix I.A, I.D) and demonstrates that Dockser's multiplier logic bit-dropping technique, when performed with a precision level retaining 9 output mantissa fraction bits, produces at least Y=0.2% relative error for 85% of possible valid inputs (greater than X=10%), meeting [1B2]. Goodin, ¶ 303.

In the alternative mapping (*supra* §§ V.B.1-V.B.2), the operand numbers input via 134 (claimed "first input signal") to the FPO (claimed "execution unit") are the same as those input to the FPP registers when Dockser's logic bit-dropping technique is used alone, and the same output numbers from the FPO are output from the FPP. Goodin, ¶ 304. Therefore Mr. Goodin's program demonstrates that Dockser meets [1B2] under either mapping. Goodin, ¶ 304.

### (3)    Register and Multiplier Logic Bit-Dropping Together Also Meets [1B2]

In an implementation of Dockser's FPP that drops bits in ***both*** the registers and the multiplier logic, where Dockser's FPP is the claimed "execution unit," the

- 38 -

amount of relative error is the same as produced by the logic bit-dropping alone, if the same selected precision level (retaining the same number of mantissa fraction bits) is applied at the registers and in the logic. Goodin, ¶ 305. This is because at least the same bits that are dropped to zero in the register bit-dropping are dropped to zero in the corresponding partial products in the logic bit-dropping, for the same selected precision level. Goodin, ¶¶ 305-307. Thus, the results of the same software program that demonstrate that Dockser's multiplier logic bit-dropping alone meets [1B2] also demonstrate that Dockser's register and logic bit-dropping, performed together at a selected precision level retaining 9 mantissa fraction bits as Dockser ([0026]) discloses, meet [1B2]. Goodin, ¶ 308; *supra* § V.B.4.c(2).

### 5. [1C] "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit"

Dockser's computing system includes a "main processor," meeting the claimed "computing device." [0015], [0035]; '961 patent, 7:37-53 ("computing device[]" implementable as "processor"); Goodin, ¶ 309. Dockser's main processor meets [1C] because it writes "subprecision select bits" to the FPP's "***control*** register," and thus is adapted to control the operation of the FPP (and its FPO) by specifying its precision level. [0018], [0025]; Goodin, ¶ 310.

- 39 -

### C.    Claim 2

Claim 2 lists alternatives for implementing the "computing device," only one of which must be met to render claim 2 unpatentable. *Apple v. Evolved Wireless*, IPR2016-01177, Paper 27 at 9-10 (Dec. 20, 2017); *Daifuku Co. v. Murata Mach.*, IPR2015-00083, Paper 63 at 13-14 (May 3, 2016); '961 patent, 25:52-63, 29:1-20 (discussing claim 2's recited alternatives disjunctively).

Claim 2 is met because Dockser discloses that its "main processor" (the "computing device" of [1C] and claim 2) is a "general-purpose processor" implementable as a "state machine" as claimed. [0035] (FPP is "part of a general purpose processor" that "may be any conventional processor,… or state machine"), [0015] (FPP is "part of the main processor"); Goodin, ¶ 311.

Claim 2 is alternatively met because a "CPU" was a well-known "conventional processor" of the type Dockser discloses ([0035]), and it would have been obvious to implement Dockser's main processor as a CPU as claimed. Goodin, ¶ 312; Ex. 1023, 1:16-28.

### D.    Claim 10

Independent claim 10 recites a device comprising a "plurality of components" comprising at least one LPHDR execution unit that is exactly as recited in claim 1.

1.    **[10A1] "A device comprising: a plurality of components comprising: at least one first… (LPHDR) execution unit"**

Dockser's computing system device meets [10A1] because it comprises a plurality of components including a main processor and an FPP (with FPO) (a claimed "LPHDR execution unit").  Goodin, ¶ 313; *see supra* §§ V.B.1, V.B.5.

If claim 10 were alternatively interpreted to require that a plurality of components be included in a single LPHDR execution unit, Dockser's FPP has multiple components (*e.g.*, registers, controller, FPO), as does Dockser's FPO (adder, multiplier).  [0015], [0019]-[0022]; Goodin, ¶ 314.

2.    **[10A2]-[10B2]**

[10A2]-[10B2] are identical to [1A2]-[1B2] and met for the same reasons discussed *supra* §§ V.B.2-V.B.4.  Goodin, ¶¶ 315-316.

**E.    Claims 4 (depending from claim 1) and 13 (depending from claim 10)**

The dynamic range of possible valid inputs to Dockser's operation extends from approximately $2^{-126}$ (much smaller than 1/1,000,000) to approximately $2^{127}$ (much larger than 1,000,000), meeting claims 4 and 13.  *Supra* § V.B.3; Goodin, ¶¶ 317-318.

**F.    Claims 5 (depending from claim 1) and 14 (depending from claim 10)**

Dockser's claimed "first operation" is reduced-precision "multiplication," meeting claims 5 and 14.  *Supra* §§ V.B.2, V.D.2; Goodin, ¶¶ 319-321.

- 41 -

## VI. <u>GROUND 2</u>: CLAIMS 1-2, 4-5, 10, 13-14, 21, AND 24-25 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND TONG

### A. Tong

Tong (Ex. 1008) is Section 102(b) prior art because it was publicly accessible by June 30, 2000. Tong's face bears a 2000 copyright date and indicates it was published by the IEEE, a "well-known, reputable compiler and publisher of scientific and technical publications," in *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, Vol. 8, No. 3, June 2000. *Ericsson v. Intellectual Ventures I*, IPR2014-00527, Paper 41 at 10–11 (May 18, 2015) (finding IEEE publication copyright line information falls under FRE 803(17) hearsay exception); *see also Hulu v. Sound View Innovations*, IPR2018-01039, Paper 29 at 19 (Dec. 20, 2019) (precedential) (finding reasonable likelihood of printed publication based on copyright date, printing date, and ISBN date from "established publisher" of "well-known book series"); Goodin, ¶ 322. Additionally, an IEEE representative (Mr. Grenier) testified that the IEEE made Tong publicly available by June 30, 2000. Ex. 1025, ¶¶ 8-11. *Guest Tek Interactive Entm't v. Nomadix*, IPR2019-00253, Paper 6 at 27-31 (May 28, 2019) (crediting IEEE copyright/publication date indicia and Mr. Grenier's testimony of public availability); *Palo Alto Networks v. Finjan*, IPR2015-01974, Paper 49 at 19-20 (Mar. 16, 2017) (same). Other IEEE publications cited Tong before 2009, further corroborating Tong's public accessibility. Ex. 1026, 27 (citation [13]); Ex.

1027, 27 (citation [31]); *see Intel v. R2 Semiconductor*, IPR2017-00707, Paper 81 at 21-22 (July 31, 2018).

Tong, like Dockser (*supra* § V.B.4.c(1)(ii)), confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision. Tong, 278 ("[P]ower dissipation in an FP [floating-point] unit can be reduced by using fewer bits in the FP representation. However, fewer bits reduces precision"); Goodin, ¶¶ 323-324. Focusing on "signal processing applications" "long… known" to be able to "get by with less precision/range than full FP" (Tong, 273), Tong explains that "[s]ince multiplication is one of the most frequent operations in signal processing applications" (Tong, 274) and "the mantissa multiplier always consumes more power than all other blocks" in an FP multiplier (Tong, 275-276), "reduction in the mantissa bitwidth is the most effective means of reducing power dissipation" (Tong, 277). Goodin, ¶ 325.

