**2022-1866, 2022-1867, 2022-1868**
**VOLUME III OF III; APPX06359-APPX10120**

# United States Court of Appeals
# for the Federal Circuit

**GOOGLE LLC,**
*Appellant*

v.

**SINGULAR COMPUTING LLC,**
*Appellee*

**Appeals from the United States Patent and Trademark Office,**
**Patent Trial and Appeal Board in Case Nos.**
**IPR2021-00155, IPR2021-00165, and IPR2021-00179**

## NON-CONFIDENTIAL JOINT APPENDIX

Alfred R. Fabricant
Peter Lambrianakos
Vincent J. Rubino, III
Richard M. Cowell
FABRICANT LLP
411 Theodore Fremd Ave.
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797

James J. Foster
PRINCE LOBEL TYE LLP
One International Place
Suite 3700
Boston, MA 02110
(617) 456-8000

Nathan R. Speed
Gregory F. Corbett
Elisabeth H. Hunt
Anant K. Saraswat
WOLF GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 646-8000

Eugene M. Paige
KEKER, VAN NEST & PETERS LLP
633 Battery St.
San Francisco, CA 94111
(415) 391-5400

Asim Bhansali
Michael Kwun
KWUN, BHANSALI, LAZARUS LLP
555 Montgomery St., Suite 750
San Francisco, CA 94111
(415) 630-2350

*Counsel for Appellee Singular
Computing LLC*

*Counsel for Appellant Google LLC*

# TABLE OF CONTENTS

## NON-CONFIDENTIAL JOINT APPENDIX VOLUME I

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00155) | Appx1-88 |
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00165) | Appx89-173 |
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00179) | Appx174-260 |
| 9/17/2019 | Exhibit 1001 | U.S. Patent 10,416,961 (IPR2021-00155) | Appx261-290 |
| 12/22/2015 | Exhibit 1001 | U.S. Patent 9,218,156 (IPR2021-00165) | Appx291-319 |
| 3/26/2013 | Exhibit 1001 | U.S. Patent 8,407,273 (IPR2021-00179) | Appx320-348 |
| 7/15/2022 | | Notice Forwarding Certified Lists (IPR-2021-00155, 00165 and 00179) | Appx349-356 Appx453-456 Appx550-553 |
| 10/30/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00155) | Appx652 Appx669 Appx673-723 |
| 10/30/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00155) | Appx1039 Appx1057-1062 Appx1161 Appx1230 Appx1271-1273 Appx1275-1280 Appx1291-1292 Appx1298-1305 Appx1339 |

## NON-CONFIDENTIAL JOINT APPENDIX VOLUME II

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 10/30/2020 | Exhibit 1007 | U.S. Patent Application Published No. 2007/0203967 ("Dockser") | Appx1465-1475 |
| 10/30/2020 | Exhibit 1008 | Tong et. al, Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic, Vol. 8, No. 3, June 2000 | Appx1476-1489 |
| 10/30/2020 | Exhibit 1009 | U.S. Patent No. 5,689,677 ("MacMillan") | Appx1490-1504 |

| 10/30/2020 | Exhibit 1010 | U.S. Patent Application Published No. 2007/0266071 ("Dockser-Lall") | Appx1505-1514 |
|---|---|---|---|
| 5/12/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00155) | Appx3972-4010 |
| 7/5/2021 | Exhibit 2002 | Exhibit 2002 (Sealed) | Appx4049 Appx4051-4059 |
| 7/5/2021 | Exhibit 2003 | Exhibit 2003 (Sealed) | Appx4061 |
| 7/5/2021 | Exhibit 2004 | Exhibit 2004 (Sealed) | Appx4081 Appx4086 |
| 7/5/2021 | Exhibit 2005 | Exhibit 2005 (Sealed) | Appx4094 Appx4098 |
| 7/5/2021 | Exhibit 2006 | Exhibit 2006 (Sealed) | Appx4113 |
| 7/5/2021 | Exhibit 2007 | Exhibit 2007 (Sealed) | Appx4131 |
| 7/5/2021 | Exhibit 2009 | Exhibit 2009 (Sealed) | Appx4161 |
| 7/6/2021 | Exhibit 2011 | The Deep Learning Revolution and Its Implications for Computer Architecture and Chip Design - Jeff Dean 2020 - 1911.05289 | Appx4182 |
| 7/6/2021 | Exhibit 2014 | Exhibit 2014 (Sealed) | Appx4286 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx4578 Appx4616-4627 Appx4629-4632 Appx4635-4660 |
| 8/9/2021 | Exhibit 2026 | Exhibit 2026 (Sealed) | Appx4671 |
| 8/9/2021 | Exhibit 2027 | Exhibit 2027 (Sealed) | Appx4673 |
| 8/9/2021 | Exhibit 2028 | Exhibit 2028 (Sealed) | Appx4676 |
| 8/9/2021 | Exhibit 2029 | Exhibit 2029 (Sealed) | Appx4678 |
| 8/9/2021 | Exhibit 2030 | Exhibit 2030 (Sealed) | Appx4682 |
| 8/9/2021 | Exhibit 2031 | Exhibit 2031 (Sealed) | Appx4687 |
| 8/9/2021 | Exhibit 2032 | Exhibit 2032 (Sealed) | Appx4688 |
| 8/9/2021 | Exhibit 2033 | Exhibit 2033 (Sealed) | Appx4689-4690 |
| 8/9/2021 | Exhibit 2034 | Google AI with Jeff Dean | Appx4691 Appx4696 |
| 8/9/2021 | Exhibit 2035 | Exhibit 2035 (Sealed) | Appx4706 |
| 8/9/2021 | Exhibit 2036 | Exhibit 2036 (Sealed) | Appx4709 |
| 8/9/2021 | Exhibit 2037 | Build and Train Machine Learning Models on Our New Google Cloud TPUs | Appx4713 |

| 8/9/2021 | Exhibit 2038 | Google's Scalable Supercomputers for Machine Learning, Cloud TPU Pods, are Now Publicly Available in Beta | Appx4716 |
|---|---|---|---|
| 8/9/2021 | Exhibit 2039 | Exhibit 2039 (Sealed) | Appx4718 |
| 8/9/2021 | Exhibit 2042 | Exhibit 2042 (Sealed) | Appx4730 |
| 8/9/2021 | Exhibit 2043 | Deposition of Richard M. Goodin, dated July 30, 2021 | Appx4732-4733 Appx4739-4743 Appx4746 Appx4749-4750 |
| 8/9/2021 | Exhibit 2049 | Belletti, et al., Tensor Processing Units for Financial Monte Carlo | Appx4939 |
| 8/9/2021 | Exhibit 2050 | Exhibit 2050 (Sealed) | Appx4949 |
| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D. (Confidential Protective Order Material (IPR2021-00155) (Sealed) | Appx4950 Appx4963-4973 Appx4985-4986 Appx4988-4989 Appx4992-4993 Appx4996-4998 Appx5001 Appx5004-5014 Appx5016 |
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx5031 Appx5044 Appx5051-5058 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IPR2021-00155) | Appx5082 Appx5112 Appx5115-5116 Appx5131-5134 Appx5136-5138 Appx5153 Appx5174 |
| 11/1/2021 | Exhibit 1072 | Transcript of October 21, 2021, Deposition of Sunil P. Khatri (IPR2021-00155, IPR2021-00165 and IPR2021-00179) | Appx5178-5180 Appx5212 Appx5316-5318 |
| 11/1/2021 | Exhibit 1076 | Cooper, K.D., Code Optimization for Embedded Systems, Air Force Research Laboratory ("Cooper") | Appx5459 Appx5464 Appx5468 |
| 11/1/2021 | Exhibit 1077 | Lienhart et. al, Proceedings of the 10th Annual IEEE Symposium on Field-Programmable Custom | Appx5478 |

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| | | Computing Machines, 2002 ("Lienhart") | |
| 11/1/2021 | Exhibit 1078 | Fang et. al, Proceedings of the 2003 Design Automation Conference, 2003 ("Fang") | Appx5488 |
| 11/1/2021 | Exhibit 1097 | U.S. Patent No. 7,921,425 ("Miner") | Appx5913-5928 |
| 12/13/2021 | Paper No. 38 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx5933 Appx5946-5952 Appx5955-5956 |
| 2/8/2022 | Exhibit 1098 | Petitioner's Demonstrative Exhibits (Confidential Protective Order Material) (IPR2021-00155, IPR2021-00165, IPR2021-00179) (Sealed) | Appx6066 Appx6086 |
| 4/6/2022 | Paper No. 56 | February 11, 2022 Hearing Transcript (Part 2: Public Redacted Version) (IPR2021-00155, IPR2021-00165, IPR2021-00179) | Appx6165-6166 Appx6184 Appx6206-6209 |
| 6/2/2022 | Paper No. 63 | Petitioner's Notice of Appeal (IPR2021-00155) | Appx6247-6248 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00155) | Appx6351-6355 |

## CONFIDENTIAL JOINT APPENDIX VOLUME III

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 11/5/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00165) | Appx6359 Appx6376 Appx6379-6430 Appx6442 |
| 11/5/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00165) | Appx6893 Appx6911-6916 Appx7120-7122 Appx7124-7129 Appx7140-7141 Appx7152-7159 Appx7194 |
| 5/13/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00165) | Appx7661-7702 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00165) (Sealed) | Appx7778 Appx7816-7828 Appx7830-7833 Appx7836-7862 |

| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D. (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx7873<br>Appx7886-7896<br>Appx7908-7909<br>Appx7911-7912<br>Appx7915-7916<br>Appx7919-7921<br>Appx7924<br>Appx7927-7938 |
|---|---|---|---|
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner Response (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx7953<br>Appx7966<br>Appx7973-7980 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IPR2021-00165) | Appx8004<br>Appx8034<br>Appx8037-8038<br>Appx8053-8056<br>Appx8058-8060<br>Appx8075-8080<br>Appx8096 |
| 12/13/2021 | Paper No. 38 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx8103<br>Appx8116-8122<br>Appx8126 |
| 6/2/2022 | Paper No. 63 | Petitioner's Notice of Appeal (IPR2021-00165) | Appx8229-8230 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00165) | Appx8326-8330 |
| 11/6/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00179) | Appx8334<br>Appx8350<br>Appx8353-8406 |
| 11/6/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00179) | Appx8633<br>Appx8653-8658<br>Appx8879-8881<br>Appx8883-8888<br>Appx8896-8897<br>Appx8922-8929<br>Appx8963 |
| 5/14/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00179) | Appx9442-9482 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00179) (Sealed) | Appx9558<br>Appx9595-9606<br>Appx9608-9611<br>Appx9614-9640 |
| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D (Confidential Protective Order Material) (IPR2021-00179) (Sealed) | Appx9651<br>Appx9664-9674<br>Appx9686-9687<br>Appx9689-9690<br>Appx9693-9694<br>Appx9696-9699<br>Appx9702-9715 |

| | | | Appx9717 |
|---|---|---|---|
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner Response (Confidential Protective Order Material (IPR2021-00179) (Sealed) | Appx9732 Appx9745 Appx9752-9759 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IRP2021-00179) | Appx9783 Appx9813 Appx9816-9817 Appx9832-9835 Appx9837-9839 Appx9854-9859 Appx9875 |
| 12/13/2021 | Paper No. 39 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material (IPR2021-00179) (Sealed) | Appx9893 Appx9906-9913 Appx9916 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00179) | Appx10118-10120 |

## CONFIDENTIAL MATERIAL OMITTED

The material redacted from this joint appendix on pages Appx38-43,

Appx49, Appx126-131, Appx137, Appx211-216, Appx223, Appx4636-4645,

Appx4647-4649, Appx5001, Appx5955-5956, Appx7837-7846, Appx7848-7850,

Appx7924, Appx8126, Appx9615-9624, Appx9626-9628, Appx9702-9703 and

Appx9916 is subject to a protective order issued by the Patent Trial and Appeal

Board in IPR2021-00155, IPR2021-00165, and IPR2021-00179.  The redacted

material includes confidential e-mails and PowerPoint presentations that are

subject to a non-disclosure agreement as well as quotes of those documents that

appear in the parties' filings and expert declarations.  All of the redacted material

was filed under seal at the Patent Trial and Appeal Board.

<div align="right">Paper No. __</div>

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————

Case No. IPR2021-00165
Patent No. 9,218,156

———————

**PETITION FOR INTER PARTES REVIEW
UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.1 et seq**

software a device comprising an LPHDR execution unit; thus Dockser/Tong also meets claim 33.

**Ground 3**: MacMillan discloses a computer system with multiple floating-point execution units operating in parallel. *Infra* § VII.A. Based on MacMillan, a POSA would have been motivated to implement a device with multiple Dockser FPPs operating in parallel. The resulting device (Dockser/MacMillan) meets dependent claim 3's requirement of multiple LPHDR execution units, and provides an alternative basis for meeting the "plurality of components" in independent claim 16. MacMillan's "CPU" that controls the execution units (MacMillan, 10:27-53, 13:12-13, 13:38-62) provides an alternative basis for meeting claim 1's "computing device adapted to control the… execution unit" and claim 2's "CPU." *Infra* §§ VII.B-H.

**Ground 4**: It would have been obvious to implement the Dockser/MacMillan device with the FPPs operating at Tong's precision levels. This Dockser/Tong/MacMillan combination meets the same claims met collectively by Grounds 1-3.

## III.    STANDING

Petitioner certifies the '156 patent is available for IPR and Petitioner is not barred or estopped from requesting IPR of the challenged claims. 37 C.F.R. § 42.104(a).

- 6 -

Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture. More education could substitute for experience, and vice versa. Goodin, ¶¶ 43-44. If the Board determines the '156 patent is only entitled to its 2013 actual filing date, a POSA in 2013 would have had the same or greater level of skill as in 2009, so the challenged claims would have been obvious for the same reasons discussed herein. Goodin, ¶ 45.

### C.    Claim Construction

Claim terms are construed herein using the standard used in civil actions under 35 U.S.C. § 282(b), and have been given their ordinary and customary meaning as understood by a POSA in accordance with the specification and prosecution history. 37 C.F.R. § 42.100(b).

### D.    Prosecution History

The examiner allowed the challenged claims, and the claims in all other applications in the priority chain, without substantively discussing any prior art. Ex. 1042, 164-166; Ex. 1043, 164-167; Ex. 1002, 404-406.

## V.    <u>GROUND 1:</u>  CLAIMS 1-2 AND 16 WOULD HAVE BEEN OBVIOUS OVER DOCKSER

The '156 patent admits LPHDR execution units were known but alleges they were considered "not useful." '156 patent, 6:63-7:16; Goodin, ¶ 184. The patent purports to encompass the idea "that LPHDR arithmetic is useful in several

- 9 -

important practical computing applications" to save power ('156 patent, 16:27-29, 23:54-67), but the claims are not limited to methods of use in ***particular*** computing applications.  Instead they recite a device comprising an LPHDR execution unit, which was known as Dockser demonstrates.  Goodin, ¶ 185.

## A.    Dockser

Dockser (Ex. 1007)[1] discloses performing "mathematical operations" including "multiplication" using a "floating-point processor having a given precision."  [0001], Abstract.  Goodin, ¶ 186.

"Floating-point" is a number representation having "a sign component, an exponent, and a mantissa."  [0001].  The sign indicates whether the number is positive or negative, and the number's absolute value equals the mantissa multiplied by a base raised to the power of the exponent.  [0001].  "[F]loating-point" representation was widely used in computing and refers to a binary (base-2) representation unless some other base is expressed (*e.g.*, decimal floating-point); that is how the term is used herein, in the '156 patent and in the prior-art references cited herein.  Goodin, ¶¶ 187-188; '156 patent, 2:35-37; Dockser, [0001]; Tong, 274.  As an example, the floating-point representation of the number 6 is:  positive sign, exponent=2, mantissa=1.5 (*i.e.*, $1.5 \times 2^2 = 6$).  Goodin, ¶ 189.

---

[1] All citations in § V are to Ex. 1007 unless otherwise indicated.

In standard floating-point representations of "normal" numbers (anything not smaller than $2^{-126}$), the mantissa is kept in the range $1 \leq mantissa < 2$, so only the fraction by which the mantissa exceeds 1 is specified (*i.e.*, the mantissa's leading 1 is "implied"). Dockser, [0002]; Dockser-Lall (Ex. 1010), [0003]-[0004]; Goodin, ¶ 190. For example, if three bits are used, the mantissa 1.5 is represented with three bits (100) that represent the fraction .5 as $(1 \times 2^{-1}) + (0 \times 2^{-2}) + (0 \times 2^{-3}) = .5$, and the mantissa 1.25 is represented as the bit sequence 010 that represents the fraction .25 as $(0 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) = .25$. Goodin, ¶ 191.

It was a well-known principle of mathematics and computing that "precision… is defined by the number of bits used to represent the mantissa"— "[t]he more [mantissa] bits… the greater the precision." [0002]; Gaffar (Ex. 1012), 4; Hekstra (Ex. 1013), 4:47-52. For example, the floating-point representation of the number 29 is positive sign, exponent=4, mantissa=1.8125 (*i.e.*, $1.8125 \times 2^4 = 29$). The 1.8125 mantissa can be represented precisely as the 4-bit sequence 1101, which represents the fraction .8125 as $(1 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) + (1 \times 2^{-4})$. If only three bits are used, the closest representable mantissas are 1.75 and 1.875—*i.e.*, the bit sequence 110 represents the mantissa $1 + (1 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) = 1.75$, while the bit sequence 111 represents the mantissa $1 + (1 \times 2^{-1}) + (1 \times 2^{-2}) + (1 \times 2^{-3}) = 1.875$. Thus, with a 3-bit mantissa, the

- 11 -

number 29 cannot be represented precisely, but can be approximated less precisely as $1.75 \times 2^4 = 28$ or $1.875 \times 2^4 = 30$. Goodin, ¶¶ 192-193.

"[M]odern computers" "commonly" use the "ANSI/IEEE-754 standard… 32-bit single format," which represents floating-point numbers using "a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa." [0002]. Dockser recognized that "[w]hile some applications may require these types of precision, other applications may not." [0003]. For example, if the lower precision from using just 16 mantissa bits suffices for a particular application, then "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," which "is of particular concern in battery operated devices where power comes at a premium." [0003]; Goodin, ¶ 194.

Dockser's "floating-point processor (FPP)" operates at a selectable "subprecision of the floating-point format," below the precision of the "IEEE-754 32-bit single format" of the input numbers it receives, by removing power from some least-significant mantissa bits in the FPP's operation, resulting in those mantissa bits being dropped and "reducing the [FPP's] power consumption." [0014]-[0018], [0026]-[0027]; Goodin, ¶ 195.

As detailed below, certain implementation details (*e.g.*, the range of numbers the 32-bit IEEE-754 standard represents) were so well known as to be unnecessary for Dockser to explain. Goodin, ¶ 196; '156 patent, 2:35-37. Ground 1 establishes

a POSA would have understood Dockser to teach a device implemented in these ways, or alternatively they would have been obvious implementations of Dockser's teachings.  References below to Dockser "meeting" claim limitations refer to Dockser's device implemented to include any details discussed below as being the understood and/or obvious implementation of what Dockser describes.

**B.    Claim 1**

**1.    [1A1] "A device comprising: at least one… (LPHDR) execution unit"**

Dockser's FPP is "incorporate[d]" in a "computing system[]…, as part of the main processor or as a coprocessor."  [0001], [0015], [0035]-[0036].  The computing system is a claimed "device" comprising the FPP.  Goodin, ¶¶ 197-198; '156 patent, 1:64, 7:45-48, 23:66-67, 27:52-55, 28:61-29:4 (claimed "device" includes "a computer including a processor and other components").

Dockser's FPP is an "execution unit" as claimed.  Goodin, ¶ 199.  It is a "specialized computing unit[] that perform[s] certain mathematical operations, e.g., multiplication, [etc.]" by "execut[ing]… instructions" including "multiply instructions."  [0001], [0019], [0024]; Goodin, ¶ 199.  Like the "processing element" (PE) the '156 patent describes as one possible embodiment of an LPHDR "execution unit" ('156 patent, 8:12-16, 8:30-33), Dockser's FPP is a "unit[] which pairs memory with arithmetic" and implements the memory as registers ('156 patent, 16:56-58; FIG. 4); both Dockser's FPP and the '156 patent's PE include

- 13 -

registers and an arithmetic unit to perform arithmetic operations on data locally stored in the registers. '156 patent, FIGs. 4, 6, 10:38-11:43, 12:53-13:3; Dockser, FIG. 1, [0015]-[0025]; Goodin, ¶¶ 200-207.



**Dockser, FIG. 1 (annotated)**    **'156 Patent, FIG. 4 (annotated)**

In an alternative mapping, the floating-point operator (FPO) inside Dockser's FPP is also a claimed "execution unit" because it "include[s]… components configured to perform… floating-point operations," including a floating-point multiplier (MUL) that "execute[s] floating-point multiply instructions." [0019]; Goodin, ¶ 208. References herein to "Dockser's execution unit" meeting a claim limitation refer to both Dockser's FPP and FPO meeting the limitation in the same way because the FPP includes the FPO.

Dockser's FPP (including its FPO) is "low precision" as claimed because "the precision" of operations in the FPP is "reduced" (*e.g.*, [0014]), and because it

operates with the minimum imprecision in [1B2]. Goodin, ¶¶ 209-210; *infra*

§ V.B.4; '156 patent, 26:39-27:51 (characterizing "degrees of precision" described

in language mirroring that in [1B2] as "low precision"); Ex. 1035, 8 (Singular's

litigation assertion that "low precision" and "high dynamic range" are "defined in

the claim").

    The '156 patent describes a 6-bit floating-point exponent as "provid[ing] the

desired high dynamic range." '156 patent, 14:56-64. Dockser's FPP (including its

FPO) is "high dynamic range" because it uses an 8-bit floating-point exponent

([0017]) that provides an even higher dynamic range, and meets the range in [1B1].

Goodin, ¶ 211; *infra* § V.B.3; '156 patent, 26:61-27:17.

### 2.    [1A2] "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"

    Dockser's FPP is "adapted to execute a first operation" as claimed because it

"perform[s]… mathematical *operations*,[2] e.g., multiplication." [0001], [0004]-

[0008], [0019] (FPP components including FPO are "configured to *execute*"

instructions of "*operations*"), [0024]. Goodin, ¶ 212.

    The FPP executes the operations at reduced precision on "operands" ("32-bit

binary floating-point *number[s]*" ([0016]-[0017], [0024])) that represent numerical

values, as claimed. Goodin, ¶¶ 213-214.

---

[2] Emphasis added throughout.

The '156 patent's "processing element" (PE) 400 (FIG. 4) is one example embodiment of an "execution unit… for performing LPHDR operations." '156 patent, 8:12-33, 10:38-40, 2:15-35, 6:3-7.  PE 400 receives input via an "I/O [Input/Output] Unit" and "stores" input values in "Registers" as "local data" on which the PE "operate[s]" and "perform[s] computations."  *Id*., 9:11-21, 10:38-62, 8:42-45, FIGs. 1, 4 (annotated below); Goodin, ¶¶ 215-216.



FIG. 4

"The input… received by… PE 400 may… take the form of electrical signals representing numerical values."  '156 patent, 11:1-4.  The PE "operate[s] on its local data" (*e.g.*, input values received at the Registers) via "data paths 402*a-i*" through "routing mechanisms… and components" that represent values as electrical signals.  *Id*., 10:62-11:4; Goodin, ¶¶ 217-218.  A POSA would have

- 16 -

understood from the patent's description that the claimed execution unit's "first input signal representing a first numerical value" encompasses an input electrical signal (*e.g.*, 402i in FIG. 4) input to PE 400 (an example "execution unit") at a register as data on which the PE performs an operation via the PE's "data paths… and components." Goodin, ¶ 219.

Like the '156 patent's example PE embodiment, Dockser's FPP receives input values (operands) at registers, and performs operations on these inputs via the FPP's data paths 134-139 and components 140-144. FIG. 1; Goodin, ¶ 220. The operands are "move[d]" into the FPP's registers as "data from [the computer system's main] memory" in 32-bit format. [0016]-[0017]. A POSA would have understood Dockser to describe that the operand "data" being input to the FPP is a "first input signal representing a first numerical value" (*i.e.*, representing the operand "number" [0017]) as claimed, because computing circuits like Dockser's "move" data between components (*e.g.*, from memory to processor) via electrical signals. Goodin, ¶ 221; Begun (Ex. 1014), 1:36-37. Alternatively, to the extent Dockser is not considered to expressly disclose that the data is moved to the FPP via electrical signals, that would have been the straightforward and obvious way to implement what Dockser describes. Goodin, ¶ 222; Begun, 1:36-37.

Dockser's FPP is thus "adapted to execute a first operation [*e.g.*, reduced-precision multiplication] on a first input signal representing a first numerical value

- 17 -

[operand]" as claimed.  Goodin, ¶ 223.  The FPP's execution of the operation produces an "*output value*" (also called "*output number*"), represented by "output bits" ([0034]), that is a "second numerical value" as claimed.  Goodin, ¶¶ 224-227.

The output value is sent to a register ([0024]), from where it is "move[d]… to… the main memory" ([0016]).  Goodin, ¶ 228.  A POSA would have understood Dockser to describe that the output value sent as bits from the FPP's registers to main memory is a "first output *signal* representing a second numerical value" as claimed, because circuits like Dockser's "move" data between such components via electrical signals.  Goodin, ¶ 229; Begun, 1:36-37.  Alternatively, to the extent Dockser is not considered to expressly disclose that the data is moved from the FPP to memory via electrical signals, that would have been the straightforward and obvious way to implement what Dockser describes.  Goodin, ¶ 229; Begun, 1:36-37.

Thus, Dockser's FPP is "adapted to execute [the] first operation [*e.g.*, reduced-precision multiplication]… to produce a first output signal [electrical signal sending output to memory] representing a second numerical value [the output number from the multiplication]" as claimed.  Goodin, ¶ 230.

- 18 -



Dockser, FIG. 1 (annotated)

In the alternative mapping where Dockser's FPO meets the claimed "execution unit" (*supra* § V.B.1), the FPO is "adapted to execute [the] first operation [reduced-precision multiplication] on a first input signal representing a first numerical value [signal 134 inputting operands to FPO] to produce a first output signal representing a second numerical value [signal 139 outputting multiplication result from FPO]" as claimed.  Goodin, ¶ 231; *infra* § V.B.4.c(2).

- 19 -



Dockser Figure 1 (annotated)

3.    **[1B1] "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000"**

Dockser's FPP operates on IEEE-754 32-bit single-format numbers having 8-bit exponents.  [0002], [0016]-[0017], [0024]; *supra* § V.B.1; Goodin, ¶ 232. The number of exponent bits determines dynamic range.  Goodin, ¶ 232; Gaffar, 4; Hekstra, 4:47-52; Grinberg (Ex. 1015), 8:48-49.

IEEE-754 8-bit exponents range from -126 to 127; thus the dynamic range of "normal" IEEE-754 single-format operands is from around $2^{-126}$ (much smaller than 1/65,000) to around $2^{127}$ (much larger than 65,000).  Goodin, ¶ 233; Dockser-Lall, [0004]; Tong, 274.  A POSA would have understood Dockser to disclose that its FPP supports these "normal" IEEE-754 single-format operands, as Dockser

makes no reference to supporting far less common "denormal" numbers (smaller

than $2^{-126}$), let alone to supporting denormal numbers exclusively. Goodin, ¶ 234;

Dockser-Lall, [0005], [0008]. To the extent Dockser is not considered to expressly

disclose that the FPP operates on "normal" IEEE-754 single-format operands, that

would have been a conventional and obvious way to implement what Dockser

discloses. Goodin, ¶ 234. Thus, "the dynamic range of the possible valid inputs"

(normal IEEE-754 single-format operands) to Dockser's FPP operation "is at least

as wide as from 1/65,000 through 65,000" as claimed. Goodin, ¶ 235.

As discussed below (§ V.B.4.c), Dockser's precision-reduction techniques

within the FPP do not change the exponents of operated-on numbers; thus the

dynamic range of the possible valid inputs in the alternative mapping where the

FPO meets the claimed "execution unit" (*supra* § V.B.1) is the same as that of the

FPP inputs. Goodin, ¶ 236.

> **4.    [1B2] "for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input"**

### a.    "Statistical Mean" Limitation

The specification's only mention of "the statistical mean, over repeated execution of… [the] operation on each… respective input[]" ('156 patent, 27:33-49) references "non-deterministic" embodiments (*id.*, 27:20-33).  Goodin, ¶ 237. A POSA would have understood the claims' "statistical mean" limitation in the context of the '156 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."  '156 patent, 4:11-17, 14:19-64, 17:12-18; Goodin, ¶ 238.

For example, if an analog circuit represents the number 1 as a voltage somewhere between 0.99 and 1.01 ('156 patent, 14:15-33), a first execution of an operation that adds 1+1 may produce a result of 1.98, a second execution may produce 2.01, and repeated executions may produce different results unpredictably. Goodin, ¶ 239.  POSAs understood that for such non-deterministic embodiments, the claimed "statistical mean" limitation refers to averaging the different outputs produced by the same operation on the same input—*e.g.*, the mean of 1.98 and 2.01 is 1.995.  Goodin, ¶ 240.

For deterministic digital embodiments, the claimed "statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input" is the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input. Goodin, ¶ 241; Ex. 1032, ¶ 129 (Singular's same assertion in litigation).

Dockser uses "a conventional floating-point multiplier" ([0020]), which a POSA would have understood is a conventional deterministic digital circuit (Goodin, ¶ 242; Weiss (Ex. 1011), 1:40-42), so repeatedly executing Dockser's multiplication operation on the same input (*i.e.,* pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution. Goodin, ¶ 243. To the extent Dockser is not considered to expressly disclose that its "conventional floating-point multiplier" ([0020]) is a deterministic digital circuit, that would have been the conventional and obvious implementation. Goodin, ¶ 244; Weiss, 1:40-42; Ex. 1022, 5:14-21 ('156 patent's inventor explaining that "digital silicon" circuits are "deterministic, which programmers like").

- 23 -

### b.    "Exact Mathematical Calculation" Limitation

The numerical value of each input operand to Dockser's operation (reduced-precision multiplication) is the number represented by the IEEE-754 32-bit sequence ([0016]-[0018]; *supra* §§ V.B.2-V.B.3), and the claimed "result of an exact mathematical calculation of the first operation on the numerical values of that same input" is the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied ***without*** reducing precision.  Goodin, ¶ 245; *see infra* Appendix I.B.[3]  As discussed *infra* § V.B.4.c, the numerical value represented by Dockser's output signal differs from this "exact mathematical calculation" because Dockser performs reduced-precision multiplication.  Goodin, ¶ 245.

### c.    Relative Error (Y) for Fraction of Valid Inputs (X) Limitation

[1B2] recites that "for at least X=5% of the possible valid inputs to the first operation," the statistical mean limitation (met in Dockser by the numerical value represented by the output signal for any single execution of the first operation on a specific valid input—*supra* § V.B.4.a) "differs by at least Y=0.05% from" the exact mathematical calculation discussed *supra* § V.B.4.b.  Goodin, ¶ 246.  The '156 patent refers to the Y percentage as the "relative error amount E by which the result calculated by [the] LPHDR element… differ[s] from the mathematically

---

[3] The Petition's word count includes Appendix I.

correct result," and the X percentage as the "fraction F of the valid inputs" for which the operation produces at least that relative error amount. '156 patent, 27:29-51; Goodin, ¶ 247.

The claimed "possible valid inputs" are met in Dockser by the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception). [0016]-[0017], [0024]-[0027]; *supra* § V.B.3; Goodin, ¶ 248. As discussed below, Dockser meets [1B2] because Dockser operates the FPP and FPO at precision levels where the claimed relative error (Y) is at least 0.05% for at least X=5% of all valid input pairs of normal IEEE-754 32-bit single-format numbers. Goodin, ¶ 249.

The precision level is selected by specifying the number of mantissa fraction bits to be retained; the remaining "excess bits" are dropped. [0004]-[0007], [0017], [0026]-[0029]; FIG. 2; Goodin, ¶¶ 250-254. In one "example," Dockser retains only the 9 most-significant bits (MSBs)—*i.e.*, the leftmost 9 bits—of the mantissa fraction, and drops the remaining 14 mantissa bits. [0025]-[0028]; Goodin, ¶ 255.

- 25 -



Dockser, Figure 2 (annotated)

Dockser discloses two precision-reducing techniques that can be used separately or together.  [0004]-[0007], Dockser claims 9-11; Goodin, ¶¶ 256-262. One technique drops bits from the operands by removing power from storage elements in the FPP's registers that correspond to the excess (dropped) mantissa bits.  [0006], [0026]; Goodin, ¶ 257.  The other technique drops bits by removing power from elements within the multiplier logic that computes the product of the operand mantissas.  [0007], [0027], [0030]-[0034]; Goodin, ¶ 258.

APPX06396



Dockser, Figure 1 (annotated)

### (1)    Dockser's Register Bit-Dropping Meets [1B2]

A POSA would have understood Dockser's "conventional floating-point multiplier" ([0020]) multiplies two floating-point operands by (in relevant part) adding their exponents and multiplying their mantissas, as the '156 patent (at 14:65-15:1.) acknowledges was the "traditional floating point method[]."  Goodin, ¶ 263; Tong, 274-275.  This conventional technique applies basic properties of multiplication and exponents where $(M_1 \times 2^{E_1}) \times (M_2 \times 2^{E_2}) = (M_1 \times M_2) \times 2^{E_1+E_2}$.  Goodin, ¶ 263.  Because Dockser reduces precision by dropping mantissa

- 27 -

bits ([0002]-[0003], [0026]), a POSA would have understood the mantissa

multiplication produces error relative to an "exact mathematical calculation."

Goodin, ¶ 264.

Specifically, Dockser's FPP receives operands into registers 115 as IEEE-

754 single-format floating-point numbers with 23 bits representing the mantissa's

fractional part (as discussed *supra* § V.A, the "1" in the mantissa's integer part is

implied), but the register bit-dropping technique removes power from the register

storage elements for "excess" least-significant mantissa bits to the right of the

selected precision level in FIG. 2.  [0006], [0016]-[0018], [0026]-[0028], FIGs. 1-2

(reproduced below, annotated); Goodin, ¶¶ 265-268.



FIG. 1



FIG. 2

"By way of example," if a precision level retaining 9 mantissa fraction bits is selected, "[p]ower can be removed from the floating-point register elements for the remaining 14 [mantissa] fraction bits." [0026]; Goodin, ¶ 269. A POSA would have understood the output of unpowered storage elements would be tied to zero voltage (*e.g.*, ground), making those 14 "excess" bits zeroes. [0026], [0029]; Goodin, ¶¶ 270-272 (citing Hawkins (Ex. 1020), 1:13-2:15 (unpowered elements should be tied to ground to prevent them from "draw[ing] unacceptably large amounts of power" and "shorting… the power supply"); Youngs (Ex. 1060), [0005]; Flynn (Ex. 1019), [0003]; Cohen (Ex. 1016), 3:63-66, 4:51-55 (interpreting low voltage as "0" is "typical[]…[in] digital computer system[s]")). To the extent

- 29 -

Dockser is not considered to disclose that the outputs of the unpowered register

storage elements would be tied to ground to represent "0," that would have been

the straightforward, well-known, conventional, and obvious way to implement

Dockser's described unpowering of register storage elements, as corroborated,

*inter alia*, by Hawkins, Youngs, Flynn and Cohen.  Goodin, ¶ 273.

As representative examples, the 23-bit sequence

01100000111100111001110 (representing a mantissa of

1.3787171840667724609375) would become 01100000100000000000000

(representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and

01000100110111000001000 (representing a mantissa of

1.26898288726806640625) would become 01000100100000000000000

(representing a mantissa of 1.267578125).  Goodin, ¶ 274.

A pair of operands with "excess" bits dropped from the registers are

multiplied together, producing a reduced-precision output that differs from the

"exact" product of the original 32-bit operands.  [0024]-[0026]; Goodin, ¶ 275.

For instance, if the two example 23-bit-fraction mantissas above were multiplied,

the exact mantissa product would be 1.7495685129631510790204629302025;

whereas the reduced-precision mantissa product output from Dockser's register bit-

dropping technique would be 1.745395660400390625 (resulting from multiplying

- 30 -

the mantissas represented by the fraction bit sequences

0110000010000000000000 and 0100010010000000000000).  Goodin, ¶ 276.

Because Dockser's output mantissa differs from the exact mantissa product, the numerical value represented by the output floating-point number (composed of mantissa, exponent, and sign) differs from the exact product of the original floating-point operands.  Goodin, ¶ 277.  A POSA would have understood, by straightforward math detailed in Appendix I.A *infra*, that the relative error (the claimed "Y" percentage) of any floating-point number output from Dockser's reduced-precision multiplication is the same as the relative error of its mantissa, independent of its exponent and sign.  Goodin, ¶ 278.

A POSA would thus have understood Dockser's register bit-dropping technique produces relative error, the amount of which depends on the number of mantissa bits dropped—the more bits dropped, the greater the error.  Goodin, ¶ 279.

Claim 1 characterizes the claimed execution unit using ***performance*** characteristics of a minimum relative error (Y) and a minimum fraction (X) of the possible valid inputs that meet Y.  Claim 1 recites no ***structural*** characteristics of the execution unit, and the specification provides no guidance how to evaluate any execution unit's structure to determine whether it meets the claimed performance characteristics.  Goodin, ¶ 280.

- 31 -

A POSA asked whether Dockser's FPP meets the claimed imprecision performance characteristics would have understood that Dockser suggests any desired number of mantissa bits can be dropped, and that numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision.  Goodin, ¶ 281.  If asked to quantify how many bits dropped would meet the claimed X and Y, a POSA would have taken one of two approaches.

### (i)    Software Demonstration

Given the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), a POSA would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped.  Goodin, ¶ 282.  As detailed in Appendix I.B *infra*, Mr. Goodin did just that.  Specifically, he wrote a software program (which a POSA would have understood how to write) that performs floating-point multiplication operations the way Dockser's register bit-dropping technique does when dropping the 14 least-significant mantissa bits to zero as taught by Dockser.  Dockser, [0026]; Goodin, ¶ 283.  The program tested all possible valid pairs of normal IEEE-754 single-format operands (by testing all possible valid mantissa pairs, because the relative error Y is independent of

- 32 -

exponent and sign—*see infra* Appendix I.A), and demonstrates that Dockser's register bit-dropping technique, when performed with a selected precision level retaining 9 mantissa fraction bits as Dockser ([0026]) discloses, produces at least Y=0.05% relative error for 92.1% of possible valid inputs (greater than X=5%), meeting [1B2]. Goodin, ¶ 284.

### (ii)     Pencil-and-Paper Algebraic Demonstration

A POSA would also have understood algebraically that Dockser's register bit-dropping technique meets [1B2], by examining the absolute ***minimum*** relative error produced by zeroing certain mantissa bit positions. Goodin, ¶ 285. As detailed in Appendix I.C *infra*, over 12% of all possible valid normal IEEE-754 single-format operands have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their tenth and eleventh fraction bits. When Dockser's register bit-dropping retains only nine fraction bits, ***every*** input in that 12% produces at ***minimum*** 0.097% relative error, which meets [1B2]'s X and Y. Goodin, ¶ 286.

### (2)     Dockser's Multiplier Logic Bit-Dropping Meets [1B2]

Dockser's second precision-reduction technique removes power from bits within the FPO's logic that multiplies the operand mantissas. [0007], [0027], [0030]-[0034]; Goodin, ¶ 287. This logic operates conventionally, computing the mantissa product by generating and adding together "partial products" similar to

- 33 -

pencil-and-paper long multiplication. [0030]-[0031]; Goodin, ¶¶ 288-290. This is illustrated in the simple example below using 5-bit mantissa fractions. Each partial product results from multiplying the multiplicand (Mantissa A) by the "0" or "1" at each position in the multiplier (Mantissa B).



Power is removed from the logic that implements the partial product bits to the right of line 405 corresponding to a precision level selected for output value 430. Dockser, [0032]-[0034]; Goodin, ¶¶ 291-292. A POSA would have understood Dockser to disclose that the bits from which power is removed in the logic are dropped to 0s, or alternatively this would have been the conventional and obvious way to implement the power removal Dockser describes. Goodin, ¶ 293; *see supra* § V.B.4.c(1).



**Dockser, Fig. 3B (annotated)**

An example using the same exemplary operand mantissas discussed *supra* § V.B.4.c(1) is illustrated below, in which dropping partial-product bits to the right of the selected precision produces an output mantissa product of 1.744140625, which differs from the exact product of 1.7495685129631510790204629302025. Goodin, ¶ 294.



A POSA would have understood the relative error introduced depends on the number of mantissa bits dropped—the more bits dropped, the greater the error. Goodin, ¶ 295.

If asked whether Dockser's FPP using a selected precision level retaining 9 bits (as Dockser [0026] teaches) in the output mantissa by dropping less-significant bits in the multiplier logic meets the claimed X and Y, given the massive number of possible inputs Dockser's FPP supports (*supra* § V.B.4.c(1)(i)), a POSA would have written a software program. Goodin, ¶ 296. As detailed in Appendix I.D *infra*, Mr. Goodin wrote a software program (which a POSA would have understood how to write) that performs floating-point multiplication operations the way Dockser's logic bit-dropping technique does by dropping to zero the mantissa

partial product bits less significant than the 9-bit selected precision level. Goodin, ¶ 297. Mr. Goodin's program tested all possible valid pairs of normal IEEE-754 single-format operands (by testing all possible valid mantissa pairs—*supra* § V.B.4.c(1)(i); *infra* Appendix I.A, I.D) and demonstrates that Dockser's multiplier logic bit-dropping technique, when performed with a precision level retaining 9 output mantissa fraction bits, produces at least Y=0.05% relative error for 99.35% of possible valid inputs (greater than X=5%), meeting [1B2]. Goodin, ¶ 297.

In the alternative mapping (*supra* §§ V.B.1-V.B.2), the operand numbers input via 134 (claimed "first input signal") to the FPO (claimed "execution unit") are the same as those input to the FPP registers when Dockser's logic bit-dropping technique is used alone, and the same output numbers from the FPO are output from the FPP. Goodin, ¶ 298. Therefore Mr. Goodin's program demonstrates that Dockser meets [1B2] under either mapping. Goodin, ¶ 298.

### (3)    Register and Multiplier Logic Bit-Dropping Together Also Meets [1B2]

In an implementation of Dockser's FPP that drops bits in ***both*** the registers and the multiplier logic, where Dockser's FPP is the claimed "execution unit," the amount of relative error is the same as produced by the logic bit-dropping alone, if the same selected precision level (retaining the same number of mantissa fraction bits) is applied at the registers and in the logic. Goodin, ¶ 299. This is because at

- 37 -

least the same bits that are dropped to zero in the register bit-dropping are dropped to zero in the corresponding partial products in the logic bit-dropping, for the same selected precision level.  Goodin, ¶¶ 299-301.  Thus, the results of the same software program that demonstrate that Dockser's multiplier logic bit-dropping alone meets [1B2] also demonstrate that Dockser's register and logic bit-dropping, performed together at a selected precision level retaining 9 mantissa fraction bits as Dockser ([0026]) discloses, meet [1B2].  Goodin, ¶ 302; *supra* § V.B.4.c(2).

### 5. [1C] "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit"

Dockser's computing system includes a "main processor," meeting the claimed "computing device."  [0015], [0035]; '156 patent, 7:45-60 ("computing device[]" implementable as "processor"); Goodin, ¶ 303.  Dockser's main processor meets [1C] because it writes "subprecision select bits" to the FPP's "***control*** register," and thus is adapted to control the operation of the FPP (and its FPO) by specifying its precision level.  [0018], [0025]; Goodin, ¶ 304.

### C. Claim 2

Claim 2 lists alternatives for implementing the "computing device," only one of which must be met to render claim 2 unpatentable.  *Apple v. Evolved Wireless*, IPR2016-01177, Paper 27 at 9-10 (Dec. 20, 2017); *Daifuku Co. v. Murata Mach.*,

IPR2015-00083, Paper 63 at 13-14 (May 3, 2016); '156 patent, 25:30-41, 28:42-60 (discussing claim 2's recited alternatives disjunctively).

Claim 2 is met because Dockser discloses that its "main processor" (the "computing device" of [1C] and claim 2) is a "general-purpose processor" implementable as a "state machine" as claimed.  [0035] (FPP is "part of a general purpose processor" that "may be any conventional processor,… or state machine"), [0015] (FPP is "part of the main processor"); Goodin, ¶ 305.

Claim 2 is alternatively met because a "CPU" was a well-known "conventional processor" of the type Dockser discloses ([0035]), and it would have been obvious to implement Dockser's main processor as a CPU as claimed. Goodin, ¶ 306; Ex. 1023, 1:16-28.

### D.    Claim 16

Independent claim 16 recites a device comprising a "plurality of components" comprising at least one LPHDR execution unit that is exactly as recited in claim 1.

#### 1.    [16A1] "A device comprising: a plurality of components comprising: at least one first… (LPHDR) execution unit"

Dockser's computing system device meets [16A1] because it comprises a plurality of components including a main processor and an FPP (with FPO) (a claimed "LPHDR execution unit").  Goodin, ¶ 307; *see supra* §§ V.B.1, V.B.5.

If claim 16 were alternatively interpreted to require that a plurality of components be included in a single LPHDR execution unit, Dockser's FPP has multiple components (*e.g.*, registers, controller, FPO), as does Dockser's FPO (adder, multiplier).  [0015], [0019]-[0022]; Goodin, ¶ 308.

### 2.    [16A2]-[16B2]

[16A2]-[16B2] are identical to [1A2]-[1B2] and met for the same reasons discussed *supra* §§ V.B.2-V.B.4.  Goodin, ¶¶ 309-310.

## VI.    <u>GROUND 2</u>: CLAIMS 1-2, 16, AND 33 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND TONG

### A.    Tong

Tong (Ex. 1008) is Section 102(b) prior art because it was publicly accessible by June 30, 2000.  Tong's face bears a 2000 copyright date and indicates it was published by the IEEE, a "well-known, reputable compiler and publisher of scientific and technical publications," in *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, Vol. 8, No. 3, June 2000.  *Ericsson v. Intellectual Ventures I*, IPR2014-00527, Paper 41 at 10–11 (May 18, 2015) (finding IEEE publication copyright line information falls under FRE 803(17) hearsay exception); *see also Hulu v. Sound View Innovations*, IPR2018-01039, Paper 29 at 19 (Dec. 20, 2019) (precedential) (finding reasonable likelihood of printed publication based on copyright date, printing date, and ISBN date from "established publisher" of "well-known book series"); Goodin, ¶ 311.

- 40 -

Additionally, an IEEE representative (Mr. Grenier) testified that the IEEE made

Tong publicly available by June 30, 2000.  Ex. 1025, ¶¶ 8-11.  *Guest Tek*

*Interactive Entm't v. Nomadix*, IPR2019-00253, Paper 6 at 27-31 (May 28, 2019)

(crediting IEEE copyright/publication date indicia and Mr. Grenier's testimony of

public availability); *Palo Alto Networks v. Finjan*, IPR2015-01974, Paper 49 at 19-

20 (Mar. 16, 2017) (same).  Other IEEE publications cited Tong before 2009,

further corroborating Tong's public accessibility.  Ex. 1026, 27 (citation [13]); Ex.

1027, 27 (citation [31]); *see Intel v. R2 Semiconductor*, IPR2017-00707, Paper 81

at 21-22 (July 31, 2018).

Tong, like Dockser (*supra* § V.B.4.c; *infra* § VII.E), confirms that the

number of mantissa bits used in a high-dynamic-range floating-point execution

unit was a well-known result-effective variable impacting power consumption and

precision.  Tong, 278 ("[P]ower dissipation in an FP [floating-point] unit can be

reduced by using fewer bits in the FP representation. However, fewer bits reduces

precision"); Goodin, ¶¶ 312-313.  Focusing on "signal processing applications"

"long… known" to be able to "get by with less precision/range than full FP"

(Tong, 273), Tong explains that "[s]ince multiplication is one of the most frequent

operations in signal processing applications" (Tong, 274) and "the mantissa

multiplier always consumes more power than all other blocks" in an FP multiplier

- 41 -

(Tong, 275-276), "reduction in the mantissa bitwidth is the most effective means of reducing power dissipation" (Tong, 277). Goodin, ¶ 314.

Tong teaches how to determine, by "emulat[ing] in software different bitwidth FP units" and "plot[ting] the accuracy" of various signal-processing applications "across a range of mantissa bitwidths" (Tong, 278), "the *minimal* number of mantissa… bits" for each application "to *reduce* power consumption, yet *maintain* [the] program's overall accuracy" (Tong, 273, emphasis original). Goodin, ¶¶ 315-319. In the "Sphinx" speech recognition application and the "ALVINN" navigation application, "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits." Tong, 278-279, 273, 282, Fig. 6; Goodin, ¶¶ 315-319.



Fig. 6. Program accuracy across various mantissa bitwidths.

Tong, Fig. 6 (annotated)

- 42 -

Having empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications, Tong teaches using "reduced-precision arithmetic" to "omit the unnecessary bits and computations on them" (Tong, 284), to thereby "reduce waste" (Tong, 273) and "significantly reduce… power consumption while maintaining a program's overall accuracy" (Tong, 274).  Tong, 279 (floating-point "provides essential dynamic range… but the fine precision… is not essential"); Goodin, ¶ 320.

### B.    Claims 1-2 and 16

Tong's teachings and empirical tests would have motivated a POSA to configure Dockser's FPP to operate at the precision levels Tong teaches for particular applications.  Goodin, ¶ 321.  Tong teaches "[m]any mobile/portable electronics applications" perform signal processing programs "such as speech and image recognition" that are "better served with a custom, reduced[-precision] FP format" (Tong, 284), and a POSA would have understood Dockser's FPP with its selectable precision level for "[p]ower management" in "battery operated devices" (Dockser, [0003]) to be well-suited for use in Tong's mobile/portable applications.  Goodin, ¶ 321.

Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx—*supra* § VI.A) would have motivated a POSA to configure Dockser's FPP in the device discussed

- 43 -

*supra* § V to operate at a selected precision level retaining as few as 5 mantissa fraction bits to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision. Goodin, ¶ 322. The resulting "Dockser/Tong" device meets claims 1-2 and 16 for the same reasons discussed *supra* § V (Ground 1), with the addition that Dockser/Tong's device retaining 5 fraction bits exceeds claim 1's X and Y values (X=5%, Y=0.05%) by greater margins than Dockser's device retaining 9 fraction bits in Ground 1. Goodin, ¶ 323.

Mr. Goodin's software program (discussed *supra* §§ V.B.4.c(1)(i), V.B.4.c(2) and *infra* Appendix I.B, I.D) that tests all possible valid input pairs demonstrates that when retaining 5 mantissa fraction bits in view of Tong, Dockser's register bit-dropping produces at least Y=0.05% relative error for 99.45% of possible valid inputs, and Dockser's logic bit-dropping produces at least Y=0.05% relative error for 99.47% of possible valid inputs. Goodin, ¶ 324. The algebraic analysis discussed *supra* § V.B.4.c(1)(ii) and *infra* Appendix I.C also demonstrates that Dockser's register bit-dropping when retaining 5 mantissa fraction bits produces a minimum of 1.56% relative error (greater than Y=0.05%) for over 12% of possible valid inputs (greater than X=5%). Goodin, ¶ 324.

Moreover, Tong and Dockser both demonstrate that POSAs knew how to optimize the number of mantissa bits as a result-effective variable for concurrently

reducing precision and power consumption in a floating-point execution unit, and how to empirically determine the optimum number of bits for a particular application by testing the application's accuracy at various mantissa bitwidths. Goodin, ¶ 325; *supra* §§ V.B.4.c, VI.A; *infra* § VII.E.  The '156 patent lists fifty-six possible combinations of six X percentages (ranging from 1% to 50%) and nine Y percentages (ranging from 0.05% to 20%) as "merely examples [that] do not constitute limitations of the…invention," with no indication that any particular claimed X-Y combination is critical in any way.  '156 patent, 27:29-51; Goodin, ¶ 326.  Determining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable, such that arriving at imprecisions resulting in the device meeting the claimed X and Y values would have been obvious.  Goodin, ¶ 327; *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1010 (Fed. Cir. 2018) ("[D]iscovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art."); *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020) ("[I]t is not inventive to discover the optimum or workable ranges by routine experimentation."); *In re Urbanski*, 809 F.3d 1237, 1242-1243 (Fed. Cir. 2016) (upholding obviousness finding where there was "no evidence" that "claimed range[]" of result-effective variable was "critical").

- 45 -

### C.    Claim 33

Tong's teaching to "emulate[] in software different bitwidth FP units" "to determine application accuracy" (Tong, 278) would have motivated a POSA to emulate the Dockser/Tong device (*supra* § VI.B) in software to assess the accuracy of applications running on the device at selected precision levels, and a POSA would have had a reasonable expectation of success in doing so.  Goodin, ¶¶ 328-329.

> **1.    [33A1] "A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: a plurality of components comprising: at least one first… (LPHDR) execution unit"**

When the Dockser/Tong device is "emulated in software" per Tong's teachings (Tong, 278) cited *supra* § VI.A, the conventional and obvious implementation of such "software" is "computer program instructions" stored in "a computer-readable memory" and "executable by [a] processor" within a "device" (*e.g.*, a computer) as claimed.  Goodin, ¶ 330; *see* Dockser, [0036] ("software" is "executed by a processor" and "reside[s] in [a] memory"); Donovan (Ex. 1029), [0008]-[0009], [0014] ("software" is "computer program with instructions"); '156 patent, 25:58-60 ("software emulator" is "embodiment[] of the [claimed] invention").  As discussed above (§ VI.C), a POSA would have been motivated by Tong to use a computer (a claimed "device comprising a computer

processor…[etc.]") to emulate the Dockser/Tong device discussed *supra* §§ V.D, VI.B (meeting the "second device" of [33A1]), which comprises a plurality of components including a main processor and Dockser's execution unit (which itself comprises multiple components). *Supra* § V.D.1; Goodin, ¶ 331. Like the '156 patent's only examples of "emulat[ing] a… device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform. '156 patent, 17:5-19, 18:52-19:11; Tong, 278; Goodin, ¶¶ 332-333.

### 2. Limitations [33A2]-[33B2]

[21A2]-[21B2] are identical to [1A2]-[1B2]. Therefore, because the emulated "second device" in Dockser/Tong is the device discussed *supra* §§ V.B, VI.B, Dockser/Tong meets [33A2]-[33B2] for the same reasons Dockser's device (operating at Dockser's or Tong's disclosed precision levels) meets the identical limitations in claim 1. Goodin, ¶¶ 334-335.

## VII. <u>GROUND 3</u>: CLAIMS 1-8 AND 16 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND MACMILLAN

### A. MacMillan

MacMillan (Ex. 1009) "improve[s]… speed of a personal computer architecture through… parallel processing capability" "[t]o provide supercomputer performance in a computer for personal use." MacMillan, 8:38-40, 5:22-45, 1:10-

47. Consistent with how "supercomputer" was used in the art, MacMillan describes supercomputer performance in terms of speed (*e.g.*, number of operations performed per second), not precision.  MacMillan, 1:15-54; Ex. 1052, 1411; Ex. 1053, 500; Goodin, ¶¶ 336-337.  MacMillan achieves "substantial performance improvements" by adding a "Single Instruction Multiple Data (SIMD)" subsystem to "existing system architectures."  MacMillan, 9:17-23, 5:48-6:10.  The SIMD subsystem includes SIMD-RAM devices having multiple parallel "processing elements (PE's)," each PE including "floating point accelerators" that "perform… operations on… 32-bit words."  MacMillan, 9:11-19, 12:35-59, FIGs. 2 and 5 (reproduced below).  Goodin, ¶¶ 338-339.



## FIG. 2

(SIMD computer system)



**FIG. 5**

(SIMD-RAM)

### B.    Dockser/MacMillan Combination

MacMillan teaches incorporating SIMD parallel processing in personal-use computers, including battery-operated "laptops, palmtops, [and] personal digital assistants"—the same types of computers for which Dockser's FPP provides "[p]ower management" through reduced-precision floating-point operations. MacMillan, 1:6-9, 5:22-45, 7:14-34; Dockser, [0003]; Goodin, ¶ 340. MacMillan teaches "power dissipation and hence power supply capacity and cost" should be considered in pursuing MacMillan's SIMD architecture. MacMillan, 3:2-6; Goodin, ¶ 341. A POSA would have been motivated to use Dockser's FPP to

- 49 -

implement each "floating-point accelerator" in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches.  Goodin, ¶ 342.

Dockser's FPP is a "floating-point accelerator" for "perform[ing] atomic operations on… 32-bit words" as in MacMillan's PE, and using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power.  MacMillan, 12:47-59; Goodin, ¶ 343; *see supra* § V.A; Ex. 1024, 1:43-58 ("floating point accelerator" is "processor element" for executing "floating point operation[s]").  MacMillan's SIMD architecture is beneficial for applications including "animation,… rendering…, and video games," which are types of the "graphics applications" for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision.  MacMillan, 7:14-34; Dockser, [0003]; Goodin, ¶ 344.

## C.    Claims 1-2

In the resulting "Dockser/MacMillan" combination, MacMillan's "computer system" (*e.g.*, 200) (7:14-34, 9:20-29) meets the "device" of [1A1], and comprises Dockser's execution unit) and MacMillan's "Host CPU" (8:56-9:31).  Goodin, ¶¶ 345-347.  MacMillan's CPU is adapted to control the operation of the SIMD subsystem, including its PEs with Dockser's execution units, by executing a

program controlling initiation of "all SIMD processing" (MacMillan, 10:27-53, 13:12-13, 13:38-62); thus the CPU meets [1C] and claim 2 ("CPU"). Goodin, ¶¶ 348-353.

All other limitations of claims 1-2 relate to characteristics of the LPHDR execution unit, which in Dockser/MacMillan is the same Dockser execution unit as in Ground 1. Thus, Dockser/MacMillan meets the remaining limitations in claims 1-2 for the reasons discussed *supra* §§ V.B-V.C. Goodin, ¶ 354.

**D.    Claim 3: "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."**

MacMillan's computer system (the claimed "device"—*supra* § VII.C) includes a Host CPU implementable as "a 386, 486 or Pentium™ processor." MacMillan, 9:30-31. POSAs understood these processors included a floating-point execution unit that performed multiplication on IEEE-754 single-format 32-bit floating-point numbers. Goodin, ¶¶ 355-359 (citing Ex. 1017, [0005]; Ex. 1018, 2:7-10; Ex. 1029, [0013]; Ex. 1030, 1:13-19; Dockser, [0002]). Thus, an obvious implementation of MacMillan's CPU includes one claimed "execution unit[]… adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." Goodin, ¶ 360.

- 51 -

MacMillan discloses an example architecture including 256 PEs, and scaling to "tens of thousands… or more." MacMillan, 12:60-13:4, 13:39-41, 16:20-22, 2:13-16. Thus, in the Dockser/MacMillan combination having a single Host CPU and at least one FPP in each PE (of which there are at least 256), the number of FPPs (LPHDR execution units) exceeds by over 100 the non-negative integer number of Host CPU floating-point execution units. Goodin, ¶¶ 361-362.

The '156 patent says "arithmetic elements… designed to perform… floating point arithmetic with a word length of 32 or more bits" are "designed to perform… arithmetic of traditional precision," and contrasts those traditional-precision elements with "LPHDR arithmetic elements" ('156 patent, 27:52-59), which may "sometimes" produce results that differ from the correct result (*id.*, 26:39-49). Goodin, ¶ 363. A POSA would therefore have understood the '156 patent to describe that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" are "traditional precision" execution units that do not "sometimes" produce results different from the correct traditional-precision result. Goodin, ¶ 364. The floating-point execution unit of MacMillan's Host CPU is such a "traditional precision" execution unit, and Dockser's execution unit that sometimes produces differing results (*supra* § V.B.4) is a claimed "LPHDR execution unit." Goodin, ¶ 365. Thus, a POSA would have understood Dockser/MacMillan meets claim 3 because its number (256 or more) of

- 52 -

Dockser's LPHDR execution units exceeds by over 100 its number (one) of

traditional-precision execution units (the single Host CPU floating-point unit).

Goodin, ¶ 366.

### E.    Claims 4-6

Claims 4-6 depend from claim 3 and each recite a minimum X and/or Y

percentage higher than claim 1's, the highest combination being "X=10% and

Y=0.2%" in claim 6.  Mr. Goodin's software program (discussed *supra*

§§ V.B.4.c(1)(i), V.B.4.c(2) and *infra* Appendix I.B, I.D) demonstrates that when

retaining 9 mantissa fraction bits as Dockser ([0026]) discloses, Dockser's register

bit-dropping produces $Y \geq 0.2\%$ relative error for 14.6% of possible valid inputs,

and Dockser's logic bit-dropping produces $Y \geq 0.2\%$ relative error for 85% of

possible valid inputs.  Goodin, ¶ 368.  Dockser/MacMillan thus meets claim 6 and

claims 4-5 (whose recited X and Y minimum values are no higher than claim 6's).

Goodin, ¶¶ 367-368; Appendix I.B-I.D (further including tables showing how each

claimed X/Y combination is met).

The algebraic analysis discussed *supra* § V.B.4.c(1)(ii) and *infra* Appendix

I.C also demonstrates that Dockser's register bit-dropping meets claim 4 when

retaining 9 fraction bits; meets claim 5 when retaining 8 fraction bits; and meets

claim 6 when retaining 7 fraction bits.  Goodin, ¶ 369.  A POSA would have found

it obvious to implement Dockser's FPP in Dockser/MacMillan while retaining only

- 53 -

8 or 7 mantissa fraction bits for multiple reasons. First, Dockser's FPP's precision level is "selectable" and a 9-fraction-bit selection is only a non-limiting "example." Dockser, [0003]-[0004], [0026], [0013]; Goodin, ¶ 370. A POSA would have understood Dockser to suggest selecting other below-maximum (Dockser claim 1) precision levels, and selecting a precision level retaining 8 or 7 fraction bits (only 1-2 fewer than Dockser's 9-bit example) to be an obvious implementation of Dockser's teachings. Goodin, ¶ 371. Second, other prior art (*e.g.*, Tong) taught a low-precision floating-point multiplier that retained even fewer fraction bits. Goodin, ¶ 372; *supra* § VI.A. Third, a POSA would have understood the number of mantissa fraction bits retained in Dockser to be a result-effective variable, so that choosing to retain any number would have been obvious in view of Dockser's teachings that the number of mantissa bits dropped/maintained was a "selectable" variable optimizable for different applications, and that the selection impacts the FPP's results through the precision of the outputs the FPP produces. Dockser, [0002]-[0003], [0014], [0024]-[0027]; Goodin, ¶¶ 373-376; *see* result-effective variable caselaw cited *supra* § VI.B.

## F.    Claim 7

The dynamic range of possible valid inputs to Dockser's operation extends from approximately $2^{-126}$ (much smaller than 1/1,000,000) to approximately $2^{127}$

- 54 -

(much larger than 1,000,000), meeting claim 7.  *Supra* § V.B.3; Goodin, ¶¶ 377-378.

### G.    Claim 8

Dockser's claimed "first operation" is reduced-precision "multiplication," meeting claim 8.  *Supra* § V.B.2; Goodin, ¶¶ 379-380.

### H.    Claim 16

In Dockser/MacMillan, MacMillan's "computer system 200" (7:14-34, 9:20-29) meets the "device" of [16A1], and comprises multiple PEs each including one or more of Dockser's execution unit.  Goodin, ¶ 381; *supra* §§ VII.B-VII.C.  The PEs are implemented on "SIMD-RAM… chips," and an example architecture includes sixteen SIMD-RAM chips each having sixteen PEs.  MacMillan, 12:35-13:4.  If claim 16 were interpreted to require "a plurality of components," ***each*** comprising at least one LPHDR execution unit, that plurality of components is met by any two or more of the SIMD-RAM chips, or any two or more of the PEs, in Dockser/MacMillan.  Goodin, ¶¶ 382-383.

All other limitations of claim 16 relate to characteristics of the LPHDR execution unit, which in Dockser/MacMillan is the same Dockser execution unit as in Ground 1.  Thus, Dockser/MacMillan meets the remaining limitations in claim 16 for the reasons discussed *supra* § V.D.  Goodin, ¶ 384.

## VIII. <u>GROUND 4</u>: CLAIMS 1-8, 16, AND 33 WOULD HAVE BEEN OBVIOUS OVER DOCKSER, TONG, AND MACMILLAN

### A.    Claims 1-8 and 16

Dockser/MacMillan (Ground 3) uses Dockser's FPP to implement each "floating-point accelerator" in the parallel PEs of MacMillan's SIMD architecture. *Supra* § VII.B.  As discussed in Ground 2, a POSA would have been motivated to implement Dockser's FPP using precision levels as low as 5 mantissa fraction bits, which Tong teaches suffices for applications including "neural network trainer" "ALVINN."  Tong, p. 278 & Table IV; *supra* §§ VI.A-VI.B.  MacMillan teaches that such "neural net[work]" applications would benefit from "supercomputer performance" provided by using (at least) 256 PEs including "floating point accelerators."  MacMillan, 1:24-37, 12:52-13:4; Goodin, ¶¶ 385-386.  In view of these combined teachings of Dockser, Tong, and MacMillan, a POSA would have been motivated to use Dockser's FPP with Tong's precision levels as low as 5 mantissa fraction bits as each floating-point accelerator in MacMillan's multiple PEs to achieve "supercomputer performance" for, *e.g.*, neural network applications while conserving power.  Goodin, ¶ 387.

The resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong) meets claims 1-8 and 16 for the same reasons Dockser/MacMillan does discussed *supra* § VII in Ground 3, except the claimed performance

- 56 -

characteristics X and Y are met by using 5 rather than 9 mantissa fraction bits, meeting the claimed "at least" X and Y values by the greater amounts explained for Dockser/Tong in Ground 2 *supra* § VI.B.  Goodin, ¶ 388.

## B.    Claim 33

Tong's teachings discussed *supra* §§ VI.A, VI.C to emulate in software a device employing reduced-precision arithmetic would have motivated a POSA to emulate in software the Dockser/Tong/MacMillan device meeting claim 16 (the "second device" recited in claim 33).  Goodin, ¶ 389.  The computer performing the emulation meets claim 33 for the reasons that same computer does in Ground 2 *supra* § VI.C, except the claimed "second device" being emulated is met by the Dockser/Tong/MacMillan device for the reasons *supra* § VIII.A.  Goodin, ¶ 390.

## C.    Alternative Interpretation of Claim 3

One MacMillan embodiment is "a system… designed primarily… for a specific application, including embedded applications… including… signal processing,… voice recognition, [etc.]."  MacMillan, 7:15-34.  Tong teaches that many "embedded applications such as voice recognition,… and other human-sensory-oriented signal-processing applications" (Tong, 274), "can get by with less precision/range than full FP" (Tong, 273).  Tong experimentally demonstrates that the optimum precision for a "benchmark suite" (Tong, 284) of "five signal processing applications" spanning a "range in complexity" is between 5 and 11

- 57 -

mantissa fraction bits (Tong, 278-279). Goodin, ¶¶ 391-393. A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels for the reasons *supra* § VIII.A, and to do so in MacMillan's embedded signal-processing system based on Tong's teachings that reduced-precision arithmetic is beneficial in such systems. Goodin, ¶ 394.

In such an embedded system designed specifically for signal processing, a POSA would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that "the fine precision of the 23-bit mantissa is not essential." Tong, 279; Goodin, ¶ 395. Dockser ([0017]) teaches that the registers in embodiments of its FPP can be "formatted differently from IEEE 32-bit single format," and a POSA would have been motivated to implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered because they correspond to mantissa bits that will always be tied to "0" in an application-specific system that always operates at reduced precision. Goodin, ¶ 396. Likewise, a POSA would have been motivated to implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-

- 58 -

bit) corresponding to the precision level selected for the embedded application. Goodin, ¶ 397.

In this implementation, the claimed "input signal" to Dockser's FPP remains in IEEE-754 32-bit single-format given that the Host CPU and data buses in the Dockser/Tong/MacMillan device use and send to Dockser's FPP standard 32-bit floating-point numbers. MacMillan, 9:30-57; *supra* §§ VII.A, VII.D; Goodin, ¶ 398. However, one or more least-significant mantissa bits of the input signal number are not stored in the register which is implemented with fewer than 32 storage elements. Goodin, ¶ 398. Because the input signal and selected precision levels are unchanged from Grounds 1-3, this implementation of Dockser/Tong/MacMillan meets independent claim 1 (including its "wherein" clause) the same way as in Grounds 1-3 where Dockser's FPP is a claimed LPHDR execution unit. Goodin, ¶ 399; *supra* §§ V-VII.

If dependent claim 3 were interpreted differently than the specification discusses (*see supra* § VII.D), such that an execution unit used for reduced-precision operations could be considered to also meet the claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide" if its hardware is capable of 32-bit multiplication in some configurations (*e.g.*, if power were applied to all register and logic elements), Dockser's FPP in the above-discussed Dockser/Tong/MacMillan implementation for an embedded

- 59 -

application is not that type of execution unit, because its hardware (having smaller-than-32-bit registers and multiplier logic) is **not** capable of 32-bit multiplication. Goodin, ¶ 400. Thus, this Dockser/Tong/MacMillan implementation meets that alternative interpretation of claim 3 because only the Host CPU floating-point unit is a claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide," and the device includes over 100 more of Dockser's FPP (LPHDR execution unit). Goodin, ¶ 401; *supra* § VII.D.

## IX.    NO BASIS EXISTS FOR DISCRETIONARY DENIAL

### A.    <u>Section 314(a)</u>: Parallel Litigation Does Not Weigh Against Institution

Singular served Petitioner with a complaint on December 20, 2019, and subsequently amended that complaint on March 20, 2020 (Ex. 1032). Petitioner moved to dismiss the amended complaint, which was denied. Exs. 1034, 1036.

Petitioner filed this Petition expeditiously, roughly four months after denial of its motion to dismiss, two months after receiving Singular's infringement contentions, and **before** preliminary invalidity contentions are due. Exs. 1033, 1037-1038. *HP Inc. v. Neodron Ltd.*, IPR2020-00459, Paper 17, 40 (Sept. 14, 2020) (instituting trial where petitioner "acted diligently" in filing petitions "approximately two months after" infringement contentions and "two weeks prior" to invalidity contentions); *IBM Corp. v. Trusted Knight Corp.*, IPR2020-00323, Paper 15, 12 (July 10, 2020) (instituting trial where petition filed "soon after"

$2^{-(K+2)}$), which is the difference produced when ones in both the $(K+1)^{th}$ and $(K+2)^{th}$ bits are changed to zeros; and the value of $M_A$ is no larger than $(1.5 - 2^{-23})$, which is the largest possible mantissa having a zero as the first fraction bit (*i.e.*, $1.0111\ldots$). Goodin, ¶ 443.

Referring to Equation B, therefore, the following inequality holds for the 12.5% of all possible $M_A$ values with zero in the first fraction bit and ones in the $(K+1)^{th}$ and $(K+2)^{th}$ fraction bits, when Dockser's register bit-dropping truncates the operands to K fraction bits:

$$Y \geq \frac{\left(2^{-(K+1)} + 2^{-(K+2)}\right)}{(1.5 - 2^{-23})} \times 100\% \qquad (\boldsymbol{Equation\ C})$$

Goodin, ¶ 444. Since each $M_A$ value can be paired with every possible value of $M_B$, the above Equation C is also true for 12.5% of all possible ***pairs*** of mantissas $M_A$ and $M_B$; thus, for a given subprecision retaining K fraction bits with Dockser's register bit-dropping technique, over 12% of all possible valid pairs of input operands will produce ***at minimum*** the relative error given by Equation C. Goodin, ¶ 445.

Similarly, 25% of all possible values of $M_A$ have zeros as the first ***two*** fraction bits (*i.e.*, $M_A = 1.00\ldots$), and 25% of those have ones in both the $(K+1)^{th}$ and $(K+2)^{th}$ bits. Goodin, ¶ 446. In this 6.25% of all possible values of $M_A$ (25% of 25%), the value of $D_A$ is at least $\left(2^{-(K+1)} + 2^{-(K+2)}\right)$, and the value of $M_A$

- 72 -

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

————————

Case No. TBD
Patent No. 9,218,156

————————

**DECLARATION OF RICHARD GOODIN**

Google Exhibit 1003
Google v. Singular

19.    I understand that for a single reference or a combination of references to render the claimed invention obvious, a POSA must have been able to arrive at the claimed invention by altering or combining the applied references.

## IV.    THE '156 PATENT

### A.    Overview

20.    The '156 patent claims a device comprising at least one "low precision high-dynamic range (LPHDR) execution unit." '156 patent, claim 1. The claimed "execution unit" is adapted to execute an operation (*e.g.*, an arithmetic operation like multiplication) on an input signal representing a first numerical value to produce an output signal representing a second numerical value. *See*, *e.g.*, '156 patent, 29:54-59 (claim 1: "A device comprising: at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"). The "execution unit" is characterized as "LPHDR" because it performs a "low precision" ("LP") operation on a "high dynamic range" ("HDR") of values.

21.    Precision relates to accuracy and can be impacted by the ability to represent numbers that differ from each other by small amounts—*e.g.*, fractional values. For example, in a decimal (base-10) representation, the number 2.13 (represented using two fractional digits) is more precise than if rounded to 2.1

(using just one fractional digit), which is more precise than if rounded to 2 (using no fractional digits).

22.    In a binary "fixed-point" representation, any fixed number of bits can be chosen to represent a number's fractional component.  For example, a binary fixed-point representation that allocates three bits to representing a fractional component can represent numbers to the nearest 1/8, which is more precise than a representation that allocates only two bits to the fractional component and can represent numbers to the nearest 1/4, which is more precise than a representation that allocates no bits to the fractional component and can only represent integers.

23.    A "low precision arithmetic" operation, as the '156 patent says, is an operation that is less precise than an exact calculation, such that "each operation might introduce" some "error" in its "results."  '156 patent, 4:13-16 (describing prior art processors that "provide low precision arithmetic, in which each operation might introduce perhaps an error of a few percentage points in its results").  For example, a low-precision operation may produce a result of 2.1 when the exact operation would produce a result of 2.13.

24.    "Dynamic range" refers to the range of numerical values that a signal can represent or a unit can operate on or produce.  *See* '156 patent, 2:39-43 ("In some embodiments, the processing elements have 'high dynamic range' in the sense that they are capable of operating on inputs and/or producing outputs

spanning a range at least as large as from one millionth to one million.").  For example, a signal that can represent any numerical value between 1 and 100 has a higher dynamic range than one that can only represent numerical values between 1 and 10.

25.    In a binary (base-2) representation of integers, the more bits used to represent a number, the wider the possible dynamic range—*e.g.*, two bits can represent the numbers 0-3, three bits can represent the numbers 0-7, etc.  Other binary representations have been developed that can have a wider dynamic range for the same number of bits.  One such well-known representation is floating-point representation.

26.    For example, in describing a prior art "16 bit floating point representation," the '156 patent quotes a 2008 Wikipedia article that explains:

> This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. ***The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range*** allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth.

'156 patent, 5:28-35.[1]  Similarly, Tong (Ex. 1008) explains that a 32-bit floating-point number in the "IEEE single-precision" format has a much wider dynamic range than a 32-bit integer:

> For instance, an IEEE single-precision number and an integer on a 32-bit machine both require 32 bits of storage for their representation. However, the dynamic range provided by the FP representation ($1.99999988 \times 2^{-126}$ to $1.99999988 \times 2^{127}$) is substantially wider than that provided by the integer representation ($1-2^{31}$).

Tong, 274.

27.    It was well known before 2009 that for a numerical representation using a fixed number of bits, a tradeoff is necessary between dynamic range and precision.  For example, a ten-bit binary fixed-point representation that allocates all ten bits to the non-fractional part, and thus represents values between zero and 1,023 but only to the nearest integer, has higher dynamic range but lower precision than a representation that allocates all ten bits to representing the fractional part and thus only represents values between zero and one but is accurate to the nearest 1/1024.

28.    Another example relates to the well-known floating-point representations, which can represent a high dynamic range of numerical values using a smaller number of digits than a fixed-point representation—*e.g.*, by

---

[1] All emphases in this declaration are added unless otherwise indicated.

representing a large number as a smaller number (called the "mantissa") scaled by an order of magnitude. A simple example of a floating-point representation of a decimal number using base ten would represent the number 3,046,000 as $3.046 \times 10^6$.

29.    In a typical binary (base-2) floating-point representation, one bit is allocated to indicate the number's sign (positive or negative), some bits are allocated to specify the "exponent" (the number's order of magnitude in base two), and other bits are allocated to specify the mantissa. *See*, *e.g.*, Dockser (Ex. 1007), [0001] ("To find the value of a floating-point number, the mantissa is multiplied by ***a base (commonly 2 in computers)*** raised to the power of the exponent."), [0002] ("the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa.); Tong (Ex. 1008), 274 ("There are two different IEEE standards for FP computation. IEEE 754 is a binary standard that requires the implied radix (base) to be two. IEEE 854 allows either radix 2 or radix 10 representation. By far, IEEE 754 is more popular and most desktop microprocessors support the IEEE 754 standard.").

30.    It was known that the number of exponent bits in a floating-point representation impacts dynamic range, that the number of mantissa (fraction) bits impacts precision, and that there was a tradeoff:

> The designer of a floating-point representation must find a compromise between the size of the [mantissa] fraction and the size of the exponent because a fixed word size means you must take a bit from one to add a bit to the other.  This trade-off is between precision and range: increasing the size of the [mantissa] fraction enhances the precision of the fraction, while increasing the size of the exponent increases the range of numbers that can be represented.

Patterson (Ex. 1031), 191.

31.    It was known in mathematics and in computing that LPHDR arithmetic had benefits.  For example, Tong (Ex. 1008) noted that "wide dynamic range" was recognized as "a desirable feature," and explained that "[i]t has long been known that many… applications can get by with less precision" over that range.  Tong, 273.  Tong explains that "Floating-point (FP) hardware provides a wide dynamic range of representable real numbers," and notes that "FP hardware's performance, simplified programming model, and adaptability over a wide dynamic range makes it a desirable feature."  Tong, 273.  Tong states that its experimental results show that "programs such as speech recognition and image processing use significantly less power with our reduced bitwidth FP representation than with an IEEE-standard FP representation."  Tong, 273.  Tong also notes that "[i]t has long been known that many such signal processing applications can get by with less precision/range than full FP," *i.e.*, than with the an "IEEE-standard FP representation."  Tong, 273.  Tong's own experiments

Dockser's or Tong's disclosed precision levels) meets the identical limitations in

claim 1.

## VIII. CLAIMS 1-8 AND 16 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND MACMILLAN

### A. MacMillan (Ex. 1009)

336.    MacMillan "improv[es]… speed of a personal computer architecture

through… parallel processing capability" "[t]o provide supercomputer

performance in a computer for personal use."  MacMillan, 8:38-40, 5:22-45, 1:10-

47.  MacMillan states in its "Background of the Invention" section that "[i]f

supercomputing performance could be achieved in low cost computers, such as

personal computers, this could dramatically expand the market for personal

computers."  MacMillan, 1:20-23.  MacMillan teaches that because of performance

limitations of "uniprocessor-based" systems, "a personal computer providing

supercomputer performance should use a parallel computing architecture."

MacMillan, 1:38-47.  MacMillan notes that "SIMD architectures have some

qualities that make them attractive candidates for adding supercomputer

performance to a computer for personal use," but that "present SIMD architectures

are much higher cost than computer systems for personal use."  MacMillan, 5:22-

27.  MacMillan identifies certain things that must be achieved in a SIMD system

"[t]o provide supercomputer performance in a computer for personal use,"

MacMillan, 5:27-28, and teaches an invention that "addresses [those] needs."

MacMillan, 5:44-45. Specifically, MacMillan's invention "relates to an improvement in the overall speed of a personal computer architecture through the addition of a parallel processing capability." MacMillan, 8:38-40.

337.    Consistent with how the term "supercomputer" was used in the art, MacMillan describes "supercomputer" performance in terms of speed (e.g., number of operations performed per second), not precision. *See* MacMillan, 1:15-54 ("Personal computers (PCs) today typically have performance up to about 300 million instructions per second (MIPs). This is much less than supercomputers, which may provide performance of 5,000 MIPs or more. … Parallel computers with over 5,000 MIPs performance are readily achievable, as demonstrated by their availability from a number of vendors, although at high prices."). For corroborating evidence of how the term "supercomputer" was used in the art, *see*, *e.g.*, *Penguin* (Ex. 1052), 1411 ("any of a class of very powerful computers that are capable of performing at great speed and are used for repeated calculation cycles on vast amounts of data"); *Oxford* (Ex. 1053), 500 ("supercomputer" is a "class of very powerful computers" capable of "performing several hundred [trillion] floating-point operations per second").

338.    MacMillan achieves "substantial performance improvements" by adding a "Single Instruction Multiple Data (SIMD)" subsystem to "existing system architectures." MacMillan, 9:17-19, 5:48-6:10. MacMillan's invention

"comprises a computer system to which has been added a Single Instruction

Multiple Data (SIMD) parallel processing capability."  MacMillan, 5:48-50.  "The

computer system, to which the SIMD capability has been added, could be a

computer system for personal use or other computer system."  MacMillan, 5:50-53.

MacMillan's "cost-effective addition of parallel processing can be made to

popular, low cost computer systems running popular operating systems," including

"Microsoft Windows based personal computers" and "UNIX-based systems."

MacMillan, 6:3-10.  MacMillan provides this "SIMD capability" with a "SIMD

subsystem" that "adds parallel processing capabilities to the personal computer,

resulting in substantial performance improvements."  9:17-19.

339.    MacMillan's SIMD subsystem includes SIMD-RAM devices having

multiple parallel "processing elements (PE's)," each PE including "floating point

accelerators" that "perform… operations on… 32-bit words."  MacMillan, 9:11-19,

12:35-59, FIG. 2, 5.  Figure 2 of MacMillan shows a "SIMD subsystem 100" that

"includes a SIMD Controller" and "one or more SIMD-RAM devices 104."

MacMillan, 9:11-12.    "Fig[ure] 5 shows a block diagram of a SIMD-RAM

device."  MacMillan, 12:35-36.  The SIMD-RAM contains "a plurality of memory

devices, in this case, dynamic random access memory (DRAM) 304, which are

coupled to a plurality of processing elements (PE's) 302 via random access logic

306."  MacMillan, 12:36-40.  "Each PE contains a 32-bit wide data path and can



FIG. 5

MacMillan, Fig. 5 (SIMD-RAM device)

## B. Dockser/MacMillan Combination

340.  MacMillan teaches incorporating SIMD parallel processing in personal-use computers, including battery-operated devices like "laptops, palmtops, [and] personal digital assistants"—the same types of computers for which Dockser's FPP provides beneficial "[p]ower management" through reduced-precision floating-point operations.  MacMillan, 1:6-9, 5:22-45, 7:14-34; Dockser, [0003].  MacMillan's invention relates to "computer systems for personal use."

MacMillan, 1:6-9.  As MacMillan explains, "SIMD architectures have some qualities that make them attractive candidates for adding supercomputer performance to a computer for personal use," but existing "SIMD architectures" have "limitations."  5:22-26.  "Overcoming" those limitations, MacMillan explains, "would allow supercomputing performance to be provided in a low cost computer system for personal use," and MacMillan's invention "addresses" those "needs"—*i.e.*, the needs to overcome those limitations.  MacMillan, 5:42-45. MacMillan defines "'[a] computer system for personal use'" as

> a system that is designed primarily for use by an individual or for a specific application, including embedded applications. ***A computer system for personal use includes*** personal computers (including, but not limited to, those that are IBM-compatible and Apple-compatible), workstations (including, but not limited to, those that use RISC technology or that use the UNIX operating system), embedded computers (including, but not limited to, computer-based equipment used for telecommunications, data communications, industrial control, process control, printing, settop boxes, signal processing, data compression or decompression, data transformation, data aggregation, data extrapolation, data deduction, data induction, video or audio editing or special effects, instrumentation, data collection or analysis or display, display terminals or screens, voice recognition, voice processing, voice synthesis, voice reproduction, data recording and playback, music synthesis, animation, or rendering), ***laptops,***

***palmtops, personal digital assistants, notebooks, subnotebooks, and
video games***.

MacMillan, 7:14-34.  These are the same types of systems in which, according to

Dockser, the problem of "unnecessary power consumption" is "of particular

concern."  Dockser, [0003] ("some graphics applications may only require a 16-bit

mantissa. For these graphics applications, any accuracy beyond 16 bits of precision

tends to result in unnecessary power consumption. This is of particular concern in

battery operated devices where power comes at a premium, such as wireless

telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and

cameras, just to name a few.").  Dockser teaches that "there is a need in the art for

a floating-point processor in which the reduced precision, or subprecision, of the

floating-point format is selectable," which Dockser addresses with this selectable-

precision FPP.  Dockser, [0003].  Thus, both MacMillan and Dockser are directed

to improvements in the same types of devices.

341.   In addition, MacMillan teaches that "power dissipation and hence

power supply capacity and cost" should be considered in pursuing the performance

improvements of MacMillan's SIMD architecture.  MacMillan, 3:2-6.  MacMillan

explains that existing "SIMD architectures…suffer from a number of

shortcomings."  MacMillan, 2:21-26.  One of these limitations is a "bottleneck

between the chips used to hold PEs [processing elements] and the chips used to

provide memory storage." MacMillan, 2:26-48. Although MacMillan notes that "[a]dding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs," MacMillan also notes that "[a]dding output buffers to drive increased pin counts also increases power dissipation and hence ***power supply capacity and cost***," which in turn "may also require increased space between chips or circuit boards for better cooling, leading to larger, more costly cabinets." MacMillan, 2:62-3:6. One of MacMillan's goals is to "overcom[e]" the "limitations" it identifies in prior art SIMD systems." MacMillan, 5:38-42. Thus, a POSA would have understood that one of MacMillan's goals in the design of its SIMD system was addressing "power dissipation and hence power supply capacity and cost." MacMillan, 3:3-4.

342.    Based on MacMillan's and Dockser's teachings that I discuss above, a POSA would have been motivated to use Dockser's FPP to implement each "floating-point accelerator[]" in the parallel PEs of MacMillan's SIMD architecture (MacMillan, 12:55-56), to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches.

343.    A POSA would have understood that Dockser's FPP is a "floating-point accelerator" for "perform[ing] atomic operations on… 32-bit words" as in MacMillan's PE, and using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to

perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power.  MacMillan, 12:47-59.  As I discussed in paragraph 339 above, MacMillan discloses that its PEs "can perform atomic operations on bits, bytes, 16-bit words, and 32-bit words."  MacMillan, 12:47-49.  MacMillan also teaches including "floating-point accelerators" in each PE.  MacMillan, 12:55-56.  As a POSA would have understood, a floating point accelerator is a processor element for executing floating point operations, as is Dockser's FPP.  For evidence corroborating that this was background knowledge for a POSA, *see*, *e.g.*, Fossum (Ex. 1024), 1:43-58 (explaining in the "Description of the Prior Art" that in "Data processing (i.e. computer) systems," "[s]ometimes a special type of ***processor element***, termed a ***floating point accelerator***, is provided for performing floating point arithmetic calculations. Floating point accelerators are specifically designed to increase the speed with which floating point calculations may be performed; when a ***floating point operation*** is to be performed, it is ***executed*** in or by the floating point accelerator rather than in another processor.").  Thus, a POSA would have understood that the "floating-point accelerators" in the PEs in MacMillan are processor elements that perform floating-point operations, just like Dockser's FPP, and therefore would have understood that using Dockser's FPP as the floating-point accelerator would enable MacMillan's PEs to perform reduced-precision floating-point arithmetic.

344.    Moreover, MacMillan teaches that its SIMD architecture is beneficial for applications including "animation,… rendering…, and video games," which a POSA would have understood are types of the "graphics applications" for which Dockser teaches that its FPP can beneficially save power by reducing unnecessary precision.  MacMillan, 7:14-33; Dockser, [0003].  As I discussed in paragraph 340 above, MacMillan's primary focus is on "computer system[s] for personal use," which includes "laptops, palmtops, personal digital assistants, notebooks, subnotebooks, and video games," MacMillan, 7:14-34, which are the same types of "battery operated devices where power comes at a premium" that Dockser is primarily focused on.  *See* Dockser, [0003] ("wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras, just to name a few").

**C.    Claims 1-2**

345.    In the combination of Dockser and MacMillan ("Dockser/MacMillan") discussed in Section VIII.B above, MacMillan's "computer system" (*e.g.*, computer system 200) (MacMillan, 7:14-34, 9:20-29) meets the "device" of limitation [1A1], and comprises Dockser's execution unit and MacMillan's "Host CPU" (MacMillan, 8:56-9:31), as I explain in paragraphs 346-347 below.

363.    The '156 patent states:

> The degree of precision of a "*low precision, high dynamic range*"
> arithmetic element may vary from implementation to implementation.
> For example, in certain embodiments, a LPHDR arithmetic element
> produces results which include fractions, that is, values greater than
> zero and less than one. For example, *in certain embodiments, a*
> *LPHDR arithmetic element produces results which are sometimes*
> (or all of the time) *no closer than 0.05% to the correct result* (that is,
> the absolute value of the difference between the produced result and
> the correct result is *no more than one-twentieth of one percent of the*
> *absolute value of the correct result*).

'156 patent, 26:39-49. The patent also states:

> For certain devices (such as computers or processors or other devices)
> embodied according the present invention, the *number of LPHDR*
> *arithmetic elements* in the device (e.g., computer or processor or
> other device) *exceeds the number*, possibly zero, of *arithmetic*
> *elements in the device which are designed to perform high dynamic*
> *range arithmetic of traditional precision* (*that is*, floating point
> arithmetic with a *word length of 32* or more bits).

'156 patent, 27:52-59. The '156 patent thus says that "arithmetic elements…

designed to perform… floating point arithmetic with a word length of 32 or more

bits" are "designed to perform… arithmetic of traditional precision," and it

contrasts those traditional-precision elements with "LPHDR arithmetic elements"

('156 patent, 27:52-59), which may "sometimes" produce results that differ from the correct result (*id*., 26:39-49).

364.    A POSA would therefore have understood the '156 patent to describe that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" in claim 3 are "traditional precision" execution units that do not "sometimes" produce results different from the correct traditional-precision result.

365.    A POSA would have understood that the floating-point execution unit of MacMillan's Host CPU is such a "traditional precision" execution unit, and would have understood that Dockser's execution unit that sometimes produces differing results from those produced by a "traditional precision" floating point unit (as I explained in Section VI.B.4 above when discussing limitation [1B2]) is a claimed "LPHDR execution unit."

366.    Thus a POSA would have understood that Dockser/MacMillan meets claim 3 of the '156 patent because Dockser/MacMillan's number (256 or more) of Dockser's LPHDR execution units exceeds by over 100 its number (one) of traditional-precision execution units (the single Host CPU floating-point unit).

390.   The computer performing the emulation meets claim 33 for the same reasons that computer meets claim 33 in the Dockser/Tong combination, which I discussed in Section VII.C above, except that the claimed "second device" being emulated is met by the Dockser/Tong/MacMillan device for the reasons I discussed in Section IX.A above.

### C.    Alternative Interpretation of Claim 3

391.   One embodiment in MacMillan is "a system… designed primarily… for a specific application, including embedded applications… including… signal processing,… voice recognition, [etc.]."  MacMillan, 7:15-34.  MacMillan relates to improving a "computer system for personal use."  MacMillan, 5:48-53 ("The present invention comprises a computer system to which has been added a Single Instruction Multiple Data (SIMD) parallel processing capability. The computer system, to which the SIMD capability has been added, could be a computer system for personal use or other computer system.").  And in the "DESCRIPTION OF THE PREFERRED EMBODIMENTS" section, MacMillan explains that:

> *'A computer system for personal use'* is a system that is designed primarily for use by an individual *or for a specific application, including embedded applications*. A computer system for personal use *includes* personal computers (including, but not limited to, those that are IBM-compatible and Apple-compatible), workstations (including, but not limited to, those that use RISC technology or that use the UNIX operating system), *embedded computers (including,*

*but not limited to, computer-based equipment used for* telecommunications, data communications, industrial control, process control, printing, settop boxes, *signal processing*, data compression or decompression, data transformation, data aggregation, data extrapolation, data deduction, data induction, video or audio editing or special effects, instrumentation, data collection or analysis or display, display terminals or screens, *voice recognition, voice processing, voice synthesis, voice reproduction*, data recording and playback, music synthesis, animation, or rendering), laptops, palmtops, personal digital assistants, notebooks, subnotebooks, and video games.

MacMillan, 7:15-34.

392.   Tong says that its "results show that programs such as *speech recognition and image processing* use significantly less power with [a] reduced bitwidth FP representation than with an IEEE-standard FP representation," and notes that "[i]t has long been known that many *such signal processing applications* can get by with less precision/range than full FP." Tong, 273.  Later, Tong explains:

For an increasing number of *embedded applications such as voice recognition, vision/image processing, and other human-sensory-oriented signal-processing applications*, FP's simplified programming model (in contrast with fixed-point systems) and large dynamic range makes FP hardware a desirable feature. Furthermore, many recognition applications achieve a high degree of accuracy starting from fairly low-resolution input sensory data.

Tong, 274. Thus, a POSA would have understood that Tong teaches that many "embedded applications such as voice recognition,… and other human-sensory-oriented signal-processing applications" (Tong, 274), "can get by with less precision/range than full FP" (Tong, 273).

393. Tong experimentally demonstrates that the optimum precision for a "benchmark suite" (Tong, 284) of "five signal processing applications" spanning a "range in complexity" is between 5 and 11 mantissa fraction bits (Tong, 278-279). Tong says that "[t]o study the relationship between program accuracy and number of bits in FP representation, [the authors] have collected a set of five signal processing applications." Tong, 278. These applications, which are described in Table IV, "range in complexity from single-purpose kernels to complete applications." Tong, 278. Figure 6 of Tong "plots the accuracy for each of the five programs across a range of mantissa bitwidths." Tong, 278. As shown in Figure 6, "[n]one of the workloads display a noticeable degradation in accuracy when the mantissa bitwidth is reduced from 23 to 11 bits. For ALVINN and Sphinx III the results are even more promising; the accuracy does not change significantly with as few as 5 mantissa bits." Tong, 278. Later, in summarizing its results, Tong notes that "[m]ost FP programs in our benchmark suite maintain the same output even when the mantissa bitwidth is reduced by half." Tong, 284.

394.    A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels for the reasons I explained in Section IX.A above.  Moreover, a POSA would have been motivated to do so in MacMillan's embedded signal-processing system based on Tong's teachings that reduced-precision arithmetic is beneficial in such systems.

395.    In such an embedded system designed specifically for signal processing, a POSA would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that "the fine precision of the 23-bit mantissa is not essential."  Tong, 279.  Tong explains that the results of its experiments with varying mantissa bitwidths "clearly demonstrate that not all programs need the precision provided by generic FP hardware."  Tong, 278.  As Tong explains,

> The reason behind this result is that ***many programs dealing with human interfaces process sensory data with intrinsically low resolutions***. Raw input data with 4-10 bits of precision is rather common in these applications. … What is quite clear from these experiments is that the FP format provides essential dynamic range (we can reduce, but not reduce dramatically, the number of exponent bits) ***but the fine precision of the 23-bit mantissa is not essential*** (half as many bits often suffice).

Tong, 278-279. Based on this teaching, a POSA would have understood that there is a class of applications, including signal processing applications that "process sensory data," that do not need 23 fraction bits.

396. In addition, Dockser teaches that the registers in embodiments of its FPP can be "formatted differently from IEEE 32-bit single format." Dockser, [0017] ("It should of course be understood, however, that other embodiments of the floating-point processor 100 may include a floating-point register file 110 that is *formatted differently* from IEEE 32-bit single format (*including but not limited to* IEEE 64-bit double format), and/or may contain a different number of register locations." Thus, a POSA would have been motivated to implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered because they correspond to mantissa bits that will always be tied to "0" in an application-specific system that always operates at reduced precision.

397. Likewise, a POSA would have been motivated to implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application.

398.   In this implementation, the claimed "input signal" to Dockser's FPP remains in IEEE-754 32-bit single-format given that the Host CPU and data buses in the Dockser/Tong/MacMillan device use and send to Dockser's FPP standard 32-bit floating-point numbers.  MacMillan, 9:30-57 ("In this embodiment of FIG. 3 … The host CPU 208 is connected to the host bus 230.  In the embodiment of FIG. 3, fast I/O is provided through the Peripheral Component interconnect bus (PCI bus) 210. … The PCI bus 210 can support up to 133 Mbytes/second peak transfer rate in its current 32-bit version."); *see* Section IX.A above (where I explain that the device in the Dockser/Tong/MacMillan combination is the computer system of MacMillan implemented with Dockser's FPPs, which are configured to use 5 mantissa bits as taught in Tong), VIII.A, VIII.D.  However, in this implementation, one or more least-significant mantissa bits of the input signal number are not stored in the FPP register because it is implemented with fewer than 32 storage elements, as I explain in paragraph 396 above.

399.   Because the input signal and selected precision levels are unchanged from the Dockser, Dockser/Tong, and Dockser/MacMillan combinations that I discuss in Sections VI-VIII above, this implementation of Dockser/Tong/MacMillan in paragraphs 395-398 above meets independent claim 1 of the '156 patent (including its "wherein" clause) the same way as in the Dockser,

Dockser/Tong, and Dockser/MacMillan combinations where Dockser's FPP is a claimed LPHDR execution unit.

400.    As I discuss in Section VIII.D above, the specification of the '156 patent makes clear to a POSA that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" referred to in claims 3 and 23 are "traditional precision" execution units that ***do not*** "sometimes" produce results different from the correct traditional-precision result. *See*, *e.g.*, paragraphs 363-364 above.  However, if claim 3 were interpreted differently than the specification discusses, such that an execution unit used for reduced-precision operations could also be a claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide" if its hardware were capable of 32-bit multiplication in some configurations (*e.g.*, if power were applied to all register and logic elements), then Dockser's FPP in the above-discussed Dockser/Tong/MacMillan implementation for an embedded application is ***not*** that type of execution unit, because its hardware (having smaller-than-32-bit registers and multiplier logic) is ***not*** capable of 32-bit multiplication.

401.    Thus, this Dockser/Tong/MacMillan implementation meets that alternative interpretation of claim 3 of the '156 patent because only the Host CPU floating-point unit is a claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide," and the device includes

over 100 more of Dockser's FPP (LPHDR execution unit), as I explained in Section VIII.D above.

## X.    APPENDIX I – TECHNICAL DETAILS OF RELATIVE ERROR ANALYSES

### A.    Dockser's Multiplier Relative Error Is Independent of Exponent and Sign

402.   In this section, I explain mathematically why it is the case that the relative error produced by performing floating-point multiplication on two floating-point numbers using Dockser's precision-reduction techniques is independent of the exponent values and sign bits of the two floating-point numbers.

403.   A POSA would have understood that if a floating-point number A has a sign bit $S_A$, a mantissa value $M_A$, and an exponent $E_A$, then the value of A is

$$A = (-1)^{(S_A)} \times 2^{(E_A)} \times (M_A)$$

*See*, *e.g.*, Dockser, [0001] ("A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa. To find the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent. The sign is applied to the resultant value."). A POSA would have understood that positive numbers are represented by having a sign bit with value 0, and negative numbers are represented with a sign bit with value 1. This is because, if $S_A = 0$, it means that the term $(-1)^{(S_A)}$ in the

I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 5, 2020

Trials@uspto.gov                                        Paper 16
571-272-7822                                    Date: May 13, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

IPR2021-00165
Patent 9,218,156 B2

Before JUSTIN T. ARBES, KRISTI L. R. SAWERT, and
JASON M. REPKO, *Administrative Patent Judges*.

PER CURIAM.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2021-00165
Patent 9,218,156 B2

## I. INTRODUCTION

Google LLC ("Petitioner") filed a petition to institute *inter partes* review of claims 1–8, 16, and 33 of U.S. Patent No. 9,218,156 B2 (Ex. 1001, "the '156 patent"). Paper 2 ("Pet."). Singular Computing LLC ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp."). On our authorization (Paper 13), Petitioner filed a Reply (Paper 14, "Reply") and Patent Owner filed a Sur-Reply (Paper 15, "Sur-Reply").

Under 35 U.S.C. § 314 and 37 C.F.R. § 42.4(a), we have authority to institute an *inter partes* review if "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). After considering the Petition, the Preliminary Response, Reply, Sur-Reply, and the evidence of record, we determine the information presented shows a reasonable likelihood that Petitioner would prevail in establishing the unpatentability of at least one of the challenged claims of the '156 patent. Accordingly, we institute an *inter partes* review of claims 1–8, 16, and 33 of the '156 patent on the grounds asserted in the Petition.

## II. BACKGROUND

### A. Related Matters

The parties identify the following district-court proceeding as a related matter involving the '156 patent: *Singular Computing LLC v. Google LLC*, No. 1:19-cv-12551-FDS (D. Mass.). Pet. xi; Paper 6, 1 (Patent Owner's Mandatory Notices). The '156 patent is also subject to a Petition for *inter partes* review in IPR2021-00164. Pet. x; Paper 6, 1. The following Board proceedings involve the same parties and related patents: IPR2021-

IPR2021-00165
Patent 9,218,156 B2

00154 and IPR2021-00155 (U.S. Patent No. 10,416,961 B2); and IPR2021-00178 and IPR2021-00179 (U.S. Patent No. 8,407,273 B2). Pet. x–xi; Paper 6, 1.

Petitioner also identifies as related matters the following patent applications, which claim priority to the same provisional application as the '156 patent: U.S. Patent Application Nos. 14/976,852, 15/784,359, 16/175,131, 16/571,871, 16/675,693, 16/882,686, 16/882,694, and 17/029,780. Pet. x.

B. *Overview of the '156 Patent*

The '156 patent, entitled "Processing with Compact Arithmetic Processing Element," relates to "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)." Ex. 1001, code [54], 6:3–7.

According to the '156 patent, conventional CPU chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications. *Id.* at 3:11–26. For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations." *Id.* at 3:19–26. According to the '156 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million

IPR2021-00165
Patent 9,218,156 B2

transistors." *Id.* at 3:27–32. But "[c]urrent architectures for general purpose computing fail to deliver this power." *Id.* at 32–33.

The '156 patent is therefore "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at 2:15–22. According to the '156 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at 2:32–35. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at 2:40–43. Figure 6, reproduced below, is an example of an LPHDR arithmetic unit according to one embodiment of the '156 patent.



FIG. 6 provides "an example design for an LPHDR arithmetic unit according to one embodiment of" the '156 patent. Ex. 1001, 2:60–61.

IPR2021-00165
Patent 9,218,156 B2

As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces output 602c. *Id.* at 12:55–56. The LPHDR arithmetic unit "is controlled by control signals 412*a-d*, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602*a-b*." *Id.* at 12:62–65. According to the '156 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602*a-b* by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at 12:65–13:1. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at 13:4–13. The '156 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at 13:11–13.

According to the '156 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at 17:20–23. The '156 patent provides, as examples, applications including "finding nearest neighbors," *id.* at 17:31–21:26, "distance weighted scoring," *id.* at 21:28–22:17, and "removing motion blur in images," *id.* at 22:19–23:34.

   C.   *The Challenged Claims*

   Petitioner challenges claims 1–8, 16, and 33 of the '156 patent. Pet. 4–6. Of the challenged claims, claims 1, 16, and 33 are independent. Claim 1, reproduced below, is illustrative of the claimed subject matter.

   1. A device comprising:

   at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input

IPR2021-00165
Patent 9,218,156 B2

signal representing a first numerical value to produce a first output signal representing a second numerical value,

> wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

Ex. 1001, 29:54–30:6.

### D. Evidence

Petitioner submits the following evidence:

| Evidence | Exhibit No. |
|---|---|
| Declaration of Richard Goodin, P.E. | 1003 |
| U.S. Patent Appl. Pub. No. 2007/0203967 A1 (published Aug. 30, 2007) ("Dockser") | 1007 |
| Tong et. al., *Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic,* IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, 8(3):273–286 (June 2000) ("Tong") | 1008 |
| U.S. Patent No. 5,689,677 (issued Nov. 18, 1997) ("MacMillan") | 1009 |

IPR2021-00165
Patent 9,218,156 B2

E. *Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 16 | 103(a)[1] | Dockser |
| 1, 2, 16, 33 | 103(a) | Dockser, Tong |
| 1–8, 16 | 103(a) | Dockser, MacMillan |
| 1–8, 16, 33 | 103(a) | Dockser, Tong, MacMillan |

Pet. 4–6. Patent Owner disputes Petitioner's asserted grounds of
unpatentability. *See generally* Prelim. Resp.

### III. DISCUSSION

Petitioner contends that claims 1–8, 16, and 33 of the '156 patent are
unpatentable under 35 U.S.C. § 103 as obvious over various combinations of
prior-art references Dockser, Tong, and MacMillan. A patent claim is
unpatentable under § 103(a) if the differences between the claimed subject
matter and the prior art are such that the subject matter, as a whole, would
have been obvious at the time the invention was made to a person having
ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co.
v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is
resolved on the basis of underlying factual determinations, including (1) the
scope and content of the prior art; (2) any differences between the claimed
subject matter and the prior art; (3) the level of ordinary skill in the art; and

---

[1] Congress amended §§ 102 and 103, among other sections, when it
passed the Leahy-Smith America Invents Act ("AIA"). Pub. L. No. 112–29,
§ 3(c), 125 Stat. 284, 287 (2011). Here, Petitioner's challenges are based on
pre-AIA statutes. *See* Pet. 4.

IPR2021-00165
Patent 9,218,156 B2

(4) when in evidence, objective indicia of non-obviousness.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

We organize our patentability analysis into four sections. First, we address the level of ordinary skill in the art. Second, we address claim construction. Third, we provide an overview of the asserted references. And fourth, taking account of the information presented, we consider whether the Petition satisfies the threshold requirement for instituting an *inter partes* review under 35 U.S.C. § 314(a).

A. *Level of Ordinary Skill in the Art*

We consider the asserted ground of unpatentability in view of the understanding of a person of ordinary skill in the art. The level of ordinary skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis. *Al-Site Corp. v. VSI Int'l Inc.*, 174

---

[2] With respect to the fourth *Graham* factor, the parties at this time do not present arguments or evidence regarding objective indicia of non-obviousness. Therefore, the obviousness analysis at this stage of the proceeding is based on the first three *Graham* factors.

F.3d 1308, 1324 (Fed. Cir. 1999) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991)).

Relying on the declaration testimony of Mr. Goodin, Petitioner contends that an ordinarily skilled artisan for the '156 patent "would have had at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture." Pet. 8–9 (citing Ex. 1003 ¶¶ 43–44). Patent Owner does not address the level of ordinary skill in the art in its Preliminary Response. *See generally* Prelim. Resp.

Based on the record presented, including our review of the '156 patent (including the types of problems and solutions described in the '156 patent), and cited prior art, we agree with Petitioner's proposed definition of the level of ordinary skill in the art with one exception. Arguably, the term "at least" creates unnecessary ambiguity. Thus, we delete that term from Petitioner's definition, and otherwise apply Petitioner's definition for this decision. *See, e.g.*, Ex. 1001, 1:31–2:10 (describing in the "Background" section of the '156 patent various conventional methods of computation and their alleged deficiencies).

*B. Claim Construction*

In interpreting the claims of the '156 patent, we "us[e] the same claim construction standard that would be used to construe the claim[s] in a civil action under 35 U.S.C. [§] 282(b)." 37 C.F.R. § 42.100(b) (2020). The claim construction standard includes construing claims in accordance with the ordinary and customary meaning of such claims as would have been

understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. *See id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc).

Petitioner contends that the terms of the challenged claims should be "given their ordinary and customary meaning as understood by a [person of ordinary skill in the art] in accordance with the specification and prosecution history," but does not propose any express interpretations. Pet. 9. Patent Owner disputes the construction of "low precision high dynamic range (LPHDR) execution unit" that Petitioner proposed in the related district court proceeding (i.e., "low precision and high dynamic range processing element designed to perform arithmetic operations on numerical values"). Prelim. Resp. 13–14 (citing Ex. 2001, 13–17 (emphasis omitted)). Patent Owner argues that Dockser does not teach an LPHDR execution unit because "the processing element itself must be fairly characterized as 'low precision'" and cannot be an execution unit "whose subprecision can be selectively reduced." *Id.* at 14 (emphasis omitted). We conclude that no terms require express interpretation at this time, and address the parties' arguments regarding whether Dockser teaches the recited LPHDR execution unit below. *See infra* § III.D.

## C. The Asserted Prior Art

Before turning to Petitioner's asserted grounds of unpatentability, we provide a brief summary of the asserted references.

### 1. Dockser

Dockser discloses performing floating-point operations with a floating-point processor having selectable precision. Ex. 1007, code (57). Figure 1 of Dockser is reproduced below.

IPR2021-00165
Patent 9,218,156 B2



FIG. 1

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

Figure 2 of Dockser is reproduced below.

IPR2021-00165
Patent 9,218,156 B2



**FIG. 2**

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the

IPR2021-00165
Patent 9,218,156 B2

9 commonly significant bits (MSBs) of the fraction are required; the hidden
or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the
floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the
floating-point operator 140 that remains unused as a result of the
subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, *see also* Fig. 2 (depicting
mantissa fraction 206 as having portion 322 for powered bits and portion
324 for unpowered bits). Figures 3A and 3B of Dockser show such removal
of power to the floating-point operator logic for a floating-point addition and
floating-point multiplication operation, respectively. Figure 3B of Dockser
is reproduced below.



FIG. 3B

Figure 3A depicts k-bit multiplicand 402 and k-bit multiplier 404 to be
multiplied together "using a shift-and-add technique," where the
multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31.
A partial product 420-i is generated for every bit in multiplier 404 at
corresponding stage 410-i and then left-shifted "as a function of the
multiplier bit with which it is associated, after which the operation moves on
to the next stage." *Id.* ¶ 31. The partial products are eventually added

IPR2021-00165
Patent 9,218,156 B2

together to generate output value 430. *Id.* "[P]ower may be removed from the logic used to implement the stages to the right of the line 405" indicating the selected subprecision. *Id.* ¶¶ 32–33.

### 2. Tong

Tong describes reducing power consumption by minimizing the bitwidth representation of floating-point data. Ex. 1008, 273. According to Tong, using a variable bitwidth floating-point unit saves power. *Id.*

### 3. MacMillan

MacMillan describes using Single Instruction Multiple Data (SIMD) parallel-processing architectures for adding supercomputer performance to personal-use computers. Ex. 1009, 5:22–54. MacMillan's computer system comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access memory (SIMD-RAM) device. *Id.* at 9:30–31, Figs. 3, 5. MacMillan describes an example architecture where the SIMD-RAM device has 256 processing elements (PEs), but states that the disclosed architecture "allows scaling to higher or lower density chips with more or fewer PEs." *Id.* at 12:60–13:4, 13:39–41, 16:20–22.

### D. Alleged Grounds of Unpatentability

We now consider whether the Petition satisfies the threshold requirement for instituting an *inter partes* review under 35 U.S.C. § 314(a) by addressing each of Petitioner's asserted grounds of unpatentability, below.

### 1. Asserted Obviousness Over Dockser

Petitioner contends that claims 1, 2, and 16 of the '156 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Dockser. Pet. 9–40. Patent Owner opposes. Prelim. Resp. 8–24. On the present record, for the

reasons detailed below, we determine that Petitioner has shown sufficiently for institution that Dockser teaches or suggests the limitations of the challenged claims.

> a)  Claim 1

Petitioner argues that Dockser teaches or suggests all the limitations of claim 1.  Pet. 13–38.  Claim 1 recites "[a] device comprising:  at least one first low precision high dynamic range (LPHDR) execution unit."  Ex. 1001, 29:54–56.  Petitioner contends that Dockser teaches a "device" (i.e., computing system) comprising a "low precision high dynamic range (LPHDR) execution unit" (i.e., the FPP).[3]  Pet. 13–15.  With respect to "low precision," Petitioner contends that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP "operates with the minimum imprecision" required by the subsequent language in claim 1.  *Id.* at 14–15 (quoting Ex. 1007 ¶ 14).  With respect to "high dynamic range," Petitioner contends that the FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '156 patent.  *Id.* at 15 (citing Ex. 1007 ¶ 17; Ex. 1001, 14:56–64).

Claim 1 recites that the LPHDR execution unit is "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value."

---

[3] Petitioner also provides an "alternative mapping" where "the floating-point operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit.  Pet. 14–15, 19, 21, 37.  We need not evaluate those arguments at this time, because we determine that Petitioner has made a sufficient showing on the current record that the FPP is an LPHDR execution unit.

IPR2021-00165
Patent 9,218,156 B2

Ex. 1001, 29:56–59. Petitioner contends that Dockser's FPP is adapted to execute a "first operation" (e.g., "reduced-precision multiplication") on a "first input signal representing a first numerical value" (i.e., input electrical signal representing an operand received at the registers) to produce a "first output signal representing a second numerical value" (i.e., output electrical signal representing an operand sent to a register and then main memory), where the FPP "performs operations on the[] inputs via the FPP's data paths 134–139 and components 140–144." Pet. 15–19.

Next, claim 1 recites that the "dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000." Ex. 1001, 29:60–62. Petitioner contends that Dockser's "dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000," as recited in claim 1, because the FPP "operates on IEEE-754 32-bit single-format numbers having 8-bit exponents" and, therefore, the dynamic range of normal operands would be "from around $2^{-126}$ (much smaller than 1/65,000) to around $2^{127}$ (much larger than 65,000)." Pet. 20.

The next limitation of claim 1 recites that

for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

Ex. 1001, 29:62–30:4. We refer to this limitation as "the imprecision limitation." With respect to the "statistical mean" portion of the imprecision

16
APPX07676

IPR2021-00165
Patent 9,218,156 B2

limitation, Petitioner contends that an ordinarily skilled artisan would have understood the limitation

> in the context of the '156 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."

Pet. 22 (quoting Ex. 1001, 4:11–17, 14:19–64, 17:12–18).

Specifically, Petitioner contends that, for "non-deterministic embodiments," the statistical mean would be the average of "the different outputs produced by the same operation on the same input." *Id.* But for "deterministic digital embodiments" like Dockser, Petitioner contends that the statistical mean is "the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input." *Id.* at 23. Consequently, Petitioner contends, repeatedly executing a multiplication operation using Dockser's floating-point multiplier "on the same input (*i.e.*, pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.*

With respect to the "exact mathematical calculation" portion of the imprecision limitation, Petitioner contends that, because Dockser performs a reduced-precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation, namely "the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied without reducing precision." *Id.* at 24 (emphasis omitted).

With respect to the relative error (Y) for fraction of valid inputs (X) portion of the imprecision limitation, Petitioner contends that Dockser teaches "for at least X=5% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.05%" from the result of the exact mathematical calculation. *Id.* at 24–38. According to Petitioner, the "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception)." *Id.* at 25. Petitioner contends that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs, pointing to Dockser's description of retaining only some of the bits of a mantissa fraction (e.g., the 9 most-significant bits of a 23-bit fraction, as shown in Figure 2, above) and dropping the remaining "excess bits" (e.g., the other 14 bits). *Id.* at 25–26. Petitioner contends that Dockser teaches dropping the excess bits to reduce precision by either (1) "removing power from storage elements in the FPP's registers that correspond to the excess (dropped) mantissa bits," or (2) "removing power from elements within the multiplier logic that computes the product of the operand mantissas." *Id.* at 26. Petitioner contends that both techniques, used either individually or in combination, teach the recited imprecision. *Id.*; *see also id.* at 27–39. We determine that Petitioner has made a sufficient showing on the current record with respect to the first precision-reducing technique, and need not evaluate Petitioner's alternative arguments at this time.

Relying on the first technique and Dockser's example of retaining 9 mantissa bits and dropping 14 mantissa bits, Petitioner contends that an ordinarily skilled artisan "would have understood the output of unpowered storage elements would be tied to zero voltage (*e.g.*, ground), making those 14 'excess' bits zeroes." *Id.* at 29. Multiplying two operands with excess bits dropped, Petitioner contends, results in an output with reduced precision from the exact product, where the amount of error depends on the number of mantissa bits dropped. *Id.* at 30–31. Petitioner contends that an ordinarily skilled artisan would have understood, by "straightforward math" described in Appendix I.A to the Petition, that "the relative error (the claimed 'Y' percentage) of any floating-point number output from Dockser's reduced-precision multiplication is the same as the relative error of its mantissa, independent of its exponent and sign." *Id.* at 31.

Petitioner then provides a detailed explanation as to why a person of ordinary skill in the art would have understood Dockser as teaching the recited X and Y percentages of claim 1. *Id.* at 31–32. First, Petitioner contends that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), [an ordinarily skilled artisan] would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 32. Petitioner contends that Mr. Goodin wrote such a program to perform reduced-precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least

IPR2021-00165
Patent 9,218,156 B2

Y=0.05% relative error for 92.1% of possible valid inputs (greater than X=5%)." *Id.* at 32–33, 66–68 (citing Ex. 1003 ¶¶ 284, 414–428).

Second, Petitioner contends that an ordinarily skilled artisan "would also have understood algebraically that Dockser's register bit-dropping technique meets [the limitation], by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." *Id.* at 33. Petitioner contends that over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their eighth and ninth fraction bits," such that retaining only 9 mantissa bits of operands would result in "*every* input in that 12% produc[ing] at *minimum* 0.097% relative error." *Id.* at 33, 68–72 (citing Ex. 1003 ¶¶ 286, 429–448).

Claim 1 recites, in a final limitation, "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit." Ex. 1001, 30:5–6. Petitioner contends that Dockser's main processor meets the computing device limitation because the processor writes subprecision select bits to the FPP's control register. Pet. 38. Petitioner contends that, this way, Dockser's main processor is adapted to control the FPP's operation by specifying its precision level. *Id.* (citing Ex. 1007 ¶¶ 15, 18, 25, 35; Ex. 1003 ¶¶ 303–304).

Petitioner's contentions about claim 1 are supported by the testimony of Mr. Goodin. *See id.* at 9–38; Ex. 1003 ¶¶ 184–304.

  *b) Patent Owner's Response*

Patent Owner makes two arguments in its Preliminary Response disputing Petitioner's contentions about claim 1. Prelim. Resp. 8–24. We address each argument separately below.

IPR2021-00165
Patent 9,218,156 B2

*(1) LPHDR Execution Unit*

First, Patent Owner argues that Dockser's FPP is not a "low precision high dynamic range (LPHDR) execution unit" because it is also "capable of operating at full precision." Prelim. Resp. 11–12. According to Patent Owner, "Dockser discloses a 32-bit FPP that includes all of the circuitry needed for full precision arithmetic on data in IEEE 32-bit format, and also having additional circuitry allowing for selectable subprecisions." *Id.* at 11. As support for this reading of Dockser, Patent Owner points to statements in Dockser that precision "may" be reduced and that certain applications require "greater precision." *Id.* at 11–12 (citing Ex. 1007 ¶¶ 3, 14, 26, 28). Patent Owner also argues that Petitioner incorrectly focuses on whether the FPP is "capable of performing a few operations that are 'low precision'" in a "9-bit subprecision mode," rather than "whether the *execution unit itself* can be fairly characterized as being 'low precision.'" *Id.* at 13. Patent Owner argues that Dockser's FPP is "a full precision processor that—even when performing operations in reduced precision mode—includes all of the circuitry and capability needed to perform full precision operations." *Id.*

We have considered Patent Owner's arguments, but disagree on the current record. We understand Patent Owner's position as, to be an LPHDR execution unit, the execution unit must be capable of low-precision operations and nothing else. We are not persuaded, on this record, that the claim language is so limiting. Claim 1 recites a "device comprising: at least one first low precision high dynamic range (LPHDR) execution unit." Ex. 1001, 29:54–56. The only limitations on the execution unit recited in the claim are that the execution unit be "low precision," "high dynamic range," and "adapted to execute a first operation" meeting certain criteria specified

21

IPR2021-00165
Patent 9,218,156 B2

in the imprecision limitation (i.e., a minimum relative error Y for a
minimum fraction X of possible valid inputs in a specified dynamic range).
*Id.* at 29:55–30:4. As Petitioner points out, the claim does not recite any
structural characteristics of the execution unit and does not include any
negative limitation precluding the execution unit from performing other
types of operations. *See* Pet. 31 ("[c]laim 1 recites no *structural*
characteristics of the execution unit"); Reply 1–2 ("there is no negative
limitation in the claims"). The recitation of "a first operation" in claim 1
further requires only one or more first operations (that meet the low
precision criteria specified in the claim); it does not say that "every"
operation must be low precision or exclude other capabilities for other
operations. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356
(Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite
article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in
open-ended claims containing the transitional phrase 'comprising.'"). On
this record, we see no reason why the claim precludes the execution unit
from having additional circuitry for performing other types of operations, as
long as the execution unit is capable of performing the recited first operation
and meeting the criteria set forth in the imprecision limitation.

Petitioner has provided sufficient evidence, at this stage of the
proceeding, that Dockser performs operations at the precision level specified
in the imprecision limitation. Dockser's FPP "perform[s] certain
mathematical operations," such as "multiplication," at "reduced precision."
Ex. 1007 ¶¶ 1, 30–32. Specifically, Petitioner expressly identifies "reduced-
precision multiplication" as the "first operation" in Dockser. Pet. 15–20; *see
also* Prelim. Resp. 10 (acknowledging that Dockser's FPP performs "a

IPR2021-00165
Patent 9,218,156 B2

reduced-precision operation"), 11 (acknowledging that the FPP has "additional circuitry [that] allows the FPP to perform some operations with selectively reduced precision"). And Petitioner calculates the relative error for multiplication of all possible input operands when the operands have 9 retained mantissa bits and 14 dropped mantissa bits.[4] Pet. 24, 29–33. That is consistent with Dockser, which discloses a specific example of multiplying 23-bit operands having 9 retained mantissa bits and 14 dropped mantissa bits. Ex. 1007 ¶¶ 26, 29.

Importantly, as Patent Owner acknowledges, Dockser's example of 9-bit precision multiplication is a distinct operation from multiplication at other levels of precision. *See* Prelim. Resp. 20–21 (arguing that Dockser can "perform an addition operation $a+b$ in full precision mode, 22-bit mode, 21-bit mode, etc." and that "[e]ach of these operations is distinct, and generally produces different outputs, with some being more precise than others"). Dockser describes exactly how such multiplication is performed, and the functionality of the FPP differs depending on which level of precision multiplication is selected. *See, e.g.*, Ex. 1007 ¶¶ 30–34, Fig. 3B; Pet. 23–32. On this record, we find the fact that Dockser is capable of performing other, different operations (e.g., 23-bit full precision) does not detract from Dockser's disclosure of a specific example meeting the "low precision" requirements of the claim.

Patent Owner further argues that Petitioner fails to show that it would have been obvious to modify Dockser's FPP to be an LPHDR execution

---

[4] Accordingly, we do not agree with Patent Owner that Petitioner improperly made a new argument in its Reply that "multiplying two input values in a way that reduces precision down to 9 mantissa bits" constitutes a "first operation." Sur-Reply 2.

IPR2021-00165
Patent 9,218,156 B2

unit.  Prelim. Resp. 14–17.  Patent Owner contends that Dockser teaches

away from such a unit because

> rather than committing itself to performing low precision
> operations on a very high percentage of all possible valid inputs
> (in order to shrink the size of the execution unit), Dockser
> specifically teaches that its selectable precision (which means
> supporting full precision and programmability, both of which
> increase the size of the execution unit) is the key feature of the
> Dockser FPP.

*Id.* at 15 (citing Ex. 1007 ¶ 3).  According to Patent Owner, Dockser's FPP

"is more complex than conventional 32-bit microprocessors, not less," so an

ordinarily skilled artisan would not have been motivated to "reverse course"

and make it only capable of low precision operations.  *Id.* at 17 (emphasis

omitted).  As explained above, however, we disagree on this record with

Patent Owner's position that an LPHDR execution unit must be incapable of

anything other than low precision operations, and thus do not agree that a

modification to Dockser in that respect would have been necessary.  We

instead find Petitioner's analysis as to why an ordinarily skilled artisan

would have understood Dockser's FPP to be an LPHDR execution unit,

supported by the testimony of Mr. Goodin, sufficient at this early stage.

### (2) Imprecision Limitation

Second, Patent Owner argues that Dockser does not teach or suggest

the imprecision limitation because Petitioner fails to show that Dockser's

output over all "possible valid inputs" meets the limitation.  Prelim. Resp.

18–24 (emphasis omitted).  According to Patent Owner, "[t]he range of

possible valid inputs for Dockser" includes all possible IEEE 32-bit values

"across the entire range of the possible subprecision select bits," not just

operands with 9 retained mantissa bits and 14 dropped mantissa bits as

Petitioner discussed in the Petition.  *Id.* at 20.  Patent Owner argues that

IPR2021-00165
Patent 9,218,156 B2

Mr. Goodin's software program addresses "only a small subset of Dockser's possible valid inputs" and fails to account for "whether the imprecision limitation is met for subprecision select bits corresponding to any implementation where fewer than 14 bits are dropped." *Id.* In Patent Owner's view, the analysis of Dockser needs to take into account operations at "full precision mode, 22-bit mode, 21-bit mode, etc." *Id.* at 20–21.

We have considered Patent Owner's arguments, but disagree on the current record. The imprecision limitation recites that "for at least X=5% of the possible valid inputs to *the first operation*, the statistical mean, over repeated execution of *the first operation* on each specific input from the at least X% of the possible valid inputs to *the first operation*," "executing *the first operation* on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of *the first operation* on the numerical values of that same input." Ex. 1001, 29:62–30:4 (emphases added). The relevant inquiry thus looks at all possible valid inputs to the first operation— not all possible valid inputs to the LPHDR execution unit overall, or all possible valid inputs to other operations. Again, in its mapping of Dockser to claim 1, Petitioner expressly identifies "reduced-precision multiplication" as "the first operation." Pet. 15–20. Dockser discloses a specific example of multiplying operands having 9 retained mantissa bits and 14 dropped mantissa bits. Ex. 1007 ¶¶ 26, 30–34, Fig. 3B. The relevant possible valid inputs for assessing the imprecision limitation, therefore, are the inputs to that operation. On this record, we see no reason why the analysis of Dockser also needs to account for other operations, such as "full precision" multiplication, which Patent Owner acknowledges are "distinct" operations.

IPR2021-00165
Patent 9,218,156 B2

*See* Prelim. Resp. 21 ("Each of these operations is distinct, and generally produces different outputs, with some being more precise than others.").

Patent Owner also challenges Mr. Goodin's analysis as "impermissibly applying hindsight and using the claims as a roadmap" because "he opines that [an ordinarily skilled artisan] would operate Dockser with the *express goal* of dropping enough bits from the mantissa to meet the imprecision limitation." *Id.* at 16 (citing Ex. 1003 ¶¶ 280–281). We disagree based on the current record. The precision level of 9 retained mantissa bits and 14 dropped mantissa bits that Mr. Goodin analyzes was not chosen with the goal of meeting the imprecision limitation, but rather is the specific example described in Dockser. *See* Ex. 1003 ¶¶ 255, 269–270, 274–276. Mr. Goodin describes the calculations performed by his software program and explains why he believes that an ordinarily skilled artisan would have understood Dockser's description of multiplication at the 9-bit precision level teaches the imprecision limitation. *See id.* ¶¶ 281–286, 414–448. Further, Mr. Goodin cites extensively to language in Dockser describing reduced-precision multiplication in support of his opinions. *See id.* ¶¶ 248–259. At this stage of the proceeding, Patent Owner has not presented any evidence indicating that Mr. Goodin's calculations for Dockser's 9-bit precision level are factually incorrect. We have reviewed that supporting testimony and are persuaded, based on the current record, that an ordinarily skilled artisan would have understood Dockser to teach the imprecision limitation of claim 1.

    *c)*  *Claims 2 and 16*

We have reviewed Petitioner's contentions regarding claims 2 and 16 and are persuaded that Petitioner has made a sufficient showing at this stage

IPR2021-00165
Patent 9,218,156 B2

for those claims as well.  *See* Pet. 38–40.  Petitioner explains how each limitation of these claims is taught or rendered obvious by the disclosure of Dockser.  *Id.*  For example, claim 2 recites that "the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine."  Ex. 1001, 30:7–11.  As Petitioner notes, Dockser discloses a general purpose processor.  Ex. 1007 ¶ 35; *see* Pet. 39.

Petitioner's contentions are also supported by the testimony of Mr. Goodin and are persuasive based on the current record.  Pet. 38–40; Ex. 1003 ¶¶ 305–310. Patent Owner does not argue the challenged claims separately, only disputing Petitioner's arguments regarding independent claim 1.  *See* Prelim. Resp. 8–34. We disagree with Patent Owner's arguments based on the current record for the reasons explained above.  *See supra* § III.D.1.b.

> d)  *Summary*

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1, 2, and 16 are unpatentable over Dockser.

> 2.  *Asserted Obviousness Over Dockser and Tong*

Petitioner contends that claims 1, 2, 16, and 33 of the '156 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Dockser and Tong. Pet. 40–47.  Patent Owner opposes.  Prelim. Resp. 24–25.  On the present record, for the reasons detailed below, we determine that Petitioner has shown sufficiently for institution that Dockser combined with Tong teaches

27

IPR2021-00165
Patent 9,218,156 B2

or suggests the limitations of the challenged claims and provides sufficient reasoning for combining the references in the manner asserted.

*a) Claim 1*

Petitioner asserts that "Tong, like Dockser," "confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision."[5] Pet. 41–42 (citing Ex. 1008, 273–278; Ex. 1003 ¶¶ 312–313).

Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 42.



Fig. 6. Program accuracy across various mantissa bitwidths.

Tong's Figure 6 is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the

---

[5] Petitioner presents sufficient evidence on the current record to establish a reasonable likelihood that Tong is a prior art printed publication under 35 U.S.C. § 102(b). *See* Pet. 40–41 (citing Ex. 1025 ¶¶ 8–11; Ex. 1026, 27; Ex. 1027, 27).

horizontal axis.  Ex. 1008, 279.  The figure shows this data for five programs:  ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx.  *Id.*  The programs implement different signal-processing tasks.  *Id.* at 278 (Table IV).  ALVINN, for example, is a neural network trainer that uses backpropagation.  *Id.*  And Sphinx is a speech-recognition program.  *Id.*

For the ALVINN and Sphinx line plots in Tong's Figure 6, Petitioner adds a dashed red line extending vertically through the data points with a mantissa bitwidth of 5.  Pet. 42.  Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits."  *Id.* (quoting Ex. 1008, 278–279, 273, 282).  In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption.  *Id.* at 43.  Petitioner characterizes Tong as "[h]aving empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications."  *Id.* (citing Ex. 1008, 273, 274, 279, 284).

Petitioner contends that "Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx[]) would have motivated [an ordinarily skilled artisan] to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits."  *Id.* at 43–44.  According to Petitioner, an ordinarily skilled artisan would have done so "to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision using Tong's techniques."  *Id.* at 44 (citing Ex. 1003 ¶ 323).  Petitioner also contends that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular

IPR2021-00165
Patent 9,218,156 B2

application was a matter of routine optimization of a result-effective variable." *Id.* at 45 (citing Ex. 1003 ¶ 327).

In response, Patent Owner argues that Dockser is deficient for the same reasons discussed in connection with the challenge based on Dockser alone and that Tong does not remedy those deficiencies. Prelim. Resp. 24–25. In Patent Owner's view, Petitioner's Dockser-Tong analysis, like the analysis of Dockser alone, accounts for "only a cherry-picked subset of the 'possible valid inputs.'" *Id.* at 24 (citing Pet. 44–45). Patent Owner argues that Petitioner's analysis ignores the remaining possible valid inputs across all subprecision selections. *Id.* at 24–25.

Patent Owner's argument about all subprecision selections, however, does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP at a "selected precision level" according to Tong. *See* Pet. 43–45. Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." *Id.* Instead of addressing the analysis of Dockser at this selected precision level, Patent Owner's arguments focus on Dockser alone. *See* Prelim. Resp. 24–25.

Petitioner's relative-error analysis of the Dockser-Tong combination, though, is different from the one in the ground based on Dockser alone. *See* Pet. 44. In particular, Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. *Id.* (citing Ex. 1003 ¶ 324). Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits. *Id.* (citing Ex. 1003 ¶ 324). Because Petitioner's rationale relies on modifying Dockser based on Tong to have a

particular precision level, we are not persuaded at this stage that Petitioner's relative-error analysis is deficient for not considering all possible subprecision selections. *See* Prelim. Resp. 24–25; *supra* § III.D.1.b.2. (explaining why Petitioner's asserted ground based on Dockser alone is not deficient for failing to address all possible IEEE 32-bit values, rather than just operands with 9 retained mantissa bits and 14 dropped mantissa bits).

### b) Claims 2, 16, and 33

We have reviewed Petitioner's contentions regarding claims 2, 16, and 33, and are persuaded that Petitioner has made a sufficient showing at this stage for those claims as well. *See* Pet. 43–47. Petitioner explains how each limitation of these claims is taught or rendered obvious by the disclosure of Dockser or the combination of Dockser and Tong. *Id.* Petitioner's contentions are also supported by the testimony of Mr. Goodin and are persuasive based on the current record. Pet. 38–40; Ex. 1003 ¶¶ 321–335. Patent Owner does not argue the challenged claims separately, only disputing Petitioner's arguments regarding independent claim 1. *See* Prelim. Resp. 8–34. We disagree with Patent Owner's arguments based on the current record for the reasons explained above. *See supra* § III.D.1.b.

Patent Owner makes an additional argument regarding independent claim 33, which recites a "device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising" an LPHDR execution unit having the same properties as recited in claim 1. Ex. 1001, 32:20–42. Patent Owner argues that an ordinarily skilled artisan "would not have been motivated to incorporate Tong's 'emulation' into the systems of Dockser" because "Tong

IPR2021-00165
Patent 9,218,156 B2

uses software emulation only for the purposes of *investigating* the behavior of *physical* devices." Prelim. Resp. 25 (citing Ex. 1008, 273, 278). We disagree based on the current record. Petitioner's position is that "Tong's teaching to 'emulate[] in software different bitwidth FP units' 'to determine application accuracy' . . . would have motivated [an ordinarily skilled artisan] to *emulate the Dockser/Tong device . . . in software* to assess the accuracy of applications running on the device at selected precision levels." Pet. 46 (quoting Ex. 1008, 278; citing Ex. 1003 ¶¶ 328–329) (emphasis added). Emulating the device of Dockser (modified based on Tong) in software appears, on this record, to be consistent with Tong, which describes the emulation of a floating-point (FP) device to determine "the relationship between program accuracy and number of bits in FP representation." Ex. 1008, 278. Based on the current record, we do not agree that Tong's disclosures regarding FP hardware would have dissuaded an ordinarily skilled artisan from making the combination that Petitioner proposes.

> c)  *Summary*

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1, 2, 16, and 33 are unpatentable over Dockser and Tong.

> 3.  *Asserted Obviousness Over Dockser and MacMillan*

Petitioner contends that claims 1–8 and 16 of the '156 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Dockser and MacMillan. Pet. 47–55. Patent Owner opposes. Prelim. Resp. 25–27. On the present record, for the reasons detailed below, we determine that Petitioner has shown sufficiently for institution that Dockser combined with MacMillan teaches or suggests the limitations of the challenged claims and

IPR2021-00165
Patent 9,218,156 B2

provides sufficient reasoning for combining the references in the manner asserted.

### a)   Claim 1

In this asserted ground, Petitioner relies on MacMillan for its teachings about multiple floating-point execution units and contends that it would have been obvious to implement a device with multiple Dockser FPPs operating in parallel.  Pet. 47–50.

Patent Owner argues that MacMillan does not remedy Dockser's deficiencies.  Prelim. Resp. 25–27.  Apart from this argument, Patent Owner does not present arguments specifically analyzing MacMillan as it is used in Petitioner's challenge to claim 1.  *Id.*  Rather, Patent Owner refers to the arguments regarding the challenge based on Dockser alone.  *Id.* at 25–26.  Thus, for the reasons discussed in connection with the asserted ground based on Dockser alone, and because we conclude that Petitioner has made a sufficient showing of obviousness based on the combination with MacMillan, we determine on this record that Petitioner has shown a reasonable likelihood of prevailing on its contention that claim 1 is unpatentable over Dockser and MacMillan.

### b)   Claim 3

Claim 3 depends from claim 1 and recites "wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  Ex. 1001, 30:13–17.  Petitioner contends that MacMillan teaches 256 processing elements (PEs), and the Dockser-MacMillan combination would have "a single Host CPU and at least one

FPP in each PE (of which there are at least 256)." Pet. 52 (citing Ex. 1003 ¶¶ 361–362). Thus, in Petitioner's proposed combined device based on Dockser and MacMillan, the number of LPHDR execution units (Dockser FPPs) "exceeds by over 100 its number (one) of traditional-precision execution units (the single Host CPU floating-point unit)." *Id.* at 52–53 (citing Ex. 1003 ¶ 366).

Patent Owner argues that "Dockser and MacMillan cannot possibly disclose the limitation of claim 3, even if one were to assume the Dockser FPP to be an LPHDR execution unit." Prelim. Resp. 27. Patent Owner argues that, because (1) Petitioner asserts that MacMillan's processor is the only execution unit (EU) for purposes of the claims, and (2) Dockser's FPPs are designed to perform multiplication on 32-bit numbers, "the number of claim 3 32-bit EUs in the Dockser/MacMillan combination must *always* be greater than or equal to the number of 'LPHDR' Dockser FPPs." *Id.*

But, under Petitioner's theory, the identified 32-bit EUs in claim 3 (i.e., "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide") are different from what Petitioner identifies as the LPHDR execution units (i.e., a Dockser FPP in each of the 256 (or more) PEs of MacMillan). *See* Pet. 51–52. Thus, under Petitioner's rationale, Dockser's FPPs do not count toward the number of 32-bit EUs in the Dockser-MacMillan combination. *See id.* Specifically, Petitioner has shown, on this preliminary record, that the claimed "low precision high-dynamic range (LPHDR) execution unit" at least encompasses Dockser's FPP. *See supra* § III.D.1.a. Petitioner contends that the '156 patent describes the LPHDR execution units as "sometimes" producing results that are different from the correct result, in

contrast to 32-bit EUs, which the '156 patent describes as "'traditional precision' execution units that do not 'sometimes' produce results different from the correct traditional-precision result." Pet. 52. Thus, if the proposed combination has 256 (or more) FPPs (LPHDR execution units) and one host CPU (the 32-bit EUs), the number of LPHDR execution units would be greater than the number of 32-bit EUs by the amount recited in claim 3.

Petitioner supports its contentions with respect to claim 3 with citations to the '156 patent. We preliminarily agree with Petitioner that the cited parts of the patent distinguish between the two sets of units. For example, the '156 patent describes the 32-bit arithmetic elements as "traditional" precision: "'arithmetic elements . . . designed to perform . . . floating point arithmetic with a word length of 32 or more bits' are 'designed to perform . . . arithmetic of traditional precision.'" Ex. 1001, 27:52–63). As for the LPHDR units, the paragraph cited by Petitioner explains how the precision may vary across implementations. *See id.* at 26:61–27:17. We preliminarily agree with Petitioner that all these embodiments, unlike the 32-bit arithmetic elements, are described as producing results that are "sometimes" or "all of the time" not closer than a certain amount to the correct result. *See* Pet. 52–53 (citing Ex. 1001, 26:39–49). Thus, Petitioner's distinction between the 256 (or more) FPPs and one host CPU in the proposed combination is consistent with the language of the challenged claims and adequately supported on this preliminary record.

   *c)*   *Claims 2, 4–8, and 16*

We have reviewed Petitioner's contentions regarding claims 2, 4–8, and 16 and are persuaded that Petitioner has made a sufficient showing at this stage for those claims as well. Pet. 50–51, 53–55. Petitioner explains

IPR2021-00165
Patent 9,218,156 B2

how each limitation of the dependent claims is taught or rendered obvious by the disclosure of Dockser and MacMillan. *Id.* Petitioner's contentions are supported by the Goodin Declaration and are persuasive based on the current record. Patent Owner does not argue claims 2, 4–8, or 16 separately. *See* Prelim. Resp. 24–27. We disagree with Patent Owner's arguments based on claim 1 for the reasons explained above. *See supra* § III.D.1.b.

### d) Summary

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1–8 and 16 are unpatentable over Dockser and MacMillan.

### 4. Asserted Obviousness Over Dockser, Tong, and MacMillan

Petitioner contends that claims 1–8, 16, and 33 of the '156 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Dockser, Tong, and MacMillan. Pet. 56–60. Patent Owner opposes. Prelim. Resp. 28–32. On the present record, for the reasons detailed below, we determine that Petitioner has shown sufficiently for institution that Dockser combined with Tong and MacMillan teaches or suggests the limitations of the challenged claims and provides sufficient reasoning for combining the references in the manner asserted.

### a) Claims 1–8, 16, and 33

Petitioner contends that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels. Pet. 56–57 (citing Ex. 1008, 278, Table IV). Petitioner contends that using Dockser's FPP with Tong's precision levels in MacMillan's multiple PEs would have achieved "supercomputer performance" while conserving power. *Id.* (citing Ex. 1003 ¶ 387).

IPR2021-00165
Patent 9,218,156 B2

In response, Patent Owner argues that "Petitioner relies on the same flawed reasoning as discussed [in the Preliminary Response] with respect to Dockser and Tong," but does not present separate arguments directed to the combination of Dockser, Tong, and MacMillan. Prelim. Resp. 28. We disagree with Patent Owner's arguments based on the current record for the reasons explained above. *See supra* §§ III.D.1, III.D.2. On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1–8, 16, and 33 are unpatentable over Dockser, Tong, and MacMillan.

b) *Petitioner's Alternative Interpretation of Claim 3*

Claim 3 depends from claim 1 and recites "wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device *adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide*." Ex. 1001, 30:13–17 (emphasis added). Petitioner provides an alternative interpretation of the "adapted-to" clause. Pet. 57–60. In particular, Petitioner argues that a unit could meet the adapted-to clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* at 58–60. Under this interpretation, Dockser's FPP would not be such a unit because it has registers and multiplier with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the adapted-to clause. *Id.* (citing Ex. 1003 ¶¶ 400–401). According to Petitioner, an ordinarily skilled artisan "would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision

levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'" *Id.* at 58.

Patent Owner argues that Petitioner does not provide a specific level of precision for its combination. Prelim. Resp. 31 (citing Pet. 58–59). Patent Owner argues that "Tong lists precisions ranging between 5 and 11 bits, but Petitioner does not state which, if any of those, [an ordinarily skilled artisan] would use." *Id.* at 32. In addition, Patent Owner argues that Petitioner does not show that, for example, one bit lower than full 32-bit operation would meet the claimed imprecision limitation. *Id.* at 31–32.

We have considered Patent Owner's arguments, but disagree on the current record. In its "alternative interpretation of claim 3," Petitioner states that the "selected precision levels are unchanged from [the other three asserted grounds]." Pet. 59. In the asserted ground based on Dockser and Tong, for example, Petitioner states that Tong's "teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx[]) would have motivated [an ordinarily skilled artisan] to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." *Id.* at 43–44. Petitioner also uses a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. *Id.* at 44 (citing Ex. 1003 ¶ 324). In at least this way, Petitioner has adequately explained, for institution and on this preliminary record, which of Tong's precision levels would be used in the proposed combination.

Patent Owner also argues that each reference teaches away from the proposed combination. Prelim. Resp. 30. In particular, Patent Owner argues

IPR2021-00165
Patent 9,218,156 B2

that (1) Dockser teaches away because "Dockser is directed entirely to selectable precision; and disparages the use of non-selectable precision units," (2) Tong teaches away because "Tong devotes much of its discussion to the benefits of variable or selectable precision," and (3) MacMillan teaches away because "MacMillan is primarily concerned with providing increased performance without increased cost." *Id.* at 30–31.

At this stage and on this record, we preliminarily determine that the references do not teach away from the claimed devices. The mere disclosure of more than one alternative does not constitute a teaching away. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Specifically, Patent Owner points to a statement that Tong makes about power savings: "This FP bitwidth reduction can deliver a significant power savings through the use of a variable bitwidth FP unit." Prelim. Resp. 31 (quoting Ex. 1008, 273). Yet Tong's statement does not discredit, criticize, or otherwise discourage the claimed invention's approach so as to teach away from it. *See Fulton*, 391 F.3d at 1201. Instead, the statement merely explains the benefits provided by Tong's alternative approach. Ex. 1008, 273.

Likewise, although Patent Owner argues the combination with MacMillan would increase manufacturing costs, Patent Owner does not provide sufficient evidence to support this position on this record. *See* Prelim. Resp. 31. Even assuming MacMillan warns against the costs, Patent Owner's argument is unsupported by any specific cost analysis. *Id.* To be sure, Patent Owner may introduce evidence that supports this argument during trial. We also note that the fact "[t]hat a given combination would not be made by businessmen for economic reasons does not mean that persons skilled in the art would not make the combination because of some

IPR2021-00165
Patent 9,218,156 B2

technological incompatibility," for example. *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983). But, at this stage and on this record, Patent Owner's argument is unpersuasive.

   *c)* *Summary*

  On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1–8, 16, and 33 are unpatentable over the combination of Dockser, Tong, and MacMillan.

## IV. CONCLUSION

  After considering the arguments presented in the parties' papers and the evidence of record, we determine that Petitioner has demonstrated at least a reasonable likelihood of success in proving that at least one claim of the '156 patent is unpatentable. Thus, we institute an *inter partes* review of all challenged claims (i.e., claims 1–8, 16, and 33) on all grounds set forth in the Petition. Our determinations at this stage of the proceeding are based on the evidentiary record currently before us. This decision to institute trial is not a final decision as to patentability of any claim for which we have instituted an *inter partes* review. *See TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) (noting that "there is a significant difference between a petitioner's burden to establish a 'reasonable likelihood of success' at institution, and actually proving invalidity by a preponderance of the evidence at trial"). We will base any final decision on the full record developed during trial.

40

IPR2021-00165
Patent 9,218,156 B2

## V. ORDER

Accordingly, it is

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review is instituted for claims 1–8, 16, and 33 of the '156 patent on the unpatentability grounds asserted in the Petition; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial, which commences on the entry date of this decision.

IPR2021-00165
Patent 9,218,156 B2

FOR PETITIONER:

Elisabeth Hunt
Richard Giunta
Anant Saraswat
WOLF, GREENFIELD & SACKS P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent Rubino
Enrique Iturralde
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com

42

IPR2021-00165
PATENT NO. 9,218,156

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 9,218,156
Filing Date: March 25, 2013
Issue Date: December 22, 2015

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

---

**PATENT OWNER'S RESPONSE**

Case No. IPR2021-00165

---

### 1. Dockser's FPP is not an "LPHDR execution unit"

As discussed above, Dockser's FPP is not a "low precision high dynamic range (LPHDR) execution unit," as recited in all challenged independent claims under Ground 3, because it does not "execute arithmetic operations "*only* at low precision and with high dynamic range." Khatri, ¶ 83. Petitioner does not argue that MacMillan remedies this deficiency.

### 2. Dockser and MacMillan Fail to Disclose "wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide"

Even if the teachings of Dockser and MacMillan were combined to produce a device with, for example, 256 Dockser units operating in parallel, such a device would fail to meet the "exceeds" limitation of claims 3-8. Khatri, ¶ 84.

The "exceeds" limitation requires that the "number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of

multiplication on floating point numbers that are at least 32 bits wide."[2]  *Id.*, ¶ 85.

As shown below, Dockser's FPP is adapted to execute at least the operation of

multiplication on floating point numbers that are at least 32 bits wide.  *Id.*

Therefore, even if Dockser's FPP were an LPHDR execution unit (which it is not,

under the proper proposed construction of that term) the Dockser/MacMillan

combination cannot meet claim 3's "exceeds" limitation, because those same

"Dockser LPHDR execution units" would also be "adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits

wide," meaning that the number of LPHDR execution units will never exceed the

number of claim 3 full-precision multiplication execution units.  *Id.*, ¶ 86.

> **(a)    *Dockser's FPP Is a Claim 3 EU Because It Is Adapted to Execute at Least the Operation of Multiplication on Floating Point Numbers That Are at Least 32 Bits Wide***

There is no dispute that Dockser is an execution unit.  Pet., 13.  And there

can be no reasonable dispute that Dockser is adapted to execute at least the

---

[2] For clarity, Patent Owner refers to "execution units in the device adapted to

execute at least the operation of multiplication on floating point numbers that are at

least 32 bits wide" as "claim 3 full-precision multiplication execution units."

operation of multiplication on floating point numbers that are at least 32 bits wide

under the plain meaning of the term.[3]  Goodin Dep. 23:17-22; Khatri ¶¶ 90-91.

Dockser discloses that its FPP takes input operands that are 32 bits wide and

stores them in IEEE-754 format.  *See e.g.*, Dockser, ¶ [0017] ("Each register

location 200 is configured to store a 32-bit binary floating-point number, in an

IEEE-754 32-bit single format.")  Khatri, ¶ 92.  Dockser also discloses that its FPP

includes "a floating-point multiplier (MUL) 144 configured to execute floating-

point multiply instructions."  Dockser, ¶ [0019]; Khatri, ¶ 92.  These points are not

in dispute; Petitioner and its expert both admitted as much.  Reply at 2; Goodin

Dep. at 36:16-21; 38:18-39:15.

Nothing more is required for a Dockser FPP to be "adapted to execute at

least the operation of multiplication on floating point numbers that are at least 32

bits wide."  *See In re Man Machine Interface Techs. LLC*, 822 F.3d 1282, 1286

(Fed. Cir. 2016) ("[T]he phrase 'adapted to' generally means 'made to,' 'designed

---

[3] Petitioner and Patent Owner agree that "adapted to execute at least the operation

of multiplication on floating point numbers that are at least 32 bits wide" means

that the execution unit performs multiplication in "traditional"—*i.e.*, full—

precision.  Pet., 52.

to,' or 'configured to,' though it can also be used more broadly to mean 'capable of' or 'suitable for.'"); Khatri, ¶ 92.

Therefore, even if Dockser's FPP is an "LPHDR execution unit" (as Petitioner incorrectly argues), the Dockser/MacMillan device would still fail to satisfy the "exceeds" limitation.  Khatri, ¶ 93.  In one example, the Dockser/MacMillan device would have 256 LPHDR execution units (counting each Dockser FPP as an "LPHDR execution unit").  However, because each Dockser FPP is also "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," the Dockser/MacMillan device would therefore also have <u>at least</u> 256 execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  *Id.*  As a result, the Dockser/MacMillan would not meet the "exceeds limitation."  *Id.*

> **(b)      Petitioner's Interpretation of "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" Is Inconsistent with the Specification and Wrong**

Petitioner attempts to put Dockser's FPP outside of the "exceeds" limitation by arguing that units are claim 3 full-precision multiplication execution units ***only if*** they are "'traditional precision' execution units that do not 'sometimes' produce

results different from the correct traditional-precision result." Pet., 52. The Board

preliminarily accepted this argument.

Petitioner's implicit construction of "adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

is inconsistent with the plain and ordinary meaning of the claim and at odds with

the specification. Khatri, ¶¶ 94-95. The Board should thus reject it.

A POSA would understand this term to include all units in the device that

are designed to perform "multiplication on floating point numbers that are at least

32 bits wide," even if those units can perform other operations as well.[4] *Id.*, ¶ 95.

---

[4] While the term at issue here includes the phrase "adapted to," Patent Owner's

construction does not depend on any particular construction of this term.

Depending on context, "adapted to" can be construed broadly (to mean "capable

of") or narrowly (to mean "designed to"). *See In re Giannelli,* 739 F.3d 1375,

1379 (Fed. Cir. 2014); *see also In re Man Machine Interface Techs. LLC*, 822 F.3d

at 1286 (citations omitted). In this situation, both of these constructions boil down

to the same thing: if a unit is "capable of" performing 32-bit multiplication, then it

is "designed to" perform 32-bit multiplication—the ability to perform full-

precision multiplication is not something that happens by accident.

First, Petitioner's interpretation directly contradicts the claim language itself which encompasses every execution unit adapted to perform "*at least*" the operation of 32-bit multiplication. Khatri, ¶ 96. Petitioner not only ignores this inclusive language, but also proposes a construction that would explicitly *exclude* units adapted to perform additional operations. *Id.*

Second, Petitioner's interpretation contradicts the teachings of the specification. *Id.*, ¶ 97. For example, while the specification does not disclose an execution unit that can be both a claim 3 full-precision multiplication execution unit and an LPHDR execution unit, it *does* disclose an execution unit that can be both a claim 3 full-precision multiplication execution unit and *a* unit (which is not an LPHDR execution unit, as explained below) that 'sometimes' produces results different from the correct traditional-precision result:

> "When a graphics processor includes support for 16 bit floating point, that support is alongside support for 32 bit floating point . . . That is, the 16 bit floating point format is supported for those applications that want it, but the higher precision formats also are supported because they are believed to be needed for traditional graphics applications and also for so called "general purpose" GPU applications. Thus, *existing GPUs devote substantial resources to 32 . . . bit arithmetic and are wasteful of transistors* . . . ."

'156 Patent, 5:36-45; Khatri, ¶ 97.

A POSA would understand that the "graphics processor" described in the passage above includes multiple execution units operating in parallel, each of which can be configured to perform both full-precision ("32 bit floating point") and half-precision ("16 bit floating point") operations. Khatri, ¶ 98. Such execution units are *both* "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" *and* "capable of performing *"*operations that 'sometimes' produce results different from the correct traditional-precision result" (*i.e.*, half-precision operations that produce results in the "16 bit floating point" format often referred to as "fp16," which is not to be confused with the earlier-mentioned bfloat16/bf16 (*brain* float 16) format used by Google's products). *Id.*

As the passage explains, these execution units are "wasteful of transistors" because, like the execution units of Dockser and Tong, they retain the *capability* of performing 32-bit multiplication, even if they can be configured to "sometimes" operate at lower precisions. *Id.*, ¶ 99. A POSA would understand that such conventional execution units having full-precision *capability* (whether or not they execute other precision operations) are precisely what the "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" limitation of claim 3 is intended to capture, and more importantly, precisely what distinguishes these conventional execution units from "LPHDR

execution units" that perform *only* low-precision arithmetic operations (and thus use "a small amount of resources") in claim 3. '156 Patent, 8:9-12; Khatri, ¶ 99.

More generally, the specification describes claim 3 full-precision multiplication execution units only by reference to their "high dynamic range arithmetic of traditional precision."  *See* '156 Patent at 28:9-16; *see also id.* at 28:9-67; Khatri, ¶ 100.  Nowhere does the specification ever preclude a claim 3 full-precision multiplication execution unit from being able to produce incorrect results.  *Id.*  Petitioner imports that requirement from a completely different section of the patent, taken completely out of context.  *See* Pet., 54 (citing '156 Patent, 26:61-27:4); Khatri, ¶ 100.  That section uses "sometimes" to describes the imprecision limitation of an LPHDR execution unit, as expressed in the X=5% limitation of the Challenged Claims.  That section says nothing about claim 3 full-precision multiplication execution units.  *See* '156 Patent, 26:61-27:4; Khatri, ¶ 100.

Petitioner's argument tacitly hinges on the idea that if a component is an LPHDR execution unit (*i.e.*, the Dockser FPP as construed by Petitioner, not as construed by Patent Owner), it cannot also be a claim 3 full-precision multiplication execution unit.  Pet., 54.  That is, Petitioner tacitly argues that one device—the Dockser FPP—cannot meet two limitations in a claim.  But the law is clear that the same structure can meet two limitations.  *See, e.g., Applied Med. Res.*

*Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use

of two terms in a claim requires that they connote different *meanings,* not that they

necessarily refer to two different *structures.*") (emphasis in original).  Therefore,

even if the Dockser FPP were an "LPHDR execution unit" (which it is not), it

would *still* be a claim 3 full-precision multiplication execution unit for the reasons

explained above.

<div style="text-align:center"><em>(c)    A POSA Would Not Combine Dockser with<br>MacMillan</em></div>

Even if the combination of Dockser and MacMillan had all the elements of

the Challenged Claims – which it does not, for the reasons explained above – a

POSA would not make that combination because it would not be operable for its

intended purpose.  Khatri, ¶ 101.

Dockser is focused on the objective of reducing power consumption and is

not in any way concerned with the objective of achieving high compute scale,

while MacMillan is focused on a parallel architecture that increases computational

power, and not focused on reducing power consumption (indeed, MacMillan's

only reference to power consumption relates to heat dissipation inside the

"cabinet" of a workstation).  *See* MacMillan, 3:4-6; Khatri, ¶ 102.

Incorporating Dockser's FPPs into MacMillan would also defeat

MacMillan's stated objective of achieving a high-scale SIMD computer

architecture at "lower system cost."  *See* MacMillan, 5:58-59 ("The invention of

this shared memory results in lower system cost . . . ."); Khatri, ¶ 103.  As

explained above, Dockser's FPPs are even _larger_ than traditional full-precision

execution units because of the control circuitry needed to implement the selectable

subprecision modes.  *Id.*; Goodin Dep. 70:6-12 (explaining that Dockser does not

reduce space compared to conventional units), 43:21-45:9 (additional circuitry

required to reduce precision).  As a result, replacing the full-precision execution

units of MacMillan with Dockser FPP units would require additional circuitry and

chip space and would therefore *increase* costs, while providing no benefit.  Khatri,

¶ 104.  A POSA would not be motivated to destroy the objectives of the prior art.

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016); *Chemours Co.

FC, LLC v. Daikin Indus., Ltd.*, No. 2020-1289, 2021 WL 3085514, at *4-*5 (Fed.

Cir. July 22, 2021).

> **3.    Dockser/MacMillan Fails to Disclose or Render
> Obvious "at least one first computing device adapted
> to control the operation of the at least one first
> LPHDR execution unit"**

Claim 1 (and therefore its dependent claims 2-8) require "at least one first

computing device adapted to control the operation of the at least one first LPHDR

execution unit."  Claim 2 further requires that the computing device "comprises at

least one of a central processing unit (CPU), a graphics processing unit (GPU), a

field programmable gate array (FPGA), a microcode-based processor, a hardware

sequencer, and a state machine."  Petitioner identifies MacMillan's "Host CPU" as

the "computing device adapted to control the operation of the at least one first

LPHDR execution unit."  Pet., 49-51; Khatri, ¶ 87.

However, MacMillan makes clear that the SIMD Controller, not the Host

CPU, controls the operation of the PEs.  MacMillan, 13:35-36 ("Since the PEs

operate under the control of the SIMD Controller . . . ."); 8:1-10 (explaining that

SIMD Controller "contains the program counter used to step through the list of

instructions that may include instructions to be executed by the PEs"); 10:65-11:5

("The SIMD Controller 252 then executes the SIMD program."); 10:3-16; Khatri,

¶ 88.  Indeed, while the PEs are executing, the SIMD Controller takes control of

the host bus; thus there is no way for the Host CPU to control (or even

communicate with) the PEs.  MacMillan, 10:53-11:5; Goodin Dep. 126:3-129:6;

142:14-143:21; Khatri, ¶ 88.  Not only is the Host CPU not disclosed as controlling

the PEs, it is merely optional.  Goodin Dep., 116:6-18; Khatri, ¶ 88.

Petitioner's expert, Mr. Goodin, agreed that the SIMD Controller controls

the operation of the PEs.

> Q. And MacMillan says that the processor elements are controlled by
> the SIMD controller?
> A. Yes, that's correct, that the processing elements are controlled by
> the SIMD controller 252.

Goodin Dep., 124:18-22.

Since Petitioner has provided no other argument with respect to the

"computing device adapted to control" limitation as recited in claims 1-8,

Petitioner has failed to show that claims 1-8 are obvious over Dockser and

MacMillan.  *See* Pet., 52-53, 56-57. Khatri, ¶ 89.

**D.      Ground 4: Claims 1-8, 16, and 33 Are Not Obvious Over Dockser in View of Tong and MacMillan**

As discussed above with respect to Grounds 2 and 3, the combination of

Dockser, Tong, and MacMillan does not disclose or render obvious an LPHDR

execution unit.  Similarly, as set forth with respect to Ground 3, the combination

does not disclose or render obvious the "at least one first computing device"

limitation.  Finally, as set forth with respect to Ground 2, Tong does not teach

using only 5 bits of mantissa.  Petitioner sets forth no further argument or evidence

with respect to any of these limitations.

**1.      The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation**

Even under Petitioner's construction of "LPHDR execution unit," the

combination of Dockser, MacMillan, and Tong would still fail to satisfy the

"exceeds" limitation.  As explained above, each Dockser FPP, even when

operating at 5-bit precision, is an "execution unit[] adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits

wide."  Thus, even under Petitioner's construction, a device with 256 (or any

number) Dockser FPPs operating at 5-bit precision would have *at least* as many

full-precision units as "LPHDR execution units."  Khatri, ¶¶ 105-06.

### 2. A POSA Would Not Combine Tong, Dockser, and MacMillan

A POSA would not be motivated to combine the teachings of Dockser,

MacMillan, and Tong.  As explained above, a person of ordinary skill in the art

would not have been motivated to incorporate Dockser's FPP into MacMillan, nor

to combine Dockser with Tong.  Khatri, ¶ 107.  Tong supplies no additional

motivation to combine the teachings of Dockser and MacMillan.

## VII. PETITIONER'S "ALTERNATIVE" ARGUMENT REGARDING CLAIMS 3-8 FAILS

Recognizing that a system with Dockser's FPPs can never meet the

"exceeds" limitation, Petitioner posits that it would be obvious to completely

redesign Dockser's FPP to carve out all support for its basic and default mode,

namely full-precision operation (*see supra* Section VI.A.1).  Specifically,

Petitioner posits that it would be obvious to cleave off parts of Dockser's 32-bit

register file to achieve some unspecified lesser bit-width, and further perform some

unspecified modification to Dockser's multiplier logic "to have only as many logic

and Tong happen to mention "signal processing." Khatri, ¶¶ 108-09. Petitioner concocted this convoluted and implausible scenario in an attempt to sidestep the Dockser FPP's full-precision capabilities.

> **A.     A POSA Would Not Be Motivated to Combine Dockser, MacMillan, and Tong under Petitioner's "Alternative" Argument**

Petitioner's assertion that a POSA would have been motivated by Tong to remove the full-precision capabilities of Dockser is wholly without merit.

Petitioner's argument is based on a fragment of a sentence in Tong, taken out of context to insinuate that full-precision operation "is not essential" to the functioning of a Tong or Dockser system. Pet., 58.

In fact, Tong teaches the opposite. Khatri, ¶¶ 110-111. Tong admits that there are "scientific programs" that "require a huge amount of precision" (Tong, 279), and broadly teaches that "it appears *inevitable* that some fraction of our operands will require full IEEE-standard precision." Tong, 280; Khatri, ¶ 111. Instead, like Dockser, Tong teaches systems that always have *both* full- and reduced-precision capabilities. *See*, *e.g.*, Tong, 282 (even when describing a device that has reduced precision units, it describes that system as "including *both* full and reduced precision FP units and using appropriate sleep-mode circuit techniques to shut down the unused unit."); Khatri, ¶ 111. With this teaching in hand, a POSA would not cleave off parts of Dockser's 32-bit register file to

achieve some unspecified lesser bit-width smaller execution unit, without also importing the Tong "full precision FP." *See generally* Tong; Khatri, ¶ 111.

In view of the above, it is clear that a person of ordinary skill would not be motivated by Tong to remove the full-precision capabilities of the Dockser units. Khatri, ¶ 112.  On the contrary, Tong would only have *reinforced* the teaching of Dockser that, while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision.  *See*, *e.g.*, Dockser, ¶ [0003]; Khatri, ¶ 112.  Similarly, Petitioner's "alternative" argument runs contrary to the teachings of Dockser and MacMillan.

Specifically, Dockser's objectives are fundamentally directed away from Petitioner's proposed "alternative" combination.  As discussed above, it is undisputed that Dockser is devoted solely to a general processor with selectable precision.  Khatri, ¶ 113.

Nowhere, however, does Dockser teach, or even suggest, removing its full-precision capabilities.  Khatri, ¶ 114; Goodin Dep. 38:3-8.  A Dockser FPP is described as always needing to support a range of selectable precisions including full precision.  Adjusting Dockser by removing its full-precision capacity violates a central tenet of Dockser—to always be able to execute full-precision operations. Khatri, ¶ 114; Dockser, ¶ [0003].  Indeed, Mr. Goodin explained that "Dockser

*requires* selectable subprecision." Goodin Dep. at 56:2-12; 57:4-12. *See also id.*

at 38:3-8 ("I don't believe Dockser discloses any embodiments without floating-

point – without selectable precision."). Mr. Goodin also explained that he did not

provide any opinions where Dockser was limited to a single subprecision. *Id.*

69:17-70:18 ("That certainly isn't part of my opinions in my declaration."). It is

not obvious to remove a reference's inventive concept—in this case supporting a

range of selectable precisions including full precision—in an attempt to meet a

challenged claim. *Chemours Co.*, 2021 WL 3085514, at *5 (reversing Board

judgment of obviousness where proposed combination "would necessarily involve

altering the inventive concept" of the prior art reference). Cleaving off circuitry

from Dockser in an alleged combination with Tong contradicts the inventive

concept of Dockser (as well as of Tong, as described in the previous subsection)

and could only be the product of impermissible hindsight. Khatri, ¶ 114.

As for MacMillan, it warns that "[t]o meet the cost objectives, the SIMD

capabilities ***should not add significant complexity*** to the architecture of a

computer system for personal use." MacMillan, 5:42-44. Petitioner's proposed

combination, which requires special, customized registers, logic elements,

arithmetic units, and programming models (see next subsection), would increase

manufacturing costs and goes directly against the teachings of MacMillan which

relies on operating with conventional components to reduce cost.  See Khatri,

¶ 115.  *E.g.*, MacMillan, 6:24-26, 34-36.

## B.    Google Has Failed to Show That the "Alternative" Combination Would Meet the Imprecision Requirements of Claims 3-8

Petitioner has not even attempted to show that the resulting combination

would meet the imprecision limitations.  Petitioner merely states that the "selected

precision levels are unchanged from Grounds 1-3."  Pet., 59.  However, as shown

above, Tong suggests 11 bits of precision for specific signal processing

applications, and Petitioner provides no analysis of whether 11 bits of precision

would meet the imprecision limitation.  *See id.* Khatri, ¶ 116.

## C.    POSA Would Not Have Recognized the Utility of Petitioner's "Alternative" Combination of Dockser, MacMillan, and Tong

Finally, a POSA would not have recognized the utility of Petitioner's

"alternative" combination of Dockser, MacMillan, and Tong because the combined

prior art references do not teach or suggest that it would be possible to write

programs that run efficiently on a Dockser/MacMillan/Tong device.  Khatri, ¶ 117.

As the '156 Patent explains, "programmers have come to think in terms of

high precision and to develop algorithms based on the assumption that computer

processors provide such precision . . . ."  '156 Patent, 5:63-67.  The notion that

low-precision computers can be programmed "is not obvious, and in fact has been

## VIII.  OBJECTIVE INDICIA OF NON-OBVIOUSNESS SUPPORT THE VALIDITY OF THE CLAIMS

Overwhelming evidence of objective indicia of non-obviousness—including skepticism, praise, unexpected results, commercial success, and outright copying of the claimed invention—confirms that the challenged claims are not obvious over the prior art references cited by Petitioner.

### A.    Legal Standard

"The objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).  "[W]e have repeatedly stressed that objective considerations of non-obviousness must be considered in *every* case."  *Id.*  Indeed, "[s]econdary considerations evidence can establish that 'an invention appearing to have been obvious in light of the prior art was not' and may be 'the most probative and cogent evidence in the record.'" *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013).

Objective indicia of non-obviousness include skepticism, praise, unexpected results, copying, and commercial success.  *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

"For secondary considerations to have probative value, the decision maker must determine whether there is a nexus between the merits of the claimed

IPR2021-00165
PATENT NO. 9,218,156

invention and the secondary considerations." *Ashland Oil, Inc. v. Delta Resins &*

*Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985).

**B.    Google's Initial Skepticism of the Invention Shows Non-Obviousness**

"Evidence of industry skepticism weighs in favor of non-obviousness.  If

industry participants or skilled artisans are skeptical about whether or how a

problem could be solved or the workability of the claimed solution, it favors non-

obviousness.  Doubt or disbelief by skilled artisans regarding the likely success of

a combination or solution weighs against the notion that one would combine

elements in references to achieve the claimed invention."  *WBIP*, 829 F.3d at 1335-

36; *see also e.g.*, *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377-

78 (Fed. Cir. 2019) ("Evidence of industry skepticism is a question of fact that

weighs in favor of non-obviousness.").

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00165
PATENT NO. 9,218,156

50

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00165
PATENT NO. 9,218,156

CONFIDENTIAL MATERIAL REDACTED

[REDACTED]

**CONFIDENTIAL MATERIAL REDACTED**

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ is evidence that the Challenged Claims are not

obvious. There is a clear nexus between these statements and the Challenged

Claims. Khatri, ¶ 123. They were written in response to Dr. Bates's disclosure of

the invention, as explained above. *Id.* Further, they express skepticism about

utility of the low-precision arithmetic performed by the large numbers of low-

precision execution units, which is a key feature of the '156 Patent claims.

### C.    Praise From Leaders in the Field Shows Non-Obviousness

Praise of the invention by others is another objective indicator of non-

obviousness. *Mintz*, 679 F.3d at 1379.

As Dr. Bates' ideas circulated more broadly ██████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

**CONFIDENTIAL MATERIAL REDACTED**

<div align="right">IPR2021-00165<br>PATENT NO. 9,218,156</div>

[REDACTED]

There is a clear nexus between the praise cited above and the Challenged

Claims. It relates directly to [REDACTED]

[REDACTED]

### D.    The Invention Is Not Obvious Because It Yields Unexpected Results

Unexpected results are further evidence of non-obviousness. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) ("Of particular importance beyond the prima facie analysis, this court also detects evidence of objective criteria showing nonobviousness. Specifically, the record shows powerful unexpected results . . . ."); *see also Neptune*, 921 F.3d at 1377-78; *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006).

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00165
PATENT NO. 9,218,156



55

IPR2021-00165
PATENT NO. 9,218,156

**CONFIDENTIAL MATERIAL REDACTED**

The fact that these results were unexpected is further confirmed by ████

████████████████████████████████████████████████████████

Similarly, Dr. David Patterson of Google candidly remarked that he was "genuinely surprised" that the bfloat16 format provided useful results and improved performance, scaling, and power use. Ex. 2012. Dr. Patterson is a "skilled artisan" and acclaimed expert in the field of computer science and computer architecture. Dr. Patterson's comments have a nexus to the '156 Patent because, as shown below, the TPUv2 product is coextensive with the claims. Moreover, his comments further have a nexus because they are directed exactly to the key features of the '156 Patent claims: low precision high dynamic range arithmetic.

The fact that the '156 Patent's invention produces unexpected results is further supported by Dockser and Tong. For example, as explained above, Dockser teaches that for "general purpose processors, however, the common situation is that . . . a greater precision may be needed." Dockser, [0003]; Khatri, ¶¶ 124-25. Similarly, Tong notes that in order to be "generally useful," an execution unit must be capable of full-precision arithmetic. Tong, 280; Khatri, ¶¶ 124-25.

The fact that the prior art references cited by Petitioner in this proceeding teach that an execution unit without full-precision capability is not "generally

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00165
PATENT NO. 9,218,156

useful," and Google's initial reaction to the '156 Patent's invention, shows that the high performance of the '156 Patent's invention across a wide variety of applications was unexpected. *Id.* This unexpected result weighs toward non-obviousness.

### E.    Google's Copying of the Invention Shows Non-Obviousness

"The fact that a competitor copied technology suggests that it would not have been obvious." *WBIP*, 829 F.3d at 1336.

As Dr. Bates was interacting with Google in 2013-14, Google had identified a "daunting and scary" problem: in order to use artificial intelligence for speech recognition, it would need to "double the computing footprint of Google just to support, like, a slightly better speech recognition model for a modest fraction of [its] users." Ex. 2034, 6.

Despite ███████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████     Google solved this problem by copying Dr. Bates' invention. Specifically, Google adopted the invention in their TPUv2 and TPUv3 products, which are coextensive with the Challenged Claims (*see* Section VIII, *infra*). Indeed, Dr. Bates's invention is central to the operation of the TPUv2 and TPUv3 products, which use execution units designed to perform operations using a

low-precision "floating point format called bfloat16" in order to achieve increased

parallelism and scale:

> Because multipliers for the bfloat16 format require so much less
> circuitry, it is possible to put more multipliers in the same chip area
> and power budget, thereby meaning that ML accelerators employing
> this format can have higher flops/sec and flops/Watt, all other things
> being equal.

Ex. 2011 at 9; Khatri, ¶¶ 126-27.

Google describes the computing enabled by the bfloat16 format as "[t]he

secret to high performance on Cloud TPUs," noting that "Cloud TPU v2 and Cloud

TPU v3 primarily use bfloat16 in the matrix multiplication unit (MXU)" and that

"inside the MXU, multiplications are performed in bfloat16 format." Ex. 2041 at

2. The bfloat16 format maintains high dynamic range by keeping the same 8 bit

exponent as found in 32-bit IEEE floating point. *Id*. However, it reduces precision

significantly by using only a 7-bit mantissa, as opposed to the 23-bit mantissa of

IEEE 32-bit floating point, which is why it requires less circuitry. *Id.*

**CONFIDENTIAL MATERIAL REDACTED**



*Id.* at 1. A nexus with the claimed invention is presumed for secondary considerations relating to Google's TPUv2 and TPUv3 products, because these products are coextensive with the Challenged Claims, as demonstrated in detail in Section VIII, *infra*. *See WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'").

A nexus between Google's products and the claimed invention is further demonstrated ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00165
PATENT NO. 9,218,156

**CONFIDENTIAL MATERIAL REDACTED**



Google's copying therefore provides clear evidence that the Challenged Claims are not obvious. *E.g.*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1139 (Fed. Cir. 2019) (disclosure of patented method and later adoption of technology supported finding of copying); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.* 711 F.3d 1348, 1369 (Fed. Cir. 2013).

### F.    The Commercial Success of Google's TPUv2 and TPUv3 Shows Non-Obviousness

Commercial success is an objective indicator of non-obviousness. *See, e.g., id.* at 1368. The commercial success of Google's TPUv2 and TPUv3 products, which are coextensive with the Challenged Claims, supports a finding of non-obviousness.

Since the release of TPuv2 in 2017, and TPUv3 in 2018, Google has leveraged the abundance of processing power made available by Dr. Bates' invention—its "secret to high performance" over its competitors—to power all of

its major products and services, including Search, Translate, Photos, Assistant, and

Gmail.  Ex. 2018.  *See also* Exs. 2040, 2015.

Using hundreds of thousands of these low-precision TPU v2 and v3 devices

to provide these AI services in its data centers throughout the U.S., Google has

saved at least $10 billion dollars.  Ex. 2017.  Thus, Google's use of Dr. Bates' low-

precision computer throughout its data centers has resulted in enormous

commercial success for Google.

This commercial success is directly tied to the claimed invention.  Google's

TPUv2 and TPUv3 products are coextensive with the Challenged Claims, as

demonstrated in detail in Section VIII, *infra*.  Further, the success of these products

in the marketplace is due in large part to their use of the claimed invention, which

allows them to achieve increased performance and parallelism.  *See*, *e.g.*, Ex. 2016

("BF16 delivers a rare combination: reducing hardware and energy while

simplifying software by making loss scaling unnecessary;" *see also* Ex. 2011

(touting the increased efficiency and performance achieved by using low-precision

multipliers).

## IX.   GOOGLE'S TPUV2 AND TPUV3 ARE COEXTENSIVE WITH THE CHALLENGED CLAIMS

Google's TPUv2 and TPUv3 are coextensive with claims 1-8 of the '156

Patent.  Set forth below is an analysis mapping the claims to the TPUv2 and

TPUv3 devices; a more fulsome analysis is also provided in Singular's district

court infringement contentions.  Exs. 2021; 2022, 1-12.  Accordingly, a nexus is

presumed between secondary considerations relating to the TPUv2 and TPUv3 and

the '156 Patent.  *WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of nexus for

objective considerations when the patentee shows that the asserted objective

evidence is tied to a specific product and that product 'is the invention disclosed

and claimed in the patent.'").

## A.    Claim 1

### 1.    "A device comprising:"

Each of the TPUv2 boards and TPUv3 boards are devices.  Khatri, ¶¶ 129-

30.



TPUv2 Board - Ex. 2016.



TPUv3 Board Ex. 2016.

**2.    "at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"**

Each of the TPUv2 and TPUv3 boards include at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation (multiplication) on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value (the product of the first numerical value multiplied by another value). Khatri, ¶ 131. Both versions include at least one Matrix Multiply Unit (MXU) that contains 128x128 = 16,384 execution units that each execute the operation of multiplication. Exs. 2016; 2011 ("the main computational capacity in each core provided by a large matrix multiply unit that can yield the results of multiplying a pair of 128x128 matrices each cycle").

IPR2021-00165
PATENT NO. 9,218,156



Ex. 2016 (annotations added).



Figure 5: A block diagram of Google's Tensor Processing Unit v2 (TPUv2)

Ex. 2011.

Each of the bfloat16 execution units in the MXU require "less circuitry"

than either FP32 or FP16 multipliers.  Ex. 2011, 9; Khatri, ¶ 132.  Accordingly,

each of the multipliers within the MXU is *only* able to perform low-precision,

bfloat16 operations and lacks the circuitry to perform, for example, perform FP16

or FP32 operations.  Khatri, ¶ 132.

### 3.    "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and"

The dynamic range of the valid inputs to the multiplication operation in the

TPUv2 and TPUv3 is governed by the number of exponent bits (8) in the floating

point 32 format.  Khatri, ¶¶ 133-34; Pet., 20-21; Ex. 1003, ¶ 231.  These inputs are

supplied by the "scalar/vector units," also known as Vector Processing Unit

(VPUs).  *E.g.*, Exs. 2016; 2049, 3-4.  As Google admits, 8 bits of exponent allow

for a dynamic range of from roughly $2^{-126}$ (smaller than 1/65,000) through $2^{127}$

(larger than 65,000).  Khatri, ¶134; Pet., 20-21; Ex. 1003, ¶ 232.

### 4.    "for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X% of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;"

Google's TPUv2 and TPUv3 boards meet this element by performing

multiplication on 32-bit numbers at bfloat16 precision, which uses 7 bits for the

mantissa.  Exs. 2041, 7; 2011, 8; 2049; Khatri, ¶ 135.  Google states that utilizing 7

bits of mantissa in multiplication operations results in a minimum of 12% of valid

floating point 32 inputs producing at least 0.39% relative error compared to the

exact mathematical calculation of a full-precision multiplication on those same

inputs.  Pet., 73; Khatri, ¶¶ 135-36.  Accordingly, the TPUv2 and TPUv3 meet this

element.

> ### 5. "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit."

Google's TPUv2 and TPUv3 devices meet this limitation as well.  Each TPU

device is controlled by a Core Sequencer (which, in turn, is controlled by a Host

Virtual Machine that is a program running on a CPU).  The Core Sequencer is a

computing device, and by issuing VLIW instructions to the MXU, it controls the

operation of the LPHDR execution units within the MXUs.  Ex. 2016, 4-5.  The

CPU is a computing device, and by running the Host VM and issuing commands to

the Core Sequencer, it controls the operation of the LPHDR execution units within

the MXUs.  Ex. 2016, 4; Khatri, ¶¶ 137-38.

IPR2021-00165
PATENT NO. 9,218,156

# Cloud TPU: a TPU board and host VM



Ex. 2045, 2.

Die sizes are adjusted by the square of the technology, as the semiconductor technology for TPUs is similar but larger and older than that of the GPU. We picked 15nm for TPUs based on the information in Table 3. Thermal Design Power (TDP) is for 16-chip systems. TPUs come with a host CPU. This GPU price adds price of a n1-standard-16 CPU.

Ex. 2011.



Ex. 2016, (annotations added)

APPX07857

**B.    Claim 2**

      **1.    "The device of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine."**

As discussed above, the Host VMs run on a CPU.  The Core Sequencer is also a hardware sequencer and a state machine.  Ex. 2016, 4; Khatri, ¶ 140.  The Core Sequencer and the CPU, independently and acting in concert, satisfy the additional requirement imposed by claim 2.  Khatri; ¶¶ 139-41.

## C.     Claim 3

1.     **"The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."**

Google's TPUv2 and TPUv3 boards meet this limitation. As discussed above, each MXU contains 128x128 execution units: a total of 16,384 LPHDR execution units in total per MXU. Khatri, ¶ 142. The TPUv2 board includes 1 MXU per core, with 2 cores in a chip, and 4 chips on a board. Ex. 2016. Thus, the TPUv2 board contains 131,072 LPHDR execution units.



TPUv2 Board – Ex. 2046 (annotations added)

The TPUv3 board contains 2 MXUs per core, 2 cores per chip, and 4 chips

per board.  Ex. 2016.  Thus, a single TPUv3 board contains 262,144 LPHDR

execution units.  Khatri, ¶ 143.



TPUv3 Board – EX. 2046 (annotations added).

The MXU execution units perform multiplication only at bfloat16 precision

and are thus not adapted to execute multiplication on floating point numbers that

are at least 32 bits wide.  Khatri, ¶ 144.

Each core (whether TPUv2 or TPUv3) contains a VPU.  *Id.*  Each VPU

contains an array of 128x8x2 32-bit arithmetic logic units (ALUs), for a total of

2048 ALUs per core.  Exs. 2016; 2046.  32-bit ALUs are adapted to perform the

operation of multiplication on 32-bit numbers.  *Id.*, ¶ 145.  With two cores per chip

and 4 chips per board, each TPUv2 or TPUv3 board contains 16,384 execution units that are adapted to perform multiplication on 32-bit numbers. *Id.*, ¶ 146.

Each TPUv2 board thus contains 131,072 LPHDR execution units and 16,384 VPUs. Khatri, ¶¶ 146-47. Each TPUv3 board contains 262,144 LPHDR execution units and 16,384 VPUs. *Id.* Accordingly, in each board "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" and each board therefore meets claim 3. *Id.*

### D.    Claim 4

#### 1.    The device of claim 3, wherein X=10%.

*See* Section VIII.A.4 (mantissa of 7 bits gives at least 12% X). Khatri ¶ 148.

### E.    Claim 5

#### 1.    The device of claim 3, wherein Y=0.2%

*See* Section VIII.A.4 (mantissa of 7 bits gives at least 0.39% Y). Khatri ¶ 149.

### F.    Claim 6

#### 1.    The device of claim 3, wherein X=10% and Y=0.2%

*See* Section VIII.D and VIII.E (mantissa of 7 bits gives at least 12% X and 0.39% Y). Khatri ¶ 150.

### G.    Claim 7

**1.    The device of claim 3, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000**

As discussed above, the bfloat16 format used in the TPUv2 and TPUv3 boards contains 8 bits of exponent, which provides a dynamic range of from roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000). Khatri, ¶ 151.

### H.    Claim 8

**1.    The device of claim 3, wherein the first operation is multiplication.**

The MXUs within the TPUv2 and TPUv3 boards perform multiplication. Khatri, ¶ 152.

## X.    CONCLUSION

For the foregoing reasons, Patent Owner respectfully requests that the Board issue a Final Written Decision confirming the patentability of all the Challenged Claims.

Respectfully submitted,

Dated: August 9, 2021    By:    */ Peter Lambrianakos    /*
Peter Lambrianakos (Reg. No. 58,279)
FABRICANT LLP
411 Theodore Fremd Avenue,
Suite 206 South
Rye, New York 10580
Tel. (212) 257-5797
Fax. (212) 257-5796

IPR2021-00165
PATENT NO. 9,218,156

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

Patent No. 9,218,156
Filing Date: March 25, 2013
Issue Date: December 22, 2015

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

**DECLARATION OF SUNIL P. KHATRI, Ph.D.**

Case No. IPR2021-00165

36.     I understand that I should perform my analysis from the viewpoint of a person of ordinary skill in the art. I understand that this hypothetical person of ordinary skill in the art is considered to have the normal skills of a person in a certain technical field. I understand that factors that may be considered in determining the level of ordinary skill in the art include, *e.g.*, the types of problems encountered in the art, prior art solutions to those problems, the sophistication of the technology, and the education level of active workers in the field.

37.     I agree with Petitioner's proposed level of skill in the art, except that I disagree that such a person would have more than two years of experience. Therefore a POSA would be: a person with a Bachelor's degree in Computer Science, Electrical Engineering, or Applied Mathematics, with 2 years of academic or industry experience in computer architecture. Pet. at 8-9.

## B.    The Claimed Invention Of The '156 Patent

38.     The '156 Patent is entitled "Processing with Compact Arithmetic Processing Element" and issued on December 22, 2015. The '156 Patent claims priority, through parent and grandparent applications, to U.S. Provisional Patent Application No. 61/218,691, filed on Jun. 19, 2009. I have reviewed the '156 Patent and its file history.

39.     The inventor of the '156 Patent, Dr. Bates, recognized that even though then-modern conventional microprocessors contained about one billion

transistors, they could perform only a handful of operations per clock cycle. '156

Patent, 1:55-63. Dr. Bates explained that a large portion of this inefficiency comes

from using transistor-intensive full-precision arithmetic units:

> As described above, today's CPU chips make inefficient use of their
> transistors. …they deliver great precision, performing exact arithmetic
> … standardized arithmetic with 32 and 64 bit floating point numbers.
> Many applications need this kind of precision. As a result,
> conventional CPUs typically are designed to provide such precision,
> using on the order of a million transistors to implement the arithmetic
> operations.

'156 Patent, 3:11-3:26.

40.    However, Dr. Bates realized that such full-precision, inefficient

components were not necessary for all applications, including many valuable ones:

> There are many economically important applications, however, which
> are not especially sensitive to precision and that would greatly benefit,
> in the form of application performance per transistor, from the ability
> to draw upon a far greater fraction of the computing power inherent in
> those million transistors. Current architectures for general purpose
> computing fail to deliver this power.

'156 Patent, 3:27-33.

41.    The '156 Patent is thus directed away from prior art computers based

on full-precision execution units that take up space and are wasteful of transistors.

As Dr. Bates further explains in the specification, "[b]ecause LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other." '156 Patent, 6:56-59. As a result, "embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures." '156 Patent, 8:8-12.

42.     By using a "very large number" of LPHDR execution units in parallel, computer systems are able to achieve significantly better performance than prior art systems. Because each LPHDR execution unit requires fewer resources (*e.g.*, fewer transistors, less physical volume) than a full-precision execution unit, "there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs." '156 Patent, 23:37-44; *see also id.*, 6:56-59. In particular, the claimed systems "might perform tens of thousands of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. '156 Patent, 23:46-49.

Singular's Exhibit No. 2051, IPR2021-00165
Page 016

43.    In addition, the '156 Patent also teaches computer systems in which the number of LPHDR execution units exceeds the number of full precision execution units:

> For certain devices … according to the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits).

'156 Patent, 27:52-59.

44.    The increased level of compute parallelism and scale in such computer systems is necessarily achieved at the cost of precision—the vast majority of the high dynamic range floating-point operations performed by the device must be performed at low precision. Dr. Bates was the first to understand that sacrificing precision for increased parallelism/scale results in significant performance gains per unit of resource over the prior art. In fact, Dr. Bates notes that when certain applications are implemented using a device that uses LPHDR execution units, the final application error is significantly lower than the error of the LPHDR execution units themselves. '156 Patent, 16:59-23:34.

## V.    THE CITED REFERENCES

### A.    Dockser

14

45.    I have reviewed U.S. Pat. Publ. 2007/0203967, titled "Floating-Point Processor With Reduced Power Requirements For Selectable Subprecision" ("Dockser"). Dockser discloses the use of a full-precision floating point processor (FPP) that can selectably reduce precision in order to reduce its power draw. *See, e.g.*, Ex. 1007, Dockser ¶ [0026].

46.    Dockser's teaching of an execution unit that is always capable of operating in both full-precision mode (its default) and reduced-precision modes is motivated by the prevalent view in the prior art that while low-precision operation might be acceptable for "certain applications," for a general-purpose processor, full-precision capability is "needed." Dockser ¶¶ [0003, 0018], claims 1, 8, 15, 20. As such, Dockser includes both full and reduced precision modes. *See e.g.*, Dockser ¶¶ [0028], [0017], [0014], [0023], Fig. 2.

47.    The components of Dockser's FPP is shown in Figure 1, reproduced below:

Singular's Exhibit No. 2051, IPR2021-00165
Page 018



**Dockser, Fig. 1 (Annotated)**

Dockser's FPP has a register file (FPR 110, shaded in **red**) comprising registers
(red boxes) that hold IEEE 32-bit full-precision values. It also includes a controller
(CTL 130, shaded in **green**) with a control register (**green** box) that can store
"subprecision select bits" corresponding to the desired level of precision. Dockser,
Fig. 1; *see also id.*, ¶¶ [0017-18]. The FPP performs arithmetic operations (e.g.,

APPX07891

including addition and multiplication) at full-precision – or at the desired sub-precision using values stored in the register file as operands. *See id.*, ¶ [0019], [0017], [0028].

48.     If no sub-precision is selected, Dockser's FPP performs arithmetic at "maximum precision" (*i.e.*, 32-bit IEEE full-precision). *See* Dockser, claims 1, 8, 15, 20; *see also id.*, ¶ [0018] ("the floating-point controller 130 *may* be used to select the sub-precision of the floating-point operations …")). Otherwise, the operation is performed at a reduced precision. In reduced-precision modes, Dockser's FPP reduces the mantissa size by powering-down some of the cells in the register file that store the mantissa, and also powers down parts of the arithmetic logic circuits (contained, *e.g.*, within the multiplier, shaded in **blue** above) that are not needed for the selected subprecision. *Id.*, ¶¶ [0026-27].

49.     Unlike the '156 Patent, Dockser does not teach systems that include multiple arithmetic units operating in parallel. Instead, Dockser discloses a single floating-point execution unit in isolation. The absence of a parallel teaching is not surprising, given that Dockser's selectable low-precision unit is designed to conserve power in "battery operated devices where power comes at a premium, such as wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras." Dockser, ¶ [0003]. A POSA would not understand Dockser to disclose or suggest using its FPP units in parallel.

Singular's Exhibit No. 2051, IPR2021-00165
Page 020

50.    Dockser discloses that it uses "conventional" arithmetic units to perform operations, such as addition and multiplication. Dockser, ¶ [0020].

51.    Because Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a POSA would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a POSA would expect it to be *larger* than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

## B.    Tong

52.    I have reviewed "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic" by Jonathan Ying Fai Tong et al. ("Tong"). Tong teaches that using lower-precision arithmetic can reduce power consumption. *See generally* Tong, pp. 273-285. Tong is based on the commonly held belief that some applications can only be performed using full-precision arithmetic: "[e]ven though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears inevitable that some fraction of our operands will require full IEEE-standard precision." *Id.* (emphasis added).

Singular's Exhibit No. 2051, IPR2021-00165
Page 021

53.     Importantly, like Dockser, Tong is focused on reducing power consumption, and does not teach parallel processing systems that include multiple arithmetic units that operate simultaneously, let alone systems having much larger numbers of low-precision units than full-precision units. Each low-precision unit disclosed by Tong is either as large as a full-precision unit or paired with a full precision unit on a 1:1 basis (Tong, 282).

54.     For example, Tong teaches "simply including both full and reduced precision FP units and using appropriate sleep-mode circuit techniques to shut down the unused unit." Tong, 282. In this approach, each low-precision unit is paired with a full-precision unit in a 1:1 ratio, requiring more physical space than a full-precision unit alone. Indeed, this approach is presented as an option in situations where silicon real-estate is not at a premium. *See* Tong, 282 ("Given the decreasing cost of silicon area …").

55.     In another example, Tong also teaches a "digit-serial" multiplication circuit that, using control signals, is operable to perform a reduced-precision operation in a single clock cycle. The result of this reduced-precision operation, in which an 8-bit operand is multiplied with a 24-bit operand, can be combined with other reduced-precision results over multiple clock cycles in a process called "digit-serial multiplication," yielding a full-precision result. When performing low-precision operations, Tong's digit-serial multiplier does consume less power than a

traditional full-precision unit. However, it occupies *more* physical space than a full-precision multiplier, because it "require[s] extra random logic for control of the multiple passes through the digit serial structure." Tong, 281; *see also* 280 ("The lower precision digit-serial design is slightly larger [than the full-precision execution unit]"), Table V (showing that Tong's digit-serial multiplier occupies ~3% more area than a conventional full-precision multiplier). Therefore, a POSA would understand that like Dockser's FPP, the execution units taught by Tong are capable of reduced-precision operation, but are *larger* than a conventional full-precision execution unit. A POSA would understand that this large size would make them unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

56.     A POSA would therefore understand that as with Dockser, Tong is focused on power-savings, does not even mention increasing computational scale and parallelism, and certainly does not teach a computer comprised of a much larger number of low-precision units compared with full-precision units.

### C.   MacMillan

57.     I have reviewed U.S. Patent No. 5,689,677, titled "Circuit For Enhancing Performance Of A Computer For Personal Use" ("MacMillan"). MacMillan is directed to a computer system that includes a host processor and "a plurality of processing elements." Macmillan, 12:39. MacMillan does not describe

the capabilities of each "processing element" (PE) in detail, noting only briefly that

"[i]nteger and floating point accelerators could be included in each PE."

MacMillan, 12:55-56.

58.     Regarding arithmetic precision/imprecision, MacMillan is silent. It

simply teaches that each PE can "perform atomic operations on data values up to

*32 bits wide*." MacMillan, 7:8-9. A POSA would understand that unlike Dockser

and Tong, MacMillan is not focused on minimizing power consumption, and is not

specifically tailored for use in portable or mobile devices. Indeed, MacMillan's

only reference to power consumption relates to heat dissipation inside the

"cabinet" of a workstation. *See* MacMillan, 3:4-6.

## VI.   CLAIM CONSTRUCTION

### A.   "Low Precision High Dynamic Range (LPHDR) Execution Unit"

59.     In my opinion, the Board should construe the term "low precision

high dynamic range (LPHDR) execution unit" as "an execution unit that executes

arithmetic operations only at low precision and with high dynamic range, wherein

'high dynamic range' and 'low precision' are defined according to the numerical

requirements below."[1] A POSA would understand this as the plain meaning of the

term as read in light of the specification.

---

[1] Where "below" refers to the remainder of the claim in which the term appears (*e.g.*, the numerical requirements that specify a minimum level of imprecision and a minimum dynamic range).

Singular's Exhibit No. 2051, IPR2021-00165
Page 024

85.     The "exceeds" limitation requires that the "number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."[2] As I explain further below, a POSA would understand that Dockser's FPP is adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

86.     Even if Dockser's FPP were an LPHDR execution unit (which it is not, in my opinion) the Dockser/MacMillan combination cannot meet claim 3's "exceeds" limitation, because those same "Dockser LPHDR execution units" would also be "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," meaning that the number of LPHDR execution units will never exceed the number of claim 3 full-precision floating point multiplication execution units. That is, even under Petitioner's incorrect argument that each Dockser FPP qualifies as an LPHDR execution unit, it *also* qualifies as a claim 3 full-precision floating-point multiplication execution unit. Therefore, no matter how many Dockser FPP's are included in a device, the number of LPHDR execution units in the device will <u>*at most equal*</u> to the number

---

[2] For clarity, I refer to "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" as "claim 3 full-precision floating point multiplication execution units."

Singular's Exhibit No. 2051, IPR2021-00165
Page 036

of claim 3 full-precision floating-point multiplication execution units – and will never "exceed [it] by at least one hundred," as claim 3 requires.

> 3) *Dockser/MacMillan Fails to Disclose or Render Obvious "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit"*

87.    The claims require "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit." Claim 2 further requires that that the computing device "comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine." I understand that Petitioner identifies MacMillan's "Host CPU" as the "computing device adapted to control the operation of the at least one first LPHDR execution unit." Pet., 51-52. I disagree.

88.    A POSA would understand that MacMillan makes clear that the SIMD Controller, not the Host CPU, controls the operation of the PEs. MacMillan, 13:35-36 ("Since the PEs operate under the control of the SIMD Controller…"); 8:1-10 (explaining that SIMD Controller "contains the program counter used to step through the list of instructions that may include instructions to be executed by the PEs"); 10:65-11:5 ("The SIMD Controller 252 then executes the SIMD program."); 10:3-16; Indeed, a POSA would understand that while the PEs are executing, the SIMD Controller has taken control of the host bus, and the Host

APPX07909

92.    Dockser discloses that its FPP takes input operands that are 32 bits wide and stores them in IEEE-754 format. *See e.g.*, Dockser, ¶ [0017] ("Each register location 200 is configured to store a 32-bit binary floating-point number, in an IEEE-754 32-bit single format."). Dockser also discloses that its FPP includes "a floating-point multiplier (MUL) 144 configured to execute floating-point multiply instructions." Dockser, ¶ [0019]. A POSA would therefore understand that Dockser multiplies 32-bit operands when operating in full precision mode, and therefore it is "adapted to" execute the operation of multiplication on numbers at least 32 bits wide.

93.    Therefore, even if Dockser's FPP is an "LPHDR execution unit" (as Petitioner incorrectly argues), the Dockser/MacMillan device would also satisfy the "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" requirement, and would thus fail to satisfy the "exceeds" limitation. If, for the sake of argument, we count each Dockser FPP as an "LPHDR execution unit," then in one example, the Dockser/MacMillan device would have 256 LPHDR execution units. However, because each Dockser FPP is also "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," the Dockser/MacMillan device would therefore also have at least 256 execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits

Singular's Exhibit No. 2051, IPR2021-00165
Page 039

wide." As a result, in my opinion, the Dockser/MacMillan cannot meet the

"exceeds" limitation.

> 5)  *Petitioner's Interpretation of "adapted to execute at least the
>     operation of multiplication on floating point numbers that are at
>     least 32 bits wide" Is Inconsistent with the Specification*

94.    I understand that Petitioner argues that Dockser's FPP does not meet

the "exceeds" limitation by arguing that units are claim 3 full-precision floating

point multiplication execution units ***only if*** they are "'traditional precision'

execution units that do not 'sometimes' produce results different from the correct

traditional-precision result." Pet., 52. I disagree.

95.    A POSA would not understand "adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

to exclude units, like Dockser, which selectably operate at full precision, as

Petitioner claims. Pet., 52.

96.    Instead, a POSA would understand this term to include any or all units

in the device that are designed to perform "multiplication on floating point

numbers that are at least 32 bits wide," even if those units can perform other

operations as well. Petitioner's (and Mr. Goodin's) interpretation directly

contradicts the claim language itself, which encompasses every execution unit

adapted to perform "*at least*" the operation of 32-bit multiplication. If such an

'156 Patent at 28:9-16; *see also id.* at 28:9-67. The specification does not preclude

a claim 3 full-precision floating point multiplication execution unit from being able

to produce incorrect results. Petitioner imports that requirement from a completely

different section of the patent, taken completely out of context. *See* Pet., 52 (citing

'156 Patent, 26:39-49); *see also* Goodin, ¶ 363. A POSA would understand that

that section uses "sometimes" to describes the imprecision limitation of an LPHDR

execution unit, as expressed in the X% limitation of the Challenged Claims. That

section says nothing about claim 3 full-precision floating point multiplication

execution units. *See* '156 Patent, 26:39-49.

**D.   A POSA Would Not Combine Dockser with MacMillan**

101.   A POSA would not combine Dockser with MacMillan because it

would not be operable for its intended purpose.

102.   Dockser is focused on the objective of reducing power consumption

and is not in any way concerned with the objective of use in parallel processing

arrays, while MacMillan is focused on a parallel architecture that increases

computational capability, and not focused on reducing power consumption (indeed,

MacMillan's only reference to power consumption relates to heat dissipation inside

the "cabinet" of a workstation). *See* MacMillan, 3:4-6.

103.   Incorporating Dockser's FPPs into MacMillan would defeat

MacMillan's stated objective of achieving a highly parallel SIMD computer

architecture at "lower system cost." *See* MacMillan, 5:58-59 ("The invention of this shared memory results in lower system cost"). As explained above, Dockser's FPPs are even _larger_ than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes.

104.    As a result, replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit. Combining Dockser and MacMillan would thus sacrifice the benefits of *both* references, which a POSA would not be motivated to do.

### E.    Ground 4: Claims 1-8, 16, and 33 Are Not Obvious Over Dockser in View of Tong and MacMillan

105.    As I explained above with respect to Grounds 2 and 3, the combination of Dockser, Tong, and MacMillan does not disclose or render obvious an LPHDR execution unit. Similarly, as set forth above with respect to Ground 3, the combination does not disclose or render obvious the "at least one first computing device" limitation. Finally, as set forth above with respect to Ground 2, Tong does not teach using only 5 bits of mantissa. I understand that Petitioner's Ground 4 arguments do not address these deficiencies.

### 1)    *The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation*

41

110.   A POSA would not have been motivated by Tong to remove the full-precision capabilities of Dockser and incorporate this modified Dockser FPP into the systems taught by MacMillan.  Petitioner's argument is based on a fragment of a sentence in Tong taken out of context, insinuating that Tong teaches that full-precision operation "is not essential" to the functioning of a Tong or Dockser system.  Pet., 58. In my opinion, this interpretation of Tong is not correct.

111.   In fact, a POSA would understand that Tong teaches the opposite. Tong admits that there are "scientific programs" that "require a huge amount of precision" (Tong, 279), and broadly teaches that "it is _inevitable_ that some fraction of our operands will require full IEEE-standard precision." Tong, 280 (emphasis added). Instead, like Dockser, Tong teaches systems that always have *both* full- and reduced-precision capabilities. *See*, *e.g.*, Tong, 282 (even when describing a device that has reduced precision units, it describes that system as "including _both_ full and reduced precision FP units, and using appropriate sleep-mode circuit techniques to shut down the unused unit."). With this teaching in hand, a POSA would not cleave off parts of Dockser's 32-bit register file to achieve some unspecified lesser bit-width smaller execution unit, without also importing the Tong "full precision FP.". This is a convoluted, hindsight-driven modification to the fundamental teachings of the cited references.

SINGULAR's Exhibit No. 2051, IPR2021-00165
Page 047

112.    In view of the above, it is clear that a person of ordinary skill would not be motivated by Tong to remove the full-precision capabilities of the Dockser units. On the contrary, Tong would only have _reinforced_ the teaching of Dockser that, while reduced-precision might be a viable option in certain limited circumstances, an execution unit should retain the ability to operate at full-precision, as I explained below. See, _e.g._, Dockser, ¶ [0003].

113.    Dockser's objectives are fundamentally directed away from Petitioner's proposed "alternative" combination. As discussed above, Dockser is devoted solely to a general processor with selectable precision.

114.    Nowhere does Dockser teach, or even suggest, removing its full-precision capabilities. As I explain above, a Dockser FPP is described as always needing to support a range of selectable precisions including full precision. Dockser, ¶ [0003]. Adjusting Dockser by removing its full-precision capacity violates a central tenet of Dockser—to always be able to execute full-precision operations. Dockser, ¶ [0003]. A POSA would not remove Dockser's inventive concept—supporting a range of selectable precisions including full precision. Thus, excising the full-precision circuitry of Dockser runs contrary to the main teaching and inventive feature of Dockser (as well as that of Tong, as I explain above).

115.   The removal of full-precision circuitry from the Dockser FPP also goes against the teachings of MacMillan, which warns that "[t]o meet the cost objectives, the SIMD capabilities *should not add significant complexity* to the architecture of a computer system for personal use." *Id.*, 5:42-44. A POSA would understand that Petitioner's proposed hindsight-driven combination, which requires special, customized registers, logic elements, arithmetic units, and programming models (see below), would increase manufacturing costs and goes directly against the teachings of MacMillan, which relies on operating with conventional components to reduce cost. *E.g.*, *id.,* 6:24-26, 34-36. Further, as I explain above, the Dockser FPP, due to its control circuitry, would likely require *more* transistors than a conventional full-precision execution unit, further increasing costs. Also, the modified Dockser FPP would result in modifications to the programs that are run on the MacMillan system, which MacMillan seeks to avoid. *See* MacMillan 2:15-16 (where avoiding "the need for reprogramming" is emphasized).

5)   Google Has Failed to Show That the "Alternative" Combination Would Meet the Imprecision Requirements of Claims 3-8

116.   I understand that Petitioner has not shown that the resulting combination would meet the imprecision limitations. As discussed above, Tong suggests 11 bits of precision for specific signal processing applications, and

46

121.    As I have stated supra, the modified Dockser FPP would result in modifications to the programs that are run on the MacMillan system, which MacMillan teaches against. See MacMillan 2:15-16 (where avoiding "the need for reprogramming" is emphasized).

122.    Without these teachings of the '156 patent, a POSA would not have been motivated to combine MacMillan and Dockser with Tong according to Petitioner's "alternative" argument because it would not have been clear to a POSA that it would be possible to program such a device to execute operations efficiently and without accumulating errors.

## VIII.  OBJECTIVE INDICIA OF NON-OBVIOUSNESS

123.    I have reviewed █████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

124.    It is my opinion that the experimental results obtained by Dr. Bates using his invention ███████████████████████████████
███████████████, would have been unexpected to those of skill in the art at the time. When the invention was filed, it was not known that a massively parallel computer that includes almost exclusively low-precision execution units, (and very

128.   Google's TPUv2 and TPUv3 are coextensive with claims 1-8 of the

'156 Patent. Set forth below is an analysis mapping the claims to the TPUv2 and

TPUv3 devices.

### A.   Claim 1

*1)   "A device comprising:"*

129.   Each of the TPUv2 boards and TPUv3 boards are devices.



TPUv2 Board - Ex. 2016.



TPUv3 Board Ex. 2016.

Singular's Exhibit No. 2051, IPR2021-00165
Page 055

130.   A POSA would understand that the above photographs show that the

TPUv2 and TPUv3 boards are circuit boards coupled to hardware components such

as processors, heatsinks, I/O ports, interconnected with each other via wiring. Both

the TPUv2 and TPUv3 boards are "devices," as a POSA would understand that

term.

> 2)   *"at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"*

131.   In my opinion, each of the TPUv2 and TPUv3 boards include at least

one first low precision high dynamic range (LPHDR) execution unit adapted to

execute a first operation (multiplication) on a first input signal representing a first

numerical value to produce a first output signal representing a second numerical

value (the product of the first numerical value multiplied by another value). Both

the TPUv2 and TPUv3 include at least one Matrix Multiply Unit (MXU) that

contains $128 \times 128$ (*i.e.*, 16,384) execution units that each execute the operation of

multiplication. Ex. 2016; Ex. 2011 ("the main computational capacity in each core

provided by a large matrix multiply unit that can yield the results of multiplying a

pair of $128 \times 128$ matrices each cycle").



Ex. 2016 (annotations added).



Ex. 2011.

132.   Google's publications explain that each of the bfloat16 execution

units in the MXU require "less circuitry" than either FP32 or FP16 multipliers:

> The IEEE fp32, IEEE fp16 and bfloat16 formats need 576 full adders,
> 121 full adders, and 64 full adders, respectively. Because multipliers
> for the bfloat16 format require so much less circuitry, it is possible to
> put more multipliers in the same chip area …

Ex. 2011, 9.

Each of the multipliers within the MXU is able to perform multiplication *only* at

low-precision, using the bfloat16 format. They lack the circuitry to perform, for

example, perform FP16 or FP32 operations. *Id. See also* Ex. 2049 at 3-4.

54

3)  *"wherein the dynamic range of the possible valid inputs to the first
operation is at least as wide as from 1/65,000 through 65,000 and"*

133.   As Google's publications explain:

While its <u>*inputs and outputs are 32-bit floating point values, the MXU*</u>
<u>*typically performs multiplications at the reduced precision of bfloat16*</u>
— a 16-bit floating point representation that provides better training
and model accuracy than the IEEE half-precision representation for
deep learning as it allocates more bits to the exponent and less to the
mantissa.

Ex. 2049 at 3-4 (emphasis added).

134.   Thus, the dynamic range of the valid inputs to the multiplication

operation in the TPUv2 and TPUv3 is governed by the number of exponent bits (8)

in the floating point 32 (FP32) format. These inputs are supplied by the

"scalar/vector units", also known as Vector Processing Unit (VPUs). As Google

admits, 8 bits of exponent allow for a dynamic range of from roughly $2^{-126}$ (smaller

than 1/65,000) through $2^{127}$ (larger than 65,000). Pet., 20-21; Ex. 1003, ¶ 232. I

agree that the dynamic range of FP32 is at least this large. Indeed, in some of its

publications, Google admits that floating-point formats with 8 bits of exponent are

capable of representing an even wider range of values, from approximately $10^{-38}$ to

$3 \times 10^{38}$. Ex. 2041 at 1.

4)  *"for at least X=5% of the possible valid inputs to the first
operation, the statistical mean, over repeated execution of the first
operation on each specific input from the at least X% of the
possible valid inputs to the first operation, of the numerical values
represented by the first output signal of the LPHDR unit executing
the first operation on that input differs by at least Y=0.05% from*

Singular's Exhibit No. 2051, IPR2021-00165
Page 058

*the result of an exact mathematical calculation of the first
operation on the numerical values of that same input;"*

135.    Google's TPUv2 and TPUv3 boards meet this element. As I explain

above, the MXU's inputs are "32-bit floating point" values, but they "perform[]

multiplications at the reduced precision of bfloat16." *See* Ex. 2049 ("While its

inputs and outputs are 32-bit floating point values, the MXU typically performs

multiplications at the reduced precision of bfloat16").

136.    Multiplication performed at bfloat16 precision uses 7 bits for the

mantissa. Ex. 2041 at 1; Ex. 2011 at 8. Petitioner states – and I agree – that

utilizing 7 bits of mantissa in multiplication operations results in a minimum of

12% of valid floating point 32 inputs, producing at least 0.39% relative error

compared to the exact mathematical calculation of a full-precision multiplication

on those same inputs. Pet., 73. Accordingly, the TPUv2 and TPUv3 meet this

element.

> 5)    *"at least one first computing device adapted to control the
> operation of the at least one first LPHDR execution unit."*

137.    Google's TPUv2 and TPUv3 devices meet this limitation as well.

Each TPU device is controlled by a Core Sequencer (which in turn is controlled by

a Host Virtual Machine that is a program running on a CPU). The Core Sequencer

is a a computing device, and by issuing VLIW instructions to the MXU, it controls

the operation of the LPHDR execution units within the MXUs:

> The *Core Sequencer* fetches VLIW (Very Long Instruction Word)
> *instructions* from the core's on-chip, software-managed Instruction
> Memory … The 322-bit VLIW instruction can launch eight
> operations: two scalar, two vector ALU, vector load and store, and a
> pair of slots that *queue data to and from the matrix multiply and
> transpose units*.

Ex. 2016, 4-5.

138.   The CPU is a computing device, and by running the Host VM and

issuing commands to the Core Seqeuncer, it controls the operation of the LPHDR

execution units within the MXUs.



Ex. 2016 (annotations added).

Die sizes are adjusted by the square of the technology, as the semiconduc-
tor technology for TPUs is similar but larger and older than that of the GPU.
We picked 15nm for TPUs based on the information in Table 3. Thermal
Design Power (TDP) is for 16-chip systems. TPUs come with a host CPU.
This GPU price adds price of a n1-standard-16 CPU.

Ex. 2011.



Ex. 2045, 2.

**B.    Claim 2**

1)    *"The device of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine."*

139.    As discussed above, the Host VMs run on a CPU.

140.    A person of ordinary skill in the art would also understand that the

Core Sequencer described above is at least a "hardware sequencer" and a "state

machine," based on the description of its function in Google's own publication:

> The *Core Sequencer* fetches VLIW (Very Long Instruction Word) *instructions* from the core's on-chip, software-managed Instruction Memory … The 322-bit VLIW instruction can launch eight operations: two scalar, two vector ALU, vector load and store, and a pair of slots that *queue data to and from the matrix multiply and transpose units*.

Ex. 2016, 4-5.

141.    Therefore, the Core Sequencer and the CPU, independently and acting

in concert, satisfy the additional requirement imposed by claim 2.

**C.    Claim 3**

Singular's Exhibit No. 2051, IPR2021-00165
Page 061

1) *"The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."*

142.    Google's TPUv2 and TPUv3 boards meet this limitation. As discussed above, each MXU contains 128x128 execution units: a total of 16,384 LPHDR execution units in total per MXU. The TPUv2 board includes 1 MXU per core, with 2 cores in a chip, and 4 chips on a board. Ex. 2016, 6. Thus, the TPUv2 board contains $128 \times 128 \times 2 \times 4 = 131{,}072$ LPHDR execution units.



TPUv2 Board – Ex. 2046 (annotations added)

143.   The TPUv3 board contains 2 MXUs per core, 2 cores per chip, and 4 chips per board. Ex. 2016. Thus, a single TPUv3 board contains $128 \times 128 \times 2 \times 2 \times 4 = 262,144$ LPHDR execution units.



TPUv3 Board – EX. 2046

144.   The MXU execution units perform multiplication at bfloat16 precision, and are not capable of performing full-precision multiplication, as I have discussed above.

145.   Based on my review of Google's public documents, and the documents Google has produced in this IPR proceeding, each core (whether TPUv2 or TPUv3) contains a Vector Unit (VPU). *Id.* Each VPU contains $128 \times 8 \times$

Singular's Exhibit No. 2051, IPR2021-00165
Page 063

2 32-bit arithmetic logic units (ALUs), for a total of 2048 ALUs per core. Ex.

2046, 34.

146.   32-bit ALUs are adapted to perform the operation of multiplication on

32-bit numbers. With two cores per chip and 4 chips per board, each TPUv2 or

TPUv3 board contains $2048 \times 4 \times 8 = 16,384$ execution units that are adapted to

perform multiplication on 32-bit numbers.

147.   As I explain above, each TPUv2 board contains 131,072 LPHDR

execution units, and each TPUv3 board contains 262,144 LPHDR execution units.

Therefore, in both the TPUv2 and TPUv3 boards, "the number of LPHDR

execution units in the device exceeds by at least one hundred the non-negative

integer number of execution units in the device adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

and each board therefore meets the additional requirement imposed by claim 3.

**D.    Claim 4**

    *1)    The device of claim 3, wherein X=10%.*

148.   See Section IX.A.4 (mantissa of 7 bits gives at least 12% X).

**E.    Claim 5**

    *1)    The device of claim 3, wherein Y=0.2%*

149.   See Section IX.A.4 (mantissa of 7 bits gives at least 0.39% Y).

**F.    Claim 6**

    *1)    The device of claim 3, wherein X=10% and Y=0.2%*

SINGULAR's Exhibit No. 2051, IPR2021-00165

150.   See Section IX.A.4 (mantissa of 7 bits gives at least 12% X and 0.39% Y).

### G.   Claim 7

> 1)   *The device of claim 3, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000*

151.   As discussed above, the bfloat16 format used in the TPUv2 and TPUv3 boards contains 8 bits of exponent, which provides a dynamic range of from roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000).

### H.   Claim 8

> 1)   *The device of claim 3, wherein the first operation is multiplication*

152.   As discussed above, the MXUs within the TPUv2 and TPUv3 boards perform multiplication.

## X.   CONCLUSION

153.   In signing this declaration, I recognize that the declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the United States Patent and Trademark Office. I also recognize that I may be subject to cross-examination in the case and that cross-examination will take place within the United States. If cross-examination is required of me, I will appear for cross-examination within the United States during the time allotted for cross-examination.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed this 9th Day of August, 2021

Respectfully submitted,

Sunil P Khatri, Ph.D.

Filed on behalf of Petitioner by:                          Paper No. __
    Elisabeth H. Hunt, Reg. No. 67,336
    Richard F. Giunta, Reg. No. 36,149
    Anant K. Saraswat, Reg. No. 76,050
    Adam R. Wichman, Reg. No. 43,988
    Nathan R. Speed, admitted *pro hac vice*
    WOLF, GREENFIELD & SACKS, P.C.
    600 Atlantic Avenue
    Boston, MA 02210
    (617) 646-8000 Phone
    (617) 646-8646 Fax

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————

Case No. IPR2021-00165
Patent No. 9,218,156

———————

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE[1]**

———————

[1] Emphases in this paper are added unless otherwise indicated, and internal quotations, citations, and original alterations are omitted.

It is undisputed that Dockser's unit is "high dynamic range."

Dockser's unit also meets the "low precision" genus, because it performs reduced-precision operations—the very **_purpose_** of Dockser's design—and **_at least_** one such "first operation" meets the species in claim 1's "wherein" clause. Petition, 14-15; Dockser, [0014] ("the precision…may be reduced" to achieve "greater efficiency" and "significant power savings"); DI, 19 ("Petitioner…provides a detailed explanation" how Dockser "teach[es] the recited X and Y percentages of claim 1"); Ex. 1071 ("Goodin-Reply"), ¶¶ 5-6.

Singular told the district court that "LPHDR execution unit" should be construed identically to "execution unit" (Ex. 1065, 9), because "'low precision high dynamic range' is defined in claim itself" (Ex. 1066, 12).  After the Petition demonstrated the claims unpatentable, Singular now alleges a narrow construction of LPHDR execution unit is needed to avoid "render[ing] the limitation meaningless."  POR, 16.  But as shown below, Singular's "construction" does not give meaning to the "construed" claim term at all—it **_repeats_** every word of the term verbatim and injects additional words (_e.g._, "only").

| Claim | Singular's Construction (POR, 15) |
|---|---|
| <span style="color:red">low precision</span> <span style="color:blue">high dynamic range</span> (LPHDR) <span style="color:green">execution unit</span> | an <span style="color:green">execution unit</span> that executes arithmetic operations <u>**only**</u> at <span style="color:red">low precision</span> and with <span style="color:blue">high dynamic range</span>, wherein '<span style="color:blue">high dynamic range</span>' and '<span style="color:red">low precision</span>' are defined according to the numerical requirements below |

27), fails because the Petition established that choosing ***any*** of those "precision levels Tong teaches for particular applications" would have been obvious "when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision." Petition, 43-45. Singular does not dispute that even 9 mantissa bits in Docker's FPP meets the claimed low precision (Ground 1); thus each of the 5-bit through 9-bit selections motivated by Tong are low precision. Goodin-Reply, ¶ 29.

## III.   GROUND 3 – SINGULAR'S ARGUMENTS AGAINST DOCKSER/MACMILLAN FAIL

### A.   Motivation to Combine

Ground 3 uses Docker's FPPs as the floating-point accelerators in MacMillan's massively-parallel SIMD architecture, "to increase performance speed as MacMillan teaches while lowering power consumption as Docker teaches," which benefits battery-operated devices. Petition, 49-50. Singular's assertion that each reference individually is "not focused on" the benefit the other undisputedly provides (POR, 36) fails to refute that the ***combination*** achieves both benefits.

Singular's assertion that Docker's FPP would "increase costs" in MacMillan's system (POR, 37) rehashes a POPR argument and is "unsupported by any specific cost analysis." DI, 39. The conclusory expert testimony cited at POR, 37 "repeat[s] verbatim Patent Owner's argument without additional facts or

data…[and thus] is entitled to little or no probative weight." *Tyco Fire Prods. v. Victaulic*, IPR2016-00279, Paper 40 at 22 (June 12, 2017).  Singular presents no **evidence** that Dockser's FPP would increase cost.  Even if it had, that would be legally irrelevant because whether a "combination would not be made by businessmen for economic reasons" is not probative of nonobviousness.  DI, 39-40 (quoting *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983)).  Goodin-Reply, ¶¶ 30-31.

### B.    "Computing Device"

MacMillan's Host CPU is a "computing device adapted to control the operation of the…LPHDR execution unit[s]" as claimed, because it executes the program that "initiat[es]" "all SIMD processing" by the processing elements (PEs) containing Dockser's LPHDR execution units.  Petition, 50-51.  The Host CPU thus controls whether, when and how the LPHDR units operate, by "start[ing] the SIMD Controller" that "executes the SIMD program" that is provided by the CPU program and uses data provided by the CPU.  MacMillan, 10:27-11:5, 13:12-62; Petition, 50-51; Ex. 1003, ¶¶ 348-353; Goodin-Reply, ¶¶ 32-35.

Singular's argument that MacMillan's Host CPU does not control the operation of the PEs because the SIMD Controller also does so (POR, 38-39) fails.  The claims are not limited to **direct** control or controlling anything beyond "operation of" the unit(s).  In Singular's own embodiment, a host computing

device controls operation of the SIMD PEs by instructing an intermediate control unit (CU). '156 Patent, 8:17-36 ("Host computer 102" "is responsible for overall **control** of the computing system"), 8:65-9:2 ("Host 102…load[s] the instructions (the program) for the PEA 104 into the CU…, then instruct[s] the CU 106 to interpret the program and cause the PEA 104 to compute according[ly]"); Goodin-Reply, ¶¶ 36-37.



**'156 Patent, Fig. 1**

Moreover, Singular alleges Google's TPU meets the claimed "computing device" via a CPU that "issu[es] commands to the Core Sequencer," thereby "control[ling] the operation of the LPHDR execution units."  POR, 68 ("Each TPU device is controlled by a Core Sequencer (which, *in turn*, is controlled by…a program running on a CPU).").  This is no different from MacMillan's Host CPU controlling PE operation by controlling the SIMD Controller.  Goodin-Reply, ¶ 38.

**C.    Claim 3**

Claim 3 requires "the number of LPHDR execution units" to exceed the number of "execution units…adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (hereinafter "32-bit EUs," as in DI, 34-35).  Because the number of Dockser FPPs in Dockser/MacMillan exceeds the single Host CPU, claim 3 is met.

The Board correctly found "Dockser's FPPs do not count toward the number of 32-bit EUs" because Dockser's FPPs are LPHDR execution units.  DI, 34-35. As the Board noted, the specification "distinguish[es] between the two sets of units," describing 32-bit EUs as "traditional precision" units ("arithmetic elements…designed to perform…arithmetic of traditional precision"), whereas LPHDR units allow "precision [to] vary across implementations" and "produc[e] results that are 'sometimes' or 'all of the time' not closer than a certain amount to the correct result."  DI, 35 (citing '156 Patent, 26:39-49, 26:61-27:17, 27:52-63).

The "sometimes" at 26:39-60 is not tied to the claims' "X" limitation (contrary to POR, 35); that limitation (called "F" in the specification) has its own later paragraph at 27:18-51.  Goodin-Reply, ¶¶ 39-41.  *See also* '156 Patent, 26:61 (LPHDR units "hav[e] various possible degrees of precision"), 28:25-29 ("[T]he number NL of LPHDR elements…and the number NH of elements designed to perform…arithmetic of traditional precision…may be the total counts of the *respective elements* within that physical device.").

Singular says Google's (and the DI's) interpretation ignores the "at least" in claim 3.  POR, 33.  Not so.  The "traditional precision" units that the specification distinguishes from LPHDR units perform "arithmetic" operation(s) on 32-bit numbers; Google's interpretation gives meaning to "at least the operation of *multiplication*" by encompassing other 32-bit arithmetic operations besides multiplication.  Goodin-Reply, ¶ 42.

Singular's assertion that the specification describes prior-art GPUs as having "multiple execution units" that each "can be both a claim 3 full-precision [32-bit] multiplication execution unit and" perform low-precision operations (POR, 33-34) is unsupported.  "When a graphics processor [GPU] includes support for 16 bit floating point, that support is *alongside* support for 32 bit floating point."  '156 Patent, 5:36-45.  NVIDIA's GPU (*id*., 5:18), for example, had multiple parallel streaming-processor (SP) cores that performed floating-point operations *only* at 32-

bit precision, and far fewer **separate** components that "support[ed]" 16-bit floating-point data.  Goodin-Reply, ¶¶ 43-53 (citing Ex. 1073 ("Lindholm"); Exs. 1074-1075).  16-bit "support" conventionally meant **inputs** were 16-bit, and no evidence establishes that this meets the low precision of any claim.  Goodin-Reply, ¶ 46; *see supra* § I.C; *infra* § V.B.4.b.



**Lindholm, Fig. 2 (annotated)**

POSAs would have understood the specification's statement that GPUs' "substantial resources to 32…bit arithmetic" were "wasteful of transistors" refers to the many traditional-precision-only units (*e.g.*, SPs) in GPUs that ***could not*** perform lower-precision operations.  Goodin-Reply, ¶¶ 54-55.

The specification is clear that claim 3's 32-bit EUs are separate and distinguished from LPHDR units.  Dockser's FPP is the latter.

## IV.    GROUND 4

### A.    Dockser/Tong/MacMillan's Non-Customized Implementation

Singular's arguments against Ground 4's non-customized implementation rely entirely on the arguments "explained above" against Grounds 2-3 (POR, 39-40), which fail as discussed *supra* §§ II-III.

### B.    Dockser/Tong/MacMillan's Customized Implementation

Ground 4 also established all challenged claims obvious over an alternative implementation incorporating customized Dockser FPPs having no full-precision capability in MacMillan's architecture for use in "an embedded system designed specifically for signal processing" that never uses full precision.  Petition, 57-60. This obvious implementation meets claims 3-8 even under Singular's interpretation of claim 3.  Singular's arguments against this customized implementation fail.

Tong's alleged teaching that ***some*** "scientific programs" require full precision (POR, 42-43) is irrelevant.  Tong ***also*** says "not all programs need the precision provided by generic FP hardware," and for an "application-specific

task"—like the applications used in Ground 4's embedded signal-processing

system—a "custom FP format may be a viable option." Tong, 278-280; Goodin-

Reply, ¶¶ 56-57. Likewise, full-precision capability is not a "central tenet" of

Dockser (contrary to POR, 43). As Petitioner noted and Singular did not dispute,

Dockser ([0017]) says the input "register file" can be "formatted differently from

IEEE 32-bit…, and/or may contain a different number of register locations." That

is the customization Ground 4 applies for the "embedded applications" MacMillan

(7:15-34) describes. Petition, 57-59; Goodin-Reply, ¶¶ 58-59.

Singular's conclusory allegation that the combination "would increase

manufacturing costs" (POR, 44) is "unsupported by any specific cost analysis" (DI,

39) and legally irrelevant. *See supra* § III.A; Goodin-Reply, ¶ 60.

Singular's assertion that MacMillan "relies on…conventional components to

reduce cost" (POR, 44-45) is unsupported. MacMillan "permits"/"allows" *some* of

its "***memory***" to be "conventional" (MacMillan, 6:24-36), but does not limit other

components (including floating-point units) to being "conventional." Goodin-

Reply, ¶ 61; Khatri-Depo., 139-143 ("MacMillan has simply no opinion…on

what's inside the PE"). In MacMillian's "embedded" systems (7:15-34), POSAs

understood that components were conventionally customized to save space/power.

Petition, 57-58; Goodin-Reply, ¶ 62; Ex. 1076, 1 ("[e]mbedded computers" "often

employ idiosyncratic processors…designed…for a limited class of applications"),

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.
_____

Case No. IPR2021-00165
Patent No. 9,218,156
_____

**REPLY DECLARATION OF RICHARD GOODIN**

Google Exhibit 1071
Google v. Singular
IPR2021-00165

31.    Dr. Khatri asserts that Dockser's FPP would "*increase* costs" in MacMillan's system.  Khatri, ¶ 104 (emphasis in original).  However, I have reviewed Dr. Khatri's declaration, and I find no evidence cited in Dr. Khatri's declaration to demonstrate that incorporating Dockser's FPP into MacMillan's system would increase cost *at all*, much less to any appreciable degree.  Dr. Khatri says in ¶ 103 of his declaration that "Dockser's FPPs are even _larger_ than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes" (emphasis in original).  But I find no evidence cited in Dr. Khatri's declaration that establishes that any size difference that may exist between Dockser's FPP and conventional units would increase cost, much less that any such increase would outweigh the cost decrease gained by Dockser's power savings.  Additionally, even if there were some cost increase, that does not mean there is no motivation to implement the combination for other beneficial reasons, such as those I discussed in my original declaration. Goodin-Orig., ¶¶ 340-344.

### B.    "Computing Device"

32.    Dr. Khatri asserts that MacMillan's CPU in the Dockser/MacMillan combination does not meet the "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit" recited in the

operation of the at least one first LPHDR execution unit" would have understood that the claim language is not limited to **_direct_** control, and does not require controlling anything beyond "the operation of" the unit(s) (*e.g.*, whether, when and/or how the LPHDR units operate).

37.    In fact, a POSA would have understood that in the '156 Patent's own described embodiment, a host computing device controls operation of the SIMD PEs by instructing an intermediate control unit ("CU") (like MacMillan's SIMD Controller) to control the PEs. *See* '156 Patent, 8:17-36, 8:65-9:2. The '156 Patent states that the "SIMD computing system 100 [that] is illustrated in FIG. 1 … includes a collection of many processing elements (PEs) 104." *Id.*, 8:17-19. "The collection of PEs is referred to [in the patent] as 'the Processing Element Array' (PEA)." *Id.*, 8:21-23. A POSA would have understood that the "PEs" in the "PEA" are an embodiment of LPHDR execution units. *See*, *e.g.*, Goodin-Orig., ¶ 200. The ""Host computer 102 "is responsible for overall **_control_** of the computing system," which includes the LPHDR execution units (*i.e.*, the PEs). *Id.*, 8:65-9:2. Furthermore, the way that the host computer exercises this control is by instructing an intermediate "control unit (CU)" (*id.*, 8:20) to execute a program to control the PEs. *See id.*, 8:65-9:2 ("Host 102 typically will load the instructions (the program) for the PEA 104 into the CU instruction memory (not shown in FIG. 1), then instruct the CU 106 to interpret the program and cause the PEA 104 to

compute according to the instructions.").   As I explained in my original

declaration (*e.g.*, Goodin-Orig., ¶¶ 349-350), the '156 Patent's control scheme is

mirrored by the process MacMillan describes whereby "the uniprocessor program"

running on the "Host CPU" "calls a system routine to start SIMD Controller

execution," as a result of which "[t]he SIMD Controller 252 then executes the

SIMD program."  MacMillan, 10:46-67; Goodin-Orig., ¶¶ 349-350 (citing, *e.g.*,

MacMillan, 9:20-31, 10:27-30, 10:46-51, 10:66-67, 8:56-9:2, 10:44-45, 13:35,

10:44-49; '156 Patent, 8:34-35, 8:53-54, 8:65-9:2).



**'156 Patent, Fig. 1**

'sometimes' operate at lower precisions" (emphasis in original).  In light of a POSA's understanding of prior-art GPUs, which I discuss above (*e.g.*, paragraphs 44-53), I disagree, and in my opinion a POSA would have disagreed.  As I discussed above (*e.g.*, paragraphs 50-53), the parallel (SIMT) architecture of the GPUs the specification discusses, which contained the vast majority of the GPU's processing units, was composed of 32-bit-only units that ***could not*** perform lower-precision operations.  A POSA would have understood the '156 Patent's specification's statement that "existing GPUs devote substantial resources to 32 … bit arithmetic and are wasteful of transistors" ('156 Patent, 5:43-45) is referring to the large number ("substantial resources") of traditional-precision-only units (*e.g.*, SPs) in the GPUs that could not sometimes perform lower-precision operations.  Thus, the specification supports my opinion that claim 3's 32-bit EUs are separate and distinct from LPHDR execution units, of which Dockser's FPP is the latter and not the former.  *See* Goodin-Orig., ¶ 363-364.

## IV.    GROUND 4 – DOCKSER/TONG/MACMILLAN COMBINATION

### A.    Customized Implementation of Dockser/Tong/MacMillan Combination

56.    As I explained in my original declaration, the challenged claims of the '156 Patent are also met by an obvious alternative implementation of the Dockser/Tong/MacMillan combination that incorporates customized Dockser FPPs (customized in a manner having no full-precision capability) in MacMillan's

architecture for use in "an embedded system designed specifically for signal processing" that never uses full precision. Goodin-Orig., ¶ 395; *see also* Goodin-Orig., ¶¶ 391-401. This obvious implementation meets claim 3 and its dependents even if claim 3 were interpreted in the manner Dr. Khatri proposes in ¶¶ 90-100 of his declaration. For the reasons I explain in paragraphs 57-69 below, I disagree with Dr. Khatri's assertions that a POSA would not have been motivated to make this customized implementation.

57.    Dr. Khatri asserts that Tong teaches that ***some*** "scientific programs" "*inevitabl*[y]" require full precision in a generic system intended for all applications. Khatri, ¶ 111 (emphasis in original). Even if true, that assertion is irrelevant to the customized implementation of the Dockser/Tong/MacMillan combination, which is ***not*** a generic system intended for all applications. The customized implementation of the Dockser/Tong/MacMillan combination is an "an embedded system designed specifically for signal processing," that "only operate[s] at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential'" for all applications. Goodin-Orig., ¶ 395 (quoting Tong, 279). Whatever Tong may say about ***other*** "different … scientific programs" (Tong, 279), Tong ***also*** teaches that "not all programs need the precision provided by generic FP hardware," and "[f]or a narrow, application-specific task"—like the applications performed by

Dockser/Tong/MacMillan's embedded signal-processing system (Goodin-Orig., ¶ 395)—a "custom FP format may be a viable option." Tong, 278-280.

58.     Dr. Khatri asserts that "a central tenet of Dockser" is "to always be able to execute full-precision operations." Khatri, ¶ 114 (citing Dockser, [0003]). I disagree with Dr. Khatri's characterization of Dockser, and in my opinion a POSA would also have disagreed. The paragraph of Dockser that Dr. Khatri cites, paragraph [0003], states:

> The performance of floating-point arithmetic operations can entail computational ***inefficiency*** because floating-point processors are commonly limited to the precision provided by either the ***single format, or both the single and double formats.*** While ***some applications <u>may</u> require these types*** of precision, ***other applications may not***. For example, some graphics applications may only require a 16-bit mantissa. For these graphics applications, any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption. This is of particular concern in battery operated devices where power comes at a premium, such as wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras, just to name a few. If it is known that an application always requires a certain reduced precision, the floating-point processor can be designed and built to that reduced precision. ***For general purpose processors***, however, the common situation is that for certain applications, e.g. generating 3D graphics, a reduced precision may be acceptable, and ***for other applications, e.g. implementing Global Positioning System***

> **(GPS) functions, a greater precision <u>may</u> be needed**. Accordingly, there is a **need in the art for** a floating-point processor in which the **reduced precision, or subprecision**, of the floating-point format is selectable. Power management techniques may also be employed to ensure that that the floating-point processor does not consume more power than necessary to support the selected subprecision.

Dockser, [0003]. Thus, this paragraph nowhere states or suggests that to "always" execute full-precision operations is a "central tenet" of Dockser (Khatri, ¶ 114); rather, this paragraph teaches that **some** processors, *i.e.* "general purpose processors," "**may**" require full precision. Other types of processors (not intended to be "general purpose") may not.

59.    Moreover, as I noted in my original Declaration (*see* Goodin-Orig., ¶ 396), and which Dr. Khatri does not appear to dispute (*see* Khatri, ¶¶ 110-115), Dockser ([0017]) explicitly teaches that its input "register file" can be "formatted differently from IEEE 32-bit…, and/or may contain a different number of register locations." That is precisely the customization applied in Dockser/Tong/MacMillan in the "embedded applications" that MacMillan describes. Goodin-Orig., ¶¶ 391-401; MacMillan, 7:15-34.

60.    Dr. Khatri asserts that "[t]he removal of full-precision circuitry from the Dockser FPP … would increase manufacturing costs." Khatri, ¶ 115. I disagree, and in my opinion a POSA would have disagreed. I find no evidence

MacMillan, 6:24-36. However, a POSA reading MacMillan would have understood that MacMillan does not limit other components (including MacMillan's floating-point units—MacMillan, 12:55-56) to being "conventional."

62.     Second, in the "embedded" systems that MacMillan (7:15-34) describes, POSAs understood that components were conventionally customized, for example to save space and power. For documentary evidence corroborating my testimony regarding a POSA's background knowledge in this regard, *see, e.g.*, Ex. 1076 ("Cooper")[3], page 1 ("[e]mbedded computers" "often employ idiosyncratic processors…designed…for a limited class of applications"), page 5 ("difference[s] between the embedded environment and more general computing environments"

---

[3] The indicia on the face of Cooper indicate that it was publicly accessible as early as 2003. For example, Cooper bears a date of "June 2003" (Cooper, cover page) and includes a statement that it had been deemed "releasable to the general public" by the "Air Force Research Laboratory" (Cooper, second page). Cooper also contains a "Report Documentation Page" (Cooper, third page) that lists a "Report Date" of "Jun 03." In my opinion, these indica, combined with Ex. 1079 and the fact that Cooper is dated years before the '156 Patent's 2009 claimed priority date, demonstrate that Cooper would have been publicly accessible prior to the '156 Patent's claimed priority date.

include "power and size constraints"); Ex. 1097 ("Miner"), 1:23-26 ("processors in embedded systems are often streamlined…to the purpose of the product device and are not configured to perform general-purpose computing"); Ex. 1077 ("Lienhart")[4], page 1 (in "special purpose computers" for "very specific problems," "arithmetic units are implemented which are optimally suited for the computation pattern of the problem."); Ex. 1078 ("Fang")[5], page 496 ("***Modern digital signal processing DSP applications*** are typically prototyped using ***floating-point arithmetic***, which offers both large dynamic range and high precision for each numerical computation.  However, ***for hardware implementations, the final form rarely uses a full-precision floating-point unit, given issues of silicon area, power, and speed***.").

63.    Dr. Khatri asserts that "Tong suggests 11 bits of precision for specific signal processing applications, and Petitioner provides no analysis of whether 11 bits of precision would meet the imprecision limitation."  Khatri, ¶ 116.  However, whether using 11 bits of precision would "meet the imprecision limitation" is

---

[4] Ex. 1080 demonstrates that Lienhart was publicly accessible as of 2002, prior to the '156 Patent's claimed priority date.

[5] Ex. 1081 demonstrates that Fang was publicly accessible as of 2003, prior to the '156 Patent's claimed priority date.

irrelevant, because the Dockser/Tong/MacMillan combination also uses other lower precision levels that Tong teaches. Tong teaches that embedded signal-processing programs "range in complexity" and can use different precision levels between 5 bits and 11 bits. Tong, 278-279; Goodin-Orig., ¶ 393. Dockser's precision is selectable, and in the embedded signal-processing system of Dockser/Tong/MacMillan, it would have been obvious to customize Dockser's FPP for the use of any of "the precision levels Tong teaches" for particular programs performed by an embedded signal-processing system. Goodin-Orig., ¶ 321. *See also* Goodin-Orig., ¶ 399 (noting that "the input signal and selected precision levels are unchanged" from my previous analysis of the Dockser, Dockser/Tong, and Dockser/MacMillan combinations), ¶ 393 ("Tong experimentally demonstrates that the optimum precision for a 'benchmark suite' (Tong, 284) of 'five signal processing applications' spanning a 'range in complexity' is between 5 and 11 mantissa fraction bits (Tong, 278-279)."), ¶ 394 ("A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels…in MacMillan's embedded signal-processing system"). Dr. Khatri does not dispute that the claimed imprecision limitation [1B2] is met by 5-bit through 9-bit precision, which are among the levels Tong teaches for various embedded signal-processing applications.

55
APPX08060

79.    Additionally, the use of a "large number" of execution units "capable of executing arithmetic operations *only* at low precision … in order to 'put more multipliers in the same chip area'" (Khatri, ¶ 127, emphasis original) was not novel.  Numerous prior-art references each individually taught using smaller, lower-bitwidth execution units to facilitate parallelization, as I explain in this paragraph and in paragraphs 80-83 below.  For example, Ex. 1088 ("Belanovic-Article"), explained that "[m]any image and signal processing applications benefit from acceleration with reconfigurable hardware," and that "[t]his acceleration results from the exploitation of fine-grained parallelism available in reconfigurable hardware."  Belanovic-Article, 657.  The article then taught that "[r]econfigurable implementations that exhibit speedup are possible if…a more flexible floating-point representation than full IEEE precision is used, thus allowing for greater parallelism."  *Id.*  The article then noted:

> Optimal implementations of algorithms frequently do not require the bitwidths specified by the IEEE standard. Often, much smaller bitwidths than those specified in the 754 standard are sufficient to provide the desired precision. Reduced bitwidth implementations require fewer resources and thus allow for more parallel implementations than using the full IEEE standard format.

Belanovic-article, 658.  Thus, a POSA would have understood that Belanovic-Article taught achieving "greater parallelism" and "more parallel implementations"

by using "reduced bitwidth implementations" that "require fewer resources." Moreover, Belanovic-Article discloses a reduced-bitwidth high-dynamic-range format with 6 exponent bits and 9 mantissa bits. *See* Belanovic-Article, p. 663, Table 2 (Format C2). Ex. 1091 demonstrates that Belanovic-Article was publicly accessible as of 2002, prior to the '156 Patent's claimed priority date.

80.     As another example, Belanovic-Thesis (Ex. 1084) explained:

> Many ***image and signal processing applications benefit from acceleration*** with ***reconfigurable hardware***. This ***acceleration results*** from the exploitation of fine-grained ***parallelism*** available in reconfigurable hardware. ***Custom circuits built for these applications in reconfigurable hardware process values*** in fixed ***or floating-point formats***.

Belanovic-Thesis, 9. Belanovic-Thesis also explained that "[r]educing datapath bitwidths to their optimal values enables design of more parallel architectures and implementation of larger designs." *Id.*, 13. Belanovic-Thesis noted that prior work showed that "implementing IEEE single precision operators was possible, but also impractical on then current FPGA technology"; the reason was that "[a]rea was the critical constraint." *Id.*, 17. Because of this, the authors of the prior work discussed in Belanovic-Thesis "propose adopting smaller, custom formats which may be more appropriate to FPGA architectures than the full IEEE formats," including a "(1-6-9)" format, which a POSA would have understood referred to 6

exponent bits and 9 mantissa fraction bits, since Belanovic-Thesis refers to "full 32 (1-8-23) bits in the IEEE standard" and IEEE single-precision has 8 exponent bits and 23 mantissa bits. *Id.*, 17-18. Belanovic-Thesis presented the results of an experiment in which arithmetic operation circuits using different number formats, including the 6-exponent-bit/9-fraction-bit format, were "synthesiz[ed]" (*i.e.*, implemented) on an FPGA. *Id.*, 46-47, Table 2.2 (annotated below). This table shows that the area of floating-point adders and multipliers ***decreases*** as bitwidth decreases, enabling more multipliers and adders to fit on a single chip. Thus, a POSA would have understood Belanovic-Thesis to teach fitting more adders and multipliers in parallel on a single chip by reducing their bitwidth in order to reduce their area. Finally, Belanovic-Thesis noted that higher parallelism may be achieved" using "bitwidths significantly lower than those of the IEEE formats." *Id.*, 70. Belanovic-Thesis noted (in 2002) that "future work" involving "custom floating-point formats" "may include algorithms that are highly parallel and have signal values that have a high enough range to require floating-point representation, yet are tolerant enough to accommodate [the] lower precision" of custom formats. *Id.*, 69-70.

Table 2.2: Operator synthesis results

| Format | Bitwidth | | | Area | | Per IC | |
|--------|-------|----------|----------|--------|--------|--------|--------|
| | total | exponent | fraction | fp_add | fp_mul | fp_add | fp_mul |
| A0 | 8 | 2 | 5 | 39 | 46 | 236 | 200 |
| A1 | 8 | 3 | 4 | 39 | 51 | 236 | 180 |
| A2 | 8 | 4 | 3 | 32 | 36 | 288 | 256 |
| B0 | 12 | 3 | 8 | 84 | 127 | 109 | 72 |
| B1 | 12 | 4 | 7 | 80 | 140 | 115 | 65 |
| B2 | 12 | 5 | 6 | 81 | 108 | 113 | 85 |
| C0 | 16 | 4 | 11 | 121 | 208 | 76 | 44 |
| C1 | 16 | 5 | 10 | 141 | 178 | 65 | 51 |
| C2 | 16 | 6 | 9 | 113 | 150 | 81 | 61 |
| D0 | 24 | 6 | 17 | 221 | 421 | 41 | 21 |
| D1 | 24 | 8 | 15 | 216 | 431 | 42 | 21 |
| D2 | 24 | 10 | 13 | 217 | 275 | 42 | 33 |
| E0 | 32 | 5 | 26 | 328 | 766 | 28 | 12 |
| E1 | 32 | 8 | 23 | 291 | 674 | 31 | 13 |
| E2 | 32 | 11 | 20 | 284 | 536 | 32 | 17 |

individual adder/multiplier area INCREASES with bitwidth

FEWER adders/multipliers per IC as bitwidth increases

**Belanovic-Thesis, Table 2.2 (annotated)**

81.    Another example is 1089 ("Hoefflinger"). Hoefflinger, a 1991 paper, related to a "digital logarithmic" (or "DIGILOG") multiplier, and explained that in the contexts of "real-time signal processing in systolic arrays," "neural networks," and "mathematical operations," there was "increasing interest" in "put[ting] many, possibly hundreds, of multipliers on a single application-specific chip." Hoefflinger, 16.7.1. Hoefflinger further explained that "[m]inimisation of the product of multiplication time and chip area becomes the key figure of merit in this

context." *Id.* Hoefflinger "reported" a "multiplier" "which improves the time-area product basically by an order of magnitude and by even larger amounts, if actual system implementations are considered." *Id.* One of the multipliers that Hoefflinger "reported" used "10 bit logarithmic data" and yielded a 16 bit result, which could be "truncated at 8 bit," resulting in a "maximum accuracy of 10%." Hoefflinger, 16.7.3 ("The DIGILOG multiplier can be tailored to the particular system requirements. Several cases are listed in table 1. The most complex version uses 10 bit logarithmic data and yields a 16 bit result. It requires 800 transistors and 8 gate delays. If a maximum accuracy of 10 % is acceptable and the result is truncated at 8 bit, only 450 transistors and 6 gate delays are required."). Thus, a POSA would have understood that Hoefflinger disclosed using "10 bit logarithmic data" for "[m]inimisation of the product of multiplication time and chip area" to "put many, possibly hundreds, of multipliers on a single application-specific chip" in "real-time signal processing in systolic arrays, [and] neural network[s]." Ex. 1092 demonstrates that Hoefflinger was publicly accessible as of 1991, prior to the '156 Patent's claimed priority date.

82.    Another example is Ex. 1077 ("Lienhart"). Lienhart, a 2002 paper, explained that in "typical FPGA designs,"

> *optimally suited calculation units with a high degree of*
> *parallelization can be designed, where a minimum amount of silicon*
> *is wasted* for modules in wait state. *This is possible if* the underlying

algorithm has a simple computation pattern which allows to design a special purpose calculation structure. ***Furthermore the required precision of operators must be small enough*** to enable an implementation.

Lienhart, page 1. Thus, a POSA would have understood Lienhart to teach that a "high degree of parallelization can be designed" if the "precision of operations [is] small enough." *Id.* Ex. 1080 demonstrates that Lienhart was publicly accessible as of 2002, prior to the '156 Patent's claimed priority date.

83.     Another example is Ex. 1090 ("Shirazi"), a 1995 paper, which noted that while "conventional" "floating point operators require excessive area," "custom formats…can be implemented on a fraction of a single FPGA." Shirazi, Abstract ("Many algorithms rely on floating point arithmetic for the dynamic range of representations and require millions of calculations per second. Such computationally intensive algorithms are candidates for acceleration using custom computing machines (CCMs) being tailored for the application. Unfortunately, ***floating point operators require excessive area*** (or time) for conventional implementations. Instead, ***custom formats, derived for individual applications***, are feasible on CCMs, ***and can be implemented on a fraction of a single FPGA***."). Ex. 1093 demonstrates that Shirazi was publicly accessible as of 1995, prior to the '156 Patent's claimed priority date.

I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 11/01/2021


Richard Goodin

91

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 9,218,156
Filing Date: March 25, 2013
Issue Date: December 22, 2015

Inventor:  Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

**PATENT OWNER'S SUR-REPLY TO PETITIONER'S REPLY**

Case No. IPR2021-00165

other than hindsight,[2] that a POSA would select 5 bits over the 7, 9, or 11-bits, especially when Tong itself acknowledges that 11-bits is needed for reliable results across *all* the selected applications.  POR, 26-27.  The Reply similarly provides no such reasoning.  Reply, 8-9.

Indeed, Tong both implicitly and explicitly teaches a POSA that any useful computer system must *retain* full-precision capabilities.  For example, Tong teaches that "it appears inevitable that some fraction of our operands will require full IEEE-standard precision."  Tong, 280.  A person of ordinary skill in the art certainly would not have been motivated by these teachings to modify Dockser to operate only in 5-bit, 7-bit, or 9-bit modes, as Google erroneously suggests.

Accordingly, Ground 2 does not render any Challenged Claims obvious.

## III.    GROUND 3

### A.    Dockser/MacMillan Cannot Meet the "Exceeds" Limitation

To meet Claim 3, the number of LPHDRs in a given device must "exceed by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers

---

[2] The Reply casts the mantissa size as a "result-effective variable" but, as with the Petition and as discussed in the POR, provides no non-hindsight basis to choose any particular mantissa size.  POR, 24-27.

that are at least 32 bits wide." '156 Patent, 30:13-17 (the "exceeds limitation"). In other words, the number of LEUs must be at least 100 greater than the number of execution units adapted to execute at least the operation of multiplication on 32-bit floating point numbers. POR, 28-37. Google has not sought to construe the exceeds limitation.

Google also does not dispute that Dockser is adapted to execute multiplication on numbers 32 bits wide. POR, 29-31. Reply, 12-15.

Instead, Google argues that if an execution unit is capable of executing low precision high dynamic range operations (*e.g.*, a Dockser unit), it cannot also be adapted to execute 32-bit operations. Reply, 12 ("Because the number of Dockser FPPs in Dockser/MacMillan exceeds the single Host CPU, the 'exceeds' claims are met."). In other words, Google's ***only*** argument that this limitation is met by its cited art is based on an unsupported and untenable construction: that a unit that performs low precision high dynamic range operations cannot also be a unit "adapted to execute at least the operation of multiplication on 32-bit floating point numbers."

Google's argument thus imports an unsupported negative limitation into the claim; in other words, Google argues that "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" actually means "execution units in the device ***that are not LPHDR execution units and that are*** adapted to execute at least the operation of

11

multiplication on floating point numbers that are at least 32 bits wide." There is no support for this negative limitation.

In an attempt to support its construction argument, Google points to a part of the specification that distinguishes between units that are "designed to perform . . . arithmetic of traditional precision," and LEUs. Reply, 12; Pet., 54. This passage, however, does not support Google's construction of this "adapted to execute" term. While an LEU and a full precision unit are different things, this does not mean that a device capable of full precision operations (*i.e.*, "adapted to execute at least . . . operations on . . . numbers that are at least 32 bits wide") suddenly loses this capability whenever it happens to be programmed to perform low precision high dynamic range operations. That full precision capability remains no matter how the device is programmed.

Google also argues in support of its position that because the specification states "a LPHDR arithmetic element produces results which are *sometimes* (or all of the time) no closer than 0.05% to the correct result", a 32-bit EU can therefore *never* produce inexact results. '156 Patent, 26:39-60. Singular does not dispute this statement—claimed LEUs sometimes produce incorrect results. However, Google makes a flawed logical leap from this uncontroversial statement to the incorrect conclusion that an execution unit capable of 32-bit multiplication—as claimed—can *never* produce incorrect results. Nothing in the passage cited above, or anywhere

else in the patent's claims or specification, supports this logical fallacy. The mere fact that an LEU *sometimes* produces inexact results does not mean that an execution unit *capable* of 32-bit multiplication can *never* produce inexact results if, for example, programmed differently. The specification simply never contemplates, let alone reaches, such a conclusion.

Google's interpretation also improperly limits the applicability of the words "at least" in the term "at least the operation of multiplication," as Singular has explained. POR, 33. Google argues that its interpretation gives meaning to this claim language because it allows for the claim to encompass "other 32-bit arithmetic operations besides multiplication." Reply, 13. This argument is absurd, in large part because the specification never compares counts of units that perform multiplication to counts of units that do not perform multiplication. Singular's interpretation on the other hand, while encompassing other 32-bit operations besides multiplication, also encompasses EUs that perform non-32-bit operations. This is important because the specification *does* repeatedly compare counts of 32-bit precision execution units to counts of non-32-bit precision execution units (*see* for example '156 Patent, 27:52-28:7). By contrast, Google's interpretation arbitrarily excludes comparing counts of devices that support 32-bit operations, to counts of devices that do not support 32-bit operations, notwithstanding the specification's support for such comparisons. POR, 33.

Finally, Google attempts to dismiss the discussion of GPUs that support both 16- and 32-bit operations, and specifically the distinction drawn between such GPUs and the claimed LEU, by citing entirely new references (Ex. 1073-75). Reply, 13-15. The references are not cited in the prosecution history of the '156 Patent and are not relevant to what the inventor intended to claim.

For the reasons given above, Dockser and MacMillan cannot meet the plain language of the claim. Google's interpretation of the "exceeds" limitation is untethered from the specification, and its irrelevant extrinsic evidence cannot improperly alter the "exceed" claims' scope.

### B.    There Is No Motivation to Combine Dockser and MacMillan

A POSA would not be motivated to combine Dockser and MacMillan because while MacMillan is focused on reducing cost, Dockser's specialized FPP is larger, and thus costlier, than even the full precision execution units used in Macmillan. POR, 36-37.

Google argues that Singular provided no evidence that incorporating Dockser would increase cost (Reply, 9-10), but Singular cited both its own and Google's expert testimony that use of a Dockser FPP increased size and complexity, and therefore cost. POR, 37. It is also apparent to anyone skilled in the art that a Dockser-like FPP that supports a wide range of precisions—including 32-bit precision—would be physically larger than a MacMillan-like FPP that supports *only*

32-bit precision, thus requiring more volume, more transistors, and a higher cost.

Google next argues that such cost concerns are not relevant to obviousness. Reply, 10. Singular's argument is not that it would be too costly to implement a Dockser/MacMillan combination, as in the cited *Farrenkopf* case. Instead, Singular's argument is that a POSA would not seek to introduce to MacMillan additional complexity and cost, in the form of Dockser FPPs, given MacMillan *is explicitly focused on reducing cost*. POR, 36-37.

## C.    Dockser and MacMillan Fail to Disclose or Render Obvious the "Computing Device"

Google does not dispute that the Host CPU in MacMillan is optional, and that the SIMD controller actually controls the PEs. *See* Reply, 10-12. Thus, Google provides no basis for finding that MacMillan's CPU meets the "computing device" limitation of the claims. POR, 37-39.

## IV.   GROUND 4

Neither Tong nor Dockser nor MacMillan suggest using in a MacMillan system a Dockser FPP that is modified by *physically removing* its full precision capabilities. POR, 40-45. Google's Reply suggests that Tong states otherwise. It does not.

Google's purported motivation comes from Tong's mention that for a "narrow, application-specific task, a single custom FP format may be a viable

option." Reply, 15-16. Tong, however, immediately dismisses the idea in the next

sentence:

> For a narrow, application-specific task, a single custom FP format may
> be a viable option. However, **to be more generally useful**, **we need to
> consider arithmetic architectures which can scale to different FP
> formats.** Even though we may be able to assume that most of our
> operands can be computed successfully in limited precision**, it appears
> inevitable that some fraction of our operands will require full IEEE-
> standard precision**.

Tong, 280 (under section "Exploiting a Variable Bitwidth Multiplier") (emphasis

added). As explained in the POR, a POSA faced with Dockser's variable precision

FPP, and Tong's variable precision teachings, would not discard both to create

Singular's non-variable single precision (*i.e.*, low precision) device. Google offers

no motivation to do so other than hindsight.[3] *See Otsuka Pharm. Co. v. Sandoz, Inc.,*

---

[3] Google's statement that Dockser says its "'register file' can be 'formatted

differently from IEEE 32-bit . . . and/or may contain a different number of register

locations'" is irrelevant. The different formatting referred to is the mapping of the

bits, not a change to a smaller number of bits. Dockser, [0017] (referring to changing

as a whole clearly shows that Google was skeptical that the invention would be workable or useful.  POR, 50-52.  ███████████████████████

████████████████████████████████████████████████

██████  POR, 52 (citing Ex. 2028).

Accordingly, the skepticism of Google's expert employees weighs in favor of non-obviousness.  *WBIP*, 829 F.3d, 1335-36 ("If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness.").

### C.    Google's Praise Is Relevant Evidence of Non-obviousness

As set forth in the POR, Google's own employees, considered experts in the field, praised Dr. Bates's invention.  POR, 53-54.  Google argues that the praise itself "identifies no specific features."  Reply, 23.  There is, however, no requirement that praise identify exactly the features being praised.  Here, the praise was directed to ████████████████████████████████████████████████.  POR, 53-54.  That is sufficient.  *See WBIP*, 829 F.3d at 1334-35.

Google further states that ███████████████████████████████ ████████████████████████████████  Reply, 24.  But as explained in the POR, Google's initial skepticism turned to praise as its employees began to understand the technology.  POR, 53-54.

UNITED STATES PATENT AND TRADEMARK OFFICE

——————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

——————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

——————

Case No. IPR2021-00165
Patent No. 9,218,156

——————

**PETITIONER'S NOTICE OF APPEAL**

IPR2021-00165
U.S. Patent No. 9,218,156

Pursuant to 35 U.S.C. §§ 141(c), 142, and 319 and 37 C.F.R. §§ 90.2(a) and

90.3, notice is hereby given that Petitioner Google LLC appeals to the United

States Court of Appeals for the Federal Circuit from the Final Written Decision

entered May 11, 2022 (Paper 57) in Case No. IPR2021-00165, the public version

of which is attached as Exhibit A, and from all orders, decisions, rulings, and

opinions underlying the Final Written Decision.

For the limited purpose of providing the Director with the information

requested in 37 C.F.R. § 90.2(a)(3)(ii), Petitioner anticipates that the issues on

appeal may include, but are not limited to:

- The panel's finding that claims 3–8 were not shown to be unpatentable as
  obvious.

 Pursuant to 37 C.F.R. § 90.3, this Notice of Appeal is timely, having been

duly filed within 63 days after the date of the Final Written Decision.

A copy of this Notice of Appeal is being filed simultaneously with the Patent

Trial and Appeal Board, the Clerk's Office for the United States Court of Appeals

for the Federal Circuit, and the Director of the U.S. Patent and Trademark Office.

Respectfully submitted,
*Google LLC*

Date:  June 2, 2022          /Elisabeth Hunt/
                             Elisabeth H. Hunt, Reg. No. 67,336

1

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————————————

GOOGLE LLC,
Patent Owner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

Patent No. 9,218,156
Filing Date: March 25, 2013
Issue Date: December 22, 2015

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

———————————————————————

## PATENT OWNER'S NOTICE OF APPEAL

## Case No. IPR2021-00165

———————————————————————

Pursuant to 35 U.S.C. §§ 141, 142, and 319 and 37 C.F.R. §§ 90.2 and 90.3, Patent Owner Singular Computing LLC ("Singular" or "Patent Owner") hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered May 11, 2022 (Paper 57) and from all underlying orders, decisions, rulings, and opinions regarding U.S. Patent No. 9,218,156 (the "'156 patent") in Case No. IPR2021-00165. This notice is timely under 37 C.F.R. § 90.3 and Fed. R. App. P. 4(a)(3) having been filed within 63 days after the date of the Final Written Decision. For the limited purpose of providing the Director with the information requested in 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner anticipates that the issues on appeal may include, but are not limited to: the Board's claim constructions or determinations not to construe terms; its application of those constructions; any implied claim constructions; its obviousness determinations including that claims 1-2, 16, and 33 of the '156 patent are unpatentable under 35 U.S.C. § 103; any findings related to secondary considerations of non-obviousness; the findings, rulings and conclusions supporting or relating to those determinations; its order dismissing Patent Owner's Motion to Exclude; and any other issues decided adversely to Patent Owner in any orders, decisions, rulings, or opinions in IPR2021-00165.

Simultaneous with this submission, three (3) copies of this Notice of Appeal are being filed with the Clerk of the United States Court of Appeals for the Federal

Circuit and are being submitted electronically through the Court's CM/ECF system, together with the requisite fee in the amount of $500.00. In addition, a copy of this Notice of Appeal is being filed with the Patent Trial and Appeal Board and served upon counsel of record for Google LLC.

<div align="right">

Respectfully submitted,

</div>

Dated:  July 12, 2022

<div align="right">

*/Peter Lambrianakos                /*
Peter Lambrianakos (Reg. No. 58,279)
Lead Counsel for Patent Owner
Vincent J. Rubino, III (Reg. No. 68,594)
Back-up Counsel for Patent Owner
Enrique W. Iturralde (Reg. No. 72,883)
Back-up Counsel for Patent Owner
Richard M. Cowell (Reg. No. 79,143)
Back-up Counsel for Patent Owner
**FABRICANT LLP**
411 Theodore Fremd Avenue
Suite 206 South
Rye, New York 10580
Telephone: 212-257-5797
Facsimile: 212-257-5796
Email: plambrianakos@fabricantllp.com
Email: vrubino@fabricantllp.com
Email: eiturralde@fabricantllpp.com
Email: rcowell@fabricantllp.com

</div>

IPR2021-00165
U.S. Patent No. 9,218,156

## <u>CERTIFICATE OF SERVICE</u>

A copy of Patent Owner's Notice of Appeal is being served via email on Petitioners' attorneys of record on the 12th day of July, 2022, the same day as the filing of the above-identified document in the United States Patent and Trademark Office/Patent Trial and Appeal Board, by serving Petitioners' correspondence address of record with the USPTO as follows:

Elisabeth H. Hunt
Email: EHunt-PTAB@WolfGreenfield.com
Richard F. Giunta
Email: RGiunta-PTAB@WolfGreenfield.com
Anant K. Saraswat
Email: ASaraswat-PTAB@WolfGreenfield.com
Nathan R. Speed
Email: Nathan.Speed@WolfGreenfield.com
Gregory F. Corbett
Email: Gregory.Corbett@WolfGreenfield.com
**WOLF, GREENFIELD & SACKS, P.C.**
600 Atlantic Avenue
Boston, Massachusetts 02210

*Attorneys for Google LLC*

Dated:  July 12, 2022

By:    */Peter Lambrianakos         /*
       Peter Lambrianakos (Reg. No. 58,279)
       Lead Counsel for Patent Owner
       FABRICANT LLP
       411 Theodore Fremd Avenue,
        Suite 206 South
       Rye, New York 10580
       Telephone: 212-257-5797
       Facsimile: 212-257-5796

Email: plambrianakos@fabricantllp.com

Paper No. \_\_

UNITED STATES PATENT AND TRADEMARK OFFICE
———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————

Case No. IPR2021-00179
Patent No. 8,407,273

———————

**PETITION FOR INTER PARTES REVIEW
UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.1 et seq.**

**Ground 2**:  Tong teaches reducing the number of mantissa bits to conserve power, and discloses experimental results demonstrating the optimum balance of precision and power consumption is achieved using just 5 mantissa bits for certain applications.  *Infra* § VI.A.  The Dockser/Tong combination, in which Tong's optimized precision levels are used in Dockser's LPHDR execution unit, renders obvious the same claims rendered obvious by Ground 1, and meets the claimed minimum error amounts by even greater margins.  Tong teaches to emulate in software a device comprising an LPHDR execution unit; thus Dockser/Tong also meets independent claim 33.

**Ground 3**:  MacMillan discloses a computer system with multiple floating-point execution units operating in parallel.  *Infra* § VII.A.  Based on MacMillan, a POSA would have been motivated to implement a device with multiple Dockser FPPs operating in parallel.  The resulting device (Dockser/MacMillan) meets claims reciting multiple LPHDR execution units (including independent claim 36), and provides alternative bases for meeting the "device" in claim 1.

**Ground 4**:  It would have been obvious to implement the Dockser/MacMillan device with the FPPs operating at Tong's precision levels. This Dockser/Tong/MacMillan combination meets the same claims met collectively by Grounds 1-3, and also claims 34-35 and 68-70, which recite a

APPX08350

substitute for experience, and vice versa. Goodin, ¶¶ 43-44. If the Board determines the '273 patent is only entitled to its 2012 actual filing date, a POSA in 2012 would have had the same or greater level of skill as in 2009, so the challenged claims would have been obvious for the same reasons discussed herein. Goodin, ¶ 45.

### C.    Claim Construction

Claim terms are construed herein using the standard used in civil actions under 35 U.S.C. § 282(b), and have been given their ordinary and customary meaning as understood by a POSA in accordance with the specification and prosecution history. 37 C.F.R. § 42.100(b).

### D.    Prosecution History

The examiner allowed the challenged claims, and the parent application's claims, without substantively discussing any prior art. Ex. 1042, 165-166; Ex. 1002, 164-167.

## V.    <u>GROUND 1</u>:  CLAIMS 1-2, 21-24, 26, AND 28 WOULD HAVE BEEN OBVIOUS OVER DOCKSER

The '273 patent admits LPHDR execution units were known but alleges they were considered "not useful." '273 patent, 6:58-7:11; Goodin, ¶ 191. The patent purports to encompass the idea "that LPHDR arithmetic is useful in several important practical computing applications" to save power ('273 patent, 16:25-27, 23:65-24:11), but the claims are not limited to methods of use in ***particular***

- 8 -

computing applications. Instead they recite a device comprising an LPHDR execution unit, which was known as Dockser demonstrates. Goodin, ¶ 192.

## A.    Dockser

Dockser (Ex. 1007)[1] discloses performing "mathematical operations" including "multiplication" using a "floating-point processor having a given precision." [0001], Abstract; Goodin, ¶ 193.

"Floating-point" is a number representation having "a sign component, an exponent, and a mantissa." [0001]. The sign indicates whether the number is positive or negative, and the number's absolute value equals the mantissa multiplied by a base raised to the power of the exponent. [0001]. "[F]loating-point" representation was widely used in computing and refers to a binary (base-2) representation unless some other base is expressed. Goodin, ¶¶ 194-195; '273 patent, 2:32-33; Dockser, [0001]; Tong, 274. As an example, the floating-point representation of the number 6 is: positive sign, exponent=2, mantissa=1.5 (*i.e.*, $1.5 \times 2^2 = 6$). Goodin, ¶ 196.

In standard floating-point representations of "normal" numbers (anything not smaller than $2^{-126}$), the mantissa is kept in the range $1 \leq mantissa < 2$, so only the fraction by which the mantissa exceeds 1 is specified (*i.e.*, the mantissa's leading 1 is "implied"). Dockser, [0002]; Dockser-Lall (Ex. 1010), [0003]-[0005];

---

[1] All citations in § V are to Ex. 1007 unless otherwise indicated.

Goodin, ¶ 197. For example, if three bits are used, the mantissa 1.5 is represented with three bits (100) that represent the fraction .5 as $(1 \times 2^{-1}) + (0 \times 2^{-2}) + (0 \times 2^{-3}) = .5$, and the mantissa 1.25 is represented as the bit sequence 010 that represents the fraction .25 as $(0 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) = .25$. Goodin, ¶ 198.

It was a well-known principle of mathematics and computing that "precision… is defined by the number of bits used to represent the mantissa"— "[t]he more [mantissa] bits… the greater the precision." [0002]; Gaffar (Ex. 1012), 4; Hekstra (Ex. 1013), 4:47-52. For example, the floating-point representation of the number 29 is positive sign, exponent=4, mantissa=1.8125 (*i.e.*, $1.8125 \times 2^4 = 29$). The 1.8125 mantissa can be represented precisely as the 4-bit sequence 1101, which represents the fraction .8125 as $(1 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) + (1 \times 2^{-4})$. If only three bits are used, the closest representable mantissas are 1.75 and 1.875—*i.e.*, the bit sequence 110 represents the mantissa $1 + (1 \times 2^{-1}) + (1 \times 2^{-2}) + (0 \times 2^{-3}) = 1.75$, while the bit sequence 111 represents the mantissa $1 + (1 \times 2^{-1}) + (1 \times 2^{-2}) + (1 \times 2^{-3}) = 1.875$. Thus, with a 3-bit mantissa, the number 29 cannot be represented precisely, but can be approximated less precisely as $1.75 \times 2^4 = 28$ or $1.875 \times 2^4 = 30$. Goodin, ¶¶ 199-200.

"[M]odern computers" "commonly" use the "ANSI/IEEE-754 standard… 32-bit single format," which represents floating-point numbers using "a 1-bit sign,

an 8-bit exponent, and a 23-bit mantissa." [0002]. Dockser recognized that "[w]hile some applications may require these types of precision, other applications may not." [0003]. For example, if the lower precision from using just 16 mantissa bits suffices for a particular application, then "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," which "is of particular concern in battery operated devices where power comes at a premium." [0003]; Goodin, ¶ 201.

Dockser's "floating-point processor (FPP)" operates at a selectable "subprecision of the floating-point format," below the precision of the "IEEE-754 32-bit single format" of the input numbers it receives, by removing power from some least-significant mantissa bits in the FPP's operation, resulting in those mantissa bits being dropped and "reducing the [FPP's] power consumption." [0014]-[0018], [0026]-[0027]; Goodin, ¶ 202.

As detailed below, certain implementation details (*e.g.*, the range of numbers the 32-bit IEEE-754 standard represents) were so well known as to be unnecessary for Dockser to explain. Goodin, ¶ 203. Ground 1 establishes a POSA would have understood Dockser to teach a device implemented in these ways, or alternatively they would have been obvious implementations of Dockser's teachings. References below to Dockser "meeting" claim limitations refer to Dockser's

- 11 -

device implemented to include any details discussed as being the understood and/or obvious implementation of what Dockser describes.

## B.     Claim 1

### 1.     [1A1] "A device comprising: at least one... (LPHDR) execution unit"

Dockser's FPP is "incorporate[d]" in a "computing system[]." [0001], [0015], [0035]-[0036]. The computing system is a claimed "device" comprising the FPP. Goodin, ¶ 204; '273 patent, 1:61, 7:40-43, 24:11, 27:63-66, 29:5-15. Within Dockser's computing system, the FPP is implemented in a "hardware component[]" such as an "ASIC" or "FPGA," which is also a claimed "device" comprising the FPP. [0035]; '273 patent, 24:65-25:22; Goodin, ¶ 206.

Dockser's FPP is an "execution unit" as claimed. Goodin, ¶ 207. It is a "specialized computing unit[] that perform[s] certain mathematical operations, e.g., multiplication, [etc.]" by "execut[ing]... instructions" including "multiply instructions." [0001], [0019], [0024]; Goodin, ¶ 207. Like the "processing element" (PE) the '273 patent describes as one possible embodiment of an LPHDR "execution unit" ('273 patent, 8:7-11, 8:25-28), Dockser's FPP is a "unit[] which pairs memory with arithmetic" and implements the memory as registers ('273 patent, 16:54-56, FIG. 4); both Dockser's FPP and the '273 patent's PE include registers and an arithmetic unit to perform arithmetic operations on data locally

- 12 -

stored in the registers. '273 patent, FIGs. 4, 6, 10:34-11:39, 12:50-12:67; Dockser,

FIG. 1, [0015]-[0025]; Goodin, ¶¶ 208-215.



**Dockser, FIG. 1 (annotated)**     **'273 Patent, FIG. 4 (annotated)**

In an alternative mapping, the floating-point operator (FPO) inside

Dockser's FPP is also a claimed "execution unit" because it "include[s]…

components configured to perform… floating-point operations," including a

floating-point multiplier (MUL) that "execute[s] floating-point multiply

instructions." [0019]; Goodin, ¶ 216. References herein to "Dockser's execution

unit" meeting a claim limitation refer to both Dockser's FPP and FPO meeting the

limitation in the same way because the FPP includes the FPO.

Dockser's FPP (including its FPO) is "low precision" as claimed because

"the precision" of operations in the FPP is "reduced" (*e.g.*, [0014]), and because it

operates with the minimum imprecision in [1B2].  Goodin, ¶¶ 217-218; *infra*

§ V.B.4; '273 patent, 26:50-27:62; Ex. 1035, 8.

The '273 patent describes a 6-bit floating-point exponent as "provid[ing] the

desired high dynamic range."  '273 patent, 14:53-61.  Dockser's FPP (including its

FPO) is "high dynamic range" because it uses an 8-bit floating-point exponent

([0017]) that provides an even higher dynamic range, and meets the range in [1B1].

Goodin, ¶ 219; *infra* § V.B.3; '273 patent, 27:5-28.

### 2.    [1A2] "adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"

Dockser's FPP is "adapted to execute a first operation" as claimed because it

"perform[s]… mathematical ***operations***,[2] e.g., multiplication."  [0001], [0004]-

[0008], [0019] (FPP components including FPO are "configured to ***execute***"

instructions of "***operations***"), [0024].  Goodin, ¶ 220.

The FPP executes the operations at reduced precision on "operands" ("32-bit

binary floating-point ***number[s]***" ([0016]-[0017], [0024])) that represent numerical

values, as claimed.  Goodin, ¶¶ 221-222.

The '273 patent's "processing element" (PE) 400 (FIG. 4) is one example

embodiment of an "execution unit… for performing LPHDR operations."  '273

patent, 8:7-28, 10:34-36, 2:12-31, 5:65-6:2.  PE 400 receives input via an "I/O

---

[2] Emphasis added throughout.

[Input/Output] Unit" and "stores" input values in "Registers" as "local data" on which the PE "operate[s]" and "perform[s] computations." *Id.*, 9:6-16, 10:34-57, 8:37-40, FIGs. 1, 4 (annotated below); Goodin, ¶¶ 223-224.



FIG. 4

"The input… received by… PE 400 may… take the form of electrical signals representing numerical values." '273 patent, 10:64-67. The PE "operate[s] on its local data" (*e.g.*, input values received at Registers) via "data paths 402*a-i*" through "routing mechanisms… and components" that represent values as electrical signals. *Id.*, 10:58-67; Goodin, ¶¶ 225-226. A POSA would have understood from the patent's description that the claimed execution unit's "first input signal representing a first numerical value" encompasses an input electrical

- 15 -

signal (*e.g.*, 402i in FIG. 4) input to PE 400 (an example "execution unit") at a register as data on which the PE performs an operation via the PE's "data paths… and components." Goodin, ¶ 227.

Like the '273 patent's example PE embodiment, Dockser's FPP receives input values (operands) at registers, and performs operations on these inputs via the FPP's data paths 134-139 and components 140-144. FIG. 1; Goodin, ¶ 228. The operands are "move[d]" into the FPP's registers as "data from [the computer system's main] memory" in 32-bit format. [0016]. A POSA would have understood Dockser to describe that the operand "data" being input to the FPP is a "first input signal representing a first numerical value" (*i.e.*, representing the operand "number" [0017]) as claimed, because computing circuits like Dockser's "move" data between components (*e.g.*, from memory to processor) via electrical signals. Goodin, ¶ 229; Begun (Ex. 1014), 1:36-37. Alternatively, to the extent Dockser is not considered to expressly disclose that the data is moved to the FPP via electrical signals, that would have been the straightforward and obvious way to implement what Dockser describes. Goodin, ¶ 230; Begun, 1:36-37.

Dockser's FPP is thus "adapted to execute a first operation [*e.g.*, reduced-precision multiplication] on a first input signal representing a first numerical value [operand]" as claimed. Goodin, ¶ 231. The FPP's execution of the operation

- 16 -

produces an "***output value***" (also called "***output number***"), represented by "output bits" ([0034]), that is a "second numerical value" as claimed.  Goodin, ¶¶ 232-235.

The output value is sent to a register ([0024]), from where it is "move[d]… to… main memory" ([0016]).  Goodin, ¶ 236.  A POSA would have understood Dockser to describe that the output value sent as bits from the FPP's registers to main memory is a "first output ***signal*** representing a second numerical value" as claimed, because circuits like Dockser's "move" data between such components via electrical signals.  Goodin, ¶ 237; Begun, 1:36-37.  Alternatively, to the extent Dockser is not considered to expressly disclose that the data is moved from the FPP to memory via electrical signals, that would have been the straightforward and obvious way to implement what Dockser describes.  Goodin, ¶ 237; Begun, 1:36-37.

Thus, Dockser's FPP is "adapted to execute [the] first operation [*e.g.*, reduced-precision multiplication]… to produce a first output signal [electrical signal sending output to memory] representing a second numerical value [the output number from the multiplication]" as claimed.  Goodin, ¶ 238.

- 17 -



Dockser, FIG. 1 (annotated)

In the alternative mapping where Dockser's FPO meets the claimed
"execution unit" (*supra* § V.B.1), the FPO is "adapted to execute [the] first
operation [reduced-precision multiplication] on a first input signal representing a
first numerical value [signal 134 inputting operands to FPO] to produce a first
output signal representing a second numerical value [signal 139 outputting
multiplication result from FPO]" as claimed.  Goodin, ¶ 239; *infra* § V.B.4.c(2).



FIG. 1

### 3. [1B1] "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000"

Dockser's FPP operates on IEEE-754 32-bit single-format numbers having 8-bit exponents. [0002], [0016]-[0017], [0024]; *supra* § V.B.1; Goodin, ¶ 240. The number of exponent bits determines dynamic range. Goodin, ¶ 240; Gaffar, 4; Hekstra, 4:47-52; Grinberg (Ex. 1015), 8:48-49.

IEEE-754 8-bit exponents range from -126 to 127; thus the dynamic range of "normal" IEEE-754 single-format operands is from around $2^{-126}$ (much smaller than 1/65,000) to around $2^{127}$ (much larger than 65,000). Goodin, ¶ 241; Dockser-Lall, [0004]; Tong, 274. A POSA would have understood Dockser to disclose that its FPP supports these "normal" IEEE-754 single-format operands, as Dockser makes no reference to supporting far less common "denormal" numbers (smaller

- 19 -

than $2^{-126}$), let alone to supporting denormal numbers exclusively. Goodin, ¶ 242; Dockser-Lall, [0005], [0008]. To the extent Dockser is not considered to expressly disclose that the FPP operates on "normal" IEEE-754 single-format operands, that would have been a conventional and obvious way to implement what Dockser discloses. Goodin, ¶ 242. Thus, "the dynamic range of the possible valid inputs" (normal IEEE-754 single-format operands) to Dockser's FPP operation "is at least as wide as from 1/65,000 through 65,000" as claimed. Goodin, ¶ 243.

As discussed below (§ V.B.4.c), Dockser's precision-reduction techniques within the FPP do not change the exponents of operated-on numbers; thus the dynamic range of the possible valid inputs in the alternative mapping where the FPO meets the claimed "execution unit" (*supra* § V.B.1) is the same as that of the FPP inputs. Goodin, ¶ 244.

### 4. Limitation [1B2]

#### a. "Statistical Mean" Limitation

The specification's only mention of "the statistical mean, over repeated execution of… [the] operation on each… respective input[]" ('273 patent, 27:44-62) references "non-deterministic" embodiments (*id*., 27:31-44). Goodin, ¶ 245. A POSA would have understood the claims' "statistical mean" limitation in the context of the '273 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same

output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable." '273 patent, 4:7-13, 14:16-61, 17:10-14; Goodin, ¶ 246.

For example, if an analog circuit represents the number 1 as a voltage somewhere between 0.99 and 1.01 ('273 patent, 14:13-30), a first execution of an operation that adds 1+1 may produce a result of 1.98, a second execution may produce 2.01, and repeated executions may produce different results unpredictably. Goodin, ¶ 247. POSAs understood that for such non-deterministic embodiments, the claimed "statistical mean" limitation refers to averaging the different outputs produced by the same operation on the same input—*e.g.*, the mean of 1.98 and 2.01 is 1.995. Goodin, ¶ 248.

For deterministic digital embodiments, the claimed "statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input" is the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input. Goodin, ¶ 249; Ex. 1032, ¶ 94.

- 21 -

Dockser uses "a conventional floating-point multiplier" ([0020]), which a POSA would have understood is a conventional deterministic digital circuit (Goodin, ¶ 250; Weiss (Ex. 1011), 1:40-42), so repeatedly executing Dockser's multiplication operation on the same input (*i.e.,* pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution. Goodin, ¶ 251. To the extent Dockser is not considered to expressly disclose that its "conventional floating-point multiplier" ([0020]) is a deterministic digital circuit, that would have been the conventional and obvious implementation. Goodin, ¶ 252; Weiss, 1:40-42; Ex. 1022, 5:14-21 ('273 patent's inventor: "digital silicon" circuits are "deterministic, which programmers like").

### b.     "Exact Mathematical Calculation" Limitation

The numerical value of each input operand to Dockser's operation (reduced-precision multiplication) is the number represented by the IEEE-754 32-bit sequence ([0016]-[0018]; *supra* §§ V.B.2-V.B.3), and the claimed "result of an exact mathematical calculation of the first operation on the numerical values of that same input" is the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied *without* reducing precision. Goodin, ¶ 253; *see infra* Appendix I.B.[3] As discussed *infra* § V.B.4.c, the numerical value represented by

---

[3] The Petition's word count includes Appendix I.

- 22 -

Docker's output signal differs from this "exact mathematical calculation" because Docker performs reduced-precision multiplication. Goodin, ¶ 253.

### c. Relative Error (Y) for Fraction of Valid Inputs (X) Limitation

Limitation [1B2] recites that "for at least X=5% of the possible valid inputs to the first operation," the statistical mean limitation (met in Docker by the numerical value represented by the output signal for any single execution of the first operation on a specific valid input—*supra* § V.B.4.a) "differs by at least Y=0.05% from" the exact mathematical calculation discussed *supra* § V.B.4.b. Goodin, ¶ 254. The '273 patent refers to the Y percentage as the "relative error amount E," and the X percentage as the "fraction F of the valid inputs" for which the operation produces at least that relative error amount. '273 patent, 27:41-62; Goodin, ¶ 255.

The claimed "possible valid inputs" are met in Docker by the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception). [0016]-[0017], [0024]-[0027]; *supra* § V.B.3; Goodin, ¶ 256. As discussed below, Docker meets [1B2] because Docker operates the FPP and FPO at precision levels where the claimed relative error (Y) is at least 0.05% for at least

X=5% of all valid input pairs of normal IEEE-754 32-bit single-format numbers. Goodin, ¶ 257.

The precision level is selected by specifying the number of mantissa fraction bits to be retained; the remaining "excess bits" are dropped. [0004]-[0007], [0026]-[0029]; FIG. 2 (annotated below); Goodin, ¶¶ 258-262. In one "example," Dockser retains only the 9 most-significant bits (MSBs)—*i.e.*, the leftmost 9 bits— of the mantissa fraction, and drops the remaining 14 mantissa bits. [0025]-[0028]; Goodin, ¶ 263.



FIG. 2

Dockser discloses two precision-reducing techniques that can be used separately or together.  [0004]-[0007], Dockser claims 9-11; Goodin, ¶¶ 264-270. One technique drops bits from the operands by removing power from storage elements in the FPP's registers that correspond to the excess (dropped) mantissa bits.  [0006], [0026]; Goodin, ¶ 265.  The other technique drops bits by removing power from elements within the multiplier logic that computes the product of the operand mantissas.  [0007], [0027], [0030]-[0034]; Goodin, ¶ 266.



FIG. 1

### (1)    Dockser's Register Bit-Dropping Meets [1B2]

A POSA would have understood Dockser's "conventional floating-point multiplier" ([0020]) multiplies two floating-point operands by (in relevant part) adding their exponents and multiplying their mantissas, as the '273 patent (at 14:62-65) acknowledges was the "traditional floating point method[]." Goodin, ¶ 271; Tong, 274-275. This conventional technique applies basic properties of multiplication and exponents where $(M_1 \times 2^{E_1}) \times (M_2 \times 2^{E_2}) = (M_1 \times M_2) \times 2^{E_1+E_2}$. Goodin, ¶ 271. Because Dockser reduces precision by dropping mantissa bits ([0002]-[0003], [0026]), a POSA would have understood the mantissa multiplication produces error relative to an "exact mathematical calculation." Goodin, ¶ 272.

Specifically, Dockser's FPP receives operands into registers 115 as IEEE-754 single-format floating-point numbers with 23 bits representing the mantissa's fractional part (the "1" in the mantissa's integer part is implied), but the register bit-dropping technique removes power from the register storage elements for "excess" least-significant mantissa bits to the right of the selected precision level in FIG. 2. [0006], [0016]-[0018], [0026]-[0028], FIGs. 1-2 (reproduced below, annotated); Goodin, ¶¶ 273-276.

- 26 -



FIG. 1



FIG. 2

APPX08372

"By way of example," if a precision level retaining 9 mantissa fraction bits is selected, "[p]ower can be removed from the floating-point register elements for the remaining 14 [mantissa] fraction bits." [0026]; Goodin, ¶ 277. A POSA would have understood the output of unpowered storage elements would be tied to zero voltage (*e.g.*, ground), making those 14 "excess" bits zeroes. [0026], [0029]; Goodin, ¶¶ 278-280 (citing Hawkins (Ex. 1020), 1:13-2:15 (unpowered elements should be tied to ground to prevent them from "draw[ing] unacceptably large amounts of power" and "shorting… the power supply"); Youngs (Ex. 1060), [0005]; Flynn (Ex. 1019), [0003]; Cohen (Ex. 1016), 3:63-66, 4:51-55 (interpreting low voltage as "0" is "typical[]…[in] digital computer system[s]")). To the extent Dockser is not considered to disclose that the outputs of the unpowered register storage elements would be tied to ground to represent "0," that would have been the straightforward, well-known, conventional, and obvious way to implement Dockser's described unpowering of register storage elements, as corroborated by Hawkins, Youngs, Flynn and Cohen. Goodin, ¶ 281.

As representative examples, the 23-bit sequence 01100000111100111001110 (representing a mantissa of 1.37871718406677724609375) would become 01100000100000000000000 (representing a mantissa of 1.376953125) by zeroing the 14 right-most bits, and 01000100110111000001000 (representing a mantissa of

1.26898288726806640625) would become 01000100100000000000000

(representing a mantissa of 1.267578125).  Goodin, ¶ 282.

A pair of operands with "excess" bits dropped from the registers are multiplied together, producing a reduced-precision output that differs from the "exact" product of the original 32-bit operands.  [0024]-[0026]; Goodin, ¶ 283. For instance, if the two example 23-bit-fraction mantissas above were multiplied, the exact mantissa product would be 1.74956851296315107902046290302025; whereas the reduced-precision mantissa product output from Dockser's register bit-dropping technique would be 1.745395660400390625 (resulting from multiplying the mantissas represented by the fraction bit sequences 01100000100000000000000 and 01000100100000000000000).  Goodin, ¶ 284.

Because Dockser's output mantissa differs from the exact mantissa product, the numerical value represented by the output floating-point number (composed of mantissa, exponent, and sign) differs from the exact product of the original floating-point operands.  Goodin, ¶ 285.  A POSA would have understood, by straightforward math detailed in Appendix I.A *infra*, that the relative error (the claimed "Y" percentage) of any floating-point number output from Dockser's reduced-precision multiplication is the same as the relative error of its mantissa, independent of its exponent and sign.  Goodin, ¶ 286.

- 29 -

A POSA would thus have understood Dockser's register bit-dropping technique produces relative error, the amount of which depends on the number of mantissa bits dropped—the more bits dropped, the greater the error.  Goodin, ¶ 287.

Claim 1 characterizes the claimed execution unit using ***performance*** characteristics of a minimum relative error (Y) and a minimum fraction (X) of the possible valid inputs that meet Y.  Claim 1 recites no ***structural*** characteristics of the execution unit, and the specification provides no guidance how to evaluate any execution unit's structure to determine whether it meets the claimed performance characteristics.  Goodin, ¶ 288.

A POSA asked whether Dockser's FPP meets the claimed imprecision performance characteristics would have understood that Dockser suggests any desired number of mantissa bits can be dropped, and that numerous obvious implementations of Dockser's FPP drop sufficient bits to yield an execution unit meeting the claimed minimum imprecision.  Goodin, ¶ 289.  If asked to quantify how many bits dropped would meet the claimed X and Y, a POSA would have taken one of two approaches.

### (i)    Software Demonstration

Given the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), a

- 30 -

POSA would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped. Goodin, ¶ 290. As detailed in Appendix I.B *infra*, Mr. Goodin did just that. Specifically, he wrote a software program (which a POSA would have understood how to write) that performs floating-point multiplication operations the way Dockser's register bit-dropping technique does when dropping the 14 least-significant mantissa bits to zero as taught by Dockser. Dockser, [0026]; Goodin, ¶ 291. The program tested all possible valid pairs of normal IEEE-754 single-format operands (by testing all possible valid mantissa pairs, because the relative error Y is independent of exponent and sign—*see infra* Appendix I.A), and demonstrates that Dockser's register bit-dropping technique, when performed with a selected precision level retaining 9 mantissa fraction bits as Dockser ([0026]) discloses, produces at least Y=0.05% relative error for 92.1% of possible valid inputs (greater than X=5%), meeting [1B2]. Goodin, ¶ 292.

### (ii)     Pencil-and-Paper Algebraic Demonstration

A POSA would also have understood algebraically that Dockser's register bit-dropping technique meets [1B2], by examining the absolute ***minimum*** relative error produced by zeroing certain mantissa bit positions. Goodin, ¶ 293. As detailed in Appendix I.C *infra*, over 12% of all possible valid normal IEEE-754

- 31 -

single-format operands have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their tenth and eleventh fraction bits.  When Dockser's register bit-dropping retains only nine fraction bits, *every* input in that 12% produces at *minimum* 0.097% relative error, which meets [1B2]'s X and Y. Goodin, ¶ 294.

### (2)     Dockser's Multiplier Logic Bit-Dropping Meets [1B2]

Dockser's second precision-reduction technique removes power from bits within the FPO's logic that multiplies the operand mantissas.  [0007], [0027], [0030]-[0034]; Goodin, ¶ 295.  This logic operates conventionally, computing the mantissa product by generating and adding together "partial products" similar to pencil-and-paper long multiplication.  [0030]-[0031]; Goodin, ¶¶ 296-298.  This is illustrated in the simple example below using 5-bit mantissa fractions.  Each partial product results from multiplying the multiplicand (Mantissa A) by the "0" or "1" at each position in the multiplier (Mantissa B).



- 32 -

Power is removed from the logic that implements the partial product bits to the right of line 405 corresponding to a precision level selected for output value 430.  Dockser, [0032]-[0034]; Goodin, ¶¶ 299-300.  A POSA would have understood Dockser to disclose that the bits from which power is removed in the logic are dropped to 0s, or alternatively this would have been the conventional and obvious way to implement the power removal Dockser describes.  Goodin, ¶ 301; *see supra* § V.B.4.c(1).



**Dockser, Fig. 3B (annotated)**

An example using the same exemplary operand mantissas discussed *supra* § V.B.4.c(1) is illustrated below, in which dropping partial-product bits to the right

- 33 -

of the selected precision produces an output mantissa product of 1.744140625, which differs from the exact product of 1.74956851296315107902046293020255. Goodin, ¶ 302.



A POSA would have understood the relative error introduced depends on the number of mantissa bits dropped—the more bits dropped, the greater the error. Goodin, ¶ 303.

If asked whether Dockser's FPP using a selected precision level retaining 9 bits (as Dockser [0026] teaches) in the output mantissa by dropping less-significant bits in the multiplier logic meets the claimed X and Y, given the massive number of possible inputs Dockser's FPP supports (*supra* § V.B.4.c(1)(i)), a POSA would

have written a software program. Goodin, ¶ 304. As detailed in Appendix I.D *infra*, Mr. Goodin wrote a software program (which a POSA would have understood how to write) that performs floating-point multiplication operations the way Dockser's logic bit-dropping technique does by dropping to zero the mantissa partial product bits less significant than the 9-bit selected precision level. Goodin, ¶ 305. Mr. Goodin's program tested all possible valid pairs of normal IEEE-754 single-format operands (by testing all possible valid mantissa pairs—*supra* § V.B.4.c(1)(i); *infra* Appendix I.A, I.D) and demonstrates that Dockser's multiplier logic bit-dropping technique, when performed with a precision level retaining 9 output mantissa fraction bits, produces at least Y=0.05% relative error for 99.35% of possible valid inputs (greater than X=5%), meeting [1B2]. Goodin, ¶ 305.

In the alternative mapping (*supra* §§ V.B.1-V.B.2), the operand numbers input via 134 (claimed "first input signal") to the FPO (claimed "execution unit") are the same as those input to the FPP registers when Dockser's logic bit-dropping technique is used alone, and the same output numbers from the FPO are output from the FPP. Goodin, ¶ 306. Therefore Mr. Goodin's program demonstrates that Dockser meets [1B2] under either mapping. Goodin, ¶ 306.

### (3)    Register and Multiplier Logic Bit-Dropping Together Also Meets [1B2]

In an implementation of Dockser's FPP that drops bits in ***both*** the registers and the multiplier logic, where Dockser's FPP is the claimed "execution unit," the amount of relative error is the same as produced by the logic bit-dropping alone, if the same selected precision level (retaining the same number of mantissa fraction bits) is applied at the registers and in the logic. Goodin, ¶ 307. This is because at least the same bits that are dropped to zero in the register bit-dropping are dropped to zero in the corresponding partial products in the logic bit-dropping, for the same selected precision level. Goodin, ¶¶ 307-309. Thus, the results of the same software program that demonstrate that Dockser's multiplier logic bit-dropping alone meets [1B2] also demonstrate that Dockser's register and logic bit-dropping, performed together at a selected precision level retaining 9 mantissa fraction bits as Dockser ([0026]) discloses, meet [1B2]. Goodin, ¶ 310; *supra* § V.B.4.c(2).

### C.    Claim 2

Dockser's execution unit comprises at least "part of…[an] ***FPGA***," meeting claim 2. [0035]; Goodin, ¶ 311.

### D.    Claim 21

The '273 patent describes a PE unit as "pair[ing] memory with arithmetic," as having "memory ***local*** to each arithmetic unit," and as implementing the memory via registers. '273 patent, 16:31-56, 10:34-57, 11:17-28, FIG. 4; Goodin,

- 36 -

¶ 312.  Dockser's FPP similarly has local registers 110.  [0015]-[0016]; *supra*

§ V.B.1.  Thus Dockser's device "includes memory locally accessible to"

Dockser's execution unit, as claim 21 recites.  Goodin, ¶¶ 313-314.

### E.     Claim 22

Dockser's FPP can be "part of… an application specific integrated circuit

(ASIC)" that meets claim 1's "device."  [0035]; Goodin, ¶ 315; *supra* § V.B.1.

Implementing Dockser's integrated circuit on a silicon chip would have been

the typical, conventional, and obvious implementation; thus, Dockser's "device is

implemented on a silicon chip" as claim 22 recites.  Goodin, ¶ 316; Ex. 1054,

[0005]; Ex. 1055, [0005].

### F.     Claim 23

Dockser's integrated-circuit device, which is "implemented on a silicon

chip" as claimed (*see supra* § V.E), "process[es]… bits" (Abstract) and therefore

"is implemented… using digital technology" as claimed.  Goodin, ¶ 317.

### G.     Claim 24

Dockser's computing system (an alternative "device" of claim 1) includes a

"main processor" which a POSA would have understood is a "digital processor" as

claimed—*e.g.*, because it communicates via "bits."  [0015], [0025], [0035];

Goodin, ¶¶ 318-319.  Alternatively, to the extent Dockser is not considered to

expressly disclose that its main processor is "digital," that would have been the

- 37 -

typical and obvious implementation of Dockser's "conventional processor."
[0035]; Goodin, ¶ 319; Ex. 1023, 1:16-48.

Dockser's main processor is "adapted to control the operation of" Dockser's
execution unit as claim 24 recites, by specifying its precision level by writing
"subprecision select bits" to the FPP's "*control* register." [0018], [0025]; Goodin,
¶ 320.

### H.    Claim 26

Dockser's computer system and ASIC are "part of a mobile device" as
claimed—*e.g.*, "wireless telephone[],… (PDA),… pager[],…[etc.]." [0003];
Goodin, ¶ 321.

### I.    Claim 28

Dockser's execution unit "represents numbers using a floating point
representation" as claim 28 recites. *Supra* §§ V.A-V.B; Goodin, ¶ 322.

## VI.    <u>GROUND 2:</u> CLAIMS 1-2, 21-24, 26, 28, AND 32-33 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND TONG

### A.    Tong

Tong (Ex. 1008) is Section 102(b) prior art because it was publicly
accessible by June 30, 2000. Tong's face bears a 2000 copyright date and
indicates it was published by the IEEE, a "well-known, reputable compiler and
publisher of scientific and technical publications," in *IEEE Transactions on Very
Large Scale Integration (VLSI) Systems*, Vol. 8, No. 3, June 2000. *Ericsson v.*

- 38 -

*Intellectual Ventures I*, IPR2014-00527, Paper 41 at 10–11 (May 18, 2015)

(finding hearsay exception for IEEE publication copyright line information); *see*

*also Hulu v. Sound View Innovations*, IPR2018-01039, Paper 29 at 19 (Dec. 20,

2019) (precedential) (finding reasonable likelihood of printed publication based on

copyright date, printing date, and ISBN date from "established publisher" of "well-

known book series"); Goodin, ¶ 323.  Additionally, an IEEE representative (Mr.

Grenier) testified that the IEEE made Tong publicly available by June 30, 2000.

Ex. 1025, ¶¶ 8-11.  *Guest Tek Interactive Entm't v. Nomadix*, IPR2019-00253,

Paper 6 at 27-31 (May 28, 2019) (crediting IEEE copyright/publication date indicia

and Mr. Grenier's testimony of public availability); *Palo Alto Networks v. Finjan*,

IPR2015-01974, Paper 49 at 19-20 (Mar. 16, 2017) (same).  Other IEEE

publications cited Tong before 2009, further corroborating Tong's public

accessibility.  Ex. 1026, 27 (citation [13]); Ex. 1027, 27 (citation [31]); *see Intel v.*

*R2 Semiconductor*, IPR2017-00707, Paper 81 at 21-22 (July 31, 2018).

Tong, like Dockser (*supra* § V.B.4.c *infra* § VII.G), confirms that the

number of mantissa bits used in a high-dynamic-range floating-point execution

unit was a well-known result-effective variable impacting power consumption and

precision.  Tong, 278 ("[P]ower dissipation… can be reduced by using fewer

bits…[which] reduces precision"); Goodin, ¶¶ 324-325.  Focusing on "signal

processing applications" "long… known" to be able to "get by with less

- 39 -

precision/range than full FP" (Tong, 273), Tong explains that "reduction in the mantissa bitwidth is the most effective means of reducing power dissipation" (Tong, 277, 274-276).  Goodin, ¶ 326.

Tong teaches how to determine, by "emulat[ing] in software different bitwidth FP units" and "plot[ting] the accuracy" of various signal-processing applications "across a range of mantissa bitwidths" (Tong, 278), "the *minimal* number of mantissa… bits" for each application "to *reduce* power consumption, yet *maintain* [the] program's overall accuracy" (Tong, 273, emphasis original). Goodin, ¶¶ 327-331.  In the "Sphinx" speech recognition application and the "ALVINN" navigation application, "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits."  Tong, 278-279, 273, 282, Fig. 6; Goodin, ¶¶ 327-331.



Fig. 6.   Program accuracy across various mantissa bitwidths.

Tong, Fig. 6 (annotated)

- 40 -

Having empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications, Tong teaches using "reduced-precision arithmetic" to "omit the unnecessary bits and computations on them" (Tong, 284), to thereby "reduce waste" (Tong, 273) and "significantly reduce… power consumption while maintaining a program's overall accuracy" (Tong, 274). Tong, 279 (floating-point "provides essential dynamic range… but the fine precision… is not essential"); Goodin, ¶ 332.

### B. Claims 1-2, 21-24, 26, 28

Tong's teachings and empirical tests would have motivated a POSA to configure Dockser's FPP to operate at the precision levels Tong teaches for particular applications. Goodin, ¶ 333. Tong teaches "[m]any mobile/portable electronics applications" perform signal processing programs "such as speech and image recognition" that are "better served with a custom, reduced[-precision] FP format" (Tong, 284), and a POSA would have understood Dockser's FPP with its selectable precision level for "[p]ower management" in "battery operated devices" (Dockser, [0003]) to be well-suited for use in Tong's mobile/portable applications. Goodin, ¶ 333.

Tong teaching that retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx—*supra* § VI.A) would have motivated a POSA to configure Dockser's FPP in the device discussed *supra* § V

- 41 -

to operate at a selected precision level retaining as few as 5 mantissa fraction bits to conserve power when running those applications, or others empirically determined to not require greater precision using Tong's techniques. Goodin, ¶ 334. The resulting "Dockser/Tong" device meets claims 1-2, 21-24, 26, and 28 for the same reasons discussed *supra* § V (Ground 1), with the addition that Dockser/Tong's device retaining 5 fraction bits exceeds claim 1's X and Y values (X=5%, Y=0.05%) by greater margins than Dockser's device retaining 9 fraction bits. Goodin, ¶ 335.

Mr. Goodin's software program (discussed *supra* §§ V.B.4.c(1)(i), V.B.4.c(2) and *infra* Appendix I.B, I.D) demonstrates that when retaining 5 mantissa fraction bits in view of Tong, Dockser's register bit-dropping produces at least Y=0.05% relative error for 99.45% of possible valid inputs, and Dockser's logic bit-dropping produces at least Y=0.05% relative error for 99.47% of possible valid inputs. Goodin, ¶ 336. The algebraic analysis discussed *supra* § V.B.4.c(1)(ii) and *infra* Appendix I.C also demonstrates that Dockser's register bit-dropping when retaining 5 mantissa fraction bits produces a minimum of 1.56% relative error (greater than Y=0.05%) for over 12% of possible valid inputs (greater than X=5%). Goodin, ¶ 336.

Moreover, Tong and Dockser both demonstrate that POSAs knew how to optimize the number of mantissa bits as a result-effective variable for concurrently

reducing precision and power consumption in a floating-point execution unit, and how to empirically determine the optimum number of bits for a particular application by testing the application's accuracy at various mantissa bitwidths. Goodin, ¶ 337; *supra* §§ V.B.4.c, VI.A; *infra* § VII.G.  The '273 patent lists fifty-six possible combinations of six X percentages (ranging from 1% to 50%) and nine Y percentages (ranging from 0.05% to 20%) as "merely examples [that] do not constitute limitations of the… invention," with no indication that any claimed X-Y combination is critical in any way.  '273 patent, 27:40-62; Goodin, ¶ 338. Determining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable, such that arriving at imprecisions resulting in the device meeting the claimed X and Y values would have been obvious.  Goodin, ¶ 339; *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1010 (Fed. Cir. 2018); *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020); *In re Urbanski*, 809 F.3d 1237, 1242-1243 (Fed. Cir. 2016).

### C.    Claim 32

Dockser/Tong implements Dockser's FPP using the precision Tong teaches for neural-network image-classification applications including ALVINN.  *Supra* §§ VI.A-VI.B.  A POSA would have had reason to implement Dockser/Tong to "perform nearest neighbor search" as claim 32 recites, because nearest-neighbor

- 43 -

search was commonly used and well known to be advantageous for image-classification (including neural-network) applications.  Goodin, ¶ 340; Ex. 1056, [0001]-[0004]; Ex. 1057, 1:15-50.

### D.    Claim 33

Tong's teaching to "emulate[] in software different bitwidth FP units" "to determine application accuracy" (Tong, 278) would have motivated a POSA to emulate the Dockser/Tong device (*supra* § VI.B) in software to assess the accuracy of applications running on the device at selected precision levels, and a POSA would have had a reasonable expectation of success in doing so.  Goodin, ¶¶ 341-342.

#### 1.    [33A1] "A device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising: at least one first… (LPHDR) execution unit"

When the Dockser/Tong device is "emulated in software" per Tong's teachings (Tong, 278) cited *supra* § VI.A, the conventional and obvious implementation of such "software" is "computer program instructions" stored in "a computer-readable memory" and "executable by [a] processor" within a "device" (*e.g.*, a computer) as claimed.  Goodin, ¶ 343; *see* Dockser, [0036]; Ex. 1029, [0008]-[0009], [0014]; '273 patent, 26:2-4.  As discussed above (§ VI.D), a POSA would have been motivated by Tong to use a computer (a claimed "device

comprising a computer processor…[etc.]") to emulate the Dockser/Tong device discussed *supra* §§ V.B, VI.B (meeting the "second device" of [33A1]), which comprises Dockser's execution unit. *Supra* § V.B.1; Goodin, ¶ 344. Like the '273 patent's only examples of "emulat[ing] a… device" comprising LPHDR execution unit(s), Tong emulates the device by executing a software application program that runs thereon with arithmetic operations in the application program replaced by software simulations of the reduced-precision arithmetic the device would perform. '273 patent, 17:3-17, 18:52-19:12; Tong, 278; Goodin, ¶¶ 345-346.

### 2. Limitations [33A2]-[33B2]

[33A2]-[33B2] are identical to [1A2]-[1B2]. Therefore, because the emulated "second device" in Dockser/Tong is the device discussed *supra* §§ V.B, VI.B, Dockser/Tong meets [33A2]-[33B2] for the same reasons Dockser's device (operating at Dockser's or Tong's disclosed precision levels) meets the identical limitations in claim 1. Goodin, ¶¶ 347-348.

## VII. <u>GROUND 3:</u> CLAIMS 1-26, 28, 36-61, AND 63 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND MACMILLAN

### A. MacMillan

MacMillan (Ex. 1009) "improve[s]… speed of a personal computer architecture through… parallel processing capability" "[t]o provide supercomputer performance in a computer for personal use." MacMillan, 8:38-40, 5:22-45, 1:10-47. Consistent with how "supercomputer" was used in the art, MacMillan

- 45 -

describes supercomputer performance in terms of speed (*e.g.*, number of operations performed per second), not precision.  MacMillan, 1:15-54; Ex. 1052, 1411; Ex. 1053, 500; Goodin, ¶¶ 349-350.  MacMillan achieves "substantial performance improvements" by adding a "Single Instruction Multiple Data (SIMD)" subsystem to "existing system architectures."  MacMillan, 9:17-23, 5:48-6:10.  The SIMD subsystem includes SIMD-RAM devices having multiple parallel "processing elements (PE's)," each PE including "floating point accelerators" that "perform… operations on… 32-bit words."  MacMillan, 9:11-19, 12:35-59, FIGs. 2 and 5 (reproduced below).  Goodin, ¶¶ 351-352.



FIG. 2

(SIMD computer system)

- 46 -



**FIG. 5**

(SIMD-RAM)

### B.     Dockser/MacMillan Combination

MacMillan teaches incorporating SIMD parallel processing in personal-use computers, including battery-operated "laptops, palmtops, [and] personal digital assistants"—the same types of computers for which Dockser's FPP provides "[p]ower management" through reduced-precision floating-point operations. MacMillan, 1:6-9, 5:22-45, 7:14-34; Dockser, [0003]; Goodin, ¶ 353.  MacMillan teaches "power dissipation and hence power supply capacity and cost" should be considered in pursuing MacMillan's SIMD architecture.  MacMillan, 3:2-6;

- 47 -

Goodin, ¶ 354.  A POSA would have been motivated to use Dockser's FPP to implement each "floating-point accelerator" in the parallel PEs of MacMillan's SIMD architecture to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches.  Goodin, ¶ 355.

Dockser's FPP is a "floating-point accelerator" for "perform[ing] atomic operations on… 32-bit words" as in MacMillan's PE, and using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power.  MacMillan, 12:47-59; Goodin, ¶ 356; *see supra* § V.A; Ex. 1024, 1:43-58.  MacMillan's SIMD architecture is beneficial for applications including "animation,… rendering…, and video games," which are types of the "graphics applications" for which Dockser teaches its FPP can beneficially save power by reducing unnecessary precision.  MacMillan, 7:14-34; Dockser, [0003]; Goodin, ¶ 357.

**C.    Claims 1, 28**

In the resulting "Dockser/MacMillan" combination, MacMillan's "computer system" (*e.g.*, 200) (7:14-34, 9:20-29), or alternatively a "SIMD-RAM *device*" (element 104/254) within MacMillan's computer system (9:11-29, 12:35-59), meets the "device" of [1A1], and comprises Dockser's FPP.  Goodin, ¶¶ 358-359. All other limitations of claims 1 and 28 relate to characteristics of the LPHDR

- 48 -

execution unit, which in Dockser/MacMillan is the same Dockser execution unit as in Ground 1.  Thus, Dockser/MacMillan meets the remaining limitations in claims 1 and 28 for the reasons discussed *supra* §§ V.B, V.I.  Goodin, ¶ 360.

### D.     Claims 3, 7, 9

MacMillan discloses an example architecture including 256 PEs, and discloses scaling to "more… PEs," up to "tens of thousands… or more." MacMillan, 12:60-13:4, 13:39-41, 16:20-22, 2:13-16; Goodin, ¶ 361.  Thus, the Dockser/MacMillan system having at least one Dockser execution unit in each PE meets claims 3, 7, and 9 reciting at least 10, 100, and 500 LPHDR execution units, respectively.  Goodin, ¶ 362.

### E.     Claims 5, 8, 10

Claims 5, 8, and 10 recite that the number of LPHDR execution units exceeds "the non-negative integer number of execution units… adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" by at least 10, 100, and 500, respectively.

MacMillan's computer system includes a Host CPU implementable as "a 386, 486 or Pentium™ processor."  MacMillan, 9:30-31.  POSAs understood these processors included a floating-point execution unit that performed multiplication on IEEE-754 single-format 32-bit floating-point numbers.  Goodin, ¶¶ 363-367 (citing Ex. 1017, [0005]; Ex. 1018, 2:7-10; Ex. 1029, [0013]; Ex. 1030, 1:13-19;

- 49 -

Dockser, [0002]).  Thus, an obvious implementation of MacMillan's CPU includes one claimed "execution unit[]… adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  Goodin, ¶ 368.

The '273 patent says "arithmetic elements… designed to perform… floating point arithmetic with a word length of 32 or more bits" are "designed to perform… arithmetic of traditional precision," and contrasts those traditional-precision elements with "LPHDR arithmetic elements" ('273 patent, 27:63-28:3), which may "sometimes" produce results that differ from the correct result (*id*., 26:50-60).  Goodin, ¶ 371.  A POSA would therefore have understood the '273 patent to describe that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" are "traditional precision" execution units that do not "sometimes" produce results different from the correct traditional-precision result.  Goodin, ¶ 372.  The floating-point execution unit of MacMillan's Host CPU is such a "traditional precision" execution unit, and Dockser's execution unit that sometimes produces differing results (*supra* § V.B.4) is a claimed "LPHDR execution unit."  Goodin, ¶ 373.

Thus, a POSA would have understood Dockser/MacMillan meets claims 5, 8, and 10 because its number (256 or more, up to "tens of thousands"—*supra* § VII.D) of Dockser's LPHDR execution units exceeds its number (one) of

- 50 -

traditional-precision execution units (the single Host CPU floating-point unit) by more than 10, more than 100, and more than 500. Goodin, ¶¶ 369-370, 374.

### F.    Claims 2, 4, 6

Dockser/MacMillan includes multiple of Dockser's LPHDR execution units. One obvious implementation includes an FPGA implementing each LPHDR execution unit (as Dockser [0035] teaches), so each execution unit comprises "at least part of an FPGA" as discussed *supra* § V.C. Thus, Dockser/MacMillan meets each of claims 2, 4, and 6. Goodin, ¶ 375.

If these claims were alternatively interpreted to require multiple LPHDR execution units implemented in a single FPGA, that also would have been an obvious implementation of Dockser/MacMillan because it was well-known for an "FPGA [to] include multiple processing elements" like Dockser/MacMillan's PEs, to decrease "space required for the circuit, and consequently, the circuit's cost and… energy losses." Goodin, ¶¶ 376-379, quoting as corroboration Ex. 1058, [0023]-[0024], [0056]-[0057], [0061]-[0064], [0069]-[0070].

### G.    Claims 11-17

Claims 11-17 each recite a minimum X and/or Y percentage higher than claim 1's, the highest being X=10% and Y=0.2% in claim 17. Mr. Goodin's software program (discussed *supra* §§ V.B.4.c(1)(i), V.B.4.c(2) and *infra* Appendix I.B, I.D) demonstrates that when retaining 9 mantissa fraction bits as

- 51 -

Dockser ([0026]) discloses, Dockser's register bit-dropping produces $Y \geq 0.2\%$ relative error for 14.6% of possible valid inputs, and Dockser's logic bit-dropping produces $Y \geq 0.2\%$ relative error for 85% of possible valid inputs.  Goodin, ¶ 381. Dockser/MacMillan thus meets claim 17 and claims 11-16 (whose recited X and Y minimum values are no higher than claim 17's).  Goodin, ¶¶ 380-381; Appendix I.B-I.D further include tables showing how each claimed X/Y combination is met.

The algebraic analysis discussed *supra* § V.B.4.c(1)(ii) and *infra* Appendix I.C also demonstrates that Dockser's register bit-dropping meets claims 11-12 when retaining 9 fraction bits; meets claims 13-16 when retaining 8 fraction bits; and meets claim 17 when retaining 7 fraction bits.  Goodin, ¶ 382.  A POSA would have found it obvious to implement Dockser's FPP in Dockser/MacMillan while retaining only 8 or 7 mantissa fraction bits for multiple reasons.  First, Dockser's FPP's precision level is "selectable" and a 9-fraction-bit selection is only a non-limiting "example."  Dockser, [0003]-[0004], [0026], [0013]; Goodin, ¶ 383.  A POSA would have understood Dockser to suggest selecting other below-maximum (Dockser claim 1) precision levels, and selecting a precision level retaining 8 or 7 fraction bits (only 1-2 fewer than Dockser's 9-bit example) to be an obvious implementation of Dockser's teachings.  Goodin, ¶ 384.  Second, other prior art (*e.g.*, Tong) taught a low-precision floating-point multiplier that retained even fewer fraction bits.  Goodin, ¶ 385; *supra* § VI.A.  Third, a POSA would have

- 52 -

understood the number of mantissa fraction bits retained in Dockser to be a result-effective variable, so that choosing to retain any number would have been obvious in view of Dockser's teachings that the number of mantissa bits dropped/maintained was a "selectable" variable optimizable for different applications, and that the selection impacts the FPP's results through the precision of the outputs the FPP produces. Dockser, [0002]-[0003], [0014], [0024]-[0027]; Goodin, ¶¶ 386-389; *supra* § V.B.4.c; *see* result-effective variable caselaw cited *supra* § VI.B.

### H.    Claim 18

The dynamic range of possible valid inputs to Dockser's operation extends from approximately $2^{-126}$ (much smaller than 1/1,000,000) to approximately $2^{127}$ (much larger than 1,000,000), meeting claim 18. *Supra* § V.B.3; Goodin, ¶¶ 390-391.

### I.    Claim 19

Dockser/MacMillan includes multiple MacMillan PEs, each containing Dockser's LPHDR execution unit. *Supra* § VII.B. MacMillan's SIMD-RAM includes "nearest neighbor interconnections… between PEs," which a POSA would have understood are local connections. MacMillan, 15:51-16:12 ("nearest neighbor interconnections" are different from "global interconnections"), Fig. 5; Goodin, ¶¶ 392-393. Dockser/MacMillan's multiple LPHDR execution units thus

- 53 -

"comprise[] a plurality of locally connected LPHDR execution units" (Dockser's execution units connected via local PE connections), meeting claim 19. Goodin, ¶ 394; *see* '273 patent, 9:37-51, 10:23-25, 16:36-38, describing "local connections" as nearest-neighbor connections between PEs.

### J.     Claim 20

Dockser/MacMillan's claimed "device" (MacMillan's computer system or SIMD-RAM device—*supra* § VII.B), "has a SIMD architecture" as claim 20 recites. MacMillan, 2:13-14, 5:22-45, 6:51-65; Goodin, ¶ 395.

### K.     Claim 21

Dockser/MacMillan's SIMD-RAM device includes memory (DRAM) coupled to multiple PEs on a SIMD-RAM chip, meeting claim 21's "memory locally accessible to the… LPHDR execution unit" (Dockser's execution unit in MacMillan's PE). MacMillan, 12:35-13:10, FIG. 5; Goodin, ¶ 396. Alternatively, Dockser's execution unit's registers in Dockser/MacMillan also meet claim 21. *Supra* § V.D; Goodin, ¶ 397.

### L.     Claims 22-23

Dockser/MacMillan's SIMD-RAM device is implemented on a "chip," which a POSA would have understood to be a silicon chip as claims 22-23 recite. MacMillan, 12:60-13:4; Goodin, ¶ 398. Alternatively, to the extent MacMillan is not considered to disclose that the "chip" is silicon, that would have been the

- 54 -

typical, conventional, and obvious implementation.  Goodin, ¶ 399; Ex. 1055,

[0005].

A POSA would have understood that the device "is implemented… using

digital technology" as claim 23 recites, because, *e.g.*, it operates on bits.

MacMillan, 12:47-49, 13:20-14:22; *supra* § V.F; Goodin, ¶ 400.

**M.     Claim 24**

Dockser/MacMillan's computer system includes MacMillan's "Host CPU"

implementable as a digital processor (*e.g.*, "Pentium™ processor").  MacMillan,

8:56-9:31; Goodin, ¶ 401.  MacMillan's CPU is adapted to control the operation of

the SIMD subsystem, including its PEs with Dockser's execution units, by

executing a program controlling initiation of "all SIMD processing" (MacMillan,

10:24-53, 13:12-13, 13:38-62), meeting claim 24.  Goodin, ¶¶ 401-405.

**N.     Claim 25**

Claim 25 combines limitations of claims 9, 19, and 21-23.

Dockser/MacMillan's SIMD-RAM device meets the claim 19 and 21-23

limitations as discussed *supra* §§ VII.I, VII.K-VII.L.  The SIMD-RAM can be

"scal[ed] to higher… density… with more… PEs" than the "example" SIMD-

RAM chip with "256 PEs" (MacMillan, 12:60-13:4); thus a SIMD-RAM with 500

PEs meeting claims 9 and 25 would have been obvious.  *Supra* § VII.D.  Goodin,

¶ 406.

### O.    Claim 26

Dockser/MacMillan's computer system and SIMD-RAM are "part of a mobile device" as claimed—*e.g.*, "palmtop[], personal digital assistant[],…[etc.]." MacMillan, 7:16-34; *supra* § VII.B; Goodin, ¶ 407.

### P.    Claim 36-61, 63

[36A1]-[36B2] are identical to [1A1]-[1B2], and are met for the reasons discussed *supra* §§ VII.C, V.B.

[36C] is identical to claim 5, except [36C] is broader by omitting the "by at least ten" recited in claim 5.  Dockser/MacMillan meets [36C] for the same reasons discussed *supra* § VII.E.  Goodin, ¶ 408.

Claims 37-61 and 63 depend from claim 36, but otherwise are identical to claims 2-26 and 28, respectively, which depend from claim 1.  The limitations recited in claims 37-61 and 63 thus are met for the reasons discussed *supra* §§ VII.C-VII.O.  Goodin, ¶ 409.

## VIII.  <u>GROUND 4:</u> CLAIMS 1-26, 28, 32-61, 63, AND 67-70 WOULD HAVE BEEN OBVIOUS OVER DOCKSER, TONG, AND MACMILLAN

### A.    Claims 1-26, 28, 32, 36-61, 63, 67

Dockser/MacMillan (Ground 3) uses Dockser's FPP to implement each "floating-point accelerator" in the parallel PEs of MacMillan's SIMD architecture. *Supra* § VII.B.  As discussed in Ground 2, a POSA would have been motivated to implement Dockser's FPP using precision levels as low as 5 mantissa fraction bits,

which Tong teaches suffices for applications including "neural network trainer" "ALVINN." Tong, p. 278 & Table IV; *supra* §§ VI.A-VI.B. MacMillan teaches that such "neural net[work]" applications would benefit from "supercomputer performance" provided by using many parallel PEs including "floating point accelerators." MacMillan, 1:24-37, 12:52-13:4; Goodin, ¶¶ 410-411. In view of these combined teachings of Dockser, Tong, and MacMillan, a POSA would have been motivated to use Dockser's FPP with Tong's precision levels as low as 5 mantissa fraction bits as each floating-point accelerator in MacMillan's multiple PEs to achieve "supercomputer performance" for, *e.g.*, neural network applications while conserving power. Goodin, ¶ 412.

The resulting Dockser/Tong/MacMillan combination (*i.e.*, MacMillan's multi-PE system using Dockser's FPP with as low as 5-fraction-bit precision as taught by Tong) meets claims 1-26, 28, 36-61, and 63 for the same reasons Dockser/MacMillan does discussed *supra* § VII in Ground 3, except the claimed performance characteristics X and Y are met by using 5 rather than 9 mantissa fraction bits, meeting the claimed "at least" X and Y values by the greater amounts explained for Dockser/Tong in Ground 2 *supra* § VI.B. Goodin, ¶ 413.

Dockser/Tong/MacMillan meets claims 32 and 67 because a POSA would have had reason to implement the Dockser/Tong/MacMillan device to "perform nearest neighbor search" for the reasons discussed *supra* § VI.C. Both MacMillan

- 57 -

and Tong teach applying their techniques in applications including neural network and signal/image processing applications, for which nearest-neighbor search was known to be advantageous.  Tong, p. 278 & Table IV; MacMillan, 1:24-37; Goodin, ¶ 414.

### B.    Claim 33-35, 68-70

Tong's teachings discussed *supra* §§ VI.A, VI.D to emulate in software a device employing reduced-precision arithmetic would have motivated a POSA to emulate in software the Dockser/Tong/MacMillan device meeting claim 1 (the "second device" recited in claim 33) and claim 36 (the "second device" recited in claim 68).  Goodin, ¶ 415.  The computer performing the emulation meets claim 33 for the reasons that same computer does in Ground 2 *supra* § VI.D, except the claimed "second device" being emulated is met by the Dockser/Tong/MacMillan device for the reasons *supra* § VIII.A.  Goodin, ¶ 416.  The emulation computer meets claim 68's preamble in the same way as it meets claim 33's identical preamble (*supra* § VI.D), and claim 68's remaining limitations (concerning the emulated "second device") are met for the same reasons the emulated Dockser/Tong/MacMillan device meets claim 36's identical limitations (*supra* §§ VIII.A, VII.P).

The Dockser/Tong/MacMillan device being emulated meets the additional limitations of claims 34-35 and 69-70 for the same reasons discussed *supra*

- 58 -

§§ VII.D-VII.E, VIII.A concerning claim 3 (reciting identical limitations to claims 34 and 69) and claim 5 (reciting identical limitations to claims 35 and 70). Goodin, ¶ 417.

### C.    Alternative Interpretation of Claims 5-6, 8, 10-18, 35-70

One MacMillan embodiment is "a system… designed primarily… for a specific application, including embedded applications… including… signal processing,… voice recognition, [etc.]." MacMillan, 7:15-34. Tong teaches that many "embedded applications such as voice recognition,… and other human-sensory-oriented signal-processing applications" (Tong, 274), "can get by with less precision/range than full FP" (Tong, 273). Tong experimentally demonstrates that the optimum precision for a "benchmark suite" (Tong, 284) of "five signal processing applications" spanning a "range in complexity" is between 5 and 11 mantissa fraction bits (Tong, 278-279). Goodin, ¶¶ 418-420. A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels for the reasons *supra* § VIII.A, and to do so in MacMillan's embedded signal-processing system based on Tong's teachings that reduced-precision arithmetic is beneficial in such systems. Goodin, ¶ 421.

In such an embedded system designed specifically for signal processing, a POSA would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view

- 59 -

of Tong's teachings that "the fine precision of the 23-bit mantissa is not essential."

Tong, 279; Goodin, ¶ 422. Dockser ([0017]) teaches that the registers in

embodiments of its FPP can be "formatted differently from IEEE 32-bit single

format," and a POSA would have been motivated to implement Dockser's FPPs in

the embedded signal-processing system with smaller than 32-bit registers to not

waste circuit space or incur unnecessary cost in having some register elements that

will always be unpowered because they correspond to mantissa bits that will

always be tied to "0" in an application-specific system that always operates at

reduced precision. Goodin, ¶ 423. Likewise, a POSA would have been motivated

to implement the multiplier logic in Dockser's FPP to have only as many logic

elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-

bit) corresponding to the precision level selected for the embedded application.

Goodin, ¶ 424.

In this implementation, the claimed "input signal" to Dockser's FPP remains

in IEEE-754 32-bit single-format given that the Host CPU and data buses in the

Dockser/Tong/MacMillan device use and send to Dockser's FPP standard 32-bit

floating-point numbers. MacMillan, 9:30-57; *supra* §§ VII.A, VII.E; Goodin, ¶

425. However, one or more least-significant mantissa bits of the input signal

number are not stored in the register which is implemented with fewer than 32

storage elements. Goodin, ¶ 425. Because the input signal and selected precision

- 60 -

levels are unchanged from Grounds 1-3, this implementation of Dockser/Tong/MacMillan meets the independent claims (including their "wherein" clause) the same way as in Grounds 1-3 where Dockser's FPP is a claimed LPHDR execution unit.  Goodin, ¶ 426; *supra* §§ V-VII.

If claims 5, 8, 10, 35-36, 40, 43, 45, 68, and 70 (and their dependents) were interpreted differently than the specification discusses (*see supra* § VII.E), such that an execution unit used for reduced-precision operations could be considered to also meet the claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide" if its hardware is capable of 32-bit multiplication in some configurations (*e.g.*, if power were applied to all register and logic elements), Dockser's FPP in the above-discussed Dockser/Tong/MacMillan implementation for an embedded application is not that type of execution unit, because its hardware (having smaller-than-32-bit registers and multiplier logic) is ***not*** capable of 32-bit multiplication.  Goodin, ¶ 427.  Thus, this Dockser/Tong/MacMillan implementation meets that alternative interpretation of claims 5-6, 8, 10-18, and 35-70 because only the Host CPU floating-point unit is a claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide," and the device includes the recited number more of Dockser's FPP (LPHDR execution unit).  Goodin, ¶ 428; *supra* § VII.E.

- 61 -

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————

Case No. TBD
Patent No. 8,407,273

———————

**DECLARATION OF RICHARD GOODIN**

Google Exhibit 1003
Google v. Singular

motivation may come from a prior-art reference or from the

knowledge or common sense of one of ordinary skill in the art.

19.    I understand that for a single reference or a combination of references

to render the claimed invention obvious, a POSA must have been able to arrive at

the claimed invention by altering or combining the applied references.

## IV.    THE '273 PATENT

### A.    Overview

20.    The '273 patent claims a device comprising at least one "low

precision high-dynamic range (LPHDR) execution unit."  '273 patent, claim 1.

The claimed "execution unit" is adapted to execute an operation (*e.g.*, an arithmetic

operation like multiplication) on an input signal representing a first numerical

value to produce an output signal representing a second numerical value.  *See*, *e.g.*,

'273 patent, 29:65-30:3 (claim 1: "A device comprising: at least one first low

precision high dynamic range (LPHDR) execution unit adapted to execute a first

operation on a first input signal representing a first numerical value to produce a

first output signal representing a second numerical value").  The "execution unit"

is characterized as "LPHDR" because it performs a "low precision" ("LP")

operation on a "high dynamic range" ("HDR") of values.

21.    Precision relates to accuracy and can be impacted by the ability to

represent numbers that differ from each other by small amounts—*e.g.*, fractional

values.  For example, in a decimal (base-10) representation, the number 2.13 (represented using two fractional digits) is more precise than if rounded to 2.1 (using just one fractional digit), which is more precise than if rounded to 2 (using no fractional digits).

22.    In a binary "fixed-point" representation, any fixed number of bits can be chosen to represent a number's fractional component.  For example, a binary fixed-point representation that allocates three bits to representing a fractional component can represent numbers to the nearest 1/8, which is more precise than a representation that allocates only two bits to the fractional component and can represent numbers to the nearest 1/4, which is more precise than a representation that allocates no bits to the fractional component and can only represent integers.

23.    A "low precision arithmetic" operation, as the '273 patent says, is an operation that is less precise than an exact calculation, such that "each operation might introduce" some "error" in its "results."  '273 patent, 4:9-12 (describing prior art processors that "provide low precision arithmetic, in which each operation might introduce perhaps an error of a few percentage points in its results").  For example, a low-precision operation may produce a result of 2.1 when the exact operation would produce a result of 2.13.

24.    "Dynamic range" refers to the range of numerical values that a signal can represent or a unit can operate on or produce.  *See* '273 patent, 2:35-39 ("In

some embodiments, the processing elements have 'high dynamic range' in the sense that they are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million."). For example, a signal that can represent any numerical value between 1 and 100 has a higher dynamic range than one that can only represent numerical values between 1 and 10.

25.    In a binary (base-2) representation of integers, the more bits used to represent a number, the wider the possible dynamic range—*e.g.*, two bits can represent the numbers 0-3, three bits can represent the numbers 0-7, etc. Other binary representations have been developed that can have a wider dynamic range for the same number of bits. One such well-known representation is floating-point representation.

26.    For example, in describing a prior art "16 bit floating point representation," the '273 patent quotes a 2008 Wikipedia article that explains:

> This format is used in several computer graphics environments including OpenEXR, OpenGL, and D3DX. ***The advantage over 8-bit or 16-bit binary integers is that the increased dynamic range*** allows for more detail to be preserved in highlights and shadows. The advantage over 32-bit single precision binary formats is that it requires half the storage and bandwidth.

'273 patent, 5:23-30.[1]  Similarly, Tong (Ex. 1008) explains that a 32-bit floating-point number in the "IEEE single-precision" format has a much wider dynamic range than a 32-bit integer:

> For instance, an IEEE single-precision number and an integer on a 32-bit machine both require 32 bits of storage for their representation. However, the dynamic range provided by the FP representation ($1.99999988 \times 2^{-126}$ to $1.99999988 \times 2^{127}$) is substantially wider than that provided by the integer representation ($1$-$2^{31}$).

Tong, 274.

27.     It was well known before 2009 that for a numerical representation using a fixed number of bits, a tradeoff is necessary between dynamic range and precision.  For example, a ten-bit binary fixed-point representation that allocates all ten bits to the non-fractional part, and thus represents values between zero and 1,023 but only to the nearest integer, has higher dynamic range but lower precision than a representation that allocates all ten bits to representing the fractional part and thus only represents values between zero and one but is accurate to the nearest 1/1024.

28.     Another example relates to the well-known floating-point representations, which can represent a high dynamic range of numerical values using a smaller number of digits than a fixed-point representation—*e.g.*, by

---

[1] All emphases in this declaration are added unless otherwise indicated.

representing a large number as a smaller number (called the "mantissa") scaled by an order of magnitude. A simple example of a floating-point representation of a decimal number using base ten would represent the number 3,046,000 as $3.046 \times 10^6$.

29.    In a typical binary (base-2) floating-point representation, one bit is allocated to indicate the number's sign (positive or negative), some bits are allocated to specify the "exponent" (the number's order of magnitude in base two), and other bits are allocated to specify the mantissa. *See, e.g.*, Docker (Ex. 1007), [0001] ("To find the value of a floating-point number, the mantissa is multiplied by ***a base (commonly 2 in computers)*** raised to the power of the exponent."), [0002] ("the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa.); Tong (Ex. 1008), 274 ("There are two different IEEE standards for FP computation. IEEE 754 is a binary standard that requires the implied radix (base) to be two. IEEE 854 allows either radix 2 or radix 10 representation. By far, IEEE 754 is more popular and most desktop microprocessors support the IEEE 754 standard.").

30.    It was known that the number of exponent bits in a floating-point representation impacts dynamic range, that the number of mantissa (fraction) bits impacts precision, and that there was a tradeoff:

> The designer of a floating-point representation must find a compromise between the size of the [mantissa] fraction and the size of the exponent because a fixed word size means you must take a bit from one to add a bit to the other. This trade-off is between precision and range: increasing the size of the [mantissa] fraction enhances the precision of the fraction, while increasing the size of the exponent increases the range of numbers that can be represented.

Patterson (Ex. 1031), 191.

31.     It was known in mathematics and in computing that LPHDR arithmetic had benefits. For example, Tong (Ex. 1008) noted that "wide dynamic range" was recognized as "a desirable feature," and explained that "[i]t has long been known that many… applications can get by with less precision" over that range. Tong, 273. Tong explains that "Floating-point (FP) hardware provides a wide dynamic range of representable real numbers," and notes that "FP hardware's performance, simplified programming model, and adaptability over a wide dynamic range makes it a desirable feature." Tong, 273. Tong states that its experimental results show that "programs such as speech recognition and image processing use significantly less power with our reduced bitwidth FP representation than with an IEEE-standard FP representation." Tong, 273. Tong also notes that "[i]t has long been known that many such signal processing applications can get by with less precision/range than full FP," *i.e.*, than with the an "IEEE-standard FP representation." Tong, 273. Tong's own experiments

Dockser's or Tong's disclosed precision levels) meets the identical limitations in

claim 1.

## VIII. CLAIMS 1-26, 28, 36-61, AND 63 WOULD HAVE BEEN OBVIOUS OVER DOCKSER AND MACMILLAN

### A. MacMillan (Ex. 1009)

349.    MacMillan "improv[es]… speed of a personal computer architecture

through… parallel processing capability" "[t]o provide supercomputer

performance in a computer for personal use."  MacMillan, 8:38-40, 5:22-45, 1:10-

47.  MacMillan states in its "Background of the Invention" section that "[i]f

supercomputing performance could be achieved in low cost computers, such as

personal computers, this could dramatically expand the market for personal

computers."  MacMillan, 1:20-23.  MacMillan teaches that because of performance

limitations of "uniprocessor-based" systems, "a personal computer providing

supercomputer performance should use a parallel computing architecture."

MacMillan, 1:38-47.  MacMillan notes that "SIMD architectures have some

qualities that make them attractive candidates for adding supercomputer

performance to a computer for personal use," but that "present SIMD architectures

are much higher cost than computer systems for personal use."  MacMillan, 5:22-

27.  MacMillan identifies certain things that must be achieved in a SIMD system

"[t]o provide supercomputer performance in a computer for personal use,"

MacMillan, 5:27-28, and teaches an invention that "addresses [those] needs."

MacMillan, 5:44-45. Specifically, MacMillan's invention "relates to an improvement in the overall speed of a personal computer architecture through the addition of a parallel processing capability." MacMillan, 8:38-40.

350. Consistent with how the term "supercomputer" was used in the art, MacMillan describes "supercomputer" performance in terms of speed (e.g., number of operations performed per second), not precision. *See* MacMillan, 1:15-54 ("Personal computers (PCs) today typically have performance up to about 300 million instructions per second (MIPs). This is much less than supercomputers, which may provide performance of 5,000 MIPs or more. … Parallel computers with over 5,000 MIPs performance are readily achievable, as demonstrated by their availability from a number of vendors, although at high prices."). For corroborating evidence of how the term "supercomputer" was used in the art, *see*, *e.g.*, *Penguin* (Ex. 1052), 1411 ("any of a class of very powerful computers that are capable of performing at great speed and are used for repeated calculation cycles on vast amounts of data"); *Oxford* (Ex. 1053), 500 ("supercomputer" is a "class of very powerful computers" capable of "performing several hundred [trillion] floating-point operations per second").

351. MacMillan achieves "substantial performance improvements" by adding a "Single Instruction Multiple Data (SIMD)" subsystem to "existing system architectures." MacMillan, 9:17-19, 5:48-6:10. MacMillan's invention

"comprises a computer system to which has been added a Single Instruction

Multiple Data (SIMD) parallel processing capability."  MacMillan, 5:48-50.  "The

computer system, to which the SIMD capability has been added, could be a

computer system for personal use or other computer system."  MacMillan, 5:50-53.

MacMillan's "cost-effective addition of parallel processing can be made to

popular, low cost computer systems running popular operating systems," including

"Microsoft Windows based personal computers" and "UNIX-based systems."

MacMillan, 6:3-10.  MacMillan provides this "SIMD capability" with a "SIMD

subsystem" that "adds parallel processing capabilities to the personal computer,

resulting in substantial performance improvements."  MacMillan, 9:17-19.

352.    MacMillan's SIMD subsystem includes SIMD-RAM devices having

multiple parallel "processing elements (PE's)," each PE including "floating point

accelerators" that "perform… operations on… 32-bit words."  MacMillan, 9:11-19,

12:35-59, FIG. 2, 5.  Figure 2 of MacMillan shows a "SIMD subsystem 100" that

"includes a SIMD Controller" and "one or more SIMD-RAM devices 104."

MacMillan, 9:11-12.    "Fig[ure] 5 shows a block diagram of a SIMD-RAM

device."  MacMillan, 12:35-36.  The SIMD-RAM contains "a plurality of memory

devices, in this case, dynamic random access memory (DRAM) 304, which are

coupled to a plurality of processing elements (PE's) 302 via random access logic

306."  MacMillan, 12:36-40.  "Each PE contains a 32-bit wide data path and can



**FIG. 5**

MacMillan, Fig. 5 (SIMD-RAM device)

## B.  Dockser/MacMillan Combination

353.  MacMillan teaches incorporating SIMD parallel processing in personal-use computers, including battery-operated devices like "laptops, palmtops, [and] personal digital assistants"—the same types of computers for which Dockser's FPP provides beneficial "[p]ower management" through reduced-precision floating-point operations.  MacMillan, 1:6-9, 5:22-45, 7:14-34; Dockser, [0003].  MacMillan's invention relates to "computer systems for personal use."

MacMillan, 1:6-9.  As MacMillan explains, "SIMD architectures have some

qualities that make them attractive candidates for adding supercomputer

performance to a computer for personal use," but existing "SIMD architectures"

have "limitations."  5:22-26.  "Overcoming" those limitations, MacMillan

explains, "would allow supercomputing performance to be provided in a low cost

computer system for personal use," and MacMillan's invention "addresses" those

"needs"—*i.e.*, the needs to overcome those limitations.  MacMillan, 5:42-45.

MacMillan defines "'[a] computer system for personal use'" as

> a system that is designed primarily for use by an individual or for a
> specific application, including embedded applications. ***A computer
> system for personal use includes*** personal computers (including, but
> not limited to, those that are IBM-compatible and Apple-compatible),
> workstations (including, but not limited to, those that use RISC
> technology or that use the UNIX operating system), embedded
> computers (including, but not limited to, computer-based equipment
> used for telecommunications, data communications, industrial control,
> process control, printing, settop boxes, signal processing, data
> compression or decompression, data transformation, data aggregation,
> data extrapolation, data deduction, data induction, video or audio
> editing or special effects, instrumentation, data collection or analysis
> or display, display terminals or screens, voice recognition, voice
> processing, voice synthesis, voice reproduction, data recording and
> playback, music synthesis, animation, or rendering), ***laptops,***

> ***palmtops, personal digital assistants, notebooks, subnotebooks, and
> video games***.

MacMillan, 7:14-34.  These are the same types of systems in which, according to

Dockser, the problem of "unnecessary power consumption" is "of particular

concern."  Dockser, [0003] ("some graphics applications may only require a 16-bit

mantissa. For these graphics applications, any accuracy beyond 16 bits of precision

tends to result in unnecessary power consumption. This is of particular concern in

battery operated devices where power comes at a premium, such as wireless

telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and

cameras, just to name a few.").  Dockser teaches that "there is a need in the art for

a floating-point processor in which the reduced precision, or subprecision, of the

floating-point format is selectable," which Dockser addresses with this selectable-

precision FPP.  Dockser, [0003].  Thus, both MacMillan and Dockser are directed

to improvements in the same types of devices.

354.   In addition, MacMillan teaches that "power dissipation and hence

power supply capacity and cost" should be considered in pursuing the performance

improvements of MacMillan's SIMD architecture.  MacMillan, 3:2-6.  MacMillan

explains that existing "SIMD architectures…suffer from a number of

shortcomings."  MacMillan, 2:21-26.  One of these limitations is a "bottleneck

between the chips used to hold PEs [processing elements] and the chips used to

provide memory storage." MacMillan, 2:26-48. Although MacMillan notes that "[a]dding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs," MacMillan also notes that "[a]dding output buffers to drive increased pin counts also increases power dissipation and hence ***power supply capacity and cost***," which in turn "may also require increased space between chips or circuit boards for better cooling, leading to larger, more costly cabinets." MacMillan, 2:62-3:6. One of MacMillan's goals is to "overcom[e]" the "limitations" it identifies in prior art SIMD systems." MacMillan, 5:38-42. Thus, a POSA would have understood that one of MacMillan's goals in the design of its SIMD system was addressing "power dissipation and hence power supply capacity and cost." MacMillan, 3:3-4.

355.   Based on MacMillan's and Dockser's teachings that I discuss above, a POSA would have been motivated to use Dockser's FPP to implement each "floating-point accelerator[]" in the parallel PEs of MacMillan's SIMD architecture (MacMillan, 12:55-56), to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches.

356.   A POSA would have understood that Dockser's FPP is a "floating-point accelerator" for "perform[ing] atomic operations on… 32-bit words" as in MacMillan's PE, and using Dockser's FPP as the floating-point accelerator in MacMillan's PE would have achieved the predictable result of enabling the PEs to

perform reduced-precision floating-point arithmetic as taught by Dockser at reduced power. MacMillan, 12:47-59. As I discussed in paragraph 352 above, MacMillan discloses that its PEs "can perform atomic operations on bits, bytes, 16-bit words, and 32-bit words." MacMillan, 12:47-49. MacMillan also teaches including "floating-point accelerators" in each PE. MacMillan, 12:55-56. As a POSA would have understood, a floating point accelerator is a processor element for executing floating point operations, as is Dockser's FPP. For evidence corroborating that this was background knowledge for a POSA, *see, e.g.*, Fossum (Ex. 1024), 1:43-58 (explaining in the "Description of the Prior Art" that in "Data processing (i.e. computer) systems," "[s]ometimes a special type of ***processor element***, termed a ***floating point accelerator***, is provided for performing floating point arithmetic calculations. Floating point accelerators are specifically designed to increase the speed with which floating point calculations may be performed; when a ***floating point operation*** is to be performed, it is ***executed*** in or by the floating point accelerator rather than in another processor."). Thus, a POSA would have understood that the "floating-point accelerators" in the PEs in MacMillan are processor elements that perform floating-point operations, just like Dockser's FPP, and therefore would have understood that using Dockser's FPP as the floating-point accelerator would enable MacMillan's PEs to perform reduced-precision floating-point arithmetic.

357.    Moreover, MacMillan teaches that its SIMD architecture is beneficial for applications including "animation,… rendering…, and video games," which a POSA would have understood are types of the "graphics applications" for which Dockser teaches that its FPP can beneficially save power by reducing unnecessary precision.  MacMillan, 7:14-33; Dockser, [0003].  As I discussed in paragraph 353 above, MacMillan's primary focus is on "computer system[s] for personal use," which includes "laptops, palmtops, personal digital assistants, notebooks, subnotebooks, and video games," MacMillan, 7:14-34, which are the same types of "battery operated devices where power comes at a premium" that Dockser is primarily focused on.  *See* Dockser, [0003] ("wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras, just to name a few").

## C.    Claims 1 and 28

358.    In the combination of Dockser and MacMillan ("Dockser/MacMillan") discussed in Section VIII.B above, MacMillan's "computer system" (*e.g.*, computer system 200) (MacMillan, 7:14-34, 9:20-29), or alternatively a "SIMD-RAM ***device***" (element 104/254) within MacMillan's computer system (MacMillan, 9:11-29, 12:35-59) meets the "device" of limitation [1A1], and comprises Dockser's execution unit, as I explain in the following paragraph.

memory per PE." MacMillan, 12:60-63. Additionally, MacMillan's "architecture is easily scaled across a range of performance simply by adding SIMD-RAM chips." MacMillan, 16:20-22. Furthermore, MacMillan's system is a SIMD system, and MacMillan notes that "[t]he SIMD architecture can be scaled to tens of thousands of processors or more, with excellent processor utilization for many programs." MacMillan, 2:13-16.

370.   Thus, in the Dockser/MacMillan combination having a single Host CPU and at least one FPP in each PE (of which there are at least 256 and optionally more than "tens of thousands"), the number of FPPs (LPHDR execution units), *i.e.*, at least 256, exceeds by over 10, by over 100, and by over 500 the non-negative integer number of Host CPU floating-point execution units, *i.e.*, 1, meeting claims 5, 8, and 10 of the '273 patent.

371.   The '273 patent states:

The degree of precision of a "***low precision, high dynamic range***" arithmetic element may vary from implementation to implementation. For example, in certain embodiments, a LPHDR arithmetic element produces results which include fractions, that is, values greater than zero and less than one. For example, ***in certain embodiments, a LPHDR arithmetic element produces results which are sometimes*** (or all of the time) ***no closer than 0.05% to the correct result*** (that is, the absolute value of the difference between the produced result and

the correct result is ***no more than one-twentieth of one percent of the absolute value of the correct result***).

'273 patent, 26:50-60.  The patent also states:

> For certain devices (such as computers or processors or other devices) embodied according the present invention, the ***number of LPHDR arithmetic elements*** in the device (e.g., computer or processor or other device) ***exceeds the number***, possibly zero, of ***arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision*** (***that is***, floating point arithmetic with a ***word length of 32*** or more bits).

'273 patent, 27:63-28:3.  The '273 patent thus says that "arithmetic elements… designed to perform… floating point arithmetic with a word length of 32 or more bits" are "designed to perform… arithmetic of traditional precision," and it contrasts those traditional-precision elements with "LPHDR arithmetic elements" ('273 patent, 27:63-28:3), which may "sometimes" produce results that differ from the correct result (*id.*, 26:50-60).

372.   A POSA would therefore have understood the '273 patent to describe that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" in claims 5, 8, and 10 are "traditional precision" execution units that do not "sometimes" produce results different from the correct traditional-precision result.

417.   The Dockser/Tong/MacMillan device being emulated meets the additional limitations of claims 34-35 and 69-70 of the '273 patent for the same reasons I discussed in Sections VIII.D-VIII.E above concerning claim 3 (which recites identical limitations to claims 34 and 69) and claim 5 (which recites identical limitations to claims 35 and 70).

### C.     Alternative Interpretation of Claims 5-6, 8, 10-18, and 35-70

418.   One embodiment in MacMillan is "a system… designed primarily… for a specific application, including embedded applications… including… signal processing,… voice recognition, [etc.]."  MacMillan, 7:15-34.  MacMillan relates to improving a "computer system for personal use."  MacMillan, 5:48-53 ("The present invention comprises a computer system to which has been added a Single Instruction Multiple Data (SIMD) parallel processing capability. The computer system, to which the SIMD capability has been added, could be a computer system for personal use or other computer system.").  And in the "DESCRIPTION OF THE PREFERRED EMBODIMENTS" section, MacMillan explains that:

> *'A computer system for personal use'* is a system that is designed primarily for use by an individual *or for a specific application, including embedded applications*. A computer system for personal use *includes* personal computers (including, but not limited to, those that are IBM-compatible and Apple-compatible), workstations (including, but not limited to, those that use RISC technology or that use the UNIX operating system), *embedded computers (including,*

> *but not limited to, computer-based equipment used for*
> telecommunications, data communications, industrial control, process
> control, printing, settop boxes, *signal processing*, data compression or
> decompression, data transformation, data aggregation, data
> extrapolation, data deduction, data induction, video or audio editing or
> special effects, instrumentation, data collection or analysis or display,
> display terminals or screens, *voice recognition, voice processing,*
> *voice synthesis, voice reproduction*, data recording and playback,
> music synthesis, animation, or rendering), laptops, palmtops, personal
> digital assistants, notebooks, subnotebooks, and video games.

MacMillan, 7:15-34.

419.   Tong says that its "results show that programs such as *speech*

*recognition and image processing* use significantly less power with [a] reduced

bitwidth FP representation than with an IEEE-standard FP representation," and

notes that "[i]t has long been known that many *such signal processing*

*applications* can get by with less precision/range than full FP." Tong, 273.  Later,

Tong explains:

> For an increasing number of *embedded applications such as voice*
> *recognition, vision/image processing, and other human-sensory-*
> *oriented signal-processing applications*, FP's simplified
> programming model (in contrast with fixed-point systems) and large
> dynamic range makes FP hardware a desirable feature. Furthermore,
> many recognition applications achieve a high degree of accuracy
> starting from fairly low-resolution input sensory data.

Tong, 274.  Thus, a POSA would have understood that Tong teaches that many

"embedded applications such as voice recognition,… and other human-sensory-

oriented signal-processing applications" (Tong, 274), "can get by with less

precision/range than full FP" (Tong, 273).

    420.    Tong experimentally demonstrates that the optimum precision for a

"benchmark suite" (Tong, 284) of "five signal processing applications" spanning a

"range in complexity" is between 5 and 11 mantissa fraction bits (Tong, 278-279).

Tong says that "[t]o study the relationship between program accuracy and number

of bits in FP representation, [the authors] have collected a set of five signal

processing applications."  Tong, 278.  These applications, which are described in

Table IV, "range in complexity from single-purpose kernels to complete

applications."  Tong, 278.  Figure 6 of Tong "plots the accuracy for each of the

five programs across a range of mantissa bitwidths."  Tong, 278.  As shown in

Figure 6, "[n]one of the workloads display a noticeable degradation in accuracy

when the mantissa bitwidth is reduced from 23 to 11 bits.  For ALVINN and

Sphinx III the results are even more promising; the accuracy does not change

significantly with as few as 5 mantissa bits."  Tong, 278.  Later, in summarizing its

results, Tong notes that "[m]ost FP programs in our benchmark suite maintain the

same output even when the mantissa bitwidth is reduced by half."  Tong, 284.

421.   A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels for the reasons I explained in Section IX.A above.  Moreover, a POSA would have been motivated to do so in MacMillan's embedded signal-processing system based on Tong's teachings that reduced-precision arithmetic is beneficial in such systems.

422.   In such an embedded system designed specifically for signal processing, a POSA would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that "the fine precision of the 23-bit mantissa is not essential."  Tong, 279.  Tong explains that the results of its experiments with varying mantissa bitwidths "clearly demonstrate that not all programs need the precision provided by generic FP hardware."  Tong, 278.  As Tong explains,

> The reason behind this result is that ***many programs dealing with human interfaces process sensory data with intrinsically low resolutions***. Raw input data with 4-10 bits of precision is rather common in these applications. … What is quite clear from these experiments is that the FP format provides essential dynamic range (we can reduce, but not reduce dramatically, the number of exponent bits) ***but the fine precision of the 23-bit mantissa is not essential*** (half as many bits often suffice).

Tong, 278-279.  Based on this teaching, a POSA would have understood that there is a class of applications, including signal processing applications that "process sensory data," that do not need 23 fraction bits.

423.    In addition, Dockser teaches that the registers in embodiments of its FPP can be "formatted differently from IEEE 32-bit single format."  Dockser, [0017] ("It should of course be understood, however, that other embodiments of the floating-point processor 100 may include a floating-point register file 110 that is *formatted differently* from IEEE 32-bit single format (***including but not limited to*** IEEE 64-bit double format), and/or may contain a different number of register locations."  Thus, a POSA would have been motivated to implement Dockser's FPPs in the embedded signal-processing system with smaller than 32-bit registers to not waste circuit space or incur unnecessary cost in having some register elements that will always be unpowered because they correspond to mantissa bits that will always be tied to "0" in an application-specific system that always operates at reduced precision.

424.    Likewise, a POSA would have been motivated to implement the multiplier logic in Dockser's FPP to have only as many logic elements as needed to multiply mantissas of the reduced bitwidth (smaller than 23-bit) corresponding to the precision level selected for the embedded application.

425.   In this implementation, the claimed "input signal" to Dockser's FPP remains in IEEE-754 32-bit single-format given that the Host CPU and data buses in the Dockser/Tong/MacMillan device use and send to Dockser's FPP standard 32-bit floating-point numbers.  MacMillan, 9:30-57 ("In this embodiment of FIG. 3 … The host CPU 208 is connected to the host bus 230.  In the embodiment of FIG. 3, fast I/O is provided through the Peripheral Component interconnect bus (PCI bus) 210. … The PCI bus 210 can support up to 133 Mbytes/second peak transfer rate in its current 32-bit version."); *see* Section IX.A above (where I explain that the device in the Dockser/Tong/MacMillan combination is the computer system of MacMillan implemented with Dockser's FPPs, which are configured to use 5 mantissa bits as taught in Tong), VIII.A, VIII.E.  However, in this implementation, one or more least-significant mantissa bits of the input signal number are not stored in the FPP register because it is implemented with fewer than 32 storage elements, as I explain in paragraph 423 above.

426.   Because the input signal and selected precision levels are unchanged from the Dockser, Dockser/Tong, and Dockser/MacMillan combinations that I discuss in Sections VI-VIII above, this implementation of Dockser/Tong/MacMillan in paragraphs 422-425 above meets the independent claims of the '273 patent (including their "wherein" clause) the same way as in the

Dockser, Dockser/Tong, and Dockser/MacMillan combinations where Dockser's FPP is a claimed LPHDR execution unit.

427.   As I discuss in Section VIII.E above, the specification of the '273 patent makes clear to a POSA that the claimed "execution units… adapted to execute… multiplication on floating point numbers that are at least 32 bits wide" referred to in claims 5, 8, 10, 35-36, 40, 43, 45, 68, and 70 are "traditional precision" execution units that ***do not*** "sometimes" produce results different from the correct traditional-precision result.  *See*, *e.g.*, paragraphs 371-372 above. However, if the above-listed claims (and their dependents) were interpreted differently than the specification discusses, such that an execution unit used for reduced-precision operations could also be a claimed "execution unit[]… adapted to execute… multiplication on floating point numbers… 32 bits wide" if its hardware were capable of 32-bit multiplication in some configurations (*e.g.*, if power were applied to all register and logic elements), then Dockser's FPP in the above-discussed Dockser/Tong/MacMillan implementation for an embedded application is ***not*** that type of execution unit, because its hardware (having smaller-than-32-bit registers and multiplier logic) is ***not*** capable of 32-bit multiplication.

428.   Thus, this Dockser/Tong/MacMillan implementation meets that alternative interpretation of claims 5-6, 8, 10-18, and 35-70 of the '273 patent because only the Host CPU floating-point unit is a claimed "execution unit[]…

adapted to execute… multiplication on floating point numbers… 32 bits wide,"

and the device includes the claims' recited number more of Dockser's FPP

(LPHDR execution unit), as I explained in Sections VIII.E above.

## X.    APPENDIX I – TECHNICAL DETAILS OF RELATIVE ERROR ANALYSES

### A.    Dockser's Multiplier Relative Error Is Independent of Exponent and Sign

429.    In this section, I explain mathematically why it is the case that the

relative error produced by performing floating-point multiplication on two

floating-point numbers using Dockser's precision-reduction techniques is

independent of the exponent values and sign bits of the two floating-point

numbers.

430.    A POSA would have understood that if a floating-point number A has

a sign bit $S_A$, a mantissa value $M_A$, and an exponent $E_A$, then the value of A is

$$A = (-1)^{(S_A)} \times 2^{(E_A)} \times (M_A)$$

*See*, *e.g.*, Dockser, [0001] ("A floating-point representation of a number commonly

includes a sign component, an exponent, and a mantissa. To find the value of a

floating-point number, the mantissa is multiplied by a base (commonly 2 in

computers) raised to the power of the exponent. The sign is applied to the resultant

value."). A POSA would have understood that positive numbers are represented

by having a sign bit with value 0, and negative numbers are represented with a sign

500.   Because the pairs of normal IEEE-754 single-format floating-point numbers whose exponents sum to etiher -126 or 127 **may or may not** overflow or underflow (depending on the values of their mantissas), I did not exclude them from the set of possible valid inputs.  Instead, in order to be conservative, I assumed for the purposes of my analysis that all pairs of normal IEEE-754 single-format floating-point numbers whose exponents add up to either -126 or 127 **are** in the set of "possible valid inputs" as claimed, but that **none** of those pairs of floating-point numbers produce a product whose value differs from the "exact mathematical calculation" by the Y% required in any of the '273 patent's claims. The reason this is a conservative approach is that it **reduces** the percentage of the possible valid inputs that are reported as producing the claimed relative error amount below that percentage's true value, because it increases the number of possible valid inputs in the percentage calculation (making the denominator larger) while potentially excluding possible valid inputs that would have produced the claimed relative error amount (making the numerator smaller).  To adjust my reported "Dockser's X" percentages in accordance with this assumption, I multiply the percentage of mantissa pairs that my software program outputs as producing the claimed relative error amount Y by the quantity ($48259 \div 48513$), which is the ratio of the number of pairs of exponent values that **cannot** produce an overflow or underflow over the number of pairs of exponent values that I

Trials@uspto.gov
571-272-7822

Paper 16
Date: May 14, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————————

IPR2021-00179
Patent 8,407,273 B2

———————————

Before JUSTIN T. ARBES, KRISTI L. R. SAWERT, and
JASON M. REPKO, *Administrative Patent Judges.*

PER CURIAM.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

## I.   INTRODUCTION

### A.   Background and Summary

Petitioner Google LLC filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–26, 28, 32–61, 63, and 67–70 of U.S. Patent No. 8,407,273 B2 (Ex. 1001, "the '273 patent") pursuant to 35 U.S.C. § 311(a).  Patent Owner Singular Computing LLC filed a Preliminary Response (Paper 9, "Prelim. Resp.") pursuant to 35 U.S.C. § 313.  Petitioner

IPR2021-00179
Patent 8,407,273 B2

also filed an explanation for filing multiple petitions ranking its petition in Case IPR2021-00178 ahead of its Petition in this proceeding (Paper 3). With our authorization (Paper 13), Petitioner also filed a Reply (Paper 14, "Reply") and Patent Owner filed a Sur-Reply (Paper 15, "Sur-Reply").

Pursuant to 35 U.S.C. § 314(a), the Director may not authorize an *inter partes* review unless the information in the petition and preliminary response "shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." For the reasons that follow, we institute an *inter partes* review as to claims 1–26, 28, 32–61, 63, and 67–70 of the '273 patent on all grounds of unpatentability asserted in the Petition.

### B. Related Matters

The parties indicate that the '273 patent is the subject of *Singular Computing LLC v. Google LLC*, Case No. 1:19-cv-12551-FDS (D. Mass.). *See* Pet. xi; Paper 8, 1. Petitioner filed another petition challenging claims 1–70 of the '273 patent in Case IPR2021-00178, and filed four other petitions challenging claims of two related patents also asserted in the district court case in Cases IPR2021-00154, IPR2021-00155, IPR2021-00164, and IPR2021-00165.

### C. The '273 Patent

The '273 patent, entitled "Processing with Compact Arithmetic Processing Element," issued on March 26, 2013. Ex. 1001, codes (45), (54). The '273 patent describes "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)." *Id.* at col. 5, l. 65–col. 6, l. 2.

According to the '273 patent, conventional central processing unit (CPU) chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications. *Id.* at col. 3, ll. 7–22. For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations." *Id.* at col. 3, ll. 15–22. According to the '273 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors." *Id.* at col. 3, ll. 23–28. But "[c]urrent architectures for general purpose computing fail to deliver this power." *Id.* at col. 3, ll. 28–29.

The '273 patent is, therefore, "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at col. 2, ll. 11–18. According to the '273 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.* at col. 2, ll. 28–31. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at col. 2, ll. 35–39.

IPR2021-00179
Patent 8,407,273 B2

Figure 6 of the '273 patent is reproduced below.



FIG. 6

Figure 6 depicts "an example design for an LPHDR arithmetic unit according to one embodiment of [the '273 patent]." *Id.* at col. 2, ll. 56–57. As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces an output 602c. *Id.* at col. 12, ll. 52–53. The LPHDR arithmetic unit "is controlled by control signals 412a-d, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602a-b." *Id.* at col. 12, ll. 59–62. According to the '273 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602a-b by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at col. 12, ll. 62–65. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier, and divider to output 602c. *Id.* at col. 13, ll. 1–8.

The '273 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at col. 13, ll. 8–10.  According to the '273 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at col. 17, ll. 18–21.  The '273 patent provides, as examples, applications including "finding nearest neighbors," *id.* at col. 17, l. 29–col. 21, l. 32, "distance weighted scoring," *id.* at col. 21, l. 34–col. 22, l. 24, and "removing motion blur in images," *id.* at col. 22, l. 26–col. 23, l. 30.

### D.  Illustrative Claim

Challenged claims 1, 33, 36, and 68 of the '273 patent are independent.  Claims 2–26, 28, and 32 depend from claim 1, claims 34 and 35 depend from claim 33, claims 37–61, 63, and 67 depend from claim 36, and claims 69 and 70 depend from claim 68.  Claim 1 recites:

> 1. A device:

> comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

> wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

IPR2021-00179
Patent 8,407,273 B2

*E.  Evidence*

Petitioner relies on the following prior art:

U.S. Patent No. 5,689,677, issued Nov. 18, 1997 (Ex. 1009, "MacMillan");

U.S. Patent Application Publication No. 2007/0203967 A1, published Aug. 30, 2007 (Ex. 1007, "Dockser"); and

Jonathan Ying Fai Tong, David Nagle, & Rob. A. Rutenbar, "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, vol. 8, no. 3 (June 2000) (Ex. 1008, "Tong").

*F.  Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–26, 28, 32–61, 63, and 67–70 of the '273 patent are unpatentable on the following grounds:

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 2, 21–24, 26, 28 | 103(a)[1] | Dockser |
| 1, 2, 21–24, 26, 28, 32, 33 | 103(a) | Dockser, Tong |
| 1–26, 28, 36–61, 63 | 103(a) | Dockser, MacMillan |
| 1–26, 28, 32–61, 63, 67–70 | 103(a) | Dockser, Tong, MacMillan |

II.  ANALYSIS

*A.  Level of Ordinary Skill in the Art*

Petitioner asserts that at the time of the earliest possible effective filing date of the '273 patent (June 19, 2009), a person of ordinary skill in

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  Here, Petitioner's challenges are based on the pre-AIA version of 35 U.S.C. § 103.

the art would have had "at least a bachelor's degree in Electrical Engineering, Computer Engineering, Applied Mathematics, or the equivalent, and at least two years of academic or industry experience in computer architecture." Pet. 7–8. Patent Owner does not address the level of ordinary skill in the art in its Preliminary Response. Based on the record presented, including our review of the '273 patent and the types of problems and solutions described in the '273 patent and cited prior art, we agree with Petitioner's proposed definition of the level of ordinary skill in the art with one exception. Arguably, the term "at least" creates unnecessary ambiguity. Thus, we delete that term from Petitioner's definition, and otherwise apply Petitioner's definition for purposes of this Decision. *See, e.g.*, Ex. 1001, col. 1, l. 26–col. 2, l. 7 (describing in the "Background" section of the '273 patent various conventional methods of computation and their alleged deficiencies).

## B. Claim Construction

We construe the challenged claims

> using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

37 C.F.R. § 42.100(b) (2020). We need to construe only those terms "that are in controversy, and only to the extent necessary to resolve the controversy." *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Petitioner states that the terms of the challenged claims should be "given their ordinary and customary meaning as

IPR2021-00179
Patent 8,407,273 B2

understood by a [person of ordinary skill in the art] in accordance with the specification and prosecution history," but does not propose any express constructions. Pet. 8. Patent Owner disputes the construction of "low precision high dynamic range (LPHDR) execution unit" that Petitioner proposed in the related district court case (i.e., "low precision and high dynamic range processing element designed to perform arithmetic operations on numerical values"), arguing that Dockser does not teach an LPHDR execution unit because "the processing element itself must be fairly characterized as 'low precision'" and cannot be an execution unit "whose subprecision can be selectively reduced." Prelim. Resp. 14 (citing Ex. 2001, 13–17) (emphasis omitted). We conclude that no terms require express construction at this time, and address the parties' arguments regarding whether Dockser teaches the recited LPHDR execution unit below. *See infra* Section II.C.2.

## C. Obviousness Ground Based on Dockser

Petitioner contends that claims 1, 2, 21–24, 26, and 28 are unpatentable over Dockser under 35 U.S.C. § 103(a), citing the testimony of Richard Goodin, P.E., as support. Pet. 8–38 (citing Ex. 1003). We are persuaded that Petitioner has established a reasonable likelihood of prevailing on its asserted ground for the reasons explained below.

### 1. Dockser

Dockser discloses performing floating-point operations with a floating-point processor having "selectable subprecision." Ex. 1007, code (57), ¶¶ 15, 17. "A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa. To find

IPR2021-00179
Patent 8,407,273 B2

the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent.  The sign is applied to the resultant value." *Id.* ¶ 1.  "The precision of the floating-point processor is defined by the number of bits used to represent the mantissa. The more bits in the mantissa, the greater the precision." *Id.* ¶ 2.  "The precision of [a] floating-point processor generally depends on the particular application.  For example, the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa." *Id.*  "Higher precision results in a higher accuracy, but commonly results in increased power consumption." *Id.*  Dockser explains that the performance of floating-point operations also can be computationally inefficient because "[w]hile some applications may require [high] types of precision, other applications may not." *Id.* ¶ 3.  For example, "some graphics applications may only require a 16-bit mantissa," such that "any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption," but other applications may require "greater precision." *Id.*  Accordingly, there was "a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable." *Id.*

IPR2021-00179
Patent 8,407,273 B2

Figure 1 of Dockser is reproduced below.



FIG. 1

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

IPR2021-00179
Patent 8,407,273 B2

Figure 2 of Dockser is reproduced below.



FIG. 2

Figure 2 depicts an exemplary data structure for floating-point register file
110 including 16 addressable register locations 200, each "configured to
store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit
exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the
relevant computational unit . . . receive[s] from the floating-point register
file 110 one or more operands stored in one or more of the register
locations" and executes the instruction "at the subprecision selected by the
floating-point controller 130." *Id.* ¶¶ 23–24.  The precision of the
floating-point operation can be reduced by "caus[ing] power to be removed
from the floating-point register elements for the excess bits of the fraction
that are not required to meet the precision specified by the subprecision

11

IPR2021-00179
Patent 8,407,273 B2

select bits" written to the control register.  *Id.* ¶¶ 6, 25–26.  For example, "if each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth."  *Id.* ¶ 26.  "Power can be removed from the floating-point register elements for the remaining 14 fraction bits."  *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected."  *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits).  Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively.  Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3B depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the

multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31.

A partial product 420-i is generated for every bit in multiplier 404 at corresponding stage 410-i and then left-shifted "as a function of the multiplier bit with which it is associated, after which the operation moves on to the next stage." *Id.* ¶ 31. The partial products are eventually added together to generate output value 430. *Id.* "[P]ower may be removed from the logic used to implement the stages to the right of the line 405" indicating the selected subprecision. *Id.* ¶¶ 32–33.

### 2. Claim 1

#### a) Petitioner's Mapping of Dockser to the Limitations of Claim 1

Petitioner argues that Dockser teaches or suggests all of the limitations of claim 1. Pet. 8–36. Petitioner contends that Dockser teaches a "device" (i.e., computing system) comprising a "low precision high dynamic range (LPHDR) execution unit" (i.e., the FPP).[2] *Id.* at 12–13. With respect to the "low precision" aspect of the limitation, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP "operates with the minimum imprecision" required by the subsequent language in claim 1. *Id.* at 13–14 (quoting Ex. 1007 ¶ 14). With respect to the "high range" aspect of the limitation, Petitioner asserts that the FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point

---

[2] Petitioner also provides an "alternative mapping" where "the floating-point operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit. Pet. 13, 18–20, 35. We need not evaluate those arguments at this time, as we determine that Petitioner has made a sufficient showing on the current record that the FPP is an LPHDR execution unit.

IPR2021-00179
Patent 8,407,273 B2

exponent disclosed in the '273 patent. *Id.* at 14 (citing Ex. 1007 ¶ 17; Ex. 1001, col. 14, ll. 53–61).

Petitioner argues that Dockser's FPP is adapted to execute a "first operation" (e.g., "reduced-precision multiplication") on a "first input signal representing a first numerical value" (i.e., input electrical signal representing an operand received at the registers) to produce a "first output signal representing a second numerical value" (i.e., output electrical signal representing an operand sent to a register and then main memory), where the FPP "performs operations on the[] inputs via the FPP's data paths 134–139 and components 140–144." *Id.* at 14–18. Petitioner further argues that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000," as recited in claim 1, because the FPP "operates on IEEE-754 32-bit single-format numbers having 8-bit exponents" and, therefore, the dynamic range of normal operands would be "from around $2^{-126}$ (much smaller than 1/65,000) to around $2^{127}$ (much larger than 65,000)." *Id.* at 19.

> The final limitation of claim 1 is that
>
> for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

We refer to this as "the imprecision limitation." With respect to the "statistical mean" aspect of the imprecision limitation, Petitioner argues that a person of ordinary skill in the art would have understood the limitation

> in the context of the '273 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."

*Id.* at 20–21 (quoting Ex. 1001, col. 4, ll. 7–13). Specifically, for "non-deterministic embodiments," the statistical mean would be the average of "the different outputs produced by the same operation on the same input." *Id.* at 21. For "deterministic digital embodiments" like Dockser, though, the statistical mean is "the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input." *Id.* Consequently, repeatedly executing a multiplication operation using Dockser's floating-point multiplier "on the same input (*i.e.*, pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.* at 22.

With respect to the "exact mathematical calculation" aspect of the imprecision limitation, Petitioner argues that because Dockser performs a reduced-precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation, namely "the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied without reducing precision." *Id.* at 22–23 (emphasis omitted).

Petitioner further explains how Dockser teaches that "for at least X=5% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.05%" from the result of the exact mathematical calculation. *Id.* at 23–36. The

"possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output representing a numerical value (rather than, *e.g.*, an overflow/underflow exception)." *Id.* at 23. Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs, pointing to Dockser's description of retaining only some of the bits of a mantissa fraction (e.g., the 9 most-significant bits of a 23-bit fraction, as shown in Figure 2 above) and dropping the remaining "excess bits" (e.g., the other 14 bits). *Id.* at 23–24. Dockser teaches dropping the excess bits to reduce precision by either (1) "removing power from storage elements in the FPP's registers that correspond to the excess (dropped) mantissa bits," or (2) "removing power from elements within the multiplier logic that computes the product of the operand mantissas." *Id.* at 25. Petitioner contends that both techniques, used either individually or in combination, teach the recited imprecision. *Id.* at 26–36. We determine that Petitioner has made a sufficient showing on the current record with respect to the first precision-reducing technique, and need not evaluate Petitioner's alternative arguments at this time.

Relying on the first technique and Dockser's example of retaining 9 mantissa bits and dropping 14 mantissa bits, Petitioner argues that a person of ordinary skill in the art "would have understood the output of unpowered storage elements would be tied to zero voltage (*e.g.*, ground), making those 14 'excess' bits zeroes." *Id.* at 28. Multiplying two operands with excess bits dropped results in an output with reduced precision from the exact product, where the amount of error depends on the number of mantissa bits dropped. *Id.* at 29–30. Petitioner contends that an ordinarily skilled artisan

would have understood, by "straightforward math" described in Appendix I.A to the Petition, that "the relative error (the claimed 'Y' percentage) of any floating-point number output from Dockser's reduced-precision multiplication is the same as the relative error of its mantissa, independent of its exponent and sign." *Id.* at 29.

Petitioner provides a detailed explanation as to why a person of ordinary skill in the art would have understood Dockser as teaching the recited X and Y percentages of claim 1. *Id.* at 30–32. First, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), a [person of ordinary skill in the art] would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 30–31. Petitioner states that Mr. Goodin wrote such a program to perform reduced-precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.05% relative error for 92.1% of possible valid inputs (greater than X=5%)." *Id.* at 31, 68–70 (citing Ex. 1003 ¶¶ 290–292, 441–455).

Second, Petitioner argues that a person of ordinary skill in the art "would also have understood algebraically that Dockser's register bit-dropping technique meets [the limitation] by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." *Id.* at 31. Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their tenth and eleventh fraction bits," such that retaining only 9 mantissa bits of operands would result in "*every* input in that

IPR2021-00179
Patent 8,407,273 B2

12% produc[ing] at *minimum* 0.097% relative error." *Id.* at 31–32, 71–76
(citing Ex. 1003 ¶¶ 293–294, 456–475). Petitioner's contentions regarding
claim 1 are supported by the testimony of Mr. Goodin. *See id.* at 8–36;
Ex. 1003 ¶¶ 193–294, 441–475.

### b) Patent Owner's Arguments

Patent Owner makes two arguments in its Preliminary Response
disputing Petitioner's contentions regarding claim 1. Prelim. Resp. 11–24.

### (1) LPHDR Execution Unit

First, Patent Owner argues that Dockser's FPP is not a "low precision
high dynamic range (LPHDR) execution unit" because it is also "capable of
operating at full precision." Prelim. Resp. 11–12. According to Patent
Owner, "Dockser discloses a 32-bit FPP that includes all of the circuitry
needed for full precision arithmetic on data in IEEE 32-bit format, and also
having additional circuitry allowing for selectable subprecisions." *Id.* at 11.
As support for this reading of Dockser, Patent Owner points to statements in
Dockser that precision "may" be reduced and that certain applications
require "greater precision." *Id.* at 11–12 (citing Ex. 1007 ¶¶ 3, 14, 26, 28).
Patent Owner also argues that Petitioner incorrectly focuses on whether the
FPP is "capable of performing a few operations that are 'low precision'" in a
"9-bit subprecision mode," rather than "whether the execution unit itself can
be fairly characterized as being 'low precision.'" *Id.* at 13 (emphasis
omitted). Patent Owner asserts that Dockser's FPP is "a full precision
processor that—even when performing operations in a reduced precision
mode—includes all of the circuitry and capability needed to perform full
precision operations." *Id.*

IPR2021-00179
Patent 8,407,273 B2

We disagree based on the current record.  Patent Owner's position is that, to be an LPHDR execution unit, the execution unit must be capable of low-precision operations and nothing else.  We are not persuaded that the claim language is so limiting.  Claim 1 recites a "device . . . comprising at least one first low precision high dynamic range (LPHDR) execution unit."  The only limitations on the execution unit recited in the claim are that the execution unit be "low precision," "high dynamic range," and "adapted to execute a first operation" meeting certain criteria specified in the imprecision limitation (i.e., a minimum relative error Y for a minimum fraction X of possible valid inputs in a specified dynamic range).  As Petitioner points out, the claim does not recite any structural characteristics of the execution unit and does not include any negative limitation precluding the execution unit from performing other types of operations.  *See* Pet. 30; Reply 1.  The recitation of "a first operation" in claim 1 further requires only one or more first operations (that meet the low precision criteria specified in the claim); it does not say that "every" operation must be low precision or exclude other capabilities for other operations.  *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'").  On this record, we see no reason why the claim precludes the execution unit from having additional circuitry for performing other types of operations, as long as the execution unit is capable of performing the recited first operation and meeting the criteria set forth in the imprecision limitation.

Petitioner has provided sufficient evidence at this stage that Dockser performs operations at the precision level specified in the imprecision

IPR2021-00179
Patent 8,407,273 B2

limitation. Dockser's FPP "perform[s] certain mathematical operations," such as "multiplication," at "reduced precision." Ex. 1007 ¶¶ 1, 30–32. Petitioner expressly identifies "reduced-precision multiplication" as the alleged "first operation" in Dockser. Pet. 14, 16–17; *see also* Prelim. Resp. 10 (acknowledging that Dockser's FPP performs "a reduced-precision operation"), 11 (acknowledging that the FPP has "additional circuitry [that] allows the FPP to perform some operations with selectively reduced precision"). Petitioner further explains how it calculated the relative error for multiplication of all possible input operands when the operands have 9 retained mantissa bits and 14 dropped mantissa bits.[3] Pet. 24, 28–32. That is consistent with Dockser, which discloses a specific example of multiplying 23-bit operands having 9 retained mantissa bits and 14 dropped mantissa bits. *See* Ex. 1007 ¶¶ 26, 29.

    Importantly, as Patent Owner acknowledges, Dockser's example of 9-bit precision multiplication is a distinct operation from multiplication at other levels of precision. *See* Prelim. Resp. 21 (arguing that Dockser can "perform an addition operation *a+b* in full precision mode, 22-bit mode, 21-bit mode, etc." and that "[e]ach of these operations is distinct, and generally produces different outputs, with some being more precise than others"). Dockser describes exactly how such multiplication is performed, and the functionality of the FPP differs depending on which level of precision multiplication is selected. *See, e.g.*, Ex. 1007 ¶¶ 30–34, Fig. 3B;

---

[3] Accordingly, we do not agree with Patent Owner that Petitioner improperly made a new argument in its Reply that "multiplying two input values in a way that reduces precision down to 9 mantissa bits" constitutes a "first operation." Sur-Reply 2.

Pet. 23–32.  On this record, we find that the fact that Dockser is capable of performing other, different operations (e.g., 23-bit full precision) does not detract from Dockser's disclosure of a specific example meeting the "low precision" requirements of the claim.

Patent Owner further argues that Petitioner fails to show that it would have been obvious to modify Dockser's FPP to be an LPHDR execution unit.  Prelim. Resp. 14–17.  Patent Owner contends that Dockser teaches away from such a unit because

> rather than committing itself to performing low precision operations on a very high percentage of all possible valid inputs (in order to shrink the size of the execution unit), Dockser specifically teaches that its selectable precision (which means supporting full precision and programmability, both of which increase the size of the execution unit) is the key feature of the Dockser FPP.

*Id.* at 15 (citing Ex. 1007 ¶ 3).  Dockser's FPP "is more complex than conventional 32-bit microprocessors, not less," so an ordinarily skilled artisan would not be motivated to "reverse course" and make it only capable of low precision operations according to Patent Owner.  *Id.* at 17 (emphasis omitted).  As explained above, however, we disagree on this record with Patent Owner's position that an LPHDR execution unit must be incapable of anything other than low precision operations, and thus do not agree that a modification to Dockser in that respect would have been necessary.  We find Petitioner's analysis as to why a person of ordinary skill in the art would have understood Dockser's FPP to be an LPHDR execution unit, supported by the testimony of Mr. Goodin, sufficient at this early stage.

*(2) Imprecision Limitation*

Second, Patent Owner argues that Dockser does not teach or suggest the imprecision limitation because Petitioner fails to show that Dockser's output over all "possible valid inputs" meets the limitation. Prelim. Resp. 18–24 (emphasis omitted). According to Patent Owner, "[t]he range of possible valid inputs for Dockser" includes all possible IEEE 32-bit values "across the entire range of the possible subprecision select bits," not just operands with 9 retained mantissa bits and 14 dropped mantissa bits as Petitioner discussed in the Petition. *Id.* at 19–20. Patent Owner argues that Mr. Goodin's software program and algebraic explanation address "only a small subset of Dockser's possible valid inputs" because they fail to account for "whether the imprecision limitation is met for subprecision select bits corresponding to any implementation where fewer than 14 bits are dropped." *Id.* at 20–22. In Patent Owner's view, the analysis of Dockser needs to take into account operations at "full precision mode, 22-bit mode, 21-bit mode, etc." *Id.* at 21.

We disagree based on the current record. The imprecision limitation recites that "for at least X=5% of the possible valid inputs to *the first operation*, the statistical mean, over repeated execution of *the first operation* on each specific input from the at least X % of the possible valid inputs to *the first operation*," "executing *the first operation* on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of *the first operation* on the numerical values of that same input" (emphasis added). The relevant inquiry thus looks at all possible valid inputs to the first operation—not all possible valid inputs to the LPHDR execution unit overall, or all possible valid inputs to other operations. Again, in its mapping of Dockser to claim 1, Petitioner expressly identifies

IPR2021-00179
Patent 8,407,273 B2

"reduced-precision multiplication" as "the first operation." Pet. 16–17.

Dockser discloses a specific example of multiplying operands having

9 retained mantissa bits and 14 dropped mantissa bits. Ex. 1007 ¶¶ 26,

30–34, Fig. 3B. The relevant possible valid inputs for assessing the

imprecision limitation, therefore, are the inputs to that operation. On this

record, we see no reason why the analysis of Dockser also needs to account

for other operations, such as "full precision" multiplication, which Patent

Owner acknowledges are "distinct" operations. *See* Prelim. Resp. 21.

Patent Owner also challenges Mr. Goodin's analysis as

"impermissibly applying hindsight and using the claims as a roadmap"

because "he opines that a [person of ordinary skill in the art] would operate

Dockser with the *express goal* of dropping enough bits from the mantissa to

meet the imprecision limitation." *Id.* at 16 (citing Ex. 1003 ¶¶ 288–289).

We disagree based on the current record. The precision level of 9 retained

mantissa bits and 14 dropped mantissa bits that Mr. Goodin analyzes is not

chosen with the goal of meeting the imprecision limitation, but rather is the

specific example described in Dockser. *See* Ex. 1003 ¶¶ 263, 277–278, 282,

284. Mr. Goodin describes the calculations performed by his software

program and provides an algebraic explanation for why he believes that a

person of ordinary skill in the art would have understood Dockser's

description of multiplication at the 9-bit precision level teaches the

imprecision limitation. *See id.* ¶¶ 290–294, 441–475. Further, Mr. Goodin

cites extensively to language in Dockser describing reduced-precision

multiplication in support of his opinions. *See id.* ¶¶ 256–267. Patent Owner

has not presented any evidence at this stage indicating that Mr. Goodin's

calculations for Dockser's 9-bit precision level are factually incorrect. We

have reviewed that supporting testimony and are persuaded, based on the

current record, that a person of ordinary skill in the art would have understood Dockser to teach the imprecision limitation of claim 1.

### c)    Conclusion

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claim 1 is unpatentable over Dockser.

### 3.    Claims 2, 21–24, 26, and 28

We have reviewed Petitioner's contentions regarding claims 2, 21–24, 26, and 28, which depend from claim 1, and are persuaded that Petitioner has made a sufficient showing at this stage for those claims as well.  *See* Pet. 36–38.  Petitioner explains how each limitation of the dependent claims is taught or rendered obvious by the disclosure of Dockser.  *Id.*  For example, claim 2 recites that "the at least one first LPHDR execution unit comprises at least part of an FPGA."  Dockser discloses a FPP that is part of "a field programmable gate array (FPGA) or other programmable logic component."  Ex. 1007 ¶ 35; *see* Pet. 36.  Petitioner's contentions are supported by the testimony of Mr. Goodin and are persuasive based on the current record.  *See* Pet. 36–38; Ex. 1003 ¶¶ 311–322.  Patent Owner does not argue the challenged dependent claims separately, only disputing Petitioner's arguments regarding independent claim 1.  *See* Prelim. Resp. 8–24.  We disagree with Patent Owner's arguments based on the current record for the reasons explained above.  *See supra* Section II.C.2.b.

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 2, 21–24, 26, and 28 are unpatentable over Dockser.

IPR2021-00179
Patent 8,407,273 B2

### D.  Obviousness Ground Based on Dockser and Tong

Petitioner contends that claims 1, 2, 21–24, 26, 28, 32, and 33 are unpatentable over Dockser and Tong under 35 U.S.C. § 103(a), citing the testimony of Mr. Goodin as support.  Pet. 38–45 (citing Ex. 1003).  We are persuaded that Petitioner has established a reasonable likelihood of prevailing on its asserted ground for the reasons explained below.

### 1.  Tong

Tong is an IEEE journal article entitled "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic." Ex. 1008, 273.  Tong teaches reducing power consumption by minimizing the bitwidth representation of floating-point data.  *Id.*  According to Tong, using a variable bitwidth floating-point unit saves power.  *Id.*

### 2.  Claim 1

Petitioner asserts that "Tong, like Dockser," "confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision."[4]  Pet. 39–40 (citing Ex. 1008, 273–278; Ex. 1003 ¶¶ 324–325).

---

[4] Petitioner presents sufficient evidence on the current record to establish a reasonable likelihood that Tong is a prior art printed publication under 35 U.S.C. § 102(b).  *See* Pet. 38–39 (citing Ex. 1025 ¶¶ 8–11; Ex. 1026, 27; Ex. 1027, 27).

Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 40.



Fig. 6. Program accuracy across various mantissa bitwidths.

Tong's Figure 6, above, is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the horizontal axis. Ex. 1008, 279. The figure shows this data for five programs: ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx. *Id.* The programs implement different signal-processing tasks. *Id.* at 278 (Table IV). ALVINN, for example, is a neural network trainer that uses backpropagation. *Id.* And Sphinx is a speech-recognition program. *Id.*

For the ALVINN and Sphinx line plots in Tong's Figure 6, Petitioner adds a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. Pet. 40. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Ex. 1008, 278, Section V.B). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption. *Id.* at 41. Petitioner characterizes Tong as "[h]aving

empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications." *Id.* (citing Ex. 1008, 273, 274, 279, 284).

Petitioner concludes that "Tong's teaching that retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx[]) would have motivated a [person of ordinary skill in the art] to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." *Id.* at 41–42. According to Petitioner, one of ordinary skill in the art would have done so "to conserve power when running those applications, or others empirically determined to not require greater precision using Tong's techniques." *Id.* at 42 (citing Ex. 1003 ¶ 334). Petitioner also concludes that "[d]etermining the optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application was a matter of routine optimization of a result-effective variable." *Id.* at 43 (citing Ex. 1003 ¶ 339).

In response, Patent Owner argues that Dockser is deficient for the same reasons discussed in connection with the challenge based on Dockser alone and Tong does not remedy those deficiencies. Prelim. Resp. 24–25. In Patent Owner's view, Petitioner's Dockser-Tong analysis, like the analysis of Dockser alone, accounts for "only a cherry-picked subset of the 'possible valid inputs.'" *Id.* at 24 (citing Pet. 44–45). Patent Owner argues that Petitioner's analysis ignores the remaining possible valid inputs across all subprecision selections. *Id.* at 24–25.

Patent Owner's argument about all subprecision selections, however, does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been motivated to configure Dockser's FPP at a "selected precision level" according to Tong. *See*

IPR2021-00179
Patent 8,407,273 B2

Pet. 41–42.  Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." *Id.*  Instead of addressing the analysis of Dockser at this selected precision level, Patent Owner's arguments focus on Dockser alone.  *See* Prelim. Resp. 24–25.

Petitioner's relative-error analysis of the Dockser-Tong combination, though, is different from the one in the ground based on Dockser alone.  *See* Pet. 42.  In particular, Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong.  *Id.* (citing Ex. 1003 ¶ 336).  Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits.  *Id.* (citing Ex. 1003 ¶ 336).  Because Petitioner's rationale relies on modifying Dockser based on Tong to have a particular precision level, we are not persuaded at this stage that Petitioner's relative-error analysis is deficient for not considering all possible subprecision selections.  *See* Prelim. Resp. 24–25; *supra* Section II.C.2.b.(2) (explaining why Petitioner's asserted ground based on Dockser alone is not deficient for failing to address all possible IEEE 32-bit values, rather than just operands with 9 retained mantissa bits and 14 dropped mantissa bits).

We find Petitioner's analysis, supported by the testimony of Mr. Goodin, sufficient to show a reasonable likelihood of prevailing on its assertion that claim 1 is unpatentable over Dockser and Tong.

### 3.  *Claims 2, 21–24, 26, 28, 32, and 33*

We have reviewed Petitioner's contentions regarding claims 2, 21–24, 26, 28, and 32, which depend from claim 1, as well as independent claim 33, which recites an LPHDR execution unit and the imprecision limitation, and are persuaded that Petitioner has made a sufficient showing at this stage for

those claims as well.  *See* Pet. 36–38, 41–45.  Petitioner explains how each limitation of the claims is taught or rendered obvious by the disclosure of Dockser or the combination of Dockser and Tong.  *Id.*  Petitioner's contentions are supported by the testimony of Mr. Goodin and are persuasive based on the current record.  *See id.*; Ex. 1003 ¶¶ 311–322, 333–348.

Patent Owner does not argue the challenged dependent claims separately, only disputing Petitioner's arguments regarding the challenged independent claims.  *See* Prelim. Resp. 8–25.  Based on the current record, we disagree with Patent Owner's arguments regarding the LPHDR execution unit and imprecision limitation for the reasons explained above.  *See supra* Section II.C.2.b.

Patent Owner makes an additional argument regarding independent claim 33, which recites a "device comprising a computer processor and a computer-readable memory storing computer program instructions, wherein the computer program instructions are executable by the processor to emulate a second device comprising" an LPHDR execution unit having the same properties as recited in claim 1.  Patent Owner contends that "a person of ordinary skill would not have been motivated to incorporate Tong's 'emulation' into the systems of Dockser" because "Tong uses software emulation only for the purposes of *investigating* the behavior of *physical* devices."  Prelim. Resp. 25 (citing Ex. 1008, 273, 278).  We disagree based on the current record.  Petitioner's position is that "Tong's teaching to 'emulate[] in software different bitwidth FP units' 'to determine application accuracy' . . . would have motivated a [person of ordinary skill in the art] to *emulate the Dockser/Tong device . . . in software* to assess the accuracy of applications running on the device at selected precision levels."  Pet. 44

IPR2021-00179
Patent 8,407,273 B2

(quoting Ex. 1008, 278; citing Ex. 1003 ¶¶ 341–342) (emphasis added).
Emulating the device of Dockser (modified based on Tong) in software
appears, on this record, to be consistent with Tong, which describes the
emulation of a floating-point (FP) device to determine "the relationship
between program accuracy and number of bits in FP representation." *See*
Ex. 1008, 278. Based on the current record, we do not see why Tong's
disclosures regarding FP hardware would have dissuaded an ordinarily
skilled artisan from making the combination that Petitioner proposes.

On this record, we are persuaded that Petitioner has shown a
reasonable likelihood of prevailing on its assertion that claims 2, 21–24, 26,
28, 32, and 33 are unpatentable over Dockser and Tong.

### E. Obviousness Ground Based on Dockser and MacMillan

Petitioner contends that claims 1–26, 28, 36–61, and 63 are
unpatentable over Dockser and MacMillan under 35 U.S.C. § 103(a), citing
the testimony of Mr. Goodin as support. Pet. 45–56 (citing Ex. 1003).
We are persuaded that Petitioner has established a reasonable likelihood of
prevailing on its asserted ground for the reasons explained below.

### 1. MacMillan

MacMillan is entitled "Circuit for Enhancing Performance of a
Computer for Personal Use." Ex. 1009, code (54). MacMillan teaches using
Single Instruction Multiple Data (SIMD) parallel-processing architectures
for adding supercomputer performance to personal-use computers. *Id.* at
col. 5, ll. 22–54. MacMillan's computer system comprises a "Host CPU"
(i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access
memory (SIMD-RAM) device. *Id.* at col. 9, ll. 30–31, Figs. 3, 5.

MacMillan describes an example architecture where the SIMD-RAM device has 256 processing elements (PEs), but states that the disclosed architecture "allows scaling to higher or lower density chips with more or fewer PEs." *Id.* at col. 12, l. 60–col. 13, l. 4, col. 13, ll. 38–41, col. 16, ll. 20–22.


### 2.   *Claim 1*

In this asserted ground, Petitioner relies on MacMillan for its teachings about multiple floating-point execution units and concludes that it would have been obvious to implement a device with multiple Dockser FPPs operating in parallel.  Pet. 47–49.

Patent Owner argues that MacMillan does not remedy Dockser's deficiencies.  Prelim. Resp. 25–28.  Apart from this argument, Patent Owner does not present arguments specifically analyzing MacMillan as it is used in Petitioner's challenge to claim 1.  *Id.*  Rather, Patent Owner refers to the arguments regarding the challenge based on Dockser alone.  *Id.* at 25–26.  Thus, for the reasons discussed in connection with the asserted ground based on Dockser alone, and because we conclude that Petitioner has made a sufficient showing of obviousness based on the combination with MacMillan, we determine on this record that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claim 1 is unpatentable over Dockser and MacMillan.  *See supra* Section II.C.2.b.


### 3.   *Claims 5, 8, 10, 40, 43, and 45*

Claim 5 recites that "the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  Claims 8 and 10

recite the same limitation, replacing "at least ten" with "at least one hundred" and "at least five hundred," respectively. Claims 40, 43, and 45, which depend from claim 36, mirror claims 5, 8, and 10.

With respect to these claims, Petitioner asserts that MacMillan teaches 256 processing elements (PEs), and the Dockser-MacMillan combination would have a "single Host CPU floating-point unit" and at least one FPP in each of the PEs, of which there can be "256 or more, up to 'tens of thousands.'" Pet. 49–51, 56 (quoting Ex. 1009, col. 2, ll. 13–15; citing Ex. 1003 ¶¶ 361, 369, 370, 374). Thus, in Petitioner's proposed combined device based on Dockser and MacMillan, the number of LPHDR execution units (Dockser FPPs) "exceeds its number (one) of traditional-precision execution units (the single Host CPU floating-point unit) by more than 10, more than 100, and more than 500." *Id.* at 50–51 (citing Ex. 1003 ¶¶ 369–370, 374).

Patent Owner argues that "Dockser and MacMillan cannot possibly disclose the limitations . . . even if one were to assume the Dockser FPP to be an LPHDR execution unit." Prelim. Resp. 27. Patent Owner argues that, because (1) Petitioner asserts that MacMillan's processor is the only execution unit (EU) for purposes of the claims, and (2) Dockser's FPPs are designed to perform multiplication on 32-bit numbers, "the number of traditional precision units in the Dockser/MacMillan combination must *always* be greater than or equal to the number of 'LPHDR' Dockser FPPs." *Id.*

But, under Petitioner's theory, the identified 32-bit EUs in claims 5, 8, 10, 40, 43, and 45 (i.e., "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide") are different from what Petitioner identifies as the

IPR2021-00179
Patent 8,407,273 B2

LPHDR execution units (i.e., a Dockser FPP in each of the 256 (or more)
PEs of MacMillan). *See* Pet. 49–51. So, under Petitioner's rationale,
Dockser's FPPs do not count toward the number of 32-bit EUs in the
Dockser-MacMillan combination. *See id.* Specifically, Petitioner has
shown, on this preliminary record, that the claimed "low precision
high-dynamic range (LPHDR) execution unit" at least encompasses
Dockser's FPP. *See supra* Section II.C.2.b.(1). Petitioner asserts that the
'273 patent describes the LPHDR execution units as "sometimes" producing
results that are different from the correct result, in contrast to 32-bit EUs,
which the '273 patent describes as "'traditional precision' execution units
that do not 'sometimes' produce results different from the correct
traditional-precision result." Pet. 50. Thus, if the proposed combination has
256 (or more) FPPs (LPHDR execution units) and one host CPU (the 32-bit
EUs), the number of LPHDR execution units would be greater than the
number of 32-bit EUs by the amounts recited in claims 5, 8, 10, 40, 43, and
45.

Petitioner supports its contentions with respect to claims 5, 8, 10, 40,
43, and 45 with citations to the '273 patent. We preliminarily agree with
Petitioner that the cited parts of the patent distinguish between the two sets
of units. For example, the patent describes the 32-bit arithmetic elements as
"traditional" precision: "'arithmetic elements . . . designed to perform . . .
floating point arithmetic with a word length of 32 or more bits' are 'designed
to perform . . . arithmetic of traditional precision.'" *Id.* (citing Ex. 1001,
col. 27, l. 63–col. 28, l. 3). As for the LPHDR units, the paragraph cited by
Petitioner explains how the precision may vary across implementations. *See*
Ex. 1001, col. 26, l. 50–col. 27, l. 4. We preliminarily agree with Petitioner
that all of these embodiments, unlike the 32-bit arithmetic elements, are

IPR2021-00179
Patent 8,407,273 B2

described as producing results that are "sometimes" or "all of the time" not closer than a certain amount to the correct result. *See* Pet. 50 (citing Ex. 1001, col. 26, ll. 50–60). Thus, Petitioner's distinction between the 256 (or more) FPPs and one host CPU in the proposed combination is consistent with the language of the challenged claims and adequately supported on this preliminary record.

We find Petitioner's analysis, supported by the testimony of Mr. Goodin, sufficient to show a reasonable likelihood of prevailing on its assertion that claims 5, 8, 10, 40, 43, and 45 are unpatentable over Dockser and MacMillan.

### 4. *Claims 2–4, 6, 7, 9, 11–26, 28, 36–39, 41, 42, 44, 46–61, and 63*

We have reviewed Petitioner's contentions regarding dependent claims 2–4, 6, 7, 9, 11–26, and 28, as well as independent claim 36, which recites an LPHDR execution unit and the imprecision limitation, and claims 37–39, 41, 42, 44, 46–61, and 63, which depend from claim 36. *See* Pet. 36–38, 49–56. Petitioner explains how each limitation of the dependent claims is taught or rendered obvious by the disclosure of Dockser or the combination of Dockser and MacMillan. *Id.* For example, Petitioner argues that "[c]laims 11–17 each recite a minimum X and/or Y percentage higher than claim 1's, the highest being X=10% and Y=0.2% in claim 17," and Mr. Goodin's software program "demonstrates that when retaining 9 mantissa fraction bits as Dockser . . . discloses, Dockser's register bit-dropping produces" a Y relative error of at least 0.2% for 14.6% of

possible valid inputs.[5] *Id.* at 51–52.  Petitioner's contentions are supported by the testimony of Mr. Goodin and are persuasive based on the current record.  *See id.*; Ex. 1003 ¶¶ 311–322, 361–362, 375–409.  Patent Owner does not argue the challenged dependent claims separately, only disputing Petitioner's arguments regarding the challenged independent claims and dependent claims 5, 8, 10, 40, 43, and 45.  *See* Prelim. Resp. 8–28.  Based on the current record, we disagree with Patent Owner's arguments regarding the LPHDR execution unit, imprecision limitation, and limitations of the dependent claims for the reasons explained above.  *See supra* Sections II.C.2, II.E.3.

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 2–4, 6, 7, 9, 11–26, 28, 36–39, 41, 42, 44, 46–61, and 63 are unpatentable over Dockser and MacMillan.

## F.   Obviousness Ground Based on Dockser, Tong, and MacMillan
### 1.   Claims 1–26, 28, 32–61, 63, and 67–70

Petitioner asserts that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels. Pet. 56–59 (citing Ex. 1008, 278, Table IV).  Petitioner concludes that using Dockser's FPP with Tong's precision levels in MacMillan's multiple PEs

---

[5] With respect to claims 11–17, we determine that Petitioner's arguments regarding the software program are sufficient for purposes of institution. The parties are encouraged to address in their papers during trial the sufficiency of Petitioner's algebraic analysis, premised on "retaining 9 fraction bits" for claims 11 and 12, "retaining 8 fraction bits" for claims 13–16, and "retaining 7 fraction bits" for claim 17.  *See* Pet. 52–53.

would have achieved "supercomputer performance" while conserving power. *Id.* (citing Ex. 1003 ¶ 412).

Patent Owner argues that "Petitioner relies on the same flawed reasoning as discussed [in the Preliminary Response] with respect to Dockser and Tong," but does not present separate arguments directed to the combination of Dockser, Tong, and MacMillan. Prelim. Resp. 28. We disagree with Patent Owner's arguments based on the current record for the reasons explained above. *See supra* Sections II.C.2, II.D.2, II.E.2. On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1–26, 28, 32–61, 63, and 67–70 are unpatentable over Dockser, Tong, and MacMillan.

### 2. Petitioner's Alternative Interpretation of Claims 5, 6, 8, 10–18, 35–61, 63, and 67–70

Claim 5 recites that "the number of LPHDR execution units in the device exceeds by at least ten the non-negative integer number of execution units in the device *adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide*" (emphasis added). Independent claims 36 and 68, and dependent claims 8, 10, 35, 40, 43, 45, and 70, recite similar limitations, modifying the number by which the number of LPHDR execution units exceeds the number of 32-bit execution units.

Petitioner provides an "alternative interpretation" of the italicized adapted-to clause. Pet. 61. In particular, Petitioner argues that a unit could meet the adapted-to clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* Under this interpretation, Dockser's FPP would not be such a unit because it has registers and multiplier with less than 32 bits, and

thus is not capable of 32-bit multiplication in the proposed combination—
rather, only the host CPU floating-point unit would meet the adapted-to
clause. *Id.* (citing Ex. 1003 ¶ 427). According to Petitioner, a person of
ordinary skill in the art "would have been motivated to customize Dockser's
FPPs in MacMillan's PEs to only operate at precision levels lower than full
FP 32-bit operations, in view of Tong's teachings that 'the fine precision of
the 23-bit mantissa is not essential.'" *Id.* at 59–60.

Patent Owner argues that Petitioner does not provide a specific level
of precision for its combination. Prelim. Resp. 30 (citing Pet. 60–61).
Patent Owner argues that "Tong suggests 11 bits of precision for certain
signal processing applications, and Petitioner provides no analysis of
whether 11 bits of precision would meet the imprecision limitation." *Id.*
Also, Patent Owner argues that Petitioner does not show that, for example,
one bit lower than full 32-bit operation would meet the claimed imprecision
limitation. *Id.* at 32.

We disagree with Patent Owner based on the current record. In its
"alternative interpretation" of claims 5, 6, 8, 10–18, and 35–70, Petitioner
states that the "selected precision levels are unchanged from [the other three
asserted grounds]." Pet. 60–61. In the asserted ground based on Dockser
and Tong, for example, Petitioner states that Tong's "teaching that retaining
5 mantissa fraction bits is sufficient in some applications (including
ALVINN and Sphinx[]) would have motivated a [person of ordinary skill in
the art] to configure Dockser's FPP . . . to operate at a selected precision
level retaining as few as 5 mantissa fraction bits." *Id.* at 41–42. Petitioner
also used a software program to determine the relative error when retaining
5 mantissa fraction bits—i.e., the number of bits that Dockser would use
under Petitioner's proposed combination with Tong. *Id.* at 42 (citing

37

IPR2021-00179
Patent 8,407,273 B2

Ex. 1003 ¶ 336).  In at least this way, Petitioner has adequately explained, for the purposes of institution and on this preliminary record, which of Tong's precision levels would be used in the proposed combination.

Patent Owner also argues that each reference teaches away from the proposed combination.  Prelim. Resp. 31.  In particular, Patent Owner argues that (1) Dockser teaches away because "Dockser is directed entirely to selectable precision; and disparages the use of non-selectable precision units," (2) Tong teaches away because "Tong devotes much of its discussion to the benefits of variable or selectable precision," and (3) MacMillan teaches away because "MacMillan is primarily concerned with providing increased performance without increased cost."  *Id.*

At this stage and on this record, we preliminarily determine that the references do not teach away from the claimed devices.  The mere disclosure of more than one alternative does not constitute a teaching away.  *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004).  Specifically, Patent Owner points to a statement that Tong makes about power savings: "This FP bitwidth reduction can deliver a significant power savings through the use of a variable bitwidth FP unit."  Prelim. Resp. 31 (quoting Ex. 1008, 273).  Yet Tong's statement does not criticize, discredit or otherwise discourage the claimed invention's approach so as to teach away from it.  *See Fulton*, 391 F.3d at 1201.  Instead, the statement merely explains the benefits provided by Tong's alternative approach.  Ex. 1008, 273.

Likewise, although Patent Owner argues that the combination with MacMillan would increase manufacturing costs, Patent Owner does not provide sufficient evidence to support this position.  *See* Prelim. Resp. 31.  Even assuming MacMillan warns against the costs, Patent Owner's argument is unsupported by any specific cost analysis.  *Id.*  To be sure,

IPR2021-00179
Patent 8,407,273 B2

Patent Owner may introduce evidence that supports this argument during trial. We also note that the fact "[t]hat a given combination would not be made by businessmen for economic reasons does not mean that persons skilled in the art would not make the combination because of some technological incompatibility," for example. *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983). But, at this stage and on this record, Patent Owner's argument is unpersuasive.

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 5, 6, 8, 10–18, 35–61, 63, and 67–70 are unpatentable over Dockser, Tong, and MacMillan.

## III. CONCLUSION

Based on the arguments presented in the Petition, we conclude that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least one claim of the '273 patent challenged in the Petition. Accordingly, we institute a trial on all claims and all grounds asserted in the Petition. The Board has not made a final determination under 35 U.S.C. § 318(a) with respect to the patentability of the challenged claims.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1–26, 28, 32–61, 63, and 67–70 of the '273 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '273 patent shall commence

IPR2021-00179
Patent 8,407,273 B2

on the entry date of this Decision, and notice is hereby given of the

institution of a trial.

IPR2021-00179
Patent 8,407,273 B2

For PETITIONER:

Elisabeth Hunt
Richard Giunta
Anant Saraswat
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


For PATENT OWNER:

Peter Lambrianakos
Vincent Rubino
Enrique Iturralde
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com

41

IPR2021-00179
PATENT NO. 8,407,273

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 8,407,273
Filing Date: February 17, 2012
Issue Date: March 26, 2013

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

**PATENT OWNER'S RESPONSE**

Case No. IPR2021-00179

### 1. Dockser's FPP is not an "LPHDR execution unit"

As discussed above, Dockser's FPP is not a "low precision high dynamic range (LPHDR) execution unit," as recited in all challenged independent claims under Ground 3, because it does not "execute arithmetic operations "*only* at low precision and with high dynamic range."  Khatri, ¶ 83.  Petitioner does not argue that MacMillan remedies this deficiency.

### 2. Dockser and MacMillan Fail to Disclose the "exceeds" Limitation

Even if the teachings of Dockser and MacMillan were combined to produce a device with, for example, 256 Dockser units operating in parallel, such a device would fail to meet the "exceeds" limitation of claims 8, 10-17, 35, 36, 40, and 43-53.  Khatri, ¶ 84.

The "exceeds" limitation requires that the "number of LPHDR execution units in the device exceeds" by various amounts "the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."[2]  *Id.*, ¶ 85.  As shown below, Dockser's FPP is adapted to execute at least the operation of

---

[2] For clarity, Patent Owner refers to "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" as "full-precision multiplication execution units."

multiplication on floating point numbers that are at least 32 bits wide. *Id.*

Therefore, even if Dockser's FPP were an LPHDR execution unit (which it is not,

under the proper proposed construction of that term) the Dockser/MacMillan

combination cannot meet the "exceeds" limitation, because those same "Dockser

LPHDR execution units" would also be "adapted to execute at least the operation

of multiplication on floating point numbers that are at least 32 bits wide," meaning

that the number of LPHDR execution units will never exceed the number of full-

precision multiplication execution units. *Id.*, ¶ 86.

> **(a)  Dockser's FPP Is a Claim 3 EU Because It Is
> Adapted to Execute at Least the Operation of
> Multiplication on Floating Point Numbers That
> Are at Least 32 Bits Wide**

There is no dispute that Dockser is an execution unit. Pet., 12. And there

can be no reasonable dispute that Dockser is adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide

under the plain meaning of the term.[3] Goodin Dep. 23:17-22; Khatri ¶¶ 90-91.

---

[3] Petitioner and Patent Owner agree that "adapted to execute at least the operation

of multiplication on floating point numbers that are at least 32 bits wide" means

that the execution unit performs multiplication in "traditional"—*i.e.*, full—

precision. Pet., 50.

Dockser discloses that its FPP takes input operands that are 32 bits wide and stores them in IEEE-754 format. *See e.g.*, Dockser, ¶ [0017] ("Each register location 200 is configured to store a 32-bit binary floating-point number, in an IEEE-754 32-bit single format.") Khatri, ¶ 92. Dockser also discloses that its FPP includes "a floating-point multiplier (MUL) 144 configured to execute floating-point multiply instructions." Dockser, ¶ [0019]; Khatri, ¶ 92. These points are not in dispute; Petitioner and its expert both admitted as much. Reply at 2; Goodin Dep. at 36:16-21; 38:18-39:15.

Nothing more is required for a Dockser FPP to be "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." *See In re Man Machine Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016) ("[T]he phrase 'adapted to' generally means 'made to,' 'designed to,' or 'configured to,' though it can also be used more broadly to mean 'capable of' or 'suitable for.'"); Khatri, ¶ 92.

Therefore, even if Dockser's FPP is an "LPHDR execution unit" (as Petitioner incorrectly argues), the Dockser/MacMillan device would still fail to satisfy the "exceeds" limitation. Khatri, ¶ 93. In one example, the Dockser/MacMillan device would have 256 LPHDR execution units (counting each Dockser FPP as an "LPHDR execution unit"). However, because each Dockser FPP is also "adapted to execute at least the operation of multiplication on

floating point numbers that are at least 32 bits wide," the Dockser/MacMillan

device would therefore also have <u>at least</u> 256 execution units "adapted to execute

at least the operation of multiplication on floating point numbers that are at least 32

bits wide." *Id.* As a result, the Dockser/MacMillan would not meet the "exceeds

limitation." *Id.*

> **(b)  *Petitioner's Interpretation of "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" Is Inconsistent with the Specification and Wrong***

Petitioner attempts to put Dockser's FPP outside of the "exceeds" limitation

by arguing that units are full-precision multiplication execution units ***only if*** they

are "'traditional precision' execution units that do not 'sometimes' produce results

different from the correct traditional-precision result." Pet., 50. The Board

preliminarily accepted this argument.

Petitioner's implicit construction of "adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

is inconsistent with the plain and ordinary meaning of the claim and at odds with

the specification. Khatri, ¶¶ 94-95. The Board should thus reject it.

A POSA would understand this term to include all units in the device that are designed to perform "multiplication on floating point numbers that are at least 32 bits wide," even if those units can perform other operations as well.[4]  *Id.*, ¶ 95.

First, Petitioner's interpretation directly contradicts the claim language itself which encompasses every execution unit adapted to perform "*at least*" the operation of 32-bit multiplication.  Khatri, ¶ 96.  Petitioner not only ignores this inclusive language, but also proposes a construction that would explicitly *exclude* units adapted to perform additional operations.  *Id.*

Second, Petitioner's interpretation contradicts the teachings of the specification.  *Id.*, ¶ 97.  For example, while the specification does not disclose an

---

[4] While the term at issue here includes the phrase "adapted to," Patent Owner's construction does not depend on any particular construction of this term. Depending on context, "adapted to" can be construed broadly (to mean "capable of") or narrowly (to mean "designed to").  *See In re Giannelli,* 739 F.3d 1375, 1379 (Fed. Cir. 2014); *see also In re Man Machine Interface Techs. LLC*, 822 F.3d at 1286 (citations omitted).  In this situation, both of these constructions boil down to the same thing: if a unit is "capable of" performing 32-bit multiplication, then it is "designed to" perform 32-bit multiplication—the ability to perform full-precision multiplication is not something that happens by accident.

execution unit that can be both a full-precision multiplication execution unit and an

LPHDR execution unit, it *does* disclose an execution unit that can be both a full-

precision multiplication execution unit and *a* unit (which is not an LPHDR

execution unit, as explained below) that 'sometimes' produces results different

from the correct traditional-precision result:

> "When a graphics processor includes support for 16 bit floating point,
> that support is alongside support for 32 bit floating point . . . That is,
> the 16 bit floating point format is supported for those applications that
> want it, but the higher precision formats also are supported because
> they are believed to be needed for traditional graphics applications
> and also for so called "general purpose" GPU applications. Thus,
> *existing GPUs devote substantial resources to 32 . . . bit arithmetic*
> *and are wasteful of transistors* . . . ."

'273 Patent, 5:31-40; Khatri, ¶ 97.

A POSA would understand that the "graphics processor" described in the

passage above includes multiple execution units operating in parallel, each of

which can be configured to perform both full-precision ("32 bit floating point")

and half-precision ("16 bit floating point") operations.  Khatri, ¶ 98.  Such

execution units are *both* "adapted to execute at least the operation of multiplication

on floating point numbers that are at least 32 bits wide" *and* "capable of

performing *"*operations that 'sometimes' produce results different from the correct

traditional-precision result" (*i.e.*, half-precision operations that produce results in

the "16 bit floating point" format often referred to as "fp16," which is not to be confused with the earlier-mentioned bfloat16/bf16 (*brain* float 16) format used by Google's products). *Id.*

As the passage explains, these execution units are "wasteful of transistors" because, like the execution units of Dockser and Tong, they retain the *capability* of performing 32-bit multiplication, even if they can be configured to "sometimes" operate at lower precisions. *Id.*, ¶ 99. A POSA would understand that such conventional execution units having full-precision *capability* (whether or not they execute other precision operations) are precisely what the "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" limitation is intended to capture, and more importantly, precisely what distinguishes these conventional execution units from "LPHDR execution units" that perform *only* low-precision arithmetic operations (and thus use "a small amount of resources"). '273 Patent, 8:3-7; Khatri, ¶ 99.

More generally, the specification describes full-precision multiplication execution units only by reference to their "high dynamic range arithmetic of traditional precision." *See* '273 Patent at 28:14-19; *see also id.* at 27:63-28:52; Khatri, ¶ 100. Nowhere does the specification ever preclude a full-precision multiplication execution unit from being able to produce incorrect results. *Id.* Petitioner imports that requirement from a completely different section of the

patent, taken completely out of context. *See* Pet., 50 (citing '273 Patent, 26:50-60); Khatri, ¶ 100. That section uses "sometimes" to describes the imprecision limitation of an LPHDR execution unit, as expressed in the X=5% limitation of the Challenged Claims. That section says nothing about full-precision multiplication execution units. *See id.*; Khatri, ¶ 100.

Petitioner's argument tacitly hinges on the idea that if a component is an LPHDR execution unit (*i.e.*, the Dockser FPP as construed by Petitioner, not as construed by Patent Owner), it cannot also be a full-precision multiplication execution unit. Pet., 50. That is, Petitioner tacitly argues that one device—the Dockser FPP—cannot meet two limitations in a claim. But the law is clear that the same structure can meet two limitations. *See, e.g., Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different *meanings,* not that they necessarily refer to two different *structures.*") (emphasis in original). Therefore, even if the Dockser FPP were an "LPHDR execution unit" (which it is not), it would *still* be a full-precision multiplication execution unit for the reasons explained above.

### (c)   *A POSA Would Not Combine Dockser with MacMillan*

Even if the combination of Dockser and MacMillan had all the elements of the Challenged Claims – which it does not, for the reasons explained above – a

POSA would not make that combination because it would not be operable for its intended purpose.  Khatri, ¶ 101.

Dockser is focused on the objective of reducing power consumption and is not in any way concerned with the objective of achieving high compute scale, while MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption (indeed, MacMillan's only reference to power consumption relates to heat dissipation inside the "cabinet" of a workstation).  *See* MacMillan, 3:4-6; Khatri, ¶ 102.

Incorporating Dockser's FPPs into MacMillan would also defeat MacMillan's stated objective of achieving a high-scale SIMD computer architecture at "lower system cost."  *See* MacMillan, 5:58-59 ("The invention of this shared memory results in lower system cost . . . ."); Khatri, ¶ 103.  As explained above, Dockser's FPPs are even *<u>larger</u>* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes.  *Id.*; Goodin Dep. 70:6-12 (explaining that Dockser does not reduce space compared to conventional units), 43:21-45:9 (additional circuitry required to reduce precision).  As a result, replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit.  Khatri, ¶ 104.  A POSA would not be motivated to destroy the objectives of the prior art.

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016); *Chemours Co.*

*FC, LLC v. Daikin Indus., Ltd.*, No. 2020-1289, 2021 WL 3085514, at *4-*5 (Fed.

Cir. July 22, 2021).

### 3. Dockser/MacMillan Fails to Disclose or Render Obvious "wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit"

Claims 24 and 59 require "that "the device further comprises a digital

processor adapted to control the operation of the at least one first LPHDR

execution unit." Petitioner identifies MacMillan's "Host CPU" as the "digital

processor." Pet., 55; Khatri, ¶ 87.

However, MacMillan makes clear that the SIMD Controller, not the Host

CPU, controls the operation of the PEs. MacMillan, 13:35-36 ("Since the PEs

operate under the control of the SIMD Controller . . . ."); 8:1-10 (explaining that

SIMD Controller "contains the program counter used to step through the list of

instructions that may include instructions to be executed by the PEs"); 10:65-11:5

("The SIMD Controller 252 then executes the SIMD program."); 10:3-16; Khatri,

¶ 88. Indeed, while the PEs are executing, the SIMD Controller takes control of

the host bus; thus there is no way for the Host CPU to control (or even

communicate with) the PEs. MacMillan, 10:53-11:5; Goodin Dep. 126:3-129:6;

142:14-143:21; Khatri, ¶ 88. Not only is the Host CPU not disclosed as controlling

the PEs, it is merely optional. Goodin Dep., 116:6-18; Khatri, ¶ 88.

Petitioner's expert, Mr. Goodin, agreed that the SIMD Controller controls the operation of the PEs.

> Q. And MacMillan says that the processor elements are controlled by the SIMD controller?
>
> A. Yes, that's correct, that the processing elements are controlled by the SIMD controller 252.

Goodin Dep., 124:18-22.

Since Petitioner has provided no other argument with respect to the "digital processor" limitation as recited in claims 24 and 59, Petitioner has failed to show those claims are obvious over Dockser and MacMillan. *See* Pet., 55. Khatri, ¶ 89.

## D. Ground 4: Claims 1-26, 28, 32-61, 63, and 67-70 Are Not Obvious Over Dockser in View of Tong and MacMillan

As discussed above with respect to Grounds 2 and 3, the combination of Dockser, Tong, and MacMillan does not disclose or render obvious an LPHDR execution unit. Similarly, as set forth with respect to Ground 3, the combination does not disclose or render obvious the "at least one first computing device" limitation. Finally, as set forth with respect to Ground 2, Tong does not teach using only 5 bits of mantissa. Petitioner sets forth no further argument or evidence with respect to any of these limitations.

### 1. The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation

Even under Petitioner's construction of "LPHDR execution unit," the combination of Dockser, MacMillan, and Tong would still fail to satisfy the

"exceeds" limitation.  As explained above, each Dockser FPP, even when operating at 5-bit precision, is an "execution unit[] adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  Thus, even under Petitioner's construction, a device with 256 (or any number) Dockser FPPs operating at 5-bit precision would have *at least* as many full-precision units as "LPHDR execution units."  Khatri, ¶¶ 105-06.

### 2. A POSA Would Not Combine Tong, Dockser, and MacMillan

A POSA would not be motivated to combine the teachings of Dockser, MacMillan, and Tong.  As explained above, a person of ordinary skill in the art would not have been motivated to incorporate Dockser's FPP into MacMillan, nor to combine Dockser with Tong.  Khatri, ¶ 107.  Tong supplies no additional motivation to combine the teachings of Dockser and MacMillan.

## VII. PETITIONER'S "ALTERNATIVE" ARGUMENT REGARDING CLAIMS 5-6, 8, 10-18, 35-70 FAILS

Recognizing that a system with Dockser's FPPs can never meet the "exceeds" limitation, Petitioner posits that it would be obvious to completely redesign Dockser's FPP to carve out all support for its basic and default mode, namely full-precision operation (*see supra* Section VI.A.1).  Specifically, Petitioner posits that it would be obvious to cleave off parts of Dockser's 32-bit register file to achieve some unspecified lesser bit-width, and further perform some

engineered Dockser unit into the system of MacMillan because both MacMillan

and Tong happen to mention "signal processing." Khatri, ¶¶ 108-09. Petitioner

concocted this convoluted and implausible scenario in an attempt to sidestep the

Dockser FPP's full-precision capabilities.

A. **A POSA Would Not Be Motivated to Combine Dockser, MacMillan, and Tong under Petitioner's "Alternative" Argument**

Petitioner's assertion that a POSA would have been motivated by Tong to

remove the full-precision capabilities of Dockser is wholly without merit.

Petitioner's argument is based on a fragment of a sentence in Tong, taken

out of context to insinuate that full-precision operation "is not essential" to the

functioning of a Tong or Dockser system. Pet., 60.

In fact, Tong teaches the opposite. Khatri, ¶¶ 110-111. Tong admits that

there are "scientific programs" that "require a huge amount of precision" (Tong,

279), and broadly teaches that "it appears *inevitable* that some fraction of our

operands will require full IEEE-standard precision." Tong, 280; Khatri, ¶ 111.

Instead, like Dockser, Tong teaches systems that always have *both* full- and

reduced-precision capabilities. *See*, *e.g.*, Tong, 282 (even when describing a

device that has reduced precision units, it describes that system as "including *both*

full and reduced precision FP units and using appropriate sleep-mode circuit

techniques to shut down the unused unit."); Khatri, ¶ 111. With this teaching in

hand, a POSA would not cleave off parts of Dockser's 32-bit register file to achieve some unspecified lesser bit-width smaller execution unit, without also importing the Tong "full precision FP." *See generally* Tong; Khatri, ¶ 111.

In view of the above, it is clear that a person of ordinary skill would not be motivated by Tong to remove the full-precision capabilities of the Dockser units. Khatri, ¶ 112. On the contrary, Tong would only have *reinforced* the teaching of Dockser that, while reduced-precision might be a viable option in certain circumstances, an execution unit should retain the ability to operate at full-precision because many applications require full precision. *See*, *e.g.*, Dockser, ¶ [0003]; Khatri, ¶ 112. Similarly, Petitioner's "alternative" argument runs contrary to the teachings of Dockser and MacMillan.

Specifically, Dockser's objectives are fundamentally directed away from Petitioner's proposed "alternative" combination. As discussed above, it is undisputed that Dockser is devoted solely to a general processor with selectable precision. Khatri, ¶ 113.

Nowhere, however, does Dockser teach, or even suggest, removing its full-precision capabilities. Khatri, ¶ 114; Goodin Dep. 38:3-8. A Dockser FPP is described as always needing to support a range of selectable precisions including full precision. Adjusting Dockser by removing its full-precision capacity violates a central tenet of Dockser—to always be able to execute full-precision operations.

Khatri, ¶ 114; Dockser, ¶ [0003].  Indeed, Mr. Goodin explained that "Dockser

*requires* selectable subprecision."  Goodin Dep. 56:2-12; 57:4-12.  *See also id.*

38:3-8 ("I don't believe Dockser discloses any embodiments without floating-point

– without selectable precision.").  Mr. Goodin also explained that he did not

provide any opinions where Dockser was limited to a single subprecision.  *Id.*

69:17-70:18 ("That certainly isn't part of my opinions in my declaration.").  It is

not obvious to remove a reference's inventive concept—in this case supporting a

range of selectable precisions including full precision—in an attempt to meet a

challenged claim.  *Chemours Co.*, 2021 WL 3085514, at *5 (reversing Board

judgment of obviousness where proposed combination "would necessarily involve

altering the inventive concept" of the prior art reference).  Cleaving off circuitry

from Dockser in an alleged combination with Tong contradicts the inventive

concept of Dockser (as well as of Tong, as described in the previous subsection)

and could only be the product of impermissible hindsight.  Khatri, ¶ 114.

    As for MacMillan, it warns that "[t]o meet the cost objectives, the SIMD

capabilities ***should not add significant complexity*** to the architecture of a

computer system for personal use."  MacMillan, 5:42-44.  Petitioner's proposed

combination, which requires special, customized registers, logic elements,

arithmetic units, and programming models (see next subsection), would increase

manufacturing costs and goes directly against the teachings of MacMillan which

relies on operating with conventional components to reduce cost. See Khatri,

¶ 115. *E.g.*, MacMillan, 6:24-26, 34-36.

**B.     Google Has Failed to Show That the "Alternative"
Combination Would Meet the Imprecision Requirements
of the Claims**

Petitioner has not even attempted to show that the resulting combination

would meet the imprecision limitations. Petitioner merely states that the "selected

precision levels are unchanged from Grounds 1-3." Pet., 60-61. However, as

shown above, Tong suggests 11 bits of precision for specific signal processing

applications, and Petitioner provides no analysis of whether 11 bits of precision

would meet the imprecision limitation. *See id.* Khatri, ¶ 116.

**C.     POSA Would Not Have Recognized the Utility of
Petitioner's "Alternative" Combination of Dockser,
MacMillan, and Tong**

Finally, a POSA would not have recognized the utility of Petitioner's

"alternative" combination of Dockser, MacMillan, and Tong because the combined

prior art references do not teach or suggest that it would be possible to write

programs that run efficiently on a Dockser/MacMillan/Tong device. Khatri, ¶ 117.

As the '273 Patent explains, "programmers have come to think in terms of

high precision and to develop algorithms based on the assumption that computer

processors provide such precision . . . ." '273 Patent, 5:55-62. The notion that

low-precision computers can be programmed "is not obvious, and in fact has been

## VIII.  OBJECTIVE INDICIA OF NON-OBVIOUSNESS SUPPORT THE VALIDITY OF THE CLAIMS

Overwhelming evidence of objective indicia of non-obviousness—including skepticism, praise, unexpected results, commercial success, and outright copying of the claimed invention—confirms that the challenged claims are not obvious over the prior art references cited by Petitioner.

### A.    Legal Standard

"The objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016). "[W]e have repeatedly stressed that objective considerations of non-obviousness must be considered in *every* case." *Id.* Indeed, "[s]econdary considerations evidence can establish that 'an invention appearing to have been obvious in light of the prior art was not' and may be 'the most probative and cogent evidence in the record.'" *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013).

Objective indicia of non-obviousness include skepticism, praise, unexpected results, copying, and commercial success. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

"For secondary considerations to have probative value, the decision maker must determine whether there is a nexus between the merits of the claimed

**CONFIDENTIAL MATERIAL REDACTED**

invention and the secondary considerations." *Ashland Oil, Inc. v. Delta Resins &*

*Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985).

### B.     Google's Initial Skepticism of the Invention Shows Non-Obviousness

"Evidence of industry skepticism weighs in favor of non-obviousness.  If

industry participants or skilled artisans are skeptical about whether or how a

problem could be solved or the workability of the claimed solution, it favors non-

obviousness.  Doubt or disbelief by skilled artisans regarding the likely success of

a combination or solution weighs against the notion that one would combine

elements in references to achieve the claimed invention."  *WBIP*, 829 F.3d at 1335-

36; *see also e.g.*, *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377-

78 (Fed. Cir. 2019) ("Evidence of industry skepticism is a question of fact that

weighs in favor of non-obviousness.").

**CONFIDENTIAL MATERIAL REDACTED**

CONFIDENTIAL MATERIAL REDACTED

**CONFIDENTIAL MATERIAL REDACTED**

**CONFIDENTIAL MATERIAL REDACTED**

██████████████████████████████

███████████████████████████████████

████████████████████████████████

████████████████ is evidence that the Challenged Claims are not

obvious.  There is a clear nexus between these statements and the Challenged

Claims.  Khatri, ¶ 123.  They were written in response to Dr. Bates's disclosure of

the invention, as explained above.  *Id.*  Further, they express skepticism about

utility of the low-precision arithmetic performed by the large numbers of low-

precision execution units, which is a key feature of the '273 Patent claims.

### C.    Praise From Leaders in the Field Shows Non-Obviousness

Praise of the invention by others is another objective indicator of non-

obviousness.  *Mintz*, 679 F.3d at 1379.

As Dr. Bates' ideas ██████████████████████████

███████████████████████████████████

████████████████████████████

████████████████████████████

███████████████████████████████████

██████████████████████████████

████████████████████

███████████████████████████████

**CONFIDENTIAL MATERIAL REDACTED**

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

████████████

There is a clear nexus between the praise cited above and the Challenged

Claims. It relates directly to █████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

████████████████████

## D.    The Invention Is Not Obvious Because It Yields Unexpected Results

Unexpected results are further evidence of non-obviousness. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) ("Of particular importance beyond the prima facie analysis, this court also detects evidence of objective criteria showing nonobviousness. Specifically, the record shows powerful unexpected results . . . ."); *see also Neptune*, 921 F.3d at 1377-78; *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006).

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00179
PATENT NO. 8,407,273

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00179
PATENT NO. 8,407,273



**CONFIDENTIAL MATERIAL REDACTED**

The fact that these results were unexpected is further confirmed ████████

████████████████████████████████████████████████████████████████ .

Similarly, Dr. David Patterson of Google candidly remarked that he was "genuinely surprised" that the bfloat16 format provided useful results and improved performance, scaling, and power use. Ex. 2012. Dr. Patterson is a "skilled artisan" and acclaimed expert in the field of computer science and computer architecture. Dr. Patterson's comments have a nexus to the '273 Patent because, as shown below, the TPUv2 product is coextensive with the claims. Moreover, his comments further have a nexus because they are directed exactly to the key features of the '273 Patent claims: low precision high dynamic range arithmetic.

The fact that the '273 Patent's invention produces unexpected results is further supported by Dockser and Tong. For example, as explained above, Dockser teaches that for "general purpose processors, however, the common situation is that . . . a greater precision may be needed." Dockser, [0003]; Khatri, ¶¶ 124-25. Similarly, Tong notes that in order to be "generally useful," an execution unit must be capable of full-precision arithmetic. Tong, 280; Khatri, ¶¶ 124-25.

The fact that the prior art references cited by Petitioner in this proceeding teach that an execution unit without full-precision capability is not "generally

**CONFIDENTIAL MATERIAL REDACTED**

useful," and Google's initial reaction to the '273 Patent's invention, shows that the

high performance of the '273 Patent's invention across a wide variety of

applications was unexpected.  *Id.*  This unexpected result weighs toward non-

obviousness.

### E.    Google's Copying of the Invention Shows Non-Obviousness

"The fact that a competitor copied technology suggests that it would not

have been obvious."  *WBIP*, 829 F.3d at 1336.

As Dr. Bates was interacting with Google in 2013-14, Google had identified

a "daunting and scary" problem: in order to use artificial intelligence for speech

recognition, it would need to "double the computing footprint of Google just to

support, like, a slightly better speech recognition model for a modest fraction of

[its] users."  Ex. 2034, 6.

Despite ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████    Google solved this problem by copying Dr. Bates'

invention.  Specifically, Google adopted the invention in their TPUv2 and TPUv3

products, which are coextensive with the Challenged Claims (*see* Section VIII,

*infra*).  Indeed, Dr. Bates's invention is central to the operation of the TPUv2 and

TPUv3 products, which use execution units designed to perform operations using a

low-precision "floating point format called bfloat16" in order to achieve increased

parallelism and scale:

> Because multipliers for the bfloat16 format require so much less
> circuitry, it is possible to put more multipliers in the same chip area
> and power budget, thereby meaning that ML accelerators employing
> this format can have higher flops/sec and flops/Watt, all other things
> being equal.

Ex. 2011 at 9; Khatri, ¶¶ 126-27.

Google describes the computing enabled by the bfloat16 format as "[t]he

secret to high performance on Cloud TPUs," noting that "Cloud TPU v2 and Cloud

TPU v3 primarily use bfloat16 in the matrix multiplication unit (MXU)" and that

"inside the MXU, multiplications are performed in bfloat16 format." Ex. 2041 at

2. The bfloat16 format maintains high dynamic range by keeping the same 8 bit

exponent as found in 32-bit IEEE floating point. *Id.* However, it reduces precision

significantly by using only a 7-bit mantissa, as opposed to the 23-bit mantissa of

IEEE 32-bit floating point, which is why it requires less circuitry. *Id.*

**CONFIDENTIAL MATERIAL REDACTED**

**(a) fp32: Single-precision IEEE Floating Point Format**   **Range: ~1e⁻³⁸ to ~3e³⁸**

**(b) fp16: Half-precision IEEE Floating Point Format**   **Range: ~5.96e⁻⁸ to 65504**

**(c) bfloat16: Brain Floating Point Format**   **Range: ~1e⁻³⁸ to ~3e³⁸**

*Id.* at 1. A nexus with the claimed invention is presumed for secondary considerations relating to Google's TPUv2 and TPUv3 products, because these products are coextensive with the Challenged Claims, as demonstrated in detail in Section VIII, *infra. See WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'").

A nexus between Google's products and the claimed invention is further demonstrated ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00179
PATENT NO. 8,407,273

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00179
PATENT NO. 8,407,273



Google's copying therefore provides clear evidence that the Challenged Claims are not obvious. *E.g.*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1139 (Fed. Cir. 2019) (disclosure of patented method and later adoption of technology supported finding of copying); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.* 711 F.3d 1348, 1369 (Fed. Cir. 2013).

### F.    The Commercial Success of Google's TPUv2 and TPUv3 Shows Non-Obviousness

Commercial success is an objective indicator of non-obviousness. *See, e.g., id.* at 1368. The commercial success of Google's TPUv2 and TPUv3 products, which are coextensive with the Challenged Claims, supports a finding of non-obviousness.

Since the release of TPuv2 in 2017, and TPUv3 in 2018, Google has leveraged the abundance of processing power made available by Dr. Bates' invention—its "secret to high performance" over its competitors—to power all of

its major products and services, including Search, Translate, Photos, Assistant, and

Gmail.  Ex. 2018.  *See also* Exs. 2040, 2015.

Using hundreds of thousands of these low-precision TPU v2 and v3 devices

to provide these AI services in its data centers throughout the U.S., Google has

saved at least $10 billion dollars.  Ex. 2017.  Thus, Google's use of Dr. Bates' low-

precision computer throughout its data centers has resulted in enormous

commercial success for Google.

This commercial success is directly tied to the claimed invention.  Google's

TPUv2 and TPUv3 products are coextensive with the Challenged Claims, as

demonstrated in detail in Section VIII, *infra*.  Further, the success of these products

in the marketplace is due in large part to their use of the claimed invention, which

allows them to achieve increased performance and parallelism.  *See*, *e.g.*, Ex. 2016

("BF16 delivers a rare combination: reducing hardware and energy while

simplifying software by making loss scaling unnecessary;" *see also* Ex. 2011

(touting the increased efficiency and performance achieved by using low-precision

multipliers).

## IX.  GOOGLE'S TPUV2 AND TPUV3 ARE COEXTENSIVE WITH THE CHALLENGED CLAIMS

Google's TPUv2 and TPUv3 are coextensive with claims 1-8 of the '273

Patent.  Set forth below is an analysis mapping the claims to the TPUv2 and

TPUv3 devices; a more fulsome analysis of claim 53 is also provided in Singular's

district court infringement contentions.  Exs. 2021; 2022, 13-22.  Accordingly, a

nexus is presumed between secondary considerations relating to the TPUv2 and

TPUv3 and the '273 Patent.  *WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of

nexus for objective considerations when the patentee shows that the asserted

objective evidence is tied to a specific product and that product 'is the invention

disclosed and claimed in the patent.'").

A.    **Claim 1**

1.  **"A device"**

Each of the TPUv2 boards and TPUv3 boards are devices.  Khatri, ¶¶ 129-

30.



TPUv2 Board - Ex. 2016.



TPUv3 Board Ex. 2016.

**2. "comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"**

Each of the TPUv2 and TPUv3 boards include at least one first low

precision high dynamic range (LPHDR) execution unit adapted to execute a first

operation (multiplication) on a first input signal representing a first numerical

value to produce a first output signal representing a second numerical value (the

product of the first numerical value multiplied by another value). Khatri, ¶ 131.

Both versions include at least one Matrix Multiply Unit (MXU) that contains

128x128 = 16,384 execution units that each execute the operation of

multiplication. Exs. 2016; 2011 ("the main computational capacity in each core

provided by a large matrix multiply unit that can yield the results of multiplying a

pair of 128x128 matrices each cycle").



**Figure 2. Block diagram of a TensorCore (our internal development name for a TPU core, and not related to the Tensor Cores of NVIDIA GPUs).**

Ex. 2016 (annotations added).

Figure 5: A block diagram of Google's Tensor Processing Unit v2 (TPUv2)

Ex. 2011.

Each of the bfloat16 execution units in the MXU require "less circuitry" than either FP32 or FP16 multipliers. Ex. 2011, 9; Khatri, ¶ 132. Accordingly,

each of the multipliers within the MXU is *only* able to perform low-precision,

bfloat16 operations and lacks the circuitry to perform, for example, perform FP16

or FP32 operations.  Khatri, ¶ 132.

### 3. "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and"

The dynamic range of the valid inputs to the multiplication operation in the

TPUv2 and TPUv3 is governed by the number of exponent bits (8) in the floating

point 32 format.  Khatri, ¶¶ 133-34; Pet., 19-20; Ex. 1003, ¶ 231.  These inputs are

supplied by the "scalar/vector units," also known as Vector Processing Unit

(VPUs).  *E.g.*, Exs. 2016; 2049, 3-4.  As Google admits, 8 bits of exponent allow

for a dynamic range of from roughly $2^{-126}$ (smaller than 1/65,000) through $2^{127}$

(larger than 65,000).  Khatri, ¶134; Pet., 19-20; Ex. 1003, ¶ 232.

### 4. "for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input;"

Google's TPUv2 and TPUv3 boards meet this element by performing

multiplication on 32-bit numbers at bfloat16 precision, which uses 7 bits for the

mantissa.  Exs. 2041, 7; 2011, 8; 2049; Khatri, ¶ 135.  Google states that utilizing 7

bits of mantissa in multiplication operations results in a minimum of 12% of valid

floating point 32 inputs producing at least 0.39% relative error compared to the

exact mathematical calculation of a full-precision multiplication on those same

inputs.  Pet., 73; Khatri, ¶¶ 135-36.  Accordingly, the TPUv2 and TPUv3 meet this

element.

**B.    Claim 3, 7, 9**

**1.    "The device of claim 1, wherein the at least one first LPHDR execution unit comprises at least [ten/one hundred/five hundred] LPHDR execution units"**

As discussed above, each MXU contains 128x128 execution units: a total of

16,384 LPHDR execution units in total per MXU. The TPUv2 board includes 1

MXU per core, with 2 cores in a chip, and 4 chips on a board. Ex. 2016, 6. Thus,

the TPUv2 board contains $128 \times 128 \times 2 \times 4 = 131{,}072$ LPHDR execution units.

Khatri, ¶ 137.

IPR2021-00179
PATENT NO. 8,407,273



TPUv2 Board – Ex. 2046 (annotations added)

The TPUv3 board contains 2 MXUs per core, 2 cores per chip, and 4 chips per board. Ex. 2016. Thus, a single TPUv3 board contains $128 \times 128 \times 2 \times 2 \times 4 = 262,144$ LPHDR execution units. Khatri, ¶ 138.



TPUv3 Board – EX. 2046

The MXU execution units perform multiplication at bfloat16 precision, and are not capable of performing full-precision multiplication, as discussed above. Khatri, ¶ 139.

**C.     Claim 5, 8, 10**

> **1.  The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least [ten/one hundred/five hundred] the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.**

Each core (whether TPUv2 or TPUv3) contains a Vector Unit (VPU). *Id.*

Each VPU contains $128 \times 8 \times 2$ 32-bit arithmetic logic units (ALUs), for a total of 2048 ALUs per core. Ex. 2046, 34. Khatri, ¶ 140.

32-bit ALUs are adapted to perform the operation of multiplication on 32-bit numbers. With two cores per chip and 4 chips per board, each TPUv2 or TPUv3 board contains $2048 \times 4 \times 8 = 16,384$ execution units that are adapted to perform multiplication on 32-bit numbers. Khatri, ¶ 141.

As explained above, each TPUv2 board contains 131,072 LPHDR execution units, and each TPUv3 board contains 262,144 LPHDR execution units. Therefore, in both the TPUv2 and TPUv3 boards, "the number of LPHDR execution units in the device exceeds" by at least ***100,000*** "the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" and each board therefore meets the "exceeds" limitations of the claims. Khatri, ¶ 142.

### D.    Claims 11-17

*See* above; a mantissa of 7 bits gives at least 12% X, and at least 0.39% Y, meeting each of claim 11-17's limitations. Khatri, ¶¶ 143-45.

### E.    Claim 18

1. **"The device of claim 8, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000."**

As discussed above, the bfloat16 format used in the TPUv2 and TPUv3 boards contains 8 bits of exponent, which provides a dynamic range of from

IPR2021-00179
PATENT NO. 8,407,273

roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000).

Khatri, ¶ 146.

### F.     Claim 24

1. **"The device of claim 1, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit**

Google's TPUv2 and TPUv3 devices meet this limitation as well.

Each TPU device is controlled by a Core Sequencer (which, in turn, is controlled by a Host Virtual Machine that is a program running on a CPU). The CPU is a digital processor, and by running the Host VM and issuing commands to the Core Sequencer, it controls the operation of the LPHDR execution units within the MXUs. Ex. 2016, 4; Khatri, ¶¶ 147-48.



Ex. 2045, 2.

70

Die sizes are adjusted by the square of the technology, as the semiconductor technology for TPUs is similar but larger and older than that of the GPU. We picked 15nm for TPUs based on the information in Table 3. Thermal Design Power (TDP) is for 16-chip systems. TPUs come with a host CPU. This GPU price adds price of a n1-standard-16 CPU.

Ex. 2011.



Figure 2. Block diagram of a TensorCore (our internal development name for a TPU core, and not related to the Tensor Cores of NVIDIA GPUs).

Ex. 2016, (annotations added)

### G. Claim 36

Claim 36 claims a device comprising at least one LPHDR execution unit with the same parameters as claim 1, with the added limitation that: "the number of LPHDR execution units in the device exceeds the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."

As discussed above with respect to claim 1, and with respect to claim 5, the TPUv2 and TPUv3 boards each include LPHDR execution units meeting claim 1's

limitations. Moreover, the number of LPHDR execution units exceed the "non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" by over 100,000. *See* above. Khatri, ¶¶ 149-50.

### H.     Claims 38, 42, 44

> **1.     The device of claim 36, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.**

*See* above with respect to claims 3, 7, 9. Khatri, ¶ 151.

### I.     Claims 40, 43, 45

> **1.     The device of claim 36, wherein the number of LPHDR execution units in the device exceeds by at least [ten/one hundred/five hundred] the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.**

*See* above with respect to claims 5, 8, 10. Khatri, ¶ 152.

### J.     Claims 46-53

*See* above with respect to claims 11-18. Khatri, ¶ 153.

## X.     CONCLUSION

For the foregoing reasons, Patent Owner respectfully requests that the Board issue a Final Written Decision confirming the patentability of all the Challenged Claims.

IPR2021-00179
PATENT NO. 8,407,273

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

Patent No. 8,407,273
Filing Date: February 17, 2012
Issue Date: March 26, 2013

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____

**DECLARATION OF SUNIL P. KHATRI, Ph.D.**

Case No. IPR2021-00179

_____

Singular's Exhibit No. 2051, IPR2021-00179
Page 001

36.     I understand that I should perform my analysis from the viewpoint of a person of ordinary skill in the art. I understand that this hypothetical person of ordinary skill in the art is considered to have the normal skills of a person in a certain technical field. I understand that factors that may be considered in determining the level of ordinary skill in the art include, *e.g.*, the types of problems encountered in the art, prior art solutions to those problems, the sophistication of the technology, and the education level of active workers in the field.

37.     I agree with Petitioner's proposed level of skill in the art, except that I disagree that such a person would have more than two years of experience. Therefore a POSA would be: a person with a Bachelor's degree in Computer Science, Electrical Engineering, or Applied Mathematics, with 2 years of academic or industry experience in computer architecture. Pet. at 7-8.

### B.     The Claimed Invention Of The '273 Patent

38.     The '273 Patent is entitled "Processing with Compact Arithmetic Processing Element" and issued on March 26, 2013. The '273 Patent claims priority, through its parent application, to U.S. Provisional Patent Application No. 61/218,691, filed on Jun. 19, 2009. I have reviewed the '273 Patent and its file history.

39.     The inventor of the '273 Patent, Dr. Bates, recognized that even though then-modern conventional microprocessors contained about one billion

11

APPX09664

transistors, they could perform only a handful of operations per clock cycle. '273

Patent, 1:52-60. Dr. Bates explained that a large portion of this inefficiency comes

from using transistor-intensive full-precision arithmetic units:

> As described above, today's CPU chips make inefficient use of their
> transistors. …they deliver great precision, performing exact arithmetic
> … standardized arithmetic with 32 and 64 bit floating point numbers.
> Many applications need this kind of precision. As a result,
> conventional CPUs typically are designed to provide such precision,
> using on the order of a million transistors to implement the arithmetic
> operations.

'273 Patent, 3:7-3:22.

40.    However, Dr. Bates realized that such full-precision, inefficient

components were not necessary for all applications, including many valuable ones:

> There are many economically important applications, however, which
> are not especially sensitive to precision and that would greatly benefit,
> in the form of application performance per transistor, from the ability
> to draw upon a far greater fraction of the computing power inherent in
> those million transistors. Current architectures for general purpose
> computing fail to deliver this power.

'273 Patent, 3:23-29.

41.    The '273 Patent is thus directed away from prior art computers based

on full-precision execution units that take up space and are wasteful of transistors.

As Dr. Bates further explains in the specification, "[b]ecause LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other." '273 Patent, 6:51-55. As a result, "embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures." '273 Patent, 8:3-7.

42.    By using a "very large number" of LPHDR execution units in parallel, computer systems are able to achieve significantly better performance than prior art systems. Because each LPHDR execution unit requires fewer resources (*e.g.*, fewer transistors, less physical volume) than a full-precision execution unit, "there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs." '273 Patent, 23:47-55; *see also id.*, 6:51-55. In particular, the claimed systems "might perform tens of thousands of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. '273 Patent, 23:57-60.

Singular's Exhibit No. 2051, IPR2021-00179
Page 016

43.    In addition, the '273 Patent also teaches computer systems in which the number of LPHDR execution units exceeds the number of full precision execution units:

> For certain devices … according to the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits).

'273 Patent, 27:63-28:3.

44.    The increased level of compute parallelism and scale in such computer systems is necessarily achieved at the cost of precision—the vast majority of the high dynamic range floating-point operations performed by the device must be performed at low precision. Dr. Bates was the first to understand that sacrificing precision for increased parallelism/scale results in significant performance gains per unit of resource over the prior art. In fact, Dr. Bates notes that when certain applications are implemented using a device that uses LPHDR execution units, the final application error is significantly lower than the error of the LPHDR execution units themselves. '273 Patent, 16:57-23:45.

## V.    THE CITED REFERENCES

### A.    Dockser

APPX09667

45.    I have reviewed U.S. Pat. Publ. 2007/0203967, titled "Floating-Point Processor With Reduced Power Requirements For Selectable Subprecision" ("Dockser"). Dockser discloses the use of a full-precision floating point processor (FPP) that can selectably reduce precision in order to reduce its power draw. *See, e.g.*, Ex. 1007, Dockser ¶ [0026].

46.    Dockser's teaching of an execution unit that is always capable of operating in both full-precision mode (its default) and reduced-precision modes is motivated by the prevalent view in the prior art that while low-precision operation might be acceptable for "certain applications," for a general-purpose processor, full-precision capability is "needed." Dockser ¶¶ [0003, 0018], claims 1, 8, 15, 20. As such, Dockser includes both full and reduced precision modes. *See e.g.*, Dockser ¶¶ [0028], [0017], [0014], [0023], Fig. 2.

47.    The components of Dockser's FPP is shown in Figure 1, reproduced below:

Singular's Exhibit No. 2051, IPR2021-00179
Page 018



**Dockser, Fig. 1 (Annotated)**

Dockser's FPP has a register file (FPR 110, shaded in **red**) comprising registers

(red boxes) that hold IEEE 32-bit full-precision values. It also includes a controller

(CTL 130, shaded in **green**) with a control register (**green** box) that can store

"subprecision select bits" corresponding to the desired level of precision. Dockser,

Fig. 1; *see also id.*, ¶¶ [0017-18]. The FPP performs arithmetic operations (e.g.,

including addition and multiplication) at full-precision – or at the desired sub-precision using values stored in the register file as operands. *See id.*, ¶ [0019], [0017], [0028].

48.    If no sub-precision is selected, Dockser's FPP performs arithmetic at "maximum precision" (*i.e.*, 32-bit IEEE full-precision). *See* Dockser, claims 1, 8, 15, 20; *see also id.*, ¶ [0018] ("the floating-point controller 130 *may* be used to select the sub-precision of the floating-point operations …")). Otherwise, the operation is performed at a reduced precision. In reduced-precision modes, Dockser's FPP reduces the mantissa size by powering-down some of the cells in the register file that store the mantissa, and also powers down parts of the arithmetic logic circuits (contained, *e.g.*, within the multiplier, shaded in **blue** above) that are not needed for the selected subprecision. *Id.*, ¶¶ [0026-27].

49.    Unlike the '273 Patent, Dockser does not teach systems that include multiple arithmetic units operating in parallel. Instead, Dockser discloses a single floating-point execution unit in isolation. The absence of a parallel teaching is not surprising, given that Dockser's selectable low-precision unit is designed to conserve power in "battery operated devices where power comes at a premium, such as wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras." Dockser, ¶ [0003]. A POSA would not understand Dockser to disclose or suggest using its FPP units in parallel.

Singular's Exhibit No. 2051, IPR2021-00179
Page 020

50.     Dockser discloses that it uses "conventional" arithmetic units to perform operations, such as addition and multiplication. Dockser, ¶ [0020].

51.     Because Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a POSA would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a POSA would expect it to be _larger_ than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

### B.     Tong

52.     I have reviewed "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic" by Jonathan Ying Fai Tong et al. ("Tong"). Tong teaches that using lower-precision arithmetic can reduce power consumption. *See generally* Tong, pp. 273-285. Tong is based on the commonly held belief that some applications can only be performed using full-precision arithmetic: "[e]ven though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears inevitable that some fraction of our operands will require full IEEE-standard precision." *Id.* (emphasis added).

Singular's Exhibit No. 2051, IPR2021-00179
Page 021

53.     Importantly, like Dockser, Tong is focused on reducing power consumption, and does not teach parallel processing systems that include multiple arithmetic units that operate simultaneously, let alone systems having much larger numbers of low-precision units than full-precision units. Each low-precision unit disclosed by Tong is either as large as a full-precision unit or paired with a full precision unit on a 1:1 basis (Tong, 282).

54.     For example, Tong teaches "simply including both full and reduced precision FP units and using appropriate sleep-mode circuit techniques to shut down the unused unit." Tong, 282. In this approach, each low-precision unit is paired with a full-precision unit in a 1:1 ratio, requiring more physical space than a full-precision unit alone. Indeed, this approach is presented as an option in situations where silicon real-estate is not at a premium. *See* Tong, 282 ("Given the decreasing cost of silicon area …").

55.     In another example, Tong also teaches a "digit-serial" multiplication circuit that, using control signals, is operable to perform a reduced-precision operation in a single clock cycle. The result of this reduced-precision operation, in which an 8-bit operand is multiplied with a 24-bit operand, can be combined with other reduced-precision results over multiple clock cycles in a process called "digit-serial multiplication," yielding a full-precision result. When performing low-precision operations, Tong's digit-serial multiplier does consume less power than a

Singular's Exhibit No. 2051, IPR2021-00179
Page 022

traditional full-precision unit. However, it occupies *more* physical space than a

full-precision multiplier, because it "require[s] extra random logic for control of

the multiple passes through the digit serial structure." Tong, 281; *see also* 280

("The lower precision digit-serial design is slightly larger [than the full-precision

execution unit]"), Table V (showing that Tong's digit-serial multiplier occupies

~3% more area than a conventional full-precision multiplier). Therefore, a POSA

would understand that like Dockser's FPP, the execution units taught by Tong are

capable of reduced-precision operation, but are <u>larger</u> than a conventional full-

precision execution unit. A POSA would understand that this large size would

make them unsuitable for scaling, and therefore unsuitable for use in parallel

processing arrays.

56.    A POSA would therefore understand that as with Dockser, Tong is

focused on power-savings, does not even mention increasing computational scale

and parallelism, and certainly does not teach a computer comprised of a much

larger number of low-precision units compared with full-precision units.

### C.    MacMillan

57.    I have reviewed U.S. Patent No. 5,689,677, titled "Circuit For

Enhancing Performance Of A Computer For Personal Use" ("MacMillan").

MacMillan is directed to a computer system that includes a host processor and "a

plurality of processing elements." Macmillan, 12:39. MacMillan does not describe

the capabilities of each "processing element" (PE) in detail, noting only briefly that "[i]nteger and floating point accelerators could be included in each PE." MacMillan, 12:55-56.

58.    Regarding arithmetic precision/imprecision, MacMillan is silent. It simply teaches that each PE can "perform atomic operations on data values up to *32 bits wide*." MacMillan, 7:8-9. A POSA would understand that unlike Dockser and Tong, MacMillan is not focused on minimizing power consumption, and is not specifically tailored for use in portable or mobile devices. Indeed, MacMillan's only reference to power consumption relates to heat dissipation inside the "cabinet" of a workstation. *See* MacMillan, 3:4-6.

## VI.    CLAIM CONSTRUCTION

### A.    "Low Precision High Dynamic Range (LPHDR) Execution Unit"

59.    In my opinion, the Board should construe the term "low precision high dynamic range (LPHDR) execution unit" as "an execution unit that executes arithmetic operations only at low precision and with high dynamic range, wherein 'high dynamic range' and 'low precision' are defined according to the numerical requirements below."[1] A POSA would understand this as the plain meaning of the term as read in light of the specification.

---

[1] Where "below" refers to the remainder of the claim in which the term appears (*e.g.*, the numerical requirements that specify a minimum level of imprecision and a minimum dynamic range).

Singular's Exhibit No. 2051, IPR2021-00179
Page 024

a device would fail to meet the any of the "exceeds" limitations of claims 5, 8, 10, 35, 36, 40, 43, and 45.

85.     The "exceeds" limitations require that the "number of LPHDR execution units in the device exceeds" by various amounts "the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."[2] As I explain further below, a POSA would understand that Dockser's FPP is adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

86.     Even if Dockser's FPP were an LPHDR execution unit (which it is not, in my opinion) the Dockser/MacMillan combination cannot meet any claim's "exceeds" limitation, because those same "Dockser LPHDR execution units" would also be "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," meaning that the number of LPHDR execution units will never exceed the number of full-precision floating point multiplication execution units. That is, even under Petitioner's incorrect argument that each Dockser FPP qualifies as an LPHDR execution unit, it *also* qualifies as a full-precision floating-point multiplication execution unit. Therefore,

---

[2] For clarity, I refer to "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" as "full-precision floating point multiplication execution units."

Singular's Exhibit No. 2051, IPR2021-00179
Page 036

no matter how many Dockser FPP's are included in a device, the number of

LPHDR execution units in the device will *at most equal* to the number of full-

precision floating-point multiplication execution units – and will never "exceed

[it]" by any amount as the claims require.

> 3) *Dockser/MacMillan Fails to Disclose or Render Obvious "wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit"*

87.    Claims 24 and 59 require that "the device further comprises a digital

processor adapted to control the operation of the at least one first LPHDR

execution unit."." I understand that Petitioner identifies MacMillan's "Host CPU"

as the "digital processor adapted to control the operation of the at least one first

LPHDR execution unit" for claim 24 only. Pet., 55. I disagree.

88.    A POSA would understand that MacMillan makes clear that the

SIMD Controller, not the Host CPU, controls the operation of the PEs. MacMillan,

13:35-36 ("Since the PEs operate under the control of the SIMD Controller…");

8:1-10 (explaining that SIMD Controller "contains the program counter used to

step through the list of instructions that may include instructions to be executed by

the PEs"); 10:65-11:5 ("The SIMD Controller 252 then executes the SIMD

program."); 10:3-16; Indeed, a POSA would understand that while the PEs are

executing, the SIMD Controller has taken control of the host bus, and the Host

CPU has relinquished the bus. At this point, the SIMD Controller executes the

92.    Dockser discloses that its FPP takes input operands that are 32 bits wide and stores them in IEEE-754 format. *See e.g.*, Dockser, ¶ [0017] ("Each register location 200 is configured to store a 32-bit binary floating-point number, in an IEEE-754 32-bit single format."). Dockser also discloses that its FPP includes "a floating-point multiplier (MUL) 144 configured to execute floating-point multiply instructions." Dockser, ¶ [0019]. A POSA would therefore understand that Dockser multiplies 32-bit operands when operating in full precision mode, and therefore it is "adapted to" execute the operation of multiplication on numbers at least 32 bits wide.

93.    Therefore, even if Dockser's FPP is an "LPHDR execution unit" (as Petitioner incorrectly argues), the Dockser/MacMillan device would also satisfy the "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" requirement, and would thus fail to satisfy the "exceeds" limitation. If, for the sake of argument, we count each Dockser FPP as an "LPHDR execution unit," then in one example, the Dockser/MacMillan device with 256 Dockser FPPs would have 256 LPHDR execution units. However, because each Dockser FPP is also "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," the Dockser/MacMillan device would therefore also have <u>at least</u> 256 execution units "adapted to execute at least the operation of multiplication on floating point

Singular's Exhibit No. 2051, IPR2021-00179
Page 039

numbers that are at least 32 bits wide." As a result, in my opinion, the

Dockser/MacMillan cannot meet the "exceeds" limitation for any of the challenged

claims.

> 5) *Petitioner's Interpretation of "adapted to execute at least the*
> *operation of multiplication on floating point numbers that are at*
> *least 32 bits wide" Is Inconsistent with the Specification*

94.    I understand that Petitioner argues that Dockser's FPP does not meet

the "exceeds" limitation by arguing that units are full-precision floating point

multiplication execution units *only if* they are "'traditional precision' execution

units that do not 'sometimes' produce results different from the correct traditional-

precision result." Pet., 50. I disagree.

95.    A POSA would not understand "adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

to exclude units, like Dockser, which selectably operate at full precision, as

Petitioner claims. Pet., 50.

96.    Instead, a POSA would understand this term to include any or all units

in the device that are designed to perform "multiplication on floating point

numbers that are at least 32 bits wide," even if those units can perform other

operations as well. Petitioner's (and Mr. Goodin's) interpretation directly

contradicts the claim language itself, which encompasses every execution unit

adapted to perform "*at least*" the operation of 32-bit multiplication. If such an

preclude a full-precision floating point multiplication execution unit from being

able to produce incorrect results. Petitioner imports that requirement from a

completely different section of the patent, taken completely out of context. *See*

Pet., 50 (citing '273 Patent, 26:50-60); *see also* Goodin, ¶ 371. A POSA would

understand that that section uses "sometimes" to describes the imprecision

limitation of an LPHDR execution unit, as expressed in the X% limitation of the

Challenged Claims. That section says nothing about full-precision floating point

multiplication execution units. *See* '273 Patent, 26:50-60.

### D.   A POSA Would Not Combine Dockser with MacMillan

101.   A POSA would not combine Dockser with MacMillan because it

would not be operable for its intended purpose.

102.   Dockser is focused on the objective of reducing power consumption

and is not in any way concerned with the objective of use in parallel processing

arrays, while MacMillan is focused on a parallel architecture that increases

computational capability, and not focused on reducing power consumption (indeed,

MacMillan's only reference to power consumption relates to heat dissipation inside

the "cabinet" of a workstation). *See* MacMillan, 3:4-6.

103.   Incorporating Dockser's FPPs into MacMillan would defeat

MacMillan's stated objective of achieving a highly parallel SIMD computer

architecture at "lower system cost." *See* MacMillan, 5:58-59 ("The invention of

this shared memory results in lower system cost"). As explained above, Dockser's

FPPs are even _larger_ than traditional full-precision execution units because of the

control circuitry needed to implement the selectable subprecision modes.

104.   As a result, replacing the full-precision execution units of MacMillan

with Dockser FPP units would require additional circuitry and chip space and

would therefore _increase_ costs, while providing no benefit. Combining Dockser

and MacMillan would thus sacrifice the benefits of _both_ references, which a POSA

would not be motivated to do.

### E.   Ground 4: Claims 1-26, 28, 32-61, 63, and 67-70 Are Not Obvious Over Dockser in View of Tong and MacMillan

105.   As I explained above with respect to Grounds 2 and 3, the

combination of Dockser, Tong, and MacMillan does not disclose or render obvious

an LPHDR execution unit. Similarly, as set forth above with respect to Ground 3,

the combination does not disclose or render obvious the "at least one first

computing device" limitation. Finally, as set forth above with respect to Ground 2,

Tong does not teach using only 5 bits of mantissa. I understand that Petitioner's

Ground 4 arguments do not address these deficiencies.

#### 1)   _The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation_

106.   Even under Petitioner's incorrect construction of "LPHDR execution

unit," in my opinion, the combination of Dockser, MacMillan, and Tong would

41

have only as many logic elements as needed to multiply mantissas of the reduced

bitwidth." Pet., 59-60. Petitioner further states that Tong suggests a precision of

"between 5 and 11 mantissa fraction bits" for "five signal processing applications."

Pet., 59. And because two of the many applications of an embedded system

disclosed in MacMillan are "signal processing" and "voice recognition," Petitioner

states that a POSA would use "Dockser's FPPs in MacMillan's architecture with

Tong's precision levels." Pet., 59. I disagree. This is nothing but a hindsight-based

modification of the references to meet the claims of the '273 Patent.

109.    A POSA would not have been motivated to re-engineer the FPP of

Dockser to remove its 32-bit capability based on one data-point in Tong, and then

incorporate the re-engineered Dockser unit into the system of MacMillan because

both MacMillan and Tong mention "signal processing." As I explain above, the

entire purpose of Dockser is to provide a processor with ***selectable subprecision***.

Limiting Dockser to one precision goes against Dockser's entire inventive concept,

and a POSA would not be motivated to do so.

      4)    A POSA would not be motivated to combine Dockser,
            MacMillan, and Tong under Petitioner's "alternative"
            argument

110.    A POSA would not have been motivated by Tong to remove the full-

precision capabilities of Dockser and incorporate this modified Dockser FPP into

the systems taught by MacMillan.  Petitioner's argument is based on a fragment of

Singular's Exhibit No. 2051, IPR2021-00179

APPX09696

a sentence in Tong taken out of context, insinuating that Tong teaches that full-precision operation "is not essential" to the functioning of a Tong or Dockser system. Pet., 60. In my opinion, this interpretation of Tong is not correct.

111.   In fact, a POSA would understand that Tong teaches the opposite. Tong admits that there are "scientific programs" that "require a huge amount of precision" (Tong, 279), and broadly teaches that "it is _inevitable_ that some fraction of our operands will require full IEEE-standard precision." Tong, 280 (emphasis added). Instead, like Dockser, Tong teaches systems that always have _both_ full- and reduced-precision capabilities. _See_, _e.g._, Tong, 282 (even when describing a device that has reduced precision units, it describes that system as "including _both_ full and reduced precision FP units, and using appropriate sleep-mode circuit techniques to shut down the unused unit."). With this teaching in hand, a POSA would not cleave off parts of Dockser's 32-bit register file to achieve some unspecified lesser bit-width smaller execution unit, without also importing the Tong "full precision FP." This is a convoluted, hindsight-driven modification to the fundamental teachings of the cited references.

112.   In view of the above, it is clear that a person of ordinary skill would not be motivated by Tong to remove the full-precision capabilities of the Dockser units. On the contrary, Tong would only have _reinforced_ the teaching of Dockser that, while reduced-precision might be a viable option in certain limited

circumstances, an execution unit should retain the ability to operate at full-precision, as I explained below. See, *e.g.*, Dockser, ¶ [0003].

113.   Dockser's objectives are fundamentally directed away from Petitioner's proposed "alternative" combination. As discussed above, Dockser is devoted solely to a general processor with selectable precision.

114.   Nowhere does Dockser teach, or even suggest, removing its full-precision capabilities. As I explain above, a Dockser FPP is described as always needing to support a range of selectable precisions including full precision. Dockser, ¶ [0003]. Adjusting Dockser by removing its full-precision capacity violates a central tenet of Dockser—to always be able to execute full-precision operations. Dockser, ¶ [0003]. A POSA would not remove Dockser's inventive concept—supporting a range of selectable precisions including full precision. Thus, excising the full-precision circuitry of Dockser runs contrary to the main teaching and inventive feature of Dockser (as well as that of Tong, as I explain above).

115.   The removal of full-precision circuitry from the Dockser FPP also goes against the teachings of MacMillan, which warns that "[t]o meet the cost objectives, the SIMD capabilities ***should not add significant complexity*** to the architecture of a computer system for personal use." *Id.*, 5:42-44. A POSA would understand that Petitioner's proposed hindsight-driven combination, which

Singular's Exhibit No. 2051, IPR2021-00179
Page 048

requires special, customized registers, logic elements, arithmetic units, and

programming models (see below), would increase manufacturing costs and goes

directly against the teachings of MacMillan, which relies on operating with

conventional components to reduce cost. *E.g.*, *id.,* 6:24-26, 34-36. Further, as I

explain above, the Dockser FPP, due to its control circuitry, would likely require

*more* transistors than a conventional full-precision execution unit, further

increasing costs. Also, the modified Dockser FPP would result in modifications to

the programs that are run on the MacMillan system, which MacMillan seeks to

avoid. *See* MacMillan 2:15-16 (where avoiding "the need for reprogramming" is

emphasized).

     5)     Google Has Failed to Show That the "Alternative"
             Combination Would Meet the Imprecision Requirements of
             the Claims

116.   I understand that Petitioner has not shown that the resulting

combination would meet the imprecision limitations. As discussed above, Tong

suggests 11 bits of precision for specific signal processing applications, and

Petitioner provides no analysis of whether 11 bits of precision would meet the

imprecision limitation.

     6)     A POSA Would Not Have Recognized the Utility of
             Petitioner's "Alternative" Combination of Dockser,
             MacMillan, and Tong

**CONFIDENTIAL MATERIAL REDACTED**

122.    Without these teachings of the '273 Patent, a POSA would not have

been motivated to combine MacMillan and Dockser with Tong according to

Petitioner's "alternative" argument because it would not have been clear to a

POSA that it would be possible to program such a device to execute operations

efficiently and without accumulating errors.

## VIII.  OBJECTIVE INDICIA OF NON-OBVIOUSNESS

123.    I have reviewed ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████.

124.    It is my opinion that the experimental results obtained by Dr. Bates

using his invention ██████████████████████████

████████████████, would have been unexpected to those of skill in the art at the

time. When the invention was filed, it was not known that a massively parallel

computer that includes almost exclusively low-precision execution units, (and very

few full-precision units) would have been able to achieve high performance across

a broad spectrum of applications, ████████████████████

████████████████████████████

49

CONFIDENTIAL MATERIAL REDACTED

███████████████████████████████████████████

████████████████████████████

125.    The fact that Dr. Bates's results were unexpected is further supported

by Dockser and Tong. For example, as I explain above, Dockser teaches that for

"general purpose processors, however, the common situation is that … a greater

precision may be needed." Dockser, [0003]. Similarly, Tong notes that even

though limited precision can be useful, "it appears inevitable that some fraction of

our operands will require full IEEE-standard precision." Tong, 280. Based on the

Dockser and Tong references cited by Petitioner in this proceeding, which teach

that an execution unit without full-precision capability is not "generally useful,"

the results presented to Google by Dr. Bates would have been unexpected to a

person of ordinary skill.

126.    Further, based on Google's publications about the design and

performance of its own TPUv2 and TPUv3 products, I conclude not only that these

products are covered by some of the challenged claims (*see below*), but also that

the claimed invention is central to their design and operation:

> As the size of an FP multiplier scales with the square of the mantissa
> width, the bf16 multiplier is half the size and energy of a fp16
> multiplier: $8^2 / 11^2 \approx 0.5$ (accounting for the implicit leading mantissa
> bit). Bf16 delivers a rare combination: reducing hardware and energy
> while simplifying software by making loss scaling unnecessary.

Ex. 2016, 7.

> As it turns out, machine learning computations used in deep learning models care more about dynamic range than they do about precision. Furthermore, one major area & power cost of multiplier circuits for a floating point format with M mantissa bits is the $(M+1) \times (M+1)$ array of full adders that are needed for multiplying together the mantissa portions of the two input numbers. The IEEE fp32, IEEE fp16 andbfloat16 formats need 576 full adders, 121 full adders, and 64 full adders, respectively. Because multipliers for the bfloat16 format require so much less circuitry, it is possible to put more multipliers in the same chip area and power budget, thereby meaning that ML accelerators employing this format can have higher flops/sec and flops/Watt, all other things being equal.

Ex. 2011, 8-9.

127.    These passages, which are excerpted from documents about the design of the TPUv2 and TPUv3, show that these products both use a large number of low-precision, high dynamic range execution units (that are capable of executing arithmetic operations *only* at low precision, as I demonstrate below) and have relatively few full-precision execution units, in order to "put more multipliers in the same chip area." *Id.* This is precisely the insight Dr. Bates described and claimed in his patents and disclosed to Google in a number of presentations between 2010 and 2017.

## IX.    GOOGLE'S TPUV2 AND TPUV3 ARE COEXTENSIVE WITH THE CHALLENGED CLAIMS

128.    Google's TPUv2 and TPUv3 are coextensive with claims 1, 3, 5, 7, 8-18, 24, 36, 38, 40, and 42-53of the '273 Patent. Set forth below is an analysis mapping the claims to the TPUv2 and TPUv3 devices.

51

### A.  Claim 1

*1)  "A device:"*

129.   Each of the TPUv2 boards and TPUv3 boards are devices.



TPUv2 Board - Ex. 2016.



TPUv3 Board Ex. 2016.

130.   A POSA would understand that the above photographs show that the

TPUv2 and TPUv3 boards are circuit boards coupled to hardware components such

as processors, heatsinks, I/O ports, interconnected with each other via wiring. Both

the TPUv2 and TPUv3 boards are "devices," as a POSA would understand that term.

> 2)  *"comprising at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"*

131.   In my opinion, each of the TPUv2 and TPUv3 boards include at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation (multiplication) on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value (the product of the first numerical value multiplied by another value). Both the TPUv2 and TPUv3 include at least one Matrix Multiply Unit (MXU) that contains $128 \times 128$ (*i.e.*, 16,384) execution units that each execute the operation of multiplication. Ex. 2016; Ex. 2011 ("the main computational capacity in each core provided by a large matrix multiply unit that can yield the results of multiplying a pair of $128 \times 128$ matrices each cycle").



53

Ex. 2016 (annotations added).



Figure 5: A block diagram of Google's Tensor Processing Unit v2 (TPUv2)

Ex. 2011.

132.   Google's publications explain that each of the bfloat16 execution

units in the MXU require "less circuitry" than either FP32 or FP16 multipliers:

> The IEEE fp32, IEEE fp16 and bfloat16 formats need 576 full adders,
> 121 full adders, and 64 full adders, respectively. Because multipliers
> for the bfloat16 format require so much less circuitry, it is possible to
> put more multipliers in the same chip area …

Ex. 2011, 9.

Each of the multipliers within the MXU is able to perform multiplication *only* at

low-precision, using the bfloat16 format. They lack the circuitry to perform, for

example, perform FP16 or FP32 operations. *Id. See also* Ex. 2049 at 3-4.

> 3)   *"wherein the dynamic range of the possible valid inputs to the first
> operation is at least as wide as from 1/65,000 through 65,000 and"*

133.   As Google's publications explain:

> While its *inputs and outputs are 32-bit floating point values, the MXU
> typically performs multiplications at the reduced precision of bfloat16*
> — a 16-bit floating point representation that provides better training
> and model accuracy than the IEEE half-precision representation for
> deep learning as it allocates more bits to the exponent and less to the
> mantissa.

54

Singular's Exhibit No. 2051, IPR2021-00179
Page 057

Ex. 2049 at 3-4 (emphasis added).

134.    Thus, the dynamic range of the valid inputs to the multiplication operation in the TPUv2 and TPUv3 is governed by the number of exponent bits (8) in the floating point 32 (FP32) format. These inputs are supplied by the "scalar/vector units", also known as Vector Processing Unit (VPUs). As Google admits, 8 bits of exponent allow for a dynamic range of from roughly $2^{-126}$ (smaller than 1/65,000) through $2^{127}$ (larger than 65,000). Pet., 20-21; Ex. 1003, ¶ 232. I agree that the dynamic range of FP32 is at least this large. Indeed, in some of its publications, Google admits that floating-point formats with 8 bits of exponent are capable of representing an even wider range of values, from approximately $10^{-38}$ to $3 \times 10^{38}$. Ex. 2041 at 1.

> 4)    "for at least X=5% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.05% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input."

135.    Google's TPUv2 and TPUv3 boards meet this element. As I explain above, the MXU's inputs are "32-bit floating point" values, but they "perform[] multiplications at the reduced precision of bfloat16." *See* Ex. 2049 ("While its

Singular's Exhibit No. 2051, IPR2021-00179
Page 058

inputs and outputs are 32-bit floating point values, the MXU typically performs

multiplications at the reduced precision of bfloat16").

136.   Multiplication performed at bfloat16 precision uses 7 bits for the

mantissa. Ex. 2041 at 1; Ex. 2011 at 8. Petitioner states – and I agree – that

utilizing 7 bits of mantissa in multiplication operations results in a minimum of

12% of valid floating point 32 inputs, producing at least 0.39% relative error

compared to the exact mathematical calculation of a full-precision multiplication

on those same inputs. Pet., 73. Accordingly, the TPUv2 and TPUv3 meet this

element.

**B.   Claim 3, 7, 9,**

　　　1)   *The device of claim 1, wherein the at least one first LPHDR*
　　　　　*execution unit comprises at least ten LPHDR execution units*

137.   Google's TPUv2 and TPUv3 boards meet this limitation. As discussed

above, each MXU contains 128x128 execution units: a total of 16,384 LPHDR

execution units in total per MXU. The TPUv2 board includes 1 MXU per core,

with 2 cores in a chip, and 4 chips on a board. Ex. 2016, 6. Thus, the TPUv2 board

contains $128 \times 128 \times 2 \times 4 = 131{,}072$ LPHDR execution units.

Singular's Exhibit No. 2051, IPR2021-00179
Page 059

IPR2021-00179
PATENT NO. 8,407,273



TPUv2 Board – Ex. 2046 (annotations added)

138.    The TPUv3 board contains 2 MXUs per core, 2 cores per chip, and 4 chips per board. Ex. 2016. Thus, a single TPUv3 board contains $128 \times 128 \times 2 \times 2 \times 4 = 262,144$ LPHDR execution units.

Singular's Exhibit No. 2051, IPR2021-00179
Page 060
APPX09710



TPUv3 Board – EX. 2046

139.    The MXU execution units perform multiplication at bfloat16 precision, and are not capable of performing full-precision multiplication, as I have discussed above.

### C.    Claim 5, 8, 10

1) *The device of claim 1, wherein the number of LPHDR execution units in the device exceeds by at least [ten/one hundred/five hundred] the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.*

140.    Based on my review of Google's public documents, and the documents Google has produced in this IPR proceeding, each core (whether TPUv2 or TPUv3) contains a Vector Unit (VPU). *Id.* Each VPU contains $128 \times 8 \times$

2 32-bit arithmetic logic units (ALUs), for a total of 2048 ALUs per core. Ex.

2046, 34.

141.    32-bit ALUs are adapted to perform the operation of multiplication on

32-bit numbers. With two cores per chip and 4 chips per board, each TPUv2 or

TPUv3 board contains $2048 \times 4 \times 8 = 16,384$ execution units that are adapted to

perform multiplication on 32-bit numbers.

142.    As I explain above, each TPUv2 board contains 131,072 LPHDR

execution units, and each TPUv3 board contains 262,144 LPHDR execution units.

Therefore, in both the TPUv2 and TPUv3 boards, "the number of LPHDR

execution units in the device exceeds" by at least 100,000 "the non-negative

integer number of execution units in the device adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide"

and each board therefore meets the "exceeds" limitations of the claims

### D.   Claim 11

*1)   The device of claim 8, wherein X=10%.*

143.    See above (mantissa of 7 bits gives at least 12% X).

### E.   Claim 12, 13, 14

*1)   The device of claim 8, wherein Y=[0.1%/0.15%/0.2%].*

144.    See above (mantissa of 7 bits gives at least 0.39% Y).

### F.   Claim 15, 16, 17

Singular's Exhibit No. 2051, IPR2021-00179
Page 062

APPX09712

1) *The device of claim 8, wherein X=10% and wherein Y=[0.1%/0.15%/0.2%].*

145.    See above (mantissa of 7 bits gives at least 12% X, and at least 0.39%

Y).

### G.    Claim 18

1) *The device of claim 8, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.*

146.    As discussed above, the bfloat16 format used in the TPUv2 and

TPUv3 boards contains 8 bits of exponent, which provides a dynamic range of

from roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000).

### H.    Claim 24

1)    *"The device of claim 1, wherein the device further comprises a digital processor adapted to control the operation of the at least one first LPHDR execution unit"*

147.

Google's TPUv2 and TPUv3 devices meet this limitation as well. Each TPU

device is controlled by a Core Sequencer, which in turn is controlled by a Host

Virtual Machine that is a program running on a CPU. Ex. 2016, 4-5.

148.    The CPU is a digital processor, and by running the Host VM and

issuing commands to the Core Sequencer, it controls the operation of the LPHDR

execution units within the MXUs.



Ex. 2016 (annotations added).



Ex. 2011.

Ex. 2045, 2.

## I.    Claim 36

149.   Claim 36 claims a device comprising at least one LPHDR execution unit with the same parameters as claim 1, with the added limitation that: "the number of LPHDR execution units in the device exceeds the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."

Singular's Exhibit No. 2051, IPR2021-00179
Page 064

150.  As discussed above with respect to claim 1, and with respect to claim 5, the TPUv2 and TPUv3 boards each include LPHDR execution units meeting claim 1's limitations. Moreover, the number of LPHDR execution units exceed the "non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" by over 100,000.  *See* above.

### J.    Claims 38, 42, 44

1)  *The device of claim 36, wherein the at least one first LPHDR execution unit comprises at least ten LPHDR execution units.*

151.  *See* above with respect to claims 3, 7, 9.

### K.    Claims 40, 43, 45

1)  *The device of claim 36, wherein the number of LPHDR execution units in the device exceeds by at least [ten/one hundred/five hundred] the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.*

152.  *See* above with respect to claims 5, 8, 10.

### L.    Claims 46-53

153.  See above with respect to claims 11-18.

## X.    CONCLUSION

154.  In signing this declaration, I recognize that the declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the United States Patent and Trademark Office. I also recognize that I may be

Singular's Exhibit No. 2051, IPR2021-00179
Page 065

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed this 9th Day of August, 2021

Respectfully submitted,

Sunil P Khatri, Ph.D.

Filed on behalf of Petitioner by:                              Paper No. __
    Elisabeth H. Hunt, Reg. No. 67,336
    Richard F. Giunta, Reg. No. 36,149
    Anant K. Saraswat, Reg. No. 76,050
    Adam R. Wichman, Reg. No. 43,988
    Nathan R. Speed, admitted *pro hac vice*
    WOLF, GREENFIELD & SACKS, P.C.
    600 Atlantic Avenue
    Boston, MA 02210
    (617) 646-8000 Phone
    (617) 646-8646 Fax

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

―――――――――

Case No. IPR2021-00179
Patent No. 8,407,273

―――――――――

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE[1]**

―――――――――

[1] Emphases in this paper are added unless otherwise indicated, and internal quotations, citations, and original alterations are omitted.

It is undisputed that Dockser's unit is "high dynamic range."

Dockser's unit also meets the "low precision" genus, because it performs reduced-precision operations—the very ***purpose*** of Dockser's design—and ***at least*** one such "first operation" meets the species in claim 1's "wherein" clause. Petition, 13-14; Dockser, [0014] ("the precision…may be reduced" to achieve "greater efficiency" and "significant power savings"); DI, 17 ("Petitioner…provides a detailed explanation" how Dockser "teach[es] the recited X and Y percentages of claim 1"); Ex. 1071 ("Goodin-Reply"), ¶¶ 5-6.

Singular told the district court that "LPHDR execution unit" should be construed identically to "execution unit" (Ex. 1065, 9), because "'low precision high dynamic range' is defined in claim itself" (Ex. 1066, 12). After the Petition demonstrated the claims unpatentable, Singular now alleges a narrow construction of LPHDR execution unit is needed to avoid "render[ing] the limitation meaningless." POR, 16. But as shown below, Singular's "construction" does not give meaning to the "construed" claim term at all—it ***repeats*** every word of the term verbatim and injects additional words (*e.g.*, "only").

| Claim | Singular's Construction (POR, 15) |
|-------|-----------------------------------|
| **low precision** **high dynamic range** (LPHDR) **execution unit** | an **execution unit** that executes arithmetic operations __**only**__ at **low precision** and with **high dynamic range**, wherein '**high dynamic range**' and '**low precision**' are defined according to the numerical requirements below |

26), fails because the Petition established that choosing *any* of those "precision levels Tong teaches for particular applications" would have been obvious "when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision." Petition, 41-43. Singular does not dispute that even 9 mantissa bits in Dockser's FPP meets the claimed low precision (Ground 1); thus each of the 5-bit through 9-bit selections motivated by Tong are low precision. Goodin-Reply, ¶ 29.

## III.   GROUND 3 – SINGULAR'S ARGUMENTS AGAINST DOCKSER/MACMILLAN FAIL

### A.   Motivation to Combine

Ground 3 uses Dockser's FPPs as the floating-point accelerators in MacMillan's massively-parallel SIMD architecture, "to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches," which benefits battery-operated devices. Petition, 47-48. Singular's assertion that each reference individually is "not focused on" the benefit the other undisputedly provides (POR, 35) fails to refute that the *combination* achieves both benefits.

Singular's assertion that Dockser's FPP would "increase costs" in MacMillan's system (POR, 35) rehashes a POPR argument and is "unsupported by any specific cost analysis." DI, 38-39. The conclusory expert testimony cited at POR, 35 "repeat[s] verbatim Patent Owner's argument without additional facts or

data…[and thus] is entitled to little or no probative weight." *Tyco Fire Prods. v. Victaulic*, IPR2016-00279, Paper 40 at 22 (June 12, 2017). Singular presents no **evidence** that Dockser's FPP would increase cost. Even if it had, that would be legally irrelevant because whether a "combination would not be made by businessmen for economic reasons" is not probative of nonobviousness. DI, 38-39 (quoting *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983)). Goodin-Reply, ¶¶ 30-31.

### B.    "Digital Processor"

MacMillan's Host CPU is a "digital processor adapted to control the operation of the…LPHDR execution unit[s]" as claimed, because it executes the program that "initiat[es]" "all SIMD processing" by the processing elements (PEs) containing Dockser's LPHDR execution units. Petition, 55. The Host CPU thus controls whether, when and how the LPHDR units operate, by "start[ing] the SIMD Controller" that "executes the SIMD program" that is provided by the CPU program and uses data provided by the CPU. MacMillan, 10:27-11:5, 13:12-62; Petition, 55; Ex. 1003, ¶¶ 401-405; Goodin-Reply, ¶¶ 32-35.

Singular's argument that MacMillan's Host CPU does not control the operation of the PEs because the SIMD Controller also does so (POR, 36-37) fails. The claim language is not limited to **direct** control or controlling anything beyond "operation of" the unit(s). In Singular's own embodiment, a host computing

device controls operation of the SIMD PEs by instructing an intermediate control unit (CU). '273 Patent, 8:12-31 ("Host computer 102" "is responsible for overall **control** of the computing system"), 8:60-64 ("Host 102…load[s] the instructions (the program) for the PEA 104 into the CU…, then instruct[s] the CU 106 to interpret the program and cause the PEA 104 to compute according[ly]"); Goodin-Reply, ¶¶ 36-37.



**'273 Patent, Fig. 1**

Moreover, Singular alleges Google's TPU meets the claimed "digital processor" via a CPU that "issu[es] commands to the Core Sequencer," thereby "control[ling] the operation of the LPHDR execution units."  POR, 70 ("Each TPU device is controlled by a Core Sequencer (which, **in turn**, is controlled by…a program running on a CPU).").  This is no different from MacMillan's Host CPU controlling PE operation by controlling the SIMD Controller.  Goodin-Reply, ¶ 38.

**C.     "Exceeds" Claims**

Certain dependent claims (hereinafter "'exceeds' claims") require "the number of LPHDR execution units" to exceed the number of "execution units…adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (hereinafter "32-bit EUs," as in DI, 32-33). Because the number of Dockser FPPs in Dockser/MacMillan exceeds the single Host CPU, the "exceeds" claims are met.

The Board correctly found "Dockser's FPPs do not count toward the number of 32-bit EUs" because Dockser's FPPs are LPHDR execution units.  DI, 32-33. As the Board noted, the specification "distinguish[es] between the two sets of units," describing 32-bit EUs as "traditional precision" units ("arithmetic elements…designed to perform…arithmetic of traditional precision"), whereas LPHDR units allow "precision [to] vary across implementations" and "produc[e] results that are 'sometimes' or 'all of the time' not closer than a certain amount to

the correct result." DI, 33-34 (citing '273 Patent, 26:50-27:4, 27:63-28:3). The "sometimes" at 26:50-27:4 is not tied to the claims' "X" limitation (contrary to POR, 34); that limitation (called "F" in the specification) has its own later paragraph at 27:29-62. Goodin-Reply, ¶¶ 39-41. *See also* '273 Patent, 27:5 (LPHDR units "hav[e] various possible degrees of precision"), 28:36-40 ("[T]he number NL of LPHDR elements…and the number NH of elements designed to perform…arithmetic of traditional precision…may be the total counts of the ***respective elements*** within that physical device.").

Singular says Google's (and the DI's) interpretation ignores the "at least" in the claim language. POR, 31. Not so. The "traditional precision" units that the specification distinguishes from LPHDR units perform "arithmetic" operation(s) on 32-bit numbers; Google's interpretation gives meaning to "at least the operation of ***multiplication***" by encompassing other 32-bit arithmetic operations besides multiplication. Goodin-Reply, ¶ 42.

Singular's assertion that the specification describes prior-art GPUs as having "multiple execution units" that each "can be both a full-precision [32-bit] multiplication execution unit and" perform low-precision operations (POR, 32-33) is unsupported. "When a graphics processor [GPU] includes support for 16 bit floating point, that support is ***alongside*** support for 32 bit floating point." '273 Patent, 5:31-40. NVIDIA's GPU (*id.*, 5:13), for example, had multiple parallel

streaming-processor (SP) cores that performed floating-point operations **only** at 32-bit precision, and far fewer **separate** components that "support[ed]" 16-bit floating-point data.  Goodin-Reply, ¶¶ 43-53 (citing Ex. 1073 ("Lindholm"); Exs. 1074-1075).  16-bit "support" conventionally meant **inputs** were 16-bit, and no evidence establishes that this meets the low precision of any claim.  Goodin-Reply, ¶ 46; *see supra* § I.C; *infra* § V.B.4.b.



Figure 2. Texture/processor cluster (TPC).

**Lindholm, Fig. 2 (annotated)**

POSAs would have understood the specification's statement that GPUs' "substantial resources to 32…bit arithmetic" were "wasteful of transistors" refers to the many traditional-precision-only units (*e.g.*, SPs) in GPUs that ***could not*** perform lower-precision operations.  Goodin-Reply, ¶¶ 54-55.

The specification is clear that the "exceeds" claims' 32-bit EUs are separate and distinguished from LPHDR units.  Dockser's FPP is the latter.

## IV.    GROUND 4

### A.    Dockser/Tong/MacMillan's Non-Customized Implementation

Singular's arguments against Ground 4's non-customized implementation rely entirely on the arguments "explained above" against Grounds 2-3 (POR, 37-38), which fail as discussed *supra* §§ II-III.

### B.    Dockser/Tong/MacMillan's Customized Implementation

Ground 4 also established all challenged claims obvious over an alternative implementation incorporating customized Dockser FPPs having no full-precision capability in MacMillan's architecture for use in "an embedded system designed specifically for signal processing" that never uses full precision.  Petition, 59-61.  This obvious implementation meets the "exceeds" claims even under Singular's interpretation.  Singular's arguments against this customized implementation fail.

Tong's alleged teaching that ***some*** "scientific programs" require full precision (POR, 40-41) is irrelevant.  Tong ***also*** says "not all programs need the precision provided by generic FP hardware," and for an "application-specific

task"—like the applications used in Ground 4's embedded signal-processing system—a "custom FP format may be a viable option." Tong, 278-280; Goodin-Reply, ¶¶ 56-57. Likewise, full-precision capability is not a "central tenet" of Dockser (contrary to POR, 41-42). As Petitioner noted and Singular did not dispute, Dockser ([0017]) says the input "register file" can be "formatted differently from IEEE 32-bit…, and/or may contain a different number of register locations." That is the customization Ground 4 applies for the "embedded applications" MacMillan (7:15-34) describes. Petition, 59-61; Goodin-Reply, ¶¶ 58-59.

Singular's conclusory allegation that the combination "would increase manufacturing costs" (POR, 42) is "unsupported by any specific cost analysis" (DI, 38-39) and legally irrelevant. *See supra* § III.A; Goodin-Reply, ¶ 60.

Singular's assertion that MacMillan "relies on…conventional components to reduce cost" (POR, 42-43) is unsupported. MacMillan "permits"/"allows" *some* of its "*memory*" to be "conventional" (MacMillan, 6:24-36), but does not limit other components (including floating-point units) to being "conventional." Goodin-Reply, ¶ 61; Khatri-Depo., 139-143 ("MacMillan has simply no opinion…on what's inside the PE"). In MacMillian's "embedded" systems (7:15-34), POSAs understood that components were conventionally customized to save space/power. Petition, 59-60; Goodin-Reply, ¶ 62; Ex. 1076, 1 ("[e]mbedded computers" "often

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.
————————————

Case No. IPR2021-00179
Patent No. 8,407,273
————————————

**REPLY DECLARATION OF RICHARD GOODIN**

Google Exhibit 1071
Google v. Singular
IPR2021-00179

31.    Dr. Khatri asserts that Dockser's FPP would "*increase* costs" in MacMillan's system.  Khatri, ¶ 104 (emphasis in original).  However, I have reviewed Dr. Khatri's declaration, and I find no evidence cited in Dr. Khatri's declaration to demonstrate that incorporating Dockser's FPP into MacMillan's system would increase cost ***at all***, much less to any appreciable degree.  Dr. Khatri says in ¶ 103 of his declaration that "Dockser's FPPs are even <u>larger</u> than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes" (emphasis in original).  But I find no evidence cited in Dr. Khatri's declaration that establishes that any size difference that may exist between Dockser's FPP and conventional units would increase cost, much less that any such increase would outweigh the cost decrease gained by Dockser's power savings.  Additionally, even if there were some cost increase, that does not mean there is no motivation to implement the combination for other beneficial reasons, such as those I discussed in my original declaration.  Goodin-Orig., ¶¶ 353-357.

**B.    "Digital Processor"**

32.    Dr. Khatri asserts that MacMillan's CPU in the Dockser/MacMillan combination does not meet the "a digital processor adapted to control the operation of the at least one first LPHDR execution unit" recited in the '273 Patent's claims.

operation of the at least one first LPHDR execution unit" would have understood that the claim language is not limited to ***direct*** control, and does not require controlling anything beyond "the operation of" the unit(s) (*e.g.*, whether, when and/or how the LPHDR units operate).

37.    In fact, a POSA would have understood that in the '273 Patent's own described embodiment, a host computing device controls operation of the SIMD PEs by instructing an intermediate control unit ("CU") (like MacMillan's SIMD Controller) to control the PEs. *See* '273 Patent, 8:12-31, 8:60-64. The '273 Patent states that the "SIMD computing system 100 [that] is illustrated in FIG. 1 … includes a collection of many processing elements (PEs) 104." *Id.*, 8:12-14. "The collection of PEs is referred to [in the patent] as 'the Processing Element Array' (PEA)." *Id.*, 8:16-18. A POSA would have understood that the "PEs" in the "PEA" are an embodiment of LPHDR execution units. *See*, *e.g.*, Goodin-Orig., ¶ 208. The ""Host computer 102 "is responsible for overall ***control*** of the computing system," which includes the LPHDR execution units (*i.e.*, the PEs). *Id.*, 8:60-64. Furthermore, the way that the host computer exercises this control is by instructing an intermediate "control unit (CU)" (*id.*, 8:15) to execute a program to control the PEs. *See id.*, 8:60-64 ("Host 102 typically will load the instructions (the program) for the PEA 104 into the CU instruction memory (not shown in FIG. 1), then instruct the CU 106 to interpret the program and cause the PEA 104 to

compute according to the instructions.").   As I explained in my original declaration (*e.g.*, Goodin-Orig., ¶¶ 402-403), the '273 Patent's control scheme is mirrored by the process MacMillan describes whereby "the uniprocessor program" running on the "Host CPU" "calls a system routine to start SIMD Controller execution," as a result of which "[t]he SIMD Controller 252 then executes the SIMD program."  MacMillan, 10:46-67; Goodin-Orig., ¶¶ 402-403 (citing, *e.g.*, MacMillan, 9:20-31, 10:27-30, 10:46-51, 10:66-67, 8:56-9:2, 10:44-45, 13:35, 10:44-49; '273 Patent, 8:29-30, 8:48-49, 8:60-64).



**'273 Patent, Fig. 1**

'sometimes' operate at lower precisions" (emphasis in original). In light of a POSA's understanding of prior-art GPUs, which I discuss above (*e.g.*, paragraphs 44-53), I disagree, and in my opinion a POSA would have disagreed. As I discussed above (*e.g.*, paragraphs 50-53), the parallel (SIMT) architecture of the GPUs the specification discusses, which contained the vast majority of the GPU's processing units, was composed of 32-bit-only units that ***could not*** perform lower-precision operations. A POSA would have understood the '273 Patent's specification's statement that "existing GPUs devote substantial resources to 32 … bit arithmetic and are wasteful of transistors" ('273 Patent, 5:38-40) is referring to the large number ("substantial resources") of traditional-precision-only units (*e.g.*, SPs) in the GPUs that could not sometimes perform lower-precision operations. Thus, the specification supports my opinion that the "exceeds" claims' 32-bit EUs are separate and distinct from LPHDR execution units, of which Dockser's FPP is the latter and not the former. *See* Goodin-Orig., ¶¶ 371-372.

## IV.    GROUND 4 – DOCKSER/TONG/MACMILLAN COMBINATION

### A.    Customized Implementation of Dockser/Tong/MacMillan Combination

56.    As I explained in my original declaration, the challenged claims of the '273 Patent are also met by an obvious alternative implementation of the Dockser/Tong/MacMillan combination that incorporates customized Dockser FPPs (customized in a manner having no full-precision capability) in MacMillan's

architecture for use in "an embedded system designed specifically for signal processing" that never uses full precision. Goodin-Orig., ¶ 422; *see also* Goodin-Orig., ¶¶ 418-428. This obvious implementation meets the "exceeds" claims and their dependents even if the "exceeds" claims were interpreted in the manner Dr. Khatri proposes in ¶¶ 90-100 of his declaration. For the reasons I explain in paragraphs 57-69 below, I disagree with Dr. Khatri's assertions that a POSA would not have been motivated to make this customized implementation.

57.    Dr. Khatri asserts that Tong teaches that ***some*** "scientific programs" "*inevitabl*[y]" require full precision in a generic system intended for all applications. Khatri, ¶ 111 (emphasis in original). Even if true, that assertion is irrelevant to the customized implementation of the Dockser/Tong/MacMillan combination, which is ***not*** a generic system intended for all applications. The customized implementation of the Dockser/Tong/MacMillan combination is an "an embedded system designed specifically for signal processing," that "only operate[s] at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential'" for all applications. Goodin-Orig., ¶ 422 (quoting Tong, 279). Whatever Tong may say about ***other*** "different … scientific programs" (Tong, 279), Tong ***also*** teaches that "not all programs need the precision provided by generic FP hardware," and "[f]or a narrow, application-specific task"—like the applications performed by

Dockser/Tong/MacMillan's embedded signal-processing system (Goodin-Orig., ¶ 422)—a "custom FP format may be a viable option." Tong, 278-280.

58.    Dr. Khatri asserts that "a central tenet of Dockser" is "to always be able to execute full-precision operations." Khatri, ¶ 114 (citing Dockser, [0003]). I disagree with Dr. Khatri's characterization of Dockser, and in my opinion a POSA would also have disagreed. The paragraph of Dockser that Dr. Khatri cites, paragraph [0003], states:

> The performance of floating-point arithmetic operations can entail computational **inefficiency** because floating-point processors are commonly limited to the precision provided by either the **single format, or both the single and double formats.** While **some applications <u>may</u> require these types** of precision, **other applications may not**. For example, some graphics applications may only require a 16-bit mantissa. For these graphics applications, any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption. This is of particular concern in battery operated devices where power comes at a premium, such as wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras, just to name a few. If it is known that an application always requires a certain reduced precision, the floating-point processor can be designed and built to that reduced precision. **For general purpose processors**, however, the common situation is that for certain applications, e.g. generating 3D graphics, a reduced precision may be acceptable, and **for other applications, e.g. implementing Global Positioning System**

> *(GPS) functions, a greater precision __may__ be needed*. Accordingly, there is a **need in the art for** a floating-point processor in which the **reduced precision, or subprecision**, of the floating-point format is selectable. Power management techniques may also be employed to ensure that that the floating-point processor does not consume more power than necessary to support the selected subprecision.

Dockser, [0003]. Thus, this paragraph nowhere states or suggests that to "always" execute full-precision operations is a "central tenet" of Dockser (Khatri, ¶ 114); rather, this paragraph teaches that *some* processors, *i.e.* "general purpose processors," "*may*" require full precision. Other types of processors (not intended to be "general purpose") may not.

59.    Moreover, as I noted in my original Declaration (*see* Goodin-Orig., ¶ 423), and which Dr. Khatri does not appear to dispute (*see* Khatri, ¶¶ 110-115), Dockser ([0017]) explicitly teaches that its input "register file" can be "formatted differently from IEEE 32-bit…, and/or may contain a different number of register locations." That is precisely the customization applied in Dockser/Tong/MacMillan in the "embedded applications" that MacMillan describes. Goodin-Orig., ¶¶ 418-428; MacMillan, 7:15-34.

60.    Dr. Khatri asserts that "[t]he removal of full-precision circuitry from the Dockser FPP … would increase manufacturing costs." Khatri, ¶ 115. I disagree, and in my opinion a POSA would have disagreed. I find no evidence

MacMillan, 6:24-36. However, a POSA reading MacMillan would have understood that MacMillan does not limit other components (including MacMillan's floating-point units—MacMillan, 12:55-56) to being "conventional."

62. Second, in the "embedded" systems that MacMillan (7:15-34) describes, POSAs understood that components were conventionally customized, for example to save space and power. For documentary evidence corroborating my testimony regarding a POSA's background knowledge in this regard, *see, e.g.*, Ex. 1076 ("Cooper")[3], page 1 ("[e]mbedded computers" "often employ idiosyncratic processors…designed…for a limited class of applications"), page 5 ("difference[s] between the embedded environment and more general computing environments"

---

[3] The indicia on the face of Cooper indicate that it was publicly accessible as early as 2003. For example, Cooper bears a date of "June 2003" (Cooper, cover page) and includes a statement that it had been deemed "releasable to the general public" by the "Air Force Research Laboratory" (Cooper, second page). Cooper also contains a "Report Documentation Page" (Cooper, third page) that lists a "Report Date" of "Jun 03." In my opinion, these indica, combined with Ex. 1079 and the fact that Cooper is dated years before the '273 Patent's 2009 claimed priority date, demonstrate that Cooper would have been publicly accessible prior to the '273 Patent's claimed priority date.

include "power and size constraints"); Ex. 1097 ("Miner"), 1:23-26 ("processors in embedded systems are often streamlined…to the purpose of the product device and are not configured to perform general-purpose computing"); Ex. 1077 ("Lienhart")[4], page 1 (in "special purpose computers" for "very specific problems," "arithmetic units are implemented which are optimally suited for the computation pattern of the problem."); Ex. 1078 ("Fang")[5], page 496 ("***Modern digital signal processing DSP applications*** are typically prototyped using ***floating-point arithmetic***, which offers both large dynamic range and high precision for each numerical computation.  However, ***for hardware implementations, the final form rarely uses a full-precision floating-point unit, given issues of silicon area, power, and speed***.").

63.    Dr. Khatri asserts that "Tong suggests 11 bits of precision for specific signal processing applications, and Petitioner provides no analysis of whether 11 bits of precision would meet the imprecision limitation."  Khatri, ¶ 116.  However, whether using 11 bits of precision would "meet the imprecision limitation" is

---

[4] Ex. 1080 demonstrates that Lienhart was publicly accessible as of 2002, prior to the '273 Patent's claimed priority date.

[5] Ex. 1081 demonstrates that Fang was publicly accessible as of 2003, prior to the '273 Patent's claimed priority date.

irrelevant, because the Dockser/Tong/MacMillan combination also uses other lower precision levels that Tong teaches. Tong teaches that embedded signal-processing programs "range in complexity" and can use different precision levels between 5 bits and 11 bits. Tong, 278-279; Goodin-Orig., ¶ 420. Dockser's precision is selectable, and in the embedded signal-processing system of Dockser/Tong/MacMillan, it would have been obvious to customize Dockser's FPP for the use of any of "the precision levels Tong teaches" for particular programs performed by an embedded signal-processing system. Goodin-Orig., ¶ 333. *See also* Goodin-Orig., ¶ 426 (noting that "the input signal and selected precision levels are unchanged" from my previous analysis of the Dockser, Dockser/Tong, and Dockser/MacMillan combinations), ¶ 420 ("Tong experimentally demonstrates that the optimum precision for a 'benchmark suite' (Tong, 284) of 'five signal processing applications' spanning a 'range in complexity' is between 5 and 11 mantissa fraction bits (Tong, 278-279).");, ¶ 421 ("A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels…in MacMillan's embedded signal-processing system"). Dr. Khatri does not dispute that the claimed imprecision limitation [1B2] is met by 5-bit through 9-bit precision, which are among the levels Tong teaches for various embedded signal-processing applications.

79.    Additionally, the use of a "large number" of execution units "capable of executing arithmetic operations *only* at low precision … in order to 'put more multipliers in the same chip area'" (Khatri, ¶ 127, emphasis original) was not novel.  Numerous prior-art references each individually taught using smaller, lower-bitwidth execution units to facilitate parallelization, as I explain in this paragraph and in paragraphs 80-83 below.  For example, Ex. 1088 ("Belanovic-Article"), explained that "[m]any image and signal processing applications benefit from acceleration with reconfigurable hardware," and that "[t]his acceleration results from the exploitation of fine-grained parallelism available in reconfigurable hardware."  Belanovic-Article, 657.  The article then taught that "[r]econfigurable implementations that exhibit speedup are possible if…a more flexible floating-point representation than full IEEE precision is used, thus allowing for greater parallelism."  *Id.*  The article then noted:

> Optimal implementations of algorithms frequently do not require the bitwidths specified by the IEEE standard. Often, much smaller bitwidths than those specified in the 754 standard are sufficient to provide the desired precision. Reduced bitwidth implementations require fewer resources and thus allow for more parallel implementations than using the full IEEE standard format.

Belanovic-article, 658.  Thus, a POSA would have understood that Belanovic-Article taught achieving "greater parallelism" and "more parallel implementations"

by using "reduced bitwidth implementations" that "require fewer resources."

Moreover, Belanovic-Article discloses a reduced-bitwidth high-dynamic-range

format with 6 exponent bits and 9 mantissa bits.  *See* Belanovic-Article, p. 663,

Table 2 (Format C2).  Ex. 1091 demonstrates that Belanovic-Article was publicly

accessible as of 2002, prior to the '273 Patent's claimed priority date.

     80.    As another example, Belanovic-Thesis (Ex. 1084) explained:

> Many ***image and signal processing applications benefit from
> acceleration*** with ***reconfigurable hardware***. This ***acceleration results***
> from the exploitation of fine-grained ***parallelism*** available in
> reconfigurable hardware. ***Custom circuits built for these applications
> in reconfigurable hardware process values*** in fixed ***or floating-point
> formats***.

Belanovic-Thesis, 9.  Belanovic-Thesis also explained that "[r]educing datapath

bitwidths to their optimal values enables design of more parallel architectures and

implementation of larger designs."  *Id.*, 13.  Belanovic-Thesis noted that prior

work showed that "implementing IEEE single precision operators was possible, but

also impractical on then current FPGA technology"; the reason was that "[a]rea

was the critical constraint."  *Id.*, 17.  Because of this, the authors of the prior work

discussed in Belanovic-Thesis "propose adopting smaller, custom formats which

may be more appropriate to FPGA architectures than the full IEEE formats,"

including a "(1-6-9)" format, which a POSA would have understood referred to 6

exponent bits and 9 mantissa fraction bits, since Belanovic-Thesis refers to "full 32 (1-8-23) bits in the IEEE standard" and IEEE single-precision has 8 exponent bits and 23 mantissa bits. *Id.*, 17-18. Belanovic-Thesis presented the results of an experiment in which arithmetic operation circuits using different number formats, including the 6-exponent-bit/9-fraction-bit format, were "synthesiz[ed]" (*i.e.*, implemented) on an FPGA. *Id.*, 46-47, Table 2.2 (annotated below). This table shows that the area of floating-point adders and multipliers ***decreases*** as bitwidth decreases, enabling more multipliers and adders to fit on a single chip. Thus, a POSA would have understood Belanovic-Thesis to teach fitting more adders and multipliers in parallel on a single chip by reducing their bitwidth in order to reduce their area. Finally, Belanovic-Thesis noted that higher parallelism may be achieved" using "bitwidths significantly lower than those of the IEEE formats." *Id.*, 70. Belanovic-Thesis noted (in 2002) that "future work" involving "custom floating-point formats" "may include algorithms that are highly parallel and have signal values that have a high enough range to require floating-point representation, yet are tolerant enough to accommodate [the] lower precision" of custom formats. *Id.*, 69-70.

Table 2.2: Operator synthesis results

| Format | Bitwidth | | | Area | | Per IC | |
|---|---|---|---|---|---|---|---|
| | total | exponent | fraction | fp_add | fp_mul | fp_add | fp_mul |
| A0 | 8 | 2 | 5 | 39 | 46 | 236 | 200 |
| A1 | 8 | 3 | 4 | 39 | 51 | 236 | 180 |
| A2 | 8 | 4 | 3 | 32 | 36 | 288 | 256 |
| B0 | 12 | 3 | 8 | 84 | 127 | 109 | 72 |
| B1 | 12 | 4 | 7 | 80 | 140 | 115 | 65 |
| B2 | 12 | 5 | 6 | 81 | 108 | 113 | 85 |
| C0 | 16 | 4 | 11 | 121 | 208 | 76 | 44 |
| C1 | 16 | 5 | 10 | 141 | 178 | 65 | 51 |
| C2 | 16 | 6 | 9 | 113 | 150 | 81 | 61 |
| D0 | 24 | 6 | 17 | 221 | 421 | 41 | 21 |
| D1 | 24 | 8 | 15 | 216 | 431 | 42 | 21 |
| D2 | 24 | 10 | 13 | 217 | 275 | 42 | 33 |
| E0 | 32 | 5 | 26 | 328 | 766 | 28 | 12 |
| E1 | 32 | 8 | 23 | 291 | 674 | 31 | 13 |
| E2 | 32 | 11 | 20 | 284 | 536 | 32 | 17 |

individual adder/multiplier area INCREASES with bitwidth

FEWER adders/multipliers per IC as bitwidth increases

**Belanovic-Thesis, Table 2.2 (annotated)**

81.    Another example is 1089 ("Hoefflinger").  Hoefflinger, a 1991 paper, related to a "digital logarithmic" (or "DIGILOG") multiplier, and explained that in the contexts of "real-time signal processing in systolic arrays," "neural networks," and "mathematical operations," there was "increasing interest" in "put[ting] many, possibly hundreds, of multipliers on a single application-specific chip." Hoefflinger, 16.7.1.  Hoefflinger further explained that "[m]inimisation of the product of multiplication time and chip area becomes the key figure of merit in this

context." *Id.* Hoefflinger "reported" a "multiplier" "which improves the time-area product basically by an order of magnitude and by even larger amounts, if actual system implementations are considered." *Id.* One of the multipliers that Hoefflinger "reported" used "10 bit logarithmic data" and yielded a 16 bit result, which could be "truncated at 8 bit," resulting in a "maximum accuracy of 10%." Hoefflinger, 16.7.3 ("The DIGILOG multiplier can be tailored to the particular system requirements. Several cases are listed in table 1. The most complex version uses 10 bit logarithmic data and yields a 16 bit result. It requires 800 transistors and 8 gate delays. If a maximum accuracy of 10 % is acceptable and the result is truncated at 8 bit, only 450 transistors and 6 gate delays are required."). Thus, a POSA would have understood that Hoefflinger disclosed using "10 bit logarithmic data" for "[m]inimisation of the product of multiplication time and chip area" to "put many, possibly hundreds, of multipliers on a single application-specific chip" in "real-time signal processing in systolic arrays, [and] neural network[s]." Ex. 1092 demonstrates that Hoefflinger was publicly accessible as of 1991, prior to the '273 Patent's claimed priority date.

82. Another example is Ex. 1077 ("Lienhart"). Lienhart, a 2002 paper, explained that in "typical FPGA designs,"

> *optimally suited calculation units with a high degree of parallelization can be designed, where a minimum amount of silicon is wasted* for modules in wait state. *This is possible if* the underlying

algorithm has a simple computation pattern which allows to design a special purpose calculation structure. ***Furthermore the required precision of operators must be small enough*** to enable an implementation.

Lienhart, page 1. Thus, a POSA would have understood Lienhart to teach that a "high degree of parallelization can be designed" if the "precision of operations [is] small enough." *Id.* Ex. 1080 demonstrates that Lienhart was publicly accessible as of 2002, prior to the '273 Patent's claimed priority date.

83. Another example is Ex. 1090 ("Shirazi"), a 1995 paper, which noted that while "conventional" "floating point operators require excessive area," "custom formats…can be implemented on a fraction of a single FPGA." Shirazi, Abstract ("Many algorithms rely on floating point arithmetic for the dynamic range of representations and require millions of calculations per second. Such computationally intensive algorithms are candidates for acceleration using custom computing machines (CCMs) being tailored for the application. Unfortunately, ***floating point operators require excessive area*** (or time) for conventional implementations. Instead, ***custom formats, derived for individual applications***, are feasible on CCMs, ***and can be implemented on a fraction of a single FPGA***."). Ex. 1093 demonstrates that Shirazi was publicly accessible as of 1995, prior to the '273 Patent's claimed priority date.

I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 11/01/2021


Richard Goodin

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 8,407,273
Filing Date: February 17, 2012
Issue Date: March 26, 2013

Inventor:  Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

_____

**PATENT OWNER'S SUR-REPLY TO PETITIONER'S REPLY**

Case No. IPR2021-00179

_____

any reason, other than hindsight,[2] that a POSA would select 5 bits over the 7, 9, or 11-bits, especially when Tong itself acknowledges that 11-bits is needed for reliable results across *all* the selected applications.  POR, 25-26.  The Reply similarly provides no such reasoning.  Reply, 8-9.

Indeed, Tong both implicitly and explicitly teaches a POSA that any useful computer system must *retain* full-precision capabilities.  For example, Tong teaches that "it appears inevitable that some fraction of our operands will require full IEEE-standard precision."  Tong, 280.  A person of ordinary skill in the art certainly would not have been motivated by these teachings to modify Dockser to operate only in 5-bit, 7-bit, or 9-bit modes, as Google erroneously suggests.

Accordingly, Ground 2 does not render any Challenged Claims obvious.

## III.    GROUND 3

### A.    Dockser/MacMillan Cannot Meet the "Exceeds" Limitation

To meet Claim 8, the number of LPHDRs in a device must "exceed by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers

---

[2] The Reply casts mantissa size as a "result-effective variable" but, as with the Petition and as discussed in the POR, provides no non-hindsight basis to choose any particular mantissa size.  POR 24-26.

that are at least 32 bits wide." '273 Patent, 30:34-38 (the "exceeds limitation").[3]  In

other words, the number of LEUs must be at least 100 greater than the number of

execution units adapted to execute at least the operation of multiplication on 32-bit

floating point numbers.  POR, 27-35.  Google has not sought to construe the exceeds

limitation.

Google also does not dispute that Dockser is adapted to execute multiplication

on numbers 32 bits wide.  POR, 28-30.  Reply, 12-15.

Instead, Google argues that if an execution unit is capable of executing low

precision high dynamic range operations (*e.g.*, a Dockser unit), that execution unit

cannot also be adapted to execute 32-bit operations.  Reply, 12 ("Because the number

of Dockser FPPs in Dockser/MacMillan exceeds the single Host CPU, the 'exceeds'

claims are met.").  In other words, Google's ***only*** argument that this limitation is met

by its cited art, is based on an unsupported and untenable construction that a unit

that performs low precision high dynamic range operations, cannot also be a unit

"adapted to execute at least the operation of multiplication on 32-bit floating point

numbers."

Google's argument thus imports an unsupported negative limitation into the

---

[3] Other claims have a similar limitation, differing only by the amount by which the

LEUs must exceed the 32-bit EUs.  (*E.g.*, claims 5, 10, etc.)

claim; in other words, Google argues that "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" actually means "execution units in the device **that are not LPHDR execution units and that are** adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide." There is no support for this negative limitation.

To support its construction argument, Google points to a part of the specification that distinguishes between units that are "designed to perform . . . arithmetic of traditional precision," and LEUs. Reply, 12; Pet., 50. This passage, however, does not support Google's construction of this "adapted to execute" term. While an LEU and a full precision unit are different things, this does not mean that a device capable of full precision operations (*i.e.*, "adapted to execute at least . . . operations on . . . numbers that are at least 32 bits wide") suddenly loses this capability whenever it happens to be programmed to perform low precision high dynamic range operations. That full precision capability remains no matter how the device is programmed.

Google also argues that because the specification states "a LPHDR arithmetic element produces results which are *sometimes* (or all of the time) no closer than 0.05% to the correct result", a 32-bit EU can therefore *never* produce inexact results. '273 Patent, 26:50-27:4. Singular does not dispute this statement—claimed LEUs

sometimes produce incorrect results.  However, Google makes a flawed logical leap from this uncontroversial statement to the incorrect conclusion that an execution unit capable of 32-bit multiplication—as claimed—can *never* produce incorrect results. Nothing in the passage cited above, or anywhere else in the patent's claims or specification, supports this logical fallacy.  The mere fact that an LEU *sometimes* produces inexact results does not mean that an execution unit *capable* of 32-bit multiplication can *never* produce inexact results if, for example, programmed differently.  The specification simply never contemplates, let alone reaches, such a conclusion.

Google's interpretation also improperly limits the applicability of the words "at least" in the term "at least the operation of multiplication," as Singular has previously explained.  POR, 31.  Google argues that its interpretation gives meaning to this claim language because it allows for the claim to encompass "other 32-bit arithmetic operations besides multiplication."  Reply, 13.  This argument is absurd, largely because the specification never compares counts of units that perform multiplication to counts of units that do not perform multiplication.  Singular's interpretation, on the other hand, while encompassing other 32-bit operations besides multiplication, also encompasses EUs that perform non-32-bit operations.  This is important because the specification *does* repeatedly compare counts of 32-bit precision execution units to counts of non-32-bit precision execution units (*see, e.g.,*

'273 Patent, 27:63-28:6).  By contrast, Google's interpretation arbitrarily excludes comparing counts of devices that support 32-bit operations, to counts of devices that do not support 32-bit operations, notwithstanding the specification's support for such comparisons.  POR, 33-34.

Finally, Google attempts to dismiss the specification's discussion of GPUs that support both 16- and 32-bit operations, and specifically the distinction drawn between such GPUs and the claimed LEU, by citing entirely new references (Exs. 1073-75).  Reply, 13-15.  The references are not cited in the prosecution history of the '273 Patent and are not relevant to what the inventor intended to claim.

For the reasons given above, Dockser and MacMillan cannot meet the plain language of the claim.  Google's interpretation of the "exceeds" limitation is entirely untethered from the specification, and its irrelevant extrinsic evidence cannot improperly alter the "exceed" claims' scope.

**B.    There Is No Motivation to Combine Dockser and MacMillan**

A POSA would not be motivated to combine Dockser and MacMillan because while MacMillan is focused on reducing cost, Dockser's specialized FPP is larger, and thus costlier, than even the full precision execution units used in Macmillan. POR, 35-36.

Google argues that Singular provided no evidence that incorporating Dockser would increase cost (Reply, 9-10), but Singular cited both its own and Google's

expert testimony that use of a Dockser FPP increased size and complexity, and therefore cost. POR, 35. It is also apparent to a POSA that a Dockser-like FPP that supports a wide range of precisions—including 32-bit precision—would be physically larger than a MacMillan-like FPP that supports *only* 32-bit precision, thus requiring more volume, more transistors, and a higher cost.

Google next argues that such cost concerns are not relevant to obviousness. Reply, 10. Singular's argument is not that it would be too costly to implement a Dockser/MacMillan combination, as in the cited *Farrenkopf* case. Instead, Singular's argument is that a POSA would not seek to introduce to MacMillan additional complexity and cost, in the form of Dockser FPPs, given MacMillan *is explicitly focused on reducing cost*. POR, 35-36.

## C. Dockser and MacMillan Fail to Disclose or Render Obvious the "Computing Device"

Google does not dispute that the Host CPU in MacMillan is optional, and that the SIMD controller actually controls the PEs. *See* Reply, 10-12. Thus, Google provides no basis for finding that MacMillan's CPU meets the "computing device" limitation of the claims. POR, 36-37.

## IV. GROUND 4

Neither Tong nor Dockser nor MacMillan suggest using in a MacMillan system a Dockser FPP modified by *physically removing* its full precision

capabilities.  POR, 38-43.  Google's Reply suggests that Tong states otherwise.  It does not.

Google's purported motivation comes from Tong's mention that for a "narrow, application-specific task, a single custom FP format may be a viable option."  Reply, 15-16.  Tong, however, immediately dismisses the idea in the next sentence:

> For a narrow, application-specific task, a single custom FP format may be a viable option. However, ***to be more generally useful***, ***we need to consider arithmetic architectures which can scale to different FP formats.*** Even though we may be able to assume that most of our operands can be computed successfully in limited precision***, it appears inevitable that some fraction of our operands will require full IEEE-standard precision***.

Tong, 280 (under section "Exploiting a Variable Bitwidth Multiplier") (emphasis added).  As explained in the POR, a POSA faced with Dockser's variable precision FPP, and Tong's variable precision teachings, would not discard both to create Singular's non-variable single precision (*i.e.*, low precision) device.  Google offers

no motivation to do so other than hindsight.[4] *See Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1298 (Fed. Cir. 2012) (affirming district court's rejection of "impermissible hindsight reasoning").

Indeed, Google's own Reply arguments show that a POSA would not remove Dockser's selectable and variable precision. Regarding Ground 2 for example, Google explains that a POSA would combine Tong and Dockser to select Tong's lowest mantissa (5 bits) explicitly ***because*** "Dockser's precision is selectable." Reply, 8 ("the Petition never argued that 'Tong Teaches Using ***only*** 5 Mantissa Bits.' Google also explains that 'Tong[]…would have motivated a POSA to configure Dockser's FPP to operate at the precision levels Tong teaches ***for particular applications***.'"). POR, 40-43.

---

[4] Google's statement that Dockser says its "'register file' can be 'formatted differently from IEEE 32-bit . . . and/or may contain a different number of register locations'" is irrelevant. The different formatting referred to is the mapping of the bits, not a change to a smaller number of bits. Dockser, [0017] (referring to changing from IEEE 32-bit to IEEE 64-bit double (*i.e.* using 2 32-bit registers) format). The different number of locations refers to changing from 16 total 32-bit registers to another number of 32-bit registers. *Id. See also* POR, 39 n.5.

**CONFIDENTIAL MATERIAL REDACTED**

work"); *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725-26 (Fed. Cir. 1990); *EIS GmbH v. Novoluto GmbH*, IPR2020-00007, Paper No. 41, 61 (P.T.A.B. Sep. 23, 2021). Both have concluded that there is no logical reason that skepticism of an invention after it has been invented is any less probative than skepticism before.

Google's remaining arguments about this issue rely on cherry-picked quotes from Google emails. Reply, 22-23. As shown in the POR, the evidence when taken as a whole clearly shows that Google was skeptical that the invention would be workable or useful. POR, 47-51. For example, ███████████████ ████████████████████████████████████████████ ████ POR, 50 (citing Ex. 2028).

Accordingly, the skepticism of Google's expert employees weighs in favor of non-obviousness. *WBIP*, 829 F.3d, 1335-36 ("If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness.").

## C.     Google's Praise Is Relevant Evidence of Non-obviousness

As set forth in the POR, Google's own employees, considered experts in the field, praised Dr. Bates's invention. POR, 51-52. Google argues that the praise itself "identifies no specific features." Reply, 23. There is, however, no requirement that praise identify exactly the features being praised. Here, the praise was directed to Singular's invention, as set forth ██████████████████. POR, 51-52. That is

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

GOOGLE LLC,
Patent Owner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

Patent No. 8,407,273
Filing Date: February 17, 2012
Issue Date: March 26, 2013

Inventor:  Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

**PATENT OWNER'S NOTICE OF APPEAL**

**Case No. IPR2021-00179**

Pursuant to 35 U.S.C. §§ 141, 142, and 319 and 37 C.F.R. §§ 90.2 and 90.3, Patent Owner Singular Computing LLC ("Singular" or "Patent Owner") hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered May 11, 2022 (Paper 57) and from all underlying orders, decisions, rulings, and opinions regarding U.S. Patent No. 8,407,273 (the "'273 patent") in Case No. IPR2021-00179. This notice is timely under 37 C.F.R. § 90.3 and Fed. R. App. P. 4(a)(3) having been filed within 63 days after the date of the Final Written Decision. For the limited purpose of providing the Director with the information requested in 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner anticipates that the issues on appeal may include, but are not limited to: the Board's claim constructions or determinations not to construe terms; its application of those constructions; any implied claim constructions; its obviousness determinations including that claims 1-2, 21-24, 26, 28, and 32-33 of the '273 patent are unpatentable under 35 U.S.C. § 103; any findings related to secondary considerations of non-obviousness; the findings, rulings and conclusions supporting or relating to those determinations; its order dismissing Patent Owner's Motion to Exclude; and any other issues decided adversely to Patent Owner in any orders, decisions, rulings, or opinions in IPR2021-00179.

Simultaneous with this submission, three (3) copies of this Notice of Appeal are being filed with the Clerk of the United States Court of Appeals for the Federal

Circuit and are being submitted electronically through the Court's CM/ECF system,

together with the requisite fee in the amount of $500.00. In addition, a copy of this

Notice of Appeal is being filed with the Patent Trial and Appeal Board and served

upon counsel of record for Google LLC.

<div align="right">

Respectfully submitted,

</div>

Dated: July 12, 2022          */Peter Lambrianakos                    /*
Peter Lambrianakos (Reg. No. 58,279)
Lead Counsel for Patent Owner
Vincent J. Rubino, III (Reg. No. 68,594)
Back-up Counsel for Patent Owner
Enrique W. Iturralde (Reg. No. 72,883)
Back-up Counsel for Patent Owner
Richard Cowell (Reg. No. 79,143)
Back-up Counsel for Patent Owner
**FABRICANT LLP**
411 Theodore Fremd Avenue
Suite 206 South
Rye, New York 10580
Telephone: 212-257-5797
Facsimile: 212-257-5796
Email: plambrianakos@fabricantllp.com
Email: vrubino@fabricantllp.com
Email: eiturralde@fabricantllpp.com
Email: rcowell@fabricantllp.com