**2022-1866, 2022-1867, 2022-1868**
**VOLUME II OF III; APPX01465-APPX06355**

# United States Court of Appeals
# for the Federal Circuit

**GOOGLE LLC,**
*Appellant*

v.

**SINGULAR COMPUTING LLC,**
*Appellee*

**Appeals from the United States Patent and Trademark Office,**
**Patent Trial and Appeal Board in Case Nos.**
**IPR2021-00155, IPR2021-00165, and IPR2021-00179**

**CORRECTED NON-CONFIDENTIAL JOINT APPENDIX**

Alfred R. Fabricant
Peter Lambrianakos
Vincent J. Rubino, III
Richard M. Cowell
FABRICANT LLP
411 Theodore Fremd Ave.
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797

James J. Foster
PRINCE LOBEL TYE LLP
One International Place
Suite 3700
Boston, MA 02110
(617) 456-8000

Nathan R. Speed
Gregory F. Corbett
Elisabeth H. Hunt
Anant K. Saraswat
WOLF GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 646-8000

Eugene M. Paige
KEKER, VAN NEST & PETERS LLP
633 Battery St.
San Francisco, CA 94111
(415) 391-5400

Asim Bhansali
Michael Kwun
KWUN, BHANSALI, LAZARUS LLP
555 Montgomery St., Suite 750
San Francisco, CA 94111
(415) 630-2350

*Counsel for Appellee Singular
Computing LLC*

*Counsel for Appellant Google LLC*

# TABLE OF CONTENTS
## NON-CONFIDENTIAL JOINT APPENDIX VOLUME I

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00155) | Appx1-88 |
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00165) | Appx89-173 |
| 5/11/2022 | Paper No. 57 | Final Written Decision (IPR2021-00179) | Appx174-260 |
| 9/17/2019 | Exhibit 1001 | U.S. Patent 10,416,961 (IPR2021-00155) | Appx261-290 |
| 12/22/2015 | Exhibit 1001 | U.S. Patent 9,218,156 (IPR2021-00165) | Appx291-319 |
| 3/26/2013 | Exhibit 1001 | U.S. Patent 8,407,273 (IPR2021-00179) | Appx320-348 |
| 7/15/2022 | | Notice Forwarding Certified Lists (IPR-2021-00155, 00165 and 00179) | Appx349-356 Appx453-456 Appx550-553 |
| 10/30/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00155) | Appx652 Appx669 Appx673-723 |
| 10/30/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00155) | Appx1039 Appx1057-1062 Appx1161 Appx1230 Appx1271-1273 Appx1275-1280 Appx1291-1292 Appx1298-1305 Appx1339 |

## NON-CONFIDENTIAL JOINT APPENDIX VOLUME II

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 10/30/2020 | Exhibit 1007 | U.S. Patent Application Published No. 2007/0203967 ("Dockser") | Appx1465-1475 |
| 10/30/2020 | Exhibit 1008 | Tong et. al, Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic, Vol. 8, No. 3, June 2000 | Appx1476-1489 |
| 10/30/2020 | Exhibit 1009 | U.S. Patent No. 5,689,677 ("MacMillan") | Appx1490-1504 |

1

| | | | |
|---|---|---|---|
| 10/30/2020 | Exhibit 1010 | U.S. Patent Application Published No. 2007/0266071 ("Dockser-Lall") | Appx1505-1514 |
| 5/12/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00155) | Appx3972-4010 |
| 7/5/2021 | Exhibit 2002 | Exhibit 2002 (Sealed) | Appx4049 Appx4051-4059 |
| 7/5/2021 | Exhibit 2003 | Exhibit 2003 (Sealed) | Appx4061 |
| 7/5/2021 | Exhibit 2004 | Exhibit 2004 (Sealed) | Appx4081 Appx4086 |
| 7/5/2021 | Exhibit 2005 | Exhibit 2005 (Sealed) | Appx4094 Appx4098 |
| 7/5/2021 | Exhibit 2006 | Exhibit 2006 (Sealed) | Appx4113 |
| 7/5/2021 | Exhibit 2007 | Exhibit 2007 (Sealed) | Appx4131 |
| 7/5/2021 | Exhibit 2009 | Exhibit 2009 (Sealed) | Appx4161 |
| 7/6/2021 | Exhibit 2011 | The Deep Learning Revolution and Its Implications for Computer Architecture and Chip Design - Jeff Dean 2020 - 1911.05289 | Appx4182 |
| 7/6/2021 | Exhibit 2014 | Exhibit 2014 (Sealed) | Appx4286 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx4578 Appx4616-4627 Appx4629-4632 Appx4635-4660 |
| 8/9/2021 | Exhibit 2026 | Exhibit 2026 (Sealed) | Appx4671 |
| 8/9/2021 | Exhibit 2027 | Exhibit 2027 (Sealed) | Appx4673 |
| 8/9/2021 | Exhibit 2028 | Exhibit 2028 (Sealed) | Appx4676 |
| 8/9/2021 | Exhibit 2029 | Exhibit 2029 (Sealed) | Appx4678 |
| 8/9/2021 | Exhibit 2030 | Exhibit 2030 (Sealed) | Appx4682 |
| 8/9/2021 | Exhibit 2031 | Exhibit 2031 (Sealed) | Appx4687 |
| 8/9/2021 | Exhibit 2032 | Exhibit 2032 (Sealed) | Appx4688 |
| 8/9/2021 | Exhibit 2033 | Exhibit 2033 (Sealed) | Appx4689-4690 |
| 8/9/2021 | Exhibit 2034 | Google AI with Jeff Dean | Appx4691 Appx4696 |
| 8/9/2021 | Exhibit 2035 | Exhibit 2035 (Sealed) | Appx4706 |
| 8/9/2021 | Exhibit 2036 | Exhibit 2036 (Sealed) | Appx4709 |
| 8/9/2021 | Exhibit 2037 | Build and Train Machine Learning Models on Our New Google Cloud TPUs | Appx4713 |

| 8/9/2021 | Exhibit 2038 | Google's Scalable Supercomputers for Machine Learning, Cloud TPU Pods, are Now Publicly Available in Beta | Appx4716 |
|---|---|---|---|
| 8/9/2021 | Exhibit 2039 | Exhibit 2039 (Sealed) | Appx4718 |
| 8/9/2021 | Exhibit 2042 | Exhibit 2042 (Sealed) | Appx4730 |
| 8/9/2021 | Exhibit 2043 | Deposition of Richard M. Goodin, dated July 30, 2021 | Appx4732-4733 Appx4739-4743 Appx4746 Appx4749-4750 |
| 8/9/2021 | Exhibit 2049 | Belletti, et al., Tensor Processing Units for Financial Monte Carlo | Appx4939 |
| 8/9/2021 | Exhibit 2050 | Exhibit 2050 (Sealed) | Appx4949 |
| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D. (Confidential Protective Order Material (IPR2021-00155) (Sealed) | Appx4950 Appx4963-4973 Appx4985-4986 Appx4988-4989 Appx4992-4993 Appx4996-4998 Appx5001 Appx5004-5014 Appx5016 |
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx5031 Appx5044 Appx5051-5058 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IPR2021-00155) | Appx5082 Appx5112 Appx5115-5116 Appx5131-5134 Appx5136-5138 Appx5153 Appx5174 |
| 11/1/2021 | Exhibit 1072 | Transcript of October 21, 2021, Deposition of Sunil P. Khatri (IPR2021-00155, IPR2021-00165 and IPR2021-00179) | Appx5178-5180 Appx5212 Appx5316-5318 |
| 11/1/2021 | Exhibit 1076 | Cooper, K.D., Code Optimization for Embedded Systems, Air Force Research Laboratory ("Cooper") | Appx5459 Appx5464 Appx5468 |
| 11/1/2021 | Exhibit 1077 | Lienhart et. al, Proceedings of the 10th Annual IEEE Symposium on Field-Programmable Custom | Appx5478 |

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| | | Computing Machines, 2002 ("Lienhart") | |
| 11/1/2021 | Exhibit 1078 | Fang et. al, Proceedings of the 2003 Design Automation Conference, 2003 ("Fang") | Appx5488 |
| 11/1/2021 | Exhibit 1097 | U.S. Patent No. 7,921,425 ("Miner") | Appx5913-5928 |
| 12/13/2021 | Paper No. 38 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material) (IPR2021-00155) (Sealed) | Appx5933 Appx5946-5952 Appx5955-5956 |
| 2/8/2022 | Exhibit 1098 | Petitioner's Demonstrative Exhibits (Confidential Protective Order Material) (IPR2021-00155, IPR2021-00165, IPR2021-00179) (Sealed) | Appx6066 Appx6086 |
| 4/6/2022 | Paper No. 56 | February 11, 2022 Hearing Transcript (Part 2: Public Redacted Version) (IPR2021-00155, IPR2021-00165, IPR2021-00179) | Appx6165-6166 Appx6184 Appx6206-6209 |
| 6/2/2022 | Paper No. 63 | Petitioner's Notice of Appeal (IPR2021-00155) | Appx6247-6248 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00155) | Appx6351-6355 |

## NON-CONFIDENTIAL JOINT APPENDIX VOLUME III

| FILING DATE | PAPER / EXHIBIT | DOCUMENT | APPX. NOS. |
|---|---|---|---|
| 11/5/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00165) | Appx6359 Appx6376 Appx6379-6430 Appx6442 |
| 11/5/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00165) | Appx6893 Appx6911-6916 Appx7120-7122 Appx7124-7129 Appx7140-7141 Appx7152-7159 Appx7194 |
| 5/13/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00165) | Appx7661-7702 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00165) (Sealed) | Appx7778 Appx7816-7828 Appx7830-7833 Appx7836-7862 |

| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D. (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx7873<br>Appx7886-7896<br>Appx7908-7909<br>Appx7911-7912<br>Appx7915-7916<br>Appx7919-7921<br>Appx7924<br>Appx7927-7938 |
|---|---|---|---|
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner Response (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx7953<br>Appx7966<br>Appx7973-7980 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IPR2021-00165) | Appx8004<br>Appx8034<br>Appx8037-8038<br>Appx8053-8056<br>Appx8058-8060<br>Appx8075-8080<br>Appx8096 |
| 12/13/2021 | Paper No. 38 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material (IPR2021-00165) (Sealed) | Appx8103<br>Appx8116-8122<br>Appx8126 |
| 6/2/2022 | Paper No. 63 | Petitioner's Notice of Appeal (IPR2021-00165) | Appx8229-8230 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00165) | Appx8326-8330 |
| 11/6/2020 | Paper No. 2 | Petition for Inter Partes Review (IPR2021-00179) | Appx8334<br>Appx8350<br>Appx8353-8406 |
| 11/6/2020 | Exhibit 1003 | Declaration of Richard Goodin (IPR2021-00179) | Appx8633<br>Appx8653-8658<br>Appx8879-8881<br>Appx8883-8888<br>Appx8896-8897<br>Appx8922-8929<br>Appx8963 |
| 5/14/2021 | Paper No. 16 | Trial Instituted Document (IPR2021-00179) | Appx9442-9482 |
| 8/9/2021 | Paper No. 28 | Patent Owner's Response (Confidential Protective Order Material) (IPR2021-00179) (Sealed) | Appx9558<br>Appx9595-9606<br>Appx9608-9611<br>Appx9614-9640 |
| 8/9/2021 | Exhibit 2051 | Declaration of Sunil P. Khatri, Ph.D (Confidential Protective Order Material) (IPR2021-00179) (Sealed) | Appx9651<br>Appx9664-9674<br>Appx9686-9687<br>Appx9689-9690<br>Appx9693-9694<br>Appx9696-9699<br>Appx9702-9715 |

| | | | Appx9717 |
|---|---|---|---|
| 11/1/2021 | Paper No. 34 | Petitioner's Reply to Patent Owner Response (Confidential Protective Order Material (IPR2021-00179) (Sealed) | Appx9732 Appx9745 Appx9752-9759 |
| 11/1/2021 | Exhibit 1071 | Reply Declaration of Richard Goodin ("Goodin-Reply") (IRP2021-00179) | Appx9783 Appx9813 Appx9816-9817 Appx9832-9835 Appx9837-9839 Appx9854-9859 Appx9875 |
| 12/13/2021 | Paper No. 39 | Patent Owner's Sur-Reply to Petitioner's Reply (Confidential Protective Order Material (IPR2021-00179) (Sealed) | Appx9893 Appx9906-9913 Appx9916 |
| 7/12/2022 | Paper No. 66 | Patent Owner's Notice of Appeal (IPR2021-00179) | Appx10118-10120 |

## CONFIDENTIAL MATERIAL OMITTED

The material redacted or omitted from this joint appendix on pages Appx38-43, Appx49, Appx126-131, Appx137, Appx211-216, Appx223, Appx4049, Appx4051-4059, Appx4061, Appx4081, Appx4086, Appx4094, Appx4098, Appx4113, Appx4131, Appx4161, Appx4286, Appx4636-4645, Appx4647-4649, Appx4671, Appx4673, Appx4676, Appx4678, Appx4682, Appx4687, Appx4688, Appx4689-4690, Appx4706, Appx4709, Appx4718, Appx4730, Appx4949, Appx5001, Appx5955-5956, Appx7837-7846, Appx7848-7850, Appx7924, Appx8126, Appx9615-9624, Appx9626-9628, Appx9702-9703 and Appx9916 is subject to a protective order issued by the Patent Trial and Appeal Board in IPR2021-00155, IPR2021-00165, and IPR2021-00179. The redacted material includes confidential e-mails and PowerPoint presentations that are subject to a non-disclosure agreement as well as quotes of those documents that appear in the parties' filings and expert declarations. All of the redacted or omitted material was filed under seal at the Patent Trial and Appeal Board.

US 20070203967A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2007/0203967 A1

Dockser (43) Pub. Date: **Aug. 30, 2007**

(54) **FLOATING-POINT PROCESSOR WITH REDUCED POWER REQUIREMENTS FOR SELECTABLE SUBPRECISION**

(76) Inventor: **Kenneth Alan Dockser**, Cary, NC (US)

Correspondence Address:
**QUALCOMM INCORPORATED**
**5775 MOREHOUSE DR.**
**SAN DIEGO, CA 92121 (US)**

(21) Appl. No.: **11/363,118**

(22) Filed: **Feb. 27, 2006**

**Publication Classification**

(51) Int. Cl.
*G06F* *7/38* (2006.01)

(52) U.S. Cl. .......................................................... **708/495**

(57) **ABSTRACT**

A method and apparatus for performing a floating-point operation with a floating-point processor having a given precision is disclosed. A subprecision for the floating-point operation on one or more floating-point numbers is selected. The selection of the subprecision results in one or more excess bits for each of the one or more floating-point numbers. Power may be removed from one or more components in the floating-point processor that would otherwise be used to store or process the one or more excess bits, and the floating-point operation is performed with power removed from the one or more components.



Google Exhibit 1007
Google v. Singular



FIG. 1

Patent Application Publication    Aug. 30, 2007    Sheet 2 of 4        US 2007/0203967 A1



FIG. 2

Case: 22-1866    Document: 56-2    Page: 12    Filed: 02/13/2023



FIG. 3A

Case: 22-1866      Document: 56-2      Page: 13      Filed: 02/13/2023



FIG. 3B

US 2007/0203967 A1                                                    Aug. 30, 2007

1

# FLOATING-POINT PROCESSOR WITH REDUCED POWER REQUIREMENTS FOR SELECTABLE SUBPRECISION

## BACKGROUND

[0001] Floating-point processors are specialized computing units that perform certain mathematical operations, e.g., multiplication, division, trigonometric functions, and exponential functions, at high speed. Accordingly, powerful computing systems often incorporate floating-point processors, either as part of the main processor or as a coprocessor. A floating-point representation of a number commonly includes a sign component, an exponent, and a mantissa. To find the value of a floating-point number, the mantissa is multiplied by a base (commonly 2 in computers) raised to the power of the exponent. The sign is applied to the resultant value.

[0002] The precision of the floating-point processor is defined by the number of bits used to represent the mantissa. The more bits in the mantissa, the greater the precision. The precision of the floating-point processor generally depends on the particular application. For example, the ANSI/IEEE-754 standard (commonly followed by modern computers) specifies a 32-bit single format having a 1-bit sign, an 8-bit exponent, and a 23-bit mantissa. Only the 23 fraction bits of the mantissa are stored in the 32-bit encoding, an integer bit, immediately to the left of the binary point, is implied. The IEEE-754 also specifies a 64-bit double format having a 1-bit sign, an 11-bit exponent, and a 53-bit mantissa. Analogous to the single encoding, only the 52 fraction bits of the mantissa are stored in the 64-bit encoding, an integer bit, immediately to the left of the binary point, is implied. Higher precision results in a higher accuracy, but commonly results in increased power consumption.

[0003] The performance of floating-point arithmetic operations can entail computational inefficiency because floating-point processors are commonly limited to the precision provided by either the single format, or both the single and double formats. While some applications may require these types of precision, other applications may not. For example, some graphics applications may only require a 16-bit mantissa. For these graphics applications, any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption. This is of particular concern in battery operated devices where power comes at a premium, such as wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras, just to name a few. If it is known that an application always requires a certain reduced precision, the floating-point processor can be designed and built to that reduced precision. For general purpose processors, however, the common situation is that for certain applications, e.g. generating 3D graphics, a reduced precision may be acceptable, and for other applications. e.g. implementing Global Positioning System (GPS) functions, a greater precision may be needed. Accordingly, there is a need in the art for a floating-point processor in which the reduced precision, or subprecision, of the floating-point format is selectable. Power management techniques may also be employed to ensure that that the floating-point processor does not consume more power than necessary to support the selected subprecision.

## SUMMARY

[0004] An aspect of a method of performing a floating-point operation with a floating-point processor having a precision format is disclosed. The method includes selecting a subprecision for the floating-point operation on one or more floating-point numbers, the selection of the subprecision resulting in one or more excess bits for each of the one or more floating-point numbers. The method further includes removing power from one or more components in the floating-point processor that would otherwise be used to store or process the one or more excess bits, and performing the floating-point operation with power removed from the one or more components.

[0005] One aspect of a floating-point processor having a precision format is disclosed. The floating-point processor includes a floating-point controller configured to select a subprecision for a floating-point operation on one or more floating-point numbers, the selection of the subprecision resulting in one or more excess bits for each of the one or more floating-point numbers. the floating-point controller being further configured to remove power from one or more components in the floating-point processor that would otherwise be used to store or process the one or more excess bits. The floating-point processor further includes a floating-point operator configured to perform the floating-point operation.

[0006] Another aspect of a floating-point processor having a precision format is disclosed. The floating-point processor includes a floating-point register having a plurality of storage elements configured to store a plurality of floating-point numbers, and a floating-point operator configured to perform a floating-point operation on the one or more of the floating-point numbers stored in the floating-point register. The floating-point processor further includes a floating-point controller configured to select a subprecision for a floating-point operation on said one or more of the floating-point numbers. the selection of the subprecision resulting in one or more excess bits for each of said one or more of the floating-point numbers, the one or more excess bits being stored in one or more of the storage elements of the floating-point register, and wherein the floating-point controller is further configured to remove power from the storage elements for the one or more excess bits.

[0007] A further aspect of a floating-point processor having a precision format is disclosed. The floating-point processor includes a floating-point register configured to store a plurality of floating-point numbers, and a floating-point operator having logic configured to perform a floating-point operation on the one or more of the floating-point numbers stored in the floating-point register. The floating-point processor further includes a floating-point controller configured to select a subprecision for a floating-point operation on said one or more of the floating-point numbers. the selection of the subprecision resulting in one or more excess bits for each of said one or more of the floating-point numbers, and wherein the floating-point controller is further configured to remove power a portion of the logic that would otherwise be used to process the one or more excess bits.

[0008] It should be understood that other embodiments of the floating-point processor, and of the method of performing floating-point operations, will become readily apparent to those skilled in the art from the following detailed

2

description, in which various embodiments of the floating-point processor and of the method of performing floating-point operations are shown and described by way of illustration. As will be realized, other and different embodiments of the floating-point processor and of the method of performing floating-point operations are possible, and the details used to describe these embodiments are capable of modification in many respects. Accordingly, the drawings and the detailed description are to be regarded as illustrative in nature, and not as restrictive.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0009]    FIG. 1 is a functional block diagram illustrating an example of a floating-point processor with selectable subprecision;

[0010]    FIG. 2 is a graphical illustration of an example of a floating-point register file used in a floating-point processor with selectable subprecision;

[0011]    FIG. 3A is a conceptual diagram illustrating an example of a floating-point addition performed using a floating-point processor with selectable subprecision; and

[0012]    FIG. 3B is a conceptual diagram illustrating an example of a floating-point multiplication that is performed using a floating-point processor with selectable subprecision.

## DETAILED DESCRIPTION

[0013]    The detailed description set forth below in connection with the appended drawings is intended to describe various embodiments of the present disclosure, but is not intended to represent the only embodiments in which the present disclosure may be practiced. The detailed description includes specific details, in order to permit a thorough understanding of the present disclosure. It will be appreciated by those skilled in the art, however, that the present disclosure may be practiced without these specific details. In some instances, well-known structures and components are shown in block diagram form, in order to more clearly illustrate the concepts of the present disclosure.

[0014]    In at least one embodiment of a floating-point processor, the precision for one or more floating-point operations may be reduced from that of the specified format. In addition, power management techniques may be employed to ensure that the floating-point processor does not consume more power than necessary to support the selected subprecision. Instructions provided to the floating-point processor to perform mathematical operations may include a programmable control field. The control field may be used to select the subprecision of the floating-point format and manage power consumption. By selecting the subprecision of the floating-point format, to that needed for a particular operation, thereby reducing the power consumption of the floating-point processor to support the selected subprecision, greater efficiency as well as significant power savings can be achieved.

[0015]    FIG. 1 is a functional block diagram illustrating an example of a floating-point processor (FPP) 100 with selectable subprecision. The floating-point processor 100 includes a floating-point register file (FPR) 110; a floating-point controller (CTL) 130; and a floating-point mathematical operator (FPO) 140. The floating-point processor 100 may

be implemented as part of the main processor, a coprocessor, or a separate entity connected to the main processor through a bus or other channel.

[0016]    The floating-point register file 110 may be any suitable storage medium. In the embodiment shown in FIG. 1, the floating-point register file 110 includes several addressable register locations 115-1 (REG1), 115-2 (REG2), . . . 115-N (REGN), each configured to store an operand for a floating-point operation. The operands may include, for example, data from a memory and/or the results of previous floating-point operations. Instructions provided to the floating-point processor may be used to move the operands to and from the main memory.

[0017]    FIG. 2 schematically illustrates an example of the data structure for a floating-point register file 110 used in a floating-point processor 100 with selectable subprecision, as described in conjunction with FIG. 1. In the embodiment illustrated in FIG. 2, the floating-point register file 110 includes sixteen addressable register locations, each register location being referred to with reference numeral 200 in FIG. 2 for convenience. Each register location 200 is configured to store a 32-bit binary floating-point number, in an IEEE-754 32-bit single format. In particular, each register location 200 contains a 1-bit sign 202, an 8-bit exponent 204, and a 24-bit fraction 206. It should of course be understood, however, that other embodiments of the floating-point processor 100 may include a floating-point register file 110 that is formatted differently from IEEE 32-bit single format (including but not limited to IEEE 64-bit double format), and/or may contain a different number of register locations.

[0018]    Referring back to FIG. 1, the floating-point controller 130 may be used to select the subprecision of the floating-point operations using a control signal 133. A control register (CRG) 137 may be loaded with subprecision select bits for example transmitted in the control field of one or more instructions. In a manner to be described in greater detail later, the subprecision select bits may be used by the floating-point controller 130 to reduce the precision of the operands. The subprecision select bits may also be used to turn off portions of the floating-point processor 100. By way of example, the subprecision select bits may be used to remove power from the floating-point register elements for the bits that are not required for the subprecision selected. The subprecision select bits may also be used to remove power from logic in the floating-point operator FPO 140 that is not used when the selected subprecision is reduced. A series of switches may be used to remove and apply power to the floating-point register elements and logic in the floating-point operator 140. The switches, which may be internal or external to the floating-point register 110 and the floating-point operator 140, may be field effect transistors or any other type of switches.

[0019]    The floating-point operator 140 may include one or more components configured to perform the floating-point operations. These components may include, but are not limited to, computational units such as a floating-point adder (ADD) 142 configured to execute floating-point add and subtract instructions, and a floating-point multiplier (MUL) 144 configured to execute floating-point multiply instructions. As seen in FIG. 1, each of the computational units ADD 142 and MUL 144 in the floating-point operator 140

is coupled to each other and to the floating-point register file **110** in a way as to allow operands to be transferred between the computational units, as well as between each computational unit and the floating-point register file **110**. The floating point operator may be coupled to the floating point register through individual connections **134**, **135**, **136**, **137**, **138** and **139**, as illustrated or may be coupled via a bus or any other suitable coupling. In at least one embodiment of the floating-point processor **100**, the output of any one of the computational units (ADD **142** and MUL **144**) may be the input of any other computational unit. The floating-point register file **110** may be used for storing intermediate results, as well as the results that are output from the floating-point operator **140**.

[0020] The adder **142** may be a conventional floating-point adder, configured to perform standard arithmetic operations in a floating-point format. The multiplier **144** may be a conventional floating-point multiplier, configured to perform floating-point multiplication. The multiplier **144** may implement with, by way of example, a Booth or modified Booth algorithm, and may include partial product generation logic that generates partial products, and a number of carry-save adders that add up the partial products.

[0021] While for simplicity only an adder **142** and a multiplier **144** are shown in FIG. 1, the floating-point operator **140** may also include other computation units (not shown), which are known in the art, and which are configured to execute other types of floating-point mathematical operations. These computational units may include, but are not limited to: a floating-point divider configured to perform floating-point divide instructions; a floating-point square-root extractor configured to perform floating-point square-root extract instructions; a floating-point exponential operator configured to execute floating-point exponential instructions; a floating-point logarithmic operator configured to perform instructions for calculating logarithmic functions; and a floating-point trigonometric operator configured to perform instructions for calculating trigonometric functions.

[0022] Different embodiments of the floating-point processor **100** may include only one, or some, or all of the computational units listed above. For example, the adder **142** and the multiplier **144** may each include one or more well-known conventional subunits such as aligners that align input operands, normalizers that shift the result into standard format, and rounders that round the result based on a specified rounding mode. Well-known circuit elements such as bit-inverters, multiplexers, counters, and combinatorial logic circuits are also included in the adder **142** and the multiplier **144**.

[0023] As illustrated in FIG. 1, the floating-point operator **140** is coupled to the floating-point register file **110** so that for each instruction of a requested floating-point operation, the relevant computational unit, i.e. the adder **142** or the multiplier **144**, can receive from the floating-point register file **110** one or more operands stored in one or more of the register locations REG1, . . . , REGN.

[0024] Upon receiving the operands from the floating-point register file **110**, one or more computational units in the floating-point operator **140** may execute the instructions of the requested floating-point operation on the received operands, at the subprecision selected by the floating-point

controller **130**. The output may be sent back to the floating-point register **110** for storage, as shown in FIG. 1.

[0025] In an embodiment of the floating-point processor **100**, a software selectable mode may be used to reduce the precision of the floating-point operations under program control or as explained above, the instructions provided to the floating-point processor **100** may include a programmable control field containing the subprecision select bits. The subprecision select bits are written to the control register **137**, which in turn controls the bit length of the mantissa for each operand during the floating-point operation. Alternatively, the subprecision select bits may be written to the control register **137** directly from any suitable user interface, including for example but not limited to a monitor screen/keyboard or mouse **150** shown in FIG. 1. In another embodiment of the floating-point processor **100**, the subprecision selection bits may be written to the control register **137** directly from the main processor, or its operating system. The control register **137**, which is shown in the floating-point controller **130**, may reside elsewhere as a stand-alone entity, integrated into another entity, or distributed across multiple entities.

[0026] The subprecision select bits may be used to reduce the precision of the floating-point operation. This may be achieved in a variety of ways. In one embodiment, the floating-point controller **130** may cause power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits. By way of example, if each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth. Power can be removed from the floating-point register elements for the remaining 14 fraction bits. If the subprecision for one or more instructions is increased to 16-bits, then the 15 MSBs of the mantissa will be required. In the latter case, power may be removed from the floating-point register elements for the 8 least-significant bits (LSBs) of the fraction.

[0027] In addition, the logic in the floating-point operator **140** corresponding to the excess mantissa bits do not require power. Thus, power savings may be achieved by removing power to the logic in the floating-point operator **140** that remains unused as a result of the subprecision selected.

[0028] FIG. 3A is a conceptual diagram illustrating an example of a floating-point addition operation with power being selectively applied to logic in the floating-point operator. In particular, FIG. 3A conceptually illustrates a floating-point addition operation with two input floating-point numbers **302** and **304**, each characterized by the selected subprecision, added together. For simplicity, it is assumed that the two numbers **302** and **304** have already been aligned, so that no shifting need be done. The floating-point addition operation in the full precision mode is performed through a succession of stages, referred to in FIG. 3A with reference numerals $310_1$, $310_2$, . . . , $310_i$, . . . $310_n$. In accordance with standard convention, the floating-point register stores in order the bits that make up each number, ranging from a rightmost LSB to a leftmost MSB. Each successive one of the stages moving from right to left across the FIG. 3A involves bits that have an increased significance compared to bits involved in the preceding stages.

4

[0029] In the example illustrated in FIG. 3A, the selected subprecision is represented with a line 305. Power may be removed from the logic used to implement each stage to the right of the line 305. The carry-out C from the last powered down stage 310; is forced to zero. Power is supplied only to the logic used to implement each stage to the left of the line 305. In FIG. 3A, the powered bits provided to the active stages of the floating-point operator are shown as Xs, using reference numeral 322, while the unpowered bits provided to the stages with power removed are shown as circles, using reference numeral 324.

[0030] FIG. 3B is a conceptual diagram illustrating an example of a floating-point multiplication operation with power being selectively applied to logic in the floating-point operator. The floating-point multiplication operation is performed in the floating-point multiplier MUL, shown in FIG. 1 with reference numeral 144. It is in the multiplier that a substantial amount of logic can be powered down, providing significant power savings. Binary multiplication as illustrated in FIG. 3B is basically a series of additions of shifted floating-point numbers. In the illustrated embodiment, binary multiplication is performed between a k-bit multiplicand 402 and a k-bit multiplier 404, using a shift-and-add technique. The shift-and-add technique may be replaced by a Booth's algorithm, or a modified Booth algorithm multiplier.

[0031] As in the case of floating-point addition, floating-point multiplication is performed in a series of stages, illustrated in FIG. 3B as 410-1, . . . , 410-m. Assuming for simplicity that Booth's algorithm is used, one partial product is generated for every bit in the multiplier 404, a partial product 420-i being generated during a corresponding stage 410-i. If the value of the multiplier is 0, its corresponding partial product consists only of 0s; if the value of the bit is 1, its corresponding partial product is a copy of the multiplicand. Each partial product 420-i is left-shifted as a function of the multiplier bit with which it is associated, after which the operation moves on to the next stage. Each partial product can thus be viewed as a shifted number. The partial product associated with bit 0 in the multiplier is left-shifted zero bits, and the partial product associated with bit 1 is left-shifted one bit. The partial products or shifted floating-point numbers 420-i are added together to generate the output value 430 for the multiplication.

[0032] In the embodiment illustrated in FIG. 3B, the selection of a desired reduced precision by the controller 130 is indicated with a line 405. As in the case of floating-point addition, described in conjunction with FIG. 3A, power may be removed from the logic used to implement the stages to the right of the line 405. Power is only applied to the stages that are actually needed to support the selected subprecision, i.e., the stages to the left of the line 405. In FIG. 3B, the bits provided to the powered logic are shown as Xs, while the bits provided to the powered down stages are shown as circles.

[0033] As seen from FIG. 3B, for the first partial product 420-1, the logic for a number of bits N, shown using reference numeral 402, is unpowered. For the second partial product, the logic for N−1 bits is unpowered, and so forth. For the m-th partial product or shifted floating-point number 420-m, the logic for a number (N−m+1) of bits, shown using

reference numeral 414, is unpowered. The number of bits N is chosen so that the precision of the remaining stages is not adversely affected.

[0034] The output value, resulting from the floating-point multiplication described above, has a width (i.e. number of bits) that is equal to the sum of the widths of the two input values 402 and 404 that are being multiplied together. The output value 430 may be truncated to the selected subprecision, i.e. any of the bits of the output value 430 that are in less the selected precision may be truncated, to generate a truncated output number characterized by the selected precision. Alternatively, the output value 430 may be rounded off to the selected precision. In either case the output bits less significant than the selected precision may also be unpowered.

[0035] The various illustrative logical units, blocks, modules, circuits, elements, and/or components described in connection with the embodiments disclosed herein may be implemented or performed in a floating-point processor that is part of a general purpose processor, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a field programmable gate array (FPGA) or other programmable logic component, discrete gate or transistor logic, discrete hardware components, or any combination thereof designed to perform the functions described herein. A general-purpose processor may be a microprocessor, but in the alternative, the processor may be any conventional processor, controller, microcontroller, or state machine. The processor may also be implemented as a combination of computing components, e.g., a combination of a DSP and a microprocessor, a plurality of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration.

[0036] The methods or algorithms described in connection with the embodiments disclosed herein may be embodied directly in hardware, in a software module executed by a processor, or in a combination of the two. A software module may reside in RAM memory, flash memory, ROM memory, EPROM memory, EEPROM memory, registers, hard disk, a removable disk, a CD-ROM, or any other form of storage medium known in the art. A storage medium may be coupled to the processor such that the processor can read information from, and write information to, the storage medium. In the alternative, the storage medium may be integral to the processor.

[0037] The previous description of the disclosed embodiments is provided to enable any person skilled in the art to make or use the present disclosure. Various modifications to these embodiments will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other embodiments without departing from the spirit or scope of the disclosure. Thus, the present disclosure is not intended to be limited to the embodiments shown herein, but is to be accorded the full scope consistent with the claims, wherein reference to an element in the singular is not intended to mean "one and only one" unless specifically so stated, but rather "one or more." All structural and functional equivalents to the elements of the various embodiments described throughout this disclosure that are known or later come to be known to those of ordinary skill in the art are expressly incorporated herein by reference, and are intended to be encompassed by the claims. Moreover,

nothing disclosed herein is intended to be dedicated to the public regardless of whether such disclosure is explicitly recited in the claims. No claim element is to be construed under the provisions of 35 U.S.C. §112, sixth paragraph, unless the element is expressly recited using the phrase "means for" or, in the case of a method claim, the element is recited using the phrase "step for."

What is claimed is:

1. A method of performing a floating-point operation with a floating-point processor having a maximum precision comprising:

selecting a subprecision less than the maximum precision for the floating-point operation on one or more floating-point numbers, the selection of the subprecision resulting in one or more excess bits for each of the one or more floating-point numbers;

removing power from one or more components in the floating-point processor that would otherwise be used to store or process the one or more excess bits; and

performing the floating-point operation with power removed from the one or more components.

2. The method of claim 1 further comprising using a floating-point register with a plurality of storage elements, the one or more excess bits being stored in one or more of the storage elements, and wherein the one or more components from which power is removed includes the storage elements for the one or more excess bits.

3. The method of claim 2 further comprising using a floating-point operator with logic to perform the floating-point operation, and wherein the one or more components from which power is removed includes a portion of the logic that would otherwise be used to process the one or more excess bits.

4. The method of claim 1 further comprising using a floating-point operator with logic to perform the floating-point operation, and wherein the one or more components from which power is removed includes a portion of the logic that would otherwise be used to process the one or more excess bits.

5. The method of claim 4 wherein the floating-point operation comprises addition.

6. The method of claim 5 further comprising forcing a carry-out from the portion of the logic to zero.

7. The method of claim 4 wherein the floating-point operation comprises multiplication.

8. A floating-point processor having a maximum precision comprising:

a floating-point controller configured to select a subprecision less than the maximum precision for a floating-point operation on one or more floating-point numbers, the selection of the subprecision resulting in one or more excess bits for each of the one or more floating-point numbers, the floating-point controller being further configured to remove power from one or more components in the floating-point processor that would otherwise be used to store or process the one or more excess bits; and

a floating-point operator configured to perform the floating-point operation.

9. The floating-point processor of claim 8 further comprising a floating-point register having a plurality of storage

elements, the one or more excess bits being stored in one or more of the storage elements, and wherein the one or more components from which power can be removed includes the storage elements for the one or more excess bits.

10. The floating-point processor of claim 9 wherein the floating-point operator comprises logic to perform the floating-point operation, and wherein the one or more components from which power can be removed includes a portion of the logic that would otherwise be used to process the one or more excess bits.

11. The floating-point processor of claim 8 wherein the floating-point operator comprises logic to perform the floating-point operation, and wherein the one or more components from which power can be removed includes a portion of the logic that would otherwise be used to process the one or more excess bits.

12. The floating-point processor of claim 11 wherein the floating-point operator includes a floating-point adder.

13. The floating-point processor of claim 12 wherein the floating-point operator is further configured to force a carry-out from the portion of the logic to zero when the power is removed.

14. The floating-point processor of claim 11 wherein the floating-point operator includes a floating-point multiplier.

15. A floating-point processor having a maximum precision comprising:

a floating-point register having a plurality of storage elements configured to store a plurality of floating-point numbers;

a floating-point operator configured to perform a floating-point operation on the one or more of the floating-point numbers stored in the floating-point register; and

a floating-point controller configured to select a subprecision less than the maximum precision for a floating-point operation on said one or more of the floating-point numbers, the selection of the subprecision resulting in one or more excess bits for each of said one or more of the floating-point numbers, the one or more excess bits being stored in one or more of the storage elements of the floating-point register, and wherein the floating-point controller is further configured to remove power from the storage elements for the one or more excess bits.

16. The floating-point processor of claim 15 wherein the floating-point operator comprises logic configured to perform the floating-point operation, and wherein the floating-point controller is further configured to remove power from a portion of the logic that would otherwise be used to process the one or more excess bits.

17. The floating-point processor of claim 16 wherein the floating-point operator includes a floating-point adder.

18. The floating-point processor of claim 17 wherein the floating-point operator is further configured to force a carry-out from the portion of the logic to zero when the power is removed.

19. The floating-point processor of claim 16 wherein the floating-point operator includes a floating-point multiplier.

20. A floating-point processor having a maximum precision comprising:

a floating-point register configured to store a plurality of floating-point numbers;

a floating-point operator having logic configured to perform a floating-point operation on the one or more of the floating-point numbers stored in the floating-point register; and

a floating-point controller configured to select a subprecision less than the maximum precision for a floating-point operation on said one or more of the floating-point numbers, the selection of the subprecision resulting in one or more excess bits for each of said one or more of the floating-point numbers, and wherein the floating-point controller is further configured to remove power from a portion of the logic that would otherwise be used to process the one or more excess bits.

21. The floating-point processor of claim 20 wherein the floating-register comprises a plurality of storage elements configured to store the floating-point number, the one or more excess bits being stored in one or more of the storage elements, and wherein the floating-point controller is further configured to remove power from the storage elements for the one or more excess bits.

22. The floating-point processor of claim 20 wherein the floating-point operator includes a floating-point adder.

23. The floating-point processor of claim 22 wherein the floating-point operator is further configured to force a carry-out from the portion of the logic to zero when the power is removed.

24. The floating-point processor of claim 20 wherein the floating-point operator includes a floating-point multiplier, and power is removed from portions of elements comprising partial products within the floating-point multiplier.

* * * * *

IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000    273

# Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic

Jonathan Ying Fai Tong, *Member, IEEE*, David Nagle, *Member, IEEE*, and Rob A. Rutenbar, *Fellow, IEEE*

*Abstract*—Low-power systems often find the power cost of floating-point (FP) hardware prohibitively expensive. This paper explores ways of reducing FP power consumption by minimizing the bitwidth representation of FP data. Analysis of several FP programs that manipulate low-resolution human sensory data shows that these programs suffer no loss of accuracy even with a significant reduction in bitwidth. Most FP programs in our benchmark suite maintain the same output even when the mantissa bitwidth is reduced by half. This FP bitwidth reduction can deliver a significant power saving through the use of a variable bitwidth FP unit. Our results show that up to 66% reduction in multiplier energy/operation can be achieved in the FP unit by this bitwidth reduction technique without sacrificing any program accuracy.

*Index Terms*—Analysis, computer-arithmetic, digital CMOS, low-power design, special low-power99.

## I. INTRODUCTION

FLOATING-POINT (FP) hardware provides a wide dynamic range of representable real numbers, freeing programmers from writing the cumbersome manual scaling code required of fixed-point representation. Unfortunately, FP hardware is very power hungry, with FP multipliers in particular being expensive components in a processor's power budget. This has limited the use of FP hardware, with most low-power processors not including any FP hardware. However, for an increasing number of embedded applications, such as voice recognition and image/vision processing, FP hardware's performance, simplified programming model, and adaptability over a wide dynamic range makes it a desirable feature.

One important characteristic of many of these mobile/portable applications is that they work primarily with low-resolution (4–10 bits) human sensory data, notably digitized speech and images. FP arithmetic allows many signal processing algorithms to process these acquired voice or vision data without concern about either the precision or range of intermediate results. Indeed, it remains common design practice [26] to prototype these algorithms in FP, then (usually manually) to translate them into an appropriate set of integer operations. In this study, we suggest that instead of rendering these computations as integer operations, we should translate them into custom-precision FP.

Specifically, we examine how software can employ the *minimal* number of mantissa and exponent bits in FP hardware to *reduce* power consumption, yet *maintain* a program's overall accuracy. We study experimentally the relationship between the accuracy of FP programs and the number of bits used in the representation of their data. Our central results demonstrate that many programs which manipulate human sensory inputs, e.g., speech and image recognition, suffer no loss of accuracy with reduced bitwidth in the mantissa or exponent. We use this result to explore various methods to minimize power dissipation in the FP unit. The fundamental principle is to reduce waste—in this case, unnecessary bits in the FP representation and computation.

Our results show that programs such as speech recognition and image processing use significantly less power with our reduced bitwidth FP representation than with an IEEE-standard FP representation. For example, the speaker-independent continuous-speech recognition program Sphinx [10] requires only 5 mantissa bits and 6 exponent bits to maintain 90% recognition accuracy—the same level of accuracy achieved with a 32-bit IEEE-standard FP representation. Compared to a conventional 32-bit FP multiplier, which uses 2078 pJ per multiplication in our implementation, our reduced bitwidth FP multiplier uses only 705 pJ, roughly one third the energy. It has long been known that many such signal processing applications can get by with less precision/range than full FP. Our central contribution here is precise documentation of the extremity of such allowable reductions across several real benchmarks. In many cases, fewer the half the bits, in an appropriate custom FP format, suffice.

The remainder of the paper is organized as follows. Section II provides background material on FP representation and algorithms. Section III constructs an ASIC-style FP multiplier for use as a baseline in subsequent experiments, and characterizes the power dissipation of its component pieces. Section IV offers a taxonomy of custom FP format variations, categorized by their potential impact on power. Section V describes experimental results from analysis of several real benchmark programs executing (in emulation) with reduced precision/range FP formats. This section also examines the utility of digit-serial variable-precision multipliers as a possible compromise when low-precision operands dominate, but higher precision operands cannot be entirely avoided. Section VI describes related work and examines in particular how transition-gating schemes recently proposed for integer arithmetic optimization perform in our FP workloads. Finally, Section VII offers some concluding remarks.

Manuscript received February 13, 1999; revised September 22, 1999. This work was supported in part by the National Science Foundation and by DARPA under Contract DAAL01-95-K-3527.

J. Y. F. Tong was with the Department of Electrical and Computer Engineering, Carnegie-Mellon University, Pittsburgh, PA 15213 USA. He is now with the M-Core Technology Center, Motorola, Austin, TX 78731 USA (e-mail: Jonathan.Tong@mot.com).

D. Nagle and R. A. Rutenbar are with the Department of Electrical and Computer Engineering, Carnegie-Mellon University, Pittsburgh, PA 15213 USA (e-mail: dnagle@ece.cmu.edu; rutenbar@ece.cmu.edu).

Publisher Item Identifier S 1063-8210(00)04346-8.

Google Exhibit 1008
Google v. Singular

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore. Restrictions apply.

APPX01476

274   IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000

## II. BACKGROUND

### A. FP Representation Versus Fixed-Point Representation

FP representation is by far the most widely used representation for real numbers. FP numbers provide a wide dynamic range of representable real numbers, freeing programmers from the manual scaling code necessary to support fixed-point operations. For instance, an IEEE single-precision number and an integer on a 32-bit machine both require 32 bits of storage for their representation. However, the dynamic range provided by the FP representation ($1.999\,999\,88 \times 2^{-126}$ to $1.999\,999\,88 \times 2^{127}$) is substantially wider than that provided by the integer representation ($1-2^{31}$).

On the other hand, FP hardware is very power hungry. In addition to performing the basic addition and multiplication operations as in the integer unit, the FP unit must process the exponents of the input operands as well as provide rounding to the final result. Typically, FP multipliers are expensive components in a processor's power budget. This has limited the use of FP operations in embedded systems, with many low-power processors not including any FP hardware. For example, recent digital signal processors (DSP's) introduced with FP hardware support seem to have met with limited success in the signal processing community [26].

For an increasing number of embedded applications such as voice recognition, vision/image processing, and other human-sensory-oriented signal-processing applications, FP's simplified programming model (in contrast with fixed-point systems) and large dynamic range makes FP hardware a desirable feature. Furthermore, many recognition applications achieve a high degree of accuracy starting from fairly low-resolution input sensory data. Leveraging these characteristics by allowing software to use the minimal number of mantissa and exponent bits, standard FP hardware can be modified to significantly reduce its power consumption while maintaining a program's overall accuracy.

### B. The IEEE 754 Standard

There are two different IEEE standards for FP computation. IEEE 754 is a binary standard that requires the implied radix (base) to be two. IEEE 854 allows either radix 2 or radix 10 representation. By far, IEEE 754 is more popular and most desktop microprocessors support the IEEE 754 standard.

One of the main concerns of the IEEE 754 Floating Point Standard [2] is the accuracy of arithmetic operations. IEEE-754 specifies that any single-precision FP number be represented using 1 sign bit, 8 bits of exponents, and 23 bits of mantissa. With double precision, the bitwidth requirements of exponent and mantissa go up to 11 and 53 bits, respectively. An IEEE single-precision number is represented in Fig. 1. Note that the exponent is a signed number represented using a bias method; for single-precision numbers the exponent is stored in excess-127 form.

In addition to specifying the bitwidth requirement for FP numbers, IEEE-754 incorporates several additional features, including delicate rounding modes and support for gradual underflow to preserve the maximal accuracy of programs. The implementation of an IEEE-compliant FP unit is not



FP value = $(-1)^s 2^{exponent} \times 1.$mantissa

Fig. 1.   Representation of single-precision IEEE FP number.

easy. In addition to the design complexity and the large area it occupies, an FP unit is also a major consumer of power in microprocessors. Many embedded microprocessors such as the StrongARM [3] and MCore200 [4] do not include an FP unit due to its significant implementation cost.

## III. POWER COMSUMPTION OF A SINGLE-PRECISION FP MULTIPLIER

To attack the power problem of the FP unit, we need a reasonable estimate of the power dissipation in different blocks of the unit. Since multiplication is one of the most frequent operations in signal processing applications and we claim that the multiplier is by far the most power hungry arithmetic unit, this section dissects the power dissipation of a single-precision FP multiplier. Subsequent sections use this FP multiplier as an illustration of our power reduction techniques, but the techniques apply to other blocks of the FP unit as well.

The FP multiplier (Fig. 2) can be divided into three major functional blocks: 1) the mantissa multiplier; 2) the exponent unit; and 3) the rounding unit (including normalization). Fig. 3, which is based on [5], shows one possible mantissa data flow for an FP multiplier. The top section (Multiply) accepts two normalized mantissas and uses a Wallace-tree reduction structure that produces the product in carry-save form (two $2n$ bit numbers). These two numbers are then added in the carry-propagate adder (CPA) section to produce a complete $2n$ bit product. If the resulting product is in the range $2 \leq \text{product} < 4$, we have a potential overflow and the constant $2^{(-n+1)}$ is added to the product and the result is truncated to $n-2$ bits to the right of the decimal point. A normalization shift (Normal) of 1 bit to the right is then necessary to restore the rounded product to the range $1 \leq \text{rounded product} < 2$, with an appropriate adjustment of the exponent. If the original $2n$ range $1 \leq \text{product} < 2$, then we need only add the constant $2^{(-n)}$. Furthermore, if the addition of $2^{(-n)}$ causes the rounded product to be equal to two, then a normalization shift of 1 bit and an exponent adjustment are necessary.

To estimate the power consumed in each of a multiplier's three main blocks (i.e., mantissa multiplier, exponent unit, rounding unit), we have adopted a standard ASIC-style design methodology and constructed a complete—though minimally optimized—FP multiplier. We synthesized a behavioral model of an FP multiplier using a standard cell-based design flow and then performed power simulation using a transistor-level simulator. Even though most FP units in microprocessors and DSP are custom-designed, our design provides usable estimates of the relative power dissipations among the different blocks inside an FP multiplier.

Our behavioral model of the FP multiplier was written in Verilog and based on the design of the Aurora III processor developed at the University of Michigan [6]. The model was

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.



Fig. 2.   Block diagram of a single-precision FP multiplier.



Fig. 3.   Mantissa data flow of an FP multiplier.

synthesized using Synopsys' Design Compiler tool and Foundation Library. Then, the synthesized netlist was fed into Duet's Epoch physical design tool to generate the physical design in a 0.5-$\mu$m CMOS process. The layout of the FP multiplier appears in Fig. 4. A SPICE netlist with all the capacitance information back-annotated was read into Synopsys' PowerMill tool to perform full transistor-level power simulation. Determining the complete power dissipated in a multiplier requires the sensitization of all possible combinations of inputs, which means we would need to have $2^{2N}$ input combinations where $N$ is the number of inputs. Fortunately, it is possible to estimate the *mean* power consumption using statistical techniques [13]. Applying these ideas, we simulated 50 batches of vectors with each batch containing 30 vectors in the Synopsys PowerMill tool; this was sufficient to ensure a 95% confidence interval. The correct cycle time was obtained from static timing analysis. The test vectors were taken from streams of actual multiplication operands found in the Sphinx III speech recognition application (discussed in Section IV-A).

Table I summarizes the average power consumption of the FP multiplier. The mantissa multiplier completely dominates the power, followed by the rounding unit which accounts for roughly one sixth of the power. We note that the power dissipation does vary significantly for different data sets; for example, in another experiment with just 100 random vectors the multiplier power consumption dropped to roughly two thirds of the total power and the rounder increased to about one quarter of the power. Nevertheless, the mantissa multiplier always consumes more power than all other blocks.

We interpret these results as follows. First, it is clear that a custom-designed FP unit, in contrast to our ASIC-style design, will have superior area, speed, power. Nevertheless, we argue that our ASIC experiment validates one clear design assumption: the mantissa multiplier itself dominates the power in an

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.

276                                                              IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000



Fig. 4.    Layout of the single-precision FP multiplier. This FP multiplier was synthesized and laid out using a conventional cell-based ASIC flow in a 0.5-$\mu$m CMOS process. The size of the multiplier is 1.09 × 1.15 sq mm.

FP multiplier. To reduce power dissipation, we should focus our efforts here. And, if we agree to interpret our data a bit more closely, the rounding unit is always the next most significant power consumer. We conclude that reducing power dissipation in these two units (multiplier, rounder) should be our priority. In the following sections, we examine different power reduction techniques specifically targeted at these two functional blocks.

## IV. ATTACKING FP POWER DISSIPATION AT A SYSTEM LEVEL

Considering the IEEE representation of FP numbers as described in Fig. 1, there are four dimensions that we can explore to reduce power dissipation, which are enumerated in Table II. We regard this as a rough taxonomy of format versus power tradeoffs. The question we seek to address is: what are the *quantitative* tradeoffs between program accuracy and the power consumption for the FP unit?

### A. Change of Implied Radix

The implied radix of the IEEE 754 standard is two. Nevertheless, a different implied radix, usually a higher radix that is a power of two, can be used. For example, historically, the IBM 360 mainframes used a radix of 16 to reduce the complexity of shift logic [25].

From a power perspective, a higher radix means less types of shifts and (potentially) fewer normalization shifts. There are basically two types of shift operations in FP operations: normalization shifts and prealignment shifts. Normalization shifts are needed after any arithmetic operations to put the final representation in a canonical format. Prealignment shifts are needed only in FP additions and subtractions to ensure the two numbers have the same exponent. Other researchers [7] have extensively evaluated the best shifter configuration for doing prealignment shifts.

As a preliminary experiment to assess the impact of using a higher radix, we used a software FP emulator to measure the number of normalization shifts when different radices are used. Our benchmarks were a large set of signal processing applications focusing on human sensory data, described in Section IV-A. The result shows that the number of normalization shifts is reduced by less than 10% for base 16, suggesting the potential for only a modest power reduction in the normalized shifter. We conclude that changing the implied radix is not a high-priority target for power optimization.

On the other hand, there does exist potential power savings in the prealignment shifter. Both [7], [8] show that a log shifter has a lower energy-delay product. For single-precision addition and subtraction, three muxes are needed in series for radix 2 representation while only two muxes are needed for radix 16 representation. This reduces the area, delay, and power of the barrel shifter.

### B. Simplifications of Rounding Modes

Whenever a FP number cannot be exactly represented, the number is rounded, introducing an error that is less than the value of the least significant bit (depending on rounding method). Because this error can be significant, especially for small numbers or when accumulated over a series of computations, the IEEE FP standard specifies four rounding modes for programmers to choose from. The default rounding mode is "round to nearest/even," which means always round to the nearest representable number, and in the case of a tie, round to the even representation. This rounding mode often involves a carry propagate addition that lies in the critical path of most FP operations. The other three optional modes are: "round to plus infinity," "round to minus infinity," and "chopped" (i.e., round-to-zero) which is equivalent to truncation. The hardware required to support the first two optional rounding modes is similar to the default "round to nearest," so there is little tradeoff in terms of power among these three rounding modes.

Chopped-mode (i.e., truncation), however, is an excellent candidate for potential power reduction. As Table I shows, the rounding unit (using the default rounding mode) consumes about one sixth of the FP multiplier's total power when running operands from a speech recognition benchmark. Using chopped-mode would eliminate almost all of this power consumption. However, truncating all results could compromise the final output accuracy of a program. As a simplistic initial experiment to assess the impact that chopped-mode has on accuracy, we evaluated the output of the SPEC95 benchmark suite [27], [28] compiled to use "chopped" rounding mode. Somewhat surprisingly, results show that seven out of the eight SPEC95fp double-precision benchmarks are independent of the rounding modes used (Table III). Therefore, disabling the rounding unit (e.g., by clock gating) could reduce total power.

Of course, we must emphasize that the effect of rounding will depend *strongly* on the input set and application. In mission critical applications, a sensitive numerical analysis of the required precision will be required. However, the experiment does suggest that there may be situations where a program's output is insensitive to the rounding modes and thus rounding may be

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore. Restrictions apply.

TABLE I
POWER CONSUMPTION OF SINGLE PRECISION FP MULTIPLIER

| Functional Block | Power Dissipation (% of total) |
|---|---|
| Mantissa Multiplier | 81.2 |
| Rounding Unit | 17.9 |
| Exponent Unit | 0.833 |
| Others (Exception handling etc.) | 0.066 |

TABLE II
DESIGN DIMENSIONS FOR FP REPRESENTATION

| Dimension | Description |
|---|---|
| Change of the implied radix | Increase the implied radix from 2 to 4 (or 16). This provides greater dynamic range but lower density of floating point numbers, potentially leading to power savings since fewer normalizing shifts are necessary. |
| Simplification of rounding modes | Full support of all the rounding modes is very expensive in terms of power. Some programs may achieve an acceptable accuracy with a modified low power rounding algorithm. |
| Reduction in mantissa bitwidth | Reduce the number of mantissa bits at the expense of precision. |
| Reduction in exponent bitwidth | Reduce the number of exponent bits at the expense of a smaller dynamic range. |

TABLE III
EFFECTS OF NO ROUNDING ON SPEC95 PROGRAMS. THE SPEC95 FP APPLICATIONS WERE COMPILED ON DIGITAL UNIX 4.0 USING f70. AN EXTRA COMPILER
FLAG "FPRM CHOPPED" IS ADDED SO TRUNCATION IS PERFORMED INSTEAD OF ROUNDING. "RUNSPEC-DFP" IS USED TO CHECK THE OUTPUT RESULTS

| Benchmark | Inputs | # of FP operations | Correct Output |
|---|---|---|---|
| mgrid | mgrid.in | 52,692 M | Yes |
| hydro2d | hydro2d.in | 18.739 M | Yes |
| applu | applu.in | 18,463 M | Yes |
| turb3d | turb3d.in | 35,596 M | Yes |
| fpppp | natoms.in | 64,807 M | Yes |
| wave5 | wave5.in | 11,435 M | No |
| tomcatv | tomcatv.in | 14,332 M | Yes |
| su2cor | su2cor.in | 14,630 M | Yes |

disabled—perhaps at the discretion of intelligent software control—to minimize power.

### C. Reducing Exponent and Mantissa Bitwidth

The most intuitive way of reducing the complexity of FP operations will be to reduce the number of bits in the FP representation. According to [1] and [9], a multiplier's power consumption decreases rapidly with the operand bitwidth. Therefore, reducing the operand bitwidth might provide huge opportunities in minimizing power.

Consider again a typical FP format: one sign bit, a relatively large fractional mantissa field, a relatively smaller exponent field. Since the sign is only 1 bit, we only examine the possibility of reducing the number of bits used in the exponent and the mantissa. As the following sections reveal, reduction in the mantissa bitwidth is the most effective means of reducing power dissipation in FP datapath elements.

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore. Restrictions apply.

278    IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000

TABLE IV
DESCRIPTION OF FP WORKLOADS

| Workload | Description | Accuracy Measurement |
|---|---|---|
| Sphinx III | CMU's speech recognition program based on fully continuous hidden Markov models. The input set is taken from the DARPA evaluation test set which consists of spoken sentences from the Wall Street Journal. [10] Source code size: 15,623 lines. | Accuracy is estimated by dividing the number of words recognized correctly by the total number of words in the input set. |
| ALVINN | Taken from SPECfp92. A neural network trainer using backpropagation. Designed to take input sensory data from a video camera and a laser range finder and guide a vehicle on the road. Source code size: 314 lines. | The input set consists of 50 road scenes and the accuracy is measured as the number of correct travel direction decisions made by the network. |
| PCASYS | A pattern-level finger print classification program developed at NIST. The program classifies images of fingerprints into six pattern-level classes using a probabilistic neural network. Source code size: 11,424 lines. | The input set consists of 50 different finger print images and the classification result is measured as percentage error in putting the image in the wrong class. The accuracy of the recognition is simply (1 - percentage error). |
| Bench22 | An image processing benchmark which warps a random image, and then compares the warped image with the original one. Source code size: 926 lines. | Percentage deviation from the original outputs is used as a measure of accuracy. |
| Fast DCT | A direct implementation of both 2-dimensional forward Discrete Cosine Transform (DCT) and inverse DCT on blocks of 8x8 pixels. Source code size: 1059 lines. | 100 random blocks of 8x8 pixels are transformed by forward DCT and then recovered by inverse DCT. Accuracy measured as percentage of correctly recovered pixels. |

## V. MINIMIZING POWER VIA BITWIDTH REDUCTION

It is obvious that power dissipation in an FP unit can be reduced by using fewer bits in the FP representation. However, fewer bits reduces precision and might result in a less accurate output. In this section, we first measure empirically the bitwidth requirements of several real programs, then suggest techniques for minimizing power dissipation by using smaller bitwidth functional units.

### A. Workloads and Methodology

To study the relationship between program accuracy and number of bits in FP representation, we have collected a set of five signal processing applications. These programs mainly deal with human sensory data such as digitized images and speech. All of them are single-precision FP programs and they are described in Table IV. As can be seen in the table, these range in complexity from single-purpose kernels to complete applications.

To determine the impact of different mantissa and exponent bitwidths, we emulated in software different bitwidth FP units by replacing each FP operation with a corresponding function call to our FP software emulation package that initially implements the IEEE-754 standard (Fig. 5). Careful modifications to the FP emulation package allowed us to emulate different mantissa and exponent bitwidths. Then, each program was run using the modified FP package, and the results were compared to determine application accuracy.



Fig. 5. FP emulation by annotating the source code.

### B. Results

Fig. 6 plots the accuracy for each of the five programs across a range of mantissa bitwidths. None of the workloads display a noticeable degradation in accuracy when the mantissa bitwidth is reduced from 23 to 11 bits. For ALVINN and Sphinx III the results are even more promising; the accuracy does not change significantly with as few as 5 mantissa bits.

Fig. 7 shows that each program's accuracy has a similar trend when the exponent bitwidth is varied. With seven or more exponent bits, the error rates remain quite stable. Once the exponent bitwidth drops below six, the error rates increase dramatically and in some cases the programs could not finish properly.

These results clearly demonstrate that not all programs need the precision provided by generic FP hardware. The reason behind this result is that many programs dealing with human interfaces process sensory data with intrinsically low resolutions. Raw input data with 4–10 bits of precision is rather common in these applications. While intermediate results often require

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.



Fig. 6.   Program accuracy across various mantissa bitwidths.



Fig. 7.   Program accuracy across various exponent bitwidths. Figs. 6 and 7 show that we can reduce both the mantissa and exponent bitwidth without affecting the accuracy of the programs. This effect is especially prominent in the mantissa. This reduction of bitwidth can be turned into a reduction in power dissipation with the use of appropriate arithmetic circuits.

more dynamic range than is available with small bitwidth fixed-point computation, the programs do not require vastly more precision. This is different from scientific programs such as large-scale computational fluid dynamics or electrical circuit simulation, which not only require a huge amount of precision and dynamic range but also delicate rounding modes to preserve the accuracy of the results. What is quite clear from these experiments is that the FP format provides essential dynamic range (we can reduce, but not reduce dramatically, the number of exponent bits) but the fine precision of the 23-bit mantissa is not essential (half as many bits often suffice).

For programs that do not need the dynamic range or the precision of FP arithmetic, the use of fixed-point arithmetic will reduce chip area, operation latency, and power consumption. Indeed, common design practice for these applications is to prototype software in FP, then translate into a suitable "finite" fixed-point representation [26]. But for the workloads in Table IV, three programs require 6 bits or more in the exponent to preserve a reasonable degree of accuracy, which means they need more than the typical 32 bits of precision that fixed point arith-

metic offers. Simply using fixed-point representation without additional (usually manual) scaling will not resolve the problem.

It should be noted that these complex applications were aggressively tuned by various software designers to achieve good performance using full IEEE representation. However, Figs. 6 and 7 show that significantly smaller bitwidth FP units can be used without compromising the necessary accuracy. For instance, certain FP constants in the Sphinx III code required more than 10 bits of mantissa to represent, but we modified those numbers so they could be represented using fewer bits during our experiment. Nevertheless (and perhaps somewhat surprisingly), these reductions in precision had little impact on the overall speech recognition accuracy. We believe that if the numerical behavior of these applications were tuned *explicitly* to a smaller bitwidth FP unit, we could obtain even better performance.

### C. Different Bitwidth Requirements Within a Single Application

The results in the previous section assumed a single custom FP format used across all FP operations. Clearly, this is a rather strict assumption. This section analyzes changing bitwidth requirements *within* a single program. Clearly, different subroutines within one program may require different bitwidths to produce the expected results. To illustrate this, we use the Fast DCT program as an example.

The Fast DCT program naturally divides into two subprograms: the *forward* DCT and the *inverse* DCT. Forward DCT converts a block of $8 \times 8$ pixels into a block of transform coefficients, which represents the spatial frequency components of the original block. Inverse DCT converts these coefficients back to a block of $8 \times 8$ pixels.

Fig. 8 shows the mantissa bitwidth requirements for forward DCT, inverse DCT, and the entire Fast DCT program. When the mantissa bitwidth in the Forward DCT section is varied, we keep the mantissa bitwidth in the inverse DCT section at 23 bits. Results show that both the forward DCT and the entire Fast DCT program require 11 bits of mantissa to maintain 100% accuracy

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.

280                                IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000



Fig. 8.   Program accuracy versus mantissa bitwidth for Fast DCT.

while the inverse DCT requires only 9 bits. All three programs (or subprograms) have exactly the same behavior (same program accuracy) when the exponent bitwidth is varied from 7 to 3 bits.

Even though the mantissa bitwidth requirements of forward DCT and inverse DCT are almost the same, the result shows that different sections of a program may indeed have different bitwidth requirements. This can be exploited to reduce power dissipation: when forward DCT is being executed on a processor, an 11-bit mantissa multiplier/adder is required, while a 9-bit mantissa multiplier/adder will be enough for inverse DCT operations.

Since both the forward DCT and inverse DCT use the same basic algorithm, their bitwidth requirements differ only a little. For programs that integrate a wider portfolio of different algorithms, we expect a wider range in the bitwidth requirements within the program.

### D.  Exploiting a Variable Bitwidth Multiplier

Our results show that different FP programs exhibit differing requirements for mantissa and exponent bitwidths. Hence, by reducing either precision or range from 32 to fewer bits, we should be able to create custom FP hardware which have lower power simply because of the bit reductions. For a narrow, application-specific task, a single custom FP format may be a viable option. However, to be more generally useful, we need to consider arithmetic architectures which can scale to different FP formats. Even though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears inevitable that some fraction of our operands will require full IEEE-standard precision. As one potential solution, we explore in this section one architecture for a *variable bitwidth FP multiplier* to reduce power consumption. To support variable bitwidth multiplications (up to 24 × 24 bit), we considered a 24 × 8 bit *digit-serial* architecture similar to the one described in Hartley and Parhi [12]. The 24 × 8 bit architecture (see Fig. 9) allows us to perform 8-, 16-, and 24-bit multiplication by passing the data once, twice, or three times though the serial multiplier. A finite state machine is used to control the number of iterations through the core multiplier. The digit

size of the digit-serial architecture does not have to be fixed. We chose a digit size of 8 bits because most processors support bus widths which are multiples of eight. It is already well understood that digit-serial arithmetic offers some power advantages (e.g., [14] offers a comparative analysis of power consumption among different digit-serial architectures). Hence, digit-serial multiplication seems well suited to our application.

To perform accurate comparisons, a complete 24 × 8 digit-serial multiplier was modeled in Verilog and then taken to layout using our previously described ASIC design flow, using a standard 0.5-$\mu$m CMOS process. Synopsys' Design Compiler tool was used to synthesize the multiplier's control logic; the complete physical design was done using Duet's Epoch layout tool.

We compare our variable bitwidth multiplier with a baseline fixed-width 24 × 24 bit Wallace tree multiplier. The layout of this Wallace tree multiplier was generated by Epoch's procedural cell generator in the same 0.5-$\mu$m process used in the design of the digit-serial multiplier. The two multipliers are described in Table V. Cycle time is estimated using Epoch's static timing analysis tool, Tactic, and is rounded to the nearest 5-ns interval for simplicity. The lower precision digit-serial design is slightly larger, since it includes control logic, and was also created in an ASIC style, in contrast to the larger Wallace tree, which is from an optimized layout compiler. Nevertheless, the digit-serial design is considerably faster, since the lowered precision (8 × 24 versus 24 × 24) creates shallower logic.

To compare energy or power, we need to make several assumptions. Assuming to first order that the multiplier core itself is the dominant energy consumer, we will focus here. Also, we do not consider here any global cycle-time impacts. Clearly, if we replace a 24 × 24 multiplier with a faster 8 × 24 multiplier, for 8- and 16-bit operands, our FP multiplier may well consume less of the overall cycle time. We might be able to shorten the cycle time if the FP multiplier is on the critical path, and if we know that 24 × 24 multiplications are rare, we can simply mandate an extra cycle. (Note again from Table V that the digit-serial multiplier is only advantageous for precisions less than full 24 × 24 bit multiplication.) But, an alternative scenario is to leave the cycle time constant, and simply slow down the lower precision multiplier (via circuit redesign, e.g., [29]) to the same delay as the full-precision multiplier. Operating at lower precision and lower speed, this multiplier will consume even less power. We choose for now to avoid these questions and tradeoffs and simply focus on the multiplier cores themselves. To sidestep these cycle time issues, we choose to focus on multiplier *energy/operation* as our metric of comparison.

Our specific goal is a first-order analysis of the energy impact of reducing mantissa precision. To do this, we look first at energy/operation as the comparison metric and assume each multiplier simply operates at the speeds determined via static timing analysis in Table V. For each design, a SPICE netlist was generated from layout and used to estimate energy/operation, using the same statistical methodology as was used for the baseline FP multiplier in Section III (i.e., 95% confidence intervals, stimuli from the Sphinx III speech workload).

Fig. 10 plots the energy/operation and latency/operation for the digit-serial multiplier. Both the energy/operation and latency/operation increase linearly with the operand bitwidth.

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.



Fig. 9.    Block diagram of a 24 × 8 digit-serial multiplier.

TABLE  V

TIMING AND AREA OF THE TWO MULTIPLIERS. TO PERFORM 16-BIT MULTIPLICATION USING THE DIGIT-SERIAL MULTIPLIER, TWO CYCLES ARE NEEDED WHICH INCREASES THE TOTAL DELAY/OP TO 30 ns. SIMILARLY, 24-BIT MULTIPLICATION TAKES THREE CYCLES (45 ns)

| Multiplier | Area | Cycle Time | Latency/op |
|---|---|---|---|
| Wallace (24x24) | .777square mm | 40ns | 40ns |
| Digit-Serial (24x8) | .804 square mm | 15ns | 15ns |



Fig. 10.    Performance of the digit-serial multiplier. Both energy/op and latency/op of the digit-serial multiplier increase linearly with the operand bitwidth. Digit-serial architecture allows us to perform variable bitwidth arithmetic and save power when the bitwidth requirement is less than that specified in the IEEE standard.



Fig. 11.    Estimated multiplier energy reduction using digit-serial multiplier. A reduction of up to 66% in energy/op is attainable for Sphinx and ALVINN with the use of a digit-serial multiplier. Both Sphinx and ALVINN need only 5 bits of mantissa to be 90% accurate, and thus an 8-bit operand bitwidth is used for the digit-serial multiplier. PCASYS requires 11 bits of mantissa while Bench22 requires 9 bits, and thus a 16-bit operand bitwidth is used which results in a 30% energy/op reduction.

This is due in part to the fact that we use a Wallace-tree structure, rather than an array multiplier [9] (for which energy savings are more dramatic as bitwidth decreases). Also, we require extra random logic for control of the multiple passes through the digit serial structure for larger width operands. This additional energy is the penalty we pay for the flexibility of doing variable bitwidth multiplication.

For 8-bit multiplication, the digit-serial multiplier consumes 78% less energy than the 24 × 24 Wallace tree multiplier (in the case of Sphinx and ALVINN). When 9–16 bits of the mantissa are required (in the case of Fast DCT, PCASYS and Bench22), the digit-serial multiplier still consumes 32% less energy than the 24 × 24 Wallace tree multiplier. The digit-serial multiplier

does consume 19% more energy when performing 24-bit multiplication due to the overhead circuitry.

Fig. 11 shows a simple estimate of the potential energy savings in the FP multiplier for our five programs if we use the digit-serial multiplier as the mantissa multiplier. The data is based on the estimate that a 24-bit Wallace tree multiplier consumes 80% of the total energy in a single-precision FP multiplier. (We have taken the data from Table I and simply rounded the multiplier core's contribution to 80%.) A reduction of 66% in multiplication energy/op is attainable for Sphinx and ALVINN with the

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.

282                                    IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000

Set Bitwidth = $B_i$ (where $B_i$ is the lower bound on data bitwidth)

do {

    Run the program with $B_i$

    Error = Run Result - Expected Result

    Increase $B_i$

} while (Error > Error Threshold)

Fig. 12.    Calculating necessary FP bitwidth for an arbitrary program.

use of a digit-serial multiplier. Both Sphinx and ALVINN need only 5 bits of mantissa to be 90% accurate, and thus an 8-bit operand bitwidth is used for the digit-serial multiplier. PCASYS requires 11 bits of mantissa while Bench22 requires 9 bits, and thus a 16-bit operand bitwidth is used; this results in a 30% energy/op reduction.

These comparison results, though still clearly approximate, do suggest that significant energy savings are achievable by using lower precision arithmetic. Of course, our digit-serial multiplier was designed using an ASIC approach and was not as heavily optimized physically as the Wallace tree multiplier, which was compiled/optimized for the process, and digit-serial arithmetic is only one architectural alternative here. Given the decreasing cost of silicon area, and the small size of a reduced precision FP unit, one might imagine simply including both full and reduced precision FP units, and using appropriate sleep-mode circuit techniques to shut down the unused unit. Assuming a richer, less homogenous arithmetic substrate for power-optimized computation naturally suggests opportunities for compiler support, i.e., exposing a more diverse set of precision/speed/power tradeoffs and allowing software developers to choose appropriately. We briefly treat this idea in Section VI.

*E. Software-Assisted Bitwidth Reduction*

Since different applications require different algorithms to determine program accuracy, software support is desirable in order to harness the benefits of this bitwidth reduction technique. This can be done by the programmer—but can be assisted greatly by the compiler.

There are two approaches that the programmer can take. For applications where the bitwidth requirement is known in advance, the programmer can annotate the source code explicitly or modify the declaration of the data types. For instance, since Sphinx requires only 5 bits of mantissa and 6 bits of exponents to maintain 90% of recognition accuracy, the programmer can simply choose an appropriate, available lower precision FP format. Given this information, the compiler can then optimize the object code for power. In applications where there is no prior knowledge of the required bitwidth, the programmer can insert an error analysis procedure [15] which adjusts the data bitwidth during data profiling (analogous to self-adjusting bit-precision techniques applied in low-power digital filters [16]). This is illustrated in Fig. 12. The final $B_i$ will be the minimum bitwidth that can satisfy the accuracy requirement for that specific data set.

In situations where the error analysis routine is too complicated or where the program users have no comprehensive

knowledge of its algorithms, a compiler can be used to annotate the source code and find at least the approximate bitwidth requirement automatically, assuming a comprehensive data set is available.

To demonstrate the possibility of compiler assisted bitwidth reduction, we added a compiler pass to the SUIF research compiler [30] to help us find the bitwidth requirement of FP programs. SUIF was developed at Stanford with the objective of providing a research vehicle that allows compiler researchers to implement their ideas without having to write a new compiler from scratch. After every step in the SUIF compilation process, a standard format is written out. This allows us to insert any optimization in a separate compiler pass.

We modified SUIF by inserting a pass that annotates the source code of FP programs. For every FP operation, the input operands were masked with the desired bitwidth. This is analogous to what we have done manually in Section IV-B. Of course, masking is an unsubtle approach to precision reduction: by zeroing low-order mantissa bits, we prevent the rounding mechanisms from correctly propagating bits up into the higher order bits we retain. Nevertheless, as an experiment this does provide some flavor of the sorts of optimizations we believe should be possible given a more diverse arithmetic substrate. Starting from the original bitwidth specified in the IEEE standard, the program was executed using a representative input set. The output was then compared with the expected result. If the results match, the bitwidth was reduced and the program was again executed using the same input set. This iterative process continues until the minimum bitwidth that can satisfy the output requirement is found. All of the above steps can be automated using a simple script. As a simple but concrete experiment here, we used the SUIF-generated code for the Fast DCT program and found the same bitwidth requirement as we did with the methodology described in Section IV-C.

Modern compilers are capable of performing sophisticated techniques of code optimization to improve program performance. Global compile-time optimization of the necessary precision/range for arithmetic operands may be feasible if we integrate variable-precision units, or a collection of mixed-precision arithmetic units in our hardware.

## VI. RELATED RESEARCH

Substantial work on low-power datapath design techniques has been done at the circuit level. In particular, there have been many studies on low-power multiplier designs due to the prevalence of multiplication in DSP-type applications [17]–[19]. However, there have been few published studies targeting power reduction techniques for FP multipliers or the entire FP unit at the system or architectural level.

The basic principle behind our proposed technique is to avoid unnecessary or useless work in the hardware. This principle has been applied in other work to either improve performance [20] or reduce power consumption [21]. For example, [20] proposes the use of "memoing" to accelerate multimedia processing. By saving the input and output of previous calculations and using the output if the inputs are encountered again, the authors report an average computational speed up of more than 20%. In [21],

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.



Fig. 13.   Clock gating architecture proposed in [24].

the idea of reusing computation results stored in a cache-like structure was proposed. But the design parameters of the structure ("execution cache" coined by the authors) are optimized for power minimization instead of just improving the execution speed. They reported energy savings up to 60% in the integer unit.

Furthermore, the idea of reducing bitwidth to save power has also been employed in other areas of low-power research. [22] showed that an average of more than 4 bits of pixel resolution can be dropped during motion estimation to obtain a power reduction of 70%. To reduce energy consumption at the I/O pins, [23] proposes sending only those address bits that have changed. For integer applications that do not need 32 bits of precision, the Intel MMX instructions allow arithmetic operations on multiple narrow subfields of a data word simultaneously.

A closely related approach was proposed by Brooks and Martonosi [24]. In that paper, the authors found that across the SPECint95 benchmarks, over half of the integer operations require 16 bits or less. They proposed to reduce processor power consumption by using aggressive clock gating to turn off portions of integer arithmetic units when the full width of a functional unit is not required (see Fig. 13). By evaluating the percentage of narrow bitwidth operations, they reported that the optimization results in an over 50% reduction in the integer unit's power consumption.

However, [24] does not include data on FP programs. Since our work focuses primarily on FP operations, we have performed a similar analysis on SPECfp95 applications. In this case, we define an operation as a *narrow bitwidth operation* when both of its operands have mantissa values that can be packed in 16 bits or less (the lower bits of the mantissa are all "zeros"). One obvious difference here is that we are looking at the most significant 16 bits of the mantissa instead of the least significant bits as in integer operations.

Also, our methodology for measuring the power savings is different. Instead of looking at the percentage of narrow bitwidth operations, we estimate the power saving by evaluating the percentage of narrow bitwidth operations *preceded* by a *non*narrow bitwidth operation (or wide bitwidth operations). It is well known that power dissipation in CMOS circuits is proportional to the switching activity of the circuits. For instance, if the narrow bitwidth operations tend to cluster together, then for consecutive operations using the same functional unit, the upper bits of the inputs remain as "zeros" or "ones" all the time which should then generate fewer transitions in the upper portion of the datapath circuits.

To estimate the power reduction by clock gating the input operands, we need to count the number of transitions from wide bitwidth operations to narrow bitwidth operations (Fig. 14). We used the instrumentation program ATOM to instrument eight

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.

284                    IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000



Fig. 14. Estimation of power reduction via clock gating. The figure shows a set of consecutive integer add operations for a 32-bit machine. Assume for illustration that narrow bitwidth operations are defined as instructions where both operands use less than 8 bits. Transition A (instr 1 → instr 2) is a transition from wide bitwidth operation to narrow bitwidth operation. Transition B (instr 2 → instr 3) is a transition from narrow bitwidth to narrow bitwidth operation. With clock gating, we only save power in transition A, but not transition B.



Fig. 15. Percentage of narrow bitwidth operations in SPECfp95.

SPECfp95 programs (Table III) and count the number of transitions from wide bitwidth operations to narrow bitwidth operations.

The results of the experiments are shown in Fig. 15. The percentage of narrow bitwidth instructions that are preceded by wide bitwidth instructions varies from 8 to 20%. Taking into account the power consumed in the overhead logic (latches and zero detection circuits), actual power reduction is approximately 5–10%.

Furthermore, we examined the occurrence of narrow width FP operands among the five programs in Table IV to see how a clock gating scheme might save power for these programs. Fig. 16 shows the result (notice that the y-axis is in log scale). For Sphinx and Alvinn, the percentage of narrow width operations is less than 1% of the total FP operations. These results suggest that arithmetic unit clock gating schemes, which can leverage the relatively high frequency of consecutive narrow bitwidth operands in integer datapaths, are less viable in the sort of human-sensory FP signal-processing workloads we think will be important in portable/mobile electronics. In general, these sorts of "dynamic" suppression techniques are very attractive because of their transparency: the hardware appears to the program to be doing a typical arithmetic operation at full precision, yet at circuit level, useless transitions are suppressed. But based on our observations of FP workloads, we believe there is merit in making *explicit* the fact that some operands *always* need more/fewer bits than others. Our initial experiments suggest that the availability of reduced-precision arithmetic could



Fig. 16. Percentage of narrow bitwidth operations in our workload.

allow compile-time optimizations that simply omit the unnecessary bits and computations on them, and by exposing these variable precision possibilities to the compiler, a wide range of further system-level optimizations may be feasible.

## VII. CONCLUSION

Many mobile/portable electronics applications will ultimately need to process human-sensory data such as speech or video imagery. This data is often acquired at relatively low bit resolutions, e.g., 4–10 bits of precision. Nevertheless, many signal processing algorithms are more easily and efficiently coded assuming an FP representation, which liberates developers from concerns over either the precision or range of the intermediate results. Common design practice is then to translate these FP algorithms into fixed precision arithmetic. The intuition underlying this study is that many of these applications—especially those that process low-resolution data and render as a result a decision, such as speech and image recognition—may be better served with a custom, reduced FP format.

By annotating source code to replace FP operators with calls to emulation routines, we were able to systematically vary the FP format across a set of speech and image processing tasks. Analysis of these FP programs shows that they suffer no loss of accuracy, even with a significant reduction in bitwidth, thus confirming our intuition. Most FP programs in our benchmark suite maintain the same output even when the mantissa bitwidth is reduced by half. Exponents can likewise be reduced, but not as dramatically. In hindsight, this result is reasonable: these codes require more dynamic range than can be achieved with fixed-width integers, but not dramatically more precision in intermediate results.

This FP bitwidth reduction can deliver a significant energy savings through the use of a variable bitwidth FP unit. By creating and comparing ASIC-style fixed-width and variable-width (reduced-width) FP multipliers, we estimated that a reduction of up to 66% in multiplier energy/operation can be achieved in the FP unit without sacrificing any program accuracy. As a result of these experiments, we suggest that the fact that some operands need different bitwidths should be exposed to compilers. This

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore. Restrictions apply.

would allow us to attempt compile-time precision/range optimizations which could then be realized using either variable-precision or a collection of mixed-precision arithmetic units in hardware. This approach has two attractive advantages: it opens another perspective on power optimization to the compiler for large-scale global optimization, and the availability of mixed-precision arithmetic always allows us to recover from extraordinary circumstances by simply repeating a computation with extra precision.

To date, there has been relatively little work on FP representation and computation from the perspective of power optimization. This is in contrast to a large and growing body of circuit, logic, and system-level optimizations for integer arithmetic. We argue that FP computation is inevitable as low-power systems evolve and that studies of the tradeoffs available among operand precision, dynamic range, and rounding modes can play an important role here.

## ACKNOWLEDGMENT

The authors would like to thank H. Schmit of Carnegie-Mellon University for his role in the creation of the ASIC design flow used in the work, P. Meier of Carnegie-Mellon University for assistance with power and energy estimation techniques, and B. Ackland and C. Nicol of Bell Laboratories, Lucent Technologies, for enlightening discussions about arithmetic issues in DSP applications.

## REFERENCES

[1] P. C. H. Meier, R. A. Rutenbar, and L. R. Carley, "Exploring multiplier architecture and layout for low power," in *Custom Integrated Circuits Conf.*, 1996.

[2] *IEEE Standard for Binary Floating-Point Arithmetic*, ANSI/IEEE Std. 754-1985, Aug. 1985.

[3] D. Dobberpuhl, "The design of a high performance low power microprocessor," in *Int. Symp. Low Power Electronics and Design*, Aug. 1996, pp. 11–16.

[4] "MCore shrinks code, power budgets," Microprocessor Rep., vol. 11, Oct. 27, 1997.

[5] M. R. Santoro, G. Bewick, and M. A. Horowitz, "Rounding algorithms for IEEE multipliers," in *10th Int. Symp. Computer Arithmetic*, 1991.

[6] T. Huff, M. Upton, P. Sherhard, P. Barker, R. McVay, T. Stanley, R. B. Brown, R. Lomax, T. Mudge, and K. Sakallah, "A high performance GaAs microprocessor," in *Proc. IEEE Laser and Optics Society Sarnoff Symp.*, Princeton, NJ, Mar. 1993.

[7] R. V. K. Pillai, D. Al-Khalili, and A. J. Al-Khalili, "Energy delay measures of barrel switch architectures for pre-alignment of floating point operands for addition," in *Int. Symp. Low Power Electronics and Design*, Aug. 1997, pp. 235–238.

[8] K. P. Acken, M. J. Irwin, and R. M. Owens, "Power comparisons for barrel shifters," in *Int. Symp. Low Power Electronics and Design*, Aug. 1996.

[9] T. K. Callaway and E. E. Swartzlander, "Power-delay characteristics of CMOS multipliers," in *IEEE 13th Symp. Computer Arithmetic*, 1997.

[10] M. Hwang, R. Rosenfeld, E. Theyer, R. Mosur, L. Chase, R. Weide, X. Huang, and F. Alleva, "Improving speech recognition performance via phone-dependent VQ codebooks and adaptive language models in SPHINX-II," in *Int. Conf. Acoustics, Speech and Signal Processing*, 1994.

[11] V. Tiwari, S. Malik, and A. Wolfe, "Power analysis of embedded software: A first step toward software power minimization," *IEEE Trans. VLSI Syst.*, vol. 2, pp. 437–445, Dec. 1994.

[12] R. I. Hartley and K. K. Parhi, *Digit-Serial Computation*. Norwell, MA: Kluwer Academic, 1995.

[13] R. Burch, F. Najm, P. Yang, and T. Trick, "McPOWER: A Monte Carlo approach to power estimation," in *IEEE/ACM Int. Conf. CAD*, 1992.

[14] Y. N. Chang, Satyanarayana, H. Janardhan, and K. K. Parhi, "Design and implementation of low-power digit-serial multipliers," in *IEEE Int. Conf. Computer Design*, 1997, pp. 186–195.

[15] C. Alippi and L. Briozzo, "Accuracy vs. precision in digital VLSI architectures for signal processing," *IEEE Trans. Computers*, vol. 47, Apr. 1998.

[16] P. Larsson and C. J. Nicol, "Self-adjusting bit-precision for low-power digital filters," in *Symp. VLSI Circuits Dig. Tech. Papers*, June 1997.

[17] I. S. Abu-Khater, A. Bellaouar, and M. I. Elmasry, "Circuit techniques for CMOS low-power high-performance multipliers," *IEEE J. Solid-State Circuits*, vol. 31, Oct. 1996.

[18] B. S. Cherkauer and E. G. Friedman, "A hybrid radix-4/radix-8 low power signed multiplier architecture," *IEEE Trans. Circuits Syst. II*, vol. 44, Aug. 1997.

[19] R. K. Krishnamurthy, H. Schmit, and L. R. Carley, "A low-power 16-bit multiplier-accumulator using series-regulated mixed swing techniques," in *IEEE Custom Integrated Circuits Conf.*, May 1998.

[20] D. Citron, D. Feitelson, and L. Rudolph, "Accelerating multi-media processing by implementing memoing in multiplication and division units," in *8th Int. Conf. Architectural Support for Programming Languages and Operation Systems*, Oct. 1998.

[21] M. Azam, P. Franzon, and W. Liu, "Low power data processing by elimination of redundant computations," in *Int. Symp. Low Power Electronics and Design*, Aug. 1997, pp. 259–264.

[22] Z. L. He, K. K. Chan, C. Y. Tsui, and M. L. Liou, "Low power motion estimation design using adaptive pixel truncation," in *Int. Symp. Low Power Electronics and Design*, Aug. 1997, pp. 167–172.

[23] E. Musoll, T. Lang, and J. Cortadella, "Exploiting the locality of memory references to reduce the address bus energy," in *Int. Symp. Low Power Electronics and Design*, Aug. 1997, pp. 202–207.

[24] D. Brooks and M. Martonosi, "Dynamically exploiting narrow width operands to improve processor power and performance," in *5th Int. Symp. High Performance Computer Architecture*, Jan. 1999.

[25] S. F. Anderson *et al.*, "The IBM system 390 model 91: Floating point execution unit," *IBM J. Res. Dev.*, vol. 11, pp. 34–53, 1967.

[26] P. Ackland and P. D'Arcy, "A new generation of DSP architectures," in *Proc. IEEE CICC*, May 1999.

[27] SPEC Benchmark Suite Release 1.0, SPEC, Santa Clara, CA, Oct. 2, 1989.

[28] SPECfp95 Benchmark, Available: http://www.spec.org.

[29] A. P. Chandrakasan, S. Sheng, and R. W. Brodersen, "Low power CMOS digital design," *IEEE J. Solid-State Circuits*, vol. 27, no. 4, pp. 473–484, 1994.

[30] M. W. Hall, J. M. Anderson, S. P. Amarasinghe, B. R. Murphy, S.-W. Liao, E. Bugnion, and M. S. Lam, "Maximizing multiprocessor performance with the SUIF compiler," *IEEE Computer*, Dec. 1996.



**Jonathan Ying Fai Tong** (S'97–M'99) received the B.S.E.E. degree from the University of Texas at Austin in 1996 and the M.S. degree from Carnegie-Mellon University, Pittsburgh, PA, in 1998.

Since 1999, he has been a Logic and Circuit Designer at Motorola's MCORE Technology Center, Austin, TX. His research interests include low-power electronics, VLSI CAD, and computer architecture.

Mr. Tong is a member of Eta Kappa Nu and Tau Beta Pi.



**David Nagle** (S'85–M'95) received the B.S., M.S., and Ph.D. degrees from the University of Michigan, Ann Arbor.

He is a member of the faculty at Carnegie-Mellon University and Director of Carnegie-Mellon University's Parallel Data Lab. He coleads CMU's Network-Attached Secure Disk (NASD) project and the Active Storage Networks project. His research interests include OS/architecture interactions, storage systems, networking, and hardware-based security.

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore. Restrictions apply.

286                                    IEEE TRANSACTIONS ON VERY LARGE SCALE INTEGRATION (VLSI) SYSTEMS, VOL. 8, NO. 3, JUNE 2000



**Rob A. Rutenbar** (S'77–M'84–SM'90–F'98) received the Ph.D. degree from the University of Michigan, Ann Arbor, in 1984.

He subsequently joined the faculty of Carnegie-Mellon University, Pittsburgh, PA. He is currently Professor of Electrical and Computer Engineering and (by courtesy) of Computer Science. From 1993 to 1998, he was Director of the CMU Center for Electronic Design Automation. His research interests focus on circuit and layout synthesis algorithms for mixed-signal ASIC's, high-speed digital systems, and FPGA's. He served on the Editorial Board of the IEEE SPECTRUM.

Dr. Rutenbar received a Presidential Young Investigator Award from the National Science Foundation in 1987. He has won Best/Distinguished paper awards from the Design Automation Conference in 1987 and the International Conference on CAD in 1991. He has been on the program committees for the IEEE International Conference on CAD, the ACM/IEEE Design Automation Conference, the ACM International Symposium on FPGA's, and the ACM International Symposium on Physical Design. He was General Chair of the 1996 ICCAD. He chaired the Analog Technical Advisory Board for Cadence Design Systems from 1992 through 1996. He is a member of the ACM and Eta Kappa Nu.

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on July 24,2020 at 18:41:05 UTC from IEEE Xplore.  Restrictions apply.



US005689677A

# United States Patent [19]

## MacMillan

[11] Patent Number: 5,689,677

[45] Date of Patent: Nov. 18, 1997

[54] **CIRCUIT FOR ENHANCING PERFORMANCE OF A COMPUTER FOR PERSONAL USE**

[76] Inventor: **David C. MacMillan**, 3931 Jefferson Ave., Redwood City, Calif. 94062

[21] Appl. No.: **464,307**

[22] Filed: **Jun. 5, 1995**

[51] Int. Cl.[6] ............................................. G06F 12/00
[52] U.S. Cl. ................................. 395/433; 365/222
[58] Field of Search ....................... 395/433; 365/222

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,172,282 | 10/1979 | Aichelmann | 395/433 |
| 4,924,381 | 5/1990 | Tokuume | 395/800 |
| 4,961,167 | 10/1990 | Kumanoya | 365/189.09 |
| 5,229,969 | 7/1993 | Lee | 365/222 |
| 5,243,699 | 9/1993 | Nickolls et al. | 395/275 |
| 5,280,474 | 1/1994 | Nickolls et al. | 370/60 |
| 5,313,590 | 5/1994 | Taylor | 395/325 |
| 5,345,556 | 9/1994 | Zapisek | 395/200 |
| 5,345,574 | 9/1994 | Sakurada | 395/442 |
| 5,475,645 | 12/1995 | Wada | 365/222 |

### OTHER PUBLICATIONS

The Illiac IV Computer, George H. Barnes, Richard M. Brown, Maso Kato, David J. Kuck, Daniel Slotnick, Richard Stokes, IEEE Transations on Cumputers, C–17, No. 8, Aug. 1968; pp. 746–757.

Illiac IV Software and Application Programming, David J Kuck, IEEE Transations on Computers, vol. C–17, No. 8, Aug. 1968; pp. 758–770.

DAP—A Distributed Array Processor, Dr. S.F. Reddaway, First Annual Symposium on Computer Architecture, Florida, Dec. 1973; pp. 61–65.

Efficient High Speed Computing with the Distributed Array Processor, P.M. Flanders, D.J. Hunt, S.F. Reddaway, D. Parkinson, Symposium on High Speed Computer and Algorithm Organization, Univ. of Illinois, Academic Press; pp. 113–128.

The Connection Machine, W. Daniel Hillis, The MIT Press, 1985.

Connection Machine CM–200 Series, Technical Summary, Thinking Machines Corporation, Jun. 1991; pp. 93–103.

"The MasPar MP–1 Architecutre", Tom Blank, Proceedings for Compcon Spring 90; pp. 20–24.

"The Design of the MasPar MP–1: A Cost Effective Massively Parallel Computer", John R. Nickolls, Compcon, Spring 90; pp. 25–28.

"A Cached VRAM for 3D Graphics", overhead presentation by Michael Deering, Michael Lavelle, and Stephen Schlapp, Sun Microsystems, Inc., 1994; pp. 6.4.1–6.4.10 (153–162).

"A 3.84 GIP's Integrated Memory Array Processing Elements and a 2–Mb SRAM", IEEE Journal of Solid State Circuits, Yamashita, N, et. al., IEEE Journal of Solid State Circuits, Nov. 1994, vol. 29, No. 11; pp. 1336–1343.

"PIM Chip Specifications", Jennifer Schrader and Mark Norder, Supercomputing Research Center, Report SRC TR–93–088, Oct. 4, 1994.

*Primary Examiner*—Tod R. Swann
*Assistant Examiner*—Christopher S. Chow
*Attorney, Agent, or Firm*—Benman Collins & Sawyer

[57] **ABSTRACT**

A circuit for modifying an instruction stream comprises a first logic circuit capable of issuing instructions and a second logic circuit means responding to the instructions. The circuit also includes a dynamic memory circuit which is responsive to the first logic and a dynamic memory means. The first logic circuit is capable of causing a refresh of the dynamic memory means by inserting a refresh instruction into a sequence of instructions.

**2 Claims, 6 Drawing Sheets**



Google Exhibit 1009
Google v. Singular



FIG. 1

Case: 22-1866    Document: 56-2    Page: 35    Filed: 02/13/2023

Case: 22-1866     Document: 56-2     Page: 36     Filed: 02/13/2023



FIG. 2

Case: 22-1866    Document: 56-2    Page: 37    Filed: 02/13/2023



FIG. 3

APPX01493

Case: 22-1866    Document: 56-2    Page: 38    Filed: 02/13/2023



FIG.4

Case: 22-1866    Document: 56-2    Page: 39    Filed: 02/13/2023



FIG. 5

Case: 22-1866    Document: 56-2    Page: 40    Filed: 02/13/2023

| PENTIUM AND SIMD CONTROLLER ADDRESSES OF: | CORRESPOND TO: PE ADDRESSES | ON PE # |
|---|---|---|
| 0 THRU 3 | 0 THRU 3 | 0 |
| 4 THRU 7 | 0 THRU 3 | 1 |
| • • • | • • • | • • • |
| 1020 THRU 1023 | 0 THRU 3 | 255 |
| 1024 THRU 1027 | 4 THRU 7 | 0 |
| 1028 THRU 1031 | 4 THRU 7 | 1 |

FIG. 6

5,689,677

**1**

## CIRCUIT FOR ENHANCING PERFORMANCE OF A COMPUTER FOR PERSONAL USE

### FIELD OF THE INVENTION

The present invention relates generally to the field of data processing, and more particularly relates to computer systems for personal use.

### BACKGROUND OF THE INVENTION

The history of computing shows that as computers at a given price level become more powerful, the volume of machines sold increases.

Personal computers (PCs) today typically have performance up to about 300 million instructions per second (MIPs). This is much less than supercomputers, which may provide performance of 5,000 MIPs or more. The performance of supercomputers is expensive, however, since these machines typically cost $100,000 or more. If supercomputing performance could be achieved in low cost computers, such as personal computers, this could dramatically expand the market for personal computers.

A personal computer with supercomputer performance could stimulate development of new software applications. There are many applications that could benefit from supercomputer performance in a personal computer. Examples of these applications are signal processing, data compression and decompression, phased-array radars, cryptography, pattern recognition, optimization, genetic algorithms, neural nets, decision support, database mining, statistical analysis, text retrieval and categorization, simulation and modeling, medical imaging, medical signal processing, data visualization, optical character recognition, audio processing, voice synthesis and recognition, speech analysis, vision systems, video processing, multimedia, virtual reality, and CAD/CAM.

Today's fastest uniprocessor-based personal computers are limited to about 300 MIPs. Moreover, it appears that factors such as clock skew, inter-chip signal delays, on-chip wiring delays, diminishing returns from additional superscalar execution units, and the complexities of heavily pipelined design all conspire to limit the maximum performance that may be achieved from uniprocessors. For these reasons, a personal computer providing supercomputer performance should use a parallel computing architecture.

Parallel computers with over 5,000 MIPs performance are readily achievable, as demonstrated by their availability from a number of vendors, although at high prices. A wide range of parallel architectures have been developed. Most efforts can be broadly categorized as either Multiple Instruction Multiple Data (MIMD) or Single Instruction Multiple Data (SIMD).

MIMD machines are particularly useful when there are a number of independent programming threads to be executed, as found in multi-tasking and multi-user environments. For example, MIMD systems appear to work well with Online Transaction Processing. However, MIMD programs have high overhead when a large number of short execution paths must be spawned, processed and then synchronized. This can occur, for example, when inner loops are coded in parallel. MIMD systems are also difficult to code and debug when the problem has a large number of threads with complex data dependencies or complex synchronization requirements. Applications with the above characteristics are often easier to code and debug, and often execute

**2**

with higher performance, on SIMD systems. The following discussion is directed towards SIMD systems.

The advantages of SIMD include easier program development and debugging, since SIMD programs use a single execution thread and easily-coded parallel data structures. In many cases, inner loops of existing FORTRAN and C programs can be quickly converted to data parallel SIMD code, resulting in immediate performance improvements.

SIMD MIPs are inherently less costly than MMMD MIPs since each SIMD processing element only requires data-path logic, not a complete processor including program counters, interrupt logic, and stack pointers.

The SIMD architecture can be scaled to tens of thousands of processors or more, with excellent processor utilization for many programs. Moreover, this scalability can generally be achieved without the need for reprogramming. In contrast, scaling MIMD execution across more than a few tens of processors has proven difficult, typically requiring major algorithm changes, re-programming, and performance tuning.

A number of computers have been proposed and developed with SIMD architectures, including ILLIAC IV, the Goodyear MPP, BLITZEN, ICL's DAP, Thinking Machines CM-1 and CM-2, and MasPar's MP-1 and MP-2. These machine architectures suffer from a number of shortcomings which will be generally described hereunder.

A first limitation is that many SIMD designs have relatively slow execution dates for data words containing multiple bits. It is also difficult to program these machines for operations on data words with multiple bits. These problems are partly due to the use of Processor Elements (PEs) designed to operate bit-serially. With these machines, operations on multiple-bit data words required either cascading PEs together, or having each PE loop serially through each data bit of its multi-bit word. With cascading, programing is more difficult, since the programmer must track the width of each word. As word widths change, the number of groups of cascaded processors changes, complicating programming and making the algorithm much more difficult to conceptualize. Interprocessor communication is also more complex to program and conceptualize when words span multiple processors and the number of groups of cascaded processors must be tracked. With looping, multiple clock cycies are required to process a multi-bit word, which can reduce performance.

A second limitation is that many SIMD designs have a bottleneck between the chips used to hold PEs and the chips used to provide memory storage. Each time data is moved between the memory and PE logic it must make an inter-chip crossing. This takes time, which decreases performance. Pin count limitations can create a further bottleneck between the separate memory and PE logic chips. When there are a limited number of pins for the PE to memory interface, multiple clock cycles may be required to transfer data for all PEs during a load or store operation. To overcome this pin bottleneck, some SIMD designs have a large register set on each PE, allowing temporary results to remain local to the PE, thereby reducing the number of loads and stores needed. However, this increases die area per PE, resulting in higher costs per PE.

Adding pins can reduce the PE-to-memory bottleneck, but leads to increased packaging costs. It may also require tighter geometries or increased numbers of layers on printed circuits boards, further increasing costs. Furthermore, adding pins increases the number of output drivers needed. This increases die area, which can rapidly increase costs due to

5,689,677

**3**

the two factors of fewer gross die per wafer and lower yields for larger die. Adding output buffers to drive increased pin counts also increases power dissipation and hence power supply capacity and cost. Increased power dissipation may also require increased space between chips or circuit boards for better cooling, leading to larger, more costly cabinets.

A third limitation of many SIMD designs is that they are a separate subsystem. A limitation resulting from this is that they may have up to three kinds of data memory and up to two kinds of program memory. Specifically, many SIMD designs have separate data memory for the Host CPU, the SIMD Controller, and the PE array. In addition, there are often separate program memories for the Host CPU and the SIMD Controller.

Consider the issues for separate data memory first. Typically, the user is connected to the host system, not to the SIMD Controller or PE array. Generally, the user provides input data to the host and receives output data from the host. Accordingly, if the data memories are separate, an explicit step is required to transfer input data from the host to the SIMD Controller or PE memory array. Similarly, on output, an explicit step is needed to transfer data from the PE array or SIMD Controller to the host. These steps take time and impact performance. A further problem is that in purchasing a system, a user must (a) purchase enough host data memory for the application with the greatest requirement for host data memory, (b) purchase enough SIMD Controller data memory for the application with the greatest requirement for SIMD Controller data memory, and (c) purchase enough PE data memory for the application with the greatest requirement for PE data memory. Generally, each of these three requirements will come from different applications.

It can be seen that when data memory locations are separate for the host, SIMD Controller and PEs, it is not sufficient to simply buy a given total amount of data memory—one must have the enough of each of the three kinds for the applications which will be run. The estimate of how much memory of each type to buy is further complicated if the system is to support many users through timesharing, since there must be enough memory to support all applications that are to run concurrently. It can be seen that having separate data memories adds to system cost since each type of data memory must be large enough for the worst case requirements. Separate data memories also makes it more difficult for the user or manufacturer to specify the required system size to meet the users performance goals and run the required applications. This can delay sales cycles, since a user may be hesitant to purchase a system until a clear understanding is achieved of how much of each type of memory is needed, so as to neither purchase more nor less than needed.

A similar problem exists when program storage for the host and SIMD Controller are separate. In such cases, there must be sufficient host program memory for the application with the greatest requirement for host program memory, and sufficient SIMD Controller program memory for the application with the greatest requirement for SIMD Controller program memory. It is not sufficient to have enough overall program memory—one must have enough of each type for the applications that are to run. Timesharing complicates the estimate of how much program memory of each type is needed. Having separate program memories increases system costs since each type of memory must be large enough for the worst case requirements. As in the data memory case, having to estimate the amount of each type of program memory can delay sales cycles.

A fourth limitation of some SIMD systems is that their memories have high cost and low density. This is a result of

**4**

the use of static random access memory (SRAM), rather than dynamic random access memory (DRAM), which is higher density, less expensive per bit, bit which must be periodically refreshed. This use of SRAM increases system costs or forces use of smaller memories than would otherwise be possible.

A fifth limitation of some SIMD systems is that they have high system cost in some SIMD systems, a significant part of this cost is due to the use of expensive host systems. Expensive systems sell in lower volumes than less costly systems. Also, selling expensive systems requires a longer, more costly sales cycles. When system costs are high, the systems must typically be shared by many different users, reducing the computing power available to any individual user. If insufficient users are available, the system purchase may not be able to be justified. High system costs also makes it more difficult to cost-justify running any specific application on the system. All these factors can reduce the number of machines sold. A small installed base can reduce the attractiveness of the platform for software developers, thereby reducing the number of software applications available for the system. This can further reduce the market acceptance of the system. Finally, when the host system is an expensive mainframe, it may have to be justified as a worthwhile investment in its own right, independent of the SIMD subsystem. This can further reduce system sales volume and slow sales cycles.

A sixth limitation of some SIMD designs is that they require complex data movements between multiple disks to process data. This limitation arises because these systems use different disk systems for the host system and SIMD array. The user is typically connected to the host system and must usually provide input data and output data, which often resides on disk. This data must be explicitly transferred between the host disk and the PE array disk before it can be processed by the SIMD system. This takes time and reduces performance, particularly for very large data sets. Large data sets are common in SIMD systems since this is what they process best. The PE arrays disk may be limited in size due to technology or cost factors. In may instances, data must be swapped between the host's disk and the PE array disk, further reducing performance.

The swapping might arise from a specific problem with a data set larger than the PE array disk, or in the case of multiple batch or timeshared jobs, whose collective disk storage needs exceed that of the PE array's disk. The latter case can be tougher to anticipate and manage. Timesharing between users whose applications are swapping data between the host disk and PE array disk could result in a horrendous performance penalty. As with the case of separate memories discussed earlier, there is a cost issue in separate disk systems, since each must be large enough to handle the worst-case requirements. In addition, it makes it more difficult to estimate how large a system to buy.

A further problem with this sixth limitation is that when special disk arrays are used for the PE array, they may not enjoy the same rate of decrease of costs that the host disks experience. Typically, a host computer will be used in many non-SIMD installations. Accordingly, the total number of host disks and controllers sold will generally greatly exceed the number of PE array disk and controllers sold. Without the same volumes being manufactured, due to the well-documented learning curve effect, the PE array disks and controllers will not experience the same rate of cost decreases as host disks and controllers.

Over time the ratio of cost of a Megabyte of PE disk storage to cost of a Megabyte of host disk storage will rise.

5,689,677

<table>
<tr><td>5</td><td>6</td></tr>
</table>

This negatively impacts the price/performance of the SIMD system when compared to a uniprocessor alternative. This negative impact may be corrected by frequently redesigning the PE array disks to take advantage of the latest technologies used for the hosts disks and controllers. However, frequent redesigns will only be effective in reducing cost if the volume of PE arrays sold is sufficient to absorb the amortized development costs and still result in a significant cost decrease.

In many instances, where hosts sell in the thousands to hundreds of thousands of systems per year, and SIMD systems sell in the tens of units per year, it may not be possible to reduce this growing gap through either volume efficiencies or more frequent redesigns. In such cases, the alternatives include a price/performance ratio that continues to deteriorate relative to uniprocessors with accompanying slowing of sales, or an infusion of outside capital to start a new design (perhaps as a financial restructuring). If left unchecked, this factor and other problems cited earlier above could lead to a SIMD vendor's inability to raise funding or to sell systems at an appealing price/performance ratio.

SIMD architectures have some qualities that make them attractive candidates for adding supercomputer performance to a computer for personal use. However, as a result of the limitations described above, present SIMD architectures are much higher cost than computer systems for personal use. To provide supercomputer performance in a computer for personal use requires improving SIMD's price/performance ratio, decreasing SIMD cost, simplifying SIMD programming, streamlining the issues involved in estimating memory and disk requirements, and expanding SIMD usage. The difficulties in achieving this are illustrated by the fact that many SIMD computer system vendors, competing in the supercomputer segment, have experienced financial difficulties resulting in bankruptcy or restructuring, partly as a result of the high cost and limited usage of their machines. Thinking Machines and Active Memory Technologies are two examples of this. Overcoming the above limitations would allow supercomputing performance to be provided in a low cost computer system for personal use, dramatically expanding the potential market for systems with supercomputer performance. To meet the cost objectives, the SIMD capabilities should not add significant complexity to the architecture of a computer system for personal use. The present invention addresses the above needs.

SUMMARY OF THE INVENTION

The present invention comprises a computer system to which has been added a Single Instruction Multiple Data (SIMD) parallel processing capability. The computer system, to which the SIMD capability has been added, could be a computer system for personal use or other computer system.

A first aspect of the present invention is that it provides shared memory for data and programs that can be used by both the host computer system and the parallel SIMD system. The invention of this shared memory results in lower system cost and more flexibility in using memory both within a given program, and in the case of timeshared execution of different programs.

Another aspect of the present invention is that it provides a convenient mechanism for mapping data structures between the scalar host processor and parallel processing arrays. The invention teaches how to use this mapping to efficiently pass data between the host and processing elements.

Another aspect of the invention is that it shows how parallel SIMD processing can be added inexpensively to existing system architectures. This cost-effective addition of parallel processing can be made to popular, low cost computer systems running popular operating systems, such as Microsoft Windows based personal computers (including Windows 3.1, Windows NT and Windows 95), Apple-compatible personal computers, and UNIX-based systems (including those by Sun Microsystems, Silicon Graphics, Hewlett Packard, and Digital Equipment Corporation).

Another aspect of the present invention is that it allows parallel processing performance to be boosted simply by adding additional shared memory, thereby providing scalable performance at various price points.

Another aspect of the present invention is that it eliminates the Von-Neumann bottleneck between the processing elements and memory by placing both on the same chip. This results in faster performance and reduced interconnections. Simplifying the interconnections reduces system cost, makes it easier to scale performance by adding memory. Since interconnections are a high failure element in a system, the invention improves reliability.

Another aspect of the present invention is that it permits use of a conventional, low cost cache memory with the host processor.

Another aspect of the present invention is that it can be used with either static or dynamic main memory.

Another aspect of the present invention is that it teaches a novel method for ensuring refresh of SIMD memory based on dynamic storage technologies, when the DRAM controller is disabled.

Another aspect of the present invention is that it allows part of the host system's main memory to be conventional memory and part to be shared SIMD memory.

Another aspect of the present invention is that it allows a SIMD computing capability to be added to an existing MIMD system through the use of SIMD memory.

Another aspect of the present invention is that it is highly beneficial in providing cost effective, scalable, high performance within embedded systems dedicated to a specific task, general purpose computing systems, and other systems known today and developed in the future.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a conventional personal computer architecture.

FIG. 2 is a block diagram of a first embodiment of a single instruction multiple data (SIMD ) computer system, in accordance with the present invention, which is based on a personal computer architecture.

FIG. 3 is a block diagram of a second embodiment of a single instruction multiple data (SIMD ) computer system, in accordance with the present invention, which is based on a personal computer architecture.

FIG. 4 is a block diagram showing the interaction of the SIMD Controller with the Host CPU for interrupts and bus control in accordance with the present invention.

FIG. 5 is a block diagram of a SIMD-RAM device in accordance with the present invention.

FIG. 6 is a table showing the mapping of the memory of the personal computer architecture of FIG. 3.

5,689,677

**7**

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Definitions

"Atomic operations" are operations that can be executed in a single step by a PE, without requiring looping through multiple data values or cascading of two or more PEs. For example, a 32-bit wide data path could perform atomic operations on data values up to 32 bits wide, including bits, bytes, 16-bit words and 32-bit words. However, it would have to either cascade two data paths, or cycle multiple times through its 32-bit wide data path, to process 64-bit words. According to the definition, these 64-bit operations would not be atomic.

"A computer system for personal use" is a system that is designed primarily for use by an individual or for a specific application, including embedded applications. A computer system for personal use includes personal computers (including, but not limited to, those that are IBM-compatible and Apple-compatible), workstations (including, but not limited to, those that use RISC technology or that use the UNIX operating system), embedded computers (including, but not limited to, computer-based equipment used for telecommunications, data communications, industrial control, process control, printing, settop boxes, signal processing, data compression or decompression, data transformation, data aggregation, data extrapolation, data deduction, data induction, video or audio editing or special effects, instrumentation, data collection or analysis or display, display terminals or screens, voice recognition, voice processing, voice synthesis, voice reproduction, data recording and playback, music synthesis, animation, or rendering), laptops, palmtops, personal digital assistants, notebooks, subnotebooks, and video games.

"A Single Instruction Multiple Data computer system" (or "SIMD computer system") is a computer system which provides a means for a single instruction to operate on multiple data items in parallel. A SIMD computer system may also include any other types of computing capability. For example, a SIMD computer system may include a uniprocessor. As another example, a SIMD Computer system may include a host processor. A further example is that a SIMD computer system may include a Digital Signal Processor (DSP). Another example is that a SIMD computer system may include a systolic array. Another example is that a SIMD computer system may include a Multiple Instruction Multiple Data (MIMD) capability, where MIMD is defined as a computer system which provides a means for multiple instructions to operate on multiple data items in parallel. Another example is that a SIMD computer system may include special functions, including, but not limited to, any mix of the above and following: networking, telecommunications, data communications, data display, data acquisition, data transformation, data aggregation, data extrapolation, data deduction, data induction, and signal processing.

"PC" means personal computer.

"IBM" means International Business Machines.

"PE" means Processor Element. A PE is a single data path in a SIMD computer system and is generally the smallest data path with a unique identity. For example, multiple PEs cascaded together are a number of PEs, not a single larger PE. As another guide to identifying a single PE, most SIMD systems provide communication between individual PEs. As yet another guide, some SIMD systems provide an Active Bit to determine whether a PE is included or excluded from a specific instruction.

**8**

A "SIMD Controller" is the part of a SIMD system that contains the program counter used to step through the list of instructions that may include instructions to be executed by the PEs. This list of instructions may also include instructions to be executed by other circuitry, including the SIMD Controller itself, the host computer, and other circuitry. Depending on the architecture, the SIMD Controller may also include branching logic, subroutine stack logic, refresh control, interrupt logic, bus control logic, registers, a data path, and possibly other circuitry.

A "host computer" is an optional part of a SIMD computer system. When present, a host computer is identified by having one or more program counters that are different from that of the SIMD controller. The host computer system may also include, depending on its architecture, branching logic, subroutine stack logic, refresh control, interrupt logic, bus control logic, registers, a data path, multiple processors, co-processors, special data paths, superscalar execution units, memory, I/O capabilities, networking capabilities, and possibly other circuitry.

A "memory storage location" retains information, which may be programs and which may be data, and which can be implemented in any memory technology, including, but not limited to, static random access memory (SRAM), dynamic random access memory (DRAM), flash random access memory, read-only memory (ROM), erasable programmable read-only memory (EPROM), electrically erasable programmable read-only memory (EEPROM), programmable read only memory (PROM), write only memory (WOM), or ferromagnetic memories. ROM, PROM, EPROM, and EEPROM may be particularly useful in embedded applications, although their usefulness is not restricted to embedded applications.

"DRAM technology" means a technology for implementing memory storage locations which requires periodic refresh operations to avoid the loss of memory contents.

Description

The present invention relates to an improvement in the overall speed of a personal computer architecture through the addition of a parallel processing capability. The following description is presented to enable one of ordinary skill in the art to make and use the invention as provided in the context of a particular application and its requirements. Various modifications to the preferred embodiments will be readily apparent to those skilled in the art, and the generic principles defined here may be applied to other embodiments. Thus, the present invention is not intended to be limited to the embodiments shown, but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

It has been discovered that the architecture of a computer system for personal use can be modified to add a single instruction multiple data (SIMD) computing capability, resulting in much higher performance computing at moderate cost.

To more clearly see the advantages of the present invention, refer to FIG. 1, which is a block diagram of a conventional personal computer architecture 10. This personal computer architecture 10 includes a Host CPU 12 which is coupled to a Host Bus 14. The computer architecture 10 includes one or more Peripheral Devices 16, such as a disk, a printer and the like, which communicate via the system to the Host CPU 12. Finally, as is well known in the art, there is main DRAM memory 20, which is connected to the Host Bus 14, and connected to a DRAM controller and buffers 18. The DRAM Controller and buffers 18 is also connected to the Host Bus 14.

5,689,677

9

As has been mentioned before, a uniprocessor system such as that of FIG. 1 has limited processing performance. FIG. 2 shows one embodiment of the invention, which adds more performance to the system of FIG. 1.

The system architecture shown in FIGS. 2 is based on a traditional IBM-compatible personal computer design. However, a system could be built in accordance with the invention for a wide variety of personal computing environments including, but not limited to, an Apple-compatible, RISC-based, or an embedded computing system.

In FIG. 2, the SIMD subsystem 100 includes a SIMD Controller 102, one or more SIMD-RAM devices 104, and an Interconnect Router 106. The SIMD-RAM devices 104 are coupled to the SIMD Controller 102, the Host Bus 14', the DRAM Controller and buffers 18' and the interconnect router 106. The SIMD Controller 102 is also coupled to the Host Bus 14' This SIMD subsystem 100 adds parallel processing capabilities to the personal computer, resulting in substantial performance improvements.

An additional embodiment of the present invention is shown in FIG. 3. This includes a personal computer system 200, which includes a SIMD subsystem 250, in accordance with the present invention. The SIMD subsystem 250 comprises a SIMD Controller 252, one or more SIMD-RAM devices 254 and Interconnect Router 256. (For further details of the basic PC architecture without the SIMD capability, see the data book "82430 PCIset Cache/Memory Subsystem", Intel Corporation, April 1994, Order Number 290478-003.)

In this embodiment of FIG. 3, the Host CPU 208 is a 386, 486 or Pentium™ processor. As previously mentioned, other processors could be substituted by one skilled in the art, including, but not limited to, those from the 68000 family, SPARC family, Alpha family, MIPS family, or PowerPC family. Another variation is that multiple microprocessors could be included in the personal computer system 200, thereby providing a MIMD capability plus the SIMD system 250. The host CPU 208 is connected to the host bus 230.

In the embodiment of FIG. 3, fast I/O is provided through the Peripheral Component interconnect bus (PCI bus) 210. The PCI, cache and memory controller 214 connects to the PCI bus 210, the host bus 230, and the cache memory 232. One or more local bus accelerators 216 connect to the SIMD-RAMs 254, the host bus 230, and the PCI bus 210. A LBA control signal 218 connects the local bus accelerator 216 to the PCI, Cache and memory controller 218. The PCI bus 210 can support up to 133 Mbytes/second peak transfer rate in its current 32-bit version. PCI Devices 212 such as striped conventional disk sets, high performance RAID arrays, and/or HiPPI channels could be placed on the PCI bus 210 for high bandwidth disk I/O and communications.

The Industry Standard Architecture bus (ISA bus) 220 connects to the PCI bus 210 through the system I/O controller 224. The ISA bus 220 allows use of the wide variety of ISA devices 222 that are designed for the ISA bus, such as disk controllers, multimedia boards, and networking boards.

Aside from the three new device types—the SIMD Controller 252, SIMD-RAM devices 254 and interconnect router 256—the computer 200 uses standard PC components.

The following discussion will describe each of the new devices in detail. It should be understood that although the following discussion will be in terms of the system shown in FIG. 3, the present invention can be utilized in a variety of environments and architectures, and that use would be within the spirit and scope of the present invention. Also, variations can be made in the design of each of the three new

10

devices, and these variations would be within the spirit and scope of the present invention.

The SIMD Controller 252

In this embodiment, the SIMD Controller 252 includes the program counter, branching logic, subroutine stack logic, SIMD-RAM refresh control, and interrupt management logic for the SIMD subsystem 250. It also includes a 32-bit data path for processing scalar values. Using the SIMD bus 240, the SIMD Controller 252 globally broadcasts data values and opcodes to the SIMD-RAMs 254 and can accept data values from a specific PE within the SIMD-RAMs 254. The SIMD bus 240 also includes an open-collector driven global-ORed result signal for parallel boolean operations. Using DeMorgan's theorem, this can also be used to provide a global-AND capability. Other variations of SIMD Controller could also be used.

One variation that might be employed is to have the SIMD Controller interface to the SIMD-RAMs by connecting the SIMD-RAMs to the host bus 230, so as to eliminate the SIMD bus 240 and minimize the pin count on the SIMD-RAMs. The global-OR function could be implemented using open-collector drivers on the SIMD-RAMs, by polling, or through other means.

In the embodiment of FIG. 3, the Host CPU 208 and SIMD system 250 could run under a variety of operating systems, including, but not limited to, Windows 95 and Windows NT. SIMD programs can be compiled as subroutines using a compiler and then linked to traditional Host CPU 208 programs. Using this convention, all SIMD processing would be initiated from a uniprocessor program. This uniprocessor program will be referred to as the parent uniprocessor program. Under this convention, once a SIMD program was activated, it could subsequently call other SIMD routines or call a Host CPU 208 program. Further calls could be made between the Host CPU 208 program and SIMD system 250, resulting in multiple levels of nesting of subroutine calls on both the Host CPU 208 and SIMD system 250.

Note that other conventions could also be used. For example, the roles could be reversed, with all processing initiated by a parent program on the SIMD subsystem 250.

FIG. 4 shows a more detailed block diagram of the relationship between the SIMD Controller 252 and the Host CPU 208. Consider the situation where the Host CPU 208 is executing a uniprocessor program. At this point, the SIMD Controller 252 is idle. When the uniprocessor program reaches a point where SIMD program execution is to begin, the uniprocessor program calls a system routine to start SIMD Controller execution. This system routine could start the SIMD Controller 252, for example, by a write by the Host CPU 208 to an I/O port on the SIMD Controller 252. Alternatively, a read or other mechanism could be used to initiate processing by the SIMD Controller 252.

When the SIMD Controller 252 is started, it requests control of the Host Bus 230 from the Host CPU 208. This could be implemented as shown in FIG. 4 through a HOLD/HLDA handshake with the Host CPU 208, or through other bus control protocols, including, but not limited to, bus control protocols implemented by a chip or chips other than the Host CPU 208. In the HOLD/HLDA protocol connection shown in FIG. 4, the SIMD Controller 252 asserts HOLD to request bus control from the Host CPU 208. The Host CPU 208 completes its current activity and relinquishes the bus, signaling this by asserting HLDA.

At this point, bus control transfers to the SIMD Controller 252. The SIMD Controller 252 then executes the SIMD program. When the SIMD program is complete, the SIMD

5,689,677

**11**

Controller **252** de-asserts HOLD to signal it is done with the bus. The Host CPU **208** then regains bus control, and signals this by de-asserting HLDA. At this point, execution is returned to the Host CPU **208** and the SIMD Controller **252** goes idle.

In most systems, it is desirable to allow the Host CPU **208** to service any interrupts as soon as possible, even if they occur during SIMD processing. This can be accomplished, for example, by having the SIMD Controller **252** monitor all of the Host CPU's **208** interrupt lines, including both maskable and non-maskable interrupts. This can be done as shown in FIG. 4, by connecting the SIMD Controller **252** directly to the Host CPU's **208** non-maskable (NMI) and maskable (INTR) interrupt lines. When an interrupt occurs, the SIMD Controller **252** detects this and releases bus control back to the Host CPU **208**. This allows the Host CPU **208** to respond quickly to the interrupt.

In the case of maskable interrupts, the interrupt may be masked by a register within the Host CPU **208** that is not visible to the SIMD Controller **252**. In such a case, the system must properly handle receipt of an asked interrupt. This could be handled by providing a similar masking register (not shown) on the SIMD Controller **252** that is set or cleared, as needed, by an I/O port write whenever the host program calls a SIMD routine, or alternatively whenever software detects or makes changes to the status of the Host CPU's **208** masking register. This SIMD Controller masking register would prevent the SIMD Controller **252** from releasing bus control back to the Host CPU **208** if an asked interrupt is received. Alternatively, maskable interrupts could be handled by always returning bus control to the Host CPU **208** on any interrupt, masked or otherwise, and letting the Host CPU's **208** system software either return processing back to the SIMD Controller **252** immediately for the masked interrupt case, or service the interrupt and then return control, for the unmasked or non-maskable case.

With some processors, such as the Pentium processor, internal instruction execution of the uniprocessor program will continue from the internal caches following the point when bus control has been relinquished through HOLD/ HLDA handshaking. In such cases, it may be necessary to provide a safeguard to ensure that execution of this uniprocessor program does not proceed until the SIMD Controller **252** is done processing and returns bus control. This safeguard will ensure that the Host CPU **208** does not use data values in its cache that are invalid copies of data in the SIMD-RAMs **254**. The cache copies could be invalid due to modification of the SIMD-RAM **254** contents by the SIMD program.

It is also necessary to provide a safeguard against further execution of the suspended uniprocessor program for the case when the Host CPU **208** services an interrupt in the middle of execution of a SIMD Controller **252** program. When the Host CPU **208** is completed with the interrupt, the SIMD Controller **252** should regain bus control until the SIMD program is done, rather than the Host CPU **208** proceeding with execution of the suspended uniprocessor program.

These safeguards can be provided, for example, by the system routine that was called by the uniprocessor program to start SIMD processing. This system routine started SIMD processing with, in the above example, an I/O write. To provide the required safeguards, it could, as a next step (after perhaps a few no-operation instructions (NOPs) if needed to allow the SIMD Controller **252** to get the bus), perform a read of a status register from an I/O port on the SIMD Controller **252** to test whether the SIMD Controller **252** has

**12**

completed execution. It would be the responsibility of the SIMD Controller program to set a bit in this status register to signal completion as its last step in any called routine. Alternatively, the status register could contain a unique process ID or other data value, rather than a bit. In any event, the Host CPU **208** world loop on the test until the status register read signaled completion of the SIMD Controller **252**. The process of reading of this register by the Host CPU **208** would require bus access by the Host CPU **208**. When no interrupts occurred, the bus access would not happen until the SIMD Controller **252** was completed and released the bus. In these cases, the read would always indicate the SIMD Controller **252** had completed. However, if there was an interrupt, the Host CPU **208** might perform the read after the return from the end of the interrupt service processing. Seeing that the SIMD Controller **252** was not completed, the Host CPU **208** could then write to the SIMD I/O port to reinitiate the taking of bus control by the SIMD Controller **252**. The Host CPU **208** would then attempt to read the I/O port to detect completion, as it had before.

Although the above description assumes use of an I/O port to start and flag completion of SIMD Controller **252** execution, a memory location could also be used. When using a memory location, it is important to ensure that it is non-cached, or that the write to the cache is also written to memory in the case of a data write by Host CPU **208**, to ensure that the SIMD Controller saw the written value in a timely manner. Similarly, in the case of a read of a memory-mapped status register on the SIMD Controller **252** by the Host CPU **208**, it is important to ensure that the Host CPU **208** is not just reading an out-of-date cached value. Flushing the cache prior to any bus transfer to the SIMD Controller is another method of handling these cache issues.

SIMD-RAMs **254**

FIG. 5 shows a block diagram of a SIMD-RAM device in accordance with the present invention. The SIMD-RAM device **254** shows a plurality of memory devices, in this case, dynamic random access memory (DRAM) **304**, which are coupled to a plurality of processing elements (PE's) **302** via random access logic **306**. The PEs **302** in turn are coupled to Routing Logic **308**. The Routing Logic **308** in turn is coupled to the Interconnect Router **256** (FIG. 3). The PE's **302** are also connected to the SIMD bus **240**. The DRAMs **304** can be directly accessed by the lines connecting to the PCI, cache and memory controller **214**, and the lines connecting to the local bus accelerator **216**.

Each PE contains a 32-bit wide data path and can perform atomic operations on bits, bytes, 16-bit words, and 32-bit words. Operations on 64-bit words and block operations could be performed by looping through two or more data values—these would not be atomic operations.

Since each DRAM **304** is independently addressed by its PE, autonomous indirect addressing can be performed, which allows each PE to use different pointers or array indexes while accessing its DRAM **304**. Integer and floating point accelerators could be included in each PE. Execution autonomy is provided, in which specific PEs can be excluded from executing specific instructions by using IF statements.

The architecture of the SIMD-RAM **254** allows scaling to higher or lower density chips with more or fewer PEs **302**, more or less memory **304**, and different amounts of memory per PE. If the memory-per-PE ratio (64 kbytes-per-PE in the above example) is maintained, lower or higher density SIMD-DRAM **254** chips could be used without software changes. With this approach, an application program would see no difference, for example, between a system imple-

5,689,677

| 13 | 14 |

mented with sixteen SIMD-RAM 254 chips, each having 1 Mbyte DRAM and 16 SIMD PEs, and a system implemented with a single SIMD-RAM 254 chip containing 16 Mbytes of DRAM and 256 PEs.

The embodiment of FIGS. 2, 3, and 5 show the invention with dynamic random access memory (DRAM) technology used to implement the memory storage locations in the SIMD-RAM 254. It is within the spirit and scope of the invention to use other technologies to implement the memory storage locations.

Memory Mapping & Data Structures

The SIMD Controller can pass data values to and from the Host CPU through the shared SIMD-RAM memory.

When SIMD processing is not being performed, the SIMD Controller 252 is idled and the DRAM 304 on the SIMD-RAM device 254 is usable by the Host CPU 208 as if it were conventional DRAM memory. In this mode, each SIMD-RAM 254 provides 1 Mbyte of storage to the Host CPU 208.

The DRAMs 304 are shared by the Host CPU 208, the SIMD Controller 252, and the PEs 302. The Host CPU 208, SIMD Controller 252, and PEs 302 can each access the memory in each access cycle as bits, bytes, 16-bit words, or 32-bit words. The SIMD Controller 252 has the same view of memory as the Host CPU 208—as a linear address space of addressable bytes organized, in this example, as 256k by 36 bits (32 data, 4 parity) per SIMD-RAM chip. The Host CPU 208 and SIMD Controller 252 can both use the memory for program instructions and data. The Host CPU 208 and SIMD Controller 252 will use the same physical address to access a given byte in memory, in order to facilitate the sharing of pointers by both devices. The PEs 302 use a different address mapping since, in this example, each PE sees just 16k words ×36 bits (32 data, 4 parity). Since the PEs operate under the control of the SIMD Controller and do not directly execute instructions from memory, they can use memory only for holding data.

FIG. 6 compares the address map of the Host CPU 208 to that of the PEs 302 for a system with 256 PE's (as might be provided by sixteen SIMD-RAM chips, each with sixteen PEs). By sequentially stepping through contiguous Host CPU 208 32-bit words, access is made to words appearing at identical addresses in successively numbered PEs. Wraparound occurs from the 32-bit word at byte N in the highest number PE (here PE 255) to the 32-bit word at byte N+4 in PE 0. Within 32-bit words, either little-endian or big-endian byte ordering could be used. The PEs could also be designed to support both big-endian or little-endian, in order to be used without modification in a variety of different systems.

The reason for stepping across PEs as one steps up in Host CPU 208 words is so that when a block of SIMD-RAM is allocated from Host CPU 208 memory space to SIMD processing, it will include memory that is mapped to all PEs. It also ensures that the span encompasses the same addresses for every PE. The 32-bit step size was chosen because it is convenient for mapping integers to PEs, and because the PEs are 32-bit devices. It should be understood, however, that other step sizes could be used and would be within the spirit and scope of the present invention.

A key issue in memory mapping is how data arrays and structures are passed between CPU programs and SIMD routines. Since the memory mapping was chosen to occur on 32-bit boundaries, transferring an array of 32-bit elements is easy. The array simply needs to have its starting element aligned to a memory word that is mapped to PE 0. Successive words will then be automatically mapped to successive PEs, which is what is desired for parallel execution. In the

event there are more elements than PEs, wraparound automatically occurs from the highest-numbered PE to the next word in PE 0.

It is more difficult to map arrays with data elements of other sizes, such as char variables, strings, doubles, and data structures. These require special handling to ensure that successive values are properly placed in PE address space, despite the fact they are not 32-bit entities.

As an example, consider an array of 8-byte double words in CPU memory. To move this into the correct PE mapping, each 8-byte double word must be split in half and stored in contiguous locations in the address space for a given PE. This is equivalent to moving the two 4-byte words into non-contiguous locations in CPU address space. Note, for example, in FIG. 6, that an 8-byte double word occupying addresses 0 through 7 in PE 0 actually appears as two 32-bit words in CPU address space—the first is at CPU addresses 0 to 3, and the second is at addresses 1024 through 1027. The next double word, which is mapped to PE 1 at addresses 0 through 7, appears to the CPU as two 32-bit words—the first at CPU addresses 4 through 7, and the second at CPU addresses 1028 through 1031.

Because of the special handling needed to pass parameters that are not 32-bits in size, special library routines could be provided to pass parallel parameters between CPU and SIMD programs. These routines could execute block transfers between memory allocated to the CPU and PEs. The routines would accept arguments of a starting CPU address, a starting PE address, a data element size, and a data element count. Using this information, the block transfer routines could activate the Interconnect Routers to distribute data items as needed, with the correct alignment, typically starting with PE 0. Alternatively, the routines could shuffle data by executing a program on the Host CPU 208. Either way, since the data elements are already located in DRAM, this operation is always some kind of data shuffle. This solves the alignment problem for any arbitrary element size for parallel data. Note that this data shuffling is only used for parallel parameters which need to be mapped across the PEs. Scalar parameters can be passed as part of the SIMD function call using conventional parameter-passing protocols, since the SIMD Controller and CPU see the same address map.

If the Host CPU 208 has a cache, it is important to ensure that any writes performed by the Host CPU 208 have been transferred to the SIMD-RAM prior to passing the bus to the SIMD Controller 252, if the SIMD Controller 252 or PEs might access those written data values. One approach to ensure that this transfer occurs is to flush the cache prior to transferring control of the bus to the SIMD Controller 252. Another approach is to mark those memory areas that will be accessed by the SIMD Controller and PEs as non-cacheable.

In some cases, it may be desirable to limit the locations that the SIMD Controller and PEs access. To provide protection between the address spaces of different programs, the SIMD Controller 252 and each PE 302 could include address limit registers indicating the range of DRAM addresses each may use, along with allowed access types, such as read, write or execute. In such cases, if an access were made outside of the allowable limits or if the access was of the wrong type, a program trap would be issued to the SIMD Controller 252 or Host CPU 208, resulting in an error routine being executed.

Refresh

Like ordinary DRAMs, SIMD-RAMs implemented with dynamic memory technologies must be refreshed to maintain data integrity. During Host CPU 208 processing, the SIMD-RAM responds to the refresh controller on the PCI,

5,689,677

15

cache and memory controller 214. As will be discussed below, it is advantageous to use a CAS-before-RAS refresh method. As with traditional DRAMs, during this CAS-before-RAS refresh, the SIMD-RAMs are responsible for providing their own refresh address using on-chip Refresh Address Registers.

During SIMD execution, the refresh controller on the PCI, cache and memory controller 214 is disabled. To maintain data integrity, the SIMD Controller 252 assumes responsibility for refresh. In some systems, the RAS and CAS signal outputs on the PCI, cache and memory controller 214 may not be tristate. In addition, these signals have tight loading and timing specifications. For these reasons, it may not be practical to have the SIMD Controller drive RAS and CAS directly. Accordingly, another approach, using special refresh commands, can be used.

These special refresh commands are similar to normal executable instructions in that they are issued by the SIMD Controller 252 over the instruction bus to the SIMD-RAM 254. They differ from normal instructions in that they cause the SIMD-RAMs 254 to perform a refresh cycle, rather than processing data. The SIMD Controller 252 generates refresh commands at a frequency sufficient to provide necessary refreshing. When these commands are issued, the SIMD Controller 252 skips incrementing its Program Counter, so that the correct executable instruction sequence can resume after the refresh. During these refreshes, the SIMD-RAMs 254 use their Refresh Address Registers just as they did with refreshes initiated by the Host CPU 208's CAS-before-RAS refresh cycle. This ensures that the refresh address sequence is maintained as program execution moves back and forth between the Host CPU 208 and the SIMD Controller 254.
The Interconnect Router 256

The Interconnect Router 256 provides high speed interprocessor communications. I't could be implemented as a wormhole router, or a crossbar. An alternative approach would be to use hypercube interconnections, at the cost of potentially more inter-chip wiring complexity. A variety of possible interconnect architectures are well documented in the literature, including papers such as "Study of Multistage SIMD Interconnection Networks", Howard Jay Siegal and S. Dianne Smith, Purdue University, Proceedings of the 5th Annual Symposium on Computer Architecture, 3–5 Apr. 1978, Palo Alto, Calif., USA, IEEE, New York, N.Y., USA, p. 223–229, and "The Universality of Various Types of SIMD Machine Interconnection Networks", Howard Jay Siegal, 4th Annual Symposium on Computer Architecture, 23–25 Mar. 1977, Silver Spring, Md., USA, IEEE, New York, N.Y., USA, p. 70–79.

A serial communications scheme could be used to further reduce wiring complexities. In addition to global interconnections provided by the Interconnect Router 256, each PE

16

could also contain logic for nearest neighbor interconnections. This facilitates rapid up/down/left/right shifts of data between PEs, as is common, for example, in image and signal processing.

The use of am Interconnect Router 256 provides high speed interprocessor communication. It is possible to use the described invention without an Interconnect Router 256 by using only the nearest neighbor interchip communications of the SIMD-RAM chip 254, and the data movement capabilities of the Host CPU 208 and SIMD Controller 252, although such an implementation may reduce the performance of interprocessor communications.
Conclusion

A system in accordance with the present invention significantly increases the computing power of computer systems for personal use (including personal computers) by adding a SIMD computing capability. The architecture replaces some or all of the personal computer's conventional main memory, resulting in a cost saving that helps offset the added cost of the new components. The architecture is easily scaled across a range of performance simply by adding SIMD-RAM chips. The low cost nature of this architecture helps generate a high volume of sales, maximizing the architecture's appeal to software developers. Finally, the system in accordance with the present invention is useful in increasing the performance of embedded computing systems.

Although the present invention has been described in accordance with the embodiments shown in the figures, one of ordinary skill in the art recognizes there could be variations to the embodiments and those variations would be within the spirit and scope of the present invention. Accordingly, many modifications may be made by one of ordinary skills in the art without departing from the spirit and scope of present invention, the scope of which is defined by the appended claims.

I claim:

1. A circuit comprising:

a first logic circuit means capable of issuing instructions;

a second logic circuit means responding to the instructions; and

a dynamic memory means, the first logic circuit means capable of causing a refresh of the dynamic memory means by inserting a new refresh instruction into a sequence of instructions.

2. The circuit of claim 1, further including a program counter means in the first logic circuit means, wherein the program counter's value is the same before and after the first logic circuit means inserts a refresh instruction into a sequence of instructions.

\* \* \* \* \*



US 20070266071A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2007/0266071 A1
Dockser et al. (43) **Pub. Date:** **Nov. 15, 2007**

(54) **MODE-BASED MULTIPLY-ADD RECODING FOR DENORMAL OPERANDS**

(76) Inventors: **Kenneth Alan Dockser**, Cary, NC
(US); **Pathik Sunil Lall**, Raleigh, NC
(US)

Correspondence Address:
**QUALCOMM INCORPORATED**
**5775 MOREHOUSE DR.**
**SAN DIEGO, CA 92121 (US)**

(21) Appl. No.: 11/382,525

(22) Filed: May 10, 2006

**Publication Classification**

(51) Int. Cl.
*G06F 7/38* (2006.01)
(52) U.S. Cl. ............................................. **708/495**

(57) **ABSTRACT**

In a denormal support mode, the normalization circuit of a floating-point adder is used to normalize or denormalized the output of a floating-point multiplier. Each floating-point multiply instruction is speculatively converted to a multiply-add instruction, with the addend forced to zero. This preserves the value of the product, while normalizing or denormalizing the product using the floating-point adder's normalization circuit. When the operands to the multiply operation are available, they are inspected. If the operands will not generate an unnormal intermediate product or a denormal final product, the add operation is suppressed, such as by operand-forwarding. Additionally, each non-fused floating-point multiply-add instruction is replaced with a multiply-add instruction having a zero addend, and a floating-point add instruction having the addend of the original multiply-add instruction is inserted into the instruction stream. Upon inspection of the operands, if an unnormal intermediate result or a denormal final result will not occur, the addend may be restored to the multiply-add instruction and the add instruction converted to a NOP.



Google Exhibit 1010
Google v. Singular



**FIG. 1**



*FIG. 2*



**FIG. 3**



**FIG. 4**

## MODE-BASED MULTIPLY-ADD RECODING FOR DENORMAL OPERANDS

### FIELD

[0001]   The present disclosure relates generally to the field of processors and in particular to a mode-based method of recoding floating-point multiply instructions to floating-point multiply-add instructions to account for denormal operands.

### BACKGROUND

[0002]   Microprocessors perform computational operations on numerical values in a wide variety of applications. High execution speed, low power consumption and small size are important goals for processor designers, particularly in embedded applications such as portable electronic devices. Modern processors employ a pipelined architecture, where sequential instructions, each having multiple execution steps, are overlapped in execution. In a pipelined architecture, each instruction is executed in a series of execution stages, such as Fetch, Decode, Execute, and Write-Back, each of which may comprise a plurality of pipe stages. A pipe stage consists of a storage element and logic that executes all or part of an instruction execution stage. Instructions flow sequentially through the pipeline. The Execute stage performs the arithmetical, logical, or memory access operation specified by the instruction, and in particular may perform a variety of arithmetical operations on numerical values.

[0003]   Digital processors represent numerical values in either fixed-point or floating-point format. A floating-point number comprises a fixed-point (referred to also known as a mantissa) multiplied by the base 2 raised to an integer exponent. In some formats, such as the IEEE 754 standard, incorporated herein by reference, the floating-point representation additionally includes a sign bit. Multiplying the significand by 2 raised to an integer exponent is the binary analog to scientific notation in the base 10 system. That is, the value of the exponent determines the number of bit positions, and the direction, that the binary point in the significand should be shifted to realize the actual numerical value—hence the term, floating point.

[0004]   When the significand is in the range $1 <=$ significand $< 2$ and the exponent is within its defined range, the floating-point value is referred to as a "normal" number. The significand of a normal floating-point number is thus of the form 1.fraction, where "fraction" is a binary value representing the fractional portion of the significand greater than one. The value of the exponent effectively shifts the binary point left (for a negative exponent) or right (for a positive exponent). In the IEEE 754 standard, the value of the exponent for a single-precision floating-point number ranges from −126 to 127. When encoding the number in IEEE 754 single-precision format, a bias of 127 is added to the raw exponent so that all encoded exponents are positive.

[0005]   A floating-point value that is represented with a significand that is less than one, i.e., $0 <$ significand $< 1$, with any exponent, is referred to herein as an "unnormal" number. One subset of unnormal floating-point numbers of particular interest is "denormal" numbers (also known as subnormal numbers). Denormal floating-point numbers represent values smaller than $1.0 \times 2^{-126}$ by utilizing a signifi-

cand in the range $0 <$ significand $< 1$, and the exponent −126. A denormal floating-point number has a significand of the form 0.fraction, with the number of leading zeros in the fraction ranging from zero to the width of the fraction—1. A denormal number effectively utilizes bit positions in the fractional portion of a normal significand to achieve a "left shift" of the binary point in excess of 126 bit positions—at the cost of loss of precision, as fewer bits remain to accurately represent the numerical value. Denormal numbers represent values very close to zero, and may be used to implement gradual underflow, allowing a calculation to lose precision slowly when the result is very small.

[0006]   In the case of a floating-point multiplier circuit, denormal products may arise in several ways. Either the multiplier or the multiplicand may be a denormal number. In this case the significand of the intermediate product will commonly be unnormal (i.e., less than one) while the final rounded product may be a normal or denormal number, depending on the numerical values of the operands. If both the multiplier and the multiplicand are denormal numbers, the final rounded product will be zero or the smallest representable denormal number.

[0007]   Additionally, the product of two normal numbers may be a denormal number if the exponents are small and would yield a normalized number requiring an exponent less than −126 (for single-precision). Note that this case is distinct from the common situation in which an intermediate value of the multiplication assumes a "non-normal" form. A normal significand may assume any value in the range [1,2)—that is, from exactly one to almost two (1.0000 to 1.1111, for a hypothetical 5-bit significand). The product of two normal significands may assume a value in the range [1,4)—that is, from exactly one to almost four. This intermediate product significand thus may assume the form 1.fraction or 1x.fraction, the latter for values from two to almost four (10.0000 to 11.1111). Floating-point multipliers adjust this intermediate result by shifting the binary point left and incrementing the exponent by one, as a routine incident of floating-point multiplication. Such a "non-normal" intermediate result is not herein considered a denormal number, and is not explicitly addressed by the present disclosure.

[0008]   In common processor applications, such as some embedded processors, denormal numbers need not always be supported. For example, denormal values may simply be represented as zero without significant loss of accuracy. However, the Java® programming language specifies support for denormal numbers. Accordingly, processors that support direct execution of Java code to accommodate denormal floating-point numbers, at least during a Java execution mode.

[0009]   Denormal floating-point numbers may be supported in software by generating an exception upon detecting a denormal number, and processing the denormal number in a software routine. This process is slow and incurs a large degree of overhead, which reduces system performance and increases power consumption.

[0010]   Denormal numbers may be supported in hardware by adding denormal detection and normalization circuits to each floating-point computational element. For example, denormal numbers may be "normalized" by shifting the significand to a normal position (i.e., 1.fraction), and allow-

APPX01510

2

ing a (non-standard) value of the exponent smaller than −126 (for the single-precision case). Likewise, the results may be "denormalized" by shifting the significand to a denormal position (i.e., 0.fraction) so that the exponent becomes −126 (for the single precision case). However, such additional circuits increase silicon area, increase latency, and introduce throughput delay, potentially increasing the minimum cycle time and hence reducing the maximum operating frequency. Additionally, denormal numbers are rarely encountered, and optimizing performance for the rare case at the expense of the common case reduces overall processor performance.

## SUMMARY

[0011]   Floating-point adders include circuits to align addends, add to normalize and round the sum. According to one or more embodiments, in a denormal support mode the normalization circuit of a floating-point adder is utilized to normalize or denormalize results from a floating-point multiplier. Each multiply instruction is speculatively replaced with a multiply-add (also known as multiply-accumulate) instruction with the addend forced to zero. This directs the multiplier output through the adder circuit without altering its value, but utilizing the normalization circuit of the adder to normalize or denormalize the product. If it is determined that neither the intermediate product will be unnormal nor the final product will be a denormal number, the add portion of the operation may be suppressed, such as by operand forwarding. Often this determination can be made early in the multiply execution by operating on the exponents of the multiply instruction operands.

[0012]   One embodiment relates to a method of executing a floating-point multiply instruction to account for an unnormal intermediate significand or a denormal final product. The floating-point multiply instruction is converted to a floating-point multiply-add instruction operative to perform a floating-point multiply operation and a floating-point add operation, and one addend of the floating-point add operation is forced to zero.

[0013]   Another embodiment relates to a processor. The processor includes one or more instruction execution pipelines, including a floating-point multiply-accumulate unit, having a normalization circuit. The processor additionally includes a pipeline controller operative to normalize or denormalize an unnormal intermediate significand or a denormal floating-point product output by the floating-point multiplier using the normalization circuit of the floating-point adder.

## BRIEF DESCRIPTION OF DRAWINGS

[0014]   FIG. 1 is a functional block diagram of a processor.

[0015]   FIG. 2 is a functional block diagram of a floating-point adder fed by a floating-point multiplier.

[0016]   FIG. 3 is a flow diagram of a method of executing a floating-point multiply instruction.

[0017]   FIG. 4 is a flow diagram of a method of executing a floating-point multiply-add instruction.

## DETAILED DESCRIPTION

[0018]   FIG. 1 depicts a functional block diagram of a processor 10. The processor 10 executes instructions in an

instruction execution pipeline 12 according to control logic 14. The control logic 14 includes one or more registers, such as status register 15, which define various operating modes. The pipeline 12 may be a superscalar design, with multiple parallel pipelines such as 12a and 12b. Each pipeline 12a, 12b includes various registers or latches 16, organized in pipe stages, and one or more Arithmetic Logic Units (ALU) 18. Pipe stage registers or latches 16 and ALUs 18 may read operands from and/or write results to registers in a General Purpose Register file 28.

[0019]   The pipelines 12a, 12b fetch instructions from an Instruction Cache (I-Cache or I$) 20, with memory addressing and permissions managed by an Instruction-side Translation Lookaside Buffer (ITLB) 22. Data is accessed from a Data Cache (D-Cache or D$) 24, with memory addressing and permissions managed by a main Translation Lookaside Buffer (TLB) 26. In various embodiments, the ITLB 22 may comprise a copy of a portion of the TLB 26. Alternatively, the ITLB 22 and TLB 26 may be integrated. Similarly, in various embodiments of the processor 10, the I-cache 20 and D-cache 24 may be integrated, or unified. Misses in the I-cache 20 and/or the D-cache 24 cause an access to main (off-chip) memory 36, under the control of a memory interface 34.

[0020]   The processor 10 may include an Input/Output (I/O) interface 38, controlling access to various peripheral devices 40, 42. Those of skill in the art will recognize that numerous variations of the processor 10 are possible. For example, the processor 10 may include a second-level (L2) cache for either or both the I and D caches. In addition, one or more of the functional blocks depicted in the processor 10 may be omitted from a particular embodiment.

[0021]   In one or more embodiments, the processor 10 operates in a denormal support mode, which may, for example, be indicated by a denormal support bit in the status register 15. In particular, the denormal support mode may be entered whenever the processor 10 directly executes Java code, and at other such times as programmers elect to support denormal floating-point numbers.

[0022]   In denormal support mode, the processor 10 speculatively converts each floating-point multiply instruction to a multiply-add (or multiply-accumulate) instruction, with an addend of zero. A multiply-add operation may be of the fused or non-fused type. In a fused multiply-add operation, the full width of the intermediate product (twice the width of the input) is passed to the adder without an intermediate rounding. In a non-fused multiply-add operation, the intermediate product of the multiply operation is rounded (often to the input precision) prior to the add operation being performed.

[0023]   In one embodiment, each floating-point multiply instruction is speculatively replaced with a fused multiply-add instruction with the addend forced to zero. This instruction stream alteration is commonly performed early in the relevant pipeline 12a, 12b, such as in a Decode stage, or in any event, prior to an Execute stage. By normal processor operation, in the Execute stage of the fused multiply-add, the output of a floating-point multiplier will be directed to the input of a floating-point adder, as depicted in FIG. 2. A floating-point adder that supports a fused multiply-add instruction has an input width sufficient to receive the intermediate product from a floating-point multiplier.

[0024]    FIG. 2 is a functional block diagram depicting the output of a floating-point multiplier 50 directed to an input of a floating-point adder 52. The floating-point adder 52 includes an alignment circuit 54 for aligning floating-point addends, an add circuit 56 for calculating a floating-point sum, a normalization circuit 58 for normalizing (or denormalizing) the sum, and a rounding circuit 60 for rounding the shifted sum. The multiplier (MR) and multiplicand (MD) inputs to the multiplier 50, and the addend input(s) to the floating-point adder 52 may be registered values, such as those stored in the GPR file 28. Augand 37 multiplexes into floating-point adder 52 in order to utilize floating-point adder 52 in normal support mode.

[0025]    To preserve the value of the output of the floating-point multiplier 50, while normalizing or denormalizing the number, the addend of the floating-point add operation is forced to zero. This may be implemented in numerous ways. For example, a value of zero may be multiplexed into the alignment circuit 54, as depicted in FIG. 2. Alternatively, the value zero may be stored to a GPR register 29, to be retrieved by the floating-point multiply-add instruction as part of normal execution. As yet another example, the output of a GPR register 29 may be gated with control logic that includes the denormal support mode bit, gating off the register value and presenting a zero in denormal support mode. In any event, the value zero is applied to the floating-point adder 52 as one addend, and the double-width output of the floating-point multiplier 50 is applied as the other addend. The addition to zero in the add circuit 56 does not alter the value of the number. The number is then normalized/denormalized in the normalization circuit 58, and rounded in the rounding circuit 60. In this manner, the processor 10 utilizes existing hardware in a floating-point adder 52 to accommodate unnormal outputs of a floating-point multiplier 50, and denormal final results.

[0026]    In another embodiment, such as where the instruction set architecture supports only non-fused multiply-add operations, each floating-point multiply instruction is speculatively replaced with a non-fused multiply-add instruction. In this case, the intermediate full-width product should be routed to the adder normalization logic 58 without rounding. This can be achieved in a variety of ways. For example, the product may bypass the add circuit 56 and be routed directly into the normalization logic 58, as depicted at multiplexer 57. While not shown, the floating-point adder 52 may be implemented as a pipelined unit with intermediate registers. In such a case, the data routed to the normalization logic could also be pipelined to match. Alternatively, the floating-point adder input logic may be modified to accept the full width of the intermediate product. In either case, the add circuit 56 and the normalizer 58 are already wide enough for the data. Also, in the case of a non-fused multiply-add operation, a leading zero count should be performed on the upper half of the intermediate product. This count should be routed to the normalization logic for control and to the exponent logic for exponent generation (not shown).

[0027]    Generally, the values of the multiplier (MR) and multiplicand (MD) are not known until deep in the pipeline, such as in an Execute stage. As a soon as the MR and MD values are known, they all are inspected to determine if they are both normal values and thus will generate a normalized significand from floating-point multiplier. In parallel, operations may be performed on the exponent values to determine if the final result will be normal. If the output of the floating-point multiplier 50 will be in a normal form and the final result will be a normal floating-point number the add operation may be suppressed. In this case, the output of the floating-point multiplier 50 may bypass the floating-point adder 52 by operand forwarding, as depicted in FIG. 2 by the path 62. This allows subsequent instructions, which are dependent on the result, to consume this data without waiting for it to pass through the adder. In some cases, such as when the result is barely denormal, it is difficult to determine early if the result will be denormal. In these cases, the add operation will be performed so that if the final product is denormal, it will be denormalized.

[0028]    The floating-point multiplication operation of a multiply-add instruction may similarly generate a denormal or unnormal number as an intermediate product. In a denormal support mode, a non-fused multiply-add instruction is altered to add the value zero to the product of the multiply operation, and an add instruction is inserted into the instruction stream following the multiply-add instruction, with the addend of the original multiply-add instruction. That is, the full-width product of the floating-point multiply operation is added to zero prior to performing an add operation with the original addend. As discussed above with respect to multiply instructions converted to multiply-add instructions, the floating-point adder should be modified to accept the wider intermediate product, or this product should be directed to the normalizer. Also, a leading zero count should be maintained for significant bits of the product, which is used to control the normalize circuit. In this manner, the add operation of the multiply-add instruction is used to perform any normalization (or denormalization) of the product, without changing its value, prior to performing the addition operation via a separate floating-point add instruction. Logic that implements fused multiply-add instructions can handle the unnormal or denormal intermediate product without the necessity of inserting a subsequent add instruction.

[0029]    As depicted in FIG. 2, the output of the floating-point multiplier 50 is directed to one input of the floating-point adder 52, and a zero is forced at the other input to the floating-point adder 52. The add circuit 56 does not alter the value of the intermediate product, which is normalized/denormalized in the normalization circuit 58 and rounded in the rounding circuit 60, as described above. The normalized (or denormalized) number is then routed to one input of the floating-point adder 52, as indicated by the path 64. The addend of the original multiply-add instruction, stored in GPR register 29, is directed to the other input of the floating-point adder 52, and the floating-point add instruction is executed. In this manner, outputs of the floating-point multiplier 50 are normalized/denormalized utilizing circuits in the floating-point adder 52, prior to performing the addition operation of the original non-fused multiply-add instruction.

[0030]    Here again, the insertion of an add instruction into the instruction stream and the alteration of the multiply-add instruction to substitute a zero addend are commonly performed early in the pipeline, such as in a Decode stage. When the values of the multiplier (MR) and multiplicand (MD) become known, such as in an Execute stage, they may be inspected and the exponents operated on to determine whether the multiply operation could possibly generate an intermediate unnormal output, or if the final result will be

4

denormal. If not, the alteration of the multiply-add instruction may be reversed, or "undone," by substituting the original addend for the addend of zero. Additionally, the floating-point add instruction that was inserted may be converted to a NOP (no operation), which may be removed by conventional pipeline optimization.

[0031] FIG. 3 depicts operation of the processor 10 when processing floating-point multiply instructions in denormal support mode. An instruction is fetched (such as from the instruction cache 20) and decoded (block 70). If the processor is not operating in a denormal support mode (block 72), it processes instructions by conventional pipeline operation (block 86). If the processor is in denormal support mode (block 72), the decoded instruction is inspected to determine whether it is a floating-point multiply instruction (block 74). If not, the instruction is executed conventionally (block 86).

[0032] If the instruction is a floating-point multiply instruction, the processor 10 substitutes a floating-point multiply-add instruction with a zero addend for the floating-point multiply instruction (block 76). When the operands for the floating-point multiply operation are available, they are inspected to determine if the floating-point multiply operation is guaranteed to produce a normal output. If the floating-point multiply operation might produce an unnormal intermediate output or the final result might be denormal (block 80), the substituted multiply-add instruction is processed by conventional pipeline operation (block 86), normalizing or denormalizing the intermediate product using the normalization circuit 58 of the floating-point adder 52, as described above. In the case of a fused multiply-add instruction, no further control is necessary. In the case of a non-fused multiply-add instruction, while the adder circuit 56 is wide enough to handle the intermediate product, the floating-point adder 52 needs to be modified to properly route the bits to the adder. Alternatively, the intermediate product is routed directly, potentially including intervening state elements, to the normalize circuit 58 of the floating-point adder 52, as depicted in FIG. 2.

[0033] If it is determined that the floating-point multiply operation will produce normal intermediate and final results (block 80), the "add to zero" operation may be suppressed, such as by operand forwarding (block 82). This avoids the performance penalty of performing an "add to zero" operation where normalization/denormalization of the floating-point multiplier 50 output is not necessary.

[0034] FIG. 4 depicts operation of the processor 10 when processing floating-point multiply-add instructions in denormal support mode. An instruction is fetched (such as from the instruction cache 20) and decoded (block 90). If the processor is not operating in a denormal support mode (block 92), it processes instructions by conventional pipeline operation (block 106). If the processor is in denormal support mode (block 92), the decoded instruction is inspected to determine whether it is a non-fused floating-point multiply-add instruction (block 94). If the instruction is not a floating-point multiply-add instruction or is a fused multiply-add instruction, the instruction is executed conventionally (block 106).

[0035] If the instruction is a non-fused floating-point multiply-add instruction (block 94), the processor normalizes/denormalizes intermediate products of the floating-point multiply operation prior to performing the floating-point add operation. First, the value zero is substituted for the addend in the floating-point multiply-add operation (block 96). A floating-point add instruction with the original addend is then inserted into the instruction stream following the modified floating-point multiply-add instruction (block 98).

[0036] When the operands for the floating-point multiply operation are available, such as in an Execute stage, they are inspected to determine whether the floating-point multiply operation is guaranteed to produce normal intermediate and final results. If the floating-point multiply operation might produce an unnormal intermediate or a denormal final result (block 100), the modified multiply-add and additional add instructions are processed by conventional pipeline operation (block 106), normalizing/denormalizing the product using the normalization circuit 58 of the floating-point adder 52, prior to performing the floating-point add operation, as described above.

[0037] If it is determined that the floating-point multiply operation will produce a normal intermediate and final product (block 100), the product normalization is suppressed. The original addend is substituted for zero in the floating-point multiply-add instruction (block 102), and the additional floating-point add operation is suppressed by converting the floating-point add instruction to a NOP (block 104). Instruction processing then continues by conventional pipeline operation (block 86).

[0038] According to one or more embodiments, intermediate unnormal outputs of floating-point multiply operations and denormal final results are normalized/denormalized utilizing normalization circuits 58 in a floating-point adder 52. This obviates the need to add normalization circuits to the output of the floating-point multiplier 50, which would add latency and delay, increase silicon area, and increase power consumption.

[0039] Although the present invention has been described herein with respect to particular features, aspects and embodiments thereof, it will be apparent that numerous variations, modifications, and other embodiments are possible within the broad scope of the present invention, and accordingly, all variations, modifications and embodiments are to be regarded as being within the scope of the disclosure. The present embodiments are therefore to be construed in all aspects as illustrative and not restrictive and all changes coming within the meaning and equivalency range of the appended claims are intended to be embraced therein.

What is claimed is:

1. A method of executing a floating-point multiply instruction to account for denormal inputs and/or a denormal product, comprising:

   converting the floating-point multiply instruction to a floating-point multiply-add instruction operative to perform a floating-point multiply operation and a floating-point add operation; and

   forcing one addend of the floating-point add operation to zero.

2. The method of claim 1 wherein the method steps are performed only in a denormal support mode.

3. The method of claim 1 wherein converting the floating-point multiply instruction to a floating-point multiply-add instruction occurs prior to an execution pipeline stage.

5

**4.** The method of claim 3 wherein converting the floating-point multiply instruction to a floating-point multiply-add instruction occurs in a decode pipeline stage.

**5.** The method of claim 1 wherein the floating-point multiply-add instruction is non-fused, and further comprising routing the output of a floating-point multiplier to a normalization circuit of a floating-point adder.

**6.** The method of claim 5 wherein routing the output of a floating-point multiplier to a normalization circuit of a floating-point adder comprises routing the output of the floating-point multiplier directly to the normalization circuit.

**7.** The method of claim 5 wherein routing the output of a floating-point multiplier to a normalization circuit of a floating-point adder comprises routing the output of the floating-point multiplier to the normalization circuit through one or more pipeline memory elements.

**8.** The method of claim 1 further comprising:

inspecting a multiplier and multiplicand of the floating-point multiply instruction;

determining, based on the inspection, that the product of the multiply operation will not be a denormal number and that the multiply operands are not denormal; and

in response to such determination, suppressing the floating-point add operation.

**9.** The method of claim 8 wherein inspecting the multiplier and multiplicand occurs in an execute pipeline stage.

**10.** The method of claim 8 wherein suppressing the floating-point add operation comprises operand-forwarding the output of a floating-point multiplier so that it may be consumed by subsequent instructions.

**11.** The method of claim 1 wherein the floating-point multiply instruction is a non-fused floating-point multiply-add instruction, and wherein converting the floating-point multiply instruction comprises:

substituting the value zero for the addend of the floating-point multiply-add instruction; and

inserting after the floating-point multiply-add instruction a floating-point add instruction having the addend of the original floating-point multiply-add instruction.

**12.** The method of claim 11 further comprising:

inspecting a multiplier and multiplicand of the floating-point multiply-add instruction;

determining, based on the inspection, that the product of the multiply operation will not be a denormal number; and

determining, based on the inspection, that the inputs to the multiply operation are not denormal numbers; and

in response to such determination, replacing the zero addend with the addend of the original multiply-add instruction, and converting the floating-point add instruction to a NOP.

**13.** A processor, comprising:

one or more instruction execution pipelines;

a floating-point multiplier;

a floating-point adder having a normalization circuit; and

a pipeline controller operative to normalize or denormalize a floating-point product output by the floating-point multiplier using the normalization circuit of the floating-point adder.

**14.** The processor of claim 13 wherein the pipeline controller normalizes or denormalize the floating-point product only in a denormal support mode.

**15.** The processor of claim 13 wherein the pipeline controller normalizes or denormalizes the floating-point product by directing the pipeline to convert each floating-point multiply instruction to a floating-point multiply-add instruction operative to perform a floating-point multiply operation and a floating-point add operation; and forcing one addend of the floating-point add operation to zero.

**16.** The processor of claim 15 wherein the pipeline controller directs the pipeline to convert each floating-point multiply instruction to a floating-point multiply-add instruction prior to an execution pipe stage.

**17.** The processor of claim 16 wherein the pipeline controller directs the pipeline to convert each floating-point multiply instruction to a floating-point multiply-add instruction in a decode pipe stage.

**18.** The processor of claim 13 wherein the pipeline controller is further operative to predict whether the floating-point multiplier could possibly produce an unnormal intermediate product or a denormal final product by inspection of a multiplier and multiplicand prior to performing a floating-point multiply operation, and if not, suppress normalization or denormalization of the output of the floating-point multiplier.

**19.** The processor of claim 18 wherein the pipeline controller suppresses normalization or denormalization of the output of the floating-point multiplier by operand-forwarding the product so that it may be consumed by subsequent instructions.

**20.** The processor of claim 13 wherein the pipeline controller normalizes or denormalizes the denormal floating-point product by:

directing the pipeline to convert each non-fused floating-point multiply-add instruction to a floating-point multiply-add instruction with an addend of zero; and

insert after the floating-point multiply-add instruction a floating-point add instruction having the addend of the original floating-point multiply-add instruction.

**21.** The processor of claim 20 wherein the pipeline controller is further operative to predict whether the floating-point multiplier could possibly produce an unnormal intermediate product or denormal final product by inspection of a multiplier and multiplicand prior to performing a floating-point multiply operation, and if not, suppress normalization of the output of the floating-point multiplier.

**22.** The processor of claim 21 wherein the pipeline controller suppresses normalization or denormalization of the output of the floating-point multiplier by replacing the zero addend with the addend of the original multiply-add instruction, and converting the floating-point add instruction to a NOP.

\*     \*     \*     \*     \*

Trials@uspto.gov
571-272-7822

Paper 16
Entered: May 12, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

————————————

IPR2021-00155
Patent 10,416,961 B2

————————————

Before JUSTIN T. ARBES, KRISTI L. R. SAWERT, and
JASON M. REPKO, *Administrative Patent Judges.*

PER CURIAM.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2021-00155
Patent 10,416,961 B2

## I.    INTRODUCTION

Google LLC ("Petitioner") filed a petition to institute *inter partes* review of claims 1–5, 10, 13, 14, 21, and 23–25 of U.S. Patent No. 10,416,961 B2 (Ex. 1001, "the '961 patent"). Paper 2 ("Pet."). Singular Computing LLC ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp.").

To institute an *inter partes* review, we must determine "that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). For the reasons discussed below, Petitioner has shown a reasonable likelihood that it would prevail with respect to all claims challenged in the Petition. And we have not been provided a sufficient reason to exercise our discretion to deny institution. Thus, we institute an *inter partes* review.

### A.    Related Matters

According to the parties, the '961 patent has been asserted in *Singular Computing LLC v. Google LLC*, No. 1:19-cv-12551-FDS (D. Mass.). *See* Pet. xi; Paper 6, 1 (Mandatory Notices).

According to the parties, the '961 patent is also challenged in IPR2021-00154. *See* Pet. x; Paper 6, 1. The parties also identify the following *inter partes* reviews as related: IPR2021-00164 and IPR2021-00165 (U.S. Patent No. 9,218,156 B2); and IPR2021-00178 and IPR2021-00179 (U.S. Patent No. 8,407,273 B2). *See* Pet. xi; Paper 6, 1.

IPR2021-00155
Patent 10,416,961 B2

### B.  The '961 Patent

The '961 patent, entitled "Processing with Compact Arithmetic Processing Element," issued on September 17, 2019. Ex. 1001, code (45). The '961 patent relates to "computer processors or other devices which use low precision high dynamic range (LPHDR) processing elements to perform computations (such as arithmetic operations)." *Id.* at 5:58–62.

According to the '961 patent, conventional CPU chips make inefficient use of transistors as a tradeoff for delivering the high precision required by many applications. *Id.* at 2:62–3:10. For example, conventional CPU chips "perform[] exact arithmetic with integers typically 32 or 64 bits long and perform[] rather accurate and widely standardized arithmetic with 32 and 64 bit floating point numbers," but require "on the order of a million transistors to implement the arithmetic operations." *Id.* at 3:3–10. According to the '961 patent, "many economically important applications . . . are not especially sensitive to precision and . . . would greatly benefit, in the form of application performance per transistor, from the ability to draw upon a far greater fraction of the computing power inherent in those million transistors." *Id.* at 3:11–17. But "[c]urrent architectures for general purpose computing fail to deliver this power." *Id.* at 16–17.

The '961 patent is therefore "directed to a processor or other device, such as a programmable and/or massively parallel processor or other device, which includes processing elements designed to perform arithmetic operations . . . on numerical values of low precision but high dynamic range ('LPHDR arithmetic')." *Id.* at 1:66–2:15. According to the '961 patent, "'low precision' processing elements perform arithmetic operations which produce results that frequently differ from exact results by at least 0.1%." *Id.*

IPR2021-00155
Patent 10,416,961 B2

at 2:16–19. In addition, "high dynamic range" processing elements "are capable of operating on inputs and/or producing outputs spanning a range at least as large as from one millionth to one million." *Id.* at 2:23–27. Figure 6, reproduced below "is an example of an LPHDR arithmetic unit according to one embodiment" of the '961 patent.



FIG. 6 provides "an example design for an LPHDR arithmetic unit according to one embodiment of" the '961 patent. Ex. 1001, 2:44–45.

As shown in Figure 6, LPHDR arithmetic unit 408 receives two inputs: A input (602a) and B input (602b), and produces output 602c. *Id.* at 12:55–56. The LPHDR arithmetic unit "is controlled by control signals 412*a-d*, coming from the CU 106, that determine which available arithmetic operation will be performed on the inputs 602*a-b*." *Id.* at 12:62–65. According to the '961 patent, Figure 6 illustrates an embodiment where "all the available arithmetic operations are performed in parallel on the inputs 602*a-b* by adder/subtractor 604, multiplier 606, and divider 608." *Id.* at 12:65–13:1. Finally, multiplexers (MUXes) 610a and 610b choose and send the desired result from among the outputs of the adder/subtractor, multiplier,

IPR2021-00155
Patent 10,416,961 B2

and divider to output 602c. *Id.* at 13:5–14. The '961 patent provides that "[t]he computing architecture literature discusses many variations which may be incorporated into the embodiment illustrated in FIG. 6." *Id.* at 13:12–14.

According to the '961 patent, the "computational tasks" that the LPHDR arithmetic units can perform "enable a variety of practical applications." *Id.* at 17:30–33. The '961 patent provides, as examples, applications including "finding nearest neighbors," *id.* at 17:41–21:43, "distance weighted scoring," *id.* at 21:45–22:35, and "removing motion blur in images," *id.* at 22:37–23:48.

### C.  Claims

Of the claims challenged by Petitioner, claims 1, 10, and 21 are independent. Claim 1 is reproduced below.

> 1. A device comprising:

> at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value,

> wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input; and

IPR2021-00155
Patent 10,416,961 B2

> at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit.

Ex. 1001, 30:17–37.

### D. Evidence

| Name | Reference | Exhibit No. |
|------|-----------|-------------|
| Dockser | US 2007/0203967 A1, published Aug. 30, 2007 | 1007 |
| Tong et al. ("Tong") | "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic," IEEE Transactions on Very Large Scale Integration (VLSI) Systems, Vol. 8, No. 3 (June 2000) | 1008 |
| MacMillan | US 5,689,677, issued Nov. 18, 1997 | 1009 |

### E. Asserted Grounds

Petitioner asserts that claims 1–5, 10, 13, 14, 21, and 23–25 are unpatentable on the following grounds listed in the table below. Pet. 4.

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|-------------------|-------------|--------------------|
| 1, 2, 4, 5, 10, 13, 14 | pre-AIA 103(a)[1] | Dockser |
| 1, 2, 4, 5, 10, 13, 14, 21, 24, 25 | pre-AIA 103(a) | Dockser, Tong |
| 1–5, 10, 13, 14 | pre-AIA 103(a) | Dockser, MacMillan |
| 1–5, 10, 13, 14, 21, 23–25 | pre-AIA 103(a) | Dockser, Tong, MacMillan |

## II.  ANALYSIS

### A.  Level of Ordinary Skill in the Art

According to Petitioner,

---

[1] Congress amended §§ 102 and 103, among other sections, when it passed the Leahy-Smith America Invents Act (AIA). Pub. L. No. 112–29, § 3(c), 125 Stat. 284, 287 (2011). Here, Petitioner's challenges are based on pre-AIA statutes. *See* Pet. 4.

IPR2021-00155
Patent 10,416,961 B2

> A [person of ordinary skill in the art ("POSA")] in 2009 would
> have had at least a bachelor's degree in Electrical Engineering,
> Computer Engineering, Applied Mathematics, or the equivalent,
> and at least two years of academic or industry experience in
> computer architecture.

Pet. 9 (citing Goodin Decl.[2] ¶ 43).

Patent Owner does not address the level of ordinary skill in the art in
its Preliminary Response. Based on the record presented, including our
review of the '961 patent and the types of problems and solutions described
in the '961 patent and cited prior art, we agree with Petitioner's proposed
definition of the level of ordinary skill in the art with one exception.
Arguably, the term "at least" creates unnecessary ambiguity. Thus, we delete
that term from Petitioner's definition, and otherwise apply Petitioner's
definition for purposes of this Decision. *See, e.g.*, Ex. 1001 1:14–62
(describing in the "Background" section of the '961 patent various
conventional methods of computation and their alleged deficiencies).

## B. Claim Construction

We need only construe terms that are in controversy and only to the
extent necessary to resolve the controversy. *Nidec Motor Corp. v.
Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

Petitioner states that the terms of the challenged claims should be
"given their ordinary and customary meaning as understood by a [person of
ordinary skill in the art] in accordance with the specification and prosecution
history," but does not propose any express interpretations. Pet. 9. Patent
Owner disputes the construction of "low precision high dynamic range

---

[2] The declaration of Richard Goodin, P.E. ("Goodin Decl.") is Exhibit 1003.

IPR2021-00155
Patent 10,416,961 B2

(LPHDR) execution unit" that Petitioner proposed in the related district court case (i.e., "low precision and high dynamic range processing element designed to perform arithmetic operations on numerical values"), arguing that Dockser does not teach an LPHDR execution unit because "the processing element itself must be fairly characterized as 'low precision'" and cannot be an execution unit "whose subprecision can be selectively reduced." Prelim. Resp. 13–14 (citing Ex. 2001, 13–17) (emphasis omitted). We conclude that no terms require express interpretation at this time, and address the parties' arguments regarding whether Dockser teaches the recited LPHDR execution unit below. *See infra* § II.C.

### C.  *Obviousness over Dockser*

Dockser discloses performing floating-point operations with a floating-point processor having selectable precision. Ex. 1007, code (57). Figure 1 of Dockser is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



FIG. 1

Figure 1 depicts floating-point processor (FPP) 100 including floating-point register file (FPR) 110 for storing floating-point numbers, floating-point controller (CTL) 130 "used to select the subprecision of the floating-point operations using a control signal 133," and floating-point mathematical operator (FPO) 140 with components "configured to perform the floating-point operations," such as floating-point adder (ADD) 142 and floating-point multiplier (MUL) 144. *Id.* ¶¶ 15, 18, 19.

Figure 2 of Dockser is reproduced below.

IPR2021-00155
Patent 10,416,961 B2



FIG. 2

Figure 2 depicts an exemplary data structure for floating-point register file 110 including 16 addressable register locations 200, each "configured to store a 32-bit binary floating-point number" as "a 1-bit sign 202, an 8-bit exponent 204, and a [23-bit] fraction 206." *Id.* ¶ 17.

"[F]or each instruction of a requested floating-point operation, the relevant computational unit . . . receive[s] from the floating-point register file 110 one or more operands stored in one or more of the register locations" and executes the instruction "at the subprecision selected by the floating-point controller 130." *Id.* ¶¶ 23–24. The precision of the floating-point operation can be reduced by "caus[ing] power to be removed from the floating-point register elements for the excess bits of the fraction that are not required to meet the precision specified by the subprecision select bits" written to the control register. *Id.* ¶¶ 6, 25–26. For example, "if

IPR2021-00155
Patent 10,416,961 B2

each location in the floating-point register file contains a 23-bit fraction, and the subprecision required for the floating-point operation is 10-bits, only the 9 commonly significant bits (MSBs) of the fraction are required; the hidden or integer bit makes the tenth." *Id.* ¶ 26. "Power can be removed from the floating-point register elements for the remaining 14 fraction bits." *Id.*

Alternatively, power can be removed in elements of "the logic in the floating-point operator 140 that remains unused as a result of the subprecision selected." *Id.* ¶¶ 7, 27, 29, 32, Fig. 2 (depicting mantissa fraction 206 as having portion 322 for powered bits and portion 324 for unpowered bits). Figures 3A and 3B of Dockser show such removal of power to the floating-point operator logic for a floating-point addition and floating-point multiplication operation, respectively. Figure 3B of Dockser is reproduced below.



FIG. 3B

Figure 3A depicts k-bit multiplicand 402 and k-bit multiplier 404 to be multiplied together "using a shift-and-add technique," where the multiplication occurs in stages 410-1 through 410-m. *Id.* ¶¶ 30–31. A partial

IPR2021-00155
Patent 10,416,961 B2

product 420-i is generated for every bit in multiplier 404 at corresponding stage 410-i and then left-shifted "as a function of the multiplier bit with which it is associated, after which the operation moves on to the next stage." *Id.* ¶ 31. The partial products are eventually added together to generate output value 430. *Id.* "[P]ower may be removed from the logic used to implement the stages to the right of the line 405" indicating the selected subprecision. *Id.* ¶¶ 32–33.

### 1.  Claim 1

#### a)  Petitioner's Mapping of Dockser to the Limitations of Claim 1

Petitioner argues that Dockser teaches or suggests all the limitations of claim 1. Pet. 10–39. Petitioner contends that Dockser teaches a "device" (i.e., computing system) comprising a "low precision high dynamic range (LPHDR) execution unit" (i.e., the FPP).[3] *Id.* at 13–15. With respect to the "low precision" aspect of the limitation, Petitioner argues that the FPP is "low precision" because "'the precision' of operations in the FPP is 'reduced'" and because the FPP "operates with the minimum imprecision" required by the subsequent language in claim 1. *Id.* at 15 (quoting Ex. 1007 ¶ 14). With respect to the "high range" aspect of the limitation, Petitioner asserts that the FPP "uses an 8-bit floating-point exponent . . . that provides an even higher dynamic range" than the 6-bit floating-point exponent disclosed in the '961 patent. *Id.* (citing Ex. 1007 ¶ 17; Ex. 1001, 14:61–15:3).

---

[3] Petitioner also provides an "alternative mapping" where "the floating-point operator (FPO) inside Dockser's FPP" constitutes an LPHDR execution unit. Pet. 14–15, 19, 38. We need not evaluate those arguments at this time, as we determine that Petitioner has made a sufficient showing on the current record that the FPP is an LPHDR execution unit.

Petitioner argues that Dockser's FPP is adapted to execute a "first operation" (e.g., "reduced-precision multiplication") on a "first input signal representing a first numerical value" (i.e., input electrical signal representing an operand received at the registers) to produce a "first output signal representing a second numerical value" (i.e., output electrical signal representing an operand sent to a register and then main memory), where the FPP "performs operations on the[] inputs via the FPP's data paths 134–139 and components 140–144." *Id.* at 15–19. Petitioner further argues that "the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000," as recited in claim 1, because the FPP "operates on IEEE-754 32-bit single-format numbers having 8-bit exponents" and, therefore, the dynamic range of normal operands would be "from around $2^{-126}$ (much smaller than 1/65,000) to around $2^{127}$ (much larger than 65,000)." *Id.* at 20.

> The next limitation of claim 1 is that
>
> for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the result of an exact mathematical calculation of the first operation on the numerical values of that same input.

We refer to this as "the imprecision limitation." With respect to the "statistical mean" aspect of the imprecision limitation, Petitioner argues that a person of ordinary skill in the art would have understood the limitation

> in the context of the '961 patent's stated intent to claim not only "repeatable" deterministic embodiments like digital circuits that always produce the same output when repeating an operation on the same input, but also analog embodiments that are

non-deterministic because they "introduce noise into their computations, so the computations are not repeatable."

*Id.* at 22 (quoting Ex. 1001, 3:63–4:2). Specifically, for "non-deterministic embodiments," the statistical mean would be the average of "the different outputs produced by the same operation on the same input." *Id.* For "deterministic digital embodiments" like Dockser, though, the statistical mean is "the same as the numerical value of the first output signal for any individual execution of the first operation on each specific input, because that output is always the same for any specific input." *Id.* at 23. Consequently, repeatedly executing a multiplication operation using Dockser's floating-point multiplier "on the same input (*i.e.*, pair of operands) with the same precision level yields the same result for every execution; therefore, the statistical mean of the outputs is the same as the output for any single execution." *Id.*

With respect to the "exact mathematical calculation" aspect of the imprecision limitation, Petitioner argues that because Dockser performs a reduced-precision multiplication, the result of the operation differs from what would be the exact mathematical result of the operation, namely "the (>32-bit) product that would result if the pair of input 32-bit operands were multiplied without reducing precision." *Id.* at 24 (emphasis omitted).

Petitioner further explains how Dockser teaches that "for at least X=10% of the possible valid inputs to the first operation," the statistical mean of the results of executing the first operation "differs by at least Y=0.2%" from the result of the exact mathematical calculation. *Id.* at 24–39. The "possible valid inputs" in Dockser are "the set of possible normal IEEE-754 32-bit single-format numbers forming pairs of operands in input signals to the execution unit that can be multiplied together to produce an output

IPR2021-00155
Patent 10,416,961 B2

representing a numerical value (rather than, *e.g.*, an overflow/underflow exception)." *Id.* at 25. Petitioner argues that Dockser's FPP operates at a precision level meeting the claimed X and Y percentages for such input pairs, pointing to Dockser's description of retaining only some of the bits of a mantissa fraction (e.g., the 9 most-significant bits of a 23-bit fraction, as shown in Figure 2 above) and dropping the remaining "excess bits" (e.g., the other 14 bits). *Id.* Dockser teaches dropping the excess bits to reduce precision by either (1) "removing power from storage elements in the FPP's registers that correspond to the excess (dropped) mantissa bits," or (2) "removing power from elements within the multiplier logic that computes the product of the operand mantissas." *Id.* at 26. Petitioner contends that both techniques, used either individually or in combination, teach the recited imprecision. *Id.* at 27–39. We determine that Petitioner has made a sufficient showing on the current record with respect to the first precision-reducing technique, and need not evaluate Petitioner's alternative arguments at this time.

Relying on the first technique and Dockser's example of retaining 9 mantissa bits and dropping 14 mantissa bits, Petitioner argues that a person of ordinary skill in the art "would have understood the output of unpowered storage elements would be tied to zero voltage (*e.g.*, ground), making those 14 'excess' bits zeroes." *Id.* at 29. Multiplying two operands with excess bits dropped results in an output with reduced precision from the exact product, where the amount of error depends on the number of mantissa bits dropped. *Id.* at 30–31. Petitioner contends that an ordinarily skilled artisan would have understood, by "straightforward math" described in Appendix I.A to the Petition, that "the relative error (the claimed 'Y' percentage) of any floating-

IPR2021-00155
Patent 10,416,961 B2

point number output from Dockser's reduced-precision multiplication is the same as the relative error of its mantissa, independent of its exponent and sign." *Id.* at 31.

Petitioner provides a detailed explanation as to why a person of ordinary skill in the art would have understood Dockser as teaching the recited X and Y percentages of claim 1. *Id.* at 32–35.

First, Petitioner states that "[g]iven the massive number of possible inputs to Dockser's FPP (including over 70 trillion possible pairs of normal IEEE-754 single-format mantissas), a [person of ordinary skill in the art] would have performed Dockser's FPP operation in software to determine the fraction X of all possible valid inputs that produce at least the claimed relative error Y when a given number of mantissa bits are dropped." *Id.* at 32. Petitioner states that Mr. Goodin wrote such a program to perform reduced-precision multiplication retaining 9 mantissa bits and dropping the 14 excess bits as in Dockser that tested all possible valid mantissa pairs and "produce[d] at least Y=0.2% relative error for 14.6% of possible valid inputs (greater than X=10%)." *Id.* at 33, 66–68 (citing Goodin Decl. ¶¶ 412–426, 464–469).

Second, Petitioner argues that a person of ordinary skill in the art "would also have understood algebraically that Dockser's register bit-dropping technique meets [the limitation] when performed at certain selected precision levels by examining the absolute *minimum* relative error produced by zeroing certain mantissa bit positions." *Id.* at 33. Petitioner explains how over 12% of possible input operands "have a zero as their most-significant (leftmost) mantissa fraction bit and ones as their eighth and ninth fraction bits," such that retaining only 7 mantissa bits of operands would result in

16

IPR2021-00155
Patent 10,416,961 B2

"*every* input in that 12% produc[ing] at *minimum* 0.39% relative error." *Id.*
at 33, 68–72 (citing Goodin Decl. ¶¶ 427–444).

Claim 1 further recites, "at least one first computing device adapted to
control the operation of the at least one first LPHDR execution unit."
Petitioner asserts that Dockser's main processor meets the computing device
limitation because the processor writes subprecision select bits to the FPP's
control register. Pet. 39. Petitioner asserts that, this way, Dockser's main
processor is adapted to control the FPP's operation by specifying its
precision level. *Id.* (citing Ex. 1007 ¶¶ 15, 18, 25, 35; Goodin Decl. ¶ 310).

Petitioner's contentions regarding claim 1 are supported by the
testimony of Mr. Goodin. *See id.* at 13–39; Goodin Decl. ¶¶ 183–310.

### b) *Patent Owner's Arguments*

Patent Owner makes two arguments in its Preliminary Response
disputing Petitioner's contentions regarding claim 1. Prelim. Resp. 7–23.

### (1) *LPHDR Execution Unit*

First, Patent Owner argues that Dockser's FPP is not a "low precision
high dynamic range (LPHDR) execution unit" because it is also "capable of
operating at full precision." Prelim. Resp. 11–12. According to Patent
Owner, "Dockser discloses a 32-bit FPP that includes all of the circuitry
needed for full precision arithmetic on data in IEEE 32-bit format, and also
having additional circuitry allowing for selectable subprecisions." *Id.* at 11.
As support for this reading of Dockser, Patent Owner points to statements in
Dockser that precision "may" be reduced and that certain applications
require "greater precision." *Id.* at 11–12 (citing Ex. 1007 ¶¶ 3, 14, 26, 28).

IPR2021-00155
Patent 10,416,961 B2

Patent Owner also argues that Petitioner incorrectly focuses on whether the FPP is "capable of performing a few operations that are 'low precision'" in a "9-bit subprecision mode," rather than "whether the execution unit itself can be fairly characterized as being 'low precision.'" *Id.* at 12–13. Patent Owner asserts that Dockser's FPP is "a full precision processor that—even when performing operations in a reduced precision mode—includes all of the circuitry and capability needed to perform full precision operations." *Id.* at 13.

We disagree based on the current record. Patent Owner's position is that, to be an LPHDR execution unit, the execution unit must be capable of low-precision operations and nothing else. We are not persuaded that the claim language is so limiting. Claim 1 recites a "device comprising . . . at least one first low precision high dynamic range (LPHDR) execution unit." The only limitations on the execution unit recited in the claim are that the execution unit be "low precision," "high dynamic range," and "adapted to execute a first operation" meeting certain criteria specified in the imprecision limitation (i.e., a minimum relative error Y for a minimum fraction X of possible valid inputs in a specified dynamic range). As Petitioner points out, the claim does not recite any structural characteristics of the execution unit and does not include any negative limitation precluding the execution unit from performing other types of operations. *See* Pet. 31; Reply 1. The recitation of "a first operation" in claim 1 further requires only one or more first operations (that meet the low precision criteria specified in the claim); it does not say that "every" operation must be low precision or exclude other capabilities for other operations. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has

repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"). On this record, we see no reason why the claim precludes the execution unit from having additional circuitry for performing other types of operations, as long as the execution unit is capable of performing the recited first operation and meeting the criteria set forth in the imprecision limitation.

Petitioner has provided sufficient evidence at this stage that Dockser performs operations at the precision level specified in the imprecision limitation. Dockser's FPP "perform[s] certain mathematical operations," such as "multiplication," at "reduced precision." Ex. 1007 ¶¶ 1, 30–32. Specifically, Petitioner expressly identifies "reduced-precision multiplication" as the "first operation" in Dockser. Pet. 15–19. And Petitioner calculates the relative error for multiplication of all possible input operands when the operands have 9 retained mantissa bits and 14 dropped mantissa bits.[4] *Id.* at 25, 30–31. That is consistent with Dockser, which discloses a specific example of multiplying 23-bit operands having 9 retained mantissa bits and 14 dropped mantissa bits. *See* Ex. 1007 ¶¶ 26, 29.

Importantly, as Patent Owner acknowledges, Dockser's example of 9-bit precision multiplication is a distinct operation from multiplication at other levels of precision. *See* Prelim. Resp. 20 (arguing that Dockser can "perform an addition operation $a+b$ in full precision mode, 22-bit mode,

---

[4] Accordingly, we do not agree with Patent Owner that Petitioner improperly made a new argument in its Reply that "multiplying two input values in a way that reduces precision down to 9 mantissa bits" constitutes a "first operation." Sur-Reply 2.

IPR2021-00155
Patent 10,416,961 B2

21-bit mode, etc." and that "[e]ach of these operations is distinct, and generally produces different outputs, with some being more precise than others"). Dockser describes exactly how such multiplication is performed, and the functionality of the FPP differs depending on which level of precision multiplication is selected. *See, e.g.*, Ex. 1007 ¶¶ 30–34, Fig. 3B; Pet. 24–36. On this record, we find the fact that Dockser is capable of performing other, different operations (e.g., 23-bit full precision) does not detract from Dockser's disclosure of a specific example meeting the "low precision" requirements of the claim.

Patent Owner further argues that Petitioner fails to show that it would have been obvious to modify Dockser's FPP to be an LPHDR execution unit. Prelim. Resp. 14–17. Patent Owner contends that Dockser teaches away from such a unit because

> rather than committing itself to performing low precision operations on a very high percentage of all possible valid inputs (in order to shrink the size of the execution unit), Dockser specifically teaches that its selectable precision (which means supporting full precision and programmability, both of which increase the size of the execution unit) is the key feature of the Dockser FPP.

*Id.* at 14–15 (citing Ex. 1007 ¶ 3). Dockser's FPP "is more complex than conventional 32-bit microprocessors, not less," so an ordinarily skilled artisan would not be motivated to "reverse course" and make it only capable of low precision operations according to Patent Owner. *Id.* at 16–17 (emphasis omitted). As explained above, however, we disagree on this record with Patent Owner's position that an LPHDR execution unit must be incapable of anything other than low precision operations, and thus do not agree that a modification to Dockser in that respect is necessary. We find Petitioner's analysis as to why a person of ordinary skill in the art would

IPR2021-00155
Patent 10,416,961 B2

have understood Dockser's FPP to be an LPHDR execution unit, supported
by the testimony of Mr. Goodin, sufficient at this early stage.

### *(2) Imprecision Limitation*

Second, Patent Owner argues that Dockser does not teach or suggest
the imprecision limitation because Petitioner fails to show that Dockser's
output over all "possible valid inputs" meets the limitation. Prelim. Resp.
17–23. According to Patent Owner, "[t]he range of possible valid inputs for
Dockser" includes all possible IEEE 32-bit values "across the entire range of
the possible subprecision select bits," not just operands with 9 retained
mantissa bits and 14 dropped mantissa bits as Petitioner discussed in the
Petition. *Id.* at 19–20. Patent Owner argues that Mr. Goodin's software
program addresses "only a small subset of Dockser's possible valid inputs"
because it fails to account for "whether the imprecision limitation is met for
subprecision select bits corresponding to any implementation where fewer
than 14 bits are dropped." *Id.* In Patent Owner's view, the analysis of
Dockser needs to take into account operations at "full precision mode, or 22-
bit mode, etc." *Id.* at 20–21.

We disagree based on the current record. The imprecision limitation
recites that "for at least X=10% of the possible valid inputs to *the first
operation*, the statistical mean, over repeated execution of *the first operation*
on each specific input from the at least X % of the possible valid inputs to
*the first operation*," "executing *the first operation* on that input differs by at
least Y=0.2% from the result of an exact mathematical calculation of *the
first operation* on the numerical values of that same input." Ex. 1001, 30:23–
34 (emphases added). The relevant inquiry thus looks at all possible valid

inputs to the first operation—not all possible valid inputs to the LPHDR execution unit overall, or all possible valid inputs to other operations. Again, in its mapping of Dockser to claim 1, Petitioner expressly identifies "reduced-precision multiplication" as "the first operation." Pet. 15–19. Dockser discloses a specific example of multiplying operands having 9 retained mantissa bits and 14 dropped mantissa bits. Ex. 1007 ¶¶ 26, 30–34, Fig. 3B. The relevant possible valid inputs for assessing the imprecision limitation, therefore, are the inputs to that operation. On this record, we see no reason why the analysis of Dockser also needs to account for other operations, such as "full precision" multiplication, which Patent Owner acknowledges are "distinct" operations. *See* Prelim. Resp. 20.

Patent Owner also challenges Mr. Goodin's analysis as "impermissibly applying hindsight and using the claims as a roadmap" because "he opines that a [person of ordinary skill in the art] would operate Dockser with the *express goal* of dropping enough bits from the mantissa to meet the imprecision limitation." *Id.* at 16 (citing Goodin Decl. ¶ 280). We disagree based on the current record. The precision level of 9 retained mantissa bits and 14 dropped mantissa bits that Mr. Goodin analyzes is not chosen with the goal of meeting the imprecision limitation, but rather is the specific example described in Dockser. *See* Goodin Decl. ¶¶ 254, 268–269, 273, 275. Mr. Goodin describes the calculations performed by his software program and explains why he believes that a person of ordinary skill in the art would have understood Dockser's description of multiplication at the 9-bit precision level teaches the imprecision limitation. *See id.* ¶¶ 281–283, 412–426. Further, Mr. Goodin cites extensively to language in Dockser describing reduced-precision multiplication in support of his opinions. *See*

IPR2021-00155
Patent 10,416,961 B2

*id.* ¶¶ 247–258. Patent Owner has not presented any evidence at this stage indicating that Mr. Goodin's calculations for Dockser's 9-bit precision level are factually incorrect. As for Petitioner's theory based on retaining 9 mantissa bits, we have reviewed that supporting testimony and are persuaded, based on the current record, that a person of ordinary skill in the art would have understood Dockser to teach the imprecision limitation of claim 1.

As for Petitioner's theory based on retaining 7 mantissa bits (Pet. 33–35), Patent Owner argues that "Petitioner uses a hindsight analysis to posit that it would have been obvious to select 7-bit precision in Dockser because 7-bit precision would meet the imprecision limitation." Prelim. Resp. 21. Patent Owner argues that the 7-bit precision mode is one of at least 17 distinct subprecision modes, and the number of the operations performed at 7-bit precision is less than one percent of the possible valid inputs overall. *Id.*

We invite the parties to address whether the Petition contains a sufficient explanation why a person of ordinary skill in the art would have selected the 7-bit mode over other precision modes in Dockser. *See, e.g.*, Pet. 10–39. The parties are also invited to discuss Petitioner's choice to analyze the 9-bit case using a software program, but analyze the 7-bit case algebraically. *Compare id.* at 68 (analyzing 9 and 5 retained fraction bits), *with id.* at 72 (analyzing 7 and 5 retained fraction bits).

IPR2021-00155
Patent 10,416,961 B2

### c)  Conclusion

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claim 1 is unpatentable over Dockser.

### 2.  Claims 2, 4, 5, 10, 13, and 14

We have reviewed Petitioner's contentions regarding claims 2, 4, 5, 10, 13, and 14 and are persuaded that Petitioner has made a sufficient showing at this stage for those claims as well. *See* Pet. 40–41. Petitioner explains how each limitation of the dependent claims is taught or rendered obvious by the disclosure of Dockser. *Id.* For example, claim 2 recites that "the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine." Ex. 1001, 30:38–42. Dockser discloses a general purpose processor. Ex. 1007 ¶ 35; *see* Pet. 40. Petitioner's contentions are supported by the testimony of Mr. Goodin and are persuasive based on the current record. *See id.* at 36–38; Goodin Decl. ¶¶ 311–312. Patent Owner does not argue the challenged dependent claims separately, only disputing Petitioner's arguments regarding independent claim 1. *See* Prelim. Resp. 7–23. We disagree with Patent Owner's arguments based on the current record for the reasons explained above. *See supra* § II.C.1.

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 2, 4, 5, 10, 13, and 14 are unpatentable over Dockser.

### D.   Obviousness over Dockser and Tong

#### 1.   Tong

Tong is an IEEE journal article entitled "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic." Ex. 1008, 273. Tong teaches reducing power consumption by minimizing the bitwidth representation of floating-point data. *Id.* According to Tong, using a variable bitwidth floating-point unit saves power. *Id.*

#### 2.   Claim 1

Petitioner asserts that "Tong, like Dockser . . . , confirms that the number of mantissa bits used in a high-dynamic-range floating-point execution unit was a well-known result-effective variable impacting power consumption and precision."[5] Pet. 43 (citing Ex. 1008, 273–278, Goodin Decl. ¶¶ 323–325). Petitioner relies on Tong's Figure 6, reproduced below with Petitioner's annotations. *Id.* at 44.

---

[5] Petitioner presents sufficient evidence on the current record to establish a reasonable likelihood that Tong is a prior art printed publication under 35 U.S.C. § 102(b). *See* Pet. 42–43 (citing Ex. 1025 ¶¶ 8–11; Ex. 1026, 27; Ex. 1027, 27).

IPR2021-00155
Patent 10,416,961 B2



Tong's Figure 6, above, is a line graph showing program accuracy, from 0% to 100%, on the vertical axis and mantissa bitwidth, from 1 to 23, on the horizontal axis. *Id.* at 43–44. The figure shows this data for five programs: ALVINN, Bench22, Fast DCT, PCASYS, and Sphinx. *Id.* The programs implement different signal-processing tasks. *See, e.g.*, Ex. 1008, 278 (Table IV). ALVINN, for example, is a neural network trainer that uses backpropagation. *Id.* And Sphinx is a speech-recognition program. *Id.*

For the ALVINN and Sphinx line plots in Tong's Figure 6, Petitioner added a dashed red line extending vertically through the data points with a mantissa bitwidth of 5. Pet. 44. Petitioner asserts that, for these programs, Tong teaches that "the accuracy does not change significantly with as few as 5 mantissa [fraction] bits." *Id.* (quoting Tong 278, § V.B.). In Petitioner's view, Tong omits unnecessary bits to reduce waste and power consumption.

IPR2021-00155
Patent 10,416,961 B2

*Id.* Petitioner characterizes Tong as "[h]aving empirically determined the minimum number of mantissa bits necessary to maintain acceptable accuracy of particular applications." *Id.* (citing Tong 273, 274, 279, 284).

Petitioner concludes that "Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx[]) would have motivated a POSA to configure Dockser's FPP . . . to operate at a selected precision level retaining as few as 5 mantissa fraction bits." *Id.* at 45. According to the Petition, one of ordinary skill in the art would have done so "to conserve power when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision." *Id.* (citing Goodin Decl. ¶ 333). Petitioner also concludes that determining the "optimum range of imprecision to achieve the best power reduction without sacrificing accuracy for a particular application" was a matter of routine optimization of a result-effective variable. *Id.* at 46–47.

Patent Owner argues that Dockser is deficient for the same reasons discussed in connection with the challenge based on Dockser alone (Ground 1), and Tong does not remedy those deficiencies. Prelim. Resp. 23–24. In Patent Owner's view, Petitioner's Dockser-Tong analysis, like the analysis of Dockser alone, accounts for "only a cherry-picked subset of the 'possible valid inputs.'" *Id.* at 24 (citing Pet. 46). Patent Owner argues that Petitioner's analysis ignores the remaining possible valid inputs across all subprecision selections. *Id.*

Yet Patent Owner's argument about all subprecision selections (Prelim. Resp. 23–24) does not squarely address Petitioner's obviousness rationale—i.e., that one of ordinary skill in the art would have been

motivated to configure Dockser's FPP at a "selected precision level" according to Tong (Pet. 45). Specifically, Petitioner's rationale proposes using a selected precision level "retaining as few as 5 mantissa fraction bits." Pet. 45. Instead of addressing the analysis of Dockser at this selected precision level, Patent Owner's arguments focus on Dockser alone. *See* Prelim. Resp. 23–24.

Petitioner's relative-error analysis of the Dockser-Tong combination, though, is different from the one in the ground based on Dockser alone. *See* Pet. 45–46. In particular, Petitioner used a software program to determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. *Id.* at 46 (citing Goodin Decl. ¶ 335). Also, the algebraic analysis cited by Petitioner uses 5 mantissa fraction bits. *Id.* (citing Goodin Decl. ¶ 336). Because Petitioner's rationale relies on modifying Dockser with Tong to have a particular precision level, we are not persuaded at this stage that Petitioner's relative-error analysis is deficient for not considering all possible subprecision selections. *See* Prelim. Resp. 23–24; *supra* § II.C (explaining why Petitioner's asserted ground based on Dockser alone is not deficient for failing to address all possible IEEE 32-bit values, rather than just operands with 9 retained mantissa bits and 14 dropped mantissa bits).

We find Petitioner's analysis, supported by the Goodin Declaration, sufficient to show a reasonable likelihood of prevailing on its assertion that claim 1 is unpatentable over Dockser and Tong.

IPR2021-00155
Patent 10,416,961 B2

### 3. *Claims 2, 4, 5, 10, 13, 14, 21, 24, and 25*

We have reviewed Petitioner's contentions regarding claims 2, 4, 5, 10, 13, 14, 21, 24, and 25. *See* Pet. 42–49 (citing *id.* at 40–41). We are persuaded that Petitioner has made a sufficient showing at this stage for those claims as well. Petitioner explains how each limitation of the dependent claims is taught or rendered obvious by the disclosure of Dockser and Tong. *Id.* at 40–49. Petitioner's contentions are supported by the Goodin Declaration and are persuasive based on the current record. *See id.* Patent Owner does not argue the claims separately. *See* Prelim. Resp. 23–24. We disagree with Patent Owner's arguments based on the current record for the reasons explained above. *See supra* § II.D.2.

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 2, 4, 5, 10, 13, 14, 21, 24, and 25 are unpatentable over the Dockser-Tong combination.

### E. *Obviousness over Dockser and MacMillan*

### 1. *MacMillan*

MacMillan is a U.S. Patent entitled "Circuit for Enhancing Performance of a Computer for Personal Use." Ex. 1009, code (54). MacMillan teaches using Single Instruction Multiple Data (SIMD) parallel-processing architectures for adding supercomputer performance to personal-use computers. *See id.* at 5:22–54. MacMillan's computer system comprises a "Host CPU" (i.e., "a 386, 486 or Pentium[] processor") and SIMD-random access memory (SIMD-RAM) device. *Id.* at 9:30–31, Figs. 3, 5. MacMillan describes an example architecture where the SIMD-RAM device has 256 processing elements (PEs), but states that the disclosed architecture "allows

IPR2021-00155
Patent 10,416,961 B2

scaling to higher or lower density chips with more or fewer PEs." *Id.* at
12:60–13:4, 13:39–41, 16:20–22.

### 2. *Claim 1*

In this ground, Petitioner cites MacMillan for its teachings about
multiple floating-point execution units and concludes that it would have
been obvious to implement a device with multiple Dockser FPPs operating
in parallel. Pet. 51–53.

Patent Owner argues that MacMillan does not remedy Dockser's
deficiencies. Prelim. Resp. 24–27. Apart from this argument, Patent Owner
does not present arguments specifically analyzing MacMillan as it is used in
Petitioner's challenge to claim 1. *See id.* Rather, Patent Owner refers to the
arguments about the challenge based on Dockser alone. *See id.* at 25
("MacMillan does not remedy the deficiency of Dockser as set forth in
Sections III.A.2 and III.A.3 above[, which discuss the ground based on
Dockser alone].". Thus, for the reasons discussed in connection with
Dockser alone (Ground 1), and because we conclude that Petitioner has
made a sufficient showing of obviousness based on the combination with
MacMillan, we determine that Petitioner has established a reasonable
likelihood of prevailing with respect to the ground based on Dockser and
MacMillan challenging claim 1.

### 3. *Claim 3*

Claim 3 recites, in part, "wherein the number of LPHDR execution
units in the device exceeds by at least one hundred the non-negative integer
number of execution units in the device adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits wide." Ex. 1001, 30:42–48.

As for claim 3, Petitioner asserts that MacMillan teaches 256 processing elements (PEs), and the Dockser-MacMillan combination would have "a single Host CPU and at least one FPP in each PE (of which there are at least 256)." Pet. 54 (citing Goodin Decl. ¶¶ 372–373). Under Petitioner's obviousness rationale, the "number (256 or more) of LPHDR execution units (Dockser FPPs) exceeds by over 100 its number (one) of traditional-precision execution units (the single Host CPU floating-point unit)." *Id.* at 54–55 (citing Goodin Decl. ¶ 377). Petitioner asserts that, in this way, the Dockser-MacMillan combination addresses the limitation that "the number of LPHDR execution units in the device *exceeds by at least one hundred* the non-negative integer number of" the other execution units. Ex. 1001, 30:43–48 (emphasis added).

Patent Owner argues that "Dockser and MacMillan cannot possibly disclose the limitation of claim 3, even if one were to assume the Dockser FPP to be an LPHDR execution unit." Prelim. Resp. 26. Patent Owner argues that, because (1) Petitioner asserts that MacMillan's processor is the only claim 3 execution unit (EU) and (2) Dockser's FPPs are designed to perform multiplication on 32-bit numbers, "the number of claim 3 32-bit EUs in the Dockser/MacMillan combination must *always* be greater than or equal to the number of 'LPHDR' Dockser FPPs." *Id.* (emphasis in original).

But, under Petitioner's theory, the 32-bit EUs in claim 3 (i.e., "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide") are different from what Petitioner identifies as the LPHDR execution units (i.e.,

IPR2021-00155
Patent 10,416,961 B2

a Dockser FPP in each of the 256 PEs of MacMillan). *See* Pet. 54. So, under Petitioner's rationale, Dockser's FPPs do not count toward the number of 32-bit EUs in the Dockser-MacMillan combination. *See id.* Specifically, Petitioner has shown, on this preliminary record, that the claimed "LPHDR execution unit" at least encompasses Dockser's FPP. *See supra* § II.C.1. Petitioner asserts that the '961 patent describes the LPHDR execution units as "sometimes" producing results that are different from the correct result, in contrast to 32-bit EUs, which the '961 patent describes as "'traditional precision' execution units that do not 'sometimes' produce results different from the correct traditional-precision result." Pet. 54. Thus, if the proposed combination has 256 FPPs (LPHDR execution units) and one host CPU (the 32-bit EUs), the number of LPHDR execution units is greater than the number of 32-bit EUs by the amount recited in claim 3.

Petitioner supports its contentions with respect to claim 3 with citations to the '961 patent. We preliminarily agree with Petitioner that the cited parts of the patent distinguish between the two sets of units. For example, the patent describes the 32-bit arithmetic elements as "traditional" precision: "'arithmetic elements . . . designed to perform . . . floating point arithmetic with a word length of 32 or more bits' are 'designed to perform . . . arithmetic of traditional precision.'" *Id.* (citing Ex. 1001, 28:9–16). As for the LPHDR units, the paragraph cited by Petitioner explains how the precision may vary across implementations. *See* Ex. 1001, 26:63–27:16. We preliminarily agree with Petitioner that all of these embodiments, unlike the 32-bit arithmetic elements, are described as producing results that are "sometimes" or "all of the time" not closer than a certain amount to the correct result. Pet. 54 (citing Ex.1001, 26:61–27:4). Thus, Petitioner's

IPR2021-00155
Patent 10,416,961 B2

distinction between the 256 FPPs and one host CPU in the proposed combination is consistent with the language of claim 3 and adequately supported on this preliminary record.

We find Petitioner's analysis, supported by the Goodin Declaration, sufficient to show a reasonable likelihood of prevailing on its assertion that claim 3 is unpatentable over Dockser and MacMillan.

### 4.   Claims 2, 4, 5, 10, 13, and 14

We have reviewed Petitioner's contentions regarding claims 2, 4, 5, 10, 13, and 14. *See* Pet. 49–55 (citing *id.* at 40–41). We are persuaded that Petitioner has made a sufficient showing at this stage for those claims as well. Petitioner explains how each limitation of the dependent claims is taught or rendered obvious by the disclosure of Dockser and MacMillan. *Id.* Petitioner's contentions are supported by the Goodin Declaration and are persuasive based on the current record. *See id.* Patent Owner does not argue claims 2, 4, 5, 10, 13, and 14 separately. *See* Prelim. Resp. 24–27. We disagree with Patent Owner's arguments based on the current record for the reasons explained above. *See supra* §§ II.E.2–3.

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 2, 4, 5, 10, 13, and 14 are unpatentable over the Dockser-MacMillan combination.

### F.   Obviousness over Dockser, Tong, and MacMillan
#### 1.   Claims 1–5, 10, 13, 14, 21, and 23–25

Petitioner asserts that it would have been obvious to operate the FPPs in the Dockser-MacMillan combination at Tong's precision levels. Pet. 56

IPR2021-00155
Patent 10,416,961 B2

(citing Ex. 1008, 278, Table IV). Petitioner concludes that using Dockser's FPP with Tong's precision levels in MacMillan's multiple PEs would have achieved "supercomputer performance" while conserving power. *Id.* (citing Goodin Decl. ¶ 384).

Patent Owner argues that "Petitioner relies on the same flawed reasoning as discussed [in the Preliminary Response] with respect to Dockser and Tong" but does not present separate arguments directed to the combination of Dockser, Tong, and MacMillan. *See* Prelim. Resp. 27. We disagree with Patent Owner's arguments based on the current record for the reasons explained above. *See supra* § II.C. On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1–5, 10, 13, 14, 21, and 23–25 are unpatentable over the combination of Dockser, Tong, and MacMillan.

### 2.   *Petitioner's Alternative Interpretation of Claims 3 and 23*

Claim 3 recites, in part, "wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device *adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide*." Ex. 1001, 30:42–48 (emphasis added). Claim 23 similarly recites that "the number of LPHDR execution units in the second device exceeds by at least one hundred the non-negative integer number of execution units in the second device *adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide*. *Id.* at 32:62–67 (emphasis added).

Petitioner provides an alternative interpretation of the italicized adapted-to clause. Pet. 59–60. In particular, Petitioner argues that a unit could meet the adapted-to clause if it is capable of 32-bit multiplication in *some* configurations. *Id.* Under this interpretation, Dockser's FPP would not be such a unit because it has registers and multiplier with less than 32 bits, and thus is not capable of 32-bit multiplication in the proposed combination—rather, only the host CPU floating-point unit would meet the adapted-to clause in claim 3. *Id.* at 60 (citing Goodin Decl. ¶ 398). According to Petitioner, "POSA would have been motivated to customize Dockser's FPPs in MacMillan's PEs to only operate at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential.'" *Id.* at 58.

Patent Owner argues that Petitioner does not provide a specific level of precision for its combination. Prelim. Resp. 30–31 (citing Pet. 58–59). Patent Owner argues that "Tong suggests 11 bits of precision for certain signal processing applications, and Petitioner provides no analysis of whether 11 bits of precision would meet the imprecision limitation." *Id.* at 29. Also, Patent Owner argues that Petitioner does not show that, for example, one bit lower than full 32-bit operation would meet the claimed imprecision limitation. *Id.* at 31.

We disagree with Patent Owner on this record. Petitioner states that "the selected precision levels are unchanged from Grounds 1–3." Pet. 59. In Ground 2 based on Dockser and Tong, for example, Petitioner states that "Tong's teaching that a precision level retaining 5 mantissa fraction bits is sufficient in some applications (including ALVINN and Sphinx[]) would have motivated a POSA to configure Dockser's FPP . . . at a selected

IPR2021-00155
Patent 10,416,961 B2

precision level retaining as few as 5 mantissa fraction bits." *Id.* at 45. Petitioner also used a software program determine the relative error when retaining 5 mantissa fraction bits—i.e., the number of bits that Dockser would use under Petitioner's proposed combination with Tong. *Id.* at 46 (citing Goodin Decl. ¶ 335). In at least this way, Petitioner has adequately explained, for the purpose of institution and on this preliminary record, which of Tong's precision levels would be used in the proposed combination.

Patent Owner also argues that each reference teaches away from the proposed combination. Prelim. Resp. 29–30. In particular, Patent Owner argues that (1) Dockser teaches away because "Dockser is directed entirely to selectable precision; and disparages the use of non-selectable precision units," (2) Tong teaches away because "Tong devotes much of its discussion to the benefits of variable or selectable precision," and (3) MacMillan teaches away because "MacMillan is primarily concerned with providing increased performance without increased cost." *Id.*

At this stage and on this record, we preliminarily determine that the references do not teach away from the claimed devices. The mere disclosure of more than one alternative does not constitute a teaching away. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Specifically, Patent Owner points to a statement that Tong makes about power savings: "This FP bitwidth reduction can deliver a significant power savings through the use of a variable bitwidth FP unit." Prelim. Resp. 30 (quoting Ex. 1008, 273). Yet Tong's statement does not discredit, criticize, or otherwise discourage the claimed invention's approach so as to teach away from it. *See Fulton*, 391

IPR2021-00155
Patent 10,416,961 B2

F.3d at 1201. Instead, the statement merely explains the benefits provided by Tong's alternative approach. Ex. 1008, 273.

Likewise, although Patent Owner argues the combination with MacMillan would increase manufacturing costs, Patent Owner does not provide sufficient evidence to support this position. *See* Prelim. Resp. 30. Even assuming MacMillan warns against the costs, Patent Owner's argument is unsupported by any specific cost analysis. *Id.* To be sure, Patent Owner may introduce evidence that supports this argument during trial. We also note that "[t]hat a given combination would not be made by businessmen for economic reasons does not mean that persons skilled in the art would not make the combination because of some technological incompatibility," for example. *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983). But, at this stage and on this record, Patent Owner's argument is unpersuasive.

On this record, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 3 and 23 are unpatentable over the combination of Dockser, Tong, and MacMillan.

## III. CONCLUSION

Based on the arguments presented in the Petition, we conclude that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least one claim of the '961 patent challenged in the Petition. Accordingly, we institute a trial on all claims and all grounds asserted in the Petition. The Board has not made a final determination under 35 U.S.C. § 318(a) with respect to the patentability of the challenged claims.

IPR2021-00155
Patent 10,416,961 B2

## IV. ORDER

It is

ORDERED that, under 35 U.S.C. § 314(a), an *inter partes* review of claims 1–5, 10, 13, 14, 21, and 23–25 of the '961 patent is instituted for all grounds in the Petition; and

FURTHER ORDERED that, under 35 U.S.C. § 314(a), *inter partes* review of the '961 patent is instituted on this Decision's entry date, and under 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is given of the trial's institution.

IPR2021-00155
Patent 10,416,961 B2

FOR PETITIONER:

Elisabeth H. Hunt
Richard F. Giunta
Anant K. Saraswat
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com


FOR PATENT OWNER:

Peter Lambrianakos
Vincent J. Rubino, III
Enrique W. Iturralde
FABRICANT LLP
plambrianakos@fabricantllp.com
vrubino@fabricantllp.com
eiturralde@fabricantllp.com

39

**APPX04049; APPX04051-4059**

**HAVE BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04061**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04081; APPX04086**

**HAVE BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04094; APPX04098**

**HAVE BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04113**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04131**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04161**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

multiplying together the mantissa portions of the two input numbers.  The IEEE fp32, IEEE fp16 and bfloat16 formats need 576 full adders, 121 full adders, and 64 full adders, respectively.  Because multipliers for the bfloat16 format require so much less circuitry, it is possible to put more multipliers in the same chip area and power budget, thereby meaning that ML accelerators employing this format can have higher flops/sec and flops/Watt, all other things being equal.  Reduced precision representations also reduce the bandwidth and energy required to move data to and from memory or to send it across interconnect fabrics, giving further efficiency gains.

### The Challenge of Uncertainty in a Fast Moving Field

One challenge for building machine learning accelerator hardware is that the ML research field is moving extremely fast (as witnessed by the growth and absolute number of research papers published per year shown in Figure 4).  Chip design projects that are started today often take 18 months to 24 months to finish the design, fabricate the semiconductor parts and get them back and install them into a production datacenter environment.  For these parts to be economically viable, they typically must have lifetimes of at least three years.  So, the challenge for computer architects building ML hardware is to predict where the fast moving field of machine learning will be in the 2 to 5 year time frame.  Our experience is that bringing together computer architects, higher-level software system builders and machine learning researchers to discuss co-design-related topics like "what might be possible in the hardware in that time frame?" and "what interesting research trends are starting to appear and what would be their implications for ML hardware?" is a useful way to try to ensure that we design and build useful hardware to accelerate ML research and production uses of ML.

## Machine Learning for Chip Design

One area that has significant potential is the use of machine learning to learn to automatically generate high quality solutions for a number of different NP-hard optimization problems that exist in the overall workflow for designing custom ASICs.  For example, currently placement and routing for complex ASIC designs takes large teams of human placement experts to iteratively refine from high-level placement to detailed placement as the overall design of an ASIC is fleshed out.  Because there is considerable human involvement in the placement process, it is inconceivable to consider radically different layouts without dramatically affecting the schedule of a chip project once the initial high level design is done.  However, placement and routing is a problem that is amenable to the sorts of reinforcement learning approaches that were successful in solving games, like AlphaGo.  In placement and routing, a sequence of placement and routing decisions all combine to affect a set of overall metrics like chip area, timing, and wire length.  By having a reinforcement learning algorithm learn to "play" the game of placement and routing, either in general across many different ASIC designs, or for a particular ASIC design, with a reward function that combines the various attributes into a single numerical reward function, and by applying significant amounts of machine-learning computation (in the form of ML accelerators), it may be possible to have a system that can do placement and routing more rapidly and more effectively than a team of human experts working with existing electronic design tools for placement and routing.   We have been exploring these approaches internally at Google and have early preliminary-but-promising looking results.  The automated ML based system also enables rapid design space exploration, as the reward function can be easily adjusted to optimize for different trade-offs in target optimization metrics.

Singular's Exhibit No. 2011, IPR2021-00155
Page 009

**APPX04286**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

IPR2021-00155
PATENT NO. 10,416,961

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 10,416,961
Filing Date: October 30, 2018
Issue Date: September 17, 2019

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

**PATENT OWNER'S RESPONSE**

Case No. IPR2021-00155

## 2. Dockser and MacMillan Fail to Disclose the "exceeds" Limitation

Even if the teachings of Dockser and MacMillan were combined to produce a device with, for example, 256 Dockser units operating in parallel, such a device would fail to meet the "exceeds" limitation of claim 3. Khatri, ¶ 84.

The "exceeds" limitation requires that the "number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."[2] *Id.*, ¶ 85. As shown below, Dockser's FPP is adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide. *Id.* Therefore, even if Dockser's FPP were an LPHDR execution unit (which it is not, under the proper proposed construction of that term) the Dockser/MacMillan combination cannot meet claim 3's "exceeds" limitation, because those same "Dockser LPHDR execution units" would also be "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits

---

[2] For clarity, Patent Owner refers to "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" as "full-precision multiplication execution units."

wide," meaning that the number of LPHDR execution units will never exceed the number of full-precision multiplication execution units.  *Id.*, ¶ 86.

    (a)   ***Dockser's FPP Is a Claim 3 EU Because It Is Adapted to Execute at Least the Operation of Multiplication on Floating Point Numbers That Are at Least 32 Bits Wide***

There is no dispute that Dockser is an execution unit.  Pet., 13.  And there can be no reasonable dispute that Dockser is adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide under the plain meaning of the term.[3]  Goodin Dep. 23:17-22; Khatri ¶¶ 90-91.

Dockser discloses that its FPP takes input operands that are 32 bits wide and stores them in IEEE-754 format.  *See e.g.*, Dockser, ¶ [0017] ("Each register location 200 is configured to store a 32-bit binary floating-point number, in an IEEE-754 32-bit single format.")  Khatri, ¶ 92.  Dockser also discloses that its FPP includes "a floating-point multiplier (MUL) 144 configured to execute floating-point multiply instructions."  Dockser, ¶ [0019]; Khatri, ¶ 92.  These points are not

---

[3] Petitioner and Patent Owner agree that "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" means that the execution unit performs multiplication in "traditional"—*i.e.*, full—precision.  Pet., 54.

in dispute; Petitioner and its expert both admitted as much. Reply at 2; Goodin

Dep. at 36:16-21; 38:18-39:15.

Nothing more is required for a Dockser FPP to be "adapted to execute at

least the operation of multiplication on floating point numbers that are at least 32

bits wide." *See In re Man Machine*, 822 F.3d 1282, 1286 (Fed. Cir. 2016) ("[T]he

phrase 'adapted to' generally means 'made to,' 'designed to,' or 'configured to,'

though it can also be used more broadly to mean 'capable of' or 'suitable for.'");

Khatri, ¶ 92.

Therefore, even if Dockser's FPP is an "LPHDR execution unit" (as

Petitioner incorrectly argues), the Dockser/MacMillan device would still fail to

satisfy the "exceeds" limitation. Khatri, ¶ 93. In one example, the

Dockser/MacMillan device would have 256 LPHDR execution units (counting

each Dockser FPP as an "LPHDR execution unit"). However, because each

Dockser FPP is also "adapted to execute at least the operation of multiplication on

floating point numbers that are at least 32 bits wide," the Dockser/MacMillan

device would therefore also have <u>at least</u> 256 execution units "adapted to execute

at least the operation of multiplication on floating point numbers that are at least 32

bits wide." *Id.* As a result, the Dockser/MacMillan would not meet the "exceeds

limitation." *Id.*

(b) ***Petitioner's Interpretation of "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" Is Inconsistent with the Specification and Wrong***

Petitioner attempts to put Dockser's FPP outside of the "exceeds" limitation by arguing that units are full-precision multiplication execution units ***only if*** they are "'traditional precision' execution units that do not 'sometimes' produce results different from the correct traditional-precision result." Pet., 54. The Board preliminarily accepted this argument.

Petitioner's implicit construction of "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" is inconsistent with the plain and ordinary meaning of the claim and at odds with the specification. Khatri, ¶¶ 94-95. The Board should thus reject it.

A POSA would understand this term to include all units in the device that are designed to perform "multiplication on floating point numbers that are at least 32 bits wide," even if those units can perform other operations as well.[4] *Id.*, ¶ 95.

---

[4] While the term at issue here includes the phrase "adapted to," Patent Owner's construction does not depend on any particular construction of this term. Depending on context, "adapted to" can be construed broadly (to mean "capable of") or narrowly (to mean "designed to"). *See In re Giannelli,* 739 F.3d 1375,

First, Petitioner's interpretation directly contradicts the claim language itself which encompasses every execution unit adapted to perform "*at least*" the operation of 32-bit multiplication.  Khatri, ¶ 96.  Petitioner not only ignores this inclusive language, but also proposes a construction that would explicitly *exclude* units adapted to perform additional operations.  *Id.*

Second, Petitioner's interpretation contradicts the teachings of the specification.  *Id.*, ¶ 97.  For example, while the specification does not disclose an execution unit that can be both a full-precision multiplication execution unit and an LPHDR execution unit, it *does* disclose an execution unit that can be both a full-precision multiplication execution unit and *a* unit (which is not an LPHDR execution unit, as explained below) that 'sometimes' produces results different from the correct traditional-precision result:

> "When a graphics processor includes support for 16 bit floating point,
> that support is alongside support for 32 bit floating point . . . That is,
> the 16 bit floating point format is supported for those applications that

1379 (Fed. Cir. 2014); *see also In re Man Machine Interface Techs. LLC*, 822 F.3d at 1286 (citations omitted).  In this situation, both of these constructions boil down to the same thing: if a unit is "capable of" performing 32-bit multiplication, then it is "designed to" perform 32-bit multiplication—the ability to perform full-precision multiplication is not something that happens by accident.

want it, but the higher precision formats also are supported because

they are believed to be needed for traditional graphics applications

and also for so called "general purpose" GPU applications. Thus,

*existing GPUs devote substantial resources to 32 . . . bit arithmetic*

*and are wasteful of transistors* . . . ."

'961 Patent, 5:23-33; Khatri, ¶ 97.

A POSA would understand that the "graphics processor" described in the

passage above includes multiple execution units operating in parallel, each of

which can be configured to perform both full-precision ("32 bit floating point")

and half-precision ("16 bit floating point") operations.  Khatri, ¶ 98.  Such

execution units are *both* "adapted to execute at least the operation of multiplication

on floating point numbers that are at least 32 bits wide" *and* "capable of

performing *"*operations that 'sometimes' produce results different from the correct

traditional-precision result" (*i.e.*, half-precision operations that produce results in

the "16 bit floating point" format often referred to as "fp16," which is not to be

confused with the earlier-mentioned bfloat16/bf16 (*brain* float 16) format used by

Google's products).  *Id.*

As the passage explains, these execution units are "wasteful of transistors"

because, like the execution units of Dockser and Tong, they retain the *capability* of

performing 32-bit multiplication, even if they can be configured to "sometimes"

operate at lower precisions.  *Id.*, ¶ 99.  A POSA would understand that such

conventional execution units having full-precision *capability* (whether or not they execute other precision operations) are precisely what the "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" limitation of claim 3 is intended to capture, and more importantly, precisely what distinguishes these conventional execution units from "LPHDR execution units" that perform *only* low-precision arithmetic operations (and thus use "a small amount of resources") in claim 3. '961 Patent, 8:1-9; Khatri, ¶ 99.

More generally, the specification describes full-precision multiplication execution units only by reference to their "high dynamic range arithmetic of traditional precision." *See* '961 Patent at 28:32-37; *see also id.* at 28:32-29:20; Khatri, ¶ 100. Nowhere does the specification ever preclude full-precision multiplication execution units from being able to produce incorrect results. *Id.* Petitioner imports that requirement from a completely different section of the patent, taken completely out of context. *See* Pet., 54 (citing '961 Patent, 26:61-27:4); Khatri, ¶ 100. That section uses "sometimes" to describes the imprecision limitation of an LPHDR execution unit, as expressed in the X=5% limitation of the Challenged Claims. That section says nothing about full-precision multiplication execution units. *See* '961 Patent, 26:61-27:4; Khatri, ¶ 100.

Petitioner's argument tacitly hinges on the idea that if a component is an LPHDR execution unit (*i.e.*, the Dockser FPP as construed by Petitioner, not as

construed by Patent Owner), it cannot also be a full-precision multiplication execution unit. Pet., 54. That is, Petitioner tacitly argues that one device—the Dockser FPP—cannot meet two limitations in a claim. But the law is clear that the same structure can meet two limitations. *See, e.g., Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different *meanings,* not that they necessarily refer to two different *structures.*") (emphasis in original). Therefore, even if the Dockser FPP were an "LPHDR execution unit" (which it is not), it would *still* be a full-precision multiplication execution unit for the reasons explained above.

(c)    ***A POSA Would Not Combine Dockser with MacMillan***

Even if the combination of Dockser and MacMillan had all the elements of the Challenged Claims – which it does not, for the reasons explained above – a POSA would not make that combination because it would not be operable for its intended purpose. Khatri, ¶ 101.

Dockser is focused on the objective of reducing power consumption and is not in any way concerned with the objective of achieving high compute scale, while MacMillan is focused on a parallel architecture that increases computational power, and not focused on reducing power consumption (indeed, MacMillan's only reference to power consumption relates to heat dissipation inside the "cabinet" of a workstation). *See* MacMillan, 3:4-6; Khatri, ¶ 102.

Incorporating Dockser's FPPs into MacMillan would also defeat

MacMillan's stated objective of achieving a high-scale SIMD computer

architecture at "lower system cost." *See* MacMillan, 5:58-59 ("The invention of

this shared memory results in lower system cost . . . ."); Khatri, ¶ 103. As

explained above, Dockser's FPPs are even <u>*larger*</u> than traditional full-precision

execution units because of the control circuitry needed to implement the selectable

subprecision modes. *Id.*; Goodin Dep. 70:6-12 (explaining that Dockser does not

reduce space compared to conventional units), 43:21-45:9 (additional circuitry

required to reduce precision). As a result, replacing the full-precision execution

units of MacMillan with Dockser FPP units would require additional circuitry and

chip space and would therefore *increase* costs, while providing no benefit. Khatri,

¶ 104. A POSA would not be motivated to destroy the objectives of the prior art.

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016); *Chemours Co.*

*FC, LLC v. Daikin Indus., Ltd.*, No. 2020-1289, 2021 WL 3085514, at \*4-\*5 (Fed.

Cir. July 22, 2021).

### 3. Dockser/MacMillan Fails to Disclose or Render Obvious "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit"

Claim 1 (and therefore its dependent claims) require "at least one first

computing device adapted to control the operation of the at least one first LPHDR

execution unit." Claim 2 further requires that the computing device "comprises at

36

least one of a central processing unit (CPU), a graphics processing unit (GPU), a

field programmable gate array (FPGA), a microcode-based processor, a hardware

sequencer, and a state machine." Petitioner identifies MacMillan's "Host CPU" as

the "computing device adapted to control the operation of the at least one first

LPHDR execution unit." Pet., 52-53; Khatri, ¶ 87.

However, MacMillan makes clear that the SIMD Controller, not the Host

CPU, controls the operation of the PEs. MacMillan, 13:35-36 ("Since the PEs

operate under the control of the SIMD Controller . . . ."); 8:1-10 (explaining that

SIMD Controller "contains the program counter used to step through the list of

instructions that may include instructions to be executed by the PEs"); 10:65-11:5

("The SIMD Controller 252 then executes the SIMD program."); 10:3-16; Khatri,

¶ 88. Indeed, while the PEs are executing, the SIMD Controller takes control of

the host bus; thus there is no way for the Host CPU to control (or even

communicate with) the PEs. MacMillan, 10:53-11:5; Goodin Dep. 126:3-129:6;

142:14-143:21; Khatri, ¶ 88. Not only is the Host CPU not disclosed as controlling

the PEs, it is merely optional. Goodin Dep., 116:6-18; Khatri, ¶ 88.

Petitioner's expert, Mr. Goodin, agreed that the SIMD Controller controls

the operation of the PEs.

> Q. And MacMillan says that the processor elements are controlled by
> the SIMD controller?

A. Yes, that's correct, that the processing elements are controlled by

the SIMD controller 252.

Goodin Dep., 124:18-22.

Since Petitioner has provided no other argument with respect to the

"computing device adapted to control" limitation as recited in claim 1, Petitioner

has failed to show that claim 1 and its dependent claims are obvious over Dockser

and MacMillan. *See* Pet., 52-53, 56-57. Khatri, ¶ 89.

### D.    Ground 4: Claims 1-5, 10, 13-14, 21, and 23-25 Are Not Obvious Over Dockser in View of Tong and MacMillan

As discussed above with respect to Grounds 2 and 3, the combination of

Dockser, Tong, and MacMillan does not disclose or render obvious an LPHDR

execution unit.  Similarly, as set forth with respect to Ground 3, the combination

does not disclose or render obvious the "at least one first computing device"

limitation.  Finally, as set forth with respect to Ground 2, Tong does not teach

using only 5 bits of mantissa.  Petitioner sets forth no further argument or evidence

with respect to any of these limitations.

#### 1.    The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation

Even under Petitioner's construction of "LPHDR execution unit," the

combination of Dockser, MacMillan, and Tong would still fail to satisfy the

"exceeds" limitation.  As explained above, each Dockser FPP, even when

operating at 5-bit precision, is an "execution unit[] adapted to execute at least the

operation of multiplication on floating point numbers that are at least 32 bits

wide." Thus, even under Petitioner's construction, a device with 256 (or any

number) Dockser FPPs operating at 5-bit precision would have *at least* as many

full-precision units as "LPHDR execution units." Khatri, ¶¶ 105-06.

## 2. A POSA Would Not Combine Tong, Dockser, and MacMillan

A POSA would not be motivated to combine the teachings of Dockser,

MacMillan, and Tong. As explained above, a person of ordinary skill in the art

would not have been motivated to incorporate Dockser's FPP into MacMillan, nor

to combine Dockser with Tong. Khatri, ¶ 107. Tong supplies no additional

motivation to combine the teachings of Dockser and MacMillan.

## 3. Petitioner's "Alternative" Argument Regarding Claims 3 and 23 Fails

Recognizing that a system with Dockser's FPPs can never meet the

"exceeds" limitation, Petitioner posits that it would be obvious to completely

redesign Dockser's FPP to carve out all support for its basic and default mode,

namely full-precision operation (*see supra* Section VI.A.1). Specifically,

Petitioner posits that it would be obvious to cleave off parts of Dockser's 32-bit

register file to achieve some unspecified lesser bit-width, and further perform some

unspecified modification to Dockser's multiplier logic "to have only as many logic

and Tong happen to mention "signal processing." Khatri, ¶¶ 108-09. Petitioner concocted this convoluted and implausible scenario in an attempt to sidestep the Dockser FPP's full-precision capabilities.

### (a) A POSA Would Not Be Motivated to Combine Dockser, MacMillan, and Tong under Petitioner's "Alternative" Argument

Petitioner's assertion that a POSA would have been motivated by Tong to remove the full-precision capabilities of Dockser is wholly without merit.

Petitioner's argument is based on a fragment of a sentence in Tong, taken out of context to insinuate that full-precision operation "is not essential" to the functioning of a Tong or Dockser system. Pet., 58.

In fact, Tong teaches the opposite. Khatri, ¶¶ 110-111. Tong admits that there are "scientific programs" that "require a huge amount of precision" (Tong, 279), and broadly teaches that "it appears _inevitable_ that some fraction of our operands will require full IEEE-standard precision." Tong, 280; Khatri, ¶ 111. Instead, like Dockser, Tong teaches systems that always have _both_ full- and reduced-precision capabilities. _See_, _e.g._, Tong, 282 (even when describing a device that has reduced precision units, it describes that system as "including _both_ full and reduced precision FP units and using appropriate sleep-mode circuit techniques to shut down the unused unit."); Khatri, ¶ 111. With this teaching in hand, a POSA would not cleave off parts of Dockser's 32-bit register file to

achieve some unspecified lesser bit-width smaller execution unit, without also

importing the Tong "full precision FP." *See generally* Tong; Khatri, ¶ 111.

In view of the above, it is clear that a person of ordinary skill would not be

motivated by Tong to remove the full-precision capabilities of the Dockser units.

Khatri, ¶ 112. On the contrary, Tong would only have <u>*reinforced*</u> the teaching of

Dockser that, while reduced-precision might be a viable option in certain

circumstances, an execution unit should retain the ability to operate at full-

precision because many applications require full precision. *See*, *e.g.*, Dockser,

¶ [0003]; Khatri, ¶ 112. Similarly, Petitioner's "alternative" argument runs

contrary to the teachings of Dockser and MacMillan.

Specifically, Dockser's objectives are fundamentally directed away from

Petitioner's proposed "alternative" combination. As discussed above, it is

undisputed that Dockser is devoted solely to a general processor with selectable

precision. Khatri, ¶ 113.

Nowhere, however, does Dockser teach, or even suggest, removing its full-

precision capabilities. Khatri, ¶ 114; Goodin Dep. 38:3-8. A Dockser FPP is

described as always needing to support a range of selectable precisions including

full precision. Adjusting Dockser by removing its full-precision capacity violates a

central tenet of Dockser—to always be able to execute full-precision operations.

Khatri, ¶ 114; Dockser, ¶ [0003]. Indeed, Mr. Goodin explained that "Dockser

*requires* selectable subprecision." Goodin Dep. at 56:2-12; 57:4-12. *See also id.*
at 38:3-8 ("I don't believe Dockser discloses any embodiments without floating-
point – without selectable precision."). Mr. Goodin also explained that he did not
provide any opinions where Dockser was limited to a single subprecision. *Id.*
69:17-70:18 ("That certainly isn't part of my opinions in my declaration."). It is
not obvious to remove a reference's inventive concept—in this case supporting a
range of selectable precisions including full precision—in an attempt to meet a
challenged claim. *Chemours Co.*, 2021 WL 3085514, at *5 (reversing Board
judgment of obviousness where proposed combination "would necessarily involve
altering the inventive concept" of the prior art reference). Cleaving off circuitry
from Dockser in an alleged combination with Tong contradicts the inventive
concept of Dockser (as well as of Tong, as described in the previous subsection)
and could only be the product of impermissible hindsight. Khatri, ¶ 114.

As for MacMillan, it warns that "[t]o meet the cost objectives, the SIMD
capabilities ***should not add significant complexity*** to the architecture of a
computer system for personal use." MacMillan, 5:42-44. Petitioner's proposed
combination, which requires special, customized registers, logic elements,
arithmetic units, and programming models (see next subsection), would increase
manufacturing costs and goes directly against the teachings of MacMillan which

IPR2021-00155
PATENT NO. 10,416,961

relies on operating with conventional components to reduce cost. See Khatri,

¶ 115. *E.g.*, MacMillan, 6:24-26, 34-36.

### *(b) Google Has Failed to Show That the "Alternative" Combination Would Meet the Imprecision Requirements of Claims 3-8*

Petitioner has not even attempted to show that the resulting combination

would meet the imprecision limitations. Petitioner merely states that the "selected

precision levels are unchanged from Grounds 1-3." Pet., 59. However, as shown

above, Tong suggests 11 bits of precision for specific signal processing

applications, and Petitioner provides no analysis of whether 11 bits of precision

would meet the imprecision limitation. *See id.* Khatri, ¶ 116.

### *(c) POSA Would Not Have Recognized the Utility of Petitioner's "Alternative" Combination of Dockser, MacMillan, and Tong*

Finally, a POSA would not have recognized the utility of Petitioner's

"alternative" combination of Dockser, MacMillan, and Tong because the combined

prior art references do not teach or suggest that it would be possible to write

programs that run efficiently on a Dockser/MacMillan/Tong device. Khatri, ¶ 117.

As the '961 Patent explains, "programmers have come to think in terms of

high precision and to develop algorithms based on the assumption that computer

processors provide such precision . . . ." '961 Patent, 5:48-55. The notion that

low-precision computers can be programmed "is not obvious, and in fact has been

## VII.  OBJECTIVE INDICIA OF NON-OBVIOUSNESS SUPPORT THE VALIDITY OF THE CLAIMS

Overwhelming evidence of objective indicia of non-obviousness—including skepticism, praise, unexpected results, commercial success, and outright copying of the claimed invention—confirms that the challenged claims are not obvious over the prior art references cited by Petitioner.

### A.    Legal Standard

"The objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).  "[W]e have repeatedly stressed that objective considerations of non-obviousness must be considered in *every* case." *Id.*  Indeed, "[s]econdary considerations evidence can establish that 'an invention appearing to have been obvious in light of the prior art was not' and may be 'the most probative and cogent evidence in the record.'" *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013).

Objective indicia of non-obviousness include skepticism, praise, unexpected results, copying, and commercial success.  *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

"For secondary considerations to have probative value, the decision maker must determine whether there is a nexus between the merits of the claimed

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00155
PATENT NO. 10,416,961

invention and the secondary considerations." *Ashland Oil, Inc. v. Delta Resins &*

*Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985).

### B. Google's Initial Skepticism of the Invention Shows Non-Obviousness

"Evidence of industry skepticism weighs in favor of non-obviousness.  If

industry participants or skilled artisans are skeptical about whether or how a

problem could be solved or the workability of the claimed solution, it favors non-

obviousness.  Doubt or disbelief by skilled artisans regarding the likely success of

a combination or solution weighs against the notion that one would combine

elements in references to achieve the claimed invention." *WBIP*, 829 F.3d at 1335-

36; *see also e.g.*, *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377-

78 (Fed. Cir. 2019) ("Evidence of industry skepticism is a question of fact that

weighs in favor of non-obviousness.").

48

IPR2021-00155
PATENT NO. 10,416,961

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00155
PATENT NO. 10,416,961

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00155
PATENT NO. 10,416,961

███████████████████████████████████████████████ is evidence that the Challenged Claims are not obvious. There is a clear nexus between these statements and the Challenged Claims. Khatri, ¶ 123. They were written in response to Dr. Bates's disclosure of the invention, as explained above. *Id.* Further, they express skepticism about utility of the low-precision arithmetic performed by the large numbers of low-precision execution units, which is a key feature of the '961 Patent claims.

### C.    Praise From Leaders in the Field Shows Non-Obviousness

Praise of the invention by others is another objective indicator of non-obviousness. *Mintz*, 679 F.3d at 1379.

As Dr. Bates' ideas circulated more broadly █████████████

████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

There is a clear nexus between the praise cited above and the Challenged

Claims.  It relates directly to ████████████████████████████████

### D.    The Invention Is Not Obvious Because It Yields Unexpected Results

Unexpected results are further evidence of non-obviousness.  *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) ("Of particular importance beyond the prima facie analysis, this court also detects evidence of objective criteria showing nonobviousness.  Specifically, the record shows powerful unexpected results . . . ."); *see also Neptune*, 921 F.3d at 1377-78; *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006).

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00155
PATENT NO. 10,416,961

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00155
PATENT NO. 10,416,961



**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00155
PATENT NO. 10,416,961

The fact that these results were unexpected is further confirmed by ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Similarly, Dr. David Patterson of Google candidly remarked that he was "genuinely surprised" that the bfloat16 format provided useful results and improved performance, scaling, and power use. Ex. 2012. Dr. Patterson is a "skilled artisan" and acclaimed expert in the field of computer science and computer architecture. Dr. Patterson's comments have a nexus to the '961 Patent because, as shown below, the TPUv2 product is coextensive with the claims. Moreover, his comments further have a nexus because they are directed exactly to the key features of the '961 Patent claims: low precision high dynamic range arithmetic.

The fact that the '961 Patent's invention produces unexpected results is further supported by Dockser and Tong. For example, as explained above, Dockser teaches that for "general purpose processors, however, the common situation is that . . . a greater precision may be needed." Dockser, [0003]; Khatri, ¶¶ 124-25. Similarly, Tong notes that in order to be "generally useful," an execution unit must be capable of full-precision arithmetic. Tong, 280; Khatri, ¶¶ 124-25.

The fact that the prior art references cited by Petitioner in this proceeding teach that an execution unit without full-precision capability is not "generally

56

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00155
PATENT NO. 10,416,961

useful," and Google's initial reaction to the '961 Patent's invention, shows that the high performance of the '961 Patent's invention across a wide variety of applications was unexpected. *Id.* This unexpected result weighs toward non-obviousness.

### E.    Google's Copying of the Invention Shows Non-Obviousness

"The fact that a competitor copied technology suggests that it would not have been obvious." *WBIP*, 829 F.3d at 1336.

As Dr. Bates was interacting with Google in 2013-14, Google had identified a "daunting and scary" problem: in order to use artificial intelligence for speech recognition, it would need to "double the computing footprint of Google just to support, like, a slightly better speech recognition model for a modest fraction of [its] users." Ex. 2034, 6.

Despite ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████ Google solved this problem by copying Dr. Bates' invention. Specifically, Google adopted the invention in their TPUv2 and TPUv3 products, which are coextensive with the Challenged Claims (*see* Section VIII, *infra*). Indeed, Dr. Bates's invention is central to the operation of the TPUv2 and TPUv3 products, which use execution units designed to perform operations using a

low-precision "floating point format called bfloat16" in order to achieve increased

parallelism and scale:

> Because multipliers for the bfloat16 format require so much less
> circuitry, it is possible to put more multipliers in the same chip area
> and power budget, thereby meaning that ML accelerators employing
> this format can have higher flops/sec and flops/Watt, all other things
> being equal.

Ex. 2011 at 9; Khatri, ¶¶ 126-27.

Google describes the computing enabled by the bfloat16 format as "[t]he

secret to high performance on Cloud TPUs," noting that "Cloud TPU v2 and Cloud

TPU v3 primarily use bfloat16 in the matrix multiplication unit (MXU)" and that

"inside the MXU, multiplications are performed in bfloat16 format." Ex. 2041 at

2. The bfloat16 format maintains high dynamic range by keeping the same 8 bit

exponent as found in 32-bit IEEE floating point. *Id*. However, it reduces precision

significantly by using only a 7-bit mantissa, as opposed to the 23-bit mantissa of

IEEE 32-bit floating point, which is why it requires less circuitry. *Id*.

IPR2021-00155
PATENT NO. 10,416,961



*Id.* at 1.  A nexus with the claimed invention is presumed for secondary

considerations relating to Google's TPUv2 and TPUv3 products, because these

products are coextensive with the Challenged Claims, as demonstrated in detail in

Section VIII, *infra.*  *See WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of

nexus for objective considerations when the patentee shows that the asserted

objective evidence is tied to a specific product and that product 'is the invention

disclosed and claimed in the patent.'").

A nexus between Google's products and the claimed invention is further

demonstrated ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00155
PATENT NO. 10,416,961

**CONFIDENTIAL MATERIAL REDACTED**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

Google's copying therefore provides clear evidence that the Challenged Claims are not obvious. *E.g.*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1139 (Fed. Cir. 2019) (disclosure of patented method and later adoption of technology supported finding of copying); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.* 711 F.3d 1348, 1369 (Fed. Cir. 2013).

### F.     The Commercial Success of Google's TPUv2 and TPUv3 Shows Non-Obviousness

Commercial success is an objective indicator of non-obviousness. *See, e.g., id.* at 1368. The commercial success of Google's TPUv2 and TPUv3 products, which are coextensive with the Challenged Claims, supports a finding of non-obviousness.

Since the release of TPuv2 in 2017, and TPUv3 in 2018, Google has leveraged the abundance of processing power made available by Dr. Bates' invention—its "secret to high performance" over its competitors—to power all of

its major products and services, including Search, Translate, Photos, Assistant, and

Gmail. Ex. 2018. *See also* Exs. 2040, 2015.

Using hundreds of thousands of these low-precision TPU v2 and v3 devices

to provide these AI services in its data centers throughout the U.S., Google has

saved at least $10 billion dollars. Ex. 2017. Thus, Google's use of Dr. Bates' low-

precision computer throughout its data centers has resulted in enormous

commercial success for Google.

This commercial success is directly tied to the claimed invention. Google's

TPUv2 and TPUv3 products are coextensive with the Challenged Claims, as

demonstrated in detail in Section VIII, *infra*. Further, the success of these products

in the marketplace is due in large part to their use of the claimed invention, which

allows them to achieve increased performance and parallelism. *See*, *e.g.*, Ex. 2016

("BF16 delivers a rare combination: reducing hardware and energy while

simplifying software by making loss scaling unnecessary;" *see also* Ex. 2011

(touting the increased efficiency and performance achieved by using low-precision

multipliers).

## VIII.  GOOGLE'S TPUV2 AND TPUV3 ARE COEXTENSIVE WITH THE CHALLENGED CLAIMS

Google's TPUv2 and TPUv3 are coextensive with at least claims 1-5, 10,

and 13-14 of the '961 Patent. Set forth below is an analysis mapping the claims to

the TPUv2 and TPUv3 devices; a more fulsome analysis as to claims 4 and 13 is

also provided in Singular's district court infringement contentions.  Exs. 2021;

2022, 23-40.  Accordingly, a nexus is presumed between secondary considerations

relating to the TPUv2 and TPUv3 and the '961 Patent.  *WBIP*, 829 F.3d at 1329

("[T]here is a presumption of nexus for objective considerations when the patentee

shows that the asserted objective evidence is tied to a specific product and that

product 'is the invention disclosed and claimed in the patent.'").

**A.    Claim 1**

**1.    "A device comprising:"**

Each of the TPUv2 boards and TPUv3 boards are devices.  Khatri, ¶¶ 129-

30.



TPUv2 Board - Ex. 2016.



TPUv3 Board Ex. 2016.

**2.    "at least one first low precision high dynamic range
(LPHDR) execution unit adapted to execute a first
operation on a first input signal representing a first
numerical value to produce a first output signal
representing a second numerical value"**

Each of the TPUv2 and TPUv3 boards include at least one first low

precision high dynamic range (LPHDR) execution unit adapted to execute a first

operation (multiplication) on a first input signal representing a first numerical

value to produce a first output signal representing a second numerical value (the

product of the first numerical value multiplied by another value).  Khatri, ¶ 131.

Both versions include at least one Matrix Multiply Unit (MXU) that contains

128x128 = 16,384 execution units that each execute the operation of

multiplication.  Exs. 2016; 2011 ("the main computational capacity in each core

provided by a large matrix multiply unit that can yield the results of multiplying a

pair of 128x128 matrices each cycle").

IPR2021-00155
PATENT NO. 10,416,961



Ex. 2016 (annotations added).



Figure 5: A block diagram of Google's Tensor Processing Unit v2 (TPUv2)

Ex. 2011.

Each of the bfloat16 execution units in the MXU require "less circuitry"

than either FP32 or FP16 multipliers. Ex. 2011, 9; Khatri, ¶ 132. Accordingly,

each of the multipliers within the MXU is *only* able to perform low-precision,

bfloat16 operations and lacks the circuitry to perform, for example, perform FP16

or FP32 operations.  Khatri, ¶ 132.

### 3. "wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and"

The dynamic range of the valid inputs to the multiplication operation in the

TPUv2 and TPUv3 is governed by the number of exponent bits (8) in the floating

point 32 format.  Khatri, ¶¶ 133-34; Pet., 20-21; Ex. 1003, ¶ 231.  These inputs are

supplied by the "scalar/vector units," also known as Vector Processing Unit

(VPUs).  *E.g.*, Exs. 2016; 2049, 3-4.  As Google admits, 8 bits of exponent allow

for a dynamic range of from roughly $2^{-126}$ (smaller than 1/65,000) through $2^{127}$

(larger than 65,000).  Khatri, ¶134; Pet., 20-21; Ex. 1003, ¶ 232.

### 4.  "for at least X=10% …;"

Google's TPUv2 and TPUv3 boards meet this element by performing

multiplication on 32-bit numbers at bfloat16 precision, which uses 7 bits for the

mantissa.  Exs. 2041, 7; 2011, 8; 2049; Khatri, ¶ 135.  Google states that utilizing 7

bits of mantissa in multiplication operations results in a minimum of 12% of valid

floating point 32 inputs producing at least 0.39% relative error compared to the

exact mathematical calculation of a full-precision multiplication on those same

IPR2021-00155
PATENT NO. 10,416,961

inputs.  Pet., 33-34, 72; Khatri, ¶¶ 135-36.  Accordingly, the TPUv2 and TPUv3 meet this element.

> **5.**     **"at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit."**

Google's TPUv2 and TPUv3 devices meet this limitation as well.  Each TPU device is controlled by a Core Sequencer (which, in turn, is controlled by a Host Virtual Machine that is a program running on a CPU).  The Core Sequencer is a computing device, and by issuing VLIW instructions to the MXU, it controls the operation of the LPHDR execution units within the MXUs.  Ex. 2016, 4-5.  The CPU is a computing device, and by running the Host VM and issuing commands to the Core Sequencer, it controls the operation of the LPHDR execution units within the MXUs.  Ex. 2016, 4; Khatri, ¶¶ 137-38.



Ex. 2045, 2.

Die sizes are adjusted by the square of the technology, as the semiconductor technology for TPUs is similar but larger and older than that of the GPU. We picked 15nm for TPUs based on the information in Table 3. Thermal Design Power (TDP) is for 16-chip systems. TPUs come with a host CPU. This GPU price adds price of a n1-standard-16 CPU.

Ex. 2011.



Ex. 2016, (annotations added)

**B.    Claim 2**

1.    **"The device of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine."**

As discussed above, the Host VMs run on a CPU.  The Core Sequencer is also a hardware sequencer and a state machine.  Ex. 2016, 4; Khatri, ¶ 140.  The Core Sequencer and the CPU, independently and acting in concert, satisfy the additional requirement imposed by claim 2.  Khatri; ¶¶ 139-41.

IPR2021-00155
PATENT NO. 10,416,961

### C.    Claim 3

1.    **"The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."**

Google's TPUv2 and TPUv3 boards meet this limitation.  As discussed above, each MXU contains 128x128 execution units: a total of 16,384 LPHDR execution units in total per MXU.  Khatri, ¶ 142.  The TPUv2 board includes 1 MXU per core, with 2 cores in a chip, and 4 chips on a board.  Ex. 2016.  Thus, the TPUv2 board contains 131,072 LPHDR execution units.



TPUv2 Board – Ex. 2046 (annotations added)

IPR2021-00155
PATENT NO. 10,416,961

The TPUv3 board contains 2 MXUs per core, 2 cores per chip, and 4 chips per board.  Ex. 2016.  Thus, a single TPUv3 board contains 262,144 LPHDR execution units.  Khatri, ¶ 143.



TPUv3 Board – EX. 2046 (annotations added).

The MXU execution units perform multiplication only at bfloat16 precision and are thus not adapted to execute multiplication on floating point numbers that are at least 32 bits wide.  Khatri, ¶ 144.

Each core (whether TPUv2 or TPUv3) contains a VPU.  *Id.*  Each VPU contains an array of 128x8x2 32-bit arithmetic logic units (ALUs), for a total of 2048 ALUs per core.  Exs. 2016; 2046.  32-bit ALUs are adapted to perform the operation of multiplication on 32-bit numbers.  *Id.*, ¶ 145.  With two cores per chip

and 4 chips per board, each TPUv2 or TPUv3 board contains 16,384 execution units that are adapted to perform multiplication on 32-bit numbers. *Id.*, ¶ 146.

Each TPUv2 board thus contains 131,072 LPHDR execution units and 16,384 VPUs. Khatri, ¶¶ 146-47. Each TPUv3 board contains 262,144 LPHDR execution units and 16,384 VPUs. *Id.* Accordingly, in each board "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" and each board therefore meets claim 3. *Id.*

### D.    Claim 4

#### 1.    The device of claim 1, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000

As discussed above, the bfloat16 format used in the TPUv2 and TPUv3 boards contains 8 bits of exponent, which provides a dynamic range of from roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000). Khatri ¶ 148.

### E.    Claim 5

#### 1.    The device of claim 1, wherein the first operation is multiplication

As discussed above, the MXUs within the TPUv2 and TPUv3 boards perform multiplication. Khatri ¶ 149.

### F.    Claim 10

Claim 10 recites a device comprising a plurality of components comprising at least one LPHDR execution unit with the same dynamic range and imprecision requirements as claim 1.  The discussion of claim 1 above explains how those specifications are met in the TPUv2 and TPUv3 boards.  Khatri, 150-51.

As explained above, each TPUv2 and TPUv3 board comprises a plurality of components, such as multiple MXU LPHDR execution units, VPUs, and other components.

### G.    Claim 13

#### 1.    The device of claim 10, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000

As discussed above, the bfloat16 format used in the TPUv2 and TPUv3 boards contains 8 bits of exponent, which provides dynamic range from roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000).  Khatri, 152.

### H.    Claim 14

#### 1.    The device of claim 10, wherein the first operation is multiplication.

MXUs within the TPUv2 and TPUv3 boards perform multiplication.  Khatri, ¶ 153.

**APPX04671**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04673**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04676**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04678**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04682**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04687**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04688**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04689-4690**

**HAVE BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**



JEFF DEAN

## Google AI with Jeff Dean

Jeff Dean, the lead of Google AI, is on the podcast this week to talk with Melanie and Mark about AI and machine learning research, his upcoming talk at Deep Learning Indaba and his educational pursuit of parallel processing and computer systems was how his career path got him into AI. We covered topics from his team's work with TPUs and TensorFlow, the impact computer vision and speech recognition is having on AI advancements and how simulations are being used to help advance science in areas like quantum chemistry. We also discussed his passion for the development of AI talent in the content of Africa and the opening of Google AI Ghana. It's a full episode where we cover a lot of ground. One piece of advice he left us with, "the way to do interesting things is to partner with people who know things you don't."

Listen for the end of the podcast where our colleague, Gabe Weiss, helps us answer the question of the week about how to get data from IoT core to display in real time on a web front end.

### Jeff Dean

Jeff Dean joined Google in 1999 and is currently a Google Senior Fellow, leading Google AI and related research efforts. His teams are working on systems for speech recognition, computer vision, language understanding, and various other machine learning tasks. He has co-designed/implemented many generations of Google's crawling, indexing, and query serving systems, and co-designed/implemented major pieces of Google's initial advertising and AdSense for Content systems. He is also a co-designer and co-implementor of Google's distributed computing infrastructure, including the MapReduce, BigTable and Spanner systems, protocol buffers, the open-source TensorFlow system for machine learning, and a variety of internal and external libraries and developer tools.

Jeff received a Ph.D. in Computer Science from the University of Washington in 1996, working with Craig Chambers on whole-program optimization techniques for object-oriented languages. He received a B.S. in computer science & economics from the University of Minnesota in 1990. He is a member of the National Academy of Engineering, and of the American Academy of Arts and Sciences, a Fellow of the Association for Computing Machinery (ACM), a Fellow of the American Association for the Advancement of Sciences (AAAS), and a winner of the ACM Prize in Computing.

### Cool things of the week

- Google Dataset Search is in beta site
- Expanding our Public Datasets for geospatial and ML-based analytics blog
  - Zip Code Tabulation Area (ZCTA) site



**Download MP3**

**Topics:** AI, Machine Learning, TPU and Parallel Processing

Singular's Exhibit No. 2034, IPR2021-00155
Page 001

APPX04691

to derive better insights.

And so having more computation is generally a good thing in computing. And around the time of maybe 2011, 2012, when the Google Brain Project that I co-founded was just getting started, we started to collaborate with a number of different product teams at Google to use deep learning in some of the products.

And the ones we collaborated with most closely with were the speech recognition team to replace kind of the older style machine-learning model that they were using for speech recognition with a deep learning-based model for the acoustic portion of it, the part of the model that goes from a very small audio recording to a part of a word. Is it a "buh" or "fff" or a "sss"?

**MELANIE:** Yeah.

**JEFF:** And then there was another model that we didn't focus on initially, kind of after that state of the processing. But replacing the acoustic model with a deep learning-based acoustic model gave a lot of gains in recognition accuracy. And so we could tell that as speech recognition gets better, people are going to use it more and more.

And so I started to do some "back of the envelope" calculations of, like, well, what happens if people start talking to their phone three minutes a day, right? Because they're going to draft all their emails, a speech, or something. And at the time, we had, you know, just lots and lots of CPUs in our data center.

And if you looked at how much computation that would be required if 100 million of our users started to do that, that was actually kind of daunting and scary. We would have to essentially double the computing footprint of Google just to support, like, a slightly better speech recognition model for modest fraction of our users.

**MELANIE:** Seems legit.

**JEFF:** Yeah. So it seems a little scary. But it's clear we want to deploy that to our users because the gains in recognition accuracy are actually quite significant. And so we started to look at what could we do for these kinds of deep-learning models that would be more computationally efficient. And there are two really nice properties that deep-learning models have.

So first, they are very tolerant of reduced precision. So essentially, if you do that precisions to like one decimal digit of accuracy, that's actually perfectly fine for these models. You don't need six or seven digits of precision like you would in floating point computations or even more in double computations.

And the second property they have is that all the algorithms are made up of, like, different compositions of handful of building blocks, essentially matrix multiply, vector dot products, linear algebra-style operations. So if you can build hardware that is only designed to accelerate low-precision linear algebra, you're golden.

And that enables you to then really tailor the hardware to do only that. It doesn't need to do twisty, branchy, C++ code of all the kinds of arbitrary things, pointer dereferences, just low-precision linear algebra. Then suddenly you can rethink how you would completely design a computer to do only that.

**MARK:** Since it's focused in exactly what it is it can do, does that mean there are certain applications that are better or worse for a TPU that you might use something else for? Or how does that work?

**JEFF:** Right. So this is one of the double-edged swords of specialization is if you over-specialize, then it's not generally applicable. But if you make something very generally applicable, then it doesn't get all the performance benefits you could get from specialization.

And we actually chose, I think, a pretty good balance for TPUs. They're essentially designed to accelerate exactly the kinds of operations you find in deep-learning models. So they're not general purpose sort of computational devices. But they are not tailored to a particular model.

They are tailored to all the kinds of operations you generally find in deep-learning models. And so you can run vision models on them. You can run speech models. You can run recurrent language models.

The first TPU, TPU v1, was targeted at only inference, where you actually need even less precision than the training process. And that was our most pressing problem. That was how we could get the speech recognition model out to the world without doubling Google's data center footprint.

And then the second TPU was really both-- was targeted at both training and inference. And the reason we didn't bite that off first was that training is a much more complex hardware design problem.

Singular's Exhibit No. 2034, IPR2021-00155
Page 006

APPX04696

**APPX04706**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04709**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

Google Cloud

Blog · Latest Stories · What's New · Product News ▾ · Solutions & Technologies ▾ · Topics ▾

AI & MACHINE LEARNING

# Build and train machine learning models on our new Google Cloud TPUs



**Jeff Dean**
Google Senior Fellow

**Urs Hölzle**
Senior Vice President, Google Cloud Infrastructure

May 17, 2017

**Try GCP**

Start building on Google Cloud with $300 in free credits and 20+ always free products.

[FREE TRIAL]

We're excited to announce that our second-generation Tensor Processing Units (TPUs) are coming to Google Cloud to accelerate a wide range of machine learning workloads, including both training and inference. We call them Cloud TPUs, and they will initially be available via Google Compute Engine.

We've witnessed extraordinary advances in machine learning (ML) over the past few years. Neural networks have dramatically improved the quality of Google Translate, played a key role in ranking Google Search results and made it more convenient to find the photos you want with Google Photos. Machine learning allowed DeepMind's AlphaGo program to defeat Lee Sedol, one of the world's top Go players, and also made it possible for software to generate natural-looking sketches.

These breakthroughs required enormous amounts of computation, both to train the underlying machine learning models and to run those models once they're trained (this is called "inference"). We've designed, built and deployed a family of Tensor Processing Units, or TPUs, to allow us to support larger and larger amounts of machine learning computation, first internally and now externally.

While our first TPU was designed to run machine learning models quickly and efficiently—to translate a set of sentences or choose the next move in Go—those models still had to be trained separately. Training a machine learning model is even more difficult than running it, and days or weeks of computation on the best available CPUs and GPUs are commonly required to reach state-of-the-art levels of accuracy.

Research and engineering teams at Google and elsewhere have made great progress scaling machine learning training using readily-available hardware. However, this wasn't enough to meet our machine learning needs, so we designed an entirely new machine learning system to eliminate bottlenecks and maximize overall performance. At the heart of this system is the second-generation TPU we're announcing today, which can both train and run machine learning models.



Singular's Exhibit No. 2037, IPR2021-00155
Page 001

APPX04713

Google Cloud

Blog    Latest Stories    What's New    Product News ▾    Solutions & Technologies ▾    Topics ▾

AI & MACHINE LEARNING

# Google's scalable supercomputers for machine learning, Cloud TPU Pods, are now publicly available in beta

**Zak Stone**
Senior Product Manager for Cloud TPUs, Google Brain Team

May 7, 2019

**Try GCP**

Start building on Google Cloud with $300 in free credits and 20+ always free products.

**FREE TRIAL**

To accelerate the largest-scale machine learning (ML) applications deployed today and enable rapid development of the ML applications of tomorrow, Google created custom silicon chips called Tensor Processing Units (TPUs). When assembled into multi-rack ML supercomputers called Cloud TPU Pods, these TPUs can complete ML workloads in minutes or hours that previously took days or weeks on other systems. Today, for the first time, Google Cloud TPU v2 Pods and Cloud TPU v3 Pods are publicly available in beta to help ML researchers, engineers, and data scientists iterate faster and train more capable machine learning models.

## Delivering business value

Google Cloud is committed to providing a full spectrum of ML accelerators, including both Cloud GPUs and Cloud TPUs. Cloud TPUs offer highly competitive performance and cost, often training cutting-edge deep learning models faster while delivering significant savings. If your ML team is building complex models and training on large data sets, we recommend that you evaluate Cloud TPUs whenever you require:

- *Shorter time to insights*—iterate faster while training large ML models
- *Higher accuracy*—train more accurate models using larger datasets (millions of labeled examples; terabytes or petabytes of data)
- *Frequent model updates*—retrain a model daily or weekly as new data comes in
- *Rapid prototyping*—start quickly with our optimized, open-source reference models in image segmentation, object detection, language processing, and other major application domains

While some custom silicon chips can only perform a single function, TPUs are fully programmable, which means that Cloud TPU Pods can accelerate a wide range of state-of-the-art ML workloads, including many of the most popular deep learning models. For example, a Cloud TPU v3 Pod can train ResNet-50 (image classification) from scratch on the ImageNet dataset in just two minutes or BERT (NLP) in just 76 minutes.

Cloud TPU customers see significant speed-ups in workloads spanning visual product search, financial modeling, energy production, and other areas. In a recent case study, Recursion Pharmaceuticals iteratively tests the viability of synthesized molecules to treat rare illnesses. What took over 24 hours to train on their on-prem cluster completed in only 15 minutes on a Cloud TPU Pod.

## What's in a Cloud TPU Pod

A single Cloud TPU Pod can include more than 1,000 individual TPU chips which are connected by an ultra-fast, two-dimensional toroidal mesh network, as illustrated below. The TPU software stack uses this mesh network to enable many racks of machines to be programmed as a single, giant ML supercomputer via a variety of flexible, high-level APIs.

The latest-generation Cloud TPU v3 Pods are liquid-cooled for maximum performance, and each one delivers more than 100 petaFLOPs of computing power. In terms of raw mathematical operations per second, a Cloud TPU v3 Pod is comparable with a top 5 supercomputer worldwide (though it operates at lower numerical precision).

It's also possible to use smaller sections of Cloud TPU Pods called "slices." We often see ML teams develop their initial models on individual Cloud TPU devices (which are generally available) and then expand to progressively larger Cloud TPU slices via both data parallelism and model parallelism to achieve greater training speed and model scale.

You can learn more about the underlying architecture of TPUs in this blog post or this interactive website, and you can learn more about individual Cloud TPU devices and Cloud TPU Pod slices here.

## Getting started

Singular's Exhibit No. 2038, IPR2021-00155
Page 001

APPX04716

**APPX04718**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

**APPX04730**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

GOOGLE LLC

Petitioners,

v.

SINGULAR COMPUTING LLC

Patent Owner

————————————

Case Nos. IPR2021-00155

IPR2021-00165

IPR2021-00179

Patent Nos. 10,416,961

9,218,156

9,218,156

————————————

VIDEOTAPED DEPOSITION OF RICHARD M. GOODIN

Friday, July 30, 2021  9:07 a.m.

Wolf, Greenfield & Sacks P.C.

600 Atlantic Avenue, Boston, MA 02210

Reported by:

Janet McHugh, RMR, CRR, CLR

JOB NO. 2021-802910

Singular's Exhibit No. 2043, IPR2021-00155

Richard Goodin  REVISED AS TO DATE
July 30, 2021

Page 2

```
1   APPEARANCES:
2   WOLF, GREENFIELD & SACKS P.C.
3   600 Atlantic Avenue
4   Boston, Massachusetts 02210
5   BY:  ANANT K. SARASWAT, ESQ.
6   Anant.Saraswat@WolfGreenfield.com
7   - and -
8   WOLF, GREENFIELD & SACKS P.C.
9   Attorneys for Petitioner, GOOGLE
10  605 Third Avenue
11  New York, New York 10158
12  BY:  ELISABETH H. HUNT, PH.D., ESQ.
13  Elisabeth.Hunt@WolfGreenfield.com
14
15  FABRICANT LLP
16  Attorneys for Respondent SINGULAR
17  411 Theodore Fremd Road, Suite 206 South,
18  Rye, New York  10580
19  BY:  PETER LAMBRIANAKOS, ESQ.
20  plambrianakos@fabricantllp.com
21  BY:  RICHARD COWELL, ESQ.
22  rcowell@fabricantllp.com
23  ALSO PRESENT:
24  Shawn Budd, Videographer
```

Page 3

```
1          I N D E X
2   WITNESS       DIRECT   CROSS   REDIRECT
3   Richard M. Goodin
4   By Mr. Lambrianakos   4
5
6
7
8
9       (No new exhibits were marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1            P R O C E E D I N G S
2           THE VIDEOGRAPHER:  We are on the
3   record.  This is the videographer speaking, Shawn
4   Budd, with U.S. Legal Support.
5           Today's date is July 30, 2021, and the
6   time is 9:07 a.m.  We are here to take the
7   remote -- the video deposition of Richard Goodin
8   in the matter of Google versus Singular Computing
9   LLC.
10          Will counsel please introduce
11  themselves for the record.
12          MR. SARASWAT:  Anant Saraswat of Wolf,
13  Greenfield for Petitioner Google.
14          With me is Elisabeth Hunt, also of Wolf
15  Greenfield for Petitioner.
16          MR. LAMBRIANAKOS:  Peter Lambrianakos
17  and Richard Cowell of Fabricant, LLP on behalf of
18  the patent owner, Singular Computing LLC.
19          THE VIDEOGRAPHER:  And the court
20  reporter is Janet McHugh.
21          Would you please swear in the witness.
22             RICHARD M. GOODIN,
23  having been duly sworn, deposes and says as
24  follows:
```

Page 5

```
1           DIRECT EXAMINATION
2   BY MR. LAMBRIANAKOS:
3       Q.   Please state your full name.
4       A.   Richard Mark Goodin.
5       Q.   Have you ever given a deposition as an
6   expert?
7       A.   Yes.
8       Q.   How many times?
9       A.   Approximately 25.
10      Q.   So you're familiar with the deposition
11  process?
12      A.   Yes, I am.
13      Q.   Any reason you can't give truthful and
14  accurate testimony here today?
15      A.   No reason.
16      Q.   Are you under any medication that would
17  prevent you from giving truthful and accurate
18  testimony?
19      A.   No, I'm not.
20      Q.   Now, you understand we're here in a
21  deposition for three IPR proceedings:  IPR
22  2021-155, -165 and -179.  Is that your
23  understanding?
24      A.   Yes, that's my understanding.
```

Singular's Exhibit No. 2043, IPR2021-00155

Richard Goodin  REVISED AS TO DATE
July 30, 2021

Page 26

1  binary floating-point number in an IEEE-754
2  32-bit single format."
3      Do you see that?
4      A.  Yes, I do.
5      Q.  Have you ever seen that sentence
6  before?
7      A.  Yes, I have.
8      Q.  And you reviewed that before you wrote
9  your declaration?
10     A.  That's correct.
11     Q.  And you know -- and you know this
12 reference very well; right?
13         MR. SARASWAT:  Objection.  Form.
14     A.  As I said earlier, I'm familiar with
15 the reference.
16     Q.  So you knew that the register locations
17 in the register store 32-bit binary
18 floating-point number without having to read from
19 your declaration; isn't that right?
20         MR. SARASWAT:  Objection.  Form.
21     A.  Yes, that's correct.  But as I say, I
22 wanted to give you the most complete answer, and
23 that was from my declaration.
24     Q.  So if I ask you -- when I asked you

Page 27

1  whether or not the registers stored 32-bit binary
2  floating-point numbers, you couldn't answer "yes"
3  based on what you see in Paragraph 17, which
4  you've read 20 times?
5         MR. SARASWAT:  Objection.  Form.
6  Argumentative.
7      A.  I prefer the answer that I gave.
8      Q.  So you'd agree, based on the sentence
9  that I just read in the record, that the answer
10 to my question was "yes"?
11         MR. SARASWAT:  Objection.  Form.
12 Argumentative.
13     A.  I would agree that Dockser here
14 discloses the statement each register identify --
15 or identify 200 is configured to store a 32-bit
16 binary floating-point number in an IEEE-754
17 32-bit single format.
18     Q.  So you agree that you read that
19 sentence into the record?  That's it?
20         MR. SARASWAT:  Objection.  Form.
21     A.  I think I was answering your question.
22     Q.  Would a person of ordinary skill in the
23 art understand from reading that sentence that
24 Dockser discloses that its registers stored

Page 28

1  32-bit binary floating-point numbers?
2         MR. SARASWAT:  Objection.  Form.
3      A.  Yes, I believe one of ordinary skill in
4  the art would believe that reading this section
5  from Dockser.
6      Q.  Dockser says that in general purpose
7  processors, you may have some applications that
8  require high precision and others that require a
9  lower precision; isn't that right?
10         MR. SARASWAT:  Objection.  Form.
11     A.  Could I have you repeat your question?
12     Q.  Dockser says that in general purpose
13 processors, you may have some applications that
14 require high precision and others that require a
15 lower precision; isn't that right?
16         MR. SARASWAT:  Objection.  Form.
17     A.  So Dockser says, in Paragraph 3, "The
18 performance of floating-point arithmetic
19 operations can entail computational inefficiency
20 because floating-point processors are commonly
21 limited to the precision provided by either the
22 single format or both the single and double
23 format.  While some applications may require
24 these types of precisions, other applications may

Page 29

1  not."
2      Q.  Does Dockser teach that if a processor
3  is always using high precision, even if only a
4  lower precision is required for an application,
5  that this causes power to be wasted?
6         MR. SARASWAT:  Objection.  Form.
7      A.  So the statement that I just read you
8  talks about computational inefficiency, which
9  could also mean power.  But I don't remember any
10 explicit disclosure in Dockser about power
11 savings.
12     Q.  So you've read Dockser 20 times, and
13 you cannot, sitting here today, recall Dockser
14 ever talking about power savings?  Is that your
15 testimony, sir?
16         MR. SARASWAT:  Objection.  Form.
17     Q.  Just sitting here today right now, is
18 that your testimony?
19         MR. SARASWAT:  Objection.  Form.
20     A.  Just sitting here right now, without
21 rereading the entire section, I don't remember
22 Dockser talking about power savings.
23     Q.  What is your understanding of what
24 Dockser believes were the advantages of the

Singular's Exhibit No. 2043, IPR2021-00155

Richard Goodin   REVISED AS TO DATE
July 30, 2021

Page 30

1  processor he discloses in this application --
2  publication?
3        MR. SARASWAT:  Objection.  Form.
4        A.   I'm sorry, I believe my previous answer
5  was incorrect.
6        If you look at Section 251 of my
7  declaration, I talk about removing power from one
8  or more components in the floating-point
9  processor that would otherwise be used to store
10  or process one or more excess bits and performing
11  the floating-point operation with power removed
12  from the one or more components.
13        So I was incorrect when I answered earlier
14  that Dockser did not consider power.
15        Q.   Does Dockser disclose that using more
16  than a certain amount of precision that is
17  required by an application results in unnecessary
18  power consumption?
19        MR. SARASWAT:  Objection.  Form.
20        A.   I'm sorry, could you repeat your
21  question?
22        Q.   Does Dockser disclose that using a
23  higher level of precision than is necessarily
24  required by an application results in unnecessary

Page 31

1  power consumption?
2        MR. SARASWAT:  Objection.  Form.
3        A.   So Dockser in Paragraph 14 says, "By
4  selecting the subprecision of the floating-point
5  format to that needed for a particular operation,
6  thereby reducing the power consumption of the
7  floating-point processor to support the selected
8  subprecision, greater efficiency, as well as a
9  significant power savings, can be achieved."
10        Q.   Does Dockser recite any advantages to
11  his processor other than power savings?
12        MR. SARASWAT:  Objection.  Form.
13        A.   I believe Dockser discloses that
14  principally power savings is a benefit, but one
15  of ordinary skill in the art would also
16  appreciate that area savings would be an
17  additional benefit.
18        MR. LAMBRIANAKOS:  Object to that
19  answer as not responsive.
20        Q.   Does Dockser recite any advantages to
21  its processor other than power savings?
22        MR. SARASWAT:  Objection.  Form.  Asked
23  and answered.
24        A.   I do not believe that Dockser recites

Page 32

1  anything but the power reduction benefits.
2        Q.   Is it your understanding that the
3  Dockser processor would use less area than a
4  traditional 32-bit floating-point processor?
5        MR. SARASWAT:  Objection.  Form.
6  Scope.
7        A.   I don't believe that the Dockser
8  processor would use less area than -- in other
9  words, Dockser -- there is really no area
10  advantage in using Dockser's method to create the
11  processor.
12        Q.   Looking at Paragraph 3 of Dockser, do
13  you recall reading the first sentence of Dockser
14  into the record a few minutes ago?
15        A.   Yes --
16        MR. SARASWAT:  Objection.  Form.
17        A.   -- I recall that.
18        Q.   Had you ever read Paragraph 3 before
19  you just read it into the record?
20        A.   Yes, I have.
21        Q.   How do you know that?
22        MR. SARASWAT:  Objection.  Form.
23        A.   Because, as I testified previously, I
24  read Dockser in its entirety about 20 times.

Page 33

1        Q.   And when is the last time you read
2  Dockser?
3        MR. SARASWAT:  Objection.  Scope.
4        A.   Probably a week and a half ago.
5        Q.   What did you do to prepare for today's
6  deposition?
7        A.   I --
8        MR. SARASWAT:  And actually, I'm going
9  to caution the witness not to reveal anything
10  that might implicate attorney-client privilege.
11        A.   I read my declarations and some of the
12  references.  I met with Mr. Saraswat and Ms. Hunt
13  and basically did deposition prep with them.
14        Q.   Did you read the Dockser reference in
15  connection with your preparation for today?
16        A.   That was when I read it, about a week
17  and a half ago, yes.
18        Q.   You haven't read it in the last week
19  and a half?
20        A.   That's correct.
21        Q.   Do you see about six lines down in
22  Paragraph 3, it says, "For example, some graphics
23  applications may require -- may only require a
24  16-bit mantissa.  For these graphics

Singular's Exhibit No. 2043, IPR2021-00155

Richard Goodin   REVISED AS TO DATE
July 30, 2021

Page 34

1  applications, any accuracy beyond 16 bits of
2  precision tends to result in unnecessary power
3  consumption"?
4       Do you see that?
5       A.  Yes, I see that.
6       Q.  And he says, "This is of particular
7  concern in battery-operated devices where power
8  comes at a premium, such as wireless telephones,
9  personal digital assistants, PDA, laptops, game
10  consoles, pagers, and cameras, just to name a
11  few"?
12       Do you see that, sir?
13       A.  Yes, I see that.
14       Q.  And then further down in that
15  paragraph, he says, "Accordingly, there is a need
16  in the art for a floating-point processor in
17  which the reduced precision or subprecision of
18  the floating-point format is selectable."
19       Do you see that?
20       A.  Yes, I see that.
21       Q.  So you'd agree that the purpose
22  disclosed here in Dockser for using reduced
23  precision would be to obtain power savings;
24  right?

Page 35

1       MR. SARASWAT:  Objection.  Form.
2       A.  Yes, in those sections that you just
3  quoted, Dockser is describing power savings for
4  using its method.
5       Q.  Do you see in the middle of that
6  paragraph, it says, "If it is known that an
7  application always requires a certain reduced
8  precision, the floating-point processor can be
9  designed and built to that reduced precision"?
10       A.  Yes, I see that line.
11       Q.  So Dockser is teaching that a
12  floating-point processor with selectable
13  precision would be unnecessary if it's known that
14  an application always requires a certain reduced
15  precision; isn't that right?
16       MR. SARASWAT:  Objection.  Form.
17       A.  I don't know I would agree that Dockser
18  is teaching this.  This was well known in the art
19  at the time of Dockser.
20       Q.  Do you agree that the number of
21  mantissa bits in a standard 32-bit floating-point
22  number is 23?
23       MR. SARASWAT:  Objection.  Form.
24       A.  Yes, I agree with that.

Page 36

1       Q.  So you agree that the 23 bits provides
2  the full level of precision for a standard 32-bit
3  operation?
4       MR. SARASWAT:  Objection.  Form.
5       A.  I'm not sure what you mean in that by
6  the "full level of precision."
7       Q.  Does 23 bits of mantissa in a standard
8  32-bit floating-point number provide the maximum
9  precision that can be obtained in an operation?
10       MR. SARASWAT:  Objection.  Form.
11       A.  No, I think I disagree with that.
12       There are numerous operations, particularly
13  in graphics, where an input may be a single
14  precision floating-point number, but the
15  operation itself may have much higher precision.
16       Q.  Does Dockser include a full precision
17  mode that uses all 23 bits of mantissa?
18       MR. SARASWAT:  Objection.  Form.
19       A.  I believe that Dockser does disclose an
20  embodiment that uses all 23 bits of mantissa in
21  IEEE-754 unit.
22       Q.  And you agree that in that embodiment,
23  Dockser discloses that the processor can use 23
24  bits of mantissa or it can operate at a lower

Page 37

1  selected precision?
2       MR. SARASWAT:  Objection.  Form.
3       A.  So in Paragraph 13, it says, "In at
4  least one embodiment of the floating-point
5  processor, the precision for one or more
6  floating-point operations may be reduced from
7  that of the specified format precision."
8       Q.  So is the answer to my question "yes"?
9       A.  Could you repeat your question?
10       Q.  And you agree that in that embodiment,
11  Dockser discloses that the processor can use 23
12  bits of mantissa or it can operate at a lower
13  selected precision?
14       MR. SARASWAT:  Objection.  Form.
15       A.  I believe in at least one embodiment of
16  Dockser it can operate on a selectable precision,
17  including the full 23 bits.
18       Q.  And in Dockser, one can select fewer
19  than 23 bits to perform operations; is that
20  right?
21       MR. SARASWAT:  Objection.  Form.
22       A.  So as I just quoted at the time, in at
23  least one embodiment of the floating-point
24  processor, the precision for one or more

Singular's Exhibit No. 2043, IPR2021-00155

APPX04741

Richard Goodin  REVISED AS TO DATE
July 30, 2021

Page 38

1  floating-point operations may be reduced from
2  that of the specified format.
3      Q.   Does Dockser disclose any embodiments
4  without selectable precision?
5          MR. SARASWAT:  Objection.  Form.
6      A.   I don't believe Dockser discloses any
7  embodiments without floating-point -- without
8  selectable precision.
9      Q.   Does Dockser disclose any differences
10  between the way it performs full precision
11  operations and the way that a standard 32-bit
12  floating-point processor performs those same
13  operations?
14          MR. SARASWAT:  Objection.  Form.
15      A.   The whole purpose of Dockser is its
16  description of bit propping in both registers
17  and/or the logic of the multiplier.
18      Q.   Would the result of a full precision
19  multiplication operation in Dockser be different
20  than the result in a standard 32-bit
21  floating-point processor?
22          MR. SARASWAT:  Objection.  Form.
23      A.   By "full precision," do you meaning
24  full precision input or full precision functional

Page 39

1  operation?
2      Q.   Both.
3          MR. SARASWAT:  Objection.  Form.
4      A.   So using a full precision input and a
5  full precision functional operation, it will
6  produce a full precision IEEE-754 output.
7      Q.   And that output would be the same that
8  you would expect in a non-selectable --
9  non-subprecision selectable 32-bit floating-point
10  processor?
11          MR. SARASWAT:  Objection.  Form.
12      A.   Yes.  If you compared the outputs
13  between a normal IEEE-754 multiplier and Dockser
14  configured as a -- with a 23-bit mantissa, it
15  would produce the same numerical output.
16      Q.   Dockser discloses that it uses
17  conventional operators; right?
18          MR. SARASWAT:  Objection.  Form.
19      A.   I don't remember that exactly from
20  Dockser.
21      Can you point me to where Dockser says that?
22      Q.   Looking at Paragraph 20 of Dockser,
23  have you read Paragraph 20 before?
24      A.   Yes, I have.

Page 40

1      Q.   Would you please review Paragraph 20
2  and let me know whether Dockser discloses that it
3  uses conventional operators?
4          MR. SARASWAT:  Objection.  Form.
5      A.   So in Paragraph 20, it says that it
6  uses standard arithmetic operations.
7      Q.   Is that your characterization of what
8  it says?
9      A.   So the exact quote from Paragraph 20
10  is:  "The adder 142 may be a conventional
11  floating-point adder configured to perform
12  standard arithmetic operations in a
13  floating-point format."
14      Q.   And it goes on to say, "The multiplier
15  144 may be a conventional floating-point
16  multiplier"; right?
17          MR. SARASWAT:  Objection.  Form.
18  Mischaracterizes.
19      A.   So the next sentence is:  "The
20  multiplier 144 may be a conventional
21  floating-point multiplier configured to perform
22  floating-point multiplication."
23      Q.   So you agree, then, that Dockser
24  discloses that it uses a conventional multiplier?

Page 41

1          MR. SARASWAT:  Objection.  Form.  Asked
2  and answered.
3      A.   So as it says here in Dockser, it's a
4  conventional floating-point multiplier configured
5  to perform floating-point multiplication.
6      Q.   So you agree, then, that Dockser
7  discloses a conventional multiplier?
8          MR. SARASWAT:  Objection.  Form.  Asked
9  and answered.
10      A.   Once again, it talks about a
11  conventional floating-point multiplier configured
12  to perform floating-point multiplication.
13      Q.   So you, as a person of ordinary skill
14  in the art, would conclude that Dockser discloses
15  using a conventional multiplier?
16          MR. SARASWAT:  Objection.  Form.  Asked
17  and answered.
18      A.   I can only go with what Dockser says,
19  and that is a floating-point multiplier
20  configured to perform floating-point
21  multiplication.
22      Q.   So you can't provide conclusions about
23  what a person of ordinary skill in the art would
24  understand by reading Dockser; correct?

Singular's Exhibit No. 2043, IPR2021-00155

APPX04742

Richard Goodin  REVISED AS TO DATE
July 30, 2021

Page 42

1          MR. SARASWAT: Objection. Form.
2     A.   No, that's not correct.
3     Q.   But you said that you could only go
4  with what Dockser says, and you can't provide an
5  opinion of what a person of ordinary skill in the
6  art would understand.  Isn't that what you just
7  testified?
8          MR. SARASWAT: Objection.
9  Mischaracterizes testimony.
10     A.   No, that isn't what I just testified
11  to.
12     Q.   Would a person of ordinary skill in the
13  art conclude that Dockser discloses using a
14  conventional multiplier?
15          MR. SARASWAT: Objection. Form.
16     A.   No.  I believe one of ordinary skill in
17  the art would conclude that Dockser uses a
18  conventional floating-point multiplier configured
19  to perform floating-point multiplication.
20     Q.   So a person of ordinary skill in the
21  art would only conclude the words on the page in
22  Dockser.  Is that what you're saying?
23          MR. SARASWAT: Objection. Form.
24  Mischaracterizes.

Page 43

1     A.   You asked me what a person of ordinary
2  skill would conclude, and, as I said, I believe a
3  person of ordinary skill would conclude that it
4  is a conventional floating-point multiplier
5  configured to perform floating-point
6  multiplication.
7     Q.   How does Dockser save power by
8  permitting a user or an application to select a
9  subprecision?
10          MR. SARASWAT: Objection. Form.
11     A.   So Dockser, in Paragraph 26, says, "The
12  precision select bits may be used to reduce the
13  precision of a floating-point operation.  This
14  may be achieved in a variety of ways.  In one
15  embodiment, the floating-point controller 130 may
16  cause power to be removed from the floating-point
17  register elements for the excess bits of the
18  fraction that are not required to meet the
19  precision specified by the subprecision select
20  bits."
21     Q.   Does the processor of Dockser require
22  circuitry to power off the bits representing the
23  portions of the mantissa that aren't going to be
24  used in the operation?

Page 44

1          MR. SARASWAT: Objection. Form.
2  Scope.
3     A.   Well, certainly, there would be
4  circuitry that would cause power to be removed
5  from a floating-point register elements for the
6  excess bits of the fraction.
7     Q.   Does Dockser disclose any other methods
8  for saving power by permitting a user or an
9  application to select subprecision?
10          MR. SARASWAT: Objection. Form.
11     A.   So in Paragraph 7 of Dockser, it talks
12  about a different embodiment.  "The
13  floating-point controller is further configured
14  to remove power, a portion of the lodge that
15  would otherwise be used to process one or more
16  excess bits."
17          And I refer to that as "the logic
18  bit-dropping" embodiment.
19          MR. SARASWAT: Counsel, just real
20  quickly, we've been going for about an hour.  Can
21  we take a break soon?
22          MR. LAMBRIANAKOS: Sure.
23  BY MR. LAMBRIANAKOS:
24     Q.   Does Dockser disclose that circuitry is

Page 45

1  required to remove power to the logic in the
2  floating-point operator that remains unused as a
3  result of the subprecision selected?
4          MR. SARASWAT: Objection. Form.
5  Scope.
6     A.   I believe that Dockser does disclose
7  circuitry that would remove power from the logic
8  in the floating-point operation in the logic
9  bit-dropping case.
10          MR. LAMBRIANAKOS: We can take that
11  break.
12          MR. SARASWAT: Thanks.
13          THE VIDEOGRAPHER: The time is 10:04.
14  We're off the record.
15          (A recess was taken.)
16          THE VIDEOGRAPHER: We are back on the
17  record.  The time is 10:21.
18  BY MR. LAMBRIANAKOS:
19     Q.   Mr. Goodin, the Bates patents do not
20  disclose a selectable precision processor, do
21  they?
22          MR. SARASWAT: Objection. Form.
23  Scope.
24     A.   So in the abstract of the Bates patent,

Singular's Exhibit No. 2043, IPR2021-00155

APPX04743

Richard Goodin  REVISED AS TO DATE
July 30, 2021

Page 54

1    A.   At least, yes.
2    Q.   Good.  So would you read this patent
3  claim and let me know whether a person of
4  ordinary skill in the art would conclude that it
5  requires a processor to have selectable
6  precision?
7        MR. SARASWAT:  Objection.  Scope.
8  Asked and answered.
9    A.   The issue isn't reading just the patent
10  claim.  The issue is there's more information.
11  You have to read the patent claim in view of the
12  specification.  You have to take into account the
13  file history.
14        And I'm not going to do that sort of
15  analysis here on the fly in a deposition.
16    Q.   You know you're here to answer my
17  questions; right?
18    A.   That's correct.
19        MR. SARASWAT:  Objection.  Scope.
20  Argumentative.
21    Q.   Does Claim 1 include within its scope
22  the requirement that the processor have
23  selectable precision?
24        MR. SARASWAT:  Objection.  Asked and

Page 55

1  answered.
2    A.   As I've said, I'm not going to undergo
3  that sort of analysis.  I spent hundreds of
4  hours doing that analysis for Dockser and the
5  other grounds.  I'm not going to off the cuff
6  perform that analysis here in my deposition.
7    Q.   You spent hundreds of hours analyzing
8  Dockser?
9        MR. SARASWAT:  Objection.
10  Mischaracterizes testimony.
11    A.   I spent hundreds of hours producing my
12  declarations.
13    Q.   Despite those hundreds of hours, you
14  couldn't answer a question about Dockser without
15  reading from Dockser; isn't that right?
16        MR. SARASWAT:  Objection.  Form.
17  Mischaracterizes testimony.
18    A.   No, that's not correct.  I said I
19  preferred reading from Dockser because that was
20  the best answer I could give you at the time.
21    Q.   So it's your position that you have not
22  given an opinion in your declaration regarding
23  whether the claims of the Bates patent require
24  selectable precision processors?

Page 56

1        MR. SARASWAT:  Objection.  Form.
2    A.   It's my opinion that Dockser meets the
3  claim elements of the Bates patent and that
4  Dockser requires selectable precision.
5    Q.   Have you given an opinion in your
6  declaration regarding whether the Bates patent
7  claims require a selectable precision processor?
8        MR. SARASWAT:  Objection.  Asked and
9  answered.
10    A.   My opinion is that Dockser meets the
11  Bates claims and that Dockser requires selectable
12  precision.  That's my opinion.
13    Q.   Didn't you refuse to tell me whether or
14  not Claim 1 requires that the processor have
15  selectable precision because you haven't done
16  that analysis?
17        MR. SARASWAT:  Objection.
18    Q.   Didn't you just do that, sir?
19        MR. SARASWAT:  Objection.
20  Mischaracterizes testimony.
21    A.   No.  I told you that determining the
22  requirement that anything with selectable
23  precision or not would meet the claim elements,
24  that I was not prepared to undertake that

Page 57

1  analysis here in the deposition.
2    Q.   Well, perhaps you misunderstood my
3  question.
4        My question is:  Do the claims of the Bates
5  patents require selectable precision?
6        MR. SARASWAT:  Objection.  Asked and
7  answered.
8    A.   And perhaps I don't understand your
9  question because my answer is the same as before,
10  which is, you know, my opinion is the claimed --
11  is the patent claims read on Dockser and that
12  Dockser requires selectable precision.
13    Q.   Do the patent claims require selectable
14  precision?
15        MR. SARASWAT:  Objection.  Asked and
16  answered.
17    A.   As I've said before, that's an analysis
18  I'm not willing to undertake here sitting in a
19  deposition.
20    Q.   And you haven't done that analysis up
21  to this time; correct?
22    A.   I have not done the analysis whether
23  any or all elements falling within the Bates
24  patent claims have selectable precision.

Singular's Exhibit No. 2043, IPR2021-00155

APPX04746

Richard Goodin  REVISED AS TO DATE
July 30, 2021

Page 66

1    I came to an understanding of the scope of
2  the Bates claims as part of my analysis of
3  Dockser.  But I don't think my understanding of
4  those claims is limited by Dockser.
5    Q.   So in the process of conducting your
6  analysis for these proceedings, did you come to
7  an understanding of what the scope of the claims
8  in the Bates patents are in the view of a person
9  of ordinary skill in the art?
10    A.   I did come to a partial understanding
11  of the scope of the claims in the Bates patent.
12    Q.   But you didn't come to a full
13  understanding of what the patent scope was; is
14  that right?
15         MR. SARASWAT:  Objection.  Form.
16    A.   I didn't perform an analysis beyond my
17  analysis of Dockser in my declaration.
18    Q.   What do you mean that you didn't
19  perform an analysis beyond your analysis of
20  Dockser?  What does that mean?
21    A.   In other words, when I did my analysis
22  of Dockser, I needed to come to a conclusion
23  about the scope of the claims.
24         And I did come to a conclusion that the

Page 67

1  scope of the claims included at least Dockser.
2  But I didn't come to a complete understanding of
3  all possible hardware that could fall within the
4  scope of the claims.
5    Q.   So your understanding of the scope of
6  the claims was done in the context of
7  understanding whether or not Dockser renders
8  those claims obvious; is that right?
9    A.   I believe that's partially true.  My
10  understanding was beyond the scope of Dockser but
11  did not extend to the point of all possible
12  hardware that might fall within the scope of the
13  claims.
14    Q.   So when you say your analysis was
15  beyond the scope of Dockser, did it include also
16  your understanding of the scope of Tong and
17  MacMillan as well as Dockser when understanding
18  the claims?
19         MR. SARASWAT:  Objection.  Form.
20    A.   It's true that I did perform the
21  analysis in my declaration of how Tong and
22  MacMillan in combination with Dockser would meet
23  the claims of the Bates patent.
24    Q.   And did you -- in so doing, did you

Page 68

1  have an understanding of the full scope of the
2  Bates patent claims?
3         MR. SARASWAT:  Objection.  Asked and
4  answered.
5    A.   As I said before, I don't believe I had
6  an understanding of the theoretical full scope of
7  the Bates patent claims.
8    Q.   In doing your analysis, did you come to
9  a conclusion regarding whether or not the Bates
10  patent claims required that an LPHDR execution
11  unit have selectable precision?
12         MR. SARASWAT:  Objection.  Asked and
13  answered.
14    A.   So in doing my analysis of the Bates
15  patent -- or -- sorry -- of Dockser and MacMillan
16  and Tong, I came to an understanding of the scope
17  of the Bates patent as it relates to those
18  references, but I didn't undertake to have an
19  understanding of other hypothetical solutions
20  that would -- might possibly fall beneath those
21  claims.
22    Q.   So if Dockser only operated at a single
23  subprecision, below 23 mantissa bits, would it
24  change your analysis regarding whether Dockser

Page 69

1  and Dockser in combination with the other
2  references renders the Bates patents obvious?
3         MR. SARASWAT:  Objection.  Form and
4  scope.
5    A.   I didn't undertake that analysis.
6    Q.   Sitting here today, would it change
7  your analysis if Dockser only operated at a
8  single subprecision below 23 mantissa bits?
9         MR. SARASWAT:  Objection.  Scope.
10    A.   I believe I would have to perform an
11  additional analysis for that embodiment.
12    Q.   So you can't answer that question?
13         MR. SARASWAT:  Objection.
14  Mischaracterizes.
15    A.   As I said, I would have to perform an
16  additional analysis for that embodiment.
17    Q.   Are you incapable of performing an
18  analysis sitting here today regarding whether
19  Dockser, if it were limited only to a single
20  subprecision, and whether that would change your
21  analysis of obviousness?
22         MR. SARASWAT:  Objection.  Scope and
23  argumentative.
24    A.   That certainly isn't part of my

Singular's Exhibit No. 2043, IPR2021-00155

Richard Goodin  REVISED AS TO DATE
July 30, 2021

Page 70

1  opinions in my declaration.
2  Q.  Are you capable of performing the
3  analysis now?
4  MR. SARASWAT:  Objection.  Scope.
5  A.  I believe I'm capable of performing the
6  analysis.  I don't believe I'm capable of
7  performing it now in this deposition.
8  Q.  So let's say that Dockser were limited
9  to an embodiment where it considered operations
10  only with five mantissa bits.  Would it still be
11  your opinion that Dockser and Dockser in
12  connection with the other references renders the
13  Bates patent claims obvious?
14  MR. SARASWAT:  Objection.  Form and
15  scope.
16  A.  I don't think I undertook an analysis
17  of any version of Dockser that had a fixed number
18  of calculation bits.
19  Q.  Does Dockser teach selectable dynamic
20  range?
21  A.  I don't believe Dockser has an
22  embodiment which features a reduced exponent or
23  dynamic range.
24  Q.  Does Dockser state that the processor

Page 71

1  disclosed in his patent publication is smaller
2  than a standard 32-bit floating-point processor?
3  MR. SARASWAT:  Objection.  Form.
4  A.  What do you mean by "smaller"?
5  Q.  Occupies less area.
6  So I'll ask the question:  Does Dockser
7  state that the processor disclosed in his patent
8  publication occupies a smaller area than a
9  standard 32-bit floating-point processor?
10  MR. SARASWAT:  Objection.  Form.
11  A.  I don't believe Dockser discloses an
12  embodiment which reduces space for the FPP.
13  Q.  Does Dockser teach that the processor
14  that he discloses could be implemented in a
15  system where there are numerous such processors
16  in parallel?
17  MR. SARASWAT:  Objection.  Form.
18  Scope.
19  A.  I don't believe Dockser, by itself,
20  discloses implementations of multiple FPUs, but I
21  also don't think it precludes it.
22  Q.  Let's turn to the Tong reference.
23  That's Exhibit 1008.
24  Have you ever seen this reference before,

Page 72

1  sir?
2  A.  Yes, I have.
3  Q.  This reference was provided to you by
4  counsel originally?
5  MR. SARASWAT:  Objection.
6  I'm just going to caution the witness
7  not to reveal anything that would be
8  attorney-client privileged.
9  A.  As I said earlier, I don't remember
10  whether this was one I found or the attorneys
11  found.
12  Q.  But you remember having read this
13  before.
14  A.  Yes, that's correct.
15  Q.  And you are very familiar with the
16  content of the Tong reference?
17  MR. SARASWAT:  Objection.  Form.
18  A.  Yes, I'm familiar with the content of
19  the Tong reference.
20  Q.  You've read this reference dozens of
21  times; is that right?
22  A.  Probably more like a dozen times.
23  Q.  And you're prepared today to testify
24  regarding what Tong discloses?

Page 73

1  A.  That's correct.
2  Q.  Does Tong teach that for certain types
3  of applications, the processor can effectively
4  use fewer mantissa bits and exponent bits than
5  required in a 32-bit IEEE standard floating
6  point?
7  MR. SARASWAT:  Objection.  Form.
8  A.  So from Paragraph 273 of Tong, it says,
9  "We study experimentally the relationship between
10  the accuracy of floating-point programs and the
11  number of bits used in the representation of the
12  data.  Our central results demonstrate that many
13  programs which manipulate human sensory inputs,
14  e.g., speech and image recognition, suffer no
15  loss of accuracy with reduced bitwidth in the
16  mantissa or the exponent."
17  Q.  And what is the purpose of Tong's study
18  of using fewer mantissa and exponent bits?
19  MR. SARASWAT:  Objection.  Form.
20  A.  I'm not sure what you mean by what the
21  purpose of this study was.
22  Q.  Have you ever read Tong before, before
23  you just read that paragraph right now?
24  A.  Yes, I have.

Singular's Exhibit No. 2043, IPR2021-00155

APPX04750

# Tensor Processing Units for Financial Monte Carlo

Francois Belletti, Davis King, Kun Yang, Roland Nelet, Yusef Shafi, Yi-Fan Chen, John Anderson

Google Research
Mountain View CA
USA
belletti@google.com

*Abstract*—Monte Carlo methods are critical to many routines in quantitative finance such as derivatives pricing, hedging and risk metrics. Unfortunately, Monte Carlo methods are very computationally expensive when it comes to running simulations in high-dimensional state spaces where they are still a method of choice in the financial industry. Recently, Tensor Processing Units (TPUs) have provided considerable speedups and decreased the cost of running Stochastic Gradient Descent (SGD) in Deep Learning. After highlighting computational similarities between training neural networks with SGD and simulating stochastic processes, we ask in the present paper whether TPUs are accurate, fast and simple enough to use for financial Monte Carlo. Through a theoretical reminder of the key properties of such methods and thorough empirical experiments we examine the fitness of TPUs for option pricing, hedging and risk metrics computation. In particular we demonstrate that, in spite of the use of mixed precision, TPUs still provide accurate estimators which are fast to compute when compared to GPUs. We also show that the Tensorflow programming model for TPUs is elegant, expressive and simplifies automated differentiation.

*Index Terms*—Financial Monte Carlo, Simulation, Tensor Processing Unit, Hardware Accelerators, TPU, GPU

## I. INTRODUCTION

The machine learning community has developed several technologies to speed up Stochastic Gradient Descent algorithms for Deep Learning [16], including new programming paradigms, special-purpose hardware, and linear-algebra computation frameworks. This paper demonstrates that the same techniques can accelerate Monte Carlo integration of stochastic processes for financial applications.

### A. Monte Carlo estimation in finance and insurance

A key problem when pricing a financial instrument — for insurance or speculation — is to estimate an average outcome defined by a probability space $(\Omega, \mathcal{F}, \mathbb{P})$: $E_{\mathbb{P}}[f(\omega)]$, where $E$ denotes the expectation. In the following we first provide a basic introduction to derivatives pricing. Namely, we focus on estimating expectations with the Monte Carlo method in cases where random fluctuations are generated by stochastic processes. We describe how hardware accelerators compute such estimators faster through parallelization.

*1) Stochastic processes in continuous time:* Stochastic processes remain the main abstraction employed to model financial asset prices. Consider a filtered probability space $(\Omega, \mathcal{F}, \mathbb{F}, \mathbb{P})$ (where $\mathbb{F} = \{\mathcal{F}_t\}$ is the corresponding canonical

filtration) supporting a $q$ dimensional Brownian motion $W$ and the Stochastic Differential Equation (SDE)

$$\mathrm{d}X_t = \mu(t, X_t)\mathrm{d}t + \sigma(t, X_t)\mathrm{d}W_t, \ t \in [0, T]. \quad (1)$$

The drift ($\mu$) and volatility ($\sigma$) functions take values respectively in $\mathbb{R}^p$ and $\mathbb{R}^{p,q}$. By definition, a strong solution $(X)$ to Eq. (1) is a process taking values in $\mathbb{R}^p$ such that $\int_{s=0}^{T} (||b(s, X_s)||_2 + ||\sigma(s, X_s)||_2^2)\, ds$ is almost surely finite and

$$X_t = X_0 + \int_0^t b(s, X_s)\,\mathrm{d}s + \int_0^t \sigma(s, X_s)\,\mathrm{d}W_s, \ t \in [0, T].$$

Assuming that $X_0$ is a random variable with finite variance independent of $W$, and that $||b(\cdot, 0)||_2$ and $||\sigma(\cdot, 0)||_2$ are square integrable (as functions of $t$), the existence of a finite Lipschitz constant $K$ such that

$$||b(t, x) - b(t, y)||_2 + ||\sigma(t, x) - \sigma(t, y)||_2 \le K||x - y||_2$$

for all $x, y \in \mathbb{R}^p$ and $t \in [0, T]$ guarantees the existence of such a strong solution on $[0, T]$. More modern models typically introduce jumps or stochastic volatility which adds realism to the corresponding simulations but does not radically change the underlying computation patterns.

*2) Monte Carlo methods in finance and insurance:* Monte-Carlo methods rely on simulation and numerical integration to estimate $E_{\mathbb{P}}[f(X_T)]$ or $E_{\mathbb{Q}}[f(X_T)]$ under the historical or risk-neutral probability ($\mathbb{P}$ and $\mathbb{Q}$ respectively) [15]. Some contracts defining financial derivatives may specify a *path dependent* outcome—such as Barrier or Asian options—in which case the theory of Black, Scholes and Merton still leads us to estimate $E_{\mathbb{P}}[f(X_{0:T})]$ or $E_{\mathbb{Q}}[f(X_{0:T})]$ where $X_{0:T}$ denotes the observation of the process $X$ on the interval $[0, T]$. In general, we thus seek an estimator for an expectation of the type

$$E[f(X_{0:T})] \text{ where } (X_t) \text{ solves (1) on } [0, T]. \quad (2)$$

Monte-Carlo methods rely on numerical discretization and integration to produce an estimator for (2) in the form of an empirical mean over simulated trajectories $\left\{\widetilde{X}_{0,T}^n | i = 1 \dots N\right\}$:

$$\widehat{I}_N = \frac{1}{N}\sum_{n=1}^{N} f\left(\widetilde{X}_{0,T}^n\right). \quad (3)$$

Singular's Exhibit No. 2049, IPR2021-00155
Page 001

arXiv:1906.02818v5 [cs.DC] 27 Jan 2020

**APPX04949**

**HAS BEEN OMITTED PURSUANT**

**TO PROTECTIVE ORDER**

IPR2021-00155
PATENT NO. 10,416,961

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

Patent No. 10,416,961
Filing Date: October 30, 2018
Issue Date: September 17, 2019

Inventor: Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

**DECLARATION OF SUNIL P. KHATRI, Ph.D.**

Case No. IPR2021-00155

Singular's Exhibit No. 2051, IPR2021-00155
Page 001
APPX04950

36.     I understand that I should perform my analysis from the viewpoint of a person of ordinary skill in the art. I understand that this hypothetical person of ordinary skill in the art is considered to have the normal skills of a person in a certain technical field. I understand that factors that may be considered in determining the level of ordinary skill in the art include, *e.g.*, the types of problems encountered in the art, prior art solutions to those problems, the sophistication of the technology, and the education level of active workers in the field.

37.     I agree with Petitioner's proposed level of skill in the art, except that I disagree that such a person would have more than two years of experience. Therefore a POSA would be: a person with a Bachelor's degree in Computer Science, Electrical Engineering, or Applied Mathematics, with 2 years of academic or industry experience in computer architecture. Pet. at 8-9.

## B.     The Claimed Invention Of The '961 Patent

38.     The '961 Patent is entitled "Processing with Compact Arithmetic Processing Element" and issued on September 17, 2019. The '961 Patent claims priority, through parent and grandparent applications, to U.S. Provisional Patent Application No. 61/218,691, filed on Jun. 19, 2009. I have reviewed the '961 Patent and its file history.

39.     The inventor of the '961 Patent, Dr. Bates, recognized that even though then-modern conventional microprocessors contained about one billion

11

transistors, they could perform only a handful of operations per clock cycle. '961

Patent, 1:40-48. Dr. Bates explained that a large portion of this inefficiency comes

from using transistor-intensive full-precision arithmetic units:

> As described above, today's CPU chips make inefficient use of their
> transistors. …they deliver great precision, performing exact arithmetic
> … standardized arithmetic with 32 and 64 bit floating point numbers.
> Many applications need this kind of precision. As a result,
> conventional CPUs typically are designed to provide such precision,
> using on the order of a million transistors to implement the arithmetic
> operations.

'961 Patent, 2:62-3:10.

40.     However, Dr. Bates realized that such full-precision, inefficient

components were not necessary for all applications, including many valuable ones:

> There are many economically important applications, however, which
> are not especially sensitive to precision and that would greatly benefit,
> in the form of application performance per transistor, from the ability
> to draw upon a far greater fraction of the computing power inherent in
> those million transistors. Current architectures for general purpose
> computing fail to deliver this power.

'961 Patent, 3:11-17.

41.     The '961 Patent is thus directed away from prior art computers based

on full-precision execution units that take up space and are wasteful of transistors.

12

As Dr. Bates further explains in the specification, "[b]ecause LPHDR processing elements are relatively small, a single processor or other device may include a very large number of LPHDR processing elements, adapted to operate in parallel with each other." '961 Patent, 6:47-52. As a result, "embodiments of the present invention may be implemented as any kind of machine which uses LPHDR arithmetic processing elements to provide computing using a small amount of resources (e.g., transistors or volume) compared with traditional architectures." '961 Patent, 8:1-5.

42.    By using a "very large number" of LPHDR execution units in parallel, computer systems are able to achieve significantly better performance than prior art systems. Because each LPHDR execution unit requires fewer resources (*e.g.*, fewer transistors, less physical volume) than a full-precision execution unit, "there is a large amount of arithmetic computational power per unit of resource. This enables larger problems to be solved with a given amount of resource than does traditional computer designs." '961 Patent, 23:57-64; *see also id.*, 6:47-52. In particular, the claimed systems "might perform tens of thousands of arithmetic operations per cycle, as opposed to hundreds in a conventional GPU or a handful in a conventional multicore CPU. '961 Patent, 23:64-24:2.

Singular's Exhibit No. 2051, IPR2021-00155
Page 016
APPX04965

43.    In addition, the '961 Patent also teaches computer systems in which the number of LPHDR execution units exceeds the number of full precision execution units:

> For certain devices … according to the present invention, the number of LPHDR arithmetic elements in the device (e.g., computer or processor or other device) exceeds the number, possibly zero, of arithmetic elements in the device which are designed to perform high dynamic range arithmetic of traditional precision (that is, floating point arithmetic with a word length of 32 or more bits).

'961 Patent, 28:9-16.

44.    The increased level of compute parallelism and scale in such computer systems is necessarily achieved at the cost of precision—the vast majority of the high dynamic range floating-point operations performed by the device must be performed at low precision. Dr. Bates was the first to understand that sacrificing precision for increased parallelism/scale results in significant performance gains per unit of resource over the prior art. In fact, Dr. Bates notes that when certain applications are implemented using a device that uses LPHDR execution units, the final application error is significantly lower than the error of the LPHDR execution units themselves. '961 Patent, 17:1-23:54.

## V.    THE CITED REFERENCES

### A.    Dockser

45.    I have reviewed U.S. Pat. Publ. 2007/0203967, titled "Floating-Point Processor With Reduced Power Requirements For Selectable Subprecision" ("Dockser"). Dockser discloses the use of a full-precision floating point processor (FPP) that can selectably reduce precision in order to reduce its power draw. *See, e.g.*, Ex. 1007, Dockser ¶ [0026].

46.    Dockser's teaching of an execution unit that is always capable of operating in both full-precision mode (its default) and reduced-precision modes is motivated by the prevalent view in the prior art that while low-precision operation might be acceptable for "certain applications," for a general-purpose processor, full-precision capability is "needed." Dockser ¶¶ [0003, 0018], claims 1, 8, 15, 20. As such, Dockser includes both full and reduced precision modes. *See e.g.*, Dockser ¶¶ [0028], [0017], [0014], [0023], Fig. 2.

47.    The components of Dockser's FPP is shown in Figure 1, reproduced below:

Singular's Exhibit No. 2051, IPR2021-00155
Page 018

IPR2021-00155
PATENT NO. 10,416,961



**Dockser, Fig. 1 (Annotated)**

Dockser's FPP has a register file (FPR 110, shaded in **red**) comprising registers

(red boxes) that hold IEEE 32-bit full-precision values. It also includes a controller

(CTL 130, shaded in **green**) with a control register (**green** box) that can store

"subprecision select bits" corresponding to the desired level of precision. Dockser,

Fig. 1; *see also id.*, ¶¶ [0017-18]. The FPP performs arithmetic operations (e.g.,

16

including addition and multiplication) at full-precision – or at the desired sub-precision using values stored in the register file as operands. *See id.*, ¶ [0019], [0017], [0028].

48.     If no sub-precision is selected, Dockser's FPP performs arithmetic at "maximum precision" (*i.e.*, 32-bit IEEE full-precision). *See* Dockser, claims 1, 8, 15, 20; *see also id.*, ¶ [0018] ("the floating-point controller 130 <u>*may*</u> be used to select the sub-precision of the floating-point operations …")). Otherwise, the operation is performed at a reduced precision. In reduced-precision modes, Dockser's FPP reduces the mantissa size by powering-down some of the cells in the register file that store the mantissa, and also powers down parts of the arithmetic logic circuits (contained, *e.g.*, within the multiplier, shaded in **blue** above) that are not needed for the selected subprecision. *Id.*, ¶¶ [0026-27].

49.     Unlike the '961 Patent, Dockser does not teach systems that include multiple arithmetic units operating in parallel. Instead, Dockser discloses a single floating-point execution unit in isolation. The absence of a parallel teaching is not surprising, given that Dockser's selectable low-precision unit is designed to conserve power in "battery operated devices where power comes at a premium, such as wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras." Dockser, ¶ [0003]. A POSA would not understand Dockser to disclose or suggest using its FPP units in parallel.

Singular's Exhibit No. 2051, IPR2021-00155

APPX04969

50.     Dockser discloses that it uses "conventional" arithmetic units to perform operations, such as addition and multiplication. Dockser, ¶ [0020].

51.     Because Dockser's execution unit is capable of full-precision, and uses conventional arithmetic units, a POSA would understand that it would have at least as many transistors and take up at least as much space as a conventional full-precision arithmetic unit, even when operating in a reduced-precision mode. Indeed, because Dockser's execution unit includes additional control circuits for selecting reduced-precision modes, a POSA would expect it to be _larger_ than a conventional full-precision execution unit, making it unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

## B.     Tong

52.     I have reviewed "Reducing Power by Optimizing the Necessary Precision/Range of Floating-Point Arithmetic" by Jonathan Ying Fai Tong et al. ("Tong"). Tong teaches that using lower-precision arithmetic can reduce power consumption. *See generally* Tong, pp. 273-285. Tong is based on the commonly held belief that some applications can only be performed using full-precision arithmetic: "[e]ven though we may be able to assume that most of our operands can be computed successfully in limited precision, it appears inevitable that some fraction of our operands will require full IEEE-standard precision." *Id.* (emphasis added).

Singular's Exhibit No. 2051, IPR2021-00155
Page 021

53.     Importantly, like Dockser, Tong is focused on reducing power consumption, and does not teach parallel processing systems that include multiple arithmetic units that operate simultaneously, let alone systems having much larger numbers of low-precision units than full-precision units. Each low-precision unit disclosed by Tong is either as large as a full-precision unit or paired with a full precision unit on a 1:1 basis (Tong, 282).

54.     For example, Tong teaches "simply including both full and reduced precision FP units and using appropriate sleep-mode circuit techniques to shut down the unused unit." Tong, 282. In this approach, each low-precision unit is paired with a full-precision unit in a 1:1 ratio, requiring more physical space than a full-precision unit alone. Indeed, this approach is presented as an option in situations where silicon real-estate is not at a premium. *See* Tong, 282 ("Given the decreasing cost of silicon area …").

55.     In another example, Tong also teaches a "digit-serial" multiplication circuit that, using control signals, is operable to perform a reduced-precision operation in a single clock cycle. The result of this reduced-precision operation, in which an 8-bit operand is multiplied with a 24-bit operand, can be combined with other reduced-precision results over multiple clock cycles in a process called "digit-serial multiplication," yielding a full-precision result. When performing low-precision operations, Tong's digit-serial multiplier does consume less power than a

19

traditional full-precision unit. However, it occupies *more* physical space than a full-precision multiplier, because it "require[s] extra random logic for control of the multiple passes through the digit serial structure." Tong, 281; *see also* 280 ("The lower precision digit-serial design is slightly larger [than the full-precision execution unit]"), Table V (showing that Tong's digit-serial multiplier occupies ~3% more area than a conventional full-precision multiplier). Therefore, a POSA would understand that like Dockser's FPP, the execution units taught by Tong are capable of reduced-precision operation, but are *larger* than a conventional full-precision execution unit. A POSA would understand that this large size would make them unsuitable for scaling, and therefore unsuitable for use in parallel processing arrays.

56.    A POSA would therefore understand that as with Dockser, Tong is focused on power-savings, does not even mention increasing computational scale and parallelism, and certainly does not teach a computer comprised of a much larger number of low-precision units compared with full-precision units.

### C.    MacMillan

57.    I have reviewed U.S. Patent No. 5,689,677, titled "Circuit For Enhancing Performance Of A Computer For Personal Use" ("MacMillan"). MacMillan is directed to a computer system that includes a host processor and "a plurality of processing elements." Macmillan, 12:39. MacMillan does not describe

APPX04972

the capabilities of each "processing element" (PE) in detail, noting only briefly that

"[i]nteger and floating point accelerators could be included in each PE."

MacMillan, 12:55-56.

58.     Regarding arithmetic precision/imprecision, MacMillan is silent. It

simply teaches that each PE can "perform atomic operations on data values up to

*32 bits wide*." MacMillan, 7:8-9. A POSA would understand that unlike Dockser

and Tong, MacMillan is not focused on minimizing power consumption, and is not

specifically tailored for use in portable or mobile devices. Indeed, MacMillan's

only reference to power consumption relates to heat dissipation inside the

"cabinet" of a workstation. *See* MacMillan, 3:4-6.

## VI.  CLAIM CONSTRUCTION

### A.  "Low Precision High Dynamic Range (LPHDR) Execution Unit"

59.     In my opinion, the Board should construe the term "low precision

high dynamic range (LPHDR) execution unit" as "an execution unit that executes

arithmetic operations only at low precision and with high dynamic range, wherein

'high dynamic range' and 'low precision' are defined according to the numerical

requirements below."[1] A POSA would understand this as the plain meaning of the

term as read in light of the specification.

---

[1] Where "below" refers to the remainder of the claim in which the term appears (*e.g.*, the numerical requirements that specify a minimum level of imprecision and a minimum dynamic range).

Singular's Exhibit No. 2051, IPR2021-00155
Page 024
APPX04973

85.    The "exceeds" limitation requires that the "number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."[2] As I explain further below, a POSA would understand that Dockser's FPP is adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide.

86.    Even if Dockser's FPP were an LPHDR execution unit (which it is not, in my opinion) the Dockser/MacMillan combination cannot meet claim 3's "exceeds" limitation, because those same "Dockser LPHDR execution units" would also be "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," meaning that the number of LPHDR execution units will never exceed the number of claim 3 full-precision floating point multiplication execution units. That is, even under Petitioner's incorrect argument that each Dockser FPP qualifies as an LPHDR execution unit, it *also* qualifies as a claim 3 full-precision floating-point multiplication execution unit. Therefore, no matter how many Dockser FPP's are included in a device, the number of LPHDR execution units in the device will _at most equal_ to the number

---

[2] For clarity, I refer to "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" as "claim 3 full-precision floating point multiplication execution units."

Singular's Exhibit No. 2051, IPR2021-00155
Page 036

of claim 3 full-precision floating-point multiplication execution units – and will never "exceed [it] by at least one hundred," as claim 3 requires.

> 3) *Dockser/MacMillan Fails to Disclose or Render Obvious "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit"*

87.     The claims require "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit." Claim 2 further requires that that the computing device "comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine." I understand that Petitioner identifies MacMillan's "Host CPU" as the "computing device adapted to control the operation of the at least one first LPHDR execution unit." Pet., 52-53. I disagree.

88.     A POSA would understand that MacMillan makes clear that the SIMD Controller, not the Host CPU, controls the operation of the PEs. MacMillan, 13:35-36 ("Since the PEs operate under the control of the SIMD Controller…"); 8:1-10 (explaining that SIMD Controller "contains the program counter used to step through the list of instructions that may include instructions to be executed by the PEs"); 10:65-11:5 ("The SIMD Controller 252 then executes the SIMD program."); 10:3-16; Indeed, a POSA would understand that while the PEs are executing, the SIMD Controller has taken control of the host bus, and the Host

92.     Dockser discloses that its FPP takes input operands that are 32 bits wide and stores them in IEEE-754 format. *See e.g.*, Dockser, ¶ [0017] ("Each register location 200 is configured to store a 32-bit binary floating-point number, in an IEEE-754 32-bit single format."). Dockser also discloses that its FPP includes "a floating-point multiplier (MUL) 144 configured to execute floating-point multiply instructions." Dockser, ¶ [0019]. A POSA would therefore understand that Dockser multiplies 32-bit operands when operating in full precision mode, and therefore it is "adapted to" execute the operation of multiplication on numbers at least 32 bits wide.

93.     Therefore, even if Dockser's FPP is an "LPHDR execution unit" (as Petitioner incorrectly argues), the Dockser/MacMillan device would also satisfy the "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" requirement, and would thus fail to satisfy the "exceeds" limitation. If, for the sake of argument, we count each Dockser FPP as an "LPHDR execution unit," then in one example, the Dockser/MacMillan device would have 256 LPHDR execution units. However, because each Dockser FPP is also "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide," the Dockser/MacMillan device would therefore also have at least 256 execution units "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits

wide." As a result, in my opinion, the Dockser/MacMillan cannot meet the "exceeds" limitation.

> 5) *Petitioner's Interpretation of "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" Is Inconsistent with the Specification*

94.    I understand that Petitioner argues that Dockser's FPP does not meet the "exceeds" limitation by arguing that units are claim 3 full-precision floating point multiplication execution units ***only if*** they are "'traditional precision' execution units that do not 'sometimes' produce results different from the correct traditional-precision result." Pet., 54-55. I disagree.

95.    A POSA would not understand "adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" to exclude units, like Dockser, which selectably operate at full precision, as Petitioner claims. Pet., 54-55.

96.    Instead, a POSA would understand this term to include any or all units in the device that are designed to perform "multiplication on floating point numbers that are at least 32 bits wide," even if those units can perform other operations as well. Petitioner's (and Mr. Goodin's) interpretation directly contradicts the claim language itself, which encompasses every execution unit adapted to perform "*at least*" the operation of 32-bit multiplication. If such an

Singular's Exhibit No. 2051, IPR2021-00155
Page 040
APPX04989

'961 Patent at 28:32-37; *see also id.* at 28:32-29:20. The specification does not

preclude a **claim 3 full-precision floating point multiplication execution unit** from

being able to produce incorrect results. Petitioner imports that requirement from a

completely different section of the patent, taken completely out of context. *See*

Pet., 54 (citing '961 Patent, 26:61-27:16); *see also* Goodin, ¶ 374. A POSA would

understand that that section uses "sometimes" to describes the imprecision

limitation of an LPHDR execution unit, as expressed in the X% limitation of the

Challenged Claims. That section says nothing about claim 3 full-precision floating

point multiplication execution units. *See* '961 Patent, 26:61-27:16.

### D.   A POSA Would Not Combine Dockser with MacMillan

101.   A POSA would not combine Dockser with MacMillan because it

would not be operable for its intended purpose.

102.   Dockser is focused on the objective of reducing power consumption

and is not in any way concerned with the objective of use in parallel processing

arrays, while MacMillan is focused on a parallel architecture that increases

computational capability, and not focused on reducing power consumption (indeed,

MacMillan's only reference to power consumption relates to heat dissipation inside

the "cabinet" of a workstation). *See* MacMillan, 3:4-6.

103.   Incorporating Dockser's FPPs into MacMillan would defeat

MacMillan's stated objective of achieving a highly parallel SIMD computer

architecture at "lower system cost." *See* MacMillan, 5:58-59 ("The invention of this shared memory results in lower system cost"). As explained above, Dockser's FPPs are even <u>*larger*</u> than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes.

104.    As a result, replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit. Combining Dockser and MacMillan would thus sacrifice the benefits of *both* references, which a POSA would not be motivated to do.

### E.    Ground 4: Claims 1-5, 10, 13-14, 21, and 23-25 Are Not Obvious Over Dockser in View of Tong and MacMillan

105.    As I explained above with respect to Grounds 2 and 3, the combination of Dockser, Tong, and MacMillan does not disclose or render obvious an LPHDR execution unit. Similarly, as set forth above with respect to Ground 3, the combination does not disclose or render obvious the "at least one first computing device" limitation. Finally, as set forth above with respect to Ground 2, Tong does not teach using only 5 bits of mantissa. I understand that Petitioner's Ground 4 arguments do not address these deficiencies.

### 1)    *The Dockser/MacMillan System as Modified by Tong Would Not Meet the "Exceeds" Limitation*

Singular's Exhibit No. 2051, IPR2021-00155
Page 044

110.    A POSA would not have been motivated by Tong to remove the full-precision capabilities of Dockser and incorporate this modified Dockser FPP into the systems taught by MacMillan.  Petitioner's argument is based on a fragment of a sentence in Tong taken out of context, insinuating that Tong teaches that full-precision operation "is not essential" to the functioning of a Tong or Dockser system.  Pet., 58. In my opinion, this interpretation of Tong is not correct.

111.    In fact, a POSA would understand that Tong teaches the opposite. Tong admits that there are "scientific programs" that "require a huge amount of precision" (Tong, 279), and broadly teaches that "it is *inevitable* that some fraction of our operands will require full IEEE-standard precision." Tong, 280 (emphasis added). Instead, like Dockser, Tong teaches systems that always have *both* full- and reduced-precision capabilities. *See*, *e.g.*, Tong, 282 (even when describing a device that has reduced precision units, it describes that system as "including *both* full and reduced precision FP units, and using appropriate sleep-mode circuit techniques to shut down the unused unit."). With this teaching in hand, a POSA would not cleave off parts of Dockser's 32-bit register file to achieve some unspecified lesser bit-width smaller execution unit, without also importing the Tong "full precision FP.". This is a convoluted, hindsight-driven modification to the fundamental teachings of the cited references.

Singular's Exhibit No. 2051, IPR2021-00155
Page 047

112.    In view of the above, it is clear that a person of ordinary skill would not be motivated by Tong to remove the full-precision capabilities of the Dockser units. On the contrary, Tong would only have _reinforced_ the teaching of Dockser that, while reduced-precision might be a viable option in certain limited circumstances, an execution unit should retain the ability to operate at full-precision, as I explained below. See, _e.g._, Dockser, ¶ [0003].

113.    Dockser's objectives are fundamentally directed away from Petitioner's proposed "alternative" combination. As discussed above, Dockser is devoted solely to a general processor with selectable precision.

114.    Nowhere does Dockser teach, or even suggest, removing its full-precision capabilities. As I explain above, a Dockser FPP is described as always needing to support a range of selectable precisions including full precision. Dockser, ¶ [0003]. Adjusting Dockser by removing its full-precision capacity violates a central tenet of Dockser—to always be able to execute full-precision operations. Dockser, ¶ [0003]. A POSA would not remove Dockser's inventive concept—supporting a range of selectable precisions including full precision. Thus, excising the full-precision circuitry of Dockser runs contrary to the main teaching and inventive feature of Dockser (as well as that of Tong, as I explain above).

Singular's Exhibit No. 2051, IPR2021-00155
Page 048

115.   The removal of full-precision circuitry from the Dockser FPP also goes against the teachings of MacMillan, which warns that "[t]o meet the cost objectives, the SIMD capabilities ***should not add significant complexity*** to the architecture of a computer system for personal use." *Id.*, 5:42-44. A POSA would understand that Petitioner's proposed hindsight-driven combination, which requires special, customized registers, logic elements, arithmetic units, and programming models (see below), would increase manufacturing costs and goes directly against the teachings of MacMillan, which relies on operating with conventional components to reduce cost. *E.g.*, *id.,* 6:24-26, 34-36. Further, as I explain above, the Dockser FPP, due to its control circuitry, would likely require *more* transistors than a conventional full-precision execution unit, further increasing costs. Also, the modified Dockser FPP would result in modifications to the programs that are run on the MacMillan system, which MacMillan seeks to avoid. *See* MacMillan 2:15-16 (where avoiding "the need for reprogramming" is emphasized).

5)   Google Has Failed to Show That the "Alternative" Combination Would Meet the Imprecision Requirements of Claims 3-8

116.   I understand that Petitioner has not shown that the resulting combination would meet the imprecision limitations. As discussed above, Tong suggests 11 bits of precision for specific signal processing applications, and

46

**CONFIDENTIAL MATERIAL REDACTED**

IPR2021-00155
PATENT NO. 10,416,961

121.  As I have stated supra, the modified Dockser FPP would result in modifications to the programs that are run on the MacMillan system, which MacMillan teaches against. See MacMillan 2:15-16 (where avoiding "the need for reprogramming" is emphasized).

122.  Without these teachings of the '961 Patent, a POSA would not have been motivated to combine MacMillan and Dockser with Tong according to Petitioner's "alternative" argument because it would not have been clear to a POSA that it would be possible to program such a device to execute operations efficiently and without accumulating errors.

## VIII.  OBJECTIVE INDICIA OF NON-OBVIOUSNESS

123.  I have reviewed ██████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████.

124.  It is my opinion that the experimental results obtained by Dr. Bates using his invention ████████████████████████████
████████████████  would have been unexpected to those of skill in the art at the time. When the invention was filed, it was not known that a massively parallel computer that includes almost exclusively low-precision execution units, (and very

128.   Google's TPUv2 and TPUv3 are coextensive with at least claims 1-5,

10, and 13-14 of the '961 Patent. Set forth below is an analysis mapping the claims

to the TPUv2 and TPUv3 devices.

### A.   Claim 1

*1)   "A device comprising:"*

129.   Each of the TPUv2 boards and TPUv3 boards are devices.



TPUv2 Board - Ex. 2016.



TPUv3 Board Ex. 2016.

130.    A POSA would understand that the above photographs show that the TPUv2 and TPUv3 boards are circuit boards coupled to hardware components such as processors, heatsinks, I/O ports, interconnected with each other via wiring. Both the TPUv2 and TPUv3 boards are "devices," as a POSA would understand that term.

> 2)    *"at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value"*

131.    In my opinion, each of the TPUv2 and TPUv3 boards include at least one first low precision high dynamic range (LPHDR) execution unit adapted to execute a first operation (multiplication) on a first input signal representing a first numerical value to produce a first output signal representing a second numerical value (the product of the first numerical value multiplied by another value). Both the TPUv2 and TPUv3 include at least one Matrix Multiply Unit (MXU) that contains $128 \times 128$ (*i.e.*, 16,384) execution units that each execute the operation of multiplication. Ex. 2016; Ex. 2011 ("the main computational capacity in each core provided by a large matrix multiply unit that can yield the results of multiplying a pair of $128 \times 128$ matrices each cycle").

53

IPR2021-00155
PATENT NO. 10,416,961



Ex. 2016 (annotations added).



Ex. 2011.

132.    Google's publications explain that each of the bfloat16 execution

units in the MXU require "less circuitry" than either FP32 or FP16 multipliers:

> The IEEE fp32, IEEE fp16 and bfloat16 formats need 576 full adders,
> 121 full adders, and 64 full adders, respectively. Because multipliers
> for the bfloat16 format require so much less circuitry, it is possible to
> put more multipliers in the same chip area …

Ex. 2011, 9.

Each of the multipliers within the MXU is able to perform multiplication only at

low precision, using the bfloat16 format. They lack the circuitry to perform, for

example, perform FP16 or FP32 operations. *Id. See also* Ex. 2049 at 3-4.

IPR2021-00155
PATENT NO. 10,416,961

     3)    *"wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/65,000 through 65,000 and"*

133.   As Google's publications explain:

> While its *inputs and outputs are 32-bit floating point values, the MXU typically performs multiplications at the reduced precision of bfloat16* — a 16-bit floating point representation that provides better training and model accuracy than the IEEE half-precision representation for deep learning as it allocates more bits to the exponent and less to the mantissa.

Ex. 2049 at 3-4 (emphasis added).

134.   Thus, the dynamic range of the valid inputs to the multiplication operation in the TPUv2 and TPUv3 is governed by the number of exponent bits (8) in the floating point 32 (FP32) format. These inputs are supplied by the "scalar/vector units", also known as Vector Processing Unit (VPUs). As Google admits, 8 bits of exponent allow for a dynamic range of from roughly $2^{-126}$ (smaller than 1/65,000) through $2^{127}$ (larger than 65,000). Pet., 20-21; Ex. 1003, ¶ 232. I agree that the dynamic range of FP32 is at least this large. Indeed, in some of its publications, Google admits that floating-point formats with 8 bits of exponent are capable of representing an even wider range of values, from approximately $10^{-38}$ to $3 \times 10^{38}$. Ex. 2041 at 1.

     4)    *" for at least X=10% of the possible valid inputs to the first operation, the statistical mean, over repeated execution of the first operation on each specific input from the at least X % of the possible valid inputs to the first operation, of the numerical values represented by the first output signal of the LPHDR unit executing the first operation on that input differs by at least Y=0.2% from the*

55

*result of an exact mathematical calculation of the first operation on
the numerical values of that same input;"*

135.    Google's TPUv2 and TPUv3 boards meet this element. As I explain

above, the MXU's inputs are "32-bit floating point" values, but they "perform[]

multiplications at the reduced precision of bfloat16." *See* Ex. 2049 ("While its

inputs and outputs are 32-bit floating point values, the MXU typically performs

multiplications at the reduced precision of bfloat16").

136.    Multiplication performed at bfloat16 precision uses 7 bits for the

mantissa. Ex. 2041 at 1; Ex. 2011 at 8. Petitioner states – and I agree – that

utilizing 7 bits of mantissa in multiplication operations results in a minimum of

12% of valid floating point 32 inputs, producing at least 0.39% relative error

compared to the exact mathematical calculation of a full-precision multiplication

on those same inputs. Pet., 33-34, 72. Accordingly, the TPUv2 and TPUv3 meet

this element.

5)    *"at least one first computing device adapted to control the
operation of the at least one first LPHDR execution unit."*

137.    Google's TPUv2 and TPUv3 devices meet this limitation as well.

Each TPU device is controlled by a Core Sequencer (which in turn is controlled by

a Host Virtual Machine that is a program running on a CPU). The Core Sequencer

is a a computing device, and by issuing VLIW instructions to the MXU, it controls

the operation of the LPHDR execution units within the MXUs:

> The *Core Sequencer* fetches VLIW (Very Long Instruction Word) *instructions* from the core's on-chip, software-managed Instruction Memory … The 322-bit VLIW instruction can launch eight operations: two scalar, two vector ALU, vector load and store, and a pair of slots that *queue data to and from the matrix multiply and transpose units*.

Ex. 2016, 4-5.

138.   The CPU is a computing device, and by running the Host VM and issuing commands to the Core Sequencer, it controls the operation of the LPHDR execution units within the MXUs.



Ex. 2016 (annotations added).

Die sizes are adjusted by the square of the technology, as the semiconductor technology for TPUs is similar but larger and older than that of the GPU. We picked 15nm for TPUs based on the information in Table 3. Thermal Design Power (TDP) is for 16-chip systems. TPUs come with a host CPU. This GPU price adds price of a n1-standard-16 CPU.

Ex. 2011.

IPR2021-00155
PATENT NO. 10,416,961



Ex. 2045, 2.

**B.    Claim 2**

> 1)    *"The device of claim 1, wherein the at least one first computing device comprises at least one of a central processing unit (CPU), a graphics processing unit (GPU), a field programmable gate array (FPGA), a microcode-based processor, a hardware sequencer, and a state machine."*

139.    As discussed above, the Host VMs run on a CPU.

140.    A person of ordinary skill in the art would also understand that the

Core Sequencer described above is at least a "hardware sequencer" and a "state

machine," based on the description of its function in Google's own publication:

> The *Core Sequencer* fetches VLIW (Very Long Instruction Word) *instructions* from the core's on-chip, software-managed Instruction Memory … The 322-bit VLIW instruction can launch eight operations: two scalar, two vector ALU, vector load and store, and a pair of slots that *queue data to and from the matrix multiply and transpose units*.

Ex. 2016, 4-5.

141.    Therefore, the Core Sequencer and the CPU, independently and acting

in concert, satisfy the additional requirement imposed by claim 2.

**C.    Claim 3**

58

IPR2021-00155
PATENT NO. 10,416,961

1) *"The device of claim 2, wherein the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."*

142.    Google's TPUv2 and TPUv3 boards meet this limitation. As discussed above, each MXU contains 128x128 execution units: a total of 16,384 LPHDR execution units in total per MXU. The TPUv2 board includes 1 MXU per core, with 2 cores in a chip, and 4 chips on a board. Ex. 2016, 6. Thus, the TPUv2 board contains $128 \times 128 \times 2 \times 4 = 131,072$ LPHDR execution units.



TPUv2 Board – Ex. 2046 (annotations added)

Singular's Exhibit No. 2051, IPR2021-00155
Page 062
APPX05011

IPR2021-00155
PATENT NO. 10,416,961

143.   The TPUv3 board contains 2 MXUs per core, 2 cores per chip, and 4 chips per board. Ex. 2016. Thus, a single TPUv3 board contains $128 \times 128 \times 2 \times 2 \times 4 = 262,144$ LPHDR execution units.



TPUv3 Board – EX. 2046

144.   The MXU execution units perform multiplication at bfloat16 precision, and are not capable of performing full-precision multiplication, as I have discussed above.

145.   Based on my review of Google's public documents, and the documents Google has produced in this IPR proceeding, each core (whether TPUv2 or TPUv3) contains a Vector Unit (VPU). *Id.* Each VPU contains $128 \times 8 \times$

Singular's Exhibit No. 2051, IPR2021-00155
Page 063

2 32-bit arithmetic logic units (ALUs), for a total of 2048 ALUs per core. Ex. 2046, 34.

146.    32-bit ALUs are adapted to perform the operation of multiplication on 32-bit numbers. With two cores per chip and 4 chips per board, each TPUv2 or TPUv3 board contains $2048 \times 4 \times 8 = 16{,}384$ execution units that are adapted to perform multiplication on 32-bit numbers.

147.    As I explain above, each TPUv2 board contains 131,072 LPHDR execution units, and each TPUv3 board contains 262,144 LPHDR execution units. Therefore, in both the TPUv2 and TPUv3 boards, "the number of LPHDR execution units in the device exceeds by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" and each board therefore meets the additional requirement imposed by claim 3.

**D.    Claim 4**

> 1)    *The device of claim 1, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.*

148.    As discussed above, the bfloat16 format used in the TPUv2 and TPUv3 boards contains 8 bits of exponent, which provides a dynamic range of from roughly $2^{-126}$ (smaller than 1/1,000,000) through $2^{127}$ (larger than 1,000,000).

**E.    Claim 5**

### 1) *The device of claim 1, wherein the first operation is multiplication*

149.   As discussed above, the MXUs within the TPUv2 and TPUv3 boards perform multiplication

### F.   Claim 10

150.   Claim 10 recites a device comprising a plurality of components comprising at least one LPHDR execution unit with the same dynamic range and imprecision requirements as claim 1.  Thus, my discussion of claim 1 above explains how those specifications are met in the TPUv2 and TPUv3 boards.

151.   As I explain above, each TPUv2 and TPUv3 board comprises a plurality of components, such as multiple MXU LPHDR execution units, VPUs, and other components.

### G.   Claim 13

### 1) *The device of claim 10, wherein the dynamic range of the possible valid inputs to the first operation is at least as wide as from 1/1,000,000 through 1,000,000.*

152.   *See* my discussion of claim 4, above.

### H.   Claim 14

### 1) *The device of claim 10, wherein the first operation is multiplication*

153.   As discussed above, the MXUs within the TPUv2 and TPUv3 boards perform multiplication.

## X.   CONCLUSION

62

IPR2021-00155
PATENT NO. 10,416,961

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed this 9th Day of August, 2021

Respectfully submitted,


Sunil P Khatri, Ph.D.

Filed on behalf of Petitioner by:                    Paper No. __
     Elisabeth H. Hunt, Reg. No. 67,336
     Richard F. Giunta, Reg. No. 36,149
     Anant K. Saraswat, Reg. No. 76,050
     Adam R. Wichman, Reg. No. 43,988
     Nathan R. Speed, admitted *pro hac vice*
     WOLF, GREENFIELD & SACKS, P.C.
     600 Atlantic Avenue
     Boston, MA 02210
     (617) 646-8000 Phone
     (617) 646-8646 Fax

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————

Case No. IPR2021-00155
Patent No. 10,416,961

———————

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE[1]**

———————

[1] Emphases in this paper are added unless otherwise indicated, and internal quotations, citations, and original alterations are omitted.

It is undisputed that Dockser's unit is "high dynamic range."

Dockser's unit also meets the "low precision" genus, because it performs reduced-precision operations—the very **_purpose_** of Dockser's design—and **_at least_** one such "first operation" meets the species in claim 1's "wherein" clause. Petition, 15; Dockser, [0014] ("the precision…may be reduced" to achieve "greater efficiency" and "significant power savings"); DI, 16 ("Petitioner…provides a detailed explanation" how Dockser "teach[es] the recited X and Y percentages of claim 1"); Ex. 1071 ("Goodin-Reply"), ¶¶ 5-6.

Singular told the district court that "LPHDR execution unit" should be construed identically to "execution unit" (Ex. 1065, 9), because "'low precision high dynamic range' is defined in claim itself" (Ex. 1066, 12). After the Petition demonstrated the claims unpatentable, Singular now alleges a narrow construction of LPHDR execution unit is needed to avoid "render[ing] the limitation meaningless." POR, 16. But as shown below, Singular's "construction" does not give meaning to the "construed" claim term at all—it _repeats_ every word of the term verbatim and injects additional words (_e.g._, "only").

| Claim | Singular's Construction (POR, 15) |
|---|---|
| **low precision** **high dynamic range** (LPHDR) **execution unit** | an **execution unit** that executes arithmetic operations **only** at **low precision** and with **high dynamic range**, wherein '**high dynamic range**' and '**low precision**' are defined according to the numerical requirements below |

27), fails because the Petition established that choosing *any* of those "precision levels Tong teaches for particular applications" would have been obvious "when running those applications, or others empirically determined (using Tong's techniques) to not require greater precision."  Petition, 45-47.  Singular does not dispute that even 9 mantissa bits in Dockser's FPP meets the claimed low precision (Ground 1); thus each of the 5-bit through 9-bit selections motivated by Tong are low precision.   Goodin-Reply, ¶ 29.

## III.    GROUND 3 – SINGULAR'S ARGUMENTS AGAINST DOCKSER/MACMILLAN FAIL

### A.    Motivation to Combine

Ground 3 uses Dockser's FPPs as the floating-point accelerators in MacMillan's massively-parallel SIMD architecture, "to increase performance speed as MacMillan teaches while lowering power consumption as Dockser teaches," which benefits battery-operated devices.  Petition, 51-52.  Singular's assertion that each reference individually is "not focused on" the benefit the other undisputedly provides (POR, 35) fails to refute that the *combination* achieves both benefits.

Singular's assertion that Dockser's FPP would "increase costs" in MacMillan's system (POR, 36) rehashes a POPR argument and is "unsupported by any specific cost analysis."  DI, 37.  The conclusory expert testimony cited at POR, 36 "repeat[s] verbatim Patent Owner's argument without additional facts or

data…[and thus] is entitled to little or no probative weight." *Tyco Fire Prods. v. Victaulic*, IPR2016-00279, Paper 40 at 22 (June 12, 2017).  Singular presents no **evidence** that Dockser's FPP would increase cost.  Even if it had, that would be legally irrelevant because whether a "combination would not be made by businessmen for economic reasons" is not probative of nonobviousness.  DI, 37 (quoting *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983)).  Goodin-Reply, ¶¶ 30-31.

### B.    "Computing Device"

MacMillan's Host CPU is a "computing device adapted to control the operation of the…LPHDR execution unit[s]" as claimed, because it executes the program that "initiat[es]" "all SIMD processing" by the processing elements (PEs) containing Dockser's LPHDR execution units.  Petition, 52-53.  The Host CPU thus controls whether, when and how the LPHDR units operate, by "start[ing] the SIMD Controller" that "executes the SIMD program" that is provided by the CPU program and uses data provided by the CPU.  MacMillan, 10:27-11:5, 13:12-62; Petition, 52-53; Ex. 1003, ¶¶ 359-364; Goodin-Reply, ¶¶ 32-35.

Singular's argument that MacMillan's Host CPU does not control the operation of the PEs because the SIMD Controller also does so (POR, 37-38) fails.  The claims are not limited to **direct** control or controlling anything beyond "operation of" the unit(s).  In Singular's own embodiment, a host computing

device controls operation of the SIMD PEs by instructing an intermediate control unit (CU). '961 Patent, 8:10-29 ("Host computer 102" "'is responsible for overall **control** of the computing system"), 8:59-63 ("Host 102…load[s] the instructions (the program) for the PEA 104 into the CU…, then instruct[s] the CU 106 to interpret the program and cause the PEA 104 to compute according[ly]"); Goodin-Reply, ¶¶ 36-37.



**'961 Patent, Fig. 1**

Moreover, Singular alleges Google's TPU meets the claimed "computing device" via a CPU that "issu[es] commands to the Core Sequencer," thereby "control[ling] the operation of the LPHDR execution units."  POR, 67 ("Each TPU device is controlled by a Core Sequencer (which, *in turn*, is controlled by…a program running on a CPU).").  This is no different from MacMillan's Host CPU controlling PE operation by controlling the SIMD Controller.  Goodin-Reply, ¶ 38.

## C.    "Exceeds" Claims

Certain dependent claims (hereinafter "'exceeds' claims") require "the number of LPHDR execution units" to exceed the number of "execution units…adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" (hereinafter "32-bit EUs," as in DI, 31-32).  Because the number of Dockser FPPs in Dockser/MacMillan exceeds the single Host CPU, the "exceeds" claims are met.

The Board correctly found "Dockser's FPPs do not count toward the number of 32-bit EUs" because Dockser's FPPs are LPHDR execution units.  DI, 31-32.  As the Board noted, the specification "distinguish[es] between the two sets of units," describing 32-bit EUs as "traditional precision" units ("arithmetic elements…designed to perform…arithmetic of traditional precision"), whereas LPHDR units allow "precision [to] vary across implementations" and "produc[e] results that are 'sometimes' or 'all of the time' not closer than a certain amount to

the correct result." DI, 32 (citing '961 Patent, 26:61-27:16, 28:9-16). The

"sometimes" at 26:61-27:16 is not tied to the claims' "X" limitation (contrary to

POR, 34); that limitation (called "F" in the specification) has its own later

paragraph at 27:41-28:8. Goodin-Reply, ¶¶ 39-41. *See also* '961 Patent, 27:17

(LPHDR units "hav[e] various possible degrees of precision"), 28:50-55 ("[T]he

number NL of LPHDR elements…and the number NH of elements designed to

perform…arithmetic of traditional precision…may be the total counts of the

***respective elements*** within that physical device.").

Singular says Google's (and the DI's) interpretation ignores the "at least" in

the claim language. POR, 32. Not so. The "traditional precision" units that the

specification distinguishes from LPHDR units perform "arithmetic" operation(s)

on 32-bit numbers; Google's interpretation gives meaning to "at least the operation

of ***multiplication***" by encompassing other 32-bit arithmetic operations besides

multiplication. Goodin-Reply, ¶ 42.

Singular's assertion that the specification describes prior-art GPUs as having

"multiple execution units" that each "can be both a full-precision [32-bit]

multiplication execution unit and" perform low-precision operations (POR, 32-33)

is unsupported. "When a graphics processor [GPU] includes support for 16 bit

floating point, that support is ***alongside*** support for 32 bit floating point." '961

Patent, 5:23-33. NVIDIA's GPU (*id*., 5:5), for example, had multiple parallel

streaming-processor (SP) cores that performed floating-point operations *only* at 32-bit precision, and far fewer *separate* components that "support[ed]" 16-bit floating-point data.  Goodin-Reply, ¶¶ 43-53 (citing Ex. 1073 ("Lindholm"); Exs. 1074-1075).  16-bit "support" conventionally meant *inputs* were 16-bit, and no evidence establishes that this meets the low precision of any claim.  Goodin-Reply, ¶ 46; *see supra* § I.C; *infra* § V.B.4.b.



Figure 2. Texture/processor cluster (TPC).

**Lindholm, Fig. 2 (annotated)**

POSAs would have understood the specification's statement that GPUs' "substantial resources to 32…bit arithmetic" were "wasteful of transistors" refers to the many traditional-precision-only units (*e.g.*, SPs) in GPUs that ***could not*** perform lower-precision operations.  Goodin-Reply, ¶¶ 54-55.

The specification is clear that the "exceeds" claims' 32-bit EUs are separate and distinguished from LPHDR units.  Dockser's FPP is the latter.

## IV.    GROUND 4

### A.    Dockser/Tong/MacMillan's Non-Customized Implementation

Singular's arguments against Ground 4's non-customized implementation rely entirely on the arguments "explained above" against Grounds 2-3 (POR, 38-39), which fail as discussed *supra* §§ II-III.

### B.    Dockser/Tong/MacMillan's Customized Implementation

Ground 4 also established all challenged claims obvious over an alternative implementation incorporating customized Dockser FPPs having no full-precision capability in MacMillan's architecture for use in "an embedded system designed specifically for signal processing" that never uses full precision.  Petition, 57-60. This obvious implementation meets the "exceeds" claims even under Singular's interpretation.  Singular's arguments against this customized implementation fail.

Tong's alleged teaching that ***some*** "scientific programs" require full precision (POR, 41-42) is irrelevant.  Tong ***also*** says "not all programs need the precision provided by generic FP hardware," and for an "application-specific

task"—like the applications used in Ground 4's embedded signal-processing system—a "custom FP format may be a viable option."  Tong, 278-280; Goodin-Reply, ¶¶ 56-57.  Likewise, full-precision capability is not a "central tenet" of Dockser (contrary to POR, 42).  As Petitioner noted and Singular did not dispute, Dockser ([0017]) says the input "register file" can be "formatted differently from IEEE 32-bit…, and/or may contain a different number of register locations."  That is the customization Ground 4 applies for the "embedded applications" MacMillan (7:15-34) describes.  Petition, 57-59; Goodin-Reply, ¶¶ 58-59.

Singular's conclusory allegation that the combination "would increase manufacturing costs" (POR, 43) is "unsupported by any specific cost analysis" (DI, 37) and legally irrelevant.  *See supra* § III.A; Goodin-Reply, ¶ 60.

Singular's assertion that MacMillan "relies on…conventional components to reduce cost" (POR, 43-44) is unsupported.  MacMillan "permits"/"allows" *some* of its "*memory*" to be "conventional" (MacMillan, 6:24-36), but does not limit other components (including floating-point units) to being "conventional."  Goodin-Reply, ¶ 61; Khatri-Depo., 139-143 ("MacMillan has simply no opinion…on what's inside the PE").  In MacMillian's "embedded" systems (7:15-34), POSAs understood that components were conventionally customized to save space/power.  Petition, 57-58; Goodin-Reply, ¶ 62; Ex. 1076, 1 ("[e]mbedded computers" "often employ idiosyncratic processors…designed…for a limited class of applications"),

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

———————

Case No. IPR2021-00155
Patent No. 10,416,961

———————

**REPLY DECLARATION OF RICHARD GOODIN**

Google Exhibit 1071
Google v. Singular
IPR2021-00155

31.     Dr. Khatri asserts that Dockser's FPP would "*increase* costs" in MacMillan's system.  Khatri, ¶ 104 (emphasis in original).  However, I have reviewed Dr. Khatri's declaration, and I find no evidence cited in Dr. Khatri's declaration to demonstrate that incorporating Dockser's FPP into MacMillan's system would increase cost *at all*, much less to any appreciable degree.  Dr. Khatri says in ¶ 103 of his declaration that "Dockser's FPPs are even _larger_ than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes" (emphasis in original).  But I find no evidence cited in Dr. Khatri's declaration that establishes that any size difference that may exist between Dockser's FPP and conventional units would increase cost, much less that any such increase would outweigh the cost decrease gained by Dockser's power savings.  Additionally, even if there were some cost increase, that does not mean there is no motivation to implement the combination for other beneficial reasons, such as those I discussed in my original declaration. Goodin-Orig., ¶¶ 351-355.

B.     "Computing Device"

32.     Dr. Khatri asserts that MacMillan's CPU in the Dockser/MacMillan combination does not meet the "at least one first computing device adapted to control the operation of the at least one first LPHDR execution unit" recited in the

operation of the at least one first LPHDR execution unit" would have understood that the claim language is not limited to ***direct*** control, and does not require controlling anything beyond "the operation of" the unit(s) (*e.g.*, whether, when and/or how the LPHDR units operate).

37.    In fact, a POSA would have understood that in the '961 Patent's own described embodiment, a host computing device controls operation of the SIMD PEs by instructing an intermediate control unit ("CU") (like MacMillan's SIMD Controller) to control the PEs.  *See* '961 Patent, 8:10-29, 8:59-63.  The '961 Patent states that the "SIMD computing system 100 [that] is illustrated in FIG. 1 … includes a collection of many processing elements (PEs) 104."  *Id.*, 8:10-12.  "The collection of PEs is referred to [in the patent] as 'the Processing Element Array' (PEA)."  *Id.*, 8:14-16.  A POSA would have understood that the "PEs" in the "PEA" are an embodiment of LPHDR execution units.  *See*, *e.g.*, Goodin-Orig., ¶ 199.  The ""Host computer 102 "is responsible for overall ***control*** of the computing system," which includes the LPHDR execution units (*i.e.*, the PEs).  *Id.*, 8:59-63.  Furthermore, the way that the host computer exercises this control is by instructing an intermediate "control unit (CU)" (*id.*, 8:13) to execute a program to control the PEs.  *See id.*, 8:59-63 ("Host 102 typically will load the instructions (the program) for the PEA 104 into the CU instruction memory (not shown in FIG. 1), then instruct the CU 106 to interpret the program and cause the PEA 104 to

compute according to the instructions.").   As I explained in my original

declaration (*e.g.*, Goodin-Orig., ¶¶ 360-361), the '961 Patent's control scheme is

mirrored by the process MacMillan describes whereby "the uniprocessor program"

running on the "Host CPU" "calls a system routine to start SIMD Controller

execution," as a result of which "[t]he SIMD Controller 252 then executes the

SIMD program."  MacMillan, 10:46-67; Goodin-Orig., ¶¶ 360-361 (citing, *e.g.*,

MacMillan, 9:20-31, 10:27-30, 10:46-51, 10:66-67, 8:56-9:2, 10:44-45, 13:35,

10:44-49; '961 Patent, 8:27-28, 8:47-48, 8:59-63).



**'961 Patent, Fig. 1**

'sometimes' operate at lower precisions" (emphasis in original).  In light of a POSA's understanding of prior-art GPUs, which I discuss above (*e.g.*, paragraphs 44-53), I disagree, and in my opinion a POSA would have disagreed.  As I discussed above (*e.g.*, paragraphs 50-53), the parallel (SIMT) architecture of the GPUs the specification discusses, which contained the vast majority of the GPU's processing units, was composed of 32-bit-only units that ***could not*** perform lower-precision operations.  A POSA would have understood the '961 Patent's specification's statement that "existing GPUs devote substantial resources to 32 … bit arithmetic and are wasteful of transistors" ('961 Patent, 5:30-33) is referring to the large number ("substantial resources") of traditional-precision-only units (*e.g.*, SPs) in the GPUs that could not sometimes perform lower-precision operations. Thus, the specification supports my opinion that the "exceeds" claims' 32-bit EUs are separate and distinct from LPHDR execution units, of which Dockser's FPP is the latter and not the former.  *See* Goodin-Orig., ¶¶ 374-375.

## IV.    GROUND 4 – DOCKSER/TONG/MACMILLAN COMBINATION

### A.    Customized Implementation of Dockser/Tong/MacMillan Combination

56.    As I explained in my original declaration, the challenged claims of the '961 Patent are also met by an obvious alternative implementation of the Dockser/Tong/MacMillan combination that incorporates customized Dockser FPPs (customized in a manner having no full-precision capability) in MacMillan's

architecture for use in "an embedded system designed specifically for signal processing" that never uses full precision. Goodin-Orig., ¶ 393; *see also* Goodin-Orig., ¶¶ 389-399. This obvious implementation meets the "exceeds" claims and their dependents even if the "exceeds" claims were interpreted in the manner Dr. Khatri proposes in ¶¶ 90-100 of his declaration. For the reasons I explain in paragraphs 57-69 below, I disagree with Dr. Khatri's assertions that a POSA would not have been motivated to make this customized implementation.

57.     Dr. Khatri asserts that Tong teaches that *some* "scientific programs" "*inevitabl*[y]" require full precision in a generic system intended for all applications. Khatri, ¶ 111 (emphasis in original). Even if true, that assertion is irrelevant to the customized implementation of the Dockser/Tong/MacMillan combination, which is *not* a generic system intended for all applications. The customized implementation of the Dockser/Tong/MacMillan combination is an "an embedded system designed specifically for signal processing," that "only operate[s] at precision levels lower than full FP 32-bit operations, in view of Tong's teachings that 'the fine precision of the 23-bit mantissa is not essential'" for all applications. Goodin-Orig., ¶ 393 (quoting Tong, 279). Whatever Tong may say about *other* "different … scientific programs" (Tong, 279), Tong *also* teaches that "not all programs need the precision provided by generic FP hardware," and "[f]or a narrow, application-specific task"—like the applications performed by

Dockser/Tong/MacMillan's embedded signal-processing system (Goodin-Orig., ¶ 393)—a "custom FP format may be a viable option." Tong, 278-280.

58.    Dr. Khatri asserts that "a central tenet of Dockser" is "to always be able to execute full-precision operations." Khatri, ¶ 114 (citing Dockser, [0003]). I disagree with Dr. Khatri's characterization of Dockser, and in my opinion a POSA would also have disagreed. The paragraph of Dockser that Dr. Khatri cites, paragraph [0003], states:

> The performance of floating-point arithmetic operations can entail computational *inefficiency* because floating-point processors are commonly limited to the precision provided by either the *single format, or both the single and double formats.* While *some applications <u>may</u> require these types* of precision, *other applications may not*. For example, some graphics applications may only require a 16-bit mantissa. For these graphics applications, any accuracy beyond 16 bits of precision tends to result in unnecessary power consumption. This is of particular concern in battery operated devices where power comes at a premium, such as wireless telephones, personal digital assistants (PDA), laptops, game consoles, pagers, and cameras, just to name a few. If it is known that an application always requires a certain reduced precision, the floating-point processor can be designed and built to that reduced precision. *For general purpose processors*, however, the common situation is that for certain applications, e.g. generating 3D graphics, a reduced precision may be acceptable, and *for other applications, e.g. implementing Global Positioning System*

> *(GPS) functions, a greater precision <u>may</u> be needed*. Accordingly, there is a **need in the art for** a floating-point processor in which the **reduced precision, or subprecision**, of the floating-point format is selectable. Power management techniques may also be employed to ensure that that the floating-point processor does not consume more power than necessary to support the selected subprecision.

Dockser, [0003]. Thus, this paragraph nowhere states or suggests that to "always" execute full-precision operations is a "central tenet" of Dockser (Khatri, ¶ 114); rather, this paragraph teaches that *some* processors, *i.e.* "general purpose processors," "*may*" require full precision. Other types of processors (not intended to be "general purpose") may not.

59.    Moreover, as I noted in my original Declaration (*see* Goodin-Orig., ¶ 394), and which Dr. Khatri does not appear to dispute (*see* Khatri, ¶¶ 110-115), Dockser ([0017]) explicitly teaches that its input "register file" can be "formatted differently from IEEE 32-bit…, and/or may contain a different number of register locations." That is precisely the customization applied in Dockser/Tong/MacMillan in the "embedded applications" that MacMillan describes. Goodin-Orig., ¶¶ 389-399; MacMillan, 7:15-34.

60.    Dr. Khatri asserts that "[t]he removal of full-precision circuitry from the Dockser FPP … would increase manufacturing costs." Khatri, ¶ 115. I disagree, and in my opinion a POSA would have disagreed. I find no evidence

MacMillan, 6:24-36. However, a POSA reading MacMillan would have understood that MacMillan does not limit other components (including MacMillan's floating-point units—MacMillan, 12:55-56) to being "conventional."

62.     Second, in the "embedded" systems that MacMillan (7:15-34) describes, POSAs understood that components were conventionally customized, for example to save space and power. For documentary evidence corroborating my testimony regarding a POSA's background knowledge in this regard, *see*, *e.g.*, Ex. 1076 ("Cooper")[3], page 1 ("[e]mbedded computers" "often employ idiosyncratic processors…designed…for a limited class of applications"), page 5 ("difference[s] between the embedded environment and more general computing environments"

---

[3] The indicia on the face of Cooper indicate that it was publicly accessible as early as 2003. For example, Cooper bears a date of "June 2003" (Cooper, cover page) and includes a statement that it had been deemed "releasable to the general public" by the "Air Force Research Laboratory" (Cooper, second page). Cooper also contains a "Report Documentation Page" (Cooper, third page) that lists a "Report Date" of "Jun 03." In my opinion, these indica, combined with Ex. 1079 and the fact that Cooper is dated years before the '961 Patent's 2009 claimed priority date, demonstrate that Cooper would have been publicly accessible prior to the '961 Patent's claimed priority date.

include "power and size constraints"); Ex. 1097 ("Miner"), 1:23-26 ("processors in embedded systems are often streamlined…to the purpose of the product device and are not configured to perform general-purpose computing"); Ex. 1077 ("Lienhart")[4], page 1 (in "special purpose computers" for "very specific problems," "arithmetic units are implemented which are optimally suited for the computation pattern of the problem."); Ex. 1078 ("Fang")[5], page 496 ("***Modern digital signal processing DSP applications*** are typically prototyped using ***floating-point arithmetic***, which offers both large dynamic range and high precision for each numerical computation.  However, ***for hardware implementations, the final form rarely uses a full-precision floating-point unit, given issues of silicon area, power, and speed***.").

63.    Dr. Khatri asserts that "Tong suggests 11 bits of precision for specific signal processing applications, and Petitioner provides no analysis of whether 11 bits of precision would meet the imprecision limitation."  Khatri, ¶ 116.  However, whether using 11 bits of precision would "meet the imprecision limitation" is

---

[4] Ex. 1080 demonstrates that Lienhart was publicly accessible as of 2002, prior to the '961 Patent's claimed priority date.

[5] Ex. 1081 demonstrates that Fang was publicly accessible as of 2003, prior to the '961 Patent's claimed priority date.

irrelevant, because the Dockser/Tong/MacMillan combination also uses other lower precision levels that Tong teaches. Tong teaches that embedded signal-processing programs "range in complexity" and can use different precision levels between 5 bits and 11 bits. Tong, 278-279; Goodin-Orig., ¶ 391. Dockser's precision is selectable, and in the embedded signal-processing system of Dockser/Tong/MacMillan, it would have been obvious to customize Dockser's FPP for the use of any of "the precision levels Tong teaches" for particular programs performed by an embedded signal-processing system. Goodin-Orig., ¶ 332. *See also* Goodin-Orig., ¶ 397 (noting that "the input signal and selected precision levels are unchanged" from my previous analysis of the Dockser, Dockser/Tong, and Dockser/MacMillan combinations), ¶391 ("Tong experimentally demonstrates that the optimum precision for a 'benchmark suite' (Tong, 284) of 'five signal processing applications' spanning a 'range in complexity' is between 5 and 11 mantissa fraction bits (Tong, 278-279).")， ¶ 392 ("A POSA would have been motivated to use Dockser's FPPs in MacMillan's architecture with Tong's precision levels…in MacMillan's embedded signal-processing system"). Dr. Khatri does not dispute that the claimed imprecision limitation [1B2] is met by 5-bit through 9-bit precision, which are among the levels Tong teaches for various embedded signal-processing applications.

79.    Additionally, the use of a "large number" of execution units "capable of executing arithmetic operations *only* at low precision … in order to 'put more multipliers in the same chip area'" (Khatri, ¶ 127, emphasis original) was not novel.  Numerous prior-art references each individually taught using smaller, lower-bitwidth execution units to facilitate parallelization, as I explain in this paragraph and in paragraphs 80-83 below.  For example, Ex. 1088 ("Belanovic-Article"), explained that "[m]any image and signal processing applications benefit from acceleration with reconfigurable hardware," and that "[t]his acceleration results from the exploitation of fine-grained parallelism available in reconfigurable hardware."  Belanovic-Article, 657.  The article then taught that "[r]econfigurable implementations that exhibit speedup are possible if…a more flexible floating-point representation than full IEEE precision is used, thus allowing for greater parallelism."  *Id.*  The article then noted:

> Optimal implementations of algorithms frequently do not require the bitwidths specified by the IEEE standard. Often, much smaller bitwidths than those specified in the 754 standard are sufficient to provide the desired precision. Reduced bitwidth implementations require fewer resources and thus allow for more parallel implementations than using the full IEEE standard format.

Belanovic-article, 658.  Thus, a POSA would have understood that Belanovic-Article taught achieving "greater parallelism" and "more parallel implementations"

I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 11/01/2021

Richard Goodin

1        UNITED STATES PATENT AND TRADEMARK OFFICE

2                    _____

3        BEFORE THE PATENT TRIAL AND APPEAL BOARD

                     _____

4


                          GOOGLE LLC,

5                         Petitioner,

6                             V.

7               SINGULAR COMPUTING LLC,

                       Patent Owner

8


                    _____

9

     Case No. IPR2021-00155/Patent No. 10,416,961

10   Case No. IPR2021-00165/Patent No. 9,218,156

     Case No. IPR2021-00179/Patent No. 8,407,273

11

12

     *********************************************

13    REMOTE VIDEOTAPED / REALTIMED DEPOSITION OF

14              SUNIL P. KHATRI, Ph.D.

15              OCTOBER 21, 2021

16   *********************************************

17

18

19

20

21

22

23

24

25   Job No. CS4838992

Google Exhibit 1072
Google v. Singular
IPR2021-00155

Page 2

1          REMOTE VIDEOTAPED / REALTIMED

2     DEPOSITION of SUNIL P. KHATRI, Ph.D.,

3     produced as a witness at the instance of the

4     Petitioner Google LLC, and remotely duly

5     sworn by agreement, was taken in the

6     above-styled and numbered cause on Thursday,

7     the 21st day of October, 2021, from 9:03 a.m.

8     to 2:03 p.m., before Pat English-Arredondo,

9     CSR (TX), RMR, CRR, CLR, CCR (LA), in and for

10    the State of Texas, reported by machine

11    shorthand in remote realtime, with the court

12    reporter located in Houston, Texas, pursuant

13    to the United States Patent and Trademark

14    Office Procedures; that the Witness will read

15    the deposition.

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2        (All via Zoom Video Communications)
 3     COUNSEL FOR PETITIONER GOOGLE LLC:
 4          Ms. Elisabeth H. Hunt (Remote Realtime)
            Mr. Anant K. Saraswat
 5          WOLF, GREENFIELD & SACKS, P.C.
            600 Atlantic Avenue
 6          Boston, Massachusetts 02210
            Phone: 617.646.8000
 7          Elisabeth.Hunt@wolfgreenfield.com
            Anant.Saraswat@wolfgreenfield.com
 8
       COUNSEL FOR PATENT OWNER SAMSUNG COMPUTING
 9     LLC:
10          Mr. Richard Cowell (Remote Realtime)
            FABRICANT LLP
11          411 Theodore Fremd Avenue
            Suite 206 South
12          Rye, New York, 10580
            Phone:  212-257-5797
13          rcowell@fabricantllp.com
14     VIDEOGRAPHER:
15          Mr. Shawn Budd, Veritext
16     COURT REPORTER:
17          Ms. Pat English-Arredondo
            CSR (TX), RMR, CRR, CLR, CCR (LA)
18
19
20
21
22
23
24
25
```

1    algorithm acceleration uses GPUs, FPGAs, and

2    custom ICs.

3                So what is a custom IC?

4        A.      A custom IC is an IC you make

5    for a specific task.  So that's why it has

6    the name "custom," because it's -- it's

7    custom designed for a specific task.

8                And it's an IC, or integrated

9    circuit.  So it's custom design integrated

10    circuit to perform a certain specific task.

11        Q.      And in what types of

12    circumstances would you custom design an

13    integrated circuit to perform a specific

14    task?

15        A.      So in the field we do that.

16    And in the industry, this is done routinely

17    and commonly.

18                One such -- there are many

19    classes of custom ICs.  One class is

20    the -- microcontrollers.  So these are the

21    small, you know, microprocessor-style

22    circuits that reside in, for example, a smart

23    TV or several of them would be in an

24    automobile to handle braking or engine

25    mixtures or the fuel mixture and such.

Page 139

1    imprecision.

2         Q.    Next sentence in Paragraph 58

3    says:  "It simply teaches that each PE can

4    'perform atomic values on data values up to

5    32 bits wide.'"

6              Do you see that?

7         A.    Yes.

8         Q.    You don't believe that that

9    statement from MacMillan is saying anything

10   regarding precision?

11             MR. COWELL:  Objection to form.

12        A.    That's just a statement

13   that -- you know, MacMillan's main teaching

14   is about how to use something called SIMD

15   architecture in the context of, you know,

16   personal computers, basically.

17             It has no opinion or no

18   teaching about the precision of the -- you

19   know, the processing elements or what they

20   contain.

21             The MacMillan -- MacMillan has

22   no opinion about that and has no teaching

23   about that in some sense basically, and

24   that's why I say it is -- MacMillan is silent

25   about that issue.

1          Q.     (By Ms. Hunt)  So when it's

2     says that each PE can perform atomic

3     operation on data values up to 32 bits wide,

4     is it saying that the PEs can be full

5     precision?

6                    MR. COWELL:  Objection to form.

7          Outside the scope.

8          A.     It's simply saying that

9     the -- you know, that the PEs, you know, can

10    perform arithmetic operations on data values

11    up to 32 bits.

12                   Whether these PEs have and what

13    they have in them and whether they are

14    floating point values and so on is not

15    something that MacMillan teaches.

16                   MacMillan is just teaching a

17    processing element.  In this processing

18    element, it may or may not be, you know,

19    floating point.

20                   MacMillan has simply no opinion

21    on this -- on what's inside the PE and, you

22    know, how that operates and whether it's

23    floating point and what the precision or

24    imprecision is of that PE, of the operations

25    in the PE.

1      Q.     (By Ms. Hunt)  Would that mean

2    that MacMillan is agnostic to what's in the

3    PE?

4            MR. COWELL:  Objection to form.

5        Outside the scope.

6      A.     MacMillan is teaching how to

7    combine several PEs in some sense in a higher

8    level.

9            So in some sense, you know, the

10   person who practices MacMillan would decide

11   what to put in the PEs, I suppose.

12           But MacMillan's focus is not

13   what's inside the PE or floating point or

14   precision or imprecision.  That's what I mean

15   by this paragraph.

16     Q.     (By Ms. Hunt)  Sorry.  Give me

17   one minute.  I'm having technical issues.

18   Bear with me.

19           Sorry about the delay.

20           Do you have your copy of

21   MacMillan in front of you?

22     A.     Yes.

23     Q.     Do you see -- sorry.  Could you

24   turn to Column 12 of MacMillan, please?

25     A.     Yes.

**AFRL-IF-RS-TR-2003-145**
**Final Technical Report**
**June 2003**



# CODE OPTIMIZATION FOR EMBEDDED SYSTEMS

**Rice University**

**Sponsored by**
**Defense Advanced Research Projects Agency**
**DARPA Order No. F297, J468**

*APPROVED FOR PUBLIC RELEASE; DISTRIBUTION UNLIMITED.*

**The views and conclusions contained in this document are those of the authors and should not be interpreted as necessarily representing the official policies, either expressed or implied, of the Defense Advanced Research Projects Agency or the U.S. Government.**

**AIR FORCE RESEARCH LABORATORY**
**INFORMATION DIRECTORATE**
**ROME RESEARCH SITE**
**ROME, NEW YORK**

Google Exhibit 1076
Google v. Singular
IPR2021-00155

## 1. Summary

This project investigated a number of problems that arise in translating computer programs for execution on embedded computer systems—compiling those programs. Embedded systems are characterized by a number of constraints that do not arise in the commodity computer world. Most of these constraints have an economic basis. Embedded computers typically have limited amounts of memory. They often employ idiosyncratic processors that have been designed to maximize their performance for a limited class of applications. The applications are often quite sensitive to performance.

Some of the problems that arise in compiling code for execution on embedded systems have solutions that are relatively local in their impact within a compiler. For example, teaching the compiler to emit code for specialized instructions on a particular processor is easily handled during instruction selection — a modern code generator, based on pattern matching, can be extended to make good use of special case operations. We investigated several of these local problems. Other problems, however, have solutions that cut across the entire compiler. We tackled several of these cross-cutting problems. In both realms (local problems and cross-cutting problems), we developed an understanding of the issues involved, did some fundamental experimentation, proposed new techniques to address the problem, and validated those techniques experimentally.

To transfer the results of this work into commercial practice, we have published papers, distributed code, communicated with industrial compiler groups, and sent students to work in those groups. The techniques developed in this project are beginning to appear in the systems of other compiler groups — both research and commercial compilers. We expect more of them to be adopted in the future.

*Major Results*

- New methods for reducing the size of compiler-generated code

- New techniques for instruction scheduling — both better schedulers for space constrained environments and stronger schedulers for hard problems

- A new algorithm for scheduling and data placement on processors with partitioned register sets — an increasingly popular feature in embedded processors

- New techniques for reducing the amount of spill code generated by a graph coloring register allocator and for reducing the impact of that spill code (both space and time)

- New techniques for some of the fundamental analyses and transformations used in code optimization for both embedded systems and commodity systems

- A new approach to building self-tuning optimizing compilers, which we call adaptive compilation.

1

*3.* Iterative repair can find schedules that consume fewer resources than those produced by list scheduling, even when list scheduling finds an optimal length schedule. For example, it often finds schedules that use fewer registers.

*4.* Blocks where list scheduling fails to find optimal results fall in a narrow range for one measurable parameter — available parallelism per issue slot. When this value falls with that range, it may be worth invoking an iterative repair scheduler. (The compiler can measure this parameter during list scheduling.)

*Computing Transformation Orders* — We conducted a series of experiments with transformation ordering. In the first, we built a simple genetic algorithm to find an ordering for the compiler's transformations that produced compact programs. The genetic algorithm was able to reduce code size by an average of thirteen percent over the default optimization sequence in our compiler. (In contrast, direct compression using pattern matching and procedure abstraction produced an average of five and one-half percent in the same compiler. See references 2 and 3.)

Studying the strings that resulted from the genetic algorithm allowed us to derive a standard transformation sequence for compact code that achieved most of the benefit of running the genetic algorithm. It achieved an average of eleven percent reduction in code size when compared to the standard transformation sequence used in our research compiler. In the case of this problem (and, perhaps, these benchmarks), we were able to generalize from the experiment to discover a more broadly applicable sequence.

Based on our experience using genetic algorithms to compute transformation sequences for compact code, we expanded our inquiry to look at other objective functions, to explore more effective genetic algorithms, and to investigate other search techniques. This line of inquiry has produced an independent, NSF-funded research program ("Building Practical Compilers Based on Adaptive Search", $1.6 million, 8/2002 through 8/2007). That project will explore a number of issues, including better search techniques, the relationship between program properties and the "best" sequences, how to apply the results in a time-constrained compiler, and how to engineer compilers so that their passes can be reordered. (Reference 9 describes some of the early experiments on this project.)

### Dealing with Constrained Resources

Resource constraints are a striking difference between the embedded environment and more general computing environments. The limited program and data memories found in embedded systems are driven by economics, as well as power and size constraints. These constraints are unlikely to ease in future.

We explored a number of techcniques for reducing the memory requirements of compiled code. In general, two approaches make sense. The first is a direct attack — compressing the compiled code. The second is indirect — building compilers that generate smaller code in the first place. We worked on both problems. Finally, our work on architectural idiosyncrasies included techniques to reduce the data-memory footprint of programs.

*Compressing Compiled Code* — We built a code compressor based on ideas put forth in a 1984 paper by Fraser, Myers, and Wendt. The tool built a suffix-tree to represent the

APPX05468

# Using Floating-Point Arithmetic on FPGAs to Accelerate Scientific N-Body Simulations

Gerhard Lienhart, Andreas Kugel and Reinhard Männer

*Dept. for Computer Science V, University of Mannheim, B6-26A, D-68131 Mannheim, Germany*
*{lienhart,kugel,maenner}@ti.uni-mannheim.de*

## Abstract

*This paper investigates the usage of floating-point arithmetic on FPGAs for N-Body simulation in natural science. The common aspect of these applications is the simple computing structure where forces between a particle and its surrounding particles are summed up. The role of reduced precision arithmetic is discussed, and our implementation of a floating-point arithmetic library with parameterized operators is presented. On the base of this library, implementation strategies of complex arithmetic units are discussed. Finally the realization of a fully pipelined pressure force calculation unit consisting of 60 floating-point operators with a resulting performance of 3.9 Gflops on an off the shelf FPGA is presented.*

## 1. Introduction

In the scientific community there is a particular interest for special purpose computers, which can compute a specific problem at a very high performance. Since the simulation of biological, chemical or physical effects became an important aspect of natural science, there has always been an insatiable demand for computation power. Examples for arbitrary large computing problems can be found in the field of theoretical astrophysics where the motion of millions of stars need to be simulated in order to understand how the structures in the universe have developed.

For very specific problems special purpose computers based on ASICs can be built. There, arithmetic units are implemented which are optimally suited for the computation pattern of the problem. An example for such an approach is the GRAPE project where a single formula for getting the gravitational interaction force is calculated in a massively parallel manner (see publication of Ebisuzaki et al. [1]). These GRAPE Computers reach a performance up to the range of Tflops, and the Gordon-Bell Price has been awarded several times.

The gain of computation speed compared to general-purpose machines is directly related to the amount of specialization on an application. But in science the exact mathematical formulation of a simulation problem is often subject to change. This aspect foils the approach of building an ASIC for the majority of applications.

FPGA based machines are somewhere between general-purpose computers and ASIC-based computers. They enable building of application specific computation units but preserve the possibility of redesigning these structures at any time. Due to the limits of programmable logic resources on an FPGA they are to date mainly used for integer and bit-level processing tasks. But with the recent progress in FPGA technology these chips are more and more interesting for scientific applications where floating-point arithmetic is needed.

Although the clock frequency of typical FPGA designs (50-200 MHz) is much below the frequencies of state of the art CPUs (1 GHz) a computational speedup is possible for some algorithms, mainly for two reasons. First, optimally suited calculation units with a high degree of parallelization can be designed, where a minimum amount of silicon is wasted for modules in wait state. This is possible if the underlying algorithm has a simple computation pattern which allows to design a special purpose calculation structure. Furthermore the required precision of operators must be small enough to enable an implementation. Secondly, a possible speedup is obtained if the environment surrounding the FPGA and the controllers on the FPGA can be designed for providing a very high bandwidth of data transfer. Both aspects together allow for a sustained calculation with maximized utilization of the operators.

There have been several investigations of using FPGAs for implementing floating-point arithmetic. Fagin and Renard [17], Shirazi et al. [15], Lourca et al. [12] and Ligon et al. [16] investigated ways of implementing floating-point adders and multipliers. Shirazi et al. [15] and Louie et al. [13] published division implementations. Li and Chu [11] presented their implementation of a square root unit on FPGA. All these investigations have in common that they were done for a particular floating-point precision. In contrast, we focus on the impact of different floating-point representations on the resulting hardware design. Additionally we use different integer

Proceedings of the 10 th Annual IEEE Symposium on Field-Programmable Custom Computing Machines (FCCM'02)
1082-3409/02 $17.00 © 2002 IEEE

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on October 13,2021 at 18:23:54 UTC from IEEE Xplore. Restrictions apply.

IEEE COMPUTER SOCIETY

Google Exhibit 1077
Google v. Singular
IPR2021-00155

Exhibit 1077 - p. 1

APPX05478

30.1

# Toward Efficient Static Analysis of Finite-Precision Effects in DSP Applications via Affine Arithmetic Modeling

Claire Fang Fang, Rob A. Rutenbar, Markus Püschel, Tsuhan Chen

{ffang, rutenbar, pueschel, tsuhan}@ece.cmu.edu
Electrical and Computer Engineering
Carnegie Mellon University

## ABSTRACT

We introduce a static error analysis technique, based on smart interval methods from *affine arithmetic*, to help designers translate DSP codes from full-precision floating-point to smaller finite-precision formats. The technique gives results for numerical error estimation comparable to detailed simulation, but achieves speedups of three orders of magnitude by avoiding actual bit-level simulation. We show results for experiments mapping common DSP transform algorithms to implementations using small custom floating point formats.

## Categories and Subject Descriptors

C.3 [Special-Purpose and Application-Based Systems]: Signal Processing Systems; J.6 [Computer-Aided Engineering]: Computer-Aided Design

## General Terms

Algorithms, Design, Performance

## Keywords

Static error analysis, affine arithmetic, probabilistic error bound, embedded hardware, custom floating-point

## 1. INTRODUCTION

Modern digital signal processing DSP applications are typically prototyped using floating-point arithmetic, which offers both large dynamic range and high precision for each numerical computation. However, for hardware implementations, the final form rarely uses a full-precision floating-point unit, given issues of silicon area, power, and speed. This creates the common—and still awkward—problem of transforming the application from its initial, for all practical purposes "infinite" precision form, into some final, finite-precision hardware format.

These final finite-precision formats can be either custom fixed-point or reduced-precision (so-called "lightweight" [3])

custom floating-point. The two-part problem for any complex DSP task is how to choose the smallest bit-level number formats, and then how to validate that the format choices maintain the necessary level of numerical precision. Several techniques have been proposed [2, 3]. Roughly speaking, these all share three common characteristics: (a) they are based on detailed simulation to capture the necessary numerical ranges and the maximum error; (b) they first strive to determine the dynamic range of each operand, to avoid catastrophic overflows; and (c) they next strive to choose the right precision to assure acceptable quality in the output.

The essential problem in all these techniques is the need to rely on detailed simulations to find the optimal range and precision of each operand. If we choose a sequence of input patterns that are too few or incorrectly distributed, we may fail to find all the extreme values that real-life use will encounter. If we employ instead a more rigorous detailed simulation strategy, the format optimization process becomes unduly expensive.

A more attractive solution is some form of *static analysis*, which guarantees that we will find the extreme values and the maximum error of each operand, but does not require us to consider a potentially unbounded set of input patterns. We use the term "static" here in the same sense as that from *static timing analysis* for gate-level logic netlists. A single evaluation pass on the network, which computes more than just the delay through each gate, derives useful bounds on each path in the network. These delays are pessimistic—they are upper bounds, but tight enough for timing signoff. For finite-precision format optimization, we seek exactly the same sort of attack: a more pattern-independent evaluation that can create usefully tight bounds on the range/error of each operand in the application.

The obvious approach for such a static analysis draws on techniques from *interval arithmetic* [8], which replaces each scalar value with a bounded interval on the real number line. An algebra of intervals lets us "simulate" the code by performing each operation on the intervals. Unfortunately, conventional interval arithmetic suffers from the problem of range explosion: as more computations are evaluated, the intervals tend to grow without bound. The problem is that correlations among variables are not captured.

A recent solution to this problem is a more sophisticated interval model called *affine arithmetic*, introduced in [1]. The approach explicitly captures some of the correlations among operands, and dramatically reduces the level of pessimism in the final intervals. It has been successfully used in analog circuit sizing [6]. We apply the idea to the novel prob-

Permission to make digital or hard copies of all or part of this work for personal or classroom use is granted without fee provided that copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page. To copy otherwise, to republish, to post on servers or to redistribute to lists, requires prior specific permission and/or a fee.
*DAC 2003*, June 2–6, 2003, Anaheim, California, USA.
Copyright 2003 ACM 1-58113-688-9/03/0006 ...$5.00.

Google Exhibit 1078
Google v. Singular
IPR2021-00155

Authorized licensed use limited to: IEEE Publications Operations Staff. Downloaded on October 13,2021 at 19:27:36 UTC from IEEE Xplore. Restrictions apply.

APPX05488



US007921425B2

**(12) United States Patent** | **(10) Patent No.:** US 7,921,425 B2
Miner et al. | **(45) Date of Patent:** Apr. 5, 2011

**(54) TECHNIQUES FOR ALLOCATING COMPUTING RESOURCES TO APPLICATIONS IN AN EMBEDDED SYSTEM**

(75) Inventors: **James Miner**, Morrisville, NC (US); **Billy Moon**, Cary, NC (US); **Mickey Sartin**, Apex, NC (US)

(73) Assignee: **Cisco Technology, Inc.**, San Jose, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1380 days.

(21) Appl. No.: **11/079,308**

(22) Filed: **Mar. 14, 2005**

(65) **Prior Publication Data**

US 2006/0206898 A1    Sep. 14, 2006

(51) **Int. Cl.**
*G06F 9/46* (2006.01)

(52) **U.S. Cl.** .................. 718/107; 718/108; 718/102

(58) **Field of Classification Search** ............... 718/104, 718/105; 717/118, 148
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,303,369 | A | * | 4/1994 | Borcherding et al. | 718/104 |
| 5,325,525 | A | * | 6/1994 | Shan et al. | 718/104 |
| 5,557,606 | A | | 9/1996 | Moon et al. | |
| 5,625,870 | A | | 4/1997 | Moon | |
| 5,627,876 | A | | 5/1997 | Moon | |
| 5,678,176 | A | | 10/1997 | Moon | |
| 5,727,211 | A | * | 3/1998 | Gulsen | 718/108 |
| 5,787,345 | A | | 7/1998 | Moon | |
| 5,896,502 | A | * | 4/1999 | Shieh et al. | 709/224 |
| 5,901,341 | A | | 5/1999 | Moon et al. | |
| 5,946,487 | A | * | 8/1999 | Dangelo | 717/148 |

| | | | | | |
|---|---|---|---|---|---|
| 5,999,731 | A | * | 12/1999 | Yellin et al. | 717/126 |
| 6,058,466 | A | * | 5/2000 | Panwar et al. | 712/15 |
| 6,223,205 | B1 | * | 4/2001 | Harchol-Balter et al. | 718/105 |
| 6,263,359 | B1 | * | 7/2001 | Fong et al. | 718/103 |
| 6,477,561 | B1 | * | 11/2002 | Robsman | 718/105 |
| 6,601,083 | B1 | * | 7/2003 | Reznak | 718/104 |
| 6,654,780 | B1 | * | 11/2003 | Eilert et al. | 718/104 |
| 6,662,202 | B1 | * | 12/2003 | Krusche et al. | 718/101 |
| 6,732,139 | B1 | * | 5/2004 | Dillenberger et al. | 718/102 |
| 6,757,897 | B1 | * | 6/2004 | Shi et al. | 718/102 |
| 6,779,183 | B1 | * | 8/2004 | Chekuri et al. | 718/105 |

(Continued)

OTHER PUBLICATIONS

Kleidermacher et al., "Safety—Critical Operating Systems, Embedded Systems Programming," Aug. 31, 2001, Publisher: embedded. com/shared/printableArticle.jhtml?articleID=9900270, Published in: Internet.

(Continued)

*Primary Examiner* — Emerson C Puente
*Assistant Examiner* — Adam Lee
(74) *Attorney, Agent, or Firm* — Stolowitz Ford Cowger LLP

(57) **ABSTRACT**

Techniques for allocating computing resources to tasks include receiving first data and second data. The first data indicates a limit for unblocked execution by a processor a set of at least one task that includes instructions for the processor. The second data indicates a maximum use of the processor by the set. It is determined whether a particular set of at least one task has exceeded the limit for unblocked execution based on the first data. If it is determined that the particular set has exceeded the limit, then execution of the particular set by the processor is blocked for a yield time interval based on the second data. These techniques can guarantee that no time-critical tasks of an embedded system on a specific-purpose device are starved for processor time by tasks of foreign applications also executed by the processor.

**37 Claims, 5 Drawing Sheets**



Google Exhibit 1097
Google v. Singular
IPR2021-00155

**US 7,921,425 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,820,263 | B1 * | 11/2004 | Klappholz | 718/108 |
| 6,859,926 | B1 * | 2/2005 | Brenner et al. | 718/100 |
| 6,970,902 | B1 | 11/2005 | Moon | |
| 7,032,222 | B1 * | 4/2006 | Karp et al. | 718/104 |
| 7,051,330 | B1 * | 5/2006 | Kaler et al. | 718/106 |
| 7,089,539 | B2 * | 8/2006 | Dornan et al. | 717/139 |
| 7,099,949 | B1 * | 8/2006 | Vanhoof et al. | 709/230 |
| 7,134,119 | B2 * | 11/2006 | Nevill | 717/139 |
| 7,168,075 | B1 * | 1/2007 | Barthel et al. | 718/103 |
| 7,178,147 | B2 * | 2/2007 | Benhase et al. | 718/104 |
| 7,206,890 | B2 * | 4/2007 | Mathiske | 711/6 |
| 7,228,354 | B2 * | 6/2007 | Chambliss et al. | 709/229 |
| 7,308,687 | B2 * | 12/2007 | Trossman et al. | 718/104 |
| 7,313,500 | B2 * | 12/2007 | Morman | 702/132 |
| 7,360,216 | B2 * | 4/2008 | Spoltore et al. | 718/102 |
| 7,415,512 | B1 | 8/2008 | Moon | |
| 7,441,243 | B2 * | 10/2008 | Fellenstein et al. | 718/104 |
| 7,549,145 | B2 * | 6/2009 | Aguilar et al. | 717/149 |
| 7,636,915 | B1 * | 12/2009 | DiVittorio | 718/100 |
| 2002/0188691 | A1 * | 12/2002 | Ignatius et al. | 709/208 |
| 2003/0028581 | A1 * | 2/2003 | Kosanovic | 709/103 |
| 2003/0084088 | A1 * | 5/2003 | Shaffer | 709/104 |
| 2004/0025009 | A1 * | 2/2004 | Camber et al. | 713/152 |
| 2004/0054999 | A1 * | 3/2004 | Willen et al. | 718/103 |
| 2005/0071843 | A1 * | 3/2005 | Guo et al. | 718/101 |
| 2005/0080898 | A1 * | 4/2005 | Block | 709/225 |
| 2005/0081187 | A1 * | 4/2005 | Odinak et al. | 717/101 |
| 2005/0120160 | A1 * | 6/2005 | Plouffe et al. | 711/1 |
| 2005/0149940 | A1 * | 7/2005 | Calinescu et al. | 718/104 |
| 2006/0037021 | A1 * | 2/2006 | Anand et al. | 718/102 |
| 2006/0150189 | A1 * | 7/2006 | Lindsley | 718/105 |
| 2006/0200807 | A1 * | 9/2006 | Bates et al. | 717/129 |

## OTHER PUBLICATIONS

Labrosse et al., "Introduction to Preemptive Multitasking", Apr. 2003, netrino.com/Publications/Glossary/Preemption.html.

Rinard, Martin C., "Operating Systems Lecture Notes. Lecture 6, CPU Scheduling", Aug. 25, 1998. http://williamstallings.com/Extras/OS-Notes/h6.html.

Linux Devices, "Basic concepts of real-time operating systems", Nov. 18, 2003.11. linuxdevices.com/articles/AT4627965573.html.

Gosling et al., "The Java Language Specification. Second Edition", Jun. 2000.

Kalinsky, David, "The Fundamentals", Nov. 18, 2003.

* cited by examiner

# FIG. 1



FIG. 2

212
RECEIVE DATA INDICATING EXTERNAL EXECUTION LIMIT FOR
SET OF TASKS NOT KNOWN TO COOPERATE USE OF A SINGLE PROCESSOR
214
RECEIVE DATA INDICATING MAXIMUM PROCESSOR USAGE FOR
SET OF TASKS NOT KNOWN TO COOPERATE USE OF A SINGLE PROCESSOR
216
DETERMINE YIELD TIME BASED ON MAXIMUM PROCESSOR USAGE
220
RECEIVE DATA INDICATING PROCESSOR INSTRUCTIONS
FOR A PARTICULAR SET OF TASKS
222
PARTICULAR SET SUBJECT TO
EXTERNAL LIMITS
?
NO
YES
230
EXECUTE INSTRUCTIONS FROM
PARTICULAR SET OF TASKS
240
EXECUTE INSTRUCTIONS FROM
PARTICULAR SET OF TASKS
244
EXECUTION EXCEEDS
EXTERNAL LIMITS
?
NO
YES
248
YIELD PROCESSOR
FOR YIELD TIME
200



**FIG. 3**



Case: 22-1866     Document: 56-2     Page: 252     Filed: 02/13/2023

**FIG. 4**

400 GRAPH

410 CURVE OF OBSERVED PERFORMANCE

422 75TH PERCENTILE PERFORMANCE

420 MAXIMUM PERFORMANCE

432 NUMBER N CORRESPONDING ON AVERAGE TO 75% PERFORMANCE

402 AXIS FOR NUMBER N OF INSTRUCTIONS BETWEEN TIMER CHECKS

430 NUMBER N CORRESPONDING ON AVERAGE TO ALLOWED DURATION

404 PERFORMANCE AXIS

0

APPX05918



FIG. 5

US 7,921,425 B2

1

# TECHNIQUES FOR ALLOCATING COMPUTING RESOURCES TO APPLICATIONS IN AN EMBEDDED SYSTEM

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to scheduling independent tasks in a multi-tasking operating system embedded in a specific purpose device, and in particular to externally constraining the use of computing resources by a task that is not known to cooperatively share computing resources.

### 2. Description of the Related Art

A still increasing number of products in commerce include information processors. For example, greeting cards, cell phones, cameras, household appliances, automobiles, machining tools, construction tools, and network devices, such as routers, among others, are specific purpose devices that include information processors. The processor, supporting components, and processor instruction sets that support the primary purpose of such a specific purpose device constitute an embedded system.

The information processors in embedded systems are often streamlined to perform a limited set of operations related to the purpose of the product device and are not configured to perform general-purpose computing. The streamlining is evident in both hardware and processor instructions (software). For example, the hardware might include less memory and storage, fewer accelerator circuits, fewer peripherals, such as printers and other displays, and smaller power supplies than are found in a general purpose computer. Similarly, the software might include a simpler operating system with fewer drivers for peripheral devices, and a reduced number of expected states and therefore a reduced number of state variables and a reduced number of instructions to handle the various states.

It is often the case that the information processor in the embedded system is not fully utilized in performing all the functions for which the specific purpose device is designed. For example, many routers that direct data packets over communication links connecting multiple network nodes include one or more processors that are used to compute the best route for a data packet, encapsulate the data in a data packet directed to the correct link, and perform error-checking to determine that communications are successful. However, only a portion of the processor capacity is consumed in performing the primary router purpose. For example, some routers use only about 20% of the information processing capacity of their processors, which often means that one or more processors in the router are idle about 80% of the time.

It is sometimes advantageous to make use of the excess capacity of processors in embedded systems. For example, the excess capacity of a processor on a refrigerator control circuit might be used by a separate software application to compute and display the expected freshness life of different foodstuffs based on the current temperature and humidity conditions in the refrigerator and freezer sections of the appliance. Similarly, the excess capacity of a processor on a network router might be used by a separate software application to provide services over and beyond those usually associated with a router, such as providing information to users on geospatial relationships among the network elements and hosts in a network. As another example, an end node connected to a network might have more data to process in a particular interval of time than it can handle; and so the end node sends a part of the data and the instructions to process that data to each of one or more of the closest routers on the network,

2

using the router computing capacity to complete the processing in the available time interval.

There are problems associated with tapping the unused capacity of processors in embedded systems, however. For example, the extra application (called here a "foreign application") that is not related to the specific purpose of the device, may consume more than the excess capacity of the processor in the specific purpose device, and, thus, interfere with the proper functioning of the device for its specific purpose. For example, a router might no longer be able to route all the data packet traffic the router receives because the foreign application has consumed more than 80% of the capacity of the router's processor in order to perform the computations on the data sent from the end node.

Embedded systems typically include multi-tasking schedulers which divide time on a processor among multiple sequences of processor instructions called tasks. Each task typically uses the processor to do one specific job, such as reading a sensor, scanning a keyboard or mouse, logging some type of data, performing a calculation on numbers in one or more registers, and sending data over a bus to a device or communication link. It is desirable that the scheduler for an embedded system ensure that the primary purpose of the device is accomplished even if some computing capacity is provided to foreign applications.

Typically, embedded system task schedulers assigns each task a priority that determines when it is given access to the processor relative to other tasks. Higher priority tasks are performed before lower priority tasks. When multiple tasks have the same high priority, a policy is used to determine which task is allowed to execute on the processor next. A common policy, called a "round robin" policy, is to take each task of the same priority in turn. Each task is allowed to run to completion and then the next task at the highest priority is allowed to use the processor.

For such a collection of tasks to successfully share a processor, the tasks must be designed to be cooperative, i.e., to prevent one task from "starving" by being unable to use the processor within a useful period of time. It is common for all the tasks associated with an embedded system to be designed to cooperate in the use of a processor. Each cooperative task uses the processor for a limited time and then yields the processor for use by other tasks.

However, instructions for foreign applications are not necessarily designed to be cooperative, and a scheduler for an embedded system can not rely on instructions internal to each task to provide the necessary sharing. One reason instructions from a foreign application might not be cooperative is that they were designed for operation on a general purpose computer in which a language compiler or a full operating system externally enforces a policy of sharing use of a processor. Thus, if such an uncooperative task is given control of the processor in an embedded system, the task might not yield the processor in time for subsequent equal or higher-priority tasks to use the processor. Thus the priority based schedulers typical in embedded systems are not adequate for scheduling tasks from many foreign applications.

In some general purpose computing systems, strict time-slicing is enforced, so that each task is allotted only a certain time on the processor and then is moved off. Tasks moved off the processor are moved to a location in memory that preserves the state of all registers used by the task, and the stack of instructions that still need to be completed. However, in embedded systems, all tasks are not equal; tasks that support the purpose of the device and are time critical, such as real-time processes, must be allowed to complete before other tasks are started which are peripheral to the purpose of the

APPX05920

US 7,921,425 B2

3

device or are not time-critical. Strict time slicing is not compatible with guaranteeing that certain tasks, such as the time-critical tasks that support the purpose of the device, run to completion.

Thus neither a priority-based policy nor a strict time-slicing policy is adequate for a task scheduler for an embedded system that allows foreign applications.

In some approaches, various hybrids between priority and time-slicing have been employed. For example, in one approach all high-priority, ready-to-execute tasks are run before any lower priority task. Multiple ready tasks at the same priority share the processor time equally by time slicing. While suitable for some purposes, this approach still suffers some disadvantages. For example, there is no provision for guaranteeing processor time for time-critical tasks; all tasks at the same priority level have equal access to the processor, even though some tasks are time critical and others are not.

In some approaches multiple ready tasks at the same priority share the processor time by running each to completion in turn. This approach also suffers some disadvantages. Again, there is no provision for guaranteeing processor time for time-critical tasks; all tasks at the same priority level have equal chance of being run to completion next, even though some tasks are time-critical and others are not.

Based on the foregoing, there is a clear need for techniques to allocate processor time to tasks that give foreign applications adequate resources without hindering the primary purpose of an embedded system. In general, there is a need for techniques to allocate computing resources among tasks that do not suffer the disadvantages of prior art approaches. For example, there is a need for techniques to schedule tasks, which allow real-time tasks that have absolute constraints on their operation to run to completion and that also accommodate tasks that are not known to be cooperative.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example, and not by way of limitation, in the figures of the accompanying drawings and in which like reference numerals refer to similar elements and in which:

FIG. 1 is a block diagram that illustrates a specific purpose device with an embedded system, according to an embodiment;

FIG. 2 is a flow diagram that illustrates a method for allocating computing resources among sets of one or more tasks, according to an embodiment;

FIG. 3 is a flow diagram that illustrates in more detail some steps of the method of FIG. 2, according to an embodiment;

FIG. 4 is a graph that illustrates considerations for selecting a parameter used to perform a step illustrated in FIG. 3, according to an embodiment; and

FIG. 5 is a block diagram that illustrates a router upon which an embodiment of the invention may be implemented.

DETAILED DESCRIPTION

A method and apparatus are described for allocating computing resources among sets of one or more tasks. In the following description, for the purposes of explanation, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent, however, to one skilled in the art that the present invention may be practiced without these specific details. In other instances, well-known structures and devices are shown in block diagram form in order to avoid unnecessarily obscuring the present invention.

4

Embodiments of the invention are described in the context of executing a JAVA™ virtual machine (JVM) to run foreign Java applications on an embedded system for a router in a network. Java is a registered trademark of Sun Microsystems, Inc. of San Cupertino, Calif. for a programming language and compiled bytecode. However, the invention is not limited to this context. In other embodiments, other methods are used to execute foreign applications (e.g., programs written in C or ACTIVEX™ or some other programming language) on embedded systems in the same or different specific purpose devices, such as aircraft control systems, automobile control systems, medical monitors, and other devices. ActiveX is a registered trademark of Microsoft Corp. of Redmond, Wash.

1.0 Embedded Systems Overview

FIG. 1 is a block diagram that illustrates a specific purpose device 102 with an embedded system 110, according to an embodiment. The specific purpose device 102 includes the embedded system 110 and instructions 120 for foreign applications, stored on one or more computer-readable media. Computer-readable media are described in more detail in a later section.

The embedded system 110 includes a system clock 111, a processor 112, and system instructions 114. A system clock repeatedly generates hardware interrupts with a particular temporal period that cause the processor to execute certain tasks. The processor 112 processes signals that represent data and instructions as described in more detail in a later section. The instructions and data that control the embedded system are stored as system instructions 114 on one or more computer-readable media. In general, the system instructions 114 include a task scheduler for sharing use of the processor 112 among multiple tasks and instructions for performing various tasks relevant to the specific purpose of the device 102. In an illustrated embodiment, the system instructions 114 include a data item for a time counter 116. In some embodiments a separate system clock 111 is omitted and an internal clock for the processor 112 controls all timing.

In an example embodiment, the specific purpose device 102 is a router for a network, as described in more detail in a later section with reference to FIG. 5. Networks of general purpose computer systems connected by external communication links are well known and widely used in commerce. The networks often include one or more network devices that facilitate the passage of information between the computer systems. A network node is a network device or computer system connected by the communication links. An end node is a node that is configured to originate or terminate communications over the network. An intermediate network node facilitates the passage of data between end nodes. A router is an example of an intermediate network node.

In the example embodiment, the system instructions 114 include instructions for a networking operating system, such as the Internetwork Operating System (IOS) available from Cisco Systems, Inc. of San Jose, Calif. and instructions for a Java virtual machine (JVM). A JVM is a programmed process that interprets instructions written in a special language called Java bytecode and translates those instructions into instructions or operating system program calls in a machine language (called native code) used by the processors. e.g., processor 112. A Java compiler converts code written in a human-compatible, high-level JAVA programming language into Java bytecode. The Java language, bytecode and JVM are well known and widely used in the art of programming processors. See for example, J. Gosling, W. Joy, G. Steele, G. Bracha, "The Java Language Specification, Second Edition," 2000, available beginning at file j.title.doc.html in directory /docs/books/jls/second_edition/html/at World Wide Web

5

domain java.sun.com, the entire contents of which are hereby incorporated by reference as if fully set forth herein.

In the example embodiment, the foreign application instructions 120 include Java bytecode or Java language instructions. For example, instructions 120 include Java byte-code and data for performing data processing for an end node (not shown) connected to the router 102.

In the illustrated embodiment, the system instructions include a data item called a time counter 116 to store the contents of a timer register on the processor, as described in more detail below.

2.0 Method for Allocating Computing Resources

FIG. 2 is a flow diagram that illustrates a method 200 for allocating computing resources among sets of one or more tasks, according to an embodiment. Although steps are depicted in FIG. 2 and subsequent flow diagrams in a particular order for purposes of illustration, in other embodiments, the steps are performed in a different order or overlapping in time, or one or more steps are omitted, or some combination of these changes are made.

In step 212, data is received which indicates an external limit on unblocked execution time for tasks that are not known to follow conventions for sharing a processor. Any method may be used to receive the data. In some embodiments, the data is input manually by a system designer. In some embodiments, the data is stored on a local or remote computer readable media, and retrieved by memory call or request for data from a local or remote storage device. In some embodiments, the data is received in a solicited or unsolicited message sent from a remote node on a network.

The limit on unblocked execution time is an external limit placed by the embedded system and is independent of any execution time limit imposed internally by the instructions that make up the tasks. In some embodiments, the limit is placed on individual tasks. In some embodiments, the limit is placed on a group of multiple tasks, such as all the tasks associated with a particular process. A set of one or more tasks that are limited by the external limit is called herein an externally limited set of tasks.

In other embodiments, the limit is placed on all tasks, even tasks that are known to cooperate in the use of a processor. In the illustrated embodiment, the limit is placed only on tasks that are not known to follow some convention for sharing a processor. For example in some embodiments, the limit is placed only on tasks that are not known to follow a Cisco design convention for sharing a processor on a router.

In some embodiments, the limit is expressed as a number that indicates time (e.g. in milliseconds. 1 millisecond. ms,−10⁻³ sec) that the externally limited set of tasks actually executes on the processor since the start of execution of the set of tasks. This limit is called the limit on execution time and is designated hereinafter by the symbol LET. In an example embodiment, the value of LET received indicates 20 ms.

In some embodiments, the limit is expressed an interval of time since the start of execution of the set of tasks, regardless of the amount of that time interval during which the set was not executing due to hardware interrupts or explicit or implicit yielding of the processor to the operating system. In other embodiments other values are used to express the limit on execution.

In step 214, data is received which indicates a maximum usage of the processor by tasks that are not known to follow conventions for sharing a processor. Any method may be used to receive the data, such as those described above for step 212. The maximum usage is an external constraint imposed by the embedded system and is independent of any usage constraint or yielding time imposed internally by the instructions that

6

make up the set of tasks. The usage indicated by the data received during step 214 includes resumed execution of the set of tasks after one or more blocking periods end. In other embodiments, the data received during step 214 indicates a maximum usage of the processor by any set of tasks.

For example, in some embodiments, the maximum usage is expressed as a percentage of the processor time that may be used by the externally limited set of tasks, designated hereinafter by the symbol LPU for limit on percent usage. In an example embodiment, the value of LPU received indicates 80%, because the primary purpose of the router is satisfied with 20% of the processor time.

A yield time during which the set of tasks yields the processor to other tasks is implied by the limit on execution time and the maximum usage. The yield time is designated by the symbol YT hereinafter. The values of LET, LPU and YT are related by Equation 1.

$$LPU=100*LET/(LET+YT)$$                1a.

A YT value indicating 5 ms is consistent with a LET value indicating 20 ms and a LPU indicating 80%. In some embodiments, during step 214, a minimum yield time is received in lieu of, or in addition to, the LPU as the measure of maximum usage of the processor by the set of tasks.

In step 216, yield time is computed based on LET and LPU, according to Equation 1b.

$$LPU=100*LET/(LET+YT)$$                1b.

In embodiments in which YT is provided in step 214, step 216 is omitted.

In step 220, data is received that indicates processor instructions for a particular set of one or more tasks. Any method may be used to receive this data. For example, in some embodiments, instructions for a task are indicated by a memory address in a queue for tasks of a certain priority. The data indicates whether a new task is starting or a previously started task stored in memory with its stack and context variables is to be resumed, as is well known in the art.

In step 222, it is determined whether the particular set of one or more tasks is subject to external limits. For example, if the memory address in the queue for tasks of the certain priority is not within a memory area dedicated to tasks that follow conventions for sharing a processor in the embedded system, then it is determined that the task is subject to external limits. Similarly, if the memory address in the queue for tasks of the certain priority is within a memory area dedicated to tasks of foreign applications, then it is determined that the task is subject to external limits. In the example embodiment, if the set of tasks are Java bytecode, then it is determined that the set of tasks is subject to external limits. In some embodiments in which all tasks are subject to external limits, step 222 is omitted.

If it is determined in step 222 that the set of tasks is not subject to external limits, then control passes to step 230 to execute the instructions from the particular set without external limits. For example, each task within a memory area dedicated to tasks that follow conventions for sharing a processor in the embedded system is executed to completion. In an example embodiment, each task that is not Java bytecode is executed to completion. Control then passes to step 220 to receive data indicating the next set of tasks.

If it is determined in step 222 that the set of tasks is subject to external limits, then control passes to step 240 to begin executing the instructions from the particular set with external limits. For example, each task outside a memory area dedicated to tasks that follow conventions for sharing a processor in the embedded system starts execution subject to

7

external limits. In an example embodiment, each task that is Java bytecode starts execution subject to external limits. Control passes to step 244 to determine whether execution exceeds external limits. If execution of the set of tasks completes before control passes to step 244, then control passes to step 220 to receive data indicating the next task or set of tasks.

In step 244, it is determined whether execution exceeds the external limits. If not, control passes back to step 240 to continue execution of the instructions from the particular set of tasks subject to external limits. However, if it is determined that execution of the set of tasks exceeds the external limits then control passes to step 248. For example, if the execution time of the set of tasks exceeds LET (e.g., 20 ms), then control passes to step 248.

In step 248, the embedded system causes the set of one or more tasks to yield the processor to satisfy the maximum usage constraint. In the illustrated embodiment, an enforcement process for the embedded system blocks execution of the task by the processor. For example, the enforcement process calls an operating system service that causes the task not to be allowed to run for a time equal to the YT (e.g., 5 ms). As a result, the current task of the externally limited set of tasks has its context and stack offloaded by the task scheduler to a memory location for storage until the task is resumed. Control then passes back to step 220 to receive data that indicates the next set of one or more tasks to be executed by the processor. After the yield time expires, the blocked task in the externally limited set of one or more tasks may be received in step 220.

3.0 Allocating Processor Time to JVM Tasks on a Router

In this section, additional details are provided for an illustrated embodiment in order to more thoroughly describe this embodiment of the invention. FIG. 3 is a flow diagram that illustrates in more detail steps 240, 244 and 248 of the method of FIG. 2, according to an embodiment 300.

Outside of embodiment 300, step 222 of FIG. 2 is represented by connector circle 222, and step 220 of FIG. 2 is represented by connector circle 220. If it is determined in step 222 that the set of tasks is subject to external limits, then control passes to step 312 to begin executing the instructions from the particular set with external limits. In an example embodiment, all Java threads executed by a JVM are treated as an externally limited set of tasks. Each task representing a single Java thread includes a bytecode interpreter loop to perform the functions of the JVM.

In step 312, a timer register is initialized. For example, the contents of a timer register are set to zero. In the example embodiment, the JVM for the router initializes a timer register when the JVM is started.

In step 340, up to a number N of processor instructions from the particular set are executed. In the example embodiment, the number N is the number of Java bytecode instructions that are interpreted by the bytecode interpreter loop.

During the execution of the up to N processor instructions, the timer register is updated. For example, every time the system clock 111 sends a hardware interrupt to the processor 112, the processor 112 increments the contents of the timer register. In an example embodiment, a router system clock issues a hardware interrupt every 0.1 ms. Thus the timer register in this embodiment increments by one every 0.1 ms. Because the system clock provides the granularity in time measurement, it is desirable for the LET value to be large compared to the system clock interrupt period; e.g., about an order of magnitude greater than the system clock period or more. In the illustrated embodiment with a 0.1 ms system clock period, an LET value of 1 ms or greater is desirable; so, the LET of 20 ms is acceptable for a system clock with a period of 0.1 ms. In other embodiments, larger or smaller

8

system clock interrupt periods are used; e.g., in one embodiment the system clock interrupt period is 1.0 ms.

Step 343 represents a branch point in which it is determined whether the set of one or more tasks has completed during the execution of the up to N processor instructions. If so, control passes to step 220 to receive data indicating the next set of one or more tasks. If not, control passes to step 344. When a Java thread voluntarily relinquishes the processor, the JVM stack and its context variables, such as time counter 116 for holding contents of the timer register, are moved off the processor into memory and control passes to step 220. During this time off of the processor, the time counter is not incremented by system clock interrupts. When the next Java thread is started, the JVM is reloaded onto the processor, the timer register is reset to the value in the time counter 116, and the timer register resumes incrementing with each system clock interrupt. Thus in the example embodiment, the timer records the actual execution time for Java threads and not total elapsed time since the timer was initialized.

In step 344, it is determined whether the contents of the timer register exceeds the limit on execution time LET. If not, control passes to back to step 340 to execute up to the next N processor instructions of the externally limited set of one or more tasks. If the contents of the timer register exceeds the limit on execution time LET, however, then control passes to step 248 to block the externally limited set of one or more tasks (e.g., to force the set to yield the processor) for the yield time YT.

Java threads do more than step through bytecode instructions in the bytecode interpreter loop. Java threads also invoke native code to perform some standard functions, such as input/output (I/O), terminating calls to subroutines and freeing memory for temporary variables (a set of processes called "garbage collection"), and waiting for events to occur. Therefore, in the example embodiment, native code for I/O and garbage collection includes one or more calls to check the contents of the timer in step 344.

For example, in some embodiments during step 344, the value of LET is 200 to indicate 200 increments of the timer register at 0.1 ms per increment, which indicates an LET of 20 ms. If the contents of the time register exceeds 200, the value of LET, then the execution time of the externally limited set exceeds 20 ms, and control passes to step 248. The yield time YT computed from Equation 1b is 50, which indicates 50 ticks of the system clock which corresponds to a yield time of 5 ms. So in step 248, the processor is given up by the externally limited set of one or more tasks for 5 ms. In the example embodiment, the JVM is blocked for 5 ms (e.g., 5 ms); thus all Java threads and the native code they spawned are blocked for the yield time.

Because the JVM might have voluntarily relinquished the processor, such as in input/output bound tasks, the JVM might not have executed continuously for the LET. Furthermore, in some circumstances, the time counter is not stopped when the JVM relinquishes the processor. For example, in some embodiments, operating system timing services are limited and it is impractical or impossible to stop the timer when the JVM is not processing a JAVA thread. In such circumstances also, the JVM has not executed continuously for the LET. If the JVM does not execute continuously for the LET, then the YT computed by Equation 1b is an overestimate of the yield time needed to constrain maximum processor usage to the LPU. Using an overestimated YT is acceptable, because an overestimated YT leads to less usage than LPU for the externally limited set of one or more tasks. Thus the processor time actually remaining for the sets of tasks that are not externally limited, such as time-critical tasks directed to

US 7,921,425 B2

9

the primary purpose of the device, is equal to or greater than the time allotted for such tasks. Thus the method **300** guarantees sufficient time to perform such time-critical tasks. In some embodiments both an elapsed time and an execution time timer are kept, and the value of YT is reduced by the difference. In some embodiments, a difference greater than YT is used to dynamically increase the value of LET.

Using the steps of method **300** in the example embodiment, it can be guaranteed that no Java thread will monopolize the processor time and starve time-critical tasks directed to performing routing functions. Yet, plenty of processor time is provided for Java threads to execute—up to 80% of processor time in the example embodiment. In practice, it has been found that the value set for LPU can be remarkably accurate. When a processor-bound Java thread is executed, the measured percentage of processor time consumed by the JVM, as measured by mechanisms available in the IOS, is invariably substantively equal to the LPU.

The performance of the embedded system to execute foreign applications is affected by the choice of the number N of processor instructions executed before checking the contents of the timer register. The number N is chosen to be small enough to check the contents of the time register at least once before the timer exceeds the LET. However, if the number N is too small, the timer might be checked so often that system performance is affected adversely. Thus, the number N is chosen to be large enough to have a relatively small effect on a performance measure for the externally limited set of one or more tasks.

FIG. **4** is a graph **400** that illustrates considerations for selecting the parameter N used to perform step **340** illustrated in FIG. 3, according to an embodiment. The horizontal axis **402** indicates the number N of processor instructions (e.g., bytecode instructions) executed before the timer register is checked in step **344**. The number N increases to the right. The vertical axis is a performance axis **404** that indicates a measure of performance for the externally limited set of one or more tasks. The performance improves upward along axis **404**.

Curve **410** is an example graph of performance measure as a function of the number N. Curve **410** shows that as N increases, the performance improves. That is, the less often the timer register is checked the more quickly the tasks are completed. The maximum performance achieved if the timer is never checked (the value of N approaches infinity) is indicated by the maximum performance position **420** along axis **404**. A horizontal line through the maximum performance position **420** shows that the curve **410** approaches this value more closely as N increases to the right.

An average value of N associated with the limiting execution time (LET) is indicated on the axis **402** by the position **430**. It is assumed for purposes of illustration that a LET of 20 ms is associated with the processor time consumed to perform 400,000 bytecode interpretations on average. A vertical dashed line is drawn through position **430** (e.g., at N=400, 000).

It is desirable that the value of N be small compared to position **430**, so that the timer is checked frequently enough to reasonably quickly determine that a set of one or more tasks has exceeded the LET. A value of N less than the value at position **430** is clearly desirable. A value of N about an order of magnitude smaller than the value of N associated with position **430** is reasonable. For example, a value of N about 40,000 or less satisfies this consideration.

It is also desirable that the value of N not be so small that performance is unreasonably impaired. Seventy five percent (75%) of maximum performance is indicated by the 75th

10

percentile performance position **422** along axis **404**. A horizontal line is drawn through the 75th percentile performance position **422**. The curve **410** crosses the 75th percentile performance position **422** at a value for N indicated on the axis **402** by the position **432**. The value of N at position **432** is the average value of N corresponding to the 75th percentile performance measure. It is assumed for purposes of illustration that the value of N at position **432** is 20,000. A vertical dashed line is drawn through position **432** (e.g., at N=20,000).

The selected value of N is a design choice that is readily made based on observations such as those illustrated in graph **400**. It is assumed for purposes of illustration that the value of N is selected to be greater than the value of N associated with the 75th percentile performance and less than the one tenth the value of N associated with LET. Thus, in the illustrated embodiment, the value of N is greater than 20,000 and less than 40,000. It is assumed for purposes of illustration that N is selected as 25000, e.g., the timer register is checked after every 25,000 bytecode interpretations.

4.0 Implementation Mechanisms—Hardware Overview

FIG. **5** is a block diagram that illustrates a computer system **500** upon which an embodiment of the invention may be implemented. The preferred embodiment is implemented using one or more computer programs running on a network element such as a router device. Thus, in this embodiment, the computer system **500** is a router.

Computer system **500** includes a communication mechanism such as a bus **510** for passing information between other internal and external components of the computer system **500**. Information is represented as physical signals of a measurable phenomenon, typically electric voltages, but including, in other embodiments, such phenomena as magnetic, electromagnetic, pressure, chemical, molecular atomic and quantum interactions. For example, north and south magnetic fields, or a zero and non-zero electric voltage, represent two states (0, 1) of a binary digit (bit). A sequence of binary digits constitutes digital data that is used to represent a number or code for a character. A bus **510** includes many parallel conductors of information so that information is transferred quickly among devices coupled to the bus **510**. One or more processors **502** for processing information are coupled with the bus **510**. A processor **502** performs a set of operations on information. The set of operations include bringing information in from the bus **510** and placing information on the bus **510**. The set of operations also typically include comparing two or more units of information, shifting positions of units of information, and combining two or more units of information, such as by addition or multiplication. A sequence of operations to be executed by the processor **502** constitute computer instructions.

Computer system **500** also includes a memory **504** coupled to bus **510**. The memory **504**, such as a random access memory (RAM) or other dynamic storage device, stores information including computer instructions. Dynamic memory allows information stored therein to be changed by the computer system **500**. RAM allows a unit of information stored at a location called a memory address to be stored and retrieved independently of information at neighboring addresses. The memory **504** is also used by the processor **502** to store temporary values during execution of computer instructions. The computer system **500** also includes a read only memory (ROM) **506** or other static storage device coupled to the bus **510** for storing static information, including instructions, that is not changed by the computer system **500**. Also coupled to bus **510** is a non-volatile (persistent) storage device **508**, such as a magnetic disk or optical disk, for

US 7,921,425 B2

11

storing information, including instructions, that persists even when the computer system 500 is turned off or otherwise loses power.

The term computer-readable medium is used herein to refer to any medium that participates in providing information to a processor 502, including instructions for execution. Such a medium may take many forms, including, but not limited to, nonvolatile media, volatile media and transmission media. Nonvolatile media include, for example, optical or magnetic disks, such as storage device 508. Volatile media include, for example, dynamic memory 504. Transmission media include, for example, coaxial cables, copper wire, fiber optic cables, and waves that travel through space without wires or cables, such as acoustic waves and electromagnetic waves, including radio, optical and infrared waves. Signals that are transmitted over transmission media are herein called carrier waves.

Common forms of computer-readable media include, for example, a floppy disk, a flexible disk, a hard disk, a magnetic tape or any other magnetic medium, a compact disk ROM (CD-ROM), a digital video disk (DVD) or any other optical medium, punch cards, paper tape, or any other physical medium with patterns of holes, a RAM, a programmable ROM (PROM), an erasable PROM (EPROM), a FLASH-EPROM, or any other memory chip or cartridge, a carrier wave, or any other medium from which a computer can read.

Information, including instructions, is provided to the bus 510 for use by the processor from an external terminal 512, such as a terminal with a keyboard containing alphanumeric keys operated by a human user, or a sensor. A sensor detects conditions in its vicinity and transforms those detections into signals compatible with the signals used to represent information in computer system 500. Other external components of terminal 512 coupled to bus 510, used primarily for interacting with humans, include a display device, such as a cathode ray tube (CRT) or a liquid crystal display (LCD) or a plasma screen, for presenting images, and a pointing device, such as a mouse or a trackball or cursor direction keys, for controlling a position of a small cursor image presented on the display and issuing commands associated with graphical elements presented on the display of terminal 512. In some embodiments, terminal 512 is omitted.

Computer system 500 also includes one or more instances of a communications interface 570 coupled to bus 510. Communication interface 570 provides a two-way communication coupling to a variety of external devices that operate with their own processors, such as printers, scanners, external disks, and terminal 512. Firmware or software running in the computer system 500 provides a terminal interface or character-based command interface so that external commands can be given to the computer system. For example, communication interface 570 may be a parallel port or a serial port such as an RS-232 or RS-422 interface, or a universal serial bus (USB) port on a personal computer. In some embodiments, communications interface 570 is an integrated services digital network (ISDN) card or a digital subscriber line (DSL) card or a telephone modem that provides an information communication connection to a corresponding type of telephone line. In some embodiments, a communication interface 570 is a cable modem that converts signals on bus 510 into signals for a communication connection over a coaxial cable or into optical signals for a communication connection over a fiber optic cable. As another example, communications interface 570 may be a local area network (LAN) card to provide a data communication connection to a compatible LAN, such as Ethernet. Wireless links may also be implemented. For wireless links, the communications

12

interface 570 sends and receives electrical, acoustic or electromagnetic signals, including infrared and optical signals, which carry information streams, such as digital data. Such signals are examples of carrier waves

In the illustrated embodiment, special purpose hardware, such as an application specific integrated circuit (IC) 520, is coupled to bus 510. The special purpose hardware is configured to perform operations not performed by processor 502 quickly enough for special purposes. Examples of application specific ICs include graphics accelerator cards for generating images for display, cryptographic boards for encrypting and decrypting messages sent over a network, speech recognition, and interfaces to special external devices, such as robotic arms and medical scanning equipment that repeatedly perform some complex sequence of operations that are more efficiently implemented in hardware.

In the illustrated computer used as a router, the computer system 500 includes switching system 530 as special purpose hardware for switching information for flow over a network. Switching system 530 typically includes multiple communications interfaces, such as communications interface 570, for coupling to multiple other devices. In general, each coupling is with a network link 532 that is connected to another device in or attached to a network, such as local network 580 in the illustrated embodiment, to which a variety of external devices with their own processors are connected. In some embodiments an input interface or an output interface or both are linked to each of one or more external network elements. Although three network links 532a, 532b, 532c are included in network links 532 in the illustrated embodiment, in other embodiments, more or fewer links are connected to switching system 530. Network links 532 typically provides information communication through one or more networks to other devices that use or process the information. For example, network link 532b may provide a connection through local network 580 to a host computer 582 or to equipment 584 operated by an Internet Service Provider (ISP). ISP equipment 584 in turn provides data communication services through the public, world-wide packet-switching communication network of networks now commonly referred to as the Internet 590. A computer called a server 592 connected to the Internet provides a service in response to information received over the Internet. For example, server 592 provides routing information for use with switching system 530.

The switching system 530 includes logic and circuitry configured to perform switching functions associated with passing information among elements of network 580, including passing information received along one network link, e.g. 532a, as output on the same or different network link, e.g., 532c. The switching system 530 switches information traffic arriving on an input interface to an output interface according to pre-determined protocols and conventions that are well known. In some embodiments, switching system 530 includes its own processor and memory to perform some of the switching functions in software. In some embodiments, switching system 530 relies on processor 502, memory 504, ROM 506, storage 508, or some combination, to perform one or more switching functions in software. For example, switching system 530, in cooperation with processor 504 implementing a particular protocol, can determine a destination of a packet of data arriving on input interface on link 532a and send it to the correct destination using output interface on link 532c. The destinations may include host 582, server 592, other terminal devices connected to local network 580 or Internet 590, or other routing and switching devices in local network 580 or Internet 590.

13

The invention is related to the use of computer system **500** for implementing the techniques described herein. According to one embodiment of the invention, those techniques are performed by computer system **500** in response to processor **502** executing one or more sequences of one or more instructions contained in memory **504**. Such instructions, also called software and program code, may be read into memory **504** from another computer-readable medium such as storage device **508**. Execution of the sequences of instructions contained in memory **504** causes processor **502** to perform the method steps described herein. In alternative embodiments, hardware, such as application specific integrated circuit **520** and circuits in switching system **530**, may be used in place of or in combination with software to implement the invention. Thus, embodiments of the invention are not limited to any specific combination of hardware and software.

The signals transmitted over network link **532** and other networks through communications interfaces such as interface **570**, which carry information to and from computer system **500**, are exemplary forms of carrier waves. Computer system **500** can send and receive information, including program code, through the networks **580**, **590** among others, through network links **532** and communications interfaces such as interface **570**. In an example using the Internet **590**, a server **592** transmits program code for a particular application, requested by a message sent from computer **500**, through Internet **590**. ISP equipment **584**, local network **580** and network link **532b** through communications interface in switching system **530**. The received code may be executed by processor **502** or switching system **530** as it is received, or **may** be stored in storage device **508** or other non-volatile storage for later execution, or both. In this manner, computer system **500** may obtain application program code in the form of a carrier wave.

Various forms of computer readable media may be involved in carrying one or more sequence of instructions or data or both to processor **502** for execution. For example, instructions and data may initially be carried on a magnetic disk of a remote computer such as host **582**. The remote computer loads the instructions and data into its dynamic memory and sends the instructions and data over a telephone line using a modem. A modem local to the computer system **500** receives the instructions and data on a telephone line and uses an infra-red transmitter to convert the instructions and data to an infra-red signal, a carrier wave serving as the network link **532b**. An infrared detector serving as communications interface in switching system **530** receives the instructions and data carried in the infrared signal and places information representing the instructions and data onto bus **510**. Bus **510** carries the information to memory **504** from which processor **502** retrieves and executes the instructions using some of the data sent with the instructions. The instructions and data received in memory **504** may optionally be stored on storage device **508**, either before or after execution by the processor **502** or switching system **530**.

5.0 Extensions and Alternatives

In the foregoing specification, the invention has been described with reference to specific embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense.

What is claimed is:

1. A method, comprising:

identifying a set of one or more tasks competing for computing resources of an embedded system, wherein the

14

embedded system is configured to process one or more primary operations of a special-purpose device, and wherein the set of tasks are separately identified from the one or more primary operations according to a programming language that the set of tasks are written in;

receiving first data that indicates a time limit for unblocked execution of the set of tasks by a processor of the embedded system, wherein the one or more primary operations are not bound by the time limit;

receiving second data that indicates a maximum allowable use of the processor by the set of tasks, wherein the maximum allowable use corresponds to an available processing time of the processor that exceeds a processing time allocated to process the one or more primary operations;

determining whether one or more tasks of the set of tasks have exceeded the time limit for unblocked execution based on the first data;

blocking execution of the one or more tasks for a yield time interval responsive to determining that the one or more tasks have exceeded the time limit, wherein the yield time interval is determined as a function of the time limit for unblocked execution and the maximum allowable use of the processor;

processing the one or more primary operations during the yield time interval; and

resuming the execution of the one or more tasks that exceeded the time limit for unblocked execution after the one or more primary operations yield the processor.

2. The method of claim 1, wherein the method further comprises determining whether the set of tasks is subject to the time limit for unblocked execution according to a type of the programming language used in writing the set of tasks.

3. The method of claim 1, wherein the one or more primary operations are known to conform to a particular convention for allocating the computing resources of the embedded system, and wherein the set of tasks is not known to conform to the particular convention for allocating the computing resources.

4. The method of claim 1, wherein the second data that indicates the maximum allowable use of the processor indicates the available processing time of the processor that leaves sufficient computing resources to process the one or more primary operations on time.

5. The method of claim 1, wherein the second data that indicates the maximum allowable use of the processor indicates the available processing time of the processor that leaves sufficient computing resources to process all hardware interrupts of the special-purpose device.

6. The method of claim 1, wherein the first data that indicates the time limit for unblocked execution indicates an allowed time duration for the unblocked execution of the set of tasks after which the execution of the set of tasks is blocked.

7. The method of claim 6, wherein the allowed time duration is more than ten times a time resolution of a system clock of the embedded system configured to send a hardware interrupt to the processor.

8. The method of claim 7, further comprising:

initializing a timer register when the set of tasks begins executing;

updating the timer register with every interrupt from the system clock;

checking contents of the timer register after a particular number N of instructions of the set of tasks; and

US 7,921,425 B2

15

determining whether the contents of the timer register exceed the allowed time duration.

**9.** The method of claim **8**, wherein the particular number N is small enough to check the contents of the timer register at least once before the timer exceeds the allowed time duration.

**10.** The method of claim **1**, wherein the yield time interval is determined by multiplying the time limit by an absolute value of a difference between one and a quotient of one hundred divided by the maximum allowable use of the processor.

**11.** The method of claim **1**, wherein the one or more primary operations yield the processor to resume the unblocked execution of the one or more tasks after the one or more primary operations are completed.

**12.** The method of claim **1**, further comprising identifying whether the programming language includes JAVA bytecode, and wherein blocking the execution further includes blocking the execution of only the one or more tasks that include the JAVA bytecode.

**13.** The method of claim **12**, further comprising loading a JAVA language virtual machine (JVM) process onto the processor to execute the one or more tasks.

**14.** The method of claim **13**, wherein the set of tasks comprise JAVA strings configured to invoke native code that perform functions other than the set of tasks, and wherein the method further comprises blocking the native code for the yield time interval.

**15.** An apparatus, comprising:

a network interface that is coupled to a network for communicating one or more packet flows therewith; and

one or more processors communicatively coupled to the network interface and configured to perform operations comprising:

identifying a set of one or more tasks including JAVA bytecode competing for computing resources of an embedded system, wherein the embedded system is configured to process one or more primary operations of a special-purpose device, and wherein the set of tasks are unrelated to the one or more primary operations;

determining a time limit for unblocked execution of the set of tasks by a processor of the embedded system, wherein the one or more primary operations are not bound by the time limit;

determining a maximum allowable use of the processor by the set of tasks, wherein the maximum allowable use corresponds to an available processing time of the processor that exceeds a processing time allocated to process the one or more primary operations;

determining whether one or more tasks of the set of tasks has exceeded the time limit for unblocked execution; and

if the one or more tasks include the JAVA bytecode, then blocking the execution of the one or more tasks for a yield time interval responsive to determining the one or more tasks of the set of tasks has exceeded the time limit for unblocked execution, wherein the yield time interval is determined as a function of the time limit for unblocked execution and the maximum allowable use of the processor.

**16.** The apparatus of claim **15**, wherein the one or more processors are further configured to perform operations comprising determining whether the set of tasks is subject to the time limit for unblocked execution, wherein the execution of the set of tasks is only blocked if it is determined that the set of tasks is subject to the time limit.

16

**17.** The apparatus of claim **16**, wherein the one or more processors are further configured to perform operations comprising determining whether the set of tasks is not known to conform to a particular convention for sharing the processor among multiple tasks, wherein the one or more primary operations are known to conform to the particular convention.

**18.** The apparatus of claim **16**, further comprising a memory configured to store the set of tasks and the one or more primary operations, wherein the set of tasks is stored in an area of the memory that is different from where the one or more primary operations are stored, and wherein the processor determines whether the set of tasks is subject to the time limit according to the area of memory that the set of tasks is stored in.

**19.** The apparatus of claim **18**, wherein the set of tasks is offloaded from the processor to the area of memory when the set of tasks is blocked, and wherein the set of tasks is reloaded into the processor after the yield time interval.

**20.** The apparatus of claim **15**, wherein the set of tasks is not included in the one or more primary operations, and wherein the processor is not a general-purpose computer.

**21.** The apparatus of claim **15**, wherein the special-purpose device comprises a router for network communications, and wherein the one or more primary operations comprise routing the network communications.

**22.** The apparatus of claim **21**, wherein the set of tasks comprises one or more JAVA strings, wherein the embedded system comprises a network operating system and instructions for a JAVA language virtual machine (JVM), wherein the network operating system is configured to execute the one or more primary operations, and wherein the JVM is configured to execute the JAVA strings.

**23.** The apparatus of claim **15**, wherein the maximum allowable use of the processor indicates the available processing time of the processor that leaves sufficient computing resources to perform the one or more primary operations.

**24.** The apparatus of claim **15**, wherein the maximum allowable use of the processor indicates the available processing time of the processor that leaves sufficient computing resources to process all hardware interrupts for the special-purpose device.

**25.** The apparatus of claim **15**, further comprising a timer register and a system clock, wherein the one or more processors are further configured to perform operations comprising:

initializing the timer register when the set of tasks begins executing;

updating the timer register with every interrupt from the system clock;

checking contents of the timer register after a particular number N of instructions of the set of tasks; and

determining whether the contents of the timer register exceed the time limit.

**26.** The apparatus of claim **15**, wherein the time limit for unblocked execution indicates an allowed time duration for the unblocked execution of the set of tasks after which the execution of the set of tasks is blocked, and wherein the one or more processors are further configured to perform operations comprising determining the yield time interval by multiplying the time limit by an absolute value of a difference between one and a quotient of one hundred divided by the maximum allowable use of the processor.

**27.** An apparatus, comprising:

means for identifying a set of one or more tasks competing for computing resources of an embedded system, wherein the embedded system is configured to process one or more primary operations of a special-purpose device, and wherein the set of tasks are separately iden-

US 7,921,425 B2

17

tified from the one or more primary operations according to a programming language that the set of tasks are written in;

means for receiving first data that indicates a time limit for unblocked execution of the set of tasks by a processor of the embedded system, wherein the one or more primary operations are not bound by the time limit;

means for receiving second data that indicates a maximum allowable use of the processor by the set of tasks, wherein the maximum allowable use corresponds to an available processing time of the processor that exceeds a processing time allocated to process the one or more primary operations;

means for determining whether one or more tasks of the set of tasks have exceeded the time limit for unblocked execution based on the first data; and

means for blocking the execution of the one or more tasks for a yield time interval responsive to determining that the one or more tasks have exceeded the time limit, wherein the yield time interval is determined as a function of the time limit for unblocked execution and the maximum allowable use of the processor, and wherein only those one or more tasks that are written in the programming language are blocked.

**28**. A computer-readable medium having stored thereon computer-executable instructions, wherein execution of the instructions by one or more processors causes the one or more processors to perform operations comprising:

identifying a set of one or more tasks competing for computing resources of an embedded system, wherein the embedded system is configured to process one or more primary operations of a special-purpose device, and wherein the set of tasks is unrelated to the one or more primary operations;

determining a time limit for unblocked execution of the set of tasks by a processor of the embedded system, wherein the one or more primary operations are not bound by the time limit;

determining a maximum allowable use of the processor by the set of tasks, wherein the maximum allowable use corresponds to an available processing time of the processor that exceeds a processing time allocated to process the one or more primary operations;

determining whether one or more tasks of the set of tasks have exceeded the time limit for unblocked execution;

identifying if the one or more tasks comprise JAVA bytecode; and

if the one or more tasks comprise the JAVA bytecode, blocking the execution of the one or more tasks for a yield time interval responsive to determining that the

18

one or more tasks have exceeded the time limit, wherein the yield time interval is determined as a function of the time limit for unblocked execution and the maximum allowable use of the processor.

**29**. The computer-readable medium of claim **28**, wherein determining whether the set of tasks has exceeded the time limit is performed only if the set of tasks is subject to the time limit.

**30**. The computer-readable medium of claim **28**, wherein the set of tasks comprises JAVA strings, and wherein the embedded system comprises a JAVA language virtual machine (JVM) configured to process the JAVA strings.

**31**. The computer-readable medium of claim **28**, wherein the operations further comprise:

initializing a timer register when the set of tasks begins executing;

updating the timer register with every interrupt from a system clock;

checking contents of the timer register after a particular number N of instructions of the set of tasks; and

determining whether the contents of the timer register exceed the time limit.

**32**. The computer-readable medium of claim **31**, wherein the operations further comprise selecting the particular number N of instructions of the set of tasks that utilize 75% or more of maximum performance of the processor.

**33**. The computer-readable medium of claim **32**, wherein the particular number N of instructions of the set of tasks is selected to be less than one tenth a number of the instructions that when executed by the processor would be associated with the time limit.

**34**. The computer-readable medium of claim **28**, wherein the yield time interval is determined by multiplying the time limit by an absolute value of a difference between one and a quotient of one hundred divided by the maximum allowable use of the processor.

**35**. The computer-readable medium of claim **28**, wherein the embedded system comprises instructions for a network operating system and a JAVA virtual machine (JVM), wherein the network operating system is configured to process the one or more primary operations, and wherein the JVM is configured to process the set of tasks.

**36**. The computer-readable medium of claim **35**, wherein the one or more primary operations comprise routing commands.

**37**. The computer-readable medium of claim **36**, wherein the special-purpose device comprises a router, and wherein the set of tasks is unrelated to operation of the router.

\* \* \* \* \*

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,

Petitioner,

v.

SINGULAR COMPUTING LLC,

Patent Owner.

Patent No. 10,416,961
Filing Date: October 30, 2018
Issue Date: September 17, 2019

Inventor:  Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

# PATENT OWNER'S SUR-REPLY TO PETITIONER'S REPLY

# Case No. IPR2021-00155

especially when Tong itself acknowledges that 11-bits is needed for reliable results across *all* the selected applications.  POR, 26-27.  The Reply similarly provides no such reasoning.  Reply, 8-9.

Indeed, Tong both implicitly and explicitly teaches a POSA that any useful computer system must *retain* full-precision capabilities.  For example, Tong teaches that "it appears inevitable that some fraction of our operands will require full IEEE-standard precision."  Tong, 280.  A person of ordinary skill in the art certainly would not have been motivated by these teachings to modify Dockser to operate only in 5-bit, 7-bit, or 9-bit modes, as Google erroneously suggests.

Accordingly, Ground 2 does not render any Challenged Claims obvious.

## III.    GROUND 3

### A.    Dockser/MacMillan Cannot Meet the "Exceeds" Limitation

To meet Claim 3, the number of LPHDRs in a given device must "exceed by at least one hundred the non-negative integer number of execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  '961 Patent, 30:43-48 (the "exceeds limitation").  In other words, the number of LEUs must be at least 100 greater than the number of execution units adapted to execute at least the operation of multiplication on 32-bit floating point numbers.  POR, 28-36.  Google has not sought to construe the exceeds limitation.

Google also does not dispute that Dockser is adapted to execute multiplication on numbers 32 bits wide.  POR, 29-30. Reply, 12-15.

Instead, Google argues that if an execution unit is capable of executing low precision high dynamic range operations (*e.g.*, a Dockser unit), that execution unit cannot also be adapted to execute 32-bit operations.  Reply, 12 ("Because the number of Dockser FPPs in Dockser/MacMillan exceeds the single Host CPU, the 'exceeds' claims are met.").  In other words, Google's *only* argument that this limitation is met by its cited art, is based on an unsupported and untenable construction that a unit that performs low precision high dynamic range operations, cannot also be a unit "adapted to execute at least the operation of multiplication on 32-bit floating point numbers."

Google's argument, thus, imports an unsupported negative limitation into the claim; in other words, Google argues that "execution units in the device adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide" actually means "execution units in the device *that are not LPHDR execution units and that are* adapted to execute at least the operation of multiplication on floating point numbers that are at least 32 bits wide."  There is no support for this negative limitation.

In an attempt to support its construction argument, Google does point to a part of the specification that distinguishes between units that are "designed to

perform . . . arithmetic of traditional precision," and LEUs.  Reply, 12; Pet., 54.  This part of the specification, however, does not support Google's construction of this "adapted to execute" term.  Though it is true that an LEU and a full precision unit are different things, this does not mean that a device capable of full precision operations (*i.e.*, "adapted to execute at least . . . operations on . . . numbers that are at least 32 bits wide") suddenly loses this capability whenever it happens to be programmed to perform low precision high dynamic range operations.  That full precision capability remains no matter how the device is programmed.

Google also argues in support of its position that because the specification states "a LPHDR arithmetic element produces results which are *sometimes* (or all of the time) no closer than 0.05% to the correct result", a 32-bit EU can therefore *never* produce inexact results.  '961 Patent, 26:67-27:1.  Singular does not dispute this statement—claimed LEUs sometimes produce incorrect results.  However, Google makes a flawed logical leap from this uncontroversial statement to the incorrect conclusion that an execution unit capable of 32-bit multiplication—as claimed—can *never* produce incorrect results.  Nothing in the passage cited above, or anywhere else in the patent's claims or specification, supports this logical fallacy.  The mere fact that an LEU *sometimes* produces inexact results does not mean that an execution unit *capable* of 32-bit multiplication can *never* produce inexact results if, for example, programmed differently.  The specification simply never contemplates, let

alone reaches, such a conclusion.

Google's interpretation also improperly limits the applicability of the words "at least" in the term "at least the operation of multiplication," as Singular has previously explained. POR, 32. Google argues that its interpretation gives meaning to this claim language because it allows for the claim to encompass "other 32-bit arithmetic operations besides multiplication." Reply, 13. This argument is absurd, in large part because the specification never compares counts of units that perform multiplication to counts of units that do not perform multiplication. Singular's interpretation on the other hand, while encompassing other 32-bit operations besides multiplication, also encompasses EUs that perform non-32-bit operations. This is important because the specification *does* repeatedly compare counts of 32-bit precision execution units to counts of non-32-bit precision execution units (see, for example, '961 Patent, 28:9-47). By contrast, Google's interpretation arbitrarily excludes comparing counts of devices that support 32-bit operations, to counts of devices that do not support 32-bit operations, notwithstanding the specification's support for such comparisons. POR, 32.

Finally, Google attempts to dismiss the specification's discussion of GPUs that support both 16- and 32-bit operations, and specifically the distinction drawn between such GPUs and the claimed LEU, by citing entirely new references (Ex. 1073-75). Reply, 13-15. The references are not cited in the prosecution history of

the '961 Patent and are not relevant to what the inventor intended to claim.

For the reasons given above, Dockser and MacMillan cannot meet the plain language of the claim. Google's interpretation of the "exceeds" limitation is entirely untethered from the specification, and its irrelevant extrinsic evidence cannot mask this deficiency to improperly alter the "exceed" claims' scope.

### B.    There Is No Motivation to Combine Dockser and MacMillan

A POSA would not be motivated to combine Dockser and MacMillan because while MacMillan is focused on reducing cost, Dockser's specialized FPP is larger, and thus costlier, than even the full precision execution units used in Macmillan. POR, 35-36.

Google argues that Singular provided no evidence that incorporating Dockser would increase cost (Reply, 9-10), but Singular cited both its own and Google's expert testimony that use of a Dockser FPP increased size and complexity, and therefore cost. POR, 36. It is also apparent to anyone skilled in the art that a Dockser-like FPP that supports a wide range of precisions—including 32-bit precision—would be physically larger than a MacMillan-like FPP that supports *only* 32-bit precision, thus requiring more volume, more transistors, and a higher cost.

Google next argues that such cost concerns are not relevant to obviousness. Reply, 10. Singular's argument is not that it would be too costly to implement a Dockser/MacMillan combination, as in the cited *Farrenkopf* case. Instead,

Singular's argument is that a POSA would not seek to introduce to MacMillan additional complexity and cost, in the form of Dockser FPPs, given MacMillan *is explicitly focused on reducing cost*.  POR, 35-36.

###    C.    Dockser and MacMillan Fail to Disclose or Render Obvious the "Computing Device"

Google does not dispute that the Host CPU in MacMillan is optional, and that the SIMD controller actually controls the PEs.  *See* Reply, 10-11.  Thus, Google provides no basis for finding that MacMillan's CPU meets the "computing device" limitation of the claims.  POR, 36-38.

## IV.    GROUND 4

Neither Tong nor Dockser nor MacMillan suggest using in a MacMillan system a Dockser FPP that is modified by *physically removing* its full precision capabilities.  POR, 41-44.  Google's Reply suggests that Tong states otherwise.  It does not.

Google's purported motivation comes from Tong's mention that for a "narrow, application-specific task, a single custom FP format may be a viable option."  Reply, 15-16.  Tong, however, immediately dismisses the idea in the next sentence:

> For a narrow, application-specific task, a single custom FP format may be a viable option. However, ***to be more generally useful, we need to consider arithmetic architectures which can scale to different FP***

*formats*. Even though we may be able to assume that most of our operands can be computed successfully in limited precision, *it appears inevitable that some fraction of our operands will require full IEEE-standard precision*.

Tong, 280 (under section "Exploiting a Variable Bitwidth Multiplier") (emphasis added).  As explained in the POR, a POSA faced with Dockser's variable precision FPP and Tong's variable precision teachings, would not discard both to create Singular's non-variable single precision (*i.e.*, low precision) device.  Google offers no motivation to do so other than hindsight.[2]  *See Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1298 (Fed. Cir. 2012) (affirming district court's rejection of "impermissible hindsight reasoning").

---

[2] Google's statement that Dockser says its "'register file' can be 'formatted differently from IEEE 32-bit . . . and/or may contain a different number of register locations'" is irrelevant.  The different formatting referred to is the mapping of the bits, not a change to a smaller number of bits.  Dockser, [0017] (referring to changing from IEEE 32-bit to IEEE 64-bit double (*i.e.* using 2 32-bit registers) format).  The different number of locations refers to changing from 16 total 32-bit registers to another number of 32-bit registers.  *Id.  See also* POR, 40 n.4.

16

CONFIDENTIAL MATERIAL REDACTED

IPR2021-00155
PATENT NO. 10,416,961

### B.    Google's Skepticism Is Relevant Evidence of Non-obviousness

Google erroneously states that evidence of skepticism after the invention date is legally irrelevant.  Reply, 22.  The Board and the Federal Circuit have considered this position.  *E.g.*, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335-36 (Fed. Cir. 2016) (giving weight to skepticism after prototype was produced); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (considering evidence of skepticism after patents issued where companies initially turned down license to patents "because they did not believe that the invention would work"); *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725-26 (Fed. Cir. 1990); *EIS GmbH v. Novoluto GmbH*, IPR2020-00007, Paper No. 41, 61 (P.T.A.B. Sep. 23, 2021).  Both have concluded that there is no logical reason that skepticism of an invention after it has been invented is any less probative than skepticism before.

Google's remaining arguments about this issue rely on cherry-picked quotes from Google emails.  Reply, 22-23.  As shown in the POR, the evidence when taken as a whole clearly shows that Google was skeptical that the invention would be workable or useful.  POR, 50-52.  ███████████████████████████

███████████████████████████████████████████

█████████████████████

Accordingly, the skepticism of Google's expert employees weighs in favor **of** non-obviousness.  *WBIP*, 829 F.3d, 1335-36 ("If industry participants or skilled

artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness.").

### C.    Google's Praise Is Relevant Evidence of Non-obviousness

As set forth in the POR, Google's own employees, considered experts in the field, praised Dr. Bates's invention. POR, 52-53. Google argues that the praise itself "identifies no specific features." Reply, 23. There is, however, no requirement that praise identify exactly the features being praised. Here, the praise was directed to Singular's invention, as set forth ███████████████████. POR, 52-53. That is sufficient. *See WBIP*, 829 F.3d at 1334-35.

Google further states that ████████████████████████████ ████████████████████████████ Reply, 24. But as explained in the POR, Google's initial skepticism turned to praise as its employees began to understand the technology. POR, 52-53.

### D.    Unexpected Results Provide Relevant Evidence of Non-obviousness

The POR sets out unexpected results in the form ████████████████ ██████████████████████. POR, 53-57. Google's only argument against ██████████ is that a subjective belief is insufficient. Reply, 24. But the ████████████████████████████████████████ ██████ Accordingly, these results weigh in favor of non-obviousness.

# United States Patent and Trademark Office
## Before the Patent Trial and Appeal Board

### *GOOGLE LLC,*
*(Petitioner)*

### *v.*

### *SINGULAR COMPUTING LLC,*
*(Patent Owner)*

*Inter Partes* Review

No. IPR2021-00155 | **U.S. Patent No. 10,416,961**
No. IPR2021-00165 | **U.S. Patent No. 9,218,156**
No. IPR2021-00179 | **U.S. Patent No. 8,407,273**

Petitioner's Demonstrative Exhibits

Google Exhibit 1098
Google v. Singular
IPR2021-00155

February 11, 2022

DEMONSTRATIVE EXHIBIT – NOT EVIDENCE  |  REDACTED VERSION   | 1

# Singular's Arguments Against Motivation to Combine Are Unsupported

Reply 9-10

## Singular's POR

explained above, Dockser's FPPs are even *larger* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes. *Id.*; Goodin Dep. 70:6-12 (explaining that Dockser does not reduce space compared to conventional units), 43:21-45:9 (additional circuitry required to reduce precision). As a result, replacing the full-precision execution units of MacMillan with Dockser FPP units would require additional circuitry and chip space and would therefore *increase* costs, while providing no benefit. Khatri,

'273 POR at 35 ('156 POR at 37; '961 POR at 36)

## Petitioner's Expert

Q. Does the processor of Dockser require circuitry to power off the bits representing the portions of the mantissa that aren't going to be used in the operation?

A. **Well, certainly, there would be circuitry that would cause power to be removed from a floating-point register elements for the excess bits of the fraction.**

     * * *

     **I believe that Dockser does disclose circuitry that would remove power from the logic in the floating-point operation in the logic bit-dropping case.**

Ex. 2043 at 43-44 (cited '273 POR at 35; '156 POR at 37; '961 POR at 36)

## Petitioner's Expert

31. Dr. Khatri asserts that Dockser's FPP would "*increase* costs" in MacMillan's system. Khatri, ¶ 104 (emphasis in original). However, I have reviewed Dr. Khatri's declaration, and I find no evidence cited in Dr. Khatri's declaration to demonstrate that incorporating Dockser's FPP into MacMillan's system would increase cost *at all*, much less to any appreciable degree. Dr. Khatri says in ¶ 103 of his declaration that "Dockser's FPPs are even *larger* than traditional full-precision execution units because of the control circuitry needed to implement the selectable subprecision modes" (emphasis in original). But I find no evidence cited in Dr. Khatri's declaration that establishes that any size difference that may exist between Dockser's FPP and conventional units would increase cost, much less that any such increase would outweigh the cost decrease gained by Dockser's power savings. Additionally, even if there were some cost increase, that does not mean there is no motivation to implement the combination for other beneficial reasons, such as those I discussed in my original declaration. Goodin-Orig., ¶¶ 353-357.

Ex. 1071 at ¶ 31 (cited Reply, 10)

21

Trials@uspto.gov                                           Paper No. 56
571-272-7822                                        Date:  April 6, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

―――――――――

PART 1:  PUBLIC PORTION

―――――――――

IPR2021-00155 (Patent 10,416,961 B2)
IPR2021-00165 (Patent 9,218,156 B2)
IPR2021-00179 (Patent 8,407,273 B2)

―――――――――

Record of Oral Hearing
Held:  February 11, 2022

―――――――――

Before JUSTIN T. ARBES, STACEY G. WHITE, and JASON M. REPKO,
*Administrative Patent Judges.*

IPR2021-00155 (Patent 10,416,961 B2)
IPR2021-00165 (Patent 9,218,156 B2)
IPR2021-00179 (Patent 8,407,273 B2)


APPEARANCES:

ON BEHALF OF THE PETITIONER:

    ELISABETH H. HUNT, ESQ.
    Wolf, Greenfield & Sacks, PC
    Federal Reserve Place
    600 Atlantic Avenue
    Boston, MA  02210


ON BEHALF OF THE PATENT OWNER:

    PATER LAMBRIANAKOS, ESQ.
    Fabricant, LLP
    411 Theodore Fremd Road
    Suite 206 South
    Rye, NY 10580


    The above-entitled matter came on for hearing on Friday, February 11, 2022, commencing at 1:00 p.m., EDT, by video/by telephone.

IPR2021-00155 (Patent 10,416,961 B2)
IPR2021-00165 (Patent 9,218,156 B2)
IPR2021-00179 (Patent 8,407,273 B2)

1  as the floating point unit in each MacMillan PE in this parallel

2  architecture.

3      Singular made three arguments on this ground that I'll step

4  through now. So slide 20. Their first argument is that Dockser's

5  unit is allegedly bigger and therefore would increase cost but

6  they have no data or documentary evidence to support that. They

7  have only expert testimony that only parrots the POR's

8  conclusory statements. That's not entitled to any weight. As

9  Your Honors told Singular at Institution they would have needed

10  some cost analysis to make this type of argument and they still

11  don't have any.

12      Slide 21. They also cite our expert who answered some

13  questions about circuitry but he only said that Dockser has some

14  circuitry to switch power off. He certainly never said that

15  amount of circuitry would cause any appreciable size or cost

16  increase and his reply declaration testified that power savings

17  from Dockser's units would be a cost decrease. So no evidence

18  supports Singular's argument against motivation to combine.

19      Side 22.

20      JUDGE REPKO: You have a little more than seven minutes

21  left.

22      MS. HUNT: Thank you. Their second argument was for

23  some claims reciting a computing device on slide 22. I don't see

24  this issue in their slides so I'll rest on the papers for that

25  argument. I will just note that their surreply's only response to

IPR2021-00155 (Patent 10,416,961 B2)
IPR2021-00165 (Patent 9,218,156 B2)
IPR2021-00179 (Patent 8,407,273 B2)

1  high precision, Dockser's whole concept is that you could have

2  selectable precision.  That's why you want a Dockser processor

3  so that when you don't need the entirety of the precision in the

4  processor you can just switch off what you don't need and in

5  order to get to the MacMillan alternate embodiment you would

6  have to go ahead and strip away the inventive concept.  That is

7  not obvious.  It is never obvious to take a reference and strip

8  away the inventive concept.

9       Tong certainly provide that motivation.  Tong says that it is

10  inevitable you are going to need full precision.  He says it is

11  inevitable that you need full precision in a system so Tong

12  doesn't teach either for ground 2 or for grounds 3 and 4 that you

13  would ever strip away the inventive concept of Dockser because

14  if anything Tong reinforces Dockser.  Tong says the same thing.

15  He says you need selectable precision.

16       Now, if MacMillan is going to be a lower cost device, right,

17  and if we turn to our slide that has some of the specification

18  from MacMillan and that is slide 17 you're not going to replace

19  your 32-bit processing element with Dockser which has even

20  more transistors.  Now we heard -- we know that on Institution

21  the Board said that there wasn't evidence regarding cost.

22  MacMillan provides all the evidence we need and a portion and

23  we cited in MacMillan on claim 17 talks about one of the issues

24  with a SIMD device, a power device.  It says,

25       "To overcome this pin bottleneck some SIMD designs have

42

IPR2021-00155 (Patent 10,416,961 B2)
IPR2021-00165 (Patent 9,218,156 B2)
IPR2021-00179 (Patent 8,407,273 B2)

1    a large register set on each PE allowing temporary results to

2    remain local to the PE, thereby reducing the number of loads and

3    stores needed.  However, this increases die area for PE resulting

4    in higher cost per PE."

5        So we see that the art itself cited by Petitioner teaches if

6    you have more registers that increases die area, that means

7    higher cost and MacMillan's teaching you don't want all these

8    extra registers because it increases cost and that's not what we're

9    trying to do here.  We're trying to have a low cost computer such

10   as a personal computer with higher performance.  So there's no

11   motivation, in fact there's a negative motivation to include a

12   Dockser processor with additional registers in the MacMillan

13   device and there's no reason to strip all that away either because

14   Dockser tells you you need that as does Tong.  So these

15   combinations fail.

16       Unless there are any questions, Your Honors, I would like

17   to retain the rest of my time for rebuttal.

18       JUDGE REPKO:  All right.  Do my colleagues have any

19   questions?  No?  Okay.  Thank you, counsel.  Petitioner, you

20   have 11 minutes for rebuttal.

21       MS. HUNT:  Thank you, Your Honor.  So let me try to step

22   backwards through some of these from the most of what counsel

23   said backwards.  So counsel was just discussing his slide 17 on

24   MacMillan where we're hearing this argument for the first time

25   that their evidence on cost is MacMillan saying that a large

IPR2021-00155 (Patent 10,416,961 B2)
IPR2021-00165 (Patent 9,218,156 B2)
IPR2021-00179 (Patent 8,407,273 B2)

1    register set on each PE in some SIMD designs from the prior art

2    would increase die area resulting in higher cost. First of all, this

3    is an improper new argument that we haven't heard before today.

4    But if their argument is that somehow this relates to what the

5    architecture is in Dockser, there is no evidence here and no

6    expert support for the idea that whatever MacMillan is talking

7    about here is something that happens in Dockser's PE.

8    MacMillan's talking about some specific design with a large

9    register set. I don't even know what registers it is that counsel is

10   pointing to in Dockser. Dockser just has input registers that a

11   TE would have and has, you know, one register for a control

12   select bits to tell you what to do. That is not a large register set

13   different from what a typical, you know, 32-bit PE would have in

14   MacMillan. There's certainly no evidence supporting that and

15   this argument has nothing to do with the selectable precision

16   nature of Dockser which was the whole basis of Singular's

17   argument in the POR.

18       Counsel said Tong says it's inevitable that you need full

19   precision. Their (audio interference) context there which says

20   (audio interference) Tong is talking about if you want a more

21   general purpose system which is not the system that we're talking

22   about in ground 4 as we discussed.

23       Counsel said that to get to the ground 4 combination you'd

24   have to strip away Dockser's inventive concept. I don't see

25   where that happens. Ground 4's customized implementation is

IPR2021-00155 (Patent 10,416,961 B2)
IPR2021-00165 (Patent 9,218,156 B2)
IPR2021-00179 (Patent 8,407,273 B2)

1    removing some hardware for precision levels that are higher than

2    the ones that you determine that you need for the particular

3    programs that you're going to perform. The petition didn't say

4    that we would be stripping away the concept of selectivity but

5    just, you know, some precision levels that in an embedded

6    system for the programs that you have tested given Tong's

7    techniques. You know what precision levels you need, you don't

8    need higher ones so not all of that hardware is necessary and

9    that's typical in an embedded system customized --

10    JUDGE WHITE: Wouldn't that precisely remove the

11    selectability? If you slim down the hardware so that you don't

12    have these other capabilities, what would you have left to select

13    between?

14    MS. HUNT: You would have the capabilities for the

15    precision levels that you need for the programs you're going to

16    perform for the signal processing programs; right? Tong

17    discusses that there's a range of precision levels that are

18    appropriate for different signal processing programs. So if

19    you're in an embedded system that can be performing a number

20    of these types of programs you would have a particular range of

21    precision levels that you determine that you need and the ones

22    that you don't need you don't need that hardware for because that

23    would always be the ones that are always powered down to zero

24    and would not be in the system.

25    Counsel also mentioned the particular goals that MacMillan

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

GOOGLE LLC,
Petitioner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

————————

Case No. IPR2021-00155
Patent No. 10,416,961

————————

**PETITIONER'S NOTICE OF APPEAL**

IPR2021-00155
U.S. Patent No. 10,416,961

Pursuant to 35 U.S.C. §§ 141(c), 142, and 319 and 37 C.F.R. §§ 90.2(a) and 90.3, notice is hereby given that Petitioner Google LLC appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered May 11, 2022 (Paper 57) in Case No. IPR2021-00155, the public version of which is attached as Exhibit A, and from all orders, decisions, rulings, and opinions underlying the Final Written Decision.

For the limited purpose of providing the Director with the information requested in 37 C.F.R. § 90.2(a)(3)(ii), Petitioner anticipates that the issues on appeal may include, but are not limited to:

- The panel's finding that claims 3 and 23 were not shown to be unpatentable as obvious.

 Pursuant to 37 C.F.R. § 90.3, this Notice of Appeal is timely, having been duly filed within 63 days after the date of the Final Written Decision.

A copy of this Notice of Appeal is being filed simultaneously with the Patent Trial and Appeal Board, the Clerk's Office for the United States Court of Appeals for the Federal Circuit, and the Director of the U.S. Patent and Trademark Office.

Respectfully submitted,
*Google LLC*

Date: June 2, 2022

/Elisabeth Hunt/
Elisabeth H. Hunt, Reg. No. 67,336

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,
Patent Owner,

v.

SINGULAR COMPUTING LLC,
Patent Owner.

Patent No. 10,416,961
Filing Date: October 30, 2018
Issue Date: September 17, 2019

Inventor:  Joseph Bates
Title: PROCESSING WITH COMPACT ARITHMETIC
PROCESSING ELEMENT

## PATENT OWNER'S NOTICE OF APPEAL

## Case No. IPR2021-00155

Pursuant to 35 U.S.C. §§ 141, 142, and 319 and 37 C.F.R. §§ 90.2 and 90.3, Patent Owner Singular Computing LLC ("Singular" or "Patent Owner") hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered May 11, 2022 (Paper 57) and from all underlying orders, decisions, rulings, and opinions regarding U.S. Patent No. 10,416,961 (the "'961 patent") in Case No. IPR2021-00155. This notice is timely under 37 C.F.R. § 90.3 and Fed. R. App. P. 4(a)(3) having been filed within 63 days after the date of the Final Written Decision. For the limited purpose of providing the Director with the information requested in 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner anticipates that the issues on appeal may include, but are not limited to: the Board's claim constructions or determinations not to construe terms; its application of those constructions; any implied claim constructions; its obviousness determinations that claims 1, 2, 4, 5, 10, 13-14, 21, and 24-25 of the '961 patent are unpatentable under 35 U.S.C. § 103; any findings related to secondary considerations of non-obviousness; the findings, rulings and conclusions supporting or relating to those determinations; its order dismissing Patent Owner's Motion to Exclude; and any other issues decided adversely to Patent Owner in any orders, decisions, rulings, or opinions in IPR2021-00155.

Simultaneous with this submission, three (3) copies of this Notice of Appeal are being filed with the Clerk of the United States Court of Appeals for the Federal

Circuit and are being submitted electronically through the Court's CM/ECF system, together with the requisite fee in the amount of $500.00. In addition, a copy of this Notice of Appeal is being filed with the Patent Trial and Appeal Board and served upon counsel of record for Google LLC.

Respectfully submitted,

Dated:  July 12, 2022

*/Peter Lambrianakos                        /*
Peter Lambrianakos (Reg. No. 58,279)
Lead Counsel for Patent Owner
Vincent J. Rubino, III (Reg. No. 68,594)
Back-up Counsel for Patent Owner
Enrique W. Iturralde (Reg. No. 72,883)
Back-up Counsel for Patent Owner
Richard M. Cowell (Reg. No. 79,143)
Back-up Counsel for Patent Owner
**FABRICANT LLP**
411 Theodore Fremd Avenue
Suite 206 South
Rye, New York 10580
Telephone: 212-257-5797
Facsimile: 212-257-5796
Email: plambrianakos@fabricantllp.com
Email: vrubino@fabricantllp.com
Email: eiturralde@fabricantllpp.com
Email: rcowell@fabricantllp.com

IPR2021-00155
U.S. Patent No. 10,416,961

## <u>CERTIFICATE OF SERVICE</u>

A copy of Patent Owner's Notice of Appeal is being served via email on Petitioners' attorneys of record on the 12th day of July, 2022, the same day as the filing of the above-identified document in the United States Patent and Trademark Office/Patent Trial and Appeal Board, by serving Petitioners' correspondence address of record with the USPTO as follows:

Elisabeth H. Hunt
Email: EHunt-PTAB@WolfGreenfield.com
Richard F. Giunta
Email: RGiunta-PTAB@WolfGreenfield.com
Anant K. Saraswat
Email: ASaraswat-PTAB@WolfGreenfield.com
Nathan R. Speed
Email: Nathan.Speed@WolfGreenfield.com
Gregory F. Corbett
Email: Gregory.Corbett@WolfGreenfield.com
**WOLF, GREENFIELD & SACKS, P.C.**
600 Atlantic Avenue
Boston, Massachusetts 02210

*Attorneys for Google LLC*

Dated:  July 12, 2022

By:  */Peter Lambrianakos          /*
Peter Lambrianakos (Reg. No. 58,279)
Lead Counsel for Patent Owner
FABRICANT LLP
411 Theodore Fremd Avenue,
 Suite 206 South
Rye, New York 10580
Telephone: 212-257-5797
Facsimile: 212-257-5796

Email: plambrianakos@fabricantllp.com

# CERTIFICATE OF SERVICE AND FILING

I hereby certify that a true and correct copy of the foregoing **Corrected Joint Appendix (confidential and non-confidential versions)** has been electronically filed with the Clerk of Court using the CM/ECF system, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including counsel for Appellee:

| | |
|---|---|
| Peter Lambrianakos | James J. Foster |
| Alfred R. Fabricant | PRINCE LOBEL TYE LLP |
| Richard M. Cowell | One International Place, |
| Vincent J. Rubino, III | Suite 3700 |
| FABRICANT LLP | Boston, MA 02210 |
| 411 Theodore Fremd Avenue, | jfoster@princelobel.com |
| Suite 206 | |
| Rye, NY 10580 | |
| plambrianakos@fabricantllp.com | |
| ffabricant@fabricantllp.com | |
| rcowell@fabricantllp.com | |
| vrubino@fabricantllp.com | |

Additionally, confidential copies will be served via e-mail only to counsel for Appellee on this 13th day of February 2023.  Counsel for Appellee has consented in writing to electronic service via e-mail pursuant to Fed. R. App. P. 25(c)(2) and Fed. Cir. R. 25(e)(4).

Date: February 13, 2023

/s/ Nathan R. Speed

Nathan R. Speed
WOLF GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA  02210
Telephone: (617) 646-8000
Fax: (617) 646-8646
nspeed@wolfgreenfield.com

*Counsel for Appellant Google, LLC*