Tong teaches how to determine, by "emulat[ing] in software different bitwidth FP units" and "plot[ting] the accuracy" of various signal-processing applications "across a range of mantissa bitwidths" (Tong, 278), "the *minimal* number of mantissa… bits" for each application "to *reduce* power consumption, yet *maintain* [the] program's overall accuracy" (Tong, 273, emphasis original). Goodin, ¶¶ 326-330. In the "Sphinx" speech recognition application and the

- 43 -

"ALVINN" navigation application, "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits."  Tong, 278-279, 273, 282, Fig. 6; Goodin, ¶¶ 326-330.



Fig. 6.   Program accuracy across various mantissa bitwidths.

Tong, Fig. 6 (annotated)

Having empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications, Tong teaches using "reduced-precision arithmetic" to "omit the unnecessary bits and computations on them" (Tong, 284), to thereby "reduce waste" (Tong, 273) and "significantly reduce… power consumption while maintaining a program's overall accuracy" (Tong, 274).  Tong, 279 (floating-point "provides essential dynamic range… but the fine precision… is not essential"); Goodin, ¶ 331.

- 44 -

### B.     Claims 1-2, 4-5, 10, and 13-14

Tong's teachings and empirical tests would have motivated a POSA to configure Dockser's FPP to operate at the precision levels Tong teaches for particular applications.  Goodin, ¶ 332.  Tong teaches "[m]any mobile/portable electronics applications" perform signal processing programs "such as speech and image recognition" that are "better served with a custom, reduced[-precision] FP format" (Tong, 284), and a POSA would have understood Dockser's FPP with its selectable precision level for "[p]ower management" in "battery operated devices" (Dockser, [0003]) to be well-suited for use in Tong's mobile/portable applications. Goodin, ¶ 332.

Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx—*supra* § VI.A) would have motivated a POSA to configure Dockser's FPP in the device discussed *supra* § V to operate at a selected precision level retaining as few as 5 mantissa fraction bits to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision. Goodin, ¶ 333.  The resulting "Dockser/Tong" device meets claims 1-2, 4-5, 10, and 13-14 for the same reasons discussed *supra* § V (Ground 1), with the addition that Dockser/Tong's device retaining 5 fraction bits exceeds claim 1's X and Y

- 45 -

values (X=10%, Y=0.2%) by greater margins than Dockser's device retaining 9

fraction bits in Ground 1.  Goodin, ¶ 334.

Mr. Goodin's software program (discussed *supra* §§ V.B.4.c(1)(i),

V.B.4.c(2) and *infra* Appendix I.B, I.D) that tests all possible valid input pairs

demonstrates that when retaining 5 mantissa fraction bits in view of Tong,

Dockser's register bit-dropping produces at least Y=0.2% relative error for 99.03%

of possible valid inputs, and Dockser's logic bit-dropping produces at least

Y=0.2% relative error for 99.44% of possible valid inputs.  Goodin, ¶ 335.  The

algebraic analysis discussed *supra* § V.B.4.c(1)(ii)and *infra* Appendix I.C also

demonstrates that Dockser's register bit-dropping when retaining 5 mantissa

fraction bits produces a minimum of 1.56% relative error (greater than Y=0.2%)

for over 12% of possible valid inputs (greater than X=10%).  Goodin, ¶ 335.

Moreover, Tong and Dockser both demonstrate that POSAs knew how to

optimize the number of mantissa bits as a result-effective variable for concurrently

reducing precision and power consumption in a floating-point execution unit, and

how to empirically determine the optimum number of bits for a particular

application by testing the application's accuracy at various mantissa bitwidths.

Goodin, ¶ 336; *supra* §§ V.B.4.c(1)(ii), VI.A.  The '961 patent lists fifty-six

possible combinations of six X percentages (ranging from 1% to 50%) and nine Y

percentages (ranging from 0.05% to 20%) as "merely examples [that] do not

constitute limitations of the… invention," with no indication that any particular claimed X-Y combination is critical in any way. '961 patent, 27:54-28:8; Goodin, ¶ 337. *See In re Urbanski*, 809 F.3d 1237, 1242-1243 (Fed. Cir. 2016) (upholding obviousness finding where there was "no evidence" that "claimed range[]" of result-effective variable was "critical"). Determining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable, such that arriving at imprecisions resulting in the device meeting the claimed X and Y values would have been obvious. Goodin, ¶ 338; *see* result-effective variable caselaw cited *supra* § V.B.4.c(1)(ii).

## C.    Claims 21 and 24-25

Tong's teaching to "emulate[] in software different bitwidth FP units" "to determine application accuracy" (Tong, 278) would have motivated a POSA to emulate the Dockser/Tong device (*supra* § VI.B) in software to assess the accuracy of applications running on the device at selected precision levels, and a POSA would have had a reasonable expectation of success in doing so. Goodin, ¶¶ 339-340.

**1.    [21A] "A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device**

**comprising: a plurality of components comprising: at least one first… (LPHDR) execution unit"**

When the Dockser/Tong device is "emulated in software" per Tong's teachings (Tong, 278) cited *supra* § VI.A, the conventional and obvious implementation of such "software" is "computer program instructions" stored in "a computer-readable memory" and "executable by [a] processor" within a "device" (*e.g.*, a computer) as claimed. Goodin, ¶ 341; *see* Dockser, [0036] ("software" is "executed by a processor" and "reside[s] in [a] memory"); Donovan (Ex. 1029), [0008]-[0009], [0014] ("software" is "computer program with instructions"); '961 patent, 26:13-15 ("software emulator" is "embodiment[] of the [claimed] invention"). As discussed above (§ VI.C), a POSA would have been motivated by Tong to use a computer (a claimed "device comprising a computer processor…[etc.]") to emulate the Dockser/Tong device discussed *supra* §§ V.D, VI.B (meeting the "second device" of [21A1]), which comprises a plurality of components including a main processor and Dockser's execution unit (which itself comprises multiple components). *Supra* § V.D.1; Goodin, ¶ 342. Like the '961 patent's only examples of "emulat[ing] a… device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform. '961 patent, 17:14-28, 18:65-19:25; Tong, 278; Goodin, ¶¶ 343-344.

- 48 -

### 2. Limitations [21A2]-[21B2], Claims 24-25

[21A2]-[21B2] are identical to [1A2]-[1B2].  Claims 24-25 depend from claim 21 but are otherwise identical to claims 4-5, respectively.  Therefore, because the emulated "second device" in Dockser/Tong is the device discussed *supra* §§ V.B, V.E-V.F, VI.B, Dockser/Tong meets [21A2]-[21B2] and claims 24-25 for the same reasons Dockser's device (operating at Dockser's or Tong's disclosed precision levels) meets the identical limitations in claims 1 and 4-5.  Goodin, ¶¶ 345-346.

## VII.  <u>GROUND 3</u>: CLAIMS 1-5, 10, AND 13-14 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND MACMILLAN

### A. MacMillan

MacMillan (Ex. 1009) "improve[s]… speed of a personal computer architecture through… parallel processing capability" "[t]o provide supercomputer performance in a computer for personal use."  MacMillan, 8:38-40, 5:22-45, 1:10-47.  Consistent with how "supercomputer" was used in the art, MacMillan describes supercomputer performance in terms of speed (*e.g.*, number of operations performed per second), not precision.  MacMillan, 1:15-54; Ex. 1052, 1411; Ex. 1053, 500; Goodin, ¶¶ 347-348.  MacMillan achieves "substantial performance improvements" by adding a "Single Instruction Multiple Data (SIMD)" subsystem to "existing system architectures."  MacMillan, 9:17-23, 5:48-6:10.  The SIMD subsystem includes SIMD-RAM devices having multiple parallel "processing

- 49 -

elements (PE's)," each PE including "floating point accelerators" that "perform…

operations on… 32-bit words."  MacMillan, 9:11-19, 12:35-59, FIGs. 2 and 5

(reproduced below).  Goodin, ¶¶ 349-350.



## FIG. 2

(SIMD computer system)



**FIG. 5**

(SIMD-RAM)

### B.    Dockser/MacMillan Combination

MacMillan teaches incorporating SIMD parallel processing in personal-use computers, including battery-operated "laptops, palmtops, [and] personal digital assistants"—the same types of computers for which Dockser's FPP provides "[p]ower management" through reduced-precision floating-point operations. MacMillan, 1:6-9, 5:22-45, 7:14-34; Dockser, [0003]; Goodin, ¶ 351. MacMillan teaches "power dissipation and hence power supply capacity and cost" should be considered in pursuing MacMillan's SIMD architecture. MacMillan, 3:2-6; Goodin, ¶ 352. A POSA would have been motivated to use Dockser's FPP to

implement each "floating-point accelerator" in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches.  Goodin, ¶ 353.

Dockser's FPP is a "floating-point accelerator" for "perform[ing] atomic operations on… 32-bit words" as in MacMillan's PE, and using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power.  MacMillan, 12:47-59; Goodin, ¶ 354; *see supra* § V.A; Ex. 1024, 1:43-58 ("floating point accelerator" is "processor element" for executing "floating point operation[s]").  MacMillan's SIMD architecture is beneficial for applications including "animation,… rendering…, and video games," which are types of the "graphics applications" for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision.  MacMillan, 7:14-34; Dockser, [0003]; Goodin, ¶ 355.

## C.    Claims 1-2 and 4-5

In the resulting "Dockser/MacMillan" combination, MacMillan's "computer system" (*e.g.*, 200) (7:14-34, 9:20-29) meets the "device" of [1A1], and comprises Dockser's execution unit) and MacMillan's "Host CPU" (8:56-9:31).  Goodin, ¶¶ 356-358.  MacMillan's CPU is adapted to control the operation of the SIMD subsystem, including its PEs with Dockser's execution units, by executing a

program controlling initiation of "all SIMD processing" (MacMillan, 10:27-53,

13:12-13, 13:38-62); thus the CPU meets [1C] and claim 2 ("CPU"). Goodin,

¶¶ 359-364.

All other limitations of claims 1-2 and 4-5 relate to characteristics of the

LPHDR execution unit, which in Dockser/MacMillan is the same Dockser

execution unit as in Ground 1. Thus, Dockser/MacMillan meets the remaining

limitations in claims 1-2 and 4-5 for the reasons discussed *supra* §§ V.B-V.C, V.E-

V.F. Goodin, ¶ 365.

### D. Claim 3: "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."

MacMillan's computer system (the claimed "device"—*supra* § VII.C)

includes a Host CPU implementable as "a 386, 486 or Pentium™ processor."

MacMillan, 9:30-31. POSAs understood these processors included a floating-point

execution unit that performed multiplication on IEEE-754 single-format 32-bit

floating-point numbers. Goodin, ¶¶ 366-370 (citing Ex. 1017, [0005]; Ex. 1018,

2:7-10; Ex. 1029, [0013]; Ex. 1030, 1:13-19; Dockser, [0002]). Thus, an obvious

implementation of MacMillan's CPU includes one claimed "execution unit[]…

adapted to execute at least the operation of multiplication on floating point

numbers that are at least 32 bits wide." Goodin, ¶ 371.

- 53 -

MacMillan discloses an example architecture including 256 PEs, and scaling to "tens of thousands... or more." MacMillan, 12:60-13:4, 13:39-41, 16:20-22, 2:13-16. Thus, in the Dockser/MacMillan combination having a single Host CPU and at least one FPP in each PE (of which there are at least 256), the number of FPPs (LPHDR execution units) exceeds by over 100 the non-negative integer number of Host CPU floating-point execution units. Goodin, ¶¶ 372-373.

The '961 patent says "arithmetic elements... designed to perform... floating point arithmetic with a word length of 32 or more bits" are "designed to perform... arithmetic of traditional precision," and contrasts those traditional-precision elements with "LPHDR arithmetic elements" ('961 patent, 28:9-16), which may "sometimes" produce results that differ from the correct result (*id.*, 26:61-27:4). Goodin, ¶ 374. A POSA would therefore have understood the '961 patent to describe that the claimed "execution units... adapted to execute... multiplication on floating point numbers that are at least 32 bits wide" are "traditional precision" execution units that do not "sometimes" produce results different from the correct traditional-precision result. Goodin, ¶ 375. The floating-point execution unit of MacMillan's Host CPU is such a "traditional precision" execution unit, and Dockser's FPP that sometimes produces differing results (*supra* § V.B.4) is a claimed "LPHDR execution unit." Goodin, ¶ 376. Thus, a POSA would have understood Dockser/MacMillan meets claim 3 because its number (256 or more) of

- 54 -

LPHDR execution units (Dockser FPPs) exceeds by over 100 its number (one) of traditional-precision execution units (the single Host CPU floating-point unit). Goodin, ¶ 377.

### E.    Independent Claim 10 and Dependent Claims 13-14

In Dockser/MacMillan, MacMillan's "computer system 200" (7:14-34, 9:20-29) meets the "device" of [10A1], and comprises multiple PEs each including one or more of Dockser's execution unit.  Goodin, ¶ 378; *supra* §§ VII.B-VII.C.  The PEs are implemented on "SIMD-RAM… chips," and an example architecture includes sixteen SIMD-RAM chips each having sixteen PEs.  MacMillan, 12:35-13:4.  If claim 10 were interpreted to require "a plurality of components," ***each*** comprising at least one LPHDR execution unit, that plurality of components is met by any two or more of the SIMD-RAM chips, or any two or more of the PEs, in Dockser/MacMillan.  Goodin, ¶¶ 379-380.

All other limitations of claims 10 and 13-14 relate to characteristics of the LPHDR execution unit, which in Dockser/MacMillan is the same Dockser execution unit as in Ground 1.  Thus, Dockser/MacMillan meets the remaining limitations in claims 10 and 13-14 for the reasons discussed *supra* §§ V.D-V.F. Goodin, ¶ 381.

- 55 -

## VIII. <u>GROUND 4</u>: CLAIMS 1-5, 10, 13-14, 21, AND 23-25 WOULD HAVE BEEN OBVIOUS OVER DOCKSER, TONG, AND MACMILLAN

### A.    Claims 1-5, 10, 13-14

Dockser/MacMillan (Ground 3) uses Dockser's FPP to implement each "floating-point accelerator" in the parallel PEs of MacMillan's SIMD architecture. *Supra* § VII.B.  As discussed in Ground 2, a POSA would have been motivated to implement Dockser's FPP using precision levels as low as 5 mantissa fraction bits, which Tong teaches suffices for applications including "neural network trainer" "ALVINN."  Tong, p. 278 & Table IV; *supra* §§ VI.A-VI.B.  MacMillan teaches that such "neural net[work]" applications would benefit from "supercomputer performance" provided by using (at least) 256 PEs including "floating point accelerators."  MacMillan, 1:24-37, 12:52-13:4; Goodin, ¶¶ 382-383.  In view of these combined teachings of Dockser, Tong, and MacMillan, a POSA would have been motivated to use Dockser's FPP with Tong's precision levels as low as 5 mantissa fraction bits as each floating-point accelerator in MacMillan's multiple PEs to achieve "supercomputer performance" for, *e.g.*, neural network applications while conserving power.  Goodin, ¶ 384.

The resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong) meets claims 1-5, 10, and 13-14 for the same reasons Dockser/MacMillan does discussed *supra* §§ VII in Ground 3, except the claimed

performance characteristics X and Y are met by using 5 rather than 9 mantissa fraction bits, meeting the claimed "at least" X and Y values by the greater amounts explained for Dockser/Tong in Ground 2 *supra* §§ VI.B.  Goodin, ¶ 385.

### B.     Claims 21, 23-25

Tong's teachings discussed *supra* §§ VI.A, VI.C to emulate in software a device employing reduced-precision arithmetic would have motivated a POSA to emulate in software the Dockser/Tong/MacMillan device meeting claim 10 (the "second device" recited in claim 21).  Goodin, ¶ 386.  The computer performing the emulation meets claims 21 and 24-25 for the reasons that same computer does in Ground 2 *supra* § VI.C, except the claimed "second device" being emulated is met by the Dockser/Tong/MacMillan device for the reasons *supra* § VIII.A.  Goodin, ¶ 387.  The Dockser/Tong/MacMillan device being emulated meets the additional limitation of claim 23 for the same reasons discussed *supra* § VII.D concerning claim 3's identical limitation.  Goodin, ¶ 388.

### C.     Alternative Interpretation of Claims 3 and 23

One MacMillan embodiment is "a system… designed primarily… for a specific application, including embedded applications… including… signal processing,… voice recognition, [etc.]."  MacMillan, 7:15-34.  Tong teaches that many "embedded applications such as voice recognition,… and other human-sensory-oriented signal-processing applications" (Tong, 274), "can get by with less

- 57 -

precision/range than full FP" (Tong, 273). Tong experimentally demonstrates that the optimum precision for a "benchmark suite" (Tong, 284) of "five signal processing applications" spanning a "range in complexity" is between 5 and 11 mantissa fraction bits (Tong, 278-279). Goodin, ¶¶ 389-391. A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels for the reasons *supra* § VIII.A, and to do so in MacMillan's embedded signal-processing system based on Tong's teachings that reduced-precision arithmetic is beneficial in such systems. Goodin, ¶ 392.

In such an embedded system designed specifically for signal processing, a POSA would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that "the fine precision of the 23-bit mantissa is not essential." Tong, 279; Goodin, ¶ 393. Dockser ([0017]) teaches that the registers in embodiments of its FPP can be "formatted differently from IEEE 32-bit single format," and a POSA would have been motivated to implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered because they correspond to mantissa bits that will always be tied to "0" in an application-specific system that always operates at reduced precision. Goodin, ¶ 394. Likewise, a POSA would have been motivated

- 58 -

to implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application. Goodin, ¶ 395.

In this implementation, the claimed "input signal" to Dockser's FPP remains in IEEE-754 32-bit single-format given that the Host CPU and data buses in the Dockser/Tong/MacMillan device use and send to Dockser's FPP standard 32-bit floating-point numbers.  MacMillan, 9:30-57; *supra* §§ VII.A, VII.D; Goodin, ¶ 396.  However, one or more least-significant mantissa bits of the input signal number are not stored in the register which is implemented with fewer than 32 storage elements.  Goodin, ¶ 396.  Because the input signal and selected precision levels are unchanged from Grounds 1-3, this implementation of Dockser/Tong/MacMillan meets independent claims 1 and 21 (including their "wherein" clause) the same way as in Grounds 1-3 where Dockser's FPP is a claimed LPHDR execution unit.  Goodin, ¶ 397; *supra* §§ V-VII.

If dependent claims 3 and 23 were interpreted differently than the specification discusses (*see supra* § VII.D), such that an execution unit used for reduced-precision operations could be considered to also meet the claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide" if its hardware is capable of 32-bit multiplication in some

- 59 -

configurations (*e.g.*, if power were applied to all register and logic elements), Dockser's FPP in the above-discussed Dockser/Tong/MacMillan implementation for an embedded application is not that type of execution unit, because its hardware (having smaller-than-32-bit registers and multiplier logic) is ***not*** capable of 32-bit multiplication. Goodin, ¶ 398. Thus, this Dockser/Tong/MacMillan implementation meets that alternative interpretation of claims 3 and 23 because only the Host CPU floating-point unit is a claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide," and the device includes over 100 more of Dockser's FPP (LPHDR execution unit). Goodin, ¶ 399; *supra* § VII.D.

## IX.    NO BASIS EXISTS FOR DISCRETIONARY DENIAL

### A.    <u>Section 314(a)</u>: Parallel Litigation Does Not Weigh Against Institution

Singular served Petitioner with a complaint on December 20, 2019, and subsequently amended that complaint on March 20, 2020 (Ex. 1032). Petitioner moved to dismiss the amended complaint, which was denied. Exs. 1034, 1036.

Petitioner filed this Petition expeditiously, four months after denial of its motion to dismiss, two months after receiving Singular's infringement contentions, and ***before*** preliminary invalidity contentions are due. Exs. 1033, 1037-1038. *HP Inc. v. Neodron Ltd.*, IPR2020-00459, Paper 17, 40 (Sept. 14, 2020) (instituting trial where petitioner "acted diligently" in filing petitions "approximately two

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

—————————

Case No. TBD
Patent No. 10,416,961

—————————

**DECLARATION OF RICHARD GOODIN**

Google Exhibit 1003
Google v. Singular

19.     I understand that for a single reference or a combination of references to render the claimed invention obvious, a POSA must have been able to arrive at the claimed invention by altering or combining the applied references.

## IV.     THE '961 PATENT

### A.     Overview

20.     The '961 patent claims a device comprising at least one "low precision high-dynamic range (LPHDR) execution unit." '961 patent, claim 1. The claimed "execution unit" is adapted to execute an operation (*e.g.*, an arithmetic operation like multiplication) on an input signal representing a first numerical value to produce an output signal representing a second numerical value. *See*, *e.g.*, '961 patent, 30:17-22 (claim 1: "A device comprising: at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"). The "execution unit" is characterized as "LPHDR" because it performs a "low precision" ("LP") operation on a "high dynamic range" ("HDR") of values.

21.     Precision relates to accuracy and can be impacted by the ability to represent numbers that differ from each other by small amounts—*e.g.*, fractional values. For example, in a decimal (base-10) representation, the number 2.13 (represented using two fractional digits) is more precise than if rounded to 2.1

(using just one fractional digit), which is more precise than if rounded to 2 (using no fractional digits).

22.    In a binary "fixed-point" representation, any fixed number of bits can be chosen to represent a number's fractional component.  For example, a binary fixed-point representation that allocates three bits to representing a fractional component can represent numbers to the nearest 1/8, which is more precise than a representation that allocates only two bits to the fractional component and can represent numbers to the nearest 1/4, which is more precise than a representation that allocates no bits to the fractional component and can only represent integers.

23.    A "low precision arithmetic" operation, as the '961 patent says, is an operation that is less precise than an exact calculation, such that "each operation might introduce" some "error" in its "results."  '961 patent, 3:65-4:1 (describing prior art processors that "provide low precision arithmetic, in which each operation might introduce perhaps an error of a few percentage points in its results").  For example, a low-precision operation may produce a result of 2.1 when the exact operation would produce a result of 2.13.

24.    "Dynamic range" refers to the range of numerical values that a signal can represent or a unit can operate on or produce.  *See* '961 patent, 2:23-27 ("In some embodiments, the processing elements have 'high dynamic range' in the sense that they are capable of operating on inputs and/or producing outputs

spanning a range at least as large as from one millionth to one million.").  For example, a signal that can represent any numerical value between 1 and 100 has a higher dynamic range than one that can only represent numerical values between 1 and 10.

25.    In a binary (base-2) representation of integers, the more bits used to represent a number, the wider the possible dynamic range—*e.g.*, two bits can represent the numbers 0-3, three bits can represent the numbers 0-7, etc.  Other binary representations have been developed that can have a wider dynamic range for the same number of bits.  One such well-known representation is floating-point representation.

26.    For example, in describing a prior art "16 bit floating point representation," the '961 patent quotes a 2008 Wikipedia article that explains:

> This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. ***The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range*** allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth.

'961 patent, 5:15-22.[1]  Similarly, Tong (Ex. 1008) explains that a 32-bit floating-point number in the "IEEE single-precision" format has a much wider dynamic range than a 32-bit integer:

> For instance, an IEEE single-precision number and an integer on a 32-bit machine both require 32 bits of storage for their representation. However, the dynamic range provided by the FP representation ($1.99999988 \times 2^{-126}$ to $1.99999988 \times 2^{127}$) is substantially wider than that provided by the integer representation ( $1\text{-}2^{31}$).

Tong, 274.

27.    It was well known before 2009 that for a numerical representation using a fixed number of bits, a tradeoff is necessary between dynamic range and precision.  For example, a ten-bit binary fixed-point representation that allocates all ten bits to the non-fractional part, and thus represents values between zero and 1,023 but only to the nearest integer, has higher dynamic range but lower precision than a representation that allocates all ten bits to representing the fractional part and thus only represents values between zero and one but is accurate to the nearest 1/1024.

28.    Another example relates to the well-known floating-point representations, which can represent a high dynamic range of numerical values using a smaller number of digits than a fixed-point representation—*e.g.*, by

---

[1] All emphases in this declaration are added unless otherwise indicated.

representing a large number as a smaller number (called the "mantissa") scaled by an order of magnitude. A simple example of a floating-point representation of a decimal number using base ten would represent the number 3,046,000 as $3.046 \times 10^6$.

29. In a typical binary (base-2) floating-point representation, one bit is allocated to indicate the number's sign (positive or negative), some bits are allocated to specify the "exponent" (the number's order of magnitude in base two), and other bits are allocated to specify the mantissa. *See*, *e.g.*, Dockser (Ex. 1009), [0001] ("To find the value of a floating-point number, the mantissa is multiplied by ***a base (commonly 2 in computers)*** raised to the power of the exponent."), [0002] ("the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa.); Tong (Ex. 1008), 274 ("There are two different IEEE standards for FP computation. IEEE 754 is a binary standard that requires the implied radix (base) to be two. IEEE 854 allows either radix 2 or radix 10 representation. By far, IEEE 754 is more popular and most desktop microprocessors support the IEEE 754 standard.").

30. It was known that the number of exponent bits in a floating-point representation impacts dynamic range, that the number of mantissa (fraction) bits impacts precision, and that there was a tradeoff:

> The designer of a floating-point representation must find a
> compromise between the size of the [mantissa] fraction and the size of
> the exponent because a fixed word size means you must take a bit
> from one to add a bit to the other.  This trade-off is between precision
> and range: increasing the size of the [mantissa] fraction enhances the
> precision of the fraction, while increasing the size of the exponent
> increases the range of numbers that can be represented.

Patterson (Ex. 1031), 191.

31.    It was known in mathematics and in computing that LPHDR
arithmetic had benefits.  For example, Tong (Ex. 1008) noted that "wide dynamic
range" was recognized as "a desirable feature," and explained that "[i]t has long
been known that many… applications can get by with less precision" over that
range.  Tong, 273.  Tong explains that "Floating-point (FP) hardware provides a
wide dynamic range of representable real numbers," and notes that "FP hardware's
performance, simplified programming model, and adaptability over a wide
dynamic range makes it a desirable feature."  Tong, 273.  Tong states that its
experimental results show that "programs such as speech recognition and image
processing use significantly less power with our reduced bitwidth FP
representation than with an IEEE-standard FP representation."  Tong, 273.  Tong
also notes that "[i]t has long been known that many such signal processing
applications can get by with less precision/range than full FP," *i.e.*, than with the
an "IEEE-standard FP representation."  Tong, 273.  Tong's own experiments

However, if only three bits are used, then the closest mantissas that can be represented are 1.75 or 1.875. That is, the bit sequence 110 represents a mantissa of $1 + (1 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) = 1.75$, while the bit sequence 111 represents a mantissa of $1 + (1 \times 2^{-1}) + (1 \times 2^{-2}) + (1 \times 2^{-3}) = 1.875$. Thus, with a 3-bit mantissa, the number 29 cannot be represented precisely, but can only be approximated less precisely as $1.75 \times 2^4 = 28$ or as $1.875 \times 2^4 = 30$.

193. Dockser explains, as was well known, that "modern computers" "commonly" use the "ANSI/IEEE-754 standard… 32-bit single format," which represents floating-point numbers using "a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa." Dockser, [0002]. Dockser recognized, however, that "[w]hile some applications may require these types of precision, other applications may not." Dockser, [0003]. For example, if the lower precision from using just 16 bits in the mantissa (vs. the IEEE-754 standard 23-bit mantissa) results in computations whose accuracy suffices for a particular application (*e.g.*, generating 3D graphics), then "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption." Dockser, [0003]. Dockser teaches that "[t]his is of particular concern in battery operated devices where power comes at a premium." Dockser, [0003].

194. Dockser's "floating-point processor (FPP)" operates at a selectable "subprecision of the floating-point format," below the precision of the "IEEE-754

view of Dockser's teachings that the number of mantissa bits dropped/maintained was a "selectable" variable to be optimized for different applications, and that the selection impacts the FPP's results through the precision of the outputs that the FPP produces, as I explain in paragraphs 290-292 below.  *See* Dockser, [0002]-[0003], [0014], [0024]-[0027].

290.    Dockser explains in its Background section that the precision of operations can be adjusted by adjusting the mantissa size, and teaches that using only the level of precision necessary for a given application is beneficial because it saves power.  *See* Dockser, [0002] ("The precision of the floating-point processor is defined by the number of bits used to represent the mantissa. The more bits in the mantissa, the greater the precision."), [0003] ("While some applications may require these types of precision, other applications may not. For example, some graphics applications may only require a 16-bit mantissa. For these graphics applications, any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption. … Accordingly, there is a need in the art for a *floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable*.").

291.    Dockser teaches an FPP in which the "precision" for "floating-point operations may be reduced" by "selecting [a] subprecision" to whatever precision level is "needed."  Dockser, [0014] ("In at least one embodiment of a floating-

| wide as from 1/1,000,000 through 1,000,000. | wide as from 1/1,000,000 through 1,000,000. |
|---|---|

| Claim 25 | Claim 5 |
|---|---|
| The device of claim 21, wherein the first operation is multiplication. | The device of claim 1, wherein the first operation is multiplication. |

346.    Therefore, because the emulated "second device" in Dockser/Tong is the device discussed in Sections VI.B, VI.E-VI.F, and VII.B above, Dockser/Tong meets limitations [21A2]-[21B2] and claims 24-25 for the same reasons Dockser's device (operating at Dockser's or Tong's disclosed precision levels) meets the identical limitations in claims 1 and 4-5.

## VIII.  CLAIMS 1-5, 10, AND 13-14 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND MACMILLAN

### A.    MacMillan (Ex. 1009)

347.    MacMillan (Ex. 1009) "improv[es]… speed of a personal computer architecture through… parallel processing capability" "[t]o provide supercomputer performance in a computer for personal use."  MacMillan, 8:38-40, 5:22-45, 1:10-47.  MacMillan states in its "Background of the Invention" section that "[i]f supercomputing performance could be achieved in low cost computers, such as personal computers, this could dramatically expand the market for personal computers."  MacMillan, 1:20-23.  MacMillan teaches that because of performance limitations of "uniprocessor-based" systems, "a personal computer providing

supercomputer performance should use a parallel computing architecture."
MacMillan, 1:38-47. MacMillan notes that "SIMD architectures have some
qualities that make them attractive candidates for adding supercomputer
performance to a computer for personal use," but that "present SIMD architectures
are much higher cost than computer systems for personal use." MacMillan, 5:22-
27. MacMillan identifies certain things that must be achieved in a SIMD system
"[t]o provide supercomputer performance in a computer for personal use,"
MacMillan, 5:27-28, and teaches an invention that "addresses [those] needs."
MacMillan, 5:44-45. Specifically, MacMillan's invention "relates to an
improvement in the overall speed of a personal computer architecture through the
addition of a parallel processing capability." MacMillan, 8:38-40.

348. Consistent with how the term "supercomputer" was used in the art,
MacMillan describes "supercomputer" performance in terms of speed (e.g.,
number of operations performed per second), not precision. *See* MacMillan, 1:15-
54 ("Personal computers (PCs) today typically have performance up to about 300
million instructions per second (MIPs). This is much less than supercomputers,
which may provide performance of 5,000 MIPs or more. … Parallel computers
with over 5,000 MIPs performance are readily achievable, as demonstrated by their
availability from a number of vendors, although at high prices."). For
corroborating evidence of how the term "supercomputer" was used in the art, *see*,

*e.g.*, *Penguin* (Ex. 1052), 1411 ("any of a class of very powerful computers that are capable of performing at great speed and are used for repeated calculation cycles on vast amounts of data"); *Oxford* (Ex. 1053), 500 ("supercomputer" is a "class of very powerful computers" capable of "performing several hundred [trillion] floating-point operations per second").

349.     MacMillan achieves "substantial performance improvements" by adding a "Single Instruction Multiple Data (SIMD)" subsystem to "existing system architectures."  MacMillan, 9:17-19, 5:48-6:10.  MacMillan's invention "comprises a computer system to which has been added a Single Instruction Multiple Data (SIMD) parallel processing capability."  MacMillan, 5:48-50.  "The computer system, to which the SIMD capability has been added, could be a computer system for personal use or other computer system."  MacMillan, 5:50-53.  MacMillan's "cost-effective addition of parallel processing can be made to popular, low cost computer systems running popular operating systems," including "Microsoft Windows based personal computers" and "UNIX-based systems."  MacMillan, 6:3-10.  MacMillan provides this "SIMD capability" with a "SIMD subsystem" that "adds parallel processing capabilities to the personal computer, resulting in substantial performance improvements."  9:17-19.

350.     MacMillan's SIMD subsystem includes SIMD-RAM devices having multiple parallel "processing elements (PE's)," each PE including "floating point



**FIG. 5**

MacMillan, Fig. 5 (SIMD-RAM device)

### B.    Dockser/MacMillan Combination

351.    MacMillan teaches incorporating SIMD parallel processing in personal-use computers, including battery-operated devices like "laptops, palmtops, [and] personal digital assistants"—the same types of computers for which Dockser's FPP provides beneficial "[p]ower management" through reduced-precision floating-point operations.  MacMillan, 1:6-9, 5:22-45, 7:14-34; Dockser, [0003].  MacMillan's invention relates to "computer systems for personal use."

MacMillan, 1:6-9.  As MacMillan explains, "SIMD architectures have some

qualities that make them attractive candidates for adding supercomputer

performance to a computer for personal use," but existing "SIMD architectures"

have "limitations."  5:22-26.  "Overcoming" those limitations, MacMillan

explains, "would allow supercomputing performance to be provided in a low cost

computer system for personal use," and MacMillan's invention "addresses" those

"needs"—*i.e.*, the needs to overcome those limitations.  MacMillan, 5:42-45.

MacMillan defines "'[a] computer system for personal use'" as

> a system that is designed primarily for use by an individual or for a
> specific application, including embedded applications. ***A computer
> system for personal use includes*** personal computers (including, but
> not limited to, those that are IBM-compatible and Apple-compatible),
> workstations (including, but not limited to, those that use RISC
> technology or that use the UNIX operating system), embedded
> computers (including, but not limited to, computer-based equipment
> used for telecommunications, data communications, industrial control,
> process control, printing, settop boxes, signal processing, data
> compression or decompression, data transformation, data aggregation,
> data extrapolation, data deduction, data induction, video or audio
> editing or special effects, instrumentation, data collection or analysis
> or display, display terminals or screens, voice recognition, voice
> processing, voice synthesis, voice reproduction, data recording and
> playback, music synthesis, animation, or rendering), ***laptops,***

***palmtops, personal digital assistants, notebooks, subnotebooks, and
video games***.

MacMillan, 7:14-34.  These are the same types of systems in which, according to

Dockser, the problem of "unnecessary power consumption" is "of particular

concern."  Dockser, [0003] ("some graphics applications may only require a 16-bit

mantissa. For these graphics applications, any accuracy beyond 16 bits of precision

tends to result in unnecessary power consumption. This is of particular concern in

battery operated devices where power comes at a premium, such as wireless

telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and

cameras, just to name a few.").  Dockser teaches that "there is a need in the art for

a floating-point processor in which the reduced precision, or subprecision, of the

floating-point format is selectable," which Dockser addresses with this selectable-

precision FPP.  Dockser, [0003].  Thus, both MacMillan and Dockser are directed

to improvements in the same types of devices.

352.  In addition, MacMillan teaches that "power dissipation and hence

power supply capacity and cost" should be considered in pursuing the performance

improvements of MacMillan's SIMD architecture.  MacMillan, 3:2-6.  MacMillan

explains that existing "SIMD architectures…suffer from a number of

shortcomings."  MacMillan, 2:21-26.  One of these limitations is a "bottleneck

between the chips used to hold PEs [processing elements] and the chips used to

provide memory storage." MacMillan, 2:26-48. Although MacMillan notes that "[a]dding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs," MacMillan also notes that "[a]dding output buffers to drive increased pin counts also increases power dissipation and hence ***power supply capacity and cost***," which in turn "may also require increased space between chips or circuit boards for better cooling, leading to larger, more costly cabinets." MacMillan, 2:62-3:6. One of MacMillan's goals is to "overcom[e]" the "limitations" it identifies in prior art SIMD systems." MacMillan, 5:38-42. Thus, a POSA would have understood that one of MacMillan's goals in the design of its SIMD system was addressing "power dissipation and hence power supply capacity and cost." MacMillan, 3:3-4.

353. Based on MacMillan's and Dockser's teachings that I discuss above, a POSA would have been motivated to use Dockser's FPP to implement each "floating-point accelerator[]" in the parallel PEs of MacMillan's SIMD architecture (MacMillan, 12:55-56), to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches.

354. A POSA would have understood that Dockser's FPP is a "floating-point accelerator" for "perform[ing] atomic operations on… 32-bit words" as in MacMillan's PE, and using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to

perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power. MacMillan, 12:47-59. As I discussed in paragraph 350 above, MacMillan discloses that its PEs "can perform atomic operations on bits, bytes, 16-bit words, and 32-bit words." MacMillan, 12:47-49. MacMillan also teaches including "floating-point accelerators" in each PE. MacMillan, 12:55-56. As a POSA would have understood, a floating point accelerator is a processor element for executing floating point operations, as is Dockser's FPP. For evidence corroborating that this was background knowledge for a POSA, *see*, *e.g.*, Fossum (Ex. 1024), 1:43-58 (explaining in the "Description of the Prior Art" that in "Data processing (i.e. computer) systems," "[s]ometimes a special type of ***processor element***, termed a ***floating point accelerator***, is provided for performing floating point arithmetic calculations. Floating point accelerators are specifically designed to increase the speed with which floating point calculations may be performed; when a ***floating point operation*** is to be performed, it is ***executed*** in or by the floating point accelerator rather than in another processor."). Thus, a POSA would have understood that the "floating-point accelerators" in the PEs in MacMillan are processor elements that perform floating-point operations, just like Dockser's FPP, and therefore would have understood that using Dockser's FPP as the floating-point accelerator would enable MacMillan's PEs to perform reduced-precision floating-point arithmetic.

355.    Moreover, MacMillan teaches that its SIMD architecture is beneficial for applications including "animation,… rendering…, and video games," which a POSA would have understood are types of the "graphics applications" for which Dockser teaches that its FPP can beneficially save power by reducing unnecessary precision.  MacMillan, 7:14-33; Dockser, [0003].  As I discussed in paragraph 351 above, MacMillan's primary focus is on "computer system[s] for personal use," which includes "laptops, palmtops, personal digital assistants, notebooks, subnotebooks, and video games," MacMillan, 7:14-34, which are the same types of "battery operated devices where power comes at a premium" that Dockser is primarily focused on.  *See* Dockser, [0003] ("wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras, just to name a few").

### C.    Claims 1-2 and 4-5

356.    In the combination of Dockser and MacMillan ("Dockser/MacMillan") discussed in Section VIII.B above, MacMillan's "computer system" (*e.g.*, computer system 200) (MacMillan, 7:14-34, 9:20-29) meets the "device" of limitation [1A1], and comprises Dockser's execution unit and MacMillan's "Host CPU" (MacMillan, 8:56-9:31), as I explain in paragraphs 357-358 below.

374.    The '961 patent states:

The degree of precision of a "*low precision, high dynamic range*" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, *in certain embodiments, a LPHDR arithmetic element produces results which are sometimes* (or all of the time) *no closer than 0.05% to the correct result* (that is, the absolute value of the difference between the produced result and the correct result is *no more than one-twentieth of one percent of the absolute value of the correct result*).

'961 patent, 26:61-27:4.  The patent also states:

For certain devices (such as computers or processors or other devices) embodied according the present invention, the *number of LPHDR arithmetic elements* in the device (e.g., computer or processor or other device) *exceeds the number*, possibly zero, of *arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision* (*that is*, floating point arithmetic with a *word length of 32* or more bits).

'961 patent, 28:9-16.  The '961 patent thus says that "arithmetic elements… designed to perform… floating point arithmetic with a word length of 32 or more bits" are "designed to perform… arithmetic of traditional precision," and it contrasts those traditional-precision elements with "LPHDR arithmetic elements"

('961 patent, 28:9-16), which may "sometimes" produce results that differ from the correct result (*id.*, 26:61-27:4).

375.   A POSA would therefore have understood the '961 patent to describe that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" in claim 3 are "traditional precision" execution units that do not "sometimes" produce results different from the correct traditional-precision result.

376.   A POSA would have understood that the floating-point execution unit of MacMillan's Host CPU is such a "traditional precision" execution unit, and would have understood that Dockser's FPP that sometimes produces differing results from those produced by a "traditional precision" floating point unit (as I explained in Section VI.B.4 above when discussing limitation [1B2]) is a claimed "LPHDR execution unit."

377.   Thus a POSA would have understood that Dockser/MacMillan meets claim 3 because Dockser/MacMillan's number (256 or more) of LPHDR execution units (Dockser FPPs) exceeds by over 100 its number (one) of traditional-precision execution units (the single Host CPU floating-point unit).

### E.    Independent Claim 10 and Dependent Claims 13-14

378.   In Dockser/MacMillan, MacMillan's "computer system 200" (MacMillan, 7:14-34, 9:20-29) meets the "device" of limitation [10A1].  This

| Claim 23 | Claim 3 |
|---|---|
| The device of claim 21, wherein the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide | The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide. |

## C.     Alternative Interpretation of Claims 3 and 23

389.   One embodiment in MacMillan is "a system… designed primarily… for a specific application, including embedded applications… including… signal processing,… voice recognition, [etc.]."  MacMillan, 7:15-34.  MacMillan relates to improving a "computer system for personal use."  MacMillan, 5:48-53 ("The present invention comprises a computer system to which has been added a Single Instruction Multiple Data (SIMD) parallel processing capability. The computer system, to which the SIMD capability has been added, could be a computer system for personal use or other computer system.").  And in the "DESCRIPTION OF THE PREFERRED EMBODIMENTS" section, MacMillan explains that:

> '*A computer system for personal use*' is a system that is designed primarily for use by an individual *or for a specific application, including embedded applications*. A computer system for personal use *includes* personal computers (including, but not limited to, those that are IBM-compatible and Apple-compatible), workstations

(including, but not limited to, those that use RISC technology or that use the UNIX operating system), ***embedded computers (including, but not limited to, computer-based equipment used for*** telecommunications, data communications, industrial control, process control, printing, settop boxes, ***signal processing***, data compression or decompression, data transformation, data aggregation, data extrapolation, data deduction, data induction, video or audio editing or special effects, instrumentation, data collection or analysis or display, display terminals or screens, ***voice recognition, voice processing, voice synthesis, voice reproduction***, data recording and playback, music synthesis, animation, or rendering), laptops, palmtops, personal digital assistants, notebooks, subnotebooks, and video games.

MacMillan, 7:15-34.

390.   Tong says that its "results show that programs such as ***speech recognition and image processing*** use significantly less power with [a] reduced bitwidth FP representation than with an IEEE-standard FP representation," and notes that "[i]t has long been known that many ***such signal processing applications*** can get by with less precision/range than full FP." Tong, 273.  Later, Tong explains:

> For an increasing number of ***embedded applications such as voice recognition, vision/image processing, and other human-sensory-oriented signal-processing applications***, FP's simplified programming model (in contrast with fixed-point systems) and large dynamic range makes FP hardware a desirable feature. Furthermore,

> many recognition applications achieve a high degree of accuracy
> starting from fairly low-resolution input sensory data.

Tong, 274. Thus, a POSA would have understood that Tong teaches that many "embedded applications such as voice recognition,… and other human-sensory-oriented signal-processing applications" (Tong, 274), "can get by with less precision/range than full FP" (Tong, 273).

391.     Tong experimentally demonstrates that the optimum precision for a "benchmark suite" (Tong, 284) of "five signal processing applications" spanning a "range in complexity" is between 5 and 11 mantissa fraction bits (Tong, 278-279). Tong says that "[t]o study the relationship between program accuracy and number of bits in FP representation, [the authors] have collected a set of five signal processing applications." Tong, 278. These applications, which are described in Table IV, "range in complexity from single-purpose kernels to complete applications." Tong, 278. Figure 6 of Tong "plots the accuracy for each of the five programs across a range of mantissa bitwidths." Tong, 278. As shown in Figure 6, "[n]one of the workloads display a noticeable degradation in accuracy when the mantissa bitwidth is reduced from 23 to 11 bits. For ALVINN and Sphinx III the results are even more promising; the accuracy does not change significantly with as few as 5 mantissa bits." Tong, 278. Later, in summarizing its

results, Tong notes that "[m]ost FP programs in our benchmark suite maintain the same output even when the mantissa bitwidth is reduced by half." Tong, 284.

392. A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels for the reasons I explained in Section IX.A above. Moreover, a POSA would have been motivated to do so in MacMillan's embedded signal-processing system based on Tong's teachings that reduced-precision arithmetic is beneficial in such systems.

393. In such an embedded system designed specifically for signal processing, a POSA would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that "the fine precision of the 23-bit mantissa is not essential." Tong, 279. Tong explains that the results of its experiments with varying mantissa bitwidths "clearly demonstrate that not all programs need the precision provided by generic FP hardware." Tong, 278. As Tong explains,

> The reason behind this result is that ***many programs dealing with human interfaces process sensory data with intrinsically low resolutions***. Raw input data with 4-10 bits of precision is rather common in these applications. … What is quite clear from these experiments is that the FP format provides essential dynamic range (we can reduce, but not reduce dramatically, the number of exponent

bits) ***but the fine precision of the 23-bit mantissa is not essential*** (half as many bits often suffice).

Tong, 278-279. Based on this teaching, a POSA would have understood that there is a class of applications, including signal processing applications that "process sensory data," that do not need 23 fraction bits.

394.   In addition, Dockser teaches that the registers in embodiments of its FPP can be "formatted differently from IEEE 32-bit single format."  Dockser, [0017] ("It should of course be understood, however, that other embodiments of the floating-point processor 100 may include a floating-point register file 110 that is ***formatted differently*** from IEEE 32-bit single format (***including but not limited to*** IEEE 64-bit double format), and/or may contain a different number of register locations."  Thus, a POSA would have been motivated to implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered because they correspond to mantissa bits that will always be tied to "0" in an application-specific system that always operates at reduced precision.

395.   Likewise, a POSA would have been motivated to implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed

to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application.

396.   In this implementation, the claimed "input signal" to Dockser's FPP remains in IEEE-754 32-bit single-format given that the Host CPU and data buses in the Dockser/Tong/MacMillan device use and send to Dockser's FPP standard 32-bit floating-point numbers.  MacMillan, 9:30-57 ("In this embodiment of FIG. 3 … The host CPU 208 is connected to the host bus 230.  In the embodiment of FIG. 3, fast I/O is provided through the Peripheral Component interconnect bus (PCI bus) 210. … The PCI bus 210 can support up to 133 Mbytes/second peak transfer rate in its current 32-bit version."); *see* Section IX.A above (where I explain that the device in the Dockser/Tong/MacMillan combination is the computer system of MacMillan implemented with Dockser's FPPs, which are configured to use 5 mantissa bits as taught in Tong), VIII.A, VIII.D.  However, in this implementation, one or more least-significant mantissa bits of the input signal number are not stored in the FPP register because it is implemented with fewer than 32 storage elements, as I explain in paragraph 395 above.

397.   Because the input signal and selected precision levels are unchanged from the Dockser, Dockser/Tong, and Dockser/MacMillan combinations that I discuss in Sections VI-VIII above, this implementation of Dockser/Tong/MacMillan in paragraphs 393-396 above meets independent claims

1 and 21 of the '961 patent (including their "wherein" clause) the same way as in the Dockser, Dockser/Tong, and Dockser/MacMillan combinationswhere Dockser's FPP is a claimed LPHDR execution unit.

398.    As I discuss in Section VIII.D above, the specification of the '961 patent makes clear to a POSA that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" referred to in claims 3 and 23 are "traditional precision" execution units that ***do not*** "sometimes" produce results different from the correct traditional-precision result. *See*, *e.g.*, paragraphs 393-394 above.  However, if dependent claims 3 and 23 were interpreted differently than the specification discusses, such that an execution unit used for reduced-precision operations could also be a claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide" if its hardware were capable of 32-bit multiplication in some configurations (*e.g.*, if power were applied to all register and logic elements), then Dockser's FPP in the above-discussed Dockser/Tong/MacMillan implementation for an embedded application is ***not*** that type of execution unit, because its hardware (having smaller-than-32-bit registers and multiplier logic) is ***not*** capable of 32-bit multiplication.

399.    Thus, this Dockser/Tong/MacMillan implementation meets that alternative interpretation of claims 3 and 23 because only the Host CPU floating-point unit is a claimed "execution unit[]… adapted to execute… multiplication on

floating point numbers... 32 bits wide," and the device includes over 100 more of

Dockser's FPP (LPHDR execution unit), as I explained in Section VIII.D above.

## X.    APPENDIX I – TECHNICAL DETAILS OF RELATIVE ERROR ANALYSES

### A.    Dockser's Multiplier Relative Error Is Independent of Exponent and Sign

400.    In this section, I explain mathematically why it is the case that the

relative error produced by performing floating-point multiplication on two

floating-point numbers using Dockser's precision-reduction techniques is

independent of the exponent values and sign bits of the two floating-point

numbers.

401.    A POSA would have understood that if a floating-point number A has

a sign bit $S_A$, a mantissa value $M_A$, and an exponent $E_A$, then the value of A is

$$A = (-1)^{(S_A)} \times 2^{(E_A)} \times (M_A)$$

*See*, *e.g.*, Dockser, [0001] ("A floating-point representation of a number commonly

includes a sign component, an exponent, and a mantissa. To find the value of a

floating-point number, the mantissa is multiplied by a base (commonly 2 in

computers) raised to the power of the exponent. The sign is applied to the resultant

value.").  A POSA would have understood that positive numbers are represented

by having a sign bit with value 0, and negative numbers are represented with a sign

bit with value 1.  This is because, if $S_A = 0$, it means that the term $(-1)^{(S_A)}$ in the

I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 30, 2020